**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NOVAVAX, INC., STANLEY C. ERCK, GREGORY F. COVINO, JOHN J. TRIZZINO, and GREGORY GLENN,<br><br>Defendants. | Civil Action No. TDC-21-2910 |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

**TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ...................................................................................1

II. PLAINTIFFS' GOOD FAITH EFFORTS TO RESOLVE THE DISCOVERY
    DISPUTES ................................................................................................................4

III. ARGUMENT .............................................................................................................5

    A.  LEGAL STANDARD.........................................................................................5

    B.  THE PARTIES' DISPUTES ...............................................................................6

        1.  Scope of References to "Manufacturing Standards" in the Requests ..........6

        2.  Plaintiffs' Request for Additional Custodians ...............................................8

        3.  Start Date of the Relevant Time Period for Requests 2, 12–14, 16,
    and 23 ..............................................................................................................13

            i.   Requests 2, 12 and 13 ..................................................................... 13

            ii.  Request 14...................................................................................... 15

            iii. Request 16...................................................................................... 16

            iv.  Request 23...................................................................................... 17

        4.  End Date of the Relevant Time Period for All Requests ...........................19

        5.  Disputes Concerning Specific Requests ......................................................21

            i.   Request No. 8 ................................................................................. 21

            ii.  Request No. 11 ............................................................................... 22

            iii. Request No. 13 ............................................................................... 23

            iv.  Request No. 16 ............................................................................... 24

IV. CONCLUSION........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. Equifax Info. Servs., LLC*,
2015 WL 1807952 (D. Md. Apr. 17, 2015) ........................................................5, 11, 15, 16, 17

*Brink's Co. v. Chubb Eur. Grp. Ltd.*,
2021 WL 5083335 (E.D. Va. Feb. 24, 2021), *report and recommendation adopted*, 2021 WL 5083332 (E.D. Va. Mar. 12, 2021) ............................................................11

*Cook v. Howard*,
484 Fed. App'x. 802 (4th Cir. 2012) ......................................................................................5

*Desrosiers v. MAG Indus. Automation Sys., LLC*,
675 F. Supp. 2d 598 (D. Md. 2009) .................................................................................6, 10

*Hatamian v. Advanced Micro Devices, Inc.*,
2015 WL 7180662 (N.D. Cal. Nov. 16, 2015) ........................................................................21

*In re Bank of New York Mellon Corp. Forex Transactions Litig. ("BNY Mellon")*,
2013 WL 5769915 (S.D.N.Y. Oct. 24, 2013) ..................................................................20, 21

*In re BofI Holding, Inc. Secs. Litig.*,
2021 WL 1812822 (S.D. Cal. May 6, 2021)............................................................................19

*In re Merck & Co. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)....................................................................................................19

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001).......................................................................................................19

*Lynn v. Monarch Recovery Management, Inc.*,
285 F.R.D. 350 (D. Md. 2012)......................................................................................5, 6, 11

*Mount Hawley Insurance Co. v. Felman Production, Inc.*,
269 F.R.D. 609 (S.D.W.V. 2010) ...........................................................................................11

*Sinnathurai v. Novavax, Inc.*,
2022 WL 17585715 (D. Md. Dec. 12, 2022)..........................................................2, 3, 4, 7, 16

**Rules**

Fed. R. Civ. P. 26(b)(1)...........................................................................................................5, 19

Fed. R. Civ. P. 37 ..........................................................................................................................1

Pursuant to Fed. R. Civ. P. 37 and Local Rules 104.7 and 104.8, Lead Plaintiffs Jeffrey Gabbert, Nuggehalli Nandkumar, and David Truong ("Plaintiffs") respectfully submit this memorandum of law in support of their Motion to Compel Production of Documents ("Motion").

## I.    **PRELIMINARY STATEMENT**

Plaintiffs' Motion seeks an order directing Defendants to (i) construe the term "Manufacturing Standards" to include regulatory requirements as they relate to clinical trials to the extent that they are relevant to Defendant Novavax, Inc. ("Novavax" or the "Company") receiving an Emergency Use Authorization ("EUA") for its Covid-19 vaccine candidate (the "Vaccine Candidate"); (ii) search the files of 13 additional custodians proposed by Plaintiffs to fill in gaps in the set of custodians to which Defendants have agreed to search; (iii) apply a "start date" of March 1, 2020 or June 1, 2020 to certain of Plaintiffs' document requests and an end date of "the present" for all document requests; and (iv) produce training materials provided to new employees at Novavax's manufacturing facilities, documents concerning the production or distribution of any approved or potential Covid-19 vaccine by any of Novavax's competitors, documents concerning agreements between Novavax and any government entity, initiative, or program in connection with the Vaccine Candidate, and documents concerning any formal or informal clinical development plan for the Vaccine Candidate.

Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint") alleges that, during the Class Period,[1] Novavax, then-CEO Stanley Erck, then-CFO Gregory Covino, and executives Gregory Glenn and John Trizzino (collectively, "Defendants") committed securities fraud by making false and misleading statements about the development and roll-out of the Vaccine Candidate. Specifically, Plaintiffs allege that Defendants misrepresented that:

---

[1] The Class Period is May 10, 2021 to October 19, 2021, inclusive. *See* Ex. 2 ("Order") at 49.

- "*[N]early all of the major challenges have been overcome*" in developing the Vaccine Candidate, and "I think *we've eliminated all of the serious hurdles* to getting – risk hurdles to getting to where we need to be to get an improved vaccine," when in reality Novavax was experiencing supply chain problems and could not maintain the Vaccine Candidate's purity, potency, or scalability (¶¶173, 178, 181)[2];

- *"[W]e made a big breakthrough . . . and we're now racing towards validating everything and putting it into a package*," when the FDA had found serious regulatory violations at the *only* U.S. facilities producing the Vaccine Candidate's antigen component (¶¶170, 179);

- "*[A]ll of our manufacturing sites [are] producing GMP material at scale*," when Novavax's Texas facility was completely, and indefinitely, shut down (¶¶171, 180);

- "*We appear to have got past (certain) supply issues and are now being able to produce at scale*," when supply chain issues were causing long delays (¶¶173, 198); and

- "[T]he combination of our recombinant protein nanoparticle, its nanoparticle structure, the particle structure of our Matrix adjuvant presented some challenges in those assays, *which have now been resolved*," when Novavax had not resolved its supply chain problems and could not maintain vaccine purity, potency, or scalability (¶¶173, 204).

Defendants moved to dismiss the Complaint, and the Court denied that motion in part, holding that Plaintiffs had sufficiently alleged that the above six statements were false or misleading. *See Sinnathurai v. Novavax, Inc.* (the "MTD Decision"), 2022 WL 17585715, at *24 (D. Md. Dec. 12, 2022). The Court further held that Plaintiffs had sufficiently alleged Defendants' scienter by (i) inferring Defendants' knowledge of facts contradicting their public statements based on allegations from multiple confidential witnesses ("CWs") and warnings from the FDA to Novavax of regulatory violations at manufacturing facilities in Texas and North Carolina (the "TX

---

[2] "¶__" or "¶¶__" refer to paragraphs of the Complaint, attached hereto as Exhibit 1. All internal quotes and citations are omitted and emphasis is added unless otherwise indicated.

Facility" and the "NC Facility" respectively); (ii) the importance of the Vaccine Candidate to Novavax; (iii) and suspicious stock sales by Erck and Trizzino. *Id.* at \*19-24.

Shortly after the MTD Decision, on February 2, 2023, Plaintiffs served Defendants with Plaintiffs' First Set of Requests for Production of Documents to Defendants Novavax, Inc. and the Individual Defendants (the "Requests" and each a "Request"). *See* Ex. 3. Defendants responded to the Requests with ***57 pages*** of boilerplate responses and objections (*see* Ex. 4), and as described in Section II.F, *infra*, the parties engaged in multiple telephonic meet and confers and exchanged five letters in an effort to reach a compromise under which Defendants would begin searching for and producing documents. *See* Exs. 5–9.

To date, however, Defendants have yet to search for or produce ***any*** documents in response to the Requests, even though those Requests were served ***over five months ago***. Instead, Defendants have dug in their heels and taken intractable positions on a number of important issues. For instance, Defendants refuse to produce documents concerning regulatory requirements as they relate to clinical trials of the Vaccine Candidate, even though the Court held that Defendants' failure to disclose that Novavax could not produce enough vaccine doses to conduct multiple clinical trials made Defendants' misstatements false and misleading. *See* MTD Decision, 2022 WL 17585715, at \*4, 16-17, 19.  Likewise, Defendants objected to the start date and end date of the "Relevant Time Period" as defined in the Requests as overbroad and unduly burdensome without providing any details as to the nature or extent of the purported burden.

Further, Defendants insist that the 17 custodians whose files the parties have agreed should be searched are sufficient for this case, even though those custodians are solely high-level employees whose files are unlikely to include the detailed evidence that Plaintiffs need to prove their case. Indeed, Defendants take the position that 17 custodians must be sufficient because it is

3

a "large number by any measure," even though those custodians (i) were not directly responsible for manufacturing facilities, allegations concerning which are central to the Complaint, (ii) do not include an individual alleged to have been involved in the FDA's catastrophic investigations of the TX and NC Facilities, and (iii) provide no insight into Novavax's alleged undisclosed problems creating vaccine doses for clinical trials.

Finally, Defendants have improperly drawn lines in the sand regarding individual Requests for (i) materials used to train employees whose insufficient training was criticized by the FDA and directly led to manufacturing delays (¶¶47, 90, 100, 137), (ii) documents concerning Defendants' focus on beating competitors to market, which Plaintiffs allege was a contributing factor in the Company's problems with purity, potency, and contamination (¶¶4, 52, 155-56, 161. 47, 90, 91), (iii) documents concerning agreements with U.S. government agencies, even though that information will demonstrate whether Defendants knew or recklessly disregarded Novavax's inability to meet the requirements of those agreements, and (iv) documents concerning any clinical development plan for the Vaccine Candidate (or the lack thereof), which allegedly contributed to Defendants' purity, potency, and scalability failures (¶¶91 172, 184, 201, 205).

As detailed below, Defendants' objections to each of the eight issues at which the parties are at an impasse are meritless and the Court should grant Plaintiffs' Motion in its entirety.

## II.   <u>PLAINTIFFS' GOOD FAITH EFFORTS TO RESOLVE THE DISCOVERY DISPUTES</u>

On February 3, 2023, within weeks of the MTD Decision, Plaintiffs served the Requests. Ex. 3. Defendants served their Responses and Objections to the Requests on March 6, 2023. Ex. 4. After the parties telephonically met and conferred regarding the Requests and related discovery issues on March 2, 10, 27, and April 28, 2023, Defendants followed up with a letter on May 2, 2023 (the "May 2 Letter" (Ex. 5)) addressing certain issues raised during the telephonic meet and

4

confer sessions. On May 12, 2023, Plaintiffs responded to the May 2 letter (the "May 12 Letter" (Ex. 6)), and Defendants responded to the May 12 Letter on May 25, 2023 (the "May 25 Letter" (Ex. 7)). On June 14, 2023, Plaintiffs responded to the May 25 Letter (the "June 14 Letter" (Ex. 8)), and Defendants responded to the June 14 Letter on July 6 (the "July 6 Letter" (Ex. 9)). Although the telephonic meet and confers and May 2, May 12, May 25, June 14 and July 6 Letters resolved many disputes concerning the Requests, despite their good faith efforts, the parties have reached an impasse as to the eight issues described below.

Fort the reasons stated below, Plaintiffs' respectfully request that the Court adopt their position with regard to each of the eight issues and grant the Motion in full.

### III.    ARGUMENT

#### A.    LEGAL STANDARD

Under the Federal Rules, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevant information is information that "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* "Relevance is . . . the foundation for any request for production, regardless of the individual to whom a request is made," *Cook v. Howard*, 484 Fed. App'x. 802, 812 (4th Cir. 2012), although "all permissible discovery must be measured against the yardstick of proportionality." *Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 355 (D. Md. 2012).

"The burden is on the party resisting discovery to explain specifically why its objections, including those based on irrelevance, are proper given the broad and liberal construction of federal discovery rules." *Desrosiers v. MAG Indus. Automation Sys., LLC*, 675 F. Supp. 2d 598, 601 (D. Md. 2009). Accordingly, when a party objects to a discovery request, "conclusory assertions of burden or cost are insufficient." *Alston v. Equifax Info. Servs., LLC*, 2015 WL 1807952, at *2 (D.

Md. Apr. 17, 2015). Instead, a "party claiming that a discovery request is unduly burdensome must allege specific facts that indicate the nature and extent of the burden, usually by affidavits or other reliable evidence." *Id.* "The failure to state with specificity the grounds for [a discovery] objection may result in waiver of the objection." *Lynn*, 285 F.R.D. at 365.

### B.    THE PARTIES' DISPUTES

#### 1.    Scope of References to "Manufacturing Standards" in the Requests

Requests 1, 5, 6, 8, 12, and 29 reference "Manufacturing Standards," which is defined in the Requests as "cGMP, as further defined in the Complaint, and any other applicable governmental or industry manufacturing standards." Ex. 3 at 6. The parties have agreed to construe this definition to include "non-privileged documents related to U.S. government-imposed manufacturing regulations or requirements application to Novavax's manufacture" of its vaccine candidate in the U.S. *See* Ex. 8 at 3-4; Ex. 9 at 5-6. As set forth in the May 12 and June 14 Letter, however, it is Plaintiffs' position that "Manufacturing Standards" *also* includes "requirements as they related to clinical trials to the extent that they are relevant to Novavax receiving EUA approval." Ex. 6 at 4-5; Ex. 8 at 4. Requirements related to clinical trials are relevant to Plaintiffs' claims and Defendants' defenses because, for example, if Novavax was required to complete a certain number of clinical trials or produce a certain number of doses to perform such clinical trials prior to the FDA granting the EUA, then those requirements are relevant to the Company's ability to timely bring the vaccine to market, which Defendants allegedly misrepresented to investors.

Defendants refuse to define "Manufacturing Standards" to include any U.S. government-imposed manufacturing regulations or requirements related to clinical trials on the grounds that the Requests do not define "Manufacturing Standards" to encompass clinical trials. Ex. 7 at 4. But on its face, the definition of "Manufacturing Standards" includes "any other applicable

6

governmental or industry manufacturing standards," which includes standards applicable to clinical trials. *See* Ex. 3 at 6.

Defendants further object to Plaintiffs' definition of "Manufacturing Standards" on the grounds that the Court dismissed all of Plaintiffs' claims concerning "the state of clinical trials." Ex. 7 at 4-5. But Defendants are wrong. For example, the Court sustained alleged misstatements by Defendants on May 10, August 5, and September 29, which Plaintiffs alleged were misleading for failing to disclose that the Company's manufacturing problems prevented it from producing vaccine doses for clinical trials. *Compare* Compl. ¶¶172, 178-81, 184, 198, 201, 204-05 *with* MTD Decision, 2022 WL 17585715, at *4, 16-17, 19. Defendants also flatly denied that Novavax had any problems producing vaccine doses for three clinical trials in 2021, thus Plaintiffs will need documents concerning U.S. government standards for clinical trials and Defendants' discussions of those standards to prove their claims. Ex. 2 at 52-53 (denying allegations in ¶¶86-87).

Finally, Defendants object to Plaintiffs' definition of Manufacturing Standards because Plaintiffs do not allege that any statements "about the timing of Novavax's EUA submission" are false and misleading. Ex. 7 at 5. This ignores, however, that the allegedly false and misleading statements that the Court sustained were directed at the Company's ability to file an EUA. For example, Defendants misrepresented that "all of the major challenges [for regulatory filings, including an EUA] have been overcome" (¶178), "we made a big breakthrough there and we're now racing towards validating everything and putting it into a package [for an EUA]" (¶¶178-79), "we've eliminated all of the serious hurdles [to filing an EUA]" (¶181), and "We appear to have got past (certain) supply issues [delaying the EUA] and are now being able to produce at scale" (¶¶197-98). These and other statements are allegedly false and misleading in part because Defendants could not manufacture sufficient vaccine doses for clinical trials *which contributed to*

7

***delays in submitting the EUA***. *See* ¶¶86-89, 172, 178-81, 184, 198, 201, 204-05. Accordingly, the U.S. government's requirements and regulations for clinical trials, including the number of clinical trials; purity and potency requirements; and Defendants' ability to meet those requirements, are relevant to Plaintiffs' claims because Plaintiffs must prove, among other things, that Defendants' undisclosed inability to produce sufficient doses in accordance with clinical trial standards made statements to investors false and misleading.

The Court thus should order Defendants to construe "Manufacturing Standards" to include standards and requirements concerning the Vaccine Candidate's clinical trials and EUA.

### 2.    Plaintiffs' Request for Additional Custodians

The parties have agreed to search the files of 17 custodians for documents responsive to the Requests. Ex. 5 at 2-3; Ex. 6 at 2. While these custodians consist of Novavax's highest-level executives during the Class Period, they do not include managers closer to the events underlying Plaintiffs' allegations of government investigations, clinical trials, Novavax's relationship with FUJIFILM, the EUA, cGMP compliance, and drug purity and potency that make up the bulk of the Complaint's allegations. *See* Ex. 6 at 1-2. Plaintiffs propose 13 additional custodians to fill these gaps. *See* Ex. 8 at 4-7.

For example, Plaintiffs propose to add Jose Torres-Vorshirm, who allegedly directly communicated with the FDA regarding inspections of FUJIFILM facilities (¶¶97-98)—allegations Defendants expressly deny (Ex. 2 at 58-59)—and whose responsibilities during the Class Period included the supply chain (*see* Ex. 8 at 5).

Since Plaintiffs will need to prove the extent of the Company's problems meeting U.S. regulators' requirements to win at trial, they also propose adding as custodians Lina Kim, Senior Director, CQA, GCP Inspections Management; Dennis Tsurkan, Regulatory Information Management Specialist, Regulatory Affairs Operations; Jared Lantzy, Director, Regulatory Affairs

Operations; and Marianne Mowrer, Senior Submission Specialist, Regulatory Affairs Operations. Ex. 8 at 5-6. Given the extent and severity of the U.S. government's complaints about Novavax and its Vaccine Candidate, custodians involving inspections, good clinical practice, regulatory submissions, and the relationship between Novavax and its regulators are essential to Plaintiffs' case. *See* ¶¶96-108. The importance to the Plaintiffs' case of understanding the nature of Novavax's communications with regulators is underscored by the fact that, by August 2021, U.S. government regulators had identified so many problems with the Vaccine Candidate that they told the Company that the U.S. would not fund **any** manufacturing of the Vaccine Candidate until Defendants "prioritize[d] alignment with the [FDA] on the Company's analytic methods before conducting additional U.S. manufacturing." ¶194.

Plaintiffs propose to include Mike Massare, who, according to his LinkedIn.com biography,[3] was responsible for "[o]ptimiz[ing] vaccine candidate yields by molecular modifications of vaccine proteins," and thus was directly involved with addressing purity and potency issues allegedly plaguing the Vaccine Candidate (*e.g.*, ¶153 (attributing delays to "combination of our recombinant *protein nanoparticle*" in assays)) and who would have been aware of supply chain issues preventing the Company from addressing those issues (¶95 (describing delays in sourcing raw materials needed to run purity checks)). In fact, Defendants do not appear to have proposed *any* custodians with insight into supply chain issues, and thus Plaintiffs propose to add Joseph Neal, Senior Director, Supply Chain Planning, Network Strategy and Optimization, as a custodian given that supply chain issues underlie a substantial portion of Plaintiffs' claims. *See, e.g.*, ¶¶49, 60, 93-95, 112-14, 143, 173, 177.

---

[3] https://www.linkedin.com/in/michael-massare-9bba753/.

9

Defendants also do not propose any custodian responsible for manufacturing facilities, even though problems at the TX and NC Facilities underlie most the Complaints' allegations. ¶¶96-108. Plaintiffs thus propose Matthew Hariegel, Director, Facilities and Engineering as a custodian.

Further, Plaintiffs allege that multiple misstatements by Defendants are misleading for failing to disclose that Defendants could not manufacture sufficient vaccine doses for clinical trials. *See* ¶¶86-89, 172, 178-81, 184, 198, 201, 204-05. Accordingly, Plaintiffs propose to add Gail Smith, Michelle Robinson, and Massare as custodians, individuals who even Defendants acknowledge are relevant to clinical trials of the Vaccine Candidate. *See* Ex. 7 at 6. Likewise, although the focus of the Complaint is the Company's inability to produce the Vaccine Candidate at the necessary level of quality (*see, e.g.*, ¶¶82-92), Defendants propose to include only one quality-related custodian (*see* Ex. 5 at 2). Plaintiffs thus propose to include Andre Johnson, Senior Director, Quality Control; and Fred Shermer, VP Quality Systems. Ex. 8 at 4-5.

Finally, while Defendants propose executive-level employees as custodians regarding the Company's manufacturing processes, Plaintiffs need at least one lower-level custodian to capture information concerning the extent of the problems at the NC and TX Facilities, and thus propose to include Brian Brashears, Senior Specialist Manufacturing. *Id.* at 5.

Defendants first object to these proposed custodians on the grounds that "Plaintiffs must show that the custodian is reasonably likely to have relevant material and that the expected benefit of searching the custodian's files outweigh the costs." Ex. 7 at 3. But this is incorrect, as "[t]he burden is on the party resisting discovery to explain specifically why its objections . . . are proper given the broad and liberal construction of federal discovery rules." *Desrosiers*, 675 F. Supp. 2d 598, 601 (D. Md. 2009). Moreover, a "party claiming that a discovery request is unduly burdensome must allege specific facts that indicate the nature and extent of the burden, usually by

10

Case 8:21-cv-02910-TDC   Document 97-1   Filed 08/23/23   Page 14 of 479

affidavits or other reliable evidence." *Alston*, 2015 WL 1807952, at \*2. Defendants have never provided *any* support for their argument that adding the 13 custodians Plaintiffs identify would be unduly burdensome or disproportional to the needs of the case. *See* Ex. 5 at 3; Ex. 7 at 6; Ex. 9 at 2–3. Accordingly, this burden objection is waived. *See Lynn*, 285 F.R.D. at 365.

Defendants appear to further object to these custodians simply because the 17 custodians to which the parties have agreed is "a large number by any measure," *i.e.*, any additional custodians are unduly burdensome on their face. *See* Ex. 9 at 2. There is no categorical cap on the number of custodians appropriate for a case, however, given that "the objective is to locate individual custodians within each party who generated relevant information, regardless of their number." *Brink's Co. v. Chubb Eur. Grp. Ltd.*, 2021 WL 5083335, at \*15 n.12 (E.D. Va. Feb. 24, 2021), *report and recommendation adopted*, 2021 WL 5083332 (E.D. Va. Mar. 12, 2021).

Defendants also further object to Plaintiffs' request for these additional custodians on the grounds that ten of the custodians are purportedly low-level employees who reported to individuals included in the 17 agreed-upon custodians, and thus any information the proposed additional custodian possesses would be captured by an agreed-upon custodian. Ex. 9 at 2-3. The fact that there may be overlap between a proposed custodian and an agreed-upon custodian, however, is not a sufficient reason for excluding the former, particularly where, as here, "it is reasonable to believe that they will have additional, highly relevant materials . . . which were not shared with [existing custodians]." *See Mount Hawley Ins. Co. v. Felman Production, Inc.*, 269 F.R.D. 609, 620 (S.D. W.Va. 2010).

For example, Plaintiffs will need to demonstrate that Novavax (i) could not meet certain FDA quality standards related to purity and potency and experienced multiple cGMP violations (¶¶170, 184, 201, 205); (ii) experienced rampant contamination at its manufacturing facilities

11

(¶¶171, 184, 201, 205); (iii) could not scale up production of its vaccine candidate, including failing to produce sufficient vaccine doses for clinical trials, and lacked a clinical development plan (¶¶172, 184, 201, 205); and (iv) experienced supply chain disruptions throughout the Class Period (¶¶173, 184, 201, 205). While communications or documents summarizing problems with purity, potency, contamination, scalability, clinical trials, and the supply chain for Novavax executives may be sufficient to show that those executives had notice, knowledge or recklessly disregarded these problems, they are unlikely to be sufficient to prove the *extent*, and thus *materiality*, of the problems. Indeed, Defendants' Answer denies these allegations, which places the truth and extent of the allegations directly at issue. *E.g.*, Ex. 2 at 98-100, 107, 116, 119.

In addition, in their motion to dismiss, Defendants vigorously asserted, for example, that problems at only two of Novavax's 10 manufacturing facilities could not render any of their alleged misstatements false or misleading. *See* ECF No. 64-1 at 19. Plaintiffs thus must gather documentary and testimonial evidence sufficient to demonstrate the extent of the problems at the two facilities. Defendants also insisted that, in September 2021, Defendant Trizzino asserted to investors that Novavax had only "resolved challenges in some of its assays that were caused by '[t]he combination of our recombinant protein nanoparticle, its nanoparticle structure, the particle structure of [the] Matrix adjuvant.'" *Id.* at 21. Plaintiffs thus must obtain documents to show that the problems at the TX and NC facilities were so substantial that they were material to investors, and understand the purported problems with protein nanoparticles to which Trizzino referred and whether Trizzino fairly characterized those problems. This level of detail about manufacturing facilities, purity and potency standards, scalability, and clinical trials is uniquely available in the files of lower-level custodians whose responsibilities directly encompassed these issues.

### 3. Start Date of the Relevant Time Period for Requests 2, 12-14, 16, and 23

While the Requests initially established a "Relevant Time Period" for each Request of December 1, 2019 to the present (*see* Ex. 3 at 12), Plaintiffs have agreed to narrow that period by moving the start date up to November 1, 2020 for all Requests except for Requests 2, 12-14, 16, 23, 25, 27, 30, 31, and 32 (*see* Ex. 7 at 2; Ex. 8 at 1). Although Defendants have agreed to not apply any date limitations to Requests 25, 27, 30, 31, and 32 (*see id.*), the parties are at an impasse as to the start dates for Requests 2, 12-14, 16, and 23.

#### i.    *Requests 2, 12 and 13*

Plaintiffs propose to start the Relevant Time Period for Request 2 on June 1, 2020 and Requests 12 and 13 on March 1, 2020.[4] Each of these Requests seeks, in pertinent part:

- Request 2: "All Documents Concerning the Company's requirement and ability to scale up production of Novavax's Covid-19 Vaccine Candidate as referenced in, inter alia, ¶¶ 57, 63 n.8, 131, 147, and 180, as well as Novavax's ability to meet such scalability requirements." Ex. 3 at 13.

- Request 12: "All Documents that Novavax provided to or received from the FDA (and/or other U.S. and non-U.S. Government regulators), and all Communications between the FDA (and/or other U.S. and non-U.S. Government regulators) and the Manufacturing Facilities (Including FUJIFILM employees or agents and Novavax's onsite employees as referenced in the Complaint) regarding Novavax's Covid-19 Vaccine Candidate." *Id.* at 16.

---

[4] While Plaintiffs' June 14 Letter could be read to suggest that Plaintiffs are proposing a start date of June 1, 2020, for Requests 12 and 13, this is inaccurate. *See* Ex. 9 at 3. As set forth in Plaintiffs' May 12 Letter, the June 2020 start date was only proposed as to Request 2. *See* Ex. 6 at 4.

- Request 13: "All Documents Concerning any contract, agreement, arrangement, or any other understanding between Novavax and any Government entity, initiative, or program (Including any Government grants, awards, or funding that Novavax received or applied for) in connection with Novavax's Covid-19 Vaccine Candidate." *Id.* at 17.

These Requests are relevant to Plaintiffs' claims and proportional to the needs of this case because responsive documents and communications will show how Defendants misrepresented the Company's ability to scale production of the Vaccine Candidate in a timely manner and knew about the manufacturing issues causing delays. For example, in their motion to dismiss, Defendants assert that "no alleged facts suggest why, at the time Defendants spoke, Novavax could not have remained confident in its ability to resolve any challenges or issues and complete its EUA application on the estimated (and proactively revised) timeline." ECF 64-1 at 19. Documents responsive to Request 2 will show that Defendants knew early in the process that Novavax lacked the ability to meet scalability requirements.

Similarly, documents responsive to Requests 12 and 13 are relevant to Plaintiffs' claims because they are the agreements and contracts with which Novavax had to comply to successfully obtain an EUA; incentivized Defendants to rush the manufacturing process, which led to delays caused by purity, potency and contamination issues (¶¶47, 82-92, 155-62); and will show whether Defendants had any reasonable basis to believe that Novavax could meet timelines or deadlines to obtain an EUA and/or scale up Vaccine Candidate production (¶¶82-95).

Defendants refuse to search for or produce any documents prior to November 1, 2020 that are otherwise responsive to Requests 2, 12 and 13 on the grounds that "Novavax's initial efforts to design and test [its Vaccine Candidate] and to lay the groundwork for creating a manufacturing

14

apparatus in 2020 have little-to-no bearing on the omissions alleged by Plaintiffs, which relate to specific operational issues impacting Novavax's ability to manufacture its COVID-19 vaccine on commercial scale consistent with certain cGMP regulations" and thus applying a March or June 2020 start date to Requests 2, 12-14, 16 and 23 "would only serve to significantly increase the document review pool while providing little in the way of relevant documents." Ex. 9 at 3.

As an initial matter, as this Court has held, Defendants' conclusory assertions that using an earlier start date would increase the document review pool object to the earlier dates as unduly burdensome without "specificity," and thus this objection is waived. *Alston*, 2015 WL 1807952, at \*2. Indeed, Defendants do not and have *never* provided any evidence demonstrating the extent of the burden imposed by moving the start date for the Relevant Time Period back by six to eight months for these Requests. *See id.*; Ex. 5 at 7-8; Ex. 7 at 2-4; Ex. 9 at 3-5. Instead, Defendants solely assert that the documents sought during this earlier time period are irrelevant because "Novavax's initial efforts to design and test [its Vaccine Candidate] and to lay the groundwork for creating a manufacturing apparatus in 2020 have little-to-no bearing on the omissions alleged by Plaintiffs." Ex. 9 at 3. As set forth above, however, this is simply untrue and the Court should order Defendants to search for and produce documents responsive to Requests 2, 3, and 13 as of the earlier dates proposed by Plaintiffs.

### ii.   *Request 14*

Plaintiffs have also proposed a start date of March 1, 2020 for Request 14. That Request seeks, in pertinent part, "All Documents Concerning any contract, agreement, arrangement or any other understanding between Novavax and any entity (Including the Manufacturing Facilities) in connection with the development, manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate." Ex. 3 at 17. Accordingly, this request seeks agreements between Novavax

15

and the TX, NC and other manufacturing Facilities in connection with the manufacturing of the Vaccine Candidate. *See id.*; Ex. 8 at 2.

Documents responsive to Request 14 are relevant to Plaintiffs' claims because the agreements, even if executed between March and November 2020, define FUJIFILM's obligation to notify Novavax of "deviations from OOS results within 2 business days," and address FUJIFILM's responsibility to cure deficiencies at facilities, Novavax's ability to have employees on site at the facilities, and the manner in which the conditions at the facilities were reported to Novavax. ¶¶107-14. The Court specifically relied on these allegations in inferring that Plaintiffs had alleged Defendants' scienter. *See* MTD Decision, 2022 WL 17585715, at *20 (D. Md. Dec. 12, 2022) ("The Amended Complaint contains facts from multiple CWs which 'confirm and corroborate' that Novavax officials were made aware of the manufacturing problems at the Texas and North Carolina Facilities related to contamination, purity, potency, scalability, and the supply chain"). Further, Defendants' Answer contests these allegations, thus they constitute disputed facts that Plaintiffs must prove at summary judgment and trial. Ex. 2 at 65-69. The way for Plaintiffs, at least in substantial part, to prove these facts, is to access the agreements themselves and Defendants' communications concerning them.

Defendants again only conclusorily object that a March 1, 2020 start would not identify relevant documents and would be unduly burdensome. The relevance objections are meritless, as described above, and the burden objection is wholly unsupported and thus waived. *See Alston*, 2015 WL 1807952, at *2.

### iii. Request 16

Plaintiffs also propose a start date of March 1, 2020 for Request 16, which seeks, in pertinent part, "All Documents Concerning any formal or informal plan (regardless of whether such plan was enacted or followed) that outlines or tracks the clinical development of Novavax's

16

Covid-19 Vaccine Candidate." Ex. 3 at 18. Documents responsive to Request 16 are relevant because they reflect Defendants' expectations at the start of the vaccine development process and changes to those expectations, including to Novavax's ability to produce sufficient vaccine doses for clinical trials, and demonstrate the severity of the problems at the Manufacturing Facilities. Ex. 8 at 2. Indeed, Defendants expressly deny Plaintiffs' allegations that the Company lacked a clinical development plan, that the failure to include a clinical development plan contributed to manufacturing problems, or that delays were caused by Novavax's inability to produce vaccine doses for clinical trials. Ex. 2 at 52-53 (denying allegations in ¶¶86-87). Accordingly, Plaintiffs will need to support these allegations with evidence at summary judgment at trial to succeed on their claims, and are thus entitled to responsive documents from March 1, 2020.

As with Requests 2 and 12-14, Defendants conclusorily object that a March 1, 2020 start date would not identify relevant documents and would be unduly burdensome. The relevance objections are meritless, as described above, and the burden objection is wholly unsupported and thus waived. *See Alston*, 2015 WL 1807952, at *2.

### iv.   Request 23

Plaintiffs also propose a start date of March 1, 2020 for Request 23, which seeks, in pertinent part:

> All Documents Concerning any investigation, examination, audit, review or inquiry, whether formal or informal, of Novavax, by any federal or state agency or stock exchange, Including the SEC, FDA, DOJ, U.S. Attorney, State Attorneys General, Concerning any of the facts alleged in the Complaint, Including the development, manufacturing, production, distribution, and FDA approval of the Company's Covid-19 Vaccine Candidate.

Ex. 3 at 19. Documents responsive to Request 23 are relevant to Plaintiffs' claims because the subject matter of regulatory inquiries into the Vaccine Candidate, and Novavax's ability or inability to address those inquires, demonstrate the existence of manufacturing problems—

including as to contamination and purity, potency, and consistency of the drug substance—and Defendants' knowledge of those problems and regulatory expectations. Ex. 8 at 3.

Curiously, Defendants recently expressed a willingness to "discuss the possibility of running . . . a properly tailored search term" over documents beginning in *July* 2020 to identify documents responsive to Request 23. Ex. 9 at 4. Defendants do not, however, identify any reason why starting the search for documents only four months after Plaintiffs' proposed start date of March 2020 would make responsive documents any more relevant or the effort any less burdensome. *See id.* In any event, as alleged in the Complaint, from April to July 2020, Novavax sought to join the U.S. government's "Operation Warp Speed" vaccine development program, including by negotiating contracts with the U.S. Department of Defense. ¶¶56-58. Multiple U.S. government regulatory agencies were undoubtedly "investigat[ing], examin[ing], audit[ing], review[ing] or inquir[ing]" into Novavax's ability to meet the FDA's purity and potency requirements and scale up production of any vaccine candidate as part of this process. These pre-contract governmental and regulatory reviews undoubtedly drove the FDA's spring 2021 investigations at the TX and NC Facilities, which uncovered "sub-optimal" "[q]uality oversight over manufacturing and testing operations" (¶101) as well as extensive purity, potency, scalability, and contamination problems (¶¶96-106), about which Defendants misled investors. Communications concerning any government or regulatory investigation, examination, audit, review, or inquiry from March 2020 through the start of the Class Period are thus directly relevant to Plaintiffs' claims and defenses because they are evidence supporting the materiality of the later investigations and Defendants' willful or reckless failure to disclose those investigations and deficiencies at the TX and NC Facilities.

Accordingly, the Court should order Defendants to search for and produce documents responsive to Request 23 as of March 1, 2020.

### 4. End Date of the Relevant Time Period for All Requests

Plaintiffs define the Relevant Time Period for the Requests as running through "the present." Ex. 3 at 12. It is well established that the relevancy of documents does not stop as soon as the Class Period ends, nor shortly thereafter. *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("Both post-class-period data and pre-class data could be used to confirm what a defendant should have known during the class period," quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)); *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 1812822, at *5 (S.D. Cal. May 6, 2021) ("in the context of securities claims, some courts have determined that documents created outside the class period may be relevant").

Defendants recently acquiesced to a cut-off of December 31, 2021 (*see* Ex. 9 at 5), but offer no reason for this arbitrary date other than it is two months after the end of the Class Period. There is however, "no rule that discovery be constrained to a particular time period beyond the general standard under Rule 26(b)(1) requiring that discovery be relevant and proportionate." *BofI*, 2021 WL 1812822, at *5. Documents post-dating the Class Period, for example, will be relevant to show Defendants' knowledge or reckless disregard of the falsity of their earlier statements.

For example, on the last day of the Class Period, the *Politico* article revealed that Defendants had "rushed the process" (¶156), the Vaccine Candidate had woefully insufficient purity and potency (¶¶156-62), and Novavax's EUA was likely significantly delayed, Defendants initially disputed the article's accuracy. *See* Sarah Owermohle, et al., *Novavax Expresses Fresh*

19

*Confidence In Its Vaccine*, Politico, Oct. 20, 2021.[5] Defendants no doubt investigated the claims in the *Politico* article after their knee-jerk response to it, and that investigation will provide evidence demonstrating the existence of contamination, potency, purity and scalability problems during the Class Period, as well as whether Defendants' misstatements were made knowingly or recklessly. (It will also show whether Defendants' response to the *Politico* article was knowingly or recklessly inaccurate.) Further, the *Politico* article suggested the U.S. government *still* had concerns about Novavax's processes and drug substance that were unaddressed. Defendants undoubtedly were working to assuage those concerns long after the Class Period ended, and those documents further support the falsity of Defendants' Class Period statements and knowledge of or recklessness as to that falsity.

Defendants' May 25 and July 6 Letters cite cases where courts purportedly refused to allow post-class period discovery, but each is distinguishable. Ex. 7 at 3; Ex. 9 at 5. For example, in *In re Bank of New York Mellon Corp. Forex Transactions Litig. ("BNY Mellon")*, 2013 WL 5769915, at *4 (S.D.N.Y. Oct. 24, 2013), the *defendants* sought post-Class Period discovery of the *plaintiffs* ostensibly to show that the plaintiffs' later trading undercut any reliance on defendants' Class Period misrepresentations, a defense that defendants had not raised in their answer. *See id.* The Court refused to allow post-Class Period discovery because "Plaintiffs' trading in BNYM securities after the Class Period [does not have] any meaningful bearing as to whether they relied on BNYM's representations during the Class Period. While it is fundamental that discovery is not limited to the issues raised in the pleadings, it is not unlimited." *Id.* In *Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 7180662, at *2 (N.D. Cal. Nov. 16, 2015), on the other hand, the

---

[5] https://www.politico.com/ news/2021/10/20/novavax-expresses-fresh-confidence-in-its-vaccine-516319.

20

court actually ordered the defendants to produce documents for two-and-a-half months after the

Class Period ended even though Plaintiffs had not explained why any discovery post- Class Period

was relevant. *See id.* Here, unlike in *BNY Mellon* or *Hatamian*, Plaintiffs seek post-class period

documents and have shown that they bear directly on the falsity of Defendants' statements during

the Class Period and Defendants' knowledge or reckless disregard of the statements' falsity.

Accordingly, the Court should direct Defendants to search for and produce documents through the

present.

### 5. Disputes Concerning Specific Requests

#### i. *Request 8*

Request 8 seeks "All Documents Concerning deviations from, violations of,

noncompliance of, or any other problems related to Manufacturing Standards in connection with

Novavax's Covid-19 Vaccine Candidate," including "the training provided to new employees at

the Manufacturing Facilities (Including Novavax's onsite employees and FUJIFIM employees)."

Ex. 3 at 15. Although Request 8 on its face seeks training materials provided to trainees,

Defendants flatly refuse to search for or provide such materials because "[t]hose materials have no

bearing on whether Defendants truthfully and non-misleadingly described the state of Novavax's

manufacturing capabilities and assay protocols in the May, August, and September statements

challenged in the Complaint." Ex. 7 at 8; Ex. 9 at 6.

Defendants overlook, however, that Plaintiffs allege that the Company's manufacturing

delays were caused by the hiring of "many new employees who had little or no previous vaccine

manufacturing experience" (¶¶47, 90) and that the FDA identified "Inadequate and ineffective

training of manufacturing workers" as a deficiency at the TX Facility (¶100). In fact, Plaintiffs

expressly alleged that the TX Facility had been shut down in part because of the actions of

inexperienced (*i.e.*, inadequately trained) new employees (¶137), allegations that Defendants

21

expressly deny (Ex. 2 at 81). Plaintiffs allege that statements by Defendants were false and misleading for failing to disclose the truth about manufacturing delays, including the shutdown of the TX Facility, and thus inadequate training directly contributed to the delays and shutdown and the materials used to train employees are relevant to Plaintiffs' claims. Accordingly, this Court should order Defendants to produce the training materials sought by Request 8.

                    ii.     *Request 11*

Request 11 seeks:

> All Documents Concerning the production or distribution of any approved or potential Covid-19 vaccine by any of Novavax's Competitors to the extent such Documents relate to (i) Novavax's Covid-19 Vaccine Candidate's market share or competitive position in the Covid-19 vaccine sector; or (ii) any heightened scrutiny, investigation, or enforcement action by government agencies on such Competitors, such as any Documents about the Government's decision to halt production of Covid-19 vaccine production at Emergent BioSolutions' Baltimore facility in April 2021.

Defendants have refused to produce any documents in response to Request 11 on the grounds that "Plaintiffs' assertion that the success of competitors may have motivated Defendants to act recklessly . . . is highly speculative" and "Novavax's knowledge of competitors' position has no bearing on Plaintiffs' surviving claims, which turn on the truth or falsity of statements about manufacturing capabilities in May 2021 or the status of assay protocols later that year." *See* Ex. 4 at 26-27; Ex. 7 at 8-9.

Defendants ignore, however, that Plaintiffs expressly allege that Defendants "rushed the process" of developing Novavax's Vaccine Candidate to try to beat competitors to market (¶¶4, 47, 90, 91, 155-56, 161), in part because the Company historically had been too late to capitalize on prior vaccine opportunities (¶52), which led directly to problems with the vaccine's purity and potency (¶¶137-38, 156-61), and contaminations and other manufacturing problems at FUJIFILM facilities (¶¶137-38, 156-61), which Defendants misrepresented to investors. Defendants'

knowledge and tracking of the status of its competitors' vaccine candidates thus is relevant to Defendants' knowledge or recklessness of the falsity of their statements, as well as the falsity of statements that "nearly all of the major challenges have been overcome" (¶178), "all of our manufacturing sites [are] producing GMP material at scale" (¶180), "we've eliminated all of the serious hurdles" (¶181); and assay challenges "have now been resolved" (¶204) given that a substantial part of the reason why these statements were false was that these problems had not been resolved *because* Defendants had rushed the process in focusing on beating competitors to market. Accordingly, the Court should order Defendants to produce the training materials sought by Request 11.

### iii.    Request 13

Request 13 seeks, in pertinent part, "All Documents Concerning any contract, agreement, arrangement, or any other understanding between Novavax and any Government entity, initiative, or program (Including any Government grants, awards, or funding that Novavax received or applied for) in connection with Novavax's Covid-19 Vaccine Candidate." Ex. 3 at 17. Defendants have agreed to produce agreements between Novavax and U.S. government entities, but not any documents concerning those agreements because Plaintiffs' "reasons for seeking those documents bear no relevance to the parties' surviving claims and defenses." Ex. 7 at 9; Ex. 9 at 7. Again, Defendants are wrong.

Plaintiffs, for example, allege that Defendants' contract with the U.S. Department of Defense "required Novavax to "establish within the United States large scale production" of one of the Vaccine Candidate's major components and to "establish a production capability within the United States" for that same component. ¶57. In addition, Defendants' agreement to join "Operation Warp Speed" required Novavax to "demonstrate that it could rapidly set up large-scale manufacturing and transition into ongoing production, including the capability to stockpile and

23

distribute large quantities of" the Vaccine Candidate. ¶58. Communications concerning these and other contractual obligations, Novavax' inability to fulfill them, and Defendants' knowledge or reckless disregard of that inability, are thus directly relevant to Plaintiffs' claims and the Court should order Defendants to search for and produce such documents.

### iv.    Request 16

Request 16 seeks "[a]ll Documents Concerning any formal or informal plan (regardless of whether such plan was enacted or followed) that outlines or tracks the clinical development of Novavax's Covid-19 Vaccine Candidate, Including any "clinical development plan" as referenced in ¶¶ 91 and 172 of the Complaint and any internal projected timelines for EUA approval and commercialization of Novavax's Covid-19 Vaccine Candidate." Ex. 3 at 18. While Defendants have agreed as part of their production in response to Request 18 to produce the timelines sought in Request 16 (*see* Ex. 4 at 35; Ex. 7 at 9), Defendants refuse to produce any documents concerning any plan for the clinical development of the Vaccine Candidate because "Plaintiffs are not entitled to expansive discovery on every aspect of Novavax's operation of clinical trials or the Vaccine Candidate's performance in those trials."  Ex. 4 at 34-35; Ex. 7 at 9.

Contrary to Defendants' assertion, Plaintiffs are not seeking documents concerning "every aspect" of the Vaccine Candidate's clinical trials. Rather, Plaintiffs allege that Defendants' failure to create and/or implement a clinical development plan caused in part the manufacturing problems and delays about which Defendants made multiple misrepresentations. *E.g.*, ¶¶91 (describing the lack of a clinical development plan); ¶¶172, 184, 201, 205 (alleging that the lack of a clinical development plan was part of the reason Defendants could not scale up production of the Vaccine Candidate, which made Defendants' statements false and misleading). Defendants have expressly denied these allegations. Ex. 2 at 99, 106, 116-17, 119. Accordingly, any formal or informal clinical development plan, as well as any communications concerning that plan (or lack thereof)

24

are directly relevant to Plaintiffs' claims, and the Court should order Defendants to search for and produce them.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs respectfully request that the Court grant their Motion in its entirety.

Dated: July 18, 2023

Respectfully submitted,

**POMERANTZ LLP**

<u>/s/ Brian Calandra</u>
Jeremy A. Lieberman (admitted *pro hac vice*)
Brian Calandra (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
bcalandra@pomlaw.com

**LABATON SUCHAROW LLP**

<u>/s/ Michael Rogers</u>
James W. Johnson (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac vice*)
David J. Schwartz (*pro hac vice* forthcoming)
James T. Christie (admitted *pro hac vice*)
Philip J. Leggio (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com
pleggio@labaton.com

***Counsel for Co-Lead Plaintiffs and Lead Counsel for the Class***

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of July, 2023, I served a copy of the

foregoing Memorandum of Law in Support of Plaintiffs' Motion to Compel Production of

Documents via email upon:

C. Thomas Brown
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7464
Thomas.Brown@ropesgray.com

Peter L. Welsh
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7865
Peter.Welsh@ropesgray.com

Edward R. McNicholas
Bar No. 24833
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4779
Edward.McNicholas@ropesgray.com

Stefan P. Schropp
Bar No. 21699
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9938
Stefan.Schropp@ropesgray.com
Counsel for Defendants

SO CERTIFIED this 18th day of JULY 2023

/s/ **_Brian Calandra_**
Brian Calandra

26

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NOVAVAX, INC., STANLEY C. ERCK, GREGORY F. COVINO, JOHN J. TRIZZINO, and GREGORY M. GLENN,<br><br>Defendants. | Civil Action No. TDC-21-2910<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ................................................................................. 2

    A.  Novavax Attempts to Seize on the Massive Need for Covid-19 Vaccines............. 3

    B.  Defendants Tout That NVX-CoV2373 Was Aligned with FDA Criteria............... 7

        1.  Defendants Reassure Investors That Novavax Overcame the
            Problems That Caused the Regulatory Delay ............................................ 8

        2.  Despite Consistently Delaying Novavax's EUA Filing Due to
            Manufacturing Problems, Defendants Again Reassure Investors
            That Such Problems Have Been Resolved.................................................. 10

        3.  The Truth About the Failed Vaccine Candidate Is Revealed to
            Investors.................................................................................................... 11

II.  JURISDICTION AND VENUE ......................................................................... 12

III. PARTIES .......................................................................................................... 12

    A.  Lead Plaintiffs.................................................................................................. 12

    B.  Defendants ....................................................................................................... 13

        1.  Corporate Defendant................................................................................ 13

        2.  Individual Defendants.............................................................................. 13

        3.  Relevant Third Parties.............................................................................. 15

IV. SUBSTANTIVE ALLEGATIONS OF FRAUD................................................. 19

    A.  Novavax's Business.......................................................................................... 19

        1.  Novavax Prior to the Covid-19 Pandemic ............................................... 19

        2.  Novavax Announces NVX-CoV2373 as a Possible Vaccine
            Candidate ................................................................................................ 20

        3.  Novavax Contracts with the United States Government to Produce
            Millions of Doses for Americans.............................................................. 21

    B.  Novavax Continues Developing NVX-CoV2373 and Partners with
        FUJIFILM Diosynth Biotechnologies ................................................................ 22

    C.  Novavax Was Required to Comply with Strict FDA Regulations ...................... 24

D.      Undisclosed Manufacturing Problems Were Causing Delays—Preventing Novavax from Timely Filing Its EUA with the FDA ........................................................ 27

       1.     Sources Within Novavax Confirm That the Manufacturing Problems Were Causing Delays ................................................................ 28

            (a)    Rampant Contamination Events Repeatedly Set Back Production at the Texas and North Carolina Facilities ................. 28

            (b)    NVX-CoV2373 Failed to Meet FDA Purity and Potency Standards Which Delayed the EUA Filing .................................. 30

            (c)    Novavax Failed to Successfully Scale Up Production .................. 31

            (d)    Novavax Experienced Supply Chain Disruptions ........................ 34

       2.     The FDA Confirmed and Corroborated that Novavax's Critical Manufacturing Facilities Experienced Major Manufacturing Problems ...................................................................................... 35

       3.     Defendants Knew About the Manufacturing Problems ........................... 39

            (a)    Defendants Stayed Apprised of the Manufacturing Problems, as Was Required by FDA Regulations ........................ 39

            (b)    Defendant Erck Personally Held Company-Wide Meetings Regarding NVX-CoV2373 ........................................... 42

            (c)    Internal Novavax Reports and Emails Contained Information from Manufacturing Facilities and Clinical Testing Updates ............................................................. 42

E.      Defendants Reassure Investors That NVX-CoV2373 Was Aligned with FDA Criteria and Would Be Timely Filing Its EUA with the FDA ..................... 43

F.      Defendants Delay the EUA Filings, Partially Revealing the Underlying Challenges They Faced—but Continue to Reassure Investors ........................... 44

G.      Rampant Contamination Issues Remained Unresolved and Worsened—Causing Manufacturing Processes to Shut Down ................................................ 48

H.      Despite Novavax's Continued Manufacturing Problems Causing Additional Regulatory Filing Delays, Defendants Again Reassure Investors That Novavax No Longer Faces Such Issues ........................................ 50

I.      Investors Finally Learn About the Manufacturing Problems That Were Preventing Novavax from Filing Its EUA with the FDA ................................... 54

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 56

A.    February 24, 2021 – *The Washington Post* Interview ........................................... 56

B.    May 10, 2021 – 1Q21 Earnings Call and Partial Disclosure / Materialization of the Risk ............................................................................... 60

C.    June 14, 2021 – Clinical Update Call ................................................................ 66

D.    August 5, 2021 – *Reuters* Interview and Partial Disclosure / Materialization of the Risk ............................................................................... 67

E.    September 21, 2021 – Devex UNGA 76 Conference .......................................... 69

F.    September 29, 2021 – Cantor Fitzgerald Global Healthcare Conference ............ 70

G.    October 19, 2021 – Final Disclosure / Materialization of the Risk ...................... 70

VI.    LOSS CAUSATION ..................................................................................................... 72

A.    May 10, 2021 – First Partial Disclosure / Materialization of the Risk ................ 74

B.    August 5, 2021 – Second Partial Disclosure / Materialization of the Risk .......... 77

C.    October 19, 2021 – Final Disclosure / Materialization of the Risk ...................... 80

VII.    ADDITIONAL INDICIA OF SCIENTER .......................................................... 83

A.    Defendants Enriched Themselves Through Insider Sales In Advanced of Important Announcements ................................................................................ 83

    1.    Defendants Erck, Trizzino, and Glenn Sold Large Blocks of Novavax Stock Right Before the EUA Delay Announcements ............... 84

    2.    Defendants Erck, Trizzino, and Glenn Reaped Massive Proceeds During the Class Period ............................................................... 85

B.    Manufacturing NVX-CoV2373 Was Critical to Novavax's Core Operations ...................................................................................................... 86

C.    Defendants' Personal Involvement in NVX-CoV2373's Development Supports That They Had Actual Knowledge or Were Reckless in Not Knowing About the Manufacturing Problems ....................................................... 89

D.    Defendants' Statements Themselves Support Scienter ......................................... 94

E.    Government's Crackdown on Emergent BioSolutions Further Supports Scienter ........................................................................................................... 95

VIII.    CONTROL PERSON ALLEGATIONS ................................................................... 97

IX.    CLASS ACTION ALLEGATIONS ........................................................................ 98

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
MARKET DOCTRINE .......................................................................................... 100

XI.    NO SAFE HARBOR ............................................................................................... 102

XII.    CAUSES OF ACTION .......................................................................................... 103

PRAYER FOR RELIEF ....................................................................................................... 108

JURY DEMAND .................................................................................................................. 109

Court-appointed Lead Plaintiffs Jeffrey A. Gabbert, Nuggehalli Balmukund Nandkumar, and David Truong ("Lead Plaintiffs"), individually and on behalf of all persons and entities who or which, during the period from February 24, 2021 through October 19, 2021, inclusive (the "Class Period"), purchased the publicly traded common stock of Novavax, Inc. ("Novavax" or the "Company") and were damaged thereby (the "Class")[1], bring this Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws against Defendants Novavax and several of Novavax's senior executives—President and Chief Executive Officer ("CEO") Stanley C. Erck, former Treasurer, Chief Financial Officer ("CFO") and Executive Vice President ("EVP") Gregory F. Covino, former CFO and current Chief Commercial Officer, Chief Business Officer, and EVP John J. Trizzino, and President of Research and Development Gregory Glenn (collectively, the "Individual Defendants").

Lead Plaintiffs' claims are brought upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Novavax with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Novavax and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Novavax, its business, and the Individual Defendants; (4) an investigation conducted by Lead Plaintiffs' attorneys, including interviews with former Novavax employees; and (5) other publicly available information concerning Novavax, its business, and the allegations contained

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Novavax during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Novavax's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

herein. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiffs have a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This securities fraud action arises out of Novavax's misleading statements made in connection with the Company's failed attempt to bring a vaccine candidate, NVX-CoV2373, to market during the Covid-19 pandemic. Specifically, Defendants misled investors about the vaccine's purported successful development, production, and imminent U.S. Food and Drug Administration ("FDA") approval; in reality, Novavax's vaccine was nowhere close to being approved for use: (a) because the vaccine's purity and potency numbers fell well below FDA safety requirements as a result of severe manufacturing problems including several undisclosed contamination events at its two U.S. manufacturing facilities; (b) because of a failure to manufacture the vaccine at scale; and (c) because of supply chain disruptions—all of which caused significant delays that jeopardized any chance Novavax had to capitalize on the market for Covid-19 vaccines.

2. Worse, Defendants personally made millions because of their rosy statements touting the successful vaccine development and manufacturing process that caused Novavax stock to remain at near record levels based on investors' belief that the Company was in pole-position to sell billions of doses in the near future. Indeed, just days before revealing bad news to the public about costly delays in Novavax's regulatory submissions due to the manufacturing problems, Defendant Erck sold over 100 thousand shares of Novavax stock, *reaping proceeds of over $22.5 million for himself* and leaving investors to take a massive hit. Likewise, Defendant Glenn *made over $3 million in sales by selling thousands of shares right before the Company announced the regulatory delays*, which caused Novavax's stock price to plummet.

3.      The truth about Novavax's failed vaccine candidate was finally revealed on October 19, 2021, when *Politico* released an article containing interviews with several Novavax employees detailing the extent of the Company's manufacturing problems, including the Company's inability to manufacture a vaccine that met the FDA's purity and potency requirements.  The article also disclosed that Novavax's vaccine would likely not be approved until late 2022—almost a full year later.  During the Class Period, ***Novavax's stock collectively fell over 50% in response to disclosures related to Novavax's manufacturing issues and inability to meet FDA requirements, thereby injuring investors***.

A.      **Novavax Attempts to Seize on the Massive Need for Covid-19 Vaccines**

4.      Novavax, headquartered in Gaithersburg, Maryland, is a biotechnology company that focuses on the development and commercialization of vaccines to prevent infectious diseases. At the beginning of the Covid-19 pandemic, Novavax found itself in a unique position to potentially capitalize on the urgent need for Covid-19 vaccines.  Indeed, in early 2020, Novavax was granted a $1.6 billion government grant to manufacture millions of doses of its vaccine candidate for American citizens.  But time was of the essence as Novavax was competing against other vaccine manufacturers such as Pfizer, Moderna, AstraZeneca, and Johnson & Johnson to get vaccines to the American public as quickly as possible.

5.      If its vaccine was delayed too long, Novavax faced the significant risk of no existing need for that vaccine, which also would mean no longer being a candidate for rapid FDA approval and sale under an emergency use authorization ("EUA") mandate.  As one analyst, CFRA, explained, "***[w]e think the future financial success of [Novavax] . . . is highly dependent on successful approvals and rapid commercialization of its Covid-19 vaccine***."  And as another analyst, Zacks, noted, "***[a]ny delay in the study outcome or any developmental setback for . . .***

3

*the COVID-19 vaccine candidate will be a major disappointment for [Novavax], leaving an adverse impact on its shares.*"

6. While EUA provides for an expedited pathway to approval, it still requires that the vaccine candidate meet certain basic safety and efficacy benchmarks imposed by the FDA, including current Good Manufacturing Practices ("cGMP"). As part of cGMP, Novavax's vaccine had to meet certain purity and potency levels and the Company had to ensure that its facilities were void of any contamination. Additionally, FDA regulations required Novavax's direct involvement with the manufacturing processes of its facilities and that it remained informed of any issues related thereto.

7. However, during the Class Period, Novavax simply could not manufacture vaccines at the required FDA purity and potency levels, experienced numerous contamination events in critical manufacturing facilities, failed to successfully scale up production, and faced supply chain disruptions—all of which caused material delays in Novavax's EUA filing. Indeed, multiple individuals who worked on the vaccine confirmed that Novavax was experiencing severe manufacturing problems that prevented the Company from timely releasing the vaccine to the public while demand still existed.

8. Two former employees who worked at Novavax's two primary vaccine manufacturing plants in Texas and North Carolina confirmed that the plants were struck with repeated contamination events that in some instances caused the manufacturing plants to be shut down (sometimes for months) while the contamination was investigated.[2]

---

[2] Novavax partnered with FUJIFILM Diosynth Biotechnologies ("FUJIFILM") to produce certain critical components of NVX-CoV2373 at FUJIFILM's manufacturing facilities in Texas (the "Texas Facility") and North Carolina (the "North Carolina Facility"). These plants were crucial to Novavax's ability to produce its vaccine candidate. Indeed, as Defendant Trizzino himself

4

9.      For instance, the former Head of Technical Operations, Gene Therapy at the Texas Facility, CW 5, explained that a microbial contamination had existed there since December 2020 and occurred on at least four occasions.  According to CW 5, these contamination incidents required shutting down the manufacturing lines for each incident of contamination found.

10.     Compounding these problems, according to CW 5, *the Texas Facility once again became so contaminated in March 2021 that the facility's manufacturing processes completely shut down from March 2021 until September 2021*.  CW 6 similarly recalled that contamination had existed at the Texas Facility since April 2021, which caused its manufacturing processes to shut down until at least the end of CW 6's tenure on June 30, 2021.  Moreover, an FDA investigation in March 2021 uncovered a microbial contamination at the Texas Facility that occurred in January 2021 but was improperly reported.

11.     Moreover, according to the former Quality Assurance Manager at the North Carolina Facility, CW 7, some contamination issues spanned the "whole gamut" of the project (*i.e.*, throughout the entire Class Period), referring to manufacturing Novavax's vaccine candidate, and said they were "always an issue," which required FUJIFILM to discard the batch, ending the process.

12.     In response to these events, the FDA inspected the Texas Facility and North Carolina Facility in March 2021 and April 2021, respectively, and confirmed that the two manufacturing facilities were experiencing severe manufacturing problems.  In a 52-page investigation report and Form 483 issued to the Texas and North Carolina Facilities in March and April 2021, the FDA identified numerous quality-related problems and issues with the vaccine's

_____

explained, the "*antigen produced at the Fuji sites in North Carolina and Texas are a critical component of our US supply chain*."

purity including that *contamination was discovered and not properly recorded and investigated, including microbial contamination that was discovered in January 2021*; that the *cleaning procedure for certain manufacturing areas was not always followed*; that employees *failed to investigate for root causes and implement adequate corrective and preventative actions to control microbial contamination*; that there were *inadequate procedures for the "Purification" step*; and that the *manufacturing process was not adequately monitored and/or controlled to ensure the quality of the drug substance was not adversely affected*.

13.     As a result, during the Class Period, *Novavax was only able to manufacture vaccines with purity levels of around 70%—with some batches of vaccines containing purity levels of as low as 30%—nowhere close to the 90% purity level required by FDA standards*. Similarly, Novavax was unable to maintain the proper level of potency throughout 2021.

14.     In addition, Novavax was not able to successfully scale up production throughout the Class Period.  For instance, *Novavax was not even able to produce the required number of doses in time for clinical trials to be performed on the drug*, which was then causing the trials to be delayed.  Moreover, former Novavax and FUJIFILM employees confirm many supply chain problems—such as domestic supply constraints—at the Texas Facility, which its Director of Manufacturing, CW 6, recalled "were always a struggle" and an "ongoing issue."  The North Carolina Facility likewise had difficulty procuring the components necessary to manufacture its Covid-19 vaccine, such as filters and resin used in the manufacturing process.

15.     In addition to FDA regulations requiring Novavax to stay apprised of any problems that developed in any facility manufacturing its vaccine, multiple former employees from the Texas and North Carolina Facilities confirm and corroborate *that Novavax was notified by the FDA and Novavax's manufacturing partners at the Texas and North Carolina Facilities of the*

6

*manufacturing problems that occurred throughout the Class Period*.  For example, several former employees from the Texas Facility confirmed that Novavax had several onsite employees at that facility, and that *they communicated with Novavax's onsite employees "every single day" regarding manufacturing, purity, and the results of quality checks*.  The Quality Assurance Manager at the North Carolina Facility similarly explained that Novavax was notified of problems at the North Carolina Facility, including contamination.  Indeed, the Quality Assurance Manager at the North Carolina Facility, CW 7, explained that the North Carolina Facility constantly communicated any problems to Novavax, which had someone onsite at the North Carolina Facility weekly at a minimum.

**B.      Defendants Tout That NVX-CoV2373 Was Aligned with FDA Criteria**

16.      Despite these significant problems related to purity, potency, contamination, scalability, and the supply chain, throughout the Class Period, Defendants falsely reassured investors that the manufacturing process was going smoothly and that Novavax was aligned with the FDA criteria (*e.g.*, certain purity, potency and other quality standards) needed for Novavax to file its EUA in a timely fashion.  For example, on February 24, 2021, in an interview with *The Washington Post*, Defendant Glenn touted to investors that Novavax was "*aligned up with [the FDA's] success criteria in all of [Novavax's] trials*."

17.      Analysts were encouraged by Defendants' reassurances.  For example, Jefferies published an analyst report stating, "[a]ltogether, everything remains on track, including EUA filing in UK, EU and USA in Q2."  Similarly, Zacks noted that the "vaccine is also advancing well."  In fact, CFRA even issued a Strong Buy rating for Novavax and reported that "[w]e think 2021 could be a turnaround year for [Novavax]," and that "[w]e think [Novavax's] Covid-19 vaccine candidate is well-placed to receive the fourth EUA in the U.S. in Q2."

7

18.     However, far from being "aligned" with the FDA's success criteria, Novavax was unable to meet the FDA's purity or potency criteria due to several manufacturing problems.  Then, in May of 2021, Novavax disclosed that it would be delaying its EUA submission to the FDA.  Specifically, on May 10, 2021, during market hours, *The Washington Post* reported that Novavax's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest."  Novavax later that day, after market hours, confirmed that it was unlikely to seek an EUA for NVX-CoV2373 in the U.S. until July 2021 at the earliest—*i.e.*, the third quarter of 2021.  As a result of this news, ***Novavax's stock price fell 8.81% on May 10, 2021***, and, following the Company's confirmation, ***continued to fall an additional 13.91% on May 11, 2021***.

19.     Notably, knowing that Novavax shares would tumble with the announcement of any delay, some of the Individual Defendants decided to enrich themselves prior to announcing the delay to the public.  For example, not long before announcing the EUA filing delay on May 10, 2021—an announcement that was certain to cause Novavax's stock price to plummet—in April 2021 (around the same time as one of the FDA inspections), Defendant Glenn cashed in over 8,000 shares for over $1.6 million in proceeds.  Defendant Trizzino likewise sold over 3,000 shares on May 5 and May 7, 2021, just days before the announcement, to make nearly $600,000 in proceeds.

### 1.     Defendants Reassure Investors That Novavax Overcame the Problems That Caused the Regulatory Delay

20.     Yet, despite delaying its regulatory filing, Defendants continued to reassure investors that Novavax had resolved the challenges that caused the regulatory delay.  Indeed, Defendant Erck told investors that "***nearly all of the major challenges have been overcome*** and we can clearly see the light at the end of the tunnel."  Defendant Erck similarly touted, with respect to solving the manufacturing problems: "***I'm happy to say we did.  We've crossed that bridge.***

8

*We're—we made a big breakthrough there and we're now racing towards validating everything and putting it into a package*."

21.     Throughout the Class Period, Defendants continued assuring investors that any manufacturing problems were in the past through statements such as "*we've eliminated all of the serious hurdles to getting—risk hurdles to getting to where we need to be to get an improved vaccine*," "*we are well positioned with our technology and timing to supply product for boosting and seasonal revaccination*," and "*our trials proved that we are on the right track*"—leading investors to believe there was nothing to worry about in terms of manufacturing problems.

22.     The market bought Defendants' story.  Indeed, in light of Defendants' continued reassurances, an analyst from Jefferies noted that Novavax's management "remains confident in their ability to execute" and that, "[w]hile [filings with the FDA] took longer than they initially expected, it appears they have everything close to being set now."  Cantor Fitzgerald also reported that despite Novavax's update, "according to management, facilities in its network have demonstrated the ability to manufacture commercial scale GMP material."  And H.C. Wainwright explained that "[w]e believe the company remains a solid player in the COVID-19 vaccine landscape and think concerns about a delay in regulatory filings and manufacturing challenges are only temporary setbacks."

23.     However, as with the previous quarter, as a result of the underlying manufacturing problems related to purity, potency, contamination, scalability, and the supply chain, on August 5, 2021, Novavax further delayed its EUA filing and reported that it expected to file for NVX-CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021.  On that same day, Novavax disclosed, "[t]he U.S. government has recently instructed *the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods*

9

*before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made*." As a result of this news, ***Novavax's stock price dropped 19.61% on August 6, 2021***. In response to this news, Seeking Alpha reported that the "news was a shocker for investors."

24. Once again knowing that the second delay would cause the stock to plummet, in July 2021, right before the Company's announcement of the delay—and ***during the very month the Texas Facility was shut down*** and being investigated by the FDA for contamination problems—***Defendant Erck sold over 100 thousand shares of Novavax stock worth over $22.5 million***. Similarly, Defendant Glenn sold over 8,000 shares in July 2021, resulting in over $1.5 million in proceeds.

> **2. Despite Consistently Delaying Novavax's EUA Filing Due to Manufacturing Problems, Defendants Again Reassure Investors That Such Problems Have Been Resolved**

25. Defendants continued to conceal the full truth regarding the underlying manufacturing problems mentioned above, and again reassured investors that "***[w]e appear to have got past (certain) supply issues and are now being able to produce at scale***" and that "***we've been extremely transparent across multiple fronts***." Notably, on September 29, 2021, Defendant Trizzino continued to assuage investors that some challenges that Novavax faced "***have now been resolved***."

26. In light of Defendants' continued reassurances, analysts and the media remained optimistic. For example, despite finding that the delays were "less than ideal," Jefferies reported that "[m]anufacturing appears to be on track w[ith] the [C]ompany reiterating plans to reach 100M doses/month and 150M doses/month by the end of Q3 and Q4, respectively." Similarly, Jefferies explained, "the risk associated w[ith] these filings has been significantly reduced and [management] remains very confident they will be able to file." Additionally, Seeking Alpha

10

stated that "[w]hile [Novavax] announced a delay in submission to US FDA, it is still on track to achieve its previously planned manufacturing capacity for Q3 and Q4."

### 3. The Truth About the Failed Vaccine Candidate Is Revealed to Investors

27. Despite Defendants' false assurances throughout the Class Period, the truth was finally revealed to investors on October 19, 2021, when a *Politico* article reported a laundry list of manufacturing delays that had been preventing, and would continue to prevent, Novavax from filing its EUA in time. Notably, the article explained that Novavax's "issues are more concerning than previously understood" and that ***the Company could take until the end of 2022 to resolve its manufacturing problems and obtain the necessary regulatory authorizations and approvals***.

28. The *Politico* article revealed that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373. For instance, according to the article, the Company "has consistently run into production problems," including that "[t]he methods [Novavax] used to test the purity of the vaccine have fallen short of regulators' standards" and that a "person familiar with the [C]ompany's manufacturing process said Novavax has recently shown purity levels hovering around 70 percent"—still well below the 90% FDA requirement. Additionally, the article disclosed that Novavax was already aware of specific concerns with NVX-CoV2373's manufacturing process as U.S. officials had warned Novavax about issues related to meeting the FDA's rigorous quality standards once the vaccine went into mass production.

29. In response to this news, ***Novavax's stock price fell $23.69 per share, or 14.76%***, to close at $136.86 per share on October 20, 2021—further damaging investors. Additionally, *Politico* reported on October 20, 2021, that Novavax's issues were "worse than previously reported and could take several more months to set right."

11

## II.     JURISDICTION AND VENUE

30.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5(a), (b), and (c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

32.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Novavax's headquarters are located in this District, the Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

33.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES

### A.     Lead Plaintiffs

34.     Lead Plaintiff Jeffrey A. Gabbert ("Gabbert") was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 26, 2022.  ECF No. 47.  As set forth in his Certification previously filed with the Court on January 11, 2022 (ECF No. 26-7), Lead Plaintiff Gabbert purchased Novavax common stock at artificially inflated prices during the Class Period.

35.     Lead Plaintiff Nuggehalli Balmukund Nandkumar ("Nandkumar") was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 26, 2022.  ECF No. 47.  As set forth in his Certification previously filed with the Court on January 11, 2022 (ECF No.

12

26-7), Lead Plaintiff Nandkumar purchased Novavax common stock at artificially inflated prices during the Class Period.

36.    Lead Plaintiff David Truong ("Truong") was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 26, 2022.  ECF No. 47.  As set forth in his Certification previously filed with the Court on January 11, 2022 (ECF No. 24-3), Lead Plaintiff Truong purchased Novavax common stock at artificially inflated prices during the Class Period.

**B.    Defendants**

**1.    Corporate Defendant**

37.    Defendant Novavax is a biotechnology company that focuses on the discovery, development, and commercialization of vaccines to prevent serious infectious diseases and address urgent global health needs.  To date, Novavax has never brought a successful candidate to market. Novavax is incorporated under the laws of Delaware with its principal executive offices located at 21 Firstfield Road, Gaithersburg, Maryland 20878.  Novavax's common stock trades on the NASDAQ exchange under the symbol "NVAX."

**2.    Individual Defendants**

38.    Defendant Stanley C. Erck ("Erck") has served as the Company's President and Chief Executive Officer since April 2011 and as a member of the Company's Board of Directors since June 2009.  In his role as President and CEO of Novavax, Defendant Erck participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the Company's ability to manufacture the NVX-CoV2373 vaccine in conformance with FDA and cGMP requirements.  Defendant Erck also sold 197,008 shares of Novavax stock during the Class Period for proceeds of $38,672,789.  In addition, during the Class Period, 3,162 shares of Erck's Novavax stock, worth $784,682, were

13

withheld by the Company to pay for his personal taxes or the exercise price in connection with Company-issued stock.

39.     Defendant Gregory F. Covino ("Covino") served as Novavax's Chief Financial Officer ("CFO"), Treasurer, and an Executive Vice President ("EVP") of the Company from November 16, 2020 until April 12, 2021.

40.     Defendant John J. Trizzino ("Trizzino") served as Novavax's Interim CFO from April 12, 2021 to August 16, 2021.  Trizzino also serves as the Company's Chief Commercial Officer, Chief Business Officer, and an EVP of the Company.  Defendant Trizzino participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the Company's ability to manufacture the NVX-CoV2373 vaccine in conformance with FDA and cGMP requirements.  Defendant Trizzino also sold 54,635 shares of Novavax stock during the Class Period for proceeds of more than $12,013,325.  In addition, during the Class Period, 2,691 shares of Trizzino's Novavax stock, worth $601,692, were withheld by the Company to pay for his personal taxes or the exercise price in connection with Company-issued stock.

41.     Defendant Gregory M. Glenn ("Glenn") has served as Novavax's President, Research and Development since March 2016.  On February 24, 2021, Defendant Glenn participated in an interview with *The Washington Post* to discuss Novavax's regulatory timeline for its EUA and Novavax's progress thus far in meeting FDA requirements, during which he made false and misleading statements and omissions of material fact relating to the Company's ability to manufacture the NVX-CoV2373 vaccine in conformance with FDA and cGMP requirements. Defendant Glenn also sold 77,862 shares of Novavax stock during the Class Period for proceeds of more than $14,508,912.  In addition, during the Class Period, 14,106 shares of Glenn's Novavax

stock, worth $2,703,649, were withheld by the Company to pay for his personal taxes or the exercise price in connection with Company-issued stock.

42. Defendants Erck, Covino, Trizzino, and Glenn are referred to herein as the "Individual Defendants." Defendant Novavax and the Individual Defendants are referred to herein, collectively, as "Defendants."

### 3. Relevant Third Parties[3]

43. **Confidential Witness ("CW") 1** worked for Novavax from December 2020 to August 2021 as a Manager – Regulatory Affairs CMC (Chemistry, Manufacturing and Controls). CW 1 worked remotely from the Washington, D.C. area. She reported to Senior Director – Regulatory Affairs CMC Jannine Haberman Cobb, who ultimately reported to Director – Regulatory Affairs Kathleen Callahan. Callahan reported to Senior Vice President/Chief Regulatory and Quality Officer Henrietta Ukwu. At Novavax, CW 1 helped manage manufacturing sites contracted by Novavax to produce its Covid-19 vaccine. Further, as part of her role on the Regulatory Affairs CMC team, CW 1 helped Novavax put together documents containing information from the Company's manufacturing sites that was then submitted to the FDA in the form of Module 3 Quality reports. CW 1 explained that the FDA communicated concerns about the stability of Novavax's vaccine batches one or two times, possibly in December 2020 and then again in March 2021.

44. **CW 2** worked at Novavax from January 2021 until October 2021 as a Medical and Communications Publications Specialist. She reported to Director – Medical Communications and Publications Betsy Kitchens, who reported to Vice President – Clinical Development,

---

[3] All Confidential Witnesses are referred to with female pronouns, regardless of gender, to protect their identity.

15

Coronavirus Vaccines Seth Toback. Toback reported to Chief Medical Officer Filip Dubovsky. CW 2 explained that her role was part of a "new and small team called Medical Affairs" that Novavax created as it began ramping up its "production headcounts to prepare to produce the [Covid-19] vaccine." The Medical Affairs team had about five or six people when CW 2 joined but grew to about 11-12 members. CW 2's role was to create scientific materials and supporting publications for primary manuscripts and secondary manuscripts for the ongoing clinical trials. She explained that whenever Novavax produced data to present, the Medical Affairs team worked on publications and submitted to peer-reviewed journals.

45. **CW 3** worked at Novavax from November 2020 until April 2021 as a Laboratory Technician. She worked out of a facility in Gaithersburg, Maryland. CW 3 conducted product improvement testing that the Company planned to use in later phases of its Covid-19 vaccine manufacturing process. Her role also involved tasks such as cleaning, tidying and organizing, along with conducting experiments. According to CW 3, the work she did was all about improving the quality of the product and making sure the Laboratory Technicians were using the products made to their highest efficiency and to have the products be as concentrated as possible so that when the product was used it would be used as efficiently as possible. CW 3 further explained that the testing was designed to achieve the "most purity" and to determine "how to get higher purity at different filtration levels." She also explained that part of her work was to improve the processing as they were finding when they were making the vaccine that there were a lot of waste products.

46. **CW 4** worked at Novavax from July 2020 to October 2021 as a Senior Director – Clinical Operations, a role that involved overseeing the company's U.K. clinical trials for its Covid-19 vaccine. CW 4 reported to Vice President – Clinical Operations Patty Reed, who

16

reported to Chief Medical Officer Filip Dubovsky. CW 4 explained that Reed managed Novavax's Operation Warp Speed group. According to CW 4, Novavax struggled to produce enough proper vaccine doses for several different clinical trials, including about 4,000 doses needed for three smaller clinical trials in 2021, causing the trials to be delayed. In regard to the reasons for the delay in producing enough proper vaccine doses for the clinical trials, CW 4 said she was told that the Company was "delayed in manufacturing" due to issues with "lesser potency" and "stability" of the vaccines. CW 4 explained that these delays were experienced by those at Novavax working on Operation Warp Speed in the United States. She further stated that there were issues with the potency of vaccines "off and on" throughout 2021.

47. **CW 5** was formerly employed by FUJIFILM at the company's College Station, Texas location from September 2020 to October 2021 as Head of Technical Operations, Gene Therapy. CW 5 reported to current Senior Director - Gene Therapy and Vaccines, Eric Dul. CW 5 advised that in this role she ran technical operations that supported manufacturing at two of the three centers at the College Station location, and that one of these was the center used for manufacturing Novavax's Covid-19 vaccine, and the other was used for gene therapy. She further advised that her responsibilities also included oversight of the processes, equipment, engineers, compliance coordinators, and low-level mediation at those two centers. CW 5 explained that quality checks on vaccine manufacturing were conducted every 24 to 48 hours, adding that she and CW 6 communicated with the two onsite Novavax employees "every single day" regarding manufacturing and the results of quality checks. CW 5 added that due to the rush to get the vaccine to market, FUJIFILM hired many new employees who had little or no previous vaccine manufacturing experience, which was at least partly responsible for those delays. She also recalled four contamination incidents that led to delays in manufacturing that started between December

17

2020 and March 2021. According to CW 5, the first three were due to bacterial contaminations, or deviations, and the fourth and significantly more serious one was a viral contamination that was discovered on March 18, 2021, which caused a shutdown in manufacturing from then until around September 2021. CW 5 explained that Novavax employees and the FDA were notified about each of the contaminations

48.     **CW 6** was formerly employed by FUJIFILM at the company's College Station, Texas location from July 2020 to June 30, 2021 as Director of Manufacturing, and her previous title was Manager Upstream Manufacturing from September 2018 to July 2020. CW 6 worked on the manufacturing of vaccines while at FUJIFILM, including Novavax's Covid-19 vaccine. CW 6 recalled that there were two delays in manufacturing the Novavax Covid-19 vaccine due to contaminations that occurred in December 2020 or January 2021 and around late April 2021. She further recalled that these delays occurred because of contaminations that occurred in the upstream part of the process. CW 6 further recalled that the resumption of manufacturing—that had been shut down due to the April 2021 contamination—kept getting pushed back and that it had still not restarted by the time her tenure ended on June 30, 2021. CW 6 also recalled that Novavax "knew everything that we were doing."

49.     **CW 7** was formerly employed by FUJIFILM from January 2013 through November 2021 at the North Carolina Facility and was based in Durham, North Carolina. She worked as a Manager, QA (Ops. & Quality Life Cycle Management), and her responsibilities included quality assurance, as well as to ensure that projects were adhering to FDA regulations and internal procedures. CW 7 explained that FUJIFILM sometimes changed the vaccine manufacturing materials given supply chain issues and Novavax would have to approve all the changes. CW 7 recalled that Novavax had teams of people from departments including quality

18

and technical who were involved in any modifications. CW 7 also recalled that the contamination problems at the North Carolina Facility spanned the "whole gamut" of the project, referring to manufacturing Novavax's vaccine candidate, and said they were "always an issue." CW 7 further recalled that any problems were constantly communicated to Novavax, which had someone onsite at the North Carolina Facility weekly at a minimum.

50. **CW 8** was formerly employed by FUJIFILM from February 2016 through January 2021. CW 8 worked as a Quality Control Analyst, and her primary responsibilities were reviewing test methods and serving as a liaison between the quality control group and analytical development group. CW 8 was based out of Morrisville, North Carolina and worked on Novavax's Covid-19 vaccine. CW 8 explained that the vaccine was being produced under an accelerated timeline, and FUJIFILM would have to alter their processes "almost constantly." For example, CW 8 further advised that because of the speed of the process, the quality control team once had to send the test methods used to test the product back to the analytical development team in order to include additional details. CW 8 explained that the lapses were the result of certain steps being skipped in favor of an accelerated production timeline. CW 8 added that early analysis steps were skipped or done concurrently rather than being done prior to the production phase.

## IV. SUBSTANTIVE ALLEGATIONS OF FRAUD[4]

### A. Novavax's Business

#### 1. Novavax Prior to the Covid-19 Pandemic

51. Novavax, headquartered in Gaithersburg, Maryland, is a biotechnology company that focuses on the discovery, development, and commercialization of vaccines to prevent serious infectious diseases and address urgent global health needs. Today, the Company's product

---

[4] Unless otherwise noted, all references to Novavax's business and operations refer to events that occurred during the Class Period as defined herein.

19

candidates include, among others, NVX-CoV2373, which is in development as a vaccine for Covid-19. But that was not always the case.

52.     Novavax has historically focused on manufacturing vaccines for novel viruses and infections. For example, prior to Covid-19, the Company tried to develop vaccines for HIV, SARS, swine flu, and the Ebola virus. However, each of the vaccines either failed in testing or the epidemics ebbed, reducing the need for Novavax's vaccine candidates.

53.     Prior to the Covid-19 pandemic, to avoid going out of business, Novavax sold all of its manufacturing facilities in 2019. At the beginning of 2020, there were only about 150 employees left at the Company. As of January 2020, Novavax had enough cash to survive only another six months, its shares traded under $4, with a market value of only $127 million, and it therefore risked being delisted from the NASDAQ stock exchange. But beginning in early 2020, the Covid-19 pandemic surfaced, providing Novavax with a golden opportunity to finally bring a vaccine to market and dig itself out of the financial ruin it had found itself in at that point.

**2.     Novavax Announces NVX-CoV2373 as a Possible Vaccine Candidate**

54.     On February 26, 2020, Novavax announced that it was developing a vaccine to protect against Covid-19. To support Novavax's efforts to develop a Covid-19 vaccine, the Coalition for Epidemic Preparedness Innovations ("CEPI")[5] awarded Novavax initial funding of $4 million on March 10, 2020. And on April 8, 2020, Novavax announced that its coronavirus vaccine candidate, NVX-CoV2373, which it claimed was a stable, prefusion protein made using Novavax's proprietary nanoparticle technology, would initiate a first-in-human trial in mid-May.

---

[5] CEPI is a global partnership among public, private, philanthropic, and civil society organizations that work together to accelerate the development of vaccines against emerging infectious diseases and enable equitable access to these vaccines for people during outbreaks.

20

55. NVX-CoV2373 was Novavax's ticket out of years and years of financial hardship and repeated failed attempts of bringing a drug to market. Indeed, the Company's future viability depended on the vaccine's success. For instance, one analyst, CFRA, even reported that "the main focus of the [C]ompany is on its NVX-CoV2373 vaccine candidate against Covid-19," and that "[w]e think the future financial success of [Novavax] and its ability to record a positive bottom-line result is highly dependent on successful approvals and rapid commercialization of its Covid-19 vaccine."

### 3. Novavax Contracts with the United States Government to Produce Millions of Doses for Americans

56. In an effort to ramp up vaccine production in the United States, in April 2020, the government initiated Operation Warp Speed. Operation Warp Speed was designed to facilitate the development, manufacturing, and distribution of Covid-19 countermeasures. These projects were to be divided among components of the (i) Department of Health and Human Services, including the Centers for Disease Control and Prevention, FDA, the National Institutes of Health, and the Biomedical Advanced Research and Development Authority; (ii) the Department of Defense ("DoD"); (iii) private firms; and (iv) other federal agencies, including the Department of Agriculture, the Department of Energy, and the Department of Veterans Affairs.

57. On June 4, 2020, Novavax entered into a contract with the DoD for the manufacture of NVX-CoV2373. With funding provided by the Defense Health Program, the government agreed to fund up to $60 million to support Novavax in its production of several components of the vaccine in the United States. According to the DoD contract, Novavax was required to "establish within the United States large scale production" of one of NVX-CoV2373's major components. The DoD contract similarly required Novavax to "establish a production capability within the United States" for that same component. The terms of the agreement further demanded

21

Novavax to deliver 10 million doses of NVX-CoV2373 to the DoD by December 2020 so long as the vaccine was approved by the FDA.

58.    Then, on July 7, 2020, Novavax chose to join Operation Warp Speed.  As a result, the government awarded Novavax $1.6 billion to complete late-stage clinical development, including a Phase 3 clinical trial; establish large-scale manufacturing; and deliver 100 million doses of NVX-CoV2373 as early as the end of 2020.  As part of the agreement, Novavax was required to demonstrate that it could rapidly set up large-scale manufacturing and transition into ongoing production, including the capability to stockpile and distribute large quantities of NVX-CoV2373 when needed.

**B.     Novavax Continues Developing NVX-CoV2373 and Partners with FUJIFILM Diosynth Biotechnologies**

59.    Because the Company did not have manufacturing facilities of its own, Novavax entered into partnerships with companies to manufacture and produce its vaccine under Novavax's direction.  For example, on July 23, 2020, Novavax contracted with FUJIFILM to manufacture bulk drug substance for NVX-CoV2373 at the Texas Facility and North Carolina Facility.[6]

60.    The Texas Facility and North Carolina Facility were critical to Novavax's development of NVX-CoV2373, and thus the Company's success.  For example, on February 19, 2021, Defendant Trizzino himself provided testimony in the form of a report to the Subcommittee on Oversight and Investigations, U.S. House of Representatives, Committee on Energy and Commerce to discuss Novavax's development of and U.S. manufacturing operations for NVX-CoV2373.  In that report, Defendant Trizzino stated that the "antigen produced at the Fuji sites in

---

[6] The Texas and North Carolina Facilities are FUJIFILM's two U.S.-based manufacturing facilities and were the only two manufacturing facilities in the United States that were producing the antigen component of NVX-CoV2373—a necessary component for producing any vaccine.

22

North Carolina and Texas are a critical component of our US supply chain." Likewise, FUJIFILM CEO Martin Meeson referred to FUJIFILM as "a critical partner to Novavax."

61.     During the same time as Novavax's rapid expansion, the FDA granted Fast Track Designation for NVX-CoV2373, "reflect[ing] the urgent need for a safe and effective vaccine to prevent COVID-19," as Defendant Glenn explained in Novavax's November 9, 2020 press release. According to the FDA, Fast Track is a process designed to facilitate the development, and to expedite the review of, drugs to treat serious conditions and fill an unmet medical need. The purpose is to get important new drugs to the patient earlier.

62.     Shortly thereafter, on February 4, 2021, Novavax announced that it had begun the rolling review process for authorization of NVX-CoV2373 by multiple regulatory agencies. Novavax explained that the "reviews will continue while the [C]ompany completes its pivotal Phase 3 trials in the United Kingdom (U.K.) and United States (U.S.) and through initial authorization for emergency use granted under country-specific regulations." As part of the rolling review, Novavax explained that it would continue to submit additional information, including clinical and manufacturing data, to the agencies. That same month, Novavax announced the complete enrollment of PREVENT-19, its pivotal Phase 3 study in the United States and Mexico to evaluate the efficacy, safety, and immunogenicity of NVX-CoV2373.[7]

---

[7] PREVENT-19—which is being conducted with support from the U.S. government partnership, *i.e.*, Operation Warp Speed—is a randomized, placebo-controlled, observer-blinded study to evaluate the efficacy, safety and immunogenicity of NVX-CoV2373 with Matrix-M in up to 30,000 subjects 18 years of age and older compared with placebo. Two thirds of the participants are assigned to randomly receive two intramuscular injections of the vaccine, administered 21 days apart, while one third of the trial participants receive placebo. Trial sites were also selected in locations where transmission rates were high to accelerate the accumulation of positive cases that could show efficacy. PREVENT-19 stands for PRE-fusion protein subunit Vaccine Efficacy Novavax Trial COVID-19.

23

## C. Novavax Was Required to Comply with Strict FDA Regulations

63. At every step of the development and manufacturing processes, Novavax was required to meet strict FDA standards including FDA cGMP. Indeed, Novavax's June 4, 2020 contract with the U.S. government specifically states that Novavax "shall manufacture enough bulk drug substance to produce ten million doses of vaccine drug product, ***all under current Good Manufacturing Practices*** and compatible with use in a late stage development clinical evaluation or Emergency Use Authorization." The contract similarly requires that Novavax "***shall ensure all quality control/assurance adhere to phase appropriate [current] Good Manufacturing Practices[] to ensure product quality and availability for use of the doses produced***."[8]

64. cGMP is a set of regulations enforced by the FDA, which provide for systems that assure proper design, monitoring, and control of manufacturing processes and facilities. Adherence to the cGMP regulations assures the identity, strength, quality, and purity of drug products by requiring that manufacturers of medications adequately control manufacturing operations.

65. Specifically, cGMP regulations require companies manufacturing and preparing drug products for administration to humans—such as Novavax—to establish a "quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors

---

[8] Likewise, according to Attachment A, Statement of Work, for an agreement between the U.S. government and Novavax entitled, "Rapid (WF10) Advanced Research & Development to Large Scale Manufacturing of NVX-CoV-2373 as a Vaccine for SARS-CoV-2 Coronavirus," one of the manufacturing requirements was for the "[e]stablishment of large-scale current Good Manufacturing Practice (cGMP) manufacturing capacity compliant with 21 CFR Parts 210 and 211."

have occurred, that they have been fully investigated." 21 C.F.R. §§ 211.1(a) and 211.22(a) (2022); *see also* 21 C.F.R. § 210.1 (2022).

66. FDA regulations state that the "*quality control unit shall be responsible for approving or rejecting drug products manufactured*, processed, packed, or held *under contract by another company*." 21 C.F.R. § 211.22(a). The *quality control unit also has "the responsibility for approving or rejecting all procedures or specifications impacting on the identity, strength, quality, and purity of the drug product*." 21 C.F.R. § 211.22(c).

67. Novavax was thus required to comply with the FDA's cGMP regulations, regardless of whether it developed and manufactured NVX-CoV2373 in-house at its own facilities or at its partners' facilities. Additionally, according to such cGMP regulations, Novavax was required to—and did—maintain direct involvement in the manufacturing process taking place in its partners' facilities, stay apprised of issues that develop in such facilities, and even advise on overall solutions to such issues.

68. According to the Director of Manufacturing at the Texas Facility, CW 6, Novavax had quality control employees and/or consultants onsite at the Texas Facility. CW 6 also recalled that other Novavax employees periodically visited the site, too. Head of Technical Operations, Gene Therapy, CW 5, similarly stated that Novavax had several employees and/or consultants on site, whom CW 5 identified as Technology Transfer Engineer Patrick Hash and Contractor Elizabeth Wang ("Novavax's Onsite Employees"). Indeed, CW 5 explained that CW 5 and CW 6 communicated with the Novavax's Onsite Employees "every single day" regarding manufacturing and the results of quality checks. CW 5 recalled that quality checks on vaccine manufacturing were conducted every 24 to 48 hours.

69.     For example, as explained in more detail below, CW 5 recalled that Novavax's Onsite Employees were notified about each contamination issue that occurred at the Texas Facility throughout the Class Period.  In fact, CW 5 further recalled that one of Novavax's Onsite Employees, Mr. Hash, was also involved in the investigations into the contaminations.  CW 5 recalled that there were phone calls and emails about contaminations and delays from Mr. Hash to Novavax headquarters, including Novavax's Quality Assurance department.  Further, according to CW 6, Novavax's Onsite Employees and others at Novavax's headquarters "knew everything that we were doing."  CW 6 added that Novavax's Onsite Employees were on the Texas Facility's manufacturing floor during "all critical processes."

70.     Similarly—and with respect to a particular viral contamination that occurred in March 2021 and ultimately shut down the Texas Facility's manufacturing processes until September 2021—CW 5 confirmed that every detail to do with the viral contamination was "communicated to" Novavax's Onsite Employees as the discovery and investigation progressed, along with daily calls with Novavax personnel in Novavax's headquarters in Maryland.

71.     cGMP regulations further require companies such as Novavax to establish procedures "to assure that the responsible officials of the firm, if they are not personally involved in or immediately aware of such actions, are notified in writing of any investigations conducted under §§ 211.198, 211.204, or 211.208 of these regulations, any recalls, reports of inspectional observations issued by the [FDA], or any regulatory actions relating to good manufacturing practices brought by the [FDA]."  21 C.F.R. § 211.180(f).  For example, with respect to Section 211.198, cGMP regulations require companies to establish written procedures with respect to all drug product complaints, which "shall include provisions for review by the quality control unit, of

26

any complaint involving the possible failure of a drug product to meet any of its specifications." 21 C.F.R. § 211.198(a).

72. Moreover, cGMP regulations require companies to maintain laboratory records that "shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays," including a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a), (a)(6).

73. cGMP regulations also require companies to maintain and follow written procedures "designed to prevent objectionable microorganisms in drug products," and that are "designed to prevent the contamination of equipment, components, drug product containers, closures, packaging, labeling materials, or drug products." 21 C.F.R. § 211.113; 21 C.F.R. § 211.56(c).

**D.** **Undisclosed Manufacturing Problems Were Causing Delays—Preventing Novavax from Timely Filing Its EUA with the FDA**

74. Throughout the Class Period, and unbeknownst to investors, Novavax consistently ran into manufacturing and production problems, which included: (a) both the Texas and North Carolina Facilities experiencing repeated contamination outbreaks; (b) Novavax failing to meet certain FDA quality standards for purity and potency levels for its vaccine; (c) failing to successfully scale up production; and (d) experiencing supply chain disruptions—all of which caused repeated delays in Novavax filing its EUA.

27

1.      **Sources Within Novavax Confirm That the Manufacturing Problems Were Causing Delays**

(a)      **Rampant Contamination Events Repeatedly Set Back Production at the Texas and North Carolina Facilities**

75.      Throughout the Class Period, Novavax experienced repeated contamination outbreaks in critical facilities that were manufacturing NVX-CoV2373, which led to numerous FDA inspections and lengthy delays in order to rectify the contamination issues. CW 5 recalled multiple incidents of contamination in the Texas Facility since December 2020, and CW 6 similarly recalled contamination in the Texas Facility since either December 2020 or January 2021. Specifically, CW 5 recalled four contamination incidents that led to delays in manufacturing that started between December 2020 and March 2021 (the latter ultimately shut down the manufacturing processes until at least September 2021).

76.      CW 5 recalled that the first contamination incident occurred in December 2020. CW 5 further recalled that the next incident followed about two or three months later, *i.e.,* in February 2021 or March 2021. CW 5 explained that when each contamination was discovered, the investigation into finding the source of those contaminations began with shutting down development and interviewing the staff involved in the manufacturing process.

77.      According to CW 5, the first three contamination incidents were caused by bacterial contaminations, or deviations. Regarding the three bacterial contaminations, CW 5 described the first one as involving a "human factor," as an employee failed to follow proper procedures, and the next one related to the re-use of blades that were supposed to be only used one time.[9] Regarding the first contamination, which occurred in December 2020 and occurred in the upstream process, CW 5 recalled that the investigation revealed that one of the staff took it upon him or herself to

---

[9] CW 5 further advised that blades are heated up and used to connect two bags via various plastic tubes hanging from the bags.

28

remove a bag (somewhere along the process), drain it, and then reattached it when the bag should have been discarded and replaced with a new one. CW 5 further advised that the other three contaminations also occurred in the upstream part of the process.[10]

78.     CW 5 explained that the next bacterial contamination occurred two or three months later when it was discovered that a blade was used multiple times, when these blades were meant to be one-offs, or used only once and then discarded according to standard operating procedure ("SOP"). CW 5 also recalled that there were difficulties in acquiring the necessary number of different components used in the manufacturing process due to global supply chain issues, and CW 5 recalled this including a lack of these blades. CW 5 assumed that the reusing of these blades had been going on for "several" weeks before it had been discovered.

79.     CW 6 recalled that one contamination occurred due to a leak in a bag used as part of a bioreactor, and that there were one or two other bacterial contaminations. CW 6 further recalled that these delays occurred because of contaminations that occurred in the upstream part of the process.

80.     Similarly, according to CW 7, contamination also existed at the North Carolina Facility during her tenure (which encompassed the entire Class Period) in the upstream process, which required FUJIFILM to discard the batch, ending the process. Furthermore, in discussing certain contamination issues that persisted at CW 5's facility throughout the Class Period, CW 5 also explained that depending upon where a contamination occurs in the process, the process may

---

[10] According to CW 5, all of the contaminations were occurring in the upstream process. CW 5 explained that, generally, the upstream process includes creating and building up the quantity of cells—cell growth and vaccine quantity. CW 5 explained that the downstream, or purity, process included purifying what had been created in the upstream process. CW 5 further explained that contamination in the upstream process usually reveals itself within 24 to 48 hours of it occurring and can often be revealed by a strong and unpleasant odor alone.

have to start back at step one again. As CW 5 explained, they would need to "dump the run . . . game over."

81. The repeated contamination events at both the Texas and North Carolina Facilities had an adverse impact on the vaccine's purity levels. Prior to and during the Class Period, Novavax's repeated contamination events prevented the Company from achieving the levels of purity and potency required by the FDA and thus significantly delayed its EUA submission.

> **(b)** **NVX-CoV2373 Failed to Meet FDA Purity and Potency Standards Which Delayed the EUA Filing**

82. Throughout the Class Period, Novavax was unable to achieve certain purity and potency criteria required by the FDA, which prevented Novavax from filing its EUA. According to *Politico* articles published on October 19, 2021 and October 29, 2021, which cited the statements of multiple U.S. government officials and other individuals with direct knowledge of Novavax's manufacturing problems during the Class Period, by the end of the Class Period in October 2021, Novavax was only able to achieve approximately a 70% level of purity—far below the 90% required by the FDA—with some batches of vaccines containing purity levels of as low as 30%. The October 29, 2021 *Politico* article quoted one former U.S. government official who stated that "[f]or weeks and weeks and weeks the team assigned to Novavax would come back, and they'd always be talking about lack of purity . . . it got to be a little bit tedious"—referring to a team of Operation Warp Speed officials working with Novavax. The October 19, 2021 article further quoted individuals stating that Novavax "rushed the process," and that "the efficacy [of the vaccine] was never going to outweigh the risk associated with the impurity that was in there."

83. Novavax's critical problems with purity issues are corroborated by CWs who worked directly on Novavax's vaccine candidate; these CWs confirmed that the purity issues delayed the filing of Novavax's EUA. For instance, CW 3, who ensured the products at Novavax

were used efficiently and to also test them for purity, explained that Novavax experienced delays in sourcing raw materials "that did slow down our work."

84.     Novavax was also unable to maintain the proper level of potency, which further delayed the regulatory process. For example, CW 4 recalled that the Company was "delayed in manufacturing" due to issues with "lesser potency" and "stability" of the vaccines. CW 4 provided the following hypothetical: "Manufacturing a vaccine is like baking a cake. You have a recipe for a cake, but you have to do it consistently. And if you start jumping around to manufacturers, when you change them, they have to make the cake the same way . . . . If they are off, then you have an issue. That can affect potency, stability. That was coming into play."

85.     CW 4 recalled that the issues with potency of vaccines occurred "off and on" throughout 2021. CW 4 learned about the manufacturing problems—including with potency and stability—causing the delays when these issues were presented to a "broad group" at Novavax that included Reed and Dubovsky, as well as "everyone" who reported to Dubovsky to discuss their own respective studies. CW 4 further explained that also on the calls were people from Quality Assurance, Regulatory, and other departments. CW 4 also recounted that she learned about the delays in filing for the EUA during internal Novavax meetings.

### (c)     Novavax Failed to Successfully Scale Up Production

86.     As a result of some of these issues, Novavax was also unable to produce enough viable doses to use for clinical trials of NVX-CoV2373. Novavax's inability to scale up NVX-CoV2373 production also contributed to delays in filing its EUA with the FDA. For example, CW 2, who was part of Novavax's Medical Affairs team, explained that she learned from colleagues that the Company was not efficient at producing vaccines at a scale that would be needed for mass production. CW 2 further explained that "we saw these delays over and over, and employees at Novavax [were] also frustrated."

31

87. For example, CW 4 recalled that Novavax struggled to produce enough proper vaccine doses for several different clinical trials, including about 4,000 doses needed for three smaller clinical trials in 2021, causing the trials to be delayed. CW 4 explained that in addition to the initial clinical trials Novavax conducted in the U.K. and the U.S. (which involved 15,000 and 30,000 subjects, respectively, requiring two doses for each subject), the Company wanted to start additional trials as new Covid-19 variants surfaced.

88. CW 4 further explained that there were at least two other studies that were being planned, adding that the studies were "delayed" and then scheduled to begin after October 2021. To this end, CW 4 stated: "Why am I seeing on the news that you're promising umpteen million doses and we can't secure 3,000 doses" for clinical trials. CW 4 explained that she learned about the shortage of vaccine doses for clinical trials from Associate Director – Clinical Supplies, Patrick Newingham. CW 4 said that she and her colleagues would inform Newingham that they needed a certain number of doses for the clinical trials.

89. Notably, CW 4 explained that if there were issues in getting a trial started, those problems would be brought to Filip Dubovsky and Defendant Erck. CW 4's understanding of how such information would have flowed up the chain of command at Novavax was that manufacturing issues were brought to Dubovsky's attention, that Dubovsky would have discussed it with Defendant Erck who in turn would have discussed it with Defendant Glenn, and that Defendant Erck—or sometimes Defendant Glenn—had to bring it to the attention of Novavax's Board of Directors.

90. CW 5 explained that due to the rush to get the vaccine to market, FUJIFILM hired many new employees who had little or no previous vaccine manufacturing experience, which was at least partly responsible for those delays. Likewise, as CW 1 explained, departments, such as

32

Operations, were focused on "wanting to push it out," referring to the vaccine, and asked the Regulatory Affairs department: "'What can we do to get done faster?'" CW 1—who worked as a Manager, Regulatory Affairs CMC at Novavax and helped manage manufacturing sites contracted by Novavax to produce its Covid-19 vaccine—was surprised by the Company's goal of producing two billion doses annually by mid-2021, and further expressed skepticism that Novavax would be able to do that, explaining that Novavax would have had to partner with everyone—meaning everyone in the biomedical manufacturing industry—if it were to meet that goal.

91. Additionally, the rush to develop and manufacture NVX-CoV2373 led Novavax to cut corners, which along with inadequate planning caused further delays. As CW 4 stated, "Novavax being small themselves and having to grow very quickly, I don't know if they were very prepared for this." CW 4 elaborated, recalling that when CW 4 arrived at Novavax, the Company kept a table or spreadsheet showing the various "lots" of the vaccine that were available, "what we can provide" for trials, and "what we have left." But CW 4 explained that this table then "went away," and that "it just felt like studies were falling from the sky but with no plan behind it." CW 4 further recalled that Novavax did not have a "clinical development plan,"[11] which she explained is typically needed.

92. Moreover, CW 8 recalled that, during her tenure, the vaccine was being produced under an accelerated timeline, and FUJIFILM would have to alter its processes "almost constantly." For example, CW 8 explained that because of the speed of the process, the quality control team once had to send the test methods used to test the product back to the analytical development team in order to include additional details. CW 8 further explained that the lapses

---

[11] One definition of a Clinical Development Plan is the blueprint of the entire clinical research strategy of a drug, which defines the critical path for the clinical program including development assessment and decision points and the project resource (personnel and budget) estimates.

were the result of certain steps being skipped in favor of an accelerated production timeline. CW 8 added that early analysis steps were skipped or done concurrently rather than being done prior to the production phase.

### (d)  Novavax Experienced Supply Chain Disruptions

93.  Additionally, Novavax's supply chain constraints created further delays in its attempt to file its EUA with the FDA. For example, CW 6 explained that supply chain issues, such as domestic supply constraints and difficulty obtaining certain materials, "were always a struggle." CW 6 further explained that the U.S. government helped to get Novavax and FUJIFILM supplies to produce the Covid-19 vaccine, but CW 6 reiterated that these supply chain issues were "an ongoing issue."

94.  Similarly, CW 7—who worked at the North Carolina Facility as a Manager, Quality Assurance—explained that Novavax had difficulty procuring the components necessary to manufacture its Covid-19 vaccine, such as filters and resin used in the manufacturing process. CW 7 recalled that the supply chain issues impacted Novavax for the duration of its vaccine development.

95.  CW 5 recalled that there were difficulties in acquiring the necessary number of different components used in the manufacturing process due to global supply chain issues, and CW 5 recalled this including a lack of blades that were used in the manufacturing process. Likewise, CW 3 explained that Novavax experienced delays in sourcing raw materials "that did slow down our work," and CW 3 further explained that the raw materials were "usually things [Novavax] needed from different companies to use their machines." Specifically, CW 3 recalled that "certain companies require special trays with gel inside them for us to run a purity check," and that "they were having difficulty sourcing those materials, which required Novavax "to make [the materials] ourselves or try different ones."

34

**2. The FDA Confirmed and Corroborated that Novavax's Critical Manufacturing Facilities Experienced Major Manufacturing Problems**

96. As a result of the numerous contamination events and manufacturing problems plaguing Novavax's vaccine development, the FDA soon got involved. In March and April 2021, the FDA conducted inspections of the Texas and North Carolina Facilities. The inspections reports and related correspondence sent to Novavax's manufacturing facilities detailed the significant manufacturing problems facing the Company at the time.

97. For example, on March 3, 2021, the FDA notified via telephone the Texas Facility's Vice President of Quality Operations, Jose Torres,[12] of an upcoming investigation. Then, on March 15, 2021, the FDA issued a formal Notice of Inspection to Gerry Farrell, the Chief Operating Officer of the Texas Facility. Indeed, the FDA inspected the Texas Facility from March 15, 2021 to March 19, 2021, to gather information with a focus on assessing whether Novavax had controls in place to ensure that manufacturing operations would not adversely impact the safety, purity, and potency of vaccines then under development.

98. At the conclusion of the investigation, the FDA conducted a meeting with the management of the Texas Facility, which included Mr. Farrell (who identified himself as the most responsible person on site), during which the FDA discussed certain "Items of Concern" that arose during the FDA investigation. These concerns involved a number of quality issues, including that the facility had "sub optimal quality operations." In response, Mr. Torres emailed the FDA on April 9, 2021, with responses to the FDA's verbal observations.

---

[12] Mr. Torres oversees the Quality Assurance, Quality Control, and Regulatory activities at the Texas Facility. Mr. Torres has four direct reports and reports to David Patterson, Senior Director of Global Quality. Others involved in the Quality Unit at the Texas Facility are: Patricia Flaherty, Director of QA Compliance; Matt Dixon, Director of QA Operations; Travis Sadowski, Director of QC; and Rawle Collins, who oversees Regulatory Affairs and eQMS.

35

99.     On April 14, 2021, the FDA issued a formal 52-page investigation memo, detailing a litany of issues with the Texas Facility ("April 14 FDA Report").[13]

100.     The FDA observed and reported many issues relating to the Texas Facility's inadequate quality control, contamination, and purity issues, including but not limited to the following:

(a)     Contamination was discovered and not properly recorded and investigated, including microbial contamination that was discovered in January 2021.

(b)     Failure to investigate, detect, and document appropriately a number of deviations, and that periodic review of deviation trending was not performed by the Quality Unit.

(c)     Cleaning procedure for certain manufacturing areas was not always followed, including using disinfectants on surfaces in manufacturing areas that were not effective in inactivating or adequately removing microorganisms.

(d)     Failure to open "change controls" when appropriate.  The report explained that the Change Control process "applies to all changes that may have the potential to impact product safety, quality, identity, purity, and strength at the [Texas Facility]."

(e)     Out-of-specification ("OOS") investigation procedures were not always followed.

(f)     Warehouse areas used for storage of GMP materials were overcrowded and poorly organized.

(g)     Inadequate and ineffective training of manufacturing workers due to sharp increase in new hires.

101.     The FDA again concluded: "***Quality oversight over manufacturing and testing operations is sub-optimal***."

---

[13] Notably, the FDA explained that it reviewed the Texas Facility's quality agreements in place at the time, and that "Fujifilm is required to notify the client of deviations and OOS results within 2 business days per section 12.0.1 of the agreements."  Although the report redacted the name of the company with whom the Texas Facility entered into the quality agreements, according to the Head of Technical Operations at the Texas Facility, CW 5, the term "client" in this case was referring to Novavax.  In fact, with respect to issues of contamination, CW 5 stated that a client, who was Novavax in this case, must be notified about a contamination within 24 to 48 hours of its discovery.

102.    According to the April 14 FDA Report, Mr. Dixon "noted that it was challenging for the Quality Unit to keep up with review activities given the recent increase in work volume due to the rapid pace of product development," to which the FDA expressed "concerns regarding [the Texas Facility]'s ability to meet demand."  Mr. Dixon further explained that failure to investigate deviations was caused by the "high throughput production."  The FDA was thus further concerned about how the Quality Unit can assure product quality and safety while the manufacturing activities continue without timely closure of deviations.[14]

103.    The FDA similarly found a number of problems during its investigation of the North Carolina Facility from April 14, 2021 to April 21, 2021.  According to an FDA Form 483 issued to the North Carolina Facility on April 21, 2021 ("April 21 FDA Form 483"), the facility contained many quality-related problems, among others.  For example, the April 21 FDA Form 483 observed and reported the following deviations at the North Carolina Facility:

(a)    Microbial control of the facility was inadequate.  Specifically, the facility's employees failed to investigate root causes and implement adequate corrective and preventative actions to control microbial contamination, as exemplified by the FDA learning from prior reports that microbial contamination (such as Paenibacillus spp., Burkholderia, Paenibacillus glucanolyticus, Penicillium rubens, and Fusarium oxysporum) was recovered from over 50 monitoring sites—including in purification sites.

(b)    There was no comprehensive risk assessment conducted to evaluate cross-contamination of drug products, including where such drug products were manufactured in the same areas with shared product contact equipment.

_____

[14] Relatedly, the FDA generated a memorandum on April 28, 2021, relating to the same investigation into the Texas Facility.  The FDA explained that the purpose of the memorandum was to describe coverage completed as part of the pre-EUA investigation from March 15, 2021 to March 19, 2021, as it related to a complaint that was delivered to FDA investigator Scott Ballard's desk in the FDA Dallas district office on April 20, 2021.  Specifically, the complaint that the FDA received outlined a number of issues that the FDA had also raised during the EUA investigation, which included the facility's lack of quality unit trending of deviations, failure to timely resolve and address deviations, failure to follow cleaning procedures, and others.

37

(c)     The manufacturing process was not adequately monitored and/or controlled to ensure the quality of the drug substance was not adversely affected.

(d)     Written procedures for manufacturing processes were inadequate, including inadequate procedures for the "Purification" step.

(e)     Discrepancies were not fully investigated to identify a root cause and corrective and preventative actions were not adequately implemented to prevent recurrence.

(f)     Procedures of material management systems were not followed or were inadequate, which led to expired materials being found in the warehouse.

104.    In addition, former Novavax employees recalled that the FDA raised similar concerns during the Class Period.  For example, CW 1 recalled that in response to the Module 3 reports submitted by Novavax (which, as explained below, contained information from the Company's manufacturing sites), the FDA raised concerns about the stability of the Company's vaccine batches.  CW 1 said that the FDA communicated its concerns via information requests that were typically sent via email to Director – Regulatory Affairs Kathleen Callahan.  Further, CW 1 explained that there was an inconsistency in not being able to repeat the result on a consistent basis, causing delays with respect to filing for EUA.

105.    In fact, CW 1 recounted that she saw the end reports the FDA sent to the Company and knew from the reports that the stability of the vaccine batches Novavax had submitted "wasn't going to cut it" for the FDA.  CW 1 also recalled that the FDA wanted to better understand a discrepancy in Novavax's potency levels, which were at 130% at one point and then at 120% another week.

106.    CW 1 explained that she learned about the FDA's response and its concerns over the stability of Novavax's vaccine batches during weekly meetings with the Company's Regulatory Affairs team, and that the information was shared directly by Callahan.  CW 1 recalled that the Regulatory Affairs team meetings were attended by Senior Director—Regulatory Affairs

38

CMC Jannine Haberman Cobb and a handful of other Regulatory Affairs employees. CW 1 said that Callahan attended the meetings at least once a week and at times would be pulled into daily meetings if the team felt it needed her guidance. CW 1 further stated that for a few months, the Regulatory Affairs team had to meet daily to keep up with the "overbearing" amount of documents that needed to be prepared for the FDA.

### 3. Defendants Knew About the Manufacturing Problems

#### (a) Defendants Stayed Apprised of the Manufacturing Problems, as Was Required by FDA Regulations

107. As explained above, cGMP regulations—to which Novavax was required to adhere—provide that Novavax's quality control unit "shall be responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company." 21 C.F.R. § 211.22(a). Additionally, with respect to any "reports of inspectional observations issued by the [FDA], or any regulatory actions relating to good manufacturing practices brought by the [FDA]," or any investigations into complaints involving the "possible failure of a drug product to meet any of its specifications," cGMP regulations provide that Novavax be notified in writing about such issues. 21 C.F.R. § 211.180(f), § 211.198(a). This is the case even if Novavax was "not personally involved in or immediately aware of such actions." 21 C.F.R. § 211.180(f). Moreover, cGMP regulations require companies to maintain laboratory records, including information relating to "results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6).

108. The FDA's very own reports explained that it reviewed the Texas Facility's quality agreements in place at the time, and that "Fujifilm is required to notify the client of deviations and OOS results within 2 business days per section 12.0.1 of the agreements." Notably, former

employees from the Texas Facility and North Carolina Facility confirm and corroborate that Novavax was notified about the manufacturing problems, such as poor purity results and contamination problems, that occurred throughout the Class Period. For example, according to CW 5, Novavax had two Onsite Employees at the Texas Facility, whom CW 5 identified as Technology Transfer Engineer Patrick Hash and Contractor Elizabeth Wang. Indeed, CW 5 explained that CW 5 and the Texas Facility Director of Manufacturing CW 6 communicated with the two Novavax's Onsite Employees "every single day" regarding manufacturing and the results of quality checks, which CW 5 recalled were conducted every 24 to 48 hours.

109. CW 5 recalled that Novavax's Onsite Employees were notified about each contamination issue that occurred throughout the Class Period. That is, they were notified about the four contamination incidents that led to delays in manufacturing that occurred since December 2020. CW 5 even recalled that Mr. Hash, one of Novavax's Onsite Employees, was involved in the investigations into the contaminations. CW 5 recalled that there were phone calls and emails about contaminations and delays from Mr. Hash to Novavax headquarters, including Novavax's Quality Assurance department.

110. CW 6 similarly recalled that Novavax had employees that worked onsite at the Texas Facility, including Mr. Hash, along with a few other Novavax employees who rotated onsite "off-and-on." CW 6 further recalled that CW 6 participated on Zoom calls "every day" with Novavax's Onsite Employees, a Novavax employee at Novavax's headquarters in Maryland named Ivailo, and other Novavax employees from different departments. According to CW 6, Novavax's Onsite Employees, Ivailo, as well as other Novavax employees "knew everything that we were doing." CW 6 further advised that there were typically 10 Novavax employees on these calls.

40

111. Similarly, CW 7—a former Manager, Quality Assurance for the North Carolina Facility—recalled that any issues were constantly communicated to Novavax, which had someone onsite at the North Carolina Facility weekly at a minimum. CW 7 advised that the level of Novavax's involvement was unlike anything she had previously encountered at FUJIFILM, meaning that Novavax was more involved in the manufacturing process than other clients at FUJIFILM.

112. CW 7 further explained that all testing results of batches at the North Carolina Facility were communicated to Novavax through a "batch record," which relayed to Novavax that testing was completed and the results of the testing. CW 7 even explained that FUJIFILM sometimes changed the vaccine manufacturing materials given certain supply chain issues, and that Novavax would have to approve all the changes. CW 7 recalled that Novavax had teams of people from departments including quality and technical who were involved in any modifications. CW 7 further explained that Novavax was involved with "everything" and was "driving" the way in which FUJIFILM manufactured the product. In fact, CW 7 advised that the level of Novavax's involvement was unlike anything she had previously encountered at FUJIFILM.

113. Further, CW 7 recounted that the vaccine's purity levels were manufactured according to information provided by and processes approved by Novavax. Additionally, CW 1 explained that FDA concerns were also discussed at weekly, and sometimes daily, Regulatory Affairs team meetings.

114. Furthermore, as mentioned above, Novavax was apprised by the FDA and Novavax's manufacturing partners at the Texas Facility and the North Carolina Facility of the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that occurred at its facilities, including those of its partners such as FUJIFILM. In fact, according

41

to the October 19, 2021 *Politico* article referenced earlier, senior Trump administration officials on Operation Warp Speed repeatedly warned the Company that it risked running into problems in scaling up manufacturing of NVX-CoV2373. Specifically, these officials worried that Novavax would have difficulty ensuring that NVX-CoV2373 consistently met the FDA's rigorous quality standards once the vaccine went into mass production.

### (b) Defendant Erck Personally Held Company-Wide Meetings Regarding NVX-CoV2373

115. Multiple former Novavax employees confirm that Defendant Erck held company-wide meetings with its employees where NVX-CoV2373 was discussed. For example, CW 2 recalled that Defendant Erck and Novavax's leadership team spoke to employees and facilitated Q&A sessions during Company-wide meetings that happened at least once a quarter; CW 2 explained that she, like most employees, attended the meetings virtually. At these meetings, CW 2 recalled that Defendant Erck discussed the topic of seeking regulatory approval.

116. Likewise, CW 1 recalled that Defendant Erck spoke to employees during monthly Company-wide meetings that included Q&A sessions, with employees being able to submit questions in advance via an app. CW 1 further recalled that the Q&A sessions included discussions about employees' concerns in regard to "our manufacturing capabilities" and "the likelihood of being able to manage all those stakeholders," in addition to concerns over whether Novavax would "be able to get our stability information stabilized."

### (c) Internal Novavax Reports and Emails Contained Information from Manufacturing Facilities and Clinical Testing Updates

117. Furthermore, Defendant Erck had access to reports that contained hundreds of pages of data from Novavax's manufacturing sites. For example, CW 1 explained that Novavax submitted documents containing information from the Company's manufacturing sites that was then submitted to the FDA in the form of Module 3 Quality reports. CW 1 further explained that

42

"those are the documents we were working on the hardest," and that "Novavax really needed to have [its] CMC module in line before we could get that emergency use authorization." CW 1 recalled that these reports consisted of "hundreds of pages."

118. CW 1 explained that the content from the manufacturing sites that was detailed in the Module 3 reports involved drug and product information and data. CW 1 further explained that the Module 3 reports were submitted to the FDA via the agency's Electronic Submissions Gateway ("ESG") and sometimes via email, depending on the preferences of the two or three FDA project managers with whom Novavax worked. CW 1 recalled that Director – Regulatory Affairs Kathleen Callahan would send such emails and handled all communications with the FDA.

### E. Defendants Reassure Investors That NVX-CoV2373 Was Aligned with FDA Criteria and Would Be Timely Filing Its EUA with the FDA

119. As described above, Novavax experienced a litany of manufacturing problems during the Class Period, such as not being able to achieve the required purity and potency levels as part of the FDA criteria, experiencing rampant contamination, failing to scale up production, and facing supply chain issues. Nonetheless, Defendants concealed these problems from investors and brazenly touted that Novavax was aligned with FDA criteria and had resolved any issues that could affect its ability to file its EUA.

120. On February 24, 2021, the first day of the Class Period, Defendant Glenn participated in an interview with *The Washington Post* to discuss Novavax's regulatory timeline for its EUA and Novavax's progress thus far to meet FDA requirements. To that end, Defendant Glenn touted that "we lined up—FDA gave advice on how to do a trial, what success means, and that really was accepted by the world, if you will, and *so we're aligned up with those success criteria in all of our trials*."

43

121. However, contrary to Defendant Glenn's representation, Novavax at the time was in fact not able to meet the required purity and potency levels, which are criteria that the FDA required Novavax to meet to file its EUA and ultimately receive approval to bring NVX-CoV2373 to market. But this, of course, was something Defendants would not want to, and did not, tell investors at the time. Indeed, NVX-CoV2373 was critical to Novavax's success, and had Defendants disclosed the truth, it would have seriously jeopardized Novavax's stock price and future as a Company. To be sure, even analysts recognized how important NVX-CoV2373 was to Novavax. For example, as one analyst, Zacks, reported, "[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, leaving an adverse impact on its shares."

122. At the same time Defendants made their above statements concerning NVX-CoV2373, analysts were encouraged by Novavax's purported ability to meet FDA criteria and bring NVX-CoV2373 to market. Jefferies was encouraged that "[a]ltogether, everything remains on track, including EUA filing in UK, EU and USA in Q2." Similarly, Zacks noted that the "vaccine is also advancing well."

123. In fact, one analyst, CFRA, even issued a Strong Buy rating for Novavax and reported that "[w]e think 2021 could be a turnaround year for [Novavax]," and that "[w]e think [Novavax's] Covid-19 vaccine candidate is well-placed to receive the fourth EUA in the U.S. in Q2."

F. **Defendants Delay the EUA Filings, Partially Revealing the Underlying Challenges They Faced—but Continue to Reassure Investors**

124. Notwithstanding the litany of above-mentioned manufacturing problems that existed but were unknown to the public—and more importantly, right before Novavax announced news certain to drive the stock price down—some of the Individual Defendants chose that time to

44

financially enrich themselves before the inevitable news to be announced.  Indeed, in mid-to-late April 2021, Defendant Glenn sold over 8,000 shares of Novavax stock and made over $1.6 million in proceeds before the devasting news to come.[15]  Similarly, Defendant Trizzino sold over 3,000 shares of Novavax stock on May 5 and May 7, 2021, making nearly $600,000 in proceeds—as compared to the zero stock sales that he made in May of the previous year.[16]

125.    Furthermore, in light of the manufacturing problems—which Defendants concealed from the public—Novavax was unable to stick to its regulatory timeline to file its EUA.  Indeed, while Defendants had thus far been successful at keeping investors in the dark about Novavax's problems, Defendants were not able to conceal the regulatory delays that were caused by such problems.  The fact of the matter is that Novavax was not able to file its EUA until it aligned its vaccine with the FDA's cGMP requirements.  Because in reality Defendants were unable to meet such standards, Novavax was forced to delay its EUA filing.

126.    Specifically, on May 10, 2021, during market hours, *The Washington Post* reported that Novavax's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest, according to four people who had recently been briefed on the [C]ompany's plans."  Similarly, later that day, during after-market hours, on a call that Novavax hosted with investors and analysts to discuss the Company's first quarter 2021 financial and operational results (the "1Q21 Earnings Call"), Novavax confirmed that it was unlikely to seek an EUA for NVX-CoV2373 in the U.S. until July 2021 at the earliest—*i.e.*, the third quarter of 2021.

127.    As a result, the price of Novavax common stock fell 8.81% on May 10, 2021, and, following the Company's 1Q21 Earnings Call, continued to fall an additional 13.91% on May 11,

---

[15] *See* SEC Form 4 of Gregory M. Glenn, dated April 19, 2021.
[16] *See* SEC Form 4 of John Trizzino, dated May 7, 2021.

45

2021. This news also elicited some concern from the market, which directly linked the drop to the delay. For example, Jefferies stated that "[s]hares of [Novavax] are taking a hit following the Q1 update." Zacks similarly reported, "Novavax announced that it[s] plans to file for authorization for Novavax in the United States . . . in the second quarter of 2021 have been delayed to the third quarter. The stock tanked on this news."

128. Yet, despite delaying its regulatory filing in light of the underlying, undisclosed manufacturing challenges, Defendants continued to reassure investors that the (non-public-but-lingering) causes of these regulatory delays were no longer an issue for Novavax. For example, on May 10, 2021, the same day that Defendants pushed out the regulatory timeline, Defendant Erck stated during the 1Q21 Earnings Call: "Our timetable for regulatory filings, we know that we're delayed from where we thought we'd be at this point. But now we're giving guidance that *nearly all of the major challenges have been overcome* and we can clearly see the light at the end of the tunnel."

129. During that same 1Q21 Earnings Call, an analyst from B. Riley Securities focused on Novavax's delayed submission and the reasons for its holdup. That analyst asked Defendant Erck if he was "able to comment on what might be these sort of things that are *causing the holdup*," and whether "it [is] just process coordinating between the different sites" or "are there *any specific issues* around any particular assay." In response, while Defendant Erck stated that "part of it has to do with *manufacturing at different sites* and showing comparability between the processes and the actual end product between the different sites" and that "it probably took a little longer than we expected to get a potency assay that was worked across," Defendant Erck reassured the analyst that such issues were solved and behind Novavax. Specifically, Defendant Erck explained: "*I'm happy to say we did. We've crossed that bridge. We're – we made a big*

46

_**breakthrough** there_ and we're now racing towards validating everything and putting it into a package."

130. Defendant Erck further assured investors that Novavax was past all of the hurdles causing delays in EUA approval: "[E]very quarter gets more data pointing to a successful vaccine, we're getting close to the end, and—which is really the beginning for us and that's what we're all racing to do. I think _**we've eliminated all of the serious hurdles to getting—risk hurdles to getting to where we need to be to get an improved vaccine**_."

131. During that same 1Q21 Earnings Call, with respect to Novavax's "current state of [] manufacturing and [] anticipated capacity," Defendant Erck stated "I think we've done a remarkable job of standing up manufacturing in these multiple plants across the globe. _**I'm happy to report that we have got to the point where we've successfully manufactured our drug substance, a recombinant protein nanoparticle, at commercial scale in each of these plants**_. The drug substance production is the most complicated step in the overall manufacturing processes."

132. That is, Defendant Erck reassured investors that Novavax's manufacturing facilities were manufacturing NVX-CoV2373 to FDA standards—for which Novavax was directly responsible and in which it was involved.

133. Given the importance of Novavax's potential vaccine to the general public, on June 10, 2021, Novavax hosted Maryland Governor Larry Hogan at the site of the Company's planned Vaccines Innovation Campus and global headquarters in Gaithersburg. Additional guests included state, regional, and local officials. Defendants Erck and Glenn personally led the tour, providing an overview of the facility and press briefing.

134. On June 14, 2021, a few days later, Novavax participated in a Clinical Update call with investors. On that call, Defendant Erck again reassured investors that "[w]ith each analysis,

47

*our trials __proved__ that we are on the right track*. And today, with safety and efficacy that are consistent across all studies, our PREVENT-19 results reaffirm our strong belief in [NVX-CoV2373]." These reassurances, however, were not true.

135. Yet, Defendants had successfully alleviated any major concerns the market may have initially had since Novavax announced that it was delaying its EUA filing. Indeed, in light of Defendants' continued reassurances, Jefferies noted that Novavax's management "remains confident in their ability to execute" and that, "[w]hile [filings with the FDA] took longer than they initially expected, it appears they have everything close to being set now." Cantor Fitzgerald also reported that despite Novavax's update, "according to management, facilities in its network have demonstrated the ability to manufacture commercial scale GMP material."

136. Similarly, H.C. Wainwright explained that "[w]e believe the [C]ompany remains a solid player in the COVID-19 vaccine landscape and think concerns about a delay in regulatory filings and manufacturing challenges are only temporary setbacks."

### G. Rampant Contamination Issues Remained Unresolved and Worsened—Causing Manufacturing Processes to Shut Down

137. While the underlying manufacturing problems related to purity, potency, contamination, scalability, and the supply chain continued, CW 5 stated that the Texas Facility faced additional manufacturing problems concerning contamination starting in March 2021, and CW 6 similarly recalled contamination occurring since April 2021. Indeed, CW 5 recalled that in March 2021—around the same time Defendant Glenn sold a significant number of his shares—a viral contamination was discovered at the Texas Facility. CW 5 explained that some of the bacterial contaminations were traced back to newer employees who had no or little experience in vaccine manufacturing. CW 5 specifically recalled that the investigation revealed an "irido virus," which CW 5 explained was short for iridescent since the virus is iridescent under certain light.

48

CW 5 explained that the facility first identified the growth of the contamination on March 18, 2021, and let the run continue for two or three days before starting an investigation two or three days after that. CW 5 advised that the investigation ultimately concluded that the contamination was most likely due to human error. CW 6 similarly recalled that there was a contamination incident at the Texas Facility around sometime in April 2021.

138. Notably, CW 5 explained that the Texas Facility's manufacturing was shut down from March 2021 to at least September 2021—during which time Defendant Erck made massive stock sales. In fact, CW 5 confirmed that the facility was at a standstill when Novavax executives unloaded stock in July 2021. Likewise, CW 6 corroborated that the contamination incident in April 2021 led to a shutdown in manufacturing and further recalled that the resumption of manufacturing kept getting pushed back and that it had still not restarted by the time her tenure ended on June 30, 2021.

139. Additionally, CW 5 confirmed that every detail about this viral contamination was "communicated to" Novavax's Onsite Employees as the discovery and investigation progressed, along with daily calls with Novavax personnel in Maryland, where Novavax is headquartered. CW 5 added that a client, who was Novavax in this case, must be notified about a contamination within 24 to 48 hours of its discovery.

140. Similarly, CW 6 explained that CW 6 participated on Zoom calls "every day" with Novavax's Onsite Employees, a Novavax employee at Novavax's headquarters in Maryland named Ivailo, and other Novavax employees from different departments. According to CW 6, Novavax's Onsite Employees, Ivailo, and the other Novavax employees on the Zoom calls "knew everything that we were doing." CW 6 further advised that there were typically 10 Novavax employees on the calls.

49

141. Yet, instead of being upfront with investors about these issues, Defendants continued to conceal the truth. But not only that, as alluded to above, some of the Individual Defendants also went further and saw this as the opportune moment for them. Indeed, during July 2021—the very month that the Texas Facility was shut down and being investigated, as well as the litany of other issues still occurring—Defendant Erck sold over 100 thousand shares of Novavax stock, reaping proceeds of over $22.5 million.[17]

142. Similarly, Defendant Glenn also cashed in during this same time. For example, in July 2021, Defendant Glenn sold over 8,000 shares for proceeds of more than $1.5 million.[18]

**H.    Despite Novavax's Continued Manufacturing Problems Causing Additional Regulatory Filing Delays, Defendants Again Reassure Investors That Novavax No Longer Faces Such Issues**

143. As with the previous quarter, Defendants were unable to prevent the inevitable risks from materializing as a result of the underlying manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that Novavax was experiencing during the Class Period. As such, on August 5, 2021, Novavax further delayed its EUA filing and reported that it expected to file for NVX-CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021.

144. On that same day, Novavax filed with the SEC its Form 10-Q for the quarter ending June 30, 2021 ("2Q21 Form 10-Q"), which was signed by Defendants Erck and Trizzino. The 2Q21 Form 10-Q revealed, "[t]he U.S. government has recently instructed the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic

---

[17] *See* SEC Form 4 of Stanley Erck, dated July 6, 2021.
[18] *See* SEC Forms 4 of Gregory Glenn, dated July 19, 2021 and July 22, 2021.

methods before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made."

145. As a result, Novavax's stock price dropped 19.61% on August 6, 2021. Upon learning of this news, analysts were initially disappointed and shocked by the EUA filing delays. For example, Jefferies reported, "[w]e understand the lack of clarity around the US/EU filings is less than ideal." Notably, Seeking Alpha reported that the "news was a shocker for investors."

146. Conveniently, Defendants Erck and Glenn cashed in for tens of millions of dollars in stock sales proceeds in the weeks leading up to this announcement and prior to Novavax's stock losing almost 20% of its value.

147. Yet, despite having to push the regulatory timeline again, Defendants continued to conceal the full truth regarding the underlying problems Novavax faced. For example, according to an August 5, 2021 *Reuters* article about an interview between Defendant Erck and *Reuters*, Defendant Erck stated: "***We appear to have got past (certain) supply issues and are now being able to produce at scale***."

148. Additionally, on Defendants' August 5, 2021 conference call to discuss the earnings results for the second quarter of 2021 ("2Q21 Earnings Call"), Defendant Erck reassured investors that "[t]oday, we remain on track to achieve manufacturing capacity of 100 million doses per month by the end of the third quarter of '21 and 150 million doses per month by the end of the fourth quarter of '21."

149. Similarly, during that 2Q21 Earnings Call, an analyst from Jefferies asked Defendant Erck about "what gives you confidence that you'll be able to file in the U.S.," and "how much risk is there associated with addressing some of those last remaining issues that are the gating steps to those filings." In response, Defendant Erck stated that "the risk reduction is dramatic,"

51

and that "I think that it's a matter of now mechanics of getting all the data—final data assembled and submitted. And it's—we're talking weeks here. We're not talking months. So I'm not worried about the future submissions."

150. Additionally, the Jefferies analyst followed-up, asking: "So you believe that at least the time lines that you've put forth, you'll be able to reach those." In response, Defendant Erck again stated: "I do. This is a very big transformation – transition of the [C]ompany we filed. We've now filed with the regulatory agencies in 3 countries, and we've got a complete filing package for those we are finishing the additional requirements in the various countries that I mentioned. We've listed dates that we plan on making with a lot of confidence."

151. In fact, during that same 2Q21 Earnings Call, in response to a J.P. Morgan analyst's request for clarity on Defendants' disclosure about "the U.S. government saying that it would like to see FDA alignment on your analytical methods before conducting additional U.S. manufacturing," Defendant Erck downplayed the severity of the situation by explaining that "there's always a time lag with the FDA these days."

152. Additionally, to help further build investor confidence, Defendants also explained that they were regularly communicating with regulatory authorities and successfully incorporating such information into their work. For instance, during a September 21, 2021 conference at Devex UNGA 76, Defendant Trizzino stated that Defendants had "been in constant communication with [regulatory] authorities under rolling review and rolling submissions," and further explained that Defendants were "now at a point in time at which all of that feedback and all that conversation has been incorporated into these documents."

153. Notably, on September 29, 2021, during the Cantor Fitzgerald Global Healthcare Conference, Defendant Trizzino further reassured investors that certain manufacturing problems

52

were fixed.  For example, in response to a Cantor Fitzgerald analyst's question about EUA and manufacturing, Defendant Trizzino said: "[T]he combination of our recombinant protein nanoparticle, its nanoparticle structure, the particle structure of our Matrix adjuvant presented some challenges in those assays, *which have now been resolved*."

154.    In light of Defendants' continued reassurances, analysts and the media remained optimistic.  For example, despite finding that the delays were "less than ideal," Jefferies reported that "[m]anufacturing appears to be on track w[ith] the company reiterating plans to reach 100M doses/month and 150M doses/month by the end of Q3 and Q4, respectively."  Similarly, Jefferies explained, "[w]hen asked what the gating steps are for submission to the UK/EU/US, [management] noted the need to reach each regulatory agencies' submission requirements, but the risk associated w[ith] these filings has been significantly reduced and [management] remains very confident they will be able to file."  Additionally, Seeking Alpha stated that "[w]hile [Novavax] announced a delay in submission to US FDA, it is still on track to achieve its previously planned manufacturing capacity for Q3 and Q4."

155.    However, contrary to the story that Defendants were selling investors, the manufacturing problems outlined above persisted—still preventing Novavax from achieving alignment with FDA criteria and filing its EUA.  Again, this is largely due to Novavax rushing the process to meet the tight turnarounds required to obtain EUA approval before there was no longer a need.  Indeed, as of September 29, 2021, the number of people in the United States with at least one Covid-19 dose exceeded 214 million people (compared to only 51,056,052 people at the start of the Class Period).  Furthermore, while the Director of the Center for Biologics Evaluation and Research at the FDA, Peter Marks, was quoted by *Bloomberg* in the first week of August 2021 as saying that "right now, one wouldn't want to rule out continuing to give emergency use

53

authorizations," he also stated, "[t]here probably is going to be a point at which we stop[] giving emergency use authorizations." Defendants thus still felt the pressure to manufacture the Company's vaccine as quickly as possible—at all costs.

### I. Investors Finally Learn About the Manufacturing Problems That Were Preventing Novavax from Filing Its EUA with the FDA

156. On October 19, 2021, *Politico* published an article, after market hours, entitled: "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," which revealed the manufacturing problems Novavax previously concealed. The *Politico* article—citing numerous Novavax employees with direct knowledge of and familiarity with Novavax's manufacturing process—revealed the underlying and undisclosed manufacturing problems that had been preventing Novavax from filing its EUA with the FDA and alerted investors for the first time that Novavax's timeline for approval was still ***another year away***.

157. Specifically, the article reported that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373. The article further explained that Novavax's "issues are more concerning than previously understood" and that the Company could ***take until the end of 2022 to resolve its manufacturing problems and win regulatory authorizations and approvals***.

158. Critically, the *Politico* article did not make references to just general manufacturing problems. Instead, the article detailed specific issues that were only internally known throughout the Class Period, such as the fact that Novavax had struggled to reach anywhere close to the purity levels required by the FDA. While the FDA sets a 90% purity level standard for each Covid-19 vaccine batch, the article revealed that Novavax had only recently shown purity levels hovering around 70%—still well below the 90% requirement. According to one person whom the article

54

quoted, "[a]t some level, I think the efficacy was never going to outweigh the risk associated with the impurity that was in there."

159.   Similarly, according to the *Politico* article, the Company "has consistently run into production problems," including "[t]he methods it used to test the purity of the vaccine," which "have fallen short of regulators' standards" as Novavax "has not been able to prove that it can produce a shot that is consistently up to snuff, according to multiple people familiar with Novavax's difficulties."

160.   As some U.S. government officials stated in the *Politico* article: "Novavax's manufacturing problems are seen as far more difficult to fix than the sanitary and design concerns that halted production of J&J's vaccine at the Emergent plant earlier this year."

161.   Moreover, the *Politico* article also found that Novavax was already aware of specific concerns with NVX-CoV2373's manufacturing process, stating that "senior Trump administration officials on Operation Warp Speed . . . repeatedly warned the [C]ompany that it risked running into problems in scaling up manufacturing of the shot, two people with direct knowledge of those discussions said"; that, "[i]n particular, they worried that Novavax would have difficulty ensuring that the vaccine consistently met the FDA's rigorous quality standards once the vaccine went into mass production—the exact problem that has now stymied the [C]ompany for months"; and that Novavax "rushed the process" and "can't make" the vaccine, according to one of the people with knowledge of the matter.

162.   As a result, the price of Novavax's stock fell 14.76% on October 20, 2021. Furthermore, *Politico* published another article the next day, on October 20, 2021, reporting that Novavax's issues were "worse than previously reported and could take several more months to set right."   Analysts attributed the reason for the stock drop to the surprising news contained in the

*Politico* report. For example, Cantor Fitzgerald explained, "the recent news articles that cited 'anonymous sources' stating Novavax has manufacturing issues that are 'jeopardizing billions of doses earmarked for poor and middle-income countries' . . . has resulted in shares trading down today."

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

163.    Lead Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of Novavax's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

164.    Throughout the Class Period, Defendants made a series of misrepresentations concerning Novavax's manufacturing capabilities and alignment with FDA criteria needed before filing its EUA for NVX-CoV2373 with the FDA. Specifically, Defendants made material misstatements and omissions including: (i) Novavax being aligned with FDA criteria while concealing multiple manufacturing problems, which included consistently falling short of FDA standards such as required purity and potency levels, experiencing rampant contamination problems, failing to scale up production of its vaccine, and facing supply chain disruptions; and (ii) when Novavax ultimately had to delay its EUA filing, reassuring investors that Novavax resolved such manufacturing problems that caused the delay.

### A.    February 24, 2021 – *The Washington Post* Interview

165.    On February 24, 2021, during market hours, *The Washington Post* published an article relating to an interview it conducted with Defendant Glenn about Novavax and NVX-CoV2373. During that interview, Defendant Glenn reassured investors that Novavax was meeting

56

the standards set forth by the FDA.  For example, Defendant Glenn touted: "[W]e lined up—FDA gave advice on how to do a trial, what success means, and that really was accepted by the world, if you will, and *so we're aligned up with those success criteria in all of our trials*."

166. Analysts were encouraged by Defendants' purported ability to meet FDA criteria and in bringing NVX-CoV2373 to market.  For example, on March 15, 2021, Zacks noted that the "vaccine is also advancing well."  On March 25, 2021, Jefferies was encouraged that "[a]ltogether, everything remains on track, including EUA filing in UK, EU and USA in Q2."  Similarly, on April 15, 2021, CFRA issued a Strong Buy rating for Novavax and reported that "[w]e think 2021 could be a turnaround year for [Novavax]," and that "[w]e think [Novavax's] Covid-19 vaccine candidate is well-placed to receive the fourth EUA in the U.S. in Q2."  And Zacks continued to believe that the "vaccine [was] also advancing well" on April 28, 2021.

167. Analysts also recognized how important NVX-CoV2373 was to Novavax.  For example, CFRA reported on April 15, 2021, that "the main focus of the [C]ompany is on its NVX-CoV2373 vaccine candidate against Covid-19," and that "[w]e think the future financial success of [Novavax] and its ability to record a positive bottom-line result is highly dependent on successful approvals and rapid commercialization of its Covid-19 vaccine."  Similarly, as Zacks reported on April 28, 2021, "[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, leaving an adverse impact on its shares."

168. Defendant Glenn's statement in his interview with *The Washington Post* was materially false and misleading because, at that time, Novavax was in reality not aligned with FDA criteria needed to successfully manufacture and produce NVX-CoV2373.  For example, Novavax had to ensure that it could produce its vaccine in large quantities while maintaining certain purity

57

and potency levels and complying with cGMP. However, Novavax was unable to achieve such criteria, and in fact also experienced other manufacturing problems, such as contamination, that further prevented Novavax from meeting FDA criteria. Indeed, CWs and multiple other individuals familiar with Novavax's manufacturing difficulties confirm that, since the beginning of the Class Period, Novavax suffered from multiple manufacturing problems related to purity, potency, contamination, scalability, and the supply chain.

169. Specifically, Defendant Glenn's statement was false and misleading because (i) NVX-CoV2373 was unable to meet certain FDA quality standards, such as purity and potency requirements; (ii) Novavax experienced rampant contamination; (iii) Novavax was unable to successfully scale up production; and (iv) Novavax's manufacturing process experienced supply chain disruptions.

170. For example, CWs, the FDA, and others familiar with Novavax's issues recalled that since the beginning of the Class Period, Novavax was not only unable to meet certain FDA quality standards needed to file its EUA, but also experienced multiple cGMP violations:

(a) Novavax had shown purity levels hovering around 70%—with some batches of vaccines containing purity levels of as low as 30%—which were nowhere close to reaching the 90% purity level generally understood to be required by FDA standards;

(b) Novavax was unable to reproduce a high-quality vaccine on a consistent basis, which was related to delays in filing for EUA;

(c) Novavax was unable to maintain the proper level of potency throughout 2021, which was a concern to the FDA and further delayed the regulatory process; and

(d) Module 3 reports submitted by Novavax to the FDA indicated that the stability of the vaccine batches "wasn't going to cut it" for the FDA.

171. Multiple CWs and the FDA likewise recounted that Novavax experienced rampant contamination problems that caused further delays:

(a)     Microbial contamination was rampant in the Texas Facility—which, Defendants explained, was "a critical component of our US supply chain"—since December 2020;

(b)     At least four contamination incidents occurred at the Texas Facility that led to delays in manufacturing that started between December 2020 and April 2021;

(c)     Each contamination incident at the Texas Facility required shutting down development and interviewing the staff involved in the manufacturing process, which further delayed the manufacturing process;

(d)     Contamination was discovered and not properly recorded and investigated in the Texas Facility, including microbial contamination that was discovered in January 2021; and

(e)     Contamination existed in the North Carolina Facility throughout the entire Class Period, which required FUJIFILM to discard the batch, ending the process before they were able to test for purity (in the downstream) and resulting in lost batches of the vaccine.

172.    Moreover, CWs also confirm Novavax's inability to scale up production throughout the Class Period:

(a)     Novavax was not able to produce the required number of doses in time as Novavax was experiencing a shortage of vaccine doses for clinical trials, which were causing trials to be delayed;

(b)     Novavax was not efficient at producing vaccines at a scale that would be needed for mass production; and

(c)     Due to rushing the process, Novavax became disorganized and did not have a clinical development plan, which was something that is typically needed, and no longer kept a table or spreadsheet showing the various lots of the vaccine that were available, able to be provided for trials, and what was left, as Novavax had in the past.

173.    Furthermore, CWs also recalled that Novavax was experiencing supply chain disruptions throughout the Class Period, which contributed to manufacturing and regulatory delays and Novavax's inability to scale up production and achieve alignment with FDA criteria:

59

(a) Supply chain issues—such as domestic supply constraints—at the Texas Facility "were always a struggle," and these supply chain issues and domestic supply constraints were "an ongoing issue";

(b) The North Carolina Facility had difficulty getting the components necessary to manufacture its Covid-19 vaccine, such as rubber silicone hoses and raw materials, which impacted Novavax for the duration of its vaccine development and caused Novavax to repeatedly delay its filing for EUA with the FDA;

(c) There were difficulties in acquiring the necessary number of different components used in the manufacturing process due to global supply chain issues, including a lack of blades that were used in the manufacturing process; and

(d) Novavax experienced delays in sourcing raw materials needed for purity tests, which slowed down Novavax's work.

**B.    May 10, 2021 – 1Q21 Earnings Call and Partial Disclosure / Materialization of the Risk**

174.    On May 10, 2021, for the first time, it was partially revealed that Novavax was experiencing manufacturing problems that were serious enough to prevent filing its EUA on the date Defendants previously promised.  Specifically, on May 10, 2021, during market hours, *The Washington Post* reported that Novavax's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest, according to four people who had recently been briefed on the [C]ompany's plans."  Similarly, later that day, after-market hours, during a conference call Novavax held to discuss the earnings results for the first quarter of 2021 ("1Q21 Earnings Call"), Novavax confirmed that it was unlikely to seek an EUA for NVX-CoV2373 in the United States until July 2021 at the earliest—*i.e.*, the third quarter of 2021.

175.    In response, Novavax's stock price fell $15.50 per share, or 8.81%, to close at $160.50 per share on May 10, 2021.  Moreover, following the Company's 1Q21 Earnings Call, Novavax's stock price continued to fall an additional $22.32 per share, or 13.91%, to close at $138.18 per share on May 11, 2021.

60

176. Analysts were initially disappointed by the news. For example, on May 11, 2021, CFRA reduced its rating on Novavax from Strong Buy to Buy in response to the news. Indeed, as Jefferies reported on May 11, 2021: "Shares of [Novavax] are taking a hit following the Q1 update." Similarly, on May 12, 2021, Zacks lowered its recommendation from neutral to underperform and stated: "Delay in the authorization filing for NVX-CoV2373, hurt the stock severely. Such delays in vaccine development do not bode well." Zacks specifically linked the delay to the stock drop: "Novavax announced that it[s] plans to file for authorization for Novavax in the United States, United Kingdom and the EU in the second quarter of 2021 have been delayed to the third quarter. The stock tanked on this news."

177. However, the Company's stock price remained artificially inflated after this announcement as Defendants knew but failed to disclose or deliberately disregarded the severity of the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain and Novavax's inability to achieve anywhere close to the FDA criteria needed to file its EUA. Instead, Defendant Erck reassured investors that any issues that Novavax may have experienced were behind Novavax, and continued convincing investors Novavax was on track to filing its EUA.

178. For example, on that same day, May 10, 2021, during the 1Q21 Earnings Call, Defendant Erck touted that the regulatory and manufacturing hurdles causing the delay were now resolved: "Our timetable for regulatory filings, we know that we're delayed from where we thought we'd be at this point. But now we're giving guidance that ***nearly all of the major challenges have been overcome*** and we can clearly see the light at the end of the tunnel."

179. During that same 1Q21 Earnings Call, an analyst from B. Riley Securities asked, with respect to Novavax's delayed submission: "[A]re you able to comment on what might be

these sort of things that are causing the holdup?  Is it just process coordinating between the different sites?  Or are there any specific issues around any particular assay?"  In response, Defendant Erck reassured investors that the Company had fixed the issues that caused the delays: "No.  I mean, and part of it has to do with manufacturing at different sites and showing comparability between the processes and the actual end product between the different sites.  And you have to develop assays that can follow those.  And so I think it probably took a little longer than we expected to get a potency assay that was worked across – told the same story across all the sites.  ***But I'm happy to say <u>we did</u>.  We've <u>crossed that bridge</u>. We're – we <u>made a big breakthrough there</u> and we're now racing towards validating everything and putting it into a package***."

180.    During that same 1Q21 Earnings Call, with respect to Novavax's "current state of [] manufacturing and [] anticipated capacity," Defendant Erck stated: "Today, our global supply chain now spans over 10 countries ***with all of our manufacturing sites producing GMP material at scale***.  I think we've done a remarkable job of standing up manufacturing in these multiple plants across the globe.  ***I'm happy to report that we have got to the point where we've successfully manufactured our drug substance, a recombinant protein nanoparticle, at commercial scale in each of these plants***.  The drug substance production is the most complicated step in the overall manufacturing processes."

181.    During that 1Q21 Earnings Call, Defendant Erck further assured investors that Novavax was past all of the hurdles causing delays in EUA approval: "[E]very quarter gets more data pointing to a successful vaccine, we're getting close to the end, and – which is really the beginning for us and that's what we're all racing to do.  I think ***we've <u>eliminated all of the serious hurdles</u> to getting – risk hurdles to getting to where we need to be to get an improved vaccine***."

182.    Analysts believed Defendants' story that such issues had been resolved and were encouraged by Defendants' reassurances. For example, on May 10, 2021, Jefferies reported that Novavax's "[management] remains very confident that they will hit 150M doses per month before the end of the year and expects to maintain that throughout 2022 and beyond." Jefferies similarly reported that Novavax's management "remains confident in their ability to execute" and that, "[w]hile [filings with the FDA] took longer than they initially expected, it appears they have everything close to being set now."

183.    Likewise, on May 11, 2021, Jefferies reported, "[w]hile the delays are clearly disappointing, we remain constructive on the name and see the outlook as promising given the clear high efficacy, clean safety profile, robust data package and optionality for a multivalent and/or CV-19/Flu combo vaccine." Cantor Fitzgerald also reported on May 11, 2021, that despite Novavax's update, "according to management, facilities in its network have demonstrated the ability to manufacture commercial scale GMP material." Similarly, on May 12, 2021, H.C. Wainwright reported: "We believe the [C]ompany remains a solid player in the COVID-19 vaccine landscape and think concerns about a delay in regulatory filings and manufacturing challenges are only temporary setbacks." H.C. Wainwright also reported: "We believe these challenges are temporary, as Novavax expects the remainder of capacity to come online and reach 150M doses per month in 4Q21, which is in line with the [C]ompany's stated goal of full capacity of 2B doses per year by [year end 2021]."

184.    Defendant Erck's statements during the 1Q21 Earnings Call were materially false and misleading for the same reasons set forth in paragraphs 168–173 herein. In addition to those reasons, at the time Defendant Erck made these reassurances on May 10, 2021, the Texas Facility and North Carolina Facility experienced additional manufacturing problems. As noted, the FDA

63

conducted an inspection of the Texas Facility from March 15, 2021 to March 19, 2021, and the FDA issued on April 14, 2021 a formal 52-page investigation memo that detailed a litany of cGMP violations and manufacturing issues with the facility, which were reported to Novavax.  The FDA ultimately concluded that "[q]uality oversight over manufacturing and testing operations is sub-optimal."

185.    For example, the FDA found (i) evidence of contamination in the Texas Facility, which was not properly recorded and investigated; (ii) failure to investigate, detect, and document appropriately a number of other deviations; (iii) that periodic review of deviation trending was not performed by the Quality Unit; and (iv) that the cleaning procedure for certain manufacturing areas was not always followed, including using disinfectants on surfaces in manufacturing areas that were not effective in inactivating or adequately removing microorganisms.

186.    Additionally, the FDA similarly found a number of issues during its investigation of the North Carolina Facility from April 14, 2021 to April 21, 2021—only weeks before Defendants' May 10, 2021 statements.  According to the FDA, the investigation of the North Carolina Facility revealed many quality-related issues, including that: (i) microbial control of the facility was inadequate, which led to rampant contamination of the facility; (ii) there was no comprehensive risk assessment conducted to evaluate cross-contamination of drug products, including where such drug products were manufactured in the same areas with shared product contact equipment; (iii) written procedures for manufacturing processes were inadequate, including inadequate procedures for the "Purification" step; (iv) the manufacturing process was not adequately monitored and/or controlled to ensure the quality of the drug substance was not adversely affected; and (v) other discrepancies were not fully investigated to identify a root cause and corrective and preventative actions were not adequately implemented to prevent recurrence.

64

187. Specifically, the FDA found a failure to investigate root causes and implement adequate corrective and preventative actions to control microbial contamination, as exemplified by the FDA learning from prior reports that microbial contamination was recovered from over 50 monitoring sites.

188. Notably, as explained in Section IV.G, according to CW 5, at the Texas Facility, a more serious contamination incident involving an "irido virus" (*i.e.*, iridescent virus) contamination was discovered on March 18, 2021. CW 5 recalled that the facility let the run continue for two or three days before starting an investigation two or three days after that, and caused a shutdown in manufacturing from March 2021 until at least September 2021. Indeed, Director of Manufacturing at the Texas Facility, CW 6, corroborated that there was a contamination incident at the Texas Facility discovered in April 2021, which led to a manufacturing shutdown that had not restarted by the time her tenure ended on June 30, 2021.

189. Thus, Defendants' above May 10, 2021 statements—*e.g.*, "nearly all of the major challenges have been overcome," "we've successfully manufactured our drug substance . . . at commercial scale in each of these plants," "we've eliminated all of the serious hurdles to getting – risk hurdles to getting to where we need to be to get an improved vaccine," and similar misstatements—were materially false and misleading because Defendants had not yet overcome the manufacturing problems, including (a) not being able to meet the requisite purity and potency levels for NVX-CoV2373; (b) experiencing rampant contamination in critical manufacturing facilities; (c) failing to successfully scale up production; and (d) facing supply chain disruptions that existed since the start of the Class Period and continued throughout. Indeed, at the time of these misstatements, Novavax's critical manufacturing facilities faced serious cGMP violations,

such as rampant contamination issues, and were unable to achieve alignment with FDA criteria. These issues in turn caused further manufacturing and regulatory delays.

### C. June 14, 2021 – Clinical Update Call

190. On June 14, 2021, during a Clinical Update Call on NVX-CoV2373, Defendant Erck reassured investors that "*[w]ith each analysis, our trials <u>proved</u> that we <u>are</u> on the right track. And today, with safety and efficacy that are consistent across all studies, our PREVENT-19 results reaffirm our strong belief in [NVX-CoV2373].*"

191. Analysts were again encouraged by Defendants' positive statements. For example, on June 14, 2021, Cantor Fitzgerald stated that "according to management, the eight facilities (up from zero a year ago) in its network have demonstrated the ability to manufacture commercial scale GMP material." Similarly, on the same day, Jefferies emphasized the importance of filing Novavax's data with regulatory agencies for approval and noted that Novavax said that it was on track to do so: "Key to [Novavax] will be [its] ability to execute on filing [its] data to the various regulatory agencies for EUA approval, ability to manufacture doses of [its] vaccine, and procure additional contracts. To these points, [management] reiterated Q3 timing on filings and achieving production goal of 100M dose/month by the end of Q3 and 150M dose/month by [year end]."

192. At this point in time, analysts were still encouraged by Novavax's ability to scale up production and meet cGMP standards. For instance, on August 4, 2021, Cantor Fitzgerald again reported that "according to management, the eight facilities (up from zero a year ago) in its network have demonstrated the ability to manufacture commercial scale GMP material."

193. Defendant Erck's statement during the Clinical Update Call was materially false and misleading for the same reasons set forth in paragraphs 168–173 and 184–189 herein. Indeed, at the same time Defendant Erck was claiming that "our trials proved that we are on the right track," Novavax was experiencing a shortage of vaccine doses for clinical trials, which were

66

causing trials to be delayed. Additionally, during this same time, Novavax was still experiencing the litany of manufacturing problems and delays outlined above. In fact, at this same time, manufacturing of NVX-CoV2373 at the Texas Facility was completely shut down.

**D.** **August 5, 2021 –** *Reuters* **Interview and Partial Disclosure / Materialization of the Risk**

194. On August 5, 2021, it was further partially revealed that Novavax was still experiencing manufacturing problems that affected Novavax's ability to file its EUA. Specifically, on August 5, 2021, Novavax further delayed its EUA filing and reported that it expected to file for NVX-CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021. Additionally, Novavax's 2Q21 Form 10-Q further revealed that "[t]he U.S. government has recently instructed the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made."

195. In response, Novavax's stock price fell $46.31 per share, or 19.61%, to close at $189.89 per share on August 6, 2021.

196. Analysts and the media were initially disappointed and shocked by this news. For example, on August 6, 2021, Jefferies reported: "We understand the lack of clarity around the US/EU filings is less than ideal." Similarly, that same day J.P. Morgan reported: "With respect to filing timelines in the US, the US [government] has requested the completion of manufacturing validation activities prior to a regulatory submission, as such a US EUA filing is now anticipated in 4Q (3Q prior)." Similarly, on August 7, 2021, Seeking Alpha reported that the "news was a shocker for investors."

197. However, the Company's stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded the severity of the manufacturing problems, which included consistently falling short of FDA standards such as required purity and potency levels, experiencing rampant contamination problems, failing to scale up production of its vaccine, facing supply chain disruptions, and Novavax's inability to achieve anywhere close to the FDA criteria needed to file its EUA. Instead, Defendant Erck continued to lead investors to believe that Novavax's issues were resolved.

198. For example, according to an August 5, 2021 *Reuters* article that discussed an interview between Defendant Erck and *Reuters*, Defendant Erck stated: "***We appear to have got past (certain) supply issues and are now being able to produce at scale***."

199. Analysts and the media were encouraged by Defendants' reassurances as Defendants undoubtedly convinced the public that any such issues were resolved and would no longer cause challenges to Novavax. For example, despite finding that the delays were "less than ideal," Jefferies reported on August 5, 2021, that "[m]anufacturing appears to be on track w[ith] the [C]ompany reiterating plans to reach 100M doses/month and 150M doses/month by the end of Q3 and Q4, respectively." Similarly, the next day, on August 6, 2021, Jefferies explained, "[w]hen asked what the gating steps are for submission to the UK/EU/US, [management] noted the need to reach each regulatory agencies' submission requirements, but the risk associated w[ith] these filings has been significantly reduced and [management] remains very confident they will be able to file."

200. Also on August 6, 2021, Cantor Fitzgerald reported that, "[o]n the manufacturing front, the [C]ompany . . . remain[s] on track to achieve capacity of 100M doses per month by the end of 3Q21, and 150M doses per month by the end of 4Q21." Likewise, Seeking Alpha reported

68

on August 7, 2021, that "[w]hile [Novavax] announced a delay in submission to US FDA, it is still on track to achieve its previously planned manufacturing capacity for Q3 and Q4."

201. Defendant Erck's statement during his interview with *Reuters* was materially false and misleading for the same reasons set forth in paragraphs 168–173 and 184–189 herein. Indeed, at the time of Defendant Erck's reassurance, Novavax was still unable to scale up production and manufacturing problems, such as not being able to meet the requisite purity and potency levels for NVX-CoV2373, experiencing rampant contamination in critical manufacturing facilities, failing to successfully scale up production, and facing supply chain disruptions, continued to prevent Novavax from doing so.

### E. September 21, 2021 – Devex UNGA 76 Conference

202. On September 21, 2021, Defendants attended a conference at Devex UNGA 76. During that conference, the Senior Global Health Reporter at Devex raised the topic of transparency on the part of manufacturers, such as Novavax. In response, Defendant Trizzino explained: "This transparency is important. ***And we've been extremely transparent across multiple fronts. All of our clinical data has been shared very quickly***."

203. Defendant Trizzino's statement during the Devex UNGA 76 Conference was materially false and misleading for the same reasons set forth in paragraphs 168–173 and 184–189 herein. Indeed, Defendant Trizzino's representation directly contradicts Defendants' conduct throughout the entire Class Period. Despite constantly discussing NVX-CoV2373's manufacturing process and development, Defendants had not been transparent with respect to the litany of manufacturing problems related to purity, potency, contamination, scalability, and the supply chain related to NVX-CoV2373 that persisted throughout the entire Class Period, let alone "extremely" transparent.

**F.      September 29, 2021 – Cantor Fitzgerald Global Healthcare Conference**

204.    On September 29, 2021, during the Cantor Fitzgerald Global Healthcare Conference, Defendant Trizzino reassured investors that manufacturing problems that had delayed Novavax's EUA filing were fixed.  For example, in response to a Cantor Fitzgerald analyst's question about EUA and manufacturing, Defendant Trizzino touted: "[T]he combination of our recombinant protein nanoparticle, its nanoparticle structure, the particle structure of our Matrix adjuvant presented some challenges in those assays, ***which have now been resolved***."

205.    Defendant Trizzino's statement during the Cantor Global Healthcare Conference was materially false and misleading for the same reasons set forth in paragraphs 168–173 and 184–189 herein.  Indeed, even at this time, Defendants had still not resolved the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that had prevented Novavax from meeting FDA criteria and filing its EUA.

**G.      October 19, 2021 – Final Disclosure / Materialization of the Risk**

206.    On October 19, 2021, the full truth concerning Novavax's underlying manufacturing problems was fully revealed and/or materialized.  On that date, *Politico* published an article, after market hours, entitled: "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," which revealed the underlying and undisclosed manufacturing problems that had been preventing Novavax from filing its EUA with the FDA.

207.    Specifically, the article reported that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373. The article further explained that Novavax's "issues are more concerning than previously understood" and that the Company could take until the end of 2022 to resolve its manufacturing issues and win regulatory authorizations and approvals.

70

208.     Additionally, while the *Politico* article explained that the FDA generally sets a 90% purity level standard for each Covid-19 vaccine batch, the article revealed from reliable sources that Novavax had only recently shown purity levels hovering around 70%. According to one person whom the article quoted with knowledge of the matter: "At some level, I think the efficacy was never going to outweigh the risk associated with the impurity that was in there."

209.     Similarly, according to the *Politico* article, the Company "has consistently run into production problems," including "[t]he methods it used to test the purity of the vaccine," which "have fallen short of regulators' standards" as Novavax "has not been able to prove that it can produce a shot that is consistently up to snuff, according to multiple people familiar with Novavax's difficulties." As some U.S. officials stated in the *Politico* article, "Novavax's manufacturing problems are seen as far more difficult to fix than the sanitary and design concerns that halted production of J&J's vaccine at the Emergent plant earlier this year."

210.     Moreover, the *Politico* article also found that Novavax was already aware of specific concerns with NVX-CoV2373's manufacturing process, stating that "senior Trump administration officials on Operation Warp Speed . . . repeatedly warned the [C]ompany that it risked running into problems in scaling up manufacturing of the shot, two people with direct knowledge of those discussions said"; that, "[i]n particular, they worried that Novavax would have difficulty ensuring that the vaccine consistently met the FDA's rigorous quality standards once the vaccine went into mass production—the exact problem that has now stymied the [C]ompany for months"; and that Novavax "rushed the process" and "can't make" the vaccine, according to one of the people with knowledge of the matter.

211.     In response, Novavax's stock price fell $23.69 per share, or 14.76%, to close at $136.86 per share on October 20, 2021. Additionally, *Politico* reported on October 20, 2021, that

Novavax's issues were "worse than previously reported and could take several more months to set right."

## VI. LOSS CAUSATION

212. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Novavax common stock and operated as a fraud or deceit on Class Period purchasers of Novavax common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

213. Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Novavax common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased Novavax stock at the artificially inflated prices at which it traded during the Class Period.

214. The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between May 10, 2021 and October 19, 2021. During this period, Novavax's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Novavax's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on October 19, 2021, that the full truth was known to the market, such that there was no longer any artificial inflation in Novavax's stock price attributable to the fraud.

215. The declines in Novavax's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

216.   As a result of their purchases of Novavax common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Novavax common stock to trade at artificially inflated levels throughout the Class Period.

217.   By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Novavax's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of Novavax common stock fell significantly.  These declines removed the inflation from the price of Novavax common stock, causing real economic loss to investors who had purchased Novavax common stock during the Class Period.

218.   Each decline in the price of Novavax common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

219.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Novavax common stock and the subsequent significant decline in the value of Novavax common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

220.   The market for Novavax common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 4,299,450 shares during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, Novavax's common stock traded at artificially inflated prices.  Lead Plaintiffs and other

73

Class members purchased Novavax common stock relying upon the integrity of the market relating to Novavax common stock and suffered economic losses as a result thereof.

221. The declines in Novavax's common stock price on May 10–11, 2021, August 6, 2021, and October 20, 2021, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors during market hours on May 10, 2021, and after the market closed on August 5, 2021 and October 19, 2021. The timing and magnitude of Novavax's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

## A. May 10, 2021 – First Partial Disclosure / Materialization of the Risk

222. On May 10, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized when *The Washington Post* reported during market hours that Novavax's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest, according to four people who had recently been briefed on the [C]ompany's plans."

223. Later that day after market hours, during the 1Q21 Earnings Call, Novavax confirmed that it was unlikely to seek an EUA for NVX-CoV2373 in the U.S. until July 2021 at the earliest—*i.e.*, the third quarter of 2021.

224. The May 10, 2021 disclosures about Novavax delaying its EUA filing because of manufacturing regulatory issues were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Novavax's then-current

74

state of its manufacturing processes and capabilities and Novavax's purported alignment with FDA criteria.

225. Moreover, *The Washington Post* article and 1Q21 Earnings Call revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. *The Washington Post* article and 1Q21 Earnings Call partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Novavax's underlying manufacturing problems that were preventing Novavax from filing its EUA with the FDA.

226. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Novavax common stock fell $15.50 per share, or 8.81%, to close at $160.50 per share on May 10, 2021. Moreover, following the Company's 1Q21 Earnings Call, Novavax's stock price continued to fall an additional $22.32 per share, or 13.91%, to close at $138.18 per share on May 11, 2021.

227. Upon learning of this news, analysts were initially disappointed. For example, on May 11, 2021, CFRA reduced its rating on Novavax from Strong Buy to Buy in response to the news. Indeed, as Jefferies reported on May 11, 2021, "[s]hares of [Novavax] are taking a hit following the Q1 update." Similarly, on May 12, 2021, Zacks lowered its recommendation from neutral to underperform and stated: "Delay in the authorization filing for NVX-CoV2373, hurt the stock severely. Such delays in vaccine development do not bode well." Zacks specifically linked the delay to the stock drop: "Novavax announced that it[s] plans to file for authorization for Novavax in the United States, United Kingdom and the EU in the second quarter of 2021 have been delayed to the third quarter. The stock tanked on this news."

228.    Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to reassure the market that any manufacturing problems related to purity, potency, contamination, scalability, and the supply chain were resolved.  For example, Defendant Erck reassured investors that "nearly all of the major challenges have been overcome and we can clearly see the light at the end of the tunnel."

229.    Similarly, with respect to solving certain manufacturing problems that caused the EUA filing delay, Defendant Erck explained: "I'm happy to say we did.  We've crossed that bridge. We're—we made a big breakthrough there and we're now racing towards validating everything and putting it into a package."  Defendant Erck likewise told investors that "we've eliminated all of the serious hurdles to getting—risk hurdles to getting to where we need to be to get an improved vaccine."

230.    Defendant Erck also stated that Novavax's then-current manufacturing progress of NVX-CoV2373 was doing so well that "[w]ith respect to the U.S. market, we are well positioned with our technology and timing to supply product for boosting and seasonal revaccination." Indeed, Defendant Erck touted that "all of our manufacturing sites [are] producing GMP material at scale," and that "I'm happy to report that we have got to the point where we've successfully manufactured our drug substance, a recombinant protein nanoparticle, at commercial scale in each of these plants."

231.    Analysts were reassured that any manufacturing problems that Novavax experienced had been resolved and that Novavax no longer faced such challenges.  For example, on May 10, 2021, Jefferies noted that Novavax's management "remains confident in their ability to execute" and that, "[w]hile [filings with the FDA] took longer than they initially expected, it appears they have everything close to being set now."  Likewise, on May 11, 2021, Jefferies

76

reported: "While the delays are clearly disappointing, we remain constructive on the name and see the outlook as promising given the clear high efficacy, clean safety profile, robust data package and optionality for a multivalent and/or CV-19/Flu combo vaccine."

232. Cantor Fitzgerald also reported on May 11, 2021, that despite Novavax's update, "according to management, facilities in its network have demonstrated the ability to manufacture commercial scale GMP material."

233. Similarly, on May 12, 2021, H.C. Wainwright reported: "We believe the [C]ompany remains a solid player in the COVID-19 vaccine landscape and think concerns about a delay in regulatory filings and manufacturing challenges are only temporary setbacks." H.C. Wainwright also reported: "We believe these challenges are temporary, as Novavax expects the remainder of capacity to come online and reach 150M doses per month in 4Q21, which is in line with the [C]ompany's stated goal of full capacity of 2B doses per year by [year end 2021]."

**B.      August 5, 2021 – Second Partial Disclosure / Materialization of the Risk**

234. On August 5, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized when Novavax issued a press release reporting its financial results and operational highlights for the second quarter of 2021. Among other news, Novavax reported that it expected to file for NVX-CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021.

235. On that same day, Novavax filed with the SEC its 2Q21 Form 10-Q, which was signed by Defendants Erck and Trizzino. The 2Q21 Form 10-Q further revealed, "[t]he U.S. government has recently instructed the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods before conducting additional U.S.

77

manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made."

236. The August 5, 2021 disclosures about Novavax's additional regulatory filing delays and the FDA's instruction to Novavax to prioritize aligning its analytic methods with the FDA were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Novavax's then-current state of its manufacturing processes and capabilities and Novavax's purported alignment with FDA criteria.

237. Moreover, the August 5, 2021 press release and 2Q21 Form 10-Q revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The August 5, 2021 press release and 2Q21 Form 10-Q partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Novavax's continued manufacturing problems that were still affecting Novavax's ability to file its EUA.

238. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Novavax common stock fell $46.31 per share, or 19.61%, to close at $189.89 per share on August 6, 2021.

239. Analysts and the media were initially disappointed and shocked by this news. For example, on August 6, 2021, Jefferies reported, "[w]e understand the lack of clarity around the US/EU filings is less than ideal." Similarly, that same day J.P. Morgan reported, "[w]ith respect to filing timelines in the US, the US [government] has requested the completion of manufacturing validation activities prior to a regulatory submission, as such a US EUA filing is now anticipated in 4Q (3Q prior)."

78

240. Similarly, on August 7, 2021, Seeking Alpha reported that the "news was a shocker for investors."

241. Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to reassure the market that such manufacturing issues were resolved and that Novavax was on track to filing its EUA. For example, Defendant Erck reassured investors that "[w]e appear to have got past (certain) supply issues and are now being able to produce at scale."

242. Despite their initial disappointment, analysts and the media were encouraged by Defendants' reassurances as Defendants convinced the public that any such issues were resolved and would no longer cause challenges to Novavax. For example, despite finding that the delays were "less than ideal," Jefferies reported on August 5, 2021, that "[m]anufacturing appears to be on track w[ith] the company reiterating plans to reach 100M doses/month and 150M doses/month by the end of Q3 and Q4, respectively." Similarly, the next day, on August 6, 2021, Jefferies explained, "[w]hen asked what the gating steps are for submission to the UK/EU/US, [management] noted the need to reach each regulatory agencies' submission requirements, but the risk associated w[ith] these filings has been significantly reduced and [management] remains very confident they will be able to file."

243. Also on August 6, 2021, Cantor Fitzgerald reported that, "on the manufacturing front, the [C]ompany . . . remain[s] on track to achieve capacity of 100M doses per month by the end of 3Q21, and 150M doses per month by the end of 4Q21." Likewise, Seeking Alpha reported on August 7, 2021, that "[w]hile [Novavax] announced a delay in submission to US FDA, it is still on track to achieve its previously planned manufacturing capacity for Q3 and Q4."

79

**C. October 19, 2021 – Final Disclosure / Materialization of the Risk**

244. On October 19, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized. On that date, *Politico* published an article, after market hours, entitled: "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign." The *Politico* article reported, in relevant part, that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373. The *Politico* article cited anonymous sources as stating that Novavax's "issues are more concerning than previously understood" and that the Company could take until the end of 2022 to resolve its manufacturing issues and win regulatory authorizations and approvals.

245. Specifically, the *Politico* article reported that Novavax's "delay, which was confirmed by three other people familiar with the discussions between Maryland-based Novavax and the Biden administration, represents a major setback in the effort to vaccinate the world in the wake of new, more transmissible variants." For example, according to the *Politico* article, the Company "has consistently run into production problems," including "[t]he methods it used to test the purity of the vaccine," which "have fallen short of regulators' standards" as Novavax "has not been able to prove that it can produce a shot that is consistently up to snuff, according to multiple people familiar with Novavax's difficulties."

246. The *Politico* article also reported that "[a]lthough Novavax recently attested to some of its analytics and testing issues in a quarterly filing with the [SEC], the [C]ompany's issues are more concerning than previously understood, according to two of the people with direct knowledge of the matter." For example, while "it is generally understood that each [Covid-19] vaccine batch should reach at least 90 percent" in terms of purity levels, Novavax "has struggled to attain anywhere close to that, one of the people with direct knowledge of the situation said,"

80

and, according to "[a]nother person familiar with the [C]ompany's manufacturing process," the Company "has recently shown purity levels hovering around 70 percent." According to one person that the article quoted with knowledge of the matter, "At some level, I think the efficacy was never going to outweigh the risk associated with the impurity that was in there."

247. Moreover, the *Politico* article revealed that Novavax's manufacturing issues were so severe that they strained global Covid-19 vaccination efforts. For example, with respect to the Covid-19 Vaccines Global Access initiative, also known as COVAX, the *Politico* article found that "[t]he global coalition is already behind on hundreds of millions of planned doses this month" and "is now also at risk of missing its already downgraded 2021 target." The *Politico* article also quoted the director of the Duke Global Health Innovation Center, who stated, "COVAX continues to be challenged for adequate supply . . . in that context, Novavax's manufacturing challenges and delays have been massively disruptive."

248. The *Politico* article also found that Novavax was already aware of specific concerns with NVX-CoV2373's manufacturing process, stating that "senior Trump administration officials on Operation Warp Speed . . . repeatedly warned the [C]ompany that it risked running into problems in scaling up manufacturing of the shot, two people with direct knowledge of those discussions said"; that, "[i]n particular, they worried that Novavax would have difficulty ensuring that the vaccine consistently met the FDA's rigorous quality standards once the vaccine went into mass production—the exact problem that has now stymied the [C]ompany for months"; and that Novavax "rushed the process" and "can't make" the vaccine, according to one of the people with knowledge of the matter.

249. Finally, the *Politico* article revealed that, even as Defendants repeatedly downplayed NVX-CoV2373's manufacturing issues, the U.S. government's confidence in

81

Novavax's ability to successfully manufacture the drug had waned. For example, the *Politico* article stated that, according to three people with knowledge of the matter, "Novavax's manufacturing problems are seen as far more difficult to fix than the sanitary and design concerns that halted production of J&J's vaccine at the Emergent plant earlier this year."

250. The October 19, 2021 disclosures about Novavax's underlying manufacturing issues and that Novavax was unable to meet FDA criteria needed to file its EUA were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Novavax's then-current state of its manufacturing processes and capabilities and Novavax's purported alignment with FDA criteria.

251. Moreover, the October 19, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Novavax's underlying manufacturing issues, Novavax's alignment with FDA criteria, and Novavax's ability to file its EUA with the FDA.

252. On this shocking news, the price of Novavax's stock price fell $23.69 per share, or 14.76%, to close at $136.86 per share on October 20, 2021.

253. Analysts understood that the drop in Novavax's stock price was caused by the aforementioned disclosures and revelations. For example, on October 20, 2021, Cantor Fitzgerald explained that "the recent news articles that cited 'anonymous sources' stating Novavax has manufacturing issues that are 'jeopardizing billions of doses earmarked for poor and middle-income countries' . . . has resulted in shares trading down today."

## VII.   ADDITIONAL INDICIA OF SCIENTER

254.   Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Novavax's and their materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A.   Defendants Enriched Themselves Through Insider Sales In Advanced of Important Announcements[19]

255.   Knowing all along that Novavax would have to delay its EUA filing due to underlying and undisclosed manufacturing issues, Defendants Erck, Trizzino, and Glenn sought to enrich themselves at the expense of Novavax investors.  As explained above, Novavax needed to meet certain FDA criteria to file its EUA with the FDA.  That is, while Defendants had promised certain dates for when Novavax would file its EUA, if NVX-CoV2373 was not yet meeting those FDA criteria—as was the case—they would have to delay the filing, which they did.  And as one analyst, Zacks, explained, "[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, ***leaving an adverse impact on its shares***."   Armed with the knowledge that Novavax's underlying manufacturing issues would require Novavax to announce regulatory filing delays on May 10, 2021 and August 5, 2021, Defendants Erck, Trizzino, and Glenn collectively sold over 100,000

---

[19] To evaluate the Individual Defendants' selling activity, Lead Plaintiffs used the publicly available trading data that the Individual Defendants are required to report to the SEC on Form 4.

83

shares, reaping tens of millions of dollars only weeks—and sometimes days—before such announcements.

**1.  Defendants Erck, Trizzino, and Glenn Sold Large Blocks of Novavax Stock Right Before the EUA Delay Announcements**

256.  After trading at only $4 per share as of January 2020, Novavax's stock price skyrocketed to almost $240 per share as of the beginning of the Class Period in light of the anticipated potential impact that bringing a successful Covid-19 vaccine to market would have on the Company.  As long as the public continued to believe that Novavax had resolved and overcome any manufacturing problems that would prevent its ability to file its EUA, Defendants would be able to prevent Novavax's stock price from falling.

257.  However, in reality, even reassurance after reassurance was not able to avoid the inevitable.  That is, despite what Defendants told the market, the underlying manufacturing issues prevented Novavax from filing its EUA—requiring Defendants to announce that they were delaying their filing.  Thus, knowing that the stock price would take a dive upon the market learning about the delay, Defendants Erck, Trizzino, and Glenn sold a vast number of shares before the announcements.

258.  For example, in July 2021, the month leading up to the second partial corrective disclosure and/or materialization of the risk event on August 5, 2021, *Defendant Erck sold over 100,000 shares of Novavax stock, reaping proceeds of over $22.5 million*.  This stands in stark contrast to the zero shares he sold and $0 in stock sale proceeds he earned at the same time the previous year in July 2020.  More notable is that Defendant Erck sold off his shares at the same time that the Texas Facility was shut down due to contamination.  Indeed, CW 5 confirmed that the facility was at a standstill when Novavax executives unloaded their stock in July 2021.

84

259.     Defendant Glenn carefully timed his Novavax stock sales prior to the first and second partial corrective disclosures and/or materialization of the risk events on May 10, 2021 and August 5, 2021, respectively.  In mid-to-late April 2021, Defendant Glenn sold over 8,000 shares of Novavax stock, reaping over $1.6 million in proceeds.  Then, in July 2021, he sold over 8,000 additional shares representing proceeds of more than $1.5 million.

260.     Furthermore, just days leading up to the first partial corrective disclosure and/or materialization of the risk event on May 10, 2021, Defendant Trizzino sold over 3,000 shares of Novavax stock on May 5 and May 7, earning nearly $600,000 in proceeds.

261.     As such, Defendants Erck, Trizzino, and Glenn—knowing that the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain would cause regulatory delays and thus Novavax's stock to drop—enriched themselves before the public found out the truth.

**2.     Defendants Erck, Trizzino, and Glenn Reaped Massive Proceeds During the Class Period**

262.     In addition, not only did Defendants Erck, Trizzino, and Glenn carefully time their stock sales at opportune moments right before Novavax's regulatory delay announcements would cause the stock to drop, but they also lined their pockets with massive proceeds throughout the Class Period when Novavax's share price was massively inflated in light of the anticipated potential impact that bringing a successful Covid-19 vaccine to market would have on the Company.  Defendants Erck, Trizzino, and Glenn took advantage of the inflated price—knowing all along that the stock would plummet once the public learned the truth.

263.     Collectively, Defendants Erck, Trizzino, and Glenn increased their total stock sales by over 33% from 247,326 shares sold during the Control Period to 329,505 shares sold during the

Class Period.[20]  The contrast between sales during the Control Period and the Class Period is also striking when measured in dollars.  Collectively, ***proceeds from Defendants' sales increased over 118% during the Class Period***, from $29,896,044 million during the Control Period to $65,195,024 million during the Class Period.

264.    Individually, Defendants Erck's, Trizzino's, and Glenn's sales also increased during the Class Period.  During the Class Period, Defendant Erck sold almost five times as many shares during the Class Period as compared to the number of Novavax shares he sold during the Control Period.  Moreover, ***Defendant Erck's proceeds from Novavax sales increased by <u>more than 750% during the Class Period</u>***—from $4,549,253 million during the Control Period to $38,672,789 million during the Class Period.  During the Class Period, Defendant Trizzino's proceeds from Novavax sales increased by almost 6%.  Similarly, Defendant Glenn's proceeds from Novavax sales increased by over 3.5% during the Class Period.

265.    Accordingly, Defendants Erck's, Trizzino's, and Glenn's trading behavior during the Class Period raises a strong inference that it occurred in anticipation of having to disclose the known underlying manufacturing problems related to purity, potency, contamination, scalability, and the supply chain and that such problems were preventing Novavax from filing its EUA—thereby supporting a strong inference of scienter.

**B.    Manufacturing NVX-CoV2373 Was Critical to Novavax's Core Operations**

266.    The Individual Defendants' knowledge of the NVX-CoV2373 vaccine manufacturing process and issues related thereto can be inferred because these facts were critical to Novavax's core operations.  Indeed, in light of the Company's dismal business prospects

---

[20] Lead Plaintiffs analyzed the trading by the Individual Defendants during the Class Period and during the similar and equal-length period preceding the Class Period beginning February 24, 2020 to October 19, 2020 (the "Control Period").

immediately preceding the Covid-19 pandemic and lack of revenue or growth, Novavax's potential profits from the NVX-CoV2373 vaccine were crucial to the Company's continued viability.

267. The Company admitted as much at multiple points prior to and throughout the Class Period. For example, in the Company's February 19, 2021 report to the Subcommittee on Oversight and Investigations, U.S. House of Representatives, Committee on Energy and Commerce, Defendant Trizzino explained that "getting this vaccine in the arms of people . . . is our **priority** and **singular goal** right now. Our team continues to work **non-stop** to get NVX-CoV2373 developed, authorized for use and ultimately delivered to vaccination clinics." Similarly, in the Company's 1Q 2021 Form 10-Q, it explained that "[a]t the **forefront** of [its] pipeline is NVX-CoV2373."

268. Indeed, the vaccine was of such importance to the Company, and the public at large, that on June 10, 2021, Novavax hosted Maryland Governor Larry Hogan at the site of the Company's planned Vaccines Innovation Campus and global headquarters in Gaithersburg. Additional guests included state, regional, and local officials. Defendants Erck and Glenn personally led the tour, providing an overview of the facility and press briefing.

269. The Texas Facility and North Carolina Facility were also critical to Novavax's development of NVX-CoV2373, and thus the Company's success. For example, Defendant Trizzino himself testified before the Subcommittee on Oversight and Investigations of the U.S. House of Representatives, Committee on Energy and Commerce on February 19, 2021, that the "antigen produced at the Fuji sites in North Carolina and Texas are a critical component of our US supply chain." Likewise, FUJIFILM CEO Martin Meeson referred to FUJIFILM as "a critical partner to Novavax." In fact, FUJIFILM's role was so important to the development of NVX-CoV2373 that then-President Trump toured the North Carolina Facility in July 2020.

87

270.    Defendants further acknowledged that achieving certain purity levels was critical to obtaining regulatory approval of the NVX-CoV2373 vaccine.  For example, Novavax stated in its 2Q21 Form 10-Q that "[a]ccepted analytical methods that we can use to demonstrate our vaccine's purity, potency and consistent lot manufacturing are ***critical*** to attaining licensure in all the territories we intend to sell."

271.    Analysts following Novavax also understood that the NVX-CoV2373 vaccine was critical to the Company's success.  For example, on April 15, 2021, CFRA issued a report stating that "[w]e think the future financial success of NVAX and its ability to record a positive bottom-line result is highly dependent on successful approvals and rapid commercialization of its Covid-19 vaccine" and "the main focus of the [C]ompany is on its NVX-CoV2373 vaccine candidate against Covid-19."   Similarly, on April 28, 2021, Zacks issued a report stating that "any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, leaving an adverse impact on its shares." On June 14, 2021, Jefferies issued a report explaining that the "[k]ey to [Novavax] will be their ability to execute on filing their data to the various regulatory agencies for EUA approval, ability to manufacture doses of their vaccine, and procure additional contracts."  As the Class Period progressed, and Defendants continued to delay the release of the vaccine, analysts reiterated that the release of the NVX-CoV2373 vaccine was key to the Company's success.  For example, on August 6, 2021, Jeffries issued a report, which stated that "[i]nvestors went into Q2 EPS w/ two key questions 1) what's the status of the EUA filings and 2) has vaccine manufacturing improved[.]"

272.    Moreover, before the Covid-19 pandemic, and the resulting capital influx from government incentives to manufacture the NVX-Co2372 vaccine, Novavax was in dire straits. After a previous failed attempt to produce a commercially viable vaccine, the Company was in

88

danger of being delisted from the NASDAQ and was forced to sell its manufacturing facilities to avoid going out of business.  By January 2020, the Company had barely enough cash left to survive for six months, and its market value was a paltry $127 million.  Indeed, the $388 million investment by CEPI was over three times the Company's then-market value and the $1.6 billion awarded to Novavax by the federal government was over twelve times the Company's pre-pandemic value.  However, during the Class Period, as Defendants misleadingly assured the market of the NVX-CoV2373 vaccine's imminent roll out, the Company's market value surged to as much as $11 billion.

273.    Given the importance of the NVX-CoV2373 vaccine to Novavax's business, knowledge of the manufacturing problems associated with the vaccine, including the fact that Novavax was unable to produce a vaccine of sufficient quality to meet regulatory requirements, can therefore be imputed to the Individual Defendants.

**C.    Defendants' Personal Involvement in NVX-CoV2373's Development Supports That They Had Actual Knowledge or Were Reckless in Not Knowing About the Manufacturing Problems**

274.    The Individual Defendants were responsible for Novavax's efforts to manufacture the NVX-CoV2373 vaccine in conformance with FDA regulations, including through personally communicating with the FDA and overseeing the manufacturing process, supporting a strong inference of scienter.

275.    Indeed, there is no question that the Individual Defendants were directly and personally involved in Novavax's efforts to manufacture a quality vaccine.  cGMP regulations and multiple CWs confirm and corroborate that Novavax was aware of the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain throughout the Class Period.

276. For example, cGMP regulations required Novavax to apprise itself of any manufacturing problems, even where another company was actually manufacturing the vaccine. Novavax was also "responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company," such as FUJIFILM or any other manufacturing partner. Additionally, with respect to any "reports of inspectional observations issued by the [FDA], or any regulatory actions relating to good manufacturing practices brought by the [FDA]," or any investigations into complaints involving the "possible failure of a drug product to meet any of its specifications," cGMP regulations required that the manufacturing company provide Novavax with written notice of the issue. In addition, cGMP regulations required Novavax to maintain laboratory records, including information relating to "results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested."

277. Thus, Novavax was aware of the particular issues that the FDA raised in connection with the FDA's investigations into the North Carolina Facility and Texas Facility, which highlighted a litany of quality issues outlined above. In fact, the FDA's very own reports support this conclusion, as it indicated that FUIJIFILM was required to notify the client (which CW 5 confirmed was Novavax) of deviations and OOS results within two business days. In fact, with respect to issues of contamination, CW 5 specifically stated that a client, who was Novavax in this case, must be notified about a contamination within 24 to 48 hours of its discovery.

278. Likewise, former employees from the Texas Facility and North Carolina Facility recalled that Novavax was notified about the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that occurred throughout the Class Period. For example, according to CW 5, Novavax had two Novavax's Onsite Employees at the Texas Facility.

Indeed, CW 5 explained that CW 5 and the Texas Facility Director of Manufacturing CW 6 communicated with the two Novavax's Onsite Employees "every single day" regarding manufacturing and the results of quality checks, which CW 5 recalled were conducted every 24 to 48 hours.

279. CW 5 recalled that Novavax's Onsite Employees were notified about each contamination issue that occurred at the Texas Facility throughout the Class Period. That is, they were notified about the four contamination incidents that led to delays in manufacturing that started in December 2020. CW 5 even recalled that Mr. Hash, one of Novavax's Onsite Employees, was involved in the investigations into the contaminations. CW 5 recalled that there were phone calls and emails about contaminations and delays from Mr. Hash to Novavax headquarters, including Novavax's Quality Assurance department.

280. Similarly—and with respect to a particular viral contamination that occurred in March 2021 and ultimately shut down the Texas Facility's manufacturing processes until at least September 2021—CW 5 confirmed that everything to do with the viral contamination was "communicated to" Novavax's Onsite Employees as the discovery and investigation progressed, along with daily calls with Novavax personnel in Maryland.

281. CW 6 similarly recalled that Novavax had some employees who worked onsite at the Texas Facility, including Mr. Hash, along with a few other Novavax employees who rotated onsite "off-and-on." CW 6 further recalled that CW 6 participated on Zoom calls "every day" with Novavax's Onsite Employees, a Novavax employee at Novavax's headquarters in Maryland named Ivailo, and other Novavax employees from different departments. According to CW 6, Novavax's Onsite Employees, Ivailo, and the other Novavax employees "knew everything that we were doing." CW 6 further advised that there were typically 10 Novavax employees on the calls.

91

282.   Likewise, CW 7—a former Manager, Quality Assurance for the North Carolina Facility—recalled that any problems were constantly communicated to Novavax, which had someone onsite at the North Carolina Facility weekly at a minimum.  Moreover, CW 7 recounted that all testing results for batches at the North Carolina Facility were communicated to Novavax through a "batch record," which relayed to Novavax that testing was completed and the results of the testing.  CW 7 even explained that FUJIFILM sometimes changed the vaccine manufacturing materials given certain supply chain issues, and that Novavax would have to approve all the changes.  CW 7 also recalled that Novavax had teams of people from departments including quality and technical who were involved in any modifications.  CW 7 further explained that Novavax was involved with "everything" and was "driving" the way in which FUJIFILM manufactured the product.  In fact, CW 7 advised that the level of Novavax's involvement was unlike anything she had previously encountered at FUJIFILM, meaning that Novavax was more involved in the manufacturing process than other clients at FUJIFILM.

283.   Additionally, Defendant Erck was also personally and directly involved in the manufacturing process's progress.  For instance, according to multiple CWs, Defendant Erck held Company-wide meetings with Novavax employees to discuss the regulatory process for the NVX-CoV2373 vaccine.  CW 2 recalled that Defendant Erck and Novavax's leadership team spoke to employees and facilitated Q&A sessions during Company-wide meetings that happened at least once a quarter.  At these meetings, CW 2 recalled that Defendant Erck discussed the topic of seeking regulatory approval.

284.   Similarly, CW 1 recalled that Defendant Erck spoke to employees during monthly Company-wide meetings that included Q&A sessions, with employees able to submit questions in advance via an app.  CW 1 further recalled that the Q&A sessions included discussions about

92

employees' concerns in regard to "our manufacturing capabilities" and "the likelihood of being able to manage all those stakeholders," in addition to concerns over whether Novavax would "be able to get our stability information stabilized." CW 4 also corroborated this information, stating that Defendant Erck spoke to employees during Company-wide, town hall-style meetings that included a Q&A session, with employees being able to submit questions in advance using an app.

285. CW 4 explained that if there were issues in getting a trial started, those problems would be brought to Chief Medical Officer Filip Dubovsky and Defendant Erck. CW 4's understanding of how such information would have flowed up the chain of command at Novavax was that manufacturing issues were brought to Dubovsky's attention, that Dubovsky would have discussed it with Defendant Erck who in turn would have discussed it with Defendant Glenn, and that Defendant Erck—or sometimes Defendant Glenn—had to bring it to the attention of Novavax's Board of Directors.

286. Furthermore, Defendant Erck had access to reports that contain hundreds of pages of data from Novavax's manufacturing sites. For example, CW 1 explained that Novavax submitted documents containing information from the Company's manufacturing sites that was then submitted to the FDA in the form of Module 3 Quality reports. CW 1 further explained that "those are the documents we were working on the hardest," and that "Novavax really needed to have [its] CMC module in line before we could get that emergency use authorization." CW 1 recalled that these reports consisted of "hundreds of pages."

287. CW 1 explained that the content from the manufacturing sites that was detailed in the Module 3 reports involved drug and product information and data. CW 1 further explained that the Module 3 reports were submitted to the FDA via the agency's ESG and sometimes via email, depending on the preferences of the two or three FDA project managers with whom

Novavax worked. CW 1 recalled that Director – Regulatory Affairs Kathleen Callahan would send such emails and handled all communications with the FDA. CW 1 also explained that Novavax stored the Module 3 reports on an internal system managed by the Quality department.

288. Further, CW 7 recounted that the vaccine's purity levels were manufactured according to information provided by and processes approved by Novavax. As mentioned above, CW 1 explained that FDA concerns were also discussed at weekly, and sometimes daily, Regulatory Affairs team meetings.

289. Defendants Erck and Glenn personally led a tour of the Company's planned Vaccines Innovation Campus and global headquarters in Gaithersburg for Governor Hogan, providing an overview of the facility and a press briefing.

290. Defendants' direct involvement in the vaccine manufacturing process thus supports a strong inference of scienter.

**D. Defendants' Statements Themselves Support Scienter**

291. Throughout the Class Period, Defendants spoke repeatedly on Novavax's ability to manufacture and commercialize the NVX-CoV2373 vaccine, leading investors to believe that nothing stood in the way of Novavax producing the vaccine at the quality required by FDA and cGMP regulations while omitting that the Company was having substantial issues developing a consistently pure vaccine on a large scale. These false and misleading statements themselves provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing that Novavax was unable to produce a vaccine of sufficient quality to satisfy governmental regulations. Accordingly, Defendants breached their duty under the federal securities laws by speaking about these topics and failing to fully disclose all relevant material information while doing so.

94

292. For instance, on February 24, 2021, in an interview with *The Washington Post*, Defendant Glenn confidently assured investors that "we lined up—FDA gave advice on how to do a trial, what success means, and that really was accepted by the world, if you will, and *so we're aligned up with those success criteria in all of our trials*."

293. Defendants made similar assurances throughout the Class Period. On May 10, 2021, Defendant Erck misleadingly assuaged the market's concerns about the delay in releasing the NVX-CoV2373 vaccine stating that "*nearly all of the major challenges have been overcome and we can clearly see the light at the end of the tunnel*." On August 5, 2021, a *Reuters* article reported that Defendant Erck stated, "*[w]e appear to have got past (certain) supply issues and are now being able to produce at scale*." On September 21, 2021, in response to a reporter's question about transparency, Defendant Trizzino explained that "[t]his transparency is important. *And we've been extremely transparent across multiple fronts. All of our clinical data has been shared very quickly*."

294. Defendants' repeated assurances to investors that Novavax was able to produce a vaccine of sufficient quality to meet regulatory standards—when they had been apprised of the multiple manufacturing problems as previously described—demonstrate that they *either* knew that the Company was experiencing substantial manufacturing problems related to purity, potency, contamination, scalability, and the supply chain, which delayed the approval of the NVX-CoV2373 vaccine, *or* were reckless in not knowing or investigating that this was the case. In either scenario, there is a strong inference that Defendants made these statements with scienter.

**E.      Government's Crackdown on Emergent BioSolutions Further Supports Scienter**

295. Like Novavax, other companies producing vaccines to combat Covid-19 were subject to the FDA regulations concerning vaccine quality standards. Indeed, these FDA

95

regulations, and the FDA's willingness to enforce them, were widely known in the industry. Novavax even acknowledged this in its 2021 Form 10-K: "The development, production and marketing of biological products, which include the vaccine candidates being developed by Novavax or our collaborators, are subject to regulation for safety, efficacy and quality by numerous governmental authorities in the U.S. and other countries."

296. Moreover, Defendants were able to see the regulatory process play out firsthand in connection with one of its manufacturing partners, Emergent. While Defendants were touting their purported alignment with the FDA criteria and transparency, federal regulators halted production at Emergent's Baltimore facility in April 2021 for more than three months until the company resolved quality control problems, including failure to prevent contamination that ruined tens of millions of doses and other cGMP violations. The facility had produced Johnson & Johnson's and AstraZeneca's vaccines, but as a result of the issues, the facility now manufactures doses only for Johnson & Johnson.

297. The FDA's crackdown on Emergent's manufacturing facility served as a reminder—and a warning—to other pharmaceutical companies producing vaccines for Covid-19. Though there was an urgent need for these vaccines, the FDA would not show leniency or allow a company to cut corners in producing a vaccine—especially one so critical to the public welfare. It was thus of utmost importance for companies—such as Novavax—to ensure that their manufacturing facilities complied with all cGMP and met the requisite FDA criteria needed for ultimate approval. Indeed, as a pharmaceutical company, a core aspect of Novavax's business is ensuring compliance with manufacturing quality standards for each jurisdiction in which it manufacturers its vaccines.

298.     As a result of this well-known trend that FDA enforcement was focusing on vaccine manufacturers' quality control, Defendants knew or were reckless in not knowing that they needed to verify the truth of their statements about the Company's ability to manufacture a vaccine of sufficient quality to meet FDA and cGMP standards.

## VIII.   CONTROL PERSON ALLEGATIONS

299.     The Individual Defendants, by virtue of their high-level and controlling positions at Novavax, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

300.     Defendants Erck, Covino, Trizzino, and Glenn, as senior executive officers of Novavax—a publicly-held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Novavax's publicly traded common stock would be based on accurate information.  Each of the Individual Defendants violated these requirements and obligations during the Class Period.

301.     Defendants Erck, Covino, Trizzino, and Glenn, because of their positions of control and authority as senior executive officers of Novavax, were able to and did control the content of Novavax's SEC filings, press releases, and other public statements issued by or on behalf of Novavax during the Class Period.  Each would have been provided with copies of the statements

made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

302.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Novavax common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts.    The scheme deceived the investing public regarding Novavax's business, operations, and management, and the intrinsic value of Novavax's common stock, and caused Lead Plaintiffs and members of the Class to purchase Novavax common stock at artificially inflated prices.

## IX.    CLASS ACTION ALLEGATIONS

303.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Novavax during the Class Period and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Novavax during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Novavax's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

304.    The members of the Class are so numerous that joinder of all members is impracticable.  According to public reports filed with the SEC, during the Class Period, Novavax had over 70 million outstanding shares of common stock and was actively traded on the NASDAQ

under the ticker symbol "NVAX." While the exact number of Class members is unknown to Lead Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Novavax and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

305. Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

306. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

307. Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a) Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b) Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c) Whether, and to what extent, the market price of Novavax common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) Whether Defendants acted with the requisite level of scienter;

(e)     Whether the Individual Defendants were controlling persons of Novavax; and

(f)     Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

308.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

309.    To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)     Lead Plaintiffs and other members of the Class purchased Novavax's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)     Novavax's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g)     as a regulated issuer, Novavax filed periodic public reports with the SEC and the NASDAQ;

(h)     Novavax regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)     Novavax was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, B. Riley Securities, Inc., Cantor Fitzgerald & Co., Cowen, H.C. Wainwright & Co., LLC, Jefferies LLC, Zacks, and J.P. Morgan Chase & Co., all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

310.    As a result of the foregoing, the market for Novavax's securities promptly digested current information regarding Novavax from publicly available sources and reflected such information in Novavax's securities price(s).  Under these circumstances, all persons and entities who or which purchased or otherwise acquired Novavax common stock during the Class Period suffered similar injuries through their purchase of Novavax common stock at artificially inflated prices and thus, the presumption of reliance applies.

311.    The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Novavax common stock.

312.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of Novavax common stock

101

between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

313. To the extent that Defendants concealed or improperly failed to disclose material facts with respect to Novavax's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI. NO SAFE HARBOR

314. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

315. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

316. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

102

317. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Novavax was experiencing multiple manufacturing problems and delays that prevented NVX-CoV2373 from meeting FDA criteria and thus causing multiple regulatory delays with respect to Novavax's ability to file its EUA with the FDA.

318. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Novavax who knew that the statement was false when made.

## XII. CAUSES OF ACTION

### <u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5(b) Promulgated Thereunder
Against Novavax and the Individual Defendants**

319. Lead Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

320. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Novavax and the Individual Defendants.

321. As alleged herein, throughout the Class Period, Novavax and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or

instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Novavax and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially inflate and maintain the price of Novavax common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase Novavax common stock at artificially inflated prices.

322.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

323.    As set forth above, Novavax and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased Novavax common stock during the Class Period.

324.    In ignorance of the false and misleading nature of Novavax's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Novavax common stock, Lead Plaintiffs and other members of the Class purchased Novavax common stock at artificially inflated prices during the

104

Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have purchased Novavax common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Novavax common stock declined precipitously, and Lead Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Novavax common stock at artificially inflated prices and the subsequent decline in the price of that security when the truth was disclosed.

325. By virtue of the foregoing, Novavax and the Individual Defendants are liable to Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) Promulgated Thereunder Against Novavax and the Individual Defendants

326. Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

327. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiffs need not allege in this Court nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

328. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the price of Novavax common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase Novavax common stock at artificially inflated prices.

105

329. In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with their purchases of Novavax common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

330. Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that Novavax was experiencing throughout the Class Period, which prevented the Company from filing its EUA with the FDA. By concealing such problems from investors, and in fact explicitly reassuring investors that any prior problems that NVX-CoV2373's manufacturing process may have faced were resolved, Defendants were able to take advantage of Novavax's inflated stock price at opportune moments throughout the Class Period before the market learned the truth.

331. For example, given how important it was for the Company to file its EUA and bring NVX-CoV2373 to market, it was evident that any delays or issues that prevented Novavax from doing so would cause Novavax's stock price to drop. To be sure, an analyst, Zacks, explained, "[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, leaving an adverse impact on its shares."

332. Furthermore, because Defendants were aware of the manufacturing problems explained above, Defendants knew that Novavax would have to delay its EUA filing. As such, knowing that the stock price would take a dive upon the market learning about the delay, Defendants Erck, Trizzino, and Glenn carefully planned the timing of their stock sales in the

weeks, and sometimes days, before announcing a delay. As a result of their continued reassurances and omissions throughout the Class Period, Defendants Erck, Trizzino, and Glenn collectively made over $65 million in proceeds during the Class Period—more than a 118% increase from the year prior.

333. Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Novavax's common stock traded.

334. During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Lead Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Novavax's common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

335. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Novavax common stock during the Class Period.

336. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their purchases of Novavax common stock during the Class Period.

## COUNT III

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

337. Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

338. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

339. The Individual Defendants had control over Novavax and made the materially false and misleading statements and omissions on behalf of Novavax within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive leadership positions and positions as directors of Novavax, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

340. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

341. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

108

A.      Determining that this action is a proper class action, certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiffs' counsel as Lead Counsel for the Class;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated: March 11, 2022

Respectfully Submitted,

**LABATON SUCHAROW LLP**

*/s/ James W. Johnson*
James W. Johnson (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac vice*)
David J. Schwartz (*pro hac vice* forthcoming)
James T. Christie (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email: jjohnson@labaton.com
         mrogers@labaton.com
         dschwartz@labaton.com
         jchristie@labaton.com

109

**POMERANTZ LLP**

Brian Calandra (admitted *pro hac vice*)
Jeremy A. Lieberman (*pro hac vice* forthcoming)
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: bcalandra@pomlaw.com
        jalieberman@pomlaw.com

*Counsel for Co-Lead Plaintiffs and*
*Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS &**
**TOLL PLLC**

*/s/ Steven J. Toll*
Steven J. Toll (Md. Bar No. 15824)
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
        dsommers@cohenmilstein.com
        dbunch@cohenmilstein.com

*Local Counsel for Co-Lead Plaintiffs*

**PORTNOY LAW FIRM**

Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, California 90067
Tel: (310) 692-8883
Email: esley@portnoylaw.com

*Additional Counsel for Co-Lead Plaintiffs and*
*the Class*

110

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NOVAVAX, INC., STANLEY C. ERCK, GREGORY F. COVINO, JOHN J. TRIZZINO, and GREGORY M. GLENN, <br><br> Defendants. | Civil Action No. TDC-21-2910 |

## <u>DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES</u>

Defendants Novavax, Inc. ("Novavax" or the "Company"), Stanley C. Erck, and John J. Trizzino (collectively, "Defendants"), by their attorneys, hereby file this Answer and Affirmative Defenses.

**ANSWER**

Defendants file this answer (the "Answer") in response to the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws [Dkt. 56] (the "Complaint") filed by Plaintiffs Jeffrey A. Gabbert, Nuggehalli Balmukund Nandkumar, and David Truong (collectively, "Plaintiffs") on March 11, 2022. This Answer is made without waiving, but instead expressly reserving, all rights that Defendants may have to file dispositive motions or other responses addressing some or all of the allegations and claims asserted in the Complaint. To the extent that certain paragraphs of Plaintiffs' Complaint include footnotes, Defendants' Answer to each numbered paragraph referencing a footnote should be read to include Defendants' response to the footnote. This Answer includes the Complaint's headings for reference only; Defendants do not admit the truth of any allegations contained in, or any inference that could be drawn from, those headings. Except as expressly admitted herein, Defendants deny all allegations. To the extent Defendants admit the contents of statements written or made orally by others, such admission does not imply any admission of the truth of such statements. Capitalized terms not otherwise defined in this Answer have the meanings ascribed to them in the Complaint. Defendants answer the Complaint's allegations as follows:

1

## I.      NATURE OF THE ACTION

1.      This securities fraud action arises out of Novavax's misleading statements made in connection with the Company's failed attempt to bring a vaccine candidate, NVX-CoV2373, to market during the Covid-19 pandemic. Specifically, Defendants misled investors about the vaccine's purported successful development, production, and imminent U.S. Food and Drug Administration ("FDA") approval; in reality, Novavax's vaccine was nowhere close to being approved for use: (a) because the vaccine's purity and potency numbers fell well below FDA safety requirements as a result of severe manufacturing problems including several undisclosed contamination events at its two U.S. manufacturing facilities; (b) because of a failure to manufacture the vaccine at scale; and (c) because of supply chain disruptions—all of which caused significant delays that jeopardized any chance Novavax had to capitalize on the market for Covid- 19 vaccines.

**ANSWER:**      Defendants deny the allegations in this Paragraph.

2.      Worse, Defendants personally made millions because of their rosy statements touting the successful vaccine development and manufacturing process that caused Novavax stock to remain at near record levels based on investors' belief that the Company was in pole-position to sell billions of doses in the near future. Indeed, just days before revealing bad news to the public about costly delays in Novavax's regulatory submissions due to the manufacturing problems, Defendant Erck sold over 100 thousand shares of Novavax stock, ***reaping proceeds of over $22.5 million for himself*** and leaving investors to take a massive hit. Likewise,

Defendant Glenn *made over $3 million in sales by selling thousands of shares right before the Company announced the regulatory delays*, which caused Novavax's stock price to plummet.

**ANSWER:** Defendants respectfully refer the Court to the Forms 4 filed with the Securities and Exchange Commission ("SEC") to report changes in Defendant Stanley C. Erck's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith. The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny the remaining allegations in this Paragraph.

3. The truth about Novavax's failed vaccine candidate was finally revealed on October 19, 2021, when *Politico* released an article containing interviews with several Novavax employees detailing the extent of the Company's manufacturing problems, including the Company's inability to manufacture a vaccine that met the FDA's purity and potency requirements. The article also disclosed that Novavax's vaccine would likely not be approved until late 2022—almost a full year later. During the Class Period, *Novavax's stock collectively fell over 50% in response to disclosures related to Novavax's manufacturing issues and inability to meet FDA requirements, thereby injuring investors*.

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article and publicly available information about the Company's stock price for their true and

3

complete contents, and Defendants deny allegations inconsistent therewith.  Defendants deny the remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

> **A.** **Novavax Attempts to Seize on the Massive Need for Covid-19 Vaccines**

4.      Novavax, headquartered in Gaithersburg, Maryland, is a biotechnology company that focuses on the development and commercialization of vaccines to prevent infectious diseases. At the beginning of the Covid-19 pandemic, Novavax found itself in a unique position to potentially capitalize on the urgent need for Covid-19 vaccines. Indeed, in early 2020, Novavax was granted a $1.6 billion government grant to manufacture millions of doses of its vaccine candidate for American citizens. But time was of the essence as Novavax was competing against other vaccine manufacturers such as Pfizer, Moderna, AstraZeneca, and Johnson & Johnson to get vaccines to the American public as quickly as possible.

**ANSWER:**    Defendants admit that Novavax maintains its corporate headquarters in Gaithersburg, Maryland.  Defendants further admit that Novavax is a biotechnology company that focuses on the discovery, development, and commercialization of vaccines to prevent serious infectious diseases and to address urgent global health needs.  Defendants admit that Novavax entered into a contract with the United States government related to the development and manufacture of Covid-19 vaccines.  Defendants deny the remaining allegations in this Paragraph.

5.      If its vaccine was delayed too long, Novavax faced the significant risk of no existing need for that vaccine, which also would mean no longer being a candidate for rapid

FDA approval and sale under an emergency use authorization ("EUA") mandate. As one analyst, CFRA, explained, "*[w]e think the future financial success of [Novavax] . . . is highly dependent on successful approvals and rapid commercialization of its Covid-19 vaccine*." And as another analyst, Zacks, noted, "*[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for [Novavax], leaving an adverse impact on its shares.*"

**ANSWER:** Defendants respectfully refer the court to the referenced analyst reports for their true and complete contents, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

6.      While EUA provides for an expedited pathway to approval, it still requires that the vaccine candidate meet certain basic safety and efficacy benchmarks imposed by the FDA, including current Good Manufacturing Practices ("cGMP"). As part of cGMP, Novavax's vaccine had to meet certain purity and potency levels and the Company had to ensure that its facilities were void of any contamination. Additionally, FDA regulations required Novavax's direct involvement with the manufacturing processes of its facilities and that it remained informed of any issues related thereto.

**ANSWER:** Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. §§ 210 and 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

7.      However, during the Class Period, Novavax simply could not manufacture vaccines at the required FDA purity and potency levels, experienced numerous contamination events in critical manufacturing facilities, failed to successfully scale up production, and faced supply chain disruptions—all of which caused material delays in Novavax's EUA filing. Indeed, multiple individuals who worked on the vaccine confirmed that Novavax was experiencing severe manufacturing problems that prevented the Company from timely releasing the vaccine to the public while demand still existed.

**ANSWER:**     Defendants deny the allegations in this Paragraph.

8.      Two former employees who worked at Novavax's two primary vaccine manufacturing plants in Texas and North Carolina confirmed that the plants were struck with repeated contamination events that in some instances caused the manufacturing plants to be shut down (sometimes for months) while the contamination was investigated.[1]

**ANSWER:**     Novavax admits that it entered into certain contracts with FUJIFILM to produce certain components of NVX-CoV2373.  Defendants deny the remaining allegations in this Paragraph.

---

[1]  Novavax partnered with FUJIFILM Diosynth Biotechnologies ("FUJIFILM") to produce certain critical components of NVX-CoV2373 at FUJIFILM's manufacturing facilities in Texas (the "Texas Facility") and North Carolina (the "North Carolina Facility"). These plants were crucial to Novavax's ability to produce its vaccine candidate. Indeed, as Defendant Trizzino himself explained, the "*antigen produced at the Fuji sites in North Carolina and Texas are a critical component of our US supply chain.*"

9. For instance, the former Head of Technical Operations, Gene Therapy at the Texas Facility, CW 5, explained that a microbial contamination had existed there since December 2020 and occurred on at least four occasions. According to CW 5, these contamination incidents required shutting down the manufacturing lines for each incident of contamination found.

**ANSWER:** Defendants deny the allegations in this Paragraph.

10. Compounding these problems, according to CW 5, the Texas Facility once again became so contaminated in March 2021 that the facility's manufacturing processes completely shut down from March 2021 until September 2021. CW 6 similarly recalled that contamination had existed at the Texas Facility since April 2021, which caused its manufacturing processes to shut down until at least the end of CW 6's tenure on June 30, 2021. Moreover, an FDA investigation in March 2021 uncovered a microbial contamination at the Texas Facility that occurred in January 2021 but was improperly reported.

**ANSWER:** Defendants deny the allegations in this Paragraph.

11. Moreover, according to the former Quality Assurance Manager at the North Carolina Facility, CW 7, some contamination issues spanned the "whole gamut" of the project (*i.e.*, throughout the entire Class Period), referring to manufacturing Novavax's vaccine candidate, and said they were "always an issue," which required FUJIFILM to discard the batch, ending the process.

**ANSWER:** Defendants deny the allegations in this Paragraph.

7

12. In response to these events, the FDA inspected the Texas Facility and North Carolina Facility in March 2021 and April 2021, respectively, and confirmed that the two manufacturing facilities were experiencing severe manufacturing problems. In a 52-page investigation report and Form 483 issued to the Texas and North Carolina Facilities in March and April 2021, the FDA identified numerous quality-related problems and issues with the vaccine's purity including that ***contamination was discovered and not properly recorded and investigated, including microbial contamination that was discovered in January 2021***; that the ***cleaning procedure for certain manufacturing areas was not always followed***; that employees ***failed to investigate for root causes and implement adequate corrective and preventative actions to control microbial contamination***; that there were ***inadequate procedures for the "Purification" step***; and that the ***manufacturing process was not adequately monitored and/or controlled to ensure the quality of the drug substance was not adversely affected***.

**ANSWER:** Defendants admit that the FDA inspected the Texas and North Carolina Facilities at certain points in 2021. Defendants specifically deny that the FDA's decision to inspect the Texas and North Carolina Facilities was made in response to the events alleged to have occurred in the preceding paragraphs. Defendants respectfully refer the Court to the FDA report and Form 483 for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

8

13.     As a result, during the Class Period, Novavax was only able to manufacture vaccines with purity levels of around 70%—with some batches of vaccines containing purity levels of as low as 30%—nowhere close to the 90% purity level required by FDA standards. Similarly, Novavax was unable to maintain the proper level of potency throughout 2021.

**ANSWER:**     Defendants deny the allegations in this Paragraph.

14.     In addition, Novavax was not able to successfully scale up production throughout the Class Period. For instance, ***Novavax was not even able to produce the required number of doses in time for clinical trials to be performed on the drug***, which was then causing the trials to be delayed. Moreover, former Novavax and FUJIFILM employees confirm many supply chain problems—such as domestic supply constraints—at the Texas Facility, which its Director of Manufacturing, CW 6, recalled "were always a struggle" and an "ongoing issue." The North Carolina Facility likewise had difficulty procuring the components necessary to manufacture its Covid-19 vaccine, such as filters and resin used in the manufacturing process.

**ANSWER:**     Defendants deny the allegations in this Paragraph.

15.     In addition to FDA regulations requiring Novavax to stay apprised of any problems that developed in any facility manufacturing its vaccine, multiple former employees from the Texas and North Carolina Facilities confirm and corroborate ***that Novavax was notified by the FDA and Novavax's manufacturing partners at the Texas and North Carolina Facilities of the manufacturing problems that occurred throughout the Class Period***. For example, several former employees from the Texas Facility confirmed that Novavax had several

onsite employees at that facility, and that *they communicated with Novavax's onsite employees "every single day" regarding manufacturing, purity, and the results of quality checks*. The Quality Assurance Manager at the North Carolina Facility similarly explained that Novavax was notified of problems at the North Carolina Facility, including contamination. Indeed, the Quality Assurance Manager at the North Carolina Facility, CW 7, explained that the North Carolina Facility constantly communicated any problems to Novavax, which had someone onsite at the North Carolina Facility weekly at a minimum.

**ANSWER:** Defendants respectfully refer the Court to the FDA regulations referenced in this Paragraph for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

**B.** **Defendants Tout That NVX-CoV2373 Was Aligned with FDA Criteria**

16. Despite these significant problems related to purity, potency, contamination, scalability, and the supply chain, throughout the Class Period, Defendants falsely reassured investors that the manufacturing process was going smoothly and that Novavax was aligned with the FDA criteria (*e.g.*, certain purity, potency and other quality standards) needed for Novavax to file its EUA in a timely fashion. For example, on February 24, 2021, in an interview with *The Washington Post*, Defendant Glenn touted to investors that Novavax was "*aligned up with [the FDA's] success criteria in all of [Novavax's] trials*."

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph related to such Defendant and claims thus require no response; to the extent a

response is deemed required, Defendants respectfully refer the Court to the February 24, 2021 *Washington Post* interview for its true and complete contents, deny any allegations inconsistent therewith, and otherwise deny those allegations. Defendants deny any remaining allegations in this Paragraph.

17. Analysts were encouraged by Defendants' reassurances. For example, Jefferies published an analyst report stating, "[a]ltogether, everything remains on track, including EUA filing in UK, EU and USA in Q2." Similarly, Zacks noted that the "vaccine is also advancing well." In fact, CFRA even issued a Strong Buy rating for Novavax and reported that "[w]e think 2021 could be a turnaround year for [Novavax]," and that "[w]e think [Novavax's] Covid-19 vaccine candidate is well-placed to receive the fourth EUA in the U.S. in Q2."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts. Defendants respectfully refer the Court to the Jefferies, Zacks, and CFRA reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith.

18. However, far from being "aligned" with the FDA's success criteria, Novavax was unable to meet the FDA's purity or potency criteria due to several manufacturing problems. Then, in May of 2021, Novavax disclosed that it would be delaying its EUA submission to the FDA. Specifically, on May 10, 2021, during market hours, *The Washington Post* reported that Novavax's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest." Novavax later that day, after market hours, confirmed that it was unlikely to seek an

11

EUA for NVX- CoV2373 in the U.S. until July 2021 at the earliest—*i.e.*, the third quarter of 2021. As a result of this news, ***Novavax's stock price fell 8.81% on May 10, 2021***, and, following the Company's confirmation, ***continued to fall an additional 13.91% on May 11, 2021***.

**ANSWER:** Defendants respectfully refer the Court to the May 10, 2021 *Washington Post* article, Novavax's public disclosures regarding EUA filing timelines, and publicly available information about the Company's stock price for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

19. Notably, knowing that Novavax shares would tumble with the announcement of any delay, some of the Individual Defendants decided to enrich themselves prior to announcing the delay to the public. For example, not long before announcing the EUA filing delay on May 10, 2021—an announcement that was certain to cause Novavax's stock price to plummet—in April 2021 (around the same time as one of the FDA inspections), Defendant Glenn cashed in over 8,000 shares for over $1.6 million in proceeds. Defendant Trizzino likewise sold over 3,000 shares on May 5 and May 7, 2021, just days before the announcement, to make nearly $600,000 in proceeds.

**ANSWER:** Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant John J. Trizzino's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny

12

any allegations inconsistent therewith. The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

### 1. Defendants Reassure Investors That Novavax Overcame the Problems That Caused the Regulatory Delay

20. Yet, despite delaying its regulatory filing, Defendants continued to reassure investors that Novavax had resolved the challenges that caused the regulatory delay. Indeed, Defendant Erck told investors that "***nearly all of the major challenges have been overcome*** and we can clearly see the light at the end of the tunnel." Defendant Erck similarly touted, with respect to solving the manufacturing problems: "***I'm happy to say we did. We've crossed that bridge. We're—we made a big breakthrough there and we're now racing towards validating everything and putting it into a package***."

**ANSWER:** Defendants respectfully refer the Court to Defendants' public disclosures and statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

21. Throughout the Class Period, Defendants continued assuring investors that any manufacturing problems were in the past through statements such as "***we've eliminated all of the serious hurdles to getting—risk hurdles to getting to where we need to be to get an improved vaccine***," "***we are well positioned with our technology and timing to supply product for boosting and seasonal revaccination***," and "***our trials proved that we are on the right***

13

*track*"—leading investors to believe there was nothing to worry about in terms of manufacturing problems.

**ANSWER:** Defendants respectfully refer the Court to Defendants' public disclosures and statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

22. The market bought Defendants' story. Indeed, in light of Defendants' continued reassurances, an analyst from Jefferies noted that Novavax's management "remains confident in their ability to execute" and that, "[w]hile [filings with the FDA] took longer than they initially expected, it appears they have everything close to being set now." Cantor Fitzgerald also reported that despite Novavax's update, "according to management, facilities in its network have demonstrated the ability to manufacture commercial scale GMP material." And H.C. Wainwright explained that "[w]e believe the company remains a solid player in the COVID-19 vaccine landscape and think concerns about a delay in regulatory filings and manufacturing challenges are only temporary setbacks."

**ANSWER:** Defendants respectfully refer the Court to the Jefferies, Cantor Fitzgerald, and H.C. Wainwright reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

23. However, as with the previous quarter, as a result of the underlying manufacturing problems related to purity, potency, contamination, scalability, and the supply

chain, on August 5, 2021, Novavax further delayed its EUA filing and reported that it expected to file for NVX- CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021. On that same day, Novavax disclosed, "[t]he U.S. government has recently instructed *the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made*." As a result of this news, *Novavax's stock price dropped 19.61% on August 6, 2021*. In response to this news, Seeking Alpha reported that the "news was a shocker for investors."

**ANSWER:** Defendants respectfully refer the Court to Novavax's statements on August 5, 2021; the Seeking Alpha report referenced in this Paragraph; and publicly available information about the Company's stock price for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

24. Once again knowing that the second delay would cause the stock to plummet, in July 2021, right before the Company's announcement of the delay—and *during the very month the Texas Facility was shut down* and being investigated by the FDA for contamination problems—*Defendant Erck sold over 100 thousand shares of Novavax stock worth over $22.5 million*. Similarly, Defendant Glenn sold over 8,000 shares in July 2021, resulting in over $1.5 million in proceeds.

15

**ANSWER:** Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Stanley C. Erck's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith. The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny the remaining allegations in this Paragraph.

> **2. Despite Consistently Delaying Novavax's EUA Filing Due to Manufacturing Problems, Defendants Again Reassure Investors That Such Problems Have Been Resolved**

25. Defendants continued to conceal the full truth regarding the underlying manufacturing problems mentioned above, and again reassured investors that "*[w]e appear to have got past (certain) supply issues and are now being able to produce at scale*" and that "*we've been extremely transparent across multiple fronts*." Notably, on September 29, 2021, Defendant Trizzino continued to assuage investors that some challenges that Novavax faced "*have now been resolved*."

**ANSWER:** Defendants respectfully refer the Court to Defendants' public statements and disclosures (including without limitation Defendant Trizzino's statements on September 29, 2021) for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

26. In light of Defendants' continued reassurances, analysts and the media remained optimistic. For example, despite finding that the delays were "less than ideal," Jefferies reported

16

that "[m]anufacturing appears to be on track w[ith] the [C]ompany reiterating plans to reach 100M doses/month and 150M doses/month by the end of Q3 and Q4, respectively." Similarly, Jefferies explained, "the risk associated w[ith] these filings has been significantly reduced and [management] remains very confident they will be able to file." Additionally, Seeking Alpha stated that "[w]hile [Novavax] announced a delay in submission to US FDA, it is still on track to achieve its previously planned manufacturing capacity for Q3 and Q4."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts or the media. Defendants respectfully refer the Court to the Jefferies and Seeking Alpha reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith.

### 3. The Truth About the Failed Vaccine Candidate Is Revealed to Investors

27. Despite Defendants' false assurances throughout the Class Period, the truth was finally revealed to investors on October 19, 2021, when a *Politico* article reported a laundry list of manufacturing delays that had been preventing, and would continue to prevent, Novavax from filing its EUA in time. Notably, the article explained that Novavax's "issues are more concerning than previously understood" and that *the Company could take until the end of 2022 to resolve its manufacturing problems and obtain the necessary regulatory authorizations and approvals*.

17

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

28. The *Politico* article revealed that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373. For instance, according to the article, the Company "has consistently run into production problems," including that "[t]he methods [Novavax] used to test the purity of the vaccine have fallen short of regulators' standards" and that a "person familiar with the [C]ompany's manufacturing process said Novavax has recently shown purity levels hovering around 70 percent"—still well below the 90% FDA requirement. Additionally, the article disclosed that Novavax was already aware of specific concerns with NVX-CoV2373's manufacturing process as U.S. officials had warned Novavax about issues related to meeting the FDA's rigorous quality standards once the vaccine went into mass production.

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

29. In response to this news, ***Novavax's stock price fell $23.69 per share, or 14.76%***, to close at $136.86 per share on October 20, 2021—further damaging investors. Additionally, *Politico* reported on October 20, 2021, that Novavax's issues were "worse than previously reported and could take several more months to set right."

18

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article and publicly available information about the Company's stock price for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

## II. JURISDICTION AND VENUE

30. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5(a), (b), and (c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

**ANSWER:** Defendants respectfully refer the Court to the statutes and regulations cited in this Paragraph for their true and complete content, and Defendants deny any allegations inconsistent therewith. Further, this Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

31. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

**ANSWER:** Defendants respectfully refer the Court to the statutes cited in this Paragraph for their true and complete content, and Defendants deny any allegations inconsistent therewith. Defendants admit that 28 U.S.C. §§ 1331 and 15 U.S.C. §§ 78aa confer subject matter jurisdiction on this Court and deny any remaining allegations in this Paragraph.

32. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Novavax's headquarters are located in this District, the

Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

**ANSWER:** Defendants respectfully refer the Court to the statutes cited in this Paragraph for their true and complete content, and Defendants deny any allegations inconsistent therewith. Defendants admit that Novavax maintains its corporate headquarters in Gaithersburg, Maryland. Defendants admit that, assuming the allegations in the Complaint to be true, venue is proper in the United States District Court for the District of Maryland. Defendants deny the remaining allegations in this Paragraph.

33. In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

### III. PARTIES

#### A. Lead Plaintiffs

34. Lead Plaintiff Jeffrey A. Gabbert ("Gabbert") was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 26, 2022. ECF No. 47. As set forth in his Certification previously filed with the Court on January 11, 2022 (ECF No. 26-7), Lead

Plaintiff Gabbert purchased Novavax common stock at artificially inflated prices during the Class Period.

**ANSWER:** Defendants respectfully refer the Court to ECF Nos. 47 and 26-7 for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

35. Lead Plaintiff Nuggehalli Balmukund Nandkumar ("Nandkumar") was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 26, 2022. ECF No. 47. As set forth in his Certification previously filed with the Court on January 11, 2022 (ECF No. 26-7), Lead Plaintiff Nandkumar purchased Novavax common stock at artificially inflated prices during the Class Period.

**ANSWER:** Defendants respectfully refer the Court to ECF Nos. 47 and 26-7 for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

36. Lead Plaintiff David Truong ("Truong") was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 26, 2022. ECF No. 47. As set forth in his Certification previously filed with the Court on January 11, 2022 (ECF No. 24-3), Lead Plaintiff Truong purchased Novavax common stock at artificially inflated prices during the Class Period.

**ANSWER:** Defendants respectfully refer the Court to ECF Nos. 47 and 24-3 for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

## B. Defendants

### 1. Corporate Defendant

37. Defendant Novavax is a biotechnology company that focuses on the discovery, development, and commercialization of vaccines to prevent serious infectious diseases and address urgent global health needs. To date, Novavax has never brought a successful candidate to market. Novavax is incorporated under the laws of Delaware with its principal executive offices located at 21 Firstfield Road, Gaithersburg, Maryland 20878. Novavax's common stock trades on the NASDAQ exchange under the symbol "NVAX."

**ANSWER:** Defendants admit that Novavax is a biotechnology company that focuses on the discovery, development, and commercialization of vaccines; that Novavax is incorporated under the laws of Delaware with its principal executive offices located at 21 Firstfield Road, Gaithersburg, Maryland 20878; and that Novavax's common stock trades on the NASDAQ exchange under the symbol "NVAX." Defendants deny any remaining allegations in this Paragraph. Defendants specifically deny that Novavax has never brought a vaccine to market.

### 2. Individual Defendants

38. Defendant Stanley C. Erck ("Erck") has served as the Company's President and Chief Executive Officer since April 2011 and as a member of the Company's Board of Directors since June 2009. In his role as President and CEO of Novavax, Defendant Erck participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the Company's ability to

22

manufacture the NVX-CoV2373 vaccine in conformance with FDA and cGMP requirements. Defendant Erck also sold 197,008 shares of Novavax stock during the Class Period for proceeds of $38,672,789. In addition, during the Class Period, 3,162 shares of Erck's Novavax stock, worth $784,682, were withheld by the Company to pay for his personal taxes or the exercise price in connection with Company-issued stock.

**ANSWER:** Defendants admit that Defendant Erck has served as Novavax's President and Chief Executive Officer since approximately April 2011 and as a member of the Company's Board of Directors since approximately June 2009. Defendants admit that Erck has participated in earnings calls and conferences with securities analysts in his role as President and CEO of Novavax. Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Stanley C. Erck's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

39. Defendant Gregory F. Covino ("Covino") served as Novavax's Chief Financial Officer ("CFO"), Treasurer, and an Executive Vice President ("EVP") of the Company from November 16, 2020 until April 12, 2021.

**ANSWER:** The Court has dismissed the claims against Defendant Covino, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants admit that Defendant Covino served as Novavax's

CFO, Treasurer, and EVP from approximately November 2020 until April 2021, and Defendants deny any remaining allegations in this Paragraph.

40. Defendant John J. Trizzino ("Trizzino") served as Novavax's Interim CFO from April 12, 2021 to August 16, 2021. Trizzino also serves as the Company's Chief Commercial Officer, Chief Business Officer, and an EVP of the Company. Defendant Trizzino participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the Company's ability to manufacture the NVX-CoV2373 vaccine in conformance with FDA and cGMP requirements. Defendant Trizzino also sold 54,635 shares of Novavax stock during the Class Period for proceeds of more than $12,013,325. In addition, during the Class Period, 2,691 shares of Trizzino's Novavax stock, worth $601,692, were withheld by the Company to pay for his personal taxes or the exercise price in connection with Company-issued stock.

**ANSWER:** Defendants admit that Defendant Trizzino was Novavax's Interim CFO and that he serves as Novavax's Chief Commercial Officer, Chief Business Officer, and EVP. Defendants admit that Defendant Trizzino has participated in earnings calls and conferences with securities analysts. Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant John J. Trizzino's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

41.     Defendant Gregory M. Glenn ("Glenn") has served as Novavax's President, Research and Development since March 2016. On February 24, 2021, Defendant Glenn participated in an interview with *The Washington Post* to discuss Novavax's regulatory timeline for its EUA and Novavax's progress thus far in meeting FDA requirements, during which he made false and misleading statements and omissions of material fact relating to the Company's ability to manufacture the NVX-CoV2373 vaccine in conformance with FDA and cGMP requirements. Defendant Glenn also sold 77,862 shares of Novavax stock during the Class Period for proceeds of more than $14,508,912. In addition, during the Class Period, 14,106 shares of Glenn's Novavax stock, worth $2,703,649, were withheld by the Company to pay for his personal taxes or the exercise price in connection with Company-issued stock.

**ANSWER:**     The Court has dismissed the claims against Defendant Glenn and the claims related to the statements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants admit that Defendant Glenn has served as Novavax's President of Research and Development; Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Gregory M. Glenn's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in this Paragraph.

42.     Defendants Erck, Covino, Trizzino, and Glenn are referred to herein as the "Individual Defendants." Defendant Novavax and the Individual Defendants are referred to herein, collectively, as "Defendants."

**ANSWER:**     The allegations contained in this Paragraph require no response.  The Court has dismissed the claims against Defendants Covino and Glenn and the allegations in this Paragraph related to such Defendants thus require no response.  To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

### 3.     Relevant Third Parties[2]

43.     **Confidential Witness ("CW") 1** worked for Novavax from December 2020 to August 2021 as a Manager - Regulatory Affairs CMC (Chemistry, Manufacturing and Controls). CW 1 worked remotely from the Washington, D.C. area. She reported to Senior Director - Regulatory Affairs CMC Jannine Haberman Cobb, who ultimately reported to Director - Regulatory Affairs Kathleen Callahan. Callahan reported to Senior Vice President/Chief Regulatory and Quality Officer Henrietta Ukwu. At Novavax, CW 1 helped manage manufacturing sites contracted by Novavax to produce its Covid-19 vaccine. Further, as part of her role on the Regulatory Affairs CMC team, CW 1 helped Novavax put together documents containing information from the Company's manufacturing sites that was then submitted to the FDA in the form of Module 3 Quality reports. CW 1 explained that the FDA

---

[2] All Confidential Witnesses are referred to with female pronouns, regardless of gender, to protect their identity.

26

communicated concerns about the stability of Novavax's vaccine batches one or two times, possibly in December 2020 and then again in March 2021.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the Complaint's descriptions of the anonymous Confidential Witness ("CW") 1.  Defendants deny the allegations the Complaint purports to attribute to CW 1 in this Paragraph.  Defendants deny any remaining allegations in this Paragraph.

44.     **CW 2** worked at Novavax from January 2021 until October 2021 as a Medical and Communications Publications Specialist. She reported to Director - Medical Communications and Publications Betsy Kitchens, who reported to Vice President - Clinical Development, Coronavirus Vaccines Seth Toback. Toback reported to Chief Medical Officer Filip Dubovsky. CW 2 explained that her role was part of a "new and small team called Medical Affairs" that Novavax created as it began ramping up its "production headcounts to prepare to produce the [Covid-19] vaccine." The Medical Affairs team had about five or six people when CW 2 joined but grew to about 11-12 members. CW 2's role was to create scientific materials and supporting publications for primary manuscripts and secondary manuscripts for the ongoing clinical trials. She explained that whenever Novavax produced data to present, the Medical Affairs team worked on publications and submitted to peer-reviewed journals.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the Complaint's descriptions of the anonymous CW 2.  Defendants deny the allegations the

27

Complaint purports to attribute to CW 2 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

45. **CW 3** worked at Novavax from November 2020 until April 2021 as a Laboratory Technician. She worked out of a facility in Gaithersburg, Maryland. CW 3 conducted product improvement testing that the Company planned to use in later phases of its Covid-19 vaccine manufacturing process. Her role also involved tasks such as cleaning, tidying and organizing, along with conducting experiments. According to CW 3, the work she did was all about improving the quality of the product and making sure the Laboratory Technicians were using the products made to their highest efficiency and to have the products be as concentrated as possible so that when the product was used it would be used as efficiently as possible. CW 3 further explained that the testing was designed to achieve the "most purity" and to determine "how to get higher purity at different filtration levels." She also explained that part of her work was to improve the processing as they were finding when they were making the vaccine that there were a lot of waste products.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the Complaint's descriptions of the anonymous CW 3. Defendants deny the allegations the Complaint purports to attribute to CW 3 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

46. **CW 4** worked at Novavax from July 2020 to October 2021 as a Senior Director - Clinical Operations, a role that involved overseeing the company's U.K. clinical trials for its

28

Covid-19 vaccine. CW 4 reported to Vice President - Clinical Operations Patty Reed, who reported to Chief Medical Officer Filip Dubovsky. CW 4 explained that Reed managed Novavax's Operation Warp Speed group. According to CW 4, Novavax struggled to produce enough proper vaccine doses for several different clinical trials, including about 4,000 doses needed for three smaller clinical trials in 2021, causing the trials to be delayed. In regard to the reasons for the delay in producing enough proper vaccine doses for the clinical trials, CW 4 said she was told that the Company was "delayed in manufacturing" due to issues with "lesser potency" and "stability" of the vaccines. CW 4 explained that these delays were experienced by those at Novavax working on Operation Warp Speed in the United States. She further stated that there were issues with the potency of vaccines "off and on" throughout 2021.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the Complaint's descriptions of the anonymous CW 4. Defendants deny the allegations the Complaint purports to attribute to CW 4 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

47. **CW 5** was formerly employed by FUJIFILM at the company's College Station, Texas location from September 2020 to October 2021 as Head of Technical Operations, Gene Therapy. CW 5 reported to current Senior Director - Gene Therapy and Vaccines, Eric Dul. CW 5 advised that in this role she ran technical operations that supported manufacturing at two of the three centers at the College Station location, and that one of these was the center used for manufacturing Novavax's Covid-19 vaccine, and the other was used for gene therapy. She

29

further advised that her responsibilities also included oversight of the processes, equipment, engineers, compliance coordinators, and low-level mediation at those two centers. CW 5 explained that quality checks on vaccine manufacturing were conducted every 24 to 48 hours, adding that she and CW 6 communicated with the two onsite Novavax employees "every single day" regarding manufacturing and the results of quality checks. CW 5 added that due to the rush to get the vaccine to market, FUJIFILM hired many new employees who had little or no previous vaccine manufacturing experience, which was at least partly responsible for those delays. She also recalled four contamination incidents that led to delays in manufacturing that started between December 2020 and March 2021. According to CW 5, the first three were due to bacterial contaminations, or deviations, and the fourth and significantly more serious one was a viral contamination that was discovered on March 18, 2021, which caused a shutdown in manufacturing from then until around September 2021. CW 5 explained that Novavax employees and the FDA were notified about each of the contaminations.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the Complaint's descriptions of CW 5 and of a third-party vendor's business. Defendants deny the allegations the Complaint purports to attribute to CW 5 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

48. **CW 6** was formerly employed by FUJIFILM at the company's College Station, Texas location from July 2020 to June 30, 2021 as Director of Manufacturing, and her previous title was Manager Upstream Manufacturing from September 2018 to July 2020. CW 6 worked

30

on the manufacturing of vaccines while at FUJIFILM, including Novavax's Covid-19 vaccine. CW 6 recalled that there were two delays in manufacturing the Novavax Covid-19 vaccine due to contaminations that occurred in December 2020 or January 2021 and around late April 2021. She further recalled that these delays occurred because of contaminations that occurred in the upstream part of the process. CW 6 further recalled that the resumption of manufacturing—that had been shut down due to the April 2021 contamination—kept getting pushed back and that it had still not restarted by the time her tenure ended on June 30, 2021. CW 6 also recalled that Novavax "knew everything that we were doing."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the Complaint's descriptions of CW 6 and of a third-party vendor's business. Defendants deny the allegations the Complaint purports to attribute to CW 6 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

49. **CW 7** was formerly employed by FUJIFILM from January 2013 through November 2021 at the North Carolina Facility and was based in Durham, North Carolina. She worked as a Manager, QA (Ops. & Quality Life Cycle Management), and her responsibilities included quality assurance, as well as to ensure that projects were adhering to FDA regulations and internal procedures. CW 7 explained that FUJIFILM sometimes changed the vaccine manufacturing materials given supply chain issues and Novavax would have to approve all the changes. CW 7 recalled that Novavax had teams of people from departments including quality and technical who were involved in any modifications. CW 7 also recalled that the

31

contamination problems at the North Carolina Facility spanned the "whole gamut" of the project, referring to manufacturing Novavax's vaccine candidate, and said they were "always an issue." CW 7 further recalled that any problems were constantly communicated to Novavax, which had someone onsite at the North Carolina Facility weekly at a minimum.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the Complaint's descriptions of CW 7 and of a third-party vendor's business. Defendants deny the allegations the Complaint purports to attribute to CW 7 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

50. **CW 8** was formerly employed by FUJIFILM from February 2016 through January 2021. CW 8 worked as a Quality Control Analyst, and her primary responsibilities were reviewing test methods and serving as a liaison between the quality control group and analytical development group. CW 8 was based out of Morrisville, North Carolina and worked on Novavax's Covid-19 vaccine. CW 8 explained that the vaccine was being produced under an accelerated timeline, and FUJIFILM would have to alter their processes "almost constantly." For example, CW 8 further advised that because of the speed of the process, the quality control team once had to send the test methods used to test the product back to the analytical development team in order to include additional details. CW 8 explained that the lapses were the result of certain steps being skipped in favor of an accelerated production timeline. CW 8 added that early analysis steps were skipped or done concurrently rather than being done prior to the production phase.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the Complaint's descriptions of CW 8 and of a third-party vendor's business. Defendants deny the allegations the Complaint purports to attribute to CW 8 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

## IV. SUBSTANTIVE ALLEGATIONS OF FRAUD[3]

### A. Novavax's Business

#### 1. Novavax Prior to the Covid-19 Pandemic

51. Novavax, headquartered in Gaithersburg, Maryland, is a biotechnology company that focuses on the discovery, development, and commercialization of vaccines to prevent serious infectious diseases and address urgent global health needs. Today, the Company's product candidates include, among others, NVX-CoV2373, which is in development as a vaccine for Covid-19. But that was not always the case.

**ANSWER:** Defendants admit that Novavax maintains its corporate headquarters in Gaithersburg, Maryland. Defendants admit that Novavax is a biotechnology company that focuses on the discovery, development, and commercialization of vaccines to prevent serious infectious diseases and to address urgent global health needs. Defendants admit that Novavax has developed a COVID-19 vaccine called NVX-CoV2373 and was developing that vaccine at the time that the Complaint was filed. Defendants specifically deny that NVX-CoV2373 is currently a vaccine "candidate." Defendants deny any remaining allegations in this Paragraph.

---

[3] Unless otherwise noted, all references to Novavax's business and operations refer to events that occurred during the Class Period as defined herein.

52.     Novavax has historically focused on manufacturing vaccines for novel viruses and infections. For example, prior to Covid-19, the Company tried to develop vaccines for HIV, SARS, swine flu, and the Ebola virus. However, each of the vaccines either failed in testing or the epidemics ebbed, reducing the need for Novavax's vaccine candidates.

**ANSWER:**     Defendants admit that Novavax has focused on manufacturing vaccines for novel viruses and infections including HIV, SARS, swine flu, and the Ebola virus. Defendants deny any remaining allegations in this Paragraph.

53.     Prior to the Covid-19 pandemic, to avoid going out of business, Novavax sold all of its manufacturing facilities in 2019. At the beginning of 2020, there were only about 150 employees left at the Company. As of January 2020, Novavax had enough cash to survive only another six months, its shares traded under $4, with a market value of only $127 million, and it therefore risked being delisted from the NASDAQ stock exchange. But beginning in early 2020, the Covid-19 pandemic surfaced, providing Novavax with a golden opportunity to finally bring a vaccine to market and dig itself out of the financial ruin it had found itself in at that point.

**ANSWER:**     Defendants deny the allegations in this Paragraph.

2.      **Novavax Announces NVX-CoV2373 as a Possible Vaccine Candidate**

54.     On February 26, 2020, Novavax announced that it was developing a vaccine to protect against Covid-19. To support Novavax's efforts to develop a Covid-19 vaccine, the Coalition for Epidemic Preparedness Innovations ("CEPI") awarded Novavax initial funding of $4 million on March 10, 2020. And on April 8, 2020, Novavax announced that its coronavirus

34

vaccine candidate, NVX-CoV2373, which it claimed was a stable, prefusion protein made using Novavax's proprietary nanoparticle technology, would initiate a first-in-human trial in mid-May.

**ANSWER:** Defendants admit that Novavax announced that it was developing a COVID-19 vaccine on or about February 26, 2020. Defendants admit that the CEPI awarded Novavax $4 million in funding on or about March 10, 2020. Defendants admit that Novavax made an announcement regarding NVX-CoV2373 on or about April 8, 2020. Defendants respectfully refer the Court to the announcements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

55. NVX-CoV2373 was Novavax's ticket out of years and years of financial hardship and repeated failed attempts of bringing a drug to market. Indeed, the Company's future viability depended on the vaccine's success. For instance, one analyst, CFRA, even reported that "the main focus of the [C]ompany is on its NVX-CoV2373 vaccine candidate against Covid-19," and that "[w]e think the future financial success of [Novavax] and its ability to record a positive bottom-line result is highly dependent on successful approvals and rapid commercialization of its Covid- 19 vaccine."

**ANSWER:** Defendants respectfully refer the Court to CFRA's report for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

35

### 3. Novavax Contracts with the United States Government to Produce Millions of Doses for Americans

56.     In an effort to ramp up vaccine production in the United States, in April 2020, the government initiated Operation Warp Speed. Operation Warp Speed was designed to facilitate the development, manufacturing, and distribution of Covid-19 countermeasures. These projects were to be divided among components of the (i) Department of Health and Human Services, including the Centers for Disease Control and Prevention, FDA, the National Institutes of Health, and the Biomedical Advanced Research and Development Authority; (ii) the Department of Defense ("DoD"); (iii) private firms; and (iv) other federal agencies, including the Department of Agriculture, the Department of Energy, and the Department of Veterans Affairs.

**ANSWER:**     Defendants admit that the United States government administered a program called Operation Warp Speed.  Defendants lack knowledge or information sufficient to form a belief as to the government's initiation or structuring of Operation Warp Speed, as alleged in this Paragraph.

57.     On June 4, 2020, Novavax entered into a contract with the DoD for the manufacture of NVX-CoV2373. With funding provided by the Defense Health Program, the government agreed to fund up to $60 million to support Novavax in its production of several components of the vaccine in the United States. According to the DoD contract, Novavax was required to "establish within the United States large scale production" of one of NVX-CoV2373's major components. The DoD contract similarly required Novavax to "establish a

36

production capability within the United States" for that same component. The terms of the agreement further demanded Novavax to deliver 10 million doses of NVX-CoV2373 to the DoD by December 2020 so long as the vaccine was approved by the FDA.

**ANSWER:** Defendants admit that on or about June 4, 2020, Novavax entered into a contract with the DoD for the manufacture of NVX-CoV2373. Defendants respectfully refer the Court to Novavax's contract with the United States for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

58. Then, on July 7, 2020, Novavax chose to join Operation Warp Speed. As a result, the government awarded Novavax $1.6 billion to complete late-stage clinical development, including a Phase 3 clinical trial; establish large-scale manufacturing; and deliver 100 million doses of NVX-CoV2373 as early as the end of 2020. As part of the agreement, Novavax was required to demonstrate that it could rapidly set up large-scale manufacturing and transition into ongoing production, including the capability to stockpile and distribute large quantities of NVX-CoV2373 when needed.

**ANSWER:** Defendants admit that on or about July 7, 2020, Novavax was selected to participate in Operation Warp Speed. Defendants respectfully refer the Court to Novavax's contract with the United States government for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

37

**B.      Novavax Continues Developing NVX-CoV2373 and Partners with FUJIFILM Diosynth Biotechnologies**

59.      Because the Company did not have manufacturing facilities of its own, Novavax entered into partnerships with companies to manufacture and produce its vaccine under Novavax's direction. For example, on July 23, 2020, Novavax contracted with FUJIFILM to manufacture bulk drug substance for NVX-CoV2373 at the Texas Facility and North Carolina Facility.[4]

**ANSWER:**    Defendants admit that Novavax entered into partnerships with companies (including FUJIFILM) to manufacture certain components of NVX-Cov2373.  Defendants deny the remaining allegations in this Paragraph.

60.      The Texas Facility and North Carolina Facility were critical to Novavax's development of NVX-CoV2373, and thus the Company's success. For example, on February 19, 2021, Defendant Trizzino himself provided testimony in the form of a report to the Subcommittee on Oversight and Investigations, U.S. House of Representatives, Committee on Energy and Commerce to discuss Novavax's development of and U.S. manufacturing operations for NVX- CoV2373. In that report, Defendant Trizzino stated that the "antigen produced at the Fuji sites in North Carolina and Texas are a critical component of our US supply chain." Likewise, FUJIFILM CEO Martin Meeson referred to FUJIFILM as "a critical partner to Novavax."

---

[4] The Texas and North Carolina Facilities are FUJIFILM's two U.S.-based manufacturing facilities and were the only two manufacturing facilities in the United States that were producing the antigen component of NVX-CoV2373—a necessary component for producing any vaccine.

**ANSWER:** Defendants respectfully refer the Court to Defendant Trizzino's report to the House Subcommittee and to FUJIFILM CEO Martin Meeson's comments for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

61. During the same time as Novavax's rapid expansion, the FDA granted Fast Track Designation for NVX-CoV2373, "reflect[ing] the urgent need for a safe and effective vaccine to prevent COVID-19," as Defendant Glenn explained in Novavax's November 9, 2020 press release. According to the FDA, Fast Track is a process designed to facilitate the development, and to expedite the review of, drugs to treat serious conditions and fill an unmet medical need. The purpose is to get important new drugs to the patient earlier.

**ANSWER:** Defendants respectfully refer the Court to Novavax's November 9, 2020 press release and the FDA's published guidance regarding Fast Track designation for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

62. Shortly thereafter, on February 4, 2021, Novavax announced that it had begun the rolling review process for authorization of NVX-CoV2373 by multiple regulatory agencies. Novavax explained that the "reviews will continue while the [C]ompany completes its pivotal Phase 3 trials in the United Kingdom (U.K.) and United States (U.S.) and through initial authorization for emergency use granted under country-specific regulations." As part of the rolling review, Novavax explained that it would continue to submit additional information,

including clinical and manufacturing data, to the agencies. That same month, Novavax announced the complete enrollment of PREVENT-19, its pivotal Phase 3 study in the United States and Mexico to evaluate the efficacy, safety, and immunogenicity of NVX-CoV2373.[5]

**ANSWER:** Defendants respectfully refer the Court to Novavax's February 2021 announcements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

## C.     Novavax Was Required to Comply with Strict FDA Regulations

63.     At every step of the development and manufacturing processes, Novavax was required to meet strict FDA standards including FDA cGMP. Indeed, Novavax's June 4, 2020 contract with the U.S. government specifically states that Novavax "shall manufacture enough bulk drug substance to produce ten million doses of vaccine drug product, *all under current Good Manufacturing Practices* and compatible with use in a late stage development clinical evaluation or Emergency Use Authorization." The contract similarly requires that Novavax "*shall ensure all quality control/assurance adhere to phase appropriate [current] Good*

---

[5] PREVENT-19—which is being conducted with support from the U.S. government partnership, i.e., Operation Warp Speed—is a randomized, placebo-controlled, observer-blinded study to evaluate the efficacy, safety and immunogenicity of NVX-CoV2373 with Matrix-M in up to 30,000 subjects 18 years of age and older compared with placebo. Two thirds of the participants are assigned to randomly receive two intramuscular injections of the vaccine, administered 21 days apart, while one third of the trial participants receive placebo. Trial sites were also selected in locations where transmission rates were high to accelerate the accumulation of positive cases that could show efficacy. PREVENT-19 stands for PRE-fusion protein subunit Vaccine Efficacy Novavax Trial COVID-19.

40

*Manufacturing Practices[] to ensure product quality and availability for use of the doses produced*."[6]

**ANSWER:** Defendants respectfully refer the Court to Novavax's contract with the United States government for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

64. cGMP is a set of regulations enforced by the FDA, which provide for systems that assure proper design, monitoring, and control of manufacturing processes and facilities. Adherence to the cGMP regulations assures the identity, strength, quality, and purity of drug products by requiring that manufacturers of medications adequately control manufacturing operations.

**ANSWER:** Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. §§ 210 and 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

---

[6] Likewise, according to Attachment A, Statement of Work, for an agreement between the U.S. government and Novavax entitled, "Rapid (WF10) Advanced Research & Development to Large Scale Manufacturing of NVX-CoV-2373 as a Vaccine for SARS-CoV-2 Coronavirus," one of the manufacturing requirements was for the "[e]stablishment of large-scale current Good Manufacturing Practice (cGMP) manufacturing capacity compliant with 21 CFR Parts 210 and 211."

65.     Specifically, cGMP regulations require companies manufacturing and preparing drug products for administration to humans—such as Novavax—to establish a "quality control unit that shall have the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated." 21 C.F.R. §§ 211.1(a) and 211.22(a) (2022); *see also* 21 C.F.R. § 210.1 (2022).

**ANSWER:**     Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. §§ 210 and 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith.   Defendants deny any remaining allegations in this Paragraph.

66.     FDA regulations state that the "quality control unit shall be responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company." 21 C.F.R. § 211.22(a). The quality control unit also has "the responsibility for approving or rejecting all procedures or specifications impacting on the identity, strength, quality, and purity of the drug product." 21 C.F.R. § 211.22(c).

**ANSWER:**     Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. § 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith.

42

67.    Novavax was thus required to comply with the FDA's cGMP regulations, regardless of whether it developed and manufactured NVX-CoV2373 in-house at its own facilities or at its partners' facilities. Additionally, according to such cGMP regulations, Novavax was required to—and did—maintain direct involvement in the manufacturing process taking place in its partners' facilities, stay apprised of issues that develop in such facilities, and even advise on overall solutions to such issues.

**ANSWER:**    Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. §§ 210 and 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith.   Defendants deny any remaining allegations in this Paragraph.

68.    According to the Director of Manufacturing at the Texas Facility, CW 6, Novavax had quality control employees and/or consultants onsite at the Texas Facility. CW 6 also recalled that other Novavax employees periodically visited the site, too. Head of Technical Operations, Gene Therapy, CW 5, similarly stated that Novavax had several employees and/or consultants on site, whom CW 5 identified as Technology Transfer Engineer Patrick Hash and Contractor Elizabeth Wang ("Novavax's Onsite Employees"). Indeed, CW 5 explained that CW 5 and CW 6 communicated with the Novavax's Onsite Employees "every single day" regarding manufacturing and the results of quality checks. CW 5 recalled that quality checks on vaccine manufacturing were conducted every 24 to 48 hours.

**ANSWER:**    Defendants deny the allegations in this Paragraph.

43

69.     For example, as explained in more detail below, CW 5 recalled that Novavax's Onsite Employees were notified about each contamination issue that occurred at the Texas Facility throughout the Class Period. In fact, CW 5 further recalled that one of Novavax's Onsite Employees, Mr. Hash, was also involved in the investigations into the contaminations. CW 5 recalled that there were phone calls and emails about contaminations and delays from Mr. Hash to Novavax headquarters, including Novavax's Quality Assurance department. Further, according to CW 6, Novavax's Onsite Employees and others at Novavax's headquarters "knew everything that we were doing." CW 6 added that Novavax's Onsite Employees were on the Texas Facility's manufacturing floor during "all critical processes."

**ANSWER:**     Defendants deny the allegations in this Paragraph.

70.     Similarly—and with respect to a particular viral contamination that occurred in March 2021 and ultimately shut down the Texas Facility's manufacturing processes until September 2021—CW 5 confirmed that every detail to do with the viral contamination was "communicated to" Novavax's Onsite Employees as the discovery and investigation progressed, along with daily calls with Novavax personnel in Novavax's headquarters in Maryland.

**ANSWER:**     Defendants deny the allegations in this Paragraph.

71.     cGMP regulations further require companies such as Novavax to establish procedures "to assure that the responsible officials of the firm, if they are not personally involved in or immediately aware of such actions, are notified in writing of any investigations

44

conducted under §§ 211.198, 211.204, or 211.208 of these regulations, any recalls, reports of inspectional observations issued by the [FDA], or any regulatory actions relating to good manufacturing practices brought by the [FDA]." 21 C.F.R. § 211.180(f). For example, with respect to Section 211.198, cGMP regulations require companies to establish written procedures with respect to all drug product complaints, which "shall include provisions for review by the quality control unit, of any complaint involving the possible failure of a drug product to meet any of its specifications." 21 C.F.R. § 211.198(a).

**ANSWER:** Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. § 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith.

72. Moreover, cGMP regulations require companies to maintain laboratory records that "shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays," including a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a), (a)(6).

**ANSWER:** Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. § 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith.

45

73. cGMP regulations also require companies to maintain and follow written procedures "designed to prevent objectionable microorganisms in drug products," and that are "designed to prevent the contamination of equipment, components, drug product containers, closures, packaging, labeling materials, or drug products." 21 C.F.R. § 211.113; 21 C.F.R. § 211.56(c).

**ANSWER:** Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. § 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith.

**D.** **Undisclosed Manufacturing Problems Were Causing Delays—Preventing Novavax from Timely Filing Its EUA with the FDA**

74. Throughout the Class Period, and unbeknownst to investors, Novavax consistently ran into manufacturing and production problems, which included: (a) both the Texas and North Carolina Facilities experiencing repeated contamination outbreaks; (b) Novavax failing to meet certain FDA quality standards for purity and potency levels for its vaccine; (c) failing to successfully scale up production; and (d) experiencing supply chain disruptions—all of which caused repeated delays in Novavax filing its EUA.

**ANSWER:** Defendants deny the allegations in this Paragraph.

1. **Sources Within Novavax Confirm That the Manufacturing Problems Were Causing Delays**

    (a) **Rampant Contamination Events Repeatedly Set Back Production at the Texas and North Carolina Facilities**

75. Throughout the Class Period, Novavax experienced repeated contamination outbreaks in critical facilities that were manufacturing NVX-CoV2373, which led to numerous FDA inspections and lengthy delays in order to rectify the contamination issues. CW 5 recalled multiple incidents of contamination in the Texas Facility since December 2020, and CW 6 similarly recalled contamination in the Texas Facility since either December 2020 or January 2021. Specifically, CW 5 recalled four contamination incidents that led to delays in manufacturing that started between December 2020 and March 2021 (the latter ultimately shut down the manufacturing processes until at least September 2021).

**ANSWER:** Defendants deny the allegations the Complaint purports to attribute to CWs 5 and 6 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

76. CW 5 recalled that the first contamination incident occurred in December 2020. CW 5 further recalled that the next incident followed about two or three months later, *i.e.*, in February 2021 or March 2021. CW 5 explained that when each contamination was discovered, the investigation into finding the source of those contaminations began with shutting down development and interviewing the staff involved in the manufacturing process.

**ANSWER:** Defendants deny the allegations in this Paragraph.

77. According to CW 5, the first three contamination incidents were caused by bacterial contaminations, or deviations. Regarding the three bacterial contaminations, CW 5

47

described the first one as involving a "human factor," as an employee failed to follow proper procedures, and the next one related to the re-use of blades that were supposed to be only used one time.[7] Regarding the first contamination, which occurred in December 2020 and occurred in the upstream process, CW 5 recalled that the investigation revealed that one of the staff took it upon him or herself to remove a bag (somewhere along the process), drain it, and then reattached it when the bag should have been discarded and replaced with a new one. CW 5 further advised that the other three contaminations also occurred in the upstream part of the process.[8]

       **ANSWER:**    Defendants deny the allegations in this Paragraph.

78.     CW 5 explained that the next bacterial contamination occurred two or three months later when it was discovered that a blade was used multiple times, when these blades were meant to be one-offs, or used only once and then discarded according to standard operating procedure ("SOP"). CW 5 also recalled that there were difficulties in acquiring the necessary number of different components used in the manufacturing process due to global supply chain

---

[7] CW 5 further advised that blades are heated up and used to connect two bags via various plastic tubes hanging from the bags.

[8] According to CW 5, all of the contaminations were occurring in the upstream process. CW 5 explained that, generally, the upstream process includes creating and building up the quantity of cells—cell growth and vaccine quantity. CW 5 explained that the downstream, or purity, process included purifying what had been created in the upstream process. CW 5 further explained that contamination in the upstream process usually reveals itself within 24 to 48 hours of it occurring and can often be revealed by a strong and unpleasant odor alone.

issues, and CW 5 recalled this including a lack of these blades. CW 5 assumed that the reusing of these blades had been going on for "several" weeks before it had been discovered.

**ANSWER:** Defendants deny the allegations in this Paragraph.

79. CW 6 recalled that one contamination occurred due to a leak in a bag used as part of a bioreactor, and that there were one or two other bacterial contaminations. CW 6 further recalled that these delays occurred because of contaminations that occurred in the upstream part of the process.

**ANSWER:** Defendants deny the allegations in this Paragraph.

80. Similarly, according to CW 7, contamination also existed at the North Carolina Facility during her tenure (which encompassed the entire Class Period) in the upstream process, which required FUJIFILM to discard the batch, ending the process. Furthermore, in discussing certain contamination issues that persisted at CW 5's facility throughout the Class Period, CW 5 also explained that depending upon where a contamination occurs in the process, the process may have to start back at step one again. As CW 5 explained, they would need to "dump the run . . . game over."

**ANSWER:** Defendants deny the allegations in this Paragraph.

81. The repeated contamination events at both the Texas and North Carolina Facilities had an adverse impact on the vaccine's purity levels. Prior to and during the Class Period, Novavax's repeated contamination events prevented the Company from achieving the

49

levels of purity and potency required by the FDA and thus significantly delayed its EUA submission.

**ANSWER:** Defendants deny the allegations in this Paragraph.

**(b)**     **NVX-CoV2373 Failed to Meet FDA Purity and Potency Standards Which Delayed the EUA Filing**

82.     Throughout the Class Period, Novavax was unable to achieve certain purity and potency criteria required by the FDA, which prevented Novavax from filing its EUA. According to *Politico* articles published on October 19, 2021 and October 29, 2021, which cited the statements of multiple U.S. government officials and other individuals with direct knowledge of Novavax's manufacturing problems during the Class Period, by the end of the Class Period in October 2021, Novavax was only able to achieve approximately a 70% level of purity—far below the 90% required by the FDA—with some batches of vaccines containing purity levels of as low as 30%. The October 29, 2021 *Politico* article quoted one former U.S. government official who stated that "[f]or weeks and weeks and weeks the team assigned to Novavax would come back, and they'd always be talking about lack of purity . . . it got to be a little bit tedious"— referring to a team of Operation Warp Speed officials working with Novavax. The October 19, 2021 article further quoted individuals stating that Novavax "rushed the process," and that "the efficacy [of the vaccine] was never going to outweigh the risk associated with the impurity that was in there."

**ANSWER:** Defendants respectfully refer the Court to the *Politico* articles published on October 19, 2021 and October 29, 2021 for their true and complete contents, and Defendants

deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

83. Novavax's critical problems with purity issues are corroborated by CWs who worked directly on Novavax's vaccine candidate; these CWs confirmed that the purity issues delayed the filing of Novavax's EUA. For instance, CW 3, who ensured the products at Novavax were used efficiently and to also test them for purity, explained that Novavax experienced delays in sourcing raw materials "that did slow down our work."

**ANSWER:** Defendants deny the allegations the Complaint purports to attribute to CW 3 and other, unspecified CWs in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

84. Novavax was also unable to maintain the proper level of potency, which further delayed the regulatory process. For example, CW 4 recalled that the Company was "delayed in manufacturing" due to issues with "lesser potency" and "stability" of the vaccines. CW 4 provided the following hypothetical: "Manufacturing a vaccine is like baking a cake. You have a recipe for a cake, but you have to do it consistently. And if you start jumping around to manufacturers, when you change them, they have to make the cake the same way If they are off, then you have an issue. That can affect potency, stability. That was coming into play."

**ANSWER:** Defendants deny the allegations the Complaint purports to attribute to CW 4 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

51

85.    CW 4 recalled that the issues with potency of vaccines occurred "off and on" throughout 2021. CW 4 learned about the manufacturing problems—including with potency and stability—causing the delays when these issues were presented to a "broad group" at Novavax that included Reed and Dubovsky, as well as "everyone" who reported to Dubovsky to discuss their own respective studies. CW 4 further explained that also on the calls were people from Quality Assurance, Regulatory, and other departments. CW 4 also recounted that she learned about the delays in filing for the EUA during internal Novavax meetings.

**ANSWER:**    Defendants deny the allegations in this Paragraph.

### (c)    Novavax Failed to Successfully Scale Up Production

86.    As a result of some of these issues, Novavax was also unable to produce enough viable doses to use for clinical trials of NVX-CoV2373. Novavax's inability to scale up NVX-CoV2373 production also contributed to delays in filing its EUA with the FDA. For example, CW 2, who was part of Novavax's Medical Affairs team, explained that she learned from colleagues that the Company was not efficient at producing vaccines at a scale that would be needed for mass production. CW 2 further explained that "we saw these delays over and over, and employees at Novavax [were] also frustrated."

**ANSWER:**    Defendants deny the allegations the Complaint purports to attribute to CW 2 in this Paragraph.  Defendants deny any remaining allegations in this Paragraph.

87.    For example, CW 4 recalled that Novavax struggled to produce enough proper vaccine doses for several different clinical trials, including about 4,000 doses needed for three smaller clinical trials in 2021, causing the trials to be delayed. CW 4 explained that in addition

to the initial clinical trials Novavax conducted in the U.K. and the U.S. (which involved 15,000 and 30,000 subjects, respectively, requiring two doses for each subject), the Company wanted to start additional trials as new Covid-19 variants surfaced.

**ANSWER:** Defendants deny the allegations in this Paragraph.

88. CW 4 further explained that there were at least two other studies that were being planned, adding that the studies were "delayed" and then scheduled to begin after October 2021. To this end, CW 4 stated: "Why am I seeing on the news that you're promising umpteen million doses and we can't secure 3,000 doses" for clinical trials. CW 4 explained that she learned about the shortage of vaccine doses for clinical trials from Associate Director - Clinical Supplies, Patrick Newingham. CW 4 said that she and her colleagues would inform Newingham that they needed a certain number of doses for the clinical trials.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 4 and as to what CW 4 knew or did not know or from where or how CW 4 learned any alleged information. Defendants deny the remaining allegations in this Paragraph.

89. Notably, CW 4 explained that if there were issues in getting a trial started, those problems would be brought to Filip Dubovsky and Defendant Erck. CW 4's understanding of how such information would have flowed up the chain of command at Novavax was that manufacturing issues were brought to Dubovsky's attention, that Dubovsky would have discussed it with Defendant Erck who in turn would have discussed it with Defendant Glenn,

53

and that Defendant Erck—or sometimes Defendant Glenn—had to bring it to the attention of Novavax's Board of Directors.

**ANSWER:** Defendants deny the allegations the Complaint purports to attribute to CW 4 in this Paragraph. The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

90.     CW 5 explained that due to the rush to get the vaccine to market, FUJIFILM hired many new employees who had little or no previous vaccine manufacturing experience, which was at least partly responsible for those delays. Likewise, as CW 1 explained, departments, such as Operations, were focused on "wanting to push it out," referring to the vaccine, and asked the Regulatory Affairs department: "'What can we do to get done faster?'" CW 1—who worked as a Manager, Regulatory Affairs CMC at Novavax and helped manage manufacturing sites contracted by Novavax to produce its Covid-19 vaccine—was surprised by the Company's goal of producing two billion doses annually by mid-2021, and further expressed skepticism that Novavax would be able to do that, explaining that Novavax would have had to partner with everyone—meaning everyone in the biomedical manufacturing industry—if it were to meet that goal.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the hiring patterns or business strategies or decisions of third-party vendor FUJIFILM.

54

Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 1 and as to CW 1's alleged reactions to any Company announcements or strategies. Defendants deny the remaining allegations in this Paragraph.

91. Additionally, the rush to develop and manufacture NVX-CoV2373 led Novavax to cut corners, which along with inadequate planning caused further delays. As CW 4 stated, "Novavax being small themselves and having to grow very quickly, I don't know if they were very prepared for this." CW 4 elaborated, recalling that when CW 4 arrived at Novavax, the Company kept a table or spreadsheet showing the various "lots" of the vaccine that were available, "what we can provide" for trials, and "what we have left." But CW 4 explained that this table then "went away," and that "it just felt like studies were falling from the sky but with no plan behind it." CW 4 further recalled that Novavax did not have a "clinical development plan,"[9] which she explained is typically needed.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 4. Defendants deny the remaining allegations in this Paragraph.

92. Moreover, CW 8 recalled that, during her tenure, the vaccine was being produced under an accelerated timeline, and FUJIFILM would have to alter its processes "almost

---

[9] One definition of a Clinical Development Plan is the blueprint of the entire clinical research strategy of a drug, which defines the critical path for the clinical program including development assessment and decision points and the project resource (personnel and budget) estimates.

constantly." For example, CW 8 explained that because of the speed of the process, the quality control team once had to send the test methods used to test the product back to the analytical development team in order to include additional details. CW 8 further explained that the lapses were the result of certain steps being skipped in favor of an accelerated production timeline. CW 8 added that early analysis steps were skipped or done concurrently rather than being done prior to the production phase.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 8. Defendants deny the remaining allegations in this Paragraph.

### (d) Novavax Experienced Supply Chain Disruptions

93. Additionally, Novavax's supply chain constraints created further delays in its attempt to file its EUA with the FDA. For example, CW 6 explained that supply chain issues, such as domestic supply constraints and difficulty obtaining certain materials, "were always a struggle." CW 6 further explained that the U.S. government helped to get Novavax and FUJIFILM supplies to produce the Covid-19 vaccine, but CW 6 reiterated that these supply chain issues were "an ongoing issue."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 6. Defendants deny the allegations the Complaint purports to attribute to CW 6 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

94.     Similarly, CW 7—who worked at the North Carolina Facility as a Manager, Quality Assurance—explained that Novavax had difficulty procuring the components necessary to manufacture its Covid-19 vaccine, such as filters and resin used in the manufacturing process. CW 7 recalled that the supply chain issues impacted Novavax for the duration of its vaccine development.

**ANSWER:**     Defendants deny the allegations in this Paragraph.

95.     CW 5 recalled that there were difficulties in acquiring the necessary number of different components used in the manufacturing process due to global supply chain issues, and CW 5 recalled this including a lack of blades that were used in the manufacturing process. Likewise, CW 3 explained that Novavax experienced delays in sourcing raw materials "that did slow down our work," and CW 3 further explained that the raw materials were "usually things [Novavax] needed from different companies to use their machines." Specifically, CW 3 recalled that "certain companies require special trays with gel inside them for us to run a purity check," and that "they were having difficulty sourcing those materials, which required Novavax "to make [the materials] ourselves or try different ones."

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CWs 3 and 5.  Defendants deny the allegations the Complaint purports to attribute to CWs 3 and 5 in this Paragraph.  Defendants deny any remaining allegations in this Paragraph.

### 2. The FDA Confirmed and Corroborated that Novavax's Critical Manufacturing Facilities Experienced Major Manufacturing Problems

96. As a result of the numerous contamination events and manufacturing problems plaguing Novavax's vaccine development, the FDA soon got involved. In March and April 2021, the FDA conducted inspections of the Texas and North Carolina Facilities. The inspections reports and related correspondence sent to Novavax's manufacturing facilities detailed the significant manufacturing problems facing the Company at the time.

**ANSWER:** Defendants admit that the FDA conducted inspections of the Texas and North Carolina Facilities in or around March and April 2021. Defendants deny that the FDA's decision to inspect the Texas and North Carolina Facilities was made in response to "numerous contamination events and manufacturing problems" as alleged in this Paragraph. Defendants respectfully refer the Court to the FDA inspection reports and related correspondence for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

97. For example, on March 3, 2021, the FDA notified via telephone the Texas Facility's Vice President of Quality Operations, Jose Torres,[10] of an upcoming investigation. Then, on March 15, 2021, the FDA issued a formal Notice of Inspection to Gerry Farrell, the

---

[10] Mr. Torres oversees the Quality Assurance, Quality Control, and Regulatory activities at the Texas Facility. Mr. Torres has four direct reports and reports to David Patterson, Senior Director of Global Quality. Others involved in the Quality Unit at the Texas Facility are: Patricia Flaherty, Director of QA Compliance; Matt Dixon, Director of QA Operations; Travis Sadowski, Director of QC; and Rawle Collins, who oversees Regulatory Affairs and eQMS.

Chief Operating Officer of the Texas Facility. Indeed, the FDA inspected the Texas Facility from March 15, 2021 to March 19, 2021, to gather information with a focus on assessing whether Novavax had controls in place to ensure that manufacturing operations would not adversely impact the safety, purity, and potency of vaccines then under development.

**ANSWER:** Defendants admit that the FDA inspected the Texas Facility from approximately March 15, 2021 to March 19, 2021. Defendants respectfully refer the Court to FDA's Notice of Inspection for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief as to the FDA's reasons, focus, or goals for inspecting the facilities. Defendants deny the remaining allegations in this Paragraph.

98. At the conclusion of the investigation, the FDA conducted a meeting with the management of the Texas Facility, which included Mr. Farrell (who identified himself as the most responsible person on site), during which the FDA discussed certain "Items of Concern" that arose during the FDA investigation. These concerns involved a number of quality issues, including that the facility had "sub optimal quality operations." In response, Mr. Torres emailed the FDA on April 9, 2021, with responses to the FDA's verbal observations.

**ANSWER:** Defendants deny the allegations in this Paragraph.

99. On April 14, 2021, the FDA issued a formal 52-page investigation memo, detailing a litany of issues with the Texas Facility ("April 14 FDA Report").[11]

---

[11] Notably, the FDA explained that it reviewed the Texas Facility's quality agreements in place

**ANSWER:** Defendants respectfully refer the Court to the April 14 FDA Report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

100. The FDA observed and reported many issues relating to the Texas Facility's inadequate quality control, contamination, and purity issues, including but not limited to the following:

(a) Contamination was discovered and not properly recorded and investigated, including microbial contamination that was discovered in January 2021.

(b) Failure to investigate, detect, and document appropriately a number of deviations, and that periodic review of deviation trending was not performed by the Quality Unit.

(c) Cleaning procedure for certain manufacturing areas was not always followed, including using disinfectants on surfaces in manufacturing areas that were not effective in inactivating or adequately removing microorganisms.

(d) Failure to open "change controls" when appropriate. The report explained that the Change Control process "applies to all changes that may have the potential to impact product safety, quality, identity, purity, and strength at the [Texas Facility]."

(e) Out-of-specification ("OOS") investigation procedures were not always followed.

(f) Warehouse areas used for storage of GMP materials were overcrowded and poorly organized.

---

at the time, and that "Fujifilm is required to notify the client of deviations and OOS results within 2 business days per section 12.0.1 of the agreements." Although the report redacted the name of the company with whom the Texas Facility entered into the quality agreements, according to the Head of Technical Operations at the Texas Facility, CW 5, the term "client" in this case was referring to Novavax. In fact, with respect to issues of contamination, CW 5 stated that a client, who was Novavax in this case, must be notified about a contamination within 24 to 48 hours of its discovery.

(g)     Inadequate and ineffective training of manufacturing workers due to sharp increase in new hires.

**ANSWER:**     Defendants respectfully refer the Court to the April 14 FDA Report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

101.     The FDA again concluded: "Quality oversight over manufacturing and testing operations is sub-optimal."

**ANSWER:**     Defendants respectfully refer the Court to the April 14 FDA Report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

102.     According to the April 14 FDA Report, Mr. Dixon "noted that it was challenging for the Quality Unit to keep up with review activities given the recent increase in work volume due to the rapid pace of product development," to which the FDA expressed "concerns regarding [the Texas Facility]'s ability to meet demand." Mr. Dixon further explained that failure to investigate deviations was caused by the "high throughput production." The FDA was thus further concerned about how the Quality Unit can assure product quality and safety while the manufacturing activities continue without timely closure of deviations.[12]

---

[12] Relatedly, the FDA generated a memorandum on April 28, 2021, relating to the same investigation into the Texas Facility. The FDA explained that the purpose of the memorandum was to describe coverage completed as part of the pre-EUA investigation from March 15, 2021 to March 19, 2021, as it related to a complaint that was delivered to FDA investigator Scott Ballard's desk in the FDA Dallas district office on April 20, 2021. Specifically, the complaint that the FDA received outlined a number of issues that the FDA had also raised during the EUA investigation, which included the facility's lack of quality unit trending of deviations, failure to timely resolve and address deviations, failure to follow cleaning procedures, and others.

**ANSWER:** Defendants respectfully refer the Court to the April 14 FDA Report and the April 28, 2021 memorandum referenced in Footnote 12 for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

103. The FDA similarly found a number of problems during its investigation of the North Carolina Facility from April 14, 2021 to April 21, 2021. According to an FDA Form 483 issued to the North Carolina Facility on April 21, 2021 ("April 21 FDA Form 483"), the facility contained many quality-related problems, among others. For example, the April 21 FDA Form 483 observed and reported the following deviations at the North Carolina Facility:

(a) Microbial control of the facility was inadequate. Specifically, the facility's employees failed to investigate root causes and implement adequate corrective and preventative actions to control microbial contamination, as exemplified by the FDA learning from prior reports that microbial contamination (such as Paenibacillus spp., Burkholderia, Paenibacillus glucanolyticus, Penicillium rubens, and Fusarium oxysporum) was recovered from over 50 monitoring sites—including in purification sites.

(b) There was no comprehensive risk assessment conducted to evaluate cross-contamination of drug products, including where such drug products were manufactured in the same areas with shared product contact equipment.

(c) The manufacturing process was not adequately monitored and/or controlled to ensure the quality of the drug substance was not adversely affected.

(d) Written procedures for manufacturing processes were inadequate, including inadequate procedures for the "Purification" step.

(e) Discrepancies were not fully investigated to identify a root cause and corrective and preventative actions were not adequately implemented to prevent recurrence.

(f)     Procedures of material management systems were not followed or were inadequate, which led to expired materials being found in the warehouse.

**ANSWER:**     Defendants respectfully refer the Court to the April 21 FDA Form 483 for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

104.     In addition, former Novavax employees recalled that the FDA raised similar concerns during the Class Period. For example, CW 1 recalled that in response to the Module 3 reports submitted by Novavax (which, as explained below, contained information from the Company's manufacturing sites), the FDA raised concerns about the stability of the Company's vaccine batches. CW 1 said that the FDA communicated its concerns via information requests that were typically sent via email to Director – Regulatory Affairs Kathleen Callahan. Further, CW 1 explained that there was an inconsistency in not being able to repeat the result on a consistent basis, causing delays with respect to filing for EUA.

**ANSWER:**     Defendants deny the allegations in this Paragraph.

105.     In fact, CW 1 recounted that she saw the end reports the FDA sent to the Company and knew from the reports that the stability of the vaccine batches Novavax had submitted "wasn't going to cut it" for the FDA. CW 1 also recalled that the FDA wanted to better understand a discrepancy in Novavax's potency levels, which were at 130% at one point and then at 120% another week.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the

anonymous CW 1.  Defendants deny the allegations the Complaint purports to attribute to CW 1 in this Paragraph.  Defendants deny any remaining allegations in this Paragraph.

106.    CW 1 explained that she learned about the FDA's response and its concerns over the stability of Novavax's vaccine batches during weekly meetings with the Company's Regulatory Affairs team, and that the information was shared directly by Callahan. CW 1 recalled that the Regulatory Affairs team meetings were attended by Senior Director—Regulatory Affairs CMC Jannine Haberman Cobb and a handful of other Regulatory Affairs employees. CW 1 said that Callahan attended the meetings at least once a week and at times would be pulled into daily meetings if the team felt it needed her guidance. CW 1 further stated that for a few months, the Regulatory Affairs team had to meet daily to keep up with the "overbearing" amount of documents that needed to be prepared for the FDA.

**ANSWER:**    Defendants deny the allegations in this Paragraph.

### 3.    Defendants Knew About the Manufacturing Problems

#### (a)    Defendants Stayed Apprised of the Manufacturing Problems, as Was Required by FDA Regulations

107.    As explained above, cGMP regulations—to which Novavax was required to adhere—provide that Novavax's quality control unit "shall be responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company." 21 C.F.R. § 211.22(a). Additionally, with respect to any "reports of inspectional observations issued by the [FDA], or any regulatory actions relating to good manufacturing practices brought by the [FDA]," or any investigations into complaints involving the "possible

64

failure of a drug product to meet any of its specifications," cGMP regulations provide that Novavax be notified in writing about such issues. 21 C.F.R. § 211.180(f), § 211.198(a). This is the case even if Novavax was "not personally involved in or immediately aware of such actions." 21 C.F.R. § 211.180(f). Moreover, cGMP regulations require companies to maintain laboratory records, including information relating to "results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6).

**ANSWER:** Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. §§ 210 and 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

108. The FDA's very own reports explained that it reviewed the Texas Facility's quality agreements in place at the time, and that "Fujifilm is required to notify the client of deviations and OOS results within 2 business days per section 12.0.1 of the agreements." Notably, former employees from the Texas Facility and North Carolina Facility confirm and corroborate that Novavax was notified about the manufacturing problems, such as poor purity results and contamination problems, that occurred throughout the Class Period. For example, according to CW 5, Novavax had two Onsite Employees at the Texas Facility, whom CW 5 identified as Technology Transfer Engineer Patrick Hash and Contractor Elizabeth Wang.

Indeed, CW 5 explained that CW 5 and the Texas Facility Director of Manufacturing CW 6 communicated with the two Novavax's Onsite Employees "every single day" regarding manufacturing and the results of quality checks, which CW 5 recalled were conducted every 24 to 48 hours.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 5. Defendants respectfully refer the Court to the FDA reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the allegations the Complaint purports to attribute to CW 5 and CW 6 in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

109. CW 5 recalled that Novavax's Onsite Employees were notified about each contamination issue that occurred throughout the Class Period. That is, they were notified about the four contamination incidents that led to delays in manufacturing that occurred since December 2020. CW 5 even recalled that Mr. Hash, one of Novavax's Onsite Employees, was involved in the investigations into the contaminations. CW 5 recalled that there were phone calls and emails about contaminations and delays from Mr. Hash to Novavax headquarters, including Novavax's Quality Assurance department.

**ANSWER:** Defendants deny the allegations in this Paragraph.

110. CW 6 similarly recalled that Novavax had employees that worked onsite at the Texas Facility, including Mr. Hash, along with a few other Novavax employees who rotated

onsite "off-and-on." CW 6 further recalled that CW 6 participated on Zoom calls "every day" with Novavax's Onsite Employees, a Novavax employee at Novavax's headquarters in Maryland named Ivailo, and other Novavax employees from different departments. According to CW 6, Novavax's Onsite Employees, Ivailo, as well as other Novavax employees "knew everything that we were doing." CW 6 further advised that there were typically 10 Novavax employees on these calls.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 6.  Defendants deny the allegations the Complaint purports to attribute to CW 6 in this Paragraph.

111.     Similarly, CW 7—a former Manager, Quality Assurance for the North Carolina Facility—recalled that any issues were constantly communicated to Novavax, which had someone onsite at the North Carolina Facility weekly at a minimum. CW 7 advised that the level of Novavax's involvement was unlike anything she had previously encountered at FUJIFILM, meaning that Novavax was more involved in the manufacturing process than other clients at FUJIFILM.

**ANSWER:**     Defendants deny the allegations in this Paragraph.

112.     CW 7 further explained that all testing results of batches at the North Carolina Facility were communicated to Novavax through a "batch record," which relayed to Novavax that testing was completed and the results of the testing. CW 7 even explained that FUJIFILM

sometimes changed the vaccine manufacturing materials given certain supply chain issues, and that Novavax would have to approve all the changes. CW 7 recalled that Novavax had teams of people from departments including quality and technical who were involved in any modifications. CW 7 further explained that Novavax was involved with "everything" and was "driving" the way in which FUJIFILM manufactured the product. In fact, CW 7 advised that the level of Novavax's involvement was unlike anything she had previously encountered at FUJIFILM.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 7. Defendants deny the allegations the Complaint purports to attribute to CWs 7 in this Paragraph.

113. Further, CW 7 recounted that the vaccine's purity levels were manufactured according to information provided by and processes approved by Novavax. Additionally, CW 1 explained that FDA concerns were also discussed at weekly, and sometimes daily, Regulatory Affairs team meetings.

**ANSWER:** Defendants deny the allegations in this Paragraph.

114. Furthermore, as mentioned above, Novavax was apprised by the FDA and Novavax's manufacturing partners at the Texas Facility and the North Carolina Facility of the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that occurred at its facilities, including those of its partners such as FUJIFILM. In fact,

according to the October 19, 2021 *Politico* article referenced earlier, senior Trump administration officials on Operation Warp Speed repeatedly warned the Company that it risked running into problems in scaling up manufacturing of NVX-CoV2373. Specifically, these officials worried that Novavax would have difficulty ensuring that NVX-CoV2373 consistently met the FDA's rigorous quality standards once the vaccine went into mass production.

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief about the worries or other thoughts or feelings of government officials. Defendants deny any remaining allegations in this Paragraph.

**(b)      Defendant Erck Personally Held Company-Wide Meetings Regarding NVX-CoV2373**

115.    Multiple former Novavax employees confirm that Defendant Erck held companywide meetings with its employees where NVX-CoV2373 was discussed. For example, CW 2 recalled that Defendant Erck and Novavax's leadership team spoke to employees and facilitated Q&A sessions during Company-wide meetings that happened at least once a quarter; CW 2 explained that she, like most employees, attended the meetings virtually. At these meetings, CW 2 recalled that Defendant Erck discussed the topic of seeking regulatory approval.

**ANSWER:** Defendants deny the allegations in this Paragraph.

116.     Likewise, CW 1 recalled that Defendant Erck spoke to employees during monthly Company-wide meetings that included Q&A sessions, with employees being able to submit questions in advance via an app. CW 1 further recalled that the Q&A sessions included discussions about employees' concerns in regard to "our manufacturing capabilities" and "the likelihood of being able to manage all those stakeholders," in addition to concerns over whether Novavax would "be able to get our stability information stabilized."

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 1.  Defendants deny the remaining allegations in this Paragraph.

> **(c)     Internal Novavax Reports and Emails Contained Information from Manufacturing Facilities and Clinical Testing Updates**

117.     Furthermore, Defendant Erck had access to reports that contained hundreds of pages of data from Novavax's manufacturing sites. For example, CW 1 explained that Novavax submitted documents containing information from the Company's manufacturing sites that was then submitted to the FDA in the form of Module 3 Quality reports. CW 1 further explained that "those are the documents we were working on the hardest," and that "Novavax really needed to have [its] CMC module in line before we could get that emergency use authorization." CW 1 recalled that these reports consisted of "hundreds of pages."

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 5.  Defendants deny the remaining allegations in this Paragraph.

118. CW 1 explained that the content from the manufacturing sites that was detailed in the Module 3 reports involved drug and product information and data. CW 1 further explained that the Module 3 reports were submitted to the FDA via the agency's Electronic Submissions Gateway ("ESG") and sometimes via email, depending on the preferences of the two or three FDA project managers with whom Novavax worked. CW 1 recalled that Director - Regulatory Affairs Kathleen Callahan would send such emails and handled all communications with the FDA.

**ANSWER:** Defendants deny the allegations in this Paragraph.

### E. Defendants Reassure Investors That NVX-CoV2373 Was Aligned with FDA Criteria and Would Be Timely Filing Its EUA with the FDA

119. As described above, Novavax experienced a litany of manufacturing problems during the Class Period, such as not being able to achieve the required purity and potency levels as part of the FDA criteria, experiencing rampant contamination, failing to scale up production, and facing supply chain issues. Nonetheless, Defendants concealed these problems from investors and brazenly touted that Novavax was aligned with FDA criteria and had resolved any issues that could affect its ability to file its EUA.

**ANSWER:** Defendants deny the allegations in this Paragraph.

120. On February 24, 2021, the first day of the Class Period, Defendant Glenn participated in an interview with *The Washington Post* to discuss Novavax's regulatory timeline for its EUA and Novavax's progress thus far to meet FDA requirements. To that end, Defendant Glenn touted that "we lined up—FDA gave advice on how to do a trial, what success means,

71

and that really was accepted by the world, if you will, and *so we're aligned up with those success criteria in all of our trials*."

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants respectfully refer the Court to the February 24, 2021 interview with *The Washington Post* for its true and complete contents, and Defendants deny any allegations inconsistent therewith and deny the remaining allegations in this Paragraph.

121.    However, contrary to Defendant Glenn's representation, Novavax at the time was in fact not able to meet the required purity and potency levels, which are criteria that the FDA required Novavax to meet to file its EUA and ultimately receive approval to bring NVX-CoV2373 to market. But this, of course, was something Defendants would not want to, and did not, tell investors at the time. Indeed, NVX-CoV2373 was critical to Novavax's success, and had Defendants disclosed the truth, it would have seriously jeopardized Novavax's stock price and future as a Company. To be sure, even analysts recognized how important NVX-CoV2373 was to Novavax. For example, as one analyst, Zacks, reported, "[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, leaving an adverse impact on its shares."

**ANSWER:** Defendants respectfully refer the Court to the April 28, 2021 Zacks analyst report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny the remaining allegations in this Paragraph.

72

122.    At the same time Defendants made their above statements concerning NVX-CoV2373, analysts were encouraged by Novavax's purported ability to meet FDA criteria and bring NVX-CoV2373 to market. Jefferies was encouraged that "[a]ltogether, everything remains on track, including EUA filing in UK, EU and USA in Q2." Similarly, Zacks noted that the "vaccine is also advancing well."

**ANSWER:**    Defendants respectfully refer the Court to the Jefferies analyst report and the Zacks analyst report for their true and complete contents, and Defendants deny any allegations inconsistent therewith.    Defendants deny any remaining allegations in this Paragraph.

123.    In fact, one analyst, CFRA, even issued a Strong Buy rating for Novavax and reported that "[w]e think 2021 could be a turnaround year for [Novavax]," and that "[w]e think [Novavax's] Covid-19 vaccine candidate is well-placed to receive the fourth EUA in the U.S. in Q2."

**ANSWER:**    Defendants respectfully refer the Court to the CFRA analyst report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

**F.    Defendants Delay the EUA Filings, Partially Revealing the Underlying Challenges They Faced—but Continue to Reassure Investors**

124.    Notwithstanding the litany of above-mentioned manufacturing problems that existed but were unknown to the public—and more importantly, right before Novavax announced news certain to drive the stock price down—some of the Individual Defendants chose that time to financially enrich themselves before the inevitable news to be announced.

73

Indeed, in mid-to-late April 2021, Defendant Glenn sold over 8,000 shares of Novavax stock and made over $1.6 million in proceeds before the devastating news to come.[13] Similarly, Defendant Trizzino sold over 3,000 shares of Novavax stock on May 5 and May 7, 2021, making nearly $600,000 in proceeds—as compared to the zero stock sales that he made in May of the previous year.[14]

**ANSWER:** The Court has dismissed all claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant John J. Trizzino's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

125. Furthermore, in light of the manufacturing problems—which Defendants concealed from the public—Novavax was unable to stick to its regulatory timeline to file its EUA. Indeed, while Defendants had thus far been successful at keeping investors in the dark about Novavax's problems, Defendants were not able to conceal the regulatory delays that were caused by such problems. The fact of the matter is that Novavax was not able to file its EUA

---

[13] *See* SEC Form 4 of Gregory M. Glenn, dated April 19, 2021.
[14] *See* SEC Form 4 of John Trizzino, dated May 7, 2021.

until it aligned its vaccine with the FDA's cGMP requirements. Because in reality Defendants were unable to meet such standards, Novavax was forced to delay its EUA filing.

**ANSWER:** Defendants deny the allegations in this Paragraph.

126. Specifically, on May 10, 2021, during market hours, *The Washington Post* reported that Novavax's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest, according to four people who had recently been briefed on the [C]ompany's plans." Similarly, later that day, during after-market hours, on a call that Novavax hosted with investors and analysts to discuss the Company's first quarter 2021 financial and operational results (the "1Q21 Earnings Call"), Novavax confirmed that it was unlikely to seek an EUA for NVX- CoV2373 in the U.S. until July 2021 at the earliest—*i.e.*, the third quarter of 2021.

**ANSWER:** Defendants respectfully refer the Court to the May 10, 2021 *Washington Post* article and the transcript of the May 10, 2021 Earnings Call for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

127. As a result, the price of Novavax common stock fell 8.81% on May 10, 2021, and, following the Company's 1Q21 Earnings Call, continued to fall an additional 13.91% on May 11, 2021. This news also elicited some concern from the market, which directly linked the drop to the delay. For example, Jefferies stated that "[s]hares of [Novavax] are taking a hit following the Q1 update." Zacks similarly reported, "Novavax announced that it[s] plans to file

for authorization for Novavax in the United States . . . in the second quarter of 2021 have been delayed to the third quarter. The stock tanked on this news."

**ANSWER:** Defendants respectfully refer the Court to publicly available information about the Company's stock price and to the referenced analyst reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

128. Yet, despite delaying its regulatory filing in light of the underlying, undisclosed manufacturing challenges, Defendants continued to reassure investors that the (non-public-but-lingering) causes of these regulatory delays were no longer an issue for Novavax. For example, on May 10, 2021, the same day that Defendants pushed out the regulatory timeline, Defendant Erck stated during the 1Q21 Earnings Call: "Our timetable for regulatory filings, we know that we're delayed from where we thought we'd be at this point. But now we're giving guidance that ***nearly all of the major challenges have been overcome*** and we can clearly see the light at the end of the tunnel."

**ANSWER:** Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

129. During that same 1Q21 Earnings Call, an analyst from B. Riley Securities focused on Novavax's delayed submission and the reasons for its holdup. That analyst asked Defendant Erck if he was "able to comment on what might be these sort of things that are

76

*causing the holdup*," and whether "it [is] just process coordinating between the different sites" or "are there *any specific issues* around any particular assay." In response, while Defendant Erck stated that "part of it has to do with *manufacturing at different sites* and showing comparability between the processes and the actual end product between the different sites" and that "it probably took a little longer than we expected to get a potency assay that was worked across," Defendant Erck reassured the analyst that such issues were solved and behind Novavax. Specifically, Defendant Erck explained: "*I'm happy to say <u>we did.</u> We've <u>crossed that bridge.</u> We're - we <u>made a big breakthrough</u> there* and we're now racing towards validating everything and putting it into a package."

**ANSWER:** Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

130. Defendant Erck further assured investors that Novavax was past all of the hurdles causing delays in EUA approval: "[E]very quarter gets more data pointing to a successful vaccine, we're getting close to the end, and—which is really the beginning for us and that's what we're all racing to do. I think *we've eliminated all of the serious hurdles to getting—risk hurdles to getting to where we need to be to get an improved vaccine*."

**ANSWER:** Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

131.    During that same 1Q21 Earnings Call, with respect to Novavax's "current state of [] manufacturing and [] anticipated capacity," Defendant Erck stated "I think we've done a remarkable job of standing up manufacturing in these multiple plants across the globe. ***I'm happy to report that we have got to the point where we've successfully manufactured our drug substance, a recombinant protein nanoparticle, at commercial scale in each of these plants***. The drug substance production is the most complicated step in the overall manufacturing processes."

**ANSWER:**    Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in this Paragraph.

132.    That is, Defendant Erck reassured investors that Novavax's manufacturing facilities were manufacturing NVX-CoV2373 to FDA standards—for which Novavax was directly responsible and in which it was involved.

**ANSWER:**    Defendants deny the allegations contained in this Paragraph.

133.    Given the importance of Novavax's potential vaccine to the general public, on June 10, 2021, Novavax hosted Maryland Governor Larry Hogan at the site of the Company's planned Vaccines Innovation Campus and global headquarters in Gaithersburg. Additional guests included state, regional, and local officials. Defendants Erck and Glenn personally led the tour, providing an overview of the facility and press briefing.

78

**ANSWER:** Defendants admit that Novavax hosted Maryland Governor Larry Hogan and other state, regional, and local officials in Gaithersburg on or about June 10, 2021. Defendants deny the remaining allegations in this Paragraph.

134. On June 14, 2021, a few days later, Novavax participated in a Clinical Update call with investors. On that call, Defendant Erck again reassured investors that "[w]ith each analysis, ***our trials <u>proved</u> that we are on the right track***. And today, with safety and efficacy that are consistent across all studies, our PREVENT-19 results reaffirm our strong belief in [NVX- CoV2373]." These reassurances, however, were not true.

**ANSWER:** The Court has dismissed the claims related to purported misstatements made on June 14, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

135. Yet, Defendants had successfully alleviated any major concerns the market may have initially had since Novavax announced that it was delaying its EUA filing. Indeed, in light of Defendants' continued reassurances, Jefferies noted that Novavax's management "remains confident in their ability to execute" and that, "[w]hile [filings with the FDA] took longer than they initially expected, it appears they have everything close to being set now." Cantor Fitzgerald also reported that despite Novavax's update, "according to management, facilities in its network have demonstrated the ability to manufacture commercial scale GMP material."

**ANSWER:** Defendants respectfully refer the Court to the referenced Jefferies and Cantor Fitzgerald statements or reports for their true and complete contents, and Defendants

79

deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

136. Similarly, H.C. Wainwright explained that "[w]e believe the [C]ompany remains a solid player in the COVID-19 vaccine landscape and think concerns about a delay in regulatory filings and manufacturing challenges are only temporary setbacks."

**ANSWER:** Defendants respectfully refer the Court to the referenced H.C. Wainwright statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith.

G. **Rampant Contamination Issues Remained Unresolved and Worsened—Causing Manufacturing Processes to Shut Down**

137. While the underlying manufacturing problems related to purity, potency, contamination, scalability, and the supply chain continued, CW 5 stated that the Texas Facility faced additional manufacturing problems concerning contamination starting in March 2021, and CW 6 similarly recalled contamination occurring since April 2021. Indeed, CW 5 recalled that in March 2021—around the same time Defendant Glenn sold a significant number of his shares—a viral contamination was discovered at the Texas Facility. CW 5 explained that some of the bacterial contaminations were traced back to newer employees who had no or little experience in vaccine manufacturing. CW 5 specifically recalled that the investigation revealed an "irido virus," which CW 5 explained was short for iridescent since the virus is iridescent under certain light. CW 5 explained that the facility first identified the growth of the contamination on March 18, 2021, and let the run continue for two or three days before starting

80

an investigation two or three days after that. CW 5 advised that the investigation ultimately concluded that the contamination was most likely due to human error. CW 6 similarly recalled that there was a contamination incident at the Texas Facility around sometime in April 2021.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny the remaining allegations in this Paragraph.

138. Notably, CW 5 explained that the Texas Facility's manufacturing was shut down from March 2021 to at least September 2021—during which time Defendant Erck made massive stock sales. In fact, CW 5 confirmed that the facility was at a standstill when Novavax executives unloaded stock in July 2021. Likewise, CW 6 corroborated that the contamination incident in April 2021 led to a shutdown in manufacturing and further recalled that the resumption of manufacturing kept getting pushed back and that it had still not restarted by the time her tenure ended on June 30, 2021.

**ANSWER:** Defendants deny the allegations in this Paragraph.

139. Additionally, CW 5 confirmed that every detail about this viral contamination was "communicated to" Novavax's Onsite Employees as the discovery and investigation progressed, along with daily calls with Novavax personnel in Maryland, where Novavax is headquartered. CW 5 added that a client, who was Novavax in this case, must be notified about a contamination within 24 to 48 hours of its discovery.

81

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 5. Defendants deny the remaining allegations in this Paragraph.

140. Similarly, CW 6 explained that CW 6 participated on Zoom calls "every day" with Novavax's Onsite Employees, a Novavax employee at Novavax's headquarters in Maryland named Ivailo, and other Novavax employees from different departments. According to CW 6, Novavax's Onsite Employees, Ivailo, and the other Novavax employees on the Zoom calls "knew everything that we were doing." CW 6 further advised that there were typically 10 Novavax employees on the calls.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 6. Defendants deny the remaining allegations in this Paragraph.

141. Yet, instead of being upfront with investors about these issues, Defendants continued to conceal the truth. But not only that, as alluded to above, some of the Individual Defendants also went further and saw this as the opportune moment for them. Indeed, during July 2021—the very month that the Texas Facility was shut down and being investigated, as well as the litany of other issues still occurring—Defendant Erck sold over 100 thousand shares of Novavax stock, reaping proceeds of over $22.5 million.[15]

---

[15] *See* SEC Form 4 of Stanley Erck, dated July 6, 2021.

**ANSWER:** Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Stanley C. Erck's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

142. Similarly, Defendant Glenn also cashed in during this same time. For example, in July 2021, Defendant Glenn sold over 8,000 shares for proceeds of more than $1.5 million.[16]

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

**H.  Despite Novavax's Continued Manufacturing Problems Causing Additional Regulatory Filing Delays, Defendants Again Reassure Investors That Novavax No Longer Faces Such Issues**

143. As with the previous quarter, Defendants were unable to prevent the inevitable risks from materializing as a result of the underlying manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that Novavax was experiencing during the Class Period. As such, on August 5, 2021, Novavax further delayed its EUA filing and reported that it expected to file for NVX-CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021.

**ANSWER:** Defendants deny the allegations in this Paragraph.

---

[16] *See* SEC Forms 4 of Gregory Glenn, dated July 19, 2021 and July 22, 2021.

144. On that same day, Novavax filed with the SEC its Form 10-Q for the quarter ending June 30, 2021 ("2Q21 Form 10-Q"), which was signed by Defendants Erck and Trizzino. The 2Q21 Form 10-Q revealed, "[t]he U.S. government has recently instructed the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made."

**ANSWER:** Defendants respectfully refer the Court to SEC Form 10-Q of Novavax for the quarter ending June 30, 2021 for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

145. As a result, Novavax's stock price dropped 19.61% on August 6, 2021. Upon learning of this news, analysts were initially disappointed and shocked by the EUA filing delays. For example, Jefferies reported, "[w]e understand the lack of clarity around the US/EU filings is less than ideal." Notably, Seeking Alpha reported that the "news was a shocker for investors."

**ANSWER:** Defendants respectfully refer the Court to publicly available information about the Company's stock price and to the referenced Jefferies and Seeking Alpha reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts. Defendants deny any remaining allegations in this Paragraph.

146. Conveniently, Defendants Erck and Glenn cashed in for tens of millions of dollars in stock sales proceeds in the weeks leading up to this announcement and prior to Novavax's stock losing almost 20% of its value.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny the remaining allegations in this Paragraph.

147. Yet, despite having to push the regulatory timeline again, Defendants continued to conceal the full truth regarding the underlying problems Novavax faced. For example, according to an August 5, 2021 *Reuters* article about an interview between Defendant Erck and *Reuters*, Defendant Erck stated: "***We appear to have got past (certain) supply issues and are now being able to produce at scale***."

**ANSWER:** Defendants respectfully refer the Court to the August 5, 2021 *Reuters* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

148. Additionally, on Defendants' August 5, 2021 conference call to discuss the earnings results for the second quarter of 2021 ("2Q21 Earnings Call"), Defendant Erck reassured investors that "[t]oday, we remain on track to achieve manufacturing capacity of 100 million doses per month by the end of the third quarter of '21 and 150 million doses per month by the end of the fourth quarter of '21."

**ANSWER:** Defendants respectfully refer the Court to the transcript August 5, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

149. Similarly, during that 2Q21 Earnings Call, an analyst from Jefferies asked Defendant Erck about "what gives you confidence that you'll be able to file in the U.S.," and "how much risk is there associated with addressing some of those last remaining issues that are the gating steps to those filings." In response, Defendant Erck stated that "the risk reduction is dramatic," and that "I think that it's a matter of now mechanics of getting all the data—final data assembled and submitted. And it's—we're talking weeks here. We're not talking months. So I'm not worried about the future submissions."

**ANSWER:** Defendants respectfully refer the Court to the transcript of the August 5, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

150. Additionally, the Jefferies analyst followed-up, asking: "So you believe that at least the time lines that you've put forth, you'll be able to reach those." In response, Defendant Erck again stated: "I do. This is a very big transformation - transition of the [C]ompany we filed. We've now filed with the regulatory agencies in 3 countries, and we've got a complete filing package for those we are finishing the additional requirements in the various countries that I mentioned. We've listed dates that we plan on making with a lot of confidence."

86

**ANSWER:** Defendants respectfully refer the Court to the transcript of the August 5, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

151. In fact, during that same 2Q21 Earnings Call, in response to a J.P. Morgan analyst's request for clarity on Defendants' disclosure about "the U.S. government saying that it would like to see FDA alignment on your analytical methods before conducting additional U.S. manufacturing," Defendant Erck downplayed the severity of the situation by explaining that "there's always a time lag with the FDA these days."

**ANSWER:** Defendants respectfully refer the Court to the transcript of the August 5, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

152. Additionally, to help further build investor confidence, Defendants also explained that they were regularly communicating with regulatory authorities and successfully incorporating such information into their work. For instance, during a September 21, 2021 conference at Devex UNGA 76, Defendant Trizzino stated that Defendants had "been in constant communication with [regulatory] authorities under rolling review and rolling submissions," and further explained that Defendants were "now at a point in time at which all of that feedback and all that conversation has been incorporated into these documents."

**ANSWER:** The Court has dismissed the claims related to purported misstatements made on September 21, 2021, and the allegations in this Paragraph related to such claims thus

require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

153. Notably, on September 29, 2021, during the Cantor Fitzgerald Global Healthcare Conference, Defendant Trizzino further reassured investors that certain manufacturing problems were fixed. For example, in response to a Cantor Fitzgerald analyst's question about EUA and manufacturing, Defendant Trizzino said: "[T]he combination of our recombinant protein nanoparticle, its nanoparticle structure, the particle structure of our Matrix adjuvant presented some challenges in those assays, *which have now been resolved*."

**ANSWER:** Defendants respectfully refer the Court to Defendant Trizzino's September 29, 2021 statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

154. In light of Defendants' continued reassurances, analysts and the media remained optimistic. For example, despite finding that the delays were "less than ideal," Jefferies reported that "[m]anufacturing appears to be on track w[ith] the company reiterating plans to reach 100M doses/month and 150M doses/month by the end of Q3 and Q4, respectively." Similarly, Jefferies explained, "[w]hen asked what the gating steps are for submission to the UK/EU/US, [management] noted the need to reach each regulatory agencies' submission requirements, but the risk associated w[ith] these filings has been significantly reduced and [management] remains very confident they will be able to file." Additionally, Seeking Alpha stated that

88

"[w]hile [Novavax] announced a delay in submission to US FDA, it is still on track to achieve its previously planned manufacturing capacity for Q3 and Q4."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the reaction and sentiments of media outlets or analysts. Defendants respectfully refer the Court to the August 5, 2021 Jefferies report and the August 7, 2021 Seeking Alpha report for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

155. However, contrary to the story that Defendants were selling investors, the manufacturing problems outlined above persisted—still preventing Novavax from achieving alignment with FDA criteria and filing its EUA. Again, this is largely due to Novavax rushing the process to meet the tight turnarounds required to obtain EUA approval before there was no longer a need. Indeed, as of September 29, 2021, the number of people in the United States with at least one Covid-19 dose exceeded 214 million people (compared to only 51,056,052 people at the start of the Class Period). Furthermore, while the Director of the Center for Biologics Evaluation and Research at the FDA, Peter Marks, was quoted by *Bloomberg* in the first week of August 2021 as saying that "right now, one wouldn't want to rule out continuing to give emergency use authorizations," he also stated, "[t]here probably is going to be a point at which we stop[] giving emergency use authorizations." Defendants thus still felt the pressure to manufacture the Company's vaccine as quickly as possible—at all costs.

89

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the number of people in the United State with at least one COVID-19 dose at the start of the Class Period and as of September 20, 2021. Defendants respectfully refer the Court to Peter Marks' statements to *Bloomberg* in the first week of August 2021 for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

## I. Investors Finally Learn About the Manufacturing Problems That Were Preventing Novavax from Filing Its EUA with the FDA

156. On October 19, 2021, *Politico* published an article, after market hours, entitled: "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," which revealed the manufacturing problems Novavax previously concealed. The *Politico* article—citing numerous Novavax employees with direct knowledge of and familiarity with Novavax's manufacturing process—revealed the underlying and undisclosed manufacturing problems that had been preventing Novavax from filing its EUA with the FDA and alerted investors for the first time that Novavax's timeline for approval was still ***another year away***.

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

157. Specifically, the article reported that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373. The article further explained that Novavax's "issues are more concerning than

previously understood" and that the Company could *take until the end of 2022 to resolve its manufacturing problems and win regulatory authorizations and approvals*.

**ANSWER:**   Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

158.   Critically, the *Politico* article did not make references to just general manufacturing problems. Instead, the article detailed specific issues that were only internally known throughout the Class Period, such as the fact that Novavax had struggled to reach anywhere close to the purity levels required by the FDA. While the FDA sets a 90% purity level standard for each Covid-19 vaccine batch, the article revealed that Novavax had only recently shown purity levels hovering around 70%—still well below the 90% requirement. According to one person whom the article quoted, "[a]t some level, I think the efficacy was never going to outweigh the risk associated with the impurity that was in there."

**ANSWER:**   Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

159.   Similarly, according to the *Politico* article, the Company "has consistently run into production problems," including "[t]he methods it used to test the purity of the vaccine," which "have fallen short of regulators' standards" as Novavax "has not been able to prove that

91

it can produce a shot that is consistently up to snuff, according to multiple people familiar with Novavax's difficulties."

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

160. As some U.S. government officials stated in the *Politico* article: "Novavax's manufacturing problems are seen as far more difficult to fix than the sanitary and design concerns that halted production of J&J's vaccine at the Emergent plant earlier this year."

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

161. Moreover, the *Politico* article also found that Novavax was already aware of specific concerns with NVX-CoV2373's manufacturing process, stating that "senior Trump administration officials on Operation Warp Speed . . . repeatedly warned the [C]ompany that it risked running into problems in scaling up manufacturing of the shot, two people with direct knowledge of those discussions said"; that, "[i]n particular, they worried that Novavax would have difficulty ensuring that the vaccine consistently met the FDA's rigorous quality standards once the vaccine went into mass production—the exact problem that has now stymied the [C]ompany for months"; and that Novavax "rushed the process" and "can't make" the vaccine, according to one of the people with knowledge of the matter.

92

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

162. As a result, the price of Novavax's stock fell 14.76% on October 20, 2021. Furthermore, *Politico* published another article the next day, on October 20, 2021, reporting that Novavax's issues were "worse than previously reported and could take several more months to set right." Analysts attributed the reason for the stock drop to the surprising news contained in the *Politico* report. For example, Cantor Fitzgerald explained, "the recent news articles that cited 'anonymous sources' stating Novavax has manufacturing issues that are 'jeopardizing billions of doses earmarked for poor and middle-income countries' . . . has resulted in shares trading down today."

**ANSWER:** Defendants respectfully refer the Court to publicly available information about the Company's stock price, the October 20, 2021 *Politico* article, and the referenced Cantor Fitzgerald report for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

163. Lead Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As

93

alleged herein, such statements artificially inflated or maintained the price of Novavax's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

**ANSWER:** Defendants admit that Plaintiffs purport to challenge the statements identified in bold and italics within this section. Defendants deny the remaining allegations in this Paragraph.

164. Throughout the Class Period, Defendants made a series of misrepresentations concerning Novavax's manufacturing capabilities and alignment with FDA criteria needed before filing its EUA for NVX-CoV2373 with the FDA. Specifically, Defendants made material misstatements and omissions including: (i) Novavax being aligned with FDA criteria while concealing multiple manufacturing problems, which included consistently falling short of FDA standards such as required purity and potency levels, experiencing rampant contamination problems, failing to scale up production of its vaccine, and facing supply chain disruptions; and (ii) when Novavax ultimately had to delay its EUA filing, reassuring investors that Novavax resolved such manufacturing problems that caused the delay.

**ANSWER:** Defendants deny the allegations set forth in this Paragraph.

A. **February 24, 2021 -** *The Washington Post* **Interview**

165. On February 24, 2021, during market hours, *The Washington Post* published an article relating to an interview it conducted with Defendant Glenn about Novavax and NVX-CoV2373. During that interview, Defendant Glenn reassured investors that Novavax was meeting the standards set forth by the FDA. For example, Defendant Glenn touted: "[W]e lined

94

up—FDA gave advice on how to do a trial, what success means, and that really was accepted by the world, if you will, and *so we're aligned up with those success criteria in all of our trials*."

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

166. Analysts were encouraged by Defendants' purported ability to meet FDA criteria and in bringing NVX-CoV2373 to market. For example, on March 15, 2021, Zacks noted that the "vaccine is also advancing well." On March 25, 2021, Jefferies was encouraged that "[a]ltogether, everything remains on track, including EUA filing in UK, EU and USA in Q2." Similarly, on April 15, 2021, CFRA issued a Strong Buy rating for Novavax and reported that "[w]e think 2021 could be a turnaround year for [Novavax]," and that "[w]e think [Novavax's] Covid-19 vaccine candidate is well-placed to receive the fourth EUA in the U.S. in Q2." And Zacks continued to believe that the "vaccine [was] also advancing well" on April 28, 2021.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

167. Analysts also recognized how important NVX-CoV2373 was to Novavax. For example, CFRA reported on April 15, 2021, that "the main focus of the [C]ompany is on its NVX- CoV2373 vaccine candidate against Covid-19," and that "[w]e think the future financial success of [Novavax] and its ability to record a positive bottom-line result is highly dependent on successful approvals and rapid commercialization of its Covid-19 vaccine." Similarly, as Zacks reported on April 28, 2021, "[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, leaving an adverse impact on its shares."

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

168. Defendant Glenn's statement in his interview with *The Washington Post* was materially false and misleading because, at that time, Novavax was in reality not aligned with FDA criteria needed to successfully manufacture and produce NVX-CoV2373. For example, Novavax had to ensure that it could produce its vaccine in large quantities while maintaining certain purity and potency levels and complying with cGMP. However, Novavax was unable to achieve such criteria, and in fact also experienced other manufacturing problems, such as contamination, that further prevented Novavax from meeting FDA criteria. Indeed, CWs and multiple other individuals familiar with Novavax's manufacturing difficulties confirm that,

since the beginning of the Class Period, Novavax suffered from multiple manufacturing problems related to purity, potency, contamination, scalability, and the supply chain.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants (a) respectfully refer the Court to the relevant subsections of 21 C.F.R. §§ 210 and 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith; and (b) Defendants deny the remaining allegations in this Paragraph.

169. Specifically, Defendant Glenn's statement was false and misleading because (i) NVX-CoV2373 was unable to meet certain FDA quality standards, such as purity and potency requirements; (ii) Novavax experienced rampant contamination; (iii) Novavax was unable to successfully scale up production; and (iv) Novavax's manufacturing process experienced supply chain disruptions.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

170. For example, CWs, the FDA, and others familiar with Novavax's issues recalled that since the beginning of the Class Period, Novavax was not only unable to meet certain FDA quality standards needed to file its EUA, but also experienced multiple cGMP violations:

(a)     Novavax had shown purity levels hovering around 70%—with some batches of vaccines containing purity levels of as low as 30%—which were nowhere close

to reaching the 90% purity level generally understood to be required by FDA standards;

(b) Novavax was unable to reproduce a high-quality vaccine on a consistent basis, which was related to delays in filing for EUA;

(c) Novavax was unable to maintain the proper level of potency throughout 2021, which was a concern to the FDA and further delayed the regulatory process; and

(d) Module 3 reports submitted by Novavax to the FDA indicated that the stability of the vaccine batches "wasn't going to cut it" for the FDA.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

171. Multiple CWs and the FDA likewise recounted that Novavax experienced rampant contamination problems that caused further delays:

(a) Microbial contamination was rampant in the Texas Facility—which, Defendants explained, was "a critical component of our US supply chain"—since December 2020;

(b) At least four contamination incidents occurred at the Texas Facility that led to delays in manufacturing that started between December 2020 and April 2021;

(c) Each contamination incident at the Texas Facility required shutting down development and interviewing the staff involved in the manufacturing process, which further delayed the manufacturing process;

(d) Contamination was discovered and not properly recorded and investigated in the Texas Facility, including microbial contamination that was discovered in January 2021; and

(e) Contamination existed in the North Carolina Facility throughout the entire Class Period, which required FUJIFILM to discard the batch, ending the process before

they were able to test for purity (in the downstream) and resulting in lost batches of the vaccine.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

172. Moreover, CWs also confirm Novavax's inability to scale up production throughout the Class Period:

    (a)    Novavax was not able to produce the required number of doses in time as Novavax was experiencing a shortage of vaccine doses for clinical trials, which were causing trials to be delayed;

    (b)    Novavax was not efficient at producing vaccines at a scale that would be needed for mass production; and

    (c)    Due to rushing the process, Novavax became disorganized and did not have a clinical development plan, which was something that is typically needed, and no longer kept a table or spreadsheet showing the various lots of the vaccine that were available, able to be provided for trials, and what was left, as Novavax had in the past.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

173. Furthermore, CWs also recalled that Novavax was experiencing supply chain disruptions throughout the Class Period, which contributed to manufacturing and regulatory delays and Novavax's inability to scale up production and achieve alignment with FDA criteria:

99

(a) Supply chain issues—such as domestic supply constraints—at the Texas Facility "were always a struggle," and these supply chain issues and domestic supply constraints were "an ongoing issue";

(b) The North Carolina Facility had difficulty getting the components necessary to manufacture its Covid-19 vaccine, such as rubber silicone hoses and raw materials, which impacted Novavax for the duration of its vaccine development and caused Novavax to repeatedly delay its filing for EUA with the FDA;

(c) There were difficulties in acquiring the necessary number of different components used in the manufacturing process due to global supply chain issues, including a lack of blades that were used in the manufacturing process; and

(d) Novavax experienced delays in sourcing raw materials needed for purity tests, which slowed down Novavax's work.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to purported misstatements made on February 24, 2021, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

### B. May 10, 2021 - 1Q21 Earnings Call and Partial Disclosure / Materialization of the Risk

174. On May 10, 2021, for the first time, it was partially revealed that Novavax was experiencing manufacturing problems that were serious enough to prevent filing its EUA on the date Defendants previously promised. Specifically, on May 10, 2021, during market hours, *The Washington Post* reported that Novavax's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest, according to four people who had recently been briefed on the [C]ompany's plans." Similarly, later that day, after-market hours, during a conference call Novavax held to discuss the earnings results for the first quarter of 2021 ("1Q21

Earnings Call"), Novavax confirmed that it was unlikely to seek an EUA for NVX-CoV2373 in the United States until July 2021 at the earliest—*i.e.*, the third quarter of 2021.

**ANSWER:** Defendants respectfully refer the Court to the May 10, 2021 *Washington Post* article and to the transcript of the May 10, 2021 Earnings Call for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

175. In response, Novavax's stock price fell $15.50 per share, or 8.81%, to close at $160.50 per share on May 10, 2021. Moreover, following the Company's 1Q21 Earnings Call, Novavax's stock price continued to fall an additional $22.32 per share, or 13.91%, to close at $138.18 per share on May 11, 2021.

**ANSWER:** Defendants respectfully refer the Court to publicly available information about the Company's stock price for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

176. Analysts were initially disappointed by the news. For example, on May 11, 2021, CFRA reduced its rating on Novavax from Strong Buy to Buy in response to the news. Indeed, as Jefferies reported on May 11, 2021: "Shares of [Novavax] are taking a hit following the Q1 update." Similarly, on May 12, 2021, Zacks lowered its recommendation from neutral to underperform and stated: "Delay in the authorization filing for NVX-CoV2373, hurt the stock severely. Such delays in vaccine development do not bode well." Zacks specifically linked the

101

delay to the stock drop: "Novavax announced that it[s] plans to file for authorization for Novavax in the United States, United Kingdom and the EU in the second quarter of 2021 have been delayed to the third quarter. The stock tanked on this news."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts. Defendants respectfully refer the Court to the referenced Jefferies and Zacks reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

177. However, the Company's stock price remained artificially inflated after this announcement as Defendants knew but failed to disclose or deliberately disregarded the severity of the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain and Novavax's inability to achieve anywhere close to the FDA criteria needed to file its EUA. Instead, Defendant Erck reassured investors that any issues that Novavax may have experienced were behind Novavax, and continued convincing investors Novavax was on track to filing its EUA.

**ANSWER:** The Court has dismissed the claims related to purported misstatements made on February 24, 2021, June 14, 2021, and September 21, 2021, and purported misstatements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale at each of its plants, and the allegations in this Paragraph related

102

to such claims thus require no response; to the extent a response is deemed required, Defendants deny those allegations.  Defendants deny any remaining allegations in this Paragraph.

178.    For example, on that same day, May 10, 2021, during the 1Q21 Earnings Call, Defendant Erck touted that the regulatory and manufacturing hurdles causing the delay were now resolved: "Our timetable for regulatory filings, we know that we're delayed from where we thought we'd be at this point. But now we're giving guidance that ***nearly all of the major challenges have been overcome*** and we can clearly see the light at the end of the tunnel."

**ANSWER:**    Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny the remaining allegations in this Paragraph.

179.    During that same 1Q21 Earnings Call, an analyst from B. Riley Securities asked, with respect to Novavax's delayed submission: "[A]re you able to comment on what might be these sort of things that are causing the holdup? Is it just process coordinating between the different sites? Or are there any specific issues around any particular assay?" In response, Defendant Erck reassured investors that the Company had fixed the issues that caused the delays: "No. I mean, and part of it has to do with manufacturing at different sites and showing comparability between the processes and the actual end product between the different sites. And you have to develop assays that can follow those. And so I think it probably took a little longer than we expected to get a potency assay that was worked across - told the same story across all the sites. ***But I'm happy to say*** ***we did.*** ***We've*** ***crossed that bridge.*** ***We're - we*** ***made a big***

103

*breakthrough there* and we're now racing towards validating everything and putting it into a package."

**ANSWER:** Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

180. During that same 1Q21 Earnings Call, with respect to Novavax's "current state of [] manufacturing and [] anticipated capacity," Defendant Erck stated: "Today, our global supply chain now spans over 10 countries *with all of our manufacturing sites producing GMP material at scale*. I think we've done a remarkable job of standing up manufacturing in these multiple plants across the globe. *I'm happy to report that we have got to the point where we've successfully manufactured our drug substance, a recombinant protein nanoparticle, at commercial scale in each of these plants*. The drug substance production is the most complicated step in the overall manufacturing processes."

**ANSWER:** Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith. The Court has dismissed the claims purported misstatements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale at each of its plants, and the allegations in this Paragraph related to such statement thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

181.    During that 1Q21 Earnings Call, Defendant Erck further assured investors that Novavax was past all of the hurdles causing delays in EUA approval: "[E]very quarter gets more data pointing to a successful vaccine, we're getting close to the end, and - which is really the beginning for us and that's what we're all racing to do. I think *we've **eliminated all o f the serious hurdles** to getting - risk hurdles to getting to where we need to be to get an improved vaccine*."

**ANSWER:**    Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in this Paragraph.

182.    Analysts believed Defendants' story that such issues had been resolved and were encouraged by Defendants' reassurances. For example, on May 10, 2021, Jefferies reported that Novavax's "[management] remains very confident that they will hit 150M doses per month before the end of the year and expects to maintain that throughout 2022 and beyond." Jefferies similarly reported that Novavax's management "remains confident in their ability to execute" and that, "[w]hile [filings with the FDA] took longer than they initially expected, it appears they have everything close to being set now."

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the thoughts, beliefs, reactions, and sentiments of analysts.  Defendants respectfully refer the Court to the referenced Jefferies report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

183. Likewise, on May 11, 2021, Jefferies reported, "[w]hile the delays are clearly disappointing, we remain constructive on the name and see the outlook as promising given the clear high efficacy, clean safety profile, robust data package and optionality for a multivalent and/or CV-19/Flu combo vaccine." Cantor Fitzgerald also reported on May 11, 2021, that despite Novavax's update, "according to management, facilities in its network have demonstrated the ability to manufacture commercial scale GMP material." Similarly, on May 12, 2021, H.C. Wainwright reported: "We believe the [C]ompany remains a solid player in the COVID-19 vaccine landscape and think concerns about a delay in regulatory filings and manufacturing challenges are only temporary setbacks." H.C. Wainwright also reported: "We believe these challenges are temporary, as Novavax expects the remainder of capacity to come online and reach 150M doses per month in 4Q21, which is in line with the [C]ompany's stated goal of full capacity of 2B doses per year by [year end 2021]."

**ANSWER:** Defendants respectfully refer the Court to the Jefferies, Cantor Fitzgerald, and H.C. Wainwright reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith.

184. Defendant Erck's statements during the 1Q21 Earnings Call were materially false and misleading for the same reasons set forth in paragraphs 168-173 herein. In addition to those reasons, at the time Defendant Erck made these reassurances on May 10, 2021, the Texas Facility and North Carolina Facility experienced additional manufacturing problems. As noted, the FDA conducted an inspection of the Texas Facility from March 15, 2021 to March 19, 2021,

106

and the FDA issued on April 14, 2021 a formal 52-page investigation memo that detailed a litany of cGMP violations and manufacturing issues with the facility, which were reported to Novavax. The FDA ultimately concluded that "[q]uality oversight over manufacturing and testing operations is sub- optimal."

**ANSWER:** Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein. Defendants respectfully refer the Court to the May 10, 2021 statements by Defendant Erck and the referenced FDA memorandum for their true and complete contents, and Defendants deny any allegations inconsistent therewith. This Paragraph's allegations that statements were false and misleading call for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

185. For example, the FDA found (i) evidence of contamination in the Texas Facility, which was not properly recorded and investigated; (ii) failure to investigate, detect, and document appropriately a number of other deviations; (iii) that periodic review of deviation trending was not performed by the Quality Unit; and (iv) that the cleaning procedure for certain manufacturing areas was not always followed, including using disinfectants on surfaces in manufacturing areas that were not effective in inactivating or adequately removing microorganisms.

**ANSWER:** Defendants respectfully refer the Court to the referenced FDA memorandum for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

186. Additionally, the FDA similarly found a number of issues during its investigation of the North Carolina Facility from April 14, 2021 to April 21, 2021—only weeks before Defendants' May 10, 2021 statements. According to the FDA, the investigation of the North Carolina Facility revealed many quality-related issues, including that: (i) microbial control of the facility was inadequate, which led to rampant contamination of the facility; (ii) there was no comprehensive risk assessment conducted to evaluate cross-contamination of drug products, including where such drug products were manufactured in the same areas with shared product contact equipment; (iii) written procedures for manufacturing processes were inadequate, including inadequate procedures for the "Purification" step; (iv) the manufacturing process was not adequately monitored and/or controlled to ensure the quality of the drug substance was not adversely affected; and (v) other discrepancies were not fully investigated to identify a root cause and corrective and preventative actions were not adequately implemented to prevent recurrence.

**ANSWER:** Defendants respectfully refer the Court to the referenced FDA memorandum for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

108

187. Specifically, the FDA found a failure to investigate root causes and implement adequate corrective and preventative actions to control microbial contamination, as exemplified by the FDA learning from prior reports that microbial contamination was recovered from over 50 monitoring sites.

**ANSWER:** Defendants respectfully refer the Court to the referenced FDA memorandum for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

188. Notably, as explained in Section IV.G, according to CW 5, at the Texas Facility, a more serious contamination incident involving an "irido virus" (*i.e.*, iridescent virus) contamination was discovered on March 18, 2021. CW 5 recalled that the facility let the run continue for two or three days before starting an investigation two or three days after that, and caused a shutdown in manufacturing from March 2021 until at least September 2021. Indeed, Director of Manufacturing at the Texas Facility, CW 6, corroborated that there was a contamination incident at the Texas Facility discovered in April 2021, which led to a manufacturing shutdown that had not restarted by the time her tenure ended on June 30, 2021.

**ANSWER:** Defendants respectfully refer the Court to the referenced FDA memorandum for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

189. Thus, Defendants' above May 10, 2021 statements—*e.g.*, "nearly all of the major challenges have been overcome," "we've successfully manufactured our drug

substance . . . at commercial scale in each of these plants," "we've eliminated all of the serious hurdles to getting - risk hurdles to getting to where we need to be to get an improved vaccine," and similar misstatements—were materially false and misleading because Defendants had not yet overcome the manufacturing problems, including (a) not being able to meet the requisite purity and potency levels for NVX-CoV2373; (b) experiencing rampant contamination in critical manufacturing facilities; (c) failing to successfully scale up production; and (d) facing supply chain disruptions that existed since the start of the Class Period and continued throughout. Indeed, at the time of these misstatements, Novavax's critical manufacturing facilities faced serious cGMP violations, such as rampant contamination issues, and were unable to achieve alignment with FDA criteria. These issues in turn caused further manufacturing and regulatory delays.

**ANSWER:** This Paragraph's allegations that statements were false and misleading call for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny those allegations. The Court has dismissed the claims related to statements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale, and the allegations in this Paragraph related to such statement thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

C. **June 14, 2021 - Clinical Update Call**

190. On June 14, 2021, during a Clinical Update Call on NVX-CoV2373, Defendant Erck reassured investors that "*[w]ith each analysis, our trials proved that we are on the right*

110

*track. And today, with safety and efficacy that are consistent across all studies, our PREVENT-19 results reaffirm our strong belief in [NVX-CoV2373].*"

**ANSWER:** The Court has dismissed the claims related to purported misstatements made on June 14, 2021 and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

191. Analysts were again encouraged by Defendants' positive statements. For example, on June 14, 2021, Cantor Fitzgerald stated that "according to management, the eight facilities (up from zero a year ago) in its network have demonstrated the ability to manufacture commercial scale GMP material." Similarly, on the same day, Jefferies emphasized the importance of filing Novavax's data with regulatory agencies for approval and noted that Novavax said that it was on track to do so: "Key to [Novavax] will be [its] ability to execute on filing [its] data to the various regulatory agencies for EUA approval, ability to manufacture doses of [its] vaccine, and procure additional contracts. To these points, [management] reiterated Q3 timing on filings and achieving production goal of 100M dose/month by the end of Q3 and 150M dose/month by [year end]."

**ANSWER:** The Court has dismissed the claims related to purported misstatements made on June 14, 2021 and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

192. At this point in time, analysts were still encouraged by Novavax's ability to scale up production and meet cGMP standards. For instance, on August 4, 2021, Cantor Fitzgerald

111

again reported that "according to management, the eight facilities (up from zero a year ago) in its network have demonstrated the ability to manufacture commercial scale GMP material."

**ANSWER:** The Court has dismissed the claims related to purported misstatements made on June 14, 2021 and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

193. Defendant Erck's statement during the Clinical Update Call was materially false and misleading for the same reasons set forth in paragraphs 168-173 and 184-189 herein. Indeed, at the same time Defendant Erck was claiming that "our trials proved that we are on the right track," Novavax was experiencing a shortage of vaccine doses for clinical trials, which were causing trials to be delayed. Additionally, during this same time, Novavax was still experiencing the litany of manufacturing problems and delays outlined above. In fact, at this same time, manufacturing of NVX-CoV2373 at the Texas Facility was completely shut down.

**ANSWER:** Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein. The Court has dismissed the claims related to purported misstatements made on June 14, 2021 and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

**D. August 5, 2021 - *Reuters* Interview and Partial Disclosure / Materialization of the Risk**

194. On August 5, 2021, it was further partially revealed that Novavax was still experiencing manufacturing problems that affected Novavax's ability to file its EUA.

Specifically, on August 5, 2021, Novavax further delayed its EUA filing and reported that it expected to file for NVX-CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021. Additionally, Novavax's 2Q21 Form 10-Q further revealed that "[t]he U.S. government has recently instructed the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made."

**ANSWER:** Defendants respectfully refer the Court to SEC Form 10-Q of Novavax for the quarter ending June 30, 2021 for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

195. In response, Novavax's stock price fell $46.31 per share, or 19.61%, to close at $189.89 per share on August 6, 2021.

**ANSWER:** Defendants respectfully refer the Court to publicly available information about the Company's stock price for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

196. Analysts and the media were initially disappointed and shocked by this news. For example, on August 6, 2021, Jefferies reported: "We understand the lack of clarity around the US/EU filings is less than ideal." Similarly, that same day J.P. Morgan reported: "With respect to filing timelines in the US, the US [government] has requested the completion of

113

manufacturing validation activities prior to a regulatory submission, as such a US EUA filing is now anticipated in 4Q (3Q prior)." Similarly, on August 7, 2021, Seeking Alpha reported that the "news was a shocker for investors."

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts and the media.  Defendants respectfully refer the Court to the referenced Jefferies, J.P. Morgan, and Seeking Alpha reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith.

197.    However, the Company's stock price remained artificially inflated after this announcement as Defendants knew and failed to disclose or deliberately disregarded the severity of the manufacturing problems, which included consistently falling short of FDA standards such as required purity and potency levels, experiencing rampant contamination problems, failing to scale up production of its vaccine, facing supply chain disruptions, and Novavax's inability to achieve anywhere close to the FDA criteria needed to file its EUA. Instead, Defendant Erck continued to lead investors to believe that Novavax's issues were resolved.

**ANSWER:**    Defendants deny the allegations in this Paragraph.

198.    For example, according to an August 5, 2021 *Reuters* article that discussed an interview between Defendant Erck and *Reuters*, Defendant Erck stated: "***We appear to have got past (certain) supply issues and are now being able to produce at scale***."

114

**ANSWER:** Defendants respectfully refer the Court to the August 5, 2021 *Reuters* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

199. Analysts and the media were encouraged by Defendants' reassurances as Defendants undoubtedly convinced the public that any such issues were resolved and would no longer cause challenges to Novavax. For example, despite finding that the delays were "less than ideal," Jefferies reported on August 5, 2021, that "[m]anufacturing appears to be on track w[ith] the [C]ompany reiterating plans to reach 100M doses/month and 150M doses/month by the end of Q3 and Q4, respectively." Similarly, the next day, on August 6, 2021, Jefferies explained, "[w]hen asked what the gating steps are for submission to the UK/EU/US, [management] noted the need to reach each regulatory agencies' submission requirements, but the risk associated w[ith] these filings has been significantly reduced and [management] remains very confident they will be able to file."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts and the media. Defendants respectfully refer the Court to the referenced Jefferies reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

200. Also on August 6, 2021, Cantor Fitzgerald reported that, "[o]n the manufacturing front, the [C]ompany . . . remain[s] on track to achieve capacity of 100M doses per month by

the end of 3Q21, and 150M doses per month by the end of 4Q21." Likewise, Seeking Alpha reported on August 7, 2021, that "[w]hile [Novavax] announced a delay in submission to US FDA, it is still on track to achieve its previously planned manufacturing capacity for Q3 and Q4."

**ANSWER:** Defendants respectfully refer the Court to the August 6 and 7, 2021 referenced Cantor Fitzgerald and Seeking Alpha reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith.

201.    Defendant Erck's statement during his interview with *Reuters* was materially false and misleading for the same reasons set forth in paragraphs 168-173 and 184-189 herein. Indeed, at the time of Defendant Erck's reassurance, Novavax was still unable to scale up production and manufacturing problems, such as not being able to meet the requisite purity and potency levels for NVX-CoV2373, experiencing rampant contamination in critical manufacturing facilities, failing to successfully scale up production, and facing supply chain disruptions, continued to prevent Novavax from doing so.

**ANSWER:** Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein. This Paragraph's allegations that statements were false or misleading call for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the allegations in this Paragraph. Defendants respectfully refer the Court to the August 5, 2021

116

*Reuters* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in this Paragraph.

### E. September 21, 2021 - Devex UNGA 76 Conference

202. On September 21, 2021, Defendants attended a conference at Devex UNGA 76. During that conference, the Senior Global Health Reporter at Devex raised the topic of transparency on the part of manufacturers, such as Novavax. In response, Defendant Trizzino explained: "This transparency is important. ***And we've been extremely transparent across multiple fronts. All of our clinical data has been shared very quickly***."

**ANSWER:** The Court has dismissed the claims related to purported misstatements made on September 21, 2021 and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

203. Defendant Trizzino's statement during the Devex UNGA 76 Conference was materially false and misleading for the same reasons set forth in paragraphs 168-173 and 184-189 herein. Indeed, Defendant Trizzino's representation directly contradicts Defendants' conduct throughout the entire Class Period. Despite constantly discussing NVX-CoV2373's manufacturing process and development, Defendants had not been transparent with respect to the litany of manufacturing problems related to purity, potency, contamination, scalability, and the supply chain related to NVX-CoV2373 that persisted throughout the entire Class Period, let alone "extremely" transparent.

117

**ANSWER:** The Court has dismissed the claims related to purported misstatements made on September 21, 2021 and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

**F.     September 29, 2021 - Cantor Fitzgerald Global Healthcare Conference**

204.   On September 29, 2021, during the Cantor Fitzgerald Global Healthcare Conference, Defendant Trizzino reassured investors that manufacturing problems that had delayed Novavax's EUA filing were fixed. For example, in response to a Cantor Fitzgerald analyst's question about EUA and manufacturing, Defendant Trizzino touted: "[T]he combination of our recombinant protein nanoparticle, its nanoparticle structure, the particle structure of our Matrix adjuvant presented some challenges in those assays, ***which have now been resolved***."

**ANSWER:** Defendants respectfully refer the Court to the transcript of Defendant Trizzino's September 29, 2021 statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in this Paragraph.

205.   Defendant Trizzino's statement during the Cantor Global Healthcare Conference was materially false and misleading for the same reasons set forth in paragraphs 168-173 and 184–189 herein. Indeed, even at this time, Defendants had still not resolved the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that had prevented Novavax from meeting FDA criteria and filing its EUA.

118

**ANSWER:** Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein. This Paragraph's allegations that statements were false or misleading call for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny those allegations. Defendants respectfully refer the Court to the transcript of Defendant Trizzino's September 29, 2021 statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

### G. October 19, 2021 - Final Disclosure / Materialization of the Risk

206. On October 19, 2021, the full truth concerning Novavax's underlying manufacturing problems was fully revealed and/or materialized. On that date, *Politico* published an article, after market hours, entitled: "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," which revealed the underlying and undisclosed manufacturing problems that had been preventing Novavax from filing its EUA with the FDA.

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 *Politico* article.

207. Specifically, the article reported that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373. The article further explained that Novavax's "issues are more concerning than

119

previously understood" and that the Company could take until the end of 2022 to resolve its manufacturing issues and win regulatory authorizations and approvals.

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

208. Additionally, while the *Politico* article explained that the FDA generally sets a 90% purity level standard for each Covid-19 vaccine batch, the article revealed from reliable sources that Novavax had only recently shown purity levels hovering around 70%. According to one person whom the article quoted with knowledge of the matter: "At some level, I think the efficacy was never going to outweigh the risk associated with the impurity that was in there."

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

209. Similarly, according to the *Politico* article, the Company "has consistently run into production problems," including "[t]he methods it used to test the purity of the vaccine," which "have fallen short of regulators' standards" as Novavax "has not been able to prove that

120

it can produce a shot that is consistently up to snuff, according to multiple people familiar with Novavax's difficulties." As some U.S. officials stated in the *Politico* article, "Novavax's manufacturing problems are seen as far more difficult to fix than the sanitary and design concerns that halted production of J&J's vaccine at the Emergent plant earlier this year."

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

210. Moreover, the *Politico* article also found that Novavax was already aware of specific concerns with NVX-CoV2373's manufacturing process, stating that "senior Trump administration officials on Operation Warp Speed . . . repeatedly warned the [C]ompany that it risked running into problems in scaling up manufacturing of the shot, two people with direct knowledge of those discussions said"; that, "[i]n particular, they worried that Novavax would have difficulty ensuring that the vaccine consistently met the FDA's rigorous quality standards once the vaccine went into mass production—the exact problem that has now stymied the [C]ompany for months"; and that Novavax "rushed the process" and "can't make" the vaccine, according to one of the people with knowledge of the matter.

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent

therewith. Defendants deny any remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

211. In response, Novavax's stock price fell $23.69 per share, or 14.76%, to close at $136.86 per share on October 20, 2021. Additionally, *Politico* reported on October 20, 2021, that Novavax's issues were "worse than previously reported and could take several more months to set right."

**ANSWER:** Defendants respectfully refer the Court to publicly available information about the Company's stock price and to the October 20, 2021 *Politico* article for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, and specifically deny the accuracy of the October 20, 2021 *Politico* article.

## VI. LOSS CAUSATION

212. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Novavax common stock and operated as a fraud or deceit on Class Period purchasers of Novavax common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

122

213. Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Novavax common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased Novavax stock at the artificially inflated prices at which it traded during the Class Period.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

214. The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between May 10, 2021 and October 19, 2021. During this period, Novavax's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Novavax's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on October 19, 2021, that the full truth was known to the market, such that there was no longer any artificial inflation in Novavax's stock price attributable to the fraud.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

215. The declines in Novavax's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected

123

and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

216. As a result of their purchases of Novavax common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Novavax common stock to trade at artificially inflated levels throughout the Class Period.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

217. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Novavax's business. As the truth about the Company and the extent of the fraud was revealed to the market, the price of Novavax common stock fell significantly. These declines removed the inflation from the price of Novavax common stock, causing real economic loss to investors who had purchased Novavax common stock during the Class Period.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

218. Each decline in the price of Novavax common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

219. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Novavax common stock and the subsequent significant decline in the value of Novavax common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

220. The market for Novavax common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 4,299,450 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as

125

alleged herein, Novavax's common stock traded at artificially inflated prices. Lead Plaintiffs and other Class members purchased Novavax common stock relying upon the integrity of the market relating to Novavax common stock and suffered economic losses as a result thereof.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

221. The declines in Novavax's common stock price on May 10-11, 2021, August 6, 2021, and October 20, 2021, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors during market hours on May 10, 2021, and after the market closed on August 5, 2021 and October 19, 2021. The timing and magnitude of Novavax's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

**A. May 10, 2021 - First Partial Disclosure / Materialization of the Risk**

222. On May 10, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period

126

were revealed and/or partially materialized when *The Washington Post* reported during market hours that Novavax's EUA "filing was delayed by manufacturing regulatory issues, until June at the earliest, according to four people who had recently been briefed on the [C]ompany's plans."

**ANSWER:** The Court has dismissed the claims purported misstatements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale at each of its plants, and the allegations in this Paragraph thus require no response to the extent they relate to those statements; to the extent a response is deemed required, Defendants deny those allegations. This Paragraph calls for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the allegations in this Paragraph. Defendants respectfully refer the Court to the referenced *Washington Post* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

223. Later that day after market hours, during the 1Q21 Earnings Call, Novavax confirmed that it was unlikely to seek an EUA for NVX-CoV2373 in the U.S. until July 2021 at the earliest—*i.e.*, the third quarter of 2021.

**ANSWER:** The Court has dismissed the claims purported misstatements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale at each of its plants, and the allegations in this Paragraph thus require no response to the

extent they relate to those statements; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny the remaining allegations in this Paragraph.

224. The May 10, 2021 disclosures about Novavax delaying its EUA filing because of manufacturing regulatory issues were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Novavax's then-current state of its manufacturing processes and capabilities and Novavax's purported alignment with FDA criteria.

**ANSWER:** The Court has dismissed the claims purported misstatements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale at each of its plants, and the allegations in this Paragraph thus require no response to the extent they relate to those statements; to the extent a response is deemed required, Defendants deny those allegations. This Paragraph calls for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the allegations in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

225. Moreover, *The Washington Post* article and 1Q21 Earnings Call revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. *The Washington Post* article and 1Q21 Earnings Call partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Novavax's underlying manufacturing problems that were preventing Novavax from filing its EUA with the FDA.

**ANSWER:** Defendants respectfully refer the Court to the *Washington Post* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. The Court has dismissed the claims purported misstatements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale at each of its plants, and the allegations in this Paragraph thus require no response to the extent they relate to those statements; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

226. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Novavax common stock fell $15.50 per share, or 8.81%, to close at $160.50 per share on May 10, 2021. Moreover, following the Company's 1Q21 Earnings Call, Novavax's stock price continued to fall an additional $22.32 per share, or 13.91%, to close at $138.18 per share on May 11, 2021.

**ANSWER:** The Court has dismissed the claims purported misstatements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale at each of its plants, and the allegations in this Paragraph thus require no response to the extent they relate to those statements; to the extent a response is deemed required, Defendants deny those allegations. This Paragraph calls for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the allegations in this Paragraph. Defendants respectfully refer the Court to publicly available information about the

129

Company's stock price for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

227. Upon learning of this news, analysts were initially disappointed. For example, on May 11, 2021, CFRA reduced its rating on Novavax from Strong Buy to Buy in response to the news. Indeed, as Jefferies reported on May 11, 2021, "[s]hares of [Novavax] are taking a hit following the Q1 update." Similarly, on May 12, 2021, Zacks lowered its recommendation from neutral to underperform and stated: "Delay in the authorization filing for NVX-CoV2373, hurt the stock severely. Such delays in vaccine development do not bode well." Zacks specifically linked the delay to the stock drop: "Novavax announced that it[s] plans to file for authorization for Novavax in the United States, United Kingdom and the EU in the second quarter of 2021 have been delayed to the third quarter. The stock tanked on this news."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts. Defendants respectfully refer the Court to the referenced Jefferies and Zacks reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith.

228. Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to reassure the market that any manufacturing problems related to purity, potency, contamination, scalability, and the supply chain were resolved. For example, Defendant Erck reassured investors that "nearly all of the major challenges have been overcome and we can clearly see the light at the end of the tunnel."

130

**ANSWER:** Defendants respectfully refer the Court to the referenced public statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

229. Similarly, with respect to solving certain manufacturing problems that caused the EUA filing delay, Defendant Erck explained: "I'm happy to say we did. We've crossed that bridge. We're—we made a big breakthrough there and we're now racing towards validating everything and putting it into a package." Defendant Erck likewise told investors that "we've eliminated all of the serious hurdles to getting—risk hurdles to getting to where we need to be to get an improved vaccine."

**ANSWER:** Defendants respectfully refer the Court to the referenced public statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

230. Defendant Erck also stated that Novavax's then-current manufacturing progress of NVX-CoV2373 was doing so well that "[w]ith respect to the U.S. market, we are well positioned with our technology and timing to supply product for boosting and seasonal revaccination." Indeed, Defendant Erck touted that "all of our manufacturing sites [are] producing GMP material at scale," and that "I'm happy to report that we have got to the point where we've successfully manufactured our drug substance, a recombinant protein nanoparticle, at commercial scale in each of these plants."

**ANSWER:** The Court has dismissed the claims purported misstatements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale at each of its plants, and the allegations in this Paragraph thus require no response to the extent they relate to those statements; to the extent a response is deemed required, Defendants deny those allegations. Defendants respectfully refer the Court to the referenced public statements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

231. Analysts were reassured that any manufacturing problems that Novavax experienced had been resolved and that Novavax no longer faced such challenges. For example, on May 10, 2021, Jefferies noted that Novavax's management "remains confident in their ability to execute" and that, "[w]hile [filings with the FDA] took longer than they initially expected, it appears they have everything close to being set now." Likewise, on May 11, 2021, Jefferies reported: "While the delays are clearly disappointing, we remain constructive on the name and see the outlook as promising given the clear high efficacy, clean safety profile, robust data package and optionality for a multivalent and/or CV-19/Flu combo vaccine."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts. Defendants respectfully refer the Court to the referenced Jefferies reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

132

232. Cantor Fitzgerald also reported on May 11, 2021, that despite Novavax's update, "according to management, facilities in its network have demonstrated the ability to manufacture commercial scale GMP material."

**ANSWER:** Defendants respectfully refer the Court to the referenced Cantor Fitzgerald report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

233. Similarly, on May 12, 2021, H.C. Wainwright reported: "We believe the [C]ompany remains a solid player in the COVID-19 vaccine landscape and think concerns about a delay in regulatory filings and manufacturing challenges are only temporary setbacks." H.C. Wainwright also reported: "We believe these challenges are temporary, as Novavax expects the remainder of capacity to come online and reach 150M doses per month in 4Q21, which is in line with the [C]ompany's stated goal of full capacity of 2B doses per year by [year end 2021]."

**ANSWER:** Defendants respectfully refer the Court to the referenced H.C. Wainwright report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

B. **August 5, 2021 - Second Partial Disclosure / Materialization of the Risk**

234. On August 5, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized when Novavax issued a press release reporting its financial results and operational highlights for the second quarter of 2021. Among

133

other news, Novavax reported that it expected to file for NVX-CoV2373's EUA in the fourth quarter of 2021, rather than the third quarter of 2021.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the allegations in this Paragraph. Defendants respectfully refer the Court to Novavax's August 5, 2021 Press Release for its full and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

235. On that same day, Novavax filed with the SEC its 2Q21 Form 10-Q, which was signed by Defendants Erck and Trizzino. The 2Q21 Form 10-Q further revealed, "[t]he U.S. government has recently instructed the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made."

**ANSWER:** Defendants admit that Novavax filed its Form 10-Q for the second quarter of 2021 with the SEC on or around August 5, 2021. Defendants respectfully refer the Court to that Form 10-Q for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

236. The August 5, 2021 disclosures about Novavax's additional regulatory filing delays and the FDA's instruction to Novavax to prioritize aligning its analytic methods with the FDA were foreseeable consequences of, and within the zone of risk concealed by, Defendants'

134

misrepresentations and omissions concerning Novavax's then-current state of its manufacturing processes and capabilities and Novavax's purported alignment with FDA criteria.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

237. Moreover, the August 5, 2021 press release and 2Q21 Form 10-Q revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The August 5, 2021 press release and 2Q21 Form 10-Q partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Novavax's continued manufacturing problems that were still affecting Novavax's ability to file its EUA.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

238. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Novavax common stock fell $46.31 per share, or 19.61%, to close at $189.89 per share on August 6, 2021.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the allegations in this

Paragraph. Defendants respectfully refer the Court to publicly available information about the Company's stock price for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

239. Analysts and the media were initially disappointed and shocked by this news. For example, on August 6, 2021, Jefferies reported, "[w]e understand the lack of clarity around the US/EU filings is less than ideal." Similarly, that same day J.P. Morgan reported, "[w]ith respect to filing timelines in the US, the US [government] has requested the completion of manufacturing validation activities prior to a regulatory submission, as such a US EUA filing is now anticipated in 4Q (3Q prior)."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts. Defendants respectfully refer the Court to the referenced Jefferies and J.P. Morgan reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

240. Similarly, on August 7, 2021, Seeking Alpha reported that the "news was a shocker for investors."

**ANSWER:** Defendants respectfully refer the Court to Seeking Alpha's report for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

241. Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to reassure the market that such manufacturing issues were

136

resolved and that Novavax was on track to filing its EUA. For example, Defendant Erck reassured investors that "[w]e appear to have got past (certain) supply issues and are now being able to produce at scale."

**ANSWER:** Defendants respectfully refer the Court to the August 5, 2021 *Reuters* article detailing the *Reuters* interview with Defendant Erck, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

242. Despite their initial disappointment, analysts and the media were encouraged by Defendants' reassurances as Defendants convinced the public that any such issues were resolved and would no longer cause challenges to Novavax. For example, despite finding that the delays were "less than ideal," Jefferies reported on August 5, 2021, that "[m]anufacturing appears to be on track w[ith] the company reiterating plans to reach 100M doses/month and 150M doses/month by the end of Q3 and Q4, respectively." Similarly, the next day, on August 6, 2021, Jefferies explained, "[w]hen asked what the gating steps are for submission to the UK/EU/US, [management] noted the need to reach each regulatory agencies' submission requirements, but the risk associated w[ith] these filings has been significantly reduced and [management] remains very confident they will be able to file."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts. Defendants respectfully refer the Court to the referenced Jefferies reports for their true and complete contents, and Defendants deny

any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

243. Also on August 6, 2021, Cantor Fitzgerald reported that, "on the manufacturing front, the [C]ompany . . . remain[s] on track to achieve capacity of 100M doses per month by the end of 3Q21, and 150M doses per month by the end of 4Q21." Likewise, Seeking Alpha reported on August 7, 2021, that "[w]hile [Novavax] announced a delay in submission to US FDA, it is still on track to achieve its previously planned manufacturing capacity for Q3 and Q4."

**ANSWER:** Defendants respectfully refer the Court to the referenced Cantor Fitzgerald and Seeking Alpha reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith.

C. **October 19, 2021 - Final Disclosure / Materialization of the Risk**

244. On October 19, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized. On that date, *Politico* published an article, after market hours, entitled: "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign." The *Politico* article reported, in relevant part, that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" with respect to NVX-CoV2373. The *Politico* article cited anonymous sources as stating that Novavax's "issues are more concerning than previously understood" and that the Company

138

could take until the end of 2022 to resolve its manufacturing issues and win regulatory authorizations and approvals.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the allegations in this Paragraph. Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

245. Specifically, the *Politico* article reported that Novavax's "delay, which was confirmed by three other people familiar with the discussions between Maryland-based Novavax and the Biden administration, represents a major setback in the effort to vaccinate the world in the wake of new, more transmissible variants." For example, according to the *Politico* article, the Company "has consistently run into production problems," including "[t]he methods it used to test the purity of the vaccine," which "have fallen short of regulators' standards" as Novavax "has not been able to prove that it can produce a shot that is consistently up to snuff, according to multiple people familiar with Novavax's difficulties."

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, and specifically deny

any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

246. The *Politico* article also reported that "[a]lthough Novavax recently attested to some of its analytics and testing issues in a quarterly filing with the [SEC], the [C]ompany's issues are more concerning than previously understood, according to two of the people with direct knowledge of the matter." For example, while "it is generally understood that each [Covid-19] vaccine batch should reach at least 90 percent" in terms of purity levels, Novavax "has struggled to attain anywhere close to that, one of the people with direct knowledge of the situation said," and, according to "[a]nother person familiar with the [C]ompany's manufacturing process," the Company "has recently shown purity levels hovering around 70 percent." According to one person that the article quoted with knowledge of the matter, "At some level, I think the efficacy was never going to outweigh the risk associated with the impurity that was in there."

**ANSWER:** Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

247. Moreover, the *Politico* article revealed that Novavax's manufacturing issues were so severe that they strained global Covid-19 vaccination efforts. For example, with respect

to the Covid-19 Vaccines Global Access initiative, also known as COVAX, the *Politico* article found that "[t]he global coalition is already behind on hundreds of millions of planned doses this month" and "is now also at risk of missing its already downgraded 2021 target." The *Politico* article also quoted the director of the Duke Global Health Innovation Center, who stated, "COVAX continues to be challenged for adequate supply . . . in that context, Novavax's manufacturing challenges and delays have been massively disruptive."

**ANSWER:**   Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny the remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

248.   The *Politico* article also found that Novavax was already aware of specific concerns with NVX-CoV2373's manufacturing process, stating that "senior Trump administration officials on Operation Warp Speed . . . repeatedly warned the [C]ompany that it risked running into problems in scaling up manufacturing of the shot, two people with direct knowledge of those discussions said"; that, "[i]n particular, they worried that Novavax would have difficulty ensuring that the vaccine consistently met the FDA's rigorous quality standards once the vaccine went into mass production—the exact problem that has now stymied the [C]ompany for months"; and that Novavax "rushed the process" and "can't make" the vaccine, according to one of the people with knowledge of the matter.

**ANSWER:**     Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny the remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

249.     Finally, the *Politico* article revealed that, even as Defendants repeatedly downplayed NVX-CoV2373's manufacturing issues, the U.S. government's confidence in Novavax's ability to successfully manufacture the drug had waned. For example, the *Politico* article stated that, according to three people with knowledge of the matter, "Novavax's manufacturing problems are seen as far more difficult to fix than the sanitary and design concerns that halted production of J&J's vaccine at the Emergent plant earlier this year."

**ANSWER:**     Defendants respectfully refer the Court to the October 19, 2021 *Politico* article for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny the remaining allegations in this Paragraph, and specifically deny any alleged facts purportedly recounted by or attributed by the Complaint to the October 19, 2021 Politico article.

250.     The October 19, 2021 disclosures about Novavax's underlying manufacturing issues and that Novavax was unable to meet FDA criteria needed to file its EUA were foreseeable consequences of, and within the zone of risk concealed by, Defendants'

142

misrepresentations and omissions concerning Novavax's then-current state of its manufacturing processes and capabilities and Novavax's purported alignment with FDA criteria.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

251. Moreover, the October 19, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Novavax's underlying manufacturing issues, Novavax's alignment with FDA criteria, and Novavax's ability to file its EUA with the FDA.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph. Defendants deny any remaining allegations in this Paragraph.

252. On this shocking news, the price of Novavax's stock price fell $23.69 per share, or 14.76%, to close at $136.86 per share on October 20, 2021.

**ANSWER:** Defendants respectfully refer the Court to publicly available information about the Company's stock price for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

143

253. Analysts understood that the drop in Novavax's stock price was caused by the aforementioned disclosures and revelations. For example, on October 20, 2021, Cantor Fitzgerald explained that "the recent news articles that cited 'anonymous sources' stating Novavax has manufacturing issues that are 'jeopardizing billions of doses earmarked for poor and middle-income countries' . . . has resulted in shares trading down today."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, reactions, and sentiments of analysts. Defendants respectfully refer the Court to Cantor Fitzgerald's referenced report for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

## VII. ADDITIONAL INDICIA OF SCIENTER

254. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Novavax's and their materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

**ANSWER:** Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding referenced section as if fully set forth herein. This Paragraph calls

144

for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

### A. Defendants Enriched Themselves Through Insider Sales In Advanced of Important Announcements[17]

255. Knowing all along that Novavax would have to delay its EUA filing due to underlying and undisclosed manufacturing issues, Defendants Erck, Trizzino, and Glenn sought to enrich themselves at the expense of Novavax investors. As explained above, Novavax needed to meet certain FDA criteria to file its EUA with the FDA. That is, while Defendants had promised certain dates for when Novavax would file its EUA, if NVX-CoV2373 was not yet meeting those FDA criteria—as was the case—they would have to delay the filing, which they did. And as one analyst, Zacks, explained, "[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, *leaving an adverse impact on its shares*." Armed with the knowledge that Novavax's underlying manufacturing issues would require Novavax to announce regulatory filing delays on May 10, 2021 and August 5, 2021, Defendants Erck, Trizzino, and Glenn collectively sold over 100,000 shares, reaping tens of millions of dollars only weeks—and sometimes days—before such announcements.

**ANSWER:** Defendants respectfully refer the Court to Zacks' referenced analysis and to the Forms 4 referenced in Footnote 17 for their true and complete contents, and Defendants

---

[17] To evaluate the Individual Defendants' selling activity, Lead Plaintiffs used the publicly available trading data that the Individual Defendants are required to report to the SEC on Form 4.

deny any allegations inconsistent therewith. The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants lack knowledge or information sufficient to form a belief as to the allegations in Footnote 17. Defendants deny any remaining allegations in this Paragraph.

### 1. Defendants Erck, Trizzino, and Glenn Sold Large Blocks of Novavax Stock Right Before the EUA Delay Announcements

256.    After trading at only $4 per share as of January 2020, Novavax's stock price skyrocketed to almost $240 per share as of the beginning of the Class Period in light of the anticipated potential impact that bringing a successful Covid-19 vaccine to market would have on the Company. As long as the public continued to believe that Novavax had resolved and overcome any manufacturing problems that would prevent its ability to file its EUA, Defendants would be able to prevent Novavax's stock price from falling.

**ANSWER:**    Defendants respectfully refer the Court to publicly available information about the Company's stock price and to the Forms 4 referenced in Footnote 17 for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

257.    However, in reality, even reassurance after reassurance was not able to avoid the inevitable. That is, despite what Defendants told the market, the underlying manufacturing issues prevented Novavax from filing its EUA—requiring Defendants to announce that they were delaying their filing. Thus, knowing that the stock price would take a dive upon the market

146

learning about the delay, Defendants Erck, Trizzino, and Glenn sold a vast number of shares before the announcements.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny the remaining allegations in this Paragraph.

258. For example, in July 2021, the month leading up to the second partial corrective disclosure and/or materialization of the risk event on August 5, 2021, ***Defendant Erck sold over 100,000 shares of Novavax stock, reaping proceeds of over $22.5 million***. This stands in stark contrast to the zero shares he sold and $0 in stock sale proceeds he earned at the same time the previous year in July 2020. More notable is that Defendant Erck sold off his shares at the same time that the Texas Facility was shut down due to contamination. Indeed, CW 5 confirmed that the facility was at a standstill when Novavax executives unloaded their stock in July 2021.

**ANSWER:** Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Stanley C. Erck's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

259. Defendant Glenn carefully timed his Novavax stock sales prior to the first and second partial corrective disclosures and/or materialization of the risk events on May 10, 2021

147

and August 5, 2021, respectively. In mid-to-late April 2021, Defendant Glenn sold over 8,000 shares of Novavax stock, reaping over $1.6 million in proceeds. Then, in July 2021, he sold over 8,000 additional shares representing proceeds of more than $1.5 million.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

260. Furthermore, just days leading up to the first partial corrective disclosure and/or materialization of the risk event on May 10, 2021, Defendant Trizzino sold over 3,000 shares of Novavax stock on May 5 and May 7, earning nearly $600,000 in proceeds.

**ANSWER:** Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant John J. Trizzino's beneficial ownership of securities for the forms' full and complete content regarding such Defendant's equity sales, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

261. As such, Defendants Erck, Trizzino, and Glenn—knowing that the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain would cause regulatory delays and thus Novavax's stock to drop—enriched themselves before the public found out the truth.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations related to such Defendant thus require no response; to the extent a response is

148

deemed required, Defendants deny those allegations. Defendants deny the remaining allegations in this Paragraph.

### 2. Defendants Erck, Trizzino, and Glenn Reaped Massive Proceeds During the Class Period

262. In addition, not only did Defendants Erck, Trizzino, and Glenn carefully time their stock sales at opportune moments right before Novavax's regulatory delay announcements would cause the stock to drop, but they also lined their pockets with massive proceeds throughout the Class Period when Novavax's share price was massively inflated in light of the anticipated potential impact that bringing a successful Covid-19 vaccine to market would have on the Company. Defendants Erck, Trizzino, and Glenn took advantage of the inflated price—knowing all along that the stock would plummet once the public learned the truth.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny the remaining allegations in this Paragraph.

263. Collectively, Defendants Erck, Trizzino, and Glenn increased their total stock sales by over 33% from 247,326 shares sold during the Control Period to 329,505 shares sold during the Class Period.[18] The contrast between sales during the Control Period and the Class Period is also striking when measured in dollars. Collectively, ***proceeds from Defendants' sales***

---

[18] Lead Plaintiffs analyzed the trading by the Individual Defendants during the Class Period and during the similar and equal-length period preceding the Class Period beginning February 24, 2020 to October 19, 2020 (the "Control Period").

*increased over 118% during the Class Period*, from $29,896,044 million during the Control Period to $65,195,024 million during the Class Period.

**ANSWER:** Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Stanley C. Erck's and John J. Trizzino's beneficial ownership of securities for the forms' full and complete content regarding such Defendants' equity sales, and Defendants deny any allegations inconsistent therewith. The Court has dismissed the claims against Defendant Glenn, and the allegations related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

264. Individually, Defendants Erck's, Trizzino's, and Glenn's sales also increased during the Class Period. During the Class Period, Defendant Erck sold almost five times as many shares during the Class Period as compared to the number of Novavax shares he sold during the Control Period. Moreover, *Defendant Erck's proceeds from Novavax sales increased by more than 750% during the Class Period*—from $4,549,253 million during the Control Period to $38,672,789 million during the Class Period. During the Class Period, Defendant Trizzino's proceeds from Novavax sales increased by almost 6%. Similarly, Defendant Glenn's proceeds from Novavax sales increased by over 3.5% during the Class Period.

**ANSWER:** Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Stanley C. Erck's and John J. Trizzino's beneficial ownership

of securities for the forms' full and complete content regarding such Defendants' equity sales, and Defendants deny any allegations inconsistent therewith. The Court has dismissed the claims against Defendant Glenn, and the allegations related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

265. Accordingly, Defendants Erck's, Trizzino's, and Glenn's trading behavior during the Class Period raises a strong inference that it occurred in anticipation of having to disclose the known underlying manufacturing problems related to purity, potency, contamination, scalability, and the supply chain and that such problems were preventing Novavax from filing its EUA— thereby supporting a strong inference of scienter.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the allegations in this Paragraph. The Court has dismissed the claims against Defendant Glenn, and the allegations related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Stanley C. Erck's and John J. Trizzino's beneficial ownership of securities for the forms' full and complete content regarding such Defendants' equity sales, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

151

## B. Manufacturing NVX-CoV2373 Was Critical to Novavax's Core Operations

266. The Individual Defendants' knowledge of the NVX-CoV2373 vaccine manufacturing process and issues related thereto can be inferred because these facts were critical to Novavax's core operations. Indeed, in light of the Company's dismal business prospects immediately preceding the Covid-19 pandemic and lack of revenue or growth, Novavax's potential profits from the NVX-CoV2373 vaccine were crucial to the Company's continued viability.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

267. The Company admitted as much at multiple points prior to and throughout the Class Period. For example, in the Company's February 19, 2021 report to the Subcommittee on Oversight and Investigations, U.S. House of Representatives, Committee on Energy and Commerce, Defendant Trizzino explained that "getting this vaccine in the arms of people . . . is our *priority* and *singular goal* right now. Our team continues to work *non-stop* to get NVX-CoV2373 developed, authorized for use and ultimately delivered to vaccination clinics." Similarly, in the Company's 1Q 2021 Form 10-Q, it explained that "[a]t the *forefront* of [its] pipeline is NVX-CoV2373."

**ANSWER:** Defendants respectfully refer the Court to Novavax's February 19, 2021 report to the Subcommittee and Novavax's Form 10-Q for the first quarter of 2021 for their true

152

and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

268. Indeed, the vaccine was of such importance to the Company, and the public at large, that on June 10, 2021, Novavax hosted Maryland Governor Larry Hogan at the site of the Company's planned Vaccines Innovation Campus and global headquarters in Gaithersburg. Additional guests included state, regional, and local officials. Defendants Erck and Glenn personally led the tour, providing an overview of the facility and press briefing.

**ANSWER:** Defendants admit that Novavax hosted Maryland Governor Larry Hogan and other state, regional, and local officials in Gaithersburg on or around June 10, 2021. Defendants deny the remaining allegations in this Paragraph.

269. The Texas Facility and North Carolina Facility were also critical to Novavax's development of NVX-CoV2373, and thus the Company's success. For example, Defendant Trizzino himself testified before the Subcommittee on Oversight and Investigations of the U.S. House of Representatives, Committee on Energy and Commerce on February 19, 2021, that the "antigen produced at the Fuji sites in North Carolina and Texas are a critical component of our US supply chain." Likewise, FUJIFILM CEO Martin Meeson referred to FUJIFILM as "a critical partner to Novavax." In fact, FUJIFILM's role was so important to the development of NVX- CoV2373 that then-President Trump toured the North Carolina Facility in July 2020.

**ANSWER:** Defendants respectfully refer the Court to Novavax's February 19, 2021 report to the Subcommittee and FUJIFILM CEO Martin Meeson's statements before the same

Subcommittee for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

270. Defendants further acknowledged that achieving certain purity levels was critical to obtaining regulatory approval of the NVX-CoV2373 vaccine. For example, Novavax stated in its 2Q21 Form 10-Q that "[a]ccepted analytical methods that we can use to demonstrate our vaccine's purity, potency and consistent lot manufacturing are *critical* to attaining licensure in all the territories we intend to sell."

**ANSWER:** Defendants respectfully refer the Court to Novavax's Form 10-Q for the first quarter of 2021 for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

271. Analysts following Novavax also understood that the NVX-CoV2373 vaccine was critical to the Company's success. For example, on April 15, 2021, CFRA issued a report stating that "[w]e think the future financial success of NVAX and its ability to record a positive bottom-line result is highly dependent on successful approvals and rapid commercialization of its Covid- 19 vaccine" and "the main focus of the [C]ompany is on its NVX-CoV2373 vaccine candidate against Covid-19." Similarly, on April 28, 2021, Zacks issued a report stating that "any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, leaving an adverse impact on its shares." On June 14, 2021, Jefferies issued a report explaining that the "[k]ey to [Novavax] will be their ability to execute on filing their data to the various regulatory agencies for EUA approval, ability to manufacture

154

doses of their vaccine, and procure additional contracts." As the Class Period progressed, and Defendants continued to delay the release of the vaccine, analysts reiterated that the release of the NVX-CoV2373 vaccine was key to the Company's success. For example, on August 6, 2021, Jeffries issued a report, which stated that "[i]nvestors went into Q2 EPS w/ two key questions 1) what's the status of the EUA filings and 2) has vaccine manufacturing improved[.]"

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the thoughts, beliefs, understandings, reactions, and sentiments of analysts. Defendants respectfully refer the Court to the referenced analyst reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

272. Moreover, before the Covid-19 pandemic, and the resulting capital influx from government incentives to manufacture the NVX-Co2372 vaccine, Novavax was in dire straits. After a previous failed attempt to produce a commercially viable vaccine, the Company was in danger of being delisted from the NASDAQ and was forced to sell its manufacturing facilities to avoid going out of business. By January 2020, the Company had barely enough cash left to survive for six months, and its market value was a paltry $127 million. Indeed, the $388 million investment by CEPI was over three times the Company's then-market value and the $1.6 billion awarded to Novavax by the federal government was over twelve times the Company's pre-pandemic value. However, during the Class Period, as Defendants misleadingly assured the

market of the NVX-CoV2373 vaccine's imminent roll out, the Company's market value surged to as much as $11 billion.

**ANSWER:** Defendants deny the allegations in this Paragraph.

273. Given the importance of the NVX-CoV2373 vaccine to Novavax's business, knowledge of the manufacturing problems associated with the vaccine, including the fact that Novavax was unable to produce a vaccine of sufficient quality to meet regulatory requirements, can therefore be imputed to the Individual Defendants.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

**C.** **Defendants' Personal Involvement in NVX-CoV2373's Development Supports That They Had Actual Knowledge or Were Reckless in Not Knowing About the Manufacturing Problems**

274. The Individual Defendants were responsible for Novavax's efforts to manufacture the NVX-CoV2373 vaccine in conformance with FDA regulations, including through personally communicating with the FDA and overseeing the manufacturing process, supporting a strong inference of scienter.

**ANSWER:** Defendants deny the allegations in this Paragraph.

275. Indeed, there is no question that the Individual Defendants were directly and personally involved in Novavax's efforts to manufacture a quality vaccine. cGMP regulations and multiple CWs confirm and corroborate that Novavax was aware of the manufacturing

problems related to purity, potency, contamination, scalability, and the supply chain throughout the Class Period.

**ANSWER:** Defendants deny the allegations in this Paragraph.

276. For example, cGMP regulations required Novavax to apprise itself of any manufacturing problems, even where another company was actually manufacturing the vaccine. Novavax was also "responsible for approving or rejecting drug products manufactured, processed, packed, or held under contract by another company," such as FUJIFILM or any other manufacturing partner. Additionally, with respect to any "reports of inspectional observations issued by the [FDA], or any regulatory actions relating to good manufacturing practices brought by the [FDA]," or any investigations into complaints involving the "possible failure of a drug product to meet any of its specifications," cGMP regulations required that the manufacturing company provide Novavax with written notice of the issue. In addition, cGMP regulations required Novavax to maintain laboratory records, including information relating to "results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested."

**ANSWER:** Defendants respectfully refer the Court to the relevant subsections of 21 C.F.R. §§ 210 and 211 for their true and accurate contents regarding cGMP regulations, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph.

277. Thus, Novavax was aware of the particular issues that the FDA raised in connection with the FDA's investigations into the North Carolina Facility and Texas Facility, which highlighted a litany of quality issues outlined above. In fact, the FDA's very own reports support this conclusion, as it indicated that FUIJIFILM was required to notify the client (which CW 5 confirmed was Novavax) of deviations and OOS results within two business days. In fact, with respect to issues of contamination, CW 5 specifically stated that a client, who was Novavax in this case, must be notified about a contamination within 24 to 48 hours of its discovery.

**ANSWER:** Defendants respectfully refer the Court to the FDA's reports for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

278. Likewise, former employees from the Texas Facility and North Carolina Facility recalled that Novavax was notified about the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that occurred throughout the Class Period. For example, according to CW 5, Novavax had two Novavax's Onsite Employees at the Texas Facility. Indeed, CW 5 explained that CW 5 and the Texas Facility Director of Manufacturing CW 6 communicated with the two Novavax's Onsite Employees "every single day" regarding manufacturing and the results of quality checks, which CW 5 recalled were conducted every 24 to 48 hours.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 5. Defendants deny the remaining allegations in this Paragraph.

279. CW 5 recalled that Novavax's Onsite Employees were notified about each contamination issue that occurred at the Texas Facility throughout the Class Period. That is, they were notified about the four contamination incidents that led to delays in manufacturing that started in December 2020. CW 5 even recalled that Mr. Hash, one of Novavax's Onsite Employees, was involved in the investigations into the contaminations. CW 5 recalled that there were phone calls and emails about contaminations and delays from Mr. Hash to Novavax headquarters, including Novavax's Quality Assurance department.

**ANSWER:** Defendants deny the allegations in this Paragraph.

280. Similarly—and with respect to a particular viral contamination that occurred in March 2021 and ultimately shut down the Texas Facility's manufacturing processes until at least September 2021—CW 5 confirmed that everything to do with the viral contamination was "communicated to" Novavax's Onsite Employees as the discovery and investigation progressed, along with daily calls with Novavax personnel in Maryland.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 5. Defendants deny the remaining allegations in this Paragraph.

159

281. CW 6 similarly recalled that Novavax had some employees who worked onsite at the Texas Facility, including Mr. Hash, along with a few other Novavax employees who rotated onsite "off-and-on." CW 6 further recalled that CW 6 participated on Zoom calls "every day" with Novavax's Onsite Employees, a Novavax employee at Novavax's headquarters in Maryland named Ivailo, and other Novavax employees from different departments. According to CW 6, Novavax's Onsite Employees, Ivailo, and the other Novavax employees "knew everything that we were doing." CW 6 further advised that there were typically 10 Novavax employees on the calls.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 6. Defendants deny the remaining allegations in this Paragraph.

282. Likewise, CW 7—a former Manager, Quality Assurance for the North Carolina Facility—recalled that any problems were constantly communicated to Novavax, which had someone onsite at the North Carolina Facility weekly at a minimum. Moreover, CW 7 recounted that all testing results for batches at the North Carolina Facility were communicated to Novavax through a "batch record," which relayed to Novavax that testing was completed and the results of the testing. CW 7 even explained that FUJIFILM sometimes changed the vaccine manufacturing materials given certain supply chain issues, and that Novavax would have to approve all the changes. CW 7 also recalled that Novavax had teams of people from departments including quality and technical who were involved in any modifications. CW 7 further explained

160

that Novavax was involved with "everything" and was "driving" the way in which FUJIFILM manufactured the product. In fact, CW 7 advised that the level of Novavax's involvement was unlike anything she had previously encountered at FUJIFILM, meaning that Novavax was more involved in the manufacturing process than other clients at FUJIFILM.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 7. Defendants deny the remaining allegations in this Paragraph.

283. Additionally, Defendant Erck was also personally and directly involved in the manufacturing process's progress. For instance, according to multiple CWs, Defendant Erck held Company-wide meetings with Novavax employees to discuss the regulatory process for the NVX- CoV2373 vaccine. CW 2 recalled that Defendant Erck and Novavax's leadership team spoke to employees and facilitated Q&A sessions during Company-wide meetings that happened at least once a quarter. At these meetings, CW 2 recalled that Defendant Erck discussed the topic of seeking regulatory approval.

**ANSWER:** Defendants deny the allegations in this Paragraph.

284. Similarly, CW 1 recalled that Defendant Erck spoke to employees during monthly Company-wide meetings that included Q&A sessions, with employees able to submit questions in advance via an app. CW 1 further recalled that the Q&A sessions included discussions about employees' concerns in regard to "our manufacturing capabilities" and "the likelihood of being able to manage all those stakeholders," in addition to concerns over whether

Novavax would "be able to get our stability information stabilized." CW 4 also corroborated this information, stating that Defendant Erck spoke to employees during Company-wide, town hall-style meetings that included a Q&A session, with employees being able to submit questions in advance using an app.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 1. Defendants deny the remaining allegations in this Paragraph.

285. CW 4 explained that if there were issues in getting a trial started, those problems would be brought to Chief Medical Officer Filip Dubovsky and Defendant Erck. CW 4's understanding of how such information would have flowed up the chain of command at Novavax was that manufacturing issues were brought to Dubovsky's attention, that Dubovsky would have discussed it with Defendant Erck who in turn would have discussed it with Defendant Glenn, and that Defendant Erck—or sometimes Defendant Glenn—had to bring it to the attention of Novavax's Board of Directors.

**ANSWER:** Defendants deny the allegations in this Paragraph.

286. Furthermore, Defendant Erck had access to reports that contain hundreds of pages of data from Novavax's manufacturing sites. For example, CW 1 explained that Novavax submitted documents containing information from the Company's manufacturing sites that was then submitted to the FDA in the form of Module 3 Quality reports. CW 1 further explained that "those are the documents we were working on the hardest," and that "Novavax really

162

needed to have [its] CMC module in line before we could get that emergency use authorization." CW 1 recalled that these reports consisted of "hundreds of pages."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the accuracy of any purportedly quoted statements that this Paragraph attributes to the anonymous CW 1. Defendants deny the remaining allegations in this Paragraph.

287. CW 1 explained that the content from the manufacturing sites that was detailed in the Module 3 reports involved drug and product information and data. CW 1 further explained that the Module 3 reports were submitted to the FDA via the agency's ESG and sometimes via email, depending on the preferences of the two or three FDA project managers with whom Novavax worked. CW 1 recalled that Director - Regulatory Affairs Kathleen Callahan would send such emails and handled all communications with the FDA. CW 1 also explained that Novavax stored the Module 3 reports on an internal system managed by the Quality department.

**ANSWER:** Defendants deny the allegations in this Paragraph.

288. Further, CW 7 recounted that the vaccine's purity levels were manufactured according to information provided by and processes approved by Novavax. As mentioned above, CW 1 explained that FDA concerns were also discussed at weekly, and sometimes daily, Regulatory Affairs team meetings.

**ANSWER:** Defendants deny the allegations in this Paragraph.

163

289. Defendants Erck and Glenn personally led a tour of the Company's planned Vaccines Innovation Campus and global headquarters in Gaithersburg for Governor Hogan, providing an overview of the facility and a press briefing.

**ANSWER:** Defendants admit that Novavax hosted Maryland Governor Larry Hogan in Gaithersburg on or around June 10, 2021. Defendants deny the remaining allegations in this Paragraph.

290. Defendants' direct involvement in the vaccine manufacturing process thus supports a strong inference of scienter.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph

D. **Defendants' Statements Themselves Support Scienter**

291. Throughout the Class Period, Defendants spoke repeatedly on Novavax's ability to manufacture and commercialize the NVX-CoV2373 vaccine, leading investors to believe that nothing stood in the way of Novavax producing the vaccine at the quality required by FDA and cGMP regulations while omitting that the Company was having substantial issues developing a consistently pure vaccine on a large scale. These false and misleading statements themselves provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing that Novavax was unable to produce a vaccine of sufficient quality to satisfy governmental regulations. Accordingly, Defendants breached their duty under the federal

securities laws by speaking about these topics and failing to fully disclose all relevant material information while doing so.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

292. For instance, on February 24, 2021, in an interview with *The Washington Post*, Defendant Glenn confidently assured investors that "we lined up—FDA gave advice on how to do a trial, what success means, and that really was accepted by the world, if you will, and *so we're aligned up with those success criteria in all of our trials*."

**ANSWER:** The Court has dismissed the claims against Defendant Glenn and the claims related to the February 24, 2021 statements, and the allegations in this Paragraph thus require no response; to the extent a response is deemed required, Defendants deny those allegations.

293. Defendants made similar assurances throughout the Class Period. On May 10, 2021, Defendant Erck misleadingly assuaged the market's concerns about the delay in releasing the NVX-CoV2373 vaccine stating that "*nearly all of the major challenges have been overcome and we can clearly see the light at the end of the tunnel*." On August 5, 2021, a *Reuters* article reported that Defendant Erck stated, "*[w]e appear to have got past (certain) supply issues and are now being able to produce at scale*." On September 21, 2021, in response to a reporter's question about transparency, Defendant Trizzino explained that "[t]his

transparency is important. *And we've been extremely transparent across multiple fronts. All of our clinical data has been shared very quickly*."

**ANSWER:** Defendants respectfully refer the Court to the transcript of the May 10, 2021 Earnings Call and the August 5, 2021 Reuters article for their true and complete contents, and Defendants deny any allegations inconsistent therewith. The Court has dismissed the claims related to statements made on May 10, 2021 about the successful manufacture of Novavax's drug substance at commercial scale, and the allegations in this Paragraph thus require no response to the extent they relate to those statements; to the extent a response is deemed required, Defendants deny those allegations. Defendants deny any remaining allegations in this Paragraph.

294. Defendants' repeated assurances to investors that Novavax was able to produce a vaccine of sufficient quality to meet regulatory standards—when they had been apprised of the multiple manufacturing problems as previously described—demonstrate that they *either* knew that the Company was experiencing substantial manufacturing problems related to purity, potency, contamination, scalability, and the supply chain, which delayed the approval of the NVX- CoV2373 vaccine, *or* were reckless in not knowing or investigating that this was the case. In either scenario, there is a strong inference that Defendants made these statements with scienter.

**ANSWER:** Defendants deny the allegations in this Paragraph.

166

E.      **Government's Crackdown on Emergent BioSolutions Further Supports Scienter**

295.    Like Novavax, other companies producing vaccines to combat Covid-19 were subject to the FDA regulations concerning vaccine quality standards. Indeed, these FDA regulations, and the FDA's willingness to enforce them, were widely known in the industry. Novavax even acknowledged this in its 2021 Form 10-K: "The development, production and marketing of biological products, which include the vaccine candidates being developed by Novavax or our collaborators, are subject to regulation for safety, efficacy and quality by numerous governmental authorities in the U.S. and other countries."

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to other unspecified companies' practices or regulatory environments or as to the FDA's enforcement priorities or goals.  Defendants respectfully refer the Court to Novavax's 2021 Form 10-K for its true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in this Paragraph.

296.    Moreover, Defendants were able to see the regulatory process play out firsthand in connection with one of its manufacturing partners, Emergent. While Defendants were touting their purported alignment with the FDA criteria and transparency, federal regulators halted production at Emergent's Baltimore facility in April 2021 for more than three months until the company resolved quality control problems, including failure to prevent contamination that ruined tens of millions of doses and other cGMP violations. The facility had produced Johnson

167

& Johnson's and AstraZeneca's vaccines, but as a result of the issues, the facility now manufactures doses only for Johnson & Johnson.

**ANSWER:** Defendants deny the allegations in this Paragraph.

297. The FDA's crackdown on Emergent's manufacturing facility served as a reminder—and a warning—to other pharmaceutical companies producing vaccines for Covid-19. Though there was an urgent need for these vaccines, the FDA would not show leniency or allow a company to cut corners in producing a vaccine—especially one so critical to the public welfare. It was thus of utmost importance for companies—such as Novavax—to ensure that their manufacturing facilities complied with all cGMP and met the requisite FDA criteria needed for ultimate approval. Indeed, as a pharmaceutical company, a core aspect of Novavax's business is ensuring compliance with manufacturing quality standards for each jurisdiction in which it manufacturers its vaccines.

**ANSWER:** Defendants deny the allegations in this Paragraph.

298. As a result of this well-known trend that FDA enforcement was focusing on vaccine manufacturers' quality control, Defendants knew or were reckless in not knowing that they needed to verify the truth of their statements about the Company's ability to manufacture a vaccine of sufficient quality to meet FDA and cGMP standards.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

## VIII. CONTROL PERSON ALLEGATIONS

299. The Individual Defendants, by virtue of their high-level and controlling positions at Novavax, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

300. Defendants Erck, Covino, Trizzino, and Glenn, as senior executive officers of Novavax—a publicly-held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Novavax's publicly traded common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

**ANSWER:** The Court has dismissed the claims against Defendants Covino and Glenn, and the allegations in this Paragraph related to such Defendants thus require no response.

169

This Paragraph further calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

301. Defendants Erck, Covino, Trizzino, and Glenn, because of their positions of control and authority as senior executive officers of Novavax, were able to and did control the content of Novavax's SEC filings, press releases, and other public statements issued by or on behalf of Novavax during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

**ANSWER:** The Court has dismissed the claims against Defendants Covino and Glenn, and the allegations in this Paragraph related to such Defendants thus require no response. This Paragraph further calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

302. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Novavax common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Novavax's business, operations, and management, and the intrinsic value of Novavax's common stock, and caused

170

Lead Plaintiffs and members of the Class to purchase Novavax common stock at artificially inflated prices.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

## IX. CLASS ACTION ALLEGATIONS

303. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Novavax during the Class Period and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Novavax during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Novavax's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

304. The members of the Class are so numerous that joinder of all members is impracticable. According to public reports filed with the SEC, during the Class Period, Novavax

had over 70 million outstanding shares of common stock and was actively traded on the NASDAQ under the ticker symbol "NVAX." While the exact number of Class members is unknown to Lead Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Novavax and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

**ANSWER:** Defendants admit that Novavax's common stock trades on the NASDAQ exchange under the symbol "NVAX." The remaining allegations in this Paragraph call for a legal conclusion to which no response is required; to the extent a response is deemed required, Defendants deny the remaining allegations in this Paragraph.

305. Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

172

306.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

**ANSWER:**    This Paragraph calls for a legal conclusion to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

307.    Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)    Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    Whether, and to what extent, the market price of Novavax common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)    Whether the Individual Defendants were controlling persons of Novavax; and

173

(f)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

**ANSWER:**    This Paragraph calls for a legal conclusion to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

308.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:**    This Paragraph calls for a legal conclusion to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

309.    To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud- on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

174

(b)      the omissions and misrepresentations were material;

(c)      the Company's securities traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)      Lead Plaintiffs and other members of the Class purchased Novavax's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)      Novavax's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g)      as a regulated issuer, Novavax filed periodic public reports with the SEC and the NASDAQ;

(h)      Novavax regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)      Novavax was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, B. Riley Securities, Inc., Cantor Fitzgerald & Co., Cowen, H.C. Wainwright & Co., LLC, Jefferies LLC, Zacks, and J.P. Morgan Chase & Co., all of which wrote reports that were distributed to the sales force and certain customers of

175

their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

310. As a result of the foregoing, the market for Novavax's securities promptly digested current information regarding Novavax from publicly available sources and reflected such information in Novavax's securities price(s). Under these circumstances, all persons and entities who or which purchased or otherwise acquired Novavax common stock during the Class Period suffered similar injuries through their purchase of Novavax common stock at artificially inflated prices and thus, the presumption of reliance applies.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

311. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Novavax common stock.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

176

312.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of Novavax common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

**ANSWER:**    This Paragraph calls for a legal conclusion to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

313.    To the extent that Defendants concealed or improperly failed to disclose material facts with respect to Novavax's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**ANSWER:**    This Paragraph calls for a legal conclusion to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

## XI.    NO SAFE HARBOR

314.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported

177

forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

315. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

316. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

178

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

317. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Novavax was experiencing multiple manufacturing problems and delays that prevented NVX-CoV2373 from meeting FDA criteria and thus causing multiple regulatory delays with respect to Novavax's ability to file its EUA with the FDA.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

318. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false

179

or misleading, or the forward-looking statement was authorized or approved by an executive officer of Novavax who knew that the statement was false when made.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

## XII. CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5(b) Promulgated Thereunder
Against Novavax and the Individual Defendants**

319. Lead Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

**ANSWER:** Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

320. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Novavax and the Individual Defendants.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

321. As alleged herein, throughout the Class Period, Novavax and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities

180

exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Novavax and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially inflate and maintain the price of Novavax common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase Novavax common stock at artificially inflated prices.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

322. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

181

323.    As set forth above, Novavax and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased Novavax common stock during the Class Period.

**ANSWER:**    This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

324.    In ignorance of the false and misleading nature of Novavax's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Novavax common stock, Lead Plaintiffs and other members of the Class purchased Novavax common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have purchased Novavax common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Novavax common stock declined precipitously, and Lead Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Novavax common stock at artificially inflated prices and the subsequent decline in the price of that security when the truth was disclosed.

182

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

325. By virtue of the foregoing, Novavax and the Individual Defendants are liable to Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

## COUNT II

### For Violation of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5(a) and (c) Promulgated Thereunder
### Against Novavax and the Individual Defendants

326. Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

**ANSWER:** Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

327. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiffs need not allege in this Court nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

183

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

328. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the price of Novavax common stock; and (iii) cause Lead Plaintiffs and members of the Class to purchase Novavax common stock at artificially inflated prices.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

329. In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with their purchases of Novavax common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

184

330. Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of the manufacturing problems related to purity, potency, contamination, scalability, and the supply chain that Novavax was experiencing throughout the Class Period, which prevented the Company from filing its EUA with the FDA. By concealing such problems from investors, and in fact explicitly reassuring investors that any prior problems that NVX-CoV2373's manufacturing process may have faced were resolved, Defendants were able to take advantage of Novavax's inflated stock price at opportune moments throughout the Class Period before the market learned the truth.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

331. For example, given how important it was for the Company to file its EUA and bring NVX-CoV2373 to market, it was evident that any delays or issues that prevented Novavax from doing so would cause Novavax's stock price to drop. To be sure, an analyst, Zacks, explained, "[a]ny delay in the study outcome or any developmental setback for . . . the COVID-19 vaccine candidate will be a major disappointment for the [C]ompany, leaving an adverse impact on its shares."

185

**ANSWER:** Defendants respectfully refer the court to the referenced analyst report for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

332. Furthermore, because Defendants were aware of the manufacturing problems explained above, Defendants knew that Novavax would have to delay its EUA filing. As such, knowing that the stock price would take a dive upon the market learning about the delay, Defendants Erck, Trizzino, and Glenn carefully planned the timing of their stock sales in the weeks, and sometimes days, before announcing a delay. As a result of their continued reassurances and omissions throughout the Class Period, Defendants Erck, Trizzino, and Glenn collectively made over $65 million in proceeds during the Class Period—more than a 118% increase from the year prior.

**ANSWER:** The Court has dismissed the claims against Defendant Glenn, and the allegations in this Paragraph related to such Defendant thus require no response; to the extent a response is deemed required, Defendants deny those allegations. Defendants respectfully refer the Court to the Forms 4 filed with the SEC to report changes in Defendant Stanley C. Erck's and John J. Trizzino's beneficial ownership of securities for the forms' full and complete content regarding such Defendants' equity sales, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph.

333. Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Novavax's common stock traded.

186

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

334. During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Lead Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Novavax's common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

**ANSWER:** Defendants deny the allegations in this Paragraph.

335. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Novavax common stock during the Class Period.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

336. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their purchases of Novavax common stock during the Class Period.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

337. Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

**ANSWER:** Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding referenced Paragraphs as if fully set forth herein.

338. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

339. The Individual Defendants had control over Novavax and made the materially false and misleading statements and omissions on behalf of Novavax within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive leadership positions and positions as directors of Novavax, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various

188

statements which Lead Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

340. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

341. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

**ANSWER:** This Paragraph calls for a legal conclusion to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiffs' counsel as Lead Counsel for the Class;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**ANSWER:** Defendants state that this Paragraph following Paragraph 341 of the Complaint sets forth Plaintiffs' prayer for relief to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in this Paragraph following Paragraph 341 of the Complaint. Defendants specifically deny that Plaintiffs are entitled to any relief whatsoever.

190

## **AFFIRMATIVE DEFENSES**

Defendants hereby assert the following affirmative defenses to Plaintiffs' claims and allegations in the Complaint. Each affirmative defense is to be considered in the alternative. Defendants undertake the burden of proof as to only those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated by Defendants. Defendants do not assume the burden of proof on any defenses whose proof burden would otherwise rest on Plaintiffs. Defendants reserve the right to add additional affirmative defenses as they may become available.

### **First Defense**

The Complaint fails to state a claim upon which relief can be granted.

### **Second Defense**

The Complaint does not plead fraud with the particularity required under Federal Rule of Civil Procedure 9(b).

### **Third Defense**

The Complaint fails to comply with the requirements of the Private Securities Litigation Reform Act, including without limitation the requirement that a complaint plead fraud with particularity and the requirement that a complaint plead facts giving rise to a strong inference that the Defendant acted with the required state of mind, as explicated by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

191

## Fourth Defense

Plaintiffs have not suffered any loss, damage, or injury as a result of any act or omission of Defendants.

## Fifth Defense

Plaintiffs did not rely on any alleged misstatement or omission by Defendants in connection with any purchase or sale of any security.

## Sixth Defense

Plaintiffs did not justifiably rely on any alleged misstatement or omission by Defendants in connection with any purchase or sale of any security.

## Seventh Defense

Any loss in the value of any Novavax stock owned by Plaintiffs was not caused by any alleged misstatement or omission by Defendants.

## Eighth Defense

Plaintiffs' recovery, if any, is barred in whole or in part to the extent they lack standing to assert their claims.

## Ninth Defense

Plaintiffs' alleged loss, if any, is the result of intervening and/or superseding causes for which Defendants were not and are not responsible.

192

**Tenth Defense**

Plaintiffs' claims are barred because Plaintiffs are not entitled to class action certification as provided by Federal Rule of Civil Procedure 23 and governing case law.

**Eleventh Defense**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

**Twelfth Defense**

Plaintiffs' claims are barred, in whole or in part, by the doctrines of estoppel and availability of adequate remedies at law.

**Thirteenth Defense**

Plaintiffs' claims are barred to the extent that they allege that Individual Defendants made trades on the basis of material nonpublic information where such trades were made pursuant to a Rule 10b5-1 plan adopted in accordance with SEC regulations.

**Fourteenth Defense**

Defendants hereby plead any and all defenses available to them, now or which may hereinafter be applicable.

Defendants reserve the right to amend their answer as discovery progresses to plead additional defenses, and to assert additional cross-claims, counterclaims or third-party claims.

## PLAINTIFFS' JURY DEMAND

Defendants deny that Plaintiffs are entitled to a trial by jury on their claims.

193

## REQUEST FOR RELIEF

WHEREFORE, Defendants respectfully request that judgment be entered in their favor against Plaintiffs, and that Defendants be awarded their costs, including reasonable attorneys' fees, and all other relief that the Court deems just and proper.

Dated:  December 27, 2022

Respectfully submitted,

_____/s/_____
C. Thomas Brown
(admitted *pro hac vice*)
Peter L. Welsh
(admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Thomas.Brown@ropesgray.com
Peter.Welsh@ropesgray.com

Edward R. McNicholas
Bar No. 24833
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4779
Edward.McNicholas@ropesgray.com

Stefan P. Schropp
Bar No. 21699
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9938
Stefan.Schropp@ropesgray.com

*Counsel for Defendants*

194

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of December, 2022, I served a copy of the

foregoing *Defendants' Answer and Affirmative Defenses* via ECF upon:

James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
(202) 408-4600
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

Brian Calandra
Jeremy A. Lieberman
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
bcalandra@pomlaw.com
jalieberman@pomlaw.com

Lesley F. Portnoy
PORTNOY LAW FIRM
1800 Century Park East, Suite 600
Los Angeles, California 90067
(310) 692-8883
esley@portnoylaw.com


         /s/
    C. Thomas Brown


*Counsel for Defendants*

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SOTHINATHAN SINNATHURAI, Individually
and on Behalf of All Others
Similarly Situated,

                Plaintiff,

v.

NOVAVAX, INC., STANLEY C. ERCK,
GREGORY F. COVINO, JOHN J. TRIZZINO,
and GREGORY GLENN,

                Defendants.

Civil Action No.: 21-cv-02910-TDC

**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS NOVAVAX, INC. AND THE INDIVIDUAL DEFENDANTS**

      Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Lead Plaintiffs Jeffrey A. Gabbert, Nuggehalli Balmukund Nandkumar, and David Truong ("Lead Plaintiffs"), by and through their undersigned counsel, hereby request that Novavax, Inc. ("Novavax" or the "Company"), Defendants Stanley C. Erck ("Erck"), Gregory F. Covino ("Covino"), John J. Trizzino ("Trizzino"), and Gregory Glenn ("Glenn") (collectively, the "Individual Defendants") produce for inspection all Documents described below ("Document Requests" or "Requests") in accordance with the following definitions and instructions at the offices of Labaton Sucharow LLP, 140 Broadway, New York, NY 10005 within thirty (30) days of the date of service or at such other location or on such other date as the parties may agree or the Court may order.

**DEFINITIONS**

1.     "Action" refers to the above-captioned action.

2.     "All," "any," and "each" shall be construed as encompassing any and all.

3.      "CAPA plan" means Corrective and Preventive Action plan, as defined by the FDA.

4.      "Competition" and "Competitor" refers to external competition faced by Novavax in the Covid-19 vaccine sector, Including Pfizer, Moderna, AstraZeneca, and Johnson & Johnson.

5.      "Complaint" refers the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed on March 11, 2022 (ECF No. 56) in the Action. "¶___" or "¶¶___" refer to paragraphs in the Complaint.

6.      "Correspondence" means any letter, memorandum, note, e-mail, Including on company and private e-mail addresses, facsimile, text message, instant message, internet message board posting, "Slack" message, Blackberry message or any other writing containing a communication from one Person or Persons to another or others. Unless otherwise specified, Correspondence shall be interpreted to include both internal Correspondence undertaken between Company personnel and external Correspondence made between Company personnel and any third party.

7.      "Communication" and "Communications" are used in a comprehensive sense, and mean and include every conceivable manner or means of disclosure, transfer, transmittal, or exchange of oral, written, electronic, or other information, in the form of facts, ideas, inquiries, or otherwise, between or among one or more persons or entities, Including all documents, writings, correspondence, memoranda, messages, meetings, conversations, discussions, conferences, agreements, e-mails, or other transmittal of information, whether face- to-face, by telephone, by mail, by facsimile, by computer, or otherwise, and further Include all forms of electronic communications and messages.

8. "Concerning" means relating to, referring to, in connection with, pertaining to, describing, reflecting, discussing, analyzing, regarding, summarizing, evidencing, embodying, or constituting.

9. "Covid-19" refers to the infectious disease caused by the SARS-CoV-2 virus that caused a worldwide pandemic in March 2020.

10. "cGMP" refers to current Good Manufacturing Practices imposed by the FDA, which provide for systems that assure proper design, monitoring, and control of manufacturing processes and facilities, and provides minimum requirements for the methods, facilities, and controls used in manufacturing, processing, and packing of a drug product, and as further defined by the FDA and within the Complaint.

11. "Date" means the exact day, month and year if ascertainable, or if not, the best approximation (including relationship to other events).

12. "Defendants" or "Defendant" means Novavax and/or the Individual Defendants.

13. "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a), Including electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term. The term "document" further includes, but is not limited to, any and all forms of recorded information, whether handwritten, printed, typed, or otherwise visually reproduced, electronically recorded or orally recorded, Including all originals, revisions, and markups of drafts, and all files, documents, databases, e-mails, and other data maintained in computer-readable form. The term "document" specifically includes, but is not limited to: working papers, communications, Including intra-company communications; minutes and records of meetings; letters; facsimile transmissions; telegrams; telephone bills and records; cables; records; books; summaries or records of personal

3

conversations or interviews; legal pleadings; affidavits; deposition transcripts; trial transcripts; forecasts; statistical statements; accountants' work papers; brochures; pamphlets; circulars; press releases; agreements; contracts; telephone messages, slips and logs; diary entries; electronic mail and messages of every kind; calendars; reports; evaluations; assessments; analyses; test results; correspondence; memoranda; notes; video recordings of every kind; audio recordings of every kind; electronic recordings of every kind; drawings; graphics; graphs; maps; diagrams; charts; photographs; tables; indices; recordings; tapes; microfilms; reports of investigations; opinions or reports of consultants; data processing and computer printouts, tapes, disks, and data and information stored in computers or data processing equipment, together with programs and program documentation necessary to utilize or retrieve such data or information; all other mechanical or electronic means of storing or recording data or information; and any other data compilation from which information can be obtained and translated through detection devices into reasonably usable form. "Documents" include, but are not limited to, all Correspondence, Communications, and ESI.

14.     "EIR" means an FDA Establishment Investigation Report.

15.     "EUA" means Emergency Use Authorization and refers to the expedited FDA approval process for the use and sale of vaccinations under an emergency use authorization mandate.

16.     "Fast Track Designation" refers to a process by the FDA designed to facilitate the development, and to expedite the review of, drugs to treat serious conditions and fill an unmet medical need.

17.     "FDA" refers to the United States Food & Drug Administration and any employee, agent, representative, or subdivision thereof.

4

18.     "Form 483" refers to an FDA Form 483 Notice of Inspectional Observations.

19.     "FUJIFILM" refers to FUJIFILM Diosynth Biotechologies, and all of its present and former officers, directors, committees, employees, partners, corporate parents, predecessors, successors, subsidiaries, affiliates, divisions, branch offices, agents, representatives, and all other persons acting, or purporting to act, on behalf of any of the foregoing.

20.     "Government" refers to any branch of the federal government for the U.S. or non-U.S. government and any U.S. or non-U.S. federal agency, committee, or department, Including: the Department of Health and Human Services; the Centers for Disease Control and Prevention; the FDA; the National Institutes of Health; the Biomedical Advanced Research and Development Authority; the Department of Defense ("DoD"); the Department of Agriculture, the Department of Energy; and the Department of Veteran Affairs.

21.     "Identify," when referring to a person, means to give, to the extent known, the person's full name, present or last known address, and email address, and when referring to a natural person, additionally, the present or last known place of employment.

22.     "Identify," when referring to Documents, means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

23.     Individual Defendants means Erck, Covino, Trizzino, and Glenn.

24.     "Manufacturing Facility" or "Manufacturing Facilities" refers to any facility that Novavax or one of its Manufacturers had a contract, agreement, arrangement, or any other understanding with to develop, manufacture, or produce the Company's Covid-19 Vaccine Candidate, Including FUJIFILM's manufacturing facilities located in Texas and North Carolina.

5

25.    "Manufacturer" or "Manufacturers" refers to any entity that Novavax had a contract, agreement, arrangement, or any other understanding with to develop, manufacture, or produce the Company's Covid-19 Vaccine Candidate, Including FUJIFILM.

26.    "Manufacturing Standards" refers to the cGMP, as further defined in the Complaint, and any other applicable governmental or industry manufacturing standards.

27.    "Novavax" or "the Company" means Novavax, Inc. and all of its present and former officers, directors, committees, employees, partners, corporate parents, predecessors, successors, subsidiaries, affiliates, divisions, branch offices, agents, representatives, and all other persons acting, or purporting to act, on behalf of any of the foregoing.

28.    "OOS" means out-of-specification and refers to a batch of products that, after testing, does not meet the production parameters.

29.    "Person" refers to any natural person or any legal entity, Including any business or governmental entity or association.

30.    "Policy" or "Policies" means policies, procedures, practices, guidelines, protocols, programs, or systems.

31.    "Quality Management Systems" refers to Novavax's Quality Unit divisions within each Manufacturing Facility, Including the quality control ("QC") and quality assurance ("QA") segments, and Novavax's Quality Management System, as well as Policies implemented therefrom, Including Policies related to securing and monitoring the Company's computer systems and databases, Including the efforts the Company took to prevent unauthorized access or changes to, or manipulation or deletion of, data; and Policies related to the testing of and/or mitigation of the risks of microbiological contamination within the Manufacturing Facilities.

32. "QA" refers to the Quality Unit's quality assurance segment, which ensures that all Policies were followed properly, Including ensuring that the QC functions properly.

33. "QC" refers to the Quality Unit's quality control segment, which focuses both on what must occur during the drug manufacturing process and what results from it.

34. "Quality Unit" refers to Novavax's Quality Unit divisions within each Manufacturing Facility, Including the quality control and quality assurance segments.

35. "Related Actions" refers to any and all litigations, investigations, and/or governmental enforcement actions concerning the conduct alleged in the Complaint.

36. "SEC" refers to the United States Securities and Exchange Commission and any subdivision thereof.

37. "SOP" refers to all of Novavax's and the Manufacturers' Standard Operating Procedures related to the processes the Manufacturing Facilities use to manufacture Novavax's Covid-19 Vaccine Candidate and comply with cGMP.

38. "Vaccine Candidate" refers to NVX-CoV2373 or any other name given to any Covid-19 vaccine that Novavax sought to develop, manufacture, produce, or distribute in response to Covid-19, Including any components or ingredients thereof (such as the antigen component of NVX-CoV2373).

39. "Warning Letter" refers to any Warning Letter issued to Novavax or a Manufacturing Facility by the FDA.

40. "You" or "Your" refers to the party responding to this demand for production and any present and former officers, directors, committees, employees, partners, corporate parents, predecessors, successors, assigns, subsidiaries, affiliates, divisions, branch offices, agents, representatives, and all other persons acting, or purporting to act, on behalf of any of the foregoing.

7

41.    The following rules of construction apply to all discovery requests:

(a)    The use of the singular form of any word includes the plural and vice versa.

(b)    The term "Including" shall be construed as "including but not limited to."

(c)    The specificity of any Request or part of a Request shall not limit the generality of any other Request or part of a Request.

(d)    Whenever necessary to bring within the scope of these Requests Documents that might otherwise be construed to be outside its scope, the use of a verb in any tense shall be construed as the use of that verb in all other tenses, and the use of the feminine, masculine or neuter genders shall include all genders.

### INSTRUCTIONS

1.    In producing Documents and other materials, you are requested to furnish all Documents or other materials in your possession, custody or control or in the possession, custody or control of any of Your agents, representatives, employees, accountants or attorneys, wherever those documents might be located.

2.    These Requests are continuing in nature. Under Rule 26(e) of the Federal Rules of Civil Procedure, you are required to supplement your responses and produce additional Documents if you obtain further or different information, and Lead Plaintiffs specifically reserve the right to seek supplementary production of Documents before trial.

3.    All documents that exist in electronic format are to be produced in their native format, or in another mutually agreeable format that provides Lead Plaintiffs with all metadata associated with such electronic documents and allows Lead Plaintiffs to search and organize such electronic documents in a manner that is as effective and efficient as that enjoyed by the producing party.

8

4.      Provide all electronically stored information ("ESI") in the form and manner agreed upon by the parties to this Action for producing ESI when the parties meet and confer at a time to be agreed upon by the parties.

5.      All Documents are to be produced as they are kept in the ordinary course of business or be organized and labelled to correspond to the categories in these Requests.

6.      If any Document was, but is no longer, in Your possession or subject to Your control, state whether it (a) is missing or lost, (b) has been destroyed, (c) has been transferred, voluntarily or involuntarily, to others, or (d) has been otherwise disposed of, and in each instance explain the circumstances of such disposition, and state the approximate date thereof.

7.      Wherever You are asked to produce a document which was formerly in Your possession, custody or control but has been lost or destroyed, You shall designate the type of document, (*i.e.*, letter, report book, brochure, email, etc.) and state:

(a)     information sufficient to enable Lead Plaintiffs to identify the document, including the title or subject heading date, name(s) and address(es) of the author or signer(s) and person(s) copied;

(b)     the substance or content of the document;

(c)     the last known location of the document;

(d)     the date on which the document was lost or destroyed; and

(e)     if destroyed, the circumstances of or reason for such destruction and the persons requesting and performing such destruction.

8.      In the event you withhold any document called for by these Requests on the basis of a claim of privilege or other right of nondisclosure, you shall comply with the procedure to be agreed upon by the parties to this Action in a protective order ("Protective Order") for handling

9

claims of privilege or other right of nondisclosure when the parties meet and confer at a time to be agreed upon by the parties.

9.      Notwithstanding the assertion of any privilege or other right of nondisclosure, any requested document that you object to producing, but that nevertheless contains non-privileged information that is responsive to these Requests, must be produced, but that portion of the document as to which the privilege or right of nondisclosure is asserted may be redacted in conformance with the Protective Order provided that such portion of the document is marked "redacted." Where any document is produced in redacted form on the basis of such assertion, you shall identify (i) the nature of the objection (Including work product protection) that is being claimed and (ii) otherwise follow the procedure in the Protective Order.

10.     Wherever You assert that a document is properly withheld from production for inspection or copying on the grounds of evidentiary privilege or immunity from discovery, You shall designate the type of document (*i.e.*, letter, report book, brochure, email, etc.) and state:

(a)      information sufficient to enable Lead Plaintiffs to identify the document, including: (i) the title or subject heading, (ii) date, (iii) name(s) and address(es) of the author or signer(s), (iv) recipients, and (v) person(s) copied;

(b)      the general subject matter dealt with in the document with reasonable specificity; and

(c)      an explanation of the privilege asserted.

11.     If an objection is made to any of these Requests, the response shall state whether Documents are being withheld from inspection and production on the basis of such objection, or whether inspection and production of the responsive Documents will occur notwithstanding such objection.

12.     These Requests shall not be deemed to call for identical copies of Documents. "Identical" means precisely the same in all respects; for example, a document with handwritten notes or editing marks shall not be deemed identical to one without such notes or marks. However, you shall not de-duplicate across custodians; if the same email, memo, letter or other document was received or maintained by more than one individual, you shall produce the same document for each and every individual from whom it was gathered.

13.     In producing Documents in connection with these Requests, each document to be produced should include all attachments and all enclosures referred to in the Documents or originally attached or enclosed with the document requested or to be produced.

14.     If any portion of a document is considered responsive to any Request, the Request shall be construed as requesting production of the entire document, including all attachments and enclosures, and in their original folder, binder, or other cover or container unless it is not possible to do so. Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label of such cover or other container must be attached to the document.

15.     If you cannot respond to these Requests in full after exercising due diligence to secure the Documents requested, you shall so state and respond to the extent possible, specifying the nature of your inability to respond to the remainder.

16.     If no documents exist which are responsive to a particular request, state this assertion in writing.

17.     In the case of any document relating in any way to any meeting or conversation, all participants in the meeting or conversation are to be identified.

11

18.     Wherever You object that a request is overly broad, burdensome or oppressive, You shall state all facts demonstrating the nature of the burden.

19.     The singular shall be construed to include the plural, and the plural shall be construed to include the singular, as necessary, to bring within the scope of this demand for production any documents that might otherwise be construed to be outside their scope.

20.     The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense, as necessary, to bring within the scope of this demand for production any documents that might otherwise be construed as outside their scope.

## RELEVANT TIME PERIOD

Unless otherwise indicated, the time period covered by these Requests is from December 1, 2019 through Present (the "Relevant Time Period"). To the extent any Request uses the phrase "at any time" or otherwise indicates that this time period does not apply, the Request is not limited by this time period. If, however, information generated prior to or after the Relevant Time Period is necessary for a correct or complete understanding of these Document Requests, the documents shall be disclosed. If any document is undated and the date of its preparation cannot be determined, the document shall be disclosed if otherwise responsive to these Document Requests.

## DOCUMENT REQUESTS

**DOCUMENT REQUEST 1:**

All Documents Concerning any and all Manufacturing Standards that Novavax's Covid-19 Vaccine Candidate was required to comply with, meet, and satisfy (such as regulations and standards related to purity, potency, and contamination), as well as Novavax's ability to comply with, meet, and satisfy such Manufacturing Standards, Including: (i) the Company's Policies to ensure such Manufacturing Standards were complied with, met, and satisfied; and (ii) the Company's tracking of any metrics or information relevant to such Manufacturing Standards.

**DOCUMENT REQUEST 2:**

All Documents Concerning the Company's requirement and ability to scale up production of Novavax's Covid-19 Vaccine Candidate as referenced in, *inter alia*, ¶¶ 57, 63 n.8, 131, 147, and 180, as well as Novavax's ability to meet such scalability requirements, Including: (i) the Company's Policies to ensure such scalability requirements were met; (ii) the Company's tracking of any metrics or information relevant to scalability; and (iii) all Documents Concerning Novavax's forecasts and/or projections for the manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate.

**DOCUMENT REQUEST 3:**

All Documents Concerning any and all inspections and re-inspections by the FDA of the Manufacturing Facilities, Including Forms 483, Warning Letters, or EIRs issued by the FDA for any Manufacturing Facility in connection with the development, manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate, Including the March 2021 FDA investigation or inspection of FUJIFILM's Texas facility, the April 9, 2021 email from Jose Torres to the FDA in response to FDA verbal observations, the April 14, 2021 FDA investigation memo, the April 2021 FDA investigation or inspection of FUJIFILM's North Carolina Facility, the April 21, 2021 FDA Form 483, the April 28, 2021 FDA memorandum, and a complaint delivered to FDA investigator Scott Ballard's desk in the FDA Dallas district office on April 20, 2021, as further described in the Complaint.

**DOCUMENT REQUEST 4:**

All Documents Concerning Novavax's development, implementation, and oversight of its Quality Management Systems, as well as all Documents sufficient to Identify Novavax employees and agents responsible for the development, implementation, and oversight of the Company's Quality Management Systems, Including all Documents Concerning Novavax's Regulatory

13

Affairs Team's Communications regarding the development, manufacturing, and production of Novavax's Vaccine Candidate.

**DOCUMENT REQUEST 5:**

All Documents, Including relevant Policies, Concerning Novavax's investigations and efforts to correct potential violations of Manufacturing Standards, Including (i) OOS results; (ii) failures to secure and monitor the Company's computer systems and databases; (iii) unauthorized access or changes to, or manipulation or deletion of Company data; and (iv) inadequate testing of and/or mitigation of the risks of microbiological contamination within the Manufacturing Facilities.

**DOCUMENT REQUEST 6:**

Documents sufficient to Identify which department and employees were responsible for reviewing, addressing, and rectifying potential violations of Manufacturing Standards, Including any potential or actual violations set forth in any Form 483, EIR, Warning Letter, or any other notice or citation from the FDA or other applicable governing body received by Defendants or a Manufacturing Facility.

**DOCUMENT REQUEST 7:**

All Documents Concerning any remedial actions undertaken by Novavax following Novavax's or any Manufacturing Facility's receipt of any Form 483, EIR, Warning Letter, or any other notice or citation from the FDA or other applicable governing body indicating a potential or actual violation of applicable laws or regulations, Including all Documents related to the preparation, submission, implementation, progress, and/or oversight of any Novavax or Manufacturer CAPA plan made in response to a Warning Letter.

14

**DOCUMENT REQUEST 8:**

All Documents Concerning deviations from, violations of, noncompliance of, or any other problems related to Manufacturing Standards in connection with Novavax's Covid-19 Vaccine Candidate, Including (i) the existence of microbial contamination in any Manufacturing Facility; (ii) the Manufacturers' failure to abide by cleaning procedures for certain manufacturing areas; (iii) the steps taken by the Company to investigate root causes of contamination or other quality-related problems; (iv) the Company's Policies to ensure proper purity and potency for the Company's Vaccine Candidate; (v) the Manufacturers' storage and organization of the Company's Vaccine Candidate; (vi) the training provided to new employees at the Manufacturing Facilities (Including Novavax's onsite employees and FUJIFIM employees); and (vii) the preventative actions considered and/or adopted by the Company to resolve contaminations or quality-related problems. This Request is not limited to Documents or actions taken in response to Novavax's or any Manufacturing Facility's receipt of any Form 483, EIR, Warning Letter, or any other notice or citation from the FDA.

**DOCUMENT REQUEST 9:**

All Documents related to any partial or full shutdown, stoppage, or halt of any manufacturing processes or facilities at any Manufacturing Facility (regardless of whether the shutdown, stoppage, or halt was voluntary or involuntary) to the extent related to any aspect of Novavax's Covid-19 Vaccine Candidate, Including all Communications between Novavax and any Manufacturing Facility about such partial or full shutdown, stoppage, or halt (and/or the reason(s) that led to such event).

**DOCUMENT REQUEST 10:**

All Documents Concerning the supply chain (both the U.S. supply chain as referenced in ¶ 60 of the Complaint and the global supply chain as referenced in ¶¶ 78 and 180 of the Complaint)

15

of each step of developing, manufacturing, and producing Novavax's Covid-19 Vaccine Candidate, Including all Documents Concerning any supply chain constraints or disruptions, as well as any impact that such constraints or disruptions had on the development, manufacturing, or production of Novavax's Covid-19 Vaccine Candidate).

**DOCUMENT REQUEST 11:**

All Documents Concerning the production or distribution of any approved or potential Covid-19 vaccine by any of Novavax's Competitors to the extent such Documents relate to (i) Novavax's Covid-19 Vaccine Candidate's market share or competitive position in the Covid-19 vaccine sector; or (ii) any heightened scrutiny, investigation, or enforcement action by government agencies on such Competitors, such as any Documents about the Government's decision to halt production of Covid-19 vaccine production at Emergent BioSolutions' Baltimore facility in April 2021.

**DOCUMENT REQUEST 12:**

All Documents that Novavax provided to or received from the FDA (and/or other U.S. and non-U.S. Government regulators), and all Communications between the FDA (and/or other U.S. and non-U.S. Government regulators) and the Manufacturing Facilities (Including FUJIFILM employees or agents and Novavax's onsite employees as referenced in the Complaint) regarding Novavax's Covid-19 Vaccine Candidate, Including (i) the FDA's decision to grant Fast Track Designation for Novavax's Covid-19 Vaccine Candidate; (ii) Operation Warp Speed ("OWS"); (iii) EUA; (iv) Novavax's compliance with Manufacturing Standards (Including data derived from all tests necessary to assure compliance with established specifications and standards, Including examinations and assays); (v) laboratory records (Including information relating to results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested);

16

(vi) any formal or informal complaints issued to the Company, any Manufacturing Facility, or any Government regulator related to any Manufacturing Standards; (vii) any actual or potential violation of any Manufacturing Standards, such as the existence of any contamination in any of the Manufacturing Facilities; and (viii) Module 3 reports as referenced in, *inter alia*, ¶¶ 104, 118, 170, and 287 of the Complaint.

**DOCUMENT REQUEST 13:**

All Documents Concerning any contract, agreement, arrangement, or any other understanding between Novavax and any Government entity, initiative, or program (Including any Government grants, awards, or funding that Novavax received or applied for) in connection with Novavax's Covid-19 Vaccine Candidate, Including any contract, agreement, arrangement, or any other understanding between Novavax and (i) the Coalition of Epidemic Preparedness Innovations ; (ii) the DoD; (iii) OWS; (iv) the Department of Health and Human Services; (v) the Centers for Disease Control and Prevention; (vi) the FDA; (vii) the National Institutes of Health; (viii) the Biomedical Advanced Research and Development Authority; (ix) the Department of Agriculture; (x) the Department of Energy; (xi) the Department of Veterans Affairs; and (xii) the Defense Health Program.

**DOCUMENT REQUEST 14:**

All Documents Concerning any contract, agreement, arrangement or any other understanding between Novavax and any entity (Including the Manufacturing Facilities) in connection with the development, manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate, Including all SOPs at all Manufacturing Facilities.

**DOCUMENT REQUEST 15:**

All Documents Concerning clinical trials for Novavax's Covid-19 Vaccine Candidate (Including Novavax's PREVENT-19 study and clinical trials in the U.S., United Kingdom, and

17

Mexico), to the extent relevant to Novavax's efforts to produce enough doses of its Covid-19 Vaccine Candidate for clinical trials.

**DOCUMENT REQUEST 16:**

All Documents Concerning any formal or informal plan (regardless of whether such plan was enacted or followed) that outlines or tracks the clinical development of Novavax's Covid-19 Vaccine Candidate, Including any "clinical development plan" as referenced in ¶¶ 91 and 172 of the Complaint and any internal projected timelines for EUA approval and commercialization of Novavax's Covid-19 Vaccine Candidate.

**DOCUMENT REQUEST 17:**

All Documents Concerning Communications or Correspondence with investors, analysts, and/or the media (Including *The Washington Post* and *Politico*) relating to Novavax's Covid-19 Vaccine Candidate.

**DOCUMENT REQUEST 18:**

All Documents Concerning Novavax's decision, efforts, and ability to file its EUA for its Covid-19 Vaccine Candidate, Including any of Novavax's decisions to delay its EUA filing, as well as any financial, operational, or reputational impact that Novavax was expected to experience or could have or did experience from any EUA filing delays.

**DOCUMENT REQUEST 19:**

All Documents setting forth Novavax's corporate structure, ownership and management, Including organizational charts, Documents Identifying reporting structures within Novavax, and descriptions of senior Novavax's officers' roles and/or responsibilities.

**DOCUMENT REQUEST 20:**

All Documents setting forth a breakdown and/or layout of Novavax's manufacturing operations for its Covid-19 Vaccine Candidate, Including the roles of each Manufacturing Facility,

18

the vaccine components or ingredients produced at the respective Manufacturing Facility, and organizational charts that display the hierarchy of each Manufacturing Facility's respective employees or agents (Including Novavax's onsite employees and FUJIFIM employees).

**DOCUMENT REQUEST 21:**

All Documents Concerning Novavax's and/or the Individual Defendants' testimony before any Government entity, agency, or committee, Including the Subcommittee on Oversight and Investigations, U.S. House of Representatives, Committee on Energy and Commerce regarding the Company's development and manufacturing of its Covid-19 Vaccine Candidate.

**DOCUMENT REQUEST 22:**

All Documents Concerning Novavax's Board of Directors' meetings, Including all board minutes (Including all drafts), summaries, presentations, minutes, audio and video recordings, agendas, notes, and any Documents circulated in connection with such meetings (Including all drafts).

**DOCUMENT REQUEST 23:**

All Documents Concerning any investigation, examination, audit, review or inquiry, whether formal or informal, of Novavax, by any federal or state agency or stock exchange, Including the SEC, FDA, DOJ, U.S. Attorney, State Attorneys General, Concerning any of the facts alleged in the Complaint, Including the development, manufacturing, production, distribution, and FDA approval of the Company's Covid-19 Vaccine Candidate. This request covers all Documents between Novavax and the federal agencies, state agencies, and stock exchanges. This Request is not limited to the Relevant Time Period.

**DOCUMENT REQUEST 24:**

All Documents Concerning the acquisition, purchase or sale of Novavax's publicly traded common stock during the Relevant Time Period by any of the Individual Defendants, their

19

immediate family members, or entities under their control, Including the dates, share amounts, and prices of such transactions, any 10b5-1 plans, and the Company's insider trading Policies.

**DOCUMENT REQUEST 25:**

All Documents produced in any Related Actions, Including the derivative action *Meyer v. Erck, et al.*, 21-cv-02996-TDC (D. Md.), and all derivative actions consolidated with *Meyer*.

**DOCUMENT REQUEST 26:**

All Documents Concerning Your data usage, document destruction, and retention Policies during the Relevant Time Period, any document retention or destruction policy with respect to ESI (Including e-mail, text messages, instant messages, computer records, disk files or other electronic records) as well as handheld devices (Blackberries, iPhones, PDAs, etc.), and any actual, suggested or contemplated policy, program, procedure, instruction, direction or request Concerning the usage, destruction, alteration, removal, concealment, non-disclosure, secrecy or confidentiality of employee devices and/or any of the Documents requested herein.

**DOCUMENT REQUEST 27:**

Documents sufficient to Identify or describe Novavax's efforts to preserve and collect Documents relevant to this Action. This Request is not limited to the Relevant Time Period.

**DOCUMENT REQUEST 28:**

All Documents Concerning insurance contracts, Policies, or agreements that may provide coverage for any Defendant in connection with this Action, Including a possible judgment in this Action or indemnification or reimbursement for payments made to satisfy any such judgment, Including any payments made or amounts incurred on those contracts, Policies or agreements.

**DOCUMENT REQUEST 29:**

All Documents Concerning any public statements made by Novavax or the Individual Defendants referenced in ¶¶ 163-211 and 221-253 of the Complaint or any other similar public

statements Concerning the development, manufacturing, production, distribution and FDA approval of the Company's Covid-19 Vaccine Candidate; the Manufacturing Standards (Including the purity and potency metrics and any contamination events in the Manufacturing Facilities); the Company's ability to scale up production; the U.S. or global supply chain as they relate to the Company's Vaccine Candidate (Including supply constraints and difficultly procuring components necessary to manufacture its Vaccine Candidate); and any impact of the Company's delayed EUA filings during the Class Period, Including all Documents that supported or formed the basis for such statements. This Request Includes all Documents Concerning the preparation, review, editing, approval, modification, and/or distribution of the Novavax's public statements, Including any scripts, opening statements, talking points (Including, for example, frequently asked questions or question and answer documents), presentations, or other remarks for any call, meeting, or other Communications with securities analysts, investors, or the media.

**DOCUMENT REQUEST 30:**

All Documents upon which Defendants intend to rely for their defense of the claims asserted in the Complaint. This Request is not limited to the Relevant Time Period.

**DOCUMENT REQUEST 31:**

All Documents You intend to rely upon in opposing Lead Plaintiffs' motion for class certification in this Action, Including all Documents that You contend demonstrate that either Lead Plaintiffs or Lead Counsel are inadequate within the meaning of Rule 23 of the Federal Rules of Civil Procedure. This Request is relevant for class certification and may be relevant to the underlying merits of Lead Plaintiffs' claims. This Request is not limited to the Relevant Time Period.

**DOCUMENT REQUEST 32:**

All Documents obtained or received by You from any Person, either in response to a subpoena issued by You or provided to You voluntarily, concerning the claims asserted in the Complaint or any defenses that may be raised by Defendants. This Request is relevant for class certification as well as the underlying merits of Lead Plaintiffs' claims. This Request is not limited to the Relevant Time Period.

Dated: February 3, 2023                    Respectfully submitted,


                                           **LABATON SUCHAROW LLP**

                                           */s/ Michael H. Rogers*
                                           James W. Johnson (admitted *pro hac vice*)
                                           Michael H. Rogers (admitted *pro hac vice*)
                                           David J. Schwartz (*pro hac vice* forthcoming)
                                           James T. Christie (admitted *pro hac vice*)
                                           Philip J. Leggio (admitted *pro hac vice*)
                                           140 Broadway
                                           New York, NY 10005
                                           Tel: (212) 907-0700
                                           Fax: (212) 818-0477
                                           Email: jjohnson@labaton.com
                                                   mrogers@labaton.com
                                                   dschwartz@labaton.com
                                                   jchristie@labaton.com
                                                   pleggio@labaton.com


                                           **POMERANTZ LLP**
                                           Brian Calandra (admitted *pro hac vice*)
                                           Jeremy A. Lieberman (admitted *pro hac vice*)
                                           600 Third Avenue, 20th Floor
                                           New York, NY 10016
                                           Tel: (212) 661-1100
                                           Fax: (212) 661-8665
                                           Email: bcalandra@pomlaw.com
                                                   jalieberman@pomlaw.com

                                           *Counsel for Co-Lead Plaintiffs and*
                                           *Lead Counsel for the Class*


22

**COHEN MILSTEIN SELLERS &
TOLL PLLC**
Steven J. Toll (Md. Bar No. 15824)
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
         dsommers@cohenmilstein.com
         dbunch@cohenmilstein.com

*Local Counsel for Co-Lead Plaintiffs*

**PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, California 90067
Tel: (310) 692-8883
Email: esley@portnoylaw.com

*Additional Counsel for Co-Lead Plaintiffs and
the Class*

23

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of February 2023, I served the attached document,

Lead Plaintiffs' First Set of Requests for Production of Documents to Defendants Novavax, Inc.

and the Individual Defendants, via electronic mail to all counsel of record.

<div align="right">

*/s/ Michael H. Rogers*
Michael H. Rogers

</div>

24

# EXHIBIT 4

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

<table>
<tr>
<td>

SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated,

*Plaintiff,*

v.

NOVAVAX, INC., *et al.*

*Defendants.*

</td>
<td>

Civil Action No. TDC-21-2910

</td>
</tr>
</table>

**DEFENDANTS' RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION**

Pursuant to Rule 26 and 34 of the Federal Rules of Civil Procedure, Defendants Novavax, Inc. ("Novavax" or the "Company"), Stanley C. Erck, and John J. Trizzino (collectively, "Defendants"), by and through their attorneys, submit these responses and objections to Plaintiffs' First Set of Requests for Production of Documents (the "Requests").

These responses are made solely for the purpose of this action. Each response is subject to all objections on the grounds of competence, relevance, materiality, propriety, and admissibility, and to any and all other objections on any grounds that would require exclusion of any statements contained herein if such request were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are expressly reserved and may be interposed at the time of trial.

The following responses are based upon the current state of this litigation and the information presently available to and located by Defendants and their attorneys through a reasonable search. Defendants have not completed their investigation of the facts relating to this

action, discovery in this action, or Defendants' preparation for trial.  The responses herein are without prejudice to Defendant's right to produce evidence of any additional facts.

No incidental or implied admissions are intended by Defendants' responses to Plaintiffs' Requests.  The fact that Defendant have responded to all or part of any request for production of documents is not intended to be, and shall not be construed to be, a waiver by Defendants of any part of any objection to any Request.

**GENERAL OBJECTIONS**

1.      Defendants object to the Requests to the extent they seek to impose requirements or obligations on Defendants in addition to, beyond the scope of, or different from those imposed by the Federal Rules of Civil Procedure, the Local Rules of the District of Maryland, or other applicable laws or rules. Defendants will comply with the obligations imposed by those Rules and applicable law.

2.      Defendants object to the Requests to the extent that they seek information that is confidential to Defendants or to third parties, without a protective order in place.  The production of any such information by Defendants would be contingent upon the entry of a mutually agreed protective order. Defendants acknowledge that Plaintiffs are negotiating in good faith on the terms of a mutually acceptable protective order for submission to the Court that would address (subject to possible specific exceptions) the objection stated in this paragraph.

3.      Defendants object to the Requests to the extent they seek information or materials protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other privilege or immunity. Defendants will produce no information or materials protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other privilege or immunity. In the event Defendants do disclose

-2-

any privileged or otherwise protected information or materials, they do so inadvertently and do not intend by the disclosure to waive the privilege or immunity.

4.    Defendants object to the Requests to the extent they assume disputed facts or legal conclusions, may be construed as an admission that any fact or circumstances alleged or suggested by Plaintiffs occurred or existed, or purport to characterize Defendants' positions, contentions, claims, defenses, or arguments in this Action. By responding to any Request, Defendants do not admit the correctness of, adopt, or acquiesce in any factual or legal conclusion, contention, assertion, or characterization contained in the Requests, and Defendants' use of any term defined in the Requests does not admit the accuracy of any such defined term.

5.    Defendants object to the Requests as overly broad, unduly burdensome, and as seeking information irrelevant to the surviving claims and defenses and disproportional to the case's needs, to the extent Requests seek "All Documents" concerning particular subjects, regardless of whether the document is in the possession, custody, or control of Defendants, regardless of the Documents' relationship to the parties' surviving claims or defenses in this Action, and regardless of whether the Complaint pleads any claims premised on the subject of the Request.  Defendants cannot and need not identify "all documents" related to a particular subject but rather only those documents that Defendants can locate through a reasonable search consistent with the Federal Rules of Civil Procedure.  In conducting any search for relevant and responsive documents, Defendants will review sources that are known or reasonably available and reasonably likely to have relevant information.  To the extent (if any) that Defendants agree to produce documents in response to Requests for "All Documents," Defendants will produce any responsive, non-privileged documents that they locate within their possession, custody, or control—through a reasonable search performed in accordance with the parties' anticipated ESI Protocol and

-3-

applicable law—of an agreed-upon, reasonable list of Custodians' files and any other known, non-custodial, reasonably available sources that are reasonably likely to have relevant information.

6.      Defendants object to the Requests to the extent that they seek production of documents not in the possession, custody, or control of Defendants as those concepts are defined by the Federal Rules of Civil Procedure and applicable law. Defendants will only produce responsive, non-privileged material that lies within their possession, custody, or control.

7.      Defendants will divulge no information that these Responses expressly indicate Defendants will withhold under an objection.  Should Defendants divulge any such information, they do so inadvertently, and the disclosure is not a waiver of the relevant objection(s).

8.      Defendants object to the Requests to the extent they purport to require Defendants to produce documents "within thirty (30) days of service." To the extent (if any) that Defendants agree to produce documents in response to the Requests, Defendants will produce responsive, non-privileged documents within their possession, custody, or control (if any such documents exist) at a mutually convenient time and place agreed to by the parties or ordered by the Court.

## OBJECTIONS TO DEFINITIONS & INSTRUCTIONS

Defendants object to the instructions (each an "Instruction," and together, the "Instructions") and definitions (each a "Definition," and together, the "Definitions") included in the Requests as follows:

1.      Defendants object to the definition of "Document" to the extent it imposes a burden on Defendants in addition to, beyond the scope of, or different from the burden imposed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Maryland, or the parties' anticipated ESI Protocol. When used in these Responses, Defendants will construe "document" or "documents" to have the same meaning given to the term in Fed. R. Civ. P. 34(a).

-4-

2.      Defendants object to the definition of "Fast Track Designation" as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses and disproportionate to the case's needs to the extent the definition purports to include any process by the FDA designed to facilitate the development, and to expedite the review of, drugs to treat serious conditions and fill an unmet medical need.  Defendants will construe "fast track designation" to refer to the expedited approval process authorized by 21 U.S.C. § 356(b).

3.      Defendants object to the definition of "FUJIFILM" as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses, disproportionate to the case's needs, and beyond Defendants' possession, custody, or control, to the extent the definition purports to include "all" of FUJIFILM's "present and former" officers, employees, affiliates, corporate predecessors and successors, and other representatives, as well as all persons purporting to act on behalf of any of the foregoing.  Defendants shall construe FUJIFILM to mean FUJIFILM Diosynth Biotechnologies.

4.      Defendants object to the definition of "Government" as seeking information irrelevant to any parties' surviving claims or defenses and disproportionate to the case's needs, and as overly broad and unduly burdensome, to the extent the definition purports to include any non-U.S. government and non-U.S. federal agency, committee, or department.  Plaintiffs premise their claims on Novavax's interactions with, and efforts to secure approval by, the U.S. FDA.  Plaintiffs do not premise any claims in the Complaint on foreign agency approvals or foreign government contacts.  Defendants will interpret "Government" to refer only to the U.S. government and any U.S. federal agency, committee, or department.

5.      Defendants object to the definition of "Identify" as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses,

disproportionate to the case's needs to the extent it seeks personal contact information such as present or last known address and email address of Novavax employees and other individuals. Plaintiffs' may contact current and former Novavax employees through Defendants' counsel at Ropes & Gray LLP.

6.      Defendants object to the definition of "Individual Defendants" as overly broad and irrelevant to the extent it purports to include Gregory F. Covino and Gregory Glenn, who were dismissed from the case.  Defendants will construe "Individual Defendants" to refer to Stanley C. Erck and John J. Trizzino, the only individuals remaining as defendants in this Action.

7.      Defendants object to the definition of "Manufacturer" and "Manufacturers" as overly broad, unduly burdensome, and irrelevant to any party's surviving claims or defenses to the extent the definition purports to cover manufacturers other than FUJIFILM.  FUJIFILM is the only manufacturer referenced by the Complaint's allegations as a basis for Plaintiffs' claims.

8.      Defendants object to the definition of "Manufacturing Facility" and "Manufacturing Facilities" as overly broad, unduly burdensome, and irrelevant to any party's surviving claims or defenses to the extent the definition purports to cover facilities other than FUJIFILM's manufacturing facilities located in Texas and North Carolina.  Plaintiffs' claims center exclusively on alleged manufacturing issues arising at those two facilities. Defendants will construe "Manufacturing Facilities" to apply only to FUJIFILM's manufacturing facilities located in Texas and North Carolina.

9.      Defendants object to the definition of "Manufacturing Standards" as vague and ambiguous, overly broad, and unduly burdensome, and as seeking information irrelevant to any party's surviving claims or defenses and disproportionate to the case's needs, to the extent the definition purports to include "any other applicable governmental or industry manufacturing

-6-

standards" without defining or specifying those standards. Defendants will construe this definition to refer to cGMP, the only manufacturing standards actually referenced in the Complaint as a basis for Plaintiffs' claims.

10.     Defendants object to the definition of "Novavax" as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses, disproportionate to the case's needs, and beyond Defendants' possession, custody, or control, to the extent the definition purports to include "all" of Novavax's "present and former" officers, employees, affiliates, corporate predecessors and successors, and other representatives, as well as all persons purporting to act on behalf of any of the foregoing. Defendants will construe "Novavax" to mean Novavax, Inc., and those of its officers, directors, and employees who were installed in their roles during the relevant time period for Defendants' responses.

11.     Defendants object to the definition of "OOS" as vague and ambiguous, overly broad, and unduly burdensome, and as seeking information irrelevant to any party's surviving claims or defenses and disproportionate to the case's needs, to the extent the definition refers to "production parameters" without defining or specifying those parameters. Defendants apply a very large number of production parameters to their vaccine production lines, many of which parameters are unrelated to the purity, potency, and contamination cGMP parameters on which Plaintiffs premise their claims. Defendants will construe "OOS" to refer to a batch of products that, after testing, does not meet the cGMP production parameters related to purity or potency issues or contamination in the production line.

12.     Defendants object to the definition of "Quality Management Systems" as seeking information irrelevant to any party's surviving claims or defenses, and as overly broad and unduly burdensome, to the extent the definition purports to include "Policies related to securing and

monitoring the Company's computer systems and databases" and "the efforts the Company took to prevent unauthorized access or changes to, or manipulation or deletion of, data."  The Complaint's allegations center exclusively on allegedly undisclosed manufacturing issues impacting Novavax's COVID-19 Vaccine Candidate; the Complaint contains no allegations at all related to, for example, the security of the Company's computer systems or data manipulation. Defendants shall construe the definition of "Quality Management Systems" to exclude information related to "Policies related to securing and monitoring the Company's computer systems and databases" and "the efforts the Company took to prevent unauthorized access or changes to, or manipulation or deletion of, data."

13.    Defendants object to Instructions 3, 4, 5, 6, and 7 to the extent they conflict with or purport to vary, alter, or amend the terms of the parties' anticipated Stipulated Protective Order ("Protective Order") and anticipated Electronic Discovery Agreement ("ESI Protocol"), the Federal Rules of Civil Procedure, or the Local Rules of the United States District Court for the District of Maryland. Defendants will produce material or log material withheld under a claim of privilege (either in full or in part) pursuant to the terms of the ESI Protocol, the Stipulated Protective Order, the Federal Rules of Civil Procedure, and the Local Rules of the United States District Court for the District of Maryland.

<div align="center">

**OBJECTIONS TO RELEVANT TIME PERIOD**

</div>

Defendants object to the "Relevant Time Period" as overly broad and unduly burdensome, and as seeking information irrelevant to any Party's surviving claims and defenses and disproportionate to the case's needs, to the extent the time period purports to seek information predating or postdating by years both the Class Period and the public statements challenged by Plaintiffs in this case.  The state of Novavax's vaccine manufacturing efforts in 2019 and 2020 has

no bearing on the truth or falsity of statements made years later, in May, August, and September 2021. Indeed, Plaintiffs nonsensically purport to seek 2019 information about Novavax's efforts to manufacture a vaccine against a novel illness first identified in 2020. Plaintiffs likewise have no basis to seek documents created after the Class Period in a litigation predicated on the alleged falsity of certain public statements at the time they were made and on Defendants' alleged fraudulent intent in making those statements. Defendants will construe the Relevant Time Period to run from January 1, 2021 through October 19, 2021, *i.e.*, starting more than five months before the first allegedly false and misleading statement was made (on May 10, 2021) through the Class Period's end.

<div align="center">

**SPECIFIC RESPONSES & OBJECTIONS**

</div>

The following Specific Responses & Objections each incorporate by reference the General Objections, the Objections to Definitions & Instructions, and the Objections to the Relevant Time Period (together, the "Preliminary Objections"), whether or not the Preliminary Objections are specifically reiterated or referenced in the Specific Objections & Responses. Defendants' Responses are made subject to and without waiving the Preliminary Objections.

**DOCUMENT REQUEST 1**

All Documents Concerning any and all Manufacturing Standards that Novavax's Covid-19 Vaccine Candidate was required to comply with, meet, and satisfy (such as regulations and standards related to purity, potency, and contamination), as well as Novavax's ability to comply with, meet, and satisfy such Manufacturing Standards, Including: (i) the Company's Policies to ensure such Manufacturing Standards were complied with, met, and satisfied; and (ii) the Company's tracking of any metrics or information relevant to such Manufacturing Standards.

<div align="center">-9-</div>

## RESPONSE TO DOCUMENT REQUEST 1

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning all Manufacturing Standards, regardless of the Documents' or standards' subject matter or connection (or lack of connection) to the parties' surviving claims and defenses in this Action. This Action centers on Novavax's compliance with cGMP Manufacturing Standards related to vaccine doses' purity, potency, and contamination, as that compliance pertains to specifically challenged public statements made about Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021. Plaintiffs are not entitled to expansive discovery into every aspect of Novavax's compliance with every Manufacturing Standard. In addition, the expense of identifying and producing "all Documents" relating in any way to any Manufacturing Standards governing Novavax's Covid-19 Vaccine Candidate would far outweigh those Documents' relevance or benefit to this Action. Defendants will not search for or produce documents related to Manufacturing Standards other than the cGMP standards for vaccine doses' purity, potency, or contamination that serve as the basis for Plaintiffs' surviving claims.

Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome to the extent the Request purports to seek information "Concerning" Novavax's "ability to comply with, meet, and satisfy" Manufacturing Standards. A near-infinite number of factors could impact or otherwise relate to Defendants' "ability" to comply with, meet, or satisfy a particular Manufacturing Standard. Defendants thus cannot identify the information sought by this part of the Request and will not respond. Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any party's

-10-

surviving claims or defenses, to the extent the Request purports to seek information about Novavax's hypothetical "ability to comply with, meet, and satisfy" Manufacturing Standards, separate from its actual compliance with such standards. Defendants will search for and produce any documents responsive to this Request only to the extent any such documents provide an assessment of Novavax's ability to comply with the relevant Manufacturing Standards included in Defendants' response to this Request.

Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome to the extent the meaning of the phrase "the Company's tracking of any . . . information relevant" to Manufacturing Standards is unclear. Defendants further object to this Request as irrelevant because not all "metrics or information relevant" to Manufacturing Standards have any bearing on Novavax's actual compliance with Manufacturing Standards. Defendants will search for and produce any documents responsive to this Request only to the extent any such documents reflect metrics or data that are tracked, compiled, or collected specifically to assess or evaluate whether Novavax's Covid-19 Vaccine Candidate meets the relevant cGMP standards for vaccine doses' purity, potency, or contamination that serve as the basis for Plaintiffs' surviving claims.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to Novavax's compliance or efforts to comply with the cGMP standards for vaccine doses' purity, potency, or contamination that serve as the basis for Plaintiffs' surviving claims, including (i) any Documents that provide an assessment of Novavax's ability to comply with such cGMP standards; (ii) any Documents that reflect metrics

-11-

or data that are tracked, compiled, or collected specifically to assess or evaluate whether Novavax's Covid-19 Vaccine Candidate meets such cGMP standards; (iii) any Policies directly applicable to compliance with such cGMP standards.

## DOCUMENT REQUEST 2

All Documents Concerning the Company's requirement and ability to scale up production of Novavax's Covid-19 Vaccine Candidate as referenced in, *inter alia*, ¶¶ 57, 63 n.8, 131, 147, and 180, as well as Novavax's ability to meet such scalability requirements, Including: (i) the Company's Policies to ensure such scalability requirements were met; (ii) the Company's tracking of any metrics or information relevant to scalability; and (iii) all Documents Concerning Novavax's forecasts and/or projections for the manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate.

## RESPONSE TO DOCUMENT REQUEST 2

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning scaling of Novavax's manufacturing capabilities, regardless of the Documents' subject matter or relationship to the parties' surviving claims or defenses in this Action. Novavax's scaling of its manufacturing operations is only relevant to the extent it pertains to the specific challenged statements about Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021. Plaintiffs are not entitled to expansive discovery into every aspect of Novavax's scaling efforts. In addition, the expense of identifying and producing "all Documents" relating in any way to scalability would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome to the extent the Request purports to seek information concerning an undefined "requirement" or "requirements," the meaning of which is unclear. Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome to the extent the Request purports to seek information "Concerning" Novavax's "ability to scale up production" or "to meet such scalability requirements." There are myriad factors that could impact Novavax's ability to scale its production capacity. Defendants thus cannot identify the information sought by these parts of the Request and will not respond.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any party's surviving claims or defenses, to the extent the Request purports to seek information about Novavax's hypothetical "ability to meet scalability requirements," separate from its actual efforts to scale up manufacturing capabilities. Defendants cannot and will not provide discovery on Novavax's hypothetical ability to scale up its manufacturing capacity.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to Novavax's (i) actual, forecasted, projected, or expected total capacity to produce Novavax's Covid-19 Vaccine Candidate doses, or (ii) forecasts and/or projections for the manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate for FUJIFILM's Texas and North Carolina facilities. Defendants will also produce any Policies relating to the forecasting referenced in parts (b)(i) and (b)(ii) of the preceding sentence.

-13-

**DOCUMENT REQUEST 3**

All Documents Concerning any and all inspections and re-inspections by the FDA of the Manufacturing Facilities, Including Forms 483, Warning Letters, or EIRs issued by the FDA for any Manufacturing Facility in connection with the development, manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate, Including the March 2021 FDA investigation or inspection of FUJIFILM's Texas facility, the April 9, 2021 email from Jose Torres to the FDA in response to FDA verbal observations, the April 14, 2021 FDA investigation memo, the April 2021 FDA investigation or inspection of FUJIFILM's North Carolina Facility, the April 21, 2021 FDA Form 483, the April 28, 2021 FDA memorandum, and a complaint delivered to FDA investigator Scott Ballard's desk in the FDA Dallas district office on April 20, 2021, as further described in the Complaint.

**RESPONSE TO DOCUMENT REQUEST 3**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning all FDA inspections of all Manufacturing Facilities, regardless of the Documents' or inspections' subject matter or relationship to the parties' surviving claims or defenses in this Action. FDA inspection activity is only relevant to the extent it pertains to purity, potency, and contamination issues alleged by the Complaint to have resulted in a failure to meet relevant cGMP standards. Plaintiffs are not entitled to expansive discovery into every single interaction that Novavax had with the FDA on any subject. In addition, the expense of identifying and producing "all Documents" relating in any way to FDA inspections would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as duplicative of Document Request 23.

-14-

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to any FDA inspections of FUJIFILM's Texas and North Carolina facilities.

**DOCUMENT REQUEST 4**

All Documents Concerning Novavax's development, implementation, and oversight of its Quality Management Systems, as well as all Documents sufficient to Identify Novavax employees and agents responsible for the development, implementation, and oversight of the Company's Quality Management Systems, Including all Documents Concerning Novavax's Regulatory Affairs Team's Communications regarding the development, manufacturing, and production of Novavax's Vaccine Candidate.

**RESPONSE TO DOCUMENT REQUEST 4**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, to the extent the Request purports to seek "all Documents" related to Novavax's Quality Management Systems—an extremely wide range of documents that expands well beyond the allegations and claims in the Complaint. Novavax's oversight of its Quality Management Systems is only relevant to the extent it pertains to the specific challenged statements about Novavax's ability to manufacture, on a commercial scale, sufficiently pure, potent doses of Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021. Plaintiffs are not entitled to expansive discovery into every aspect of Novavax's Quality Management Systems or Novavax's monitoring of such systems. In addition, the expense of identifying and producing "all

-15-

Documents" relating in any way to Novavax's Quality Management Systems would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, to the extent the Request purports to seek documents related to—and sufficient to identify Novavax employees responsible for—the development and implementation of the Company's Quality Management Systems.  The development and implementation of those systems is irrelevant to the parties' surviving claims or defenses, which implicate Novavax's ability to manufacture, on a commercial scale, sufficiently pure, potent doses of Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021.  Defendants will not produce documents related to—or sufficient to identify the Novavax employees responsible for—developing or implementing the Quality Management Systems.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to Novavax's oversight of its Quality Management Systems in connection with its manufacture of its COVID-19 Vaccine Candidate.

**DOCUMENT REQUEST 5**

All Documents, Including relevant Policies, Concerning Novavax's investigations and efforts to correct potential violations of Manufacturing Standards, Including (i) OOS results; (ii) failures to secure and monitor the Company's computer systems and databases; (iii) unauthorized access or changes to, or manipulation or deletion of Company data; and (iv) inadequate testing of

and/or mitigation of the risks of microbiological contamination within the Manufacturing Facilities.

**RESPONSE TO DOCUMENT REQUEST 5**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning Novavax's investigations and efforts to correct potential violations of Manufacturing Standards, regardless of the Documents', investigations', efforts', or standards' subject matter or lack of connection to the parties' surviving claims and defenses in this Action. Novavax's investigations and efforts to correct potential violations of Manufacturing Standards are only relevant to this Action to the extent the investigations or efforts pertain to the cGMP standards for vaccine doses' purity, potency, or contamination that serve as the basis for Plaintiffs' surviving claims. Plaintiffs are not entitled to expansive discovery into every aspect of Novavax's compliance with Manufacturing Standards. In addition, the expense of identifying and producing "all Documents" relating in any way to Novavax's investigation and efforts related to compliance with Manufacturing Standards would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request purports to seek information about any failures to secure and monitor the Company's computer systems and databases and any unauthorized access or changes to, or manipulation or deletion of, Company data. The Complaint's allegations center exclusively on allegedly undisclosed manufacturing issues affecting Novavax's COVID-19 Vaccine Candidate; the Complaint contains no allegations at all related to, for example,

-17-

cybersecurity or data manipulation.  Plaintiffs are not entitled to discovery into subjects that have no bearing on the allegations in the Complaint.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to (1) subparts (i) and (iv) of this Request and (2) the FUJIFILM Texas and North Carolina facilities.  Defendants will not search for or produce documents responsive to subparts (ii) and (iii) of this Request, pursuant to Defendants' Preliminary and Specific Objections.

## DOCUMENT REQUEST 6

Documents sufficient to Identify which department and employees were responsible for reviewing, addressing, and rectifying potential violations of Manufacturing Standards, Including any potential or actual violations set forth in any Form 483, EIR, Warning Letter, or any other notice or citation from the FDA or other applicable governing body received by Defendants or a Manufacturing Facility.

## RESPONSE TO DOCUMENT REQUEST 6

Defendants object to this Request on grounds that it seeks Documents beyond Defendants' possession, custody, or control, to the extent the Request seeks information about departments and employees at unspecified legal entities or businesses—including information in the possession of FUJIFILM and the FDA, third parties whose employees may have been "responsible for reviewing, addressing, and rectifying potential violations of Manufacturing Standards." Defendants will construe the Request to seek Documents sufficient to identify departments and

-18-

employees of Novavax.  Defendants will not search for or produce Documents beyond their possession, custody, or control.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol.

**DOCUMENT REQUEST 7**

All Documents Concerning any remedial actions undertaken by Novavax following Novavax's or any Manufacturing Facility's receipt of any Form 483, EIR, Warning Letter, or any other notice or citation from the FDA or other applicable governing body indicating a potential or actual violation of applicable laws or regulations, Including all Documents related to the preparation, submission, implementation, progress, and/or oversight of any Novavax or Manufacturer CAPA plan made in response to a Warning Letter.

**RESPONSE TO DOCUMENT REQUEST 7**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request purports to seek "All Documents" concerning all remedial actions taken in response to all FDA notices or citations, regardless of the Documents', remedial actions', or FDA notices' subject matter or relationship to the parties' surviving claims or defenses in this Action.  Any remedial actions taken by Novavax are relevant only to the extent they pertain to purity, potency, and contamination issues alleged by the Complaint to have resulted in a failure to meet relevant cGMP standards.  Plaintiffs are not entitled to expansive discovery into every aspect of any remedial action Novavax undertook in response to any FDA notice on any subject.

In addition, the expense of identifying and producing "all Documents" relating in any way to any remedial actions taken by Novavax would far outweigh those Documents' relevance or benefit to this Action.

Defendants object to this Request as overly broad, unduly burdensome, vague, and ambiguous, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request purports to seek information about remedial actions taken in response to any notice or citation from an unspecified "other applicable governing body."  Plaintiffs premise their claims on allegations about inspections and reports issued to Novavax by the FDA; Plaintiffs allege nothing at all about inspections, reports, notices, citations, or other activity by any other governing body.  Defendants will not search for or produce documents about remedial actions undertaken by governing bodies other than the FDA.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to remedial actions undertaken by Novavax in response to Novavax's or the FUJIFILM Texas and North Carolina facilities' receipt of the FDA notices or reports related to cGMP purity, potency, or contamination standards, as alleged in the Complaint.

**DOCUMENT REQUEST 8**

All Documents Concerning deviations from, violations of, noncompliance of, or any other problems related to Manufacturing Standards in connection with Novavax's Covid-19 Vaccine Candidate, Including (i) the existence of microbial contamination in any Manufacturing Facility; (ii) the Manufacturers' failure to abide by cleaning procedures for certain manufacturing areas;

-20-

(iii) the steps taken by the Company to investigate root causes of contamination or other quality related problems; (iv) the Company's Policies to ensure proper purity and potency for the Company's Vaccine Candidate; (v) the Manufacturers' storage and organization of the Company's Vaccine Candidate; (vi) the training provided to new employees at the Manufacturing Facilities (Including Novavax's onsite employees and FUJIFIM employees); and (vii) the preventative actions considered and/or adopted by the Company to resolve contaminations or quality-related problems. This Request is not limited to Documents or actions taken in response to Novavax's or any Manufacturing Facility's receipt of any Form 483, EIR, Warning Letter, or any other notice or citation from the FDA.

**RESPONSE TO DOCUMENT REQUEST 8**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning deviations from or violations of any and all Manufacturing Standards, regardless of the Documents' or standards' subject matter or lack of connection to the parties' surviving claims and defenses in this Action. Defendants further object to this Request as overly broad, unduly burdensome, vague, and ambiguous, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning (a) "any other problems related to Manufacturing Standards" for Novavax's Covid-19 Vaccine Candidate and (b) other unspecified "quality-related problems"—regardless of the Documents' or problems' subject matter or relationship to the parties' surviving claims or defenses in this Action. This Action implicates Novavax's compliance with cGMP standards related to vaccine doses' purity, potency, and contamination, as that compliance pertains to specifically challenged public

-21-

statements made about Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021. Plaintiffs are not entitled to expansive discovery into every aspect of Novavax's compliance with Manufacturing Standards. In addition, the expense of identifying and producing "all Documents" relating in any way to the extremely broad subject matter of the Request and its seven sub-topics would far outweigh those Documents' relevance or benefit to this Action. Defendants will not search for or produce Documents related to "any other problems related to Manufacturing Standards," other "quality-related problems," or deviations from or violations of or noncompliance with Manufacturing Standards, unless such problems or issues relate to the particular purity, potency, and contamination issues alleged by the Complaint to have resulted in a failure to meet relevant cGMP standards.

Defendants further object to this request to the extent that "Manufacturer" and "Manufacturers" purports to cover manufacturers other than FUJIFILM. FUJIFILM is the only manufacturer referenced by the Complaint's allegations as a basis for Plaintiffs' claims. Defendants will not search for or produce documents related to other manufacturers.

Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request purports to seek documents related to "the Manufacturers' storage and organization of the Company's Vaccine Candidate." Defendants do not understand what "the Manufacturers' storage and organization of the Company's Vaccine Candidate" means and therefore cannot and will not produce documents related to subpart (v) of this request.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims and defenses and disproportional

-22-

to the case's needs, to the extent the Request seeks information relating to "the training provided to new employees at the Manufacturing Facilities," regardless of the training's subject matter. Such information is entirely irrelevant to the parties' surviving claims and defenses, which implicate specific challenged statements about Novavax's ability to manufacture, on a large scale, sufficiently pure, potent doses of Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021. Defendants will not search for or product Documents related to the training provided to new employees at the Manufacturing Facilities.

Defendants further object to this Request on grounds that it seeks Documents beyond Defendants' possession, custody, or control, to the extent the Request seeks information in the possession of FUJIFILM, a third party, whose employees may have been responsible for, among other things, "abid[ing] by cleaning procedures for certain manufacturing areas," overseeing "storage and organization of the Company's Vaccine Candidate," "investigat[ing] root causes of contamination or other quality related problems," or "the training provided to new employees at the Manufacturing Facilities." Defendants will not search for or produce Documents that lie beyond their possession, custody, or control.

Defendants further object to this Request as duplicative of Request No. 1.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to deviations from, violations of, or noncompliance with cGMP standards related to purity, potency, or contamination in connection with Novavax's Covid-19 Vaccine Candidate.

-23-

**DOCUMENT REQUEST 9**

All Documents related to any partial or full shutdown, stoppage, or halt of any manufacturing processes or facilities at any Manufacturing Facility (regardless of whether the shutdown, stoppage, or halt was voluntary or involuntary) to the extent related to any aspect of Novavax's Covid-19 Vaccine Candidate, Including all Communications between Novavax and any Manufacturing Facility about such partial or full shutdown, stoppage, or halt (and/or the reason(s) that led to such event).

**RESPONSE TO DOCUMENT REQUEST 9**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" relating to shutdowns, stoppages, or halts of any manufacturing processes for any reason, regardless of the stoppage's relationship to the allegations in the Complaint.  As written, Plaintiff's requests would cover brief stoppages for reasons unrelated to the allegations in the Complaint, for example routine maintenance. Any stoppages at Novavax's Manufacturing Facilities are only relevant to the extent they pertain to the specific challenged statements about Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021.  Those allegations do not entitle Plaintiffs to conduct a fishing expedition into the entirety of Novavax's manufacturing processes.

Defendants further object to this Request on grounds that it seeks Documents beyond Defendants' possession, custody, or control, to the extent the Request seeks facility-stoppage information that is in the possession of FUJIFILM, the FDA, or other third parties. Defendants will not search for or produce Documents that lie beyond their possession, custody, or control.

-24-

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to the shutdowns, stoppages, or halts specifically alleged in the Complaint to have occurred at the FUJIFILM Texas and North Carolina facilities.

## DOCUMENT REQUEST 10

All Documents Concerning the supply chain (both the U.S. supply chain as referenced in ¶ 60 of the Complaint and the global supply chain as referenced in ¶¶ 78 and 180 of the Complaint) of each step of developing, manufacturing, and producing Novavax's Covid-19 Vaccine Candidate, Including all Documents Concerning any supply chain constraints or disruptions, as well as any impact that such constraints or disruptions had on the development, manufacturing, or production of Novavax's Covid-19 Vaccine Candidate).

## RESPONSE TO DOCUMENT REQUEST 10

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" relating to supply chain issues of any type, regardless of the Documents' subject matter or relationship to the parties' surviving claims or defenses in this Action. The only supply chain issues relevant to Plaintiffs' claims are the issues alleged in the Complaint to have caused material delays to Novavax's EUA filing; Plaintiffs are not entitled to expansive discovery into every aspect of Novavax's supply chain. In addition, the expense of identifying and producing "all Documents" relating in any way to the supply chain issues described in the Request would far outweigh those Documents' relevance or benefit to this Action.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to any specific supply chain issues alleged in the paragraphs of the Complaint referenced in this request.

**DOCUMENT REQUEST 11**

All Documents Concerning the production or distribution of any approved or potential Covid-19 vaccine by any of Novavax's Competitors to the extent such Documents relate to (i) Novavax's Covid-19 Vaccine Candidate's market share or competitive position in the Covid-19 vaccine sector; or (ii) any heightened scrutiny, investigation, or enforcement action by government agencies on such Competitors, such as any Documents about the Government's decision to halt production of Covid-19 vaccine production at Emergent BioSolutions' Baltimore facility in April 2021.

**RESPONSE TO DOCUMENT REQUEST 11**

Defendants object to the Requests as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, and as overly broad and unduly burdensome, because Novavax's "market share or competitive position" has no bearing on the allegations in the Complaint, which relate exclusively to specific challenged statements about Novavax's ability to manufacture, on a commercial scale, sufficiently pure, potent doses of Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021. There are no allegations in the Complaint concerning Novavax's competitive position relative to other vaccine manufacturers. Plaintiffs are not entitled to expansive discovery into every aspect of Novavax's business or vaccine development efforts.

-26-

Defendants further object to this Request on grounds that it seeks Documents beyond Defendants' possession, custody, or control, to the extent the Request seeks information concerning the production and distribution of vaccines by competitors.  Most or all of such information lies in the possession, custody, or control of third parties, such as Novavax's competitors or the FDA.  Defendants will not search for or produce documents that lie beyond their possession, custody, or control.

Defendants further object to this Request to the extent it seeks public information concerning enforcement activity by the Government against Novavax's competitors—information that is readily available to Plaintiffs with the same or less burden than it is available to Novavax. Defendants will not search for or produce publicly available information accessible to Plaintiffs with a burden equal to or less than the burden to Novavax.

Pursuant to their Preliminary and Specific Objections, Defendants will not search for or produce documents in response to this Request.

**DOCUMENT REQUEST 12**

All Documents that Novavax provided to or received from the FDA (and/or other U.S. and non-U.S. Government regulators), and all Communications between the FDA (and/or other U.S. and non-U.S. Government regulators) and the Manufacturing Facilities (Including FUJIFILM employees or agents and Novavax's onsite employees as referenced in the Complaint) regarding Novavax's Covid-19 Vaccine Candidate, Including (i) the FDA's decision to grant Fast Track Designation for Novavax's Covid-19 Vaccine Candidate; (ii) Operation Warp Speed ("OWS"); (iii) EUA; (iv) Novavax's compliance with Manufacturing Standards (Including data derived from all tests necessary to assure compliance with established specifications and standards, Including examinations and assays); (v) laboratory records (Including information relating to results of tests

-27-

and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested); (vi) any formal or informal complaints issued to the Company, any Manufacturing Facility, or any Government regulator related to any Manufacturing Standards; (vii) any actual or potential violation of any Manufacturing Standards, such as the existence of any contamination in any of the Manufacturing Facilities; and (viii) Module 3 reports as referenced in, inter alia, ¶¶ 104, 118, 170, and 287 of the Complaint.

**RESPONSE TO DOCUMENT REQUEST 12**

Defendants object to this Request as overly broad, unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs to the extent the Request seeks "All Documents" or "All Communications" that Novavax provided to or received from the FDA or any other government agency in any country in any way related to the Covid-19 Vaccine Candidate, regardless of the Documents' subject matter or lack of connection to the parties' surviving claims and defenses in this Action. Any FDA activity or communications involving Novavax are only relevant to the extent they pertain to purity, potency, and contamination issues alleged by the Complaint to have resulted in a failure to meet relevant cGMP standards. Plaintiffs are not entitled to expansive discovery into every single interaction that Novavax had with the FDA (or any other government regulator) on any subject related to the Covid-19 Vaccine Candidate. In addition, the expense of identifying and producing "all Documents" or "all Communications" relating to Novavax's communications with the FDA would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to

the case's needs, to the extent the Request purports to seek information related to foreign, non-U.S. governments or regulators. Plaintiffs premise their claims on Novavax's interactions with, and efforts to secure approval by, the U.S. FDA. Plaintiffs do not premise any claims in the Complaint on foreign agency approvals or foreign government contacts. Defendants will not search for or produce Documents or Communications exchanged with non-U.S. governments or their agencies or with U.S. agencies other than the FDA.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks documents related to the U.S. government's decisions to grant Fast Track Designation for Novavax's Covid-19 Vaccine Candidate and Operation Warp Speed funding. Such decisions have no bearing on the allegations in the Complaint, which relate exclusively to the specific challenged statements about Novavax's ability to manufacture, on a commercial scale, sufficiently pure, potent doses of Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021. In addition, the expense of identifying and producing "all Documents" relating in any way to the FDA communications about Fast Track status and OWS described in the Request would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks all communications with the FDA regarding laboratory records. This Action implicates Novavax's compliance with cGMP standards related to vaccine doses' purity, potency, and contamination, as that compliance pertains to specifically challenged public statements made about Novavax's Covid-19 Vaccine Candidate between May

-29-

2021 and October 2021. Defendants will only produce lab records to the extent they relate to purity or potency assays, or tests related to contamination incidents at the Texas and North Carolina FUJIFILM facilities.

Defendants further object to this Request on grounds that it seeks Documents beyond Defendants' possession, custody, or control, to the extent the Request seeks Documents or Communications exchanged between third-party regulators and third-party Manufacturing Facilities, such as FUJIFILM. Defendants will not search for or produce information that lies beyond their possession, custody, or control.

Defendants object to this Request as vague and ambiguous, overly broad, and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request purports to seek information about Documents regarding "potential violations," as that term is unclear and undefined and can cover a wide range of activity irrelevant to the Complaint. An infinite number of "potential violations" could theoretically arise in any facility. Moreover, the surviving allegations in the Complaint relate only to statements relating to manufacturing issues that are alleged to have actually occurred, not unknown, hypothetical manufacturing issues that could have occurred or had the potential to occur.

Defendants further object to subpart (iii) of this Request as duplicative of Document Request 18, and to subpart (vii) of this Request as duplicative of Document Requests 1 and 8.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to (1) purity, potency, and contamination issues

-30-

alleged by the Complaint to have resulted in a failure to satisfy applicable cGMP standards; or (2) Novavax's EUA submission for its Covid-19 Vaccine Candidate.

**DOCUMENT REQUEST 13**

All Documents Concerning any contract, agreement, arrangement, or any other understanding between Novavax and any Government entity, initiative, or program (Including any Government grants, awards, or funding that Novavax received or applied for) in connection with Novavax's Covid-19 Vaccine Candidate, Including any contract, agreement, arrangement, or any other understanding between Novavax and (i) the Coalition of Epidemic Preparedness Innovations; (ii) the DoD; (iii) OWS; (iv) the Department of Health and Human Services; (v) the Centers for Disease Control and Prevention; (vi) the FDA; (vii) the National Institutes of Health; (viii) the Biomedical Advanced Research and Development Authority; (ix) the Department of Agriculture; (x) the Department of Energy; (xi) the Department of Veterans Affairs; and (xii) the Defense Health Program.

**RESPONSE TO DOCUMENT REQUEST 13**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning any contract, agreement, arrangement, or any other understanding between Novavax and any government agency or program related to Novavax's Covid-19 Vaccine Candidate, regardless of the Documents' subject matter or lack of connection to the parties' surviving claims and defenses in this Action. Plaintiffs' claims relate exclusively to the impact of contamination issues at the FUJIFILM Texas and North Carolina facilities on Novavax's ability to produce at commercial scale its Covid-19 Vaccine Candidate and to satisfy FDA cGMP regulations. In addition, the expense of identifying and

-31-

producing "all Documents" or "all Communications" on these subjects would far outweigh those Documents' relevance or benefit to this Action.

Pursuant to their Preliminary and Specific Objections, Defendants will not search for or produce documents in response to this Request.

**DOCUMENT REQUEST 14**

All Documents Concerning any contract, agreement, arrangement or any other understanding between Novavax and any entity (Including the Manufacturing Facilities) in connection with the development, manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate, Including all SOPs at all Manufacturing Facilities.

**RESPONSE TO DOCUMENT REQUEST 14**

Defendants object to this request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks any and all contracts and understandings between Novavax and "any entity" concerning, in any way, the development, manufacturing, production, or distribution of Novavax's Covid-19 Vaccine Candidate. Again, the Complaint's allegations relate exclusively to third-party FUJIFILM's manufacture of certain drug-product components at FUJIFILM's Texas and North Carolina facilities, and to alleged purity, potency, and contamination issues that were allegedly omitted from public statements made between May and October 2021. Nothing in the Complaint speaks to other aspects of Novavax's development, manufacture, or production of its Covid-19 Vaccine Candidate; and the Complaint alleges no claims premised on the vaccine's distribution.

Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome to the extent the meaning of the terms "arrangement" and "any other

understanding" is unclear and undefined.    Defendants will construe the Request to seek information about contracts and agreements.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to contracts or agreements with FUJIFILM concerning its production of components for Novavax's Covid-19 Vaccine Candidate at FUJIFILM's Texas and North Carolina facilities.

**DOCUMENT REQUEST 15**

All Documents Concerning clinical trials for Novavax's Covid-19 Vaccine Candidate (Including Novavax's PREVENT-19 study and clinical trials in the U.S., United Kingdom, and Mexico), to the extent relevant to Novavax's efforts to produce enough doses of its Covid-19 Vaccine Candidate for clinical trials.

**RESPONSE TO DOCUMENT REQUEST 15**

Defendants object to this Request as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, and as overly broad and unduly burdensome, because the Court has dismissed Plaintiffs' claims based on alleged misrepresentations or omissions about clinical trials.  As explained in Defendants' briefing in support of its motion to dismiss the complaint, which the Court granted in relevant part, Plaintiffs allege insufficient facts to support a claim that any statement about clinical trials was false or misleading when made.  Absent any claim based on a challenged statement about clinical trials, documents related to such clinical trials or clinical development are irrelevant to this litigation and an improper target of discovery.

Pursuant to their objections, Defendants will not search for or produce documents in response to this Request.

**DOCUMENT REQUEST 16**

All Documents Concerning any formal or informal plan (regardless of whether such plan was enacted or followed) that outlines or tracks the clinical development of Novavax's Covid-19 Vaccine Candidate, Including any "clinical development plan" as referenced in ¶¶ 91 and 172 of the Complaint and any internal projected timelines for EUA approval and commercialization of Novavax's Covid-19 Vaccine Candidate.

**RESPONSE TO DOCUMENT REQUEST 16**

Defendants object to this Request as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, and as overly broad and unduly burdensome, because the Court has dismissed Plaintiffs' claims based on alleged misrepresentations or omissions about clinical trials. As explained in Defendants' briefing in support of its motion to dismiss the complaint, which the Court granted in relevant part, Plaintiffs allege insufficient facts to support a claim that any statement about clinical trials was false or misleading when made. Absent any claim based on a challenged statement about clinical trials, documents related to such clinical trials or clinical development are irrelevant to the parties' surviving claims and defenses and an improper target of discovery.

Defendants further object to this Request as unduly burdensome and disproportionate to the case's needs to the extent the Request seeks "All Documents" concerning any clinical development plan. The expense of identifying and producing "all Documents" concerning any clinical development plan would far outweigh those Documents' relevance or benefit to this Action.

-34-

Defendants further object to this Request as duplicative of Document Request 18, to the extent this Request seeks all Documents concerning any internal projected timelines for EUA approval of Novavax's Covid-19 Vaccine Candidate

Pursuant to their Preliminary and Specific Objections, Defendants will not search for or produce Documents in response to this Request, except to the extent (if any) that Defendants agree to produce Documents in response to the duplicative Request(s).

**DOCUMENT REQUEST 17**

All Documents Concerning Communications or Correspondence with investors, analysts, and/or the media (Including *The Washington Post* and *Politico*) relating to Novavax's Covid-19 Vaccine Candidate.

**RESPONSE TO DOCUMENT REQUEST 17**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning any Communications with "investors, analysts, and/or the media" related to any aspect of Novavax's Covid-19 Vaccine Candidate, regardless of the communications' relevance to the Complaint's allegations. The Complaint's allegations relate narrowly to the impact of contamination issues at the FUJIFILM Texas and North Carolina facilities on Novavax's ability to produce its Covid-19 Vaccine Candidate at commercial scale and to satisfy FDA cGMP regulations; such claims do not entitle Plaintiffs to Documents or Communications relating to every conceivable aspect of the Company's Covid-19 Vaccine Candidate. In addition, the expense of identifying and producing "all Documents" or "all Communications" on these subjects would far outweigh those Documents' relevance or benefit to this Action.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol.

**DOCUMENT REQUEST 18**

All Documents Concerning Novavax's decision, efforts, and ability to file its EUA for its Covid-19 Vaccine Candidate, Including any of Novavax's decisions to delay its EUA filing, as well as any financial, operational, or reputational impact that Novavax was expected to experience or could have or did experience from any EUA filing delays.

**RESPONSE TO DOCUMENT REQUEST 18**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any party's surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" related to Novavax's efforts, ability, and decision to file its EUA for its Covid-19 Vaccine Candidate, regardless of those Documents' relevance to the Complaint's allegations.  Numerous factors went into Novavax's effort, ability, and decision to file the EUA for its Covid-19 Vaccine Candidate, many of which have no bearing on the purity, potency, and contamination issues alleged by the Complaint to have impacted Novavax's ability to satisfy applicable cGMP standards.  In addition, the expense of identifying and producing "all Documents" relating in any way to every conceivable factor that could have impacted Novavax's timeline for filing its EUA would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as unduly burdensome and disproportionate to the case's needs to the extent the Request seeks "All Documents" concerning any EUA delays.

The expense of identifying and producing "all Documents" concerning any EUA delays would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome to the extent the meaning of the term "reputational impact" is unclear and undefined.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks documents related to impacts Novavax "could have" experienced.  Defendants cannot (and will not) guess at whether Documents relate to hypothetically possible financial, operational, or reputational impacts, and Defendants cannot (and will not) provide discovery on such unknown, hypothetical impacts.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to Novavax's projected timeline for filing an EUA application for Novavax's COVID-19 Vaccine Candidate.

**DOCUMENT REQUEST 19**

All Documents setting forth Novavax's corporate structure, ownership and management, Including organizational charts, Documents Identifying reporting structures within Novavax, and descriptions of senior Novavax's officers' roles and/or responsibilities.

**RESPONSE TO DOCUMENT REQUEST 19**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information disproportional to the case's needs, to the extent the Request seeks "All Documents"

setting forth Novavax's corporate, ownership, management, and reporting structures and descriptions of officers' roles and responsibilities. Plaintiffs do not need all Documents that set forth Novavax's structure before they can understand that structure. In addition, the expense of identifying and producing "all Documents" concerning Novavax's corporate structure would outweigh those Documents' relevance or benefit to this Action.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce Documents sufficient to show Novavax's (a) corporate structure, and (b) management structure for those departments, divisions, and other Company units with responsibility for the commercial manufacture of Novavax's Covid-19 Vaccine Candidate.

## DOCUMENT REQUEST 20

All Documents setting forth a breakdown and/or layout of Novavax's manufacturing operations for its Covid-19 Vaccine Candidate, Including the roles of each Manufacturing Facility, the vaccine components or ingredients produced at the respective Manufacturing Facility, and organizational charts that display the hierarchy of each Manufacturing Facility's respective employees or agents (Including Novavax's onsite employees and FUJIFIM employees).

## RESPONSE TO DOCUMENT REQUEST 20

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" setting forth a breakdown or layout of Novavax's manufacturing operations for its Covid-19 Vaccine Candidate. Plaintiffs do not need every document that sets forth the structure of Novavax's manufacturing operations for its Covid-19 Vaccine Candidate before Plaintiffs can understand that structure. In addition, the expense of

identifying and producing "all Documents" setting forth Novavax's manufacturing operations would outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims and defenses and disproportional to the case's needs, to the extent it seeks organizational charts that display the hierarchy of each Manufacturing Facility's respective employees or agents. The Complaint's claims center exclusively on purported manufacturing issues at FUJIFILM's Texas and North Carolina facilities. Those allegations do not entitle Plaintiffs to conduct a fishing expedition into the entirety of Novavax's global manufacturing system. Providing discovery into the hierarchy of elements and parts of Novavax's manufacturing apparatus that have no bearing on Plaintiffs' claims would be unduly burdensome and impose costs disproportionate to the expected benefit to the case. In particular, Defendants will not provide organizational charts displaying the hierarchy of employees and agents at manufacturing facilities other than the two specifically addressed in the Complaint.

Defendants further object to this Request on grounds that it seeks Documents beyond Defendants' possession, custody, or control, to the extent the Request seeks manufacturing information that is in the possession of third parties such as FUJIFILM and other manufacturers. Defendants will not search for or produce information that lies beyond their possession, custody, or control.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce Documents sufficient to show (a) an overview of Novavax's manufacturing operations for its Covid-19 Vaccine Candidate and (b) (if such Documents exist in Novavax's possession, custody, or control) the organizational structure of Novavax's onsite

-39-

employees and of their key FUJIFILM contacts, in both cases at the FUJIFILM Texas and North Carolina facilities addressed in the Complaint.

**DOCUMENT REQUEST 21**

All Documents Concerning Novavax's and/or the Individual Defendants' testimony before any Government entity, agency, or committee, Including the Subcommittee on Oversight and Investigations, U.S. House of Representatives, Committee on Energy and Commerce regarding the Company's development and manufacturing of its Covid-19 Vaccine Candidate.

**RESPONSE TO DOCUMENT REQUEST 21**

Defendants object to this Request as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, and as overly broad and unduly burdensome, to the extent the Request seeks documents relating to any government testimony about Novavax's development of its Covid-19 Vaccine Candidate, without regard to the testimony's subject matter or whether the testimony is related to the Complaint's allegations. The Complaint's allegations relate narrowly to the impact of contamination issues at the FUJIFILM Texas and North Carolina facilities on Novavax's ability to produce largescale quantities of its Covid-19 Vaccine Candidate and to satisfy FDA cGMP regulations; such claims do not entitle Plaintiffs to Documents or Communications relating to every conceivable aspect of the Company's Covid-19 Vaccine Candidate. In addition, the expense of identifying and producing "all Documents" or "all Communications" on these subjects would far outweigh those Documents' relevance or benefit to this Action.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request purports to seek information related to any non-U.S.

-40-

Government entity, agency, or committee. Plaintiffs premise their claims on Novavax's interactions with, and efforts to secure approval by, the U.S. FDA. Plaintiffs do not premise any claims in the Complaint on foreign agency approvals or foreign government contacts.

Defendants further object to this Request as overly broad and unduly burdensome because the testimony referenced in the Request is publicly available and thus accessible to Plaintiffs with at least the same, if not less, burden than it is available to Defendants. Defendants will not produce in discovery materials that are publicly available and therefore equally available to Plaintiffs with the same or less cost.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to Defendant Trizzino's testimony on February 19, 2021, before the U.S. House of Representatives' Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, as alleged in Paragraph 269 of the Complaint.

**DOCUMENT REQUEST 22**

All Documents Concerning Novavax's Board of Directors' meetings, Including all board minutes (Including all drafts), summaries, presentations, minutes, audio and video recordings, agendas, notes, and any Documents circulated in connection with such meetings (Including all drafts).

**RESPONSE TO DOCUMENT REQUEST 22**

Defendants object to this Request as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, and as overly broad and unduly burdensome, to the extent the Request seeks "All Documents" relating to any Novavax

Board meetings and materials on any subject, without regard to the Documents' or meetings' subject matter or whether the Documents or meetings are related in any way to the Complaint's allegations. Board meetings and materials are relevant only insofar as they pertain to the Complaint's allegations, which relate exclusively to specific challenged statements about Novavax's ability to manufacture, on a commercial scale, sufficiently pure, potent doses of Novavax's Covid-19 Vaccine Candidate between May 2021 and October 2021. Plaintiffs may not seek discovery on Board meetings or materials that address topics unrelated to the content of the statements that the Complaint alleges were misleading and that occurred at or around the time of those challenged statements. Defendants will not search for or produce Documents related to Board meetings or materials on subjects that have no bearing whatsoever on the parties' claims or defenses.

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, to the extent the Request seeks emails and other Communications with Board members relating to meetings or materials. The burden of collecting and producing such sweeping information from the entire Board outweighs any minimal or nonexistent relevance or benefit from the information's production.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged minutes, pre-read materials, presentations, memoranda, or agendas that (a) were circulated to Novavax's Board of Directors in connection with meetings of the Board and (b) concern the impact of alleged purity, potency, and contamination issues at the FUJIFILM Texas and North Carolina facilities on Novavax's ability

to produce largescale quantities of its Covid-19 Vaccine Candidate and to satisfy FDA cGMP regulations.

## DOCUMENT REQUEST 23

All Documents Concerning any investigation, examination, audit, review or inquiry, whether formal or informal, of Novavax, by any federal or state agency or stock exchange, Including the SEC, FDA, DOJ, U.S. Attorney, State Attorneys General, Concerning any of the facts alleged in the Complaint, Including the development, manufacturing, production, distribution, and FDA approval of the Company's Covid-19 Vaccine Candidate. This request covers all Documents between Novavax and the federal agencies, state agencies, and stock exchanges. This Request is not limited to the Relevant Time Period.

## RESPONSE TO DOCUMENT REQUEST 23

Defendants object to this Request because, on its face, it seeks information or materials protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or other privileges or immunities. Defendants will produce no information or materials protected by the attorney-client privilege, the work-product doctrine, the joint defense or common interest privilege, or any other privilege or immunity.

Defendants further object to this request as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, and as overly broad and unduly burdensome, to the extent the Request seeks "All Documents" concerning any investigation involving Novavax at any time in the Company's history, regardless of those investigations' relevance to the Complaint's allegations.   While the Request seeks materials related to investigations "Concerning any of the facts alleged in the Complaint," the Request ostensibly purports to seek all Documents concerning any investigation, at any point in time, that relates in

-43-

any way to "the development, manufacturing, production, distribution, and FDA approval of the Company's Covid-19 Vaccine Candidate." Such a scope exceeds the discovery that the Federal Rules of Civil Procedure (including Rule 26) permit Plaintiffs to request. Government investigations are relevant only to the extent they relate to purity, potency, and contamination issues alleged by the Complaint to have resulted in a failure to satisfy applicable cGMP standards. Those allegations do not entitle Plaintiffs to discovery on every investigation concerning any conceivable aspect of the Company's COVID-19 vaccine development operations at any time. Defendants will not search for or produce Documents related to any formal or informal investigations, examinations, audits, reviews, or inquiries conducted by federal or state agencies or stock exchanges outside of the relevant time period accepted by Defendants. Defendants also will not search for or produce such Documents to the extent the underlying investigation, examination, audit, review, or inquiry relates to issues, topics, allegations, or other facts unrelated to the Complaint's allegations.

Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome to the extent it purports to seek "all Documents between Novavax and the federal agencies, state agencies, and stock exchanges." Defendants cannot determine what Documents Plaintiffs purport to seek by this Request for Documents "between" Novavax and other entities, and Defendants thus cannot and will not search for or produce Documents in response to this part of the Request.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents (a) that they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) that fall within the relevant time period as defined by

-44-

Defendants and that (i) Defendants have agreed to produce in response to the partly duplicative Document Request 3 or (ii) concern any U.S. federal or state agency inspection, investigation, examination, audit, or inquiry related to purity, potency, or contamination issues at the FUJIFILM Texas and North Carolina facilities.

**DOCUMENT REQUEST 24**

All Documents Concerning the acquisition, purchase or sale of Novavax's publicly traded common stock during the Relevant Time Period by any of the Individual Defendants, their immediate family members, or entities under their control, Including the dates, share amounts, and prices of such transactions, any 10b5-1 plans, and the Company's insider trading Policies.

**RESPONSE TO DOCUMENT REQUEST 24**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" concerning any and all trades in Novavax common stock by the Individual Defendants during the Relevant Time Period. First, only stock transactions by Defendants that the Complaint alleges are suspicious are relevant to Plaintiffs' claims. Defendants will not produce documents concerning Individual Defendants' stock transactions that Plaintiffs have not alleged as a basis for their claims. Second, the expense of identifying and producing "all Documents" relating in any way to Individual Defendants' transactions in Novavax stock would far outweigh those Documents' relevance or benefit to this Action.

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the

-45-

case's needs, to the extent the Request purports to seek documents related to trading activity of Defendants' family members, who are not parties to this action.

Defendants further object to this Request to the extent it seeks publicly available information concerning the Individual Defendants' transactions in Novavax stock, which, as Plaintiffs know, are detailed in Individual Defendants' public filings with the U.S. Securities and Exchange Commission.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged Documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the parties' anticipated ESI Protocol, and (b) relate to the Individual Defendants' stock transactions that the Complaint specifically alleges are suspicious.

**DOCUMENT REQUEST 25**

All Documents produced in any Related Actions, Including the derivative action Meyer v. Erck, et al., 21-cv-02996-TDC (D. Md.), and all derivative actions consolidated with Meyer.

**RESPONSE TO DOCUMENT REQUEST 25**

Defendants object to this Request as overly broad, and as seeking information irrelevant to the parties' surviving claims and defenses and disproportional to the case's needs, to the extent the Request seeks all discovery in other separate cases and investigations (that is, cloned discovery). This Request seeks documents created, sent, received, or produced for separate proceedings in which absent third parties assert separate causes of action based on statutes or regulations inapplicable here. For example, certain of these separate matters asserted claims under fiduciary duty and other similar theories absent from this Action and irrelevant to Plaintiffs' claims. Plaintiffs cannot properly assert a categorical request for the discovery produced in these other

cases, unless the fact that particular documents were produced or received by a party in such other cases is relevant to this Action's subject matter. It is irrelevant to this Action that Novavax may have produced various discovery to, or received various discovery from, absent third parties in unrelated cases. To produce all discovery from these other, entirely separate litigations or investigations is disproportional to the Action's needs. Defendants will not search for or produce all Documents produced in Related Actions whose claims and parties bear little or no relationship to the claims and parties in this Action.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any Documents that Novavax (a) produced to certain shareholders who, between December 2021 and June 2022, served demands to inspect the Company's corporate books and records pursuant to 8 *Del. C.* § 220; and (b) produces in response to requests for production in the related derivative actions captioned *In re Novavax Inc. Stockholder Derivative Litig.*, No. 8:21-cv-02996-TDC (D. Md.); *Kirst v. Novavax, Inc., et al.*, No. C-15-CV-21-000618 (Cir. Ct. Montgomery Cnty, Md.); *Mesa v. Erck, et al.*, C.A. No. 2022-0770-NAC (Del. Ch.); *Acosta v. Novavax, Inc., et al.*, C.A. No. 2022-1133-NAC (Del. Ch.).

**DOCUMENT REQUEST 26**

All Documents Concerning Your data usage, document destruction, and retention Policies during the Relevant Time Period, any document retention or destruction policy with respect to ESI (Including e-mail, text messages, instant messages, computer records, disk files or other electronic records) as well as handheld devices (Blackberries, iPhones, PDAs, etc.), and any actual, suggested or contemplated policy, program, procedure, instruction, direction or request Concerning the usage, destruction, alteration, removal, concealment, non-disclosure, secrecy or confidentiality of employee devices and/or any of the Documents requested herein.

**RESPONSE TO DOCUMENT REQUEST 26**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" related to Defendant's policies on document retention and destruction. Such a sweeping scope includes many Documents that bear little or no relevance to the issues disputed in this case—for example, emails related to applying Novavax's document retention or destruction obligation to information nonresponsive to Plaintiffs' requests. Such a Request would also include Documents plainly protected by the attorney-client privilege, work product doctrine, and other privileges or immunities. The burden and expense of collecting, identifying, and producing "All" non-privileged Documents relating to Novavax's document retention policies would far outweigh those Documents' minimal relevance or benefit to this Action. Defendants will not search for or produce all Documents relating to the listed policies.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' claims or defenses and disproportional to the case's needs, to the extent the Request purports to seek all Documents concerning any "instruction, direction or request Concerning the usage, destruction, alteration, removal, concealment, non-disclosure, secrecy or confidentiality of employee devices and/or any of the Documents requested" by the Requests. This Request purports to seek essentially every Document in which any person refers to using or modifying any file or Document responsive to Plaintiffs' very broad Requests—a sweeping set of Documents that exceeds Defendants' search and production obligations under the Federal Rules of Civil Procedure. Such a Request would also include Documents plainly protected by the attorney-client privilege, work product doctrine, and other privileges or

immunities.  Plaintiffs have (and when discovery concludes will have) no grounds to doubt that Defendants have discharged their document preservation, collection, review, and production obligations in good faith and consistent with the Federal Rules of Civil Procedure.  Such Documents are thus irrelevant to the parties' claims and defenses, and the burdens of collecting and reviewing such Documents greatly exceed any minimal or nonexistent benefit they may have to the case.  Defendants will not search for or produce documents responsive to this part of the Request.

Defendants further object to this Request as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, and as overly broad and unduly burdensome, to the extent the Request purports to seek information about "suggested or contemplated" policies, programs, procedures, instructions, directors, or requests.  Only actually implemented policies or protocols bear any relevance to Plaintiffs' discovery efforts and to Defendants' discharge of their preservation obligations under the Federal Rules.  Defendants will not search for or produce Documents related to suggested or contemplated policies or protocols.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce Documents sufficient to show any of Novavax's general corporate document destruction and retention policies in effect between the date that the Complaint was filed and the date of these Requests.

**DOCUMENT REQUEST 27**

Documents sufficient to Identify or describe Novavax's efforts to preserve and collect Documents relevant to this Action. This Request is not limited to the Relevant Time Period.

**RESPONSE TO DOCUMENT REQUEST 27**

Defendants object to this Request because it seeks documents that are irrelevant to the parties' claims and defenses without a preliminary showing by Plaintiff that Defendants' production was deficient. Discovery about Defendants' preservation and collection efforts bears no relevance to the claims or defenses in the Action because, absent evidence that Defendants have failed to preserve or otherwise meet their discovery obligations, Defendants' preservation and collection conduct is not at issue.

Defendants further object that this Request seeks documents protected by the attorney-client privilege and work product doctrine, among other possible privileges or immunities. The only documents "sufficient to show" Defendant's efforts to preserve and collect Documents relevant to this Action are substantially likely to be created or sent by or at the direction of counsel in anticipation of litigation, and thus will be protected by privilege. Given that most of the documents are almost certainly protected from disclosure, the burden of collecting and reviewing these documents greatly outweighs any minimal or nonexistent benefit the documents might have. The parties will discuss locations where responsive information is most likely to be found and agree upon an ESI Protocol for document collection and production. Defendants will discharge and have discharged, competently and in good faith, their document preservation and other discovery obligations under the Federal Rules. Absent some good faith basis for asserting that Defendants have acted improperly with respect to their discovery obligation (and there is none), Defendants are under no obligation to independently demonstrate or prove such compliance.

Pursuant to Defendants' Preliminary and Specific Objections, Defendants will not search for or produce Documents in response to this Request.

**DOCUMENT REQUEST 28**

All Documents Concerning insurance contracts, Policies, or agreements that may provide coverage for any Defendant in connection with this Action, Including a possible judgment in this Action or indemnification or reimbursement for payments made to satisfy any such judgment, Including any payments made or amounts incurred on those contracts, Policies or agreements.

**RESPONSE TO DOCUMENT REQUEST 28**

Defendants object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, to the extent the Request seeks "All Documents" related to insurance contracts or policies. Such a sweeping scope includes a very large number of Documents that bear little or no relevance to the issues disputed in this case—for example, emails related to policy renewals or discussing the policies' application to or coverage for events other than this litigation. The burden and expense of identifying and producing "all Documents" relating to Novavax's applicable insurance policies would far outweigh those Documents' minimal or nonexistent relevance or benefit to this Action. Defendants will not search for or produce all Documents related to the insurance policies, contracts, or agreements described by this Request.

Defendants further object to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent the Request purports to seek "All Documents" related to "any payments made or amounts incurred on those contracts." Defendants cannot determine what payments this Request purports to include, and Defendants thus cannot respond to this Request. Moreover, by purporting to seek "All Documents" related to the unspecified payments, the Request relies on a sweeping scope that includes a very large number of Documents bearing little or no relevance to the issues disputed in this case. The burden and expense of identifying and producing "all

Documents" relating to payments on Novavax's applicable insurance policies would far outweigh those Documents' minimal or nonexistent relevance or benefit to this Action.  Defendants will not search for or produce all Documents related to payments on the insurance policies, contracts, or agreements described by this Request.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce copies of any insurance policies or agreements that may provide coverage to any Defendant in connection with this Action.

**DOCUMENT REQUEST 29**

All Documents Concerning any public statements made by Novavax or the Individual Defendants referenced in ¶¶ 163-211 and 221-253 of the Complaint or any other similar public statements Concerning the development, manufacturing, production, distribution and FDA approval of the Company's Covid-19 Vaccine Candidate; the Manufacturing Standards (Including the purity and potency metrics and any contamination events in the Manufacturing Facilities); the Company's ability to scale up production; the U.S. or global supply chain as they relate to the Company's Vaccine Candidate (Including supply constraints and difficultly procuring components necessary to manufacture its Vaccine Candidate); and any impact of the Company's delayed EUA filings during the Class Period, Including all Documents that supported or formed the basis for such statements. This Request Includes all Documents Concerning the preparation, review, editing, approval, modification, and/or distribution of the Novavax's public statements, Including any scripts, opening statements, talking points (Including, for example, frequently asked questions or question and answer documents), presentations, or other remarks for any call, meeting, or other Communications with securities analysts, investors, or the media.

**RESPONSE TO DOCUMENT REQUEST 29**

Defendants object to this Request as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to the case's needs, and as overly broad and unduly burdensome, to the extent the Request seeks documents related to public statements other than the six statements that the Complaint specifically challenges and that survived Defendants' motion to dismiss. *See* Compl. ¶¶ 178–81, 198, 204. Plaintiffs' surviving claims center narrowly on several public statements made by Novavax between May 2021 and October 2021. Documents concerning any other public statements (including those that the Court dismissed from the Action) are irrelevant to those claims, and the burden of collecting and reviewing such Documents greatly outweighs any minimal or nonexistent relevance or benefit to this Action. Defendants will not search for or produce Documents related to any public statements other than those statements that the Complaint specifically challenges and that survived Defendants' motion to dismiss.

Defendants further object to this Request to the extent it seeks publicly available information concerning public statements. Defendants will not produce any Documents that are equally available to Plaintiffs from public sources with the same or less cost as the Documents are available to Defendants.

Defendants further object to this Request as vague and ambiguous, overly broad, and unduly burdensome to the extent the boundaries of what constitutes a "similar" public statement are subjective and undefined. Defendants cannot identify the information sought by these parts of the Request and will not respond.

Subject to and without waiving Defendants' Preliminary and Specific Objections, Defendants will produce any responsive, non-privileged documents that (a) they locate within their possession, custody, or control through a reasonable search performed in accordance with the

parties' anticipated ESI Protocol, and (b) relate to the public statements that the Complaint specifically challenges and that survived Defendants' motion to dismiss.

**<u>DOCUMENT REQUEST 30</u>**

All Documents upon which Defendants intend to rely for their defense of the claims asserted in the Complaint. This Request is not limited to the Relevant Time Period.

**<u>RESPONSE TO DOCUMENT REQUEST 30</u>**

Defendants object to this Request as premature; the parties have only just begun fact discovery, and Defendants continue to investigate the parties' claims and defenses and to develop litigation and trial strategies. Defendants reserve the right to produce responsive Documents at the time(s) set forth in the Court's scheduling order, any pretrial order, or any other applicable Court order or stipulation between the parties.

Subject to and without waiving their Preliminary and Specific Objections, Defendants will produce—at the appropriate time set forth in the Court's scheduling order, any pretrial order, or any other relevant Court order or stipulation between the parties—any responsive, non-privileged Documents within Defendants' possession, custody, or control.

**<u>DOCUMENT REQUEST 31</u>**

All Documents You intend to rely upon in opposing Lead Plaintiffs' motion for class certification in this Action, Including all Documents that You contend demonstrate that either Lead Plaintiffs or Lead Counsel are inadequate within the meaning of Rule 23 of the Federal Rules of Civil Procedure. This Request is relevant for class certification and may be relevant to the underlying merits of Lead Plaintiffs' claims. This Request is not limited to the Relevant Time Period.

**RESPONSE TO DOCUMENT REQUEST 31**

Defendants object to this Request as premature; the parties have only just begun fact discovery, and Defendants continue to investigate the parties' claims and defenses and to develop litigation and trial strategies. Defendants reserve the right to produce responsive Documents at the time(s) set forth in the Court's scheduling order, any pretrial order, or any other applicable Court order or stipulation between the parties.

Subject to and without waiving their Preliminary and Specific Objections, Defendants will produce, at the appropriate time, any responsive, non-privileged Documents within Defendants' possession, custody, or control.

**DOCUMENT REQUEST 32**

All Documents obtained or received by You from any Person, either in response to a subpoena issued by You or provided to You voluntarily, concerning the claims asserted in the Complaint or any defenses that may be raised by Defendants. This Request is relevant for class certification as well as the underlying merits of Lead Plaintiffs' claims. This Request is not limited to the Relevant Time Period.

**RESPONSE TO DOCUMENT REQUEST 32**

Defendants object to this Request as premature; the parties have only just begun fact discovery, and Defendants continue to investigate the parties' claims and defenses and to develop litigation and trial strategies. Defendants reserve the right to produce responsive Documents at the time(s) set forth in the Court's scheduling order, any pretrial order, or any other applicable Court order or stipulation between the parties.

Defendants further object to this Request as overly broad and unduly burdensome, and as seeking information irrelevant to any parties' surviving claims or defenses and disproportional to

the case's needs, to the extent the Request purports to seek all Action-related Documents "obtained or received by You from any Person" who "provided [the Documents] to You voluntarily."  Such a Request purports to ask for Documents that Defendants merely receive in the ordinary course of business—regardless of whether the Person produces the Documents in response to a subpoena or formal or informal information request issued in connection with this Action, and regardless of whether Plaintiffs served a Request asking for the Documents.  A near-infinite number of Documents could fit that plainly overbroad scope.  Defendants have no obligation to produce every Document related to the parties' claims and defenses simply because Defendants receive the Documents.  Defendants will not search for or produce all Documents provided to them voluntarily by any Person.

Subject to and without waiving their Preliminary and Specific Objections, Defendants will produce—at the appropriate time set forth in the Court's scheduling order, any pretrial order, or any other relevant Court order or stipulation between the parties—any Documents produced to Defendants by any person other than Plaintiffs in response to a subpoena, discovery request, or other formal or informal information request issued in connection with the Action.

Dated: March 6, 2023

<div align="center">

_____/s/_____
C. Thomas Brown
(admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7464
Thomas.Brown@ropesgray.com

Peter L. Welsh
(admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7865
Peter.Welsh@ropesgray.com

Edward R. McNicholas
Bar No. 24833
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4779
Edward.McNicholas@ropesgray.com

Stefan P. Schropp
Bar No. 21699
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9938
Stefan.Schropp@ropesgray.com

*Counsel for Defendants*

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of March, 2023, I served a copy of the foregoing

*Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Production* by email

upon the following counsel of record:

James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
(202) 408-4600
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

Brian Calandra
Jeremy A. Lieberman
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
bcalandra@pomlaw.com
jalieberman@pomlaw.com

Lesley F. Portnoy
PORTNOY LAW FIRM
1800 Century Park East, Suite 600
Los Angeles, California 90067
(310) 692-8883
esley@portnoylaw.com

_____*/s/*_____
C. Thomas Brown

*Counsel for Defendants*

# EXHBIIT 5



ROPES & GRAY LLP
PRUDENTIAL TOWER
800 BOYLSTON STREET
BOSTON, MA 02199-3600
WWW.ROPESGRAY.COM

May 2, 2023

C. Thomas Brown
T +1 617 951 7464
thomas.brown@ropesgray.com

**BY E-MAIL**

Michael H. Rogers
James T. Christie
Philip J. Leggio
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
mrogers@labaton.com
jchristie@labaton.com
pleggio@labaton.com

Brian Calandra
Jeremey A. Lieberman
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, NY 10016
bcalandra@pomlaw.com
jalieberman@pomlaw.com

**Re:**   ***Sinnathurai v. Novavax, Inc., et al.*, Civil Action No. 21-cv-02910-TDC (D. Md.) –
Custodians and Discovery Scope**

Counsel:

I write on behalf of Defendants Novavax, Inc., Stanley Erck, and John J. Trizzino
(collectively, "Defendants") regarding Plaintiffs' document requests in the above-referenced matter.
Thank you again for speaking with us last week concerning the scope of discovery. We are writing
to follow up on some of the open issues from that discussion, and to propose certain compromises
on issues of dispute raised during our call. It is our hope that this letter helps to clarify our positions
and advance our discussions regarding discovery in this matter. We will be prepared to discuss
these issues on our call tomorrow.

ROPES & GRAY LLP

<div align="center">- 2 -</div>                                                        May 2, 2023

## Custodians

As previewed on our call, Defendants are prepared to collect and review documents from additional custodians requested by Plaintiffs, as listed below and reflected in the enclosed revised version of our custodian proposal. With the additions to the list set forth below—which include high-level Novavax employees whose roles center on the key issues alleged in the Complaint— Defendants have now agreed to a total of 17 custodians, which we consider a more than sufficient set for this case.

*Previously agreed:*

- Stanley Erck, President and CEO

- John Trizzino, Executive VP, CCO & CBO; Interim CFO

- Silvia Taylor, Senior Vice President, Investor Relations and Corporate Affairs

- Rick Crowley, Executive Vice President, COO

- Kathleen Callahan, Vice President, Regulatory Affairs

- Gregory Glenn, President, Research and Development

- Brian Webb, Senior Vice President, Global Manufacturing Operations

- Nancy Nidel, Senior Director of Drug Product Manufacturing

*Additions to the list:*

- Brian Rosen, Senior VP, Commercial Strategy

- Filip Dubovsky, Executive VP, Chief Medical Officer

- Henrietta Ukwu, Senior VP, Regulatory and Quality Officer

- John Kutney, Senior Director, Manufacturing

- Madeline Fisher, VP,  Quality Operations and CDMO Quality

- Madelyn Caltabiano, Senior VP, Global Program Management

- Greg Covino, Executive VP, CFO

ROPES & GRAY LLP

- 3 -                                                                              May 2, 2023

- Jim Kelly, Executive VP, CFO

- Patty Reed, Vice President, Clinical Operations

As noted on our earlier call, we were surprised to see 44 names on Plaintiffs' proposed custodians list after you had told us during a prior meet-and-confer that you believed approximately 30 custodians would be an appropriate number. Collecting and reviewing documents for 44, or even or 30, custodians would be overly burdensome and disproportional to the case's needs, particularly on the accelerated discovery timeline that Plaintiffs demanded. Nonetheless, as we discussed last week, we are willing to consider the possibility of adding a small number of the remaining custodians on Plaintiffs' list in compromise of our dispute about the appropriate numbers of custodians. But in order to reach a position on any of these specifically, we think it is appropriate for Plaintiffs to explain why they believe any of these custodians' files might be relevant to the parties' surviving claims and defenses, and why that alleged relevance outweighs the burden of collecting, reviewing, and producing those custodians' documents.

As a general matter, we do not see how any of these remaining custodians' files will offer information that is important to resolving the parties' surviving claims and defenses, or that is sufficiently beneficial to the case to justify the production expense. Some proposed custodians' roles have no apparent relevance to the parties' surviving claims and defenses, and other listed individuals appear to be duplicative of custodians whom Defendants have already accepted. For example, it is unclear how the files of Novavax's Chief HR Officer or corporate finance professionals are relevant to this case about manufacturing. Plaintiffs also included several Novavax employees with roles focused on the clinical-trial stage of vaccine development, but the Court dismissed Plaintiffs' claims related to statements about clinical trials. Other proposed custodians occupied low-level roles several degrees removed from the senior executives at issue. In several instances, Defendants have already agreed to provide documents from managers and executives to whom the lower-level individuals reported. We believe those higher-level custodians are the most likely sources of important and relevant information. This case turns on the facts known to certain senior leaders at the time Defendants issued the challenged statements. Documents held by low- or mid-level personnel shed little to no light on this key question. Also, the alleged facts purportedly omitted from the challenged statements do not justify an extensive dive into highly technical and detailed records held by low-level employees on the vaccine-production front lines. The truth of the challenged statements—that manufacturing facilities were producing vaccine doses at commercial scale, and that assay challenges had been resolved—turns on whether or not certain alleged manufacturing problems still existed when the statements were made, not on the minute details of those alleged problems. For example, it is relevant whether FUJIFILM's Texas facility was shut down due to contamination in mid-May, as Plaintiffs claim, but it is far less relevant or important to the case whether any contamination stemmed from one subspecies of bacteria or another. The burden of adding a significant number of custodians from these irrelevant departments and lower levels of the reporting chain greatly outweighs any minimal or nonexistent benefit of including them in discovery.

ROPES & GRAY LLP

- 4 -                                                                                                    May 2, 2023

In order to facilitate discussions, we have listed the remaining custodians on your list along with a short commentary about each:

- Andre Johnson, Senior Director, Quality Control – Any relevant information in Mr. Johnson's possession would be captured by Brian Webb, Senior Vice President, Global Manufacturing Operations, to whom he reported.

- Erika (Trahan) Schultz, Senior Manager, Investor and Public Relations – Any relevant information in Ms. Schultz's possession would be captured by Silvia Taylor, Senior Vice President, Investor Relations and Corporate Affairs, to whom she reported.

- Fred Shemer, VP, Quality Systems – Any relevant information in Mr. Shemer's possession would be captured by Henrietta Ukwu, Senior VP, Regulatory and Quality Officer, to whom he reported.

- Jose Torres-Vorshirm, Vice President, Supply Chain – Any relevant information in Mr. Torres-Vorshirm's possession would be captured by Rick Crowley, Executive Vice President, COO, to whom he reported.

- Matthew Hariegel, Director, Facilities and Engineering – Any relevant information in Mr. Hariegel's possession would be captured by Brian Webb, Senior Vice President, Global Manufacturing Operations, to whom he reported.

- Brian Brashears, Senior Specialist, Manufacturing – Mr. Brashears is a lower-level employee who started at Novavax in the middle of the class period and is unlikely to have any relevant documents. Moreover, any relevant information in his possession would be captured by Brian Webb, Senior Vice President, Global Manufacturing Operations, to whom he reported.

- Dennis Tsurkan, Regulatory Information Management Specialist, Regulatory Affairs Operations – Mr. Tsurkan is a lower-level employee. Any relevant information which Mr. Tsurkan would have possessed or been included on would also be possessed by agreed-upon custodians above him in the reporting chain, namely Kathleen Callahan, Vice President, Regulatory Affairs.

- Frank Czworka, Senior Vice President, Global Sales – As a sales-focused executive, Mr. Czworka is unlikely to possess a sufficient amount of relevant information about the manufacturing issues relevant to the parties' surviving claims and defenses to justify the expense of searching Mr. Czworka's custodial files.

- Jared Lantzy, Director, Regulatory Affairs, Operations – Mr. Lantzy is a lower-level employee unlikely to have a sufficient amount of relevant information to justify the expense

ROPES & GRAY LLP

- 5 -                                                                                    May 2, 2023

of including him in discovery.  Moreover, any relevant information which he would have possessed or been included on would also be possessed by Kathleen Callahan, Vice President, Regulatory Affairs, to whom he reported.

- Joseph Neal, Senior Director, Supply Chain Planning and Network Strategy and Optimization – Mr. Neal is a lower-level employee unlikely to have a sufficient amount of relevant information to justify the expense of including him in discovery.  Any relevant information which Mr. Neal would have possessed or been included on would also be possessed by agreed-upon custodians above him in the reporting chain, including Rick Crowley, Executive Vice President, COO, and Brian Webb, Senior Vice President, Global Manufacturing Operations.

- Lina Kim, Senior Director, CQA, GCP Inspections Management – Any relevant information in Ms. Kim's possession would be captured by Madeline Fisher, VP Quality Operations and CDMO Quality, to whom she reported.

- Marianne Mowrer, Senior Submission Specialist, Regulatory Affairs Operations – Ms. Mowrer is a lower-level employee unlikely to have a sufficient amount of relevant information to justify the expense of including her in discovery.  Any relevant information which Ms. Mowrer would have possessed or been included on would also be possessed by agreed-upon custodians above her in the reporting chain, namely Kathleen Callahan, Vice President, Regulatory Affairs.

- Sven Andreasson, Senior VP, Corporate Development – Mr. Andreasson's role focuses on strategic opportunities and corporate development, matters unrelated to the manufacturing issues disputed in this case.  He is therefore unlikely to have a sufficient amount of relevant information to justify the expense of including him in discovery.

The following proposed custodians likely possess little or no information relevant to the parties' surviving claims and defenses, and their files thus offer insufficient expected benefit to justify the search burden.

- Christopher Dunne, VP, Finance – The parties' surviving claims and defenses do not turn on Novavax's financial reporting, financial disclosures, or financial controls. In any case, any relevant information in Mr. Dunne's possession would likely be captured by Novavax's chief financial officers during the relevant time period, to whom Mr. Dunne reported.

- Gale Smith, VP, Discovery and Pre-Clinical Research & Chief Scientist – Mr. Smith's role is on its face irrelevant to Plaintiffs' surviving claims. The Court has already dismissed Plaintiffs' claims premised on statements concerning the performance of NVX-CoV2373 in clinical trials, and there are no allegations regarding any pre-clinical trials. We are thus

ROPES & GRAY LLP

- 6 -                                                                                          May 2, 2023

aware of no basis to believe that Mr. Smith would possess relevant documents and see no basis for such a claim in the Complaint.

- Jill Hoyt, Executive VP, Chief HR Officer – The parties' surviving claims and defenses do not turn on Novavax's Human Resources practices or the conduct of Novavax's Human Resources department.

- Joyce Plested, Senior Director, Clinical Immunology – Ms. Joyce's role is irrelevant to Plaintiffs' surviving claims. The Court has dismissed Plaintiffs' claims premised on statements concerning the performance of NVX-CoV2373 in clinical trials. We are thus aware of no basis to believe that Ms. Plested would possess relevant documents and see no basis for such a claim in the Complaint.

- Michelle Robinson, Senior Clinical Project Manager – Ms. Robinson's role is irrelevant to Plaintiffs' surviving claims. The Court has dismissed Plaintiffs' claims premised on statements concerning the performance of NVX-CoV2373 in clinical trials. We are thus aware of no basis to believe that Ms. Robinson would possess relevant documents and see no basis for such a claim in the Complaint.

- Mike Massare, Senior Director, Vaccine Development – Mr. Massare's role is on its face irrelevant to Plaintiffs' surviving claims. The Court has already dismissed Plaintiffs' claims premised on statements concerning the performance of NVX-CoV2373 in clinical trials. We are thus aware of no basis to believe that Mr. Massare would possess relevant documents and see no basis for such a claim in the Complaint.

- Monika Ciesielczyk, Director, Financial Planning and Analysis – Plaintiffs' claims do not center in any sense on Novavax's financial reporting, financial disclosures, or financial controls. In any case, any relevant information which Ms. Ciesielczyk would have possessed or been included on would also be possessed by agreed-upon custodians above her in the reporting chain, including Novavax's chief financial officers during the relevant time period.

- Najma Khan, Director, SEC Reporting and Accounting Policy – Plaintiffs' claims do not center in any sense on Novavax's financial reporting, financial disclosures, or financial controls. We are thus aware of no basis to believe that Ms. Khan would possess relevant documents and see no basis for such a claim in the Complaint.

- Patrick Newingham, Associate Director, Clinical Supplies – Mr. Newingham's role is on its face irrelevant to Plaintiffs' surviving claims. The Court has already dismissed Plaintiffs' claims premised on statements concerning the performance of NVX-CoV2373 in clinical trials. In any case, any relevant information which he would have possessed or been included on would also be possessed by Nancy Nidel, Senior Director of Drug Product Manufacturing, to whom he reported.

ROPES & GRAY LLP

- 7 -                                                                May 2, 2023

- Raburn Mallory, VP, Global Clinical Lead, Coronavirus – Mr. Mallory's role is on its face irrelevant to Plaintiffs' surviving claims. The Court has already dismissed Plaintiffs' claims premised on statements concerning the performance of NVX-CoV2373 in clinical trials. In any case, any relevant information which Mr. Mallory would have possessed or been included on would also be possessed by agreed-upon custodians above him in the reporting chain, including Filip Dubovsky, Executive VP, Chief Medical Officer and Gregory Glenn, President, Research and Development.

Defendants also decline to add John Herrmann, Novavax's Executive Vice President and Chief Legal Officer. Almost all of Mr. Herrmann's documents are certain to be privileged. To any limited extent that Mr. Hermann generated responsive, non-privileged documents, those documents would almost certainly include other high-ranking employees at Novavax that Defendants have already agreed to include in discovery. The burden of reviewing and logging Mr. Hermann's documents therefore outweighs any minimal benefit that could be obtained from their review.

Plaintiffs' list also included an individual who is not employed by Novavax: Eric Dul. Based on Plaintiffs' Complaint and public records, Mr. Dul appears to have worked at third-party FUJIFILM. Because Novavax has no possession, custody, or control over Mr. Dul's email and other files, Defendants cannot produce his information. The list also included two duplicate entries for custodians whom Defendants had already proposed: Kathleen Callahan and Silvia Taylor.

**Discovery Scope**

At our previous meet-and-confer, we left open the following issues: (1) the relevant time period for discovery; (2) the scope of the term "Manufacturing Standards" from Plaintiffs' First Set of Requests for Production (the "Requests"); and (3) the scope of the term "Manufacturing Facilities" from Plaintiffs' Requests.

As to those open issues, we propose the following:

- Time Period: Defendants are willing to expand the relevant discovery period to run from November 1, 2020 (over six months before the start of the Class Period) through November 30, 2021 (weeks after the original complaint was filed and over a month after the publication of the *Politico* article that marks the end of the Class Period).

  During our last meet-and-confer, you suggested that Plaintiffs' case centers on the impact of alleged manufacturing issues on Novavax's ability to roll out NVX-CoV2373 on the timeline that the Company promised to investors—a reading of Plaintiffs' claims that we dispute. Putting aside this dispute for now, in the interest of advancing discovery negotiations, this revised time period captures the earliest of any manufacturing issues alleged by the Complaint—most notably, alleged contamination issues at FUJIFILM's Texas facility arising in December 2020—and aligns roughly with the FDA's November

ROPES & GRAY LLP

- 8 -                                                                    May 2, 2023

2020 decision to expedite its review of NVX-CoV2373.  That expedition decision confirmed the accelerated timeline that Novavax discussed with investors.  Earlier start dates in 2020, for example in June (when Novavax first contracted with the Department of Defense) or July (when Novavax first contracted with FUJIFILM) are not reasonably connected to the topics of the challenged statements.  Moreover, the Company had not yet begun efforts to manufacture NVX-CoV2373 commercially as of those earlier dates, and thus there were no manufacturing issues that could impact the Company's timeframe for bringing NVX-CoV2373 to market.

On the back end, this proposed time period builds in additional time to capture any relevant reactions to the release of the *Politico* article on October 19, 2021.

- <u>Manufacturing Standards</u>: Defendants are willing to include in their productions any responsive, non-privileged documents related to U.S. government-imposed manufacturing regulations applicable to Novavax's manufacture of NVX-CoV2373 in the United States.

- <u>Manufacturing Facilities</u>: Defendants are willing to offer discovery related to all of Novavax's U.S.-based Manufacturing Facilities.

The Complaint solely implicates Novavax's efforts to secure regulatory approval for NVX-CoV2373 from the FDA and to bring NVX-CoV2373 to market in the United States.  This proposal captures information concerning any manufacturing issues that conceivably could have impacted those U.S.-focused efforts.

We look forward to discussing these and other issues on tomorrow's call.

Very truly yours,

*/s/ C. Thomas Brown*

C. Thomas Brown


cc:     Peter L. Welsh
        Charles D. Zagnoli
        J. William Piereson

# EXHIBIT 6

**Labaton
Sucharow**

212 907 0646  direct
212 907 0700  main
212 883 7006  fax
pleggio@labaton.com

**New York Office**
140 Broadway
New York, NY 10005

May 12, 2023

**VIA EMAIL**

C. Thomas Brown
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199-3600

RE:     *Sinnathurai v. Novavax, Inc., et al.*, Civil Action No. 21-cv-02910-TDC (D. Md.)

Counsel:

I write in response to Defendants' May 2, 2023 letter (the "Letter") and to memorialize the parties' May 3, 2023 meet and confer regarding Plaintiffs' First Set of Requests for Production of Documents to Defendants Novavax, Inc. and the Individual Defendants (the "Requests"). Specifically, please find below our positions regarding: (1) custodians; (2) scope of discovery, including (a) Relevant Time Period, (b) Manufacturing Standards, and (c) Manufacturing Facilities; and (3) Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Production (the "Responses").

**I.      CUSTODIANS**

On March 20, 2023, Defendants proposed a list of 8 custodians. The parties met and conferred on March 27, 2023, whereby Plaintiffs indicated that 8 custodians for a case of this magnitude is insufficient. In response, Plaintiffs proposed 36 additional potential custodians, totaling 44 custodians. On April 28, 2023, during a meet and confer, Defendants agreed to add 7–9 additional custodians which would result in 15–17 custodians total. Plaintiffs explained that they would be willing to compromise and consider a total of 30–36 custodians. Defendants agreed to follow up in writing with a revised custodian list.

On May 2, 2023, Defendants agreed to add 9 custodians. The agreed-upon 17 custodians listed in Defendants' Letter are as follows:

1.   Stanley Erck, President and CEO

2.   John Trizzino, Executive VP, CCO & CBO; Interim CFO

3.   Silvia Taylor, Senior Vice President, Investor Relations and Corporate Affairs

4.   Rick Crowley, Executive Vice President, COO

**Labaton Sucharow**

C. Thomas Brown
May 12, 2023
Page 2

5. Kathleen Callahan, Vice President, Regulatory Affairs

6. Gregory Glenn, President, Research and Development

7. Brian Webb, Senior Vice President, Global Manufacturing Operations

8. Nancy Nidel, Senior Director of Drug Product Manufacturing

9. Brian Rosen, Senior VP, Commercial Strategy

10. Filip Dubovsky, Executive VP, Chief Medical Officer

11. Henrietta Ukwu, Senior VP, Regulatory and Quality Officer

12. John Kutney, Senior Director, Manufacturing

13. Madeline Fisher, VP, Quality Operations and CDMO Quality

14. Madelyn Caltabiano, Senior VP, Global Program Management

15. Greg Covino, Executive VP, CFO

16. Jim Kelly, Executive VP, CFO

17. Patty Reed, Vice President, Clinical Operations

During the meet and confer on May 3, 2023, Plaintiffs explained that 17 custodians for this action is insufficient. Additionally, Plaintiffs addressed several of Defendants' reasons for excluding a majority of the custodians on that same meet and confer. For example, Plaintiffs explained that the fact that an individual had reported to an already agreed-upon custodian is not a legitimate reason for excluding the former as a custodian. As further explained on that call, Plaintiffs must ultimately prove every element of a Section 10(b) claim, which includes, *inter alia*, falsity in addition to scienter. Thus, even information in the custodial files of so-called lower-level employees is relevant to several elements of Plaintiffs' claims. Moreover, Plaintiffs disagree with Defendants' position that nothing related to clinical trials is at all relevant to this case. To the extent any aspect of clinical trials is related to Novavax receiving EUA approval (*e.g.*, requirement to hold a certain number of clinical trials before receiving EUA approval or being able to manufacture a certain number of doses for such trials), then such information is relevant.

**Labaton Sucharow**

C. Thomas Brown
May 12, 2023
Page 3

While Plaintiffs continue to believe that all the previously proposed custodians are relevant (and reserve the right to revisit this issue once discovery has been substantially completed) in an effort to compromise, Plaintiffs propose including the following 13 custodians, for a total of 30 custodians:

1. Andre Johnson, Senior Director, Quality Control

2. Fred Shemer, VP, Quality Systems

3. Jose Torres-Vorshirm, Vice President, Supply Chain

4. Matthew Hariegel, Director, Facilities and Engineering

5. Brian Brashears, Senior Specialist, Manufacturing

6. Dennis Tsurkan, Regulatory Information Management Specialist, Regulatory Affairs Operations

7. Jared Lantzy, Director, Regulatory Affairs, Operations

8. Joseph Neal, Senior Director, Supply Chain Planning, Network Strategy and Optimization

9. Lina Kim, Senior Director, CQA, GCP Inspections Management

10. Marianne Mowrer, Senior Submission Specialist, Regulatory Affairs Operations

11. Gale Smith, VP, Discovery and Pre-Clinical Research & Chief Scientist

12. Michelle Robinson, Senior Clinical Project Manager

13. Mike Massare, Senior Director, Vaccine Development

Please confirm that Defendants are amenable to including the above 13 individuals as custodians.

## II.   SCOPE OF DISCOVERY

### A.   <u>Relevant Time Period</u>

Initially, Plaintiffs defined the Relevant Time Period as "December 1, 2019 through Present." Defendants objected to this definition in their Responses, construing the Relevant Time Period as January 1, 2021 through October 19, 2021.

**Labaton
Sucharow**

C. Thomas Brown
May 12, 2023
Page 4

Following a discussion on the relevant time period in Defendants' Letter, Defendants counter-proposed a start date of November 1, 2020.  During the meet and confer on May 3, 2023, Plaintiffs explained that November 1, 2020 generally works for a start date, although there will be certain instances where an earlier date is more appropriate depending on the Request, as detailed below. Please confirm that Defendants are amenable to a start date of November 1, 2021 with the exception of Requests Nos. 2, 12–14, 16, 19, 23, 25, 27–28, 30–32, for which the start date will be March 1, 2020.

With respect to the back end, Plaintiffs reiterate the position that the end of the Relevant Time Period should be the Present.  The relevancy of documents does not stop as soon as the Class Period ends, nor shortly thereafter.  (*See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("[B]oth post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period,' noting that '[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.'" (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)) (second alteration in original))). Furthermore, to the extent Defendants are concerned with the burden of searching for and producing documents until the Present, Defendants have not shown how they are burdened or how the request is disproportional to the case's needs.  In fact, the documents to the Present are already only limited to a limited number of additional relevant and responsive non-privileged documents.  Please confirm that Defendants are amenable to an end date of the Present.

    **B.    Manufacturing Standards**

Initially, Plaintiffs defined Manufacturing Standards as referring to cGMP and any other applicable governmental or industry manufacturing standards. Defendants objected to this definition in their Responses, construing the Manufacturing Standards as referring only to cGMP.

After Plaintiffs expressed concerns about Manufacturing Standards being limited to solely cGMP, Defendants proposed the following in their Letter: "Defendants are willing to include in their productions any responsive, non-privileged documents related to U.S. government-imposed manufacturing regulations applicable to Novavax's manufacture of NVX-CoV2373 in the United States." During the meet and confer on May 3, 2023, Plaintiffs told Defendants that Plaintiffs are amenable to construing the Manufacturing Standards as set forth in Defendants' Letter. However, Plaintiffs' agreement is contingent on Defendants' confirmation that Novavax was not required to meet or comply with any non-U.S. requirements or regulations for the FDA to grant EUA approval for Novavax's vaccine.  Plaintiffs' agreement is also contingent on Defendants' confirmation that Novavax was not required to meet or comply with any requirement or regulation other than a "manufacturing" standard for the FDA to grant EUA approval for Novavax's vaccine.

Additionally, as explained on prior meet and confers, Plaintiffs believe that Manufacturing Standards should also include requirements as they relate to clinical trials to the extent relevant to Novavax

**Labaton**
**Sucharow**

C. Thomas Brown
May 12, 2023
Page 5

receiving EUA approval.  For example, if Novavax was required to complete a certain number of clinical trials or produce a certain number of doses to perform such clinical trials prior to the FDA granting EUA, then such information is relevant to the Company's ability to timely bring the vaccine to market.  Further, Plaintiffs unequivocally reject Defendants' assertion that anything related to clinical trials is no longer relevant to this action.  For example, the Court sustained alleged misstatements by Defendants on May 10, August 5, and September 29. Am. Compl. ¶¶178-81, 198, 204. Plaintiffs expressly allege that each of these statements were misleading because Defendants failed to disclose that "Novavax was not able to produce the required number of doses in time as Novavax was experiencing a shortage of vaccine doses for clinical trials, which were causing trials to be delayed." *See id.* ¶¶172, 184, 201, and 205.  Accordingly, information concerning clinical trials is directly relevant the claims to the claims Judge Chuang sustained, the defenses Defendants will assert to those claims, and is proportional to the needs of this action.

Therefore, Plaintiffs accept Defendants' proposal regarding the scope of the Manufacturing Standards set forth in their Letter, contingent on the above-mentioned confirmations, and Defendants' agreement to produce information related to clinical trials as referenced above as part of its production in response to the following requests concerning Manufacturing Standards: 1, 3, 4, 5, 6, 7, 8, 12, 13, 22, and 23.

Please address the above concerns and confirm that Defendants are amenable to including the above-referenced clinical trial information within the scope of Manufacturing Standards as it pertains to the applicable Requests.

### C.    Manufacturing Facilities

Initially, Plaintiffs defined Manufacturing Facilities as any facility that Novavax or one of its Manufacturers had a contract, agreement, arrangement, or any other understanding with to develop, manufacture, or produce the Company's Covid-19 Vaccine Candidate, Including FUJIFILM's manufacturing facilities located in Texas and North Carolina. Defendants objected to this definition in their Responses, construing the Manufacturing Facilities as referring only to FUJIFILM's manufacturing facilities located in Texas and North Carolina.

After Plaintiffs expressed concerns about Manufacturing Facilities being limited to just the Texas and North Carolina facilities, Defendants proposed the following in their Letter: "Defendants are willing to offer discovery related to all of Novavax's U.S.-based Manufacturing Facilities."  During the meet and confer on May 3, 2023, Plaintiffs told Defendants that Plaintiffs are amenable to construing the Manufacturing Facilities as set forth in Defendants' Letter, contingent on Defendants' confirmation that there was not any component or ingredient of Novavax's vaccine being manufactured or produced outside of the U.S. that was required for Novavax to manufacture or produce the vaccine within the U.S.

**Labaton**
**Sucharow**

C. Thomas Brown
May 12, 2023
Page 6

The following Requests are subject to the scope of the Manufacturing Standards: 3, 5, 6, 7, 8, 9, 10, 12, 14, 20, 22, and 23.

Please address the above concern.

## III.    PLAINTIFFS' POSITION ON DEFENDANTS' RESPONSES TO SPECIFIC REQUESTS

Unless stated otherwise, every Request should be subject to the Relevant Time Period described in Section II.B *supra*.

Request No. 1 – This Request is subject to the scope of Manufacturing Standards.

Request No. 2 – This Request should not be limited to the Relevant Time Period; instead, responsive Documents from June 2020 should be searched for, collected, and produced.  Furthermore, as discussed during the meet and confer on May 3, 2023, to the extent that Novavax had any requirement to scale up production (*e.g.*, per any agreement imposed under or by Operation Warp Speed, Fast Track Designation, DoD, etc.), then such documents should be responsive to this Request. Defendants indicated that they would take this under consideration.

Request No. 3 – This Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities.

Request No. 4 – This Request is subject to the scope of Manufacturing Standards.  Furthermore, as discussed during the meet and confer on May 3, 2023, to the extent that Novavax's Quality Management System (which includes Quality Control and Quality Assurance units) relates to any quality-related aspect of manufacturing the vaccine—even if such aspect does not directly relate to a particular Manufacturing Standard—such information is relevant.

Request No. 5 – This Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities.

Request No. 6 – This Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities.  Furthermore, Defendants indicated that they will follow up with the Company to determine if it has any documents sufficient to show responsibilities of employees at the Manufacturing Facilities.

Request No. 7 – This Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities.

Request No. 8 – This Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities.  Furthermore, during the meet and confer on May 3, 2023, Defendants agreed that to the

**Labaton Sucharow**

C. Thomas Brown
May 12, 2023
Page 7

extent there are Manufacturers (other than FUJIFILM) in the U.S. that were involved in manufacturing and producing Novavax's vaccine, then such Manufacturers will be included within this Request. Defendants also explained that to the extent storage and organization of vaccines regulations are included within Manufacturing Standards, then such documents related to storage and organization will be responsive to this Request. With respect to the training materials referenced in this Request, Plaintiffs believe that training materials provided to employees at the Manufacturing Facilities that relate to how to manufacture the vaccine, ensure all Manufacturing Standards are met, and how to remedy such issues are relevant and should be searched for and produced. While Defendants agreed that they will search for and produce documents related to *accessing* such training materials' adequacy, Defendants did not agree to search for or produce the actual training materials (other than what falls within another Request). However, Plaintiffs continue to believe that all such training materials covered under this Request should be searched for and produced even if not sought in a different Request.

Request No. 9 – This Request is subject to the scope of Manufacturing Facilities. Defendants agreed that this Request will not be limited to just those stoppages explicitly mentioned in the Complaint, but Defendants explained that there can be planned routine stoppages of the plants, so they are trying to limit the responsive documents to stoppages that are actually related to this case. Plaintiffs stated that, in light of being in the dark about the types of stoppages at the facilities, Plaintiffs continue to believe that any stoppage within the Manufacturing Facilities are relevant. Defendants proposed limiting this Request to *unexpected* stoppages, for example, a fire in a facility. However, Plaintiffs inquired whether Defendants had a method of determining what a routine stoppage was compared to an unexpected stoppage, and that Plaintiffs are concerned with who is making that distinction and how that distinction would be made. Defendants acknowledge that Plaintiffs had a valid point as to distinguishing between a routine and unexpected stoppage as that would be a difficult line to draw. Defendants indicated that they will discuss this topic internally to determine if there is a method to which the parties could agree.

Request No. 10 – This Request is subject to the scope of Manufacturing Facilities—particularly whether anything was shipped from outside of the U.S. to any of the U.S. Manufacturing Facilities as that would relate to the global supply chain. Defendants indicated that they will look into this further and get back to Plaintiffs. Furthermore, Defendants agreed to produce documents related to the U.S. supply chain in response to this Request.

Request No. 11 – As discussed during the meet and confer on May 3, 2023, Plaintiffs do not agree with Defendants' position that anything related to competition is not relevant. Novavax was operating with urgency under contracts created by Operation Warp Speed. Novavax was also competing with companies striving to produce as many vaccines as possible as well. Defendants' knowledge and tracking of that information relates to Defendants' state of mind when it came rushing its own vaccine production. Indeed, the Complaint alleges that Novavax was rushing the manufacturing process to

**Labaton Sucharow**

C. Thomas Brown
May 12, 2023
Page 8

meet the tight turnarounds required to obtain EUA approval before there was no longer a need. Similarly, Defendants' knowledge of heightened scrutiny and the like against other companies also speaks to Defendants' state of mind about their own practices (*e.g.*, relates to possible recklessness—an element of Plaintiffs' claim). Defendants indicated that the explanation was helpful to understand Plaintiffs' position, and that Defendants will take this under consideration.

Request No. 12 – This Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities. Furthermore, as discussed during the meet and confer on May 3, 2023, Plaintiffs do not agree with Defendants' position that Operation Warp Speed and Fast Track Designation are not relevant to this action. Operation Warp Speed and Fast Track Designation are relevant because these are the agreements and contracts with which Novavax had to comply as they related to EUA. They are also relevant because they provided Defendants with a reason for having to rush the manufacturing process before there was no longer a need for Novavax's vaccine for EUA purposes—as explained above. Documents related to Operation Warp Speed and Fast Track Designation are also relevant to the extent that they relate to any timelines or deadlines that Novavax had to meet to achieve EUA, as well as any requirements Novavax had to meet in terms of scaling up production.

Request No. 13 – This Request is subject to the scope of Manufacturing Standards. This Request should not be limited to the Relevant Time Period. Defendants asked if Plaintiffs could limit the scope of this Request because Defendants do not believe that documents as they pertain to all of the government entities listed in this Request are relevant. While Plaintiffs believe that all such entities are relevant, in an effort to compromise, Plaintiffs will narrow this Request to documents concerning any contract, agreement, arrangement, or any other understanding between Novavax and the DoD, FDA, and CDC, in connection with Novavax's Covid-19 Vaccine Candidate. This Request includes any contract, agreement, arrangement, or any other understanding as it pertains to Operation Warp Speed and Fast Track Designation.

Request No. 14 – This Request is subject to the scope of Manufacturing Facilities. This Request should not be limited to the Relevant Time Period.

Request No. 15 – This Request relates to the extent to which documents concerning clinical trials are relevant to this action. Plaintiffs' position is that the documents sought in this Request are relevant and should be searched for and produced. Indeed, as explained during the meet and confer on May 3, 2023, the Court did not hold that anything related to clinical trials is not relevant to this action. Instead, the Court explained that the results of the clinical trials did not show that the vaccine was unsafe. The Court did not hold, for example, that the Company's ability to manufacture enough doses for clinical trials was not relevant to the case. In fact, the request specifically highlights that reasoning when it limits the request to "to the extent relevant to Novavax's efforts to produce enough doses of its Covid-19 Vaccine Candidate for clinical trials."

**Labaton Sucharow**

C. Thomas Brown
May 12, 2023
Page 9

Request No. 16 – This Request relates to the extent to which documents concerning clinical trials are relevant to this action. This Request should not be limited to the Relevant Time Period.

Request No. 17 – Defendants confirmed that they will produce documents in response to this Request and will not limit it to any particular aspect of the manufacturing process.

Request No. 18 – Defendants indicated that they will confirm that there was no intention in using the word "projected" when referring to their agreement to produce timelines in response to this Request.

Request No. 19 – No action required for this Request. This Request should not be limited to the Relevant Time Period.

Request No. 20 – This Request is subject to the scope of Manufacturing Facilities.

Request No. 21 – As discussed during the meet and confer on May 3, 2023, Plaintiffs believe that any testimony given by any Individual Defendant to any government entity, agency, or committee about the Company's development and manufacturing of its Covid-19 Vaccine Candidate is relevant—not just Defendant Trizzino's testimony referenced in the Complaint. Please confirm that you are not limiting this Request to just Defendant Trizzino's testimony referenced in the Complaint.

Request No. 22 – This Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities.

Request No. 23 – This Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities. This Request should not be limited to the Relevant Time Period. Defendants also confirmed that they will search for and produce any communications with U.S. government agencies with respect to any investigation.

Request No. 24 – As discussed during the meet and confer on May 3, 2023, Plaintiffs do not agree that the scope of this Request should be limited to only those transactions referenced in the Complaint. Instead, all transactions of Novavax common stock by all Individual Defendants are relevant. Additionally, the trading of the Individual Defendants' families is also relevant because an Individual Defendant can still benefit from such trades. For example, if the spouse or partner of one of the Individual Defendants benefits from trading Novavax common stock, that Individual Defendant most likely would also benefit. However, Plaintiffs are willing to narrow this part of the Request to just transactions of Novavax common stock by immediate family members of the Individual Defendants or those who live in the same household as an Individual Defendant. Moreover, Plaintiffs are willing to compromise on the time period of this Request. Plaintiffs propose that this Request should be subject to the Relevant Time Period, instead of beginning in June 2020 as previously proposed.

**Labaton Sucharow**

C. Thomas Brown
May 12, 2023
Page 10

Request No. 25 – This Request should not be limited to the Relevant Time Period.  Defendants represented that the actions listed in their Responses were the only actions that they were aware of at the time of drafting the Responses. Defendants also represented that there have been no additional productions other than the § 220 books and records request.  Defendants also represented that they do not intend to produce any discovery in any other action at this point in time.  Plaintiffs would like Defendants to confirm that no other related actions exist.  For example, please confirm that nothing was produced in the following three actions, which were not listed in Defendants Responses: (i) Charles R. Blackburn, et al. v. Stanley C. Erck, et al., No. 1:22-cv-01417-TDC ; (ii) Amy Snyder v. Stanley C. Erck, et al., No. 8:22-cv-01415-TDC; (iii) Shui Shing Yung v. Stanley C. Erck, et al., No. 8:21-cv-03248-TDC.

Request No. 26 – In addition to searching for and producing documents in response to this Request from the date of the initial complaint filing until the date of the Requests, Defendants indicated that Defendants are open to searching for and producing such policies from the Relevant Time Period. Please confirm whether Defendants will produce such documents from the Relevant Time Period.

Request No. 27 – This Request should not be limited to the Relevant Time Period.  Defendants represented that a document preservation letter was timely sent out in this action.  Defendants agreed to produce to Plaintiffs the dates that the document preservation letters were sent, but they will not produce the contents of such letters.  Defendants indicated that they will discuss internally about whether to also produce the recipients of the letters.

Request Nos. 28–32 – No action required for these Requests. These Requests (excluding Request No. 29) should not be limited to the Relevant Time Period.

Please let us know Defendants' position on each of the above Requests.

We look forward to hearing from you soon.  Please let us know if you would like to set up a meet and confer to discuss any of the above topics.

Sincerely,

*/s/ Philip J. Leggio*

Philip J. Leggio

cc:     Peter L. Welsh            Michael H. Rogers
        Charles D. Zagnoli        James T. Christie
        J. William Piereson       Brian Calandra

# EXHIBIT 7



ROPES & GRAY LLP
PRUDENTIAL TOWER
800 BOYLSTON STREET
BOSTON, MA 02199-3600
WWW.ROPESGRAY.COM

May 25, 2023

C. Thomas Brown
T +1 617 951 7464
thomas.brown@ropesgray.com

**BY E-MAIL**

Michael H. Rogers
James T. Christie
Philip J. Leggio
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
mrogers@labaton.com
jchristie@labaton.com
pleggio@labaton.com

Brian Calandra
Jeremey A. Lieberman
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, NY 10016
bcalandra@pomlaw.com
jalieberman@pomlaw.com

**Re:**    *Sinnathurai v. Novavax, Inc., et al.*, **Civil Action No. 21-cv-02910-TDC (D. Md.) – Custodians and Discovery Scope**

Counsel:

I write on behalf of Defendants Novavax, Inc., Stanley Erck, and John J. Trizzino (collectively, "Defendants") regarding Plaintiffs' discovery letter, dated May 12, 2023 ("Plaintiffs' letter"), in the above-referenced matter. Detailed below are Defendants' responses to Plaintiffs' positions concerning: (1) the scope of discovery, including (a) the length of the Relevant Time Period, (b) the Manufacturing Standards, and (c) the Manufacturing Facilities; (2) custodians; and (3) certain of Defendants' specific Responses and Objections to Plaintiffs' First Set of Requests for Production. We are hopeful that this lengthy response will facilitate agreement to the extent possible, and otherwise limit and clarify remaining disputes for resolution.

ROPES & GRAY LLP

- 2 -                                                                                           May 25, 2023

## I.      Discovery Scope

### A.  Relevant Time Period

*Start Date*.   During the parties' May 3, 2023, meet and confer, Plaintiffs indicated a willingness to accept Defendants' proposed discovery start date of November 1, 2020, aside from "some" document Requests for which Plaintiffs would seek documents dating back to June or July 2020.  During the parties' discussion, Plaintiffs mentioned only two Requests—Requests 2 and 24— for which they sought documents dating back to summer 2020.  We were thus surprised to see that Plaintiffs' May 12 letter requests a proposed start date of March 1, 2020, for 12 of Plaintiffs' 32 Requests.  Not only is this date much earlier than the compromise date mentioned by Plaintiffs on the May 3 call; Plaintiffs also seek to apply it to nearly half of their Requests.  Moreover, many of the Requests subject to the proposed extended time period—such as Requests 2, 12, 13, 14, 16 and 23— seek "All documents" on a given subject, including broad subjects of central relevance to the litigation.  This would expand the timeframe by an additional eight months beyond the fourteen months that Defendants have already offered and that Plaintiffs suggested was acceptable on May 3.

Defendants are willing to agree to no date limitations for Requests 25, 27, 30, 31, and 32, while reserving all other objections.

As to Requests 19 and 28, Defendants have completed their productions after specifically negotiating those productions' scopes with you; therefore, the time period issue is moot as to those Requests.[1]

As to the timeframe applicable to Requests 2, 12–14, 16, and 23, Defendants cannot and will not agree to such a broad expansion of the relevant period.  As we have explained in past meet-and-confers and correspondence, the state of Novavax's nascent vaccine development efforts earlier in 2020 have little or no bearing on the parties' surviving claims and defenses.  Plaintiffs challenge statements that described Novavax's ability, as of May, August, and September 2021, to manufacture the vaccine at commercial scale or run consistent and successful assays across facilities.  Plaintiffs claim those statements were misleading based on allegations of contamination incidents, shutdowns at certain plants, and disappointing assay results—all of which allegedly occurred in 2021.  Defendants have provided Plaintiffs with more than adequate context for those allegations about 2021 events by agreeing to extend discovery back to November 2020, around the time that the FDA granted Novavax a FastTrack designation.  Defendants are prepared to agree to a discovery timeframe covering over six months prior to the six-month Class Period, i.e., beginning November 1, 2020.  Plaintiffs have been unable to articulate a reasonable basis to demand more.

---

[1] Defendants completed their response to Document Request 19 with their March 21, 2023 and April 11, 2023 productions.  Defendants also completed their response to Request 28 with their April 25, 2023 production.

ROPES & GRAY LLP

- 3 -                                                                                      May 25, 2023

Defendants are willing to consider producing specific non-email documents that predate November 1, 2020, if Plaintiffs identify the specific type or category of documents they seek from that earlier period and the reasons that those documents are relevant to the parties' surviving claims and defenses.  For example, as discussed below, Defendants agree to produce copies of Novavax's base contracts or agreements executed between Novavax, on the one hand, and the Department of Defense, the U.S. FDA, or the CDC, on the other hand, in connection with NVX-CoV2373, including any contracts or agreements related to Operation Warp Speed or FastTrack designation, even though those contracts predate the relevant time period.  But Defendants will not agree to conduct a sweeping review of all custodial files over an additional eight months for those Requests. That expansion of discovery is particularly inappropriate when Plaintiffs have been unable to articulate a compelling relevance theory for those documents, let alone a theory that justifies the significant burden of their collection and review.

*End Date*.  Defendants also disagree that Plaintiffs are entitled to post-Class Period discovery through the present.  Even assuming for argument's sake that "post-class period data ***may*** be relevant to determining what a defendant knew or should have known during the class period," *In re Scholastic Corp. Securities Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) (emphasis added), Plaintiffs have not explained why post-Class Period discovery is actually relevant on the facts here—much less why such discovery must extend nearly two years beyond the five-month Class Period.  *See In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.,* 2013 WL 5769915, at *4 (S.D.N.Y. Oct. 24, 2013) (rejecting post-Class Period discovery where party had "not sufficiently articulated basis to expand the time frame beyond" the Class Period); *Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 7180662, at *3 (N.D. Cal. Nov. 16, 2015) (rejecting plaintiffs' request for six months of post-class period discovery and finding that "two and a half months should be sufficient to give context" to allegations from 18-month class period).  No such explanation exists.  The statements challenged by Plaintiffs spoke to the then-present state of Novavax's commercial-scale vaccine manufacturing and assay development in May, August, and September 2021.  What happened to Novavax's manufacturing in the two years following those statements does not shed light on the state of Novavax's vaccine manufacturing or assay development processes during the 2021 Class Period.  Plaintiffs are, again, attempting to massively expand discovery based on highly speculative relevance theories.

Plaintiffs state that post-Class Period discovery will be "limited to a limited number of additional relevant and responsive non-privileged documents," but this claim concedes the inappropriateness of Plaintiffs' time period:  Plaintiffs ask Defendants to review sweeping sets of documents over two years in the hopes of finding "a limited number of additional relevant and responsive non-privileged documents."  The benefits of that review fall far short of outweighing the likely costs.  Moreover, Plaintiffs provide no basis to believe that Defendants review will be limited. In fact, Plaintiffs have issued a long list of very broadly worded document requests.  Many of these Requests, as written, call for documents that are likely to be evenly distributed throughout the Class Period and the two years following it.  For example, Request 1 seeks "[a]ll Documents Concerning any and all Manufacturing Standards that Novavax's Covid-19 Vaccine Candidate was required to comply with, meet, and satisfy," and Request 10 seeks "[a]ll Documents Concerning the supply chain

ROPES & GRAY LLP

- 4 -                                                                              May 25, 2023

(both the U.S. supply chain . . . and the global supply chain . . . ) of each step of developing, manufacturing, and producing Novavax's Covid-19 Vaccine Candidate." Novavax continues to comply with manufacturing standards and source supplies to this day. Plaintiffs apparently cannot explain why the significant additional burden of reviewing two years of post-Class Period documents would be justified on this case's facts.

As we have noted on past meet-and-confers, we are willing to consider adding another couple of weeks to our currently proposed end date, but only if Plaintiffs offer a reasonable compromise and explain why the additional weeks are sufficiently relevant to the surviving claims and defenses to justify the added burden. Unless and until Plaintiffs provide that counteroffer and explanation, Defendants stand by their view that a November 30, 2021, cutoff date—a few weeks after the complaint was filed in this case—is an appropriate and reasonable end date.

### B.  Manufacturing Standards

In their May 2 letter, Defendants offered "to include in their productions any responsive, non-privileged documents related to U.S. government-imposed manufacturing regulations applicable to Novavax's manufacture of NVX-CoV2373 in the United States." Plaintiffs told Defendants both on the May 3 call and in their May 3 letter that "Plaintiffs are amenable to construing the Manufacturing Standards as set forth in Defendants' Letter," so long as Defendants could confirm that Novavax was not required to meet or comply with "any non-U.S. requirements or regulations for the FDA to grant EUA approval for Novavax's vaccine" nor with "any requirement or regulation other than a 'manufacturing' standard for the FDA to grant EUA approval for Novavax's vaccine." Based on our current understanding and investigation to date, the FDA did not condition EUA approval on Novavax's compliance with any foreign requirements or regulations. Please confirm that Plaintiffs will agree on Defendants' proposed compromise definition of "Manufacturing Standards."

Plaintiffs also noted in their letter that they "believe that Manufacturing Standards should also include requirements as they relate to clinical trials to the extent relevant to Novavax receiving EUA approval." However, that definition conflicts directly with—and goes well beyond—Plaintiffs' definition of Manufacturing Standards in their own Requests for Production. There, Plaintiffs tellingly defined the term to refer only "to the cGMP, as further defined in the Complaint, and any other applicable governmental or industry *manufacturing* standards" (emphasis added). More critically, Defendants disagree with Plaintiffs' continued assertion that any and all documents related to clinical trials are relevant to the parties' surviving claims and defenses. The Court dismissed Plaintiffs' claims premised on trial-related statements because Plaintiffs had failed to plead sufficient facts about the clinical trials to suggest that any statements about their success were false or misleading. Plaintiffs have articulated no rationale for why, after their failure to state a claim premised on clinical trials, they should now receive expansive discovery into those trials. Indeed, the only relevant allegation Plaintiffs can identify is the Complaint's assertion that "Novavax was not able to produce the required number of doses" for clinical trials. But that narrow allegation does not entitle Plaintiffs to full discovery on every aspect of Novavax's clinical trials or NVX-CoV2373's

ROPES & GRAY LLP

- 5 -                                                                May 25, 2023

performance in those trials. Plaintiffs' surviving claims center exclusively on whether two Novavax executives knowingly made false or misleading statements about the Company's ability to *manufacture* NVX-CoV2373 at commercial scale. The status of the Company's clinical trials has no bearing at all on whether the executives accurately described the Company's ability to manufacture drugs at commercial scale or the state of manufacturing assay development. To the extent that there exist any documents concerning Novavax's purported inability to manufacture sufficient vaccine doses to run clinical trials, Defendants will agree to produce those documents in response to Plaintiffs' Requests for manufacturing-related documents, including Request 2. Defendants otherwise will not agree to plenary discovery related to Novavax's clinical trials.

Likewise, Plaintiffs appear to contend that they are entitled to expansive discovery on Novavax's clinical trials merely because the trials purportedly could have impacted the Company's EUA submission and approval timeline. But the EUA filing timeline is not the basis for Plaintiffs' surviving claims. Plaintiffs claim that two executives knowingly misstated or misleadingly described the company's ability to manufacture drug substance or components at commercial scale, or the extent to which challenges in assay design had been overcome. The Complaint does not challenge statements about the Company's anticipated future timeline for filing an EUA application; nor could it do so, when those statements are protected by the PSLRA's safe harbor for forward-looking statements. And the Complaint makes no allegation that NVX-CoV2373 failed to perform adequately in clinical trials, a fact explicitly emphasized by the Court when it dismissed Plaintiffs' trials-related claims. Discovery must be tailored to the claims Plaintiffs actually pled and the defenses Novavax and the named executives actually assert.

### C. Manufacturing Facilities

In their May 3 letter, Defendants explained that they are "willing to offer discovery related to all of Novavax's U.S.-based Manufacturing Facilities." At the May 3 meet and confer, Plaintiffs agreed to this compromise "contingent on Defendants' confirmation that there was not any component or ingredient of Novavax's vaccine being manufactured or produced outside of the U.S. that was required for Novavax to manufacture or produce the vaccine within the U.S." We currently understand that, during the relevant time period, Novavax planned to base its EUA filing with the U.S. FDA on the Company's U.S. manufacturing facilities, and to produce at those facilities the components of doses intended for U.S. sale. At a certain point in or around late September 2021, Novavax began to consider shifting its strategy to use foreign facilities to support the U.S. FDA EUA filing. However, that plan was not implemented until, at earliest, October 2021—after all of the statements at issue had been made. At the time relevant to discovery in this case, Novavax was focused on basing its EUA filing on its contracted third-party facilities based in the U.S. Therefore, the burden for searching for and producing documents related to manufacturing facilities outside of the United States outweighs the minimal speculative benefit that producing such documents may offer. Please confirm that Plaintiffs will agree on Defendants' proposed compromise definition of "Manufacturing Facilities."

ROPES & GRAY LLP

- 6 -                                                                                    May 25, 2023

## II.     Custodians

On March 20, 2023, Defendants proposed a list of eight custodians. The parties met and conferred on March 27, where Plaintiffs indicated that they thought 30 custodians would be appropriate for this case and explained that they would follow up with a proposed list.  On April 21, Plaintiffs sent a list including 44 total proposed custodians.  On May 2, Defendants responded to Plaintiffs' proposal and agreed to add nine additional custodians, resulting in a total of 17 custodians. In that May 2 letter, Defendants also made clear that they would be willing to consider adding a small number of additional custodians from Plaintiffs' list, but asked that Plaintiffs "explain why they believe any of these custodians' files might be relevant to the parties' surviving claims and defenses, and why that alleged relevance outweighs the burden of collecting, reviewing, and producing those custodians' documents."  To facilitate this discussion, Defendants also provided detailed information about all of the names on Plaintiffs' list of 44.  The parties then met and conferred on May 3, where Defendants again expressed a willingness to consider adding a limited number of additional custodians upon Plaintiffs' explanation of (i) why each additional proposed custodian would provide relevant, nonduplicative information, and (ii) why the benefits of that information would outweigh the burden of collecting, reviewing, and producing those additional custodians' files.

Despite Defendants' repeated requests, Plaintiffs have made no effort to explain how any additional proposed custodians would provide sufficient benefit to justify the search burden.  Nor have Plaintiffs made any reasonable counteroffers of a limited number of additional custodians.  In their May 12 letter, Plaintiffs simply demanded that Defendants add 13 additional custodians without explaining why the relevance of those custodians' uniquely held materials would outweigh the burden of collecting, reviewing, and producing them.  Plaintiffs appear to be of the view that they are somehow entitled to 30 custodians by default, simply because this is a securities case that they believe calls for extensive discovery.  That is not the case.  For each custodian requested, Plaintiffs must show that the custodian is reasonably likely to have relevant material and that the expected benefit of searching the custodian's files outweigh the costs.  *See* Fed. R. Civ. P. 26(b)(1).  Unless and until Plaintiffs provide the explanation that Defendants have now twice requested, Defendants will not agree to add any additional custodians on top of the 17 already offered.

Beyond Plaintiffs' failure to explain why the additional custodians are necessary, Plaintiffs also proposed adding numerous custodians responsible for running or overseeing Novavax's clinical trials.  For example, Plaintiffs requested that Defendants add Gale Smith, VP, Discovery and Pre-Clinical Research & Chief Scientist; Michelle Robinson, Senior Clinical Project Manager; and Mike Massare, Senior Director, Vaccine Development. Defendants will not add these additional custodians. As discussed above, Plaintiffs are not entitled to discovery into Novavax's clinical trials or NVX-CoV2373's performance in clinical trials.  To the extent Defendants have agreed to produce any documents that they identify during their review about the Company's ability to manufacture sufficient vaccine doses for clinical trials, we would expect those documents to appear in the files of the many manufacturing custodians to whom Defendants have already agreed.

ROPES & GRAY LLP

                                        - 7 -                              May 25, 2023


### III.     Defendants' Responses to Plaintiffs' Position on Specific Requests

Defendants reiterate that each Request that refers to "Manufacturing Standards" or "Manufacturing Facilities" are subject to the parties' agreed-upon construction of those terms, as discussed above. Defendants further reiterate that each Request is subject to the Relevant Time Period set forth above. Subject to those points, Defendants respond to each remaining Request-specific disagreement as follows.[2]

Request No. 2 – For the reasons set forth above in Section I.A., this Request should be limited to the Relevant Time Period. Defendants will produce the base contracts or agreements executed between Novavax, on the one hand, and the Department of Defense, the U.S. FDA, or the CDC, on the other hand, in connection with NVX-CoV2373, including any contracts or agreements related to Operation Warp Speed or FastTrack designation, regardless of date. Novavax will also produce amendments to such contracts, to the extent the amendments contain or relate to requirements to scale up production, regardless of date.

Request No. 3 – This Request does not refer to Manufacturing Standards and thus is not subject to its scope.

Request No. 4 – This Request does not refer to Manufacturing Standards and thus is not subject to its scope. Defendants understand that Novavax's Quality Management System is a repository that contains a wide range of materials, much of which do not relate to "quality-related aspect[s] of manufacturing the vaccine," as described in Plaintiffs' letter. As discussed during the May 3 meet and confer, Plaintiffs' other Requests will capture any materials related to those quality-related manufacturing issues. Accordingly, Defendants will agree to (i) collect documents from potentially relevant locations in Novavax's Quality Management System, (ii) apply the parties' agreed-upon search terms to those materials, and (iii) produce any non-privileged documents located on the Quality Management System that are responsive to Plaintiffs' other Requests. Defendants will also not agree to produce all documents related in any way to the Quality Management System, an effort which would require Defendants to collect and review a significant amount of information that is irrelevant to Plaintiffs' surviving claims.

Request No. 6 – Plaintiffs' letter misstates the follow up that Defendants agreed to with respect to Request 6. Plaintiffs claim that Defendants "indicated that they will follow up with the Company to determine if it has any documents sufficient to show responsibilities of employees at the

---

[2] Defendants do not address Requests 1, 5, and 20 in this section, as any open issues related to those Requests concerning the scope of Manufacturing Facilities, Manufacturing Standards, and the Relevant Time Period have already been addressed above. Defendants continue to reserve all rights with respect to their responses to these Requests.

ROPES & GRAY LLP

- 8 -                                                                        May 25, 2023

Manufacturing Facilities."  In fact, Defendants agreed to check whether the Company had records detailing who at the Manufacturing Facilities was responsible for attending to violations of Manufacturing Standards.  We currently understand that the Company does not have such records in its possession, custody, or control.

Request No. 7 – This Request does not refer to Manufacturing Standards and thus is not subject to its scope.

Request No. 8 –Plaintiffs misstate the parties' discussion from the May 3 meet and confer: the parties did not discuss specific facilities to be included in this request.  To the extent Defendants have agreed to produce any documents in response to this request, the scope of production will be limited to the agreed upon scope of Manufacturing Facilities. Defendants will produce documents related to storage and organization in response to this Request only to the extent that regulations related to storage and organization of vaccines are included within Manufacturing Standards. As explained on the May 3 call, this Request seeks irrelevant information that has no bearing on the parties' surviving claims and defenses but, in a spirit of compromise, Defendants will search for and produce documents assessing, or reflecting assessments of, the adequacy of training materials against U.S. government regulatory requirements, to the extent the training materials were provided to employees at the Manufacturing Facilities. Defendants will not search for or produce the actual training materials.  Those materials have no bearing on whether Defendants truthfully and non-misleadingly described the state of Novavax's manufacturing capabilities and assay protocols in the May, August, and September statements challenged in the Complaint.

Request No. 9 – Defendants are willing to produce documents, to the extent they exist, related to unplanned shutdowns, stoppages, or halts that were not accounted for in Novavax's production timelines for NVX-CoV2373.  We do not believe that these lines are as hard to draw in practice as Plaintiffs suggested on the call.  Scheduled and planned stoppages should be readily identifiable from the documents' face.  Stoppages due to unexpected equipment malfunctions or other unanticipated problems will be equally identifiable from the documents' face.  When it is unclear from a document's face whether the stoppage was planned or unplanned, we expect that Defendants would typically treat the stoppage as unplanned and thus responsive.  The goal of Defendants' limitation of their response is not to unduly narrow the response, but rather to avoid needing to search for and produce extensive records of planned stoppages for such routine matters as scheduled maintenance and cleaning.  By definition, those stoppages would not have disrupted Novavax's broader efforts to produce the vaccine at commercial scale.

Request No. 10 – Defendants will agree to produce documents about the Company's U.S. supply chain as it related to the U.S. Manufacturing Facilities, within the scope of discovery.

Request No. 11 – Defendants maintain that Novavax's tracking of its competitive position relative to other vaccine manufacturers is irrelevant to Plaintiffs' surviving claims and defenses and disproportional to the case's needs.  Plaintiffs' assertion that the success of competitors may have

ROPES & GRAY LLP

- 9 -                                                                        May 25, 2023

motivated Defendants to act recklessly in the manufacture of its vaccine is highly speculative, and the burden of searching a wide category of documents for such a hypothetical point outweighs any benefits that such documents would offer. Even if such documents exist, Novavax's knowledge of competitors' position has no bearing on Plaintiffs' surviving claims, which turn on the truth or falsity of statements about manufacturing capabilities in May 2021 or the status of assay protocols later that year. Specifically, Plaintiffs claim that Defendants misled the public as to the ability of the Company's manufacturing facilities to produce vaccine doses at commercial scale, and as to whether the Company had overcome challenges in designing assay protocols. How quickly Defendants were attempting to stand up their manufacturing process has no bearing on these statements' truth or falsity. It also does not provide Defendants with any motive to mislead the public. Novavax could not fool the FDA into approving the vaccine by misleading shareholders, nor would false or misleading public statements create vaccine doses that the Company had not manufactured.

Request No. 12 – For the reasons set forth above in Section I.A., this Request should be limited to the Relevant Time Period. Defendants will produce the base contracts or agreements executed between Novavax, on the one hand, and the Department of Defense, the U.S. FDA, or the CDC, on the other hand, in connection with NVX-CoV2373, including any contracts or agreements related to Operation Warp Speed or FastTrack designation, regardless of date. Novavax will also produce amendments to such contracts, to the extent the amendments contain or relate to requirements to scale up production, regardless. Defendants will not produce all documents related to these large, carefully negotiated contracts with the U.S. government. As explained above, Plaintiffs proffered reasons for seeking those documents bear no relevance to the parties' surviving claims and defenses and impose a burden on Defendants that significantly outweighs the minimal or nonexistent benefit of searching for such documents.

Request No. 13 – This Request does not refer to Manufacturing Standards and thus is not subject to its scope. As set forth above in Section I.A., this Request should be limited to the Relevant Time Period. Defendants will produce the contracts, agreements, and amendments described above with respect to Request No. 12.

Request No. 14 –As set forth above in Section I.A., this Request should be limited to the Relevant Time Period.

Request Nos. 15 & 16 – As set forth above in Section I.A., these Requests should be limited to the Relevant Time Period. As explained above, Plaintiffs are not entitled to expansive discovery on every aspect of Novavax's operation of clinical trials or NVX-CoV2373's performance in those trials. Defendants will search for, review, and produce responsive, non-privileged materials concerning the Complaint's lone surviving allegation relating to clinical trials (and the only such allegation referenced in Plaintiffs' letter): that Novavax was unable to produce a sufficient number of doses for use in clinical trials. As also set forth above, Defendants expect that manufacturing personnel that Defendants have already agreed to include as custodians will have responsive materials related to that allegation.

ROPES & GRAY LLP

- 10 -                                                                                      May 25, 2023

Request No. 17 – Defendants again confirm that they will produce documents in response to this Request related to the manufacture of NVX-CoV2373 and will not limit their production to documents concerning the contamination issues alleged in the Complaint.

Request No. 18 – Defendants have confirmed that they did not intend the word "projected" to narrow the scope of the "timelines" that Defendants agreed to produce in response to this Request. Defendants will produce the responsive timelines described in their response to this Request.

Request No. 19 – Defendants completed their response to Document Request 19 with their March 21, 2023 and April 11, 2023 productions.

Request No. 21 – Beyond the Congressional testimony referenced in the Complaint, Defendants will agree to produce responsive, non-privileged documents concerning Novavax or an Individual Defendant's testimony before any Government entity, agency, or committee during the Relevant Time Period only to the extent that such testimony relates to manufacturing NVX-CoV2373 at commercial scale.

Request No. 22 – This Request does not refer to Manufacturing Standards and thus is not subject to its scope.

Request No. 23 –As described above in Section I.A., this Request should be limited to the Relevant Time Period.  Plaintiffs otherwise misconstrue what Defendants represented in the May 3 meet and confer—Defendants agreed to produce communications with the U.S. government agencies concerning any U.S. federal or state agency inspection, investigation, examination, audit, or inquiry with respect to (1) Manufacturing Standards (as defined above) and (2) other things specifically listed in the Request (namely manufacturing, production, distribution, and FDA approval).

Request No. 24 – In addition to the documents Defendants have already agreed to produce related to the Individual Defendants' stock transactions that the Complaint specifically alleges are suspicious, Defendants are willing to produce documents sufficient to show: (1) the dates, share amounts, and prices of any acquisition, purchase, or sale of Novavax's publicly traded common stock executed by the Individual Defendants during the Class Period; (2) any 10b5-1 trading plans for the Individual Defendants that were in effect during the Class Period; and (3) the Company's insider trading Policies. Moreover, to the extent that Defendants locate documents in the Individual Defendants' possession, custody, or control sufficient to show the dates, share amounts, and prices of acquisition, purchase, or sale of Novavax's publicly traded common stock during the Relevant Time Period by Individual Defendants' immediate family members, Defendants will produce those documents.  But, as a general matter, we expect documents related to stock trades by Individual Defendants' spouses or adult children to lie beyond the Individual Defendants' possession, custody, or control.  To the extent publicly available documents (such as SEC Forms 4) reflect information about the trades of Individual Defendants' family members, such documents are equally available to Plaintiffs as they are to Defendants, and Defendants will not undertake the burden of collecting, reviewing, and producing

ROPES & GRAY LLP

- 11 -                                                                                    May 25, 2023

such publicly available documents. To the extent that Plaintiffs seek documents in the possession of Individual Defendants' immediate family members, such documents are not in the possession, custody, or control of Defendants and Defendants are therefore unable to produce such documents.

Request No. 25 – As described above in Section I.A., Defendants are willing to forego a date range for this Request, to the extent Defendants agreed to respond to these Requests at all.  Beyond the actions listed in Defendants' Responses and Objections to Plaintiffs' first set of Requests for Production,[3] Novavax and certain of its directors and officers were recently named in a related stockholder derivative action captioned *Needelman v. Erck, et al.*, No. C-15-CV-23-001550 (Md. Cir. Ct.).  Moreover, Plaintiffs appear to be confused about the nature of the three actions inquired about in their letter:  *Charles R. Blackburn, et al. v. Stanley C. Erck, et al.*, No. 1:22-cv-01417-TDC (D. Md.); *Amy Snyder v. Stanley C. Erck, et al.*, No. 8:22-cv-01415-TDC (D. Md.); and *Shui Shing Yung v. Stanley C. Erck, et al.*, No. 8:21-cv-03248-TDC (D.Md.).  All three actions were consolidated with the federal derivative action *In re Novavax Inc. Stockholder Derivative Litigation* and no longer proceed separately.  The plaintiffs in these three now-consolidated cases received the same documents as the shareholders who submitted requests to inspect books and records pursuant to 8 Del. C. § 220. No other documents have been produced to the plaintiffs in the derivative litigation.

Request No. 26 – Defendants are willing to produce documents sufficient to show any of Novavax's general corporate document destruction and retention policies in effect during the Relevant Time Period.

Request No. 27 – As described above in Section I.A., Defendants are willing to forego a date range for this Request, to the extent Defendants agreed to respond to these Requests at all. Defendants are willing to provide the date of the Company's litigation hold memorandum. That said, the memorandum itself and the list of its recipients are protected work product.  The recipient list reflects counsel's mental impressions of the case and potential discovery sources.  Moreover, the recipient list has no relevance absent a showing of spoliation. *See Franck v. New York Health Care Inc.*, 2022 WL 471333 (S.D.N.Y. Feb. 16, 2022); *Little Hocking Water Ass'n, Inc. v. E.I. Dupont de Nemours & Co.*, No. 2:09-CV-1081, 2013 WL 5311292, at *3 (S.D. Ohio Sept. 20, 2013). Plaintiffs have made no such showing here.

Request No. 28 – Defendants completed their response to Request 28 with their April 25, 2023 production.

---

[3] Those actions included: *In re Novavax Inc. Stockholder Derivative Litig.*, No. 8:21-cv-02996-TDC (D. Md.); *Kirst v. Novavax, Inc., et al.*, No. C-15-CV-21-000618 (Cir. Ct. Montgomery Cnty, Md.); *Mesa v. Erck, et al.*, C.A. No. 2022-0770-NAC (Del. Ch.); and *Acosta v. Novavax, Inc., et al.*, C.A. No. 2022-1133-NAC (Del. Ch.).

ROPES & GRAY LLP

- 12 -                                                                              May 25, 2023

Request Nos. 29-32 – As set forth above in Section I.A., Defendants are willing to forego a date range for Requests 30, 31, and 32, to the extent Defendants agreed to respond to these Requests at all.

*          *          *

We look forward to hearing from you on these points soon.

Very truly yours,

*/s/ C. Thomas Brown*

C. Thomas Brown


cc:     Peter L. Welsh
        Charles D. Zagnoli
        J. William Piereson

# EXHBIIT 8

**Labaton**
**Sucharow**

212 907 0646  direct
212 907 0700  main
212 883 7006  fax
pleggio@labaton.com

**New York Office**
140 Broadway
New York, NY 10005

June 14, 2023

**VIA EMAIL**

C. Thomas Brown
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199-3600

RE:     *Sinnathurai v. Novavax, Inc., et al.*, Civil Action No. 21-cv-02910-TDC (D. Md.)

Counsel:

I write in response to Defendants' May 25, 2023 letter (the "Letter") regarding Plaintiffs' First Set of Requests for Production of Documents to Defendants Novavax, Inc. and the Individual Defendants (the "Requests").   Specifically, please find below our positions regarding: (1) scope of discovery, including (a) Relevant Time Period, (b) Manufacturing Standards, and (c) Manufacturing Facilities; (2) custodians; and (3) Plaintiffs' position on Defendants' responses to specific requests.

**I.     DISCOVERY SCOPE**

**A.     Relevant Time Period**

*Start Date.*  As Plaintiffs' May 12 letter explained, Plaintiffs are generally amenable to a November 1, 2020 start date for the Relevant Time Period for each Request, with the exception of certain Requests.

Plaintiffs appreciate and agree to Defendants willingness to not apply date limitations for Requests 25, 27, 30, 31, and 32.  As to Requests 19 and 28, Plaintiffs also agree that at this time the time period issue is moot as to those Requests, but Plaintiffs reserve all rights to revisit these Requests if necessary.

As to the timeframe applicable to Requests 2, 12–14, 16, and 23, Defendants' Letter stated that they would produce  non-email documents that predate November 1, 2020, including "copies of Novavax's base contracts or agreements executed between Novavax, on the one hand, and the Department of Defense, the U.S. FDA, or the CDC, on the other hand, in connection with NVX-CoV2373, including any contracts or agreements related to Operation Warp Speed or FastTrack designation[.]"  Plaintiffs are amenable to that proposal with the following modifications:

Requests 2, 12, and 13 – Plaintiffs disagree with Defendants' position that these Requests should be limited to the Relevant Time Period.  To the extent such responsive documents include any timelines and/or deadlines that Novavax had to meet to achieve EUA, as well as any requirements Novavax had to meet in terms of scaling up production, such documents that existed as of June 1, 2020 are

# Labaton Sucharow

C. Thomas Brown
June 14, 2023
Page 2

relevant to the falsity of Defendants' statements regarding the Company's ability to scale production in a timely manner and their knowledge of manufacturing issues and delays in the timeline for filing for EUA, and such documents should therefore be produced.  Additionally, it is Plaintiffs' position that Defendants must produce such timelines, deadlines, contracts or agreements referenced in your May 25 Letter with respect to these Requests regardless of date.[1]

Request 14 – Plaintiffs disagree with Defendants' position that this Request should be limited to the Relevant Time Period.  This Request seeks, for example, contracts or agreements between Novavax and the Manufacturing Facilities in connection with the manufacturing of the vaccine.  Such contracts or agreements are relevant even if they were executed prior to the Relevant Time Period because, for example, they describe Fujifilm's obligation to notify Novavax of "deviations and OOS results within 2 business days." Compl. ¶108. They also likely address Fujifilm's responsibilities regarding curing deficiencies, Novavax's ability to have employees on site at the facilities, and the manner in which the conditions at the facilities were reported to Novavax. *Id.* ¶¶107-14.

Request 16 – Plaintiffs disagree with Defendants' position that this Request should be limited to the Relevant Time Period.  Similar to the plans, timelines or schedules referenced in previous requests, the timelines referenced in Request No. 16 that existed prior to the Relevant Time Period, if any, are relevant to this action because, among other things, they reflect Defendants' expectations at the start of the vaccine development process and changes to those expectations demonstrate the severity of the problems and the Manufacturing Facilities.[2]

---

[1] To clarify, while Plaintiffs agree to limit the types of documents that Defendants should search for and produce from before the Relevant Time Period, Plaintiffs do not agree to extend such limitations into the Relevant Time Period.  That is, Defendants must still search for and produce all requested, responsive documents for each of the Requests during the Relevant Time Period—subject to our agreements on the scope of the Manufacturing Standards and Manufacturing Facilities.  For example, for Request No. 2, while Plaintiffs agree to limit pre-Relevant Time Period documents to contracts, agreements, timelines, deadlines, and requirements to scale up production, Defendants must still produce documents responsive to the remainder of the Request for the Relevant Time Period, such as, *inter alia*, Company policies related to scalability requirements and the Company's tracking of any metrics or information relevant to scalability.  Similarly, for Request No. 12, Plaintiffs expect Defendants to search for and produce all responsive documents during the Relevant Time Period concerning, *inter alia*, documents that Novavax provided to or received from the FDA and communications between the FDA and the Manufacturing Facilities.

[2] Defendants' Letter, when discussing the Relevant Time Period, does not assert that Request 16 should be limited to the Relevant Time Period.  However, Defendants' Letter groups Requests 15 and 16 together, and then states that "these Requests should be limited to the Relevant Time Period."  Thus, it is unclear what Defendants' position is on the time period for Request 15.  Regardless, Request 15 should not be limited to the Relevant Time Period for similar reasons Request 16 should not be.

**Labaton
Sucharow**

C. Thomas Brown
June 14, 2023
Page 3

Request 23 – Plaintiffs disagree with Defendants' position that this Request should be limited to the Relevant Time Period. Investigations into Novavax's Manufacturing Standards and any of the facts alleged in the Complaint, including the development, manufacturing, production, distribution, and FDA approval of the Company's Covid-19 Vaccine Candidate are relevant regardless of when such investigations were initiated because, among other things, the subject matter of regulatory inquiries into Novavax related to the Company's Covid-19 Vaccine Candidate, and Novavax's ability or inability to address those inquiries reflect Defendants' knowledge of problems manufacturing the Covid-19 Vaccine Candidate and regulatory expectations as to purity, potency, and consistency of the drug substance.

Unless Defendants are willing to revise their position on the above issues, it appears that the parties are at an impasse. Plaintiffs will move the Court for relief along with the other issues identified in this letter.

*End Date.* With respect to the back end of the Relevant Time Period, Plaintiffs reiterate the position that the end of the Relevant Time Period should be the Present. Defendants' position that "[t]he benefits of that review fall far short of outweighing the likely costs" fails to show how this request is burdensome or disproportional to the needs of the case. As Plaintiffs have already explained, the relevancy of documents does not stop as soon as the Class Period ends, nor shortly thereafter. (*See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("[B]oth post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period,' noting that '[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.'" (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)) (second alteration in original))). The Requests for documents to the Present are clearly relevant for reasons such as, but not limited to, the fact that Defendants' subsequent remedial measures are relevant to proving certain elements of Plaintiffs' claims. Unless Defendants are willing to revise their position on this issue, it appears that the parties are at an impasse, and Plaintiffs will move the Court for relief.

## B. Manufacturing Standards

Defendants' Letter represented that "the FDA did not condition EUA approval on Novavax's compliance with any foreign requirements or regulations." Letter at 4. Based on this representation, Plaintiffs agree to construe the definition of "Manufacturing Standards" to include productions of any responsive, non-privileged documents related to U.S. government-imposed manufacturing regulations or requirements applicable to Novavax's manufacture of NVX-CoV2373 in the United States. However, Plaintiffs reserve the right to expand this request upon the discovery of foreign requirements, regulations, or similar conditions for EUA approval that contradict Defendants' representation.

**Labaton Sucharow**

C. Thomas Brown
June 14, 2023
Page 4

In addition, Plaintiffs position is that that Manufacturing Standards should include requirements as they related to clinical trials to the extent that they are relevant to Novavax receiving EUA approval. For the reasons explained in Plaintiffs' May 12 letter, information concerning clinical trials is directly relevant to the claims Judge Chuang sustained, the defenses Defendants may assert to defend those claims, and is proportional to the needs of this action.

Please confirm whether Defendants are amendable to including the above-referenced clinical trial information within the scope of Manufacturing Standards as it pertains to the applicable Requests. If not, the parties appear to be at an impasse and Plaintiffs will move the Court for appropriate relief.

### C. <u>Manufacturing Facilities</u>

During the parties' May 3 meet and confer, Plaintiffs suggested a willingness to accept Defendants' proposal "to offer discovery related to all of Novavax's U.S.-based Manufacturing Facilities." However, this compromise was, as Defendants' Letter suggests, "contingent on Defendants' confirmation that there was not any component or ingredient of Novavax's vaccine being manufactured or produced outside of the U.S. that was required for Novavax to manufacture or produce the vaccine within the U.S." Given that Defendants' Letter acknowledges that "in or around late September 2021, Novavax began to consider shifting its strategy to use foreign facilities to support the U.S. FDA EUA filings[,]" Plaintiffs believe that documents related to this potential shift in strategy are highly relevant to their claims. Thus, while Plaintiffs agree to accept Defendants' proposal to offer discovery related to all of Novavax's U.S.-based Manufacturing Facilities, Plaintiffs believe that documents related to Novavax's potential shift in strategy to use foreign facilities are relevant and should be produced because such documents support Defendants' knowledge of the fact that Novavax's U.S. facilities were unable to meet manufacturing and/or production deadlines and capacity due to complications. Please confirm that Defendants are amenable to this proposal.

## II. CUSTODIANS

As explained in Plaintiffs' May 12 letter, Plaintiffs continue to believe that all the previously proposed custodians are relevant. However, in an effort to compromise, Plaintiffs' May 12 letter proposed a narrowed list of 13 additional custodians, for a total of 30 custodians. While Plaintiffs have limited insight due to the limited document discovery in this action thus far, Plaintiffs believe that each of the 13 additional custodians are relevant for the following reasons:

1. Andre Johnson served as a Senior Director, Quality Control, for Novavax during the Class Period. Given Mr. Johnson's position, he will have relevant information, as Quality Control is highly relevant to the Complaint's allegations. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Mr. Johnson's custodial file is necessarily in Brian Webb's custodial file simply because Mr. Johnson reported to Mr. Webb.

**Labaton Sucharow**

C. Thomas Brown
June 14, 2023
Page 5

2.  Fred Shemer served as Vice President, Quality Systems, for Novavax during the Class Period. Given Mr. Shemer's position, he will have relevant information, as the Complaint alleges, *inter alia*, that there were certain issues and disruptions in Novavax's supply chain. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Mr. Shemer's custodial file is necessarily in Henrietta Ukwa's custodial file simply because Mr. Shemer reported to Ms. Ukwa.

3.  Jose Torres-Vorshirm served as Vice President, Supply Chain, for Novavax during the Class Period. Given Mr. Torres-Vorshirm's position, he will have relevant information, as Novavax's supply chain management is highly relevant to the Complaint's allegations. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Mr. Torres-Vorshirm's custodial file is necessarily in Rick Crowley's custodial file simply because Mr. Torres-Vorshirm reported to Mr. Crowley.

4.  Matthew Hariegel served as a Director, Facilities and Engineering, for Alexion during the Class Period. Given Mr. Hariegel's position, he will have relevant information to the extent that he had exposure to issues associated with the manufacturing and production of Novavax's Covid-19 Vaccine Candidate at the Company's manufacturing facilities. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Mr. Hariegel's custodial file is necessarily in Mr. Webb's custodial file simply because Mr. Hariegel reported to Mr. Webb.

5.  Brian Brashears served as a Senior Specialist, Manufacturing, for Novavax during the Class Period. Given Mr. Brashears' position, he will have relevant information to the extent that he had exposure to issues associated with the manufacturing and production of Novavax's Covid-19 Vaccine Candidate at the Company's manufacturing facilities. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Mr. Brashears' custodial file is necessarily in Mr. Webb's custodial file simply because Mr. Brashears reported to Mr. Webb.

6.  Dennis Tsurkan served as a Regulatory Information Management Specialist, Regulatory Affairs Operations, for Novavax during the Class Period. Given Mr. Tsurkan's position, he will have relevant information because he would have been involved with and/or had exposure to issues associated with the manufacturing and production of Novavax's Covid-19 Vaccine Candidate. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Mr. Tsurkan's custodial file is necessarily in Kathleen Callahan's custodial file simply because Mr. Tsurkan reported to Ms. Callahan.

7.  Jared Lantzy served as a Director, Regulatory Affairs, Operations, for Novavax during the Class Period. Given Mr. Lantzy's position, he will have relevant information because he appears to have been involved with and/or had exposure to issues associated with the manufacturing and production of Novavax's Covid-19 Vaccine Candidate. Plaintiffs disagree

**Labaton Sucharow**

C. Thomas Brown
June 14, 2023
Page 6

with the assertion and assumption that any relevant information that is in Mr. Lantzy's custodial file is necessarily in Ms. Callahan's custodial file simply because Mr. Lantzy reported to Ms. Callahan.

8. Joseph Neal served as a Senior Director, Supply Chain Planning, Network Strategy and Optimization, for Novavax during the Class Period. Given Mr. Neal's position, he will have relevant information, as the Complaint alleges, *inter alia*, that there were certain issues and disruptions in Novavax's supply chain. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Mr. Neal's custodial file is necessarily in Mr. Webb's custodial file simply because Mr. Neal reported to Mr. Webb.

9. Lina Kim served as a Senior Director, CQA, GCP Inspections Management, for Novavax during the Class Period. Given Ms. Kim's position, she will have relevant information to the extent that she was involved with and/or had exposure to issues associated with the manufacturing and production of Novavax's Covid-19 Vaccine Candidate. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Ms. Kim's custodial file is necessarily in Madeline Fisher's custodial file simply because Ms. Kim reported to Ms. Fisher.

10. Marianne Mowrer served as a Senior Submission Specialist, Regulatory Affairs Operations, for Novavax during the Class Period. Given Ms. Mowrer's position, she will have relevant information because she appears to have been involved with and/or had exposure to issues associated with the manufacturing and production of Novavax's Covid-19 Vaccine Candidate. Plaintiffs disagree with the assertion and assumption that any relevant information that is in Ms. Mowrer's custodial file is necessarily in Ms. Callahan's custodial file simply because Ms. Mowrer reported to Ms. Callahan.

11. Gale Smith served as a VP, Discovery and Pre-Clinical Research & Chief Scientist, for Novavax during the Class Period. Given Mr. Smith's position, he will have information relevant to Plaintiffs' claims because clinical trials were related to Novavax receiving EUA approval. As explained above, Plaintiffs unequivocally reject Defendants' contention that nothing related to clinical trials is at all relevant to this case. While the Court may have found that the clinical trials did not show that the vaccine was unsafe, the Court did not hold that no aspect of the clinical trials was relevant to this case. Indeed, to the extent any aspect of clinical trials is related to Novavax receiving EUA approval (*e.g.*, requirement to hold a certain number of clinical trials before receiving EUA approval or being able to manufacture a enough doses for such trials), then such information is clearly relevant. Thus, it is necessary to have custodians who have relevant information.

# Labaton Sucharow

C. Thomas Brown
June 14, 2023
Page 7

12. Michelle Robinson served as a Senior Clinical Project Manager and an Associate Director, Clinical Project Management, for Novavax during the Class Period. Ms. Robinson will have information relevant to Plaintiffs' claims, as her responsibilities included, *inter alia*, working with cross-function project and program teams to identify and address constrains to achieve project and program deliverables, timelines, and budgets in fulfilment of corporate objectives.[3] For the reasons explained above, Plaintiffs unequivocally reject Defendants' contention that nothing related to clinical trials is at all relevant to this case.

13. Mike Massare served as a Senior Director, Vaccine Development, during the Class Period. Mr. Massare will have information relevant to Plaintiffs' claims, as his responsibilities included, *inter alia*, initiating and developing new vaccine targets. For the reasons explained above, Plaintiffs unequivocally reject Defendants' contention that nothing related to clinical trials is at all relevant to this case.[4]

Please confirm that Defendants are amenable to including the above 13 individuals as custodians. If Defendants stand on their objection to these proposed custodians, then the parties appear to be at an impasse and Plaintiffs will move the Court for appropriate relief.

## III.    PLAINTIFFS' POSITION ON DEFENDANTS' RESPONSES TO SPECIFIC REQUESTS

Unless stated otherwise, Plaintiffs' position is that every Request should be subject to the parties' agreed-upon construction of the Relevant Time Period, "Manufacturing Standards," and "Manufacturing Facilities," as discussed above. Subject to those points, Plaintiffs' position with respect to each of the remaining specific Requests is as follows:

Request No. 2 – As discussed in Section I.A, this Request should not be limited to the Relevant Time Period. Plaintiffs appreciate and agree to Defendants' willingness to produce the documents outlined in Defendants' Letter to this specific Request. However, Request 2 encompasses more than just the contracts and agreements mentioned in Defendants' Letter; the Request also seeks, for instance, Novavax's forecasts, projections, and timelines, Company policies related to scalability requirements, and the Company's tracking of any metrics or information relevant to scalability. Please confirm that Defendants are not limiting this Request to only those specific documents mentioned in Defendants' Letter.

---

[3] Plaintiffs obtained information regarding Ms. Robinson's responsibilities as an Alexion employee through her LinkedIn profile.

[4] Plaintiffs obtained information regarding Mr. Massare's responsibilities as an Alexion employee through his LinkedIn profile.

**Labaton Sucharow**

C. Thomas Brown
June 14, 2023
Page 8

Request No. 3 – Plaintiffs reiterate that this Request is subject to the scope of Manufacturing Facilities, as well as Manufacturing Standards to the extent that any of the inspections and re-inspections by the FDA of the Manufacturing Facilities involved any Manufacturing Standards.

Request No. 4 – Plaintiffs reiterate that this Request is subject to the scope of Manufacturing Standards to the extent that any component of Novavax's Quality Management System was responsible for ensuring any Manufacturing Standards were met.  While Plaintiffs believe that all documents related to the Quality Management System are relevant, Plaintiffs will agree to Defendants proposal.  Accordingly, Defendants have agreed to: (i) collect documents from potentially relevant locations in Novavax's Quality Management System, (ii) apply the parties' agreed-upon search terms to those materials, and (iii) produce any non-privileged documents located on the Quality Management System that are responsive to Plaintiffs' other Requests.

Request No. 6 – Plaintiffs reiterate that this Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities.  Furthermore, despite any disagreement as to what Defendants had agreed to follow up about with respect to Request 6, Plaintiffs request that Defendants follow up with the Company to determine whether it has any documents (*i.e.*, not just records) sufficient to show the responsibilities of employees at the Manufacturing Facilities.

Request No. 7 – Plaintiffs reiterate that this Request is subject to the scope of Manufacturing Facilities, as well as Manufacturing Standards to the extent that any remedial actions involved Manufacturing Standards in any way.

Request No. 8 – Plaintiffs reiterate that this Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities.  Plaintiffs reiterate their position from their May 12 letter and continue to believe that all such training materials covered under this Request should be searched for and produced even if not sought in a different Request.

Request No. 9 – Plaintiffs reiterate that this Request is subject to the scope of Manufacturing Facilities. Defendants have offered "to produced documents, to the extent they exist, related to unplanned shutdowns, stoppages, or halts that were not accounted for in Novavax's production timelines for NVC-CoV2372." Letter at 8.  Plaintiffs are willing to accept this proposal subject to the following condition: When it is unclear from a document's face whether the stoppage was planned or unplanned, we expect that Defendants *will always* treat the document as responsive.

Request No. 10 – Plaintiffs reiterate that this Request is subject to the scope of Manufacturing Facilities.  Plaintiffs appreciate and accept Defendants' willingness to produce documents about the Company's U.S. supply chain as it related to the U.S. Manufacturing Facilities.  Letter at 8.  Plaintiffs' acceptance of Defendants' position is thus based on Plaintiffs interpreting Defendants' response to

**Labaton Sucharow**

C. Thomas Brown
June 14, 2023
Page 9

this Request as a representation that nothing was shipped from outside of the U.S. to any of the U.S. Manufacturing Facilities as that would relate to the global supply chain.

Request No. 11 – For the reasons explained in Plaintiffs' May 12 letter, Plaintiffs do not agree with Defendants' subjective assertion that anything related to competition is not relevant. Therefore, Plaintiffs reiterate their position from their May 12 letter.

Request Nos. 12 and 13 – As discussed in Section I.A, these Requests should not be limited to the Relevant Time Period. Plaintiffs also reiterate that Request 12 is subject to the scope of Manufacturing Standards and Manufacturing Facilities. Plaintiffs appreciate and agree to Defendants' willingness to produce the documents outlined in Defendants' Letter to these specific Requests. However, Request 12 encompasses more than just the contracts and agreements mentioned in Defendants' Letter; the Request also seeks, for instance, documents that Novavax provided to or received from the FDA and communications between the FDA and the Manufacturing Facilities. Please confirm that Defendants are not limiting these Requests to only those specific documents mentioned in Defendants' Letter.

Request No. 14 – As discussed in Section I.A, this Request should not be limited to the Relevant Time Period. Plaintiffs also reiterate that this Request is also subject to the scope of Manufacturing Facilities.

Request Nos. 15 and 16 – As discussed in Section I.A, these Requests should not be limited to the Relevant Time Period. As explained above and in Plaintiffs' May 12 letter, Plaintiffs' position is that the documents sought in this Request are relevant and should be searched for and produced.

Request No. 17 – Defendants confirmed that they will produce documents in response to this Request and will not limit it to any particular aspect of the manufacturing process.

Request No. 18 – Defendants confirmed that there was no intention in using the word "projected" when referring to their agreement to produce timelines in response to this Request. Letter at 10. Defendants reiterated that they will produce responsive timelines described in their response to this Request. *Id.*

Request No. 21 – Defendants confirmed that "[b]eyond the Congressional testimony referenced in the Complaint, Defendants will agree to produce responsive, non-privileged documents concerning Novavax or an Individual Defendant's testimony before any Government entity, agency, or committee during the Relevant Time Period only to the extent that such testimony relates to manufacturing NVX-CoV2373 at commercial scale." Letter at 10.

**Labaton Sucharow**

C. Thomas Brown
June 14, 2023
Page 10

Request No. 22 – Plaintiffs reiterate that this Request is subject to the scope of Manufacturing Standards and Manufacturing Facilities to the extent that any Board of Director documents involve any Manufacturing Standards of Facilities.

Request No. 23 – As discussed in Section I.A, this Request should not be limited to the Relevant Time Period. With respect to the types of documents Defendants agreed to produce in response to this Request, Plaintiffs accept Defendants' position. That is, Defendants agreed "to produce communications with the U.S. government agencies concerning any U.S. federal or state agency inspection, investigation, examination, audit, or inquiry with respect to (1) Manufacturing Standards (as defined above) and (2) other things specifically listed in the Request (namely manufacturing, production, distribution, and FDA approval)." Letter at 10.

Request No. 24 – Plaintiffs agree to the proposal for this Request in Defendants' Letter.

Request No. 25 – Defendants agreed to forego a date range for this Request. Letter at 11. Moreover, Defendants asserted that the plaintiffs in the federal derivative action *In re Novavax Inc. Stockholder Derivative Litigation* submitted requests to inspect books and records pursuant to 8 Del. C. § 220. *Id.* Defendants also asserted that "[n]o other documents have been produced to the plaintiffs in the derivative litigation." *Id.* Plaintiffs accept Defendants' representations as to this Request.

Request No. 26 – Defendants confirmed that they are "willing to produce documents sufficient to show any of Novavax's general corporate document destruction and retention policies in effect during the Relevant Time Period." Letter at 11. Defendants had also previously indicated that Defendants will search for and produce documents in response to this Request from the date of the initial complaint filing until the date of the Requests.

Request No. 27 – Defendants confirmed that they are willing to forego a date range for this Request. Letter at 11. Defendants also confirmed that they are "willing to provide the date of the Company's litigation hold memorandum." *Id.* Plaintiffs reserve all rights to revisit the remainder of this Request.

Request Nos. 30–32 – Defendants confirmed that they are "willing to forego a date range for Requests 30, 31, and 32[.]" Letter at 12.

Please let us know Defendants' position on each of the above Requests as soon as possible. Given the parties' multiple meet and confers and letter correspondence, if Defendants elect to stand on their positions, the parties appear to be at an impasse and Plaintiffs will move the Court in due course for relief on these important open issues.

**Labaton Sucharow**

C. Thomas Brown
June 14, 2023
Page 11

We look forward to hearing from you soon.

Sincerely,

Philip J. Leggio

cc:     Peter L. Welsh            Michael H. Rogers
        Charles D. Zagnoli        James T. Christie
        J. William Piereson       Brian Calandra
                                  Lauren Molinaro

# EXHIBIT 9



ROPES & GRAY LLP
PRUDENTIAL TOWER
800 BOYLSTON STREET
BOSTON, MA 02199-3600
WWW.ROPESGRAY.COM

July 6, 2023

C. Thomas Brown
T +1 617 951 7464
thomas.brown@ropesgray.com

**BY E-MAIL**

Michael H. Rogers
James T. Christie
Philip J. Leggio
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
mrogers@labaton.com
jchristie@labaton.com
pleggio@labaton.com

Brian Calandra
Jeremey A. Lieberman
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, NY 10016
bcalandra@pomlaw.com
jalieberman@pomlaw.com

**Re:** ***Sinnathurai v. Novavax, Inc., et al.*, Civil Action No. 21-cv-02910-TDC (D. Md.) – Depositions, Custodians, and Discovery Scope**

Counsel:

I write on behalf of Defendants Novavax, Inc., Stanley Erck, and John J. Trizzino (collectively, "Defendants") regarding (1) discovery concerning Plaintiffs' pending motion for class certification, and (2) open discovery issues discussed in Plaintiffs' June 14, 2023 letter (the "Letter") related to Plaintiffs' First Set of Requests for Production (the "Requests").

ROPES & GRAY LLP

- 2 -                                                                July 6, 2023

## I.    CLASS CERTIFICATION DISCOVERY

Assuming the Court grants the pending assented-to motion, Defendants are presently due to respond to Plaintiffs' pending class certification motion by August 11. As a result, Defendants expect that Plaintiffs will promptly produce documents responsive to Requests 5–8, 26, and 28 from Defendants' First Set of Requests for Production, all of which relate to Plaintiffs' class certification motion. Please let us know when we can expect to begin receiving Plaintiffs' productions.

In addition, Defendants will proceed with the previously noticed depositions of Lead Plaintiffs David Truong, Jeffrey A. Gabbert, and Nuggehalli Balmukund Nandkumar, as well as Plaintiffs' expert Chad Coffman, CFA, ahead of the August 11 deadline. Please provide, as soon as possible, dates between July 24 and August 1, 2023, during which Messrs. Truong, Gabbert, Nandkumar, and Coffman are available to be deposed. Defendants would prefer to conduct these depositions in-person, but, given the time sensitivities and out of consideration for the deponents' schedules, we are willing to discuss the possibility of taking some of these depositions via Zoom, except for that of Mr. Coffman.

## II.    CUSTODIANS

The parties appear to have reached an impasse on the number of custodians whose files Defendants will search. Defendants have offered to produce documents for 17 custodians—a large number by any measure, and one that includes numerous key individuals even beyond Defendants Erck and Trizzino and former Defendant Glenn. Defendants have also repeatedly expressed a willingness to add select additional custodians if Plaintiffs can offer any basis to suggest (1) that those custodians would yield non-duplicative discovery not already provided by the custodians whom Defendants have agreed to produce and (2) that the importance of those non-duplicative documents to the parties' claims and defenses would outweigh the burden of collecting, reviewing, and producing them. Plaintiffs apparently cannot do so. In their Letter, Plaintiffs merely repeat their demand for all 13 additional custodians by listing their job title at Novavax[1] and offering the conclusory assertion that "[g]iven [the individual's] position, [he/she] will have relevant information" concerning certain extremely broad subjects. But Defendants have already agreed to custodians expected to provide significant discovery on all of these topics. Plaintiffs again fail to specify why any information possessed by their 13 additional custodians would be non-duplicative of this extensive, already-offered discovery, much less how the additional custodians' documents would provide sufficient benefit to justify the additional search burden that would be imposed on Defendants. Moreover, as Defendants have explained multiple times, the custodians Defendants have already offered on these topics will provide not only insight into the subjects listed by

---

[1] Plaintiffs make repeated references to certain proposed custodians' roles and responsibilities at Alexion—an entity unfamiliar to us and, to our knowledge, unconnected to this litigation. *See, e.g.*, Ltr. at 5, 7 n.3 & 4. Defendants assume that these references were made in error and that Plaintiffs intended to describe the proposed custodians' roles at Novavax.

ROPES & GRAY LLP

- 3 -                                                                                    July 6, 2023

Plaintiffs, but also much better insight into what senior executives knew about those topics than the 13 additional, low-level custodians proposed by Plaintiffs.  Defendants therefore stand on their objections to providing documents from the 13 additional proposed custodians, for the reasons previously articulated in our past correspondence and calls.

### III.    DISCOVERY SCOPE

#### a.    Relevant Time Period

**Start Date**: Plaintiffs and Defendants have agreed that the Relevant Time Period should generally begin on November 1, 2020, with the exception of Requests 25, 27, 30, 31, and 32.

With respect to Requests 2, 12, and 13, Plaintiffs seek a start date of June 1, 2020, but are otherwise unclear whether they are (i) continuing to seek all documents responsive to those requests for the pre-November 2020 time period or (ii) accepting a narrower subset of documents from that period.  For example, as to Request 2, Plaintiffs appear to suggest that they are seeking only "contracts, agreements, timelines, deadlines, and requirements to scale up production" from between June and November 2020.  *See* Ltr. at 2 n.1.  To the extent that Plaintiffs are seeking all documents responsive to Requests 2, 12, and 13 from between June and November 2020, then, Defendants are unwilling to agree to that proposal, and the parties are at an impasse as to the start date for those requests.  But to the extent that Plaintiffs are only seeking narrower buckets of documents from June 2020 until November 2020, Defendants would be willing to continue to meet and confer as to which specific documents Plaintiffs are seeking.  Please clarify Plaintiffs' position, as Defendants do not wish to suggest that the parties are at an impasse based on a misunderstanding.

In their Letter, Plaintiffs also assert that an earlier start date should apply to Requests 14, 16, and 23.  Plaintiffs, however, never specify what start date they believe should apply to those requests.  Based on prior discussions, Defendants assume that Plaintiffs are seeking a start date of March 1, 2020 for these requests.  Please let us know if that assumption is incorrect.

Defendants will not agree to a blanket March or June 2020 start date for Requests  2, 12–14, 16, and 23.[2]  As Defendants have repeatedly explained, Novavax's initial efforts to design and test NVX-CoV2373 and to lay the groundwork for creating a manufacturing apparatus in 2020 have little-to-no bearing on the omissions alleged by Plaintiffs, which relate to specific operational issues impacting Novavax's ability to manufacture its COVID-19 vaccine on commercial scale consistent with certain cGMP regulations.  As a result, applying a March 2020 start date to Requests 14, 16, and 23 or a June 2020 start date to Requests 2, 12, and 13—each of which is expansively scoped— would only serve to significantly increase the document review pool while providing little in the way of relevant documents.

---

[2] Plaintiffs' Letter is internally inconsistent as to whether Plaintiffs seek to exclude Request 15 from the Relevant Time Period.  Regardless, Defendants do not agree to do so.

ROPES & GRAY LLP

- 4 -                                                                July 6, 2023

That said, Defendants reiterate that "they are willing to consider producing specific non-email documents that predate November 1, 2020" if "Plaintiffs identify [a] specific type or category of documents they seek from that earlier period and the reasons that those documents are relevant to the parties' surviving claims and defenses." Defs.' May 25 Ltr. at 3. If Plaintiffs would like to request specific categories of pre-November 2020 documents, Defendants remain willing to listen.[3]

With respect to Request 23, while Defendants are unwilling to agree to a March 2020 start date, Defendants are willing to discuss the possibility of running, over a period of July 2020 through the end of the Relevant Time Period, a properly tailored search term—to be agreed upon by the parties at a later date—targeting any formal investigations or examinations by U.S. government regulators that related to the commercial manufacture of NVX-CoV2373.

To the extent that Plaintiffs will not agree to the above proposals concerning the Relevant Period's start date, it appears that the parties are at an impasse on that issue.

**End Date**: Defendants continue to reject Plaintiffs' position that the Relevant Time Period should continue to the present. The putative Class Period—which spans just over five months—ended nearly **two years** ago. Beyond the vague assertion that "subsequent remedial measures are relevant to proving certain elements of Plaintiffs' claims," Ltr. At 3, Plaintiffs offer no basis whatsoever to understand why expansive post-Class Period discovery beyond what Defendants are already offering is necessary or even relevant. Using their chosen example, Plaintiffs do not even explain how, for instance, a hypothetical remedial measure in the summer of 2023 provides any relevant context for the challenged statements about the vaccine manufacturing state in the summer of 2021. And, assuming for the sake of argument that those remedial measures lend some context to the events of the Class Period, Plaintiffs simply make no effort to explain why that context is so important that it justifies the time, effort, and expense required for Defendants to collect and review hundreds of thousands of documents stretching years after the events relevant to this case. Defendants will not agree to Plaintiffs' proposed end date for that reason alone.

Nor do Plaintiffs' cases support their position. Plaintiffs' Letter cites *In re Merck & Co. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005), to support the contention that "the relevancy of documents does not stop as soon as the Class Period ends, **nor shortly thereafter**." Ltr. At 3. Of course, Plaintiffs' two-year request does not seek discovery from shortly after the Class Period, as *Merck* contemplated. Also, *Merck* merely holds that post-Class Period discovery may be relevant in some circumstances. *Id.* At 271–72. The case in no way suggests that Plaintiffs are automatically entitled to post-Class Period discovery, let alone to two years of it. Courts actually considering the question of *how much* post-Class Period discovery is appropriate have routinely rejected extensive periods of

---

[3] For example, as to Request 14, Defendants understand that there were two main manufacturing agreements between Novavax and FUJIFILM from prior to November 2020. Defendants will agree to produce those agreements, but remain unwilling to collect, review, and produce "all documents" related to those contracts from prior to November 2020.

ROPES & GRAY LLP

- 5 -                                                          July 6, 2023

the type Plaintiffs seek here.  *See, e.g.*, *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 2013 WL 5769915, at *4 (S.D.N.Y. Oct. 24, 2013) (rejecting post-Class Period discovery where party had "not sufficiently articulated basis to expand the time frame beyond" the Class Period); *Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 7180662, at *3 (N.D. Cal. Nov. 16, 2015) (rejecting plaintiffs' request for six months of post-class period discovery and finding that "two and a half months should be sufficient to give context" to allegations from 18-month class period). Plaintiffs tellingly have yet to offer a case supporting their position here.

In the spirit of compromise, Defendants will agree to extend the end of the Relevant Period from November 30, 2021 until December 31, 2021.  Two-and-a-half months of post-Class Period discovery—roughly half the length of the putative Class Period—is more than enough to "give context" to Defendants' alleged Class Period conduct.  *Hatamian*, 2015 WL 7180662, at *3.  To the extent Plaintiffs are not amenable to that proposal, the parties have reached an impasse with respect to the Relevant Period's end date.

### b.  Manufacturing Standards

The parties have agreed to "construe the definition of 'Manufacturing Standards' to include productions of any responsive, non-privileged documents related to U.S. government-imposed manufacturing regulations or requirements applicable to Novavax's manufacture of NVX-CoV2373 in the United States."

However, in their Letter, Plaintiffs also contend that this definition should include "requirements as they related to clinical trials to the extent that they are relevant to Novavax receiving EUA approval."  *See* Ltr. At 4.  As Defendants explained in their May 25 letter, such a definition not only goes beyond Plaintiffs' own original definition of "Manufacturing Standards," but beyond the scope of the surviving claims in this case.  The Court dismissed Plaintiffs' clinical trials-related claims.  Plaintiffs' only remaining claims assert that Defendants misled shareholders about the state of Novavax's commercial-scale manufacturing efforts, not the state of clinical trials. Plaintiffs' attempts to tie their requests for discovery on clinical trials to the EUA filing timeline are misguided.  Plaintiffs do not (indeed, cannot) challenge statements about the timing of Novavax's EUA submission.[4]  Even assuming for argument's sake that some challenge in clinical trials delayed Novavax's EUA filing, such events would not bear on the truth, falsity, or completeness of the statements challenged by Plaintiffs or have any bearing on Defendants' alleged scienter about

---

[4] As explained in Defendants' May 25 letter: "The Complaint does not challenge statements about the Company's anticipated future timeline for filing an EUA application; nor could it do so, when those statements are protected by the PSLRA's safe harbor for forward-looking statements.  And the Complaint makes no allegation that NVX-CoV2373 failed to perform adequately in clinical trials, a fact explicitly emphasized by the Court when it dismissed Plaintiffs' trials-related claims. Discovery must be tailored to the claims Plaintiffs actually pled and the defenses Novavax and the named executives actually assert."

ROPES & GRAY LLP

- 6 -                                                                                                        July 6, 2023

those statements.  Therefore, Defendants will not agree to Plaintiffs' proposed expansion to the definition of "Manufacturing Standards."

### c.  Manufacturing Facilities

Defendants have agreed "to offer discovery related to all of Novavax's U.S.-based Manufacturing Facilities."  Plaintiffs' letter requested that Defendants also produce documents "related to Novavax's potential shift in strategy to use foreign facilities."  Ltr. At 4.  Defendants will agree to produce documents related to the Company's shift in strategy to use foreign facilities to support the U.S. FDA EUA filings starting around September or October 2021.

### IV.    RESPONSES TO SPECIFIC REQUESTS

Defendants address below the remaining specific Requests under discussion by the parties. To the extent this letter has already addressed issues related to a specific request (for example, its time period), we address in this section only any issues not already previously addressed above.[5]

**Request 2**:  Defendants are not limiting this request to only those specific documents mentioned in Defendants' May 25 letter; rather, the letter identified specific documents that Defendants were agreeing to produce in addition to the documents that Defendants specifically agreed to produce in their written Responses and Objections to this request, dated March 6, 2023.

**Request 6**:  Plaintiffs Letter states that "Plaintiffs request that Defendants follow up with the Company to determine whether it has any documents (i.e., not just records) sufficient to show the responsibilities of employees at the Manufacturing Facilities."  To date, Defendants have not identified any documents that would be responsive to this request.  To the extent that Defendants locate any document responsive to this request in their document review, Defendants will produce those documents.

**Request 8**:  Plaintiffs' Letter asserts that they "continue to believe that all such training materials covered under this Request should be searched for and produced even if not sought in a different Request."  Defendants disagree and will produce only those documents that Defendants agreed to produce in their May 25 letter.

**Request 9**:  Defendants agree to err on the side of producing a document when it is not apparent from the document's and its family members' faces whether a stoppage was planned or unplanned.

**Request 10**:  In their Letter, Plaintiffs accepted Defendants' offer to produce documents about the Company's U.S. supply chain as it related to the U.S. Manufacturing Facilities.  However, Plaintiffs

---

[5] Defendants do not address Requests 1, 3–5, 7, 17–22, and 24–32 in this section, as there are no open issues related to those Requests. Defendants continue to reserve all rights with respect to their responses to these Requests.

ROPES & GRAY LLP

- 7 -                                                                                      July 6, 2023

specified that their "acceptance of Defendants' position is [] based on Plaintiffs interpreting Defendants' response to this Request as a representation that nothing was shipped from outside of the U.S. to any of the U.S. Manufacturing Facilities as that would relate to the global supply chain." Defendants do not understand the clarification that Plaintiffs are seeking and would appreciate Plaintiffs' rephrasing their question.

**Request 11**:  Plaintiffs' Letter reiterates that Plaintiffs "do not agree with Defendants' subjective assertion that anything related to competition is not relevant."  Defendants continue to assert that Novavax's tracking of its competitive position relative to other vaccine manufacturers is irrelevant to Plaintiffs' surviving claims and defenses and disproportional to the case's needs, and stand on their May 25 letter.

**Requests 12 & 13**: Defendants are not limiting these Requests to only those specific documents mentioned in Defendants' May 25 letter; rather, the letter identified specific documents that Defendants were agreeing to produce in addition to the documents (if any) that Defendants specifically agreed to produce in their written Responses and Objections to these requests, dated March 6, 2023.

**Requests 15 & 16**: As explained in Defendants' May 25 letter and in Section III.B above, broad discovery into clinical trials is inappropriate, and Defendants will not expand the limited agreed responsiveness scope that they described in their May 25 letter.

We look forward to hearing from you on these points soon.

Very truly yours,

*/s/ C. Thomas Brown*

C. Thomas Brown


cc:     Peter L. Welsh
        Charles D. Zagnoli
        J. William Piereson