**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated, <br><br> *Plaintiff,* <br><br> v. <br><br> NOVAVAX, INC., *et al.*, <br><br> *Defendants.* | Civil Action No. TDC-21-2910 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 4

    I.     DISCOVERY ON NOVAVAX'S CLINICAL TRIALS IS IRRELEVANT ........ 4

    II.    PLAINTIFFS HAVE NOT SHOWN THAT THEIR 13 ADDITIONAL
           CUSTODIANS WILL PROVIDE UNIQUE DISCOVERY THAT
           JUSTIFIES THE CONSIDERABLE COSTS OF ALMOST DOUBLING
           THE CUSTODIAN LIST .............................................................................. 6

    III.   PLAINTIFFS' PROPOSED DATE RANGES BEAR NO CONNECTION TO
           THEIR SURVIVING CLAIMS ................................................................. 12

           A.     Plaintiffs' Demand for Two Years of Post-Class Period Discovery ......... 13

           B.     Plaintiffs' Demands to Expand Pre-Class Period Discovery Dates for
                 Requests 2, 12–14, 16, and 23 .................................................................. 15

    IV.   REMAINING DISPUTES CONCERNING SPECIFIC REQUESTS ................. 20

    V.    DEFENDANTS DID NOT WAIVE THEIR BURDEN OBJECTIONS ............. 22

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alston v. Equifax Information Servs., LLC*,
2015 WL 1807952 (D. Md. Apr. 17, 2015) ................................................................22

*In re BofI Holding, Inc. Sec. Litig.*,
2021 WL 1812822 (S.D. Cal. May 6, 2021) ..............................................................15

*Class Produce Grp., LLC v. Harleysville Worcester Ins. Co.*,
2018 WL 5892791 (D. Md. Nov. 9, 2018) .................................................................22

*Deng v. N.Y. State Office of Mental Health*,
2015 WL 9450845 (S.D.N.Y. Dec. 23, 2015) ..............................................................5

*D.J.'s Diamond Imports, LLC v. Brown*,
2013 WL 1345082 (D. Md. Apr. 1, 2013) ....................................................................5

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
297 F.R.D. 99 (S.D.N.Y. 2013) .............................................................................7, 11

*Hatamian v. Advanced Micro Devices, Inc.*,
2015 WL 7180662 (N.D. Cal. Nov. 16, 2015) ..........................................................15

*Hyles v. New York City*,
2016 WL 4077114 (S.D.N.Y. Aug. 1, 2016) .............................................................12

*Lynn v. Monarch Recovery Mgm't*,
285 F.R.D. 350 (D. Md. 2012) ..................................................................................22

*Parker v. Ciena Corp.*,
2017 WL 2364291 (D. Md. May 30, 2017) ..........................................................16, 18

*Sinnathurai v. Novavax, Inc.*,
2022 WL 17585715 (D. Md. Dec. 12., 2022) ...........................................................1, 5

*In re Smith & Nephew Birmingham Hip
Resurfacing Hip Implant Prods. Liability Litig.*,
2018 WL 3079699 (D. Md. Jun. 20, 2018) ..................................................................6

*Testerman v. Proctor & Gamble M'fing Co.*,
2015 WL 5719657 (D. Md. Sept. 29, 2015) ..............................................................18

*Topline Solutions, Inc. v. Sandler Systems, Inc.*,
2017 WL 1230817 (D. Md. Apr. 3, 2017) .................................................................14

*In re Toyota Motor Corp. Sec. Litig.*,
  2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ........................................................................14

*Va. Dep't of Corr. v. Jordan*,
  921 F.3d 180 (4th Cir. 2019) ...........................................................................7, 8, 17

**Other Authorities**

Fed. R. Civ. P. 26 ............................................................................................... *passim*

Fed. R. Civ. P. 34 ......................................................................................................23

Fed. R. Civ. P. 37 ........................................................................................................1

D. Md. L.R. 104.7 .......................................................................................................1

D. Md. L.R. 104.8 .......................................................................................................1

Pursuant to Fed. R. Civ. P. 37 and Local Rules 104.7 and 104.8, Defendants Novavax, Inc. ("Novavax" or "the Company"), Stanley C. Erck, and John J. Trizzino (together, "Defendants")[1] respectfully submit this Opposition to the Motion to Compel Production of Documents (the "Motion" or "Br.") served by Lead Plaintiffs Jeffrey Gabbert, Nuggehalli Nandkumar, and David Truong ("Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs' surviving securities claims center around six statements about Novavax's efforts to bring its COVID-19 vaccine to market at the height of the pandemic, all of which were made in a four-month window between May 2021 and September 2021—namely:

- Erck's statements on Novavax's May 10, 2021 Earnings Call that (i) "nearly all of the major challenges have been overcome and we can clearly see the light at the end of the tunnel," (ii) that "we made a big breakthrough" on developing a potency assay that "told the same story across all the sites" and "we're now racing towards validating everything and putting it into a package," (iii) that "all of our manufacturing sites [are] producing GMP material at scale," and (iv) that "we've eliminated all of the . . . risk hurdles to getting to where we need to be to get an improved vaccine";

- Erck's comment in an August 5, 2021 *Reuters* Interview that "[w]e appear to have got past (certain) supply issues and are now being able to produce at scale"; and

- Trizzino's comment at a September 29, 2021 Healthcare Conference that the Company had "resolved" certain "challenges" with the Company's purity and potency assays.

*See* Compl. ¶¶ 178–181, 198, 204. Plaintiffs contend that all six of these statements were false for the same reason: that they purportedly omitted details of certain *manufacturing* challenges that Novavax was encountering at the time of the statements in 2021, including alleged plant shutdowns and difficulties in developing working assays to test the purity and potency of the vaccine. This timeframe and these topics are appropriate guides to the proper scope of discovery in this case.

---

[1] Plaintiffs' motion papers inaccurately characterize Gregory F. Covino and Gregory M. Glenn as defendants. *See, e.g.*, Br. 1. Neither Glenn nor Covino are defendants after the Court dismissed all claims against them. *See Sinnathurai v. Novavax, Inc.*, 2022 WL 17585715, at *24 (D. Md. Dec. 12., 2022) (the "MTD Order").

Defendants have already agreed to provide Plaintiffs with expansive discovery on their surviving claims.  Specifically, prior to Plaintiffs' filing their Motion, Defendants had already agreed (i) to collect and review documents from seventeen custodians, including Defendants Erck and Trizzino and 15 other employees responsible for overseeing the manufacturing efforts at the center of Plaintiffs' allegations; (ii) to provide discovery dating back to November 2020 for all of Plaintiffs' many unobjectionable document requests, more than six months before the beginning of the putative Class Period[2]; and (iii) to provide post-Class Period discovery until December 31, 2021, roughly two-and-a-half months after the putative Class Period's end, to provide context for Defendants' alleged conduct during the Class Period.  Defendants have negotiated in good faith a scope of discovery that balances Plaintiffs' need to investigate their case with the burdens imposed on Defendants in collecting, reviewing, and producing that discovery.

In this context, Plaintiffs' accusation that Defendants have been "tak[ing] intractable positions on a number of important issues" rings hollow.  Br. 3.  Defendants have merely opposed Plaintiffs' attempts to expand discovery in this case massively beyond the timeframe and topics on which Plaintiffs' surviving claims rest, based on dismissed claims concerning clinical trials and other dubious relevance justifications.  The reality is that Defendants have agreed to numerous compromises and made many reasonable concessions to provide Plaintiffs with the discovery that they need, as the correspondence attached to Plaintiffs' Motion makes clear.  Despite those efforts, Plaintiffs have flatly refused to make reasonable compromises on key issues.

To begin, Plaintiffs cannot explain how expansive discovery on clinical trials is needed here where none of the challenged statements has anything to do with the progress or results of

---

[2] The putative Class Period runs from May 10, 2021, through October 19, 2021, inclusive. Capitalized terms not otherwise defined have the same meanings as in Defendants' discovery responses and their correspondence with Plaintiffs.

clinical trials.   Plaintiffs also make wildly unreasonable demands regarding the number of custodians, insisting that they are somehow entitled to documents from over thirty different people—effectively double the already large number to which Defendants have agreed—simply because they perceive this case to be a "significant" one.   But Plaintiffs offer nothing justifying their talismanic treatment of this number, nor do they provide specific bases for the additional custodians they seek, despite having received detailed descriptions of each's role and responsibilities.   Plaintiffs also have not explained or been compromising on their demand for over two years' worth of post-Class Period discovery, effectively quadrupling the relevant time period. Having already been offered a significant number of custodians over a time period more than twice the length of the Class Period itself, Plaintiffs nonetheless demand ever more.

There is also much in the Motion that is premature.   Plaintiffs conjure up disputes where there are none, repeatedly seeking productions that Defendants have already agreed to provide. Rather than identifying concrete, defined topics on which Defendants have refused to provide any discovery, Plaintiffs instead speculate that they need more information than the copious amounts Defendants have already agreed to provide.   But as of the date of this brief, Defendants have not even begun producing documents, making it unclear why Plaintiffs are so certain those complained-of "gaps" exist in the first place.   Plaintiffs could have waited to receive Defendants' productions of agreed-upon discovery and then, if they believed that they required additional detail about specifically identified subjects, discussed with Defendants the possibility of running targeted searches for that information.   Instead, Plaintiffs have run to Court to complain that Defendants have not agreed to produce the overbroad discovery that Plaintiffs have demanded.   In doing so, Plaintiffs have no grounds to believe that they will not receive more than enough information about their claims from the significant productions Defendants have already agreed to make.

Plaintiffs' Motion should therefore be denied in its entirety.

3

**ARGUMENT**

I.    **DISCOVERY ON NOVAVAX'S CLINICAL TRIALS IS IRRELEVANT**

Plaintiffs' demand that Defendants provide sweeping information on Novavax's clinical trials overreaches the bound of relevant discovery. *See* Fed. R. Civ. P. 26(b)(1) (proposed discovery must be "relevant" to Plaintiffs' surviving claims). Plaintiffs seek to define the term "Manufacturing Standards" in their Requests to include "requirements as they relate[] to clinical trials to the extent that they are relevant to Novavax receiving EUA approval."[3] Br. 6. Plaintiffs similarly request that Defendants add to their document review multiple custodians whose primary responsibility involved clinical research or trials, *id.* at 8, 10, and that Defendants search for documents concerning clinical development plans in response to Request 16, *id.* at 24.

Novavax's clinical trials are irrelevant to the parties' surviving claims and defenses. The Court dismissed all of Plaintiffs' claims based on public statements about clinical trials, because Plaintiffs' fraud claims center exclusively on alleged *manufacturing* issues. *See* MTD Order, 2022 WL 17585715, at *12 ("All of Plaintiffs' allegations of non-compliance with FDA standards relate to manufacturing processes."); *id.*, at *16 ("Plaintiffs have not alleged that the clinical trial results did not show that the vaccine was safe and efficacious."). Plaintiffs allege only that two Company executives knowingly or recklessly made false statements about Novavax's ongoing efforts to manufacture NVX-CoV2373 at commercial scale. They assert no claims about the vaccine's performance in clinical trials, its efficacy in protecting against COVID-19, its design, or Novavax's administration or execution of the trials. Clinical trials and manufacturing are distinct elements of the vaccine development process: Novavax used the trials to confirm that the vaccine

---

[3] Plaintiffs ignore that their own definition of the term included only "applicable governmental or industry *manufacturing* standards"—and thus by its own language excluded regulations concerning clinical trials. *See* Ex. 3 at 6.

4

actually provided effective protection against COVID-19 and was properly designed. Separately, manufacturing efforts focus on mass-producing doses of the vaccine so that it could be commercially available once approved. None of the remaining challenged statements relate to the clinical trial phase of Novavax's vaccine rollout—and thus provide no basis for sweeping discovery related to clinical trials. *See D.J.'s Diamond Imports, LLC v. Brown*, 2013 WL 1345082, at *6 (D. Md. Apr. 1, 2013) (denying motion to compel interrogatory response where interrogatory "relate[d] solely to a claim that has already been dismissed"); *Deng v. N.Y. State Office of Mental Health*, 2015 WL 9450845, at *1–2 (S.D.N.Y. Dec. 23, 2015) (denying motion to compel discovery on dismissed theories because they were "not relevant to the surviving claims").

Plaintiffs justify their demands by pointing exclusively to one narrow allegation that survived the pleading stage: that Novavax's EUA submission was delayed by difficulties producing enough doses to run certain clinical trials. *See, e.g.*, Br. 3–4, 6–8, 10, 12, 17. But Defendants ***have already agreed to produce*** any documents concerning those alleged trial-dose shortages—and conveyed as much multiple times in their correspondence. *See* Ex.[4] 7 at 9; Ex. 9 at 5. Plaintiffs' allegation about the manufacture of trial doses does not entitle them to irrelevant discovery into any other facets of the Company's trials. Novavax's ability to *manufacture* doses for use in trials bears no relationship to such matters as how the vaccine performed in the trials or how the trials were administered or conducted—a distinction the Court also applied in its MTD Order. *See* MTD Order, 2022 WL 17585715, at *16 ("[T]he fact that Novavax was experiencing shortages of vaccine doses for use in clinical trials, if true, does not render Erck's statements on the successful results of trials that were completed false or misleading."). Since Defendants have already agreed to provide the only clinical trial information that Plaintiffs can identify as relevant

---

[4] Citations to "Ex." refer to the exhibits attached to Plaintiffs' Motion.

to their surviving claims, their motion to compel further discovery on that subject should be denied.

*See* Fed. R. Civ. P. 26(b)(1); *In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prods. Liability Litig.*, 2018 WL 3079699, at *2 (D. Md. Jun. 20, 2018) ("Any discovery request that is not targeted at the plaintiffs' surviving claims . . . is irrelevant").

## II.   PLAINTIFFS HAVE NOT SHOWN THAT THEIR 13 ADDITIONAL CUSTODIANS WILL PROVIDE UNIQUE DISCOVERY THAT JUSTIFIES THE CONSIDERABLE COSTS OF ALMOST DOUBLING THE CUSTODIAN LIST

Defendants have already agreed to collect and review documents from seventeen custodians.  Yet Plaintiffs seek to nearly double this number, demanding an additional thirteen custodians beyond the seventeen that Defendants have agreed to provide—for a total of thirty custodians.  *See* Br. 8–12.  This appears to be a three-part strategy: (1) opening with a wildly overbroad demand, then (2) retreating to a still overbroad, yet less extremely so, demand, and (3) calling that new position "reasonable."  Plaintiffs initially proposed 43 custodians, many of which were plainly irrelevant to their surviving claims.  For example, Plaintiffs sought documents from Novavax's Chief HR Officer and various corporate finance professionals, whose roles have no relationship whatsoever to the alleged manufacturing issues underlying Plaintiffs' case.  *See* Ex. 5 at 3.  Plaintiffs then offered to "compromise" at thirty custodians by eliminating the patently irrelevant names.  *See* Ex. 6 at 3.  On their side, Defendants voluntarily doubled their initial list to offer a total of seventeen names.  Defendants repeatedly explained that they believe the existing seventeen custodians, who have comprehensive roles and responsibilities that cover the manufacturing and regulatory issues alleged in the Complaint.  Defendants also expressed that they were willing to consider a reasonable number of additional custodians if Plaintiffs explained why they could be expected to yield ***unique***, relevant information whose benefits outweigh the burden of searching their files.  *See* Ex. 5 at 3, Ex. 7 at 6, Ex. 9 at 2.  Defendants even prepared detailed descriptions of the duties of Novavax personnel on Plaintiffs' list to facilitate these

6

discussions, including descriptions of the proposed custodians' roles, their place in reporting chains, and the reasons why Defendants believe discovery from those custodians would be irrelevant or not proportional to the needs of the case. *See* Ex. 5 at 4–7. And Defendants further explained why they expected the agreed-upon seventeen custodians to cover the vast majority of information that Plaintiffs seek from the additional thirteen custodians on their list. *See* Ex. 9 at 2.

Plaintiffs now argue they are entitled to thirty custodians simply because of the supposed magnitude of their damages claims as Plaintiffs calculate them. But claiming significant damages does not permit Plaintiffs to demand some large number of custodians, regardless of their ability to justify the need for each and every additional custodian specifically. Even if relevant, Plaintiffs' additional custodians must be of sufficient importance to the case to outweigh the burden and expense of collecting and reviewing their files. *See* Fed. R. Civ. P. 26(b) (scope of discovery must properly account for whether "the burden or expense of the proposed discovery outweighs its likely benefit"); *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 188–89 (4th Cir. 2019) (proportionality requirement "relieves parties from the burden of taking unreasonable steps to ferret out every relevant document"). To that end, Plaintiffs must "demonstrate that the additional requested custodians would provide *unique* relevant information not already obtained," and that the benefits of that information would outweigh the costs of searching for it. *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 106–07 (S.D.N.Y. 2013) (emphasis in original).

Plaintiffs did not seriously attempt to do so before they served their Motion on Defendants, even after Defendants provided ample information about the disputed custodians. Instead, they simply demanded more custodians that they claimed were relevant. *Cf.* Fed. R. Civ. P. 26, 2015 Advis. Comm. Notes.("A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues"). According to

Plaintiffs, they needed information from "lower-level" custodians to obtain an adequate "level of detail" about the manufacturing-related omissions alleged in their Complaint. *See, e.g.*, Br. 12. Beyond the fact that Plaintiffs have no basis to assume that the already-offered productions are inadequate, they have never articulated why, even if relevant, obtaining more granular detail would be proportional to this case's needs. Fed. R. Civ. P. 26(b)(1); *Jordan*, 921 F.3d at 188–89. Plaintiffs have not explained why information held by low-level employees is necessary to probe whether the challenged statements at issue in this case were knowingly false or misleading. Plaintiffs' claims center on whether certain of Defendants' statements were rendered false by omitting information about, for example, plant shutdowns or the status of the Company's validation of its assays; they do not need extremely granular discovery from all levels of the Company to determine whether or not those issues persisted at the time the challenged statements were made. Nor does the technical information held by the lower-level employees speak to what *Erck and Trizzino* knew about those alleged issues when they spoke.

Now, for the first time, Plaintiffs claim that the additional 13 custodians will fill purported "gaps" in Defendants' eventual productions. *See* Br. 8. These gaps do not exist. For example, Plaintiffs urge that they need additional custodians to capture "the extent of the problems at the NC and TX Facilities" and "the extent of the Company's problems meeting U.S. regulators' requirements." *See* Br. 8, 10. They also suggest that Defendants "do not propose any custodian responsible for manufacturing facilities." *See* Br. 3–4, 10. In fact, Defendants offered numerous individuals directly responsible for day-to-day oversight of the manufacturing issues that Plaintiffs discuss in their brief, including oversight and management of the Texas- and North Carolina-based

third-party manufacturing facilities (or CDMOs[5]) that "underlie most [of] the Complaint['s] allegations." *Id.* Those individuals include:

- Stanley Erck, President & CEO;

- Rick Crowley, Executive Vice President, COO;

- Brian Webb, Senior Vice President, Global Manufacturing Operations;

- Madeline Fisher, Vice President, Quality Operations & CDMO Quality;

- Patty Reed, Vice President, Clinical Operations;

- Nancy Nidel, Senior Director, Drug Product Manufacturing; and

- John Kutney, Senior Director, Manufacturing.

Plaintiffs never explain how these custodians' files will provide insufficient insight into the issues alleged in the Complaint. Plaintiffs offer a conclusory assertion that they need "at least one lower-level custodian to capture information concerning the extent of the problems at the NC and TX Facilities," Br. 10, but they ignore that Defendants have provided *two* Senior Directors with directly relevant roles.[6] Such inaccurate, conclusory characterizations of the agreed custodians do not justify expanding the list.

Likewise, Plaintiffs contend that they need additional custodians relevant to "the relationship between Novavax and its regulators." *See* Br. 8–9. Relevant, proportionate discovery has already been offered that meets this need. Specifically, Defendants have offered multiple custodians with responsibility for regulatory submissions, compliance, and communications.

---

[5] That is, a third-party contract development and manufacturing organization, such as the FUJIFILM facilities in Texas and North Carolina.

[6] Plaintiffs wrongly contend that Defendants offered only "Novavax's highest-level executives" as custodians. Br. 8. In fact, Defendants offered numerous Senior Vice Presidents, Vice Presidents, and Senior Directors who were directly responsible for day-to-day manufacturing issues that Plaintiffs discuss in their brief. *See* Ex. 5 at 2.

Those individuals include:

- Stanley Erck, President & CEO;

- Filip Dubovsky, Executive Vice President, Chief Medical Officer;

- Gregory Glenn, President of Research & Development;

- Henrietta Ukwu, Senior Vice President, Regulatory & Quality Officer;

- Kathleen Callahan, Vice President, Regulatory Affairs; and

- Patty Reed, Vice President, Clinical Operations.

Again, Plaintiffs did not articulate during the meet-and-confer process why these custodians are inadequate to investigate "the relationship between Novavax and its regulators" or the supposed "extent of the Company's problems meeting U.S. regulators' requirements." *See* Br. 8–9.

Plaintiffs are also mistaken that Defendants have not proposed "any custodians with insight into supply chain issues." Br. 9. Defendants offered Rick Crowley, the Company's current COO and the executive in charge of the Company's supply chain structure and employees, as well as Brian Webb, the Company's Senior Vice President for Global Manufacturing Operations, who also oversaw supply-chain management efforts. And of course, to the extent supply chain–related information is relevant to Plaintiffs' claims, Defendants would expect that information to appear in the files of manufacturing personnel. Plaintiffs claim that supply chain disruptions caused manufacturing scale-up delays, an issue that would have been discussed and addressed by manufacturing personnel. Plaintiffs have not explained why their proposed additional custodians would provide unique discovery on top of those individuals. Plaintiffs now, for the first time, specify their reasons for demanding Jose Torres-Vorshirm—Novavax's former VP of Global Supply Chain & Strategic Sourcing—but Plaintiffs mischaracterize their allegations about him. Plaintiffs' Motion asserts that this employee "communicated with the FDA regarding inspections

of FUJIFILM facilities"—a claim Plaintiffs support by citing two Complaint paragraphs.  Br. 8, *citing* Compl. ¶¶ 97–98.  But the Jose Torres mentioned in the Complaint is not the same person as the Jose Torres-Vorshirm whose documents Plaintiffs demand; the Complaint's Torres is an employee of third-party FUJIFILM.[7]

Finally, Plaintiffs seek to add several custodians purportedly responsible for clinical trials. *See* Br. 10.  But as discussed above, "clinical trials" in general are not relevant to this lawsuit and are thus fall outside the scope of permissible discovery. There is only one, narrow clinical trial-related issue alleged in the Complaint:  whether Novavax struggled to manufacture enough doses to run certain trials. *See supra* at 5.  The custodians already offered by Defendants are the most proportional source of relevant information on this topic.  Plaintiffs have identified no other clinical trial-related issue relevant to their surviving claims—let alone an issue that would justify adding custodians responsible solely for overseeing clinical trials.

At bottom, Plaintiffs' demands for additional custodians are based on unsupported speculation that they *might* need greater detail about certain manufacturing issues.  Such baseless speculation does not justify the burden of *doubling* the (already large) number of custodians whose files Defendants will collect and review—a burden that is obvious on its face. *See Fort Worth Emps.*, 297 F.R.D. at 107 (denying motion to compel additional custodians where plaintiffs "provid[ed] no evidence that there are unique responsive documents . . . that would justify the inclusion of additional custodians").  Quite simply, Plaintiffs filed their motion to compel without any actual basis for the sweeping, burdensome demands they have made.  Before accusing

---

[7] *See* Compl. ¶¶ 97-98; *compare* LinkedIn Profile of Jose Torres, VP of Quality Operations at FUJIFILM, *available at* https://www.linkedin.com/in/jose-torres-b103b17/, *with* LinkedIn Profile of Jose Torres-Vorshirm, former VP of Global Supply Chain & Strategic Sourcing at Novavax, *available at* https://www.linkedin.com/in/jose-torres-vorshirm-31a32b40.

Defendants of gaps in their as-yet-unmade productions, or claiming that Plaintiffs needed more information about specific technical matters, Plaintiffs should have waited for the results of the comprehensive, substantial document review that Defendants have already agreed to perform.  If, after receiving and evaluating Defendants' productions for the seventeen agreed custodians, Plaintiffs can identify defined gaps in those productions, then Defendants will discuss whether additional custodians are appropriate.  *See, e.g.*, *Hyles v. New York City*, 2016 WL 4077114, at *1 (S.D.N.Y. Aug. 1, 2016) (ordering parties to start with productions for "agreed upon" custodians and noting that, after review of the initial productions, it might be appropriate to run "targeted searches" of other custodians).  Since Plaintiffs currently cannot identify a single actual gap in Defendants' custodians, Plaintiffs' request to nearly double the list is clearly premature, unsupported, and improper as it fails to meet the relevance and proportionality threshold on its face.

## III.   PLAINTIFFS' PROPOSED DATE RANGES BEAR NO CONNECTION TO THEIR SURVIVING CLAIMS

Defendants have agreed to review and produce documents from a timeframe more than double that of the Class Period itself, starting approximately six months before and going another two months after.  Regardless, Plaintiffs seek to massively expand that period, all while offering no explanation for why the additional period will yield documents relevant to the parties' surviving claims and defenses and proportional to the case's needs.

The discovery provided by the lengthy agreed time period will give Plaintiffs more than adequate context for their surviving claims.  Plaintiffs challenge public statements about the ***then-current*** state of Novavax's manufacturing efforts in May, August, and September 2021.  In an attempt to paint these statements as false or misleading, Plaintiffs alleged very specific manufacturing problems that even Plaintiffs claim arose and existed in 2021 when the challenged

12

statements were made—for example, contamination issues at the Texas and North Carolina facilities, and issues validating assay protocols or achieving certain purity and potency levels in manufactured doses. To prove their claims, Plaintiffs must demonstrate that the alleged problems existed in May, August, and September 2021, when the statements were made, and that the speaking executives knew about or recklessly disregarded the problems when they assured investors that challenges had been overcome or facilities were producing at commercial scale. Plaintiffs have consistently failed to explain why documents created a year or more before those challenged statements or many months or even years after would have sufficient bearing on these surviving claims and defenses to justify the considerable collection and review costs.

### A.  Plaintiffs' Demand for Two Years of Post-Class Period Discovery

Plaintiffs insist that the relevant discovery period should run through the present, nearly *two years* after the end of the putative Class Period in October 2021. *See* Br. 19–21. This would require Defendants to produce post-Class Period discovery from an additional period *quadruple* the length of the five-month Class Period. Defendants have offered compromises on the Relevant Period's end date, including their latest agreement to review documents through the end of 2021, a month and a half after this litigation was filed. And Defendants have expressed a willingness to consider adding an additional month or two if Plaintiffs could explain the need. But Plaintiffs have refused to negotiate or propose any compromise short of their demand for two years of additional documents. More to the point, Plaintiffs have failed to offer any compelling explanation for why documents created many months or even years after the challenged statements would bear any relevance to the parties' surviving claims and defenses, much less why those documents' benefit to the case would outweigh the review burdens.

Plaintiffs suggest that they have shown a need for post-Class period documents that "bear directly on the falsity of [the challenged statements]," as though they had identified numerous,

specific categories of documents of particular relevance to their claims.  Br. 21.  Plaintiffs have done no such thing.  Plaintiffs offer a single, flimsy justification for seeking over two years of post-Class Period discovery:  that Defendants "no doubt investigated the claims in the [October 2021] *Politico* article" that marks the Class Period's end, and that this hypothetical investigation would "provide evidence demonstrating the existence of [manufacturing issues] during the Class Period."  Br. 20.  But Plaintiffs ignore that Defendants have already agreed to review documents created in the ***two and a half months*** following the article's publication.  That period includes the weeks before and after Novavax's release of statements and SEC filings refuting the article's claim that Novavax's EUA submission was at least a year away.  *See* Declaration of C. Thomas Brown ("Brown Decl."), Exs. A, B at 23 ("We expect to submit the complete regulatory package to the FDA by the end of 2021").  Plaintiffs' speculation about a single subject does not justify the burden of reviewing *almost two years'* worth of post-Class Period documents concerning *all* of Plaintiffs' requests.  *See In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *8 (C.D. Cal. Mar. 12, 2012) (rejecting post-class period discovery through the present where, as here, plaintiffs offered "little explanation" for why defendants "should be obligated to search for and produce documents created well after the Class Period"); *Topline Solutions, Inc. v. Sandler Systems, Inc.*, 2017 WL 1230817, at *5 (D. Md. Apr. 3, 2017) (Rule 26 does not provide "license to engage in an unwieldy, burdensome, and speculative fishing expedition").

Indeed, Plaintiffs' own Motion emphasizes that they are seeking discovery about every factor that impacted Novavax's ability to file its EUA application.  *See, e.g.*, Br. at 7–8, 14, 19, 24. Assuming for the sake of argument that all such discovery is relevant—a point Defendants' dispute—that would set the back end of discovery at ***January 31, 2022***, the day that Novavax announced that it had successfully submitted its EUA application to the FDA.  *See* Brown Decl. Exs. C, D at 5 ("In January 2022, we also submitted a request to the [FDA] for EUA of NVX-

14

CoV2373"). Even taking Plaintiffs' case theory at face value, there is ***still*** no cogent basis to require Defendants to provide two years of post-Class Period discovery.

Notably, Plaintiffs have never cited a single authority supporting such expansive discovery. Instead, Plaintiffs merely cite cases suggesting that post-class period discovery may be relevant in certain circumstances. *See, e.g.*, Br. 19, *citing In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005), *and In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 1812822, at *5 (S.D. Cal. May 6, 2021). Defendants have never disputed that general notion. Indeed, Defendants have agreed to provide two-and-a-half months of discovery after the putative Class Period to "give context" to Plaintiffs' allegations—exactly the sort of agreement that other Courts have found appropriate in securities cases. *Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 7180662, at *2 (N.D. Cal. Nov. 16, 2015) (ordering two-and-a-half months of post-Class Period discovery, compared to 18-month class period). Plaintiffs have utterly failed to identify any reason that they require more.

### B. Plaintiffs' Demands to Expand Pre-Class Period Discovery Dates for Requests 2, 12–14, 16, and 23

The parties have agreed on a general start date of November 1, 2020 for Defendants' document review, but Plaintiffs seek a March 1, 2020 start date for Requests 12, 13, 14, 16, and 23, and a June 1, 2020 start date for Request 2.[8] *See* Br. 13–18. The November 2020 start date aligns neatly with the manufacturing-centered fraud theory underlying Plaintiffs' allegations. Most notably, the November 2020 start date pre-dates by at least a month the beginning of the contamination issues alleged in the Complaint (which purportedly began in December 2020). *See* Compl. ¶¶ 47–48. The agreed time period also provides Plaintiffs with documents predating the

---

[8] Plaintiffs give themselves credit for "agree[ing] to narrow" the beginning of the Relevant Time Period from their initial start date of December 1, 2019. *See* Br. 13. In other words, in a case centered around statements made in 2021 about Novavax's manufacture of a COVID-19 vaccine, Plaintiffs sought documents from before the COVID-19 pandemic *even began*. Here again, Plaintiffs seek to credit themselves for retreating from an obviously unreasonable position.

first, May 2021 challenged statement by **over six months**.  The putative Class Period itself is only five months long and thus accounts for less than half of the time period offered by Defendants. Plaintiffs' demand to expand the time period even further—and for some of their broadest, most sweeping requests—again ignores these realities and rests on plainly inadequate justifications.

Plaintiffs cannot explain why thousands of emails from the pandemic's earliest months would have any bearing on claims focused on statements about the state of Novavax's manufacturing work a year later.  Indeed, the Complaint itself emphasizes that Novavax was operating in a context where crucial dynamics were changing "almost constantly."  Compl. ¶ 50. Facts about Novavax's then-nascent or even nonexistent manufacturing efforts in early or mid-2020 would have little or no bearing at all on the state of those efforts a year or more later. Plaintiffs have failed to justify the considerable burden of the expansive review they seek.  *See Parker v. Ciena Corp.*, 2017 WL 2364291, at *2 (D. Md. May 30, 2017) ("Measuring Plaintiff's requested compelled discovery 'against the yardstick of proportionality' . . . clearly demonstrates that Plaintiff's motion to compel demands discovery that is not proportional to his claim.").

**Request 2 (June 1, 2020)**: This Request seeks "[a]ll Documents Concerning the Company's requirement and ability to scale up production of Novavax's Covid-19 Vaccine Candidate . . . as well as Novavax's ability to meet such scalability requirements . . . ." Ex. 3 at 13. This is a massive, sweeping category of documents.  During 2020 and 2021, the entire Company was focused almost exclusively on launching its COVID vaccine to end a global pandemic.  Yet for this same period, Plaintiffs ask Defendants to collect from seventeen custodians (including a half-dozen with manufacturing-focused roles)—and then review—every document that talks about the Company's efforts to scale up its COVID-vaccine manufacturing capabilities.  Defendants have already agreed to conduct that review over a **13-month** period.  That review will provide expansive discovery about Novavax's manufacturing efforts over the six months preceding the

16

earliest statements challenged in Plaintiffs' complaint, the nine months preceding the next, and the ten months preceding the last.  But Plaintiffs now baselessly demand an additional *five* months of discovery (dating back to June 2020).

Plaintiffs cannot explain why additional documents from pre-November 2021 are relevant, much less important enough to justify the obvious and considerable burdens of the additional review.  Plaintiffs made no allegations in their Complaint (or Motion) that suggested there existed before November 2020 any manufacturing problems that would have rendered one of the surviving challenged statements knowingly or recklessly false when made.  Plaintiffs claim only that the additional months "will show that Defendants knew early in the process that Novavax lacked the ability to meet scalability requirements." *Id.*  But Plaintiffs fail to explain why those alleged facts are at all relevant to challenged statements made a year or more later—let alone why the alleged facts would be sufficiently probative of Plaintiffs' claims to justify the significant burden of adding another five months to an already lengthy time period.  Any supposed doubts in 2020 about Novavax's ability to scale up production would have little if any relevance to statements about the status of Novavax's manufacturing over a year later.  As the Complaint concedes, Novavax was operating in a dynamic environment that was changing "almost constantly."  Compl. ¶ 50.  Plaintiffs have utterly failed to identify any nexus between their claims' elements and any initial views that Novavax might have had about scaling its manufacturing in early or mid-2020.

Plaintiffs have also provided no compelling explanation of their requested discovery's benefits to justify the considerable burdens it imposes.  Fed. R. Civ. P. 26(b)(1); *Jordan*, 921 F.3d at 188–89.  Plaintiffs' desire to try to show early doubts about Novavax's scaling abilities does not justify their demand that Defendants review thousands of additional emails that predate the challenged statements by a year.  If they wish, Plaintiffs can try to explore these purported early doubts through much less burdensome means, such as deposition testimony.  But they have failed

to justify the significant document-review expansion that they seek. *See Parker*, 2017 WL 2364291, at *2 (discovery must be measured against "the yardstick of proportionality").

**Requests 12–14 (March 1, 2020):** For Requests 12 and 13, Plaintiffs seek "agreements and contracts with which Novavax had to comply to successfully obtain an EUA" dating back to March 1, 2020. Br. 14. For Request 14, Plaintiffs demand "agreements between Novavax and the [Texas], [North Carolina], and other Manufacturing Facilities in connection with the manufacturing of the Vaccine Candidate." Br. 15–16. But Defendants have already agreed to provide Plaintiffs with those contracts, regardless of date. *See* Ex. 7 at 9; Ex. 9 at 4 n.3—as well as documents related to the contracts from the agreed 13-month time period. It is false that Defendants have refused to produce "any documents" from prior to November 2020. Br. 14.

As to Requests 12 and 14, Plaintiffs' Motion seeks contracts that Defendants have already agreed to provide. Plaintiffs have thus waived any arguments for all pre-November 2020 documents related to those contracts. *Testerman v. Proctor & Gamble M'fing Co.*, 2015 WL 5719657, at *12 n. 17 (D. Md. Sept. 29, 2015). In any case, for Requests 12, 13, and 14, Plaintiffs have not explained why the considerable burden of searching and producing those pre-November 2020 documents would be justified. Plaintiffs claim to want to understand the requirements that Novavax had to "comply" with "to successfully obtain an EUA," Br. 14, and FUJIFILM's and Novavax's respective rights and obligations under their contracts, *see* Br. 16 (contracts are allegedly necessary because they "define FUJIFILM's obligation to notify Novavax of [OOS deviations]" and "address FUJIFILM's responsibility to cure deficiencies at facilities," among other obligations). But the contracts spell out those requirements on their face, and Defendants have already agreed to produce all documents about the contracts from November 2020 onwards— the period relevant to Plaintiffs' surviving claims. By their own admission, Defendants have provided Plaintiffs with all the documents they require.

18

**Request 16 (March 1, 2020):** Plaintiffs claim to need an additional ***eight months*** of documents responsive to this Request to "demonstrate the severity of the problems at the Manufacturing Facilities" and show "Defendants' expectations at the start of the vaccine development process." Br. 17. Plaintiffs' demand first fails because Request 16 seeks plainly irrelevant documents concerning clinical trials. The Complaint emphasizes that a clinical development plan is "the blueprint of the entire clinical research strategy of a drug," Compl. ¶ 92 n.11—confirming such plans are unrelated to the manufacturing-related claims that survived Defendants' dismissal motion. Now unrelated to any surviving claim or defense, this Request exceeds the bounds of proper discovery. *See supra* at 4–6.

But even beyond that dispositive fact, Plaintiffs' basis for expanding the time period is inadequate. Plaintiffs make no effort to explain how clinical development plans (or similar documents) from before Novavax had even *begun to establish* a manufacturing apparatus could show the severity of purported manufacturing challenges that arose over a year later. Plaintiffs' Motion misrepresents their Complaint's substance when, for example, Plaintiffs claim that Paragraphs 184, 201, and 205 allege that "the lack of a clinical development plan was part of the reason Defendants could not scale up production." Br. 24. Those paragraphs make no mention of a clinical development plan at all, much less allege it played some role in manufacturing issues. Similarly, Defendants' earliest "expectations" about the vaccine development process have no bearing on the issues that Plaintiffs allege impacted Novavax's manufacturing efforts a year later and that were purportedly omitted from Defendants' challenged statements. *See* Br. at 17; *see also supra* at 13, 15. Having failed to justify the additional ***eight months*** of discovery that they seek, Plaintiffs' request for this expanded time period must be denied.

**Request 23 (March 1, 2020):** During the parties' discussions, Defendants offered to run a search term targeting formal investigations or examinations conducted by the U.S. Government

between July 2020 and the general discovery period's start on November 1, 2020.  *See* Ex. 9 at 4. Plaintiffs never responded to this compromise offer before filing their Motion.  In any event, it is entirely unclear how the U.S. Government's investigations or reviews in 2020 could or would show anything about the state of Novavax's manufacturing efforts a year later in May, August, and September 2021—when the surviving challenged statements were made.  Those statements described the then-present state of Novavax's manufacturing system and made no representations about historical facts.  Nor would the securities laws obligate Novavax to affirmatively disclose that the U.S. government allegedly was skeptical of the Company's ability to manufacture NVX-CoV2373 a year in the past.   Plaintiffs' sole relevance argument here appears to be that investigations from 2020 "undoubtedly" drove the FDA's spring 2021 investigations of the FUJI Texas and North Carolina facilities.  *See* Br. 18.  Plaintiffs' speculation that early 2020 FDA investigations existed, and that those investigations motivated later investigations in 2021, is wholly unsupported and conclusory.   And in any case, Plaintiffs' relevance argument is nonsensical:  the government would have inspected facilities in 2021 as part of Novavax's efforts to file its EUA, not to follow up on unspecified investigations conducted a year or more earlier, before Novavax had even begun to stand up its manufacturing apparatus.   Such tenuous, speculative relevance theories do not justify the eight-month expansion of the discovery period that Plaintiffs' demand.

## IV.    REMAINING DISPUTES CONCERNING SPECIFIC REQUESTS

Save for Plaintiffs' position on Request 16, which is addressed above in Section I, Defendants address Plaintiffs' remaining points in turn below.  *See* Br. 21–25.

**Request 8:** Plaintiffs claim to need training materials responsive to this request to investigate their allegation that Novavax relied on "inadequately trained" employees.  Br. 21.  As an initial matter, this request is overbroad on its face: it seeks training materials regardless of

subject, and would sweep in plainly irrelevant training materials such as, for example, materials covering sexual harassment policies or anti-bribery regulations and anti-kickback laws. Moreover, Defendants have already agreed to provide documents bearing directly on their "inadequate training" allegation: documents reflecting assessments of training materials' adequacy against U.S. Government regulatory requirements for the training provided to Manufacturing Facility employees. Plaintiffs have not explained why they require the training materials themselves, or why that production would be proportional to the case's needs. Plaintiffs' allegation about employee training is at best tangentially related to their claims, which focus on alleged contamination, purity, and potency issues at various facilities.

**Request 11:** Plaintiffs seek "all documents" concerning efforts by Novavax's competitors to develop a COVID-19 vaccine. *See* Br. 22. But Plaintiffs are not entitled to any and all documents concerning the development of other COVID-19 vaccines. Requiring Novavax to review "all documents" concerning any aspect of competitors' vaccine development efforts will almost certainly require Novavax to review large quantities of clearly irrelevant materials with no bearing on Novavax's purported need to beat its competitors to market. For instance, Plaintiffs have not explained their supposed need for documents discussing design characteristics of those competitors' vaccines or evaluating competitor-vaccines' clinical trial results. Defendants would be amenable to producing documents responsive to this Request if Plaintiffs can propose appropriately targeted search terms that would return only documents *specifically* pertaining to their allegations that Novavax "rushed" NVX-CoV2373 because of competition considerations. But so far, Plaintiffs have refused to narrow this Request or propose means of obtaining the requested information other than a broad email review of all competitor-related documents over 13 months and seventeen (even thirty) custodians. As Plaintiffs currently construe this Request, then, it is plainly overbroad and unworkable and seeks clearly irrelevant information.

21

**Request 13:** Plaintiffs assert a need for "all communications" concerning the government contracts sought by this Request, demanding documents concerning Novavax's "inability to fulfill" the scaling-related obligations in those contracts. *See* Br. 23-24. Defendants have already agreed to provide Plaintiffs with documents from between November 1, 2020, and December 31, 2021, concerning any requirement related to Novavax's scale-up of production capacity in response to Request 2. That agreed production will encompass the relevant documents sought by Plaintiffs' Request 13. The only unique discovery sought by Plaintiffs here is therefore entirely irrelevant to this case—for example, documents or communications relating to aspects of Novavax's government contracts that do not bear in any way on Novavax's scaling efforts, such as provisions governing the handling of classified information, data rights, or payment procedures.

## V.    DEFENDANTS DID NOT WAIVE THEIR BURDEN OBJECTIONS

Plaintiffs contend that Defendants waived their burden objections to the start date for certain requests and to producing documents from certain custodians. *See* Br. 11, 15, 16, 17. Plaintiffs argue that Defendants have not explained their burden objections with "specificity" or provided sufficient evidence to support their objections.

Plaintiffs are wrong on multiple fronts. To begin, Plaintiffs' own cited cases show only that parties waive discovery objections by responding to discovery requests with boilerplate language and without further explanation. *See Alston v. Equifax Information Servs., LLC*, 2015 WL 1807952, at \*2–3 (D. Md. Apr. 17, 2015) (finding waiver where defendant stated burden objections "using boilerplate language"); *Lynn v. Monarch Recovery Mgm't*, 285 F.R.D. 350, 356 (D. Md. 2012) (emphasizing that objections must be "non-boilerplate"). Defendants' objections were anything but boilerplate. Instead, Defendants amply explained the basis for their objections to Plaintiffs' massive custodian list and proposed time periods, both in their initial responses and their subsequent correspondence with Plaintiffs. *See* Exs. 4–5, 7, 9. In other words, Defendants'

objections are not "plainly deficient" as would be required for a waiver.  *Class Produce Grp., LLC v. Harleysville Worcester Ins. Co.*, 2018 WL 5892791, at *3 (D. Md. Nov. 9, 2018).

Plaintiffs also fault Defendants for not providing "evidence" to back up their burden claims.  But nothing in Fed. R. Civ. P. 34 or its comments suggests that Defendants needed to submit evidence of burden with their initial responses and objections or subsequent correspondence.  *See generally* Fed. R. Civ. P. 34.  Throughout the parties' meet-and-confers, Plaintiffs never once asked for the sort of burden evidence that they now claim was required.  Moreover, it is unclear what evidence Plaintiffs would have had Defendants produce at the meet-and-confer stage.  For example, Plaintiffs criticize Defendants for making what they call "conclusory assertions" about "increas[ing] the document review pool."  *See, e.g.*, Br. 15.  But when the parties were disputing custodians and date ranges, there existed no document review pool from which Defendants could measure the impact of nearly doubling the custodians and tripling the months; even now, the parties are just beginning to meet and confer on search terms and other threshold discovery matters.  *See* Br. 3.  The parties only recently settled on a set of custodians and dates that Defendants could use to begin collecting documents; on July 18—the day that Plaintiffs served their Motion—the parties agreed to move ahead with collecting and producing documents for the seventeen agreed custodians.  Until after Plaintiffs had filed their motion, Defendants simply had no specific, concrete data from which they could provide a data-driven burden estimate.  And in any case, the burden imposed by Plaintiffs' demands is plain on the demands' face: doubling the custodian list and tripling the length of the relevant period would plainly add a large number of documents for Defendants to review, but not documents that would be likely responsive or relevant to the parties' surviving claims or defenses.  *See supra* at 6–18.

Moreover, it is unclear what evidence Plaintiffs would have had Defendants produce at the meet-and-confer stage.  For example, Plaintiffs criticize Defendants for making what they call

"conclusory assertions" about "increas[ing] the document review pool." *See, e.g.*, Br. 15. But when the parties were disputing custodians and date ranges, there existed no document review pool from which Defendants could measure the impact of nearly doubling the custodians and tripling the months. *See* Br. 3. The parties only agreed on July 18—the day Plaintiffs served their Motion— that Defendants would move ahead with collecting and reviewing documents for the seventeen agreed custodians. Even now, the parties continue to discuss whether Defendants will use search terms or technology assisted review ("TAR") tools, and to negotiate any specific search terms or TAR parameters. Those decision points will determine key variables for any cost estimate, such as the proportion of the collected documents subject to review and the scope of data processing and data hosting costs. Until after Plaintiffs had filed their Motion, Defendants simply had no specific, concrete data from which they could provide a data-driven burden estimate. And in any case, the burden imposed by Plaintiffs' demands is plain on the demands' face: doubling the custodian list and tripling the length of the relevant period would plainly add a large number of documents for Defendants to review, but not documents that would be likely responsive or relevant to the parties' surviving claims or defenses. *See supra* at 6–18.

Despite finding Plaintiffs' argument to be not well founded, Defendants are nonetheless providing with this Opposition certain basic, recently available statistics about the size of the parties' agreed document collection and about the estimated size of Plaintiffs' additional demands.[9] *See* Brown Decl. ¶¶ 3–4, 6, 8–9. For now, Defendants can only report the total number of documents captured by the parties' agreed custodian list and time period, and then roughly estimate the number of documents that would be captured by Plaintiffs' additional custodians and

---

[9] Even these basic statistics only became available very recently: the parties confirmed Defendants would begin collecting the agreed-upon custodians' documents on July 18 (the day Plaintiffs served their Motion), and Defendants only recently finished processing the files.

time periods—in both cases, before the application of any search terms or TAR tools. But even this basic data confirms what was apparent from the start: that Plaintiffs' demands would substantially expand an already large document review—necessarily imposing significant and unnecessary costs on Defendants. *See* Brown Decl. ¶¶ 4, 8–9 (the agreed date range for seventeen custodians yields 1,527,892 documents; the expanded date ranges and custodians Plaintiff proposes would increase that total by 1,618,446 documents, bringing the total to ***3,146,338*** documents). Defendants will gladly provide a declaration more precisely estimating the burdens and costs imposed by Plaintiffs' requests when the data necessary for such estimates becomes available; Defendants respectfully request the opportunity to submit such a declaration, if the Court deems such evidence necessary.

Plaintiffs' misplaced waiver arguments underscore a key flaw in their Motion: Plaintiffs demanded that Defendants double their custodians and triple their time period's length before Defendants had even begun collecting documents to review—let alone before Plaintiffs had seen initial document productions and determined that they had material gaps. Plaintiffs should have waited to serve their Motion until Defendants at least had collected and established their document review universe for the already agreed search parameters. Then, the parties could have had a more informed discussion about whether there exist any actual gaps in Defendants' comprehensive, already-offered discovery. Indeed, even if the discovery sought in Plaintiffs' Motion was in scope under Fed. R. Civ. P. 26(b)(1)—and it is not, for the reasons discussed above—the Court should limited that additional discovery under Fed. R. Civ. P. 26(b)(2)(C); as the discussion above shows, Defendants have already offered Plaintiffs' requested discovery from "other source[s] that [are] more convenient, less burdensome, or less expensive." *See* Fed. R. Civ. P. 26(b)(2)(C).

## CONCLUSION

For the reasons discussed above, Plaintiffs' Motion should be denied in its entirety.

25

Dated:  August 4, 2023

Respectfully submitted,

_____/s/_____

C. Thomas Brown
(admitted *pro hac vice*)
Peter L. Welsh
(admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Thomas.Brown@ropesgray.com
Peter.Welsh@ropesgray.com

Edward R. McNicholas
Bar No. 24833
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4779
Edward.McNicholas@ropesgray.com

Stefan P. Schropp
Bar No. 21699
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9938
Stefan.Schropp@ropesgray.com

*Counsel for Defendants*

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of August, 2023, I served a copy of the foregoing

*Defendants' Opposition to Plaintiffs' Motion to Compel Production of Documents* via e-mail upon:

James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
Philip J. Leggio
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com
pleggio@labaton.com

Brian Calandra
Jeremy A. Lieberman
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
bcalandra@pomlaw.com
jalieberman@pomlaw.com
esley@portnoylaw.com

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
(202) 408-4600
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

Lesley F. Portnoy
PORTNOY LAW FIRM
1800 Century Park East, Suite 600
Los Angeles, California 90067
(310) 692-8883


_____/s/_____
C. Thomas Brown

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiff,*<br><br>v.<br><br>NOVAVAX, INC., *et al.*,<br><br>*Defendants.* | Civil Action No. TDC-21-2910 |

**DECLARATION OF C. THOMAS BROWN
IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

1.      I am a partner at Ropes & Gray LLP and am representing Defendants Novavax, Inc., Stanley C. Erck, and John J. Trizzino ("Defendants") in the above-captioned action.  I have been admitted to practice *pro hac vice* before this Court for purposes of this action.  The facts set forth in this declaration are based on my personal knowledge and information provided to me by the attorneys and other professionals at Ropes & Gray working on this matter under my supervision.

2.      I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion to Compel Production of Documents.

**I.      DOCUMENT COLLECTION STATISTICS & ESTIMATES**

3.      Defendants have collected email PST files for the 17 custodians upon which the parties have agreed (the "Agreed Custodians").  Those files contain a total of 3,907,089 documents.

1

4.      Applying the parties' agreed date range of November 1, 2020, through December 31, 2021, yields a total of approximately 1,527,892 emails for these 17 Agreed Custodians.

5.      The precise size of the document set Defendants will review remains uncertain. As of the date hereof, the parties are still negotiating search terms and the application of technology assisted review ("TAR") to create Defendants' document review pool.  Among other topics, the parties continue to discuss whether Defendants will use search terms or TAR, or both, to create a population of documents for review.  At this time, then, Defendants cannot estimate what effect any actual or draft search terms or any TAR processes might have on this document set's size.  Defendants also continue to collect documents from non-email repositories.

6.      Based on collection results to date, and assuming an approximately even distribution of potentially responsive documents across all custodians subject to discussion in Plaintiffs' Motion,[1] Defendants estimate that Plaintiffs' 13 demanded additional custodians would add **approximately 1,168,388 emails** after applying the parties' agreed date range but before applying any search terms or TAR tools.  Defendants used the following formula to calculate this estimate:  (1,527,892 emails collected from the 17 Agreed Custodians / 17 Agreed Custodians) * 13 additional custodians demanded by Plaintiffs.

---

[1] Defendants have not yet collected files from the 13 additional requested but disputed custodians. Therefore, this number reflects only an estimate of the number of documents that these additional, disputed custodians' files would yield.  The approximate document figures are calculated based on the set of documents from each time period already collected from the 17 Agreed Custodians.  Specifically, the numbers are calculated by dividing the total number of documents from each time period for the Agreed Custodians by 17, and then multiplying the resulting number by 13 disputed custodians.  This estimation's precision could be affected by such variables as differences in the numbers of emails sent, received, or stored by custodians or custodians' employment dates.

7.    On this basis, Defendants estimate that all 30 custodians demanded by Plaintiffs would yield **approximately 2,696,280 total emails** within the parties' agreed date range, but before applying search terms or TAR tools.

8.    Plaintiffs also demand two expansions of the parties' agreed date range for Defendants' document review.

9.    **First**, Plaintiffs demand that Defendants expand the start date by 5-8 months for certain requests.  The Agreed Custodians yielded the following numbers of emails between the date ranges indicated, before applying search terms or any TAR processes:[2]

> i.   March 1 – October 31, 2020:  530,023 additional documents
>
> ii.  June 1 – October 31, 2020:  387,663 additional documents

10.    Based on these results for the Agreed Custodians, and assuming an equivalent distribution of Plaintiffs' 13 additional custodians' documents across custodians and across time, Defendants estimate that the 13 additional custodians demanded by Plaintiffs would add approximately the following numbers of documents over the indicated date ranges, before applying search terms or TAR processes:

> i.   March 1 – Oct. 31, 2020:  approximately 405,312 additional documents
>
> ii.  June 1 – Oct. 31, 2020:  approximately 296,448 additional documents

---

[2] Defendants are unable to precisely estimate the number of documents that earlier start dates would likely add to the set of documents Defendants would review.  Plaintiffs seek to expand the start date only for specific document requests, but Defendants do not yet know which search terms will correspond to those requests—or whether the parties will agree that Defendants may use search terms at all.  The parties continue to discuss these matters.  With those threshold variables unresolved, Defendants cannot estimate what proportion of the collected documents would be subject to review.  However, Defendants anticipate that an earlier start date would require Defendants to review a substantial portion of the estimated numbers provided here.  At least one of the requests for which Plaintiffs demand an earlier start date—Request 2—is among Plaintiffs' broadest requests.  This request also targets documents centrally related to a major corporate undertaking (scaling up COVID vaccine manufacturing capabilities) and to many custodians' central job responsibilities.

11.    Defendants thus estimate that all 30 custodians demanded by Plaintiffs would yield the following approximate numbers of documents over the indicated date ranges, but before applying search terms or TAR tools:

      i.    <u>March 1 – Oct. 31, 2020</u>:  approximately 935,335 additional documents

      ii.    <u>June 1 – Oct. 31, 2020</u>:  approximately 684,111 additional documents

12.    **Second**, Plaintiffs demand that Defendants expand the end date for their review by 19 months for all requests.

13.    The 17 Agreed Custodians yielded **1,807,750 documents** over the period of January 1, 2022, through the applicable document-collection dates.

14.    Based on these results for the Agreed Custodians, and assuming that the documents in the 13 disputed custodians' files are approximately equivalently distributed across the custodians and across time, Defendants estimate that the 13 additional requested custodians demanded by Plaintiffs would yield **approximately 1,382,397 documents** from the period of January 1, 2022, through the collection dates, before applying search terms or TAR processes.

## II.    <u>EXHIBITS TO OPPOSITION BRIEF</u>

15.    Attached hereto as Exhibit A is a true and correct copy of an article titled "Novavax expresses fresh confidence in its vaccine," published by *Politico* on October 20, 2021, and downloaded from the website Politico.com on August 4, 2023.

16.    Attached hereto as Exhibit B is a true and correct copy of certain pages excerpted from Novavax, Inc.'s Form 10-Q, filed with the United States Securities and Exchange Commission on November 5, 2021.

17.    Attached hereto as Exhibit C is a true and correct copy of a press release titled "Novavax Submits Request to the U.S. FDA for Emergency Use Authorization of COVID-19

4

Vaccine," published by Novavax Investor Relations on January 31, 2022 and downloaded from Novavax.com on August 4, 2023.

18.     Attached hereto as Exhibit D is a true and correct copy of certain pages excerpted from Novavax, Inc.'s Form 10-K, filed with the United States Securities and Exchange Commission on March 1, 2022.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.

Executed at Brookline, Massachusetts on August 4, 2023.

_____/s/_____

C. Thomas Brown (admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7464
Thomas.Brown@ropesgray.com

5

# EXHIBIT A

**CORONAVIRUS**

# Novavax expresses fresh confidence in its vaccine

In wake of report on manufacturing difficulties, the Maryland-based drug firm vowed to file for emergency-use authorization by the end of the year.



Researchers work on samples from the Novavax phase 3 Covid-19 clinical vaccine trial. | Karen Ducey/Getty Images

By **SARAH OWERMOHLE**, **ERIN BANCO** and **ADAM CANCRYN**
10/20/2021 10:10 AM EDT

   

Novavax on Wednesday issued a statement reinforcing its position that its vaccine will be ready for global use this year, following a POLITICO report on Tuesday that it had fundamental manufacturing issues that would delay its ability to contribute to the global fight against Covid-19.

The company said it plans to file "within the next couple weeks" in Europe, the United Kingdom, Canada, Australia and New Zealand and to file for emergency use in the U.S. by the end of 2021.

Advertisement

Novavax did not address the assertions of two people with direct knowledge of the company's processes that it has struggled to eliminate impurities in its vaccine production or that its tests for those vaccine batches had been inconsistent.

Following POLITICO's report Tuesday, Novavax's stock was down 24 percent at market's opening on Wednesday.

People familiar with the discussions told POLITICO that U.S. officials are skeptical that Novavax can resolve key production issues in the months ahead, presenting the latest hurdle in the global scramble to send more doses to low- and middle-income countries.

Novavax is expected to play a critical role in that effort. The company and its production partners pledged more than 1.3 billion doses to the international vaccine consortium The COVAX Facility, with hundreds of millions of shots expected this year.

"We are confident that our vaccine will soon play a significant role in the global COVID-19 vaccine arsenal, differentiated by its potential to help address two major issues slowing the world's ability to end the pandemic: global distribution challenges and vaccine hesitancy," President and CEO said Stanley Erck said in a statement.

Its manufacturing challenges come as COVAX struggles to hit its goals. The

**FILED UNDER:** VACCINATION, CORONAVIRUS, THE VACCINE RACE, NOVAVAX

coming from AstraZeneca and Pfizer.

## Breaking News Alerts

Sign up for POLITICO Breaking News Alerts to receive the latest updates in your inbox.

**EMAIL**

Your Email

**INDUSTRY**

Select Industry ▼

**SIGN UP**

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Use. You may unsubscribe at any time by following the directions at the bottom of the newsletter or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT                                    Recommended by Outbrain|

**The Actual Cost of a New Walk-In Shower May...**

KohlerSafeShowers.com

**Massachusetts Will Cover Cost to Install Solar Panel...**

Find out if you qualify. Get your free quote today!

EasySolar

**Vanguard vs. Fidelity vs. Schwab**

SmartAsset

**Average Retirement Savings: Are You Normal?**

SmartAsset

**Windows Users Didn't Know This Simple Trick To Block...**

Safe Tech Tips

**See Search Results For Top New Device For Sleep Apnea**

Yahoo! Search

# EXHIBIT B

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## Form 10-Q

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
      **For the quarterly period ended September 30, 2021**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
      **For the transition period from to .**

**Commission File No. 000-26770**

# NOVAVAX, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-2816046** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **21 Firstfield Road   Gaithersburg   MD** | **20878** |
| (Address of principal executive offices) | (Zip code) |

**(240) 268-2000**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, Par Value $0.01 per share | NVAX | The Nasdaq Global Select Market |

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes x No o

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes x No o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | x | Accelerated Filer | o |
| Non-accelerated filer | o | Smaller reporting company | o |
| Emerging growth company | o | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No x

The number of shares outstanding of the Registrant's Common Stock, $0.01 par value, was 75,608,073 as of October 31, 2021.

**NOVAVAX, INC.**
**TABLE OF CONTENTS**

|  |  | Page No. |
|---|---|---|
| **PART I. FINANCIAL INFORMATION** |  | 1 |
| Item 1. | Consolidated Financial Statements | 1 |
|  | Consolidated Balance Sheets as of September 30, 2021 (unaudited) and December 31, 2020 | 1 |
|  | Unaudited Consolidated Statements of Operations and Unaudited Consolidated Statements of Comprehensive Loss for the three and nine months ended September 30, 2021 and 2020 | 2 |
|  | Unaudited Consolidated Statements of Changes in Stockholders' Equity for the three and nine months ended September 30, 2021 and 2020 | 3 |
|  | Unaudited Consolidated Statements of Cash Flows for the nine months ended September 30, 2021 and 2020 | 5 |
|  | Notes to the Consolidated Financial Statements (unaudited) | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 33 |
| Item 4. | Controls and Procedures | 33 |
| **PART II. OTHER INFORMATION** |  | 34 |
| Item 1. | Legal Proceedings | 34 |
| Item 1A. | Risk Factors | 34 |
| Item 6. | Exhibits | 62 |
| **SIGNATURES** |  | 63 |

i

# EXHIBIT C

NEWS & MEDIA

# Novavax Submits Request to the U.S. FDA for Emergency Use Authorization of COVID-19 Vaccine

**January 31, 2022**

*- NVX-CoV2373 demonstrated overall efficacy of ~90% in PREVENT-19 clinical trial conducted during the emergence of variant strains*

GAITHERSBURG, Md., Jan. 31, 2022 /PRNewswire/ -- Novavax, Inc. (Nasdaq: NVAX), a biotechnology company dedicated to developing and commercializing next-generation vaccines for serious infectious diseases, today announced that it has submitted a request to the U.S Food and Drug Administration (FDA) for Emergency Use Authorization (EUA) for NVX-CoV2373, its protein-based COVID-19 vaccine candidate for immunization of individuals 18 year of age and older against SARS-CoV-2.

The request for EUA is based on the totality of pre-clinical, clinical and manufacturing-related (CMC) data provided to the agency, including results of two large pivotal clinical trials that demonstrated an overall efficacy of approximately 90 percent and a reassuring safety profile.

"We're extremely proud of the work of our teams and we look forward to FDA's review of our EUA request. We believe our vaccine offers a differentiated option built on a well-understood protein-based vaccine platform that can be an alternative to the portfolio of available vaccines to help fight the COVID-19 pandemic," said Stanley C. Erck, President and Chief Executive Officer, Novavax. "I'd like to also extend our thanks for the support of the U.S. Department of Health and Human Services and the U.S. Department of Defense for their partnership leading up to today's milestone of EUA request submission."

Novavax conducted two pivotal Phase 3 clinical trials: PREVENT-19 which enrolled approximately 30,000 participants in the U.S. and Mexico and published results in the**New England Journal of Medicine** *(NEJM)* and a trial with almost 15,000 participants in the U.K. which was also published in **NEJM**. In both trials, the vaccine demonstrated efficacy with a reassuring safety profile. Serious and severe adverse events were low in number and balanced between vaccine and placebo groups. The most common adverse reactions observed during clinical studies (frequency category of very common ≥1/10) were headache, nausea or vomiting, myalgia, arthralgia, injection site tenderness/pain, fatigue, and malaise. Novavax will continue to collect and analyze real-world data, including the monitoring of safety and the evaluation of variants, as the vaccine is distributed in authorized markets. As part of the PREVENT-19 trial, a booster study is ongoing to evaluate the safety and effectiveness of a third does of the vaccine, as well as a study in adolescents aged 12-17.

NVX-CoV2373 has been granted conditional authorization by multiple regulatory agencies worldwide, including the European Commission, and emergency use listing (EUL) from the **World Health Organization** (WHO), with additional filings currently under review.

**About NVX-CoV2373**
NVX-CoV2373 is a protein-based vaccine engineered from the genetic sequence of the first strain of SARS-CoV-2, the virus that causes COVID-19 disease. NVX-CoV2373 was created using Novavax' recombinant nanoparticle technology to generate antigen derived from the coronavirus spike (S) protein and is formulated with Novavax' patented saponin-based Matrix-M™ adjuvant to enhance the immune response and stimulate high levels of neutralizing antibodies. NVX-CoV2373 contains purified protein antigen and can neither replicate, nor can it cause COVID-19.

Novavax' COVID-19 vaccine is packaged as a ready-to-use liquid formulation in a vial containing ten doses. The vaccination regimen calls for 0.5 ml doses (5 mcg antigen and 50 mcg Matrix-M adjuvant) given intramuscularly 21 days apart. The vaccine is stored at 2˚- 8˚ C enabling the use of existing vaccine supply and cold chain channels. Use of the vaccine should be in accordance with official

recommendations.

Novavax has established partnerships for the manufacture, commercialization and distribution of NVX-CoV2373 worldwide. Existing authorizations leverage Novavax' manufacturing partnership with Serum Institute of India (SII), the world's largest vaccine manufacturer by volume. They will later be supplemented with data from additional manufacturing sites throughout Novavax' global supply chain.

**About the NVX-CoV2373 Phase 3 trials**

NVX-CoV2373 is being evaluated in two pivotal Phase 3 trials.

PREVENT-19, a trial in the U.S. and Mexico that enrolled almost 30,000 participants, achieved 90.4% efficacy overall. It was designed as a 2:1 randomized, placebo-controlled, observer-blinded study to evaluate the efficacy, safety and immunogenicity of NVX-CoV2373. The primary endpoint for PREVENT-19 was the first occurrence of PCR-confirmed symptomatic (mild, moderate or severe) COVID-19 with onset at least 7 days after the second dose in serologically negative (to SARS-CoV-2) adult participants at baseline. The statistical success criterion included a lower bound of 95% CI >30%. The key secondary endpoint is the prevention of PCR-confirmed, symptomatic moderate or severe COVID-19. Both endpoints were assessed at least seven days after the second study vaccination in volunteers who had not been previously infected with SARS-CoV-2. It was generally well-tolerated and elicited a robust antibody response after the second dose in both studies. Full results of the trial were published in the **_New England Journal of Medicine_** (NEJM).

A trial conducted in the U.K. with 14,039 participants was designed as a randomized, placebo-controlled, observer-blinded study and achieved overall efficacy of 89.7%. The primary endpoint was based on the first occurrence of PCR-confirmed symptomatic (mild, moderate or severe) COVID-19 with onset at least 7 days after the second study vaccination in serologically negative (to SARS-CoV-2) adult participants at baseline. Full results of the trial were published in **_NEJM_**.

PREVENT-19 is being conducted with support from the U.S. government, including the Department of Defense, the Biomedical Advanced Research and Development Authority (BARDA), part of the Office of the Assistant Secretary for Preparedness and Response at the U.S. Department of Health and Human Services (HHS), and the National Institute of Allergy and Infectious Diseases (NIAID), part of the National Institutes of Health (NIH) at HHS. BARDA is providing up to $1.75 billion under a Department of Defense agreement.

**About Matrix-M™ Adjuvant**

Novavax' patented saponin-based Matrix-M™ adjuvant has demonstrated a potent and generally well-tolerated effect by stimulating the entry of antigen-presenting cells into the injection site and enhancing antigen presentation in local lymph nodes, boosting immune response.

**About Novavax**

Novavax, Inc. (Nasdaq: NVAX) is a biotechnology company that promotes improved health globally through the discovery, development and commercialization of innovative vaccines to prevent serious infectious diseases. The company's proprietary recombinant technology platform harnesses the power and speed of genetic engineering to efficiently produce highly immunogenic nanoparticles designed to address urgent global health needs. NVX-CoV2373, the company's COVID-19 vaccine, received Conditional Marketing Authorization from the European Commission, Emergency Use Listing from the World Health Organization, Emergency Use Authorization in Indonesia and the Philippines, and has been submitted for regulatory authorization in multiple markets globally.

For more information, visit **www.novavax.com** and connect with us **LinkedIn**.

**Forward-Looking Statements**

Statements herein relating to the future of Novavax, its operating plans and prospects, its partnerships, the ongoing development of NVX-CoV2373, the scope, timing and outcome of future regulatory filings and actions, including Novavax' plans to supplement authorizations with data from the additional manufacturing sites in Novavax' global supply chain, the potential impact of Novavax and NVX-CoV2373 in addressing vaccine access, offering an alternative to existing COVID-19 vaccines, controlling the pandemic and protecting populations, and

the efficacy, safety and intended utilization of NVX-CoV2373 are forward-looking statements. Novavax cautions that these forward-looking statements are subject to numerous risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements. These risks and uncertainties include challenges satisfying, alone or together with partners, various safety, efficacy, and product characterization requirements, including those related to process qualification and assay validation, necessary to satisfy applicable regulatory authorities; difficulty obtaining scarce raw materials and supplies; resource constraints, including human capital and manufacturing capacity, on the ability of Novavax to pursue planned regulatory pathways; challenges meeting contractual requirements under agreements with multiple commercial, governmental, and other entities; and those other risk factors identified in the "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections of Novavax' Annual Report on Form 10-K for the year ended December 31, 2020 and subsequent Quarterly Reports on Form 10-Q, as filed with the Securities and Exchange Commission (SEC). We caution investors not to place considerable reliance on forward-looking statements contained in this press release. You are encouraged to read our filings with the SEC, available at **www.sec.gov** and **www.novavax.com**, for a discussion of these and other risks and uncertainties. The forward-looking statements in this press release speak only as of the date of this document, and we undertake no obligation to update or revise any of the statements. Our business is subject to substantial risks and uncertainties, including those referenced above. Investors, potential investors, and others should give careful consideration to these risks and uncertainties.

**Contacts:**

<u>Investors</u>
Novavax, Inc.
Erika Schultz | 240-268-2022
**ir@novavax.com**

Solebury Trout
Alexandra Roy | 617-221-9197
**aroy@soleburytrout.com**

<u>Media</u>
Ali Chartan | 240-720-7804
Laura Keenan Lindsey | 202-709-7521
**media@novavax.com**

SOURCE Novavax, Inc.

        

| Trial | Description | Trial Population | Status | Partners |
|---|---|---|---|---|
| Cov-Boost | • Heterologous boosting in previously vaccinated individuals<br>• NVX-CoV2373 is one of seven COVID-19 vaccines evaluated | n = 2,886<br>≥ 30 years<br>(n = 446 NVX-CoV2373 admin) | Enrollment Complete | • Led by University Hospital Southampton NHS Foundation Trust and other NIHR sites<br>• Supported by UK government VTF and Department of Health and Social Care |
| Com-COV2 | • Mixed vaccine regimens for primary vaccination<br>• NVX-CoV2373 is one of four COVID-19 vaccines evaluated | n = 1,072<br>≥ 50 years<br>(n = 359 NVX-CoV2373 admin) | Enrollment Complete | • Conducted by University of Oxford<br>• Supported by UK government VTF |
| Com-COV3 | • Mixed vaccine regimens for primary vaccination in adolescents<br>• NVX-CoV2373 is one of three COVID-19 vaccines evaluated | n ~ 360<br>12 – 16 years | Enrollment Ongoing | • Conducted by University of Oxford<br>• Supported by UK government VTF and NIHR |
| OCTAVE-DUO | • Evaluating third dose in participants with impaired immune systems due to lymphoid malignancies<br>• NVX-CoV2373 is one of three COVID-19 vaccines evaluated | n ~ 320<br>(n ~ 107 NVX-CoV2373 admin) | Enrollment Ongoing | • Led by University of Glasgow and University of Birmingham<br>• Supported by UK government VTF and UK Research and Innovation |

**NVX-CoV2373 Regulatory and Licensure**

We have completed multiple regulatory submissions and expect to complete additional filings. We are in constant discussions with regulatory authorities globally for our completed and anticipated submissions. We continue to work closely with governments, regulatory authorities, and non-governmental organizations in our commitment to ensuring equitable global access to our COVID-19 vaccine. Below is a summary and status of our regulatory processes through the date of filing this Form 10-Q.

In November 2021, in partnership with Serum Institute of India Pvt. Ltd. ("SIIPL"), we received emergency use authorization ("EUA") from the National Agency of Drug and Food Control of the Republic of Indonesia, or Badan Pengawas Obat dan Makanan, following the August 2021 regulatory submission made by SIIPL with our support. EUA was granted for our recombinant nanoparticle protein-based vaccine with our Matrix-M$^{TM}$ adjuvant, which will be manufactured and marketed in Indonesia by SIIPL under the brand name COVOVAX™. Indonesia contracted with SIIPL for the purchase of 50 million doses of COVOVAX™. This marks the first regulatory authorization worldwide of a protein-based COVID-19 vaccine based on Phase 3 clinical data demonstrating efficacy and a favorable safety profile.

In November 2021, we completed the rolling submission of all modules required by the EMA to support final regulatory review. The final step to complete the application in the European Union will be an invitation from EMA to file for conditional marketing authorization ("CMA").

In October and November 2021, we completed rolling regulatory submissions in key markets for NVX-CoV2373. We filed for CMA with the UK MHRA, leveraging our manufacturing partnership with SIIPL. Additionally, we filed for provisional approval with Australia's Therapeutic Goods Administration, authorization with Health Canada, and provisional approval with New Zealand Medicines and Medical Devices Authority and the WHO for emergency use listing ("EUL").

In partnership with SIIPL, in August 2021, for our COVID-19 vaccine that will be manufactured and commercialized with SIIPL, we filed regulatory submission for EUA with the Drugs Controller General of India, regulatory agencies in Indonesia and the Philippines, and EUL with the WHO. The grant of EUL by the WHO is a prerequisite for exports to numerous countries participating in the COVAX Facility, which was established to allocate and distribute vaccines equitably to participating countries and economies.

These filings mark the first protein-based COVID-19 vaccine submitted in these markets.

In the U.S, we are in continued discussions with the FDA about submission of our investigational new drug application for NVX-CoV2373. We continue to address and complete various Chemistry, Manufacturing and Controls ("CMC") requirements, which ensure that our manufacturing processes are in accordance with regulatory standards. As of November 2021, we validated the potency and purity of our assays and are in the final process of testing our product using these assays. We expect to submit the complete regulatory package to the FDA by the end of 2021.

23

# EXHIBIT D

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the fiscal year ended December 31, 2021**

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

   **For the transition period from    to    .**

Commission File No. 000-26770

# NOVAVAX, INC.

(Exact name of Registrant as specified in its charter)

| **Delaware** | **22-2816046** |
|---|---|
| *(State of incorporation)* | *(I.R.S. Employer Identification No.)* |

| **21 Firstfield Road,** | |
| **Gaithersburg, Maryland** | **20878** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: (240) 268-2000**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, Par Value $0.01 per share | NVAX | The Nasdaq Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act: Not Applicable**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant had elected not to use the extended transition period for complying with any new or revised financial accounting standards provide pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.    ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant (based on the last reported sale price of Registrants common stock on June 30, 2021 on the Nasdaq Global Select Market) was approximately $15,697,000,000.

As of February 21, 2022, there were 76,282,986 shares of the Registrant's common stock outstanding.

Documents incorporated by reference: Portions of the Registrant's Definitive Proxy Statement to be filed no later than 120 days after the fiscal year ended December 31, 2021 in connection with the Registrant's 2020 Annual Meeting of Stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K to the extent indicated herein.

**NOVAVAX, INC.**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | BUSINESS | 5 |
| Item 1A. | RISK FACTORS | 29 |
| Item 1B. | UNRESOLVED STAFF COMMENTS | 61 |
| Item 2. | PROPERTIES | 61 |
| Item 3. | LEGAL PROCEEDINGS | 61 |
| Item 4. | MINE SAFETY DISCLOSURES | 62 |
| | | |
| **PART II** | | |
| Item 5. | MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS | 63 |
| Item 6. | RESERVED | 64 |
| Item 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 64 |
| Item 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 76 |
| Item 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 76 |
| Item 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 76 |
| Item 9A. | CONTROLS AND PROCEDURES | 76 |
| Item 9B. | OTHER INFORMATION | 77 |
| Item 9C. | DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | 77 |
| | | |
| **PART III** | | |
| Item 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 77 |
| Item 11. | EXECUTIVE COMPENSATION | 78 |
| Item 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 78 |
| Item 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 78 |
| Item 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 78 |
| | | |
| **PART IV** | | |
| Item 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 78 |
| Item 16. | FORM 10-K SUMMARY | 85 |

**Item 1.   BUSINESS**

**Overview**

Novavax, Inc., together with our wholly-owned subsidiaries, Novavax AB and Novavax CZ, is a biotechnology company that promotes improved health globally through the discovery, development and commercialization of innovative vaccines to prevent serious infectious diseases. Our proprietary recombinant technology platform harnesses the power and speed of genetic engineering to efficiently produce highly immunogenic nanoparticles designed to address urgent global health needs.

The vaccine candidates in our near-term pipeline, including both our coronavirus vaccine candidate ("NVX-CoV2373") and our seasonal quadrivalent influenza vaccine candidate ("NanoFlu"), are genetically engineered, three-dimensional nanostructures of recombinant proteins critical to disease pathogenesis. NVX-CoV2373 has received provisional approval, conditional marketing authorization ("CMA") and emergency use authorization ("EUA") from multiple regulatory authorities globally. In January 2022, we also submitted a request to the U.S. Food and Drug Administration ("FDA") for EUA of NVX-CoV2373. We also advanced our NanoFlu Program vaccine program through a Phase 3 clinical trial, which demonstrated positive top-line results and achieved statistical significance in key secondary endpoints. Additionally, we are exploring a number of combination vaccine candidates including a COVID-Influenza combination vaccine currently in a Phase 1/2 clinical trial. We believe that our protein-subunit-based candidates elicit differentiated immune responses that may be more efficacious than naturally occurring immunity or other vaccine approaches. These vaccine candidates incorporate our proprietary saponin-based Matrix-M™ adjuvant to enhance the immune response and stimulate higher levels of neutralizing antibodies.

We were incorporated in 1987 under the laws of the State of Delaware. Our principal executive offices are located at 21 Firstfield Road, Gaithersburg, Maryland, 20878, and our telephone number is (240) 268-2000. Our common stock is listed on the Nasdaq Global Select Market under the symbol "NVAX."

**NVX-CoV2373 Regulatory and Licensure**

We have made substantial progress in advancing NVX-CoV2373 toward regulatory approvals. We have received several authorizations, which collectively have the potential to reach over six billion individuals, and we have completed additional regulatory submissions in other major markets. We are in active discussions with regulatory authorities and remain focused on seeking additional authorizations for NVX-CoV2373. We continue to work closely with governments, regulatory authorities, and non-governmental organizations in our commitment to facilitating equitable global access to our COVID-19 vaccine.

For the territories in which our vaccine has gained authorization, NVX-CoV2373 is marketed under the brand name of Covovax™ (manufacturing and commercialization by the Serum Institute of India Pvt. Ltd. ("SIIPL")) or as Nuvaxovid™ COVID-19 Vaccine (SARS-CoV-2 rS [Recombinant, adjuvanted]).

Through the date of filing this Annual Report on Form 10-K, the below is a summary of regulatory authorizations for NVX-CoV2373, the first protein-based COVID-19 vaccine to be approved for commercial use based on Phase 3 data:

5