**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiff,*<br><br>v.<br><br>NOVAVAX, INC., *et al.,*<br><br>*Defendants.* | Civil Action No. TDC-21-2910 |

**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND
<u>APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND................................................................................................... 3

ARGUMENT ........................................................................................................................ 4

I.     PLAINTIFFS ARE NOT ENTITLED TO A CLASS-WIDE PRESUMPTION OF
       RELIANCE AND THUS CANNOT SATISFY RULE 23(b)(3) ........................................ 4

       A.     Mr. Coffman's Analysis of the Fifth *Cammer* Factor—*i.e.*, Cause-and-
              Effect—Is Fundamentally Flawed and Should Be Disregarded ............................ 6

       B.     Plaintiffs Cannot Rely on the *Affiliated Ute* Presumption of Reliance................. 14

II.    DEFENDANTS HAVE REBUTTED ANY RELIANCE PRESUMPTION WITH
       EVIDENCE THE ALLEGED MISSTATEMENTS LACKED PRICE IMPACT ............. 15

       A.     The *Politico* Article Is Not a Valid Corrective Disclosure and Thus Provides
              No Basis for Inferring Price Impact..................................................................... 17

       B.     The August 5 Form 10-Q Provides No Basis for Inferring Price Impact from
              the May 10 Statements....................................................................................... 23

III.   PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(a) ......... 25

       A.     Mr. Nandkumar Is Atypical and Inadequate Because He Could Not Have
              Suffered Any Net Damages Across the Class Period ........................................... 26

       B.     Mr. Gabbert's Trading Activity Between May 11 and August 5 Renders Him
              Atypical and Inadequate .................................................................................... 30

       C.     Messrs. Truong & Nandkumar Lack an Adequate Understanding of the Case
              or Inclination to Control the Litigation................................................................ 33

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States.*,
  406 U.S. 128 (1972)......................................................................................................6, 14

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F. 4th 74 (2d. Cir. 2023) ................................................................................................21

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................................................... *passim*

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ..........................................................................................5

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ........................................................................18

*Cox v. Collins*,
  7 F.3d 394 (4th Cir. 1993) ...................................................................................................15

*Deiter v. Microsoft Corp.*,
  436 F.3d 461 (4th Cir. 2006) ...........................................................................................25, 26

*Di Donato v. Insys Therapeutics, Inc.*,
  333 F.R.D 427 (D. Ariz. 2019) .........................................................................................8, 10

*In re Enron Corp. Sec.*,
  529 F. Supp. 2d 644 (N.D. Tex. 2006) ..............................................................................33, 34

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) .........................................................................................23

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) ..............................................................................................4, 5

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
  141 S. Ct. 1951 (2021)............................................................................................ *passim*

*Gordon v. Sonar Cap. Mgm't LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015)..................................................................................26, 27

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ..............................................................................................4, 33

*Gurary v. Winehouse*,
 235 F.3d 792 (2d Cir. 2000)....................................................................................29

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014)..................................................................................5, 15, 16

*Harris v. Sand Canyon Corp.*,
 274 F.R.D. 556 (D.S.C. 2010) ................................................................................32

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ........................................................10

*In re Intuitive Surgical Secs. Litig.*,
 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ........................................................18

*In re Kosmos Energy Ltd. Sec. Litig.*,
 299 F.R.D. 133 (N.D. Tex. 2014) ..........................................................................35

*Krogman v, Sterritt*,
 202 F.R.D. 467 (N.D. Tex. 2001) .............................................................................5

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 299 F. Supp. 3d 430 (S.D.N.Y. 2018)....................................................................14

*Luczak v. Nat'l Beverage Corp.*,
 548 F. Supp. 3d 1256 (S.D. Fla. 2021) ............................................................31, 32

*In re Monster Worldwide, Inc. Sec. Litig.*,
 251 F.R.D. 132 (S.D.N.Y. 2008) ...........................................................................33

*Morris v. Wachovia Sec., Inc.*,
 223 F.R.D. 284 (E.D. Va. 2004) .......................................................................25, 33

*Passman v. Peloton Interactive, Inc.*,
 2023 WL 3195941 (S.D.N.Y. May 2, 2023) .......................................................25, 33

*Pirnik v. Fiat Chrysler Auto., N.V.*,
 327 F.R.D. 38 (S.D.N.Y. 2018) .............................................................................22

*In re PolyMedica Corp. Sec. Litig.*,
 453 F. Supp. 2d 260 (D. Mass. 2006) .......................................................................8

*Poulos v. Caesars World, Inc.*,
 379 F.3d 654 (9th Cir. 2004) .................................................................................15

*In re Qualcomm Inc. Sec. Litig.*,
 2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ........................................................19

*Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................................................................22

*S.E.C. v. Badian*,
822 F. Supp. 2d 352 (S.D.N.Y. 2011)........................................................................................14

*Shiring v. Tier Techs., Inc.*,
244 F.R.D. 307 (E.D.Va. 2007) .................................................................................25, 33, 35

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)................................................................................................................31

*Vladimir v. Bioenvision, Inc.*,
2007 WL 4526532 (S.D.N.Y. Dec. 21, 2007) ........................................................................28

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)..................................................................................................14, 15

*Wu v. MAMSI Life & Health Ins. Co.*,
269 F.R.D. 554 (D. Md. 2010)..................................................................................................25

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................................... *passim*

Pursuant to Federal Rule of Civil Procedure 23, Defendants Novavax, Inc. ("Novavax" or "the Company"), Stanley C. Erck, and John J. Trizzino (together, "Defendants") respectfully submit this Opposition to the Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Motion" or "Class Certification Motion" or "Br.") filed by Lead Plaintiffs Jeffrey Gabbert, Nuggehalli Nandkumar,[1] and David Truong ("Plaintiffs"). *See* ECF No. 85.[2]

## PRELIMINARY STATEMENT

Plaintiffs' Class Certification Motion, and the expert report of Chad Coffman on which it substantially relies, suffer from a fundamental defect in their attempt to invoke the fraud-on-the-market presumption set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). As Mr. Coffman himself testified, the event study he constructed to test the relationship between new information and the market price of Novavax's stock employed essentially the same parameters that he uses in every engagement to test price reaction to new information, and thus market efficiency. This rote approach is not sufficient to show market efficiency here. During the putative Class Period, Novavax was a monoline Covid vaccine company trading in a highly volatile market in the middle of a Covid pandemic. Yet the analysis offered by Plaintiffs and Mr. Coffman approaches Novavax no differently from the way one might evaluate trading in a multi-line company during a period of relative market stability. They make no attempt to consider, much less account for, unique features of Novavax and its trading environment. The result is a flawed study, insufficient to satisfy

---

[1] Mr. Nandkumar is bringing his own claims and was also assigned claims by his son, Shawn Kumar. *See* ECF No. 26-7. To avoid confusion, Defendants refer solely to "Mr. Nandkumar" throughout this brief, and not separately to his son.

[2] Citations to "¶__" refer to the Complaint (ECF No. 56). Citations to "Ex." refer to the Brown Declaration's remaining exhibits.

1

Plaintiffs' burden of demonstrating market efficiency. Without such a showing, Plaintiffs cannot rely on the fraud-on-the-market presumption set forth in *Basic*, and no class can be certified.

To evaluate Mr. Coffman's economic methodology and conclusions, Defendants engaged Dr. S.P. Kothari, a professor of accounting and finance at MIT's Sloan School of Management and the former Chief Economist and Director of the Division of Economic and Risk Analysis at the SEC. Prof. Kothari confirmed that Mr. Coffman's event study suffers from several methodological flaws that render its conclusions unreliable—not least because the study failed to consider several critical, unique market forces impacting Novavax's stock price movements during the relevant period. Consequently, as Prof. Kothari opines, Plaintiffs and their expert have failed to demonstrate that Novavax's stock traded in an efficient market—a necessary showing to satisfy Rule 23(b)'s requirement that common reliance issues predominate over individual ones.

Even if Plaintiffs could demonstrate market efficiency, Plaintiffs cannot show that Defendants' alleged misstatements had any impact on Novavax's stock price, a necessary showing at the class certification stage, under Supreme Court precedent. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021). Plaintiffs' case depends on inferring the statements' impact on Novavax's stock price from the back-end stock drop following alleged corrective disclosures. But here, none of the corrective disclosures alleged by Plaintiffs could have been *corrective* of earlier statements, meaning they cannot serve as proxies for front-end price impact. Most notably, the anonymously sourced *Politico* article that Plaintiffs allege as their key, final corrective disclosure was laden with incorrect and misleading information about Novavax's manufacturing efforts—as the market quickly recognized and Novavax itself promptly explained.

Finally, the three proposed class representatives all fail to satisfy Rule 23(a)'s independent requirements. Two Plaintiffs are inadequate and atypical because they were not harmed by the stock drops following Plaintiffs' alleged corrective disclosures, as Prof. Kothari's analysis

2

demonstrates.  And two are separately inadequate because lack an adequate understanding of the case.  The Court should therefore decline to certify this case for class treatment.

## FACTUAL BACKGROUND

Given the Court's familiarity with the factual allegations underlying this case, Defendants will not rehash them at length.  As relevant to their Class Certification Motion, Plaintiffs' surviving claims under Section 10(b) of the Exchange Act rest on six alleged misstatements made by Defendants Erck and Trizzino between May and September 2021:

- Erck's statements on a May 10, 2021 earnings call that:
    a. "nearly all of the major challenges have been overcome and we can clearly see the light at the end of the tunnel";
    b. "we made a big breakthrough" on developing a potency assay that "told the same story across all the sites" and "we're now racing towards validating everything and putting it into a package";
    c. "all of our manufacturing sites [are] producing GMP material at scale";
    d. "we've eliminated all of the . . . risk hurdles to getting to where we need to be to get an improved vaccine";
- Erck's comment in an August 5, 2021 *Reuters* interview that "[w]e appear to have got past (certain) supply issues and are now being able to produce at scale"; and
- Trizzino's comment at a September 29, 2021 healthcare conference that the Company had "resolved" certain "challenges" with the Company's purity and potency assays.

¶¶ 178–181, 198, 204; *see* Dkt. 75–76 (order granting in part, denying in part Defendants' dismissal motion).  Plaintiffs allege that these statements misrepresented the status of Novavax's efforts to manufacture its vaccine candidate—NVX-CoV2373—at commercial scale and omitted details about manufacturing challenges that Novavax was allegedly experiencing at the time.

Plaintiffs' proposed Class Period runs from May 11 through October 19, 2021—that is, from the first trading day following the first alleged misstatement through the date that *Politico* released an anonymously sourced article about Novavax's efforts to manufacture NVX-CoV2373. *See* Br. at 1–2 (citing ¶ 303).  According to Plaintiffs, the *Politico* article "revealed new

3

information" about the manufacturing efforts that caused Novavax's stock price to drop the following trading day. ¶¶ 251–52. Plaintiffs identify the article as the "Final Disclosure" that "fully revealed" the truth that Defendants' statements had supposedly concealed. ¶ 244. Plaintiffs also allege that certain statements in Novavax's August 5, 2021 Form 10-Q were "partial corrective" disclosures, specifically statements that "the U.S. government [would] not fund additional U.S. manufacturing until" Novavax had "align[ed] with the [FDA] on [the Company's] analytical methods." Br. at 10 (citing ¶ 144). Plaintiffs allege that these disclosures caused Novavax's stock to drop on August 6, 2021. *See* ¶ 238.

## ARGUMENT

Plaintiffs seek to certify a class pursuant to Rule 23(b)(3), *see* Br. at 18–29, and thus bear the burden of showing that the "numerosity, commonality, typicality, representativeness, predominance, and superiority requirements of both Rule 23(a) and (b)(3) are met." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 458 (4th Cir. 2003) (Niemeyer, J., concurring in part); *see Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). Plaintiffs fail to meet that burden. ***First***, Plaintiffs have failed to show that they are entitled to the rebuttable presumption of class-wide reliance recognized in *Basic*, which means that they cannot satisfy Rule 23(b)(3)'s predominance requirement. ***Second***, even if Plaintiffs were entitled to invoke *Basic*'s reliance presumption, that presumption is rebuttable, and Defendants have rebutted it with compelling evidence that the alleged misstatements lacked any impact on Novavax's stock price at the time that they were made. ***Third***, in any event, none of Plaintiffs Nandkumar, Truong, or Gabbert have satisfied the adequacy or typicality prongs of Rule 23(a).

## I.    PLAINTIFFS ARE NOT ENTITLED TO A CLASS-WIDE PRESUMPTION OF RELIANCE AND THUS CANNOT SATISFY RULE 23(B)(3)

To maintain a class action, Plaintiffs must establish that "questions of law or fact common

4

to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In a securities case, that requirement often turns on whether Plaintiffs are entitled to invoke the rebuttable presumption of class-wide reliance described in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988): that is, a presumption that all class members relied on Defendants' fraudulent statements, such that questions of reliance are common to all class members. *See also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*"). That presumption is based on the so-called "fraud-on-the-market" theory, which posits that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic*, 485 U.S. at 246. Evaluating whether the *Basic* presumption applies requires examining whether Novavax's stock traded in an efficient market throughout the Class Period, among other undisputed factors. *Gariety*, 368 F.3d at 363 ("Reliance can . . . be treated as a common issue [if] plaintiffs purchased their stock in an efficient market.").

Absent any presumption of reliance, however, "a Rule 10b-5 suit cannot proceed as a class action," because "[e]ach plaintiff would have to prove reliance individually" and "common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 281–82. Plaintiffs' Motion fails to carry its burden of establishing any such presumption. Plaintiffs attempt to demonstrate market efficiency through an analysis prepared by their expert, Chad Coffman. *See* ECF No. 85-4, Expert Report of Chad Coffman, CFA ("Coffman Rpt.") ¶¶ 24–77. This analysis considers various efficiency factors,[3] including the key factor of whether there exists a reliable cause-and-effect relationship between new company-specific information

---

[3] Mr. Coffman considered the "efficiency factors" described in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), as well as several additional factors. *See* Coffman Rpt. ¶¶ 20–23, 65, 72–77. Mr. Coffman's Report focuses primarily on the *Cammer* factors: (1) trading volume; (2) analyst coverage; (3) "market makers"; (3) SEC Form S-3 Eligibility; and (5) price reaction to new information.

5

and Novavax's stock price.  *Id.* ¶¶ 46–49.  But, as detailed by Defendants' expert, Prof. Kothari, the event study that Mr. Coffman uses to examine this cause-and-effect relationship—and therefore his conclusion that the relationship exists—is fundamentally flawed in several respects. *See* Decl. of C. Thomas Brown ("Brown Decl."), Ex. A, Expert Report of Dr. S.P. Kothari, Ph.D ("Kothari Rpt.") ¶¶ 31–87.  Plaintiffs also briefly but mistakenly argue that they are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States.*, 406 U.S. 128 (1972).  Br. at 26–27.  That presumption is inapplicable here, where Plaintiffs allege affirmative misstatements.  Plaintiffs thus fail to satisfy Rule 23(b)(3).

> **A.**    **Mr. Coffman's Analysis of the Fifth *Cammer* Factor—*i.e.*, Cause-and-Effect—Is Fundamentally Flawed and Should Be Disregarded**

Mr. Coffman opines that there exists a "clear cause-and-effect relationship between new public information about Novavax and the market price of Novavax Common Stock."  *See* Coffman Rpt. ¶ 48.  As explained below and further explained in Prof. Kothari's report, that conclusion is unreliable for a host of reasons.

To demonstrate the requisite cause-and-effect relationship, Mr. Coffman constructed an event study that examined how Novavax's stock responded on "news" days versus "no-news" days across an Analysis Period of May 11, 2020 through October 19, 2022.  *Id.* ¶¶ 25 n.28, 46–49, 52– 60 & Ex. 7; *see also* Kothari Rpt. ¶¶ 31–34.  Using this methodology, Mr. Coffman concluded that there was a statistically significant price movement on six out of ten earnings dates, and no statistically significant price movements on any of the 25 "no-news" dates.  *See* Coffman Rpt. ¶¶ 57, 59; *see also* Kothari Rpt. ¶ 35.  These results, Mr. Coffman suggests, demonstrate a cause-and-effect relationship.  Coffman Rpt. ¶¶ 48, 64; *see also* Kothari Rpt.  ¶ 35.  .

But Mr. Coffman's analysis is deficient in multiple respects.  Most fundamentally, Mr. Coffman used a cookie-cutter template to construct his event study.  At his deposition,

Mr. Coffman testified repeatedly that he never considered alternative parameters for his event study and relied instead on an approach that he uses in all (or almost all) of his matters.  Brown Decl. Ex. B, Tr. of Sept. 14, 2023 Deposition of Chad W. Coffman ("Coffman Tr.") at 60:22–61:6, 86:18–87:20.  He took that approach even though Novavax was operating in a historically unprecedented market environment in 2021:  it was developing and producing a novel vaccine— the Company's primary product—on an expedited basis at the height of a global pandemic, subjecting Novavax's efforts to extreme levels of market scrutiny and highly unusual market forces.  As a result, Novavax's stock returns throughout Mr. Coffman's Analysis Period were marked by high and unusual volatility and by excessive retail trading that contributed to that volatility.  *See* Kothari Rpt. ¶¶ 59, 63–68.  Yet, at his deposition, when asked whether he considered those factors, Mr. Coffman testified that, while he was "certainly aware" of Novavax's unique position, he has a "fairly standard approach to these types of analyses" and he chose to follow that approach with Novavax.  Coffman Tr." at 102:5–103:14.  Mr. Coffman did not, for example, consider alternative industry indexes that were more targeted to the unique Covid accine manufacturers rather than to biotechnology companies generally.  *Id.* at 66:24–67:18.  Nor did Mr. Coffman consider any alternative means of classifying "news" and "no-news" days.  *Id.* at 86:18– 87:20.  And, critically, Mr. Coffman made no effort whatsoever to consider the unique market contexts that impacted Novavax's stock price movements.  Mr. Coffman's reliance on a boilerplate, "fairly standard" analysis in a distinctly non-standard period is insufficient.

As a result of this boilerplate approach to the market efficiency analysis, Mr. Coffman's event study—on which Plaintiffs' argument depends—suffers several fatal defects:

***Insufficient Number of*** "***News***" ***&*** "***No-News***" ***Days [Kothari Rpt. ¶¶ 41–44].***  Mr. Coffman's market-efficiency conclusion is based on an inappropriately small sample of "news" and "no-news" days.  Mr. Coffman based his conclusions on a total of 35 days (10 "news" days

and 25 "no-news" days) across the two-and-a-half-year Analysis Period.  That sample accounts for a minute fraction (5.7%) of the trading days during that timeframe and ignores 581 days (or 94%) of the Analysis Period.  Likewise, only *two* of Mr. Coffman's 10 "news" days and *three* of his 25 "no-news" days land in the Class Period during which he seeks to establish a cause-and-effect relationship.  His sample thus accounts for only 1.8% and 2.7% of the 113 trading days during that Class Period, respectively, excluding the remaining *96%* of trading days.  As Prof. Kothari emphasizes, such a small sample of cherry-picked days cannot be relied upon to extrapolate a cause-and-effect relationship between Novavax-related news and Novavax's stock price movements across the entire Class Period.  *See* Kothari Rpt. ¶¶ 41–44.  Indeed, another court has *disregarded* Mr. Coffman's event studies on the same grounds.  *See Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D 427, 440 (D. Ariz. 2019) (finding Mr. Coffman's event study unreliable because "there are just too few 'news days' to observe a meaningful correlation between 'news' and 'price reaction'"); *see also In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006) (different expert's  study based on "five days [out of 160] on which news was released and which exhibited large price fluctuations proves nothing" about cause-and effect relationship's existence).

*Arbitrary Definition of "News" & "No-News" Days [Kothari Rpt. ¶¶ 78–87].*  Mr. Coffman's definition of "news" and "no-news" days is also arbitrary.  As discussed above, Mr. Coffman identifies only three of 113 trading days during the Class Period as "no news" days (*i.e.*, days with fewer than five news articles, no analyst reports, and no SEC filings).  In Mr. Coffman's categories, then, the remaining 110 trading days could be days on which company-specific news (even important news) was released.  But Mr. Coffman only plucked two earnings announcements (May 11 and August 5, 2021) from those remaining 110 days, and otherwise did not meaningfully examine the content of the information in the news articles, analyst reports, or

8

SEC filings on the remaining 108 trading days.  *See* Kothari Rpt. ¶¶ 78–79.  Plaintiffs' own production of the materials relied upon by Mr. Coffman included *202* Novavax press releases about company-specific developments on 169 different days over Mr. Coffman's Analysis Period, beyond the 10 earnings releases that Mr. Coffman deems news.  *Id.* ¶¶ 82–84.  That production included 28 press releases within the Class Period.  Mr. Coffman's analysis ignored every single one of those 202 releases.

In his study, Prof. Kothari analyzed a broader set of news days and no-news days across four different tests.  The results of his analysis undercut Mr. Coffman's conclusions:  Prof. Kothari found that more reliable definitions produce results showing that Novavax's stock did *not* react consistently to company-specific news throughout the Class Period, contrary to Mr. Coffman's conclusions based on arbitrary definitions.  Prof. Kothari also evaluated "low news" days—days that Mr. Coffman would not characterize as "no news" days but that coincided with the release of little-to-no Novavax-specific news.   Prof. Kothari's analysis found repeated examples of statistically significant abnormal returns on those days.  *See* Kothari Rpt. ¶ 49 n.59.  Those seemingly random, statistically significant price swings show that Novavax's stock price movements could not be reliably attributed to some contemporaneous release of company-specific news.  But Mr. Coffman did not consider those erratic price swings at all in his analysis, further undermining the credibility of his methodology and his results.

***Lack of Directionality Analysis [Kothari Rpt. ¶¶ 49–51].***  Mr. Coffman made no meaningful effort to determine whether Novavax's stock price reacted to positive or negative news in a directionally consistent manner.  As Prof. Kothari explains, Mr. Coffman's finding of statistically significant returns on 60% of his news days does not, on its own, show cause-and-effect.  *See* Kothari Rpt. ¶ 49.  In any efficient market, a stock's price is expected to rise following unexpected positive news and fall following unexpected negative news.  A negative price reaction

9

to good news, or a positive price reaction to bad news, can be important evidence that the cause-and-effect relationship required for market efficiency does not exist. *Id.* ¶ 50.

Yet, Mr. Coffman admits that he "didn't do a detailed analysis of directionality." Coffman Tr. at 93:20–94:10; 96:25–97:22; *id.*at 98:3–12 (testifying that he did not "go through each day and evaluate whether the price moved in some way consistent with the news on that day"). As other courts have found, Mr. Coffman's failure to conduct a directionality analysis severely (if not completely) undermines his cause-and-effect conclusions. *See Di Donato*, 333 F.R.D. at 441 (finding Mr. Coffman's event study unreliable because it "failed to assess . . . the direction of the stock price response to 'news'); *see also IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *11, 21 (S.D.N.Y. Oct. 29, 2013) (rejecting different expert's market efficiency report that "[did] not make a directional prediction of what price movement ought to be").

In fact, Prof. Kothari found abnormal returns that were inconsistent with news on at least one of the six dates for which Mr. Coffman finds a statistically significant abnormal return after an earnings release. On March 1, 2021, Novavax announced after market close that it had *beaten* estimates for earnings per share and quarterly revenue by $0.17 and $77.2 million respectively. *See* Kothari Rpt. ¶ 51 n.64. Despite that positive news, Novavax had a statistically significant *negative* abnormal return on the following trading day. *Id.* ¶ 51. Such directionally inconsistent price movements are important evidence against a cause-and-effect relationship—evidence Mr. Coffman ignored entirely. *Id.* ¶¶ 49–51.

***Failure to Consider Noise Trading [Kothari Rpt. ¶¶ 52–68].*** Mr. Coffman's analysis is also flawed because he failed to evaluate the possibility that Novavax's stock returns were impacted by "noise trading" throughout the Analysis Period (and Class Period). Prof. Kothari emphasizes that the trading patterns of Novavax stock during the Analysis Period were marked by heavy, high-frequency trading driven primarily by retail investors (not institutional traders), as

well as by unusual, high levels of volatility that far outstripped the broader market's volatility.  As even Mr. Coffman recognizes, the average weekly trading volume of Novavax stock was *more than 14 times higher* than the average volume of all other stocks on the NYSE and NASDAQ exchanges during the Analysis Period, *see* Coffman Rpt. ¶ 28—a figure that Mr. Coffman testified would put Novavax stock in "a minority," Coffman Tr. at 42:5–16.  Prof. Kothari explains that those trends are consistent with excessive "noise trading" in Novavax stock—that is, trading by uninformed investors who do not trade on company-specific information.  *See* Kothari Rpt. ¶¶ 58–59.

Mr. Coffman entirely failed to consider how these patterns impacted his market efficiency analysis.  As Prof. Kothari explains, excessive "noise trading" by retail investors can undercut the assumption that a stock price is efficiently incorporating company-specific information or properly reacting to company-specific news.  *Id.* ¶ 59.  Though Mr. Coffman testified that Novavax's extreme trading volume reflected a "tremendous amount of liquidity in [Novavax] stock," Coffman Tr. at 42:23–43:5, Prof. Kothari explains that the amount of liquidity, if caused by noise trading, evidences that Novavax stock was *inefficient*:  it would mean that stock price movements are mainly driven, not by company specific information, but by high-frequency retail trading based on sentiment, speculation, and short-term price movements.  Prof. Kothari identified weeks during Mr. Coffman's Analysis Period where the weekly turnover for Novavax's stock approached or exceeded 100%, meaning that *each and every* share of Novavax's outstanding stock was changing hands during those periods.  *See* Kothari Rpt. ¶ 65.  Prof. Kothari emphasizes that there is no basis to assume that such extreme trading-volume levels and accompanying price swings stem from company-specific news.  *Id.*  But Mr. Coffman did not examine the risk that Novavax's stock volatility was driven by noise trading; in fact, Mr. Coffman did not know what noise trading was,

11

much less consider how it could have impacted the efficiency of Novavax's stock price.  *See* Coffman Tr. at 44:3–14.

The proposed class representatives' trading activity provides further evidence of the uninformed noise trading, which Mr. Coffman again ignored.  All three Lead Plaintiffs turned over their Novavax holdings constantly throughout the Class Period, engaging in numerous (often daily) buy/sell transactions in Novavax stock numbering in the thousands of shares; for instance, the Lead Plaintiffs would sell a certain number of Novavax shares on a given day only to buy the same or greater number later that same day or the next day.  Consistent with noise trading, Messrs. Nandkumar and Truong repeatedly testified that they could not recall if they were basing their large trades on any company-specific information at all, let alone on material news.  *See, e.g.*, Brown. Decl. Ex. C, Tr. of Aug. 1, 2023 Deposition of Nuggehalli B. Nandkumar ("Nandkumar Tr.") at 108:10–14, 109:3–110:2, 121:21–122:3, 125:12–18, 131:18–132:16; *id.*, Ex. D, Tr. of Aug. 30, 2023 Deposition of David Truong ("Truong Tr.") at 93:2–19, 94:9–12, 98:12–25, 101:12–19.  And Mr. Gabbert testified that he frequently would buy and sell large tranches of Novavax shares on the same day.  *See, eg.*, *id.*, Ex. E, Tr. of Aug. 25, 2023 Deposition of Jeffrey Gabbert ("Gabbert Tr.") at 92:10–18 (May 10 sales), 95:20–96:5 (May 10 purchase), 99:15–100:6 (testifying to selling 5,000 shares and buying 5,000 shares on June 15); 102:5–19 (testifying to buying 2,000 shares and selling 2,000 shares on August 5).  Plaintiffs' trading activity only makes it more inexplicable that Mr. Coffman failed to consider noise trading's impact on Novavax's market efficiency.

***Arbitrary Selection of Outlier Dates [Kothari Rpt. ¶¶ 52–57].***  As discussed above, Mr. Coffman excluded four "outlier" dates from his event study—January 21, 2020; February 27 and 28, 2020; and January 29, 2021.  Why exactly Mr. Coffman marked those four dates as outliers is unclear from his Report; Mr. Coffman simply explained that those outlier dates were "due" to

12

"Covid-19 vaccine development news."    Coffman Rpt. Ex. 5.    In fact, Mr. Coffman's "methodology" for excluding outliers was no methodology at all.    Mr. Coffman explained at his deposition that he did not select those four outlier dates based on any kind of threshold or benchmark, but because they had a "big impact on what [he was] estimating."    Coffman Tr. at 110:16–111:18.    In other words, Mr. Coffman apparently excluded dates as "outliers" simply because they significantly impacted the analysis of Novavax's market efficiency.    That sort of results-driven, arbitrary methodology destroys any confidence in Mr. Coffman's conclusions.

Beyond his haphazard methodology for identifying outlier dates, Mr. Coffman's selection of outliers is further undermined by the risk of noise trading, discussed above.    Prof. Kothari analyzed Novavax's daily price changes on Mr. Coffman's outlier dates and concluded that they were driven in at least large part by noise trading, not company-specific news.    For instance, Mr. Coffman excluded as outliers February 27 and 28, 2020, "due to Covid-19 vaccine development news."    Coffman Rpt. Ex. 5.    But Prof. Kothari reviewed the supposed "vaccine development news" that Mr. Coffman cites and discovered that the only company-specific news released on those dates simply repeated information that had been previously released two days prior, on February 26.    *See* Kothari Rpt. ¶ 55.    Prof. Kothari found similar issues with Mr. Coffman's exclusion of January 29, 2021, when Novavax's stock price rose by 65%.    *Id.* ¶ 56.    Analysts' consensus price target only rose by 10% on that day and by 28% over the course of that week.    *See Id.* ¶ 56.    The analysts' modest price increase suggests that a significant part of the January 29 increase could *not* be attributed to the Novavax-specific news.    *Id.* ¶ 57.    But Mr. Coffman did not even bother to consider these dynamics in selecting his outliers, only further establishing that his event study methodology is fundamentally flawed.

***Tainted Estimation Period [Kothari Rpt. ¶¶ 69–71].***    Mr. Coffman's cause-and-effect conclusions also hinge on his use of a "rolling" 120-trading day estimation window to estimate the

13

predicted return of Novavax's stock on each day.  As Prof. Kothari explains, an estimation window is necessary to calculate a stock's "expected" return on a given day and thus for calculating any abnormal return on that day:  the expected return is calculated based on the estimated historical relationship between the stock's return and selected indices' returns over the estimation window. *See* Kothari Rpt. ¶ 69.

Mr. Coffman's "rolling" estimation window creates unreliable results because it includes days within the Class Period—*days when Novavax's returns were allegedly impacted by supposed misstatements*.  Prof. Kothari cautions that an economist cannot reliably predict a stock's return absent alleged fraud by using expected returns that were based on a "tainted" sample.  *See* Kothari Rpt. ¶ 70; *see also, S.E.C. v. Badian*, 822 F. Supp. 2d 352, 361-62 (S.D.N.Y. 2011) (collecting authorities; striking expert opinions that "use[d] estimation windows that include[d] the period of alleged manipulative trading," because doing so "undermin[ed] the purpose of an estimation window, which is to estimate the normal return *without* the influence of the suspect trades"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 481 (S.D.N.Y. 2018) ("[T]he selection of a clean period wholly independent of periods involving challenged conduct is recommended practice.").

In light of the above, Mr. Coffman's event study is unreliable evidence of a cause-and-effect relationship between Novavax's stock price and company-specific news.  Plaintiffs therefore cannot establish market efficiency and are not entitled to invoke the *Basic* presumption.

## B. Plaintiffs Cannot Rely on the *Affiliated Ute* Presumption of Reliance

Plaintiffs also mistakenly assert that they are entitled to an *Affiliated Ute* class-wide reliance presumption because their claims relate to alleged omissions.  *See* Br. at 26–27.  *Affiliated Ute* held that defendants who had "made no positive representation[s] or recommendation[s]" *whatsoever* could not "stand mute" while engaging in deceptive conduct.  406 U.S. at 153.  That

is, *Affiliated Ute* involved a scenario where defendants made no statements at all. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017) (*Affiliated Ute* presumption applied when "no positive statements exist"). Accordingly, *Affiliated Ute* applies in cases that involve "only nondisclosure." *Cox v. Collins*, 7 F.3d 394, 395–96 (4th Cir. 1993).

This is not such a case. Plaintiffs' claims are "based as much on what is *there* as what is purportedly missing," making *Affiliated Ute* inapplicable. *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 667 (9th Cir. 2004). For example, Plaintiffs allege that Erck affirmatively misrepresented on May 10 that "all of our manufacturing sites [are] producing GMP material at scale" while FUJI's Texas facility was shut down. ¶ 180. Plaintiffs likewise allege that Defendants made numerous affirmative statements that misrepresented the then-present status of Novavax's efforts to manufacture NVX-CoV2373 at scale *and*—in the same statements—omitted details about manufacturing challenges that did not comport with Defendants' manufacturing-related representations. *See* ¶¶ 178–181, 198, 204. The *Affiliated Ute* presumption therefore does not apply to Plaintiffs' claims. *See Waggoner*, 875 F.3d at 96 (*Affiliated Ute* inapplicable because plaintiffs "allege[d] numerous affirmative misstatements by the Defendants"); *id.* (*Affiliated Ute* does not apply to "half truths" or to "misstatements whose only omissions is the truth that the statement misrepresents").

## II.     DEFENDANTS HAVE REBUTTED ANY RELIANCE PRESUMPTION WITH EVIDENCE THE ALLEGED MISSTATEMENTS LACKED PRICE IMPACT

Even if Plaintiffs had established a reliance presumption, it is readily rebutted because the alleged misstatements lacked price impact. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248; *see also Halliburton II*, 573 U.S. at 279–80 (*Basic* presumption can be "rebutted by . . . evidence

that the asserted misrepresentation (or its correction) did not affect the market price"). Where a misstatement did not impact the price when made, "*Basic*'s fundamental premise 'completely collapses, rendering class certification inappropriate.'" *Goldman*, 141 S. Ct. at 1959 (quoting *Halliburton II*, 573 U.S. at 283).

The *Goldman* decision guides the price-impact analysis at the class certification stage. The Supreme Court emphasized that "courts should be open to *all* probative evidence [concerning price impact]—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 1960. And, critically, the Supreme Court emphasized that courts should consider that evidence regardless of its overlap with merits issues. *Id.* at 1960–61. *Goldman* also clarified how price impact should be evaluated in cases, like this one, "proceeding under [an] inflation-maintenance theory":

> Under [that] theory, price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement. Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation.[4]

*Id.* at 1961 (cleaned up). However, the "inference" that "the back-end price drop equals front-end inflation" is only possible where the "contents" of an alleged misstatement and a later allegedly corrective disclosure match—that is, where the disclosure actually *corrects* the prior statements. *Goldman*, 141 S. Ct. at 1961. The inference "starts to break down where there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* Absent a proper corrective disclosure, securities plaintiffs could not establish an inference that the ensuing stock

---

[4] Plaintiffs do not allege that any of the challenged statements increased Novavax's stock price at the time they were made. Nor could they with respect to almost all of those statements: on May 11—the first day of the Class Period and the day after the May 10 earnings call that accounts for four of Plaintiffs' six challenged statements—Novavax's stock price *fell* by nearly 14%. *See* ¶ 18. Plaintiffs therefore must be proceeding under an inflation maintenance theory.

16

drop in fact reflected the amount of artificial inflation caused by the alleged misstatements.  And if plaintiffs are unable to show price impact stemming from "the specific misrepresentation[s] challenged in the suit," a class cannot be certified.  *Halliburton II*, 573 U.S. at 281–82.

Plaintiffs cite two stock price declines following two alleged corrective disclosures as the evidence that Novavax's price was artificially inflated by alleged misstatements during the Class Period:  the August 5, 2021 Form 10-Q, which Plaintiffs claim was a "partial corrective disclosure" of alleged manufacturing challenges, and the October 19, 2021 *Politico* article, which Plaintiffs claim revealed "the truth" about those difficulties.  *See supra* at 3–4.  But neither disclosure qualifies as a corrective disclosure that related back to Defendants' prior statements about Novavax's manufacturing efforts.  The *Politico* article was no revelation of "the truth" at all; it was replete with stale, misleading, and inaccurate reporting that was (i) met with immense skepticism by market participants and (ii) almost immediately corrected following its release.  And Novavax's stock price immediately *rebounded* after the release of the August 5 alleged partial corrective disclosure, refuting any inference that prior statements caused front-end price impact; and, in any event, analysts did not view the disclosure as corrective.  Thus, the price drops following these disclosures offer no basis to infer price impact from the alleged misstatements.

> A.    **The *Politico* Article Is Not a Valid Corrective Disclosure and Thus Provides No Basis for Inferring Price Impact**
>
> > i.    The *Politico* Article Is Not a Corrective Disclosure for Purposes of Inferring Front-End Price Impact

Plaintiffs claim that the October 19 *Politico* article is the key corrective disclosure and a "materialization of the risk" concerning Novavax's purportedly delayed manufacturing efforts.  ¶¶ 206–211.  Plaintiffs contend that *Politico* "revealed the underlying and undisclosed manufacturing problems that had been preventing Novavax from filing its EUA with the FDA and alerted investors for the first time that Novavax's timeline for approval was still *another year away*,"

17

causing a corresponding stock price drop. *Id.* ¶ 156; *see also id.* ¶ 211. But the *Politico* article was anything but truth revealing; it was based on misleading, incomplete, and anonymously sourced information that the market did not view as corrective of Defendants' prior manufacturing-related statements. *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at \*23 (S.D.N.Y. Oct. 18, 2019) ("merely speculative or negative commentary" is not corrective), *recommendation adopted by* 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020). As a result, the October 20 price decline cannot support an inference that the prior statements had any front-end price impact. *See Goldman*, 141 S. Ct. at 1961; *In re Intuitive Surgical Secs. Litig.*, 2016 WL 7425926, at \*15–16 (N.D. Cal. Dec. 22, 2016) (at class certification, finding lack of price impact where disclosures could not be considered "corrective"). Far from "materializing the risk" that Novavax was far from resolving its manufacturing challenges, the *Politico* article reported risks that were already disclosed or *did not even exist*.

The *Politico* article revealed little new information about Novavax's manufacturing challenges and the resulting delays in its EUA submission. By October 2021, the market was well aware that had encountered challenges in manufacturing at scale (including through earlier disclosures cited by Plaintiffs themselves) and that those challenges were creating uncertainty about the EUA timeline. *See, e.g.*, ¶¶ 126 (citing *Washington Post* article that attributed EUA delays to "manufacturing regulatory" issues), 194 (citing August 5, 2021 Form 10-Q disclosing government-ordered manufacturing halt); Brown Decl. Ex. W (August 8, 2021 *New York Times* article noting that "Novavax has struggled for months to mass manufacture its product" and that "federal officials said it is unclear when or if" vaccine would be authorized for U.S. distribution); *id.*, Ex. X (August 26, 2021 *Scrip* article noting that Novavax's FDA submission had "been badly delayed by manufacturing quality issues"). Novavax's purported manufacturing difficulties were thus baked into Novavax's stock price well before the *Politico* article broke.

18

Nor was the *Politico* article some comprehensive revelation of "underlying and undisclosed manufacturing problems," as Plaintiffs contend.  ¶ 156.  The article makes *no mention* of alleged contamination issues or plant shutdowns, supposed challenges in developing assay methodologies that worked consistently across manufacturing sites, or supply chain disruptions—all core issues that Plaintiffs claim were omitted from Defendants' challenged statements.  The article's silence on those subjects alone suggests a "mismatch" between the article's contents and Defendants' supposed misrepresentations, and that mismatch prevents an inference of front-end price impact. *See Goldman*, 141 S. Ct. at 1961; *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023) (finding "price impact less likely" because "corrective disclosures did not actually contain new information correcting the alleged misrepresentations").

What little "new" information the article did contain was either misleading or incorrect. The article supposedly "revealed" two specific, manufacturing-related facts:  (i) that NVX-CoV2373 had allegedly been, at some unspecified point in time, "recently . . . hovering around" 70% purity, below FDA requirements; and (ii) that Novavax's manufacturing issues might prevent the vaccine from reaching "full licensure" until "the end of 2022."  Brown Decl. Ex. J at 4, 6.

On the purity issue, the article's information was misleading and stale.  Its anonymous sources simply asserted that "Novavax" had "recently shown" substandard purity levels. *Id.* at 4. The statements failed to differentiate between any of Novavax's multiple third-party manufacturers, creating the false impression that *all* of the Company's manufacturing sites were experiencing purity issues. *Id.*  Novavax corrected that error the following day when it reiterated that it had numerous sites across the globe that were "routinely producing high-quality product at commercial scale."  Brown Decl. Ex. L at 1.  Novavax's India manufacturing partner, the Serum Institute of India (or SIPL), had been producing doses at nearly 90% purity when the *Politico* article was released. *See* Brown. Decl. Exs. AA–DD.  Weeks earlier, Novavax had already decided

19

to begin shifting its reliance, for purposes of regulatory approval submissions in the U.S. and other countries, to SIPL's facilities. *See* Ex. AA (explaining that "initial US filing and supply [will] be from Serum"). Novavax would ultimately rely on SIPL as the primary manufacturer for the Company's U.S. EUA submission. *Id.* Ex. CC. The *Politico* article thus did not reveal "the truth" about Novavax's purity issues; it painted a misleading, incomplete picture of the vaccine-production efforts that was corrected by later events.

The *Politico* article's also anonymously sourced suggestion that Novavax may be unable to reach "full licensure" until "the end of 2022" was based on this inaccurate understanding of the Company's manufacturing status—and was rapidly proven incorrect. Novavax had announced in its August 5, 2021, Form 10-Q that it expected to file its EUA application in the fourth quarter of 2021. On October 20, 2021, the morning after the *Politico* article, *Politico* itself reported that Novavax expected to "complete multiple ongoing rolling regulatory submissions within the next couple of weeks in key markets" and to file its U.S. EUA "before the end of 2021," contrary to the October 19 article's reporting. Brown. Decl. Ex. K at 1. Novavax followed through on that announcement with a slew of regulatory submissions in the United Kingdom (October 27), Australia (October 29), Canada (November 1), and New Zealand (November 3), as well as its first regulatory authorization in Indonesia (November 1). *See* Brown. Decl. Exs. Q–U. These filings quickly dispelled the *Politico* article's suggestion that Novavax was incapable of manufacturing regulatory-compliant vaccine at any of its third-party facilities. With respect to its U.S. filing, Novavax announced again on November 4, 2021, that it expected to file its FDA submission by year end 2021—in line with previous guidance and in direct contradiction of the *Politico* article's gloomier predictions. Novavax ultimately submitted its FDA EUA package on January 31, 2022—only slightly behind its goal and far ahead of the severely delayed timeline that *Politico* announced. *Id.* Ex. Y. The FDA granted EUA authorization to Novavax's vaccine in July 2022. *Id.* Ex. Z.

The *Politico* article thus did not reveal the "truth" about the timing of Novavax's regulatory submissions; it injected into the market highly misleading, ultimately incorrect information.

The mere fact that Novavax's stock price dropped on the day immediately following the article's publication does not alone permit an inference that the article somehow corrected front-end price inflation caused by Novavax's prior statements. Instead, the market must "understand" the article to have been corrective. *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F. 4th 74, 80–81 (2d. Cir. 2023) (applying Supreme Court's *Goldman* decision on remand). Here, the market saw through the *Politico* article's sensational, inaccurate claims. For one thing, Novavax's stock price swiftly *rebounded* as information correcting the article's inaccuracies entered the market. *See* Kothari Rpt. ¶ 77. That rebound shows that investors (i) did not view the *Politico* article to be fundamentally at odds with Novavax's prior manufacturing-related representations, and, relatedly, (ii) did not view the post-*Politico* price drop as an accurate reflection of the stock's true value. After all, if investors were willing to buy Novavax stock after the post-*Politico* decline and drive the price back to pre-publication levels, investors could not have viewed the pre-*Politico* price to have been somehow "artificially inflated" by Defendants' alleged misstatements.

Similarly, Prof. Kothari analyzed Novavax's cumulative abnormal return ("CAR") from market close on October 19, 2021, through market close on November 5, 2021—the period covering the *Politico* article's release and Novavax's subsequent corrections of the article. Prof. Kothari found that the change in Novavax's stock price over that period "*was indistinguishable from zero*." *Id.* ¶ 77 (emphasis added). That the *Politico* article had no lasting impact on Novavax's stock price supports the conclusion that investors did not view the article as correcting earlier statements.

Prominent analysts covering Novavax also viewed the article as not value-relevant. The day after the article's release, Cantor Fitzgerald maintained its price target for Novavax and

21

emphasized that it was not concerned about the article's "anonymous sources" because "Novavax is past commercial scale-up activities and is finalizing [regulatory] submissions." Brown. Decl., Ex. N at 1. On the same day, Jefferies maintained its "Buy" rating for Novavax, citing their understanding that the Company "can make the vaccine consistently" based on its international regulatory submissions. *Id.*, Ex. M at 1. Another analyst—who also maintained a "Buy" rating for Novavax—viewed the article's claims as nothing new, describing them as "inflammatory," "cliché," and "overdone." *Id.*, Ex. O at 1. One analyst even opined that, of "many inaccurate media reports about Novavax . . . [the] article recently published by *Politico* took the cake for the percentage of inaccuracies per paragraph." *Id.*, Ex. P at 3. Like the rest of the market, analysts did not view the article as "correcting" prior representations about Novavax's manufacturing.

Because the *Politico* article was not a corrective disclosure that somehow set right Defendants' earlier statements, the stock price decline that followed the article's release cannot support an inference that Defendants' alleged misstatements had any front-end price impact. By its very nature, the inaccurate and misleading information in the report could not correct Novavax's prior manufacturing-related statements and thus could not "match" those statements under *Goldman*. *See Goldman*, 141 S. Ct. at 1961; *see also Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) (finding lack of price impact and denying class certification where "there was no evidence to suggest that the Company's disclosures were disclosures linked to the alleged misrepresentations"), *rev'd on other grounds*, 64 F.4th 731 (2023).

        ii.     The Class Period Must Be Shortened

Because the *Politico* article is not a valid corrective disclosure, the Class Period cannot end on October 19, 2021. In securities actions, the class period ends on the date "when the *full truth* has been disclosed to the market" through a proper corrective disclosure. *Pirnik v. Fiat Chrysler*

22

*Auto., N.V.*, 327 F.R.D. 38, 48 (S.D.N.Y. 2018) (emphasis added; citations omitted).  But as discussed, the *Politico* article did not reveal anything resembling "the full truth" about Novavax's manufacturing efforts, and thus cannot be considered corrective.  Any Class Period could only end, *at the latest*, on August 5, 2021—the date of the only other supposedly corrective disclosure and corresponding stock drop alleged by Plaintiffs.  Plaintiffs have alleged no other corrective disclosure and price drop that could have harmed stockholders who purchased Novavax stock after August 5.  A class of those stockholders thus cannot be certified.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 271–76 (N.D. Tex. 2015) (denying class certification as to alleged corrective disclosure dates for which Defendants had demonstrated lack of price impact).

> **B.      The August 5 Form 10-Q Provides No Basis for
>           Inferring Price Impact from the May 10 Statements**

Plaintiffs also allege that Novavax's August 5, 2021 Form 10-Q—which informed investors that the U.S. government had told Novavax to halt manufacturing "to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods"—was a "partial disclosure / materialization of the risk" and caused a stock drop on August 6.  ¶¶ 194–95.  The only surviving statements made before that disclosure are Erck's May 10 statements, *supra* at 3. Plaintiffs thus must show that the August 5 disclosure permits an inference of a front-end price impact from those May 10 statements.

The fatal problem with this inference is the mirror image of the problem with the *Politico* article:  there is no back-end impact from which to infer a corresponding amount of front-end inflation. *See Goldman*, 141 S. Ct. at 1961 (securities plaintiffs typically show front-end inflation by "claim[ing] that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation").  While Plaintiffs point to the fact that Novavax's stock dipped by 19.61% on August 6, they ignore that on the *very next trading day* (August 9, a Monday), Novavax's stock

price *recovered half its value*, and then *fully rebounded* by August 10. *See* Kothari Rpt. ¶ 88. Prof. Kothari was unable to identify any company-specific news released on August 9 or 10 that would explain the rebound. *Id.* This price history shows that the Form 10-Q lacked any kind of permanent price impact. *Id.* ¶ 90. Indeed, the quick rebound showed that investors believed the stock was *undervalued* after the drop, not artificially inflated before it.

Analysts likewise remained just as optimistic about Novavax's price outlook after the Form 10-Q's release as they had been before; none viewed the August 5 disclosure as a correction of earlier statements, or its price effects as a correction of earlier inflation. In their Complaint, Plaintiffs selectively quote various analyst reports to suggest that the market was "shocked" by Novavax's August 5 announcement and viewed it as correcting the May 10 challenged statements. ¶ 196. Those analyst reports' complete contents show that commentators did ***not*** view the announcement as revealing any corrective information that would impact the stock's value. For example, Plaintiffs quote language from an August 6 Jefferies report regarding a "lack of clarity around the US/EU filings," ¶ 196, but Plaintiffs omit that Jefferies "continue[d] to like the long-term outlook" for the stock and actually *increased* the price target from $235 to $250, Brown Decl. Ex. H at 1. Likewise, Plaintiffs quote an August 7 Seeking Alpha report describing the August 5 announcement as "a shocker for investors." ¶ 196. But Plaintiffs cherry-picked that language from a sentence describing the announcement as inappropriately "overshadow[ing] all positive news about the company." Brown Decl. Ex. I at 2. Prof. Kothari reviewed the six analyst reports issued on August 5 and August 6 and found that none of the analysts lowered their Novavax price targets in response to the August 5 disclosure. *See* Kothari Rpt. ¶ 89. There is thus no basis to infer that the August 5 filing was viewed as "corrective" of the May 10 statements, such that the August 6 price drop could support an inference of front-end inflation from those statements.

24

### III.     PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(A)

Before certifying a class, the Court must conclude that this action meets Rule 23(a)'s four requirements of "numerosity," "commonality," "typicality," and "adequacy." *See* Fed. R. Civ. P. 23(a)(1)–(4).  When applying this Rule, the Court must perform "a rigorous analysis of the particular facts of the case." *Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 291 (E.D. Va. 2004) (citation omitted).  Here, Plaintiffs fail to satisfy the "typicality" and "adequacy" prongs.

Rule 23(a) requires that "claims or defenses of representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a).  This requirement "goes to the heart of a representative [party's] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).  In considering representatives' typicality, the key inquiry is whether "[t]he representative party's interest in prosecuting his own case . . . simultaneously tend[s] to advance the interests of the absent class members." *Id.* at 466 –67.  That inquiry will, in turn, frequently center on whether a class representative is subject to "unique defenses" that absent class members may not be. *Wu v. MAMSI Life & Health Ins. Co.*, 269 F.R.D. 554, 563 (D. Md. 2010) (class representative's exposure to "several unique defenses preclude[d] a finding of typicality").

Rule 23(a)(4) requires that any would-be class representative "will fairly and adequately protect the interests of the class."  A key part of that equation is whether the representative has "demonstrated the requisite level of knowledge and control of the litigation to ensure that he will vigorously prosecute the claims asserted." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D.Va. 2007); *see also Passman v. Peloton Interactive, Inc.*, 2023 WL 3195941, at *16 (S.D.N.Y. May 2, 2023) ("[A] class representative must be aware of the basic facts underlying the lawsuit and not likely to abdicate his obligations to fellow class members.") (citation omitted).

All three proposed representatives fail on independently dispositive typicality and adequacy grounds.  Mr. Nandkumar is inadequate and atypical because he could not have suffered

*any* net damages during the Class Period.  Mr. Gabbert is inadequate and atypical because he suffered no harm from the August 6 stock drop, depriving him of standing or at least placing his incentives directly at odds with class members who *did* suffer such alleged harm.[5]  Separately, Messrs. Nandkumar and Truong lack the understanding of basic aspects of the litigation that they must possess to represent the class.  The Plaintiffs therefore fail to satisfy Rule 23(a).

### A. Mr. Nandkumar Is Atypical and Inadequate Because He Could Not Have Suffered Any Net Damages Across the Class Period

Mr. Nandkumar is atypical and inadequate because, according to Plaintiffs' case theory and basic economic and mathematical principles, he necessarily benefitted more from the alleged fraud than he suffered damages from it.  In securities fraud actions, a plaintiff's damages from the fraud must be "offset by any gains that are attributable" to that fraud; a plaintiff can only satisfy their claim's required damages element if they can show that, after this offset, their damages are positive.  *Gordon v. Sonar Cap. Mgm't LLC*, 92 F. Supp. 3d 193, 201–02, 205 (S.D.N.Y. 2015) ("net seller" representative was atypical when he was "subject to the potentially meritorious defense that he suffered no economic loss attributable to defendants' alleged wrongdoing") (citing *In re Refco Inc. Sec. Litig.*, 2013 WL 4078410, at *2 (S.D.N.Y. Aug. 2, 2013)).

Plaintiffs claim that two corrective disclosures corrected price inflation caused by Defendants' misstatements and otherwise consistently present throughout the Class Period.  Thus, the Class Period can be separated into two periods: (i) **"Period 1**," running from May 11, 2021 (the start of the Class Period) through August 5, 2021 (the date of the alleged first, partial corrective disclosure), and (ii) **"Period 2**," running from August 6, 2021 (the day after the alleged first, partial

---

[5] Federal Rule of Civil Procedure 23(a)'s typicality requirement "tends to merge with the commonality and adequacy-of-representation requirements." *See Deiter*, 436 F.3d at 466.  Here, the same flaws that render Mr. Gabbert and Mr. Nandkumar atypical also undercut their ability to adequately protect the interests of absent class members.

corrective disclosure) through October 19, 2021 (the day of the allegedly final corrective disclosure). *See* Kothari Rpt. ¶ 92. Under Plaintiffs' case theory, Novavax's stock price was artificially inflated by the greatest amount during Period 1, prior to any corrective disclosure that eliminated any part of that inflation. Artificial inflation would necessarily be lower in Period 2, after the alleged August 5 partial corrective disclosure eliminated some portion of the alleged inflation caused by the May 10 statements.

Plaintiffs claim to have been damaged by this alleged inflation and the later corrective disclosures: Plaintiffs claim they bought shares during the Class Period at inflated prices and then suffered losses when the corrective disclosures caused stock drops that removed the alleged inflation. But Mr. Nandkumar also reaped a benefit from the alleged fraud and price inflation. He held significant Novavax shares on the first day of the Class Period, before the start of the fraud alleged by Plaintiffs' surviving claims. *See* Kothari Rpt. ¶ 99 n.126. Mr. Nandkumar later sold those shares during the Class Period at allegedly inflated Class Period prices. In doing so, Mr. Nandkumar sold his pre-Class Period shares at a higher price than he would have sold them for if not for the alleged fraud: either Mr. Nandkumar earned more profit on those sales than he would have earned (if he sold the shares at a higher price than he bought them), or he lost less money on the sales than he would have and thus avoided a loss (if he sold the shares at a lower price than he bought them). *See Gordon*, 92 F. Supp. 3d at 201–02.

Mr. Nandkumar's claimed damages would equal the amount of alleged price inflation caused by fraud and eliminated by a given corrective disclosure, multiplied by the number of shares that he bought during the Class Period and held on each stock-drop date. *See* Kothari Rpt. ¶¶ 93–97. The benefits gained by Mr. Nandkumar equal the amount of still-uncorrected stock-price inflation caused by the alleged fraud multiplied by the number of pre-Class Period shares sold at allegedly inflated prices. In short, the amount of benefit gained by Mr. Nandkumar turns on the

27

amount of inflation present in the price, and the amount of damages do as well.  The only material variable between these formulas is the number of shares.  As a result, if Mr. Nandkumar suffered damages on a number of shares smaller than the number of shares he bought before and sold during the Class Period, then the benefit that Mr. Nandkumar gained from the alleged fraud necessarily exceed any damages caused by it.  And, in fact, Mr. Nandkumar sold more pre-Class Period shares than he held allegedly damaged shares on the corrective disclosure dates.

As Prof. Kothari's analysis demonstrates, Mr. Nandkumar was a "net seller" of Novavax stock during Period 1, and a "net buyer" during Period 2:

- **Period 1:** Entering the Class Period, Mr. Nandkumar held 21,000 shares of Novavax stock. During Period 1, he bought another 22,000 shares and sold 37,000 shares—leaving him with net *sales* of 15,000 shares over Period 1.  Thus, as of the market's open on August 5, when Novavax allegedly issued a partial corrective disclosure, Mr. Nandkumar held 6,000 shares.

- **Period 2:** As of the market's open on August 6, 2021, Mr. Nandkumar held 6,000 shares of Novavax stock.  During Period 2, he bought 52,500 more shares and sold 40,000 shares—for a net *purchase* of 12,500 shares during Period 2.  He thus ended Period 2, on the second alleged corrective disclosure date of October 19, 2021, with 18,500 shares.

*See* Kothari Rpt. ¶¶ 99–101.

Given this trading history and Plaintiffs' case theory, Mr. Nandkumar cannot recover damages caused by either of the corrective disclosures alleged by Plaintiffs.  He necessarily benefitted more from the alleged fraud than he suffered damages from its correction:  he sold more pre-Class Period shares at allegedly inflated Class Period prices than he held damaged shares on corrective disclosure dates—regardless of the order in which we assume Mr. Nandkumar sold his pre-Class Period and intra-Class Period shares.

*LIFO.*  If Mr. Nandkumar had sold his shares in "last in, first out" ("LIFO") order,[6] then

---

[6] In securities cases, LIFO is "favor[ed]" because, as relevant here, it "offsets gains accrued to the plaintiffs due to the inflation of stock prices during the class period." *Vladimir v. Bioenvision, Inc.*, 2007 WL 4526532, at *5 (S.D.N.Y. Dec. 21, 2007).

of the 37,000 shares that Mr. Nandkumar sold during Period 1, he would (i) first sell the 22,000 shares that he purchased during Period 1, then (ii) sell 15,000 of the 21,000 shares that he owned prior to the Class Period's start.  Mr. Nandkumar would be left holding 6,000 shares at the end of Period 1, *all of which were purchased before the Class Period*. *See* Kothari Rpt. ¶ 99.  Mr. Nandkumar cannot claim damages as to shares that he already held prior to any misstatements. *See Gurary v. Winehouse*, 235 F.3d 792, 799 (2d Cir. 2000) (Purchases that "occurred before any alleged deception began" cannot "give rise" to Section 10(b) claim).

Mr. Nandkumar also suffered no recoverable damages for shares bought in Period 2. Beyond the 6,000 pre-Class Period shares that he carried into Period 2, for which he cannot recover damages under a LIFO assumption, Mr. Nandkumar bought an additional 12,500 shares during Period 2.  But the damages to those 12,500 shares are more than offset by the benefit Mr. Nandkumar earned from selling 15,000 pre-Class Period shares at the *peak* of alleged inflation during Period 1.  The damages on those 12,500 shares equal 12,500 multiplied by a fraction of the total inflation allegedly caused by the supposed fraud—*i.e.*, the portion of the total inflation that Plaintiffs claim remained uncorrected by the August 5 disclosure and that Plaintiffs claim the *Politico* article fully corrected.  The benefit that Mr. Nandkumar earned from selling 15,000 pre-Class Period shares in Period 1 equals 15,000 multiplied by the *full* amount of the alleged inflation, which was completely uncorrected prior to August 5.  Thus, the benefits earned necessarily exceed the damages suffered, and Mr. Nandkumar has no recoverable damages after the necessary offset.

***FIFO.***  Even using a less-favored FIFO (or "first in, first out") assumption, Mr. Nandkumar has no recoverable damages.  Of the 37,000 shares that Mr. Nandkumar sold in Period 1, he (i) would first sell the 21,000 shares that he had purchased before the start of the Class Period on May 11, and then (ii) would sell 16,000 of the 22,000 shares that he purchased during Period 1, after the Class Period's start.  As of the August 5 corrective  disclosure, then, Mr. Nandkumar

29

would hold 6,000 shares that he bought after May 10.  In Period 2, of the 40,000 shares that Mr. Nandkumar sold during this period, he would first sell those 6,000 Period 1 shares at the less-inflated prices of Period 2.  Mr. Nandkumar would then end Period 2 with 18,500 shares bought at Period 2's allegedly partly inflated prices.  *See* Kothari Rpt. ¶ 100–01.

Across both Period 1 and Period 2, then, Mr. Nandkumar suffered damages equal to 6,000 multiplied by a portion of the alleged inflation supposedly corrected by the August 5 corrective disclosure, and 12,500 multiplied by the remaining portion of the alleged inflation.  But those damages are again more than offset by the benefit Mr. Nandkumar gained from selling 21,000 pre-Class Period shares during Period 1, at the full allegedly inflated price.  The benefits from that sale are equal to 21,000 multiplied by the peak amount of the alleged inflation.  Mathematically, the benefit Mr. Nandkumar gained from selling 21,000 pre-Class Period shares at allegedly inflated prices will always exceed his alleged damages from the August 6 and October 20 stock drops.  Mr. Nandkumar thus has no recoverable damages under well-established securities case law.

Because he suffered no recoverable damages from the conduct challenged by Plaintiffs, Mr. Nandkumar is an atypical and inadequate class representative:  he cannot adequately and zealously represent the interests of individuals seeking to recover damages in this case when Mr. Nandkumar did not suffer those damages, and he is subject to unique defenses.

### B.    Mr. Gabbert's Trading Activity Between May 11 and August 5 Renders Him Atypical and Inadequate

Mr. Gabbert is atypical and inadequate because of his trading activity during Period 1.  That trading activity shows that Mr. Gabbert could not have suffered any damages from the post-August 5 stock price drop alleged by Plaintiffs.  Based on Mr. Gabbert's trading history, Prof. Kothari determined that Mr. Gabbert held no shares of Novavax stock as of May 11, 2021; Prof. Kothari also determined that between May 11, 2021 (the Class Period's start) and August 5, 2021 (the date

30

of the first alleged partial corrective disclosure), Mr. Gabbert bought 43,000 shares of Novavax stock *and* sold 43,000 shares of Novavax stock. *See* Kothari Rpt. ¶ 98.  Thus, as of August 6, the day of the first price drop alleged by Plaintiffs, Mr. Gabbert had completely exited his Novavax position and owned zero shares of Novavax stock.[7]  To the extent that the August 5 Form 10-Q was a corrective disclosure at all, *supra* at 23–24, Mr. Gabbert suffered no injury from the misrepresentations that the disclosure purportedly corrected or the stock drop that ensued on August 6.

Critically, because (i) the *Politico* article is not a valid corrective disclosure that gives rise to cognizable damages, and (ii) Mr. Gabbert was not harmed by the August 6 stock drop, Mr. Gabbert *suffered no injury at all* from any stock drop from which Plaintiffs claim an injury.  Mr. Gabbert thus lacks standing to assert his own claims or to serve as a class representative.  *Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1263 (S.D. Fla. 2021) (Plaintiff did not suffer injury-in-fact where "he did not own shares of [company] when the alleged corrective disclosures were made" and was atypical due to lack of standing); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546 n.6 (2016) ("[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.").

But even if the *Politico* article could have qualified as a corrective disclosure (it cannot), Mr. Gabbert would still be an inadequate and atypical class representative.  His lack of damages from the August 6 price drop puts Mr. Gabbert in a "markedly different" "factual situation" from putative class members who will seek to prove loss causation and damages based on that price

---

[7] Mr. Gabbert did buy 2,500 Novavax shares on August 6, the day of the stock drop.  However, he bought those shares at $189.23, which was *lower than the closing price for that day* ($189.89). That eliminates any possibility that he suffered damages.  *See* Kothari Rpt. ¶ 120 n.130.

drop, undercutting his typicality.  *Luczak*, 548 F. Supp. 3d at 1266 (class representative who sold prior to one of three corrective disclosures was atypical because "Plaintiff and the Putative Class will be required to prove that their losses were caused by distinct and separate events, potentially fomenting a disunified class and placing the interests of the Class in significant jeopardy").  At the very least, Mr. Gabbert faces unique defenses related to his lack of economic loss and loss causation, making him an inadequate class representative.

Mr. Gabbert's lack of August 6 damages would particularly impact his ability to be a class representative if the question of the *Politico* article's status as a corrective disclosure were left undecided at this class certification stage:  the lack of August 6 harm would misalign his interests with those of absent class members who *may have* suffered alleged damages from the August 6 price drop.  Because the post-*Politico* stock drop is Mr. Gabbert's only potentially viable source of damages, he will have extremely strong incentives to put all of his efforts into defending the *Politico* article as a corrective disclosure against the overwhelming evidence to the contrary.  It is thus predictable, if not likely, that the *Politico* article's status as a corrective disclosure will become a major focal point of Plaintiffs' case, at the possible expense of Plaintiffs advancing the putative class's claims for damages related to the earlier alleged disclosure and price drop.[8]  *See, e.g., Harris v. Sand Canyon Corp.*, 274 F.R.D. 556, 568 (D.S.C. 2010) (finding proposed representative atypical due to "legal and factual issues unique to them that are likely to distract from their representation of the class").

---

[8] On this issue, *Luczak*, cited above, is directly on point.  There, the district court emphasized that a class representative is atypical where absent class members rely on multiple corrective disclosures to show loss causation but the "viability of the [class representative's] claim turns entirely" on a single corrective disclosure.  548 F. Supp. 3d at 1266.  That is the exact risk present here with Mr. Gabbert.

**C.      Messrs. Truong & Nandkumar Lack an Adequate Understanding of the Case or Inclination to Control the Litigation**

Their testimony demonstrates that Messrs. Nandkumar and Truong lack the requisite understanding of the litigation and control over the efforts of the putative class's counsel.

While "[in] a complex lawsuit . . . the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative," *Gunnells*, 348 F.3d at 430 (citation omitted), a putative class representative still must know at least the basics about the litigation that they seek to lead and about their duties to absent class members. *See Morris,* 223 F.R.D. at 296 (finding class representative qualified where he testified that he, among other things, "saw the [complaint], was able to accurately describe it," and "understood his duty" as class representative). The standard is "not so low as to be meaningless." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008). Messrs. Nandkumar and Truong's deposition testimony showed that neither meets the knowledge requirement. That alone justifies finding both unqualified to serve as class representatives. *See Shiring*, 244 F.R.D. at 316 (finding proposed class representative inadequate where his "deposition testimony demonstrat[ed] a lack of knowledge regarding the allegations contained in the Complaint"); *Passman*, 2023 WL 3195941, at *17 (S.D.N.Y. May 2, 2023) (class representative inadequate because of his "wholly deficient" understanding of the case); *In re Monster Worldwide*, 251 F.R.D.at 135–36 (same).

Mr. Nandkumar lacks basic knowledge about the action. For instance, he is unfamiliar with named Defendant Trizzino, who made one of the public statements for which Mr. Nandkumar and the other Plaintiffs seek damages. *See* Nandkumar Tr. at 31:4–6. Likewise, when asked at his deposition about the nature of the Complaint's core allegations, Mr. Nandkumar responded that "the only thing [he] remember[ed]" was that the Complaint related to "a time when [the] vaccine was going to come out to the market." *Id.* at 30:5-30:19. He similarly did not know anything

33

about the confidential witnesses that offer the key factual allegations underlying the Complaint. *Id.* at 31:19–32:10.  Nor did he recall any details about alleged misstatements beyond Erck "saying some dates and timeline[s]" about the vaccine's release.  *Id.* at 30:12–30:19; *cf. In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 732–33 (N.D. Tex. 2006) (finding representatives inadequate where they had "substantial lack of knowledge about who the named parties are" or their roles "beyond conclusory allegations of fraud").  Mr. Nandkumar also did not know certain basic information about the case and its posture, including the name of the presiding Judge, the Court in which the case is pending, or basic details about the case schedule.  Nandkumar Tr. at 37:7–37:18. Mr. Nandkumar also testified that he has not made much (if any) effort to keep up with developments in the action.  *Id.* at 74:10-74:15 ("Q: What orders and opinions of the Court in this case do you recall having reviewed? A: I don't remember really . . . .  Whenever my counsel has asked me to send documents, I've sent them to him. Besides that, I don't remember anything.").  And, when asked about what he understood his duties to be as class representative, Mr. Nandkumar responded that he is unaware of any duties beyond serving as "a potential witness." *Id.* at 34:19–35:8.  In short, Mr. Nandkumar lacks an adequate understanding of the case and, critically, his representative role.

Mr. Truong displayed a similar lack of knowledge.  For example, he testified that this case's operative Complaint, which was filed in March 2022, was filed "during this year, 2023." *See* Truong Tr. at 25:5–25:16.  He similarly testified that he was unaware of any pending motions before the Court, despite the fact that Plaintiffs had recently filed a motion to compel certain broad discovery. *Id.* at 35:4–9.  Like Mr. Nandkumar, Mr. Truong could not identify the Judge presiding over this litigation or the Court in which the case was pending. *Id.* at 34:24–35:4.  And—also like Mr. Nandkumar—Mr. Truong lacked even a basic understanding of his duties to the absent putative class members; he appeared not to know even that a class representative must act in the

class's best interests. *Id.* at 33:3–13; 66:1–12 ("Q: What is your understanding of what it means to serve as a fiduciary for the benefit of the class? A: That I . . . have to do deposition and testify in this case if it goes to trial . . . [and] that I mak[e] a major decision [concerning] mediation or settlement . . . [,] that's it."). Much like Mr. Nandkumar's testimony, Mr. Truong's testimony only underscored that he lacked the basic case knowledge required of any would-be class representative.

Finally, both Mr. Nandkumar and Mr. Truong lack involvement in prosecuting the case. *See Shiring*, 244 F.R.D. at 315 n.15 (collecting cases emphasizing that PSLRA was enacted in part to do away with "lawyer-driven" securities litigation)*; In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 148–50 (N.D. Tex. 2014) (finding lead plaintiff inadequate where it was unclear "whether [lead plaintiff] or its counsel [was] the one actually pursuing the case"). For instance, neither Mr. Nandkumar nor Mr. Truong recalled providing any comments on the Complaint before it was filed. *See* Nandkumar Tr. at 28:6–21; Truong Tr. at 24:16–22. Mr. Nandkumar, in particular, testified that he had spoken to his counsel "[m]aybe two or three times" during the "initial stages" of the case—which took place well over a year ago—and "nothing else." Nandkumar Tr. at 36:8–14. Mr. Truong similarly testified that he has only spoken to his counsel "10, 11 times" since he sought to be appointed Lead Plaintiff in January 2022. *See* Truong Tr. at 33:19–24. And, as discussed above, Mr. Truong was not even aware that his attorneys had recently filed a motion to compel. *See id.* at 35:5–9.

As a consequence, Plaintiffs Nandkumar and Truong fail to satisfy Rule 23(a)(4) and are not qualified to serve as class representatives.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Class Certification Motion should be denied in its entirety. Alternatively, Defendants request an evidentiary hearing on (i) the applicability of the *Basic* presumption of class-wide reliance and (ii) the alleged misstatements' lack of price impact.

Dated:  September 22, 2023

Respectfully submitted,

_____/s/_____

C. Thomas Brown
(admitted *pro hac vice*)
Peter L. Welsh
(admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Thomas.Brown@ropesgray.com
Peter.Welsh@ropesgray.com

Charles D. Zagnoli
(admitted *pro hac vice*)
ROPES & GRAY LLP
191 North Wacker Drive
Chicago, IL 60606
(312) 845-1200
Charles.Zagnoli@ropesgray.com

Edward R. McNicholas
Bar No. 24833
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 508-4779
Edward.McNicholas@ropesgray.com

Stefan P. Schropp
Bar No. 21699
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9938
Stefan.Schropp@ropesgray.com

*Counsel for Defendants*

36

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of September, 2023, I served a copy of the

foregoing *Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification and*

*Appointment of Class Representatives and Class Counsel* via ECF upon:

James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
Philip J. Leggio
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com
pleggio@labaton.com

Brian Calandra
Jeremy A. Lieberman
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
bcalandra@pomlaw.com
jalieberman@pomlaw.com
esley@portnoylaw.com

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
(202) 408-4600
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

Lesley F. Portnoy
PORTNOY LAW FIRM
1800 Century Park East, Suite 600
Los Angeles, California 90067
(310) 692-8883



_____/s/_____
C. Thomas Brown

*Counsel for Defendants*