# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOTHINATHAN SINNATHURAI,

Individually, and on

Behalf of All Others          Case No. TDC-21-2910

Similarly Situated,

                    Plaintiffs,

   vs.

NOVAVAX, INC.,

STANLEY C. ERCK,

GREGORY F. COVINO,

JOHN J. TRIZZINO, and

GREGORY M. GLENN,

                    Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

REMOTE VIDEO DEPOSITION OF

CHAD WILLIAM COFFMAN

September 14, 2023

10:05 a.m. Central

Stenographically Reported By:

Deanna Amore - CRR, RPR, CSR - 084-003999

APPEARANCES OF COUNSEL
(All Participants Appeared Remotely.)

On Behalf of the Plaintiffs, SOTHINATHAN SINNATHURAI, Individually, and All Others Similarly Situated:

LABATON SUCHAROW
MICHAEL H. ROGERS
PHILLIP J. LEGGIO
300 Delaware Avenue
Suite 1340
Wilmington, Delaware 19801
pleggio@labaton.com
mrogers@labaton.com
        - and -
LABATON SUCHAROW
JAMES T. CHRISTIE
140 Broadway
34th Floor
New York, New York 1005
jchristie@labaton.com
        - and -
POMERANTZ
BRIAN CALANDRA
1100 Glendon Avenue
15th Floor
Los Angeles, California 90024
bcalandra@pomlaw.com

                    APPEARANCES OF COUNSEL
            (All Participants Appeared Remotely.)

    On Behalf of the Defendants, NOVAVAX, INC., et al.:

                ROPES & GRAY
                CHARLES D. ZAGNOLI
                191 North Upper Wacker Drive
                32nd Floor
                Chicago, Illinois 60606
                charles.zagnoli@ropesgray.com
                      - and -
                ROPES & GRAY
                C. THOMAS BROWN
                Prudential Tower
                800 Boylson Street
                Boston, Massachusetts 02199
                thomas.brown@ropesgray.com
                      - and -
                ROPES & GRAY
                EILEEN M. FALK
                2099 Pennsylvania Avenue, N.W.
                eileen.falk@ropesgray.com
                      - and -
                ROPES & GRAY
                WILL PIERESON
                1211 Avenue of the Americas
                New York, New York 10036
                will.piereson@ropesgray.com
        ALSO PRESENT:
            Tim Tupiak, Legal Videographer

                    *   *   *   *   *

Page 4

I N D E X

WITNESS                                           EXAMINATION

CHAD COFFMAN

   EXAMINATION BY MR. BROWN                         7

                    EXHIBITS

   Exhibit 1      3.16.2023 Expert Report     14
                  of Chad William Coffman

   Exhibit 2      "Event Studies in           78
                  Economics and Finance"

                  Journal of Economic

                  Literature March 1997;

                  NOVAVAX_COFFMAN_8531

   Exhibit 3      "Novavax:  A Great Buy on  120

                  Quickly Growing

                  Production Super Low

                  Evaluation and Many EUA

                  Funds";

                  NOVAVAX_COFFMAN_3718-3732

   Exhibit 4      B. Riley Securities        127

                  Analyst Report Re:

                  Novavax, Inc.

Page 5

THE VIDEOGRAPHER:  Good morning.  We are going on the record.  The time is 10:05 a.m. Central time on September 14, 2023.

Quality of recording depends on quality of camera and Internet connection of participants. What is heard from the witness and seen on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit No. 1 in the video-recorded deposition of Chad Coffman, taken in the matter of Sinnathurai versus Novavax, Incorporated, et al., filed in the United States District Court for the District of Maryland, Case No. TDC-21-2910.

My name is Tim Tupiak.  I'm the videographer.  The court reporter is Deanna Amore. We are both with the firm Veritext Legal Solutions.

I'm not related to any party in this action, nor am I financially interested in the outcome.

If counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney, after which

Page 6

the reporter will administer the oath.

MR. BROWN:  C. Thomas Brown, of Ropes & Gray, on behalf of defendants, Novavax and the individual defendants, and together with me are my colleagues Charles Zagnoli, Will Piereson, and Eileen Falk.

MR. ROGERS:  Michael Rogers, from Labaton Sucharow LLP, on behalf of lead plaintiff David Truong and the class.

MR. CHRISTIE:  James Christie, from Labaton Sucharow, also on behalf of the lead plaintiffs and the class.

MR. CALANDRA:  Brian Calandra, Pomerantz LLP, on behalf of the lead plaintiffs and the class.

MR. LEGGIO:  And Phillip Leggio, also on behalf of lead plaintiffs and the class.

MR. ROGERS:  If you missed it, that was Leggio.

THE STENOGRAPHER:  Good morning, Counsel.  Do all parties agree to the remote swearing and that it will be admissible in this proceeding?

MR. ROGERS:  Yes.

MR. BROWN:  Yes.

(Whereupon, the witness was duly sworn.)

THE STENOGRAPHER:  Thank you.

You may proceed.

Page 7

CHAD WILLIAM COFFMAN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BROWN:

Q.   Good morning, Mr. Coffman.  Thanks for making time for us today and for accommodating our schedule changes in the Zoom.  Hope this ended up being more convenient for you.

A.   Yes.  Thank you.  Good morning.

Q.   Great.

If you would, please, sir, state your full name and address for the record.

A.   Sure.  My name is Chad William Coffman.

Do you want my home address or business address?

Q.   Business address is fine in this case.

A.   Business address is 140 South Dearborn Street, Suite 1000, Chicago, Illinois 60603.

I just realized I left my door open.  I am going to close that real quick.

Okay.  Thank you.

Q.   And if I could ask you, sir, what is the name of the business that is located at the address that you just gave?

Page 8

A.    Global Economics Group, LLC.

Q.    Fair to say you've been deposed a number of times before?

A.    I have, yes.

Q.    So I'm -- I know you are familiar with the ground rules but just to remind ourselves of them, I'll try to get my questions out clearly and completely, and then give you an opportunity to answer and hopefully won't talk over you.  I know it's even more challenging in this remote circumstance for the court reporter to get everything down.  So we'll make extra efforts not to talk over each other, and if, for whatever reason I accidentally talk over you and you're not finished, just let me know, and I'll step back so you can finish your answer.

If you need a -- if you need a break, let me know.  We'll try to do them about every hour or so just as a matter of course so people can get up and walk around a little bit, but, otherwise, hopefully, we can move through reasonably efficiently.

My colleague, Mr. Piereson, is going to email around, to your counsel and to you, the documents, and we'll confirm with you and with

Page 9

counsel that you received any exhibits that we send you before we proceed to ask any questions about it.

A.   Okay.

Q.   Is there any reason that you would be unable to give complete and truthful testimony here today, sir?

A.   No.

Q.   Approximately, how many -- well, you are deposed in connection with your work; is that fair to say, sir?

MR. ROGERS:   Objection.

THE WITNESS:   In the course of my work, yes, I've been deposed numerous times.

BY MR. BROWN:

Q.   Okay.   Approximately how many times would you estimate you've been deposed in the course of your work?

A.   I don't know an exact number, but it's probably on the order of 75 or so.

Q.   How many times in this calendar year?

A.   Again, I don't have an exact number, but if I had to estimate, I'd say four or five.

Q.   And of those four or five, how many of those matters were related to a securities

litigation claim?

A.    I believe all of them were.

Q.    When were you first contacted about a possible engagement in connection with this case?

A.    I don't recall.

Q.    Would it have been more than a year ago?

A.    I don't believe so.  I don't have that recollection, no.

Q.    Would you have a recollection of approximately how far in advance it was before you submitted your expert report, dated 3-16-23, in connection with the case certification motion?

A.    I don't remember the date.  I remember working on this matter in the months leading up to that, to the report being filed, but how many months, I just don't recall.

Q.    Who retained you in this matter?

A.    Counsel for the lead plaintiffs.

Q.    And which counsel for the lead plaintiffs reached out to you initially?

A.    I don't have a clear recollection of that. It was probably Labaton, but I'm not certain of that.

Q.    Have you worked previously with anyone at the Labaton Sucharow firm?

A.   Yes.

Q.   Approximately how many securities litigation matters have you worked on in connection -- with the Labaton Sucharow firm in your work as an expert?

A.   I don't -- I don't know.  As I sit here, I don't recall.

Q.   More than 10?

A.   Yes, more than 10.

Q.   More than 20?

A.   Probably more than 20, yes.

Q.   What about the Pomerantz firm?  Have you worked with the Pomerantz firm previously before this?

A.   I have, yes.

Q.   More than ten times?

A.   I'm not sure.  Yeah, I just don't recall how many times.

Q.   What did you do to prepare for your deposition today?

A.   I reread my report.

I reviewed some of the backup material to my report.

I didn't read the complaint, you know, front to back but skimmed the complaint.

Page 12

I read the motion to dismiss order and then had a brief call with counsel for lead plaintiffs.

Q.   Setting aside the brief call that you had, approximately how much time would you estimate that you spent doing the review of materials that you just described?

A.   Four or five hours.

Q.   And how long was your call with counsel?

A.   Less than an hour.

Q.   And when did that occur?

A.   Yesterday.

Q.   And I don't want to know about anything that you discussed, but who individually was actually present on that call?

A.   I recall Mr. Rogers being on that call and Mr. Christie.  I don't remember if there were other people on the call.

Q.   My colleague, Mr. Piereson, sent around a copy of your report.  Have you received that in your email, sir?

A.   I have not.  Let me double-check.

Q.   Okay.

A.   You might want to make sure I'm on your email.

Q.   Yeah.  I think we might have just sent it to counsel.  Apologies.  That was my error.

MR. BROWN:  Mike, have you gotten it?

MR. ROGERS:  I don't see it.

MR. BROWN:  There should be an email.  I see your email on the list.

MR. ROGERS:  Let me check my spam.

No, I don't see it there either, but I have a hardcopy.  So don't worry about it.

MR. BROWN:  Okay.  All right.  What about -- James, have you got --

MR. ROGERS:  I do have it.  I got it from Will. I was looking for your name.

MR. BROWN:  It's from Will.  Will be the one sending it around.

And, Will, can you please make sure that Mr. Coffman gets a copy of that as well, please?

MR. PIERESON:  Yes, I'll add him to the chain.

BY MR. BROWN:

Q.   I know you're familiar with it, but we need to get you a fresh copy that we can mark.

A.   No, I understand.  Yeah, I'll let you know when I receive it.

Q.   Okay.  Thank you.

MR. BROWN:  Madam reporter, did you get a copy?

Page 14

THE STENOGRAPHER:  I did.  Thank you.

MR. BROWN:  We took the docket version so the first page just says Exhibit A on it, and the second page begins the actual report.

THE WITNESS:  Sorry for the delay.  I don't know why it's taking a while to get through.

MR. BROWN:  That's all right.  It's one of the drawbacks.  We'll charge it against the time we didn't spend traveling.

(Technical discussion off the record.)

(Whereupon, Coffman Exhibit 1 was marked for identification.)

BY MR. BROWN:

Q.   So, sir, I've marked here Exhibit 1 which is a 76-page document with a case citation on the top and the label Document 85-4 filed 3-16-23.  It says Exhibit A.  If you could just turn to the second page with the caption title, and do you recognize this document, sir?

A.   Yes, this appears to be the report I filed.

Q.   And did you prepare this report in connection with a motion for class certification in this case?

Page 15

A.    That's my understanding of how it was being used.

Q.    Have you prepared for submission any other reports, any other expert reports, in this case to date?

A.    No.

Q.    And did you draft this report yourself, sir?

A.    It was certainly drafted at my direction. I participated in the drafting, and it's all my opinion and my words, but I did have assistance with -- from staff in preparing it.

Q.    Were there particular members of your staff that worked with you on this report?

A.    Mark Hedstrom is the one that comes to mind, and I know there were other -- several other staff members that worked on this as well, but I worked primarily with Mark.

Q.    If you could take a look quickly at page 39, it's page 40 of the PDF, right under paragraph 85.

A.    I see that.

Q.    Is that your signature at the bottom of the page, sir?

A.    It is.

Q.   And did you review the report that you submitted before providing that signature?

A.   Yes, I did.

Q.   So, to your knowledge, everything that is in this report accurately reflects your opinions or the broader context that you thought was important to supply in connection with providing this opinion?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I believe it certainly reflects my opinions and has a summary of the basis for reaching those opinions, yes.

BY MR. BROWN:

Q.   If you would turn, please, to paragraph 6, which is on page 4 or page 5 of the PDF -- what's the easiest way?  I'm largely going to be referring to paragraphs.  I'll avoid referring to pages unless you're having trouble finding it.  I think paragraphs are easier to work with.

A.   That's fine.

Q.   Okay.  So if I could draw your attention first to paragraph 6, and at the end of paragraph 6, just as you turn over onto the last page, you state that you have "formed the opinion that the market for Novavax's common stock was

efficient during the class period."

Is that one of the opinions that you have offered to date in this case, sir?

A.   Yes.

Q.   And since the date of this report, has your -- has that opinion changed in any way?

A.   No, it has not.

Q.   Okay.  The paragraph under that, paragraph 7, you state "I have also formed the opinion that damages in this action can be calculated on a class-wide basis using a common methodology."

And, sir, is that an opinion you intend to offer in this case as well?

A.   Yes.

Q.   Has that opinion changed since the date you provided this report?

A.   No.

Q.   To date, have you formed any other opinions that you expect to provide in this case?

A.   No.

Q.   We'll come back and talk a little bit more about the bases for those opinions in a second, but I'd first just like to direct your attention, please, to the back of the report, to Appendix B,

which is your resume and professional experience statement at the end.  I think that's page 58 of the PDF to get there more quickly.

A.   Okay.  I'm there.

Q.   Thank you.

And was the resume -- or excuse me -- the -- whatever we want to call it, the information stated in Appendix B accurate as of 3-16-23?

A.   To the best of my knowledge, yes.

Q.   To your knowledge, other than any additional cases you may have become involved in, would there be any changes to this document between then and now?

A.   No.

Q.   What -- if you could, please, sir, describe for me your educational background after high school?

A.   Sure.

I have obtained a bachelor's degree from Knox College with a major in economics with honors. I then did a master's in public policy at the University of Chicago and then have also obtained a CFA certification, a Chartered Financial Analyst certification.

Q.   Was there any particular area of focus for

your master's in public policy?

A.   Well, it wasn't -- they don't have like formal focuses, but in terms of what I focused on, I focused on economics, I focused on statistics, and quantitative analysis, finance is something I focused on, just in terms of the types of courses I took.

Q.   And in connection with obtaining your chartered financial analyst designation, did you have to go through any formal coursework?

A.   There wasn't formal coursework, but there were three exams over three years that had to be passed.

Q.   And what, in general terms, are the topics of those three exams?

A.   It spanned everything from some statistics, accounting, valuation, finance, anything really tied to management of assets, financial assets -- I'm sure there's other areas too -- ethics.  Those are the things that come to mind.  I'm sure there's other areas I'm forgetting, but it's really a certification for people that are involved in finance and money management and asset management.

Q.   Understood.

Do you -- so you don't hold a doctoral degree in economics or any other subject?

A.    No.

Q.    Okay.  Did you ever at any point pursue such a degree?

A.    No.

Q.    Could you describe the work that you did at Chicago Partners, LLC?

A.    Sure.  It evolved over time.  When I first started at Chicago Partners, I was really a support staff for a number of different academics who were doing consulting work -- some involving litigation, some not involving litigation.

Over time I began to specialize in doing complex data analysis, financial analysis, as well as working on securities litigation-type cases, as well as antitrust cases, general valuation.

So I really supported -- I can't think of an academic or expert that worked that I didn't support in some way at any point or another.

And then I really developed a management role there as well in terms of being involved in selecting staff and training staff and ultimately began to develop my own -- my own practice which started out really focusing on working as neutral

Page 21

for mediators in class action securities litigation and other types of cases where I would be involved in matters where both sides would engage me to assist in the mediation process.

And then also started developing -- started doing some testimonial work in employment-type matters and class action securities matters as well.

Q.   Approximately what year did you first give the sort of testimonial work -- participate in sort of the testimonial work that you just described?

A.   Probably 2007-2008, somewhere in that time frame.  Maybe there was one a little earlier than that, but I don't think there was a lot before 2007.

Q.   And how did it come to you -- so you're no longer with Chicago Partners; correct?

A.   Correct.

Q.   And how did it come to be that you decided to leave Chicago Partners?

A.   The former president of Chicago Partners had left the firm and after some period of time had reached out to me and was interested in forming a new firm, along with a couple other colleagues, and so a group of us formed a new firm outside of

Global -- outside of Chicago Partners.

Q.   And is that the Global Economics Group firm?

A.   Yes, it was first known as Winnemac Consulting when it was first founded, but then we did a name change to Global Economics Group, yes.

Q.   I had heard about Winnemac.  That was one of my questions.  When did the name change from Winnemac to Global Economics Group?

A.   I think it was 2009 or 2010, somewhere in that time frame.

Q.   And what is the business, in general, of the Global Economics Group as of today?

A.   It's really involved in the application of economics, finance, accounting, and valuation principles to questions that were asked as consultants is the best way I can describe it.

Q.   And are you a partner or a principal in that group?  Is that a fair description of the title?

A.   Yeah, I'm a member of the LLC.

Q.   And how many members does the LLC have?

A.   There are three currently.

Q.   Your resume lists a business called Market

Page 23

Platform Dynamics.  What is Market Platform Dynamics?

A.   That's a business that was involved in providing consulting services really in the area of two-sided markets, more management consulting-type work.  That firm is actually in the process of being dissolved.  There's just no activity left in it.  So it's not something that's active.

Q.   Was it a business that when it was active you worked in at the same time as being a member of the Global Economics Group?

A.   Yeah, but my role was essentially a management role doing -- I was not involved in the consulting itself except for something very small way back when it first started, but over the last ten years, I've really not been doing any consulting-type work for that firm.  It's just been management.

Q.   Moving on to your Experience section, first as a starting point, since the date of this particular document, 3-16-23, approximately how many additional securities litigation matters have you become engaged on?

MR. ROGERS:  Objection.  Foundation.

You can answer.

THE WITNESS:  There certainly are some. I don't -- I don't know how many.

Also, your question didn't distinguish between testifying engagements and just consulting engagements, so I -- but we've certainly been engaged -- I've certainly been engaged on additional matters since then.  I don't know how many.

BY MR. BROWN:

Q.   Do any of those additional matters involve the Labaton Sucharow firm?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Probably.  As I sit here right now, I don't have a specific recollection of one. I haven't really thought about that, but it's certainly possible.

BY MR. BROWN:

Q.   What about the Pomerantz firm?

A.   Again, I don't have a specific recollection of one, but it's possible.

Q.   And how many times have you, in connection with a securities litigation matter, provided actual testimony in court, whether it be at a hearing or trial?

MR. ROGERS:  Is there a time for that question,

Tom?

MR. BROWN:  Pardon?

MR. ROGERS:  Is there a time frame for that question?

MR. BROWN:  In his time at Global Economics Group.

MR. ROGERS:  Thank you.

THE WITNESS:  I certainly recall a few.  It would probably be a handful or less.  I'm trying to think of them all right now.  There are certainly a number of those, but it's not a large number.

BY MR. BROWN:

Q.   What about the number of times that you have been -- strike that.

In those matters that you're recalling, do you have any recollection as to the number of times you appeared on behalf of the plaintiffs or the defendant or as some form of neutral?

A.   There's one case I recall testifying for defendants.  There's -- the others are -- I was a -- working on behalf of plaintiff.

Q.   What was the case you recall testifying on behalf of the defendants in that case?

A.   That was a valuation matter that I would have to look -- give me just a second.  Let me look

Page 26

at my CV and see if I can identify that particular
matter.

Yes.  If you go to page 3 of 19 at the top
on the CV, it's the first one listed on page 3 of
19, the Pallas v BPRS and Nudo matter.

Q.   So back to the report -- well, first off,
separate from the report, would you be able to
approximate the number of hours that you personally
have spent considering issues in connection with
this case that we have before us today?

MR. ROGERS:  Objection to form.

THE WITNESS:  As I sit here right now, I don't
know.  In preparation of the report, I can
approximately say somewhere between 15 and
20 hours.  Beyond that, I just don't know.

BY MR. BROWN:

Q.   And the 20 or 15 hours you're referring
to, that's your personal time, not the time of your
team?

A.   That's correct, yes.

Q.   And would you have an approximation for
how much time individuals on your team had spent in
addition to your own time on this matter, and on
the report, I should say, to be specific?

A.   It's certainly over 100, probably less

Page 27

than 500, but where it falls in that range, I just don't know.  We obviously have records that reflect that, but I just don't know as I sit here.

Q.   Is your -- is the compensation being provided to your firm in this matter in any way dependent on the conclusions in your report?

A.   No, not at all.

Q.   Is it in any way dependent on the outcome of the case?

A.   No, not at all.

Q.   If I could refer you now to your Appendix A, the documents considered, that's page 54 of the PDF, I believe.

A.   I see that.

Q.   Is this, to your knowledge, a complete list of all the documents that you considered in forming your opinions expressed in the report that is before us right now?

A.   To the best of my knowledge, it is. Obviously, for some of the items on here, it's really a summary, not a complete listing of every single individual document.

You know, for example, under the News section, I did not -- I wanted to spare the trees of listing every single article my staff or

Page 28

I looked at.  Taking into account the summary form of some of the bullet points, yes, it's meant to reflect all the documents I considered.

Q.   Okay.  Let me direct your attention, in particular, at the first section, Court Documents. Are the Consolidated Amended Class Action Complaint, Bullet 1 and the Memorandum Opinion on the Motion to Dismiss, Bullet 2, is that a complete list of all the court filings in this case that you reviewed in connection with preparing this report?

A.   Yes.

Q.   And Section 3, or Part 3, SEC Filings, there's a listing of a series of various filings by Novavax, Inc., one, two, three, four, five, six of them.  Are there any other SEC filings by Novavax that you are aware of having reviewed in connection with forming your opinions in this case?

A.   You know, just to note those are six different categories.  There's obviously multiple documents within each, but I don't recall having reviewed any SEC filings outside of this list, no.

Q.   If I could ask you about the first bullet point on your -- under Security Data, I'm trying to understand a little bit.

I take it this is a summary of various

sources that you would use for historical data around the securities information about Novavax, Incorporated?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  This is meant to reflect that I -- yeah, I or my staff downloaded from a service we have, S&P Capital IQ, historical data related to the pricing of these securities or indices.

BY MR. BROWN:

Q.   Is there a source of historical securities data that you tend to view as more reliable than any of the others that you have listed here in the bullet point?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I guess I'm not clear.  I think there's really only one source that's listed there. It's S&P Capital IQ.  That's the -- that's the service from which we obtain that, all of that data.

BY MR. BROWN:

Q.   Does S&P Capital IQ collect data on its own or does it amalgamate data from other sources?

MR. ROGERS:  Objection.  Foundation.

THE WITNESS:  Well, I don't know exactly what all their procedures are.  For most of these, what

I'm referring to here, it's things like closing prices and volume and other such statistics, which I -- you know, at base are generated, I understand, by securities exchanges, and then there's some sort of feed that's available, not just to S&P Capital IQ but to lots of market participants. So I assume they are getting their data in some way -- whether directly or indirectly, I'm not sure -- through -- from the exchanges and other people that put together these sorts of indices. I am sure they're getting data somehow there, but I'm not privy to exactly what their procedures are for obtaining that data.

BY MR. BROWN:

    Q.   Let's move back into the report.

        First, if I could direct your attention to your Section 4, the "Overview of the Company and Allegations."

    MR. ROGERS:  What paragraph?  What paragraph are we looking at?

    MR. BROWN:  Starts with paragraph 10.

    THE WITNESS:  I'm there.

    MR. BROWN:  Section 4.

BY MR. BROWN:

    Q.   The overview that's set out in

paragraphs 10 through 13 here, you've listed various filings and sources, including the complaint.

My question to you, sir, is did you make any independent efforts to verify the accuracy or inaccuracy of any of the information on which you sourced your description of the Overview of the Company and Allegations?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Well, let me go through it carefully.

Paragraph 10 is really just a summary of the company, and that -- those descriptions come directly from information in Novavax's own SEC filings.  I did not undertake anything outside of reviewing those SEC filings to verify whether what Novavax was reporting was accurate.

Same thing with paragraph 11.  That information was taken directly from things published by Novavax.  I didn't do any of my own work to investigate outside of that other than that I, obviously, through the work we did, verified that the ticker "NVAX" represents Novavax.

Paragraph 12 summarizes the allegations in an overarching way, the allegations in the

Page 32

complaint, and the general theory underlying their claim.

But beyond that, reading the complaint itself, I had discussions with plaintiffs' counsel to make sure I understood what the claims in the case involved as well.  So -- but the information here was summarized straight from the complaint.

Likewise, paragraph 13 goes into more detail about what I understand the complaint to be alleging, and, again, certainly, in the course of my work, had conversations with counsel to -- and nothing in my conversations with counsel were inconsistent with what I understood is in the complaint about what their claims are.

So I don't think I did any investigation outside of what I just described to verify the accuracy of any particular statement that was in those documents.

BY MR. BROWN:

Q.    Okay.  Thank you.

If we could move forward a little bit in the report then to paragraph 18.

A.    Okay.

Q.    And, sir, if I could ask you to explain for me what exactly does it mean to say that an

Page 33

efficient market exhibits the "semi-strong form of efficiency"?

A.    So when economists refer to "semi-strong efficiency," they're referring to a state where markets quickly incorporate any widely disseminated public information into the market price so that there's not a -- I guess I don't know how to say it any better than that.

It's the prices react quickly to new information and absorb all widely disseminated publicly -- public information rapidly.

Q.    And is there a generally understood definition of how fast "quickly" would be with respect to that?

MR. ROGERS:   Objection.   Form.

THE WITNESS:   I think I use the word "rapidly." I think I might have said "quickly" as well.

But, generally, when I think of rapidly or quickly, and in terms of how the analyses are normally performed by other financial economists looking at this question, it's usually in a matter of -- certainly within a matter of a day or some small number of days is what's generally being discussed.

Page 34

BY MR. BROWN:

Q.    And so I understand precisely the nature of your opinion, is the opinion that you're expressing about the efficiency of the market for Novavax stock an opinion that includes a view about the nature of that efficiency or -- as in semi-strong, strong, or weak, or simply that it is efficient to one of those standards?

MR. ROGERS:  Objection.  Form.

You can answer.

THE WITNESS:  Yeah, no, I'm saying -- my opinion is that it's efficient at the semi-strong level.  That's the standard I've adopted in my report.

BY MR. BROWN:

Q.    Thank you.

If we could move on to your discussion of the Cammer factors that starts with paragraph 20.

A.    Okay.

Q.    Directing your attention to paragraph 22, you state, at the beginning, "While there is a well-accepted economic theory of market efficiency, there are no broadly accepted, bright-line empirical tests that allow one to classify a particular market as 'efficient' or 'inefficient.'

Page 35

In my view, the Cammer decision identified important metrics to consider when evaluating efficiency for purposes of the 'fraud on the market' theory."

I would like to ask you, sir, could you please explain to me why it is that you think that the Cammer factors, in particular, are important in the metrics with respect to "fraud on the market" theory?

A.   Sure.   I think further on in my report with respect to each of these factors, in addition to the additional factors I look at beyond the Cammer factors, I attempt to describe my views as to why I think each factor makes sense as a metric for or as a factor to consider in market efficiency.

So I can go through each one of those individually, if that's what you'd like me to do, but I think that there's a paragraph in each of the individual sections for each Cammer factor why I think each factor is a -- is a reasonable metric to look at when studying market efficiency.

Q.   At the end of that particular paragraph, you state that "none of the individual tests or metrics is determinative as to whether a particular

Page 36

market is efficient."

My question to you, sir, is are there any of the tests in the Cammer factors that you would consider to be more important than others in supporting an opinion that a market -- particular market is efficient?

A.    Sure.  I think not all of the metrics are the same.  I think there are certain quantitative ones that are more directly addressing the question of market efficiency and whether the structure of the market supports efficiency than some of the others.

Q.    And which of those factors would you think would fall into that more supportive bucket that you described?

A.    Again, I don't know about more supportive. I would just place somewhat greater weight on those.

I think the volume, average weekly volume. Obviously, an efficient market needs activity to reflect prices.  So there being sufficient volume and participation in the market, I think that's a -- one that probably weighs more than average.

Cammer Factor 5, which is a more direct test of whether information is impacting the market

Page 37

price, I think is -- weighs higher than average.

I think the -- so amongst the Cammer factors, I would say those two probably weigh more than others.

Among the other factors, I think bid-ask spread is a way -- again, a measurable tool for how much it costs to trade in a market, and, therefore, that's a more direct measure of how -- how much price -- how much you effectively have to price or pay to get liquidity at different -- different precision.

And then I think autocorrelation is a, you know, a good, direct test of weak form efficiency, which is, obviously, a predicate to semi-strong form efficiency.  So, again, I think that's an empirical test that would weigh more than some of the others.

Q.   With respect to just the Cammer factors, are there any of those factors that you -- that, in your view, are necessary such as -- such that if that particular factor isn't present, you wouldn't be able to conclude that a particular market was efficient?

A.   No, I don't think so.  I mean, as I've talked about, and as I've testified previously in

Page 38

other matters, I think the Cammer Factor 5 is the most direct test.

However, you can conceive of situations where there might not be a lot of price reaction to a lot of information in particular scenarios or there's -- or all the information over some period of time is as expected, and so you don't see measurable statistically significant stock price movements.  That doesn't necessarily mean that you should conclude the market is inefficient.

So I don't think there's any one test that if it just happens to not meet that criteria or meet that factor, that you would immediately jump to the conclusion you can't come to the conclusion it's efficient.

Q.    Let me direct your attention now onto the description or the discussion of Cammer Factor 1 in particular.  So I'm at paragraph 26 where that starts, page 15 of the PDF.

A.    Okay.  I'm there.

Q.    First off, if you would, sir, please explain why it is that, in your view, average weekly trading volume of a security is a valuable tool for determining whether a market is efficient or not.

A.    Sure.

So in paragraph 27 is where I describe this.  I say "Volume as a fraction of shares outstanding is an important indicator of market efficiency for several reasons."

"First, it's objectively quantifiable and can be compared across securities."

"Second," it's -- "high volume is generally indicative of continuity, liquidity and market depth, which are highly indicative of market efficiency."  So it sort of sets the conditions for market efficiency.

And then substantial volume also indicates there's likely a market for distribution and information about the security, and then I cite to a source that explains how -- that describes how trading volume is reflective of why it would tend to support an efficient market.

So I think those are the reasons, in my view, it's an important -- and, again, the whole idea is is there sufficient market activity to believe that conditions are present for market efficiency.  So that's the underlying reason.

Q.    In paragraph 28 you state that "The average weekly trading volume for Novavax Common

Stock during the Class Period was 30.89 percent of shares outstanding compared to 2.14 percent for the average weekly trading volume on both the NYSE and NASDAQ exchanges."

Could I ask you first, sir, how is it that you went about determining what the weekly trading volume for Novavax common stock was?

A.    Sure.  The -- we obtained volume information from S&P Capital IQ.  Those -- that data is reported daily, or even more frequently than daily, but you can get it daily in the exchange.

So we downloaded a data file that had volume in it on a daily basis and calculated, on average, what was that volume over, you know, weekly periods where each period represented five trading days.

So that's reflected -- the data and the calculation is reflected on Exhibit 3 to my report. So each one of those blue bars on Exhibit 3 to my report represents a five-day trading window and reflects the percentage of the shares outstanding that was traded during that week, and then there was an average taken of those.

Q.    30.98 percent of shares outstanding traded

versus the New York Stock Exchange and NASDAQ averages of 2.14 percent.

Would -- is that -- so is it fair to say that Novavax shares were, in the class period, trading at a volume that was significantly higher than the average for other shares listed on the same indices?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I think you meant to say "exchanges."

BY MR. BROWN:

Q.   Yes.  Yes.  "Exchanges."  Sorry.

A.   Yes.  They -- yes is the answer.  This stock traded more frequently -- much more frequently than the average stock during this period of time.

Q.   So you've performed this kind of calculation of average weekly trading volumes in connection with previous analyses of market efficiencies in securities cases; is that fair to say?

A.   I have, yes.

Q.   Have you ever encountered a stock that traded at something in the neighborhood of 31 percent of shares outstanding on a weekly basis?

Page 42

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Yes, I have come across that in the past.

BY MR. BROWN:

Q.   How frequently as a percentagewise would you say in cases that you have encountered that or greater as the percentage of average weekly trading volume?

A.   It would certainly be a minority.  This is obviously well above average trading volume.  But it's certainly not a number I haven't seen before, but it -- you know, I'm not denying this would certainly be in the, you know, much larger than what we would typically see or see on average, but it's not sort of totally outside the norm of what I've seen in other cases.

Q.   Is there a point at which trading volume would, you know, cross a particular threshold where you would begin to question whether the trading was driven by market information versus some other factor?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  No.  What it reflects to me is there was a tremendous amount of liquidity in this stock.  If one wanted to transact in this stock,

there were plenty of people out there engaged in trading this stock.  So it would not be find -- it would not be difficult to find somebody who is willing to trade with you if you wanted to get liquidity in the stock.

BY MR. BROWN:

Q.    Well, is it also fair to say the higher percentage indicates that there is a lot of people who are, in fact, trading frequently in the stock?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I think it's fair to say that there were probably lots of people trading frequently in the stock, yes.  That's how you get to numbers like this.

BY MR. BROWN:

Q.    Are you familiar with the concept of noise trading?

A.    I mean, I've heard of it.  I don't know precisely how to define it or -- but if you have a particular definition in mind, please give it to me, but it's something I've heard that term, and I have a general concept of what it means, but I don't -- that's not something I've studied carefully.  So if you have a particular definition in mind, it would --

Page 44

Q.   No.   But I think this gets to what my question was going to be.

You didn't undertake any efforts to determine whether or not there was any sort of noise trading in connection with Novavax stock over the class period?

MR. ROGERS:  Objection.  Form and foundation.

THE WITNESS:  Without knowing exactly what you mean by "noise trading," I think it's fair to say I did not undertake any specific analysis of whether there was or wasn't what you're calling "noise trading" because I simply didn't do it, but it's not clear exactly to me what you mean by "noise trading."

BY MR. BROWN:

Q.   Let me move on to the numbers presented in paragraph 29 where you discuss annualized turnover velocity.

First, if I could, sir, ask you just to explain on the record what is the concept of annualized turnover velocity ratio?

A.   Again, it's really just an annualization of the average weekly trading volume is probably the easiest way to say it.  It puts it in annual numbers, and the reason we do it is it becomes

comparable, directly comparable, to numbers that are reported by the exchange for what the annualized turnover velocity for all the stocks are on the exchanges.

Q.   Toward the bottom of the page there in paragraph 29, you present that the annualized turnover velocity ratio for Novavax common stock was 1,549 percent compared with the NYSE and NASDAQ average of 111 percent for the class period.

Could I ask, first, sir, before talking about the details of those numbers, how did you go about calculating the annualized turnover velocity ratios presented there?

A.   Sure.  Well, the formula is below in Footnote 33, but it's -- again, essentially, it turns into a measure of volume over shares outstanding annualized rather than on a weekly basis is effectively what it gets you to.

Q.   Have you, in any of the market efficiency analyses you've done before in which you've looked at annualized turnover velocity, encountered a stock that had 1,549 percent or greater annual turnover?

A.   Not often, but it -- I believe that has occurred before but not often.  It's high,

Page 46

certainly high, relative to the average.

Q.   Is the fact that it is high relative to the average, would that in any way affect the way you would analyze how to apply Cammer No. 1 with respect to Novavax stock?

A.   No, I think all it's really telling us is that there's a substantial amount of volume and that the conditions for market efficiency in terms of the need for a liquid market and a continuous market are easily met.

Q.   If we can move on to Factor 2, "Analyst Coverage."

First, as a starting matter, why is it that you believe that analyst coverage is a factor in determining market efficiency?

A.   That's really described in paragraph 32. So I say there "Analyst coverage can be important evidence of efficiency.  Significant analyst coverage implies that there is sufficient interest in the company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed."

So, you know, getting behind that a little bit, you know, analyst coverage is expensive.  It

Page 47

takes people and data and time to put reports together.  Companies wouldn't do that unless there was a market for that information and people were willing to pay for that information.

So, again, I think it's indicative of interest in a security and a desire for people to obtain information and expert analysis related to a security.  So that's the sense in which it's indicative of an efficient market is that there is clearly widely disseminated information regarding the security.

Q.  Does the consideration of analyst coverage in the context of a market efficiency analysis in any way take into account the substantive quality of the particular analysts that report on that stock?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I mean, certainly, simply counting them doesn't, and there certainly is a wide variety of types and quality of analyst reports.  I think in this particular case I've highlighted in paragraph 33 that there's, you know, well-known firms that produce high-quality analyst reports, at least have the reputation of providing higher-quality analyst reports, issued reports on

Novavax including Jefferies, Cantor Fitzgerald, and JPMorgan.  I'm sure there is others as well.

But, yes, there's definitely a -- and that's why I highlight those, is that those tend to be the types of reports that are much more in depth than some other types.

BY MR. BROWN:

Q.    In paragraph 34, you discuss developments in the way that information is disseminated about markets since 1989.  My question to you, sir, is does -- setting aside sort of formal analyst reports, does the existence of online conversation, whether in chat rooms or feeds or anything like that, feed in to the question of analyst reports or are you simply focused on formal firms whose business it is to produce such information?

A.    I guess I'm not limiting it to formal firms that are providing information.  In fact, I give sort of, you know, 24-hour cable news networks and email and RSS feeds as examples.

I certainly think social media is another way in which information is disseminated and gathered.  I think people have to take into account the relative reliability of different sources.

But, you know, back in 1995 when I first

Page 49

started doing work in this area, to get an SEC filing, we had to have it faxed to us.  Now, you know, any person can get on the web and within seconds download any SEC filing they want.

So the point of this paragraph is really to say if you want information on a company and analysis about a company or data about a company, there's many more ways to get it now and have it at your fingertips than when Cammer was considering this question in 1989.

And so while, you know, formal clearly analyst coverage still plays a role and is important and that's why I look at it, there's just many more ways people can get information now than just looking at that.

Q.   Let's move on to Factor 3, "Market Makers."  So beginning at paragraph 37, first, just so we are clear on the record, what is a market maker with respect to a particular stock?

A.   Well, it's essentially somebody who stands ready to trade a particular stock.  In particular, you know, in an exchange-traded stock, like Novavax, there's usually people that are dedicated to making sure there's a functioning market.  So they stand ready to trade, to buy and sell to

facilitate market trades.  That's my understanding of what a market maker is.

Now, in -- a lot of trades take place even without a market maker because of electronic exchanges.  So, again, technology has, I think, made specific human market makers less important, but it's certainly a factor that Cammer looked at at the time when looking at an over-the-counter stock when you had to rely effectively on a market maker to buy and sell.

Now, with the type of trading that happens on the exchanges, I think there's many more mechanisms that ensure a free-flowing market than even relying on a market maker, but my understanding of what a market maker is is somebody who stands ready to trade, buy, or sell that works at the exchange or is resident or has a -- is a member of the exchange.

Q.   Directing your attention to paragraph 40, the discussion of the New York Stock Exchange or NASDAQ markets, I'd appreciate if you could explain to me how is it that being listed on the -- one of those two exchanges would affect the analysis of market makers?

MR. ROGERS:  Objection.  Form.

Page 51

THE WITNESS:  Sure.  Well, I think that's explained really in paragraph 39 and 40.

And, again, paragraph 40, in particular, I say "The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day.  Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes."  And then I provide a citation for that.

And I talk about how the minimum requirements to be listed in remain in good standing, you know, virtually -- and the rules of the exchanges virtually guarantee a liquid market for these securities, and therefore, the counting of market makers is less relevant because you have these institutional systems that essentially guarantee the ability to buy and sell during the trading day without the influence of market makers.

BY MR. BROWN:

Q.   What are the minimum requirements that you're referring to in the next-to-last sentence?

A.   I don't know off the top of my head what all those listing requirements are, but I know

Page 52

there are size requirements and minimum average price requirements over a particular point, but I -- sitting here, I don't remember what all those requirements are.  But the general purpose of those requirements is to have stocks listed on these exchanges that are certainly large enough to gather interest and priced in such a way that it's -- that it's easy to transact in those securities.

Q.   So in forming your opinion regarding market efficiency, did you consider that the public listing of NASDAQ was sufficient for your purposes to determine that the number of market makers factor had been met?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  In my view, the fact that Novavax was listed on NASDAQ certainly gave me the view that it met the Cammer market maker factor in the sense that the -- what the factor is focused on would certainly be met by any stock that was trading on the NASDAQ, but I did go beyond that and in paragraph 41 did note that there were 95 market makers in Novavax common stock over the class period.

So I did do both, but, yes, generally, once a stock is trading on the NYSE or NASDAQ,

I would consider it to have met this criteria.

BY MR. BROWN:

Q.   Let me move on then to Factor 4, the "SEC Form S-3 Eligibility."

First off, could I ask you to explain what is your understanding of how a company becomes eligible to file Form S-3?

A.   Well, my understanding is the SEC allows certain companies to file Form S-3s because they have sufficiently provided information over a longer period of time to the market, and so it's assumed at that point that sufficient information about the company is widely disseminated and publicly available, and so that's my understanding of -- and it essentially allows companies to just include things by reference because it's assumed that what they've -- what they've disclosed previously is already widely publicly available.

Q.   In paragraph 44 you begin with the sentence "I found no evidence that Novavax was not S-3 eligible throughout the class period."

Just as a hypothetical, let me ask you, if you had found that to be the case, that it was not S-3 eligible during the class period, if all the other factors remained as you described them in

Page 54

your report, would that have changed your opinion as to the overall market efficiency of Novavax stock in the class period?

MR. ROGERS:  Objection to form.

THE WITNESS:  No, it would not have changed it, and I -- you know, in reviewing and preparing for my deposition, it also became clear to me there was one time that they had a 10-Q that I believe that was filed a day late.  There was some hiccup in the filing of it.  So it was technically not timely, but I think they filed it the next morning or something like that.

So I was aware that there -- or I did become aware there was at least a hiccup, but I'm not aware of any factor that would make them ineligible, but no, even if they were ineligible, given the strength of all the other factors I've analyzed, that would have no impact whatsoever on my opinion.

MR. BROWN:  Mike, I prefer that we take a quick break now because we are about to get to five, which is going to take longer, and we have been going about an hour.

MR. ROGERS:  Sounds like a plan.

THE VIDEOGRAPHER:  Off the record.  The time is

Page 55

11:15 a.m.  This is the end of Media Unit No. 1.

(A short break was taken.)

THE VIDEOGRAPHER:  We are going back on the video record.  The time is 11:29 a.m., and this is Media Unit No. 2.

BY MR. BROWN:

Q.   Mr. Coffman, I think that we had gotten to paragraph 45 in your report, which is Cammer Factor No. 5, the "Price Reaction to New Information."

First, just as a starting point, if I could ask, as I had with the other factors, why is it that you consider Factor No. 5 to be relevant to your assessment of whether a particular market is efficient?

A.   Sure.  I describe that in paragraph 46, where I say, "Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency."

And then I start to describe generally the event study methodology and techniques and how that's a methodology that has been used thousands of times in the literature to evaluate the cause-and-effect relationship between new

Page 56

information and market prices.

Q.    In paragraph 46 you note that an event study is a technique that's often used for assessing the causal relationships that you're discussing.  Could you describe generally what is an event study?

A.    Sure.  So that's described in paragraph 47.  So it's conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from what's expected is statistically significantly high enough to reject random movement as the cause, and, therefore, when there's news at the time a price moves in a significant way, an event study allows you to scientifically say with sufficient or with certain levels of certainty that the information provided was actually the causal reason that the price moved.

Q.    You say, in the second sentence of paragraph 46, that the event study is often -- is a technique "often relied upon."  Are there other techniques that could be used for the purpose of establishing causal connection?

A.    Well, I mean, there are -- I mean, there are other statistical ways besides the linear

Page 57

regression approach that's often used, but I think it would still fall under the rubric of an event study, but there are certain different numerical techniques that could be used to perform an event study than what I describe, but what I've described is certainly the most often used and the standard way I've seen it used in most circumstances.

Q.    And your -- in past cases where you have evaluated Cammer Factor 5, is there any case where you haven't used an event study as the technique for considering whether Factor 5, in your view, had been met?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Not that I'm aware of or not that I can recall.  I think in every time I've done an analysis of market efficiency, I've performed some form of event study.

BY MR. BROWN:

Q.    In paragraph 47, you list various types of what's described as sources of new information, press releases, earnings reports, news, analyst reports.

My question to you is, sir, for purposes of an event study, is the -- is it important to determine whether a particular source of news is

Page 58

providing accurate or inaccurate news?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I don't think it's important for assessing whether there's a cause-and-effect relationship.  So in the context of evaluating market efficiency and saying is there evidence that the market price was reacting to whatever information was out there, whether it's accurate or inaccurate, isn't really an issue.

BY MR. BROWN:

Q.  So is it fair to say, then, you're distinguishing between the question of whether the market reacts to new information of whatever quality, and the separate question of whether that information is accurate, inaccurate, or complete or not?

A.  Correct.  It's really a test of whether there's evidence of whether the information impacted the market, not whether or not the information itself was accurate.

Q.  In assessing whether the reaction of a market to a particular piece of new information, are there techniques for determining whether -- strike that.  Let me start again.

In assessing the reaction of a market to a

Page 59

particular piece of new information in the context of an event study, are there ever techniques applied that look to the relative importance of one piece of information, say, you know, earnings, achievement of targets, versus some other piece of information that might be provided regarding the company?

MR. ROGERS:  Objection to form.

THE WITNESS:  Well, if those pieces of information you're referring to are released simultaneously, then the event study technique itself of measuring the abnormal price movement and whether or not it's statistically significant is not capable on its own of determining which piece of information or the weight of any given piece of information that is released simultaneously.

Now, there are other methods one could use in those circumstances -- things like fundamental valuation analysis or maybe other things in certain circumstances that one could do to try to ascertain or evaluate that -- but the event study itself would not allow you to do that to segregation or weighting of what the market was really reacting to.

BY MR. BROWN:

Q.   Could you explain for purposes of your event study the distinction between what you define as the analysis period and the class period that's been proposed in this case?

A.   Sure.

So in order to have a sufficiently powerful statistical test of whether there is cause and effect and using earning announcements as the type of information that I wanted to test for, I just wanted to ensure I had enough data, and a sufficiently powerful set of data.

So, in other words, to do that, I started with the class period and realized to have sufficient data, I wanted to expand that period. So I chose one year, one full calendar year, prior to the class period and one full year after the class period to add to the period over which I was going to analyze cause and effect.  So what I call the analysis period is the class period plus one year on either end.

Q.   And what's the reason you selected one year versus some other alternative period of time?

A.   That's a fairly standard thing I do.  I've done it in a number of other reports where, you

Page 61

know, again, the goal was to achieve enough data. You know, for these analyses, I like to have at least eight to ten data points, and so I adopted something I've adopted in similar reports, which is to take a year on either end, and there was really no reason not to -- not to choose that methodology.

Q.  Is your opinion in this matter regarding the efficiency of the market limited to the class period, or does it encompass the entirety of the analysis period as you've defined it?

A.  Well, I think the opinion I'm giving is for the class period, which is obviously a subset of the analysis period.  So for some of the Cammer factors, and other factors, I only looked at the class period.  I didn't expand it to the analysis period.  This was really only for the purpose of looking at cause and effect and running the event study.  I have no reason to believe that any time during the analysis period was inefficient, and I haven't seen any evidence to suggest that, but the opinion I'm giving is for the class period.

Q.  And when you provide -- in this instance, when you provide an opinion that the market was efficient for the class period, is that an opinion that it was continuously efficient from beginning

Page 62

to end or that -- for some whatever period of time over that class period that it was efficient?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Well, the analyses are really geared towards looking at it as a whole.  So is there evidence that the conditions and outcomes are consistent with an efficient market over the entire period.  So I think it can be applied to any part of a class period, but it's not really looking at any individual part of the class period separately from another part.

And so, yeah, my opinion is effectively that the conditions were, and outcomes suggest, that this was an efficient stock throughout the class period.

BY MR. BROWN:

Q.   Let's move on to paragraph 49.

I'd like to first begin by asking you to sort of explain your understanding of what is the estimation window as you have framed it in paragraph 49.  What's that concept?

A.   Sure.  So for any event or any date or any outcome you're looking to test -- in this case we're looking at daily -- daily changes in the stock price -- you need some period over which to

Page 63

evaluate, you know, how does this stock relate to the outside factors you want to control for.

And so in this particular case, I'm controlling for the S&P 500 Total Return, which is a broad market index, and then the NASDAQ Biotech Index, which is an industry-specific index.

So the question is how does this stock typically react to changes in those control variables because on the date you're looking to test, you, obviously, have movements in those control variables as well that you have to take into account and want to isolate and remove from the return as -- that portion of the return was likely expected because of movements in those factors.

So you need a period over which to determine what is the usual relationship or what's the observed relationship between this stock, Novavax in this case, and those industries -- and those indices, and so you need a period of time over which to define, you know, that you're going to measure those usual relationships.  So that's what the estimation window is.

Q.   And in this case, you -- what is the estimation window that you have selected?

A.   So for each date I'm analyzing, the estimation window is 120 trading days, which is roughly six months, 120 trading days before the relevant event.  So if I'm testing January 3, I'm taking the immediately preceding 120 trading days prior to January 3.

Q.   As you used it in your last answer, when you referred to relevant event, you're referring to the trading on a particular day as opposed to some particular piece of news that you're trying to determine whether it had a statistically significant effect?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Well, when I'm saying the "movement on a particular day," I'm referring to -- to be precise, the percentage change in the closing price of Novavax on any given day relative to its closing price the prior day.

BY MR. BROWN:

Q.   In this case you selected the S&P 500 Total Return Index and the NASDAQ Biotechnology Total Return Index for purposes of this analysis.  Is that a fair description of your work here?

A.   Yes, those are the control indices I used

Page 65

in my event study.

Q.    And how did you select those particular control indices as opposed to some other options?

A.    Sure.

So the S&P 500 Total Return Index is a broad market index that's used by many people to be a reflection of the broad movement in the stock market.  I've used that consistently across, I believe, virtually -- if not all, virtually all of the reports I've ever issued where I wanted to control for a broad market index, that's the one I've used.

For the industry index, I have done a number of different market efficiency and damages and other types of reports in securities litigation, and I've used the NASDAQ Biotech Index as a good control for that industry generally in a number of different matters, and so that was the first thing that came to mind in this case was to use that same index that I've used in other matters that have involved this industry.

And then I also considered, as I state in one of the footnotes, Novavax itself pointed to a particular biotechnology and pharmaceutical index, I believe.  Let me find that footnote just so I can

Page 66

make sure I'm giving you a precise answer.

Yeah, the Russell 2000 Growth Biotechnology Index is something that was cited by the company in its 10-Ks.  I also considered using that.  I actually did an analysis with that index as well just to verify and show that my results were robust using either of those indices, and my conclusions don't change based on using either of those indices.

Q.   Is the purpose of selecting, in this instance, the NASDAQ Biotechnology Total Return Index, to attempt to have a factor that assesses Novavax within its particular market area as opposed to the broader market?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Yes, that's a fair characterization of the purpose of it.  It's to say if there are factors influencing and prices are moving companies that are in the biotechnology sector, generally, those are things I would want to control for, and so that index is meant to control for factors affecting their industry.

BY MR. BROWN:

Q.   Did you consider any index that was focused more particularly on companies that were

Page 67

working on potential treatments or vaccines for COVID-19?

MR. ROGERS:  Objection.  Foundation.

THE WITNESS:  That is not something I considered at the time my report was being prepared, no.

BY MR. BROWN:

Q.   If such an index were available, would it be something that you would, as a matter of course, consider as potentially relevant to your analysis?

MR. ROGERS:  Objection.  Calls for speculation and hypothetical.

THE WITNESS:  Certainly I have seen cases in matters where sort of more granularly focused industries have been used.  I did not do that in this case.  Again, for sort of consistency across analyses I perform in this industry, I thought the NASDAQ Biotech Index was a good control for this.

And, again, I also tested it against the index the company itself described as what it should be compared against for performance purposes in its 10-K.  So given that that index was of similar scope and sort of identified the same general industry that the company was identifying, I thought the NASDAQ Biotech Index was a good index

Page 68

to use and consistent with the scope of what the company was suggesting was its industry as well.

BY MR. BROWN:

Q.   In selecting the NASDAQ Biotechnology Total Return Index, did you -- before making that selection, do any analysis as to the percentage of the companies in the index that had a business focus on COVID-19 as opposed to not?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I didn't do that specific analysis.  I noted that Novavax is in the index. So I did enough research to know that they represented at least 1 percent of the index so it wasn't going to exert an undue influence, but I didn't look to see what percent of that index was made up of other vaccine -- COVID vaccine companies or anything like that.

BY MR. BROWN:

Q.   Is there a way -- in the selection of the two different indices, the S&P and the NASDAQ Biotechnology, is there a way in which either was weighted for purposes of your analysis?  Was that a meaningful concept with respect to what you've done?

A.   Yes, in the sense that the regression

analysis itself -- when you do a multiple regression analysis and include multiple factors in a regression, the way in which the regression coefficients are computed takes into account the levels of correlations amongst the different variables.  So inherently in the procedure on performing there is -- the data tells you how to weight each one in terms of how much it is affecting the security.

So, for example, if you look at Footnote 58 -- this is obviously just for a particular day -- but it says the predicted return of, in this case, minus .37 percent is found by multiplying the coefficients from each of the indices by the returns of each of those indices, and you see that the coefficient for the market index is 2.76, and the coefficient on the industry index is 2.32.

So at least for that regression on that particular day, it's giving a little more weight to the market index than it is to the industry index, but that can shift over time depending on how the relationship amongst the variables change.

So, yes, the regression itself does that weighting.

Page 70

Q.   And so then is it fair to understand, based on your description there, that the weighting is dynamic over time depending on how the relationship of Novavax stock in this case is related to whatever the relevant indices are?

A.   That's correct.  Since for each day I'm using the prior 120 days to -- as an estimation window, each one of those days has a different 120-day window.  So, yes, those relationships shift over time based on what the data is telling us.

Q.   Do you ever or have you ever, in the context of providing an opinion about market efficiency, done an analysis in which you used only one index as opposed to two or more?

A.   I certainly recall doing that, and there are certainly times that I believe that was appropriate to do.  I can't, off the top of my head, remember what those matters were.

But, yes, there are times where I've done testing of whether an industry index has any predictive power whatsoever and determined that it didn't and therefore left the industry index out and just went with a broad market index.

Q.   So do I take from the answer that you just gave that in order to determine that you should use

Page 71

a particular index, you have to come to some view that that index has a predictive power of whatever degree for the relevant stock for the time period that you're analyzing?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I don't think that's quite right. The way I think about is, you know, there's, as I said, thousands of event studies in the academic literature that talk about how controlling for a broad market index and an industry index is a reasonable and typical thing to do.

So when I approach one of these analyses, you know, my first thought is to certainly select a broad market index, and like I said, I almost invariably use the S&P 500 Total Return Index for that, and then to select a reasonable index that likely controls for the factors affecting that general industry.

And it's important to have a rationale ahead for what you're selecting ahead of actually doing it.  In other words, you don't want to -- you don't want to just go data mining and find the index that gives you the best predictive power because that can give you false -- you know, sort of the false positives into what's really going on.

Now, then once you've selected an index and you go ahead and run it, if the outcome is such that it's clear that including one of those variables is simply adding noise to your regression and not really giving you any predictive power whatsoever, then there's a choice to be made on whether you continue to include that or not or at least evaluate whether the alternate results of your study are somehow influenced by whether you include that or not.

I don't think there's a hard-and-fast rule that, therefore, you shouldn't include it or that you have to go determine it's predictive before you leave it in.

BY MR. BROWN:

Q.   So do I understand what you're saying is that the point is not necessarily to identify an index that's going to be predictive but rather that gives you a framework of the particular industry that the stock is trading in?

A.   Well, ultimately, the whole purpose of it is for it to have some predictive power, and that's the goal or that's the reason you look for and include an industry index.

And in this case, you know, if you look at

Page 73

Exhibit 5 of my report, clearly both the NASDAQ 500 Return Index and the S&P 500 Total Return Index in this case have predictive power. So I never crossed the threshold question that you're getting to in this matter certainly, which is, you know, were these predictive -- do these controls have some predictive power on how Novavax stock was trading?  And the clear answer was yes for both of them.  So I never met that theoretical question in this case.

Q.   Assume for -- you've -- the period or the estimation period that you selected is rolling such that for each day you analyze, you look back the 120 trading days prior to that particular day as opposed to just from the start of the class period. Is that a correct description?

A.   That's correct, yes.

Q.   Okay.  So assuming that on the first day of the class period, that some sort of materially inaccurate information entered the market, the total mix of publicly available information, does that not mean that from the second day forward that your estimation period includes a day on which there would be a reaction to materially inaccurate information?

MR. ROGERS:  Objection.  Form and foundation.

THE WITNESS:  No, I think there's a lot of things built into that question that aren't quite right.  I mean, certainly, when you get to the second day of the class period, you're going to be including the percentage change in price on the first day of the class period into your estimation window.  Whether or not there was an actual affirmative price impact of that misstatement is a separate question.

And that's why I'm sort of losing it in your question, but I think, I mean, as a matter of fact, that that percentage change in price on that day enters into the estimation window.

BY MR. BROWN:

Q.   You've cited an article in your Footnote 56 by a Mr. A. Craig McKinley called "Event Studies in Economics and Finance."  Is that the -- an article on which you're, among others, basing your decision to use a rolling period of 120 days as opposed to some other time period?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Well, I think that's certainly giving an example that's consistent with what I'm doing, but I don't -- I didn't set out to say that

that's the right period because McKinley said it.

You know, I think that's a source that, you know, clearly identifies this as a reasonable approach, but, no, I'm not using -- the 120 days is something that I've used for many, many, many years.  I think it's a reasonable -- it reasonably balances the need to have enough data prior to an event to have a meaningful statistical study but not so far as to get a long distance and time away from the event you're testing where circumstances could have changed.  So I wouldn't say that I'm relying specifically on that article or that 120 days, but it certainly is reflective that this is a reasonable approach.

BY MR. BROWN:

Q.    Is there any instance in which you have performed a market efficiency analysis under Cammer Factor 5 where you've used an estimation period different than 120 days?

A.    Yes.

Q.    And how frequently have you done that?

A.    Well, it's usually only been in cases where the facts and circumstances of the case dictated that that's what needed to happen.

So, for example, in a case where there was

Page 76

a substantial change in the nature of the company just prior to or at some point in the period I was analyzing, I've selected periods that start after that date regardless of how many days it is.

So, for example, if there's -- I might select a 120-day fixed window to cover the first 120 days after an event like that rather than, you know, go back a full 120 days; or clearly in a situation where there's an IPO or something like that where you can't -- literally can't go back more than 120 days, I've used a fixed window that might include the event in question but also include some future date.

So it really can differ depending on specific facts and circumstances, but my default methodology when it's appropriate and reasonable to do so is to use the 120-day window.

Q.   And you saw, in this particular case, no reason to deviate from what you describe as your default approach here?

A.   That's correct, yes.

Q.   Focusing separately on the issue of the rolling quality of the period as opposed to the number of days, did you consider the possibility of using a 120-day estimation period from the day

prior to the class period and back 120 days without rolling forward on each day?

A.   No, I didn't consider that.

Q.   Is there a reason why you didn't consider that as a potential approach here?

A.   Because I've found throughout the years of doing this that there can be important changes in the relationship amongst the variables and important changes in the volatility of the stock that are not captured if you allow that time -- if you really use an estimation window that's away from the time period in which you're trying to test.  So I think the risks become greater of mis-specifying the relationships and the volatility of the stock if you do that.

MR. BROWN:  Will, could you put Tab 17 into the email list, please?

THE WITNESS:  I'm using the Exhibit Share just to avoid the distraction of my inbox.  So thank you for putting it there as well.

MR. BROWN:  Sure.  Did it make it?

THE WITNESS:  It's not there yet.

MR. BROWN:  All right.  Let's put it there.

THE WITNESS:  I've got it now.

MR. ROGERS:  Has Charley emailed it?

Page 78

MR. BROWN:  Will did.

MR. ROGERS:  Will, I'm sorry.  Has Will emailed it?  I haven't gotten it yet.

MR. BROWN:  He has.  I got it, but he and I are on the same system.  So I probably got it faster.  We'll wait until then.

MR. ROGERS:  And if you want to introduce the document, I don't want to hold things up.

MR. BROWN:  Will, make sure it gets into the Exhibit Share because it looks like things are appearing pretty quickly there.

MR. PIERESON:  It's loaded there.

MR. BROWN:  I have to reload it.  Sorry about that.  I killed 1 million trees to print them all out, but I had the advantage of knowing in advance what was coming.  So...

(Whereupon, Coffman Exhibit 2 was marked for identification.)

BY MR. BROWN:

Q.  So, sir, I have circulated around and will mark as Exhibit 2 the article "Event Studies in Economics and Finance" which I believe is the article that is meant to be cited by your Footnote 56.  This bears NOVAVAX_COFFMAN_8531, beginning Bates number, through 8557.

Page 79

A.   Yes.

Q.   So, sir, in your footnote you have a pull quote from just one sentence in that particular article:  "For example, in an event study, using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."

A.   Yes.

Q.   If I could direct your attention to the third PDF page of the article.  So it's 8533 of the Bates number and it's 15 in the upper right-hand corner, I guess, from whatever journal this appeared in.

A.   Yes, I see that.

Q.   All right.  So, first, if you look in the second column, there's a paragraph that begins "Given the selection of a normal performance model, the estimation window needs to be defined," and then there's a -- there are a couple of sentences after that.

And the one I'm focusing on is the second one, "For example," and I just want to make sure I confirm that that's the sentence that you were citing as a pull quote in your Footnote 56?

A.   Yes.

Q.   Okay.  If I could ask you, then, to read on to the last sentence of that paragraph that appears after the sentence that's quoted in your Footnote 56:  "Generally, the period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates."

So my question to you, sir, is does that sentence suggest to you, that for purposes of an event study, that you would exclude a period in which there are known or at least believed to be materially inaccurate information circulating in the market?

MR. ROGERS:  Objection.  Form.  And foundation.

THE WITNESS:  No, I don't think that's what this sentence is referring to at all.

BY MR. BROWN:

Q.   Okay.  What do you think it's referring to?

A.   I think it's talking about the very event you're trying to test.  So if I'm trying to test January 3 of a particular year, that you don't -- that's the event date; right?  That's the event window.  That you don't want to include the event window itself, so January 3 that you're trying to

test, in the estimation window.  So that's why you always look at -- you try to, when feasible, use a period, an estimation window before that date.  So I don't think it's making any reference whatsoever to a class period or anything like that.  It's saying you just don't want that January 3 date that you're trying to test in the estimation window itself.

Q.   So, in other words, the reference to event isn't to event in the sense of some alleged inaccurate or corrected disclosure but, rather, simply, the day on whose stock movements you're trying to piece out, what percentage is company specific and what percentage is simply movement connected to the broader indices you're comparing it to?

A.   Correct, this is referring to the event window, not the estimation window in that sentence.

Q.   If we could move on to paragraph -- well, no, let me actually start with a different question.

Within the course of the analysis period, is it fair to say that you have selected a subset of dates that you have used for purposes of determining the application of Cammer Factor 5 over

Page 82

the course of the whole period?

A.   Well, I think what you mean by your question is I had to select which dates to test for cause and effect, and I determined that an appropriate methodology and a methodology I've used in many matters is to say I'm going to pick a -- you know, it's like a drug trial; right?

You pick a treatment date or treatment group and a control group, and the treatment group here I selected is earnings announcement date.  So is there evidence that the market price of Novavax moved on earnings announcement dates when there was substantial amounts of information released about the company versus a control set of dates which is what I call the no news dates or least news dates.

So the analysis of Cammer Factor 5 is based on looking at the results for those particular dates, not every single date during the class period.  I think that's what your question is getting at.

Q.   Yes.  You answered what I was getting at, yes.

So, in this instance you selected 10 news and 25 non-news days.  Is that a fair description

Page 83

of the selection for this particular study?

A.   Yeah, let me get to that exhibit so I just make sure I can confirm those numbers.

Correct, there were 10 earnings announcements dates.  I identified that's effectively the treatment group, and then there's the 25 least news days which is the control group.

Q.   So is there a minimum number of days as a percentage of the total number of days in the analysis period that you believe that it's important to select in order to ensure a robust analysis?

A.   No, I don't think there's a minimum. I mean, there's certain practical minimums in terms of the number, not in terms of the percentage. That's an important concept.  I mean -- and you see that concept every day.

When polls are done of the electorate, you know, it's not a matter of what percentage of the population you're sampling, it's that you have enough of the sample.  So the fact that you're sampling, say, a thousand voters out of, you know, 400 million, that's not the relevant comparison. It's do you have a large enough sample that the law of large numbers kicks in and you can draw relevant

Page 84

conclusions from the size of your sample.

So in terms of running this sort of statistical test, I mean, yes, you need practically more than two or three data points, and obviously, the larger sample you have, you know, the more powerful the statistical test can be, but there's no specific minimum you need.

And, certainly, in my view, having 10 earnings announcements and 25 least news dates certainly is a reasonably sized sample from which to draw the -- and the parameters that I'm calculating, the statistical tests and how powerful they are, you know, the sample size is taken into account in doing -- in performing those tests. So what I've selected is certainly enough, in my opinion.

Q.   And could I ask the basis for your conclusion that in this instance that the sample size was sufficiently large?

A.   Well, again, in terms of the number of least news days or no news days, you know, again, I just -- just because of the -- how the law of large numbers works, getting above 20 or close to 30, you know, is a sufficient size, and that's something I shoot for.  Sometimes it's much larger

than that; sometimes it's a little lower than that. But 25 is certainly sufficient.

And the whole point of doing an analysis matter period, as I talked about earlier, was to expand the period enough so that I felt like there was -- so that I knew there would be a large enough sample to do a powerful statistical test on earnings announcements as well.  So the whole point of doing the analysis period was to be able to expand the number of earnings announcements I could look at.

Q.   How was it that you came to the conclusion that for purposes of defining the -- let me start again.

Is there any particular reason that you focused with respect to Novavax disclosures only on earnings announcements as opposed to other public announcements the company might make through press release or some other form of filing?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Sure.  This is a standard approach I've used.  There's a long literature in the economics literature on earnings announcements and why they're important for companies and why they contain material information for companies,

and the whole efficient market -- testing of the efficient market hypothesis was, in large part, based on testing earnings announcements.

It's a -- you know, and it's something that every company releases on a quarterly basis. So it gives you a very objective set of events to test that is well supported in the literature. That's not to say you couldn't select, you know, others way to do it, but, in my view, this is a reasonable and appropriate and objective set of dates to test that can be replicated not just for Novavax but for many, many public companies because it's something that's required. It's a -- you know, quarterly reporting of earnings is something that's required by the SEC. So that's why I chose earnings announcements.

BY MR. BROWN:

Q. Separate from the question of why you affirmatively chose earnings announcements, did you consider any other alternative basis for including additional dates and then reject that for the purpose of performing this analysis?

A. No, I mean, again, over the history of working on matters like this and seeing what other people have done, I've, you know, thought about

historically not in the particular -- you know, with respect to this company and this matter, but historically, I've thought about whether there's, you know, other categories of news one could objectively identify and include in these types of analysis.  And it's difficult and it's subjective because it's, you know, companies participate in different industries, they have different types of announcements.

Sometimes their press releases are material; sometimes they are not.  So it becomes hard to identify an objective set of events or define an objective set of news that you can repeat over and over again in different -- for different companies.

And so that's why I, long ago, settled on earnings announcements for the reasons I described.  They occur regularly.  They occur in every public company.  There's a literature that supports that as being the important sets of information.

You know, the whole theory of valuation of companies depend on valuing them based on discounted future cash flows, and earnings announcements give you critical information for evaluating what the future cash flows could be.  So

there's a whole set of reasons I think that this is a reasonable and appropriate methodology that's very objective.

Q.   In paragraph 59, you describe how you selected the days and the analysis period on which you would identify as being no news days, and you describe having selected days in which there were five or fewer Novavax-related news items in the Factiva database.

How is it that you came to that particular criterion for determining the, quote/unquote, "no news days"?

A.   Sure.  That was a bit of an iterative process.  I mean, as I'm sure you're well aware, during this period, during COVID, you know, coverage of the vaccine companies and vaccines and what was going on was just -- you know, there was incredible interest, obviously, and there was lots of news.  And so in many cases, I can set that threshold at zero and just say, you know, it can really be a no news analysis where there's nothing.

Here, during this period, there were so few days that there wasn't at least some article that mentioned Novavax in some context that I had to include at least the possibility that there was

Page 89

some mention of Novavax, and so, you know, I set that threshold in a way to get sufficient number of data points.

So working with my staff, I asked them, you know, how many data points would we have if that was set at three, if it was set at four, if it was set at five, and when we got to five -- and there were 25 dates.  I think there were actually more than 25 dates.  I think it was closer to 30 -- then I said that's the most reasonable threshold we can pick.

And then my staff and I went through all of the articles on those particular days to make sure there was nothing that could be considered material about Novavax in any of those articles, and that's how the number went from something along the lines of 30 down to 25 is there were some articles, even on those days, that I couldn't objectively say with certainty that this was immaterial information, and so certain of the days got excluded, and that's how we ended up down at the 25.

Q.   Have you, in other cases, chosen a different threshold?

I think you partly answered this before,

Page 90

but just so it's clear on the record, in other cases you selected a different threshold than five or fewer Factiva news items; is that fair?

A.    Sure.  Sure.  In many matters I'm able to select zero because that gives me enough data to work with.  In some, I believe, it's been one or two articles.  You know, again, to get to a reasonable data -- a reasonably sized control group, I had to go up to five in this case.

Q.    On the days that were -- let me ask the question differently.

For making the determination of the inclusion as something being more or less than five, is that simply a raw count of the number of distinct items listed in the Factiva database or is there some additional analysis as to the importance or content of what those items might be?

MR. ROGERS:  Objection.

THE WITNESS:  It had nothing to do with content.  It was just a raw number of articles or in the database.

And, again, once we got to that step -- just to be clear, I want to reiterate, though, once we got to that step and got to that list of dates, based on the five, we then did go through and

evaluate the content to make sure on the dates that are being included in this analysis, that there was clearly nothing material in those -- in those five or fewer articles on those particular days.

BY MR. BROWN:

Q.   And were there any instances where you determined that there was something in those five or fewer articles that you would consider material to the company?

A.   I think on a few days, like I said, it's not that I determined that there was something material.  There was something I couldn't clearly reject as immaterial.  So, again, I didn't do a deep analysis of whether it ended up being material or whether it did move the price or didn't move the price.  I just said, you know, based on this content alone, I can't reject this wouldn't move the -- you know, that this wouldn't be meaningful to some investor, and so for those days, I determined that it wasn't really a no news day.

MR. ROGERS:  Ms. Amore, I just wanted to get an objection to form in on that last question.

BY MR. BROWN:

Q.   And let's just look as an example at your Exhibit 7, which is page 47 of the PDF in

Page 92

Exhibit 1.

A.   Yes.

Q.   In Footnote 1 there is a listing of what are called outliers, and then there is a series of dates, 1-21-2020, 2-27 and 28-20, 1-29-21.

Are those the dates that you're referring to as the ones that you couldn't include them in the, quote/unquote, "no news set"?

A.   No.

Q.   Okay.  What was your criterion for determining that something that you would not be able to exclude the possibility of it being material?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I don't have a specific recollection of all those different things, but one that -- I believe one that is sort of jumping to mind -- and I don't remember all the specifics of it -- but I think there was an article basically saying, you know, that Novavax was starting -- like they had started enrolling patients in a clinical trial.  Like it didn't seem to be big news.  Like they had already announced -- I think they already announced that that trial was going to take place.

You know, but the fact that they were

Page 93

moving forward with actually enrolling patients in a particular trial, I couldn't conclude just by looking at the article itself that the market wouldn't care about that.

So I was like that's enough of a news item that I -- most of the news articles we're talking about literally just mention Novavax in passing; right?  So where there's really nothing firm-specific that's going on or that new.

It's articles that would say something like, you know, listing out the companies that were pursuing a vaccine, you know, and Novavax would just be on that list.  Those are the type of articles I was like, okay, that's not really news, and so this can still be a no-news date even though this article appeared with the word "Novavax."

But if there was anything that looked to me to be a new announcement of some kind about the company, providing company-specific information that might be considered by the market as new or moving in some direction for the company specifically, then I -- then I would determine that that's not really a no-news date.

BY MR. BROWN:

Q.   Going back up to the main body of

Page 94

Exhibit 7, is this -- is it fair to say that this lays out the ten days that you used as, shall we call them the earnings announcement days for the determination of when you would expect a market reaction to Novavax-specific information?

MR. ROGERS:  Objection to form.

THE WITNESS:  This certainly identifies the ten days.  I would take issue with the last part of your question, which is that these are days I was expected there to be a price movement.  Obviously, for any given earnings announcement, you might not expect the price to move very much because there's really -- you know, either they were just meeting expectations or there was a mix of positive and negative news.  So it doesn't mean I expect each one of these to have a significant reaction.

BY MR. BROWN:

Q.   I understand.

So the point is you have an earnings announcement where what is disclosed might be consistent with already-existing expectations, and therefore, it would be relevant as a company news day, but it wouldn't necessarily move the needle on where the price of the stock was?

A.   Exactly.  Correct.

Case 8:21-cv-02910-TDC   Document 108-2   Filed 09/22/23   Page 96 of 178

Page 95

Q.   Okay.  For any of the ten days on these --
on this list, did you sort of undertake this sort
of analysis to determine whether the substance of
what was disclosed in that particular earnings
announcement was consistent or not with prior
expectations that was in public information?

A.   I would say to a degree, yes.  I mean,
I, certainly, for each of these earnings
announcements, looked at the announcement itself.
If there was -- I believe there were also
conference calls, transcripts.  I think there were
also analyst reports around these days that
I looked at, news articles around these days that
I looked at.

So I gained some sense, yes, of sort of
some interpretation of these dates, but I didn't --
I didn't do a formal analysis of sort of how did it
differ exactly from expectations on every dimension
that might be relevant, but I gained a general
understanding of how the results compared against,
you know, expectations on certain dimensions.

Q.   And for any of these ten days, did you
attempt any analysis as to determine as to whether
the related price movement was consistent with the
character of the information, whether positive or

1-800-727-6396          Veritext Legal Solutions          www.veritext.com

Page 96

negative, that was released at that time?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Again, I looked at it with an eye towards, you know, is there any date, amongst these ten where the price movement just seems to be the wrong direction; right?  Like every single thing positive and the price went down, vice versa.

This was a particularly active time for these sorts of stocks in terms of, you know, expectations shifting a lot.  Even announcements by the other firms that were racing to try to get a vaccine were just anecdotally, you know, and in the analyst reports that were covering it, having an effect expectations even in between earnings announcements and things like that.

So, you know, it's hard to do a -- a -- the type of analysis you're describing where you would have an expectation exactly of which way it would move, and there was enough mixed information on all these dates that I don't think you could say that any of the movements either direction would have been, you know, totally inconsistent with market efficiency.

BY MR. BROWN:

Q.   But so then is it fair to say that the

Page 97

efficient, the goal of the efficiency analysis here is to determine whether or not the stock reacts to new information, not whether it reacts consistently with the new information?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Well, I mean, in terms of the -- exactly how these parameters and comparisons are being run, it's not looking at directionality, that's correct, but, again, I did my own analysis of each of these dates to make sure that there wasn't a day where it was obvious that the price was moving inconsistent with what you would expect based on the whole of the information that was being evaluated or the general context of what was going on in the market as well.

So there was certainly -- I was on the lookout for whether there was an obvious, you know, what would be considered an irrationally directional price movement that I would have then been saying is supporting market efficiency.  So I did look at that, but I didn't do a, you know, detailed analysis of directionality.

BY MR. BROWN:

Q.   Let me ask the question with respect not to these ten days but to what would be the,

Page 98

quote/unquote, "news days," so not in the 25 and not in the 10.

Did you undertake any analysis to determine whether on any or all of those days the movement of the price was consistent with the character of what was included in the news that was released on those days?

MR. ROGERS:  Objection.  Form.  And compound.

THE WITNESS:  No, in the sense that did I go through each day and evaluate whether the price moved in some way consistent with what the news on that day?

I didn't undertake that analysis for every day nor would it be necessary to reach the conclusion I'm trying to reach but -- and I just want to be careful in how you described every other day that sort of falls outside this as a, quote/unquote, "news day."

You know, I'm sure within what you're calling "news days," there's many days that there was potentially material firm-specific news. There's many other in which there wasn't.  So I wouldn't necessarily try to characterize that as a, quote/unquote, "news day."

But certainly, anecdotally, I certainly

saw a number of different price reactions to news that made perfect sense and that clearly the price moved in the way you would expect to fall outside of these ten days.  So I certainly saw days where there is certainly additional evidence out there of the stock moving with respect to new news in ways that made perfect sense, but I didn't undertake an analysis of every single day, no.

BY MR. BROWN:

Q.   And, just to be clear, when I was saying "news," I was using "news days" as a contrast to the "no news" descriptor, not to express any particular view about the materiality or not of the, quote/unquote, "news."

A.   Understood.

And I just wanted to be sure the record was clear as to what I mean by "news day" in that context as well.

Q.   Yeah.

So and using my -- using my shorthand descriptor for a news day, if there were a news day where, you know, the, call it, six articles that came out that day all said, you know, positive things about Novavax, and then there was a statistically significant negative movement in the

stock price, would an example like that lead you to do any follow-up analysis as to the efficiency of the market?

MR. ROGERS:  Objection.  Form.  Foundation. Calls for speculation.

THE WITNESS:  I think it would be -- the short answer would be no in the sense that one day like that could easily be chalked up to random movement. So the whole idea is that even when you're testing for statistical significance, things can be significant 5 percent of the time just based on random movement.  So one day would not be a strange occurrence at all.

If you saw that consistently over a whole host of days, you know, is that something that I would take note of and would potentially investigate further, sure; but one day like that, no, that would not raise it to the threshold of questioning market efficiency.

BY MR. BROWN:

Q.  And here you didn't undertake any analysis to sort of determine how many, if any, of those days would have had that quality of movement you were describing in your last answer?

MR. ROGERS:  Objection.  Form and foundation.

THE WITNESS:  That was not part of the procedure of my study, no.

MR. BROWN:  We have now been going another hour, and I think if we can take a break now, based on some of the answers I've been given, see if I can streamline the last section of this a little bit.  So if everyone wants a ten-minute break now, it's okay.  I'm happy to do it.  I also don't know if you need or want lunch this early.  I'm happy to keep on going and would just as soon do so.

THE WITNESS:  Yeah, I'm certainly happy to do one more -- one more session before we take a lunch break.  I don't know, you know, how late you expect on going, but I can certainly go another hour before lunch.

MR. BROWN:  Okay.  Mike, is that okay with you?

MR. ROGERS:  Mr. Coffman dictates.

MR. BROWN:  Let's see if we can do that. I can't make any promises, but I'll do my best to see if we can get this down to one more round.

THE WITNESS:  Okay.  Thank you.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:35 p.m.  This is the end of Media Unit 2.

                    (A short break was taken.)

Page 102

THE VIDEOGRAPHER:  We are going back on the video record.  The time is 12:51 p.m., and this is Media Unit No. 3.

BY MR. BROWN:

Q.    Mr. Coffman, in constructing your event study for purposes of this case, how, if at all, did the fact that Novavax was pursuing the marketing of a COVID-19 vaccine in the midst of the COVID-19 pandemic come into play, if at all?

A.    Well, it came into play somewhat in the outputs of what I did.  I don't think I -- I don't think there was -- again, I have a fairly standard approach to these types of analyses.  There was nothing about what you just said that made me think that the standard approach to what I was -- I would normally do to analyze market efficiency is any different.

Certainly, the fact that they were attempting to produce a vaccine during the pandemic that was, you know, being -- you know, that there was a lot of investment going on by the government and things like that, I mean, that certainly entered into my, you know, analysis and thoughts when I was looking at the earnings announcements and that was clearly part of what they were doing.

And then when you look at Exhibit 6, which is the volatility of the stock across different 120-day windows that I was testing, clearly consistent with lots of other firms during COVID, they were much more volatile during the peak of what I would say is the fear of the pandemic and immediate reaction of the pandemic from May 2020 to, you know, sort of the end of 2020, and then the volatility became lower and steadier later than that.

But beyond that -- those things, I don't think there was any particular reason to consider that for taking a different approach, but I was certainly aware of it.

Q.  So would your analysis of the outputs like the volatility of the stock -- well, first of all, does that -- is the question of how volatile a particular stock is at all relevant from the outset to an analysis of whether it's trading in an efficient market?

MR. ROGERS:  Objection.  Form and foundation.  Sorry.

THE WITNESS:  Yeah.  No.  The volatility is what it is.  You know, the factors I consider and the methodologies I generally adopt and adopted in

this matter aren't affected by that other than, again, if there's some particular reason they're highly volatile over a period of time, that's something you note and look at because it can affect the event study, but the approach I took which accounts for, you know, changes over time in those variables, I think is entirely appropriate to this.

So the short answer to your question is, no, volatility itself does not change sort of the overarching approach to this question.  It can be something to consider within Cammer Factor 5 and whether or not the model you have is appropriate to deal with the changes in volatility that are going on but beyond that, no.

BY MR. BROWN:

Q.   Would the level of volatility -- in constructing an event study, would the level of volatility of the stock affect at all your decision as to the number of days within your analysis period that you needed to select or was that not a relevant factor?

A.   That's not a relevant consideration, no.

Q.   If I could actually direct your attention to -- you referenced Exhibit 6.  I'll direct your

Page 105

attention to Exhibit 5 because the print is a little larger, but it's the note that appears on both of those pages, which I believe is the same.

Exhibit 5 is page 45 of 76 in the filing.

A.   Yep, I have it.

Q.   Okay.  So I'm trying to sort of understand what's actually being communicated by the note so I understand what you're saying there.

So toward the middle of the note, third line down the middle of the page, a sentence begins "The returns of Novavax have not been removed from the industry index."

Is that a reference to the point you made earlier in your testimony about Novavax not forming a significant enough portion of biotechnology index that you thought there needed to be some correction for that, its inclusion in that?

A.   That's correct.  They represented less than 1 percent of that index.  So I did not feel it was necessary to reconstruct the index without them in it in order to perform a valid study.

Q.   Okay.  The next sentence:  "The returns of the industry index are net of the S&P 500 Total Return Index."

What -- what is that meant to communicate?

A.   So that means that the -- if, for example, the broad market index was up 3 percent on a day, let's say, and the industry index was up 5 percent, what's actually entering the regression is the difference between those.  So it's the 2 percent.

So it's the amount the industry index differed from the broad market index is what's flowing into the regression, and the reason for doing that, it actually has no -- whether you do that or not has absolutely no impact whatsoever on the outcome of whether any particular day is statistically significant or not, but what it allows is it makes the interpretation of the coefficient much cleaner in the sense that it's the incremental impact of the industry index is what the coefficient is measuring.

BY MR. BROWN:

Q.   Next sentence:  "Earnings announcements of the alleged corrective disclosure dates and four outlier dates have been removed from the estimation."

I'm trying to understand what you mean by that sentence, in particular to what you're referring to by the word "estimation."

A.   Sure.  So that's referring to within each

estimation is the data you use in the estimation window to evaluate the typical relationship between the regression estimate -- the regression analysis you run during that estimation window, those dates have been removed from the data when estimating that regression because the purpose of the regression is to say what is the typical relationship amongst these variables in the absence of sort of, you know, profound firm-specific news. So these events were removed from the data when doing that regression analysis.

Q.   And just to be clear so I understand it correctly, when you refer to their being removed, that would be from the -- if they were included in the 120 days that -- trading days that were prior to the particular date you were focused on?

A.   That's correct, yes.

Q.   And when you would do that, would you then, you know, add an additional few days earlier on in the period to account for the loss of the number of days or is it 120 minus those that are removed?

A.   It would be the 120 minus those that are removed.

MR. ROGERS:  I apologize.  The feed has been a

Page 108

little inconsistent.  I didn't hear that question.

Ms. Amore, could you read back that question?  I apologize.

(Whereupon, the record was read.)

MR. ROGERS:  Thank you.  You can just interpose an objection to form for that one.  Thank you.

BY MR. BROWN:

Q.    So to focus then on the sentence portion by portion, the reference to the "earnings announcements" is the ten dates that are set out on Exhibit 7; is that fair?

A.    Yes.

Q.    The "alleged corrective disclosure dates," is that a reference to the dates that are alleged in the amended consolidated complaint as being alleged corrective disclosure dates?

A.    Yes.

MR. ROGERS:  Object to form.

THE WITNESS:  And just -- sorry.  And just for a clarification point, so, for the very first part of the analysis period, the earnings announcements excluded could go beyond those ten because there could be additional earnings announcements before the analysis period.  So it would be those ten for

sure but also potentially earlier ones as well.

BY MR. BROWN:

Q.    Understood.

So if you were early on enough and you reached back and there was some other date that was also a quarterly announcement, that would be spun out as well.

A.    Correct.

Q.    So -- okay.  I follow you.

So Exhibit 7 isn't necessarily a complete list, but it's a sample list at a minimum of the --

A.    It's certainly all the ones during the analysis period that were removed from the estimation, but there were additional ones even prior to the analysis period.

Q.    Okay.  Understand.  I got it.

So then I want to ask about the four outlier dates that have been removed from the estimation.  First, before talking about those in particular, what is the basis, in your view, for deciding to remove certain outlier dates from the regression?

A.    Sure.  So it's a fairly standard thing to do.  So the idea is -- again, the whole purpose of running these regressions is to establish in the

absence of sort of fundamental news, what's the relationship between the security of interest, in this case, Novavax, and these control indices.

And so those estimates of how sensitive they are to each other and what the total volatility is in the absence of news can be very sensitive if you have a large outlier.

So part of the process of performing this study was to identify were there any outliers where the returns were so large and there was specific news on those days that easily explained them, that needed to be removed because they were having an undue influence on the estimation of these relationships, and on those four days, I concluded there were.

Q.   Was there a particular threshold that you established as the basis for determining whether a date was an outlier in terms of the percentage move in the stock price?

A.   No.  It's one of those things where it sort of smacks you in the face and it's obvious.

So, for example, where you would normally see if there was an outlier really impacting the regression in such a way that it created an issue, if you were looking at Exhibit 5, for example, and

all of a sudden, the purple line jumps up, you know, from two to three and a half and then exactly 120 days later, it jumps back down from 3 and a half to wherever it is, like, there's an obvious outlier effect on the regression estimation.

That's when we would identify something and go follow up and say, "Okay. This looks like one day is having some enormous impact on the output here. Let's go see what that is." And that's what resulted in reviewing those four days and eliminating them.

So it's not a specific percentage threshold. It's a -- it's sort of a question of is there something obvious here that there's -- there's one day that's having a big impact on what we're estimating, and, again, estimating in terms of relationship, not the outcome of my analysis but just the relationships amongst the variables.

Q.   Does that mean that the selection of one of those removal dates would necessarily mean that that date somehow had some kind of news that was driving an abnormal move in the stock price?

A.   Yes.  So if there was a day that had one of these big movements and I had no explanation for it whatsoever, then I wouldn't remove it from the

Page 112

estimation.

Here, on these particular days, there were obvious, you know, outside influences that were happening, and there was also obvious, you know, market news or company-specific news that was really driving the enormous volatility on that particular day.

Q.    When you refer to "market news," do you mean that there could be -- that you would consider the possibility of news that wasn't necessarily about Novavax in particular still being relevant to determining whether that was a news-driven movement in the stock price?

MR. ROGERS:  Objection to form and foundation.

THE WITNESS:  Well, not broad market news.  The whole purpose of the indices is to do that.

What I'm really talking about is news that's very specific to precisely what they're doing.  So in this particular case, you know, given that they're a vaccine company that was clearly trying to get in on the market for vaccines related to COVID-19.

You know, there was -- you know, COVID-19 spread, and so on this January 21, 2020, date, was a profound day in the market where COVID-19 was

Page 113

clearly going to be a huge issue, and so I believe there might have been other vaccine companies that may have responded, you know, on that date as well. But they clearly had a very outsized returned on that day.

Leaving that day in was having an outsized effect on the measurement of these relationships, and then the other dates, I think, are more Novavax specific.

BY MR. BROWN:

Q.    It wouldn't be sufficient to identify an outlier date, would it, just by saying that a particular date was the date on which you observed the greatest percentage movement over your estimation period in the stock price?

MR. ROGERS:  Objection.

THE WITNESS:  To do that without any further analysis, I think would not -- is not what I did or not -- you know, I reserve judgment on whether, you know, in certain circumstances that may or may not be appropriate, but that's certainly not what I did, and that's not what I set out to do.

If there's a large return, my -- my procedure is to try to understand, you know, is there an obvious explanation for that.

Page 114

BY MR. BROWN:

Q.   Let me move on to paragraph -- well, first off, let me just ask you quickly, focusing your attention beginning on paragraph 65, and -- which is page 31 of your report, 32 of the PDF, the Krogman factors.

A.   Okay.

Q.   Did I understand -- in forming your opinion as regards market efficiency in this case, are you relying entirely on the Cammer factors and simply discussing the Krogman factors in addition, or are you relying on both?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  I'm considering and relying on all of them all in total.

BY MR. BROWN:

Q.   Would your -- if the Krogman factors had been left out and were not an element of your analysis and you focused only on the Cammer factors, would that change your opinion as regards market efficiency?

MR. ROGERS:  Objection.  Calls for speculation.

THE WITNESS:  Probably not, but I don't know. You know, I haven't studied that question.  Given that all the other factors were also supportive of

Page 115

market efficiency, I never had to sort of think of it that way.

But given the strength of the cause and effect and the amount of volume here and the analysts' reports that are present, I probably would have been able to reach the opinion based just on those factors, but, you know, I tend to be pretty thorough on this and look at the same factors, you know, across my report.  So I looked at all these additional factors as well.

BY MR. BROWN:

Q.   Let's move on to the Common Damages Methodology section of your report.  So let me focus your attention beginning at paragraph 78 --

A.   Okay.

Q.   -- under Roman numeral VIII.

A.   I see that.

Q.   In the first sentence, "Counsel for Lead Plaintiff also asked me to opine on whether per share damages could be measured for all class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiff's theory of liability."

What does it mean for a methodology to be "consistent with the lead plaintiff's theory of

Page 116

liability"?

A.   Well, I don't know if I could answer what that might mean in a more general way, but certainly, in this context, what I mean is they have a theory in their -- that's obvious in their complaint that the market price of Novavax was artificially inflated due to the withholding of relevant information from the market or affirmative misstatements and omissions that caused the market price to be higher than it would be otherwise and alleged that that's what damaged investors and that they were damaged then when the stock price fell upon the revelation of the relevant truth that was -- that was improperly disclosed.

So that's what I understand the theory of liability is, and the methodology that I described in this section is perfectly tailored to match that theory of liability.  So that's what I mean, and that's what I understood the question to be is whether there's a match between the damages approach and methodology and their theory of the case.

Q.   In this particular opinion, do I correctly understand that you're limiting what you're saying to the availability of the methodology and are not

Page 117

point, at this point, offering an opinion as to the quantum of any damages that may have been suffered by a member of the class?

A.   That's correct, yes.

Q.   Does the availability -- we talked about -- I'm going to talk about an issue that we talked about earlier with respect to market efficiency in the context of the damages methodology.

Does the availability of the out-of-pocket damages methodology in this instance depend on the accuracy or completeness of the corrective disclosures of the alleged misinformation in the market?

MR. ROGERS:   Objection.   Form and foundation.

THE WITNESS:   The availability of the common method does not depend on that, no.

BY MR. BROWN:

Q.   So, for example, you're familiar with the Politico article that's discussed in the complaint as a corrective disclosure in this case?

A.   I'm aware of it, yes.

Q.   Okay.   Now, is your opinion in any way dependent on some analysis as to whether the statements that were made in the Politico article

were correct or not?

A.   No.

Q.   So if -- assume that the Politico article had, for whatever reason, inaccurately reported the status of Novavax's vaccine and that information was later corrected, would that affect, in your view, the availability of the common damages methodology?

MR. ROGERS:  Objection.  Foundation.  And calls for speculation.

THE WITNESS:  No, not at all.  I mean, that may have some bearing on a loss causation analysis and to what degree a price movement, you know -- you know, one might have to think about to what degree the inaccurate information was impacting the price versus the accurate information.  So that sort of loss causation analysis might be necessary, but whatever the outcome of that analysis would be applicable classwide and could be used in the out-of-pocket methodology I've described regardless.

BY MR. BROWN:

Q.   Okay.  So then if I'm understanding your view correctly, that the consideration of the accuracy or inaccuracy of any particular statement

that may have made a -- the price -- that may have led to a move in the market price is about the question of causation of quantum of damages, not whether the market itself was efficient in responding to information.

MR. ROGERS:  Objection.  Form and foundation.

THE WITNESS:  Certainly I agree with the last part which is that it's not an issue for efficiency, and it's certainly not an issue for whether or not the out-of-pocket methodology is applicable.

It could have some relevance, like I said, to loss causation or damages but not whether the methodology I've described is appropriate or could be used classwide.

And just to put a finer point on it, I mean, I've made no judgment whatsoever, made no investigation of whether the Politico article is correct, incorrect, partially correct, anything like that.  But even if a finder of fact determined there was nothing in that article that was corrective and that the only corrective information was on the earlier alleged corrective disclosure date, that's an outcome that certainly the out-of-pocket methodology could handle

Page 120

appropriately and be dealt with classwide.

So that's what I mean by saying that the applicability of the out-of-pocket methodology is completely unaffected by that.

MR. BROWN:  Could I ask, Will, you to put Tab 14, which is NOVAVAX_COFFMAN_3718, into the document mix, please.

(Whereupon, Coffman Exhibit 3 was marked for identification.)

MR. BROWN:  What are we on?  3?  4?

MR. PIERESON:  3.

BY MR. BROWN:

Q.  Let me know when you've got that.

A.  Okay.  I have it up.

MR. ROGERS:  Once again, I haven't got the email yet.

MR. BROWN:  We can wait.

MR. ROGERS:  That's okay.

MR. BROWN:  Well, first, let me just identify for the record, this is a document that was produced to us in response to requests that we served.  It's got Bates No. NOVAVAX_COFFMAN_3718 through 3732.

It appears to be a printout of a website article from Upside Research dated

October 30, 2021, 8:00 a.m. Eastern time, titled "Novavax:  A Great Buy on Quickly Growing Production Super Low Evaluation and Many EUA Funds."

Let me stop before I ask about the substance of it.

MR. BROWN:  Mike, did you get it yet?

MR. ROGERS:  Nope.

MR. BROWN:  Let me wait a second.  I want to make sure you got it.

MR. ROGERS:  Let me open it up.

I have the document up, Tom.

THE WITNESS:  Would you give me just one second?  I want to check something in my report before you ask me a question about this document.

BY MR. BROWN:

Q.   Sure.  Take your time.

MR. ROGERS:  Tom, while Mr. Coffman is doing that, where in the document were you reading from so I can follow?

MR. BROWN:  I was reading at the very top of the title "Novavax:  A Great Buy Quickly Growing." I was just identifying it.

MR. ROGERS:  Got it.  Thank you.

MR. BROWN:  I hadn't gotten to any of the

Page 122

bullets yet.

MR. ROGERS:  Thank you.

THE WITNESS:  Okay.  Sorry about that.  All right.  Go ahead.

BY MR. BROWN:

Q.   No problem.

So, first, this document was produced to us in response to a document request for relevant materials that were in your possession, and so my question to you first is how, if at all, did you rely on this particular Upside Research article in the formation of your opinions?

A.   I think it would have been taken into account that this was filed on -- that this was made public on October 30, 2021, and therefore, would have been treated as a news item on that day.

I don't recall any of the specific content of this article influencing my study or review in any way.  It would have just been noted that this was widely disseminated on that date.  I don't think it has any -- I don't think it would have any other specific impact.  It might have been counted as an analyst report for the purposes of Exhibit 2 in doing my market efficiency analysis.  I'm sorry.  Not Exhibit 2.  Whatever exhibit number that is,

Page 123

the analyst.

Q.   Right.

A.   But beyond that, I don't think I relied on any specific content in this article in forming my opinions.

Q.   Okay.  So just directing your attention then, in particular, on the first printed out page, one, two, three, four, five bullets down, there is -- the bullet reads "A recent article full of inaccuracies caused the stock to unjustifiably drop 20 percent."

Just to be clear, what I understand you just described before, that -- nothing about, say, that particular bullet was relevant to the formation of the opinions you're offering in this case?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  No.  No.  And whether that statement is true, false, inaccurate, or purely speculative plays no role and doesn't affect my conclusions on either of opinions I've given in any way.

BY MR. BROWN:

Q.   Would it affect -- so you've opined that there's a commonly available damages methodology.

Page 124

Assuming that that -- that the Court were to determine that that methodology is acceptable for purposes of the certification motion here, would this article become relevant to your view as to how you would go about calculating any damages?

MR. ROGERS:  Objection.  Form.  Foundation. And misstates prior testimony.

THE WITNESS:  It's my practice to consider any document that becomes available to me that might talk about what caused the price to move, contemporaneous document that talks about what may or may not have caused the price to move.  That doesn't mean I'll agree with it, but it's certainly something I would consider.

BY MR. BROWN:

Q.   In your -- referring you back to the portion of your report that talks about the analysts, so beginning at paragraph 31, so page 16 of your report, 17 of the PDF.

A.   Give me just one second.  I want to check one other thing.

Q.   Yeah.  Sure.  Take your time.

A.   Okay.  Sorry.  Ask your question.  I was distracted by something.

Q.   I wanted to direct your attention to

Page 125

Footnote 36, which is a note to the first sentence in paragraph 33 --

A.   Okay.

Q.   -- where you're describing the sourcing of your analyst reports from S&P Capital IQ?

A.   Uh-huh.

Q.   Did you consider whether at all you needed to look beyond S&P Capital IQ to review additional analyst reports other than those that were available there for purposes of your opinions here?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  Well, as I think I say in the first sentence of paragraph or Footnote 13 [sic], "I obtained Novavax analyst reports from counsel, and S&P Capital IQ."

So I considered both what I got from Capital IQ, which I know does not have complete coverage of analyst reports.  There's only -- there's a number of analysts that do not submit their reports to S&P Capital IQ.  So I also requested of counsel to send me any analyst reports they had, and so I took that into account as well.

Even that is unlikely a complete and total set of analyst reports because some analyst reports just are not available to those services or, you

Page 126

know, are very expensive to get.  So I -- there are likely analyst reports that are out there that I do not have in my possession.

BY MR. BROWN:

Q.   For the purposes of the opinions that you're offering for now, it was sufficient to be aware of the existence of those analyst reports without having to review their substantive content; is that fair?

A.   That's fair, certainly.  Again, because the only purpose at this point was, No. 1, was there sufficient analyst coverage, and so having citations of which reports are out there, even if I don't have the physical report was something I considered and I believe appropriately so.

And then, yeah, I don't think there was need to go beyond what I did to reach the conclusions I've drawn.

Q.   Okay.  One of the reports that you reference or -- excuse me -- let me rephrase that.

In the third sentence, you note that you could tell from the earnings call that there were analysts from B. Riley Securities but that you didn't have access to those reports in the context of preparing this opinion; is that a fair

Page 127

assessment?

A.   Yes, that's correct.

MR. ROGERS:  Objection.

MR. BROWN:  Could we, Will, send around Tab 13, I think it is?

(Whereupon, Coffman Exhibit 4 was marked for identification.)

(Technical discussion off the record.)

BY MR. BROWN:

Q.   So, sir, we've marked a copy as Exhibit 4 of a B. Riley Securities -- it's labeled a "Flash" -- dated Wednesday, October 27, 2021, and in the top right-hand corner, it's labeled that it's in reference to Novavax, Inc.

A.   I see that.

Q.   So just to be clear, this particular report, since it's from B. Riley, is not one you would have looked at in the context of preparing your opinions to date?

A.   I don't believe so, no.  Again, I'd have to go back and double-check to be absolutely certain, but I think given that we gave that example, probably not.

Q.   Okay.  And if I just point you to the very

bottom of the first page under the label "Key Points," there's a bullet point with a bolded sentence:  "Recent inflammatory claims to manufacturing delay cliche overdone, in our view."

Seeing that sentence in the B. Riley analyst report, at this stage regarding Novavax, that wouldn't affect your opinions that you're offering to date in this case?

MR. ROGERS:  Objection.  Form.

THE WITNESS:  No, because that has no influence on whether the market was efficient or not, and it has no influence on whether -- the applicability of the out-of-pocket damages methodology.  So, no, it would not.

BY MR. BROWN:

Q.   Would it be relevant to the use of the methodology for damages calculations if it were determined to be applicable here?

MR. ROGERS:  Objection to form.

THE WITNESS:  No.  Again, it -- you know, it conceivably is something that should be considered for purposes of loss causation and whether and to what degree the price decline associated with the Politico article may be relevant or not, but that's not a loss causation analysis that I've undertaken

Page 129

at this point.  So it's certainly something that seems relevant to consider but what conclusion you can draw from, obviously, this one opinion of an analyst, you know, I'm not going to speculate about.

BY MR. BROWN:

Q.   If the Court were to convene one, are you prepared to appear at a live hearing on the issue of class certification in this matter?

A.   I don't see any reason I wouldn't.

MR. BROWN:  I have no further questions at this time.

MR. ROGERS:  I have no questions either.

MR. BROWN:  All right.  Thanks very much, Mr. Coffman.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  One moment, please.

We are going off the record.  The time is 1:32 p.m.  This concludes today's testimony given by Chad Coffman.  The total number of media unit used was three.  They will be retained by Veritext Legal Solutions.  Thank you.

Page 130

C E R T I F I C A T E

I, DEANNA AMORE, a Shorthand Reporter and notary public, within and for the State of Illinois, County of DuPage, do hereby certify:

That CHAD COFFMAN, the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of September 2023.

Deanna M. Amore, CRR, RPR, CSR

Page 131

MICHAEL H. ROGERS

mrogers@labaton.com

September 18, 2023

RE:    Sothinathan Sinnathurai, Et Al. v. Novavax, Inc.

9/14/2023, Chad Coffman (#6096915)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 132

Sothinathan Sinnathurai, Et Al. v. Novavax, Inc., Et Al.

Chad Coffman (#6096915)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Chad Coffman                            Date

Page 133

Sothinathan Sinnathurai, Et Al. v. Novavax, Inc., Et Al.

Chad Coffman (#6096915)

ACKNOWLEDGEMENT OF DEPONENT

I, Chad Coffman, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

Chad Coffman                                     Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

**[& - 32]**                                                                          Page 1

| **&** | |
| --- | --- |
| **&** 3:3,7,10,13 6:2 | |

| **0** | |
| --- | --- |
| **02199** 3:9 | |
| **084-003999** 1:25 | |

| **1** | |
| --- | --- |

**1** 4:6 5:11 14:12,15 28:7 38:17 46:4 55:1 68:13 78:14 92:1,3 105:19 126:11
**1,549** 45:8,22
**1-21-2020** 92:5
**1-29-21** 92:5
**10** 11:8,9 30:21 31:1,12 54:8 66:4 67:22 82:24 83:4 84:8 98:2 115:21
**100** 26:25
**1000** 7:19
**10036** 3:14
**1005** 2:11
**10:05** 1:23 5:2
**11** 31:18
**1100** 2:13
**111** 45:9
**11:15** 55:1
**11:29** 55:4

**12** 31:24
**120** 4:13 64:2,3 64:5 70:7,9 73:14 74:21 75:4,13,19 76:6,7,8,11,17 76:25 77:1 79:6 103:3 107:15,21,23 111:3
**1211** 3:14
**12384** 130:20
**127** 4:19
**12:35** 101:23
**12:51** 102:2
**13** 31:1 32:8 125:13 127:4
**1340** 2:6
**14** 1:22 4:6 5:3 120:6
**140** 2:10 7:18
**15** 26:14,17 38:19 79:11
**15th** 2:14
**16** 124:18
**16th** 130:17
**17** 77:16 124:19
**18** 32:22 131:3
**19** 26:3,5 67:2 68:8 102:8,9 112:22,23,25
**191** 3:4
**19801** 2:7

**1989** 48:10 49:10
**1995** 48:25
**1997** 4:11
**1:32** 129:19

| **2** | |
| --- | --- |

**2** 4:8 28:8 46:11 55:5 78:17,21 101:24 106:5 122:23,25
**2-27** 92:5
**2.14** 40:2 41:2
**2.32.** 69:18
**2.76** 69:17
**20** 11:10,11 26:15,17 34:18 84:23 123:11 133:15
**2000** 66:2
**2007** 21:15
**2007-2008** 21:12
**2009** 22:11
**2010** 22:11
**2020** 103:7,8 112:24
**2021** 121:1 122:15 127:13
**2023** 1:22 5:3 130:17 131:3
**2099** 3:11
**21** 112:24
**21-2910** 1:5 5:16

**22** 34:20
**24** 48:19
**25** 82:25 83:7 84:9 85:2 89:8 89:9,17,22 98:1
**26** 38:18
**27** 39:2 127:13
**28** 39:24
**28-20** 92:5
**29** 44:17 45:6

| **3** | |
| --- | --- |

**3** 4:13 26:3,4 28:12,12 40:19 40:20 49:16 53:4,7,21,24 64:4,6 80:22 80:25 81:6 102:3 106:2 111:3 120:8,10 120:11
**3-16-23** 10:11 14:17 18:8 23:21
**3.16.2023** 4:6
**30** 84:24 89:9 89:17 121:1 122:15 131:17
**30.89** 40:1
**30.98** 40:25
**300** 2:6
**31** 41:25 114:5 124:18
**32** 46:16 114:5

**[32nd - activity]**

**32nd** 3:5
**33** 45:15 47:22 125:2
**34** 48:8
**34th** 2:10
**36** 125:1
**37** 49:17 69:13
**3718** 120:6,22
**3718-3732** 4:18
**3732** 120:23
**39** 15:20 51:2
**3s** 53:9

**4**

**4** 4:19 16:15 30:17,23 53:3 120:10 127:6 127:11
**40** 15:20 50:19 51:2,3
**400** 83:23
**41** 52:21
**44** 53:19
**45** 55:8 105:4
**46** 55:16 56:2 56:20
**47** 56:8 57:19 91:25
**49** 62:17,21

**5**

**5** 16:15 36:24 38:1 55:9,13 57:9,11 73:1 75:18 81:25 82:17 100:11

104:12 105:1,4 106:3 110:25
**500** 27:1 63:4 64:21 65:5 71:15 73:2,2 105:23
**54** 27:13
**56** 74:17 78:24 79:24 80:4
**58** 18:2 69:11
**59** 88:4

**6**

**6** 16:14,22,23 103:1 104:25
**60603** 7:19
**60606** 3:5
**6096915** 131:5 132:2 133:2
**65** 114:4

**7**

**7** 4:4 17:9 91:25 94:1 108:12 109:10
**75** 9:20
**76** 14:16 105:4
**78** 4:8 115:14

**8**

**800** 3:8
**85** 15:21
**85-4** 14:17
**8531** 4:12 78:24
**8533** 79:10

**8557** 78:25
**8:00** 121:1

**9**

**9/14/2023** 131:5
**90024** 2:14
**95** 52:21

**a**

**a.m.** 1:23 5:2 55:1,4 121:1
**ability** 51:19
**able** 26:7 37:22 85:9 90:4 92:12 115:6
**abnormal** 59:12 111:22
**above** 42:10 84:23 131:6 133:7
**absence** 107:8 110:1,6
**absolutely** 106:10 127:22
**absorb** 33:10
**academic** 20:19 71:8
**academics** 20:11
**acceptable** 124:2
**accepted** 34:22 34:23
**access** 126:24

**accidentally** 8:14
**accommodati...** 7:7
**account** 28:1 47:14 48:23 63:12 69:4 84:14 107:20 122:14 125:22
**accounting** 19:17 22:16
**accounts** 104:6
**accuracy** 31:5 32:17 117:12 118:25 131:9
**accurate** 18:8 31:17 58:1,8 58:15,20 118:16
**accurately** 16:5
**achieve** 61:1
**achievement** 59:5
**acknowledge...** 133:3
**acknowledg...** 131:12
**act** 115:21
**action** 5:21 17:10 21:1,7 28:6 130:12
**active** 23:8,9 46:21 96:8
**activity** 23:7 36:20 39:21

**[actual - analyzing]** Page 3

**actual** 14:4 24:23 74:8
**actually** 12:15 23:6 56:17 66:5 71:20 81:20 89:8 93:1 104:24 105:7 106:4,9
**add** 13:18 60:18 107:19
**adding** 72:4
**addition** 26:23 35:11 114:11
**additional** 18:11 23:22 24:7,10 35:12 86:21 90:16 99:5 107:19 108:24 109:14 115:10 125:8
**additions** 133:6
**address** 7:13,15 7:16,17,18,24
**addressing** 36:9
**administer** 6:1
**admissible** 6:19
**adopt** 103:25
**adopted** 34:13 61:3,4 103:25
**advance** 10:10 78:15
**advantage** 78:15

**affect** 46:3 50:23 104:5,19 118:6 123:20 123:24 128:7
**affected** 104:1
**affecting** 66:22 69:9 71:17
**affiliations** 5:24
**affirmative** 74:9 116:8
**affirmatively** 86:19
**ago** 10:6 87:16
**agree** 5:9 6:18 119:7 124:13
**ahead** 71:20,20 72:2 122:4
**al** 3:2 5:14 131:4 132:1,1 133:1,1
**allegations** 30:18 31:8,24 31:25
**alleged** 81:10 106:19 108:14 108:15,17 116:11 117:13 119:23
**alleging** 32:10
**allotted** 131:20
**allow** 34:24 59:22 77:10
**allows** 53:8,15 56:15 106:13

**alternate** 72:8
**alternative** 60:23 86:20
**amalgamate** 29:22
**amended** 28:6 108:16
**americas** 3:14
**amore** 1:25 5:18 91:21 108:2 130:3,21
**amount** 42:24 46:7 106:6 115:4
**amounts** 82:13
**analyses** 33:19 41:19 45:20 61:2 62:4 67:17 71:12 102:13
**analysis** 19:5 20:15,15 44:10 47:7,13 49:7 50:23 57:16 59:19 60:4,20 61:10,13,15,19 64:23 66:5 67:10 68:6,11 68:22 69:1,2 70:13 75:17 81:22 82:17 83:10,12 85:3 85:9 86:22 87:6 88:5,21 90:16 91:2,14

95:3,17,23 96:17 97:1,9 97:22 98:3,13 99:8 100:2,21 102:23 103:15 103:19 104:20 107:3,11 108:22,25 109:13,15 111:17 113:18 114:19 117:24 118:12,17,18 122:24 128:25
**analyst** 4:20 18:23 19:9 46:11,14,17,18 46:25 47:12,20 47:23,25 48:11 48:14 49:12 57:21 95:12 96:13 122:23 123:1 125:5,9 125:14,18,21 125:24,24 126:2,7,12 128:6 129:4
**analysts** 47:15 115:5 124:18 125:19 126:23
**analyze** 46:4 60:19 73:13 102:16
**analyzed** 54:18
**analyzing** 64:1 71:4 76:3

**[anecdotally - attempting]** Page 4

**anecdotally**
96:12 98:25
**angeles** 2:14
**announced**
92:23,24
**announcement**
82:10,12 93:18
94:3,11,20
95:5,9 109:6
**announcements**
60:9 83:5 84:9
85:8,10,17,18
85:23 86:3,16
86:19 87:9,17
87:24 95:9
96:10,15
102:24 106:18
108:11,22,24
**annual** 44:24
45:22
**annualization**
44:22
**annualized**
44:17,21 45:3
45:6,12,17,21
**answer** 8:9,16
23:25 34:10
41:13 64:7
66:1 70:24
73:8 100:7,24
104:9 116:2
**answered**
82:22 89:25
**answers** 101:5

**antitrust** 20:17
**apologies** 13:2
**apologize**
107:25 108:3
**appear** 129:8
**appearances**
2:1 3:1 5:24
**appeared** 2:1
3:1 25:17
79:13 93:16
**appearing**
78:11
**appears** 14:21
80:3 105:2
120:24
**appended**
133:7
**appendix** 17:25
18:8 27:12
**applicability**
120:3 128:12
**applicable**
118:19 119:11
128:18 131:8
**application**
22:15 81:25
**applied** 59:3
62:8
**apply** 46:4
**appreciate**
50:21
**approach** 57:1
71:12 75:4,14
76:20 77:5
85:22 102:13

102:15 103:13
104:5,11
116:21
**appropriate**
70:17 76:16
82:5 86:10
88:2 104:7,13
113:21 119:14
**appropriately**
120:1 126:15
**approximate**
26:8
**approximately**
9:9,16 10:10
11:2 12:5 21:9
23:21 26:14
**approximation**
26:21
**area** 18:25 23:4
49:1 66:13
**areas** 19:19,21
**article** 27:25
74:16,19 75:12
78:21,23 79:4
79:10 88:23
92:19 93:3,16
117:20,25
118:3 119:18
119:21 120:25
122:11,18
123:4,9 124:4
128:24
**articles** 89:13
89:15,18 90:7
90:20 91:4,8

93:6,10,14
95:13 99:22
**artificially**
116:7
**ascertain** 59:20
**aside** 12:4
48:11
**asked** 22:17
89:4 115:19
**asking** 62:18
**assesses** 66:12
**assessing** 56:4
58:4,21,25
**assessment**
55:14 127:1
**asset** 19:23
**assets** 19:18,19
**assist** 21:4
**assistance**
15:11
**associated**
128:23
**assume** 30:7
73:11 118:3
**assumed** 53:12
53:16
**assuming** 73:18
124:1
**attached**
131:11
**attempt** 35:13
66:12 95:23
**attempting**
102:19

[attention - bprs]

**attention** 16:21 17:24 28:4 30:16 34:20 38:16 50:19 79:9 104:24 105:1 114:4 115:14 123:6 124:25

**attorney** 5:25 131:13

**audio** 5:8

**autocorrelation** 37:12

**availability** 116:25 117:5 117:10,16 118:7

**available** 30:5 53:14,18 67:8 73:21 123:25 124:9 125:10 125:25 131:6

**avenue** 2:6,13 3:11,14

**average** 36:19 36:23 37:1 38:22 39:25 40:3,15,24 41:6,15,18 42:7,10,14 44:23 45:9 46:1,3 52:1

**averages** 41:2

**avoid** 16:17 77:19

**aware** 28:16 54:13,14,15 57:14 88:14 103:14 117:22 126:7

**b**

**b** 4:19 17:25 18:8 115:21 126:23 127:12 127:18 128:5

**bachelor's** 18:19

**back** 8:15 11:25 17:22,25 23:15 26:6 30:15 48:25 55:3 73:13 76:8,10 77:1 93:25 102:1 108:2 109:5 111:3 124:16 127:22

**background** 18:16

**backup** 11:22

**balances** 75:7

**bars** 40:20

**base** 30:3

**based** 66:8 70:2 70:10 82:18 86:3 87:22 90:25 91:16 97:13 100:11 101:4 115:6

**bases** 17:23

**basically** 92:19

**basing** 74:20

**basis** 16:11 17:11 40:14 41:25 45:18 84:17 86:5,20 109:20 110:17

**bates** 78:25 79:11 120:22

**bcalandra** 2:15

**bearing** 118:12

**bears** 78:24

**began** 20:14,24

**beginning** 5:25 34:21 49:17 61:25 78:25 114:4 115:14 124:18

**begins** 14:4 79:16 105:10

**behalf** 1:5 2:2 3:2 6:3,7,10,13 6:14 25:17,21 25:23

**believe** 10:2,7 16:10 27:13 39:22 45:24 46:14 54:8 61:18 65:9,25 70:16 78:22 83:10 90:6 92:17 95:10 105:3 113:1 126:15 127:21

**believed** 80:11

**best** 18:9 22:18 27:19 71:23 101:19

**better** 33:8

**beyond** 26:15 32:3 35:12 52:20 103:11 104:15 108:23 123:3 125:8 126:17

**bid** 37:5

**big** 92:22 111:15,24

**billions** 51:6

**biotech** 63:5 65:16 67:18,25

**biotechnology** 64:22 65:24 66:3,11,19 68:4,21 105:15

**bit** 8:20 17:22 28:24 32:21 46:25 88:13 101:7

**blood** 130:12

**blue** 40:20

**body** 93:25

**bolded** 128:2

**boston** 3:9

**bottom** 15:23 45:5 128:1

**boylson** 3:8

**bprs** 26:5

**[break - case]**

**break** 8:17 54:21 55:2 101:4,7,13,25
**brian** 2:13 6:12
**brief** 12:2,4
**bright** 34:23
**broad** 63:5 65:6,7,11 70:23 71:10,14 106:2,7 112:15
**broader** 16:6 66:14 81:15
**broadly** 34:23
**broadway** 2:10
**brown** 3:7 4:4 6:2,2,21 7:5 9:15 13:3,5,10 13:14,19,25 14:2,7,14 16:13 24:9,17 25:2,5,12 26:16 29:9,20 30:14,21,23,24 32:19 34:1,15 41:11 42:4 43:6,15 44:15 48:7 51:21 53:2 54:20 55:6 57:18 58:10 60:1 62:16 64:19 66:23 67:7 68:3,18 72:15 74:15 75:15 77:16,21,23

78:1,4,9,13,19 80:17 86:17 91:5,23 93:24 94:17 96:24 97:23 99:9 100:20 101:3 101:16,18 102:4 104:16 106:17 108:8 109:2 113:10 114:1,16 115:11 117:18 118:22 120:5 120:10,12,17 120:19 121:7,9 121:16,21,25 122:5 123:23 124:15 126:4 127:4,10 128:15 129:6 129:11,14
**bucket** 36:14
**built** 74:3
**bullet** 28:2,7,8 28:22 29:13 123:9,14 128:2
**bullets** 122:1 123:8
**business** 7:15 7:17,18,24 22:13,25 23:3 23:9 48:16 68:7
**buy** 4:13 49:25 50:10,16 51:19

121:2,22

**c**

**c** 1:10 3:7 6:2 130:1,1
**cable** 48:19
**calandra** 2:13 6:12,12
**calculated** 17:11 40:14
**calculating** 45:12 84:12 124:5
**calculation** 40:19 41:18
**calculations** 128:17
**calendar** 9:21 60:16
**california** 2:14
**call** 12:2,4,9,15 12:16,18 18:7 60:19 82:15 94:3 99:22 126:22
**called** 7:2 22:25 74:17 92:4
**calling** 44:11 98:20
**calls** 67:11 95:11 100:5 114:22 118:9
**camera** 5:5
**cammer** 34:18 35:1,7,13,20 36:3,24 37:2

37:18 38:1,17 46:4 49:9 50:7 52:17 55:9 57:9 61:13 75:18 81:25 82:17 104:12 114:10,19
**cantor** 48:1
**capable** 59:14
**capital** 29:7,17 29:21 30:6 40:9 125:5,8 125:15,17,20
**caption** 14:19
**captured** 77:10
**care** 93:4
**careful** 98:16
**carefully** 31:11 43:24
**case** 1:5 5:16 7:17 10:4,12 14:16,25 15:4 17:3,14,20 25:19,22,23 26:10 27:9 28:9,17 32:6 47:21 53:23 57:9 60:5 62:23 63:3,19 63:24 64:20 65:19 67:16 69:13 70:4 72:25 73:3,10 75:23,25 76:18 90:9 102:6

110:3 112:19 114:9 116:22 117:21 123:16 128:8

**cases** 18:11 20:16,17 21:2 41:20 42:6,16 57:8 67:13 75:22 88:19 89:23 90:2

**cash** 87:23,25

**categories** 28:19 87:4

**causal** 55:17 56:4,17,23

**causation** 118:12,17 119:3,13 128:22,25

**cause** 55:25 56:13 58:4 60:8,19 61:17 82:4 115:3

**caused** 116:9 123:10 124:10 124:12

**central** 1:23 5:2

**certain** 10:22 36:8 53:9 56:16 57:3 59:19 83:14 89:20 95:21 109:21 113:20 127:23

**certainly** 15:9 16:10 24:1,5,6 24:16 25:8,10 26:25 32:10 33:22 42:9,11 42:13 46:1 47:18,19 48:21 50:7 52:6,16 52:19 57:6 67:13 70:15,16 71:13 73:5 74:4,23 75:13 84:8,10,15 85:2 94:7 95:8 97:16 98:25,25 99:4,5 101:11 101:14 102:18 102:22 103:14 109:12 113:21 116:4 119:7,9 119:24 124:13 126:10 129:1

**certainty** 56:16 89:19

**certification** 10:12 14:24 18:23,24 19:22 124:3 129:9

**certify** 130:5,11

**cfa** 18:23

**chad** 1:19 4:3,7 5:12 7:1,14 129:20 130:6 131:5 132:2,24 133:2,4,12

**chain** 13:18

**chalked** 100:8

**challenging** 8:10

**change** 22:6,9 64:16 66:8 69:23 74:6,13 76:1 104:10 114:20 132:4,7 132:10,13,16 132:19

**changed** 17:6 17:16 54:1,5 75:11

**changes** 7:8 18:12 62:24 63:8 77:7,9 104:6,14 131:10 133:6

**character** 95:25 98:6

**characterizati...** 66:17

**characterize** 98:23

**charge** 14:8

**charles** 3:4 6:5

**charles.zagnoli** 3:6

**charley** 77:25

**chartered** 18:23 19:9

**chat** 48:13

**check** 12:22 13:7 121:14

124:20 127:22

**chicago** 3:5 7:19 18:22 20:8,10 21:17 21:20,21 22:1

**choice** 72:6

**choose** 61:6

**chose** 60:16 86:15,19

**chosen** 89:23

**christie** 2:9 6:9 6:9 12:17

**circulated** 78:20

**circulating** 80:12

**circumstance** 8:11

**circumstances** 57:7 59:18,20 75:10,23 76:15 113:20

**citation** 14:16 51:11

**citations** 126:13

**cite** 39:15

**cited** 66:3 74:16 78:23

**citing** 79:24

**claim** 10:1 32:2

**claims** 32:5,14 128:3

**clarification** 108:21

**[class - conceivably]**

**class** 6:8,11,13 6:15 14:24 17:1,11 21:1,7 28:6 40:1 41:4 44:6 45:9 52:22 53:21,24 54:3 60:4,14 60:17,18,20 61:8,12,15,21 61:24 62:2,9 62:10,15 73:15 73:19 74:5,7 77:1 81:5 82:20 115:20 117:3 129:9

**classify** 34:24

**classwide** 118:19 119:15 120:1

**cleaner** 106:14

**clear** 10:21 29:15 44:13 49:18 54:7 72:3 73:8 90:1 90:23 99:10,17 107:12 123:12 127:17

**clearly** 8:7 47:10 49:11 73:1 75:3 76:8 91:3,12 99:2 102:25 103:3 112:20 113:1,4

**cliche** 128:4

**clinical** 92:21

**close** 7:21 84:23

**closer** 89:9

**closing** 30:1 64:16,18

**coefficient** 69:16,17 106:14,16

**coefficients** 69:4,14

**coffman** 1:19 4:3,7,12,18 5:12 7:1,6,14 13:17 14:12 55:7 78:17,24 101:17 102:5 120:6,8,22 121:18 127:6 129:15,20 130:6 131:5 132:2,24 133:2 133:4,12

**colleague** 8:23 12:19

**colleagues** 6:4 21:24

**collect** 29:21

**college** 18:20

**column** 79:16

**come** 17:22 19:20 21:16,19 31:13 38:14 42:2 71:1 102:9

**comes** 15:15

**coming** 78:16

**common** 16:25 17:11 39:25 40:7 45:7 52:22 115:12 115:22 117:16 118:7

**commonly** 123:25

**communicate** 105:25

**communicated** 105:7

**companies** 47:2 53:9,15 66:19 66:25 68:7,16 85:24,25 86:12 87:7,15,22 88:16 93:11 113:2

**company** 30:17 31:8,13 46:20 46:21 49:6,7,7 53:6,13 55:18 59:7 66:4 67:20,24 68:2 76:1 81:13 82:14 85:18 86:5 87:2,19 91:9 93:19,19 93:21 94:22 112:5,20

**comparable** 45:1,1

**compared** 39:7 40:2 45:8 67:21 95:20

**comparing** 81:15

**comparison** 83:23

**comparisons** 97:7

**compensation** 27:4

**complaint** 11:24,25 28:7 31:3 32:1,3,7,9 32:14 108:16 116:6 117:20

**complete** 9:6 27:15,21 28:8 58:15 109:10 125:17,23 133:8

**completed** 131:17

**completely** 8:8 120:4

**completeness** 117:12

**complex** 20:15

**compound** 98:8

**computed** 69:4

**computerized** 51:9

**conceivably** 128:21

**[conceive - correct]**

**conceive** 38:3

**concept** 43:16
43:22 44:20
62:21 68:23
83:16,17

**conclude** 37:22
38:10 93:2

**concluded**
110:14

**concludes**
129:19

**conclusion**
38:14,14 84:18
85:12 98:15
129:2

**conclusions**
27:6 66:8 84:1
123:21 126:18

**conditioned**
56:9

**conditions**
39:11,22 46:8
62:6,13

**conducted** 56:8

**conference**
95:11

**confirm** 8:25
79:23 83:3

**connected**
81:15

**connection** 5:5
9:10 10:4,12
11:4 14:24
16:7 19:8
24:21 26:9

28:10,16 41:19
44:5 55:17
56:23

**consider** 35:2
35:15 36:4
52:10 53:1
55:13 66:24
67:10 76:24
77:3,4 86:20
91:8 103:12,24
104:12 112:9
124:8,14 125:7
129:2

**consideration**
47:12 104:23
118:24

**considered**
27:12,16 28:3
65:22 66:4
67:5 89:14
93:20 97:18
125:16 126:15
128:21

**considering**
26:9 49:9
57:11 114:14

**consistency**
67:16

**consistent** 62:7
68:1 74:24
94:21 95:5,24
98:5,11 103:4
115:22,25

**consistently**
65:8 97:3

100:14

**consolidated**
28:6 108:16

**constructing**
102:5 104:18

**consultants**
22:18

**consulting**
20:12 22:5
23:4,5,14,17
24:4

**contacted** 10:3

**contain** 85:25

**contemporan...**
124:11

**content** 90:17
90:20 91:1,17
122:17 123:4
126:8

**context** 16:6
47:13 58:5
59:1 70:12
88:24 97:14
99:18 116:4
117:8 126:24
127:19

**continue** 5:8
72:7

**continuity** 39:9

**continuous**
46:9

**continuously**
61:25

**contrast** 99:11

**control** 63:2,8
63:11 64:25
65:3,11,17
66:21,21 67:18
82:9,14 83:7
90:8 110:3

**controlling**
63:4 71:9

**controls** 71:17
73:7

**convene** 129:7

**convenient** 7:9

**conversation**
48:12

**conversations**
32:11,12

**convincing**
55:19

**copies** 131:14

**copy** 12:20
13:17,21,25
127:11

**corner** 79:12
127:14

**correct** 21:17
21:18 26:20
58:17 70:6
73:16,17 76:21
81:17 83:4
94:25 97:9
105:18 107:17
109:8 117:4
118:1 119:19
119:19 127:2
133:8

**[corrected - day]**

**corrected** 81:11
   118:6
**correction**
   105:16
**corrections**
   133:6
**corrective**
   106:19 108:14
   108:17 117:12
   117:21 119:22
   119:22,23
**correctly**
   107:13 116:23
   118:24
**correlations**
   69:5
**costs** 37:7
**counsel** 2:1 3:1
   5:23 6:17 8:24
   9:1 10:18,19
   12:2,9 13:2
   32:4,11,12
   115:18 125:14
   125:21 131:14
**count** 90:14
**counted** 122:22
**counter** 50:8
   51:7
**counting** 47:19
   51:16
**county** 130:5
**couple** 21:24
   79:19
**course** 8:19
   9:13,17 32:10

67:9 81:22
   82:1
**courses** 19:6
**coursework**
   19:10,11
**court** 1:1 5:15
   5:18 8:11
   24:23 28:5,9
   124:1 129:7
**cover** 76:6
**coverage** 46:12
   46:14,17,19,25
   47:12 49:12
   88:16 125:18
   126:12
**covering** 96:13
**covid** 67:2 68:8
   68:16 88:15
   102:8,9 103:4
   112:22,23,25
**covino** 1:11
**craig** 74:17
**created** 110:24
**criteria** 38:12
   53:1
**criterion** 88:11
   92:10
**critical** 87:24
**cross** 42:18
**crossed** 73:4
**crr** 1:25 130:21
**cs** 131:15
**csr** 1:25 130:21
**currently** 22:24

**cv** 26:1,4

**d**

**d** 3:4 4:1
**daily** 40:10,11
   40:11,14 62:24
   62:24 79:5
**damaged**
   116:11,12
**damages** 17:10
   65:14 115:12
   115:20 116:20
   117:2,8,11
   118:7 119:3,13
   123:25 124:5
   128:13,17
**data** 20:15
   28:23 29:1,7
   29:11,19,21,22
   30:7,11,13
   40:10,13,18
   47:1 49:7
   60:11,12,15
   61:1,3 69:7
   70:10 71:22
   75:7 79:5 84:4
   89:3,5 90:5,8
   107:1,5,10
**database** 88:9
   90:15,21
**date** 10:13 15:5
   17:3,5,16,19
   23:20 62:22
   63:9 64:1 76:4
   76:13 80:23
   81:3,6 82:8,10

82:19 93:15,23
   96:4 107:16
   109:5 110:18
   111:21 112:24
   113:3,12,13,13
   119:24 122:20
   127:20 128:8
   132:24 133:12
**dated** 10:11
   120:25 127:13
**dates** 81:24
   82:3,12,14,15
   82:16,19 83:5
   84:9 86:11,21
   89:8,9 90:24
   91:1 92:5,6
   95:16 96:20
   97:10 106:19
   106:20 107:4
   108:11,14,15
   108:17 109:18
   109:21 111:20
   113:8
**david** 6:8
**day** 33:22
   40:21 51:6,20
   54:9 64:9,15
   64:17,18 69:12
   69:20 70:6,9
   73:13,14,18,22
   73:23 74:5,7
   74:14 76:6,17
   76:25,25 77:2
   81:12 83:17
   91:20 94:23

97:11 98:10,12
98:14,17,18,24
99:8,17,21,21
99:23 100:7,12
100:17 103:3
106:2,11 111:8
111:15,23
112:7,25 113:5
113:6 122:16
130:17 133:15
**days** 33:23
40:17 64:2,3,5
70:7,8 73:14
74:21 75:4,13
75:19 76:4,7,8
76:11,24 77:1
79:6 82:25
83:7,8,9 84:21
84:21 88:5,6,7
88:12,23 89:13
89:18,20 90:10
91:4,10,19
94:2,3,8,9 95:1
95:12,13,22
97:25 98:1,4,7
98:20,20 99:4
99:4,11 100:15
100:23 104:20
107:15,15,19
107:21 110:11
110:14 111:3
111:10 112:2
131:17
**deal** 104:14

**dealt** 120:1
**deanna** 1:25
5:18 130:3,21
**dearborn** 7:18
**decentralized**
51:7
**decided** 21:19
**deciding**
109:21
**decision** 35:1
74:20 104:19
**declare** 133:4
**decline** 128:23
**dedicated**
49:23
**deemed** 133:6
**deep** 91:14
**default** 76:15
76:20
**defendant**
25:18
**defendants**
1:14 3:2 6:3,4
25:20,23
**define** 43:19
60:3 63:21
87:13
**defined** 61:10
79:18
**defining** 85:13
**definitely** 48:3
**definition**
33:13 43:20,24
**degree** 18:19
20:2,5 71:3

95:7 118:13,14
128:23
**delaware** 2:6,7
**delay** 14:5
128:4
**denying** 42:12
**depend** 87:22
117:11,17
**dependent** 27:6
27:8 117:24
**depending**
69:22 70:3
76:14
**depends** 5:4
**deponent**
131:13 133:3
**deposed** 8:2
9:10,14,17
**deposing**
131:13
**deposition** 1:18
5:12 11:20
54:7
**depth** 39:10
48:5
**describe** 18:16
20:7 22:18
35:13 39:2
55:16,21 56:5
57:5 76:19
88:4,7
**described** 12:7
21:11 32:16
36:15 46:16
53:25 56:7

57:5,20 67:20
87:17 98:16
116:16 118:20
119:14 123:13
**describes** 39:16
**describing**
96:17 100:24
125:4
**description**
22:20 31:7
38:17 64:23
70:2 73:16
82:25
**descriptions**
31:13
**descriptor**
99:12,21
**designation**
19:9
**desire** 47:6
**detail** 32:9
**detailed** 97:22
**details** 45:11
**determination**
90:12 94:4
**determinative**
35:25
**determine** 44:4
52:12 57:25
63:17 64:11
70:25 72:13
93:22 95:3,23
97:2 98:4
100:22 124:2

**determined**
70:21 82:4
91:7,11,20
119:20 128:18
**determining**
38:24 40:6
46:15 58:23
59:14 81:25
88:11 92:11
110:17 112:12
**develop** 20:24
**developed**
20:21
**developing**
21:5
**developments**
48:8
**deviate** 76:19
**deviation** 56:11
**dictated** 75:24
**dictates** 101:17
**differ** 76:14
95:18
**differed** 106:7
**difference**
106:5
**different** 20:11
28:19 37:10,10
48:24 57:3
65:14,18 68:20
69:5 70:8
75:19 81:20
87:8,8,14,14
89:24 90:2
92:16 99:1

102:17 103:2
103:13
**differently**
90:11
**difficult** 43:3
87:6
**dimension**
95:18
**dimensions**
95:21
**direct** 17:24
28:4 30:16
36:24 37:8,13
38:2,16 79:9
104:24,25
124:25
**directing** 34:20
50:19 123:6
**direction** 15:9
93:21 96:6,21
**directional**
97:19
**directionality**
97:8,22
**directly** 30:8
31:14,19 36:9
45:1
**disclosed** 53:17
94:20 95:4
116:14
**disclosure**
81:11 106:19
108:14,17
117:21 119:23

**disclosures**
85:16 117:13
**discounted**
87:23
**discuss** 44:17
48:8
**discussed** 12:14
33:24 117:20
**discussing** 56:5
114:11
**discussion**
14:10 34:17
38:17 50:20
127:8
**discussions**
32:4
**dismiss** 12:1
28:8
**disseminated**
33:5,10 47:10
48:9,22 53:13
122:20
**dissolved** 23:7
**distance** 75:9
**distinct** 90:15
**distinction** 60:3
**distinguish**
24:3
**distinguishing**
58:12
**distracted**
124:24
**distraction**
77:19

**distributed**
46:23
**distribution**
39:14
**district** 1:1,2
5:15,15
**docket** 14:2
**doctoral** 20:1
**document**
14:16,17,20
18:12 23:21
27:22 78:8
120:7,20
121:12,15,19
122:7,8 124:9
124:11
**documents**
8:25 27:12,16
28:3,5,20
32:18
**doing** 12:6
20:12,14 21:6
23:13,16 49:1
70:15 71:21
74:25 77:7
84:14 85:3,9
102:25 106:9
107:11 112:19
121:18 122:24
**door** 7:20
**double** 12:22
127:22
**download** 49:4
**downloaded**
29:6 40:13

**[draft - encountered]**

**draft** 15:7
**drafted** 15:9
**drafting** 15:10
**draw** 16:21
  83:25 84:11
  129:3
**drawbacks**
  14:8
**drawn** 126:18
**drive** 3:4
**driven** 42:20
  112:12
**driving** 111:22
  112:6
**drop** 123:10
**drug** 82:7
**due** 116:7
**duly** 6:23 7:2
  130:8
**dupage** 130:5
**dynamic** 70:3
**dynamics** 23:1
  23:2

**e**

**e** 4:1 130:1,1
  132:3,3,3
**earlier** 21:13
  85:4 105:14
  107:19 109:1
  117:7 119:23
**early** 101:9
  109:4
**earning** 60:9
**earnings** 57:21
  59:4 82:10,12

83:4 84:9 85:8
85:10,17,23
86:3,14,16,19
87:17,23 94:3
94:11,19 95:4
95:8 96:14
102:24 106:18
108:10,22,24
126:22
**easier** 16:19
**easiest** 16:16
  44:24
**easily** 46:10
  100:8 110:11
**eastern** 121:1
**easy** 52:8
**economic** 4:10
  34:22
**economics** 4:9
  8:1 18:20 19:4
  20:2 22:2,6,10
  22:14,16 23:11
  25:5 74:18
  78:22 85:23
**economists**
  33:3,20
**educational**
  18:16
**effect** 55:25
  58:4 60:9,19
  61:17 64:12
  82:4 96:14
  111:5 113:7
  115:4

**effectively** 37:9
  45:18 50:9
  62:12 83:6
**efficiencies**
  41:20
**efficiency** 33:2
  33:4 34:4,6,22
  35:3,16,22
  36:10,11 37:13
  37:15 39:5,11
  39:12,23 45:19
  46:8,15,18
  47:13 52:10
  54:2 55:20
  57:16 58:6
  61:8 65:14
  70:13 75:17
  96:23 97:1,20
  100:2,19
  102:16 114:9
  114:21 115:1
  117:8 119:9
  122:24
**efficient** 17:1
  33:1 34:8,12
  34:25 36:1,6
  36:20 37:23
  38:15,24 39:18
  47:9 55:15
  61:24,25 62:2
  62:7,14 86:1,2
  97:1 103:20
  119:4 128:11
**efficiently** 8:22

**efforts** 8:12
  31:5 44:3
**eight** 61:3
**eileen** 3:11 6:5
**eileen.falk** 3:12
**either** 13:8
  60:21 61:5
  66:7,8 68:21
  94:13 96:21
  123:21 129:13
**electorate**
  83:18
**electronic** 50:4
**element** 114:18
**eligibility** 53:4
**eligible** 53:7,21
  53:24
**eliminating**
  111:11
**email** 8:24
  12:21,25 13:5
  13:6 48:20
  77:17 120:16
**emailed** 77:25
  78:2
**empirical** 34:24
  37:16
**employment**
  21:7
**encompass**
  61:9
**encountered**
  41:23 42:6
  45:21

**[ended - exhibit]**                                                      Page 14

ended  7:8
  89:21 91:14
engage  21:3
engaged  23:23
  24:6,6 43:1
engagement
  10:4
engagements
  24:4,5
enormous
  111:8 112:6
enrolling  92:21
  93:1
ensure  50:13
  60:11 83:11
entered  73:20
  102:23
entering  106:4
enters  74:14
entire  62:7
entirely  104:7
  114:10
entirety  61:9
erck  1:10
errata  131:11
  131:13,17
error  13:2
essentially
  23:12 45:15
  49:20 51:18
  53:15
establish
  109:25
established
  110:17

establishing
  55:17 56:23
estimate  9:17
  9:23 12:5
  107:3
estimated  79:6
estimates  80:7
  110:4
estimating
  107:5 111:16
  111:16
estimation
  62:20 63:23,25
  64:2 70:7
  73:12,23 74:7
  74:14 75:18
  76:25 77:11
  79:18 80:5
  81:1,3,7,18
  106:21,24
  107:1,1,4
  109:14,19
  110:13 111:5
  112:1 113:15
et  3:2 5:14
  131:4 132:1,1
  133:1,1
ethics  19:20
eua  4:16 121:3
evaluate  55:24
  59:21 63:1
  72:8 91:1
  98:10 107:2
evaluated  57:9
  97:14

evaluating  35:2
  58:5 87:25
evaluation  4:16
  121:3
event  4:8 55:22
  56:2,6,15,20
  57:2,4,10,17,24
  59:2,11,21
  60:3 61:17
  62:22 64:4,8
  65:1 71:8
  74:18 75:8,10
  76:7,12 78:21
  79:4,7 80:6,10
  80:20,23,23,24
  81:9,10,17
  102:5 104:5,18
events  55:18
  86:6 87:12
  107:10
evidence  46:18
  53:20 55:19
  58:6,18 61:20
  62:6 82:11
  99:5
evolved  20:9
exact  9:19,22
exactly  29:24
  30:12 32:25
  44:8,13 94:25
  95:18 96:18
  97:7 111:2
examination
  4:2,4 7:4 130:7

examined  7:3
example  27:23
  69:10 74:24
  75:25 76:5
  79:4,22 91:24
  100:1 106:1
  110:22,25
  117:19 127:24
examples  48:20
exams  19:12,15
except  23:14
exchange  40:12
  41:1 45:2
  49:22 50:17,18
  50:20 115:21
exchanges  30:4
  30:9 40:4
  41:10,12 45:4
  50:5,12,23
  51:5,15 52:6
exclude  80:10
  92:12
excluded  89:21
  108:23
excuse  18:6
  126:20
exert  68:14
exhibit  4:6,8,13
  4:19 14:3,12
  14:15,18 40:19
  40:20 73:1
  77:18 78:10,17
  78:21 83:2
  91:25 92:1
  94:1 103:1

**[exhibit - financial]**

104:25 105:1,4
108:12 109:10
110:25 120:8
122:23,25,25
127:6,11
**exhibits** 4:5 9:1
33:1
**existence** 48:12
126:7
**existing** 94:21
**expand** 60:15
61:15 85:5,10
**expect** 17:20
94:4,12,15
97:12 99:3
101:13
**expectation**
96:18
**expectations**
94:14,21 95:6
95:18,21 96:10
96:14
**expected** 38:7
56:9,11 63:14
94:10
**expensive**
46:25 126:1
**experience** 18:1
23:19
**expert** 4:6
10:11 11:5
15:4 20:19
47:7
**explain** 32:24
35:6 38:22

44:20 50:21
53:5 60:2
62:19
**explained** 51:2
110:11
**explains** 39:16
**explanation**
111:24 113:25
**express** 99:12
**expressed**
27:17
**expressing** 34:4
**extra** 8:12
**eye** 96:3

**f**

**f** 1:11 130:1
**face** 110:21
**facilitate** 50:1
**fact** 43:9 46:2
48:18 52:15
74:13 83:21
92:25 102:7,18
119:20
**factiva** 88:9
90:3,15
**factor** 35:14,15
35:20,21 36:24
37:21 38:1,13
38:17 42:21
46:11,14 49:16
50:7 52:13,17
52:18 53:3
54:15 55:9,13
57:9,11 66:12
75:18 81:25

82:17 104:12
104:22
**factors** 34:18
35:7,11,12,13
36:3,13 37:3,5
37:18,19 53:25
54:17 55:12
56:10 61:14,14
63:2,15 66:18
66:22 69:2
71:17 103:24
114:6,10,11,17
114:20,25
115:7,9,10
**facts** 75:23
76:15
**fails** 131:19
**fair** 8:2 9:10
22:20 41:3,20
43:7,11 44:9
58:11 64:23
66:16 70:1
81:23 82:25
90:3 94:1
96:25 108:12
126:9,10,25
**fairly** 60:24
102:12 109:23
**falk** 3:11 6:5
**fall** 36:14 57:2
99:3
**falls** 27:1 98:17
**false** 71:24,25
123:19

**familiar** 8:5
13:20 43:16
117:19
**far** 10:10 75:9
**fast** 33:13
72:11
**faster** 78:5
**faxed** 49:2
**fear** 103:6
**feasible** 81:2
**feed** 30:5 48:14
107:25
**feeds** 48:13,20
**feel** 105:19
**fell** 116:12
**felt** 85:5
**fewer** 88:8 90:3
91:4,8
**file** 40:13 53:7
53:9
**filed** 5:14 10:15
14:17,22 54:9
54:11 122:14
**filing** 49:2,4
54:10 85:19
105:4
**filings** 28:9,12
28:13,15,21
31:2,15,16
**finance** 4:9
19:5,17,23
22:16 74:18
78:22
**financial** 18:23
19:9,19 20:15

**[financial - four]**

33:20
**financially** 5:21
**find** 43:2,3
65:25 71:22
**finder** 119:20
**finding** 16:18
**fine** 7:17 16:20
**finer** 119:16
**fingertips** 49:9
**finish** 8:16
**finished** 8:15
**firm** 5:19 10:25
11:4,12,13
21:22,24,25
22:3 23:6,17
24:11,18 27:5
93:9 98:21
107:9
**firms** 47:23
48:15,18 96:11
103:4
**first** 7:2 10:3
14:3 16:22
17:24 20:9
21:9 22:4,5
23:15,20 26:4
26:6 28:5,22
30:16 38:21
39:6 40:5
44:19 45:10
46:13 48:25
49:17 53:5
55:11 62:18
65:19 71:13
73:18 74:7

76:6 79:15
103:16 108:21
109:19 114:2
115:18 120:19
122:7,10 123:7
125:1,13 128:1
130:7
**fitzgerald** 48:1
**five** 9:23,24
12:8 28:14
40:16,21 54:21
88:8 89:7,7
90:2,9,14,25
91:3,7 123:8
**fixed** 76:6,11
**flash** 127:12
**floor** 2:10,14
3:5
**flowing** 50:13
106:8
**flows** 87:23,25
**focus** 18:25
68:8 108:9
115:14
**focused** 19:3,4
19:4,6 48:15
52:18 66:25
67:14 85:16
107:16 114:19
**focuses** 19:3
**focusing** 20:25
76:22 79:21
114:3
**follow** 100:2
109:9 111:7

121:20
**follows** 7:3
**footnote** 45:15
65:25 69:11
74:17 78:24
79:2,24 80:4
92:3 125:1,13
**footnotes** 65:23
**foregoing**
133:5
**forgetting**
19:21
**form** 16:9
24:12 25:18
26:11 28:1
29:4,14 31:9
33:1,15 34:9
37:13,15 41:8
42:1,22 43:10
44:7 47:17
50:25 52:14
53:4,7,9 54:4
57:13,17 58:2
59:8 62:3
64:13 66:15
68:9 71:5 74:1
74:22 80:14
85:19,20 91:22
92:14 94:6
96:2 97:5 98:8
100:4,25
103:21 108:7
108:19 112:14
114:13 117:15
119:6 123:17

124:6 125:11
128:9,19
**formal** 19:3,10
19:11 48:11,15
48:17 49:11
95:17
**formation**
122:12 123:15
**formed** 16:24
17:9,19 21:25
**former** 21:21
**forming** 21:23
27:17 28:17
52:9 105:14
114:8 123:4
**formula** 45:14
**forth** 130:7
**forward** 32:21
73:22 77:2
93:1
**found** 53:20,23
69:13 77:6
**foundation**
23:24 29:23
44:7 67:3 74:1
80:14 100:4,25
103:21 112:14
117:15 118:9
119:6 124:6
**founded** 22:5
**four** 9:23,24
12:8 28:14
89:6 106:19
109:17 110:14
111:10 123:8

**fraction** 39:3
**frame** 21:13
  22:12 25:3
**framed** 62:20
**framework**
  72:19
**fraud** 35:3,8
**free** 50:13
**frequently**
  40:10 41:14,15
  42:5 43:9,13
  75:21
**fresh** 13:21
**front** 11:25
**full** 7:12 60:16
  60:17 76:8
  123:9
**functioning**
  49:24
**fundamental**
  59:18 110:1
**funds** 4:17
  121:4
**further** 35:10
  100:17 113:17
  129:11 130:11
**future** 76:13
  87:23,25

**g**

**gained** 95:15
  95:19
**gather** 52:6
**gathered** 48:23
**geared** 62:5

**general** 19:14
  20:17 22:13
  32:1 43:22
  52:4 67:24
  71:18 95:19
  97:14 116:3
**generally** 33:12
  33:18,23 39:9
  52:24 55:21
  56:5 65:17
  66:20 80:4
  103:25
**generated** 30:3
**getting** 30:7,11
  46:24 73:5
  82:21,22 84:23
**give** 8:8 9:6
  21:9 25:25
  43:20 48:19
  71:24 87:24
  121:13 124:20
**given** 54:17
  59:15 64:17
  67:22 79:17
  94:11 101:5
  112:19 114:24
  115:3 123:21
  127:23 129:19
  130:9 133:9
**gives** 71:23
  72:19 86:6
  90:5
**giving** 61:11,21
  66:1 69:20
  72:5 74:24

**glendon** 2:13
**glenn** 1:13
**global** 8:1 22:1
  22:2,6,10,14
  23:11 25:5
**go** 5:9 19:10
  26:3 31:10
  35:17 45:11
  52:20 71:22
  72:2,13 76:8
  76:10 90:9,25
  98:9 101:14
  108:23 111:7,9
  122:4 124:5
  126:17 127:22
**goal** 61:1 72:23
  97:1
**goes** 32:8
**going** 5:1 7:21
  8:23 16:16
  44:2 54:22,23
  55:3 60:19
  63:21 68:14
  71:25 72:18
  74:5 82:6
  88:17 92:24
  93:9,25 97:15
  101:3,10,14,22
  102:1,21
  104:14 113:1
  117:6 129:4,18
**good** 5:1 6:17
  7:6,10 37:13
  51:13 65:17
  67:18,25

**gotten** 13:3
  55:7 78:3
  121:25
**government**
  102:21
**granularly**
  67:14
**gray** 3:3,7,10
  3:13 6:2
**great** 4:13 7:11
  121:2,22
**greater** 36:17
  42:7 45:22
  77:13
**greatest** 113:14
**gregory** 1:11
  1:13
**ground** 8:6
**group** 8:1
  21:25 22:2,7
  22:10,14,20
  23:11 25:6
  82:9,9,9 83:6,7
  90:9
**growing** 4:14
  121:2,22
**growth** 66:2
**guarantee**
  51:15,19
**guess** 29:15
  33:7 48:17
  79:12

**[h - includes]**

| h | | i | importance |
|---|---|---|---|

**h** 2:5 131:1 132:3
**half** 111:2,4
**hand** 79:11 127:14 130:17
**handful** 25:9
**handle** 119:25
**happen** 75:24
**happening** 112:4
**happens** 38:12 50:11
**happy** 101:8,9 101:11
**hard** 72:11 87:12 96:16
**hardcopy** 13:9
**head** 51:24 70:18
**hear** 108:1
**heard** 5:6 22:8 43:18,21
**hearing** 24:24 129:8
**hedstrom** 15:15
**hereinbefore** 130:7
**hereto** 133:7
**hereunto** 130:16
**hiccup** 54:9,14
**high** 18:17 39:8 45:25 46:1,2

47:23 56:12
**higher** 37:1 41:5 43:7 47:25 116:10
**highlight** 48:4
**highlighted** 47:22
**highly** 39:10 104:3
**historical** 29:1 29:7,10
**historically** 87:1,3
**history** 86:23
**hold** 20:1 78:8
**home** 7:15
**honors** 18:20
**hope** 7:8
**hopefully** 8:9 8:21
**host** 100:15
**hour** 8:18 12:10 48:19 54:23 101:4,14
**hours** 12:8 26:8 26:15,17
**huge** 113:1
**huh** 125:6
**human** 50:6
**hypothesis** 86:2
**hypothetical** 53:22 67:12

**i**

**idea** 39:21 100:9 109:24
**identification** 14:13 78:18 120:9 127:7
**identified** 35:1 67:23 83:5
**identifies** 75:3 94:7
**identify** 26:1 72:17 87:5,12 88:6 110:9 111:6 113:11 120:19
**identifying** 67:24 121:23
**illinois** 3:5 7:19 130:5
**immaterial** 89:20 91:13
**immediate** 103:7
**immediately** 38:13 64:5
**impact** 54:18 74:9 106:10,15 111:8,15 122:22
**impacted** 58:19
**impacting** 36:25 110:23 118:15
**implies** 46:19

**importance** 59:3 90:16
**important** 16:6 35:2,7 36:4 39:4,20 46:17 49:13 50:6 57:24 58:3 71:19 77:7,9 83:11,16 85:24 87:20
**improperly** 116:14
**inaccuracies** 123:10
**inaccuracy** 31:6 118:25
**inaccurate** 58:1 58:9,15 73:20 73:24 80:12 81:11 118:15 123:19
**inaccurately** 118:4
**inbox** 77:19
**include** 53:16 69:2 72:7,10 72:12,24 76:12 76:13 80:24 87:5 88:25 92:7
**included** 80:5 91:2 98:6 107:14
**includes** 34:5 73:23

**including** 31:2 48:1 72:3 74:6 86:20
**inclusion** 90:13 105:17
**inconsistent** 32:13 96:22 97:12 108:1
**incorporate** 33:5
**incorporated** 5:14 29:3
**incorrect** 119:19
**incredible** 88:18
**incremental** 106:15
**independent** 31:5
**index** 63:5,6,6 64:21,22 65:5 65:6,11,13,16 65:20,24 66:3 66:5,12,21,24 67:8,18,20,22 67:25,25 68:5 68:7,11,13,15 69:17,18,21,21 70:14,20,22,23 71:1,2,10,10,14 71:15,16,23 72:1,18,24 73:2,3 105:12 105:15,19,20

105:23,24 106:2,3,6,7,15
**indicates** 39:13 43:8
**indicative** 39:9 39:10 47:5,9
**indicator** 39:4
**indices** 29:8 30:10 41:7 63:20 64:25 65:3 66:7,9 68:20 69:15,15 70:5 81:15 110:3 112:16
**indirectly** 30:8
**individual** 6:3 27:22 35:20,24 62:10
**individually** 1:4 2:3 12:14 35:18
**individuals** 26:22
**industries** 63:19 67:15 87:8
**industry** 63:6 65:13,17,21 66:22 67:17,24 68:2 69:17,21 70:20,22 71:10 71:18 72:19,24 105:12,23 106:3,6,15

**inefficient** 34:25 38:10 61:19
**ineligible** 54:16 54:16
**inflammatory** 128:3
**inflated** 116:7
**influence** 51:20 68:14 110:13 128:10,12
**influenced** 72:9
**influences** 112:3
**influencing** 66:18 80:6 122:18
**information** 18:7 29:2 31:6 31:14,19 32:6 33:6,10,11 36:25 38:5,6 39:15 40:9 42:20 46:21,22 47:3,4,7,10 48:9,16,18,22 49:6,14 53:10 53:12 55:10 56:1,17 57:20 58:8,13,15,18 58:20,22 59:1 59:4,6,10,15,16 60:10 73:20,21 73:25 80:12 82:13 85:25

87:20,24 89:20 93:19 94:5 95:6,25 96:19 97:3,4,13 116:8 118:5,15 118:16 119:5 119:22
**inherently** 69:6
**initially** 10:20
**instance** 61:22 66:11 75:16 82:24 84:18 117:11
**instances** 91:6
**institutional** 51:18
**intend** 17:13
**interest** 46:19 47:6 52:7 88:18 110:2
**interested** 5:21 21:23 130:13
**internet** 5:5
**interpose** 108:6
**interpretation** 95:16 106:13
**introduce** 78:7
**invariably** 71:15
**investigate** 31:21 100:17
**investigation** 32:15 119:18
**investment** 102:21

**[investor - larger]**

**investor** 91:19
**investors** 116:11
**involve** 24:10
**involved** 18:11 19:23 20:22 21:2 22:15 23:3,13 32:6 65:21
**involving** 20:12 20:13
**ipo** 76:9
**iq** 29:7,17,21 30:6 40:9 125:5,8,15,17 125:20
**irrationally** 97:18
**isolate** 63:12
**issue** 58:9 76:22 94:8 110:24 113:1 117:6 119:8,9 129:8
**issued** 47:25 65:10
**issues** 26:9
**item** 93:5 122:16
**items** 27:20 88:8 90:3,15 90:17
**iterative** 88:13

**j**

**j** 1:12 2:5
**james** 2:9 6:9 13:11
**january** 64:4,6 80:22,25 81:6 112:24
**jchristie** 2:11
**jefferies** 48:1
**john** 1:12
**journal** 4:10 79:12
**jpmorgan** 48:2
**judgment** 113:19 119:17
**jump** 38:13
**jumping** 92:17
**jumps** 111:1,3

**k**

**k** 67:22
**keep** 101:10
**key** 128:1
**kicks** 83:25
**killed** 78:14
**kind** 41:17 93:18 111:21
**knew** 85:6
**know** 8:5,9,15 8:18 9:19 11:6 11:24 12:13 13:20,22 14:6 15:16 24:2,7 26:13,15 27:2 27:3,23 28:18 29:24 30:3

33:7 36:16 37:13 40:15 42:12,13,18 43:18 46:24,25 47:22 48:19,25 49:3,11,22 51:14,24,25 54:6 59:4 61:1 61:2 63:1,21 68:12 71:7,13 71:24 72:25 73:6 75:2,3 76:8 82:7 83:19,22 84:5 84:13,21,24 86:4,8,14,25 87:1,4,7,21 88:15,17,20 89:1,5 90:7 91:16,18 92:20 92:25 93:11,12 94:13 95:21 96:4,9,12,16,22 97:17,21 98:19 99:22,23 100:15 101:8 101:13,13 102:20,20,23 103:8,24 104:6 107:9,19 111:2 112:3,4,19,23 112:23 113:3 113:19,20,24 114:23,24 115:7,9 116:2

118:13,14 120:13 125:17 126:1 128:20 129:4
**knowing** 44:8 78:15
**knowledge** 16:4 18:9,10 27:15,19
**known** 22:4 47:23 80:11
**knox** 18:20
**krogman** 114:6 114:11,17
**ks** 66:4

**l**

**labaton** 2:4,9 6:7,10 10:22 10:25 11:4 24:11
**labaton.com** 2:7,8,11 131:2
**label** 14:17 128:1
**labeled** 127:12 127:14
**large** 25:11 52:6 83:24,25 84:19,23 85:6 86:2 110:7,10 113:23
**largely** 16:16
**larger** 42:13 84:5,25 105:2

**[largest - made]**                                                    Page 21

**largest** 51:4
**late** 54:9
  101:13
**law** 83:24
  84:22
**lays** 94:2
**lead** 6:7,10,13
  6:15 10:18,19
  12:2 100:1
  115:18,23,25
**leading** 10:14
**leave** 21:20
  72:14
**leaving** 113:6
**led** 119:2
**left** 7:20 21:22
  23:7 70:22
  114:18
**legal** 3:16 5:19
  129:22 131:23
**leggio** 2:5 6:14
  6:14,16
**level** 34:13
  104:17,18
**levels** 56:16
  69:5
**liability** 115:23
  116:1,16,18
**likely** 39:14
  63:14 71:17
  126:2
**likewise** 32:8
**limited** 61:8
**limiting** 48:17
  116:24

**line** 34:23
  105:10 111:1
  132:4,7,10,13
  132:16,19
**linear** 56:25
**lines** 89:17
**liquid** 46:9
  51:5,15
**liquidity** 37:10
  39:9 42:24
  43:5 51:8
**list** 13:6 27:16
  28:9,21 57:19
  77:17 90:24
  93:13 95:2
  109:11,11
**listed** 26:4
  29:12,16 31:1
  41:6 50:22
  51:13 52:5,16
  90:15
**listing** 27:21,25
  28:13 51:25
  52:11 92:3
  93:11
**lists** 22:25
**literally** 76:10
  93:7
**literature** 4:11
  55:24 71:9
  85:22,23 86:7
  87:19
**litigation** 10:1
  11:3 20:12,13
  20:16 21:1

  23:22 24:22
  65:16
**little** 8:20 17:22
  21:13 28:24
  32:21 46:24
  69:20 85:1
  101:6 105:2
  108:1
**live** 129:8
**llc** 8:1 20:8
  22:22,23
**llp** 6:7,12
**loaded** 78:12
**located** 7:24
**long** 12:9 75:9
  85:22 87:16
**longer** 21:17
  53:11 54:22
**look** 15:19
  25:25,25 35:12
  35:22 49:13
  59:3 68:15
  69:10 72:23,25
  73:13 79:15
  81:2 85:11
  91:24 97:21
  103:1 104:4
  115:8 125:8
**looked** 28:1
  45:20 50:7
  61:14 93:17
  95:9,13,14
  96:3 115:9
  127:19

**looking** 13:13
  30:20 33:21
  49:15 50:8
  61:17 62:5,9
  62:23,24 63:9
  82:18 93:3
  97:8 102:24
  110:25
**lookout** 97:17
**looks** 78:10
  111:7
**los** 2:14
**losing** 74:11
**loss** 107:20
  118:12,17
  119:13 128:22
  128:25
**lot** 21:14 38:4,5
  43:8 50:3 74:2
  96:10 102:21
**lots** 30:6 43:12
  88:18 103:4
**low** 4:15 121:3
**lower** 85:1
  103:9
**lunch** 101:9,12
  101:15

**m**

**m** 1:13 3:11
  130:21
**madam** 13:25
**made** 50:6
  68:16 72:6
  99:2,7 102:14
  105:13 117:25

**[made - mean]**

119:1,17,17 122:15 133:5

**main**  93:25

**major**  18:20

**make**  8:12 12:24 13:16 31:4 32:5 54:15 66:1 77:21 78:9 79:22 83:3 85:18 89:13 91:1 97:10 101:19 121:10

**maker**  49:19 50:2,4,10,14,15 52:17

**makers**  49:17 50:6,24 51:8 51:17,20 52:12 52:22

**makes**  35:14 106:13

**making**  7:7 49:24 68:5 81:4 90:12

**management** 19:18,23,24 20:21 23:5,13 23:18

**manufacturing** 128:4

**march**  4:11

**mark**  13:21 15:15,18 78:21

**marked**  14:13 14:15 78:18 120:9 127:7,11

**market**  16:25 22:25 23:1 30:6 33:1,6 34:4,22,25 35:4,8,15,22 36:1,5,6,10,11 36:20,22,25 37:7,22 38:10 38:24 39:4,10 39:10,12,14,18 39:21,22 41:19 42:20 45:19 46:8,9,10,15,21 47:3,9,13 49:16,19,24 50:1,2,4,6,10 50:13,14,15,24 51:8,15,17,20 52:10,12,17,21 53:11 54:2 55:14,19,20 56:1,10 57:16 58:6,7,13,19,22 58:25 59:23 61:8,23 62:7 63:5 65:6,8,11 65:14 66:13,14 69:16,21 70:12 70:23 71:10,14 73:20 75:17 79:5,5 80:13 82:11 86:1,2

93:3,20 94:4 96:23 97:15,20 100:3,19 102:16 103:20 106:2,7 112:5 112:8,15,21,25 114:9,21 115:1 116:6,8,9 117:7,14 119:2 119:4 122:24 128:11

**marketing** 102:8

**markets**  23:5 33:5 48:10 50:21 51:7

**marriage** 130:13

**maryland**  1:2 5:15

**massachusetts** 3:9

**master's**  18:21 19:1

**match**  51:10 116:17,20

**material**  11:22 85:25 87:11 89:15 91:3,8 91:12,14 92:13 98:21

**materiality** 99:13

**materially** 73:19,24 80:12

**materials**  12:6 122:9

**matter**  5:13 8:19 10:14,17 24:22 25:24 26:2,5,23 27:5 33:21,22 46:13 61:7 67:9 73:5 74:12 83:19 85:4 87:2 104:1 129:9 130:14

**matters**  9:25 11:3 21:3,7,8 23:22 24:7,10 25:15 38:1 65:18,20 67:14 70:18 82:6 86:24 90:4

**mckinley**  74:17 75:1

**mean**  32:25 37:24 38:9 43:18 44:9,13 47:18 56:24,24 73:22 74:4,12 82:2 83:14,16 84:3 86:23 88:14 94:15 95:7 97:6 99:17 102:22 106:22 111:19 111:20 112:9 115:24 116:3,4 116:18 118:11

119:17 120:2 124:13

**meaningful** 68:23 75:8 91:18

**means** 43:22 106:1

**meant** 28:2 29:5 41:9 66:21 78:23 105:25

**measurable** 37:6 38:8

**measure** 37:8 45:16 63:22

**measured** 115:20

**measurement** 113:7

**measuring** 59:12 106:16

**mechanisms** 50:13

**media** 5:11 48:21 55:1,5 101:24 102:3 129:20

**mediation** 21:4

**mediators** 21:1

**meet** 38:12,13

**meeting** 94:13

**member** 22:22 23:10 50:18 117:3

**members** 15:13 15:17 22:23 115:21

**memorandum** 28:7

**mention** 89:1 93:7

**mentioned** 88:24

**met** 46:10 52:13,17,19 53:1 57:12 73:9

**method** 117:17

**methodologies** 103:25

**methodology** 17:12 55:22,23 61:6 76:16 82:5,5 88:2 115:13,22,24 116:16,21,25 117:9,11 118:8 118:20 119:10 119:14,25 120:3 123:25 124:2 128:13 128:17

**methods** 59:17

**metric** 35:14,21

**metrics** 35:2,8 35:25 36:7

**michael** 2:5 6:6 131:1

**middle** 105:9 105:10

**midst** 102:8

**mike** 13:3 54:20 101:16 121:7

**million** 78:14 83:23

**mind** 15:16 19:21 43:20,25 65:19 92:18

**minimum** 51:12,22 52:1 83:8,13 84:7 109:11

**minimums** 83:14

**mining** 71:22

**minority** 42:9

**minus** 69:13 107:21,23

**minute** 101:7

**mis** 77:14

**misinformation** 117:13

**missed** 6:16

**misstatement** 74:9

**misstatements** 116:9

**misstates** 124:7

**mix** 73:21 94:14 120:7

**mixed** 96:19

**model** 56:9 79:5,5,17 80:6 104:13

**moment** 129:17

**money** 19:23

**months** 10:14 10:16 64:3

**morning** 5:1 6:17 7:6,10 54:11

**motion** 10:12 12:1 14:24 28:8 124:3

**move** 8:21 30:15 32:21 34:17 44:16 46:11 49:16 53:3 62:17 81:19 91:15,15 91:17 94:12,23 96:19 110:18 111:22 114:2 115:12 119:2 124:10,12

**moved** 56:18 82:12 98:11 99:3

**movement** 56:12 59:12 64:15 65:7 81:14 94:10 95:24 96:5 97:19 98:5 99:25 100:8,12 100:23 112:12

113:14 118:13
**movements**
38:9 55:18
56:9 63:10,14
81:12 96:21
111:24
**moves** 56:14
**moving** 23:19
66:19 93:1,21
97:12 99:6
**mrogers** 2:8
131:2
**multiple** 28:19
69:1,2
**multiplying**
69:14

**n**

**n** 4:1
**n.w.** 3:11
**name** 5:17 7:13
7:14,24 13:13
22:6,9
**nasdaq** 40:4
41:1 45:8
50:21 51:4,9
52:11,16,20,25
63:5 64:21
65:16 66:11
67:18,25 68:4
68:20 73:2
**nature** 34:2,6
76:1
**necessarily**
38:9 72:17
94:23 98:23

109:10 111:20
112:10
**necessary**
37:20 98:14
105:20 118:17
133:6
**need** 8:17,17
13:21 46:9
62:25 63:16,20
75:7 84:3,7
101:9 126:17
**needed** 75:24
104:21 105:16
110:12 125:7
**needle** 94:23
**needs** 36:20
79:18
**negative** 94:15
96:1 99:25
**neighborhood**
41:24
**net** 105:23
**networks** 48:20
**neutral** 20:25
25:18
**never** 73:4,9
115:1
**new** 2:11,11
3:14,14 21:24
21:25 33:9
41:1 50:20
55:9,18,25
57:20 58:13,22
59:1 93:9,18
93:20 97:3,4

99:6
**news** 27:23
48:19 56:13
57:21,25 58:1
64:10 82:15,15
82:24,25 83:7
84:9,21,21
87:4,13 88:6,8
88:12,19,21
90:3 91:20
92:8,22 93:5,6
93:14,15,23
94:15,22 95:13
98:1,6,11,18,20
98:21,24 99:1
99:6,11,11,12
99:14,17,21,21
107:9 110:1,6
110:11 111:21
112:5,5,8,10,12
112:15,17
122:16
**noise** 43:16
44:5,9,12,14
72:4
**non** 82:25
**nope** 121:8
**norm** 42:15
**normal** 79:17
80:6
**normally** 33:20
102:16 110:22
**north** 3:4
**notary** 130:4
133:13,19

**note** 28:18
52:21 56:2
100:16 104:4
105:2,7,9
125:1 126:21
131:10
**noted** 68:11
122:19 133:7
**noticing** 5:25
**novavax** 1:9
3:2 4:12,13,18
4:21 5:13 6:3
28:14,15 29:3
31:17,20,23
34:5 39:25
40:7 41:4 44:5
45:7 46:5 48:1
49:23 52:15,22
53:20 54:2
63:19 64:17
65:23 66:13
68:11 70:4
73:7 78:24
82:11 85:16
86:12 88:8,24
89:1,15 92:20
93:7,12,16
94:5 99:24
102:7 105:11
105:14 110:3
112:11 113:8
116:6 120:6,22
121:2,22
125:14 127:15
128:6 131:4

132:1 133:1
**novavax's**
  16:25 31:14
  118:5
**nudo** 26:5
**number** 8:2
  9:19,22 20:11
  25:11,11,13,16
  26:8 33:23
  42:11 52:12
  60:25 65:14,18
  76:24 78:25
  79:11 83:8,9
  83:15 84:20
  85:10 89:2,16
  90:14,20 99:1
  104:20 107:21
  122:25 125:19
  129:20
**numbers** 43:14
  44:16,25 45:1
  45:11 83:3,25
  84:23
**numeral**
  115:16
**numerical** 57:3
**numerous** 9:14
**nvax** 31:23
**ny** 131:15
**nyse** 40:3 45:8
  51:4,9 52:25

**o**

**oath** 6:1
**object** 108:19

**objection** 9:12
  16:9 23:24
  24:12 26:11
  29:4,14,23
  31:9 33:15
  34:9 41:8 42:1
  42:22 43:10
  44:7 47:17
  50:25 52:14
  54:4 57:13
  58:2 59:8 62:3
  64:13 66:15
  67:3,11 68:9
  71:5 74:1,22
  80:14 85:20
  90:18 91:22
  92:14 94:6
  96:2 97:5 98:8
  100:4,25
  103:21 108:7
  112:14 113:16
  114:13,22
  117:15 118:9
  119:6 123:17
  124:6 125:11
  127:3 128:9,19
**objective** 86:6
  86:10 87:12,13
  88:3
**objectively**
  39:6 87:5
  89:19
**observed** 63:18
  113:13

**obtain** 29:18
  47:7
**obtained** 18:19
  18:22 40:8
  125:14
**obtaining** 19:8
  30:13
**obvious** 97:11
  97:17 110:21
  111:4,14 112:3
  112:4 113:25
  116:5
**obviously** 27:2
  27:20 28:19
  31:22 36:20
  37:14 42:10
  61:12 63:10
  69:11 84:4
  88:18 94:10
  129:3
**occur** 12:11
  87:18,18
**occurred** 45:25
**occurrence**
  100:13
**october** 121:1
  122:15 127:13
**offer** 17:14
**offered** 17:3
**offering** 117:1
  123:15 126:6
  128:8
**okay** 7:22 9:4
  9:16 12:23
  13:10,24 16:21

17:8 18:4 20:4
  28:4 32:20,23
  34:19 38:20
  73:18 80:1,18
  92:10 93:14
  95:1 101:8,16
  101:16,21
  105:6,22 109:9
  109:16 111:7
  114:7 115:15
  117:23 118:23
  120:14,18
  122:3 123:6
  124:23 125:3
  126:19 127:25
**omissions**
  116:9
**once** 52:25 72:1
  90:22,23
  120:15
**ones** 36:9 92:7
  109:1,12,14
**online** 48:12
**open** 7:20
  121:11
**opine** 115:19
**opined** 123:24
**opinion** 15:11
  16:8,24 17:6
  17:10,13,16
  28:7 34:3,3,5
  34:12 36:5
  52:9 54:1,19
  61:7,11,21,23
  61:24 62:12

70:12 84:16
114:9,20 115:6
116:23 117:1
117:23 126:25
129:3
**opinions**  16:5
16:11,12 17:2
17:20,23 27:17
28:17 122:12
123:5,15,21
125:10 126:5
127:20 128:7
**opportunity**
8:8
**opposed**  64:9
65:3 66:14
68:8 70:14
73:15 74:21
76:23 85:17
**options**  65:3
**order**  9:20 12:1
60:7 70:25
83:11 105:21
**orders**  51:10
**outcome**  5:22
27:8 62:23
72:2 106:11
111:17 118:18
119:24 130:14
**outcomes**  62:6
62:13
**outlier**  106:20
109:18,21
110:7,18,23
111:5 113:12

**outliers**  92:4
110:9
**output**  111:9
**outputs**  102:11
103:15
**outset**  103:18
**outside**  21:25
22:1 28:21
31:15,21 32:16
42:15 56:10
63:2 98:17
99:3 112:3
**outsized**  113:4
113:6
**outstanding**
39:4 40:2,22
40:25 41:25
45:17
**overall**  54:2
**overarching**
31:25 104:11
**overdone**  128:4
**overview**  30:17
30:25 31:7
**own**  20:24,24
26:23 29:22
31:14,20 59:14
97:9

**p**

**p.m.**  101:23
102:2 129:19
**page**  14:3,4,16
14:19 15:20,20
15:24 16:15,15
16:24 18:2

26:3,4 27:13
38:19 45:5
79:10 91:25
105:4,10 114:5
123:7 124:18
128:1 132:4,7
132:10,13,16
132:19
**pages**  16:17
105:3
**pallas**  26:5
**pandemic**
102:9,19 103:6
103:7
**paragraph**
15:21 16:14,22
16:23 17:8,9
30:19,19,21
31:12,18,24
32:8,22 34:18
34:20 35:19,23
38:18 39:2,24
44:17 45:6
46:16 47:22
48:8 49:5,17
50:19 51:2,3
52:21 53:19
55:8,16 56:2,8
56:20 57:19
62:17,21 79:16
80:2 81:19
88:4 114:2,4
115:14 124:18
125:2,13

**paragraphs**
16:17,19 31:1
**parameter**  80:7
**parameters**
79:6 84:11
97:7
**pardon**  25:2
**part**  28:12 62:8
62:10,11 86:2
94:8 101:1
102:25 108:21
110:8 119:8
**partially**
119:19
**participants**
2:1 3:1 5:5
30:6
**participate**
21:10 87:7
**participated**
15:10
**participation**
36:22
**particular**
15:13 18:25
23:21 26:1
28:5 32:17
34:25 35:7,23
35:25 36:5
37:21,22 38:5
38:18 42:18
43:20,24 47:15
47:21 49:19,21
49:21 51:3
52:2 55:14

57:25 58:22 59:1 63:3 64:9 64:10,15 65:2 65:24 66:13 69:12,20 71:1 72:19 73:14 76:18 79:3 80:22 82:19 83:1 85:15 87:1 88:10 89:13 91:4 93:2 95:4 99:13 103:12 103:18 104:2 106:11,23 107:16 109:20 110:16 112:2,7 112:11,19 113:13 116:23 118:25 122:11 123:7,14 127:17

**particularly** 66:25 96:8

**parties** 5:9 6:18 130:12

**partly** 89:25

**partner** 22:19

**partners** 20:8 20:10 21:17,20 21:21 22:1

**party** 5:20

**passed** 19:13

**passing** 93:7

**past** 42:3 57:8

**patients** 92:21 93:1

**pay** 37:10 47:4

**pdf** 15:20 16:15 18:3 27:13 38:19 79:10 91:25 114:5 124:19

**peak** 103:5

**pennsylvania** 3:11

**people** 8:19 12:18 19:22 30:10 43:1,8 43:12 47:1,3,6 48:23 49:14,23 65:6 86:25

**percent** 40:1,2 40:25 41:2,25 45:8,9,22 68:13,15 69:13 100:11 105:19 106:2,3,5 123:11

**percentage** 40:22 42:7 43:8 64:16 68:6 74:6,13 81:13,14 83:9 83:15,19 110:18 111:12 113:14

**percentagewise** 42:5

**perfect** 99:2,7

**perfectly** 116:17

**perform** 57:4 67:17 105:21

**performance** 67:21 79:17 80:6

**performed** 33:20 41:17 57:16 75:17

**performing** 69:7 84:14 86:22 110:8

**period** 17:1 21:22 38:6 40:1,16 41:4 41:16 44:6 45:9 52:23 53:11,21,24 54:3 60:4,4,14 60:15,17,18,18 60:20,20,23 61:9,10,12,13 61:15,16,19,21 61:24 62:1,2,8 62:9,10,15,25 63:16,20 71:3 73:11,12,15,19 73:23 74:5,7 74:20,21 75:1 75:19 76:2,23 76:25 77:1,12 80:4,5,10 81:3 81:5,22 82:1

82:20 83:10 85:4,5,9 88:5 88:15,22 104:3 104:21 107:20 108:22,25 109:13,15 113:15

**periods** 40:16 76:3

**person** 49:3

**personal** 26:18

**personally** 26:8

**pharmaceutical** 65:24

**phillip** 2:5 6:14

**physical** 126:14

**pick** 82:6,8 89:11

**piece** 58:22 59:1,4,5,14,15 64:10 81:13

**pieces** 59:9

**piereson** 3:13 6:5 8:23 12:19 13:18 78:12 120:11

**place** 5:9 36:17 50:3 92:24

**plaintiff** 6:7 25:21 115:19

**plaintiff's** 115:23,25

**plaintiffs** 1:7 2:2 6:11,13,15 10:18,19 12:3

**[plaintiffs - prices]** Page 28

25:17 32:4
**plan** 54:24
**platform** 23:1,1
**play** 102:9,10
**plays** 49:12
  123:20
**please** 7:12
  13:16,17 16:14
  17:25 18:15
  35:6 38:21
  43:20 77:17
  120:7 129:17
**pleggio** 2:7
**plenty** 43:1
**plus** 60:20
**pocket** 117:10
  118:20 119:10
  119:25 120:3
  128:13
**point** 20:4,20
  23:20 28:23
  29:13 42:17
  49:5 52:2
  53:12 55:11
  72:17 76:2
  85:3,8 94:19
  105:13 108:21
  117:1,1 119:16
  126:11 127:25
  128:2 129:1
**pointed** 65:23
**points** 28:2
  61:3 84:4 89:3
  89:5 128:2

**policy** 18:21
  19:1
**politico** 117:20
  117:25 118:3
  119:18 128:24
**polls** 83:18
**pomerantz**
  2:12 6:12
  11:12,13 24:18
**pomlaw.com**
  2:15
**population**
  83:20
**portion** 63:13
  105:15 108:9
  108:10 124:17
**positive** 94:14
  95:25 96:7
  99:23
**positives** 71:25
**possession**
  122:9 126:3
**possibility**
  76:24 88:25
  92:12 112:10
**possible** 10:4
  24:16,20
**potential** 67:1
  77:5
**potentially**
  67:10 98:21
  100:16 109:1
**power** 70:21
  71:2,23 72:5
  72:22 73:3,7

**powerful** 60:8
  60:12 84:6,12
  85:7
**practical** 83:14
**practically**
  84:3
**practice** 20:24
  124:8
**preceding** 64:5
**precise** 64:16
  66:1
**precisely** 34:2
  43:19 112:18
**precision** 37:11
**predicate** 37:14
**predicted**
  69:12
**predictive**
  70:21 71:2,23
  72:5,13,18,22
  73:3,6,7
**prefer** 54:20
**preparation**
  26:13
**prepare** 11:19
  14:23
**prepared** 15:3
  67:6 129:8
**preparing**
  15:12 28:10
  54:6 126:25
  127:19
**present** 3:16
  12:15 37:21
  39:22 45:6

115:5
**presented**
  44:16 45:13
**president** 21:21
**press** 57:21
  85:18 87:10
**pretty** 78:11
  115:8
**prevent** 80:5
**previous** 41:19
**previously**
  10:24 11:13
  37:25 53:18
**price** 33:6 37:1
  37:9,9 38:4,8
  52:2 55:9,19
  56:9,14,18
  58:7 59:12
  62:25 64:17,18
  74:6,9,13
  82:11 91:15,16
  94:10,12,24
  95:24 96:5,7
  97:11,19 98:5
  98:10 99:1,2
  100:1 110:19
  111:22 112:13
  113:15 116:6
  116:10,12
  118:13,15
  119:1,2 124:10
  124:12 128:23
**priced** 52:7
**prices** 30:2
  33:9 36:21

**[prices - questioning]**                                         Page 29

56:1 66:18
**pricing** 29:8
**primarily**
15:18
**principal** 22:19
**principles**
22:17
**print** 78:14
105:1
**printed** 123:7
**printout**
120:24
**prior** 60:16
64:6,18 70:7
73:14 75:7
76:2 77:1 79:7
95:5 107:15
109:15 124:7
**privy** 30:12
**probably** 9:20
10:22 11:11
21:12 24:13
25:9 26:25
36:23 37:3
43:12 44:23
78:5 114:23
115:5 127:24
**problem** 122:6
**procedure** 69:6
101:2 113:24
**procedures**
29:25 30:12
**proceed** 6:25
9:2

**proceeding**
6:19
**process** 21:4
23:6 88:14
110:8
**produce** 47:23
48:16 102:19
**produced**
120:21 122:7
**production**
4:15 121:3
**professional**
18:1
**profound** 107:9
112:25
**promises**
101:19
**proposed** 60:5
**provide** 17:20
51:10,11 61:22
61:23
**provided** 17:17
24:22 27:5
53:10 56:17
59:6
**providing** 16:2
16:7 23:4
47:24 48:18
51:8 58:1
70:12 93:19
**prudential** 3:8
**public** 18:21
19:1 33:6,11
52:10 85:17
86:12 87:18

95:6 122:15
130:4 133:19
**publicly** 33:11
53:14,18 73:21
**published**
31:20
**pull** 79:2,24
**purely** 123:19
**purple** 111:1
**purpose** 52:4
56:22 61:16
66:10,17 72:21
86:22 107:6
109:24 112:16
126:11
**purposes** 35:3
52:11 57:23
60:2 64:22
67:21 68:22
80:9 81:24
85:13 102:6
122:23 124:3
125:10 126:5
128:22
**pursue** 20:4
**pursuing** 93:12
102:7
**put** 30:10 47:1
77:16,23
119:16 120:5
**puts** 44:24
**putting** 77:20

**q**

**quality** 5:4,4
47:14,20,23,25
58:14 76:23
100:23
**quantifiable**
39:6
**quantitative**
19:5 36:8
**quantum** 117:2
119:3
**quarterly** 86:5
86:14 109:6
**question** 24:3
24:25 25:4
31:4 33:21
36:2,9 42:19
44:2 48:10,14
49:10 57:23
58:12,14 63:7
73:4,10 74:3
74:10,12 76:12
80:8 81:21
82:3,20 86:18
90:11 91:22
94:9 97:24
103:17 104:9
104:11 108:1,3
111:13 114:24
116:19 119:3
121:15 122:10
124:23
**questioning**
100:19

**[questions - reference]**                                    Page 30

**questions** 8:7
  9:2 22:9,17
  129:11,13
**quick** 7:21
  54:20
**quickly** 4:14
  15:19 18:3
  33:5,9,13,17,19
  78:11 114:3
  121:2,22
**quite** 71:6 74:3
**quote** 79:3,24
  88:11 92:8
  98:1,18,24
  99:14
**quoted** 80:3
**quotes** 51:10

**r**

**r** 130:1 132:3,3
**racing** 96:11
**raise** 100:18
**random** 56:12
  100:8,12
**range** 27:1
**rapidly** 33:11
  33:16,18
**rather** 45:17
  72:18 76:7
  81:11
**ratio** 44:21
  45:7
**rationale** 71:19
**ratios** 45:13
**raw** 90:14,20

**reach** 98:14,15
  115:6 126:17
**reached** 10:20
  21:23 109:5
**reaching** 16:12
**react** 33:9 63:8
**reacting** 58:7
  59:23
**reaction** 38:4
  55:9 58:21,25
  73:24 94:5,16
  103:7
**reactions** 99:1
**reacts** 58:13
  97:2,3
**read** 11:24 12:1
  80:1 108:2,5
  131:9 133:5
**reading** 32:3
  121:19,21
**reads** 123:9
**ready** 49:21,25
  50:16
**real** 7:21
**realized** 7:20
  60:14
**really** 19:18,22
  20:10,18,21,25
  22:15 23:4,16
  24:15 27:21
  29:16 31:12
  44:22 46:6,16
  49:5 51:2 58:9
  58:17 59:23
  61:5,16 62:4,9

  71:25 72:5
  76:14 77:11
  88:21 91:20
  93:8,14,23
  94:13 110:23
  112:6,17
**reason** 8:14 9:5
  39:23 44:25
  56:18 60:22
  61:6,18 72:23
  76:19 77:4
  85:15 103:12
  104:2 106:8
  118:4 129:10
  131:11 132:6,9
  132:12,15,18
  132:21
**reasonable**
  35:21 71:11,16
  75:3,6,14
  76:16 86:10
  88:2 89:10
  90:8
**reasonably**
  8:21 75:6
  84:10 90:8
**reasons** 39:5,19
  87:17 88:1
**recall** 10:5,16
  11:7,17 12:16
  25:8,19,22
  28:20 57:15
  70:15 122:17
**recalling** 25:15

**receipt** 131:18
**receive** 13:23
**received** 9:1
  12:20
**recent** 123:9
  128:3
**recognize**
  14:20
**recollection**
  10:8,9,21
  24:14,20 25:16
  92:16
**reconstruct**
  105:20
**record** 5:2,10
  5:24 7:13
  14:11 44:20
  49:18 54:25
  55:4 90:1
  99:16 101:22
  102:2 108:4
  120:20 127:9
  129:18 130:9
**recorded** 5:7
  5:12
**recording** 5:4,8
**records** 27:2
**refer** 27:11
  33:3 107:13
  112:8
**reference** 53:16
  81:4,9 105:13
  108:10,15
  126:20 127:15

**referenced** 104:25 131:6
**referred** 64:8
**referring** 16:16 16:17 26:17 30:1 33:4 51:23 59:10 64:8,15 80:16 80:18 81:17 92:6 106:24,25 124:16
**reflect** 27:2 28:3 29:5 36:21
**reflected** 40:18 40:19
**reflection** 65:7
**reflective** 39:17 75:13
**reflects** 16:5,10 40:22 42:23
**regarding** 46:21 47:10 52:9 59:6 61:7 128:6
**regardless** 76:4 118:21
**regards** 114:9 114:20
**regression** 57:1 68:25 69:2,3,3 69:19,24 72:4 106:4,8 107:3 107:3,6,7,11 109:22 110:24

111:5
**regressions** 109:25
**regularly** 87:18
**reiterate** 90:23
**reject** 56:12 86:21 91:13,17
**relate** 63:1
**related** 5:20 9:25 29:7 47:7 70:5 88:8 95:24 112:21 130:11
**relationship** 55:25 58:5 63:17,18 69:23 70:4 77:8 107:2,8 110:2 111:17
**relationships** 56:4 63:22 70:9 77:14 110:14 111:18 113:7
**relative** 46:1,2 48:24 59:3 64:17
**release** 85:19
**released** 59:10 59:16 82:13 96:1 98:7
**releases** 57:21 86:5 87:10
**relevance** 119:12

**relevant** 51:17 55:13 64:4,8 67:10 70:5 71:3 83:23,25 94:22 95:19 103:18 104:22 104:23 112:11 116:8,13 122:8 123:14 124:4 128:16,24 129:2
**reliability** 48:24
**reliable** 29:11
**relied** 56:21 123:3
**reload** 78:13
**rely** 50:9 51:7,9 122:11
**relying** 50:14 75:12 114:10 114:12,14
**remain** 51:13
**remained** 53:25
**remember** 10:13,13 12:17 52:3 70:18 92:18
**remind** 8:6
**remote** 1:18 6:18 8:10
**remotely** 2:1 3:1
**removal** 111:20

**remove** 63:12 109:21 111:25
**removed** 105:11 106:20 107:5,10,13,22 107:24 109:13 109:18 110:12
**repeat** 87:13
**rephrase** 126:20
**replicated** 86:11
**report** 4:6,20 10:11,15 11:21 11:23 12:20 14:4,21,23 15:7,14 16:1,5 17:5,17,25 26:6,7,13,24 27:6,17 28:10 30:15 32:22 34:14 35:10 40:19,21 47:15 54:1 55:8 67:5 73:1 114:5 115:9,13 121:14 122:23 124:17,19 126:14 127:18 128:6
**reported** 1:24 40:10 45:2 118:4
**reporter** 5:18 6:1 8:11 13:25

130:3
**reporting**
31:17 86:14
**reports** 15:4,4
47:1,21,24,25
47:25 48:5,12
48:14 57:21,22
60:25 61:4
65:10,15 95:12
96:13 115:5
125:5,9,14,18
125:20,21,24
125:24 126:2,7
126:13,19,24
**represented**
40:16 68:13
105:18
**represents**
31:23 40:21
**reputation**
47:24
**request** 122:8
**requested**
125:21
**requests**
120:21
**required** 86:13
86:15 133:13
**requirements**
51:13,22,25
52:1,2,4,5
**reread** 11:21
**research** 68:12
120:25 122:11

**reserve** 113:19
**resident** 50:17
**respect** 33:14
35:8,11 37:18
46:5 49:19
68:23 85:16
87:2 97:24
99:6 117:7
**responded**
113:3
**responding**
119:5
**response**
120:21 122:8
**resulted** 111:10
**results** 66:6
72:8 82:18
95:20
**resume** 18:1,6
22:25
**retained** 10:17
129:21
**return** 63:4,13
63:13 64:21,22
65:5 66:11
68:5 69:12
71:15 73:2,3
105:24 113:23
131:13,17
**returned** 113:4
**returns** 69:15
105:11,22
110:10
**revelation**
116:13

**review** 12:6
16:1 122:18
125:8 126:8
131:7
**reviewed** 11:22
28:10,16,21
**reviewing**
31:16 54:6
111:10
**right** 13:10
14:7 15:20
24:13 25:10
26:12 27:18
71:6 74:4 75:1
77:23 79:11,15
80:23 82:7
93:8 96:6
122:4 123:2
127:14 129:14
**riley** 4:19
126:23 127:12
127:18 128:5
**risks** 77:13
**robust** 66:7
83:11
**rogers** 2:5 6:6,6
6:16,20 9:12
12:16 13:4,7
13:12 16:9
23:24 24:12,25
25:3,7 26:11
29:4,14,23
30:19 31:9
33:15 34:9
41:8 42:1,22

43:10 44:7
47:17 50:25
52:14 54:4,24
57:13 58:2
59:8 62:3
64:13 66:15
67:3,11 68:9
71:5 74:1,22
77:25 78:2,7
80:14 85:20
90:18 91:21
92:14 94:6
96:2 97:5 98:8
100:4,25
101:17 103:21
107:25 108:6
108:19 112:14
113:16 114:13
114:22 117:15
118:9 119:6
120:15,18
121:8,11,18,24
122:2 123:17
124:6 125:11
127:3 128:9,19
129:13 131:1
**role** 20:22
23:12,13 49:12
123:20
**rolling** 73:12
74:20 76:23
77:2
**roman** 115:16
**rooms** 48:13

**ropes** 3:3,7,10 3:13 6:2
**ropesgray.com** 3:6,9,12,15
**roughly** 64:3
**round** 101:20
**rpr** 1:25 130:21
**rss** 48:20
**rubric** 57:2
**rule** 72:11
**rules** 8:6 51:14
**run** 72:2 97:8 107:4
**running** 61:17 84:2 109:25
**russell** 66:2

**s**

**s** 53:4,7,9,21,24 132:3
**s&p** 29:7,17,21 30:6 40:9 63:4 64:21 65:5 68:20 71:15 73:2 105:23 125:5,8,15,20
**sample** 83:21 83:24 84:1,5 84:10,13,18 85:7 109:11
**sampling** 83:20 83:22
**saw** 76:18 99:1 99:4 100:14
**saying** 34:11 58:6 64:14

72:16 81:6 92:20 97:20 99:10 105:8 113:12 116:24 120:2
**says** 14:3,18 69:12
**scenarios** 38:5
**schedule** 7:8
**school** 18:17
**scientifically** 56:15
**scope** 67:23 68:1
**screen** 5:6
**sec** 28:12,15,21 31:14,16 49:1 49:4 53:3,8 86:15
**second** 14:4,19 17:23 25:25 39:8 56:19 73:22 74:5 79:16,21 121:9 121:14 124:20
**seconds** 49:4
**section** 23:19 27:24 28:5,12 30:17,23 101:6 115:13,21 116:17
**sections** 35:20
**sector** 66:20
**securities** 4:19 9:25 11:2

20:16 21:1,7 23:22 24:22 29:2,8,10 30:4 39:7 41:20 46:20,22 51:16 52:8 65:15 126:23 127:12
**security** 28:23 38:23 39:15 47:6,8,11 51:5 69:9 110:2
**see** 13:4,5,8 15:22 26:1 27:14 38:7 42:14,14 68:15 69:16 79:14 83:16 101:5,18 101:20 110:23 111:9 115:17 127:16 129:10
**seeing** 86:24 128:5
**seem** 92:22
**seems** 96:5 129:2
**seen** 5:6 42:11 42:16 57:7 61:20 67:13
**segregation** 59:22
**select** 65:2 71:13,16 76:6 82:3 83:11 86:8 90:5 104:21

**selected** 60:22 63:25 64:20 72:1 73:12 76:3 81:23 82:10,24 84:15 88:5,7 90:2
**selecting** 20:23 66:10 68:4 71:20
**selection** 68:6 68:19 79:17 83:1 111:19
**sell** 49:25 50:10 50:16 51:19
**semi** 33:1,3 34:7,12 37:14
**send** 9:1 125:21 127:4
**sending** 13:15
**sense** 35:14 47:8 52:18 68:25 81:10 95:15 98:9 99:2,7 100:7 106:14
**sensitive** 110:4 110:7
**sent** 12:19 13:1 131:14
**sentence** 51:23 53:20 56:19 79:3,23 80:2,3 80:9,16 81:18 105:10,22 106:18,23

108:9 115:18
125:1,13
126:21 128:3,5
**sentences** 79:19
**separate** 26:7
58:14 74:10
86:18
**separately**
62:10 76:22
**september** 1:22
5:3 130:17
131:3
**series** 28:13
92:4
**served** 120:22
**service** 29:6,18
**services** 23:4
125:25
**session** 101:12
**set** 30:25 60:12
74:25 82:14
86:6,10 87:12
87:13 88:1,19
89:1,6,6,7 92:8
108:11 113:22
125:24 130:7
130:16
**sets** 39:11
87:20
**setting** 12:4
48:11
**settled** 87:16
**several** 15:16
39:5

**share** 77:18
78:10 115:20
**shares** 39:3
40:2,22,25
41:4,6,25
45:16 51:6
**sheet** 131:11
**shift** 69:22 70:9
**shifting** 96:10
**shoot** 84:25
**short** 55:2
100:6 101:25
104:9
**shorthand**
99:20 130:3
**show** 66:6
**sic** 125:13
**sided** 23:5
**sides** 21:3
**sign** 131:12
**signature** 15:23
16:2 130:20
**signed** 131:20
**significance**
100:10
**significant** 38:8
46:18 56:14
59:13 64:12
94:16 99:25
100:11 105:15
106:12
**significantly**
41:5 56:12
**similar** 61:4
67:23

**similarly** 1:6
2:3
**simply** 34:7
44:12 47:18
48:15 72:4
81:12,14 90:14
114:11
**simultaneously**
59:11,16
**single** 27:22,25
82:19 96:6
99:8
**sinnathurai** 1:3
2:3 5:13 131:4
132:1 133:1
**sir** 7:12,23 9:7
9:11 12:21
14:15,20 15:8
15:24 17:3,13
18:15 31:4
32:24 35:5
36:2 38:21
40:5 44:19
45:10 48:10
57:23 78:20
79:2 80:8
127:11
**sit** 11:6 24:13
26:12 27:3
**sitting** 52:3
**situated** 1:6 2:3
**situation** 76:9
**situations** 38:3
**six** 28:14,18
64:3 99:22

**size** 52:1 84:1
84:13,19,24
**sized** 84:10
90:8
**skimmed** 11:25
**smacks** 110:21
**small** 23:14
33:23
**social** 48:21
**solutions** 5:19
129:22 131:23
**somebody** 43:3
49:20 50:15
**somewhat**
36:17 102:10
**soon** 101:10
**sorry** 14:5
41:12 78:2,13
103:22 108:20
122:3,24
124:23
**sort** 21:10,10
30:4 39:11
42:15 44:4
48:11,19 62:19
67:14,16,23
71:24 73:19
74:11 84:2
92:17 95:2,2
95:15,17 98:17
100:22 103:8
104:10 105:6
107:9 110:1,21
111:13 115:1
118:16

**sorts** 30:10
 96:9
**sothinathan**
 1:3 2:2 131:4
 132:1 133:1
**sounds** 54:24
**source** 29:10,16
 39:16 57:25
 75:2
**sourced** 31:7
**sources** 29:1,22
 31:2 48:24
 57:20
**sourcing** 125:4
**south** 7:18
**spam** 13:7
**spanned** 19:16
**spare** 27:24
**specialize**
 20:14
**specific** 24:14
 24:19 26:24
 44:10 50:6
 55:18 63:6
 68:10 76:15
 81:14 84:7
 92:15 93:9,19
 94:5 98:21
 107:9 110:10
 111:12 112:5
 112:18 113:9
 122:17,22
 123:4
**specifically**
 75:12 93:22

**specifics** 92:18
**specifying** 56:8
 77:14
**speculate** 129:4
**speculation**
 67:11 100:5
 114:22 118:10
**speculative**
 123:20
**spend** 14:9
**spent** 12:6 26:9
 26:22
**spread** 37:6
 112:24
**spun** 109:6
**staff** 15:12,14
 15:17 20:11,23
 20:23 27:25
 29:6 89:4,12
**stage** 128:6
**stand** 49:25
**standard** 34:13
 57:6 60:24
 85:21 102:12
 102:15 109:23
**standards** 34:8
**standing** 51:14
**stands** 49:20
 50:16
**stanley** 1:10
**start** 55:21
 58:24 73:15
 76:3 81:20
 85:13

**started** 20:10
 20:25 21:5,6
 23:15 49:1
 60:13 92:21
**starting** 23:20
 46:13 55:11
 92:20
**starts** 30:21
 34:18 38:19
**state** 5:23 7:12
 16:24 17:9
 33:4 34:21
 35:24 39:24
 65:22 130:4
**stated** 18:8
**statement** 18:2
 32:17 118:25
 123:19
**statements**
 117:25
**states** 1:1 5:14
**statistical**
 56:25 60:8
 75:8 84:3,6,12
 85:7 100:10
**statistically**
 38:8 56:11
 59:13 64:11
 99:25 106:12
**statistics** 19:4
 19:17 30:2
**status** 118:5
**steadier** 103:9
**stenographer**
 6:17,24 14:1

**stenographic...**
 1:24
**step** 8:15 90:22
 90:24
**stock** 16:25
 34:5 38:8 40:1
 40:7 41:1,14
 41:15,23 42:25
 42:25 43:2,5,9
 43:13 44:5
 45:7,22 46:5
 47:16 49:19,21
 49:22 50:9,20
 52:19,22,25
 54:3 62:14,25
 63:1,7,18 65:7
 70:4 71:3
 72:20 73:8
 77:9,15 81:12
 94:24 97:2
 99:6 100:1
 103:2,16,18
 104:19 110:19
 111:22 112:13
 113:15 116:12
 123:10
**stocks** 45:3
 52:5 96:9
**stop** 121:5
**straight** 32:7
**strange** 100:12
**streamline**
 101:6
**street** 3:8 7:19

**strength** 54:17 115:3

**strike** 25:14 58:24

**strong** 33:1,3 34:7,7,12 37:14

**structure** 36:10

**studied** 43:23 114:24

**studies** 4:8 71:8 74:18 78:21

**study** 55:22 56:3,6,15,20 57:3,5,10,17,24 59:2,11,21 60:3 61:18 65:1 72:9 75:8 79:4 80:10 83:1 101:2 102:6 104:5,18 105:21 110:9 122:18

**studying** 35:22

**subject** 20:2

**subjective** 87:6

**submission** 15:3

**submit** 125:19

**submitted** 10:11 16:2

**subscribed** 133:14

**subset** 61:12 81:23

**substance** 95:3 121:6

**substantial** 39:13 46:7 76:1 82:13

**substantive** 47:14 126:8

**sucharow** 2:4,9 6:7,10 10:25 11:4 24:11

**sudden** 111:1

**suffered** 117:2

**sufficient** 36:21 39:21 46:19 52:11 53:12 56:16 60:15 84:24 85:2 89:2 113:11 126:6,12

**sufficiently** 53:10 60:7,12 84:19

**suggest** 61:20 62:13 80:9

**suggesting** 68:2

**suite** 2:6 7:19

**summarized** 32:7

**summarizes** 31:24

**summary** 16:11 27:21 28:1,25 31:12

**super** 4:15 121:3

**supply** 16:7

**support** 20:10 20:20 39:18

**supported** 20:18 86:7

**supporting** 36:5 97:20

**supportive** 36:14,16 114:25

**supports** 36:11 87:19

**sure** 7:14 11:17 12:24 13:16 18:18 19:19,21 20:9 30:9,11 32:5 35:10 36:7 39:1 40:8 45:14 48:2 49:24 51:1 55:16 56:7 60:6 62:22 65:4 66:1 77:21 78:9 79:22 83:3 85:21 88:13,14 89:14 90:4,4 91:1 97:10 98:19 99:16 100:17 106:25 109:1,23 121:10,17 124:22

**swearing** 6:18

**sworn** 6:23 7:3 130:8 133:14

**system** 51:9 78:5

**systems** 51:18

**t**

**t** 2:9 130:1,1 132:3,3

**tab** 77:16 120:6 127:4

**tailored** 116:17

**take** 5:9 15:19 28:25 47:14 48:23 50:3 54:20,22 61:5 63:11 70:24 92:24 94:8 100:16 101:4 101:12 121:17 124:22

**taken** 5:12 31:19 40:24 55:2 84:13 101:25 122:13

**takes** 47:1 69:4

**talk** 8:9,13,14 17:22 51:12 71:9 117:6 124:10

**talked** 37:25 85:4 117:5,7

**talking** 45:10 80:20 93:6 109:19 112:17

**[talks - thought]**                                                Page 37

talks   124:11,17
targets   59:5
tdc   1:5 5:16
team   26:19,22
technical   14:10
  127:8
technically
  54:10
technique   56:3
  56:21 57:10
  59:11
techniques
  55:22 56:22
  57:4 58:23
  59:2
technology
  50:5
tell   126:22
telling   46:6
  70:10
tells   69:7
ten   11:16 23:16
  61:3 94:2,7
  95:1,22 96:5
  97:25 99:4
  101:7 108:11
  108:23,25
tend   29:11
  39:17 48:4
  115:7
term   43:21
terms   19:3,6,14
  20:22 33:19
  46:8 69:8
  83:14,15 84:2

84:20 96:9
97:6 110:18
111:16
test   36:25
  37:13,16 38:2
  38:11 58:17
  60:8,10 62:23
  63:10 77:13
  80:21,21 81:1
  81:7 82:3 84:3
  84:6 85:7 86:7
  86:11
tested   67:19
testified   7:3
  37:25
testifying   24:4
  25:19,22
testimonial
  21:6,10,11
testimony   9:6
  24:23 105:14
  124:7 129:19
  130:9,9 131:9
  131:18 133:8
testing   56:10
  64:4 70:20
  75:10 86:1,3
  100:9 103:3
tests   34:24
  35:24 36:3
  84:12,14
thank   6:24 7:10
  7:22 13:24
  14:1 18:5 25:7
  32:20 34:16

77:19 101:21
  108:6,7 121:24
  122:2 129:16
  129:22
thanks   7:6
  129:14
theoretical
  73:9
theory   32:1
  34:22 35:4,9
  87:21 115:23
  115:25 116:5
  116:15,18,21
thing   31:18
  60:24 65:19
  71:11 96:6
  109:23 124:21
things   19:20
  30:1 31:19
  53:16 59:18,19
  66:20 74:3
  78:8,10 92:16
  96:15 99:24
  100:10 102:22
  103:11 110:20
think   13:1
  16:18 18:2
  20:18 21:14
  22:11 25:10
  29:15 32:15
  33:16,17,18
  35:6,10,14,19
  35:21 36:7,8
  36:13,19,22
  37:1,2,5,12,15

37:24 38:1,11
39:19 41:9
43:11 44:1,9
46:6 47:5,21
48:21,23 50:5
50:12 51:1
54:11 55:7
57:1,15 58:3
61:11 62:8
71:6,7 72:11
74:2,12,23
75:2,6 77:13
80:15,18,20
81:4 82:2,20
83:13 88:1
89:8,9,25
91:10 92:19,23
95:11 96:20
100:6 101:4
102:11,12,14
103:12 104:7
113:8,18 115:1
118:14 122:13
122:21,21
123:3 125:12
126:16 127:5
127:23
third   79:10
  105:9 126:21
thomas   3:7 6:2
thomas.brown
  3:9
thorough   115:8
thought   16:6
  24:15 67:17,25

**[thought - trying]**

71:13 86:25
87:3 105:16
**thoughts**
102:23
**thousand** 83:22
**thousands**
55:23 71:8
**three** 19:12,12
19:15 22:24
28:14 84:4
89:6 111:2
123:8 129:21
**threshold**
42:18 73:4
88:20 89:2,10
89:24 90:2
100:18 110:16
111:13
**ticker** 31:23
**tied** 19:18
**tim** 3:16 5:17
**time** 5:2,2 7:7
12:5 14:8 20:9
20:14 21:12,22
22:12 23:10
24:25 25:3,5
26:18,18,22,23
38:7 41:16
47:1 50:8
53:11 54:8,25
55:4 56:14
57:15 60:23
61:18 62:1
63:20 67:5
69:22 70:3,10

71:3 74:21
75:9 77:10,12
96:1,8 100:11
101:23 102:2
104:3,6 121:1
121:17 124:22
129:12,18
131:19
**timeframe**
131:8
**timely** 54:10
**times** 8:3 9:14
9:16,21 11:16
11:18 24:21
25:13,16 55:24
70:16,19
**title** 14:19
22:21 121:22
**titled** 121:1
**today** 7:7 9:7
11:20 22:14
26:10
**today's** 129:19
**together** 6:4
30:10 47:2
**tom** 25:1
121:12,18
**took** 14:2 19:7
104:5 125:22
**tool** 37:6 38:24
**top** 14:17 26:3
51:24 70:17
121:21 127:14
**topics** 19:14

**total** 63:4 64:21
64:22 65:5
66:11 68:5
71:15 73:2,21
83:9 105:23
110:5 114:15
125:23 129:20
**totally** 42:15
96:22
**toward** 45:5
105:9
**towards** 62:5
96:4
**tower** 3:8
**trade** 37:7 43:4
49:21,25 50:16
**traded** 40:23
40:25 41:14,24
49:22 51:6
**trades** 50:1,3
**trading** 38:23
39:17,25 40:3
40:6,17,21
41:5,18 42:7
42:10,17,19
43:2,9,12,17
44:5,9,12,14,23
50:11 51:8,20
52:20,25 64:2
64:3,5,9 72:20
73:8,14 103:19
107:15
**training** 20:23
**transact** 42:25
52:8

**transcript**
130:8 131:6,20
133:5,8
**transcripts**
95:11
**traveling** 14:9
**treated** 122:16
**treatment** 82:8
82:8,9 83:6
**treatments**
67:1
**trees** 27:24
78:14
**tremendous**
42:24
**trial** 24:24 82:7
92:22,24 93:2
**trizzino** 1:12
**trouble** 16:18
**true** 123:19
130:9 133:8
**truong** 6:8
**truth** 116:13
**truthful** 9:6
**try** 8:7,18
59:20 81:2
96:11 98:23
113:24
**trying** 25:9
28:23 64:10
77:12 80:21,21
80:25 81:7,13
98:15 105:6
106:22 112:21

**[tupiak - velocity]**

**tupiak**  3:16
5:17
**turn**  14:18
16:14,23
**turnover**  44:17
44:21 45:3,7
45:12,21,23
**turns**  45:16
**two**  23:5 28:14
37:3 50:23
51:4 68:20
70:14 84:4
90:7 111:2
123:8
**type**  20:16 21:7
23:5,17 50:11
60:10 93:13
96:17
**types**  19:6 21:2
47:20 48:5,6
57:19 65:15
87:5,8 102:13
**typical**  71:11
107:2,7
**typically**  42:14
63:8

**u**

**uh**  125:6
**ultimately**
20:23 72:21
**unable**  9:6
**unaffected**
120:4
**under**  15:20
17:8 27:23

28:23 57:2
75:17 115:16
115:21 128:1
**underlying**
32:1 39:23
**understand**
13:22 28:24
30:3 32:9 34:2
70:1 72:16
94:18 105:6,8
106:22 107:12
109:16 113:24
114:8 116:15
116:24 123:12
**understanding**
15:1 50:1,15
53:6,8,14
62:19 95:20
118:23
**understood**
19:25 32:5,13
33:12 99:15
109:3 116:19
**undertake**
31:15 44:3,10
95:2 98:3,13
99:7 100:21
**undertaken**
128:25
**undue**  68:14
110:13
**unit**  5:11 55:1,5
101:24 102:3
129:20

**united**  1:1 5:14
**university**
18:22
**unjustifiably**
123:10
**unquote**  88:11
92:8 98:1,18
98:24 99:14
**upper**  3:4
79:11
**upside**  120:25
122:11
**use**  29:1 33:16
59:17 65:20
68:1 70:25
71:15 74:20
76:17 77:11
81:2 107:1
128:16
**used**  15:2 55:23
56:3,22 57:1,4
57:6,7,10 64:7
64:25 65:6,8
65:12,16,20
67:15 70:13
75:5,18 76:11
81:24 82:5
85:22 94:2
118:19 119:15
129:21 131:20
**using**  17:11
60:9 66:4,7,8
70:7 75:4
76:25 77:18
79:4 99:11,20

99:20 115:22
**usual**  63:17,22
**usually**  33:21
49:23 75:22

**v**

**v**  26:5 131:4
132:1 133:1
**vaccine**  68:16
68:16 88:16
93:12 96:12
102:8,19
112:20 113:2
118:5
**vaccines**  67:1
88:16 112:21
**valid**  105:21
**valuable**  38:23
**valuation**  19:17
20:17 22:16
25:24 59:19
87:21
**valuing**  87:22
**variables**  63:9
63:11 69:6,23
72:4 77:8
104:7 107:8
111:18
**variety**  47:20
**various**  28:13
28:25 31:2
57:19
**velocity**  44:18
44:21 45:3,7
45:12,21

**verified** 31:22
**verify** 31:5,16
 32:16 66:6
 131:9
**veritext** 5:19
 129:21 131:14
 131:23
**veritext.com**
 131:15
**versa** 96:7
**version** 14:2
**versus** 5:13
 41:1 42:20
 59:5 60:23
 82:14 118:16
**vice** 96:7
**video** 1:18 5:8
 5:12 55:4
 102:2
**videographer**
 3:16 5:1,18
 54:25 55:3
 101:22 102:1
 129:17
**view** 29:11 34:5
 35:1 37:20
 38:22 39:20
 52:15,16 57:11
 71:1 84:8 86:9
 99:13 109:20
 118:7,24 124:4
 128:4
**views** 35:13
**viii** 115:16

**virtually** 51:14
 51:15 65:9,9
**volatile** 103:5
 103:17 104:3
**volatility** 77:9
 77:14 103:2,9
 103:16,23
 104:10,14,17
 104:19 110:6
 112:6
**volume** 30:2
 36:19,19,21
 38:23 39:3,8
 39:13,17,25
 40:3,7,8,14,15
 41:5 42:8,10
 42:17 44:23
 45:16 46:7
 115:4
**volumes** 41:18
**voters** 83:22
**vs** 1:8

**w**

**wacker** 3:4
**wait** 78:6
 120:17 121:9
**walk** 8:20
**want** 7:15
 12:13,24 18:7
 49:4,6 63:2,12
 66:20 71:21,22
 78:7,8 79:22
 80:24 81:6
 90:23 98:16
 101:9 109:17

 121:9,14
 124:20
**wanted** 27:24
 42:25 43:4
 60:10,11,15
 65:10 91:21
 99:16 124:25
**wants** 101:7
**way** 16:16 17:6
 20:20 22:18
 23:15 27:5,8
 30:8 31:25
 37:6 44:24
 46:3,3 47:14
 48:9,22 52:7
 56:14 57:7
 68:19,21 69:3
 71:7 86:9 89:2
 96:18 98:11
 99:3 110:24
 115:2 116:3
 117:23 122:19
 123:22 130:13
**ways** 49:8,14
 56:25 99:6
**we've** 24:5
 127:11
**weak** 34:7
 37:13
**web** 49:3
**website** 120:24
**wednesday**
 127:13
**week** 40:23

**weekly** 36:19
 38:23 39:25
 40:3,6,16
 41:18,25 42:7
 44:23 45:17
**weigh** 37:3,16
**weighs** 36:23
 37:1
**weight** 36:17
 59:15 69:8,20
**weighted** 68:22
**weighting**
 59:23 69:25
 70:2
**went** 40:6
 70:23 89:12,16
 96:7
**whatsoever**
 54:18 70:21
 72:6 81:4
 106:10 111:25
 119:17
**whereof** 130:16
**wide** 17:11
 47:20
**widely** 33:5,10
 46:23 47:10
 53:13,18
 122:20
**will.piereson**
 3:15
**william** 1:19
 4:7 7:1,14
**willing** 43:4
 47:4

**[wilmington - zoom]**

Page 41

**wilmington** 2:7
**window** 40:21
  62:20 63:23,25
  64:2 70:8,9
  74:8,14 76:6
  76:11,17 77:11
  79:18 80:24,25
  81:1,3,7,18,18
  107:2,4
**windows** 103:3
**winnemac** 22:5
  22:8,10
**withholding**
  116:7
**witness** 4:2 5:6
  6:22 7:2 9:13
  14:5 16:10
  24:1,13 25:8
  26:12 29:5,15
  29:24 30:22
  31:10 33:16
  34:11 41:9
  42:2,23 43:11
  44:8 47:18
  51:1 52:15
  54:5 57:14
  58:3 59:9 62:4
  64:14 66:16
  67:4,13 68:10
  71:6 74:2,23
  77:18,22,24
  80:15 85:21
  90:19 92:15
  94:7 96:3 97:6
  98:9 100:6

101:1,11,21
103:23 108:20
112:15 113:17
114:14,23
117:16 118:11
119:7 121:13
122:3 123:18
124:8 125:12
128:10,20
129:16 130:6
130:10,16
131:8,10,12,19
**word** 33:16
  93:16 106:24
**words** 15:11
  60:13 71:21
  81:9
**work** 9:10,13
  9:18 11:5
  16:19 20:7,12
  21:6,10,11
  23:6,17 31:21
  31:22 32:11
  49:1 64:24
  90:6
**worked** 10:24
  11:3,13 15:14
  15:17,18 20:19
  23:10
**working** 10:14
  20:16,25 25:21
  67:1 86:24
  89:4
**works** 50:16
  84:23

**world** 51:5
**worry** 13:9
**wrong** 96:6

**x**

**x** 4:1

**y**

**yeah** 11:17
  13:1,22 22:22
  23:12 29:6
  34:11 62:12
  66:2 83:2
  99:19 101:11
  103:23 124:22
  126:16
**year** 9:21 10:6
  21:9 60:16,16
  60:17,21,23
  61:5 80:22
**years** 19:12
  23:16 75:6
  77:6
**yep** 105:5
**yesterday**
  12:12
**york** 2:11,11
  3:14,14 41:1
  50:20

**z**

**zagnoli** 3:4 6:5
**zero** 88:20 90:5
**zoom** 7:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.