# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOTHINATHAN SINNATHURAI, :

Individually and on       : Civil Action No.:

Behalf of All Others      : TDC-21-2910

Similarly Situated        :

    Plaintiffs            :

           Vs.            :

NOVAVAX, INC., ET AL       :

    Defendants            :

                --------------------

          Deposition of NUGGEHALLI BALMUKUND

NANDKUMAR, was taken via videotape and Zoom on

Tuesday, August 1, 2023, commencing at 9:10 a.m.

Central Time, at 951 Doral Drive, Bartlett,

Illinois, before MICHELE D. LAMBIE, Notary Public.

                --------------------

Reported By:

          Michele D. Lambie, CSR-RPR

Page 2

APPEARANCES:

ON BEHALF OF THE WITNESS:

Pomerantz, LLP.

BRIAN CALANDRA, ESQUIRE.

bcalandra@pomlaw.com.

600 3rd Avenue.

New York, New York  10016.

(212) 661-1100

Portnoy Law Firm.

LESLEY F. PORTNOY.

info@portnoylaw.com.

1800 Century Park East.

Suite 600.

Los Angeles, California  90069.

(310) 692-8883

APPEARANCES CONTINUED:

ON BEHALF OF DAVID TRUONG AND OTHER

CLASS MEMBERS:

Labaton Sucharow.

MICHAEL ROGERS, ESQUIRE.

mrogers@labaton.com.

ELINA RAKHLIN, ESQUIRE.

erakhlin@labaton.com.

140 Broadway.

34th Floor.

New York, New York  10005.

(212) 907-0747

Labaton Sucharow.

PHILLIP LEGGIO, ESQUIRE.

pleggio@labaton.com.

300 Delaware Avenue.

Suite 1340.

Wilmington, Delaware  19801.

(302) 573-2540

Page 4

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANTS:

Ropes & Gray.

C. THOMAS BROWN, ESQUIRE.

thomas.brown@ropesgray.com.

PETER L. WELSH, ESQUIRE.

peter.welsh@ropes.com.

J. WILLIAM PIERESON, ESQUIRE.

will.piereson@ropes.com.

One International Place.

Boston, Massachusetts  02110-2624.

(617) 951-7171

Ropes & Gray.

EILEEN M. FALK, ESQUIRE.

eileen.falk@ropesgray.com.

2099 Pennsylvania Avenue, N.W.

Washington, D.C.  20006.

(202) 508-4721

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANTS: (Cont.)

Ropes & Gray.

CHARLES ZAGNOLI, ESQUIRE.

charles.zagnoli@ropes.com.

191 North Upper Wacker Drive.

32nd Floor.

Chicago, Illinois  60606.

(312) 845-1374

ALSO PRESENT:  Ryan Heathcock - Videographer

Page 6

EXAMINATION INDEX

NUGGEHALLI BALMUKUND NANDKUMAR

        BY MR. BROWN                                12
        BY MR. CALANDRA                            162
        R BY MR. BROWN                             166

EXHIBIT INDEX
(Attached to Transcript.)

                                                   MAR

Exhibit 1  Memorandum of Law                        46

Exhibit 2  Assignment                               50

Exhibit 3  Chart Referencing Purchases              54

Exhibit 4  Certification Pursuant to Federal        59
           Securities Laws

Exhibit 5  Plaintiff's Memorandum of Law in         66
           Support of Motion for Class
           Certification and Appointment of
           Class Representatives and Class
           Counsel

Exhibit 6  Declaration                              69

Exhibit 7  Document Bates Numbered                  82
           NOVAVAX_NANDKUMAR_0000003

Exhibit 8  Document Bates Numbered                  89
           NOVAVAX_NANDKUMAR_0000006

```
                                        Page 7
```

NANDKUMAR EXHIBITS CONTINUED:

Exhibit 9  Document Bates Numbered                89
           NOVAVAX_NANDKUMAR_0000001

Exhibit 10 Documents Bates Numbered               98
           NOVAVAX_NANDKUMAR_00000142 through
           NOVAVAX_NANDKUMAR_00000197

Exhibit 11 Documents Bates Numbered               98
           NOVAVAX_NANDKUMAR_00000142 through
           NOVAVAX_NANDKUMAR_00000197

Exhibit 12 Documents Bates Numbered               99
           NOVAVAX_NANDKUMAR_00000081 through
           NOVAVAX_NANDKUMAR_00000141

Exhibit 13 Documents Bates Numbered               99
           NOVAVAX_NANDKUMAR_00000008 through
           NOVAVAX_NANDKUMAR_00000037

Exhibit 14 Documents Bates Numbered               99
           NOVAVAX_NANDKUMAR_00000228 through
           NOVAVAX_NANDKUMAR_00000272

Exhibit 15 Documents Bates Numbered               99
           NOVAVAX_NANDKUMAR_00000038 through
           NOVAVAX_NANDKUMAR_00000080

Exhibit 16 Documents Bates Numbered              147
           NOVAVAX_NANDKUMAR_00000352 through
           NOVAVAX_NANDKUMAR_00000373

Exhibit 17 Documents Bates Numbered              149
           NOVAVAX_NANDKUMAR_00000321 through
           NOVAVAX_NANDKUMAR_00000339

Exhibit 18 Documents Bates Numbered              151
           NOVAVAX_NANDKUMAR_00000273 through
           NOVAVAX_NANDKUMAR_00000284

Page 8

NANDKUMAR EXHIBITS CONTINUED:

Exhibit 19 Documents Bates Numbered           152

NOVAVAX_NANDKUMAR_00000303 through

NOVAVAX_NANDKUMAR_00000320

Exhibit 20 Documents Bates Numbered           153

NOVAVAX_NANDKUMAR_00000285 through

NOVAVAX_NANDKUMAR_00000302

Exhibit 21 Documents Bates Numbered           154

NOVAVAX_NANDKUMAR_00000340 through

NOVAVAX_NANDKUMAR_00000351

Page 9

P R O C E E D I N G S

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room, and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely.

The parties further agree that if the witness is testifying from a state where I am not a Notary, that the witness may be sworn in by a Notary.

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:10 a.m. Central on August the 1st, 2023.

Please note that this deposition is being conducted virtually.  The quality of the recording depends on the quality of the camera and internet connection of the participants.

What is seen from the witness and heard

Page 10

on the screen is what will be recorded.  The audio and video recording will continue to take place unless all parties agree to go off the record.

And so this begins media unit number one in the video-recorded deposition of Nandkumar.  This is being taken by counsel for the defense in the matter of Sothinathan Sinnathurai, et al. versus Novavax, Inc., et al.  This case has been filed in the United States District Court for the District of Maryland.  The Case Number is TDC-21-2910.

My name is Ryan Heathcock, and I represent Veritext Legal Solutions, and I am the videographer.  Our court reporter today is Ms. Michele Lambie also from the firm Veritext Legal Solutions.

I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your

Page 11

appearance.

Counsel and all present, would you now state your appearances and affiliations for the record, beginning with the noticing attorney?

MR. BROWN:  C. Thomas Brown of Ropes & Gray on behalf of Defendant Novavax, Inc. and the individual Defendants in this case.

MR. CALANDRA:  Brian Calandra, Pomerantz, LLP on behalf of the witness, Nandkumar.

MR. ROGERS:  And also Michael Rogers also from Labaton Sucharow on behalf of David Truong and the class, and I'm joined by my colleague, Phil Leggio.

MR. PORTNOY:  And Lesley Portnoy from Portnoy Law Firm on behalf of the witness Nandkumar.

THE WITNESS:  I am Nandkumar, and I am the witness.

THE VIDEOGRAPHER:  At this time, will the court reporter please swear in the witness?

NUGGEHALLI BALMUKUND NANDKUMAR,

the Deponent, called for examination by the Defendants, being first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

THE VIDEOGRAPHER:  Counsel, at this time, you may proceed.

MR. BROWN:  Thank you.

EXAMINATION

BY MR. BROWN:

Q.    Good morning, Mr. Kumar.  Thank you for appearing today.  Hopefully, this electronic format, even with the troubles with the documents, will make this more efficient for everyone.

If you have any trouble hearing or with the technology, please let us know immediately so we can make sure that the record is clean.

Have you been deposed before, sir?

A.    Yes.

Q.    How many times?

A.    Twice.

Q.    And were any of those two depositions

Page 13

related to a federal securities case?

A.    No.

Q.    How long ago was the last of those two depositions?

A.    One was about 18 years ago.  Another one was about four years, five years ago, almost five.

Q.    So a while?

A.    Yes.

Q.    Okay.  Well, just to review a few ground rules.  I'll be asking questions, and then when I'm done, I'll give you the opportunity to give an answer.

If you have not understood my question, please let me know, and I'll attempt to rephrase.

And if your counsel objects, unless he instructs you not to answer, please give an answer after he's been able to get his objection registered on the record.

If you could make sure to give verbal answers because our court reporter here is transcribing every word that we say, and she can't

Page 14

get down, you know, head nods or hand signals or anything like that.

So I will also do my best to speak clearly and pause and give you the chance to answer so that we don't talk over each other so that she can get a clean record.

Is there any reason, sir, that you'd be unable to give complete and truthful testimony today in response to the questions I'll ask you?

A.   No reason.

Q.   Okay.  Have you ever given testimony at a live trial?

A.   At what trial?

Q.   A live trial in a courtroom.

A.   Yes, one time.

Q.   How long ago was that?

A.   That was 17, 18 years ago.

Q.   Okay.  If you are called to give live testimony in the trial of this case, would you be ready and able to appear?

A.   Yes, sir.

Page 15

Q.   Okay.  What did you do to prepare for this deposition today?

A.   I just glanced through the Complaint, relied on the Complaint put together by my counsel based on all of the information.

Q.   And without revealing the content of any discussions you might have had with your counsel, did you meet with your counsel in order to prepare for your deposition?

A.   No, I did not meet physically.  No, not physically.

Q.   Okay. Did you meet virtually or by telephone?

A.   By virtually, yes.

Q.   Okay.  And when --

A.   I meant, I'm sorry, by teleconference.

Q.   By teleconference?

A.   Yes.

Q.   Okay.  And was it one teleconference or multiple teleconferences?

A.   One.

Page 16

Q.   Okay.  And when did that occur?

A.   A couple of days back.

Q.   Okay.  And about how long did it last?

A.   About 45 minutes.

Q.   Okay.  And who participated besides yourself in that conference?  Just names.

A.   Brian Calandra and Lesley Portnoy.

Q.   Aside from the discussions that you had on that conference with your lawyers, have you discussed your deposition testimony today with anyone else?

A.   No, sir.

Q.   Okay.  If you would, please, sir, state what your present home address is.

A.   Present home address is 951 Doral Drive, D-O-R-A-L, Drive, Bartlett, Illinois 60103.

Q.   And approximately how many years have you lived at that address?

A.   Thirty-six years.

Q.   What is your post-high school educational background?

A.    Master's degree in engineering.

Q.    In engineering?

A.    Yes.

Q.    And where did you obtain that degree?

A.    Texas Tech University in -- in Lubbock, Texas.

Q.    Do you hold any professional licenses of any kind?

A.    No, I don't.

Q.    Have you taken any courses in financial planning or investing?

A.    Not -- just some online.  I looked through -- through some of them through Ameritrade and other stuff like that, but nothing formally in a class or anything.

Q.    Okay.  So do you hold any formal certifications in investing or financial planning?

A.    No, I don't.

Q.    Are you currently employed, sir?

A.    I'm not on any payroll, but I own companies.  So I'm a CEO of those companies.  I

have vice-presidents reporting to me.

Q.    Okay.    And -- and what, generally, is the business of the companies that you own and serve as CEO of?

A.    We make backup equipment for using generators for data centers and hospitals and skyscrapers and -- you know, big generators and assemblies like that.

Q.    And so is -- is it a manufacturing operation largely?

A.    Yes, it is a manufacturing operation.

Q.    Is this a business that you founded or that you purchased?

A.    I have three different businesses.    One of them I founded in 1983.    Then I have another one in Chattanooga, Tennessee which we acquired in 1998, and then in Milwaukee in 2014, we acquired that.

Q.    And are -- are you the sole owner of all of these companies or do you have other investors?

A.    Currently, I'm the sole owner.    Before

Page 19

that, I had a partner.  His name was Bruce Carter, so he retired --

Q.    When --

A.    -- back in -- I'm 75.  So he's 77. He -- he retired a couple of years back.

Q.    You kept on going then?

A.    Yes.

Q.    Yeah.  When he --

A.    We have a lot of employees that I have the responsibility, so I had to do the right thing, so ...

Q.    Is it part of your job responsibility as CEO of your company to trade in public securities?

A.    No, it is not.

Q.    Okay.  Do you trade pub- -- public securities frequently on your personal account?

A.    That's correct.

Q.    And -- and how long approximately have you been involved in trading public securities?

A.    Since I'll say 19- -- 1992 or '93.

Q.    Have you ever been an officer or director

Page 20

of a publicly traded company?

A.   No.

Q.   Other than the case in which we're presently involved in, have you ever been involved in a securities fraud lawsuit as a plaintiff?

A.   No, I have not.

Q.   What law firm represents you in this case?

A.   Pomerantz LLP.

Q.   Okay.  And what is your relationship, if any, with Mr. Portnoy's law firm?

A.   Other than client relationship, attorney/client relationship, other than that, nothing.

Q.   How long has Mr. Portnoy represented you?

A.   I think about three years -- two and a half to three years, something in -- around two years, something in that range.

Q.   Okay.  And what about the -- the Pomerantz firm, how long have they represented you?

A.   About the same time.

Q.   Okay.  How was it that you came to be connected with a representative of -- of the Pomerantz firm?

A.   On my own securities in TD Ameritrade, so when I looked -- looked through the detail, it said -- there was an article regarding this lawsuit going forward, so I -- I contacted them.

Q.   You contacted them regarding this particular lawsuit or another lawsuit?

A.   Yes, this particular lawsuit.

Q.   Oh, okay.  What about Mr. Portnoy's firm, how did you come to -- come in contact with Mr. Portnoy's firm?

A.   In the same -- the same vein, but we had -- one AstraZeneca lawsuit was also there, so I contacted him, but it never went anywhere.  So we just dropped it.  I just dropped it, so ...

Q.   Okay.  What -- what, if any, is your recollection of your involvement in the AstraZeneca lawsuit?

A.   We had a similar issue, but there was

Page 22

a -- other than that, I don't remember.  I lost money there, too, so that's why there was similar emails from Portnoy's company.  That's how I picked up that name.

Q.   Okay.  Were you involved in any sort of deposition or document discovery that related to the AstraZeneca case?

A.   No, it didn't go to that level.  I never -- I don't think -- other than sending my securities document from Ameritrade, I don't think I had given anything else.

Q.   Aside from the folks who represent you at the Pomerantz and Portnoy firms, are you aware of any other lawyers or firms representing plaintiffs in this case?

A.   No, I don't.

Q.   Okay.  Have you had any contact with anyone from the Labaton Sucharow firm?

A.   No.

Q.   Okay.  Are you familiar with a concept of a monitoring agreement?

A.   Concept of what?

Q.   A monitoring agreement.

A.   A monitoring -- no, I don't.

Q.   Okay.  So you don't have any monitoring agreement with a -- with any law firm?

A.   No.

MR. CALANDRA:  And I'll just counsel the witness, you haven't done this so far, but when asked questions about communications with counsel, please do not reveal any communications, the substance of any communications you made with any lawyer.

MR. BROWN:  Yes.  And just to be clear, I'm trying to get at who -- who he spoke with, not what the content was, but fair point.

BY MR. BROWN:

Q.   Are you being compensated in any way for your time here today?

A.   No, sir.

Q.   Have you been compensated in any way for serving as the Lead Plaintiff appointed in this

Page 24

case so far?

A.    No, sir.

Q.    Do you expect to be?

A.    If we win the case, yes.

Q.    Do you mean that in terms of achieving a damages award or some -- something --

A.    That's correct.

Q.    -- other than that?

A.    That's correct.

Q.    Okay.  Why is it that you selected the Pomerantz firm to be your counsel in this case?

A.    When I looked at the Ameritrade notes, I saw the name first.  On that given day, I clicked on that and called them.

Q.    Okay.  Did you consider contacting another firm aside from the Pomerantz firm in connection with this case?

A.    No.

Q.    Do you have an understanding of what it means for a case to proceed as a class action?

A.    Yes, I have a general understanding.

Q.   Okay.  Could you describe your general understanding for me, please?

A.   It's a group of individuals getting together who have lost money or whatever, the -- in the security they invested in, and they are all pulling together to come together to come as a class, a class action suit.

Q.   Separate, again, from any specific advice that your lawyers have given you, do you individually have a general understanding of what the requirements are for a case to proceed as a class action?

A.   General requirements?  Just telling the truth.  That's all I know.

Q.   Are you familiar with the concept of a class period?

A.   Yes.

Q.   And what's your understanding of that concept, sir?

A.   It's the time between when the securities issues have occurred between the two times, time

limits.  It's a time limit between two dates.

Q.   Okay.  And what are the -- what are the -- what are the causes of the beginning and ending dates in your understanding?

A.   During those dates, I have lost money and some -- based on information I see.

Q.   Do you have an understanding of whether in this particular case that there is a -- there's a class period that has been defined?

A.   Yes, I have read through the document.

Q.   Okay.  And what's your understanding in this case of what the class period is?

A.   The date is something like February 20- -- 2021 through October 2021, some dates like that.

Q.   And do you have an understanding starting with the first date, February 2021, why -- why it would be that that would be the start date for the class period?

A.   I don't know.  I'm not sure.

Q.   Okay.  And what about the October 2021

Page 27

date?

A.   I don't know.   I'm not sure.   The same answer.   I don't know.

Q.   Okay.   Do you have an understanding of what the proposed membership of the class in this particular case is?

A.   No, I really don't know membership.   I don't know.

Q.   Okay.   After the point at which you were -- so do you recall filing a motion in order to be appointed one of the Lead Plaintiffs in this case?

A.   Yes.

Q.   Okay.   Did you review that motion paper before it was filed?

A.   Yes, I did.

Q.   Okay.   We'll take a look at that in -- in a minute, but I -- I just want to get a few other things out of the way before we get to documents.

So after you were appointed the Lead Plaintiff, did you authorize your attorneys to file

Page 28

a Complaint in this action?

A.   Yes, I did.

Q.   Okay.  Do you know approximately when that Complaint was filed?

A.   It was sometime in 2022.  I don't recall.

Q.   Okay.  Did you participate at all in the -- in the drafting of that Complaint?

A.   No, I did not participate, but whatever the Complaint was, I just looked through.

Q.   Okay.  So that was my next question.  Did you review the amended or, excuse me, review the Complaint before it was filed?

A.   I just glanced through.  There was a lot of legal stuff in there that I'm not really familiar, so I just looked through and then saw what the main Complaint was.

Q.   Okay.  And without pointing to any specific content, do you recall providing any edits or comments on the draft that you were provided to review?

A.   No, I didn't.

Q.   Okay.  So aside from discussions with your lawyers about the -- the content of the Complaint, did you personally separate from them take any steps to investigate the allegations that were made in the Complaint before it was filed?

A.   No.

Q.   Okay.

A.   I did not.

Q.   Do you know who the Defendants are in this action?

A.   Yeah, the company and the CEO as presented in the Complaint.

Q.   Do you know the name of the CEO?

A.   Yes.  Stanley Erck.  In the Complaint, their names are listed, but he's the only person that I relate to.

Q.   Okay.  What's your understanding generally of the nature of the alleged false or misleading statements that were made in connection with the Complaint you filed?

A.   As far as I was concerned from the

Page 30

information and TV news items and stuff like that I -- I looked at, it looked like it was misleading information coming out.  So that was my -- that's what it was, the Complaint was.

Q.   Okay.  And with respect to that misleading information, any particular topics about Novavax' business that you recall that allegedly the misleading information related to?

A.   It was a time when the -- the vaccine was going to come out in the market.  That was the -- that was the only thing I remember.

Q.   Do you have any specific recollection, separate from reviewing the Complaint itself, just sitting here today of any statements made by Mr. Erck that are claimed to be false or misleading?

A.   I don't really recall other than just he was saying some dates and timeline when it was going to be coming out, and that's all I recall.

Q.   When you say it was going to be coming out, do you mean the --

Page 31

A.   The vaccine would be approved by FDA.

Q.   Okay.  Thank you.  Thank you for that clarification.

Who is -- are you familiar with Mr. John Trizzino?

A.   No, I am not.

Q.   Are you familiar with a Mr. Gregory Covino?

A.   No, I am not.

Q.   Other than Mr. Erck, whom you referenced before, are you familiar with the names of any directors of Novavax, Inc.?

A.   I only recall Gregory, Greg, one time somewhere, but I'm not sure how or when.

Q.   The same question, but with respect to any officer in the management of Novavax aside from Mr. Erck?

A.   No, sir, I don't.

Q.   Are you familiar with the concept of a confidential witness?

A.   Confidential witness?

Page 32

Q.    Yes, sir.

A.    I guess, no, I'm not sure exactly what it means, that term.

Q.    Okay.  So do you sitting here right now have any recollection of any allegations that were made based on statements by confidential witnesses that were related in the Complaint?

A.    No.  Other than what I read through the document, I don't know anything.  I've never spoken to anybody.

Q.    Okay.  So is it -- is it fair to say that you relied on your counsel to ensure the accuracy and completeness of the allegations that were made in the Complaint?

A.    That's correct.

Q.    Do you recall -- you -- you referenced a little bit ago seeing an -- an announcement of the possibility of a lawsuit that the Pomerantz firm and that Mr. Portnoy's firm had put up.

Do you -- do you recall, in particular, what the format of that announcement was?  How did

you see it first?

A.   Okay.  I -- I have couple of screens in my -- all in my offices wherever I go, so I have -- I've always had CNBC going in the background --

Q.   Um-hmm.

A.   -- and then I have -- I've watched many interviews with Meg Tirrell, the CNBC correspondent, and also on Cramer's on the Mad Money show.

Q.   Yes.

A.   So those are the news -- news things, and I guess maybe the rest of it I've read from different places, including Ameritrade, which I'm -- I'm always looking at those news items.

Q.   So do you -- so do you primarily conduct your personal trading through an Ameritrade account?

A.   That's correct.

Q.   Do you keep securities accounts on any another platform?

Page 34

A.   Yes, and Morgan Stanley.

Q.   Okay.  Are you aware of whether or not you traded at all in Novavax stock in your Morgan Stanley account?

A.   I don't remember.  I don't think so, but I don't do trading there.  But I used to do for a long time back, but I stopped doing it.

Q.   Okay.

A.   They were too expensive.

Q.   When you say they're too expensive, you mean their -- their per-trade fees?

A.   Per-trade fees, correct.

Q.   Okay.  You understand that in connection with the motion for class certification in this case that there was a request that you be appointed as a representative of the -- of the certified class, if it's certified?

A.   Yes.

Q.   Okay.  And why do you -- if you're still appointed, what -- what would you understand your duties to be as a representative of the class?

A.    Please can you repeat the question?

Q.    Sure.  If you are appointed in connection with the certification of a class as a representative, what would you understand your duties as that representative to be?

A.    I'll be a potential witness and to be deposed and -- like I am being, I am doing now. Other than that, I don't know anything else.

Q.    Okay.  Do you have any understanding as -- as the representative what your involvement with the counsel prosecuting the case would be?

MR. CALANDRA:  And, Mr. Kumar, just a reminder, do not communicate specific -- the substance of specific conversations you had with me or Mr. Portnoy.

THE WITNESS:  Counsel, can you please repeat the question again?

BY MR. BROWN:

Q.    Yeah.  What, if anything, do you understand your role vis-a-vis the counsel who are prosecuting the case would be if you're the

representative?

A.   Other than talking to them in discussion, other than that, I don't recall any -- I don't know anything I'm going to provide them other than what they already have.

Q.   Okay.  Other than the preparation session that you referenced for this deposition, the telephone call, approximately how many times have you spoken with your counsel about this case?

A.   Maybe two or three times before during the initial couple of initial stages.  After that, when we actually filed and all of those things, and I was just getting a date regarding this case.  That's -- other than that, nothing else.

Q.   Other than the Complaint, which we discussed a few moments ago, do you recall reviewing any other filings in this case?

A.   Whatever was filed I -- I believe was -- a copy was sent to me to look at, and I did go through that, glanced through that, and then that's -- that's all I remember.

Q.   What's your understanding of the -- of the current status of the -- of the case right now?

A.   The current status is that the suit is proceeding.  That's why the deposition is being taken, so there was no settlement agreement or anything as far as I know.

Q.   Do you know the name of the Judge that's presiding over the case?

A.   I -- I don't remember offhand.

Q.   Okay.  Do you know in what court the -- the case is pending?

A.   I didn't register it in my mind.

Q.   Okay.  Do you know the date on which under the current schedule the discovery in the case is supposed to end?

A.   Is supposed to end?

Q.   Yes, sir.

A.   No, I don't remember, sir.

Q.   What's your general understanding of the business of Novavax, Inc.?

A.   All I know is they're a biotech research

Page 38

company that does -- a company in Maryland, and they came up with this vaccine, to produce this vaccine, and they were trying to go to the market. That's all I know about them.

Q.   And the -- the vaccine, what was the intended target of that vaccine?

A.   It was a COVID vaccine.

Q.   Okay.  So not with reference to this particular lawsuit, but just generally, how is it that you first became aware of Novavax, Inc.?

A.   It was all through CNBC news media.  I knew Moderna and Pfizer brand particularly were around there, so it was Novavax and one more in Germany, CureVac or something, somebody was also coming up, so ...

Q.   Is it fair to say that you paid attention to companies that were working on vaccines for COVID?

A.   That's -- that's correct.

Q.   Okay.  When you decide to invest in a particular public company, do you typically develop

an -- an investment strategy or thesis with respect to that company?

MR. CALANDRA: Objection. Compound question, but go ahead, Mr. Kumar.

THE WITNESS: Please repeat the question again, please, sir.

MR. BROWN: Yeah, sure. Can you read it back, please, Ms. Lambie?

(Whereupon, the record was read as requested.)

THE WITNESS: The strategy is to make money, and sometimes I put targets if I know certain times. If not, I don't put set targets or anything. I just see how things are going, and it depends on what my mind set is, mood is I'll -- I'll do those things, but usually I -- some of these things I have kept for a long time.

BY MR. BROWN:

Q. When you say set a target, what -- what do you mean by that?

A. You know, the price target so that I

liquidate the thing at a certain price in my mind.

It's not -- I don't even set it on the system.

Just in my own mind I think about those, and then I

say, okay, if this reaches this, that should -- I

will sell it.

Q.   With respect to Novavax in particular,

what prompted your decision to first invest in

Novavax stock?

A.   I thought it was a very good possibility,

because other than in the U.S. and a couple other

countries, most of the -- the rest of the world did

not have a good vaccine.  I thought this would go

every- -- everywhere, and -- and it would sell a

lot more than -- because I -- I remember the price

was lower than Moderna and Pfizer vaccine, so I

thought this would go well.  That's -- that was the

reason I invested in it.

Q.   Do you remember approximately when it was

that you first invested in Novavax stock?

A.   I'm sorry, I don't recall exactly.  I

don't remember.

Q.   Do you remember approximately what the market price was of Novavax stock when you first invested?

A.   Offhand, I don't remember exactly, so I'm --

Q.   Do you recall when you first invested having what you referred to as a -- as a target for what the price of Novavax would be that would lead you to liquidate?

A.   I -- I don't remember the numbers that -- clearly at this time, so ...

Q.   Are you familiar with the concept of shorting a stock?

A.   I don't short that much, but I -- I -- I know a little bit of that; yeah.

Q.   Have you ever shorted Novavax?

A.   I guess I short in a panic, not really with a strategy to short term or anything.

Q.   But I mean the -- the form of your holding Novavax, do you recall whether at any time you held short as opposed to holding long?

Page 42

A.    I might have sold in a short period many times, but it was only because I heard some negative news or something and I wanted to reduce my exposure to that.

Q.    Okay.  So just to be clear, you're -- you're referencing reducing the size of your position in order to re- -- to cut down on your exposure to price declines?

A.    That's correct.

Q.    Okay.  How would you describe your level of risk tolerance as an investor in public securities?

A.    I'm an aggressive investor.

Q.    Do you employ any kind of mathematical model or algorithm to help guide your trading in public securities?

MR. CALANDRA:  Objection.  Compound question, but go ahead, Mr. -- Mr. Kumar.

THE WITNESS:  Yeah, there's no model or anything, just -- I mean, my -- my involvement is, say, I need to make 25, 30 percent on this stock

before I sell depending on some stocks and not on every one.  Some of them don't go that high, right, but as vaccines were concerned at that time, they were going very high just like the AI stocks now, so ...

BY MR. BROWN:

Q.   Do you have any particular sources of information that you typically rely on when deciding what public companies to invest in?

A.   I listen to a lot of Bloom- -- Bloomberg analysts, CNBC analysts coming on different times.

During COVID time, we had a lot of -- our two plants had shut down.  One was open, so I was -- I had a lot of time to sit in front of the thing and listen to a lot of these experts.  That's the only source of information I had.

Q.   So a moment ago you referenced a Morgan Stanley trading account separate from your Ameritrade account?

A.   Yes.

Q.   I just want to focus on the trading in

Page 44

your Ameritrade account with respect to this question.

A.   Okay.

Q.   So with respect to the trading that you do in that account, do you have an invest -- an investment advisor whose views you solicit as part of making trading decisions?

A.   No.  Once in a while, somebody calls me some days.  That's all they do.  I -- maybe once or twice a year maybe they just want to see if I'm around or whatever, but I don't seek any advice or anything.

I have attended a couple of their free seminars; one online, one physically in Chicago area.

Q.   Okay.  Are you aware that the Defendants in this case have served a Request for Production of Documents by you?

A.   Yes.

Q.   Okay.  And were you personally responsible for locating documents that were

Page 45

responsive to the request?

A.    Yes, sir, I was.

Q.    When you were asked to provide documents, what efforts did you undertake in order to find responsive documents?

A.    First, I went to TD Ameritrade and looked at all of the activities I had regarding Novavax, and then I sent them out to counsel.

And then on my email account, I just put Novavax and see there some articles had shown up. I had kept it in my file, and only those I sent.

Most of time it's available on different sites, so I didn't have to print or save or anything. So I just go right to those things, and some of them I sent it out.

Q.    We're going to try and do the documents now, so I -- let me -- maybe if we could go off the record just for a moment so we make sure that that process is set up okay.

A.    Sounds good.

Q.    And if it is, then we can go back on the

Page 46

record.

A.   Okay.

MR. BROWN:  Okay.

THE VIDEOGRAPHER:  The time is 9:50 a.m. Central.  We're now off the record.

(Recess taken -- 09:50 a.m.)

(Whereupon, Nandkumar Deposition Exhibit No. 1, Memorandum of Law, marked for identification.)

(After recess -- 09:53 a.m.)

THE VIDEOGRAPHER:  The time is 9:53 a.m. Central.  We are now back on the record.

Counsel, you may proceed.

MR. BROWN:  Okay.

BY MR. BROWN:

Q.   Thank you very much.  Mr. Kumar, you received a document that has been marked as Exhibit 1?

A.   Yes.

Q.   It's a Memorandum of Law in support of your appointment as Lead Plaintiff filed in this

Page 47

case on January 11th, 2022.

Are you able to open that document and -- and review it, sir?

A.   Yes, sir, I have it here.

Q.   Okay.  Just a general question about the document, and -- and if you need to flip through the pages, you can do that to answer, but maybe you don't need to.

The question is simply, Do you recall reviewing this document before it was filed?

A.   I cannot for sure say how many documents, but I -- I have looked at some documents.  I'm not sure if this is a specific one or not.  I don't remember.

Q.   Okay.  Are you familiar with Mr. Jeffrey Gabbert?

A.   No.

Q.   Okay.  Have you ever spoken with Mr. Jeffrey Gabbert?

A.   No, I don't recall anything.

Q.   If you turn to page 8 of the motion paper

that I gave you, --

A.   Okay.

Q.   -- it's -- I'm talking about the bottom number page.  At the top of the page, it says 13 of 20.

A.   Okay.

Q.   And at the bottom, it has an 8.

A.   Okay.

Q.   So it's --

A.   I have it.

Q.   It's 13 of the PDF I think, but 8 on the bottom.

A.   Okay.

Q.   In the very last paragraph if you read the first sentence of the last paragraph, Kumar and Gabbert have further demonstrated their adequacy by submitting a joint declaration attesting to, inter alia, their discussions with one another and with counsel regarding their joint motion.

I -- I just want to ask you, sir, does that reference to their discussions with one

another refresh your recollection as to whether you've had any discussions with Mr. Jeffrey Gabbert before?

A.   I really don't remember who I spoke to at different times, but I'm not really sure, Counsel.

Q.   Okay.  Thanks very much.

MR. BROWN:  Eileen, if you could send around Tab 1B, the assignment.

MS. FALK:  Yes.

MR. BROWN:  We'll wait for that to turn up in everybody's box.

BY MR. BROWN:

Q.   Mr. Kumar, just for your reference so you know, I'm going to be showing you a couple of other documents that were filed together with the motion you -- the motion paper you just saw --

A.   Okay.

Q.   -- that were exhibits to it, but we'll mark them separately.

A.   Okay.

Q.   So let me know when you have that

document.  It should -- on the first page of it, it should just say Exhibit 1.  It will have a bunch of court numbers at the top.

(Whereupon, Nandkumar Deposition Exhibit No. 2, Assignment, marked for identification.)

MR. BROWN:  I don't have it yet either, so.  Maybe -- or internally.  Maybe Ropes needs to pay more for its emails, too.

MR. CALANDRA:  It's so hard to find good IT these days.

MR. BROWN:  I know.  Well, I don't know, it seems like the IT are the people run it, not us.

MR. CALANDRA:  That is very true.

MR. BROWN:  Yeah.  All right.

THE WITNESS:  It is okay.

MR. BROWN:  I've got it.

BY MR. BROWN:

Q.  So this is Exhibit 2.  Let me just mark it here so I don't lose track.

This is a document which in the proper part of it is labeled an Assignment, and it begins

with the name Shawn N. Kumar.  Is Shawn N. Kumar your son?

A.    That's correct.

Q.    How old is your son, sir?

A.    He's --

Q.    You may have multiple sons.  How old is Shawn?

A.    Shawn is -- the day before yesterday he was 40.

Q.    Happy Birthday.

A.    Yes.

Q.    So does -- did you have any discussions with your son about assigning claims that he would have with respect to trading Novavax stock to you?

A.    Assigning trade?

Q.    Assigning claims.

A.    Claims?

Q.    Yes, sir.

A.    Yes, I did have a discussion with him.

Q.    Okay.  And what was the -- what was the nature of those discussions that you had with him

about that?

A.   No, I told him what I was doing and then -- because he's -- he buys securities based on my recommendation, whatever I tell him.  So based on that, so he did what -- I did tell him what I was going to do.  He said, Okay.

Q.   Do you -- so your -- your son has a separate -- your son Shawn has a separate -- well, I don't know if you have multiple sons, but when I'm referring to your son, I'll be referring to Shawn; is that fair?

A.   Yeah.  He's the only son I have.

Q.   Okay.  Fair enough.  Fair enough.  So when you're -- your son, does he have a -- a separate Ameritrade account that he uses to conduct public securities trades?

A.   Yes.

Q.   Okay.  Do you personally have delegated authority to -- to direct trades to happen in that account?

A.   I personally don't do anything.

He's -- he's -- he's got access to it at anytime on his phone as well as here.  In fact, we work -- he's also one of the presidents in our company, so we are always working.  His desk is next to mine, so we work together.

Q.    Okay.  So you -- you have -- would you say that you frequently discuss with your son decisions about trading in various public companies?

A.    Yes.

Q.    Okay.  Is it your understanding that your son generally follows the advice that you give him with respect to trading in public companies?

A.    Yeah, he does, and he's a little more conservative than I am.  So whatever he wants to do, but basically, he leaves -- leaves it to me to tell him about different things, so ...

Q.    But when it comes to actually executing the trade decision, he would be the one that would have to -- to make the instruction for his account, --

Page 54

A.   That's correct.

Q.   -- not you?

A.   Yeah.

Q.   Okay.

A.   He would execute himself.

Q.   Okay.  So it's -- it's your understanding that in proceeding in this case, that, in addition to your own personal claims, you're -- you're also acting on behalf of your son?

A.   That's correct.  I do.

MR. BROWN:  Eileen, if you could send around 1C.

(Whereupon, Nandkumar Deposition Exhibit No. 3, Chart Referencing Purchases, marked for identification.)

MR. CALANDRA:  And, Tom, just for my understanding, --

MR. BROWN:  Yes.

MR. CALANDRA:  -- are you labeling these exhibits as Exhibit 1, 1B, 1C or are they going to be 1, 2, 3?  It doesn't --

Page 55

MR. BROWN:  I have just numbered them 1, 2, 3 so far, yeah.

MR. CALANDRA:  Okay.

MR. BROWN:  Because I'm not going to -- I'm not going to use all of the exhibits to all of the different motions, and I think that -- for example, I mean, I'm not telling you something you wouldn't have already anticipated. Things like certifications, --

MR. CALANDRA:  Sure.

MR. BROWN:  -- it's easier to have them as their own document so we can refer back to them.

MR. CALANDRA:  I just didn't want to later get -- find myself tied up in knots.

MR. BROWN:  No, understood.  So that -- so the motion paper itself would be 1.  The Assignment would be 2, and then this certification that Eileen is sending around right now --

MR. CALANDRA:  Will be 3.

MR. BROWN:  -- will be 3.

MR. CALANDRA:  Yes, make sense.

Page 56

MR. BROWN:  Even though confusingly on the docket printout, it says Exhibit 2 on the first page.

MR. CALANDRA:  The clerk is going to have a blast with this.

MR. BROWN:  Yeah.  We didn't want to -- if we started taking off the exhibit cover pages, then we're altering the documents and the page guidance at the top gets off, it's like there's no winning in this.

MR. CALANDRA:  No.

MR. BROWN:  All right.  Does everyone have that document?

THE WITNESS:  I don't have it yet.

BY MR. BROWN:

Q.   Okay.

MR. CALANDRA:  I just got it.  I guess it was first out of the -- the queue or whatever.

MR. BROWN:  We'll wait a moment.

BY MR. BROWN:

Q.   Got it?

Page 57

A.   Not yet.  Yeah, I got it.

Q.   Okay.  So, sir, you've been presented with Exhibit 3 which is a chart?

A.   Exhibit 2, right?

Q.   Well, it says Exhibit 2 on the front page, but for this deposition, it's Exhibit 3.

A.   Okay.  Got it.

Q.   Okay.  Which is -- appears to be a chart reflecting various purchases and -- and sales by you and your son and Mr. Gabbert.  I just want to ask you, have -- have you -- do you recall seeing this document before?

A.   Yes.

Q.   Okay.  What's your understanding of what it presents?

A.   I'm sorry, I thought this was from Ameritrade.  I see other names on this, so I don't recall listing like this.  No, I don't recall getting this page, particular page.

Q.   Okay.  Would -- who would you think -- so you didn't prepare this document?

Page 58

A.   No, I didn't.

Q.   Okay.  Do you have any idea who might have prepared this document?

A.   Our counsel might have taken information from the documents we sent and must have prepared from that.

Q.   Okay.  In connection with the Lead Plaintiff motion, did you provide trading records to your counsel so they could prepare --

A.   Yes.

Q.   -- the information?

A.   Yes, I did.

Q.   Okay.  Yes.  And you would have expected your counsel to prepare the information completely and accurately --

A.   Yes, sir.

Q.   -- for filing with the court?

A.   Yeah, that's correct.

Q.   Okay.  Do you have any reason to dispute the presentation of information that appears on this document with respect to your own trades?

That would be on the -- the very first page there.

A.    No, I don't dispute anything.

Q.    Okay.  And what about on the second page with respect to the trades regarding your son's account?

A.    The same thing.

Q.    Okay.  You can put that document aside.

MR. BROWN:  Eileen, if we could send around 1D now.

(Whereupon, Nandkumar Deposition Exhibit No. 4, Certification Pursuant to Federal Securities Laws, marked for identification.)

MR. BROWN:  When we spend minutes waiting for them, we can just think of all of the minutes we've saved by not traveling somewhere to do this together.

THE WITNESS:  I agree.

MR. CALANDRA:  Oh, yes.

MR. BROWN:  The tolerance.

MR. CALANDRA:  The firm is very happy that we didn't pay for hotel rooms or anything else

Page 60

like that at all.  It all comes together.

MR. BROWN:  Yes, it works.

THE WITNESS:  Okay.  I have that document.

MR. BROWN:  We aim to -- we aim to save you guys some money.

MR. CALANDRA:  Thank you.  Efficiency is key.

MR. BROWN:  Yeah.  That's right.

BY MR. BROWN:

Q.   Right.  This one, hopefully, actually says Exhibit 4 on the first page, correct, sir?

A.   Yes.

Q.   That's probably the last time this is going to happen, but --

A.   Yes.

Q.   -- sir, you have been presented with what we've labeled as Exhibit --

MR. CALANDRA:  I'm sorry, Tom, I actually haven't gotten it yet, so ...

MR. BROWN:  Oh, okay.  Sorry.  Keep an

Page 61

eye out.

MR. CALANDRA:  I -- I was really hoping it would -- it would slip in there as you were talking so I didn't have to interrupt.

MR. BROWN:  Sorry about that.  I'll wait. It's interesting it keeps varying who it is that does or doesn't get it first.

MR. CALANDRA:  Yes.  Okay.  There it is. Sorry everyone.  Exhibit 4, I've got it.  I'm good.

MR. BROWN:  No problem.

BY MR. BROWN:

Q.   So, sir, you've been shown Exhibit 4, and if you flip over just to the second page, the label at the top of the page is Certification Pursuant to the Federal Securities Laws, and then 1, paragraph 1 begins with your name.  So that's -- that's the page that I'm on.

A.   Yes.  Yes.

Q.   Do you recall having reviewed this document before?

A.   Yes.

Page 62

Q.    And did you execute this document yourself?

A.    Yes, on DocuSign.

Q.    Okay.  So the -- on the second page of the certification itself, is that your -- the signature there, you authorized that via DocuSign?

A.    That's correct.

Q.    Okay.  And what's your understanding of the purpose of this particular certification?

A.    I guess that I reviewed the Complaint and then I'm willing to be the representative for the class action.

Q.    If you look at paragraph 5, it says, The attached sheet lists all my transactions and Novavax securities during the class period as specified in the Complaint.  Do you see that, sir?

A.    Yes.

Q.    Okay.  If you would flip over to the next page, which is what I assume is the reference to the attached sheet, you see a list --

A.    Yes.

Q.   -- with your -- your name at the top and it carries over on to a second page with just one line on the second page, do you see that?

A.   Yes, sir, I do.

Q.   Did you prepare this particular chart?

A.   No, I did not.

Q.   Okay.  Do you know who did?

A.   I assume our counsel and their office did it.

Q.   Okay.  Do you have any reason to dispute the accuracy of anything listed in this chart?

A.   No, sir, I don't.

Q.   Do you have any reason to dispute the completeness of anything listed in this chart based on the description in -- in the paragraph 5, the page before it?

A.   No, I don't.

Q.   Okay.  Let me ask you then to turn over one additional page.  It will say page 6 of 10 at the very top of it, and a similar looking chart with respect to your son.

Page 64

Again, I assume you -- you did not personally prepare this chart yourself, sir?

A.   That's correct.  I did not prepare.

Q.   And just for completeness, I -- I know I asked you about your records, but in -- in connection with your service as or the motion to certify you as the -- to select you as the Lead Plaintiff, did you also provide your counsel with trading statements for your son's account?

A.   Yes.  My son -- some of them my son provided, and I provided, too, some of them.

Q.   Okay.  With respect to this chart about your son's trades, do you have any reason to dispute the -- the accuracy of any -- of any of the information presented on here?

A.   No, I don't dispute.

Q.   Okay.  Do you have a reason to dispute the completeness of any of the information listed on here?

A.   No.

Q.   Okay.

Page 65

MR. BROWN:  Counsel, we've been going for about an hour, and I think now is a good time for a break if that's okay with you, give the witness a break?

MR. CALANDRA:  Sounds good to me.

MR. BROWN:  Okay.  So do we want to take -- is ten minutes sufficient to get up, get some water, whatever you need to do?

MR. CALANDRA:  Certainly.

MR. BROWN:  We'll come back 11:25 or 10:25 Central?

THE WITNESS:  Okay.

MR. CALANDRA:  Sounds good.

MR. BROWN:  Thanks everyone.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  The time is 10:13 Central.  We are now off the record.

(Recess taken -- 10:13 a.m.)

(After recess -- 10:26 a.m.)

THE VIDEOGRAPHER:  This is the beginning of media unit number two in the video-recorded

Page 66

deposition of Mr. Nandkumar.  The time is 10:26 a.m. Central.  We are now back on the record.

Counsel, you may proceed.

MR. BROWN:  Thank you.  Welcome back everyone.

Eileen -- oh, I should have said this ahead of time so it was already out there, but if you could send around Tab 3.

(Whereupon, Nandkumar Deposition Exhibit No. 5, Plaintiff's Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel, marked for identification.)

MR. BROWN:  My bad.  There goes -- there goes my efficiency gold star.

THE WITNESS:  Okay.  I just received the email.

MR. BROWN:  Okay.  Brian and Lesley, do you have it, too?

MR. CALANDRA:  Not yet.

MR. BROWN:  We'll give it another minute.

Sorry about that.

MR. CALANDRA:  But -- yeah.

MR. BROWN:  I don't claim -- I don't claim responsibility for the delays on the internets.  It's like the SEC delayed broadcast rules.

THE WITNESS:  That's right.

MR. BROWN:  It can be about exhibits you don't like that are coming over the transom.

MR. CALANDRA:  I also find the delay frustrating in sporting events when I get text alerts as to things that have happened in a game I'm watching before they occur.

There we go.  Got it.

MR. BROWN:  Okay.

MR. CALANDRA:  Yes.

MR. BROWN:  Great.

MR. CALANDRA:  We are good.

BY MR. BROWN:

Q.   Okay.  Are we on -- sorry, I lost my count.  Are we on --

Page 68

MR. CALANDRA:  This is 5 I believe, yes.

MR. BROWN:  Yes, Exhibit 5.

BY MR. BROWN:

Q.   Okay.  So, Mr. Kumar, this is -- I've put in front of you Exhibit 5, the -- the court filing dated 3-16-23 with the label Plaintiff's Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel.  Do you see that document, sir?

A.   Yes, sir.

Q.   Okay.  Have you reviewed this document before today?

A.   I might have.  I'm not sure a hundred percent, but I'm sure.

Q.   All right.  But did -- you didn't -- you didn't participate in drafting this document, did you?

A.   No, I did not.

Q.   Okay.  Do you recall authorizing your counsel to file this document on your behalf?

A.   Yes.

Page 69

Q.   Are you familiar with a gentleman by the name of Chad Kaufman?

A.   No, I am not.

Q.   Okay.  You never met a Mr. Chad Kaufman before --

A.   No.

Q.   -- or spoken with him by phone?  Okay.

MR. BROWN:  Eileen, if you could send around I guess that would be 3C.

(Whereupon, Nandkumar Deposition Exhibit No. 6, Declaration, marked for identification.)

MR. BROWN:  This will be Exhibit 6 when you get it.  Okay.  Great.  So, folks, let me know when you have it.

THE WITNESS:  I have it.

MR. BROWN:  It's his declaration.

MR. PORTNOY:  I got it.

MR. CALANDRA:  So I am the bottle neck as they say.

MR. BROWN:  That's okay.  You're giving us -- we can have a relaxed pace.

Page 70

MR. CALANDRA:  That's right.

MR. BROWN:  We'll -- we'll store up -- we'll store up speed and conflict for a later deposition.

MR. CALANDRA:  Yes, that's right.  We're banking.

MR. BROWN:  Okay.

MR. CALANDRA:  Got it.

MR. BROWN:  Excellent.  Great.  Thanks.

BY MR. BROWN:

Q.    So, Mr. Kumar, you've been given an exhibit marked Exhibit 6.  This was a document that was filed together with the motion paper that we just looked at.

If you would turn to the first page with writing on it, the one that begins with the description Declaration of -- of you, do you see that?

A.    Yes.  Yes.

Q.    Okay.  Did you draft this document, sir?

A.    No, I did not.

Page 71

Q.   Did you review it at any point?

A.   Yes, I did.

Q.   Okay.  Did you provide comments on a draft of it?

A.   No, I did not.

Q.   Okay.  Who -- who did draft it?

A.   Who did the drafting?

Q.   Who drafted it, yes, please, if you know.

A.   I'm not sure who the counsel was.

Q.   Okay.  But the -- this was a document that was drafted for you by your counsel?

A.   That's correct.

Q.   Okay.  On the second page, I just want to confirm that that is a -- a DocuSign signature that you authorized?

A.   That's correct.

Q.   Okay.  And before you signed that document by DocuSign, did you read its contents?

A.   Yes.

Q.   Okay.  If I could ask you just to look at, back at the first page of that again where it

Page 72

says Declaration.  On the -- on the second line, there's a reference to reply memorandum in further support.  Do you have any idea why it refers to a reply memorandum?

A.   Second line?

Q.   Yes, sir, the second line of the title.  It begins with the word, Plaintiffs.

A.   Reply memorandum, I'm -- I'm not sure.  I don't know what it is.

Q.   Okay.  If you would turn over to the second page of this, I'm focused on paragraph, paragraph 5.

A.   Okay.

Q.   The first sentence reads, I've acted to protect my own and the class's interest in this action by retaining counsel -- competent -- competent counsel.  And then the second sentence says, I am well aware of the extensive experience of proposed Class Counsel -- Class Counsel Labaton Sucharow and Pomerantz -- Labaton Sucharow LLP and Pomerantz LLP, excuse me, in protecting shareholder

Page 73

rights in class action litigation.  Do you see that sentence, sir?

A.    Yes.

Q.    What to your knowledge are specific cases in which the Labaton Sucharow firm has been involved aside from this one?

A.    I -- I frequently noticed this name in different securities litigations and all of those things.  Only, like I said, in the Novavax case, this showed up on the first line item, so I picked that.

Q.    Okay.  But can you name, other than the Novavax case, any of the experiences which you describe you frequently see the name of the -- of these firms?

A.    I might have noticed in AstraZeneca thing, and in many other cases, this -- these are -- it's constantly coming around in different areas, so I -- personally, I do not recall exactly which ones.

Q.    The next paragraph, paragraph 6, begins,

Page 74

I have diligently pursued the effective prosecution of this action. The second sentence, Among other things, I authorized the filing of the motion seeking to be appointed Lead Plaintiff and reviewed the operative Complaint, motions, discovery requests and responses, as well as the Court's related orders and opinions. I want to just ask you about the last reference there to the Court's orders and opinions.

What orders and opinions of the Court in this case do you recall having reviewed?

A. I don't remember really -- so, sorry. Whenever my counsel has asked me to send documents, I've sent them to him. Besides that, I don't remember anything.

Q. Do you recall reviewing at any time an order on a Motion to Dismiss that was filed by the Defendants in this case?

A. Yes, I do.

Q. Okay. And when approximately do you recall reviewing that?

A.    That was I think sometime last year and -- yeah, sometime last year, and then it didn't go through, so I don't know what the -- the legal -- the legal word is.

Q.    Okay.

A.    It was not agreed upon, so -- and then it's proceeding for court action, so ...

Q.    When you -- when you mean it didn't go through, are you referring to the fact that the motion was denied?

A.    Denied.

Q.    Okay.

A.    Yeah.

Q.    Do you have any understanding sitting here today of what, if any, effect the Motion to Dismiss decision by the Court had on the class period in this case?

A.    No, I don't know it.

Q.    Do you know if any change at all was made to the class period based on the Court's order on the Motion to Dismiss?

Page 76

A.    I don't recall anything.

Q.    Looking at the next sentence after that, I have also par- -- participated in strategic decisions and have communicated frequently with counsel by firm -- phone and email concerning the status, court order and strategy, including with respect to the pretrial discovery and the collection of potentially relevant hard copy and electric documents -- electronic documents and communications from my files.

Focusing on the first part of that sentence, there's a reference to participating in strategic decisions.  At the time of this -- of this certification, or Declaration, excuse me, 3-16-23, what strategic decisions in the case do you recall having been involved in?

MR. CALANDRA:  And I'll -- I am inclined -- I am objecting on the basis of privilege, and I'm inclined to instruct Mr. Kumar not to answer that question.  But I will say, Mr. Kumar, if you can answer that question without

revealing communications we've had -- you've had with counsel, then go ahead.  Otherwise, I am not -- I'm instructing you not to answer.

MR. BROWN:  Yeah, let me just respond to that objection, Brian.

He makes a statement in the Declaration that he participated in particular decisions and he signed it and it's on the public docket, so I think it's perfectly fair game to say what decisions. I'm not asking him to tell me what it is that you advised him with regard to those decisions, just what the specific decisions were.

MR. CALANDRA:  Yes, but any -- those decisions involve him seeking our counsel and how to proceed with the case as well as our responses to that, and I think that invades privilege.

So that's -- that is my instruction.  I understand your position, and, you know, we can meet and confer and revisit, but that's where I -- that's where I come out on this.

BY MR. BROWN:

Q.   Mr. Kumar, are you going to follow your counsel's direction not to answer that question?

A.   Yes, sir.

Q.   Okay.  All right.

MR. BROWN:  Well, we'll move on, but I don't see how, Brian, you can put a document on the public file referencing specific actions and then say that inquiry into those, what those actions were is somehow protected by privilege.

MR. CALANDRA:  Inquiry into the substance, inquiry into the -- of course, we can meet and confer about this.  That's --

MR. BROWN:  Yes, that's a --

BY MR. BROWN:

Q.   All right.  Moving on.  Sir, have you -- have you ever listened to a -- an earnings call?  Well, let me ask you, you're familiar with the concept of an earnings call?

A.   Yes, I am.

Q.   What's an earnings call?

A.   Usually, the -- in an earnings call, the

CEO or the president, whoever is presenting information on the security to the investors, to the analysts and they relay information regarding their earnings quarterly and what the future holds good in that -- in that earnings call, and also they take analysts' questions and see which -- which way the company is going.

Q.   Have you ever listened live to an earnings call presented by Novavax, Inc.?

A.   No, I have not.

Q.   Have you ever reviewed the transcript of any earnings call that was conducted by Novavax, Inc.?

A.   No, I have not.

Q.   Okay.  And just to be specific on that, have you at any point ever reviewed a transcript of a -- an earnings call that Novavax conducted on Monday, May 10th, 2021?

A.   No, I have not.

Q.   So at any point in your trading of Novavax stock, you wouldn't have relied on

Page 80

information that you heard yourself or read with respect to the earnings call held on --

A.   I missed a word.  Can you please repeat that again, please?

Q.   Yeah, let me start over again.

So in any trading decision that you made with respect to Novavax stock, you -- in none of those decisions did you ever rely on statements that were made that you either heard or read in an earnings call held on Monday, May 10th, 2021?

A.   No, I don't recall anything.  Yeah.

Q.   Okay.  Are you familiar with the website Politico?

A.   I am -- I've heard -- I've read a few articles on Politico, yeah.

Q.   Yeah.  What's -- what's your understanding of what Politico does generally?

A.   It basically gives -- sometimes it gives information or updates on certain news items.  I'm not -- I don't remember clearly all of those different ones.

Q.    Have you ever read any -- anything produced by Politico that related to Novavax?

A.    No, I have not.

Q.    Okay.  Do you recall visiting the Politico website on or around October 19th, 2021?

A.    No, I don't.

Q.    So then it would be fair to say that in any trading decisions that you made with respect to Novavax you were not using any information you obtained from Politico as part of that decision-making?

A.    That's --

MR. CALANDRA:  Objection to form, but go ahead, Mr. Kumar.

THE WITNESS:  Sorry.

MR. CALANDRA:  No, no.  You are --

BY MR. BROWN:

Q.    You can answer.

MR. CALANDRA:  You can answer the question.

THE WITNESS:  Oh, okay.

Page 82

THE COURT REPORTER:  What's your answer?

THE WITNESS:  Oh, my answer is I have not made any decision based on Politico information, so ...

BY MR. BROWN:

Q.  Have you ever participated by, you know, listening or reading materials from healthcare investment conferences held by the company Cantor Fitzgerald?

A.  No, I am not.

MR. BROWN:  Eileen, if you could send around Tab 7, please.

(Whereupon, Nandkumar Deposition Exhibit No. 7, Document Bates Numbered NOVAVAX_NANDKUMAR_0000003, marked for identification.)

MR. BROWN:  I think I'm back to alignment again.

MR. CALANDRA:  Oh, that's twice, yeah.

MR. BROWN:  Yeah.

MR. CALANDRA:  It's like shopping at the

supermarket and finding that your randomly selected

items come out to $10 or something.

MR. BROWN:  Yeah, it can happen.

BY MR. BROWN:

Q.    There we go.

A.    Okay.  I have the document.

Q.    Okay.  Great.

MR. CALANDRA:  And I, of course, do not.

MR. BROWN:  That's fine.  And, Eileen,

just so you know, right after this, you might as

well send another email around.  Just include 8 and

9, and, again, we'll be --

MR. CALANDRA:  Good news, I just got it.

This is a record.  All right.  So I'm in.

MR. BROWN:  Okay.

MR. CALANDRA:  Yeah.

MR. BROWN:  Great.

BY MR. BROWN:

Q.    So, Mr. Kumar, if you -- if you take a

look at the exhibit marked No. 7 that I -- that has

been sent around to you, --

A.   Yes.

Q.   -- it starts with Bates number NOVAVAX_NANDKUMAR_ and a bunch of zeros with 3.  At the very top, there's a, an email from April of this year forwarding this to Mr. Calandra.

Is that fair to say, that that's you, part of your collection of documents that were responsive to discovery requests and providing it to your counsel --

A.   That's correct.

Q.   -- for this case?  Okay.  And what is the document that falls below the forward email that you have from yourself to Mr. Cal- -- to Mr. Calandra?

A.   Like I mentioned earlier, it was I put Novavax under the search area, and then this -- these documents were delivered.  I put it in and five showed up, so I just sent them to him.

Q.   Okay.  Is there anything -- focusing on the email that is dated Friday, March 26th that's below here, is it fair to say that this is some

kind of email that's generated automatically and sent to you about various holdings that you have?

A.    That's correct.

Q.    Okay.

A.    It's not sent to me.  It's available on site.  This one I -- for some reason, I kept it, so ...

Q.    Okay.  So why -- do you have any recollection of why it is you would have kept this particular one as opposed to having it on just email --

A.    I don't remember offhand, so ...

Q.    Okay.  What -- what is -- it comes from an address account at seekingalpha.com on behalf of Seeking Alpha.  What is Seeking Alpha?

A.    It's a site, where I subscribe to that. So I list all of my portfolios on there, so as in a bid comes, it comes on my app on my hand phone. And I always look at the app and see what's -- what's going on with the individual securities, if any news item is coming or what's happening.  It

Page 86

highlights those, whatever it is in circulation, and that way I don't have to search for this.

The same thing Ameritrade does, too, so certain areas.  Stocks, whatever stocks I want in that portfolio, the -- the news items relating to that shows up.

Q.    Okay.  Is there anything in this -- is there any particular reason why it was that this report from Seeking Alpha you decided to send and keep in your own email box as opposed to simply reviewing it on the site?

A.    I am -- I don't remember.  I don't recall at this time.

Q.    Okay.  Do you recall separate from this email ever using information that you obtained from the Seeking Alpha site in connection with the decision to buy or sell Novavax stock?

A.    No.

Q.    Are there any sites -- you listed Ameritrade and Seeking Alpha.  Are -- are there any -- I'm focused on websites.  Are there any

other websites that you commonly used to obtain information about companies in which you're considering investing?

A.   Yes.   Street.com is one of them.   It's Cramer owned, was one of them at one time, I believe.   So other than that, most of the time it's on the news, TV news.

Q.   Do you recall the, that -- I'm sorry. What was the name of the site that -- that's run by -- that's operated by Mr. Cramer again?

A.   Street.com.

Q.   Street.com?

A.   Yes.

Q.   Do you ever -- do you ever recall having used information that you obtained from TheStreet.com site as part of a decision to buy or sell Novavax stock?

A.   I don't remember, sir.   I'm not sure.

Q.   Do you recall whether after forwarding this email to yourself from the Seeking Alpha site on Friday, March 26th, 2021, you either bought or

Page 88

sold Novavax stock?

A.   I don't remember that, sir.

Q.   Okay.  If -- if you had decided to trade, would you have likely done such a trade in your Ameritrade account?

MR. CALANDRA:  Objection, but go ahead, Mr. Kumar.

THE WITNESS:  If I -- please repeat the question again.

BY MR. BROWN:

Q.   Yeah.  If -- if you had decided to trade Novavax in response to this email, is it likely that you would have made such a trade in your Ameritrade account or somewhere else?

MR. CALANDRA:  Same objection, but go ahead.

THE WITNESS:  The Ameri- -- the Ameritrade account, sorry.

BY MR. BROWN:

Q.   Okay.  You can put that one aside, and then there is following up hopefully Tab 8 and Tab

9.

MR. CALANDRA:  And I have them.

MR. BROWN:  Which will be Exhibit 8 and Exhibit 9.

(Whereupon, Nandkumar Deposition Exhibit No. 8, Document Bates Numbered NOVAVAX_NANDKUMAR_0000006, marked for identification.)

(Whereupon, Nandkumar Deposition Exhibit No. 9, Document Bates Numbered NOVAVAX_NANDKUMAR_0000001, marked for identification.)

MR. BROWN:  Do you have them, too, Lesley?  You got them?

MR. CALANDRA:  You're muted, Lesley, but --

MR. PORTNOY:  Yes.

MR. BROWN:  Just to make sure it got around to everybody.

BY MR. BROWN:

Q.   Do you have those two, Mr. Kumar?

Page 90

A.   After this, I don't --

Q.   So you -- you'll have an email from my colleague, Eileen Falk, that will have two documents attached.  One is labeled Tab 8 at the beginning and the other one is labeled Tab 9.

A.   Okay.  I don't have it yet.

Q.   Okay.  We'll wait for you to get them.

A.   Yeah, I've got it.

Q.   Okay.  Let's start with Tab 8, and we'll mark that as Exhibit 8.

A.   Okay.

Q.   Here again, we have an email chain that begins with Bates label NOVAVAX_NANDKUMAR_ and a bunch of zeros to 6, and you see, again, at the top, there's an email in which you April 10th of this year forward this, the email chain below to Mr. Calandra.

Was this forwarding part of the same document collection that you described with respect to the prior email?

A.   That's correct.

Page 91

Q.   Okay.  And here again, there is in the substantive email at the bottom from SA Breaking News Team dated May 26th, 2021.  Is this an email that was sent to you automatically or that you requested to be sent to you?

A.   It -- it automatically came in I'm sure, yeah.

Q.   Okay.  Do you recall sitting here today any particular thoughts you had on May 26th, 2021 about the prospects for Novavax' stock price?

A.   No.  I recall I was trying -- as you can see, I sent it to my brother, who is Amar Nuggehalli, because I had told him to buy some of their stock.  So he lost money, too, so he's -- I just informed him about this news because he doesn't follow it closely.  I was following it, so I ...

Q.   Do you frequently provide stock trading advice to your brother?

A.   Not --

MR. CALANDRA:  Objection.

Page 92

THE WITNESS:  Not frequently.

MR. CALANDRA:  Mr. Kumar, sorry, objection to form, but please go ahead and answer.

THE WITNESS:  Not frequently; once in a while.  When we discuss during social -- when we meet each other and he asks something about it, I tell him, so that's about it.

BY MR. BROWN:

Q.   Yeah.  I see from the email address that it suggests that your brother works together with you in your -- in your companies; is that -- is that correct?

A.   He's the CFO of the company.

Q.   How long has your brother been the CFO of the company?

A.   Since '87.

Q.   Okay.

A.   1987, yeah.

Q.   If you look in the -- in the substance of the email below, one, two, three, four, five bullets down I believe there's a reference to

Page 93

Novavax, do you see that?

A.   Okay.

Q.   There's a statement there, Novavax, and then the ticker symbol, has previously said the company has started talks with the FDA for emergency use auth- -- use authorization for its COVID-19 vaccine; however, Novavax has pushed back the timeline for its regulatory submission from Q2 2021 to Q3 2021.  Do you see that bullet, sir?

A.   Yes, sir.

Q.   Do you recall whether the information provided in that particular bullet led you to trade Novavax stock?

A.   I do not recall the specific thing what I did at that time.  I'm not sure, so ...

Q.   Okay.  Do you have a -- a general recollection in approximately May of 2021 how many times a month you would be making trades in Novavax stock?

A.   I don't recall.  I think I sent all of the trades to my counsel.  I really don't recall

Page 94

the number of trades that I sent, but I was watching it carefully because it was going up and down constantly.  So that's all I know.

Q.   Okay.  Would -- were you -- what would you say is the time frequency with which you would look and see where the price of Novavax stock was in or around May of 2021?

A.   On every day basis on my phone I constantly get information, alert information, so I'm -- I'm in touch quite often, so ...

Q.   Would you consider yourself to be a day trader?

MR. CALANDRA:  Objection.  Vague, but go ahead, Mr. Kumar.

THE WITNESS:  Yeah.  Some stocks I do. Nowadays I -- I do, but if not, I'm not a day trader.  I keep -- because I know a lot of industry company.  That's what my background is, so I keep it for longer time knowing what they do, what -- what the future is and all that stuff like that.

Page 95

BY MR. BROWN:

Q.   Do you have any professional background relevant to vaccine manufacturing?

A.   No, I don't.

Q.   Do you have any professional background relative to pharmaceutical development?

A.   I have invested in a company called Reviva Pharmaceuticals.  My brother-in-law, who is a gastroenterologist, recommended that, so I invested something.

At one time, I was on the board because we were only small group of five investors.  Now I am not on the board any more.

Q.   What was the business of that company?

A.   They're -- they're making -- right now they're in Phase 3 studies of schizophrenia, the drug for GERD and schizophrenia.

Q.   You can put that aside and move on to the next one, the Tab 9 hopefully labeled or Exhibit 9 hopefully labeled Tab 9.

A.   Okay.

Page 96

Q.   Okay.   This is an email beginning with Bates label NOVAVAX_NANDKUMAR_001.

A.   Okay.

Q.   So, again, the top email, fair to say this was part of the same document collection that you did in response to the discovery requests we made in this case?

A.   That's correct.

Q.   Okay.   And if you look at the email below from Account@SeekingAlpha to you and then it's forwarded on by you the same day to a, an email address premadoc@aol.com?

A.   Yes.

Q.   Who's -- who has the email address premadoc@aol.com?

A.   My wife.   My wife's name is Premaladha. Premadoc, she's a doctor.

Q.   Okay.   Do you recall any particular reason why you would have forwarded this email along to your wife on that day?

A.   Yeah.   I -- I saw this is about heart

inflammation and I'm a heart patient, so at that time, everybody was worried about what the effects is.  So I thought maybe it's relevant, but she's up through -- up on these kind of things.  She's an internal medicine/endocrinologist, so she knows.  But I just forwarded it to her for thinking it's new news, but she knew already, so ...

Q.   Right.  Was there anything that specifically related to Novavax in this email that was part of the decision to forward it to your wife?

A.   No.  Just for the general information on our vaccine, so I just sent it to her.

Q.   Okay.  Do you recall in response to this information on -- on August 20, in this August 26th, 2021 email making any trading decision with respect to Novavax?

A.   No, I don't recall anything, sir.

Q.   Okay.

MR. BROWN:  the next thing I want to do is the trading records, and I think it might be

easier, actually, if I just send his all in one email.  Let's mark them all in a row and then we can go through them because there's going to be a little bit of going back and forth among them.  So if we can just have them ALL together.

MR. CALANDRA:  Okay.

MR. BROWN:  Eileen, if we just do -- just do Mr. -- Mr. Kumar's set, just his, not his son's, all -- all in one email, so that's May through October, Tabs 10 through 15.

(Whereupon, Nandkumar Deposition Exhibit No. 10, Documents Bates Numbered NOVAVAX_NANDKUMAR_00000142 through NOVAVAX_NANDKUMAR_00000197, marked for identification.)

(Whereupon, Nandkumar Deposition Exhibit No. 11, Documents Bates Numbered NOVAVAX_NANDKUMAR_00000142 through NOVAVAX_NANDKUMAR_00000197, marked for identification.)

(Whereupon, Nandkumar Deposition Exhibit

Page 99

No. 12, Documents Bates Numbered

NOVAVAX_NANDKUMAR_00000081 through

NOVAVAX_NANDKUMAR_00000141, marked for

identification.)

(Whereupon, Nandkumar Deposition Exhibit

No. 13, Documents Bates Numbered

NOVAVAX_NANDKUMAR_00000008 through

NOVAVAX_NANDKUMAR_00000037, marked for

identification.)

(Whereupon, Nandkumar Deposition Exhibit

No. 14, Documents Bates Numbered

NOVAVAX_NANDKUMAR_00000228 through

NOVAVAX_NANDKUMAR_00000272, marked for

identification.)

(Whereupon, Nandkumar Deposition Exhibit

No. 15, Documents Bates Numbered

NOVAVAX_NANDKUMAR_00000038 through

NOVAVAX_NANDKUMAR_00000080, marked for

identification.)

MR. BROWN:  And I'm going to keep on my

numbering.

Page 100

THE WITNESS:  It might be a big file coming back here.

MR. BROWN:  Yes.  These are your --

THE WITNESS:  Ameritrade.

MR. BROWN:  -- what appear to be I will -- I will -- what appear to be to us your Ameritrade account statements for the months May, June, July, August, September and October of 2021.

THE WITNESS:  Okay.

MR. BROWN:  That's what you're -- that's what you're waiting for.

THE WITNESS:  Yes.

(Brief pause.)

MR. BROWN:  And we'll go ahead and exhibit -- designate these as Exhibits 10, 11, 12, 13, 14, and 15 which hopefully match up with the tab number on the files.

THE WITNESS:  I haven't gotten it yet, so ...

BY MR. BROWN:

Q.   Okay.  Let me know when it comes through.

Page 101

I just got it myself.

A.   Sure.

Q.   All told, it's about a 10 megabyte file, so it may take just a couple of seconds to get through.

A.   Yeah.  Okay.  Got it.

Q.   Okay.

MR. BROWN:  Brian, let me know when you have got it.

MR. CALANDRA:  (Nodding head yes.)

MR. BROWN:  You got it?

THE WITNESS:  Yeah, I've got it.

MR. CALANDRA:  My nodding was agreeing that I will let you know.

MR. BROWN:  Okay.

MR. CALANDRA:  I have not received it yet.

MR. BROWN:  Okay.

MR. PORTNOY:  I haven't received the document.

MR. BROWN:  Fair enough.

Page 102

MR. CALANDRA:  I have received it.

MR. BROWN:  Good.

BY MR. BROWN:

Q.    All right.  Are we ready?

A.    Yes.

Q.    Very good.  Thank you.  Okay.  So, sir, I am putting in front of you a series of exhibits which appear to be Ameritrade account statements.

Let me ask you to start with the one that's marked Exhibit 10 and should be in a file that's labeled Tab 10.

A.    Yes.

Q.    Okay.  And this document begins with NOVAVAX_NANDKUMAR_ Bates number 142 and it goes through 197, and take a moment to flip through that if you need to, sir, but my -- my question to you is simply, is it fair to say that this is your TD Ameritrade account statement for the period May 1st through 31st, 2021?

A.    That's correct.

Q.    Okay.  And there are a series of

redactions of information that your counsel have

determined are not relevant to this, so reserving

any objections on that, I just want to direct your

attention to what is page 4 of 54 in the account

statement.

A.   Page -- okay, page 54.

Q.   Page 4 of 54.

A.   Oh, 4 of 54.

Q.   Yeah.  So I think just PDF page --

A.   Yeah.  Okay.

Q.   I think that will make it PDF page 6

because I think there are two that are not labeled.

A.   Yeah, 4 of 54 I have it here.

Q.   Okay.  Great.  Now, do you see at the top

of this page a label, Account Positions?

A.   Yes.

Q.   Okay.  Is it fair to say that the Account

Positions section lists your holdings as of the end

of the statement period; i.e., 5-31-21?

A.   Okay.  Yeah.

Q.   Is that your understanding of what the

Page 104

presentation is?

A.   Yeah.  This -- okay.  5-31, yeah.

Q.   Yes.  So if you look in the middle of that page, --

A.   Yes.

Q.   -- there's a reference, the one unredacted line refers to Novavax, and it has the NVX ticker symbol, and then after that, it shows a quantity 3,000?

A.   Yes.

Q.   So the -- do you understand that to mean that the -- the statement is saying that as of 5-31-2021, you owned 3,000 shares of Novavax stock in this particular account?

A.   That's correct.

MR. CALANDRA:  Object to form.

BY MR. BROWN:

Q.   That's your -- that's your understanding of what it communicates, --

A.   Yes.

Q.   -- that you had 3,000 shares on 5-31?

MR. CALANDRA:  Same objection.

BY MR. BROWN:

Q.  Okay.  Do you have any reason to think that that number is inaccurate?

A.  No, I don't.

Q.  Okay.  And if you would turn on to what is at the bottom labeled page 10 of 54, so I think it would be page 12 in the PDF.

A.  Okay.  10 of 54 I have.

Q.  So there are a number of transactions listed there for the -- for the dates 5-3 through 5-4 in various securities.  If you'd take a look at that list, sir, is it fair to say that none of those is a Novavax trade?

A.  That's correct.  I don't see it.

Q.  Okay.  Is there any reason why the -- a trade in the first line VIR Biotechnology, Inc. would be relevant to your investments in Novavax?

A.  I'm not sure.

Q.  Okay.  The same question for Enphase Energy, Inc. on the next line?

A.   Which page number?

Q.   The next one under the VI -- VIR Biotechnology.

A.   Oh, I see.  No.

Q.   Yeah.

A.   I don't know why.

Q.   Okay.  Would -- would you give the same answer with respect to Carnival Corporation?

A.   Yes.

Q.   And Qualcomm?

A.   Yes.

Q.   What about Vaxart?  Do you know what the business of Vaxart is?

A.   Yeah.  They were in the vaccine-making business also.

Q.   Okay.  Was -- what about below the next line -- below the Qaulcomm, there's a reference to Moderna?

A.   Yes.

Q.   What's the significance of Moderna?

A.   Same, vaccine.  They were primarily first

Page 107

vaccine producer.

Q.    So during the period of May 2021, you were making investment decisions with respect to vaccine manufacturing companies other than Novavax?

A.    Yes.

Q.    Had you developed with respect to vaccine, COVID vaccine manufacturers in that period any investment strategy over the arc of all COVID vaccine manufacturers?

A.    I specifically don't recall anything.  I would just be looking at news items, whether they have potential to sell how many millions in this country, how many millions overseas.  Those are my decision-making points, so ...

Q.    If you would continue flipping through, you'll see that there are a, a number of redacted pages.  Is it fair to say that you make transactions in your -- at this time period, you were making transactions in your TD Ameritrade account on almost a daily basis?

A.    Yes.

Q.   And that you were making those transactions in multiple companies on any given day?

A.   Yes.

Q.   Okay.  If you go to the one that's labeled 19 of -- of 54, there's a reference to a buy transaction of 2,500 shares of Novavax stock, do you see that?

A.   Yes, I do.

Q.   Sitting here today, do you have any recollection of why it was on that particular day you decided to buy 2,500 shares of Novavax stock?

A.   No, I don't remember anything specific like that, so ...

Q.   Okay.  If you turn over to the next page or two more pages, pardon me, --

A.   Okay.

Q.   -- labeled page 21 of 54?

A.   Okay.

Q.   You'll see on that page three different references to Novavax.  All of them indicate a 5-11

Page 109

trade date.  Do you see those, sir?

A.   Yes, I do.

Q.   And in that case, it shows three different transactions; one for 5,000, one for 7,000, and a third for 2,000 shares, all of those sell transactions.  Do you know why it -- it would be that sale transactions in Novavax on a particular day would be broken out into multiple lines on this statement?

A.   I normally don't sell all at one time.  It was a big number, I guess.  I'm not sure exactly, but all 14,000, so I was just trying to see whether the stock was going down, whether --

Q.   Was there a particular reason that you decided on May 11th, 2021 to sell Novavax stock?

A.   No, I don't recall.  I don't remember.

Q.   Okay.  Do you -- do you recall any particular news item or other information that you reviewed with respect to Novavax on -- on or about that day?

A.   No.  It was -- I'm sure it's all based on

certain things going on in the market.  I cannot recall, pinpoint exactly which one it was.

Q.    Okay.  Did -- so the -- the total there, would you agree with me, it shows a total number of shares sold on that day, 14,000 shares?

A.    Yeah.

Q.    Is my math right?

A.    On that page, yeah.

Q.    Yeah.  So if you look previously the day before that, your -- the purchase that's shown is 2,500.  Do you know before May 10th, 2021 how many shares of Nov- -- before your purchase on May 10th -- you -- you would agree with me that you -- you owned at least 14 less -- at least 11,500 shares of Novavax prior to May 10th, 2021?

A.    I'm sure I don't -- I would have to see the whole document, but I can see from here; yes.

Q.    Okay.  Do you recall when it was prior to May 10th, 2021 that you would have purchased those shares?

A.    No, I don't remember.

Q.   Okay.  Separate from any particular recall of, you know, what you might have read or heard on May 11th with regard to those sale transactions, is there anything on a -- you know, a particular routine that you would have on a given day of information that you would review commonly in order to make your decisions about trading for that particular day?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I know specifically I never have a routine to sell at anything.  It's always based on market information, what I got, and I make the decision that morning or night before after looking at certain things, and then next day morning I execute or -- based on those decisions.  It's always a news item that's made me do that because I was holding it for longer time.

BY MR. BROWN:

Q.   So just so I'm clear, would you -- would you make a decision based on a particular news item

Page 112

or based on a -- the change in the price?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  Most -- most of the time it's a news -- news item as I recall.  It's never -- I had not set any target or anything because I didn't know it was so volatile, so there was nothing like that.  So -- because at a moment, I'm start at a certain time, and at a moment, I'm down, so both -- so both ways, so ...

BY MR. BROWN:

Q.   So you -- you described Novavax as a volatile stock.  You -- you thought of it as a volatile stock during this time period?

A.   As I was watching, yes, it was a volatile stock based on what news items were coming on, what -- I perfectly remember when Stanley came on, Erck come on, just all kinds of movement in the stock was happening, so that's what I recall.

Q.   You just made a reference to a comment by -- by Mr. Erck.  Are you -- are you recalling

some specific comment or are you just generally speaking of Mr. Erck?

A.   No, nothing specific.  I always remember they would announce, make some CEO is coming, so I would always listen to it, his interview with Meg Tirrell or Cramer or somebody.  So I would listen to it and then see what the experts recommend, and then I would --

Q.   You recall --

A.   -- based on -- based on what Stanley Erck said, I would make the decisions based on that.

Q.   So you recall seeing Mr. Erck appear on Mr. Cramer's program?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I'm -- I'm not hundred percent sure, but I recall on CNBC very often I think I have seen him in the morning with Cramer, but I'm not -- but I don't want to for sure say.

BY MR. BROWN:

Q.   If -- if you wish, you can continue to

flip through the rest of the document.

There -- there are a number of other trades listed on -- that are unredacted, purchases and sales in Novavax stock.

Assuming that -- do you have any reason to think that there's any kind of inaccuracy in the statement that TD Ameritrade provided you regarding the purchases and sales that you made in Novavax stock in May of 2021?

A.   No, I don't think so.  I think they're pretty accurate.

Q.   Okay.  So assuming that all of the sales and purchases that you made in Novavax' stock in this account are unredacted in this form of the document, if I wanted to know what your trading history was on that particular month, would you tell me, Just take a look at that statement, I can trust it?

A.   That's correct.

Q.   Okay.  Let me ask you to take a look then at the June statement.  That's Tab 11, and it's

Page 115

also hopefully Exhibit 11.

A.    Tab 11, okay.

Q.    Yeah.  This is a document that begins with NOVAVAX_NANDKUMAR_ Bates number 81 and runs through 141.

Sir, do you recognize this as your TD Ameritrade account for the month of June of 2021?

A.    That's correct.

Q.    And would you say the same as you did with respect to May?  That is, that if I wanted to know what your buy and sell transaction history was for that particular month -- month in Novavax stock, this is the document you would direct me to?

A.    Yes.

Q.    You don't have any reason to dispute the accuracy of this statement that TD Ameritrade provided to you?

A.    No, I don't.

Q.    Okay.  If you will take a look starting at the page labeled page 2 of 59.  At the very beginning, it's the --

A.    Okay.

Q.    -- the Account Positions list, right?

A.    Okay.

Q.    So there are a number of positions in presumably other stocks that are redacted, and if you would flip through, sir, that page and the one that's labeled page 3, 4, 5, 6, and 7, all of those under the label Account Positions, I just want to know, would -- would you agree with me that nowhere on those pages is there any listing showing a holding of Novavax stock?

A.    That's correct.  I don't -- I don't see it here.

Q.    Okay.  Would it be fair to say then that, you know, as of the close of the market on 6-30-2021, that your holding of Novavax stock in this account was zero shares?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I don't see it on this page, so I assume it's correct.

BY MR. BROWN:

Q.   Okay.  We can move on to --

A.   And it's -- on Bates page 12 of 59, I see one of them here.  I just noticed it.  It's a settle date of 6-2; sold on 5-28.

Q.   Yeah.  But that was a sale, right?

A.   That's correct.

Q.   Okay.  So my question with respect to the -- do you understand the positions -- is it your understanding that the account positions are listed as of the end of the particular month for which the statement is provided, --

A.   That's correct.

Q.   -- right?  So without doing the math of every transaction in here, if I were to go through, take your starting number, add in the purchases, subtract out the sales, I would likely get to zero shares for that particular -- the end of that particular month?

MR. CALANDRA:   Objection to form, but go ahead.

Page 118

THE WITNESS:  That's correct.

BY MR. BROWN:

Q.  Okay.  And just to be clear so that the record is clear about the way the statement appears to work, if you would turn to page 58 of 59, so I think that would be 60 in the PDF.

A.  58, yeah, I see it.

Q.  Okay.  Do you see the -- the label at the top, Trades Pending Settlement?

A.  Yes.

Q.  What's your understanding of what it means for a trade to be pending settlement?

A.  That's in my -- my decision that I sold it on 6-30, but until 7-2, that's when I -- those funds would be available in the account.

Q.  So just with reference to that, you're referring to the -- to the transaction at the very bottom of page 58?

A.  Yes.

Q.  Is that -- that's labeled a buy transaction; isn't it, sir?

A.    That's a buy transaction; correct.

Q.    Okay.  So would it be fair for me to read this that -- to say that on -- on June 30th, you had placed an order to purchase a thousand shares, but those shares wouldn't actually show up in your account until 7-2-21, which is under the label Settle Date?

A.    Yes.

Q.    Is that a fair reading?  Okay.

So to the extent that the section we were looking at before, the position statement indicated zero shares held, would you understand that to mean that it wasn't including shares that had not yet settled?

A.    That's correct.

MR. CALANDRA:  Objection.

BY MR. BROWN:

Q.    Okay.  Thank you.  We can move on to 12. That's the July statement.

A.    Twelve?

Q.    Yes.  This is NOVAVAX_NANDKUMAR_198

through 227.  Sir, are you there?

A.   Yes.  Go ahead.

Q.   Do you recognize --

A.   I was getting it open.

Q.   Okay.  Let me wait for you to get it open.

A.   Yeah, it's open now.

Q.   You recognize this as the TD Ameritrade account statement for you for the month of July of 2021?

A.   Yes.

Q.   And as with the prior statements, do you have any reason to dispute the -- the accuracy of the information reported on your statement?

A.   No, I don't.

Q.   And if I were to ask you to -- to tell me about your trading history of Novavax stock in July of 2021, is this the statement you would direct me to?

A.   That's correct.

Q.   Okay.  And if you flip to page 5 of

Page 121

2028 --

MR. CALANDRA:  Objection.  Only that it's 5 of 28, not 2028.

MR. BROWN:  Sorry.  Sorry.  Good catch. Well -- well taken.  Let me restate that.

BY MR. BROWN:

Q.   Let me direct you to 5 of 28.  Do you see there's a label Novavax, Inc. holding 5,000 shares? Do you see that?

A.   Yes.

Q.   So is it your understanding that that is communicating that as of 7-31-21, you owned 5,000 shares of Novavax?

A.   That's correct.

Q.   If you flip on to page 8 of 28, --

A.   Okay.

Q.   -- there's a reference to a buy transaction at a thousand shares on 7-21-21, do you see that, sir?

A.   Yes.

Q.   Do you recall why it is that on 7-21-21

you decided to buy a thousand shares of Novavax'
stock?

A.    I do not recall the specific reason, no.

Q.    Okay.  The account type is labeled
Margin.  Do you have an understanding of what that
means?

A.    Yes.

Q.    What does it mean?

A.    I'm borrowing from my funds from my
Ameritrade based on my portfolio value depending on
how much they loan on each of them.

Q.    Do you make all of your purchases
on -- so if I -- if I describe trades like that as
being made on margin, do you understand what I
mean?

A.    Yes.

Q.    Okay.  Do you make all of the trades in
your TD Ameritrade account on margin?

A.    It depends on the time.  Sometimes I
don't have any margins; sometimes I do.

Q.    Okay.  In the time period between May and

Page 123

October of 2021, were you trading primarily on margin?

MR. CALANDRA:  Objection to form, but go ahead, Mr. Kumar.

THE WITNESS:  I don't remember at this time.  I have to see the statement.

BY MR. BROWN:

Q.   Okay.  If I wanted to know the form of the transaction, I could rely -- you believe I could rely on the way that TD Ameritrade presented it?

A.   That's correct.

Q.   Okay.  All right.  Let's move on to No. 13.  That's Tab 13, also Exhibit 13.

A.   Okay.

Q.   Here we have your, what appears to be your August statement, August 2021 TD Ameritrade statement?

A.   Yes.

Q.   Is that your understanding of what this document is?

A.   Yes.

Q.   Okay.  And that's with the others, you have no reason to dispute the accuracy of the information on this document?

A.   That's correct.

Q.   And if I wanted to -- to know the history of your trading of Novavax stock in August of 2021, is this the document you would direct me to?

A.   That's correct.

Q.   Okay.

MR. BROWN:  Oh, and just for the record, this has Bates number NOVAVAX_NANDKUMAR_8 through 37.

BY MR. BROWN:

Q.   And if you would turn, sir, to page 4 of 28.

A.   Okay.

Q.   Just your holdings.  And it shows on this line here, 15,000 shares next to Novavax.  So is it fair to say that as of August 31st, 2021, you held 15,000 shares of Novavax?

Page 125

A.    That's correct.

Q.    Okay.

MR. CALANDRA:  Objection to form retroactively.  Apologies.

BY MR. BROWN:

Q.    If I could ask you to turn to -- let me find where I changed my tab here.  Okay.  Page 20 of 28, and just for your reference, this is going to show transactions with trade dates 8-24-21.  So just let me know when you're there.

A.    20 of 28, okay.  I've got it.

Q.    Okay.  So, if you look on 20, page 20 of 28, you see two different trades, both buy trades on 8-24, one for 2 and one for 3,000 shares.  Do you have any understanding or any recollection now of why it would have been on August 24th, 2021 you bought a total of 5,000 shares of Novavax?

A.    No, I don't remember.

MR. CALANDRA:  Objection to form.  You can answer.

THE WITNESS:  I don't remember, I'm

Page 126

sorry.

BY MR. BROWN:

Q.   Okay.  If you look at the next page, you see a transaction labeled -- labeled 8-25.  That's a sale, do you see that?

A.   Yeah.

Q.   And would you agree with me that that line represents or purports to report a sale of 5,000 shares?

A.   Yes.

Q.   So on August 25th, you made sale transactions to the same number of shares that you had purchased the day before?

A.   Yeah, it looks like that.

Q.   Okay.  Is there any reason sitting here now why you would say that you had bought 5,000 shares one day, the 24th, and then sold them the next, on the 25th?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  Maybe I heard something.

That was -- that would be the reason.

BY MR. BROWN:

Q.   Okay.  Well, if you -- if you look at the -- if you look at the price of the sale transaction, you see that as $242.58?

A.   Right.

Q.   Would you agree with me that that's higher than the two purchase prices listed at 240.60 and 232.69?

A.   Right.

Q.   Is it possible that your decision to make the sale of the same number of shares you just bought the day before was based on the upward movement in the price?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I'm -- I'm not sure.  It's the -- I'm not -- always I was concerned about margin, and so I would make decisions based on what news I was receiving, whether next minute it might go down, all of the way down.  I didn't know what

Page 128

it was going to do, so I just don't remember the exact reason why I did what I did.

BY MR. BROWN:

Q.    Yeah.    When you say that you -- you said at the beginning of your answer, last answer you were concerned about margin.    What do you mean by concerned about margin?

A.    No.    I -- I -- I wanted to make sure I have enough flexibility to pay back margin if there is an issue, so that's what I was -- I was referring to.

Q.    Okay.    If you turn on a few more pages to 23 of 28, --

A.    Okay.

Q.    -- do you see a reference to a trade date 8-26-21, there are three transactions all together?

A.    Yes.

Q.    And they're all purchase transactions. Just to -- to do the math, I -- I get that 3,600 plus 1,348 plus 52 --

A.    Yes.

Page 129

Q.   -- is equaling 5,000, would you agree with that?

A.   Yes.

Q.   So on August 26, 2021, you purchased a total of 5,000 shares of Novavax?

A.   Yes.

Q.   Okay.  Any information that you recall sitting here today as to why you would have decided on that day to make a purchase of 5,000 total shares of Novavax?

A.   No, I really don't recall what the reason.

Q.   Okay.  So I'll represent to you that August 26th, 2021 was a Thursday.

A.   Okay.

Q.   And if you move along a little further in the statement, pages 26 and 27 --

A.   Okay.

Q.   -- of 28 --

A.   Okay.

Q.   -- you'll see a listing of sale

Page 130

transactions, you know, of one, two -- turning over to the next page -- three, four, five sale and one buy transactions of Novavax.  Just let me know when you're there.

A.    Yeah, I'm here.

Q.    Okay.  So the trade date on these is listed as 8-30-21.  I'll represent to you that day was a Monday.

A.    Okay.

Q.    The last trade we looked at was a Thursday.  This is the next Monday.  Doing the -- the sale math, if you add the 24, 100, 100, 100, and 4,676, would you agree with me that gets you to 5,000 shares?

A.    Yes.

Q.    Okay.  Do you have an idea of why it would have been that the next Monday after the Thursday purchase of 5,000 shares you would have then sold 5,000 shares?

MR. CALANDRA:  Objection to form, but go ahead.

Page 131

THE WITNESS:  You mean buy?

BY MR. BROWN:

Q.   No.  I'm talking about the -- I'm talking about the sale transaction that's --

A.   Again on 8-30 and then --

Q.   Yeah.  Settle date 9-01, yeah.

A.   Why I sell?  I don't recall at this time the real reason, so ...

Q.   Okay.  And then the -- the final line there shows a, the day after that trade date 8-31, settlement date 9-2, a purchase back?

MR. CALANDRA:  Objection to form, by the way, but go ahead.  Sorry, Mr. Kumar.

BY MR. BROWN:

Q.   Any understanding --

A.   The same reason.  I don't remember the reasons at this time, so ...

Q.   Okay.  Would you think it would be a fair description for someone to say that buying 5,000 shares on a Thursday, selling 5,000 on a Monday and then buying 5,000 back on a Tuesday was a pattern

Page 132

that looked like day trading?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  It could be, but I -- I was not day trading.  I'm not here all the time in front of it, so whenever I received the news, it was always based on some kind of alert of news that I would get on my phone I would make decisions, but I'm not doing every minute of that thing.  You can see the timing, so ...

BY MR. BROWN:

Q.   Yeah.  But you -- you don't have any specific recollection of what the information was around those dates at the end of August that was leading to those particular transactions?

A.   No.  No, really, I don't, so ...

Q.   Okay.  You can turn on then to Exhibit 14.

A.   Okay.

Q.   So Tab 14, again, this is Nandkumar -- NOVAVAX_NANDKUMAR_228 through 271.

A.   Okay.

MR. BROWN:  And, Counsel, let me just say, I know we're well past an hour here without -- since the last break.  I'm -- I'm going to ask him to identify his son's statements as well and a few other questions, but I -- I think actually -- I mean, I'm happy, if you're comfortable, just to kind of power through and I think we can be done in a half an hour or so and get everyone out of here as opposed to stopping for lunch.

MR. CALANDRA:  Mr. Kumar, if you're comfortable with that, I'm fine with that, but you shouldn't -- if you're feeling exhausted --

MR. BROWN:  If you want a break or whatever --

MR. CALANDRA:  -- or if you just want to move around, that's fine.

THE WITNESS:  Yeah.  No, a half an hour is good.  I'm just trying to stretch my back. That's what it is.  I'm good.

MR. CALANDRA:  Do we want to take 5 like they -- as they say in the show Barry, a tight 5?

THE WITNESS:  I would rather finish up in 30 minutes because I have another place to go at 1:00, so ...

MR. CALANDRA:  Okay.

MR. BROWN:  We'll keep going.

MR. CALANDRA:  Sounds good.

BY MR. BROWN:

Q.   Okay.  All right.  So, sir, you recognize this as your September 2021 TD Ameritrade account?

A.   Yes.

Q.   And as before, it would be fair to say that you wouldn't disagree with the presentation of your sale transactions, buy and sell transactions in Novavax stock as appearing on this statement?

A.   That's correct.

Q.   And if I asked you where -- where would I go to learn what your trading history in Novavax was in the month of September 2021, is this the document you would direct me to?

Page 135

A.    That's correct.

Q.    Okay.  And if you go to the page labeled 5 of 43 under Account Positions, --

A.    Okay.

Q.    -- you see a listing of Novavax 15,000. Do you understand that to mean that as of September 30th, 2021, you held 15,000 shares of Novavax?

MR. CALANDRA:  Objection to form, but go ahead.

BY MR. BROWN:

Q.    That's your understanding?

A.    Yes.

Q.    Okay.  If you would turn over to -- these are the trades we've already looked at.  Let me orient myself here.  Here we go.

Page 11 of 43, there's a series of trades listed with the date 9-3-2021?

A.    Yeah.

Q.    And I'll just represent to you, sir, that September 3rd, 2021 was a Friday.

A.    Okay.

Q.    That was a Friday of the Labor Day weekend --

A.    Okay.

Q.    -- of that particular year.  And your -- the -- the sum, would you agree, of those four transactions indicates a total purchase order on 9-3-2021 of 5,000 shares?

A.    Yes, I do.

Q.    Okay.  And -- and if you turn over, you see a whole bunch of other purchases that are listed for 9-3?

A.    Yes.

Q.    With smaller numbers.  I -- I won't -- you can dispute it if you'd like, but we've added -- we've added all of those up, the ones on page 11 of 43 and 12 carrying over on to 13 --

A.    Yes.

Q.    -- of 43 and we get 7,500.

A.    Yes.

Q.    But first off, do you have an

understanding of -- of why it would be that you would have one, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22 separate, separately broken out buy orders for just that one day?

A.   I buy in bulk.  I never buy in small quantities like that.

Q.   Right.

A.   So I don't know how it happened, that they -- it is buying the stock from me, that's what is going on.

Q.   Right.  So it's fair to say that you -- you would place a bulk order, but from time to time, the -- the -- what's -- what's available, the blocks that are available might not match up and, therefore, you'll be paired up with the closest pricing available at that time?

A.   That's correct.

Q.   Okay.

MR. CALANDRA:  Objection to form retroactively, but go ahead.

Page 138

MR. BROWN:  Yeah.

BY MR. BROWN:

Q.   So even if I see this many lines, this -- your recollection is that you placed a single order to buy and then TD would have executed that trade --

A.   That's correct.

Q.   -- based on the blocks that were available?

A.   Yes, that's correct.

Q.   And if you -- if you look on, following on that page, 13 of 43, there's under the label 9-7, I'll represent to you that's the Tuesday, the next business day, because Monday was Labor Day, so that's Tuesday, there's a series of sell transactions that are on page 13 of 43 and then a couple more on page 15 of 43.

A.   Yeah.

Q.   So we've added those up, and those -- those add up to 7,500 shares total.

First off, with respect to the separate

lines, is -- is the -- is the sell issue the same as the buy issue?  You would place a single order and then TD would break it out based on the blocks --

A.   That's correct.

Q.   -- of trading available?  Okay.  So do you have any recollection sitting here why it would be that on Friday, September 3rd, 2021, you would place a purchase order for 7,500 shares and then the next business day, Tuesday, September 7th, would place an order to sell the same number of shares?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I'm not sure.  I don't remember at this time.

BY MR. BROWN:

Q.   Okay.  Would it -- would the -- would the movement of the price of the stock have had anything to do with your decision to make the purchase decision on the Friday and then the sale

decision on Tuesday?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  No.  I didn't know where to go, what to do, so I have no -- I don't remember at this time what it is, why I did it.

BY MR. BROWN:

Q.   But at -- at the time that you would have made the trade orders, one of the things that you would have looked at is the -- is the price at which the transaction would occur; is that fair to say?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I don't think so.  Most of the time I bought it based on market information.  It was such a volatile time.  Constantly there was news coming out on these stocks, so I was reactive to these stocks's information here, so ...

BY MR. BROWN:

Q.   So if you could describe for me what, if

any, the relationship between what you described as the volatility of the stock had on your decisions about whether to buy or sell at a particular price?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  Yeah, the -- the volatility is based on what news items were coming out in the market, and then they were -- it was quite volatile, and so I -- I didn't know how -- how low it would go or how high it would go, so I was not looking at it.  I was trying to see if the product comes out, it would be a good thing, so I was reacting to that.

BY MR. BROWN:

Q.    If you would turn over to Tab 15, please.

A.    Okay.

Q.    This is the October statement.

A.    October, okay.  Tab 15, okay.

Q.    So this is -- Exhibit 15, NOVAVAX_NANDKUMAR_ Bates number 38 through 80. And, sir, do you recognize this as your TD

Page 142

Ameritrade account statement for the month of October 2021?

A.    Yes.

Q.    And as with the others, you have no reason to dispute the accuracy of the information TD provided to you on this statement?

A.    That's correct.

Q.    And if I wanted to look at your trading history for that particular month, this is the document you would direct me to?

A.    That's correct.

Q.    Okay.  If I can ask you to take a look at page 6 of 41.

A.    Okay.  All right.

Q.    This is under the label Account Positions, and it shows 19,000 shares.  Is it fair to say that's indicating that as of close of October 31st, 2021, you held 19,000 shares of Novavax stock in this particular account?

A.    That's correct.

MR. CALANDRA:  Objection to form, but go

ahead.

THE WITNESS:  That's correct.

BY MR. BROWN:

Q.    That's how you would read it?

A.    Yes.

Q.    Okay.  If I can just point your attention back briefly to the document we just looked at, Exhibit 14.  On page 5 of 43 of that document, --

A.    Okay.

Q.    -- you'll see there's a reference to the same part of the statement, but as of 9-30-2021, you held 15,000 shares of Novavax?

A.    Yes.

MR. CALANDRA:  Objection to form.

BY MR. BROWN:

Q.    Is that how you would read that?

MR. CALANDRA:  Same objection.

THE WITNESS:  Yes.

BY MR. BROWN:

Q.    Okay.  So would it be fair to say that

Page 144

from September 30th, 2021 until October 31st, 2021, the net of any trading you may have done in Novavax would be to increase by 4,000 shares, from 15,000 to 19,000?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  Yes, that's what it shows.

BY MR. BROWN:

Q.   Okay.  You can flip through the document for the October one, No. 15, if you'd like and confirm this for yourself, but I'll represent to you that in the Account Activity section, everything is redacted and we don't see any transactions showing for Novavax stock.

A.   Okay.

Q.   So --

A.   That's correct.

Q.   Okay.  So do you have any recollection of making any transactions of Novavax stock in October of 2021?

A.   I don't remember anything.

Q.    Okay.  Would you agree with me that at some point in October of 2021, it appears that you made a purchase of Novavax stock?

MR. CALANDRA:  Objection to form, but, yes, go ahead Mr. Kumar.

THE WITNESS:  Yeah.  According to the statement, yeah.

BY MR. BROWN:

Q.    Okay.  So but you don't -- you don't know whether that was the net of a series of transactions or one, or just one single purchase transaction; is that fair to say?

A.    Like I said, it's always in big blocks transaction.  I don't know what I did, so ...

Q.    Do you recall any particular news about Novavax that came out in October of 2021 that affected your trading decisions in Novavax stock?

A.    No, I don't recall at this time.  Sorry.

Q.    Okay.  Okay.  You can put that document aside.

MR. BROWN:  Maybe, actually, if we're

Page 146

just going to power through this, I might take a
five-minute bio break, but I think I can get
through pretty quickly after that.  I'll ask Eileen
to go ahead send around the remaining exhibits --

THE WITNESS:  Okay, sure.

MR. BROWN: -- which are your son's
trading statements for the same.

THE WITNESS:  Okay.

MR. BROWN:  So that will be, Eileen, 16
through 21.

So come back at the top of the hour, five
minutes?

THE WITNESS:  Okay.

MR. BROWN:  Thank you.

MR. CALANDRA:  Sounds good.

MR. BROWN:  Agreeable, Counsel?  Okay.

Are we going off the record?  I haven't
heard it.  Ryan?

THE VIDEOGRAPHER:  The time is 11:55
Central.  We are now off the record.

(Recess taken -- 11:55 a.m.)

(Whereupon, Nandkumar Deposition Exhibit No. 16, Documents Bates Numbered NOVAVAX_NANDKUMAR_00000352 through NOVAVAX_NANDKUMAR_00000373, marked for identification.)

(After recess -- 12:03 p.m.)

THE VIDEOGRAPHER:  This is the beginning of media unit number three in the video-recorded deposition of Mr. Nandkumar.  The time is 12:03 Central.  We're back on the record.  Thank you. You may proceed.

MR. BROWN:  Thank you.

BY MR. BROWN:

Q.  So, Mr. Kumar, just turning now to what we're going to mark as Exhibit 16.  It should have the label Tab 16 in the folder that you got.

A.  Yeah.

Q.  This appears to be your son Shawn's TD Ameritrade statement --

A.  Okay.

Q.  -- for the period -- period May 1st

Page 148

through 31st, 2021.

A.    Yes.

MR. BROWN:  For the record, it has Bates number NOVAVAX_NANDKUMAR_352 through 373.

BY MR. BROWN:

Q.    First off, how -- did you personally provide this statement to your counsel or did your son do it?

A.    I'm not sure.  One of us did. Maybe -- some of them I did I know for sure.

Q.    Okay.  Do you -- do you separately receive copies of his trading statements apart from whatever TD provides to him?

A.    No, I don't.

Q.    Okay.  And with respect to your son's trading and positions in the month of March 2021, do you have any reason to dispute the accuracy of the TD Ameritrade statement that was provided?

A.    No.

Q.    And if I wanted to look at his TD Ameritrade trading in Novavax stock for that month,

is this the document you would direct me to?

A.    That's correct.

Q.    Do you know if your son in the month of -- in that month made any buy or sale transactions that he didn't discuss with you?

A.    No.  He -- he always made based on what I tell -- told him.

Q.    Okay.  So it would be fair to say that if he made a particular transaction, it's fair of me to assume that he would have had some conversation with you about that transaction?

A.    That's correct.

Q.    Okay.  Let's move on then to the June statement.  This is Tab 17.

MR. BROWN:  We'll mark it as Exhibit 17.

THE WITNESS:  Okay.

MR. BROWN:  It's NOVAVAX_NANDKUMAR_321 through 339.

(Whereupon, Nandkumar Deposition Exhibit No. 17, Documents Bates Numbered NOVAVAX_NANDKUMAR_00000321 through

Page 150

NOVAVAX_NANDKUMAR_00000339, marked for identification.)

THE WITNESS:  Okay.

BY MR. BROWN:

Q.    And, sir, here again, do you understand this to be the June TD Ameritrade statement for your son Shawn's account?

A.    Yes.

Q.    Okay.  And do you have any reason to dispute the accuracy of the information in this document?

A.    No, I don't dispute.

Q.    And if I wanted to know the transactions that your son executed in Novavax stock in June of 2021, is this the document you would direct me to?

A.    Yes.

Q.    Do you know if your son makes transactions or has made transactions in Novavax stock in any account other than this TD Ameritrade account?

A.    No.  This is the only one he has got.  He

has got Morgan Stanley, but he doesn't trade from there.

Q.   Okay.  And if you would then put this aside and go to Tab 18, which we'll mark as Exhibit 18,

(Whereupon, Nandkumar Deposition Exhibit No. 18, Documents Bates Numbered NOVAVAX_NANDKUMAR_00000273 through NOVAVAX_NANDKUMAR_00000284, marked for identification.)

THE WITNESS:  Okay.

MR. BROWN:  This is NOVAVAX_NANDKUMAR_273 through 284.

THE WITNESS:  Okay.

BY MR. BROWN:

Q.   If you look at the statement, sir, do you understand this to be the July 2021 statement for your son Shawn's TD Ameritrade account?

A.   Yes.

Q.   Do you have any reason to dispute the accuracy of the information in this document?

A.    No, I don't.

Q.    And if I wanted to see your son's transaction history in Novavax stock for the month of July 2021, is this the document you would direct me to?

A.    That's correct.

Q.    Okay.  Thank you.  You can move on to 19, which is the -- should be the August statement labeled Tab 19.

A.    Okay.

(Whereupon, Nandkumar Deposition Exhibit No. 19, Documents Bates Numbered NOVAVAX_NANDKUMAR_00000303 through NOVAVAX_NANDKUMAR_00000320, marked for identification.)

MR. BROWN:  For the record, NOVAVAX_NANDKUMAR_303 through 320.

THE WITNESS:  Yes.

BY MR. BROWN:

Q.    Again, do you understand this to be the August 2021 TD Ameritrade statement for your son

Shawn?

A.   Yes.

Q.   And if I wanted -- do you have any reason to dispute the accuracy of the information in this document?

A.   No, I don't.

Q.   Okay.  And if I wanted to know your son's trading history in Novavax stock in the month of August 2021, is this the document you would direct me to?

A.   Yes.

Q.   You can put that one aside and move on to 20.

(Whereupon, Nandkumar Deposition Exhibit No. 20, Documents Bates Numbered NOVAVAX_NANDKUMAR_00000285 through NOVAVAX_NANDKUMAR_00000302, marked for identification.)

MR. BROWN:  We'll label this one as Exhibit 20, NOVAVAX_NANDKUMAR_285 through 302.

BY MR. BROWN:

Q.    Are you with me?  Sir, is it fair to read this document as being the September 2021 TD Ameritrade statement for your son Shawn's account?

A.    Yes.

Q.    Okay.  Do you have any reason to dispute the accuracy of the information in this statement?

A.    No, I don't.

Q.    And if I wanted to know your son Shawn's trading history in Novavax stock for the month of September 2021, is this the document you would direct me to?

A.    Yes, sir.

Q.    Okay.  Last one.

A.    Okay.

Q.    No. 21.

(Whereupon, Nandkumar Deposition Exhibit No. 21, Documents Bates Numbered NOVAVAX_NANDKUMAR_00000340 through NOVAVAX_NANDKUMAR_00000351, marked for identification.)

BY MR. BROWN:

Page 155

Q.    Also Exhibit 21.  I'll have to say I'm very proud of myself.  I've never had so many exhibits and tab numbers match up.  It might not be a world record, but it's a personal record.

A.    Good.

Q.    After 20 years of lawyering and finally.

So, sir, this is document Bates stamped NOVAVAX_NANDKUMAR_340 through 351.  If you would take a look at that.

Do you believe this to be your son Shawn's TD Ameritrade statement for the month of October 2021?

A.    Yes.

Q.    Okay.  Do you have any reason to dispute the accuracy of the information in this document?

A.    No.

Q.    Okay.  If I wanted to know your son Shawn's trading history in Novavax stock for the month of October 2021, is this document a document you would direct me to?

A.    Yes.

Q.    Is there any other document you would direct me to besides this one?

A.    No.

Q.    Okay.  With respect to your account from the period of May through October of 2021, the period that we looked at all of the statements for, do you sitting here today know whether or not at some point during that time frame, during those months your account would have had a balance of zero shares of Novavax stock?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I'd have to check.  I'm not sure.

BY MR. BROWN:

Q.    Is it -- do you think it's possible?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I -- it's possible, but I don't -- I don't think so.  I think it was there every month maybe.  I'm not sure.

BY MR. BROWN:

Q.   Okay.   But it's possible that at some point over the course of one of those months, you might have sold down to zero and then soon after bought back so that you, again, became a holder?

A.   It's possible.

MR. CALANDRA:   Objection to form, but go ahead.

THE WITNESS:   It's possible.

BY MR. BROWN:

Q.   Is it -- would -- would you have the same answers with respect to your son Shawn's account?

MR. CALANDRA:   Objection to form, but go ahead.

THE WITNESS:   Yes, it is possible.

BY MR. BROWN:

Q.   What's your understanding of the present, you know, as of today, status of the approvals for the Novavax COVID vaccine in the United States?

A.   Currently, I lost interest in the -- in the company, but I know it still is very down

there.  I never had seen the stock at that low level of 6 or -- and -- and I don't pay attention, but right now, they got some approvals in some countries, but the -- the value is very, very low. That's what I hear.

Q.   Do you know any particular countries in which you understand that the vaccine has been approved in some way?

A.   Maybe Thailand, Indonesia, something like that, so ...

Q.   Do you know if there's been any kind of approval in the United States specifically?

A.   Yeah.  I think there was some kind of a partial approval or some special approval.  I don't know.  I don't recall exactly because I'm not following that stock any more.

Q.   When did you stop following the stock?

A.   After I sold all the shares, I didn't have any more interest anymore.

Q.   When -- when was it that you remember selling all of the shares and losing interest?

A.   I -- I don't recall at this time, but my statement will show it, so ...

Q.   Okay.  Would it have been after October of 2021?

A.   I don't recall.  Possibly.  I'm not sure.

Q.   Do you have an understanding yourself of what you think the amount of -- or first off, do you -- do you believe that you were caused any damage by the alleged false or misleading statements that are set out in the Complaint that was filed on your behalf?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  Yes.  Yes, for sure, because so many times I -- I bought stock based on exactly what I heard and on the news item I read something, and then that's why this Complaint was correct to lodge, so ...

BY MR. BROWN:

Q.   Do you have an understanding of the approximate amount that you think you were damaged

Page 160

by the alleged false or misleading statements?
Just to be clear, I'm talking about you personally
in your trading, not the class.

A.   Yeah, I think it's -- it's more than
close to a million dollars I'm sure.

Q.   Okay.  More than a million dollars?

A.   Yeah, I think so.  I'm -- I'll
have -- I'll have to check.  I can get the number
from Ameritrade and look at it, so ...

Q.   More than $2 million?

A.   No.  It should be less than 2.

Q.   What about your son, do you have an idea
of what amount you believe he was damaged by
trading Novavax stock due to the alleged false or
misleading statements set out in the Complaint?

A.   Maybe in the hundred to $200,000 range.
I don't recall exactly at this time.

Q.   Less than your -- than your damage?

A.   Oh, yes.  Yes.

Q.   Okay.  Do you have an idea of what the
approximate market capitalization of Novavax is

Page 161

right now?

A.   Currently?

Q.   Yes, sir.

A.   I have not checked on it recently, no.

Q.   Do you know who the current CEO of Novavax is?

A.   I don't remember the name, but I know Stanley Erck is no longer there.  That I know.

Q.   Do you know, aside from its COVID vaccine, what other products Novavax was working on in the period of May through October of 2021?

A.   No, I don't.

Q.   Do you know prior to its entry into the COVID vaccine area what products Novavax was working on?

A.   I don't know anything.  I didn't even hear about the name until then.

Q.   And do you have any understanding of any products presently in the market that Novavax has other than its COVID vaccine?

A.   No, I don't know anything.

MR. BROWN:  I have no further questions at this time.

THE WITNESS:  Thank you, Counsel.

MR. BROWN:  I assume -- I assume Mr. Calandra doesn't either, but I'll let him answer.

MR. CALANDRA:  I might, so I'd love five minutes of my own to just regroup and then be back at 1:22?

MR. BROWN:  Okay.  That's fine.

MR. CALANDRA:  Thanks.

THE VIDEOGRAPHER:  The time is 12:17 p.m. Central.  We are now off the record.

(Recess taken -- 12:17 p.m.)

(After recess -- 12:22 p.m.)

THE VIDEOGRAPHER:  The time is 12:22 p.m. Central.  We are now back on the record.

Counsel, you may proceed.

MR. CALANDRA:  Thank you.

EXAMINATION

BY MR. CALANDRA:

Page 163

Q.   Mr. Kumar, could you bring back up Plaintiff's Exhibit 1?  That would be the first exhibit we saw today, and the file name is Tab 1, Docket 26-2.

A.   Yeah, I got it.

MR. BROWN:  Just to be clear, I think that was Defendant's Exhibit, not Plaintiff's, but if you guys want to adopt it, I'm happy to have you sign on.

MR. CALANDRA:  Thank you.

MR. BROWN:  Yeah.

MR. CALANDRA:  Well noted.

MR. BROWN:  Yeah.

MR. CALANDRA:  Defendant's Exhibit 1. You know, I left my -- the defense side a few years ago, but the -- the roots run very deep.

MR. BROWN:  Yeah, well --

THE WITNESS:  This is 26-2?

BY MR. CALANDRA:

Q.   Yes, that's correct.  It's Defend -- I almost did it again.  It's Defendant's Exhibit 1.

Page 164

A.    Okay.  Got it.

Q.    And then if you -- on the front page of that document, do you see at the top it says Case 8:21-cv-02910TDC and then slightly more to the right it says it was filed with a date following?

A.    Yes.

Q.    What date is that?

A.    TDC 20 --

Q.    At the very top in blue?

A.    1-11-22.

Q.    Right.  January 11th, 2022?

A.    Right.

Q.    And how long ago was that?

A.    About a year and a half ago, 18 months.

Q.    Okay.  So if you would then go to page 8, and that's -- as Mr. Brown said earlier, it's the 8 at the bottom of the page, not 8 of the PDF.

A.    Okay.  8 at the bottom, okay.  Got it. Go ahead.

Q.    And at the bottom of that page, it says, Kumar and Gabbert have further demonstrated their

adequacy by submitting a joint Declaration attesting to, inter alia, their discussions with one another.  Did I read that correctly?

A.    Yes.

Q.    Do you remember a teleconference about the time that this was filed in early January 2022?

A.    Yeah.  Now I -- I remember he's the Plaintiff.  I got confused with the name of a Novavax employee.  Yeah, I remember Gabbert.  In the beginning, we discussed that; yes.

Q.    Yes.  So there was a teleconference, and you participated and Mr. Gabbert participated?

A.    That's correct.

Q.    And did your counsel participate?

A.    Yes.

Q.    And did Mr. Portnoy participate?

A.    Yes, he did, too.

Q.    And by counsel, I meant members of Pomerantz; is that right?

A.    That's correct, yeah.

Q.    Okay.

Page 166

MR. CALANDRA:  And that's all I have pending recross should Mr. Brown ask questions that I want to respond to.

MR. BROWN:  Just on the same point, sir.

REEXAMINATION

BY MR. BROWN:

Q.    Between the time that I asked you questions about that and the time that Mr. Calandra asked you questions about that, did you review any notes or other materials that refreshed your recollection about a teleconference in approximately January 2022?

A.    I didn't have any notes or anything.  I just recalled this name because he's a Plaintiff also.  I didn't know he was -- I was always thinking when -- he was part of Novavax in my mind.

MR. BROWN:  No more questions.

THE WITNESS:  Okay.

MR. CALANDRA:  And I have nothing further as well.

THE VIDEOGRAPHER:  If there are no

Page 167

further questions pending, we are going to go off the record at 12:26 p.m. Central.

This concludes today's testimony as provided by Mr. Nandkumar.  The total number of media unit numbers used today was three, and they will be retained by Veritext Legal Solutions.

Gentlemen, thank you all very much, ladies.  We are now off the record.

MR. CALANDRA:  We would take the video, the AV, and the transcript.  I don't need a rough.

(Whereupon, the deposition of Nuggehalli Balmukund Nandkumar was concluded at 1:26 p.m., and the reading and signing of the transcript was not waived.)

Page 168

State of Maryland

County of Baltimore, to wit:

I, Michele D. Lambie, a Notary Public of the State of Maryland, County of Baltimore, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 14th day of August 2023.

*Michele D Lambie*

Page 169

BRIAN CALANDRA, ESQUIRE

bcalandra@pomlaw.com

August 15, 2023

RE:  Sothinathan Sinnathurai, Et Al. v. Novavax, Inc., Et Al.

8/1/2023, Nuggehalli Balmukund Nandkumar (#6028131)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at CS-NY@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 170

Sothinathan Sinnathurai, Et Al. v. Novavax, Inc., Et Al.

Nuggehalli Balmukund Nandkumar (#6028131)

**E R R A T A   S H E E T**

**PAGE**_____ **LINE**_____ **CHANGE**_____

_____

**REASON**_____

**PAGE**_____ **LINE**_____ **CHANGE**_____

_____

**REASON**_____

**PAGE**_____ **LINE**_____ **CHANGE**_____

_____

**REASON**_____

**PAGE**_____ **LINE**_____ **CHANGE**_____

_____

**REASON**_____

**PAGE**_____ **LINE**_____ **CHANGE**_____

_____

**REASON**_____

**PAGE**_____ **LINE**_____ **CHANGE**_____

_____

**REASON**_____

_____  _____

Nuggehalli Balmukund Nandkumar        Date

**Page 171**

Sothinathan Sinnathurai, Et Al. v. Novavax, Inc., Et Al.

Nuggehalli Balmukund Nandkumar (#6028131)

                    ACKNOWLEDGEMENT OF DEPONENT

    I, Nuggehalli Balmukund Nandkumar, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____    _____

Nuggehalli Balmukund Nandkumar      Date

*If notary is required

                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

                    _____ DAY OF _____, 20___.



                    _____

                    NOTARY PUBLIC

**[& - 162]**                                                                  Page 1

**&**

**&**   4:3,14 5:3
11:5

**0**

**00000008**   7:10
99:7
**0000001**   7:2
89:11
**0000003**   6:18
82:15
**00000037**   7:10
99:8
**00000038**   7:14
99:17
**0000006**   6:20
89:7
**00000080**   7:14
99:18
**00000081**   7:8
99:2
**00000141**   7:8
99:3
**00000142**   7:4,6
98:13,18
**00000197**   7:4,6
98:14,19
**00000228**   7:12
99:12
**00000272**   7:12
99:13
**00000273**   7:20
151:8
**00000284**   7:20
151:9

**00000285**   8:4
153:16
**00000302**   8:5
153:17
**00000303**   8:2
152:13
**00000320**   8:3
152:14
**00000321**   7:18
149:21
**00000339**   7:18
150:1
**00000340**   8:6
154:18
**00000351**   8:7
154:19
**00000352**   7:16
147:3
**00000373**   7:16
147:4
**001**   96:2
**02110-2624**
4:11
**02910tdc**   164:4
**09:50**   46:6
**09:53**   46:10

**1**

**1**   1:15 6:9 46:8
46:18 50:2
54:20,21 55:1
55:16 61:15,16
163:2,3,14,21
**1,348**   128:20
**1-11-22**   164:10

**10**   7:3 63:19
83:2 98:10,12
100:15 101:3
102:10,11
105:7,9
**100**   130:12,12
130:13
**10005**   3:11
**10016**   2:7
**10:25**   65:11
**10:26**   65:19
66:2
**10th**   79:18
80:10 90:15
110:11,13,15
110:19
**11**   7:5 98:17
100:15 114:21
115:1,2 135:16
136:16 137:3
**11,500**   110:15
**11:25**   65:10
**11th**   47:1
109:15 111:3
164:11
**12**   6:3 7:7 99:1
100:15 105:8
117:3 119:18
136:16 137:3
**12:17**   162:12
162:14
**12:22**   162:15
162:16
**12:26**   167:2

**13**   7:9 48:4,11
99:6 100:16
123:14,14,14
136:17 137:3
138:12,16
**1340**   3:18
**14**   7:11 99:11
100:16 110:14
132:18,20
137:3 143:8
**14,000**   109:12
110:5
**140**   3:9
**141**   115:5
**142**   102:14
**147**   7:15
**149**   7:17
**14th**   168:17
**15**   7:13 98:10
99:16 100:16
137:3 138:17
141:15,18,19
144:10 169:3
**15,000**   124:19
124:21 135:5,7
143:13 144:3
**151**   7:19
**152**   8:2
**153**   8:4
**154**   8:6
**16**   7:15 137:3
146:9 147:2,15
147:16
**162**   6:4

**[16532 - 30th]**

**16532**  168:20
**166**  6:4
**17**  7:17 14:17
  137:3 149:14
  149:15,20
**18**  7:19 13:5
  14:17 137:3
  151:4,5,7
  164:14
**1800**  2:13
**19**  8:2 19:20
  93:7 108:6
  137:4 152:7,9
  152:12
**19,000**  142:16
  142:18 144:4
**191**  5:6
**197**  102:15
**198**  119:21
**19801**  3:19
**1983**  18:15
**1987**  92:18
**1992**  19:20
**1998**  18:17
**19th**  81:5
**1:00**  134:5
**1:22**  162:9
**1:26**  167:12
**1b**  49:8 54:20
**1c**  54:12,20
**1d**  59:9
**1st**  9:16 102:18
  147:21

**2**

**2**  6:10 50:5,18
  54:21 55:2,17
  56:2 57:4,5
  115:20 125:14
  160:10,11
**2,000**  109:5
**2,500**  108:7,12
  110:11
**20**  8:4 26:14
  48:5 97:15
  125:7,11,12,12
  137:4 153:13
  153:15,20
  155:6 164:8
  171:15
**200,000**  160:16
**20006**  4:18
**2014**  18:17
**202**  4:19
**2021**  26:14,14
  26:17,21 79:18
  80:10 81:5
  87:21 91:3,9
  93:9,9,17 94:7
  97:16 100:8
  102:19 107:2
  109:15 110:11
  110:15,19
  114:9 115:7
  120:10,18
  123:1,17 124:7
  124:20 125:16
  129:4,14
  134:11,20

135:7,20 139:8
142:2,18 144:1
144:1,20 145:2
145:16 148:1
148:16 150:15
151:17 152:4
152:21 153:9
154:2,10
155:12,19
156:5 159:4
161:11
**2022**  28:5 47:1
  164:11 165:6
  166:12
**2023**  1:15 9:16
  168:17 169:3
**2028**  121:1,3
**2099**  4:17
**21**  8:6 108:18
  137:4 146:10
  154:15,17
  155:1
**21-2910**  1:5
  10:11
**212**  2:8 3:12
**22**  137:4
**227**  120:1
**228**  132:21
**23**  128:13
**232.69**  127:9
**24**  130:12
**240.60**  127:9
**242.58**  127:5
**24th**  125:16
  126:17

**25**  42:21
**25th**  126:11,18
**26**  129:4,17
**26-2**  163:4,18
**26th**  84:20
  87:21 91:3,9
  97:16 129:14
**27**  129:17
**271**  132:21
**273**  151:12
**28**  121:3,7,15
  124:16 125:8
  125:11,13
  128:13 129:19
**284**  151:13
**285**  153:20

**3**

**3**  6:11 54:14,21
  55:2,19,20
  57:3,6 66:8
  84:3 95:16
  116:7
**3,000**  104:9,13
  104:21 125:14
**3,600**  128:19
**3-16-23**  68:6
  76:15
**30**  42:21 134:4
  169:17
**300**  3:17
**302**  3:20
  153:20
**303**  152:17
**30th**  119:3
  135:7 144:1

**[310 - 9-3-2021]**                                                        Page 3

**310** 2:16
**312** 5:9
**31st** 102:19
  124:20 142:18
  144:1 148:1
**320** 152:17
**321** 149:17
**32nd** 5:7
**339** 149:18
**340** 155:8
**34th** 3:10
**351** 155:8
**352** 148:4
**37** 124:13
**373** 148:4
**38** 141:20
**3c** 69:9
**3rd** 2:6 135:20
  139:8

**4**

**4** 6:12 59:11
  60:12 61:9,12
  103:4,7,8,13
  116:7 124:15
**4,000** 144:3
**4,676** 130:13
**40** 51:9
**41** 142:13
**43** 135:3,16
  136:16,19
  138:12,16,17
  143:8
**45** 16:4
**46** 6:9

**5**

**5** 6:14 62:13
  63:15 66:10
  68:1,2,5 72:12
  116:7 120:21
  121:3,7 134:1
  134:2 135:3
  143:8
**5,000** 109:4
  121:8,12
  125:17 126:9
  126:16 129:1,5
  129:9 130:14
  130:18,19
  131:19,20,21
  136:7
**5-11** 108:21
**5-28** 117:5
**5-3** 105:11
**5-31** 104:2,21
**5-31-2021**
  104:13
**5-31-21** 103:19
**5-4** 105:12
**50** 6:10
**508-4721** 4:19
**52** 128:20
**54** 6:11 103:4,6
  103:7,8,13
  105:7,9 108:6
  108:18
**573-2540** 3:20
**58** 118:5,7,18
**59** 6:12 115:20
  117:3 118:5

**6**

**6** 6:17 63:19
  69:11,12 70:12
  73:21 90:14
  103:11 116:7
  142:13 158:2
**6-2** 117:5
**6-30** 118:14
**6-30-2021**
  116:16
**60** 118:6
**600** 2:6,14
**60103** 16:16
**6028131** 169:5
  170:2 171:2
**60606** 5:8
**617** 4:12
**66** 6:14
**661-1100** 2:8
**69** 6:17
**692-8883** 2:16

**7**

**7** 6:18 82:12,14
  83:20 116:7
**7,000** 109:5
**7,500** 136:19
  138:20 139:9
**7-2** 118:14
**7-2-21** 119:6
**7-21-21** 121:18
  121:21
**7-31-21** 121:12
**75** 19:4
**77** 19:4

**7th** 139:10

**8**

**8** 6:19 47:21
  48:7,11 83:11
  88:21 89:3,6
  90:4,9,10
  121:15 124:12
  164:15,16,17
  164:18
**8-24** 125:14
**8-24-21** 125:9
**8-25** 126:4
**8-26-21** 128:16
**8-30** 131:5
**8-30-21** 130:7
**8-31** 131:10
**8/1/2023** 169:5
**80** 141:20
**81** 115:4
**82** 6:18
**845-1374** 5:9
**87** 92:16
**89** 6:19 7:2
**8:21** 164:4

**9**

**9** 7:2 83:12
  89:1,4,10 90:5
  95:19,19,20
**9-01** 131:6
**9-2** 131:11
**9-3** 136:11
**9-3-2021**
  135:17 136:7

**9-30-2021**
143:12
**9-7** 138:13
**90069** 2:15
**907-0747** 3:12
**93** 19:20
**951** 1:16 16:15
**951-7171** 4:12
**98** 7:3,5
**99** 7:7,9,11,13
**9:10** 1:15 9:15
**9:50** 46:4
**9:53** 46:11

**a**

**a.m.** 1:15 9:15
46:4,6,10,11
65:18,19 66:2
146:21
**able** 13:17
14:20 47:2
**above** 169:6
171:7
**access** 53:1
**account** 19:16
33:18 34:4
43:18,19 44:1
44:5 45:9
52:15,20 53:21
59:5 64:9
85:14 88:5,14
88:18 96:10
100:7 102:8,18
103:4,15,17
104:14 107:20
114:14 115:7

116:2,8,17
117:10 118:15
119:6 120:9
122:4,18
134:11 135:3
142:1,15,19
144:12 150:7
150:19,20
151:18 154:3
156:4,9 157:12
**accounts** 33:20
**accuracy** 32:12
63:11 64:14
115:16 120:13
124:3 142:5
148:17 150:10
151:21 153:4
154:6 155:15
169:9
**accurate**
114:11
**accurately**
58:15
**achieving** 24:5
**acknowledge**
9:3,7
**acknowledge...**
171:3
**acknowledg...**
169:12
**acquired** 18:16
18:17
**acted** 72:14
**acting** 54:9

**action** 1:4
10:18 24:20
25:7,12 28:1
29:10 62:12
72:16 73:1
74:2 75:7
168:15
**actions** 78:7,8
**activities** 45:7
**activity** 144:12
**actually** 36:12
53:18 60:11,19
98:1 119:5
133:7 145:21
**add** 117:16
130:12 138:20
**added** 136:15
136:15 138:19
**addition** 54:7
**additional**
63:19
**additions** 171:6
**address** 16:14
16:15,18 85:14
92:9 96:12,14
**adequacy**
48:16 165:1
**administer** 9:8
**administered**
9:8
**adopt** 163:8
**advice** 25:8
44:11 53:12
91:19

**advised** 77:11
**advisor** 44:6
**affected** 145:17
**affiliations**
11:3
**aggressive**
42:13
**ago** 13:3,5,6
14:16,17 32:17
36:16 43:17
163:16 164:13
164:14
**agree** 9:10 10:3
59:17 110:4,13
116:9 126:7
127:7 129:1
130:13 136:5
145:1
**agreeable**
146:16
**agreed** 75:6
**agreeing**
101:13
**agreement**
22:21 23:2,5
37:5
**ahead** 39:4
42:18 66:7
77:2 81:14
88:6,16 92:3
94:14 100:14
111:10 112:3
113:15 116:19
117:21 120:2
123:4 126:20

**[ahead - aside]**

127:16 130:21
131:13 132:3
135:9 137:21
139:14 140:3
140:14 141:5
143:1 144:6
145:5 146:4
156:12,18
157:8,14
159:13 164:19
**ai** 43:4
**aim** 60:5,5
**al** 1:9 10:7,8
169:4,4 170:1
170:1 171:1,1
**alert** 94:9 132:7
**alerts** 67:12
**algorithm**
42:15
**alia** 48:18
165:2
**alignment**
82:17
**allegations**
29:4 32:5,13
**alleged** 29:18
159:9 160:1,14
**allegedly** 30:7
**allotted** 169:20
**alpha** 85:15,15
86:9,16,20
87:20
**altering** 56:8
**amar** 91:12

**amended** 28:11
**ameri** 88:17
**ameritrade**
17:13 21:4
22:10 24:12
33:14,17 43:19
44:1 45:6
52:15 57:17
86:3,20 88:5
88:14,18 100:4
100:7 102:8,18
107:19 114:7
115:7,16 120:8
122:10,18
123:10,17
134:11 142:1
147:19 148:18
148:21 150:6
150:19 151:18
152:21 154:3
155:11 160:9
**amount** 159:7
159:21 160:13
**analysts** 43:11
43:11 79:3,6
**angeles** 2:15
**announce**
113:4
**announcement**
32:17,21
**answer** 13:12
13:16,16 14:4
27:3 47:7
76:20,21 77:3
78:2 81:18,19

82:1,2 92:3
106:8 125:20
128:5,5 162:6
**answers** 13:20
157:12
**anticipated**
55:8
**anybody** 32:10
**anymore**
158:19
**anytime** 53:1
**aol.com** 96:12
96:15
**apart** 148:12
**apologies** 125:4
**app** 85:18,19
**appear** 14:20
100:5,6 102:8
113:12
**appearance**
11:1
**appearances**
2:1 3:1 4:1 5:1
11:3
**appeared** 168:6
**appearing**
12:11 134:16
**appears** 57:8
58:20 118:4
123:16 145:2
147:18
**appended**
171:7
**applicable**
169:8

**appointed**
23:21 27:11,20
34:15,20 35:2
74:4
**appointment**
6:15 46:21
66:11 68:8
**approval**
158:12,14,14
**approvals**
157:18 158:3
**approved** 31:1
158:8
**approximate**
159:21 160:21
**approximately**
16:17 19:18
28:3 36:8
40:18 41:1
74:20 93:17
166:12
**april** 84:4
90:15
**arc** 107:8
**area** 44:15
84:16 161:14
**areas** 73:19
86:4
**article** 21:6
**articles** 45:10
80:15
**aside** 16:8
22:12 24:16
29:1 31:16
59:7 73:6

**[aside - beginning]**

88:20 95:18 145:20 151:4 153:12 161:9

**asked** 23:9 45:3 64:5 74:13 134:18 166:7,9

**asking** 13:10 77:10

**asks** 92:6

**assemblies** 18:8

**assigning** 51:13 51:15,16

**assignment** 6:10 49:8 50:5 50:21 55:17

**assume** 62:19 63:8 64:1 116:21 149:10 162:4,4

**assuming** 114:5 114:12

**astrazeneca** 21:15,19 22:7 73:16

**attached** 6:8 62:14,20 90:4 169:11

**attempt** 13:14

**attended** 44:13

**attention** 38:16 103:4 143:6 158:2

**attesting** 48:17 165:2

**attorney** 11:4 20:13 169:13

**attorneys** 9:2 27:21

**audio** 10:1

**august** 1:15 9:15 97:15,15 100:8 123:17 123:17 124:7 124:20 125:16 126:11 129:4 129:14 132:14 152:8,21 153:9 168:17 169:3

**auth** 93:6

**authority** 52:19

**authorization** 93:6

**authorize** 27:21

**authorized** 62:6 71:15 74:3

**authorizing** 68:19

**automatically** 85:1 91:4,6

**av** 167:10

**available** 45:12 85:5 118:15 137:14,15,17 138:9 139:6 169:6

**avenue** 2:6 3:17 4:17

**award** 24:6

**aware** 22:13 34:2 38:10 44:16 72:18

**b**

**back** 16:2 19:4 19:5 34:7 39:8 45:21 46:12 55:12 65:10 66:2,4 71:21 82:17 93:7 98:4 100:2 128:9 131:11 131:21 133:20 143:7 146:11 147:10 157:5 162:8,17 163:1

**background** 16:21 33:5 94:18 95:2,5

**backup** 18:5

**bad** 66:14

**balance** 156:9

**balmukund** 1:13 6:3 11:21 167:12 169:5 170:2,24 171:2 171:4,12

**baltimore** 168:2,4

**banking** 70:6

**barry** 134:2

**bartlett** 1:16 16:16

**based** 15:5 26:6 32:6 52:3,4 63:14 75:20 82:3 109:21 111:13,16,21 112:1,16 113:10,10,11 122:10 127:13 127:19 132:7 138:8 139:3 140:16 141:7 149:6 159:15

**basically** 53:16 80:18

**basis** 76:18 94:8 107:20

**bates** 6:18,19 7:2,3,5,7,9,11 7:13,15,17,19 8:2,4,6 82:14 84:2 89:6,10 90:13 96:2 98:12,17 99:1 99:6,11,16 102:14 115:4 117:3 124:12 141:20 147:2 148:3 149:20 151:7 152:12 153:15 154:17 155:7

**bcalandra** 2:5 169:2

**beginning** 11:4 26:3 65:20

**[beginning - bullet]**

90:5 96:1
115:21 128:5
147:7 165:10
**begins**  10:4
50:21 61:16
70:16 72:7
73:21 90:13
102:13 115:3
**behalf**  1:5 2:2
3:2 4:2 5:2
11:6,9,11,15
54:9 68:20
85:14 159:11
**believe**  36:18
68:1 87:6
92:21 123:9
155:10 159:8
160:13
**best**  14:3
**bid**  85:18
**big**  18:7 100:1
109:11 145:13
**bio**  146:2
**biotech**  37:21
**biotechnology**
105:17 106:3
**birthday**  51:10
**bit**  32:17 41:15
98:4
**blast**  56:5
**blocks**  137:15
138:8 139:4
145:13
**bloom**  43:10

**bloomberg**
43:10
**blue**  164:9
**board**  95:11,13
**borrowing**
122:9
**boston**  4:11
**bottle**  69:18
**bottom**  48:3,7
48:12 91:2
105:7 118:18
164:17,18,20
**bought**  87:21
125:17 126:16
127:13 140:16
157:5 159:15
**box**  49:11
86:10
**brand**  38:12
**break**  65:3,4
133:4,15 139:3
146:2
**breaking**  91:2
**brian**  2:4 11:8
16:7 66:18
77:5 78:6
101:8 169:1
**brief**  100:13
**briefly**  143:7
**bring**  163:1
**broadcast**  67:5
**broadway**  3:9
**broken**  109:8
137:4

**brother**  91:12
91:19 92:10,14
95:8
**brown**  4:4 6:3
6:4 11:5,5 12:7
12:9 23:13,16
35:18 39:7,18
43:6 46:3,14
46:15 49:7,10
49:12 50:6,11
50:14,16,17
54:11,18 55:1
55:4,11,15,20
56:1,6,12,15,19
56:20 59:8,13
59:19 60:2,5,9
60:10,21 61:5
61:10,11 65:1
65:6,10,14
66:4,14,18,21
67:3,8,15,17,19
68:2,3 69:8,12
69:16,20 70:2
70:7,9,10 77:4
77:21 78:5,13
78:14 81:17
82:5,11,17,20
83:3,4,9,15,17
83:18 88:10,19
89:3,13,18,20
92:8 95:1
97:20 98:7
99:20 100:3,5
100:10,14,20
101:8,11,15,18

101:21 102:2,3
104:17 105:2
111:19 112:11
113:20 117:1
118:2 119:17
121:4,6 123:7
124:11,14
125:5 126:2
127:2 128:3
131:2,14
132:11 133:2
133:15 134:7,9
135:10 138:1,2
139:17 140:7
140:20 141:14
143:3,16,20
144:8 145:8,21
146:6,9,14,16
147:12,13
148:3,5 149:15
149:17 150:4
151:12,15
152:16,19
153:19,21
154:21 156:15
157:1,10,16
159:19 162:1,4
162:10 163:6
163:11,13,17
164:16 166:2,4
166:6,17
**bruce**  19:1
**bulk**  137:6,13
**bullet**  93:9,12

**[bullets - certifications]** Page 8

**bullets** 92:21
**bunch** 50:2
  84:3 90:14
  136:10
**business** 18:3
  18:12 30:7
  37:20 95:14
  106:13,15
  138:14 139:10
**businesses**
  18:14
**buy** 86:17
  87:16 91:13
  108:7,12
  115:11 118:20
  119:1 121:17
  122:1 125:13
  130:3 131:1
  134:15 137:4,6
  137:6 138:5
  139:2 141:3
  149:4
**buying** 131:19
  131:21 137:10
**buys** 52:3

**c**

**c** 4:4 9:1 11:5
**cal** 84:13
**calandra** 2:4
  6:4 11:8,8 16:7
  23:7 35:12
  39:3 42:17
  50:9,13 54:16
  54:19 55:3,10
  55:13,19,21

56:4,11,17
59:18,20 60:7
60:19 61:2,8
65:5,9,13
66:20 67:2,10
67:16,18 68:1
69:18 70:1,5,8
76:17 77:13
78:10 81:13,16
81:19 82:19,21
83:8,13,16
84:5,14 88:6
88:15 89:2,15
90:17 91:21
92:2 94:13
98:6 101:10,13
101:16 102:1
104:16 105:1
111:9 112:2
113:14 116:18
117:20 119:16
121:2 123:3
125:3,19
126:19 127:15
130:20 131:12
132:2 133:12
133:17 134:1,6
134:8 135:8
137:20 139:13
140:2,13 141:4
142:21 143:15
143:18 144:5
145:4 146:15
156:11,17
157:7,13

159:12 162:5,7
162:11,19,21
163:10,12,14
163:19 166:1,8
166:19 167:9
169:1
**california** 2:15
**call** 36:8 78:17
  78:18,20,21
  79:5,9,12,17
  80:2,10
**called** 12:1
  14:18 24:14
  95:7
**calls** 44:8
**camera** 9:19
**cantor** 82:8
**capitalization**
  160:21
**carefully** 94:2
**carnival** 106:8
**carries** 63:2
**carrying**
  136:16
**carter** 19:1
**case** 10:8,10
  11:7 13:1
  14:19 20:3,8
  22:7,15 24:1,4
  24:11,17,20
  25:11 26:8,12
  27:6,12 34:15
  35:11,21 36:9
  36:13,17 37:2
  37:8,11,15

44:17 47:1
54:7 73:9,13
74:11,18 75:17
76:15 77:15
84:11 96:7
109:3 164:3
**cases** 73:4,17
**catch** 121:4
**caused** 159:8
**causes** 26:3
**centers** 18:6
**central** 1:16
  9:15 46:5,12
  65:11,17 66:2
  146:20 147:10
  162:13,17
  167:2
**century** 2:13
**ceo** 17:21 18:4
  19:13 29:11,13
  79:1 113:4
  161:5
**certain** 39:13
  40:1 80:19
  86:4 110:1
  111:15 112:9
**certainly** 65:9
**certification**
  6:12,15 34:14
  35:3 55:17
  59:11 61:14
  62:5,9 66:11
  68:7 76:14
**certifications**
  17:17 55:9

**[certified - complaint]**

| | | | |
|---|---|---|---|
| **certified** 34:16 34:17 | **claims** 51:13,16 51:17 54:8 | **colleague** 11:12 90:3 | **communicates** 104:19 |
| **certify** 64:7 168:5,9,12 | **clarification** 31:3 | **collection** 76:8 84:7 90:19 96:5 | **communicating** 121:12 |
| **cfo** 92:13,14 | **class** 3:3 6:14 6:15,15 11:12 | **come** 21:12,12 25:6,6 30:10 | **communicati...** 23:9,10,11 76:10 77:1 |
| **chad** 69:2,4 | 17:15 24:20 25:7,7,12,16 | 65:10 77:20 83:2 112:18 | **companies** 17:21,21 18:3 |
| **chain** 90:12,16 | 26:9,12,19 27:5 34:14,17 | 146:11 | 18:20 38:17 43:9 53:9,13 |
| **chance** 14:4 | 34:21 35:3 | **comes** 53:18 60:1 85:13,18 | 87:2 92:11 107:4 108:2 |
| **change** 75:19 112:1 170:4,7 | 62:12,15 66:11 66:12,12 68:7 | 85:18 100:21 141:12 | **company** 19:13 20:1 22:3 |
| 170:10,13,16 170:19 | 68:8,8 72:19 72:19 73:1 | **comfortable** 133:8,13 | 29:11 38:1,1 38:21 39:2 |
| **changed** 125:7 | 75:16,20 160:3 | **coming** 30:3,19 30:20 38:15 | 53:3 79:7 82:8 92:13,15 93:5 |
| **changes** 169:10 171:6 | **class's** 72:15 | 43:11 67:9 73:18 85:21 | 94:18 95:7,14 157:21 |
| **charles** 5:4 | **clean** 12:16 14:6 | 100:2 112:16 113:4 140:18 | **compensated** 23:17,20 |
| **charles.zagnoli** 5:5 | **clear** 23:13 42:5 111:20 | 141:7 | **competent** 72:16,17 |
| **chart** 6:11 54:14 57:3,8 | 118:3,4 160:2 163:6 | **commencing** 1:15 | **complaint** 15:3 15:4 28:1,4,7,9 |
| 63:5,11,14,20 64:2,12 | **clearly** 14:4 41:11 80:20 | **comment** 112:20 113:1 | 28:12,16 29:3 29:5,12,14,20 |
| **chattanooga** 18:16 | **clerk** 56:4 | **comments** 28:19 71:3 | 30:4,13 32:7 32:14 36:15 |
| **check** 156:13 160:8 | **clicked** 24:13 | **commonly** 87:1 111:6 | 62:10,16 74:5 159:10,17 |
| **checked** 161:4 | **client** 20:12,13 | **communicate** 35:13 | 160:15 |
| **chicago** 5:8 44:14 | **close** 116:15 142:17 160:5 | **communicated** 76:4 | |
| **circulation** 86:1 | **closely** 91:16 | | |
| **civil** 1:4 | **closest** 137:17 | | |
| **claim** 67:3,4 | **cnbc** 33:4,8 38:11 43:11 | | |
| **claimed** 30:15 | 113:17 | | |

**[complete - count]**

| | | | |
|---|---|---|---|
| **complete** 14:8 171:8 | **confidential** 31:20,21 32:6 | **continue** 10:2 107:15 113:21 | 142:7,11,20 143:2 144:17 |
| **completed** 169:17 | **confirm** 71:14 144:11 | **continued** 3:1 4:1 5:1 7:1 8:1 | 149:2,12 152:6 159:18 163:20 |
| **completely** 58:14 | **conflict** 70:3 | **conversation** 149:10 | 165:13,20 171:8 |
| **completeness** 32:13 63:14 64:4,18 | **confused** 165:8 **confusingly** 56:1 | **conversations** 35:14 | **corrections** 171:6 |
| **compound** 39:3 42:17 | **connected** 21:2 **connection** 9:20 24:17 29:19 34:13 35:2 58:7 64:6 86:16 | **copies** 148:12 169:14 | **correctly** 165:3 **correspondent** 33:9 |
| **concept** 22:20 23:1 25:15,19 31:19 41:12 78:18 | | **copy** 36:19 76:8 | **counsel** 6:16 10:6 11:2 12:5 13:15 15:4,7,8 23:7,9 24:11 |
| **concerned** 29:21 43:3 127:18 128:6,7 | **conservative** 53:15 | **corporation** 106:8 | 32:12 35:11,16 35:20 36:9 |
| **concerning** 76:5 | **consider** 24:15 94:11 | **correct** 19:17 24:7,9 32:15 33:19 34:12 38:19 42:9 51:3 54:1,10 58:18 60:12 62:7 64:3 71:12,16 84:10 85:3 90:21 92:12 96:8 102:20 104:15 105:15 114:19 115:8 116:12 116:21 117:7 117:13 118:1 119:1,15 120:20 121:14 123:12 124:5,9 125:1 134:17 135:1 137:18 138:7,10 139:5 | 45:8 46:13 48:19 49:5 |
| **concluded** 167:12 | **considering** 87:3 | | 58:4,9,14 63:8 64:8 65:1 66:3 66:12 68:9,20 |
| **concludes** 167:3 | **constantly** 73:18 94:3,9 140:17 | | 71:9,11 72:16 72:17,19,19 74:13 76:5 |
| **conduct** 33:16 52:15 | **cont** 5:2 **contact** 21:12 22:17 | | 77:2,14 84:9 93:21 103:1 133:2 146:16 |
| **conducted** 9:18 79:12,17 | **contacted** 21:7 21:8,16 | | 148:7 162:3,18 165:14,18 |
| **confer** 77:19 78:12 | **contacting** 24:15 | | 168:8,13 169:14 |
| **conference** 16:6,9 | **content** 15:6 23:15 28:18 29:2 | | **counsel's** 78:2 |
| **conferences** 82:8 | **contents** 71:18 | | **count** 67:21 |

**[countries - delivered]**

**countries** 40:11 158:4,6
**country** 107:13
**county** 168:2,4
**couple** 16:2 19:5 33:2 36:11 40:10 44:13 49:14 101:4 138:17
**course** 78:11 83:8 157:3
**courses** 17:10
**court** 1:1 9:2 10:9,14 11:20 13:20 37:10 50:3 58:17 68:5 74:10 75:7,16 76:6 82:1
**court's** 74:6,8 75:20
**courtroom** 14:14
**cover** 56:7
**covid** 38:7,18 43:12 93:7 107:7,8 157:19 161:9,14,20
**covino** 31:8
**cramer** 87:5,10 113:6,18
**cramer's** 33:9 113:13
**cs** 169:15

**csr** 1:21
**curevac** 38:14
**current** 37:2,3 37:14 161:5
**currently** 17:19 18:21 157:20 161:2
**cut** 42:7
**cv** 164:4

**d**

**d** 1:17,21 9:1 16:16 168:3
**d.c.** 4:18
**daily** 107:20
**damage** 159:9 160:18
**damaged** 159:21 160:13
**damages** 24:6
**data** 18:6
**date** 26:13,17 26:18 27:1 36:13 37:13 109:1 117:5 119:7 128:15 130:6 131:6,10 131:11 135:17 164:5,7 170:24 171:12
**dated** 68:6 84:20 91:3
**dates** 26:1,4,5 26:14 30:18 105:11 125:9 132:14

**david** 3:2 11:11
**day** 24:13 51:8 94:8,11,16 96:11,20 108:3 108:11 109:8 109:20 110:5,9 111:6,8,15 126:13,17 127:13 129:9 130:7 131:10 132:1,5 136:1 137:5 138:14 138:14 139:10 168:17 171:15
**days** 16:2 44:9 50:10 169:17
**decide** 38:20
**decided** 86:9 88:3,11 108:12 109:15 122:1 129:8
**deciding** 43:9
**decision** 40:7 53:19 75:16 80:6 81:11 82:3 86:17 87:16 97:10,16 107:14 111:14 111:21 118:13 127:11 139:20 139:21 140:1
**decisions** 44:7 53:8 76:4,13 76:15 77:7,9 77:11,12,14

80:8 81:8 107:3 111:7,16 113:11 127:19 132:8 141:2 145:17
**declaration** 6:17 48:17 69:11,16 70:17 72:1 76:14 77:6 165:1
**declare** 171:4
**declines** 42:8
**deemed** 171:6
**deep** 163:16
**defend** 163:20
**defendant** 11:6
**defendant's** 163:7,14,21
**defendants** 1:10 4:2 5:2 11:7 12:2 29:9 44:16 74:18
**defense** 10:6 163:15
**defined** 26:9
**degree** 17:1,4
**delaware** 3:17 3:19
**delay** 67:10
**delayed** 67:5
**delays** 67:4
**delegated** 52:18
**delivered** 84:17

**[demonstrated - documents]**

**demonstrated**
  48:16 164:21
**denied**  75:10
  75:11
**depending**  43:1
  122:10
**depends**  9:19
  39:15 122:19
**deponent**  12:1
  169:13 171:3
**deposed**  12:17
  35:7
**deposing**
  169:13
**deposition**  1:13
  9:3,4,5,17 10:5
  15:2,9 16:10
  22:6 36:7 37:4
  46:7 50:4
  54:13 57:6
  59:10 66:1,9
  69:10 70:4
  82:13 89:5,9
  98:11,16,21
  99:5,10,15
  147:1,9 149:19
  151:6 152:11
  153:14 154:16
  167:11
**depositions**
  12:21 13:4
**describe**  25:1
  42:10 73:14
  122:13 140:21

**described**
  90:19 112:12
  141:1
**description**
  63:15 70:17
  131:19
**designate**
  100:15
**desk**  53:4
**detail**  21:5
**determined**
  103:2
**develop**  38:21
**developed**
  107:6
**development**
  95:6
**different**  18:14
  33:14 43:11
  45:12 49:5
  53:17 55:6
  73:8,18 80:21
  108:20 109:4
  125:13
**diligently**  74:1
**direct**  52:19
  103:3 115:13
  120:18 121:7
  124:8 134:21
  142:10 149:1
  150:15 152:4
  153:9 154:11
  155:20 156:2
**direction**  78:2

**director**  19:21
**directors**  31:12
**disagree**
  134:14
**discovery**  22:6
  37:14 74:5
  76:7 84:8 96:6
**discuss**  53:7
  92:5 149:5
**discussed**  16:10
  36:16 165:10
**discussion**  36:2
  51:19
**discussions**
  15:7 16:8 29:1
  48:18,21 49:2
  51:12,21 165:2
**dismiss**  74:17
  75:16,21
**dispute**  58:19
  59:2 63:10,13
  64:14,16,17
  115:15 120:13
  124:3 136:14
  142:5 148:17
  150:10,12
  151:20 153:4
  154:5 155:14
**district**  1:1,2
  10:9,10
**docket**  56:2
  77:8 163:4
**doctor**  96:17
**document**  6:18
  6:19 7:2 22:6

  22:10 26:10
  32:9 46:17
  47:2,6,10 50:1
  50:20 55:12
  56:13 57:12,21
  58:3,21 59:7
  60:4 61:20
  62:1 68:9,11
  68:16,20 70:12
  70:20 71:10,18
  78:6 82:14
  83:6 84:12
  89:6,10 90:19
  96:5 101:20
  102:13 110:17
  114:1,15 115:3
  115:13 123:21
  124:4,8 134:21
  142:10 143:7,9
  144:9 145:19
  149:1 150:11
  150:15 151:21
  152:4 153:5,9
  154:2,10 155:7
  155:15,19,19
  156:1 164:3
**documents**  7:3
  7:5,7,9,11,13
  7:15,17,19 8:2
  8:4,6 12:12
  27:19 44:18,21
  45:3,5,16
  47:11,12 49:15
  56:8 58:5
  74:13 76:9,9

**[documents - exhausted]** Page 13

84:7,17 90:4
98:12,17 99:1
99:6,11,16
147:2 149:20
151:7 152:12
153:15 154:17
**docusign** 62:3
62:6 71:14,18
**doing** 34:7 35:7
52:2 117:14
130:11 132:9
**dollars** 160:5,6
**doral** 1:16
16:15
**draft** 28:19
70:20 71:4,6
**drafted** 71:8,11
**drafting** 28:7
68:16 71:7
**drive** 1:16 5:6
16:15,16
**dropped** 21:17
21:17
**drug** 95:17
**due** 160:14
**duly** 12:2 168:7
**duties** 34:21
35:5

**e**

**e** 9:1,1 170:3,3
170:3
**earlier** 84:15
164:16
**early** 165:6

**earnings** 78:16
78:18,20,21
79:4,5,9,12,17
80:2,10
**easier** 55:11
98:1
**east** 2:13
**edits** 28:18
**educational**
16:20
**effect** 75:15
**effective** 74:1
**effects** 97:2
**efficiency** 60:7
66:15
**efficient** 12:13
**efforts** 45:4
**eight** 137:3
**eileen** 4:15 49:7
54:11 55:18
59:8 66:6 69:8
82:11 83:9
90:3 98:7
146:3,9
**eileen.falk** 4:16
**either** 50:6 80:9
87:21 162:5
**electric** 76:9
**electronic**
12:11 76:9
**elina** 3:7
**email** 45:9
66:17 76:5
83:11 84:4,12
84:20 85:1,11

86:10,15 87:20
88:12 90:2,12
90:15,16,20
91:2,3 92:9,20
96:1,4,9,11,14
96:19 97:9,16
98:2,9
**emails** 22:3
50:8
**emergency**
93:6
**employ** 42:14
**employed**
17:19
**employee** 165:9
**employees** 19:9
**endocrinolog...**
97:5
**energy** 105:21
**engineering**
17:1,2
**enphase** 105:20
**ensure** 32:12
**entry** 161:13
**equaling** 129:1
**equipment**
18:5
**erakhlin** 3:8
**erck** 29:14
30:15 31:10,17
112:18,21
113:2,10,12
161:8
**errata** 169:11
169:13,17

**esquire** 2:4 3:5
3:7,15 4:4,6,8
4:15 5:4 169:1
**et** 1:9 10:7,8
169:4,4 170:1
170:1 171:1,1
**events** 67:11
**everybody**
89:19 97:2
**everybody's**
49:11
**exact** 128:2
**exactly** 32:2
40:20 41:4
73:19 109:12
110:2 158:15
159:16 160:17
**examination**
6:1 12:1,8
162:20 168:9
**examined**
168:8
**example** 55:7
**excellent** 70:9
**excuse** 28:11
72:21 76:14
**execute** 54:5
62:1 111:16
**executed** 138:5
150:14
**executing**
53:18
**exhausted**
133:14

**[exhibit - first]**                                                        Page 14

**exhibit** 6:7,9,10
6:11,12,14,17
6:18,19 7:2,3,5
7:7,9,11,13,15
7:17,19 8:2,4,6
46:7,17 50:2,4
50:18 54:13,20
56:2,7 57:3,4,5
57:6 59:10
60:12,18 61:9
61:12 66:9
68:2,5 69:10
69:12 70:12,12
82:13 83:20
89:3,4,5,9
90:10 95:19
98:11,16,21
99:5,10,15
100:15 102:10
115:1 123:14
132:17 141:19
143:8 147:1,15
149:15,19
151:4,6 152:11
153:14,20
154:16 155:1
163:2,3,7,14,21
**exhibits** 7:1 8:1
49:18 54:20
55:5 67:8
100:15 102:7
146:4 155:3
**expect** 24:3
**expected** 58:13

**expensive** 34:9
34:10
**experience**
72:18
**experiences**
73:13
**experts** 43:15
113:7
**exposure** 42:4
42:8
**extensive** 72:18
**extent** 119:10
**eye** 61:1

**f**

**f** 2:11
**fact** 53:2 75:9
**fails** 169:19
**fair** 23:15
32:11 38:16
52:11,13,13
77:9 81:7 84:6
84:21 96:4
101:21 102:17
103:17 105:13
107:17 116:14
119:2,9 124:20
131:18 134:13
137:12 140:11
142:16 143:21
145:12 149:8,9
154:1
**falk** 4:15 49:9
90:3
**falls** 84:12

**false** 29:18
30:15 159:9
160:1,14
**familiar** 22:20
25:15 28:15
31:4,7,11,19
41:12 47:15
69:1 78:17
80:12
**far** 23:8 24:1
29:21 37:6
55:2
**fda** 31:1 93:5
**february** 26:13
26:17
**federal** 6:12
13:1 59:11
61:15
**feeling** 133:14
**fees** 34:11,12
**file** 27:21 45:11
68:20 78:7
100:1 101:3
102:10 163:3
**filed** 10:9 27:15
28:4,12 29:5
29:20 36:12,18
46:21 47:10
49:15 70:13
74:17 159:11
164:5 165:6
**files** 76:10
100:17
**filing** 27:10
58:17 68:5

74:3
**filings** 36:17
**final** 131:9
**finally** 155:6
**financial** 17:10
17:17
**financially**
10:18
**find** 45:4 50:9
55:14 67:10
125:7
**finding** 83:1
**fine** 83:9
133:13,18
162:10
**finish** 134:3
**firm** 2:10 10:15
11:15 20:7,11
20:20 21:3,11
21:13 22:18
23:5 24:11,16
24:16 32:18,19
59:20 73:5
76:5
**firms** 22:13,14
73:15
**first** 12:2 24:13
26:17 33:1
38:10 40:7,19
41:2,6 45:6
48:15 50:1
56:2,18 59:1
60:12 61:7
70:15 71:21
72:14 73:10

**[first - given]**

76:11 105:17 106:21 136:21 138:21 148:6 159:7 163:2

**fitzgerald** 82:9

**five** 13:6,6 84:18 92:20 95:12 130:2 137:2 146:2,11 162:7

**flexibility** 128:9

**flip** 47:6 61:13 62:18 102:15 114:1 116:6 120:21 121:15 144:9

**flipping** 107:15

**floor** 3:10 5:7

**focus** 43:21

**focused** 72:11 86:21

**focusing** 76:11 84:19

**folder** 147:16

**folks** 22:12 69:13

**follow** 78:1 91:16

**following** 88:21 91:16 138:11 158:16,17 164:5

**follows** 12:4 53:12

**foregoing** 171:5

**form** 41:19 81:13 92:3 104:16 111:9 112:2 113:14 114:14 116:18 117:20 123:3,8 125:3,19 126:19 127:15 130:20 131:12 132:2 135:8 137:20 139:13 140:2,13 141:4 142:21 143:15 144:5 145:4 156:11,17 157:7,13 159:12

**formal** 17:16

**formally** 17:14

**format** 12:12 32:21

**forth** 98:4

**forward** 21:7 84:12 90:16 97:10

**forwarded** 96:11,19 97:6

**forwarding** 84:5 87:19 90:18

**founded** 18:12 18:15

**four** 13:6 92:20 130:2 136:6 137:2

**frame** 156:8

**fraud** 20:5

**free** 44:13

**frequency** 94:5

**frequently** 19:16 53:7 73:7,14 76:4 91:18 92:1,4

**friday** 84:20 87:21 135:20 136:1 139:8,21

**front** 43:14 57:5 68:5 102:7 132:6 164:2

**frustrating** 67:11

**funds** 118:15 122:9

**further** 9:7,10 48:16 72:2 129:16 162:1 164:21 166:19 167:1 168:9,12

**future** 79:4 94:20

**g**

**g** 9:1

**gabbert** 47:16 47:19 48:16 49:2 57:10 164:21 165:9

165:12

**game** 67:12 77:9

**gastroenterol...** 95:9

**general** 24:21 25:1,10,13 37:19 47:5 93:16 97:12

**generally** 18:2 29:18 38:9 53:12 80:17 113:1

**generated** 85:1

**generators** 18:6,7

**gentleman** 69:1

**gentlemen** 167:7

**gerd** 95:17

**germany** 38:14

**getting** 25:3 36:13 57:19 120:4

**give** 13:11,11 13:16,19 14:4 14:8,18 53:12 65:3 66:21 106:7

**given** 14:11 22:11 24:13 25:9 70:11 108:2 111:5 171:9

**[gives - holding]**

**gives** 80:18,18
**giving** 69:20
**glanced** 15:3
 28:13 36:20
**go** 10:3 22:8
 33:3 36:20
 38:3 39:4
 40:12,16 42:18
 43:2 45:14,17
 45:21 67:14
 75:3,8 77:2
 81:13 83:5
 88:6,15 92:3
 94:13 98:3
 100:14 108:5
 111:9 112:2
 113:14 116:18
 117:15,20
 120:2 123:3
 126:19 127:15
 127:21 130:20
 131:13 132:2
 134:4,19 135:2
 135:8,15
 137:21 139:13
 140:2,5,13
 141:4,10,10
 142:21 144:5
 145:5 146:4
 151:4 156:11
 156:17 157:7
 157:13 159:12
 164:15,19
 167:1

**goes** 66:14,15
 102:14
**going** 9:15 19:6
 21:7 30:10,19
 30:20 33:4
 36:4 39:14
 43:4 45:16
 49:14 52:6
 54:20 55:4,5
 56:4 60:15
 65:1 78:1 79:7
 85:20 94:2
 98:3,4 99:20
 109:13 110:1
 125:8 128:1
 133:4 134:7
 137:11 146:1
 146:17 147:15
 167:1
**gold** 66:15
**good** 9:14
 12:10 40:9,12
 45:20 50:9
 61:9 65:2,5,13
 67:18 79:5
 83:13 102:2,6
 121:4 133:20
 133:21 134:8
 141:12 146:15
 155:5
**gotten** 60:20
 100:18
**gray** 4:3,14 5:3
 11:6

**great** 67:17
 69:13 70:9
 83:7,17 103:14
**greg** 31:13
**gregory** 31:7
 31:13
**ground** 13:9
**group** 25:3
 95:12
**guess** 32:2
 33:13 41:17
 56:17 62:10
 69:9 109:11
**guidance** 56:9
**guide** 42:15
**guys** 60:6 163:8

**h**

**h** 170:3
**half** 20:17
 133:9,19
 164:14
**hand** 14:1
 85:18 168:16
**happen** 52:19
 60:15 83:3
**happened**
 67:12 137:9
**happening**
 85:21 112:19
**happy** 51:10
 59:20 133:7
 163:8
**hard** 50:9 76:8
**head** 14:1
 101:10

**healthcare** 82:7
**hear** 158:5
 161:17
**heard** 9:21 42:2
 80:1,9,14
 111:3 126:21
 146:18 159:16
**hearing** 12:14
**heart** 96:21
 97:1
**heathcock** 5:12
 10:12
**held** 41:21 80:2
 80:10 82:8
 119:12 124:20
 135:7 142:18
 143:13
**help** 42:15
**hereto** 171:7
**high** 16:20 43:2
 43:4 141:10
**higher** 127:8
**highlights** 86:1
**history** 114:16
 115:11 120:17
 124:6 134:19
 142:9 152:3
 153:8 154:9
 155:18
**hmm** 33:6
**hold** 17:7,16
**holder** 157:5
**holding** 41:20
 41:21 111:18
 116:11,16

**[holding - involvement]**                                        Page 17

121:8
**holdings** 85:2
  103:18 124:18
**holds** 79:4
**home** 16:14,15
**hopefully** 12:11
  60:11 88:21
  95:19,20
  100:16 115:1
**hoping** 61:2
**hospitals** 18:6
**hotel** 59:21
**hour** 65:2
  133:3,9,19
  146:11
**hundred** 68:13
  113:16 160:16

**i**

**i.e.** 103:19
**idea** 58:2 72:3
  130:16 160:12
  160:20
**identification**
  46:9 50:5
  54:15 59:12
  66:13 69:11
  82:16 89:8,12
  98:15,20 99:4
  99:9,14,19
  147:5 150:2
  151:10 152:15
  153:18 154:20
**identify** 133:5
**illinois** 1:17 5:8
  16:16

**immediately**
  12:15
**inaccuracy**
  114:6
**inaccurate**
  105:4
**inclined** 76:18
  76:19
**include** 83:11
**including** 33:14
  76:6 119:13
**increase** 144:3
**index** 6:1,7
**indicate** 108:21
**indicated**
  119:11
**indicates** 136:6
**indicating**
  142:17
**individual** 11:7
  85:20
**individually**
  1:4 25:10
**individuals**
  25:3
**indonesia**
  158:9
**industry** 94:17
**inflammation**
  97:1
**info** 2:12
**information**
  15:5 26:6 30:1
  30:3,6,8 43:8
  43:16 58:4,11

58:14,20 64:15
  64:18 79:2,3
  80:1,19 81:9
  82:3 86:15
  87:2,15 93:11
  94:9,9 97:12
  97:15 103:1
  109:18 111:6
  111:13 120:14
  124:4 129:7
  132:13 140:16
  140:19 142:5
  150:10 151:21
  153:4 154:6
  155:15
**informed** 91:15
**initial** 36:11,11
**inquiry** 78:8,10
  78:11
**instruct** 76:19
**instructing**
  77:3
**instruction**
  53:20 77:17
**instructs** 13:16
**intended** 38:6
**inter** 48:17
  165:2
**interest** 72:15
  157:20 158:19
  158:21
**interested**
  10:18 168:14
**interesting**
  61:6

**internal** 97:5
**internally** 50:7
**international**
  4:10
**internet** 9:19
**internets** 67:5
**interrupt** 61:4
**interview** 113:5
**interviews** 33:8
**invades** 77:16
**invest** 38:20
  40:7 43:9 44:5
**invested** 25:5
  40:17,19 41:3
  41:6 95:7,10
**investigate**
  29:4
**investing** 17:11
  17:17 87:3
**investment**
  39:1 44:6 82:8
  107:3,8
**investments**
  105:18
**investor** 42:11
  42:13
**investors** 18:20
  79:2 95:12
**involve** 77:14
**involved** 19:19
  20:4,4 22:5
  73:6 76:16
**involvement**
  21:19 35:10
  42:20

**issue** 21:21
  128:10 139:1,2
**issues** 25:21
**item** 73:10
  85:21 109:18
  111:17,21
  112:5 159:16
**items** 30:1
  33:15 80:19
  83:2 86:5
  107:11 112:16
  141:7

**j**

**j** 4:8
**january** 47:1
  164:11 165:6
  166:12
**jeffrey** 47:15
  47:19 49:2
**job** 19:12
**john** 31:4
**joined** 11:12
**joint** 48:17,19
  165:1
**judge** 37:7
**july** 100:8
  119:19 120:9
  120:17 151:17
  152:4
**june** 100:8
  114:21 115:7
  119:3 149:13
  150:6,14

**k**

**kaufman** 69:2
  69:4
**keep** 33:20
  60:21 86:10
  94:17,18 99:20
  134:7
**keeps** 61:6
**kept** 19:6 39:17
  45:11 85:6,9
**key** 60:8
**kind** 17:8 42:14
  85:1 97:4
  114:6 132:7
  133:8 158:11
  158:13
**kinds** 112:18
**knew** 38:12
  97:7
**knots** 55:14
**know** 12:15
  13:14 14:1
  18:7 25:14
  26:20 27:2,3,7
  27:8 28:3 29:9
  29:13 32:9
  35:8 36:3 37:6
  37:7,10,13,21
  38:4 39:12,21
  41:15 49:14,21
  50:11,11 52:9
  63:7 64:4
  69:13 71:8
  72:9 75:3,18
  75:19 77:18

82:6 83:10
  94:3,17 100:21
  101:8,14 106:6
  106:12 109:6
  110:11 111:2,4
  111:11 112:7
  114:15 115:11
  116:9,15 123:8
  124:6 125:10
  127:21 130:1,3
  133:3 137:9
  140:4 141:9
  145:9,14
  148:10 149:3
  150:13,17
  153:7 154:8
  155:17 156:7
  157:18,21
  158:6,11,15
  161:5,7,8,9,13
  161:16,21
  163:15 166:15
**knowing** 94:19
**knowledge**
  73:4
**knows** 97:5
**kumar** 12:10
  35:12 39:4
  42:18 46:16
  48:15 49:13
  51:1,1 68:4
  70:11 76:19,21
  78:1 81:14
  83:19 88:7
  89:21 92:2

94:14 123:4
  131:13 133:12
  145:5 147:14
  163:1 164:21
**kumar's** 98:8

**l**

**l** 4:6 16:16
**labaton** 3:4,14
  11:11 22:18
  72:19,20 73:5
**labaton.com.**
  3:6,8,16
**label** 61:13
  68:6 90:13
  96:2 103:15
  116:8 118:8
  119:6 121:8
  138:12 142:15
  147:16 153:19
**labeled** 50:21
  60:18 90:4,5
  95:19,20
  102:11 103:12
  105:7 108:6,18
  115:20 116:7
  118:20 122:4
  126:4,4 135:2
  152:9
**labeling** 54:19
**labor** 136:1
  138:14
**ladies** 167:8
**lambie** 1:17,21
  10:15 39:8
  168:3

**[largely - made]**

**largely** 18:10

**law** 2:10 6:9,14
11:15 20:7,11
23:5 46:8,20
66:10 68:7
95:8 168:8

**laws** 6:13 59:12
61:15

**lawsuit** 20:5
21:6,9,9,10,15
21:20 32:18
38:9

**lawyer** 23:12

**lawyering**
155:6

**lawyers** 16:9
22:14 25:9
29:2

**lead** 23:21
27:11,20 41:8
46:21 58:7
64:7 74:4

**leading** 132:15

**learn** 134:19

**leaves** 53:16,16

**led** 93:12

**left** 163:15

**legal** 10:13,16
28:14 75:4,4
167:6 169:23

**leggio** 3:15
11:13

**lesley** 2:11
11:14 16:7
66:18 89:14,15

**level** 22:8 42:10
158:2

**licenses** 17:7

**lieu** 9:7

**likely** 88:4,12
117:17

**limit** 26:1

**limits** 26:1

**line** 63:3 72:1,5
72:6 73:10
104:7 105:17
105:21 106:17
124:19 126:8
131:9 170:4,7
170:10,13,16
170:19

**lines** 109:9
138:3 139:1

**liquidate** 40:1
41:9

**list** 62:20 85:17
105:13 116:2

**listed** 29:15
63:11,14 64:18
86:19 105:11
114:2 117:11
127:8 130:7
135:17 136:11

**listen** 43:10,15
113:5,6

**listened** 78:16
79:8

**listening** 82:7

**listing** 57:18
116:10 129:21

135:5

**lists** 62:14
103:18

**litigation** 73:1

**litigations** 73:8

**little** 32:17
41:15 53:14
98:4 129:16

**live** 14:12,14,18
79:8

**lived** 16:18

**llp** 2:3 11:9
20:9 72:20,21

**loan** 122:11

**locating** 44:21

**lodge** 159:18

**long** 13:3 14:16
16:3 19:18
20:15,20 34:7
39:17 41:21
92:14 164:13

**longer** 94:19
111:18 161:8

**look** 27:17
36:19 62:13
71:20 83:20
85:19 92:19
94:6 96:9
104:3 105:12
110:9 114:17
114:20 115:19
125:12 126:3
127:3,4 138:11
142:8,12
148:20 151:16

155:9 160:9

**looked** 17:12
21:5,5 24:12
28:9,15 30:2,2
45:6 47:12
70:14 130:10
132:1 135:14
140:10 143:7
156:6

**looking** 33:15
63:20 76:2
107:11 111:15
119:11 141:11

**looks** 126:14

**los** 2:15

**lose** 50:19

**losing** 158:21

**lost** 22:1 25:4
26:5 67:20
91:14 157:20

**lot** 19:9 28:13
40:14 43:10,12
43:14,15 94:17

**love** 162:7

**low** 141:9
158:1,4

**lower** 40:15

**lubbock** 17:5

**lunch** 133:11

**m**

**m** 4:15

**mad** 33:9

**made** 23:11
29:5,19 30:14
32:6,13 75:19

**[made - minutes]**

80:6,9 81:8 82:3 88:13 96:7 111:17 112:20 114:8 114:13 122:14 126:11 140:9 145:3 149:4,6 149:9 150:18 171:5

**main** 28:16

**make** 12:13,16 13:19 18:5 39:11 42:21 45:18 53:20 55:21 89:18 103:11 107:17 111:7,13,21 113:4,11 122:12,17 127:11,19 128:8 129:9 132:8 139:20

**makes** 77:6 150:17

**making** 44:7 81:11 93:18 95:15 97:16 106:14 107:3 107:14,19 108:1 144:19

**management** 31:16

**manufacturers** 107:7,9

**manufacturing** 18:9,11 95:3 107:4

**mar** 6:9

**march** 84:20 87:21 148:16

**margin** 122:5 122:14,18 123:2 127:19 128:6,7,9

**margins** 122:20

**mark** 49:19 50:18 90:10 98:2 147:15 149:15 151:4

**marked** 46:8 46:17 50:5 54:14 59:12 66:12 69:11 70:12 82:15 83:20 89:7,11 98:14,19 99:3 99:8,13,18 102:10 147:4 150:1 151:9 152:14 153:17 154:19

**market** 30:10 38:3 41:2 110:1 111:13 116:15 140:16 141:8 160:21 161:19

**maryland** 1:2 10:10 38:1

168:1,4

**massachusetts** 4:11

**master's** 17:1

**match** 100:16 137:15 155:3

**materials** 82:7 166:10

**math** 110:7 117:14 128:19 130:12

**mathematical** 42:14

**matter** 10:7

**mean** 24:5 30:21 34:11 39:20 41:19 42:20 55:7 75:8 104:11 119:12 122:8 122:15 128:6 131:1 133:7 135:6

**means** 24:20 32:3 118:12 122:6

**meant** 15:16 165:18

**media** 10:4 38:11 65:21 147:8 167:5

**medicine** 97:5

**meet** 15:8,10,12 77:19 78:12 92:6

**meg** 33:8 113:5

**megabyte** 101:3

**members** 3:3 165:18

**membership** 27:5,7

**memorandum** 6:9,14 46:8,20 66:10 68:6 72:2,4,8

**mentioned** 84:15

**met** 69:4

**michael** 3:5 11:10

**michele** 1:17,21 10:15 168:3

**middle** 104:3

**million** 160:5,6 160:10

**millions** 107:12 107:13

**milwaukee** 18:17

**mind** 37:12 39:15 40:1,3 166:16

**mine** 53:4

**minute** 27:18 66:21 127:20 132:9 146:2

**minutes** 16:4 59:13,14 65:7 134:4 146:12

**[minutes - new]** Page 21

162:8
**misleading**
29:19 30:2,6,8
30:16 159:9
160:1,15
**missed** 80:3
**model** 42:15,19
**moderna** 38:12
40:15 106:18
106:20
**moment** 43:17
45:18 56:19
102:15 112:8,9
**moments** 36:16
**monday** 79:18
80:10 130:8,11
130:17 131:20
138:14
**money** 22:2
25:4 26:5
33:10 39:12
60:6 91:14
**monitoring**
22:21 23:2,3,4
**month** 93:18
114:16 115:7
115:12,12
117:11,19
120:9 134:20
142:1,9 148:16
148:21 149:3,4
152:3 153:8
154:9 155:11
155:19 156:21

**months** 100:7
156:9 157:3
164:14
**mood** 39:15
**morgan** 34:1,3
43:17 151:1
**morning** 9:14
12:10 111:14
111:16 113:18
**motion** 6:14
27:10,14 34:14
47:21 48:19
49:15,16 55:16
58:8 64:6
66:11 68:7
70:13 74:3,17
75:10,15,21
**motions** 55:6
74:5
**move** 78:5
95:18 117:2
119:18 123:13
129:16 133:18
149:13 152:7
153:12
**movement**
112:18 127:14
139:19
**moving** 78:15
**mrogers** 3:6
**multiple** 15:20
51:6 52:9
108:2 109:8
**muted** 89:15

**n**

**n** 9:1 51:1,1
**n.w.** 4:17
**name** 10:12
19:1 22:4
24:13 29:13
37:7 51:1
61:16 63:1
69:2 73:7,12
73:14 87:9
96:16 161:7,17
163:3 165:8
166:14
**named** 168:5
**names** 16:6
29:15 31:11
57:17
**nandkumar**
1:14 6:3,18,20
7:1,2,4,4,6,6,8
7:8,10,10,12,12
7:14,14,16,16
7:18,18,20,20
8:1,2,3,4,5,6,7
10:5 11:9,16
11:17,21 46:7
50:4 54:13
59:10 66:1,9
69:10 82:13,15
84:3 89:5,7,9
89:11 90:13
96:2 98:11,13
98:14,16,18,19
98:21 99:2,3,5
99:7,8,10,12,13

99:15,17,18
102:14 115:4
119:21 124:12
132:21,21
141:20 147:1,3
147:4,9 148:4
149:17,19,21
150:1 151:6,8
151:9,12
152:11,13,14
152:17 153:14
153:16,17,20
154:16,18,19
155:8 167:4,12
169:5 170:2,24
171:2,4,12
**nature** 29:18
51:21
**necessary**
171:6
**neck** 69:18
**need** 42:21 47:6
47:8 65:8
102:16 167:10
**needs** 50:7
**negative** 42:3
**net** 144:2
145:10
**never** 21:16
22:9 32:9 69:4
111:11 112:6
137:6 155:2
158:1
**new** 2:7,7 3:11
3:11 97:7

**[news - ny]**

**news** 30:1
33:12,12,15
38:11 42:3
80:19 83:13
85:21 86:5
87:7,7 91:3,15
97:7 107:11
109:18 111:17
111:21 112:5,5
112:16 127:20
132:6,7 140:18
141:7 145:15
159:16
**night** 111:14
**nine** 137:3
**nodding** 101:10
101:13
**nods** 14:1
**normally**
109:10
**north** 5:6
**notarial** 168:16
**notary** 1:17
9:12,13 168:3
171:13,19
**note** 9:17
169:10
**noted** 163:12
171:7
**notes** 24:12
166:10,13
**noticed** 73:7,16
117:4
**noticing** 11:4

**nov** 110:12
**novavax** 1:9
6:18,20 7:2,4,4
7:6,6,8,8,10,10
7:12,12,14,14
7:16,16,18,18
7:20,20 8:2,3,4
8:5,6,7 10:8
11:6 30:7
31:12,16 34:3
37:20 38:10,13
40:6,8,19 41:2
41:8,16,20
45:7,10 51:14
62:15 73:9,13
79:9,12,17,21
80:7 81:2,9
82:15 84:3,16
86:17 87:17
88:1,12 89:7
89:11 90:13
91:10 93:1,3,7
93:13,18 94:6
96:2 97:9,17
98:13,14,18,19
99:2,3,7,8,12
99:13,17,18
102:14 104:7
104:13 105:14
105:18 107:4
108:7,12,21
109:7,15,19
110:15 112:12
114:4,8,13
115:4,12

116:11,16
119:21 120:17
121:8,13 122:1
124:7,12,19,21
125:17 129:5
129:10 130:3
132:21 134:16
134:19 135:5,7
141:20 142:19
143:13 144:2
144:14,19
145:3,16,17
147:3,4 148:4
148:21 149:17
149:21 150:1
150:14,18
151:8,9,12
152:3,13,14,17
153:8,16,17,20
154:9,18,19
155:8,18
156:10 157:19
160:14,21
161:6,10,14,19
165:9 166:16
169:4 170:1
171:1
**nowadays**
94:16
**nuggehalli** 1:13
6:3 11:21
91:13 167:11
169:5 170:2,24
171:2,4,12

**number** 10:4
10:10 48:4
65:21 84:2
94:1 100:17
102:14 105:4
105:10 106:1
107:16 109:11
110:4 114:2
115:4 116:4
117:16 124:12
126:12 127:12
139:11 141:20
147:8 148:4
160:8 167:4
**numbered** 6:18
6:19 7:2,3,5,7,9
7:11,13,15,17
7:19 8:2,4,6
55:1 82:14
89:6,10 98:12
98:17 99:1,6
99:11,16 147:2
149:20 151:7
152:12 153:15
154:17
**numbering**
99:21
**numbers** 41:10
50:3 136:13
155:3 167:5
**nvx** 104:8
**ny** 169:15

**[o - okay]**

| **o** | occurred  25:21 | 28:6,10,17 | 84:11,19 85:4 |
|---|---|---|---|
| **o**  9:1 16:16 | **october**  26:14 | 29:1,7,17 30:5 | 85:8,13 86:7 |
| **oath**  9:8,9 | 26:21 81:5 | 31:2 32:4,11 | 86:14 88:3,20 |
| **object**  104:16 | 98:10 100:8 | 33:2 34:2,8,13 | 90:6,7,9,11 |
| **objecting**  76:18 | 123:1 141:17 | 34:19 35:9 | 91:1,8 92:17 |
| **objection**  13:17 | 141:18 142:2 | 36:6 37:10,13 | 93:2,16 94:4 |
| 39:3 42:17 | 142:18 144:1 | 38:8,20 40:4 | 95:21 96:1,3,9 |
| 77:5 81:13 | 144:10,19 | 42:5,10 44:3 | 96:18 97:14,19 |
| 88:6,15 91:21 | 145:2,16 | 44:16,20 45:19 | 98:6 100:9,21 |
| 92:3 94:13 | 155:12,19 | 46:2,3,14 47:5 | 101:6,7,15,18 |
| 105:1 111:9 | 156:5 159:3 | 47:15,18 48:2 | 102:6,13,21 |
| 112:2 113:14 | 161:11 | 48:6,8,13 49:6 | 103:6,10,14,17 |
| 116:18 117:20 | **offhand**  37:9 | 49:17,20 50:15 | 103:20 104:2 |
| 119:16 121:2 | 41:4 85:12 | 51:20 52:6,13 | 105:3,6,9,16,20 |
| 123:3 125:3,19 | **office**  63:8 | 52:18 53:6,11 | 106:7,16 108:5 |
| 126:19 127:15 | **officer**  19:21 | 54:4,6 55:3 | 108:15,17,19 |
| 130:20 131:12 | 31:16 | 56:16 57:2,7,8 | 109:17 110:3 |
| 132:2 135:8 | **offices**  33:3 | 57:14,20 58:2 | 110:18 111:1 |
| 137:20 139:13 | **oh**  21:11 59:18 | 58:7,13,19 | 114:12,20 |
| 140:2,13 141:4 | 60:21 66:6 | 59:3,7 60:3,21 | 115:2,19 116:1 |
| 142:21 143:15 | 81:21 82:2,19 | 61:8 62:4,8,18 | 116:3,14 117:2 |
| 143:18 144:5 | 103:8 106:4 | 63:7,10,18 | 117:8 118:3,8 |
| 145:4 156:11 | 124:11 160:19 | 64:12,17,21 | 119:2,9,18 |
| 156:17 157:7 | **okay**  13:9 | 65:3,6,12 | 120:5,21 |
| 157:13 159:12 | 14:11,18 15:1 | 66:16,18 67:15 | 121:16 122:4 |
| **objections** | 15:12,15,19 | 67:20 68:4,11 | 122:17,21 |
| 10:20 103:3 | 16:1,3,5,13 | 68:19 69:4,7 | 123:8,13,15 |
| **objects**  13:15 | 17:16 18:2 | 69:13,20 70:7 | 124:2,10,17 |
| **obtain**  17:4 | 19:15 20:10,19 | 70:20 71:3,6 | 125:2,7,11,12 |
| 87:1 | 21:1,11,18 | 71:10,13,17,20 | 126:3,15 127:3 |
| **obtained**  81:10 | 22:5,17,20 | 72:10,13 73:12 | 128:12,14 |
| 86:15 87:15 | 23:4 24:10,15 | 74:20 75:5,12 | 129:7,13,15,18 |
| **occur**  16:1 | 25:1 26:2,11 | 78:4 79:15 | 129:20 130:6,9 |
| 67:13 140:11 | 26:21 27:4,9 | 80:12 81:4,21 | 130:16 131:9 |
| | 27:14,17 28:3 | 83:6,7,15 | 131:18 132:17 |

132:19 133:1 134:6,10 135:2 135:4,13,21 136:3,9 137:19 139:6,18 141:16,18,18 142:12,14 143:6,10,21 144:9,15,18 145:1,9,19,19 146:5,8,13,16 147:20 148:11 148:15 149:8 149:13,16 150:3,9 151:3 151:11,14 152:7,10 153:7 154:5,13,14 155:14,17 156:4 157:2 159:3 160:6,20 162:10 164:1 164:15,18,18 165:21 166:18

**old** 51:4,6
**once** 44:8,9 92:4
**ones** 73:20 80:21 136:16
**online** 17:12 44:14
**open** 43:13 47:2 120:4,6,7
**operated** 87:10

**operation** 18:10,11
**operative** 74:5
**opinions** 74:7,9 74:10
**opportunity** 13:11
**opposed** 41:21 85:10 86:10 133:10
**order** 15:8 27:10 42:7 45:4 74:17 75:20 76:6 111:7 119:4 136:6 137:13 138:5 139:2,9 139:11
**orders** 74:7,9 74:10 137:5 140:9
**orient** 135:15
**outcome** 10:19 168:15
**overseas** 107:13
**own** 17:20 18:3 21:4 40:3 54:8 55:12 58:21 72:15 86:10 162:8
**owned** 87:5 104:13 110:14 121:12

**owner** 18:19,21

**p**

**p** 9:1
**p.m.** 147:6 162:12,14,15 162:16 167:2 167:12
**pace** 69:21
**page** 47:21 48:4,4 50:1 56:3,9 57:6,19 57:19 59:1,3 60:12 61:13,14 61:17 62:4,19 63:2,3,16,19,19 70:15 71:13,21 72:11 103:4,6 103:6,7,9,11,15 104:4 105:7,8 106:1 108:15 108:18,20 110:8 115:20 115:20 116:6,7 116:21 117:3 118:5,18 120:21 121:15 124:15 125:7 125:12 126:3 130:2 135:2,16 136:16 138:12 138:16,17 142:13 143:8 164:2,15,17,20 170:4,7,10,13 170:16,19

**pages** 47:7 56:8 107:17 108:16 116:10 128:12 129:17
**paid** 38:16
**paired** 137:16
**panic** 41:17
**paper** 27:14 47:21 49:16 55:16 70:13
**par** 76:3
**paragraph** 48:14,15 61:15 62:13 63:15 72:11,12 73:21 73:21
**pardon** 108:16
**park** 2:13
**part** 19:12 44:6 50:21 76:11 81:10 84:7 87:16 90:18 96:5 97:10 143:12 166:16
**partial** 158:14
**participants** 9:20
**participate** 28:6,8 68:16 165:14,16
**participated** 16:5 76:3 77:7 82:6 165:12,12
**participating** 9:3 76:12

**[particular - pomlaw.com.]**

**particular** 21:9 21:10 26:8 27:6 30:6 32:20 38:9,21 40:6 43:7 57:19 62:9 63:5 77:7 85:10 86:8 91:9 93:12 96:18 104:14 108:11 109:8 109:14,18 111:1,5,8,21 114:16 115:12 117:11,18,19 132:15 136:4 141:3 142:9,19 145:15 149:9 158:6

**particularly** 38:12

**parties** 9:10 10:3 168:13,14

**partner** 19:1

**party** 10:17

**past** 133:3

**patient** 97:1

**pattern** 131:21

**pause** 14:4 100:13

**pay** 50:8 59:21 128:9 158:2

**payroll** 17:20

**pdf** 48:11 103:9 103:11 105:8

118:6 164:17

**pending** 37:11 118:9,12 166:2 167:1

**pennsylvania** 4:17

**people** 50:12

**percent** 42:21 68:14 113:17

**perfectly** 77:9 112:17

**period** 25:16 26:9,12,19 42:1 62:15 75:17,20 102:18 103:19 107:2,7,18 112:14 122:21 147:21,21 156:5,6 161:11

**person** 9:8 29:15

**personal** 19:16 33:17 54:8 155:4

**personally** 29:3 44:20 52:18,21 64:2 73:19 148:6 160:2 168:6

**peter** 4:6

**peter.welsh** 4:7

**pfizer** 38:12 40:15

**pharmaceutical** 95:6

**pharmaceutic...** 95:8

**phase** 95:16

**phil** 11:12

**phillip** 3:15

**phone** 53:2 69:7 76:5 85:18 94:8 132:8

**physically** 9:4 15:10,11 44:14

**picked** 22:3 73:10

**piereson** 4:8

**pinpoint** 110:2

**place** 4:10 10:2 134:4 137:13 139:2,9,11 168:6

**placed** 119:4 138:4

**places** 33:14

**plaintiff** 20:5 23:21 27:21 46:21 58:8 64:8 74:4 165:8 166:14

**plaintiff's** 6:14 66:10 68:6 163:2,7

**plaintiffs** 1:7 22:14 27:11 72:7

**planning** 17:11 17:17

**plants** 43:13

**platform** 33:21

**please** 9:17 10:21 11:20 12:15 13:14,16 16:13 23:10 25:2 35:1,16 39:5,6,8 71:8 80:3,4 82:12 88:8 92:3 141:15

**pleggio** 3:16

**plus** 128:20,20

**point** 23:15 27:9 71:1 79:16,20 143:6 145:2 156:8 157:3 166:4

**pointing** 28:17

**points** 107:14

**politico** 80:13 80:15,17 81:2 81:5,10 82:3

**pomerantz** 2:3 11:8 20:9,20 21:3 22:13 24:11,16 32:18 72:20,21 165:19

**pomlaw.com** 169:2

**pomlaw.com.** 2:5

**[portfolio - provided]** Page 26

**portfolio** 86:5
122:10
**portfolios**
85:17
**portnoy** 2:10
2:11 11:14,14
11:15 16:7
20:15 22:13
35:15 69:17
89:17 101:19
165:16
**portnoy's**
20:11 21:11,13
22:3 32:19
**portnoylaw.c...**
2:12
**position** 42:7
77:18 119:11
**positions**
103:15,18
116:2,4,8
117:9,10 135:3
142:16 148:16
**possibility**
32:18 40:9
**possible** 127:11
156:16,19
157:2,6,9,15
**possibly** 159:5
**post** 16:20
**potential** 35:6
107:12
**potentially**
76:8

**power** 133:8
146:1
**premadoc**
96:12,15,17
**premaladha**
96:16
**preparation**
36:6
**prepare** 15:1,8
57:21 58:9,14
63:5 64:2,3
**prepared** 58:3
58:5
**present** 5:12
9:4 11:2 16:14
16:15 157:17
**presentation**
58:20 104:1
134:14
**presented**
29:12 57:2
60:17 64:15
79:9 123:10
**presenting** 79:1
**presently** 20:4
161:19
**presents** 57:15
**president** 79:1
**presidents** 18:1
53:3
**presiding** 37:8
**presumably**
116:5
**pretrial** 76:7

**pretty** 114:11
146:3
**previously** 93:4
110:9
**price** 39:21
40:1,14 41:2,8
42:8 91:10
94:6 112:1
127:4,14
139:19 140:10
141:3
**prices** 127:8
**pricing** 137:17
**primarily**
33:16 106:21
123:1
**print** 45:13
**printout** 56:2
**prior** 90:20
110:15,18
120:12 161:13
**privilege** 76:19
77:16 78:9
**probably** 60:14
**problem** 61:10
**proceed** 12:6
24:20 25:11
46:13 66:3
77:15 147:11
162:18
**proceeding**
10:21 37:4
54:7 75:7
**proceedings**
168:11

**process** 45:19
**produce** 38:2
**produced** 81:2
**producer** 107:1
**product** 141:11
**production**
44:17
**products**
161:10,14,19
**professional**
17:7 95:2,5
**program**
113:13
**prompted** 40:7
**proper** 50:20
**proposed** 27:5
72:19
**prosecuting**
35:11,21
**prosecution**
74:1
**prospects**
91:10
**protect** 72:15
**protected** 78:9
**protecting**
72:21
**proud** 155:2
**provide** 36:4
45:3 58:8 64:8
71:3 91:18
148:7
**provided** 28:19
64:11,11 93:12
114:7 115:17

117:12 142:6
148:18 167:4
**provides**
148:13
**providing**
28:18 84:8
**pub** 19:15
**public** 1:17
19:13,15,19
38:21 42:11,16
43:9 52:16
53:8,13 77:8
78:7 168:3
171:19
**publicly** 20:1
**pulling** 25:6
**purchase**
110:10,12
119:4 127:8
128:18 129:9
130:18 131:11
136:6 139:9,21
145:3,11
**purchased**
18:13 110:19
126:13 129:4
**purchases** 6:11
54:14 57:9
114:3,8,13
117:16 122:12
136:10
**purports** 126:8
**purpose** 62:9
**pursuant** 6:12
59:11 61:14

**pursued** 74:1
**pushed** 93:7
**put** 15:4 32:19
39:12,13 45:9
59:7 68:4 78:6
84:15,17 88:20
95:18 145:19
151:3 153:12
**putting** 102:7

**q**

**q2** 93:8
**q3** 93:9
**qaulcomm**
106:17
**qualcomm**
106:10
**quality** 9:18,19
**quantities**
137:7
**quantity** 104:9
**quarterly** 79:4
**question** 13:13
28:10 31:15
35:1,17 39:4,5
42:18 44:2
47:5,9 76:20
76:21 78:2
81:20 88:9
102:16 105:20
117:8
**questions** 13:10
14:9 23:9 79:6
133:6 162:1
166:2,8,9,17
167:1

**queue** 56:18
**quickly** 146:3
**quite** 94:10
141:8

**r**

**r** 6:4 9:1 16:16
170:3,3
**rakhlin** 3:7
**randomly** 83:1
**range** 20:18
160:16
**rather** 134:3
**reaches** 40:4
**reacting** 141:13
**reactive** 140:18
**read** 26:10 32:8
33:13 39:7,9
48:14 71:18
80:1,9,14 81:1
111:2 119:2
143:4,17 154:1
159:16 165:3
169:9 171:5
**reading** 82:7
119:9 167:13
**reads** 72:14
**ready** 14:20
102:4
**real** 131:8
**really** 27:7
28:14 30:17
41:17 49:4,5
61:2 74:12
93:21 129:11
132:16

**reason** 14:7,10
40:17 58:19
63:10,13 64:13
64:17 85:6
86:8 96:19
105:3,16
109:14 114:5
115:15 120:13
122:3 124:3
126:15 127:1
128:2 129:12
131:8,16 142:5
148:17 150:9
151:20 153:3
154:5 155:14
169:11 170:6,9
170:12,15,18
170:21
**reasons** 131:17
**recall** 27:10
28:5,18 30:7
30:17,19 31:13
32:16,20 36:3
36:16 40:20
41:6,20 47:9
47:20 57:11,18
57:18 61:19
68:19 73:19
74:11,16,21
76:1,16 80:11
81:4 86:12,14
87:8,14,19
91:8,11 93:11
93:14,20,21
96:18 97:14,18

**[recall - remember]**                                   Page 28

107:10 109:16
109:17 110:2
110:18 111:2
112:5,19 113:9
113:12,17
121:21 122:3
129:7,11 131:7
145:15,18
158:15 159:1,5
160:17
**recalled** 166:14
**recalling**
112:21
**receipt** 169:18
**receive** 148:12
**received** 46:17
66:16 101:16
101:19 102:1
132:6
**receiving**
127:20
**recently** 161:4
**recess** 46:6,10
65:18,19
146:21 147:6
162:14,15
**recognize**
115:6 120:3,8
134:10 141:21
**recollection**
21:19 30:12
32:5 49:1 85:9
93:17 108:11
125:15 132:13
138:4 139:7

144:18 166:11
**recommend**
113:7
**recommendat...**
52:4
**recommended**
95:9
**record** 9:15
10:3 11:4
12:16 13:18
14:6 39:9
45:18 46:1,5
46:12 65:17
66:2 83:14
118:4 124:11
146:17,20
147:10 148:3
152:16 155:4,4
162:13,17
167:2,8 168:11
**recorded** 10:1
10:5 65:21
147:8 168:10
**recording** 9:18
10:2
**records** 58:8
64:5 97:21
**recross** 166:2
**redacted**
107:16 116:5
144:13
**redactions**
103:1
**reduce** 42:3

**reducing** 42:6
**reexamination**
166:5
**refer** 55:12
**reference** 38:8
48:21 49:13
62:19 72:2
74:8 76:12
92:21 104:6
106:17 108:6
112:20 118:16
121:17 125:8
128:15 143:11
**referenced**
31:10 32:16
36:7 43:17
169:6
**references**
108:21
**referencing**
6:11 42:6
54:14 78:7
**referred** 41:7
**referring** 52:10
52:10 75:9
118:17 128:11
**refers** 72:3
104:7
**reflecting** 57:9
**refresh** 49:1
**refreshed**
166:10
**regard** 77:11
111:3

**regarding** 21:6
21:8 36:13
45:7 48:19
59:4 79:3
114:7
**register** 37:12
**registered**
13:18
**regroup** 162:8
**regulatory** 93:8
**relate** 29:16
**related** 10:17
13:1 22:6 30:8
32:7 74:7 81:2
97:9 168:13
**relating** 86:5
**relationship**
20:10,12,13
141:1
**relative** 95:6
**relaxed** 69:21
**relay** 79:3
**relevant** 76:8
95:3 97:3
103:2 105:18
**relied** 15:4
32:12 79:21
**rely** 43:8 80:8
123:9,10
**remaining**
146:4
**remember** 22:1
30:11 34:5
36:21 37:9,18
40:14,18,21

41:1,4,10 47:14 49:4 74:12,15 80:20 85:12 86:12 87:18 88:2 108:13 109:16 110:21 112:17 113:3 123:5 125:18,21 128:1 131:16 139:16 140:5 144:21 158:20 161:7 165:5,7 165:9

**reminder** 35:13

**remotely** 9:6,9

**repeat** 35:1,17 39:5 80:3 88:8

**rephrase** 13:14

**reply** 72:2,4,8

**report** 86:9 126:8

**reported** 1:20 120:14

**reporter** 9:2 10:14 11:20 13:20 82:1

**reporting** 9:5 18:1

**represent** 10:13 22:12 129:13 130:7 135:19 138:13 144:11

**representative** 21:2 34:16,21 35:4,5,10 36:1 62:11

**representatives** 6:15 66:12 68:8

**represented** 20:15,20

**representing** 22:14

**represents** 20:7 126:8

**request** 34:15 44:17 45:1

**requested** 39:10 91:5

**requests** 74:6 84:8 96:6

**required** 171:13

**requirements** 25:11,13

**research** 37:21

**reserving** 103:2

**respect** 30:5 31:15 39:1 40:6 44:1,4 51:14 53:13 58:21 59:4 63:21 64:12 76:7 80:2,7 81:8 90:19 97:17 106:8 107:3,6 109:19

115:10 117:8 138:21 148:15 156:4 157:12

**respond** 77:4 166:3

**response** 14:9 88:12 96:6 97:14

**responses** 74:6 77:15

**responsibility** 19:10,12 67:4

**responsible** 44:21

**responsive** 45:1 45:5 84:8

**rest** 33:13 40:11 114:1

**restate** 121:5

**retained** 167:6

**retaining** 72:16

**retired** 19:2,5

**retroactively** 125:4 137:21

**return** 169:13 169:17

**reveal** 23:10

**revealing** 15:6 77:1

**review** 13:9 27:14 28:11,11 28:20 47:3 71:1 111:6 166:9 169:7

**reviewed** 61:19 62:10 68:11 74:4,11 79:11 79:16 109:19

**reviewing** 30:13 36:17 47:10 74:16,21 86:11

**revisit** 77:19

**reviva** 95:8

**right** 19:10 32:4 37:2 43:2 45:14 50:14 55:18 56:12 57:4 60:9,11 67:7 68:15 70:1,5 78:4,15 83:10,14 95:15 97:8 102:4 110:7 116:2 117:6,14 123:13 127:6 127:10 134:10 137:8,12 142:14 158:3 161:1 164:5,11 164:12 165:19

**rights** 73:1

**risk** 42:11

**rogers** 3:5 11:10,10

**role** 35:20

**room** 9:4

**rooms** 59:21

**roots** 163:16
**ropes** 4:3,14
  5:3 11:5 50:7
**ropes.com.** 4:7
  4:9 5:5
**ropesgray.com.**
  4:5,16
**rough** 167:10
**routine** 111:5
  111:12
**row** 98:2
**rpr** 1:21
**rules** 13:10
  67:6
**run** 50:12 87:9
  163:16
**runs** 115:4
**ryan** 5:12
  10:12 146:18

**s**

**s** 9:1 170:3
**sa** 91:2
**sale** 109:7
  111:3 117:6
  126:5,8,11
  127:4,12
  129:21 130:2
  130:12 131:4
  134:15 139:21
  149:4
**sales** 57:9
  114:3,8,12
  117:17
**save** 45:13 60:5

**saved** 59:15
**saw** 24:13
  28:15 49:16
  96:21 163:3
**saying** 30:18
  104:12
**says** 48:4 56:2
  57:5 60:12
  62:13 72:1,18
  164:3,5,20
**schedule** 37:14
**schizophrenia**
  95:16,17
**school** 16:20
**screen** 10:1
**screens** 33:2
**seal** 168:16
**search** 84:16
  86:2
**sec** 67:5
**second** 59:3
  61:13 62:4
  63:2,3 71:13
  72:1,5,6,11,17
  74:2
**seconds** 101:4
**section** 103:18
  119:10 144:12
**securities** 6:13
  13:1 19:13,16
  19:19 20:5
  21:4 22:10
  25:20 33:20
  42:12,16 52:3
  52:16 59:11

  61:15 62:15
  73:8 85:20
  105:12
**security** 25:5
  79:2
**see** 26:6 33:1
  39:14 44:10
  45:10 57:17
  62:16,20 63:3
  68:9 70:17
  73:1,14 78:6
  79:6 85:19
  90:14 91:12
  92:9 93:1,9
  94:6 103:14
  105:15 106:4
  107:16 108:8
  108:20 109:1
  109:13 110:16
  110:17 113:7
  116:12,20
  117:3 118:7,8
  121:7,9,19
  123:6 125:13
  126:4,5 127:5
  128:15 129:21
  132:10 135:5
  136:10 138:3
  141:11 143:11
  144:13 152:2
  164:3
**seeing** 32:17
  57:11 113:12
**seek** 44:11

**seeking** 74:4
  77:14 85:15,15
  86:9,16,20
  87:20
**seekingalpha**
  96:10
**seekingalpha....**
  85:14
**seems** 50:12
**seen** 9:21
  113:18 158:1
**select** 64:7
**selected** 24:10
  83:1
**sell** 40:5,13
  43:1 86:17
  87:17 107:12
  109:6,10,15
  111:12 115:11
  131:7 134:15
  138:15 139:1
  139:11 141:3
**selling** 131:20
  158:21
**seminars** 44:14
**send** 49:7 54:11
  59:8 66:8 69:8
  74:13 82:11
  83:11 86:9
  98:1 146:4
**sending** 22:9
  55:18
**sense** 55:21
**sent** 36:19 45:8
  45:11,15 58:5

**[sent - sir]** Page 31

74:14 83:21
84:18 85:2,5
91:4,5,12
93:20 94:1
97:13 169:14
**sentence** 48:15
72:14,17 73:2
74:2 76:2,12
**separate** 25:8
29:3 30:13
43:18 52:8,8
52:15 86:14
111:1 137:4
138:21
**separately**
49:19 137:4
148:11
**september**
100:8 134:11
134:20 135:6
135:20 139:8
139:10 144:1
154:2,10
**series** 102:7,21
135:16 138:15
145:10
**serve** 18:3
**served** 44:17
**service** 64:6
**serving** 23:21
**session** 36:6
**set** 39:13,15,19
40:2 45:19
98:8 112:6
159:10 160:15

168:7
**settle** 117:5
119:7 131:6
**settled** 119:14
**settlement** 37:5
118:9,12
131:11
**seven** 137:2
**shareholder**
72:21
**shares** 104:13
104:21 108:7
108:12 109:5
110:5,5,12,15
110:20 116:17
117:18 119:4,5
119:12,13
121:8,13,18
122:1 124:19
124:21 125:14
125:17 126:9
126:12,17
127:12 129:5
129:10 130:14
130:18,19
131:20 135:7
136:7 138:20
139:9,12
142:16,18
143:13 144:3
156:10 158:18
158:21
**shawn** 51:1,1,7
51:8 52:8,11
153:1

**shawn's** 147:18
150:7 151:18
154:3,8 155:11
155:18 157:12
**sheet** 62:14,20
169:11
**shopping** 82:21
**short** 41:14,17
41:18,21 42:1
**shorted** 41:16
**shorting** 41:13
**show** 33:10
119:5 125:9
134:2 159:2
**showed** 73:10
84:18
**showing** 49:14
116:10 144:14
**shown** 45:10
61:12 110:10
**shows** 86:6
104:8 109:3
110:4 124:18
131:10 142:16
144:7
**shut** 43:13
**side** 163:15
**sign** 163:9
169:12
**signals** 14:1
**signature** 62:6
71:14 168:20
**signed** 71:17
77:8 169:20

**significance**
106:20
**signing** 167:13
**similar** 21:21
22:2 63:20
**similarly** 1:6
**simply** 47:9
86:10 102:17
**single** 138:5
139:2 145:11
**sinnathurai** 1:3
10:7 169:4
170:1 171:1
**sir** 12:17 14:7
14:21 16:12,13
17:19 23:19
24:2 25:19
31:18 32:1
37:17,18 39:6
45:2 47:3,4
48:20 51:4,18
57:2 58:16
60:12,17 61:12
62:16 63:4,12
64:2 68:9,10
70:20 72:6
73:2 78:3,15
87:18 88:2
93:9,10 97:18
102:6,16
105:13 109:1
115:6 116:6
118:21 120:1
121:19 124:15
134:10 135:19

141:21 150:5
151:16 154:1
154:12 155:7
161:3 166:4
**sit** 43:14
**site** 85:6,16
86:11,16 87:9
87:16,20
**sites** 45:13
86:19
**sitting** 30:14
32:4 75:14
91:8 108:10
126:15 129:8
139:7 156:7
**situated** 1:6
**six** 16:19 137:2
**size** 42:6
**skyscrapers**
18:7
**slightly** 164:4
**slip** 61:3
**small** 95:12
137:6
**smaller** 136:13
**social** 92:5
**sold** 42:1 88:1
110:5 117:5
118:13 126:17
130:19 157:4
158:18
**sole** 18:19,21
**solicit** 44:6
**solutions** 10:13
10:16 167:6

169:23
**somebody**
38:14 44:8
113:6
**son** 51:2,4,13
52:7,8,10,12,14
53:7,12 54:9
57:10 63:21
64:10,10
147:18 148:8
149:3 150:7,14
150:17 151:18
152:21 154:3,8
155:10,17
157:12 160:12
**son's** 59:4 64:9
64:13 98:8
133:5 146:6
148:15 152:2
153:7
**sons** 51:6 52:9
**soon** 157:4
**sorry** 15:16
40:20 57:16
60:19,21 61:5
61:9 67:1,20
74:12 81:15
87:8 88:18
92:2 121:4,4
126:1 131:13
145:18
**sort** 22:5
**sothinathan**
1:3 10:7 169:4
170:1 171:1

**sounds** 45:20
65:5,13 134:8
146:15
**source** 43:16
**sources** 43:7
**speak** 14:3
**speaking** 113:2
**special** 158:14
**specific** 25:8
28:18 30:12
35:13,14 47:13
73:4 77:12
78:7 79:15
93:14 108:13
113:1,3 122:3
132:13
**specifically**
97:9 107:10
111:11 158:12
**specified** 62:16
**speed** 70:3
**spend** 59:13
**spoke** 23:14
49:4
**spoken** 32:9
36:9 47:18
69:7
**sporting** 67:11
**stages** 36:11
**stamped** 155:7
**stanley** 29:14
34:1,4 43:18
112:17 113:10
151:1 161:8

**star** 66:15
**start** 26:18
80:5 90:9
102:9 112:9
**started** 56:7
93:5
**starting** 26:16
115:19 117:16
**starts** 84:2
**state** 9:11
10:21 11:3
16:13 168:1,4
**statement** 77:6
93:3 102:18
103:5,19
104:12 109:9
114:7,17,21
115:16 117:12
118:4 119:11
119:19 120:9
120:14,18
123:6,17,18
129:17 134:16
141:17 142:1,6
143:12 145:7
147:19 148:7
148:18 149:14
150:6 151:16
151:17 152:8
152:21 154:3,6
155:11 159:2
**statements**
29:19 30:14
32:6 64:9 80:8
100:7 102:8

120:12 133:5
146:7 148:12
156:6 159:10
160:1,15
**states** 1:1 10:9
157:19 158:12
**status** 37:2,3
76:6 157:18
**stenographic...**
168:10
**steps** 29:4
**stock** 34:3 40:8
40:19 41:2,13
42:21 51:14
79:21 80:7
86:17 87:17
88:1 91:10,14
91:18 93:13,19
94:6 104:13
108:7,12
109:13,15
112:13,14,16
112:19 114:4,9
114:13 115:13
116:11,16
120:17 122:2
124:7 134:16
137:10 139:19
141:2 142:19
144:14,19
145:3,17
148:21 150:14
150:19 152:3
153:8 154:9
155:18 156:10

158:1,16,17
159:15 160:14
**stocks** 43:1,4
86:4,4 94:15
116:5 140:18
**stocks's** 140:19
**stop** 158:17
**stopped** 34:7
**stopping**
133:10
**store** 70:2,3
**strategic** 76:3
76:13,15
**strategy** 39:1
39:11 41:18
76:6 107:8
**street.com** 87:4
87:12
**street.com.**
87:11
**stretch** 133:20
**studies** 95:16
**stuff** 17:14
28:14 30:1
94:20
**submission**
93:8
**submitting**
48:17 165:1
**subscribe**
85:16
**subscribed**
171:14
**substance**
23:11 35:14

78:11 92:19
**substantive**
91:2
**subtract**
117:17
**sucharow** 3:4
3:14 11:11
22:18 72:20,20
73:5
**sufficient** 65:7
**suggests** 92:10
**suit** 25:7 37:3
**suite** 2:14 3:18
**sum** 136:5
**supermarket**
83:1
**support** 6:14
46:20 66:10
68:7 72:3
**supposed** 37:15
37:16
**sure** 12:16
13:19 26:20
27:2 31:14
32:2 35:2 39:7
45:18 47:11,13
49:5 55:10
68:13,14 71:9
72:8 87:18
89:18 91:6
93:15 101:2
105:19 109:11
109:21 110:16
113:17,19
127:17 128:8

139:15 146:5
148:9,10
156:14,21
159:5,14 160:5
**swear** 11:20
**sworn** 9:12
12:2 168:7
171:14
**symbol** 93:4
104:8
**system** 40:2

**t**

**t** 170:3,3
**tab** 49:8 66:8
82:12 88:21,21
90:4,5,9 95:19
95:20 100:17
102:11 114:21
115:2 123:14
125:7 132:20
141:15,18
147:16 149:14
151:4 152:9
155:3 163:3
**tabs** 98:10
**take** 10:2 27:17
29:4 65:7 79:6
83:19 101:4
102:15 105:12
114:17,20
115:19 117:16
134:1 142:12
146:1 155:9
167:9

**[taken - time]** Page 34

**taken** 1:14 10:6 17:10 37:5 46:6 58:4 65:18 121:5 146:21 162:14
**talk** 14:5
**talking** 36:2 48:3 61:4 131:3,3 160:2
**talks** 93:5
**target** 38:6 39:19,21 41:7 112:6
**targets** 39:12 39:13
**td** 21:4 45:6 102:17 107:19 114:7 115:6,16 120:8 122:18 123:10,17 134:11 138:5 139:3 141:21 142:6 147:18 148:13,18,20 150:6,19 151:18 152:21 154:2 155:11
**tdc** 1:5 10:11 164:8
**team** 91:3
**tech** 17:5
**technology** 12:15
**teleconference** 15:16,17,19

165:5,11 166:11
**teleconferences** 15:20
**telephone** 15:13 36:8
**tell** 12:2 52:4,5 53:17 77:10 92:7 114:17 120:16 149:7
**telling** 25:13 55:7
**ten** 65:7 137:3
**tennessee** 18:16
**term** 32:3 41:18
**terms** 24:5
**testified** 12:4
**testifying** 9:11
**testimony** 14:8 14:11,19 16:10 167:3 169:9,18 171:8
**texas** 17:5,6
**text** 67:11
**thailand** 158:9
**thank** 12:7,10 31:2,2 46:16 60:7 65:15 66:4 102:6 119:18 146:14 147:10,12 152:7 162:3,19 163:10 167:7

**thanks** 49:6 65:14 70:9 162:11
**thesis** 39:1
**thestreet.com** 87:16
**thing** 19:10 30:11 40:1 43:15 59:6 73:17 86:3 93:14 97:20 132:9 141:12
**things** 27:19 33:12 36:12 39:14,16,17 45:14 53:17 55:9 67:12 73:9 74:3 97:4 110:1 111:15 140:9
**think** 20:16 22:9,10 34:5 40:3 48:11 55:6 57:20 59:14 65:2 75:1 77:8,16 82:17 93:20 97:21 103:9,11 103:12 105:3,7 113:18 114:6 114:10,10 118:6 131:18 133:6,9 140:15 146:2 156:16 156:20,20

158:13 159:7 159:21 160:4,7 163:6
**thinking** 97:6 166:16
**third** 109:5
**thirty** 16:19
**thomas** 4:4 11:5
**thomas.brown** 4:5
**thought** 40:9 40:12,16 57:16 97:3 112:13
**thoughts** 91:9
**thousand** 119:4 121:18 122:1
**three** 18:14 20:16,17 36:10 92:20 108:20 109:3 128:16 130:2 137:2 147:8 167:5
**thursday** 129:14 130:11 130:18 131:20
**ticker** 93:4 104:8
**tied** 55:14
**tight** 134:2
**time** 1:16 10:21 11:19 12:5 14:15 20:21 23:18 25:20,21 26:1 30:9

**[time - transcript]**                                            Page 35

31:13 34:7
39:17 41:11,20
43:3,12,14
45:12 46:4,11
60:14 65:2,16
66:1,7 74:16
76:13 86:13
87:5,6 93:15
94:5,19 95:11
97:2 107:18
109:10 111:18
112:4,9,14
122:19,21
123:6 131:7,17
132:5 137:13
137:14,17
139:16 140:6,8
140:16,17
145:18 146:19
147:9 156:8
159:1 160:17
162:2,12,16
165:6 166:7,8
168:6 169:19
**timeframe**
169:8
**timeline** 30:18
93:8
**times** 12:19
25:21 36:8,10
39:13 42:2
43:11 49:5
93:18 159:15
**timing** 132:10

**tirrell** 33:8
113:6
**title** 72:6
**today** 10:14
12:11 14:9
15:2 16:10
23:18 30:14
68:12 75:15
91:8 108:10
129:8 156:7
157:18 163:3
167:5
**today's** 167:3
**together** 15:4
25:4,6,6 49:15
53:5 59:16
60:1 70:13
92:10 98:5
128:16
**told** 52:2 91:13
101:3 149:7
**tolerance** 42:11
59:19
**tom** 54:16
60:19
**top** 48:4 50:3
56:9 61:14
63:1,20 84:4
90:15 96:4
103:14 118:9
146:11 164:3,9
**topics** 30:6
**total** 110:3,4
125:17 129:5,9
136:6 138:20

167:4
**touch** 94:10
**track** 50:19
**trade** 19:13,15
34:11,12 51:15
53:19 88:3,4
88:11,13 93:12
105:14,17
109:1 118:12
125:9 128:15
130:6,10
131:10 138:6
140:9 151:1
**traded** 20:1
34:3
**trader** 94:12,17
**trades** 52:16,19
58:21 59:4
64:13 93:18,21
94:1 114:2
118:9 122:13
122:17 125:13
125:13 135:14
135:16
**trading** 19:19
33:17 34:6
42:15 43:18,21
44:4,7 51:14
53:8,13 58:8
64:9 79:20
80:6 81:8
91:18 97:16,21
111:7 114:15
120:17 123:1
124:7 132:1,5

134:19 139:6
142:8 144:2
145:17 146:7
148:12,16,21
153:8 154:9
155:18 160:3
160:14
**transaction**
108:7 115:11
117:15 118:17
118:21 119:1
121:18 123:9
126:4 127:5
131:4 140:11
145:12,14
149:9,11 152:3
**transactions**
62:14 105:10
107:18,19
108:2 109:4,6
109:7 111:4
125:9 126:12
128:16,18
130:1,3 132:15
134:15,15
136:6 138:16
144:14,19
145:11 149:5
150:13,18,18
**transcribing**
13:21
**transcript** 6:8
79:11,16
167:10,13
168:11 169:6

**[transcript - versus]**

169:20 171:5,8
**transom** 67:9
**traveling** 59:15
**trial** 14:12,13
14:14,19
**trizzino** 31:5
**trouble** 12:14
**troubles** 12:12
**true** 50:13
168:11 171:8
**truong** 3:2
11:11
**trust** 114:18
**truth** 12:3,3,3
25:14
**truthful** 14:8
**try** 45:16
**trying** 23:14
38:3 91:11
109:12 133:20
141:11
**tuesday** 1:15
131:21 138:13
138:15 139:10
140:1
**turn** 47:21
49:10 63:18
70:15 72:10
105:6 108:15
118:5 124:15
125:6 128:12
132:17 135:13
136:9 141:15
**turning** 130:1
147:14

**tv** 30:1 87:7
**twelve** 119:20
**twice** 12:20
44:10 82:19
**two** 12:21 13:3
20:16,17 25:21
26:1 36:10
43:13 65:21
89:21 90:3
92:20 103:12
108:16 125:13
127:8 130:1
137:2
**type** 122:4
**typically** 38:21
43:8

**u**

**u.s.** 40:10
**um** 33:6
**unable** 14:8
**under** 37:14
84:16 106:2
116:8 119:6
135:3 138:12
142:15
**understand**
34:13,20 35:4
35:20 77:18
104:11 117:9
119:12 122:14
135:6 150:5
151:17 152:20
158:7
**understanding**
24:19,21 25:2

25:10,18 26:4
26:7,11,16
27:4 29:17
35:9 37:1,19
53:11 54:6,17
57:14 62:8
75:14 80:17
103:21 104:18
117:10 118:11
121:11 122:5
123:20 125:15
131:15 135:11
137:1 157:17
159:6,20
161:18
**understood**
13:13 55:15
**undertake** 45:4
**unit** 10:4 65:21
147:8 167:5
**united** 1:1 10:9
157:19 158:12
**university** 17:5
**unredacted**
104:7 114:3,14
**updates** 80:19
**upper** 5:6
**upward** 127:13
**use** 55:5 93:6,6
**used** 34:6 87:1
87:15 167:5
169:20
**uses** 52:15
**using** 18:5 81:9
86:15

**usually** 39:16
78:21

**v**

**v** 169:4 170:1
171:1
**vaccine** 30:9
31:1 38:2,3,5,6
38:7 40:12,15
93:7 95:3
97:13 106:14
106:21 107:1,4
107:7,7,9
157:19 158:7
161:10,14,20
**vaccines** 38:17
43:3
**vague** 94:13
**value** 122:10
158:4
**various** 53:8
57:9 85:2
105:12
**varying** 61:6
**vaxart** 106:12
106:13
**vein** 21:14
**verbal** 13:19
**verify** 169:9
**veritext** 10:13
10:15 167:6
169:14,23
**veritext.com**
169:15
**versus** 10:8

**[vi - works]** Page 37

**vi** 106:2
**vice** 18:1
**video** 10:2,5
    65:21 147:8
    167:9
**videographer**
    5:12 9:14
    10:14 11:19
    12:5 46:4,11
    65:16,20
    146:19 147:7
    162:12,16
    166:21
**videotape** 1:14
**views** 44:6
**vir** 105:17
    106:2
**virtually** 9:18
    15:12,14
**vis** 35:20,20
**visiting** 81:4
**volatile** 112:7
    112:13,14,15
    140:17 141:9
**volatility** 141:2
    141:6
**vs** 1:8

**w**

**wacker** 5:6
**wait** 49:10
    56:19 61:5
    90:7 120:5
**waiting** 59:13
    100:11

**waived** 167:14
**want** 27:18
    43:21 44:10
    48:20 55:13
    56:6 57:10
    65:6 71:13
    74:7 86:4
    97:20 103:3
    113:19 116:8
    133:15,17
    134:1 163:8
    166:3
**wanted** 42:3
    114:15 115:10
    123:8 124:6
    128:8 142:8
    148:20 150:13
    152:2 153:3,7
    154:8 155:17
**wants** 53:15
**washington**
    4:18
**watched** 33:7
**watching** 67:13
    94:2 112:15
**water** 65:8
**way** 23:17,20
    27:19 79:7
    86:2 118:4
    123:10 127:21
    131:13 158:8
    168:14
**ways** 112:10
**we've** 59:15
    60:18 65:1

    77:1 135:14
    136:15,15
    138:19
**website** 80:12
    81:5
**websites** 86:21
    87:1
**weekend** 136:2
**welcome** 66:4
**welsh** 4:6
**went** 21:16
    45:6
**wife** 96:16,20
    97:11
**wife's** 96:16
**will.piereson**
    4:9
**william** 4:8
**willing** 62:11
**wilmington**
    3:19
**win** 24:4
**winning** 56:10
**wish** 113:21
**wit** 168:2
**witness** 2:2
    9:11,12,21
    11:9,15,17,18
    11:20 23:8
    31:20,21 35:6
    35:16 39:5,11
    42:19 50:15
    56:14 59:17
    60:3 65:3,12
    65:15 66:16

    67:7 69:15
    81:15,21 82:2
    88:8,17 92:1,4
    94:15 100:1,4
    100:9,12,18
    101:12 111:11
    112:4 113:16
    116:20 118:1
    123:5 125:21
    126:21 127:17
    131:1 132:4
    133:19 134:3
    139:15 140:4
    140:15 141:6
    143:2,19 144:7
    145:6 146:5,8
    146:13 149:16
    150:3 151:11
    151:14 152:18
    156:13,19
    157:9,15
    159:14 162:3
    163:18 166:18
    168:5,16 169:8
    169:10,12,19
**witnesses** 32:6
**word** 13:21
    72:7 75:4 80:3
**work** 53:2,5
    118:5
**working** 38:17
    53:4 161:10,15
**works** 60:2
    92:10

**[world - zoom]** Page 38

**world** 40:11
155:4
**worried** 97:2
**writing** 70:16

**y**

**yeah** 19:8
29:11 35:19
39:7 41:15
42:19 50:14
52:12 53:14
54:3 55:2 56:6
57:1 58:18
60:9 67:2 75:2
75:13 77:4
80:5,11,15,16
82:19,20 83:3
83:16 88:11
90:8 91:7 92:9
92:18 94:15
96:21 101:6,12
103:9,10,13,20
104:2,2 106:5
106:14 110:6,8
110:9 115:3
117:6 118:7
120:7 126:6,14
128:4 130:5
131:6,6 132:12
133:19 135:18
138:1,18 141:6
145:6,7 147:17
158:13 160:4,7
163:5,11,13,17
165:7,9,20

**year** 44:10 75:1
75:2 84:5
90:16 136:4
164:14
**years** 13:5,6,6
14:17 16:17,19
19:5 20:16,17
20:18 155:6
163:15
**yesterday** 51:8
**york** 2:7,7 3:11
3:11

**z**

**zagnoli** 5:4
**zero** 116:17
117:17 119:12
156:10 157:4
**zeros** 84:3
90:14
**zoom** 1:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.