# EXHIBIT F



| Company: | NOVAVAX INC |
|---|---|
| Document: | 10-Q (Q2 2021) · 08/05/2021 |
| | Entire Document |
| File Number: | 000-26770 |
| Pages: | 66 |

3/17/2022 3:26:46 PM

Intelligize, Inc.    info@intelligize.com    1-888-925-8627

Table of Contents

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**Form 10-Q**

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the quarterly period ended June 30, 2021**

**OR**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from to .**

**Commission File No. 000-26770**

# NOVAVAX, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **22-2816046** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **21 Firstfield Road   Gaithersburg   MD** | **20878** |
|---|---|
| (Address of principal executive offices) | (Zip code) |

**(240) 268-2000**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, Par Value $0.01 per share | NVAX | The Nasdaq Global Select Market |

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated Filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The number of shares outstanding of the Registrant's Common Stock, $0.01 par value, was 74,484,166 as of July 31, 2021.

Table of Contents

**NOVAVAX, INC.**
**TABLE OF CONTENTS**

|  |  | Page No. |
|---|---|---|
| **PART I. FINANCIAL INFORMATION** |  | 1 |
| Item 1. | Consolidated Financial Statements | 1 |
|  | Consolidated Balance Sheets as of June 30, 2021 (unaudited) and December 31, 2020 | 1 |
|  | Unaudited Consolidated Statements of Operations and Unaudited Consolidated Statements of Comprehensive Loss for the three and six months ended June 30, 2021 and 2020 | 2 |
|  | Unaudited Consolidated Statements of Changes in Stockholders' Equity (Deficit) for the three and six months ended June 30, 2021 and 2020 | 3 |
|  | Unaudited Consolidated Statements of Cash Flows for the six months ended June 30, 2021 and 2020 | 5 |
|  | Notes to the Consolidated Financial Statements (unaudited) | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 33 |
| Item 4. | Controls and Procedures | 34 |
| **PART II. OTHER INFORMATION** |  | 34 |
| Item 1. | Legal Proceedings | 34 |
| Item 1A. | Risk Factors | 62 |
| Item 6. | Exhibits | 63 |
| **SIGNATURES** |  | 64 |

Table of Contents

**PART I. FINANCIAL INFORMATION**

**Item 1. Financial Statements**

**NOVAVAX, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share information)**

| | June 30, 2021 | December 31, 2020 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 2,074,880 | $ 553,398 |
| Marketable securities | - | 157,649 |
| Restricted cash | 46,398 | 93,880 |
| Accounts receivable | 49,989 | 262,012 |
| Unbilled services | 21,374 | - |
| Prepaid expenses and other current assets | 162,351 | 181,264 |
| Total current assets | 2,354,992 | 1,248,203 |
| Restricted cash | 1,461 | 1,460 |
| Property and equipment, net | 213,186 | 179,954 |
| Intangible assets, net | 5,281 | 5,725 |
| Goodwill | 134,294 | 135,379 |
| Other non-current assets | 40,373 | 11,758 |
| Total assets | $ 2,749,587 | $ 1,582,479 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 73,995 | $ 54,332 |
| Accrued expenses | 249,178 | 142,468 |
| Deferred revenue | 1,220,073 | 273,228 |
| Current portion of finance lease liabilities | 98,383 | 105,862 |
| Other current liabilities | 9,887 | 3,782 |
| Total current liabilities | 1,651,516 | 579,672 |
| Convertible notes payable | 322,746 | 322,035 |
| Non-current finance lease liabilities | 9,193 | 40,083 |
| Other non-current liabilities | 20,570 | 13,480 |
| Total liabilities | 2,004,025 | 955,270 |
| Commitments and contingencies | | |
| Preferred stock, $0.01 par value, 2,000,000 shares authorized at June 30, 2021 and December 31, 2020; no shares issued and outstanding at June 30, 2021 and December 31, 2020 | - | - |
| Stockholders' equity: | | |
| Common stock, $0.01 par value, 600,000,000 shares authorized at June 30, 2021 and December 31, 2020; and 74,672,351 shares issued and 74,248,279 shares outstanding at June 30, 2021 and 71,350,365 shares issued and 70,953,739 shares outstanding at December 31, 2020 | 747 | 714 |
| Additional paid-in capital | 3,237,085 | 2,535,476 |
| Accumulated deficit | (2,449,235) | (1,874,199) |
| Treasury stock, 424,072 shares, cost basis at June 30, 2021 and 396,626 shares, cost basis at December 31, 2020 | (47,205) | (41,806) |
| Accumulated other comprehensive income | 4,170 | 7,024 |
| Total stockholders' equity | 745,562 | 627,209 |
| Total liabilities and stockholders' equity | $ 2,749,587 | $ 1,582,479 |

The accompanying notes are an integral part of these financial statements.

1

Table of Contents

**NOVAVAX, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except per share information)**
**(unaudited)**

| | | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2021 | 2020 | | 2021 | 2020 |
| **Revenue:** | | | | | | |
| Government contracts | $ | 240,534 | $ - | $ | 623,238 | $ - |
| Grant and other | | 34,026 | 35,538 | | 98,551 | 38,915 |
| Royalties | | 23,457 | - | | 23,457 | - |
| Total revenue | | 298,017 | 35,538 | | 745,246 | 38,915 |
| | | | | | | |
| **Expenses:** | | | | | | |
| Research and development | | 570,685 | 34,846 | | 1,163,356 | 51,741 |
| General and administrative | | 73,161 | 17,719 | | 136,351 | 27,098 |
| Total expenses | | 643,846 | 52,565 | | 1,299,707 | 78,839 |
| Loss from operations | | (345,829) | (17,027) | | (554,461) | (39,924) |
| **Other income (expense):** | | | | | | |
| Investment income | | 369 | 297 | | 731 | 732 |
| Interest expense | | (5,968) | (3,403) | | (10,807) | (6,806) |
| Other income (expense) | | 2,659 | 2,612 | | (3,934) | 2,613 |
| Net loss before income tax expense | $ | (348,769) | $ (17,521) | $ | (568,471) | $ (43,385) |
| Income tax expense | | 3,548 | - | | 6,565 | - |
| Net loss | $ | (352,317) | $ (17,521) | $ | (575,036) | $ (43,385) |
| | | | | | | |
| Basic and diluted net loss per share | $ | (4.75) | $ (0.30) | $ | (7.82) | $ (0.84) |
| | | | | | | |
| Basic and diluted weighted average number of common shares outstanding | | 74,118 | 58,618 | | 73,580 | 51,401 |

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(in thousands)**
**(unaudited)**

| | | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2021 | 2020 | | 2021 | 2020 |
| Net loss | $ | (352,317) | $ (17,521) | $ | (575,036) | $ (43,385) |
| **Other comprehensive income (loss):** | | | | | | |
| Net unrealized losses on marketable securities available-for-sale, net of reclassifications | | - | 176 | | (9) | 44 |
| Foreign currency translation adjustment | | 4,527 | 1,115 | | (2,845) | (731) |
| Other comprehensive loss | | 4,527 | 1,291 | | (2,854) | (687) |
| Comprehensive loss | $ | (347,790) | $ (16,230) | $ | (577,890) | $ (44,072) |

The accompanying notes are an integral part of these financial statements.

2

Table of Contents

**NOVAVAX, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)**
**Three Months Ended June 30, 2021 and 2020**
**(in thousands, except share information)**
**(unaudited)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Other Comprehensive Income (Loss) | Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| **Balance at March 31, 2021** | **74,470,583** | $ **745** | $ **3,180,114** | $ **(2,096,918)** | $ **(44,457)** | $ **(357)** | $ **1,039,127** |
| Non-cash stock-based compensation | - | - | 53,123 | - | - | - | 53,123 |
| Stock issued under incentive programs | 201,768 | 2 | 3,848 | - | (2,748) | - | 1,102 |
| Foreign currency translation adjustment | - | - | - | - | - | 4,527 | 4,527 |
| Net loss | - | - | - | (352,317) | - | - | (352,317) |
| **Balance at June 30, 2021** | **74,672,351** | $ **747** | $ **3,237,085** | $ **(2,449,235)** | $ **(47,205)** | $ **4,170** | $ **745,562** |
| | | | | | | | |
| **Balance at March 31, 2020** | **53,906,322** | $ **539** | $ **1,450,279** | $ **(1,457,665)** | $ **(2,638)** | $ **(14,486)** | $ **(23,971)** |
| Preferred stock beneficial conversion feature | - | - | 24,139 | (24,139) | - | - | - |
| Non-cash stock-based compensation | - | - | 7,932 | - | - | - | 7,932 |
| Stock issued under incentive programs | 316,815 | 3 | 8,947 | - | - | - | 8,950 |
| Issuance of common stock, net of issuance costs of $2,647 | 7,039,495 | 70 | 207,775 | - | - | - | 207,845 |
| Unrealized loss on marketable securities | - | - | - | - | - | 176 | 176 |
| Foreign currency translation adjustment | - | - | - | - | - | 1,115 | 1,115 |
| Net loss | - | - | - | (17,521) | - | - | (17,521) |
| **Balance at June 30, 2020** | **61,262,632** | $ **612** | $ **1,699,072** | $ **(1,499,325)** | $ **(2,638)** | $ **(13,195)** | $ **184,526** |

The accompanying notes are an integral part of these financial statements.

Table of Contents

**NOVAVAX, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)**
**Six Months Ended June 30, 2021 and 2020**
**(in thousands, except share information)**
**(unaudited)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Other Comprehensive Income (Loss) | Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| **Balance at December 31, 2020** | 71,350,365 | $ 714 | $ 2,535,476 | $ (1,874,199) | $ (41,806) | $ 7,024 | $ 627,209 |
| Non-cash stock-based compensation | - | - | 106,183 | - | | - | 106,183 |
| Stock issued under incentive programs | 743,019 | 7 | 30,593 | - | (5,399) | - | 25,201 |
| Issuance of common stock, net of issuance costs of $7,292 | 2,578,967 | 26 | 564,833 | - | - | - | 564,859 |
| Unrealized loss on marketable securities | - | - | - | - | - | (9) | (9) |
| Foreign currency translation adjustment | - | - | - | - | - | (2,845) | (2,845) |
| Net loss | - | - | - | (575,036) | - | - | (575,036) |
| **Balance at June 30, 2021** | 74,672,351 | $ 747 | $ 3,237,085 | $ (2,449,235) | $ (47,205) | $ 4,170 | $ 745,562 |
| | | | | | | | |
| **Balance at December 31, 2019** | 32,399,352 | $ 324 | $ 1,260,551 | $ (1,431,801) | $ (2,583) | $ (12,508) | $ (186,017) |
| Preferred stock beneficial conversion feature | - | - | 24,139 | (24,139) | | - | - |
| Non-cash stock-based compensation | - | - | 11,897 | - | - | - | 11,897 |
| Stock issued under incentive programs | 350,054 | 3 | 9,007 | - | (55) | - | 8,955 |
| Issuance of common stock, net of issuance costs of $5,145 | 28,513,226 | 285 | 393,478 | - | - | - | 393,763 |
| Unrealized loss on marketable securities | - | - | - | - | - | 44 | 44 |
| Foreign currency translation adjustment | - | - | - | - | - | (731) | (731) |
| Net loss | - | - | - | (43,385) | - | - | (43,385) |
| **Balance at June 30, 2020** | 61,262,632 | $ 612 | $ 1,699,072 | $ (1,499,325) | $ (2,638) | $ (13,195) | $ 184,526 |

The accompanying notes are an integral part of these financial statements.

4

Table of Contents

**NOVAVAX, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**
**(unaudited)**

| | Six Months Ended June 30, | |
|---|---|---|
| | **2021** | **2020** |
| **Operating Activities:** | | |
| Net loss | $ (575,036) | $ (43,385) |
| Reconciliation of net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 4,727 | 1,905 |
| Non-cash stock-based compensation | 106,183 | 11,897 |
| Right-of-use assets written off | 12,707 | - |
| Other | 3,855 | (1,081) |
| Changes in operating assets and liabilities: | | |
| Receivables, prepaid expenses and other assets | 193,004 | (61,079) |
| Accounts payable and accrued expenses | 115,212 | 27,094 |
| Deferred revenue | 946,845 | 157,173 |
| Net cash provided by operating activities | 807,497 | 92,524 |
| | | |
| **Investing Activities:** | | |
| Capital expenditures | (28,932) | (3,884) |
| Acquisition of Novavax CZ, net of cash required | - | (164,204) |
| Purchases of marketable securities | (2,167) | (107,608) |
| Proceeds from maturities and sale of marketable securities | 159,807 | 29,750 |
| Net cash provided by (used in) investing activities | 128,708 | (245,946) |
| | | |
| **Financing Activities:** | | |
| Net proceeds from sale of preferred stock | - | 199,822 |
| Net proceeds from sales of common stock | 564,859 | 393,763 |
| Net proceeds from the exercise of stock-based awards | 26,903 | 8,955 |
| Finance lease payments | (53,618) | - |
| Net cash provided by financing activities | 538,144 | 602,540 |
| Effect of exchange rate on cash, cash equivalents and restricted cash | (348) | 276 |
| Net increase in cash, cash equivalents and restricted cash | 1,474,001 | 449,394 |
| Cash, cash equivalents and restricted cash at beginning of period | 648,738 | 82,180 |
| Cash, cash equivalents and restricted cash at end of period | $ 2,122,739 | $ 531,574 |
| | | |
| **Supplemental disclosure of non-cash activities:** | | |
| Right-of-use assets from new lease agreements | $ 28,826 | $ - |
| Capital expenditures included in accounts payable and accrued expenses | $ 11,037 | $ 2,753 |
| | | |
| **Supplemental disclosure of cash flow information:** | | |
| Cash interest payments | $ 10,046 | $ 6,094 |
| Cash paid for income taxes | $ 3,017 | $ - |

The accompanying notes are an integral part of these financial statements.

5

Table of Contents

**NOVAVAX, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**June 30, 2021**
**(unaudited)**

**Note 1 - Organization**

Novavax, Inc. ("Novavax," and together with its wholly owned subsidiaries, including Novavax AB and Novavax CZ, the "Company") is a biotechnology company that promotes improved health globally through the discovery, development and commercialization of innovative vaccines to prevent serious infectious diseases. The Company's vaccine candidates, including both its coronavirus vaccine candidate, NVX-CoV2373, and its lead influenza vaccine candidate, NanoFlu™, are genetically engineered, three-dimensional nanostructures of recombinant proteins critical to disease pathogenesis and may elicit differentiated immune responses, which may be more efficacious than naturally occurring immunity or traditional vaccines. NVX-CoV2373 and NanoFlu™ include the use of the Company's proprietary Matrix-M™ adjuvant.

**Note 2 - Summary of Significant Accounting Policies**

*Basis of Presentation*

The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP") for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S-X. The consolidated balance sheet as of June 30, 2021, the consolidated statements of operations and the consolidated statements of comprehensive loss for the three and six months ended June 30, 2021 and 2020, the consolidated statements of changes in stockholders' equity (deficit) for the three and six months ended June 30, 2021 and 2020 and the consolidated statements of cash flows for the six months ended June 30, 2021 and 2020 are unaudited, but include all adjustments (consisting of normal recurring adjustments) that the Company considers necessary for a fair presentation of the financial position, operating results, comprehensive loss, changes in stockholders' equity (deficit) and cash flows, respectively, for the periods presented. Although the Company believes that the disclosures in these unaudited consolidated financial statements are adequate to make the information presented not misleading, certain information and footnote information normally included in consolidated financial statements prepared in accordance with U.S. GAAP have been condensed or omitted as permitted under the rules and regulations of the United States Securities and Exchange Commission ("SEC").

The unaudited consolidated financial statements include the accounts of Novavax, Inc. and its wholly owned subsidiaries, including Novavax AB and Novavax CZ. All intercompany accounts and transactions have been eliminated in consolidation.

The accompanying unaudited consolidated financial statements are presented in U.S. dollars. The functional currency of Novavax AB, which is located in Sweden, is the local currency (Swedish Krona), and the functional currency of Novavax CZ, which is located in the Czech Republic, is the local currency (Czech Koruna). The translation of assets and liabilities of these subsidiaries to U.S. dollars is made at the exchange rate in effect at the consolidated balance sheet date, while equity accounts are translated at historical rates. The translation of the statement of operations data is made at the average exchange rate in effect for the period. The translation of operating cash flow data is made at the average exchange rate in effect for the period, and investing and financing cash flow data is translated at the exchange rate in effect at the date of the underlying transaction. Translation gains and losses are recognized as a component of accumulated other comprehensive income in the accompanying unaudited consolidated balance sheets. Accumulated other comprehensive income included a foreign currency translation balance of $4.2 million and $7.0 million as of June 30, 2021 and December 31, 2020, respectively.

The accompanying unaudited consolidated financial statements should be read in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2020. Results for this or any interim period are not necessarily indicative of results for any future interim period or for the entire year. The Company operates in one business segment.

6

Table of Contents

*Use of Estimates*

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ materially from those estimates.

*Cash and Cash Equivalents*

Cash and cash equivalents consist of highly liquid investments with maturities of three months or less from the date of purchase. Cash and cash equivalents consist of the following at (in thousands):

|  | June 30, 2021 | December 31, 2020 |
|---|---|---|
| Cash | $ 82,563 | $ 122,312 |
| Money market funds | 238,028 | 96,116 |
| Government-backed securities | 57,250 | 44,250 |
| Treasury securities | 199,990 | 44,052 |
| Corporate debt securities | 1,386,056 | 246,668 |
| Agency securities | 110,993 | - |
| Cash and cash equivalents | $ 2,074,880 | $ 553,398 |

Cash equivalents are recorded at cost, which approximate fair value due to their short-term nature.

*Marketable Securities*

The Company invests in marketable securities that generally consist of debt securities with maturities greater than three months from the date of purchase that include commercial paper, government-backed securities, treasury securities, corporate notes and agency securities. Classification of marketable securities between current and non-current is dependent upon the maturity date at the balance sheet date taking into consideration the Company's ability and intent to hold the investment to maturity.

Interest and dividend income are recorded when earned and included in investment income in the consolidated statements of operations. Premiums and discounts, if any, on marketable securities are amortized or accreted to maturity and included in investment income in the consolidated statements of operations. The specific identification method is used in computing realized gains and losses on the sale of the Company's securities.

The Company classifies its marketable securities with readily determinable fair values as "available-for-sale." Investments in securities that are classified as available-for-sale are measured at fair market value in the consolidated balance sheets, and unrealized gains and losses on marketable securities are reported as a separate component of stockholders' equity (deficit) until realized. Marketable securities are evaluated periodically to determine whether a decline in value is "other-than-temporary." The term "other-than-temporary" is not intended to indicate a permanent decline in value. Rather, it means that the prospects for a near-term recovery of value are not necessarily favorable, or that there is a lack of evidence to support fair values equal to, or greater than, the carrying value of the security. Management reviews criteria, such as the magnitude and duration of the decline, as well as the Company's ability to hold the securities, including whether the Company will be required to sell a security prior to recovery of its amortized cost basis, the investment issuer's financial condition and business outlook to predict whether the loss in value is other-than-temporary. Realized gains and losses and declines in value determined to be other-than-temporary are recorded as other income (expense) in the consolidated statements of operations.

*Restricted Cash*

The Company's current and non-current restricted cash includes payments received under the Coalition for Epidemic Preparedness Innovations ("CEPI") funding agreements, payments received under the Bill & Melinda Gates Foundation ("BMGF") grant agreements and cash collateral accounts under letters of credit that serve as security deposits for certain facility leases. The Company will utilize the CEPI and BMGF funds as it incurs expenses for services performed under these agreements.

Table of Contents

As of June 30, 2021, the restricted cash balances (both current and non-current) consisted of $1.2 million for payments received from BMGF, $45.2 million of payments under the CEPI funding agreements and $1.5 million of security deposits. As of December 31, 2020, the restricted cash balances (both current and non-current) consisted of $1.5 million for payments received from BMGF, $92.4 million of payments under the CEPI funding agreements and $1.5 million of security deposits.

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported in the consolidated balance sheets that sum to the total of the same such amounts shown in the statement of cash flows (in thousands):

| | June 30, 2021 | | December 31, 2020 |
|---|---|---|---|
| Cash and cash equivalents | $ | 2,074,880 | $ 553,398 |
| Restricted cash current | | 46,398 | 93,880 |
| Restricted cash non-current | | 1,461 | 1,460 |
| Cash, cash equivalents and restricted cash | $ | 2,122,739 | $ 648,738 |

### Revenue Recognition

The Company has various arrangements that include a right for a third party to use the Company's intellectual property as a functional license. These licensing arrangements include sales-based royalties, as well as certain development and commercial milestone payments, and the license is deemed to be the predominant item to which the sales-based royalties or milestone payments relate. For arrangements that include a development or regulatory milestone payment, the Company evaluates whether the associated event is considered probable of achievement and estimates the amount to be included in the transaction price using the most likely amount method. Milestone payments that are not within the Company or licensee's control, such as those dependent upon receipt of regulatory approval, are not considered probable of achievement until the triggering event occurs. At the end of each reporting period, the Company reevaluates the probability of achievement of each milestone and any related constraint, and if necessary, adjusts its estimate of the overall transaction price. Any such adjustments are recorded on a cumulative catch-up basis and affect revenue and results of operations in the period of adjustment. For arrangements that include sales-based royalties, including milestone payments based upon the achievement of a certain level of product sales, wherein the license is deemed to be the sole or predominant item to which the payments relate, the Company recognizes revenue on the satisfaction (or partial satisfaction) of its performance obligation to which some or all of the payment has been allocated, which is normally on the occurrence of the related sales. As a practical expedient, the Company has elected not to disclose the aggregate amount of the transaction price for the variable consideration that represents a sales-based royalties under the licensing arrangements. Consideration for optional goods and/or services is excluded from the transaction price at contract inception. During the three and six months ended June 30, 2021, the Company recognized sales-based royalties of $23.5 million.

### Income Taxes

The Company accounts for income taxes in accordance with ASC Topic 740, *Income Taxes*. Under the liability method, deferred income taxes are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis and operating loss carryforwards.

The Company has historically generated significant federal, state and foreign tax net operating losses, which may be subject to limitation in future periods. Management has fully reserved the related deferred tax assets with a valuation allowance in the current reporting period as more likely than not the related benefit will not be realized. The Company is currently subject to examination in all open tax years.

During the three and six months ended June 30, 2021, the Company recognized $3.5 million and $6.6 million, respectively, of income tax expense related to foreign withholding tax on royalties.

### Net Loss per Share

Net loss per share is computed using the weighted average number of shares of common stock outstanding. As of June 30, 2021 and 2020, the Company had outstanding stock options, stock appreciation rights ("SARs") and unvested restricted stock units ("RSUs") totaling 6,092,983 and 7,797,651, respectively.

As of June 30, 2021, the Company's Notes (see Note 7) would have been convertible into approximately 2,385,800 shares of the Company's common stock assuming a common stock price of $136.20 or higher. These shares, after giving effect to the add back of interest expense and unamortized debt issuance costs on the Notes and any shares due to the Company upon settlement of its capped call transactions, are excluded from the computation, as their effect is antidilutive.

8

Table of Contents

***Recent Accounting Pronouncements***

*Not Yet Adopted*

In August 2020, the Financial Accounting Standards Board ("FASB") issued ASU No. 2020-06, *Debt-Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging-Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity* ("ASU 2020-06"), which will simplify the accounting for certain financial instruments with characteristics of liabilities and equity, including certain convertible instruments and contracts in an entity's own equity. Specifically, the new standard will remove the separation models required for convertible debt with cash conversion features and convertible instruments with beneficial conversion features. It will also remove certain settlement conditions that are currently required for equity contracts to qualify for the derivative scope exception and will simplify the diluted earnings per share calculation for convertible instruments. ASU 2020-06 will be effective January 1, 2022 for the Company and may be applied using a full or modified retrospective approach. Management has evaluated the impact of adopting ASU 2020-06 and has determined that it will not have a material impact on the Company's consolidated financial statements.

**Note 3 - Fair Value Measurements**

The following table represents the Company's fair value hierarchy for its financial assets and liabilities (in thousands):

| | Fair Value at June 30, 2021 | | | Fair Value at December 31, 2020 | | |
|---|---|---|---|---|---|---|
| **Assets** | **Level 1** | **Level 2** | **Level 3** | **Level 1** | **Level 2** | **Level 3** |
| Money market funds(1) | $ 238,028 | $ - | $ - | $ 96,116 | $ - | $ - |
| Government-backed securities(1) | - | 57,250 | - | - | 44,250 | - |
| Treasury securities(2) | - | 199,990 | - | - | 54,088 | - |
| Corporate debt securities(3) | - | 1,386,056 | - | - | 373,681 | - |
| Agency securities(4) | - | 110,993 | - | - | 20,600 | - |
| Total cash equivalents and marketable securities | $ 238,028 | $ 1,754,289 | $ - | $ 96,116 | $ 492,619 | $ - |
| **Liabilities** | | | | | | |
| Convertible notes payable | $ - | $ 580,405 | $ - | $ - | $ 407,238 | $ - |

(1) Classified as cash and cash equivalents as of June 30, 2021 and December 31, 2020, respectively, on the consolidated balance sheets.
(2) Includes $199,990 and $44,052 classified as cash and cash equivalents as of June 30, 2021 and December 31, 2020, respectively, on the consolidated balance sheets.
(3) Includes $1,386,056 and $246,668 classified as cash and cash equivalents as of June 30, 2021 and December 31, 2020, respectively, on the consolidated balance sheets.
(4) Includes $110,993 classified as cash and cash equivalents as of June 30, 2021 on the consolidated balance sheets.

Fixed-income investments categorized as Level 2 are valued at the custodian bank by a third-party pricing vendor's valuation models that use verifiable observable market data, e.g., interest rates and yield curves observable at commonly quoted intervals and credit spreads, bids provided by brokers or dealers or quoted prices of securities with similar characteristics. Pricing of the Company's Notes (see Note 7) has been estimated using other observable inputs, including the price of the Company's common stock, implied volatility, interest rates and credit spreads among others.

During the six months ended June 30, 2021 and 2020, the Company did not have any transfers between levels.

9

Table of Contents

**Note 4 - Marketable Securities**

Marketable securities classified as available-for-sale as of June 30, 2021 and December 31, 2020 were comprised of (in thousands):

| | June 30, 2021 | | | | December 31, 2020 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| Treasury securities | $ - | $ - | $ - | $ - | $ 10,038 | $ - | $ (2) | $ 10,036 |
| Corporate debt securities | - | - | - | - | 127,003 | 13 | (3) | 127,013 |
| Agency securities | - | - | - | - | 20,599 | 1 | - | 20,600 |
| Total marketable securities | $ - | $ - | $ - | $ - | $ 157,640 | $ 14 | $ (5) | $ 157,649 |

The primary objective of the Company's investment policy is the preservation of capital; thus, the Company's investment policy limits investments to certain types of instruments with high-grade credit ratings, places restrictions on maturities and concentrations in certain industries and requires the Company to maintain a certain level of liquidity. As of June 30, 2021, all of the Company's investments were in securities classified as cash and cash equivalents.

**Note 5 - Goodwill and Other Intangible Assets**

*Goodwill*

The change in the carrying amounts of goodwill for the six months ended June 30, 2021 was as follows (in thousands):

| | Amount |
| --- | --- |
| Balance at December 31, 2020 | $ 135,379 |
| Currency translation adjustments | (1,085) |
| Balance at June 30, 2021 | $ 134,294 |

*Identifiable Intangible Assets*

Purchased intangible assets consisted of the following as of June 30, 2021 and December 31, 2020 (in thousands):

| | June 30, 2021 | | | December 31, 2020 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Intangible Assets, Net | Gross Carrying Amount | Accumulated Amortization | Intangible Assets, Net |
| Finite-lived intangible assets: | | | | | | |
| Proprietary adjuvant technology | $ 8,741 | $ (3,460) | $ 5,281 | $ 9,099 | $ (3,374) | $ 5,725 |
| Collaboration agreements | 3,947 | (3,947) | - | 4,109 | (4,109) | - |
| Total identifiable intangible assets | $ 12,688 | $ (7,407) | $ 5,281 | $ 13,208 | $ (7,483) | $ 5,725 |

Amortization expense for the six months ended June 30, 2021 and 2020 was $0.2 million and $0.3 million, respectively.

Estimated amortization expense for existing intangible assets for the remainder of 2021 and for each of the five succeeding years ending December 31 will be as follows (in thousands):

| Year | Amount |
| --- | --- |
| 2021 (remainder) | $ 219 |
| 2022 | 437 |
| 2023 | 437 |
| 2024 | 437 |
| 2025 | 437 |
| 2026 | 437 |

Table of Contents

**Note 6 - Leases**

During the second quarter of 2021, the Company evaluated the impact of changes in facts and circumstances on its Contract Manufacturing Organizations and Contract Development and Manufacturing Organizations agreements that had previously been determined to represent embedded lease arrangements. The Company concluded that the impact resulted in the modification of existing leases and, in accordance with its policy, the Company remeasured and reallocated the remaining consideration in the contracts and reassessed the lease classification as of the effective date of the modification. As a result, the Company recognized a Right-Of-Use ("ROU") asset and a corresponding long-term operating lease liability of $11.4 million on the remeasurement of one of its long-term supply agreements using an incremental borrowing rate of 6.5%. The Company expensed the ROU asset since it relates to research and development activities for the development of NVX-CoV2373 for which the Company does not have an alternative future use. Modifications to leases with a lease term of 12 months or less at the commencement date did not result in a change in lease classification and, in accordance with the Company's election to apply the practical expedient in ASC Topic 842, *Leases* ("ASC 842"), it did not recognize a ROU asset or lease liability but instead, lease payments are recognized as an expense on a straight-line basis over the modified lease term and variable lease payments that do not depend on an index or rate, are recognized as an expense in the period in which the variable lease costs are incurred based on performance or usage in accordance with contractual agreements.

During the three and six months ended June 30, 2021, the Company recognized a short-term lease expense of $86.6 million and $214.2 million, respectively, related to its embedded leases, including a new lease that commenced during the first quarter of 2021. The Company did not recognize a short-term lease expense related to embedded leases during the three and six months ended June 30, 2020.

During the three and six months ended June 30, 2021, the Company recognized $1.8 million and $4.0 of interest expenses, respectively, on its finance lease liabilities. The Company did not recognize any interest expense related to finance lease liabilities during the three and six months ended June 30, 2020.

During the second quarter of 2021, the Company extended the term of certain of its existing research and development facility and offices leases by two years to five years, giving rise to additional ROU assets and related long-term operating lease liabilities of approximately $7.2 million.

**Note 7 - Long-Term Debt**

*Convertible Notes*

The Company incurred approximately $10.0 million of debt issuance costs during the first quarter of 2016 relating to the issuance of $325 million aggregate principal amount of convertible senior unsecured notes that will mature on February 1, 2023 (the "Notes"), which were recorded as a reduction to the Notes on the consolidated balance sheet. The $10.0 million of debt issuance costs is being amortized and recognized as additional interest expense over the seven year contractual term of the Notes on a straight-line basis, which approximates the effective interest rate method.

Total convertible notes payable consisted of the following at (in thousands):

|  | June 30, 2021 | December 31, 2020 |
|---|---|---|
| Principal amount of Notes | $ 325,000 | $ 325,000 |
| Unamortized debt issuance costs | (2,254) | (2,965) |
| Total convertible notes payable | $ 322,746 | $ 322,035 |

The interest expense incurred in connection with the Notes consisted of the following (in thousands):

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2021 | 2020 | 2021 | 2020 |
| Coupon interest at 3.75% | $ 3,047 | $ 3,047 | $ 6,094 | $ 6,094 |
| Amortization of debt issuance costs | 356 | 356 | 712 | 712 |
| Total interest expense on Notes | $ 3,403 | $ 3,403 | $ 6,806 | $ 6,806 |

Table of Contents

**Note 8 - Stockholders' Equity**

During the six months ended June 30, 2021 and 2020, the Company sold 2.6 million and 28.5 million, respectively, of shares of its common stock resulting in net proceeds of approximately $565 million and $392 million, respectively, under its various At Market Issuance Sales agreements.

In June 2021, the Company entered into an At Market Issuance Sales Agreement (the "June 2021 Sales Agreement"), which allows it to issue and sell up to $500 million in gross proceeds of shares of its common stock, and terminated its existing At Market Issuance Sales agreement. As of June 30, 2021, no shares had been sold under the June 2021 Sales Agreement.

**Note 9 - Stock-Based Compensation**

*Equity Plans*

The 2015 Stock Incentive Plan, as amended ("2015 Plan"), was approved at the Company's annual meeting of stockholders in June 2015. Under the 2015 Plan, equity awards may be granted to officers, directors, employees and consultants of and advisors to the Company and any present or future subsidiary.

The 2015 Plan authorizes the issuance of up to 12.4 million shares of common stock under equity awards granted under the 2015 Plan, including an increase of 1.5 million shares approved for issuance under the 2015 Plan at the Company's 2021 annual meeting of stockholders. All such shares authorized for issuance under the 2015 Plan have been reserved. The 2015 Plan will expire on March 4, 2025.

The Amended and Restated 2005 Stock Incentive Plan ("2005 Plan") expired in February 2015 and no new awards may be made under such plan, although awards will continue to be outstanding in accordance with their terms.

The 2015 Plan permits and the 2005 Plan permitted the grant of stock options (including incentive stock options), restricted stock, stock appreciation rights and restricted stock units. In addition, under the 2015 Plan, unrestricted stock, stock units and performance awards may be granted. Stock options and stock appreciation rights generally have a maximum term of ten years and may be or were granted with an exercise price that is no less than 100% of the fair market value of the Company's common stock at the time of grant. Grants of stock options are generally subject to vesting over periods ranging from one to four years.

*Stock Options and Stock Appreciation Rights*

The following is a summary of stock options and SARs activity under the 2015 Plan and 2005 Plan for the six months ended June 30, 2021:

| | 2015 Plan | | 2005 Plan | |
| --- | --- | --- | --- | --- |
| | Stock Options and SARs | Weighted-Average Exercise Price | Stock Options | Weighted-Average Exercise Price |
| Outstanding at January 1, 2021 | 5,420,463 | $ 38.05 | 214,186 | $ 88.11 |
| Granted | 47,458 | $ 148.49 | - | $ - |
| Exercised | (598,441) | $ 44.14 | (35,401) | $ 106.49 |
| Canceled | (50,881) | $ 121.33 | - | $ - |
| Outstanding at June 30, 2021 | 4,818,599 | $ 37.50 | 178,785 | $ 84.47 |
| Shares exercisable at June 30, 2021 | 692,187 | $ 70.17 | 178,785 | $ 84.47 |
| Shares available for grant at June 30, 2021 | 2,360,263 | | | |

The fair value of stock options granted under the 2015 Plan was estimated at the date of grant using the Black-Scholes option-pricing model with the following assumptions:

12

Table of Contents

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| Weighted average Black-Scholes fair value of stock options granted | $166.66 | $77.41 | $131.66 | $76.99 |
| Risk-free interest rate | 0.6%-1.1% | 0.3%-0.6% | 0.5%-1.1% | 0.3%-1.5% |
| Dividend yield | -% | -% | -% | -% |
| Volatility | 126.2%-142.0% | 116.0%-151.5% | 124.7%-142.0% | 116.0%-151.5% |
| Expected term (in years) | 4.1-6.1 | 3.9-7.6 | 4.1-6.1 | 3.9-7.6 |

The total aggregate intrinsic value and weighted-average remaining contractual term of stock options and SARs outstanding under the 2015 Plan and 2005 Plan as of June 30, 2021 was approximately $865 million and 8.1 years, respectively. The total aggregate intrinsic value and weighted-average remaining contractual term of stock options and SARs exercisable under the 2015 Plan and 2005 Plan as of June 30, 2021 was approximately $121 million and 5.5 years, respectively. The aggregate intrinsic value represents the total intrinsic value (the difference between the Company's closing stock price on the last trading day of the period and the exercise price, multiplied by the number of in-the-money stock options and SARs) that would have been received by the holders had all stock option and SAR holders exercised their stock options and stock appreciation rights on June 30, 2021. This amount is subject to change based on changes to the closing price of the Company's common stock. The aggregate intrinsic value of stock options and vesting of restricted stock awards for the six months ended June 30, 2021 and 2020 was approximately $115 million and $8 million, respectively.

***Employee Stock Purchase Plan***

The Employee Stock Purchase Plan, as amended (the "ESPP"), was approved at the Company's annual meeting of stockholders in June 2013. The ESPP currently authorizes an aggregate of 600,000 shares of common stock to be purchased. The ESPP allows employees to purchase shares of common stock of the Company at each purchase date through payroll deductions of up to a maximum of 15% of their compensation, at 85% of the lesser of the market price of the shares at the time of purchase or the market price on the beginning date of an option period (or, if later, the date during the option period when the employee was first eligible to participate). As of June 30, 2021, there were 212,876 shares available for issuance under the ESPP.

The ESPP is considered compensatory for financial reporting purposes. As such, the fair value of ESPP shares was estimated at the date of grant using the Black-Scholes option-pricing model with the following assumptions:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2021** | **2020** |
| Range of Black-Scholes fair values of ESPP shares granted | $128.70-$238.85 | $2.87-$21.80 | $128.70-$238.85 | $2.57-$35.00 |
| Risk-free interest rate | 0.1% | 1.5%-2.6% | 0.1% | 1.5%-2.6% |
| Dividend yield | -% | -% | -% | -% |
| Volatility | 120.4%-159.4% | 66.6%-150.9% | 120.4%-159.4% | 66.6%-154.4% |
| Expected term (in years) | 0.5-2.0 | 0.5-2.0 | 0.5-2.0 | 0.5-2.0 |

Table of Contents

***Restricted Stock Units***

The following is a summary of restricted stock units activity for the six months ended June 30, 2021:

| | Number of Shares | | Per Share Weighted-Average Fair Value |
|---|---|---|---|
| Outstanding and Unvested at January 1, 2020 | 1,044,980 | $ | 72.59 |
| Restricted stock units granted | 134,099 | $ | 178.71 |
| Restricted stock units vested | (66,457) | $ | 79.20 |
| Restricted stock units forfeited | (17,023) | $ | 128.59 |
| Outstanding and Unvested at June 30, 2021 | 1,095,599 | $ | 84.30 |

The Company recorded all stock-based compensation expense in the consolidated statements of operations as follows (in thousands):

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2021 | | 2020 | |
| Research and development | $ | 24,779 | $ | 4,098 | $ | 48,569 | $ | 6,005 |
| General and administrative | | 28,344 | | 3,834 | | 57,614 | | 5,892 |
| Total stock-based compensation expense | $ | 53,123 | $ | 7,932 | $ | 106,183 | $ | 11,897 |

As of June 30, 2021, there was approximately $230 million of total unrecognized compensation expense related to unvested stock options, SARs, restricted stock units and the ESPP. The increase in unrecognized compensation expense is primarily due to the significant increase in the Company's common stock price starting in 2020. This unrecognized non-cash compensation expense is expected to be recognized over a weighted-average period of one year, and will be allocated between research and development and general and administrative expenses accordingly. This estimate does not include the impact of other possible stock-based awards that may be made during future periods and awards that require approval by the stockholders.

**Note 10 -Contingencies**

In February 2021, a Novavax stockholder filed a derivative complaint against certain members of the Company's board of directors and certain members of senior management in the Delaware Court of Chancery with Novavax as a nominal defendant. The plaintiff challenges two sets of equity awards made in April 2020 and in June 2020 on the ground that they were "spring-loaded," that is, made at a time when certain board members or members of senior management allegedly possessed undisclosed positive material information concerning the Company. The complaint asserts claims for breach of fiduciary duty, waste, and unjust enrichment. The plaintiff seeks an award of damages to the Company, an order rescinding the April 2020 and June 2020 awards or requiring disgorgement, and an award of attorneys' fees incurred in connection with the litigation. On May 10, 2021, the defendants moved to dismiss the complaint in its entirety. On June 17, 2021, the Company's stockholders voted FOR ratification of the April 2020 awards and ratification of the June 2020 awards. Details of the ratification proposals are set forth in the Company's Definitive Proxy Statement filed with the SEC on May 3, 2021. The results of the vote were disclosed in the Company's Current Report on Form 8-K filed with the SEC on June 24, 2021. Should the plaintiff elect to move forward with his claims, the defendants intend to move for summary judgment on ratification grounds while continuing to pursue dismissal. As such, the Company is not expecting any material estimable financial impact of the plaintiff's claim.

**Note 11 - Revenue**

During the three and six months ended June 30, 2021 and 2020, the Company performed research and development under government contracts and grant, license and clinical development agreements. The Company's revenue primarily

14

Table of Contents

consisted of funding under U.S. government contracts and the Company's funding arrangement with CEPI to advance the clinical development and manufacturing of NVX-CoV2373.

The Company recorded revenue as follows (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Government contracts | | | | |
| OWS | $ 239,493 | $ - | $ 603,053 | $ - |
| DoD | 1,041 | 311 | 20,185 | 311 |
| Grants and other | | | | |
| CEPI | 31,955 | 34,246 | 93,516 | 36,504 |
| BMGF | - | 159 | 2,628 | 414 |
| Other | 2,071 | 822 | 2,407 | 1,686 |
| Royalties | 23,457 | - | 23,457 | - |
| Total | $ 298,017 | $ 35,538 | $ 745,246 | $ 38,915 |

### *Government Contracts and Grants*

The Company's U.S. government contracts comprise an agreement with Advanced Technology International ("ATI"), the Consortium Management Firm acting on behalf of the Medical CBRN Defense Consortium in connection with the partnership formerly known as Operation Warp Speed ("OWS") and a contract with the U.S. Department of Defense (the "DoD"). As of June 30, 2021, the Company's OWS agreement was fully funded up to $1.75 billion to support certain activities related to the development of NVX-CoV2373 and the manufacture and delivery of 100 million doses of the vaccine candidate to the U.S. government. The U.S. government has recently instructed the Company to prioritize alignment with the U.S. Food and Drug Administration on the Company's analytic methods before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made. The U.S. government also instructed the Company to proceed with work under the OWS Agreement related to all other activities, including ongoing clinical trials and nonclinical studies, regulatory interactions, analytics/assays and characterization of manufactured vaccine and project management. The Company's revenue from CEPI comprises grant and forgivable loan funding. The latter is repayable if the proceeds from the sales of NVX-CoV2373 to one or more third parties cover the Company's costs of manufacturing the vaccine, not including manufacturing costs funded by CEPI.

### *Collaboration and License Agreements*

In February 2021, the Company finalized an expanded collaboration and license agreement with SK bioscience to manufacture and commercialize NVX-CoV2373 for sale to the government of Korea. Concurrently, SK bioscience finalized an advance purchase agreement with the Korean government to supply 40 million doses of NVX-CoV2373 to the Republic of Korea beginning in 2021. The agreement is in addition to the Company's existing manufacturing arrangement with SK bioscience entered into in August 2020. Under the collaboration agreement, SK bioscience was granted an exclusive license to develop, manufacture and commercialize NVX-CoV2373 in the Republic of Korea. SK bioscience expanded its capacity to manufacture the antigen component of NVX-CoV2373 for use in the final drug product globally, including product distributed by the COVAX Facility. SK bioscience will also purchase a certain quantity of NVX-CoV2373 directly from the Company, subject to approval by relevant regulatory authority, and sufficient doses of Matrix-M™ adjuvant to manufacture the remainder of the 40 million doses of NVX-CoV2373 it expects to sell to the Korean government. SK bioscience will pay the Company a tiered royalty in the low to middle double-digit range on the sale of NVX-CoV2373. The Company recognized royalties of $23.5 million during the three and six months ended June 30, 2021 related to SK bioscience's sale of the antigen component of NVX-CoV2373 to the Korean government. In May 2021, the Company entered a non-binding Memorandum of Understanding ("MOU") with the Ministry of Health and Welfare of Korea and SK bioscience to explore further cooperation in the development and manufacturing of vaccines, including NVX-CoV2373. Under the MOU, the Company agreed to potentially explore the development of new vaccine products with SK bioscience, including COVID-19 variant vaccines, and/or an influenza/COVID-19 combination vaccine.

In February 2021, the Company finalized a collaboration agreement previously announced in August 2020, with Takeda Pharmaceutical Company Limited ("Takeda") for the exclusive development, manufacturing and commercialization of NVX-CoV2373 in Japan. Under the agreement, the Company will transfer technology and supply the Matrix-M™ adjuvant to Takeda, which will manufacture the antigen component of NVX-CoV2373. Takeda will receive funding from the Government

15

Table of Contents

of Japan's Ministry of Health, Labour and Welfare to support the technology transfer, establishment of infrastructure and scale-up of manufacturing. The Company will be entitled to receive royalties based on the achievement of certain development and commercial milestones, as well as on a portion of net profits from the sale of the vaccine.

*Vaccine Supply Agreements*

During the six months ended June 30, 2021, the Company entered into various Advanced Purchase Agreements ("APAs"), including an agreement with Her Majesty the Queen in Right of Canada as represented by the Minister of Public Works and Government Services to supply 52 million doses of NVX-CoV2373. The Company will submit an application for regulatory approval in Canada following its first submission for regulatory approval in another priority market and the Canada authority will provide reasonable assistance to the Company with obtaining such regulatory approval. As part of the agreement, Canada will have the option to purchase up to an additional 24 million doses of NVX-CoV2373. In February 2021, the Company reached a MOU with the Canadian government to produce NVX-CoV2373 in Canada. The Company plans to produce NVX-CoV2373 at the National Research Council's Biologics Manufacturing Centre in Montreal once both the vaccine candidate and the facility receive Health Canada approvals.

In May 2021, the Company finalized an APA with Gavi, the Vaccine Alliance ("Gavi") building upon its MOU previously announced in February 2021. Under the terms of the agreement, 1.1 billion doses of NVX-CoV2373 are to be made available to countries participating in the COVAX Facility, which was established to allocate and distribute vaccines equitably to participating countries and economies. The Company expects to manufacture and distribute 350 million doses of NVX-CoV2373 to countries participating under the COVAX Facility. Under a separate purchase agreement with Gavi, Serum Institute of India Private Limited ("SIIPL") is expected to manufacture and deliver the balance of the 1.1 billion doses of NVX-CoV2373 for low- and middle-income countries participating in the COVAX Facility. The Company expects to deliver doses with antigen and adjuvant manufactured at facilities directly funded under the Company's funding agreement with CEPI. The Company expects to supply significant doses that Gavi would allocate to low-, middle- and high-income countries, subject to certain limitations, utilizing a tiered pricing schedule and Gavi may prioritize such doses to low- and middle- income countries, at lower prices. Additionally, the Company may provide additional doses of NVX-CoV2373, to the extent available from CEPI funded manufacturing facilities, in the event that SIIPL cannot materially deliver expected vaccine doses to the COVAX Facility. Together with SIIPL, the Company expects to initiate delivery of doses following receipt of appropriate regulatory authorizations. Under the agreement, the Company received an upfront payment from Gavi of $350 million during the second quarter of 2021 and expects to receive an additional payment of $350 million if the Company secures emergency use listing for NVX-CoV2373 by the World Health Organization ("WHO").

During the six months ended June 30, 2021, changes in the Company's accounts receivables, unbilled services and deferred revenue balances were as follows (in thousands):

|  | December 31, 2020 | Additions | Deductions | June 30, 2021 |
|---|---|---|---|---|
| Accounts receivable | $ 262,012 | $ 1,309,924 | $ (1,521,947) | $ 49,989 |
| Unbilled services | - | 499,239 | (477,865) | 21,374 |
| Deferred revenue | 273,228 | 1,192,483 | (245,638) | 1,220,073 |

As of June 30, 2021, the deferred revenue of $1.2 billion primarily comprised of approximately $1.1 billion related to upfront payments under APAs.

The aggregate amount of the transaction price allocated to performance obligations that were unsatisfied (or partially unsatisfied) was $7.0 billion as at June 30, 2021. The Company expects to fulfil its unsatisfied performance obligations within 12 months.

**Note 12 - Subsequent Events**

In August 2021, the Company announced that it finalized the terms of an APA with the European Commission, which the parties expect to execute during the third quarter of 2021, for the purchase of up to 100 million initial doses of NVX-CoV2373, with the option of the European Commission to purchase an additional 100 million doses through 2023.

In August 2021, the Company filed regulatory submissions in partnership with SIIPL for emergency use authorization in multiple markets. Regulatory submissions were filed with the Drugs Controller General of India, as well as regulatory agencies in Indonesia and the Philippines. In addition to these filings, the Company expects to file a submission to the WHO for emergency use listing in August of 2021.

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

Any statements in the discussion below and elsewhere in this Quarterly Report about expectations, beliefs, plans, objectives, assumptions or future events or performance of Novavax, Inc. ("Novavax," together with its wholly owned subsidiaries Novavax AB and Novavax CZ, the "Company," "we" or "us") are not historical facts and are forward-looking statements. Such forward-looking statements include, without limitation, statements about our capabilities, goals, expectations regarding future revenue and expense levels and capital raising activities; our operating plans and prospects; potential market sizes and demand for our product candidates; the efficacy, safety and intended utilization of our product candidates; the development of our clinical-stage product candidates and our recombinant vaccine and adjuvant technologies; the development of our preclinical product candidates; the conduct, timing and potential results from clinical trials and other preclinical studies; plans for and potential timing of regulatory filings; our expectation of manufacturing capacity, timing, production and delivery for NVX-CoV2373; our expectations with respect to the anticipated ongoing development and potential commercialization or licensure of NVX-CoV2373 and NanoFlu™; the expected timing and content of regulatory actions; funding from the U.S. government partnership formerly known as Operation Warp Speed ("OWS"), the U.S. Department of Defense ("DoD") and the Coalition for Epidemic Preparedness Innovations ("CEPI"), and payments from the Bill & Melinda Gates Foundation ("BMGF"); funding under our advance purchase agreements and supply agreements; our available cash resources and usage and the availability of financing generally; plans regarding partnering activities and business development initiatives; and other matters referenced herein. Generally, forward-looking statements can be identified through the use of words or phrases such as "believe," "may," "could," "will," "would," "possible," "can," "estimate," "continue," "ongoing," "consider," "anticipate," "intend," "seek," "plan," "project," "expect," "should," "would," "aim," or "assume," the negative of these terms or other comparable terminology, although not all forward-looking statements contain these words.

Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on our current beliefs and expectations about the future of our business, future plans and strategies, projections, anticipated events and trends, the economy and other future conditions. Forward-looking statements involve estimates, assumptions, risks and uncertainties that could cause actual results or outcomes to differ materially from those expressed or implied in any forward-looking statements, and, therefore, you should not place considerable reliance on any such forward-looking statements. Such risks and uncertainties include, without limitation, challenges satisfying, alone or together with partners, various safety, efficacy, and product characterization requirements, including those related to process qualification and assay validation, necessary to satisfy each applicable regulatory authority, like the U.S. Food and Drug Administration ("FDA"), World Health Organization ("WHO"), UK Medicines and Healthcare Products Regulatory Agency ("MHRA"), the European Medicines Agency ("EMA"), the Republic of Korea's Ministry of Food and Drug Safety ("MFDS"), or Japan's Ministry of Health, Labour and Welfare ("MHLW"); difficulty obtaining scarce raw materials; resource, including human capital and manufacturing capacity, constraints on our ability to pursue these regulatory pathways, alone or with partners, in multiple jurisdictions simultaneously, leading to staggering of regulatory filings and potential regulatory actions; challenges meeting contractual requirements under agreements with multiple commercial, governmental, and other entities; and other risks and uncertainties identified in Part II, Item 1A "Risk Factors" of this Quarterly Report and in Part I, Item 1A "Risk Factors" of our Annual Report on Form 10-K, which may be detailed and modified or updated in other documents filed with the United States Securities and Exchange Commission ("SEC") from time to time, and are available at www.sec.gov and at www.novavax.com. You are encouraged to read these filings as they are made.

We cannot guarantee future results, events, level of activity, performance or achievement. Any or all of our forward-looking statements in this Quarterly Report may turn out to be inaccurate or materially different from actual results. Further, any forward-looking statement speaks only as of the date when it is made, and we undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, unless required by law. New factors emerge from time to time, and it is not possible for us to predict which factors will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

**Overview**

Novavax, Inc., together with our wholly-owned subsidiaries, Novavax AB and Novavax CZ, is a biotechnology company promoting improved global health through the discovery, development and commercialization of innovative vaccines to prevent serious infectious diseases and address urgent, global health needs. Our vaccine candidates, including both our coronavirus vaccine candidate ("NVX-CoV2373") and our seasonal quadrivalent influenza vaccine candidate ("NanoFlu™"), are genetically engineered, three-dimensional nanostructures of recombinant proteins critical to disease pathogenesis. We believe that our protein-subunit-based candidates elicit differentiated immune responses that may be more efficacious than naturally occurring immunity or other vaccine approaches. Additionally, our Matrix-M™ adjuvant has been shown to enhance functional immune responses and has been well-tolerated in multiple clinical trials. To date, we have formulated many of the vaccine candidates in our pipeline with our Matrix-M™ adjuvant, including NVX-CoV2373 and NanoFlu™.

17

Table of Contents

**Near-term Clinical Development Pipeline**

Our development pipeline encompasses vaccine candidates addressing therapeutic areas including coronavirus, seasonal influenza, respiratory syncytial virus ("RSV") and other emerging infectious diseases. At the forefront of our pipeline is NVX-CoV2373. We have advanced NVX-CoV2373 through two Phase 3 clinical trials, which have demonstrated high efficacy against the original COVID-19 strain and commonly circulating variants of COVID-19 with a favorable safety profile. We have also advanced our NanoFlu™ vaccine program through a Phase 3 clinical trial, which demonstrated positive top-line results and achieved statistical significance in key secondary endpoints. We continue to evaluate the viability of certain combination vaccines, including combinations of our NanoFlu™, NVX-CoV2373 and respiratory syncytial virus fusion (F) protein nanoparticle vaccine candidate ("RSV F Vaccine").

We remain focused on bringing our NVX-CoV2373 vaccine candidate to market following global regulatory approvals. Through ongoing crossover and booster studies in our clinical trials, as well as the development of our COVID-19 variant strain vaccine candidates, we continue to collect data to characterize and optimize vaccine performance. We expect to leverage these clinical insights to advance our booster strategy given the evolving COVID-19 pandemic.

In addition to our COVID-19 clinical development, NanoFlu™ continues to be a priority for our team, especially as it relates to development of our NanoFlu™ / NVX-CoV2373 combination vaccine candidate ("qNIV/CoV2373").

Although NVX-CoV2373 and NanoFlu™ are our near-term priorities, we remain optimistic that the additional programs in our pipeline, including our vaccine candidates for RSV and other emerging infectious diseases, present viable opportunities for future development.

The pipeline chart below summarizes the clinical and preclinical development programs that we are focusing on in the near-term.

(1)Supported by funding from OWS, DoD, CEPI and BMGF

Table of Contents

(2)Ongoing PREVENT-19, a Phase 3 clinical trial in the U.S. and Mexico; Ongoing PREVENT-19 pediatric expansion in the U.S.; Ongoing Phase 3 clinical trial in the UK; Ongoing Phase 2b clinical trial in South Africa

(3)Reflects malaria vaccine candidate ("R21") created by the University of Oxford and formulated with Matrix-M™ adjuvant; Ongoing Phase 3 clinical trial in Africa; R21 is licensed to Serum Institute of India Private Limited ("SIIPL"); Novavax will have commercial rights to sell and distribute R21 in certain countries, primarily in travelers' and military vaccine markets

(4)Reflects malaria transmission blocking vaccine candidate ("R0.6C") manufactured by Statens Serum Institut; Ongoing Phase 1 clinical trial in the Netherlands to evaluate R0.6C, Matrix-M™ adjuvant and common aluminum hydroxide adjuvant

**Matrix-M™ Adjuvant**

Our proprietary Matrix-M™ adjuvant has demonstrated potent and well-tolerated efficacy by stimulating the entry of antigen presenting cells ("APCs") into the injection site and enhancing antigen presentation in local lymph nodes, which in turn activates T-cell, B-cell, and APC populations, thereby boosting immune response. Our Matrix-M™ adjuvant has been shown to increase neutralizing antibodies and induces long-lasting memory B cells, which enhances B-cell immunity and recruits and increases the frequency of CD4+ and CD8+ T cells to enhance T-cell immunity in preclinical models. The potent immune-stimulating mechanism of action enables a lower dose of antigen required to achieve the desired immune response, ultimately contributing to increased supply and manufacturing capacity. These immune-boosting and dose-sparing capabilities contribute to the adjuvant's highly unique profile. Our Matrix-M™ adjuvant is being evaluated in combination with several other vaccine antigens produced by other manufacturers.

**Coronavirus**

**NVX-CoV2373 Clinical Development**

We have evaluated NVX-CoV2373 in various preclinical and clinical trials, including two Phase 3 trials, one Phase 2b trial, and one Phase 1/2 trial. Through our clinical development program to date, we confirmed the use of a 5-microgram dose of NVX-CoV2373 with Matrix-M™ adjuvant for late-stage development. We have also collected data that indicates a reassuring safety profile and high levels of efficacy for NVX-CoV2373 against original COVID-19 strain and commonly circulating variants. A summary and status of our clinical development of NVX-CoV2373 follows:

***PREVENT-19 Pediatric Expansion***

In June 2021, we completed enrollment of the pediatric expansion of our PREVENT-19 Phase 3 trial in the U.S. that was initiated in April 2021. The pediatric expansion is a placebo-controlled study to evaluate efficacy, safety, and immunogenicity of NVX-CoV2373 in 2,248 adolescent participants aged 12 to 17 across up to 75 sites in the U.S. Participants will randomly receive either the vaccine candidate or placebo in two doses, administered 21 days apart. Two-thirds of participants will receive intramuscular injections of the vaccine and one-third will receive placebo. All primary doses have been administered and a blinded crossover is planned to take place in August 2021 to ensure that all trial participants receive active vaccine before the start of the 2021-2022 school year. Participants will be monitored for safety for up to two years following the final administered dose.

***PREVENT-19 Phase 3 U.S. and Mexico***

In June 2021, we announced results from the final analysis of our PREVENT-19 Phase 3 trial in the U.S. and Mexico initiated in December 2020. The final analysis was conducted on events accrued prior to participants receiving crossover vaccine. In the final analysis, NVX-CoV2373 achieved its primary efficacy endpoint with an overall efficacy of 90.4% despite over half the illness cases being caused by Variants of Interest ("VoI") and Variants of Concern ("VoC"). Additionally, NVX-CoV2373 demonstrated 100% protection against moderate and severe disease, including those caused by variants.

PREVENT-19 was a randomized, placebo-controlled, observer-blinded trial to evaluate the efficacy, safety, and immunogenicity of NVX-CoV2373 in 29,960 participants aged 18 years or older across 119 sites in the U.S. and Mexico. Enrollment for PREVENT-19 emphasized recruiting high-risk groups most impacted by COVID-19. The participant trial population was composed of the following: 22% Latin American, 12% African American, 7% Native American, 4% Asian American, 37% with underlying medical co-morbidities and 13% older adults aged 65 years and older. The trial design was harmonized to align with other Phase 3 trials conducted under the auspices of OWS, including the use of a single external, independent Data and Safety Monitoring Board to evaluate safety. The trial's primary endpoint was the first occurrence of PCR-confirmed, symptomatic (mild, moderate or severe) COVID-19 with onset at least seven days after the second study

19

Table of Contents

vaccination in participants who had not been previously infected with SARS-CoV-2. Two-thirds of the participants were assigned to randomly receive two intramuscular injections of NVX-CoV2373 comprising 5 micrograms of antigen with 50 micrograms of Matrix-M™ adjuvant, administered 21 days apart, while one-third of the trial participants received placebo. The primary efficacy analysis was event-driven, based on the number of participants with symptomatic mild, moderate, or severe COVID-19 disease.

Efficacy endpoints were accrued from January 25, 2021, through April 30, 2021, at a time when the Alpha (B.1.1.7) variant strain became the predominant strain in the U.S. Other strains, including VoI and VoC, were also on the rise during the PREVENT-19 endpoint accrual window. PREVENT-19 met a key secondary endpoint, demonstrating 100% efficacy against variants not considered VoC/VoI. NVX-CoV2373 also demonstrated 92.6% efficacy against VoC/VoI, achieving a key exploratory endpoint of the study. Among high-risk populations (participants over age 65, under age 65 with certain comorbidities, or having life circumstances with frequent COVID-19 exposure), NVX-CoV2373 demonstrated 91.0% efficacy. Preliminary safety data showed NVX-CoV2373 to be generally well-tolerated, with serious and severe adverse events low in number and balanced between vaccine and placebo groups. Participants will be followed for 24 months following the second injection. PREVENT-19 was conducted with support and funding from OWS.

### Phase 3 United Kingdom ("UK")

In June 2021, the final analysis of our Phase 3 UK trial was published in the *New England Journal of Medicine.* The publication of the final analysis highlights the robust safety and efficacy data for NVX-CoV2373. The final analysis confirmed 89.7% overall efficacy, with over 60% of the cases caused by the Alpha (B.1.1.7) variant strain. The analysis also confirmed 96.4% efficacy against non-Alpha (non-B.1.1.7) variant strains, which represents strains most similar to the original COVID-19 virus. The final analysis also demonstrated that initial vaccine side effects were mostly mild and transient, and that no imbalance was seen in more serious adverse events compared with the placebo arm. The final analysis builds upon the interim analysis conducted in January 2021 and updated analysis announced in March 2021. The trial was a randomized, observer-blinded, placebo-controlled study that enrolled 15,203 adults aged 18 to 84. Half of the trial participants received two intramuscular injections of NVX-CoV2373 comprising 5 micrograms of antigen with 50 micrograms of Matrix-M™ adjuvant, administered 21 days apart, while the other half of the trial participants received placebo. The trial was conducted in partnership with the UK government Vaccines Taskforce and led by researchers at St George's, University of London and St George's Hospital, London.

### Phase 3 UK Co-Administration Sub-Study

In June 2021, we announced data from the co-administration sub-study of NVX-CoV2373 and an approved influenza vaccine, conducted as part of our Phase 3 UK trial. In this study, 431 participants enrolled in our Phase 3 UK trial received an approved seasonal influenza vaccine (Seqirus, adjuvanted, trivalent seasonal influenza vaccine or a cell-based quadrivalent seasonal influenza vaccine). Approximately half of the participants in the study were also co-vaccinated with NVX-CoV2373, while the remainder received placebo. Results demonstrated a robust immune response and a favorable safety and reactogenicity profile. Immunogenicity of the influenza vaccine was preserved with concomitant administration, while a modest decrease in the immunogenicity of NVX-CoV2373 was found. There was an adequate number of participants aged 18 to 64 to confirm an efficacy trend of 87.5% against COVID-19. The majority of local and systemic reactogenicity events were absent or mild, with small increases in pain and tenderness at the injection site and muscle aches being elevated amongst participants who were co-vaccinated with NVX-CoV2373 and influenza vaccine. Rates of severe adverse events ("SAEs") were low in all groups, and there were no additional early safety concerns associated with co-administration. Rates of unsolicited adverse events ("AEs"), medically attended AEs, and SAEs were low and balanced between the groups. Data from this study have been submitted for peer review and are available ahead of publication via the preprint server on medRxiv. The co-administration sub-study represents the first study of a SARS-CoV-2 vaccine candidate and an approved influenza vaccine, and was led by researchers at St George's, University of London and St George's Hospital, London.

### Phase 2b South Africa

In May 2021, results from the initial primary analysis of our Phase 2b South Africa trial were published in the *New England Journal of Medicine.* The publication of the initial primary analysis, which was previously announced in January 2021, highlights NVX-CoV2373's cross-protection against the Beta (B.1.351) variant strain prevalent in South Africa during the study.

The Phase 2b South Africa trial was a randomized, observer-blinded, placebo-controlled study that enrolled 4,404 participants. Half of the trial participants received two intramuscular injections of NVX-CoV2373 comprising 5 micrograms of antigen with 50 micrograms of Matrix-M™ adjuvant, administered 21 days apart, while the other half of the trial participants received placebo.

Table of Contents

In the complete analysis announced in March 2021, NVX-CoV2373 demonstrated 55.4% efficacy for the prevention of mild, moderate and severe COVID-19 disease in the 95% of the trial population that was HIV-negative. Overall efficacy, including both HIV-positive and HIV-negative participants, was 48.6% predominantly against the Beta (B.1.351) variant strain, with the complete analysis showing that NVX-CoV2373 achieved its primary efficacy endpoint in the overall trial population. During the efficacy analysis, the Beta (B.1.351) variant strain circulating in South Africa accounted for approximately 93% of sequenced cases in our Phase 2b trial. There were no cases of severe disease in the NVX-CoV2373 group, and all hospitalization and death occurred in the placebo group. This trial also showed that the vaccine is well-tolerated, with low levels of SAEs through day 35, balanced between vaccine and placebo groups.

While the interim analysis announced in January 2021 reported that prior infection with the original COVID-19 strain may not completely protect against subsequent infection by the variant predominantly circulating in South Africa, the complete analysis indicated that there may be a late protective effect of prior exposure with the original COVID-19 strain. In placebo recipients, at 90 days the illness rate was 8.0% in baseline seronegative participants, with a rate of 5.9% in baseline seropositive participants. CEPI funded the manufacturing of doses of NVX-CoV2373 for this Phase 2b clinical trial, which was also supported in part by a $15.0 million grant from BMGF.

**NVX-CoV2373 Booster and Crossover Studies**

*Novavax-Led Crossover Studies*

In April 2021, we initiated crossover arms in our Phase 3 UK, Phase 2b South Africa and PREVENT-19 Phase 3 trials. In June 2021, we completed crossover arms in our Phase 3 UK trial. As of August 2021, our Phase 2b South Africa and PREVENT-19 crossover arms are ongoing.

In our Phase 3 UK and PREVENT-19 trials, participants were offered the opportunity to receive an additional round of injections. Participants who elected to do so received an additional two-dose regimen of either vaccine for those who originally received placebo or placebo for those who originally received vaccine. In our Phase 2b South Africa trial, participants will receive either active vaccine for those who initially received placebo or a booster dose of active vaccine for those who initially received active vaccine. Throughout our crossover arms, participants in all of our trials will remain blinded to their courses of treatment to preserve the ability to assess clinical data in an unbiased manner.

*Novavax-Led Booster Study*

In August 2021, we announced data from our six-month booster study in the Phase 2 portion of our U.S. and Australia Phase 1/2 trial, which we initiated in March 2021. In this booster study, select participants in the 5 microgram dose cohort from the Phase 2 portion of the Phase 1/2 trial received a third 5 microgram dose (a booster dose) at six months to examine the functional immune response of our vaccine candidate. Results from this study showed that twenty-eight days following boosting, anti-spike IgG increased approximately 4.6-fold compared to the peak response seen after the second dose (Day 217 GMEU = 200,408 (95% CI: 159,796; 251,342)). This boosted value represents a 3.7 to 4.4-fold increase in anti-spike IgG values that were associated with protection in our PREVENT-19 and Phase 3 UK trials. Similarly, wild-type neutralization responses increased approximately 4.3-fold compared to the peak response seen after Dose 2 (IC50 neutralization titers = 6,231 (95% CI: 4,738; 8,195)). This boosted value represents a 4.6 to 5.5-fold increase over the neutralization response associated with protection in our PREVENT-19 and Phase 3 UK trials. The data showed that functional hACE-2 inhibitory antibodies were induced with primary vaccination against Alpha (B.1.1.7), Beta (B.1.351) and Delta and that these levels increased 6- to 10-fold following a single 6-month boost with prototype vaccine. Additionally, functional ACE-2 binding inhibition antibodies cross-reactive with the Delta (B.1.617.2) variant strain were more than 6-fold higher than the primary vaccination series. The administration of booster doses was generally well-tolerated. Local and systemic reactogenicity increased between dose one, dose two, and dose three, with 90% of symptoms rated as mild or moderate after the third dose.

*Mix-and-Match COVID-19 Vaccine Booster Trial ("Cov-Boost")*

In July 2021, enrollment was completed in Cov-Boost, a mix-and-match (vaccine interchangeability) COVID-19 vaccine booster trial, for which we announced our participation in May 2021. The trial, which was initiated in June 2021, enrolled 2,886 participants aged 30 years and older. NVX-CoV2373 is one of seven COVID-19 vaccines that is being studied to evaluate the potential for providing a booster dose from different manufacturers to individuals who have previously received two doses of an authorized vaccine. Of the 2,886 participants enrolled, 230 participants received a full dose of NVX-CoV2373, while 216 participants received a half volume dose of NVX-CoV2373. The trial assesses the safety and immune response against COVID-19 provided by the various vaccine schedules. The trial is led by the University Hospital Southampton NHS

21

Table of Contents

Foundation Trust and other UK National Institute for Health Research sites. Cov-Boost is receiving support from the UK government Vaccines Taskforce and Department of Health and Social Care.

***Comparing COVID-19 Vaccine Schedule Combinations - Stage 2 ("Com-COV2")***

In May 2021, enrollment was completed in Com-COV2, a newly expanded investigator-initiated Phase 2 clinical trial, for which we announced our participation in April 2021. The trial enrolled 1,072 adults aged 50 years and older who received their first vaccination during the previous 8-12 weeks. NVX-CoV2373 is one of four COVID-19 vaccines that is being studied to evaluate the potential for combined regimens that mix vaccines from different manufacturers to achieve immune protection against COVID-19. Participants received one of four different vaccines as a second dose, 359 of whom were administered NVX-CoV2373. The trial compares the immune system responses from those who receive a heterologous regimen to those who receive a homologous regimen. Participants in this non-inferiority study are followed for reactogenicity (safety) and immune responses. The trial is conducted by the University of Oxford and supported by the UK government Vaccines Taskforce. The MHRA and Joint Committee on Vaccination and Immunisation formally assesses the safety and efficacy of any new vaccination regiment before it is made available to the public.

**NVX-CoV2373 Clinical Development Conducted by Partners**

***Phase 2/3 India***

In March 2021, SIIPL initiated a Phase 2/3 clinical trial of NVX-CoV2373 in India. The initial cohort was fully enrolled in April 2021 and the total study includes approximately 1,600 participants aged 18 to 65 years.

***Phase 1/2 Japan***

In March 2021, Takeda Pharmaceutical Company Limited ("Takeda") completed enrollment of a Phase 1/2 clinical trial of NVX-CoV2373 in Japan. This placebo-controlled trial will evaluate the immunogenicity and safety of NVX-CoV2373 in 200 participants aged 20 years and older.

**Variant Strain (Monovalent and/or Bivalent) Vaccine Development**

Our nanoparticle vaccine technology is purpose-built to rapidly address evolving infectious disease threats. In January 2021, we initiated development of new constructs against the emerging strains of COVID-19, and in February 2021, we selected variant strain vaccines for preclinical evaluation. We are currently evaluating multiple variant strain vaccine candidates, including a recombinant spike protein antigen based on the Beta (B.1.351) virus lineage ("rS-B.1.351").

***COVID-19 Beta (B.1.351) Variant Strain Vaccine ("rS-B.1.351")***

In June 2021, we announced data from three complementary non-clinical studies of our rS-B.1.351 variant strain vaccine. The studies compared rS-B.1.351 to NVX-CoV2373 as standalone, in combination, and as a heterologous prime boost vaccine. The data showed that rS-B.1.351 demonstrated strong immunogenicity and protection against the Alpha (B.1.1.7) variant strain, Beta (B.1.351) variant strain and the original COVID-19 virus in animal studies. The findings also showed a broad array of cellular and humoral responses in animal models against all virus strains evaluated. Data from these studies have been submitted for peer review and are available ahead of publication via the preprint server on bioRxiv. We expect to initiate clinical evaluation of rS-B.1.351 in the fall of 2021.

In one study, thirty randomly selected human serum samples from Phase 2 clinical trial participants after their second dose of NVX-CoV2373 were assayed and analyzed for their ability to neutralize Alpha (B.1.1.7) and Beta (B.1.351) variant strains. The trial participants' sera demonstrated a neutralizing capacity of the Alpha (B.1.1.7) variant strain equal to NVX-CoV2373, with a modest reduction in neutralizing capacity again the Beta (B.1.351) variant strain. These findings support the initial development and evaluation of a B.1.351-directed vaccine as a booster or in a combination vaccine approach.

In an additional preclinical study, mice were immunized with NVX-CoV2373 or rS-B.1.351 alone, in combination, or as a heterologous prime boost. Preclinical data from this study demonstrated that rS-B.1.351 was highly immunogenic and produced neutralizing antibodies.

In another preclinical study, non-human primates ("NHPs") that were originally immunized with NVX-CoV2373 were boosted approximately one year later with one or two doses of rS-B.1.351. Preclinical data from this study showed that NHPs

22

Table of Contents

boosted with rS-B.1.351 induced strong neutralizing immune responses to the original COVID-19 strain, as well as Alpha (B.1.1.7) and Beta (B.1.351) variant strains. Data from this preclinical study builds upon initial data announced in May 2021.

**NVX-CoV2373 Regulatory and Licensure**

As of August 2021, we continue to work to complete various Chemistry, Manufacturing and Controls ("CMC") requirements, which ensure that our manufacturing processes are in accordance with regulatory standards (see further discussion of our manufacturing activities below under the heading "NVX-CoV2373 Manufacturing and Supply"). Below is a summary and status of our regulatory processes through the date of filing this Form 10-Q.

In August 2021, we filed regulatory submissions in partnership with SIIPL for emergency use authorization ("EUA") in multiple markets. Regulatory submissions were filed with the Drugs Controller General of India ("DCGI"), as well as regulatory agencies in Indonesia and the Philippines. In addition to these filings, we expect to file a submission to the WHO for emergency use listing ("EUL") in August of 2021.

In April 2021, SK bioscience Ltd. ("SK bioscience") initiated the regulatory submission process in collaboration with Novavax to the MFDS for authorization of NVX-CoV2373.

We expect to file for authorization with the MHRA in the third quarter of 2021. We expect to complete additional filings for authorization within weeks of filing with the MHRA, including with EMA, Australian Therapeutic Goods Administration, Health Canada, and New Zealand Medsafe.

We are actively engaged in communications with the FDA through submissions to our open investigational new drug application ("IND") and discussions on various aspects of the program required to support the regulatory approval process. We plan to file submissions for EUA with the FDA in the fourth quarter of 2021.

**COVID-19 Vaccine Funding**

We have secured critical funding throughout 2020 and into 2021 to support the development of NVX-CoV2373. Through the date of filing this Form 10-Q, funding for NVX-CoV2373 encompasses over $2 billion from sources including the BMGF, CEPI, the DoD, and OWS.

In April 2021, our Base Agreement and a Project Agreement (together, as amended and supplemented, the "OWS Agreement") entered into with Advanced Technology International, Inc., the Consortium Management Firm acting on behalf of the Medical CBRN Defense Consortium in connection with OWS, was amended to fully fund the agreement up to $1.75 billion to support certain activities related to the development of NVX-CoV2373. This includes the manufacture and delivery of 100 million doses of NVX-CoV2373 to the U.S. government. We expect this funding will assist in rapidly developing our large-scale manufacturing capacity and transitioning into ongoing production, including the capability to stockpile and distribute large quantities of NVX-CoV2373 for use in clinical trials and potentially for commercial sale, if authorized for emergency use or licensed. The OWS Agreement is funding the late-stage clinical studies necessary to determine the safety and efficacy of NVX-CoV2373, including PREVENT-19. Funding under the OWS Agreement is expected to support our plans to file submissions for EUA and licensure with the FDA. Accepted analytical methods that we can use to demonstrate our vaccine's purity, potency and consistent lot manufacturing are critical to attaining licensure in all the territories we intend to sell our vaccine. In the U.S., these analytical methods will be reviewed and approved by the FDA. The U.S. government has recently instructed us to prioritize alignment with the FDA on our analytic methods before conducting additional U.S. manufacturing and further indicated that the U.S. government will not fund additional U.S. manufacturing until such agreement has been made. The U.S. government also instructed us to proceed with work under the OWS Agreement related to all other activities including ongoing clinical trials and nonclinical studies, regulatory interactions, analytics/assays and characterization of manufactured vaccine and project management.

A summary and status of our historical COVID-19 funding developments follows:

23

Table of Contents

| Funding Partner | Amount | Additional Detail |
|---|---|---|
| BMGF | $15 million | • Received $15 million grant to support our Phase 2b clinical trial in South Africa initiated in August 2020 |
| CEPI | $399.5 million | • Entitled to receive up to $399.5 million of funding to support the development of NVX-CoV2373<br>• To supply NVX-CoV2373 through the COVAX Facility |
| DoD | $45.7 million | • Entitled to receive up to $45.7 million of funding to support the development of NVX-CoV2373<br>• To manufacture and deliver 10 million doses of NVX-CoV2373 to the U.S. government |
| U.S. Government | $1.75 billion | • Allotted funding of $1.75 billion to support the development of NVX-CoV2373<br>• To manufacture and deliver 100 million doses of NVX-CoV2373 to the U.S. government |

**NVX-CoV2373 Manufacturing and Supply**

We have established a global manufacturing and supply chain to support the commercialization of NVX-CoV2373. With significant progress made throughout 2020 and through the second quarter of 2021, our global supply chain spans over ten countries and includes Novavax-owned facilities in the Czech Republic and Sweden, as well as partnerships with contract manufacturing organizations around the world. In the second quarter of 2021, we remained focused on readying our global supply chain for commercialization in order to ensure we promptly deliver NXV-CoV2373 upon anticipated regulatory authorizations.

We expect our global manufacturing capacity of NVX-CoV2373 to be approximately 100 million doses per month by the end of the third quarter of 2021. We anticipate the remainder of our manufacturing capacity will be ready by the end of the fourth quarter of 2021, which we expect will support total global manufacturing capacity of approximately 150 million doses per month. Of this anticipated capacity, approximately one billion annualized doses will be manufactured by SIIPL.

A summary and status of key manufacturing and supply developments during the second quarter of 2021 follows:



| Antigen Production of NVX-CoV2373 | • National Research Council's Biologics Manufacturing Centre in Canada |
|---|---|
| Antigen Production, Out-licensing & Collaborations | • SK bioscience in the Republic of Korea<br>• Takeda in Japan |

In June 2021, we announced the completion of construction of the National Research Council of Canada's Biologics Manufacturing Centre and ongoing technology transfer for the production of NVX-CoV2373. Technology transfer to establish a step-by-step process of producing NVX-CoV2373 at the Biologics Manufacturing Centre began in April 2021 following a collaboration agreement entered into with the National Research Council of Canada in March 2021. These developments build upon a Memorandum of Understanding ("MOU") entered into in February 2021 with the Canadian government to produce

Table of Contents

NVX-CoV2373 at the Biologics Manufacturing Centre in Canada. Large-scale GMP production is expected to begin once the facility has received Health Canada approval.

In May 2021, we entered a non-binding MOU with the MOHW and SK bioscience to explore further cooperation in the development and manufacturing of vaccines, including NVX-CoV2373. Under the agreement, we agreed to potentially explore the development of new vaccine products with SK bioscience, including COVID-19 variant vaccines, and/or an influenza/COVID-19 combination vaccine. We will continue to collaborate with SK bioscience in manufacturing of the vaccines utilizing SK bioscience's facility, with support from the Korean government. The MOU builds upon previous agreements entered with SK bioscience, including a development and supply agreement entered into in August 2020 and a collaboration and license agreement entered into in February 2021, whereby we granted SK bioscience an exclusive license to develop, manufacture and commercialize NVX-CoV2373 in the Republic of Korea.

In May 2021, the MHLW announced it was in contract discussions to potentially order 150 million doses of our COVID-19 vaccine candidate from Takeda. This development follows the exclusive license agreement we entered into with Takeda in February 2021 for the development, manufacturing and commercialization of NVX-CoV2373 in Japan. We anticipate Takeda will have a manufacturing capacity of 250 million doses per year. Takeda is in process of establishing vaccine procurement based on technology transfer by Novavax of NVX-CoV2373. Distribution of NVX-CoV2373 in Japan by Takeda is expected to begin in late 2021 or early 2022. Takeda is responsible for regulatory submission to Japan's Pharmaceutical and Medical Devices Agency ("PMDA").

**NVX-CoV2373 Supply Agreements**

We expect our global supply chain will enable us to deliver upon our supply commitments around the world. We have entered into advance purchase agreements (referred to as "APAs" or "supply agreements" throughout this Form 10-Q), as well as multiple supply and license agreements with strategic partners. The APAs typically contain terms that include upfront payments intended to assist us in funding investments related to building out and operating our manufacturing and distribution network, among other expenses, in support of our global supply commitment. Such upfront payments generally become non-refundable upon our achievement of certain development and commercial milestones.

A summary and status of key supply agreements executed since the beginning of the second quarter of 2021 and through the date of filing this Form 10-Q follows:

In May 2021, we finalized an APA with Gavi, the Vaccine Alliance ("Gavi"), building upon our MOU previously announced in February 2021. Under the terms of the agreement, 1.1 billion doses of NVX-CoV2373 are to be made available to countries participating in the COVAX Facility, which was established to allocate and distribute vaccines equitably to participating countries and economies. We expect to manufacture and distribute 350 million doses of NVX-CoV2373 to countries participating under the COVAX Facility. Under a separate purchase agreement with Gavi, SIIPL is expected to manufacture and deliver the balance of the 1.1 billion doses of NVX-CoV2373 for low- and middle-income countries participating in the COVAX Facility. We expect to deliver doses with antigen and adjuvant manufactured at facilities directly funded by the investments previously received from CEPI (the "CEPI Funding Agreement"). We expect to supply significant doses that Gavi would allocate to low-, middle- and high-income countries, subject to certain limitations, utilizing a tiered pricing schedule and Gavi may prioritize such doses to low- and middle-income countries at lower prices. Additionally, we may provide additional doses of NVX-CoV2373, to the extent available from CEPI-funded manufacturing facilities, in the event that SIIPL cannot materially deliver expected vaccine doses to the COVAX Facility. Together with SIIPL, we expect to initiate delivery of doses following receipt of appropriate regulatory authorizations. Under the agreement, we received an upfront payment from Gavi of $350 million during the second quarter of 2021 and expect to receive an additional payment of $350 million if we secure EUL for NVX-CoV2373 by the WHO.

We expect to sign additional APAs or supply agreements that are currently in active discussions and negotiations. For example, in August 2021, we announced that we finalized the terms of an APA with the European Commission, which the parties expect to execute during the third quarter of 2021, for the purchase of up to 100 million initial doses of NVX-CoV2373, with the option of the European Commission to purchase an additional 100 million doses through 2023.

In addition to our supply agreements, we have committed 110 million doses of NVX-CoV2373 to the U.S. government under the OWS Agreement and our contract with the DoD (the "DoD Contract").

25

Table of Contents

**Seasonal Influenza**

**NanoFlu™ Vaccine Program (Older Adults)**

To date, we have advanced NanoFlu™ through a Phase 3 clinical trial in which NanoFlu™ achieved all primary endpoints and achieved statistical significance in key secondary endpoints. In 2020, we took steps to ensure the continued advancement of NanoFlu™ in parallel with our COVID-19 activities and formed a leadership team solely dedicated to our NanoFlu™ vaccine program. This NanoFlu™ vaccine development unit benefits from joint shared services with key cross-functional departments and builds on the Company's established knowledge base in the discovery and development of innovative vaccines. Our NanoFlu™ vaccine team remains focused on advancing our combination NanoFlu™ / NVX-CoV2373 vaccine candidate, qNIV/CoV2373, to clinical development.

**Combination Vaccines**

With the ongoing development of NanoFlu™, NVX-CoV2373 and our RSV F Vaccine, a strong rationale exists for developing combination respiratory vaccines designed to protect susceptible populations against these diseases. Although testing is at an early stage, we believe that the combination of influenza with COVID-19, influenza with RSV, and influenza with both RSV and COVID-19 may be achievable, as these vaccines all use our recombinant nanoparticle technology and include our proprietary Matrix-M™ adjuvant.

**NanoFlu™/NVX-CoV2373 Combination Vaccine ("qNIV/CoV2373")**

In May 2021, we announced data from a preclinical study of qNIV/CoV2373 to assess its immunogenicity and protective efficacy in animal models. Preclinical data from this study showed that qNIV/CoV2373 induced functional influenza and COVID-19 antibody responses, with hemagglutination inhibition and ACE2 receptor-inhibiting titers that were comparable between immunization with the combination vaccine and with its respective component vaccines. qNIV/CoV2373 also induced elevated levels of SARS-CoV-2 anti-S IgG two weeks after the first immunization, which increased significantly after the second dose, with levels comparable to animals that received NVX-CoV2373 alone. Human ACE2 receptor inhibiting antibody levels responded similarly. qNIV/CoV2373 also induced antibodies against SARS-CoV-2 neutralizing epitopes that are common between the original COVID-19 strain and the Beta (B.1.351) variant strain. When challenged with SARS-CoV-2, examination of viral load in the upper and lower respiratory tract showed little or no virus was detected four days after infection in animals immunized with either qNIV/CoV2373 or with NVX-CoV2373 alone. Data from this study are available ahead of publication via the preprint server for biology on bioRxiv. We expect to initiate clinical evaluation of qNIV/CoV2373 later in 2021.

**Malaria**

**R21 - Malaria Vaccine**

R21 is a malaria vaccine candidate created by the Jenner Institute, University of Oxford, and formulated with our Matrix-M™ adjuvant. The University of Oxford has partnered with SIIPL for commercial development of R21 and has granted them a license for the vaccine. We expect to manufacture and supply the Matrix-M™ adjuvant component of R21 to SIIPL. SIIPL has committed to manufacture at least 200 million doses per year of R21 after licensure. Additionally, SIIPL has rights to use Matrix-M™ adjuvant in the vaccine in regions where the disease is endemic and will pay royalties to us on its market sales of the vaccine. We will have commercial rights to sell and distribute the SIIPL-manufactured vaccine in certain countries, primarily in the travelers' and military vaccine markets.

*R21 Clinical Development*

In May 2021, the first doses were administered in a Phase 3 licensure trial of R21 to assess the efficacy and safety of the malaria vaccine candidate. This double-blinded, randomized, controlled Phase 3 trial includes 4,800 participants aged five to 36 months across five sites in Burkina Faso, Kenya, Mali and Tanzania. Participants will receive three vaccinations four weeks apart and a booster vaccination one year later.

In April 2021, we announced the pre-print publication of data in *Preprints with The Lancet* from a Phase 2b clinical trial evaluating R21. The Phase 2b randomized, controlled, double-blind trial was conducted at the Clinical Research Unit of Nanoro / Institut de Recherche en Sciences de la Santé in Africa and recruited 450 participants aged five to 17 months from the catchment area of Nanoro, Burkina Faso. In three study arms, participants received 5 micrograms of R21 with either 25 micrograms of Matrix-M™ adjuvant, 50 micrograms of Matrix-M™ adjuvant, or a rabies vaccine as a control. R21 demonstrated

Table of Contents

77% efficacy in the higher adjuvant dose group and 71% efficacy in the lower adjuvant dose group. Both adjuvant dose levels were well tolerated in young children, with no severe reactions to the vaccine reported.

**R0.6C - Malaria Transmission Blocking Vaccine**

R0.6C is a novel malaria transmission blocking vaccine candidate manufactured by Statens Serum Institut that has been formulated in a preclinical study with our Matrix-M™ adjuvant. R0.6C is a vaccine candidate based on the protective epitopes of the Pfs48/45 protein. Development of R0.6C is supported by grants from the European Union's Horizon 2020 research and innovation program and funded by PATH's Malaria Vaccine Initiative.

*R0.6C Clinical Development*

In June 2021, a Phase 1 clinical trial for R0.6C was initiated at Radboud University Medical Center in the Netherlands. The trial enrolled healthy, adult volunteers and will assess the safety and immunogenicity of R0.6C. The trial will also evaluate our Matrix-M™ adjuvant and the common aluminum hydroxide adjuvant. This Phase 1 trial follows a preclinical study of R0.6C formulated with our Matrix-M™ adjuvant, which showed greater than 80% reduction of transmission of the parasite that causes malaria.

**Sales of Common Stock**

During the six months ended June 30, 2021 and 2020, we sold 2.6 million and 28.5 million, respectively, of shares of our common stock resulting in net proceeds of approximately $565 million and $392 million, respectively, under our various At Market Issuance Sales agreements.

In June 2021, we entered into an At Market Issuance Sales Agreement (the "June 2021 Sales Agreement"), which allows us to issue and sell up to $500 million in gross proceeds of shares of our common stock, and terminated our existing At Market Issuance Sales agreement. As of June 30, 2021, no shares had been sold under the June 2021 Sales Agreement.

*Critical Accounting Policies and Use of Estimates*

There are no material changes to our critical accounting policies as described in Item 7 of our Annual Report on Form 10-K for the fiscal year ended December 31, 2020, as filed with the SEC.

*Recent Accounting Pronouncements Not Yet Adopted*

See "Note 2—Summary of Significant Accounting Policies" included in our Notes to Consolidated Financial Statements (under the caption "*Recent Accounting Pronouncements*").

**Results of Operations**

The following is a discussion of the historical financial condition and results of the Company's operations that should be read in conjunction with the unaudited consolidated financial statements and notes set forth in this Quarterly Report.

**Three Months Ended June 30, 2021 and 2020**

<u>Revenue:</u>

| | Three Months Ended June 30, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **Change** |
| **Revenue (in thousands):** | | | |
| Government contracts | $ 240,534 | $ - | $ 240,534 |
| Grants and other | 34,026 | 35,538 | (1,512) |
| Royalties | 23,457 | - | 23,457 |
| Total revenue | $ 298,017 | $ 35,538 | $ 262,479 |

Revenue for the three months ended June 30, 2021 was $298.0 million as compared to $35.5 million for the same period in 2020, an increase of $262.5 million. Revenue for the three months ended June 30, 2021 was primarily comprised of

Table of Contents

revenue for services performed under the OWS Agreement and the CEPI Funding Agreement. Revenue for the three months ended June 30, 2020 was primarily comprised of revenue for services performed under the CEPI Funding Agreement. During the three month ended June 30, 2021, we recognized royalties of $23.5 million under our licensing arrangements. The significant increase in revenue was due to increased development activities relating to NVX-CoV2373 under the OWS Agreement and the CEPI Funding Agreement.

We expect revenue in 2021 to significantly increase as compared with 2020 due to our NVX-CoV2373 program, which we anticipate will continue to be funded by OWS and CEPI and/or other revenue sources. Further, we anticipate bringing our NVXCoV2373 vaccine candidate to market following global regulatory approvals which, if achieved, should significantly increase revenue. In anticipation, we have entered into various APA, as well as multiple supply and license agreements with strategic partners to supply NVX-CoV2373 in their specified territories under which we are entitled to receive royalties from the sale of NVX-CoV2373 by such partners.

**Expenses:**

| | Three Months Ended June 30, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **Change** |
| **Expenses (in thousands):** | | | |
| Research and development | $ 570,685 | $ 34,846 | $ 535,839 |
| General and administrative | 73,161 | 17,719 | 55,442 |
| Total expenses | $ 643,846 | $ 52,565 | $ 591,281 |

***Research and Development Expenses***

In the three months ended June 30, 2021, our research and development activities were primarily focused on the development of NVX-CoV2373 and included direct external research and development expenses related to NVX-CoV2373 of $497.2 million, primarily comprised of costs related to the following:

•expenses incurred under agreements with contract research organization ("CROs") that conduct our clinical trials and third-party consultants related to the development of NVX-CoV2373;

•expenses incurred on developing and manufacturing the antigen drug substance and Matrix-M™ components of NVX-CoV2373 under agreements that we established with third-party contract manufacturing organizations ("CMOs") and contract manufacturing and development organizations ("CDMOs");

•expenses incurred for the procurement of raw materials, laboratory supplies and equipment; and

•other costs related to preclinical studies and regulatory consulting, as well as related program management activities to support our growing global operations.

Research and development expenses increased to $570.7 million for three months ended June 30, 2021 as compared to $34.8 million for three months ended June 30, 2020, an increase of $535.8 million primarily due to research and development of NVX-CoV2373, as summarized in the table below (in millions):

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | **2021** | **2020** |
| NVX-CoV2373 | $ 497,196 | $ 17,293 |
| NanoFlu™ | 3,168 | 4,611 |
| Other vaccine development programs | 210 | 738 |
| Total direct external research and development expense | 500,574 | 22,642 |
| Employee expenses | 24,556 | 4,794 |
| Stock-based compensation expense | 24,779 | 4,098 |
| Facility expenses | 3,410 | 902 |
| Other expenses | 17,366 | 2,410 |
| Total research and development expenses | $ 570,685 | $ 34,846 |

28

Table of Contents

For 2021, we expect research and development expenses to significantly increase over 2020 expenses due to our continued development activities for our NVX-CoV2373 program and increases in employee-related costs. Following a potential regulatory approval of NVX-CoV2373, we expect products sales will result in certain types of costs that have been previously recorded as research and development in our Consolidated Statement of Operations to be capitalized as inventory and expensed as cost of goods sold when product is delivered. Cost of goods sold expenses could be significant in 2021 depending on our commercial shipment levels for those shipments in which the costs were recorded into inventory.

We do not provide forward-looking estimates of costs and time to complete our research programs due to the many uncertainties associated with vaccine development. As we obtain data from preclinical studies and clinical trials, we may elect to discontinue or delay clinical trials in order to focus our resources on more promising vaccine candidates. Completion of clinical trials may take several years or more, but the length of time can vary substantially depending upon the phase, size of clinical trial, primary and secondary endpoints and the intended use of the vaccine candidate. The cost of clinical trials may vary significantly over the life of a project as a result of a variety of factors, including:

•the number of participants who participate in the clinical trials;

•the number of sites included in the clinical trials;

•if clinical trial locations are domestic, international or both;

•the time to enroll participants;

•the duration of treatment and follow-up;

•the safety and efficacy profile of the vaccine candidate; and

•the cost and timing of, and the ability to secure, regulatory approvals.

As a result of these uncertainties, we are unable to determine the duration and completion costs of our research and development projects or when, and to what extent, we will generate future cash flows from our research projects.

***General and Administrative Expenses***

General and administrative expenses increased to $73.2 million for the three months ended June 30, 2021 from $17.7 million for the same period in 2020, an increase of $55.4 million. The increase in general and administrative expenses is primarily due to increased employee-related costs, primarily stock-based compensation expense, and an increase in professional fees in support of our NVX-CoV2373 program. As of June 30, 2021, we had 195 employees dedicated to general and administrative functions as compared with 61 employees as of June 30, 2020. For 2021, we expect general and administrative expenses to significantly increase due to increased activities related to supporting our NVX-CoV2373 program and increases in employee-related costs and professional fees.

**Other Income (Expense):**

| | Three Months Ended June 30, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **Change** |
| **Other Income (Expense) (in thousands):** | | | |
| Investment income | $ 369 | $ 297 | $ 72 |
| Interest expense | (5,968) | (3,403) | (2,565) |
| Other income | 2,659 | 2,612 | 47 |
| Total other income (expense), net | $ (2,940) | $ (494) | $ (2,446) |

We had total other expense, net, of $2.9 million for the three months ended June 30, 2021 as compared to $0.5 million for the same period in 2020. In the three months ended June 30, 2021, we also recorded interest expense of $1.8 million for finance leases.

29

Table of Contents

**Income Tax Expense:**

During the three months ended June 30, 2021, we recognized $3.5 million of income tax expense related to foreign withholding tax on royalties. We did not recognize any income tax expense for the three months ended June 30, 2020.

**Net Loss:**

| | | Three Months Ended June 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | Change |
| **Net Loss (in thousands, except per share information):** | | | | | | |
| Net loss | $ | (352,317) | $ | (17,521) | $ | (334,796) |
| Net loss per share | $ | (4.75) | $ | (0.30) | $ | (4.45) |
| Weighted average shares outstanding | | 74,118 | | 58,618 | | 15,500 |

Net loss for the three months ended June 30, 2021 was $352.3 million, or $4.75 per share, as compared to $17.5 million, or $0.30 per share, for the same period in 2020. The increase in net loss was primarily due to a significant increase in development activities relating to NVX-CoV2373 and increase in employee-related costs, primarily stock-based compensation expense, partially offset by increased revenue under the OWS Agreement and CEPI Funding Agreement.

The increase in weighted average shares outstanding for the three months ended June 30, 2021 is primarily a result of sales of our common stock in 2021 and 2020.

**Six Months Ended June 30, 2021 and 2020**

**Revenue:**

| | | Six Months Ended June 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | Change |
| **Revenue (in thousands):** | | | | | | |
| Government contracts | $ | 623,238 | $ | - | $ | 623,238 |
| Grants and other | | 98,551 | | 38,915 | | 59,636 |
| Royalties | | 23,457 | | - | | 23,457 |
| Total revenue | $ | 745,246 | $ | 38,915 | $ | 706,331 |

Revenue for the six months ended June 30, 2021 was $745.2 million as compared to $38.9 million for the same period in 2020, an increase of $706.3 million. Revenue for the six months ended June 30, 2021 was primarily comprised of revenue for services performed under the OWS Agreement and CEPI Funding Agreement. Revenue for the six months ended June 30, 2020 was primarily comprised of revenue for services performed under the CEPI Funding Agreement. The significant increase in revenue was due to increased development activities relating to NVX-CoV2373 under the OWS Agreement and CEPI Funding Agreement.

**Expenses:**

| | | Six Months Ended June 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | Change |
| **Expenses (in thousands):** | | | | | | |
| Research and development | $ | 1,163,356 | $ | 51,741 | $ | 1,111,615 |
| General and administrative | | 136,351 | | 27,098 | | 109,253 |
| Total expenses | $ | 1,299,707 | $ | 78,839 | $ | 1,220,868 |

30

Table of Contents

***Research and Development Expenses***

In the six months ended June 30, 2021, our research and development activities were primarily focused on the development of NVX-CoV2373 and included direct external research and development expenses related to NVX-CoV2373 of $1.0 billion, primarily comprised of costs related to the following:

•expenses incurred under agreements with CROs that conduct our clinical trials and third-party consultants related to the development of NVX-CoV2373;

•expenses incurred on developing and manufacturing the antigen drug substance and Matrix-M™ components of NVX-CoV2373 under agreements that we established with third-party CMOs and CDMOs;

•expenses incurred for the procurement of raw materials, laboratory supplies and equipment; and

•other costs related to preclinical studies and regulatory consulting, as well as related program management activities to support our growing global operations.

Research and development expenses increased to $1.2 billion for the six months ended June 30, 2021 from $51.7 million for the same period in 2020, an increase of $1.1 billion, primarily due to increased development activities relating to NVX-CoV2373, as summarized in the table below (in millions):

| | Six Months Ended June 30, | |
| | 2021 | 2020 |
|---|---|---|
| NVX-CoV2373 | $ 1,035,320 | $ 18,851 |
| NanoFlu™ | 4,294 | 8,456 |
| Other vaccine development programs | 514 | 1,902 |
| Total direct external research and development expense | 1,040,128 | 29,209 |
| Employee expenses | 49,511 | 9,363 |
| Stock-based compensation expense | 48,569 | 6,005 |
| Facility expenses | 6,405 | 2,090 |
| Other expenses | 18,743 | 5,074 |
| Total research and development expenses | $ 1,163,356 | $ 51,741 |

***General and Administrative Expenses***

General and administrative expenses increased to $136.4 million for the six months ended June 30, 2021 from $27.1 million for the same period in 2020, an increase of $109.3 million. The increase in general and administrative expenses is primarily due to increased employee-related costs, primarily stock-based compensation expense and an increase in professional fees in support of our NVX-CoV2373 program. As of June 30, 2021, we had 195 employees dedicated to general and administrative functions versus 61 employees as of June 30, 2020.

**Other Income (Expense):**

| | Six Months Ended June 30, | | |
| | 2021 | 2020 | Change |
|---|---|---|---|
| **Other Income (Expense) (in thousands):** | | | |
| Investment income | $ 731 | $ 732 | $ (1) |
| Interest expense | (10,807) | (6,806) | (4,001) |
| Other income (expense) | (3,934) | 2,613 | (6,547) |
| Total other income (expense), net | $ (14,010) | $ (3,461) | $ (10,549) |

We had total other expense, net of $14.0 million for the six months ended June 30, 2021 as compared to $3.5 million for the same period in 2020. In the six months ended June 30, 2021, we also recorded an interest expense of $4.0 million for finance leases. In the six months ended June 30, 2021 and 2020, other income included a loss of $3.1 million and a gain of $2.7 million, respectively, on the intercompany loan with Novavax CZ due to changes in the exchange rates.

Table of Contents

**Income Tax Expense:**

During the six months ended June 30, 2021, we recognized $6.6 million of income tax expense related to foreign withholding tax on royalties. We did not recognize any income tax expense for the six months ended June 30, 2020.

**Net Loss:**

|  | Six Months Ended June 30, | | |
|  | 2021 | 2020 | Change |
| --- | --- | --- | --- |
| **Net Loss (in thousands, except per share information):** | | | |
| Net loss | $ (575,036) | $ (43,385) | $ (531,651) |
| Net loss per share | $ (7.82) | $ (0.84) | $ (6.98) |
| Weighted average shares outstanding | 73,580 | 51,401 | 22,179 |

Net loss for the six months ended June 30, 2021 was $575.0 million, or $7.82 per share, as compared to $43.4 million, or $0.84 per share, for the same period in 2020. The increase in net loss was primarily due to increased development activities relating to NVX-CoV2373, increased employee-related costs, primarily stock-based compensation expense, partially offset by increased revenue under the OWS Agreement and CEPI Funding Agreement.

The increase in weighted average shares outstanding for the six months ended June 30, 2021 is primarily a result of sales of our common stock in 2021 and 2020.

**Liquidity Matters and Capital Resources**

Our future capital requirements depend on numerous factors including, but not limited to, our projected activities related to the development of NVX-CoV2373, including significant commitments under various CRO, CMO and CDMO agreements, the progress of preclinical studies and clinical trials, the time and costs involved in obtaining regulatory approvals, the costs of filing, prosecuting, defending and enforcing patent claims and other intellectual property rights and other manufacturing, sales and distribution costs. We plan to continue developing other vaccines and product candidates, such as NanoFlu™ vaccine and potential combination vaccines candidates, which are in various stages of development. We believe our operating expenses and capital requirements will fluctuate depending upon the timing of events, such as the progress of our NVX-CoV2373 clinical trials and approval for the use of NVX-CoV2373 in the U.S. and internationally, as well as the scope, initiation and progress of our preclinical studies and clinical trials related to other research and development activities.

We have entered into APAs or supply agreements with various countries globally that, if our product candidate is approved, are expected to result in the delivery of approximately 550 million doses, including Gavi, of NVX-CoV2373 throughout 2021 and into the first half of 2022. The APAs or supply agreements typically contain terms that include upfront payments intended to assist us in funding investments related to building out and operating our manufacturing and distribution network, among other expenses, in support of our global supply commitment. Such upfront payments generally become non-refundable upon our achievement of certain development and commercial milestones. We expect to sign additional APAs or supply agreements that are currently in active discussions and negotiations.

In May 2021, we finalized an APA with Gavi, building upon our MOU previously announced in February 2021. Under the terms of the agreement, 1.1 billion doses of NVX-CoV2373 are to be made available to countries participating in the COVAX Facility, which was established to allocate and distribute vaccines equitably to participating countries and economies. We expect to manufacture and distribute 350 million doses of NVX-CoV2373 to countries participating under the COVAX Facility. Under a separate purchase agreement with Gavi, SIIPL is expected to manufacture and deliver the balance of the 1.1 billion doses of NVX-CoV2373 for low- and middle-income countries participating in the COVAX Facility. We expect to deliver doses with antigen and adjuvant manufactured at facilities directly funded by the investments previously received from CEPI. We expect to supply significant doses that Gavi would allocate to low-, middle- and high-income countries, subject to certain limitations, utilizing a tiered pricing schedule and Gavi may prioritize such doses to low- and middle- income countries, at lower prices. Additionally, we may provide additional doses, to the extent available from CEPI-funded manufacturing facilities, in the event that SIIPL cannot materially deliver expected vaccine doses to the COVAX Facility. Together with SIIPL, we expect to initiate delivery of doses following receipt of appropriate regulatory authorizations. Under the agreement, we received an upfront payment of $350 million from Gavi during the second quarter of 2021 and expect to receive an additional payment of $350 million if we secure EUL for NVX-CoV2373 by the WHO.

Table of Contents

We have also entered into supply and license agreements with strategic partners to supply NVX-CoV2373 in their specified territories under which we are entitled to receive royalties primarily from the sale of NVX-CoV2373 by our partners. During the three and six months ended June 30, 2021, we received royalties of $23.5 million under these licensing arrangements.

In the six months ended June 30, 2021, we funded our operations with cash and marketable securities on hand, upfront payments under APAs, proceeds from the sale of common stock together with revenue under the OWS Agreement and CEPI Funding Agreement that support our NVX-CoV2373 vaccine development activities. We anticipate our future operations to be funded by our cash, cash equivalents and marketable securities, upfront payments under our APAs, revenue under our OWS Agreement and CEPI Funding Agreement, and following any potential global regulatory approvals, revenue from product sales, royalties under licensing arrangements with our strategic partners and/or other potential funding sources.

As of June 30, 2021, we had $2.1 billion in cash and cash equivalents, marketable securities and restricted cash as compared to $806.4 million as of December 31, 2020. These amounts consisted of $2.1 billion in cash and cash equivalents and $47.9 million in restricted cash as of June 30, 2021 as compared to $553.4 million in cash and cash equivalents $157.6 million in marketable securities and $95.3 million in restricted cash as of December 31, 2020.

The following table summarizes cash flows for the six months ended June 30, 2021 and 2020 (in thousands):

|  | 2021 | 2020 | Change |
|---|---|---|---|
| Net cash provided by (used in): |  |  |  |
| Operating activities | $ 807,497 | $ 92,524 | $ 714,973 |
| Investing activities | 128,708 | (245,946) | 374,654 |
| Financing activities | 538,144 | 602,540 | (64,396) |
| Effect on exchange rate on cash, cash equivalents and restricted cash | (348) | 276 | (624) |
| Net increase in cash, cash equivalents and restricted cash | 1,474,001 | 449,394 | 1,024,607 |
| Cash, cash equivalents and restricted cash at beginning of period | 648,738 | 82,180 | 566,558 |
| Cash, cash equivalents and restricted cash at end of period | $ 2,122,739 | $ 531,574 | $ 1,591,165 |

Net cash provided by operating activities increased to $807.5 million for the six months ended June 30, 2021, as compared to $92.5 million for the same period in 2020. The increase in cash provided is primarily due to payments under APAs recorded as deferred revenue and the timing of payments to third-parties.

During the six months ended June 30, 2021 and 2020, our investing activities consisted primarily of maturities and sale of marketable securities, net of purchases, our acquisition of Novavax CZ in 2020 and, to a much lesser extent, capital expenditures. Capital expenditures for the six months ended June 30, 2021 and 2020 were $28.9 million and $3.9 million, respectively, and the increase in capital expenditures was primarily due to the build out of our facilities and related capital expenditures to support NVX-CoV2373. For 2021, we expect an increase in our capital expenditures due to further development activities for our NVX-CoV2373 program, including the additional build-out of research and development and manufacturing facilities and related equipment, and the build-out of our new corporate office facility to accommodate anticipated increases in headcount.

Our financing activities consisted primarily of sales of our common stock under our At Market Issuance Sales Agreements, payments of finance lease liabilities and exercise of stock-based awards. In the six months ended June 30, 2021 and 2020, we received net proceeds of approximately $565 million and $392 million, respectively, from selling shares of common stock through our At Market Issuance Sales Agreements.

**Off-Balance Sheet Arrangements**

We did not have any material off-balance sheet arrangements as of June 30, 2021.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

The primary objective of our investment activities is preservation of capital, with the secondary objective of maximizing income. As of June 30, 2021, we had cash and cash equivalents of $2.1 billion, $47.9 million in restricted cash and working capital of $703.5 million.

33

Table of Contents

Our exposure to market risk is primarily confined to our investment portfolio, which historically has been classified as available-for-sale. We do not believe that a change in the market rates of interest would have any significant impact on the realizable value of our investment portfolio. Changes in interest rates may affect the investment income we earn on our marketable securities when they mature and the proceeds are reinvested into new marketable securities and, therefore, could impact our cash flows and results of operations.

Interest and dividend income is recorded when earned and included in investment income. Premiums and discounts, if any, on marketable securities are amortized or accreted to maturity and included in investment income. The specific identification method is used in computing realized gains and losses on the sale of our securities.

We are headquartered in the U.S. where we conduct the vast majority of our business activities. We have two foreign consolidated subsidiaries, Novavax AB, which is located in Sweden, and Novavax CZ, which is located in the Czech Republic. A 10% decline in the exchange rate between the U.S. dollar and Swedish Krona would result in a decline of stockholders' equity of approximately $8 million as of June 30, 2021. A 10% decline in the exchange rate between the U.S. dollar and Czech Koruna would result in a decline of stockholders' equity of approximately $5 million as of June 30, 2021.

Our Notes have a fixed interest rate and we have no additional material debt. As such, we do not believe that we are exposed to any material interest rate risk as a result of our borrowing activities.

### Item 4. Controls and Procedures

**Evaluation of Disclosure Controls and Procedures**

Our management, with the assistance of our chief executive officer and chief financial officer, has reviewed and evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of June 30, 2021. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving such control objectives. Based on the evaluation of our disclosure controls and procedures as of June 30, 2021, our chief executive officer and chief financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

**Changes in Internal Control over Financial Reporting**

Our management, including our chief executive officer and chief financial officer, has evaluated any changes in our internal control over financial reporting that occurred during the quarterly period ended June 30, 2021, and has concluded that there was no change that occurred during the quarterly period ended June 30, 2021 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Management's assessment of and conclusion on the effectiveness of disclosure controls and procedures and internal controls over financial reporting did not include the internal controls related to the operations acquired in the acquisition of Novavax CZ that are included in our June 30, 2021 consolidated financial statements through May 27, 2021. Our audit of internal control over financial reporting also did not include an evaluation of the internal control over financial reporting of Novavax CZ through May 27, 2021.

### PART II. OTHER INFORMATION

### Item 1. Legal Proceedings

On February 26, 2021, a Novavax stockholder named Thomas Golubinski filed a derivative complaint against certain members of the Novavax board of directors and certain members of senior management in the Delaware Court of Chancery. Novavax is a nominal defendant. The plaintiff challenges two sets of equity awards, made in April 2020 and in June 2020, on the ground that they were "spring-loaded," that is, made at a time when certain board members or members of senior management allegedly possessed undisclosed positive material information concerning the Company. The complaint asserts claims for breach of fiduciary duty, waste, and unjust enrichment. The plaintiff seeks an award of damages to the Company, an order rescinding the April 2020 and June 2020 awards or requiring disgorgement, and an award of attorneys' fees incurred in connection with the litigation. On May 10, 2021, the defendants moved to dismiss the complaint in its entirety. On June 17,

Table of Contents

2021, the Company's stockholders voted FOR ratification of the April 2020 awards and ratification of the June 2020 awards. Details of the ratification proposals are set forth in the Company's Definitive Proxy Statement on Schedule 14A filed with the SEC on May 3, 2021. The results of the vote were disclosed in the Company's Current Report on Form 8-K filed with the SEC on June 24, 2021. Should the plaintiff elect to move forward with his claims, the defendants intend to move for summary judgment on ratification grounds while continuing to pursue dismissal.

**Item 1A. Risk Factors**

You should carefully consider the following risk factors in evaluating our business. A number of risks could cause our actual results to differ materially from those that are indicated by forward-looking statements. Some risks relate principally to our business and the industry in which we operate. Others relate principally to the securities market and ownership of our common stock. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties of which we are unaware, or that we currently deem immaterial, also may become important factors that affect us. Any of the following risks could result in material adverse impacts on our business, financial condition or results of operations. You also should consider the other information included in this Quarterly Report on Form 10-Q as well as our other filings with the SEC.

**Summary of Risk Factors**

Our business is subject to numerous risks. The following is a summary of the principal risk factors described in this section:

- We have a history of losses and our future profitability is uncertain.

- We will continue to require significant funding to maintain our current level of operations and fund the further development of our vaccine candidates.

- Because our vaccine product development efforts depend on new and rapidly evolving technologies, our efforts may not succeed.

- The regulatory and commercial success of our COVID-19 vaccine candidate, NVX-CoV2373, remains uncertain. We may be unable to obtain regulatory approval or produce a successful vaccine in a timely manner, if at all.

- We are a biotechnology company and face significant risk in developing, manufacturing and commercializing our products.

- Because we depend on third-parties to conduct some of our laboratory testing and clinical trials, and a significant amount of our vaccine manufacturing and distribution, we may encounter delays in or lose some control over our efforts to develop and supply products.

- Many of our competitors have significantly greater resources and experience, which may negatively impact our commercial opportunities and those of our current and future licensees.

- There is significant competition in the development of a vaccine against COVID-19, influenza, and RSV and we may never see returns on the significant resources we are devoting to our vaccine candidates.

- We have not completed the development of vaccine products, and we may not succeed in obtaining the FDA licensure necessary to sell such vaccine products.

- The regulatory pathway for NVX-CoV2373 is continually evolving, and may result in unexpected or unforeseen challenges.

- We are conducting, and plan to conduct in the future, a number of clinical trials for NVX-CoV2373 at sites outside the United States and the FDA may not accept data from trials conducted in such locations.

35

Table of Contents

•Even if regulatory approval is received for our vaccine candidates, the later discovery of previously unknown problems with a product, manufacturer or facility may result in restrictions, including withdrawal of the product from the market.

•Our success depends on our ability to maintain the proprietary nature of our technology.

•Our business may be adversely affected if we do not successfully execute our business development initiatives.

•Servicing our 3.75% convertible senior unsecured notes due 2023 (the "Notes") requires a significant amount of cash, and we may not have sufficient cash flow resources to pay our debt.

•Because our stock price has been and will likely continue to be highly volatile, the market price of our common stock may be lower or more volatile than expected.

•Litigation could have a material adverse impact on our results of operation and financial condition.

We or the third parties upon whom we depend may be adversely affected by natural or man-made disasters or public health emergencies, such as the COVID-19 pandemic.

**Risks Related to Our Financial Condition and Capital Requirements**

*We have a history of losses and our future profitability is uncertain.*

Our expenses have exceeded our revenue since our formation in 1987, and our accumulated deficit at June 30, 2021 was $2.4 billion. Our revenues and expenses fluctuate significantly from period to period. For most of our history our expenses have exceeded our revenues, which may occur during most periods in the foreseeable future. Our net losses for the last three fiscal years were $418.3 million in 2020, $132.7 million in 2019 and $184.7 million in 2018.

Historically, our losses have resulted predominantly from research and development expenses for our vaccine candidates, manufacturing-related expenses, expenses associated with efforts to obtain regulatory approvals, costs related to protection of our intellectual property and other general and administrative operating expenses, a significant portion of which have been noncash. Our expenses have exceeded our revenue since inception, and we believe our expenses will fluctuate over time, and may substantially increase in some years, as a result of continuing efforts to develop, test, manufacture, and make regulatory filings for our vaccine candidates, and, if our product candidates are approved, commercialization efforts.

As of the end of the second quarter of 2021, our investment in the development and manufacture of NVX-CoV2373 has been substantial, and we expect such levels of investment to continue for the rest of 2021 and beyond, although the precise magnitude of our total investment will depend on the duration of the COVID-19 pandemic, the competitive landscape, the timing and results of our applications for regulatory approvals, the availability of funding, and whether and what booster shot protocols are recommended by governments, regulatory authorities, and healthcare providers. If we are unable to timely commercialize a vaccine against COVID-19, we likely would never recoup our investments. We expect to continue to incur significant operating expenses and anticipate significant losses over time as we seek to:

•conduct additional clinical trials and seek regulatory approvals for NVX-CoV2373 and other potential vaccine candidates;

•conduct preclinical studies for other potential vaccine candidates;

•expand our global manufacturing and distribution capacity; and

•maintain, expand and protect our intellectual property portfolio.

As a result, we expect our cumulative operating losses to increase until such time, if ever, that product sales, licensing fees, royalties, milestones, contract research and other sources generate sufficient revenue to fully fund our operations. We may never achieve profitability and may not sustain profitability, if achieved.

Table of Contents

***We will continue to require significant funding to maintain our current level of operations and fund the further development of our vaccine candidates.***

We do not currently generate sufficient revenue from product sales, licensing fees, royalties, milestones, contract research or other sources to fully fund our operations. We, therefore, will use our cash resources, and expect to require additional funds, to maintain our operations, continue our research and development programs, commence future preclinical studies and clinical trials, seek regulatory approvals and manufacture and market any products that are approved for commercialization.

To date, we have financed our operations primarily through the sale of equity and debt securities, government funding and grant agreements, and additional funding may not be available to us on favorable terms, or at all. Although we have entered into supply agreements for NVX-CoV2373 that include prepayments from the purchasers, until we can generate sufficient product revenue in amounts sufficient to fully fund our operations, which we may never do, we expect to finance our cash needs through a combination of additional public or private equity or debt financings, as well as existing cash, potential collaborations, strategic alliances and marketing, distribution or licensing arrangements, funding from governmental and non-governmental funding entities, and potentially other sources. While we may continue to apply for contracts or grants from academic institutions, non-profit organizations and governmental entities, we may not be successful. Adequate additional funding may not be available to us on acceptable terms, if at all. Furthermore, negative interpretations of clinical trial data or setbacks, or perceived setbacks, with respect to manufacturing ability and/or capacity or regulatory filing timelines for NVX-CoV2373 or our other vaccine candidates, as well as the competitive landscape posed by other COVID-19 vaccines, may impair our ability to raise additional financing on favorable terms, or at all. If we cannot raise the additional funds required for our anticipated operations, we may be required to delay significantly, reduce the scope of or eliminate one or more of our research or development programs, downsize our organization, or seek alternative measures to avoid insolvency, including arrangements with collaborative partners or others that may require us to relinquish rights to certain of our technologies or vaccine candidates. If we raise additional funds through future offerings of shares of our common stock or other securities, such offerings would cause dilution of current stockholders' percentage ownership in the Company, which could be substantial. Future offerings also could have a material and adverse effect on the price of our common stock.

***Economic uncertainty may adversely affect our access to capital, cost of capital and ability to execute our business plan as scheduled.***

Generally, worldwide economic conditions remain uncertain, particularly due to the COVID-19 pandemic. Access to capital markets is critical to our ability to operate. Traditionally, biotechnology companies have funded their research and development expenditures by raising capital in the equity markets. Declines and uncertainties in these markets in the past have severely restricted raising new capital and have affected companies' ability to continue to expand or fund existing development, manufacturing, regulatory and commercialization efforts. We require significant capital for our current and expected operations. The general economic and capital market conditions, both in the U.S. and worldwide, have been volatile in the past and at times have adversely affected our access to capital and increased the cost of capital. The capital and credit markets may not be available to support future capital raising activity on favorable terms. If economic conditions decline, our future cost of equity or debt capital and access to the capital markets could be adversely affected. In addition, if we are unable to access the capital markets on favorable terms, our ability to execute our business plan as contemplated would be compromised. Moreover, we rely and intend to rely on third-parties, including clinical research organizations, contract manufacturing organizations and other important vendors and consultants. Global economic conditions may result in a disruption or delay in the performance of our third-party contractors and suppliers. If such third-parties are unable to adequately satisfy their contractual commitments to us in a timely manner, our business could be adversely affected.

***Our existing funding and supply agreements do not assure success of our vaccine candidates or that we will be able to fully fund our vaccine candidates.***

The OWS Agreement, the DoD Agreement and the CEPI funding agreement each reimburse a portion of the expenses associated with the development and commercialization of NVX-CoV2373. To the extent funding commitments in such agreements are conditioned on our meeting certain milestones or conditions, including regulatory approval in applicable jurisdictions, we may not ultimately receive the full amount of committed funds and could be exposed to urgent need for additional funding to support our NVX-CoV2373 development, manufacturing and distribution activities. For example, in connection with the OWS Agreement, the USG has instructed us to prioritize alignment with the FDA on our analytic methods before conducting additional U.S. manufacturing and further indicated that the USG will not fund additional U.S. manufacturing until such agreement has been made. The OWS Agreement includes provisions giving the USG termination rights based on a determination that the funded project will not produce beneficial results commensurate with the expenditure of resources and that termination would be in the USG's interest. Such a determination would result in the loss of funding under that agreement and could result in other actions by the U.S. government. The CEPI funding agreement provides CEPI certain "march-in" rights in the event of certain breaches of that agreement. We may be unable to timely obtain additional government or private funding, if at all. Additionally, we have entered into, and plan to continue entering into, supply agreements for NVX-

37

Table of Contents

CoV2373 that include prepayments from the purchasers. In the event we are unable to successfully develop and commercialize NVX-CoV2373 or fail to meet certain product volume or delivery timing obligations under our supply agreements, we may be required to refund significant portions of the prepayments, which could have a material and adverse effect on our financial condition. Our inability to succeed with key clinical or development activities could jeopardize our ability to obtain licensure from the FDA or other regulatory authorities to sell NVX-CoV2373. As a result, our existing funding and supply agreements may be insufficient to fund our commercial launch.

**Risks Related to Product Development and Commercialization**

***Because our vaccine product development efforts depend on new and rapidly evolving technologies, our efforts may not succeed.***

Our vaccine development efforts depend on new, rapidly evolving technologies and on the marketability and profitability of our products. Our development efforts and, if those are successful, commercialization of NVX-CoV2373 and our other vaccines could fail for a variety of reasons, including if:

• our recombinant nanoparticle vaccine technologies, any or all of the products based on such technologies or our proprietary manufacturing process prove ineffective or unsafe;

• new strains of COVID-19 evolve, with respect to which NVX-CoV2373 proves less effective;

• we or our third-party manufacturer facilities fail to reproducibly scale-up manufacturing with sufficiently high yields at reasonable cost and on projected timelines, or such manufacturing fails to generate product that consistently satisfies purity, potency, quality, stability, and shelf-life standards necessary for obtaining regulatory approvals or achieving commercial viability;

• the products are difficult to manufacture on a large-scale or uneconomical to market;

• our in-house or third-party manufacturing facilities fail regulatory inspections;

• proprietary rights of third-parties prevent us or our collaborators from exploiting technologies, and manufacturing or marketing products; or

• third-party competitors achieve and maintain greater market share due to earlier approvals or superior marketing capabilities.

***The regulatory and commercial success of our COVID-19 vaccine candidate, NVX-CoV2373, remains uncertain. We may be unable to obtain regulatory approval or produce a successful vaccine in a timely manner, if at all.***

In response to the outbreak of COVID-19, we are pursuing the development and manufacture of our vaccine candidate, NVX-CoV2373. Even though we have reported positive data from Phase 1, 2 and 3 clinical trials, such results may not be sufficient to support regulatory submissions, authorizations and approvals, accelerated or otherwise, on our projected timelines, if at all.

Additionally, even if NVX-CoV2373 receives regulatory approval, successful commercialization depends on our ability to effectively scale up manufacturing capabilities at our own locations and those of our manufacturing partners and contractors. In May 2020, we acquired Novavax CZ (formerly Praha Vaccines, a.s.) including its vaccine manufacturing facility in Bohumil, Czech Republic and approximately 150 of its employees. We also are actively entering into agreements with third parties to manufacture the antigen component of NVAX-CoV2373 and our proprietary Matrix-M™ adjuvant, as well as to distribute NVX-CoV2373. Because of contractual restraints and the limited number of third-party manufacturers with the expertise, required regulatory approvals and facilities to manufacture NVX-CoV2373 and its components at commercial scale, replacement of a manufacturer may be expensive and time-consuming and may cause interruptions in production. Manufacturing of NVX-CoV2373 and its components involves a complicated process that will require significant investments of time and financial resources to implement, and our efforts to establish manufacturing capabilities may not meet expectations as to timing, scale-up, reproducibility, yields, purity, cost, potency or quality. Shortages of raw materials and supplies also negatively impact our manufacturing efforts. We may not be able to timely and effectively produce NVX-CoV2373 in adequate quantities to address global demand.

We have not previously had a commercial launch of any vaccine product, and doing so in a pandemic environment with an urgent, critical global need creates additional challenges. In addition to scaling up our manufacturing capabilities, we

Table of Contents

need to develop global distribution channels and form partnerships with third parties worldwide, as well as hire, train and integrate additional management, administrative and sales and marketing personnel. Rapid and significant growth may strain our administrative and operational infrastructure, imposing significant additional responsibilities on our organization, and our efforts to establish these capabilities may not meet expectations as to timing, scale-up, reproducibility, yields, purity, cost, potency or quality. If we fail to successfully manage our growth and the increased complexity of our operations, our business, financial position, results of operations and prospects may be materially and adversely affected.

***We are a biotechnology company and face significant risk in developing, manufacturing and commercializing our products.***

We focus our research and development activities on vaccines, an area in which we believe we have particular strengths and a technology that appears promising. The outcome of any research and development program is highly uncertain. Only a small fraction of biopharmaceutical development programs ultimately result in commercial products or even product candidates and a number of events could delay our development efforts and negatively impact our ability to make regulatory submissions or obtain regulatory approval for, and to manufacture, market and sell, NVX-CoV2373 or any other vaccine on our projected timelines, if at all. Vaccine candidates that initially appear promising often fail to yield successful products, and we may not ultimately be able to demonstrate the safety, potency, purity, stability and efficacy necessary to obtain regulatory authorization to market our product candidates. In many cases, preclinical studies or clinical trials will show that a product candidate is not efficacious or that it raises safety concerns or has other side effects that outweigh its intended benefit. Success in preclinical or early clinical trials may not translate into success in large-scale clinical trials. Further, success in clinical trials often leads to increased investment, accelerating cumulative losses. Even if clinical trial results appear positive, regulatory approval may not be obtained if the FDA does not agree with our interpretation of the results, and we may face challenges when scaling-up the production process to commercial levels. Even after a product is approved and launched, general usage or post-marketing clinical trials may identify safety or other previously unknown problems with the product, or manufacturing issues may emerge, either of which may result in regulatory approvals being suspended, limited to narrow the scope of the approval, or revoked, which may otherwise prevent successful commercialization. Intense competition in the vaccine industry could also limit the successful commercialization of any products for which we receive commercial approval.

***Because we depend on third-parties to conduct some of our laboratory testing and clinical trials, and a significant amount of our vaccine manufacturing and distribution, we may encounter delays in or lose some control over our efforts to develop and supply products.***

We are highly dependent on third-party organizations to conduct some of our laboratory testing and clinical trials and a significant amount of our vaccine manufacturing activities and distribution. If we are unable to obtain any necessary services on acceptable terms, we may not complete our product development or commercialization efforts in a timely manner. We may lose control over these activities or become too dependent upon these parties. These third-parties may not complete testing, manufacturing or distribution activities on schedule, or in satisfaction of regulatory or commercial requirements. Certain of our facilities are also contracted for defined time frames and through association with OWS and CEPI, and we may not be able to access those facilities for sufficient periods of time to provide adequate supply.

We are responsible for confirming that each of our clinical trials is conducted in accordance with its general investigational plan and protocol. Moreover, the FDA and foreign regulatory agencies require us to comply with regulations and standards, commonly referred to as good clinical practices, for conducting, recording and reporting the results of clinical trials to assure that data and reported results are credible and accurate and that the rights, safety and welfare of clinical trial participants are adequately protected. The FDA and foreign regulatory agencies also require us to comply with good manufacturing practices. Our reliance on third-parties does not relieve us of these responsibilities and requirements. These third-parties may not successfully carry out their contractual duties or regulatory obligations. Furthermore, if a third-party manufacturer is producing materials or products for themselves or other companies, that manufacturer is exposed to regulatory risks for the production of such materials and products. As a result, failure to meet the regulatory requirements for the production of those materials and products may generally affect the regulatory status of the third-party manufacturer's facility, which could impact its ability to produce our materials and products. Any of our third-party service providers may need to be replaced, the quality or accuracy of the data they obtain may be compromised, the services provided to us may be delayed, or the product they manufacture may be contaminated due to the failure to adhere to our clinical and manufacturing protocols, regulatory requirements or for other reasons. In any such event, our preclinical development activities or clinical trials may be extended, delayed, suspended or terminated, and we may not be able to obtain regulatory approval of, or successfully commercially manufacture on a timely basis, our vaccine candidates.

***The results from the Prepare trial, including that ResVax failed to meet the primary endpoint of the trial, will likely create challenges, some of which may be significant, around further development of that vaccine.***

While the Prepare results suggest that ResVax is safe and is likely efficacious in more serious manifestations of RSV disease, the trial failed to achieve its primary clinical endpoint. Not achieving the primary clinical endpoint has been viewed negatively by our investors. Although the failure to achieve the primary endpoint in the trial is not evidence that the vaccine is

Table of Contents

ineffective, it means that regulatory agencies like the FDA and EMA are likely to require additional clinical trial data prior to licensure. This development may be viewed negatively by our potential collaborators and partners, which may make the ongoing development of ResVax, and any other RSV F Vaccine candidates, more challenging.

**We may have product liability exposure.**

The administration of drugs or vaccines to humans, whether in clinical trials or after marketing approval, can result in product liability claims. We maintain product liability insurance coverage for our current clinical programs, including our NVX-CoV2373 trials. If and when we obtain marketing approval for any vaccine candidate, we intend to expand our insurance coverage to include the sale of commercial products; however, we may not be able to obtain or maintain insurance coverage on commercially reasonable terms, at a reasonable cost or in sufficient amounts to protect us against losses due to liability. Furthermore, such insurance coverage and our resources may not be sufficient to satisfy all liabilities that result from product liability claims. A successful claim may prevent us from obtaining adequate product liability insurance in the future on commercially desirable terms, if at all. Even if a claim is not successful, defending such a claim would be time- consuming and expensive, may damage our reputation in the marketplace and would likely divert management's attention.

In addition, because we are developing NVX-CoV2373 in response to the outbreak of COVID-19, a global pandemic, we may have a widely used vaccine as an investigational vaccine or a product authorized for temporary or emergency use prior to our receipt of marketing approval. Unexpected safety issues in these circumstances could lead to product liability claims and our existing insurance may not be adequate for such claims.

Regardless of merit or eventual outcome, liability claims may result in:

•decreased demand for our products;

•withdrawal of regulatory approvals;

•voluntary or mandatory recalls of our products;

•necessity for additional nonclinical or clinical studies, changes in labeling, or changes to manufacturing processes, specifications and/or facilities;

•impairment of our business reputation and negative media attention;

•withdrawal of clinical trial participants;

•costs of related litigation;

•substantial monetary awards to participants or other claimants;

•loss of revenue; and

•inability to commercialize our vaccine candidates.

In the United States, the PREP Act, provides immunity for manufacturers from all claims under state or federal law for "loss" arising out of the administration or use of a "covered countermeasure." However, injured persons may still bring a suit for "willful misconduct" against the manufacturer under some circumstances. "Covered countermeasures" include security countermeasures and "qualified pandemic or epidemic products", including products intended to diagnose or treat pandemic or epidemic disease, such as pandemic vaccines, as well as treatments intended to address conditions caused by such products. For these immunities to apply, the Secretary of DHHS must issue a declaration in cases of public health emergency or "credible risk" of a future public health emergency. On March 17, 2020, the Secretary of DHHS issued a declaration under the PREP Act and has issued subsequent amendments thereto to provide liability immunity for activities related to certain countermeasures against the ongoing COVID-19 pandemic. While we believe our products would be covered under the provisions of the PREP Act, this cannot be assured. Also, the Secretary of the HHS may not make other declarations in the future that cover any of our other product candidates, and the U.S. Congress may reduce coverage under the PREP Act or repeal it altogether. Product liability lawsuits may result in substantial liabilities and may require us to limit commercialization of our product candidates.

***If we are unable to effectively manufacture our vaccines in sufficient quantities, at sufficient yields or are unable to obtain regulatory approvals for a manufacturing facility for our vaccines, we may experience delays or an adverse impact on product development, clinical trials, regulatory approval and commercial distribution.***

Table of Contents

Completion of our clinical trials and commercialization of our vaccine candidates require access to, or development of, facilities to effectively manufacture our vaccine candidates at sufficient yields and at commercial-scale. We have limited experience manufacturing any of our vaccine candidates in the volumes necessary to support commercial sales. While we have recently increased our projected global manufacturing capacity for NVX-CoV2373, our efforts to establish manufacturing capabilities may not meet expectations as to timing, scale-up, reproducibility, yields, purity, cost, potency or quality. The antigen component of NVX-CoV2373 is currently being manufactured at Novavax CZ, as well as numerous partnered manufacturing sites, including FUJIFILM in the United States, SIIPL in India and Takeda in Japan, among others. Challenges manufacturing either the antigen component or the adjuvant, or issues in later manufacturing stages, could compromise production of NVX-CoV2373.

Manufacturing our vaccine candidates involves a complicated process with which we have limited experience. We are highly dependent on third-party organizations to conduct a significant amount of our vaccine manufacturing activities. If we and our third-party manufacturing organizations are unable to manufacture our vaccine candidates in clinical quantities or, if and when necessary, in commercial quantities and at sufficient yields and at required specifications, then commercialization will be delayed, and we will need to identify and reach supply arrangements with additional third-parties. Third-party manufacturers also must receive FDA or equivalent foreign regulatory body approval before they can produce clinical material or commercial product. Our vaccines are in competition with other products for access to these third-party facilities and may be subject to delays in manufacture if third-parties prioritize other products. We may not be able to enter into any necessary additional third-party manufacturing arrangements on acceptable terms, or on a timely basis. In addition, we have to enter into technical transfer agreements and share our know-how with the third-party manufacturers, which can be time-consuming and may result in delays.

Because of contractual restraints and the limited number of third-party manufacturers with the expertise, required regulatory approvals and facilities to manufacture our bulk vaccines at commercial-scale, replacement of a manufacturer may be expensive and time-consuming and may cause interruptions in the production of our vaccine. We and our third-party manufacturers may also encounter production challenges related to:

- costs, scale up, and yields;

- shortages of raw materials and supplies;

- quality control and assurance;

- contamination, lot consistency, potency, and purity;

- shortages of qualified personnel and other capacity constraints;

- compliance with strictly enforced and evolving federal, state and foreign regulations that vary in each country where products might be sold including nationalization or other territory restrictions placed on our owned and third-party manufacturing sites; and

- capital funding.

Delays or interruptions could have a material adverse effect on our business, financial condition, results of operations and cash flows.

***We must identify vaccines for development with our technologies and establish successful third-party relationships.***

The near and long-term viability of our vaccine candidates depend in part on our ability to successfully establish new strategic collaborations with pharmaceutical and biotechnology companies, non-profit organizations and government agencies. Establishing strategic collaborations and obtaining government funding is difficult and time-consuming. Potential collaborators may reject collaborations based upon their assessment of our financial, regulatory or intellectual property position or based on their internal pipelines; government agencies may reject contract or grant applications based on their assessment of public need, the public interest, our products' ability to address these areas, or other reasons beyond our expectations or control. Collaborators also may seek to modify or terminate relationships. Past success in establishing strategic collaborations with pharmaceutical and biotechnology companies, non-profit organizations and government agencies in the past is no guarantee of future success in entering into new relationships or in performing under existing relationships. If we fail to establish a sufficient number of collaborations or government relationships on acceptable terms, or fail to perform under collaborations or

41

Table of Contents

relationships to the satisfaction of counter-parties, we may not be able to commercialize our vaccine candidates or generate sufficient revenue to fund further research and development efforts.

The collaborations we have established or may establish may not result in the successful development or commercialization of any vaccine candidates for several reasons, including the fact that:

•we may not have the ability to control the activities of our partners and cannot provide assurance that they will fulfill their obligations to us, including with respect to the license, development and commercialization of vaccine candidates, in a timely manner or at all;

•such partners may not devote sufficient resources to our vaccine candidates or properly maintain or defend our intellectual property rights;

•our partners could independently develop, or develop with third parties, products that compete directly or indirectly with our vaccine candidates if such partners believe that competitive products are more likely to be successfully developed or can be commercialized under terms that are more economically attractive than ours;

•any failure on the part of our partners to perform or satisfy their obligations to us could lead to delays in the development or commercialization of our vaccine candidates and affect our ability to realize product revenue; and

•disagreements, including disputes over the ownership of technology developed with such collaborators, could result in litigation, which would be time consuming and expensive, and may delay or terminate research and development efforts, regulatory approvals and commercialization activities.

If we or our collaborators fail to maintain our existing agreements or in the event we fail to establish agreements as necessary, we could be required to undertake research, development, manufacturing and commercialization activities solely at our own expense. These activities would significantly increase our capital requirements and, given our lack of sales, marketing and distribution capabilities, significantly delay the commercialization of our vaccine candidates.

***Even if licensed to market, our vaccine products may not be initially or ever profitable.***

Whether we make a profit from the sale of our vaccine products is dependent on a number of variables, including the costs we incur manufacturing, testing and releasing, packaging and shipping such vaccine product. Additionally, the CEPI funding agreement necessitates that we allocate a certain number of doses of NVX-CoV2373 to certain middle and lower income countries, and the Grant Agreement with BMGF necessitates that we commit to a specific amount of sales in certain specified middle and lower income countries, which may impact negatively our ability to generate profit. We cannot predict when, if at all, our approved vaccine products will be profitable to the Company.

***Even if we successfully commercialize any of our vaccine candidates, either alone or in collaboration, we face uncertainty with respect to pricing, third-party reimbursement and healthcare reform, all of which could adversely affect any commercial success of our vaccine candidates.***

Our ability to collect revenue from the commercial sale of our vaccines may depend on our ability, and that of any current or potential future collaboration partners or customers, to obtain adequate levels of approval, coverage and reimbursement for such products from third-party payers such as:

•government health administration authorities such as the Advisory Committee for Immunization Practices of the Centers for Disease Control and Prevention;

•private health insurers;

•managed care organizations;

•pharmacy benefit management companies; and

•other healthcare related organizations.

Third-party payers are increasingly challenging the prices charged for medical products and may deny coverage or offer inadequate levels of reimbursement if they determine that a prescribed product has not received appropriate clearances from the FDA, or foreign equivalent, or other government regulators; is not used in accordance with cost-effective treatment

42

Table of Contents

methods as determined by the third-party payer; or is experimental, unnecessary or inappropriate. Prices could also be driven down by managed care organizations that control or significantly influence utilization of healthcare products.

In both the U.S. and some foreign jurisdictions, there have been a number of legislative and regulatory proposals and initiatives to change the health care system in ways that could affect our ability to sell vaccines and could adversely affect the prices that we receive for our vaccine candidates, if approved. Some of these proposed and implemented reforms could result in reduced pharmaceutical pricing or reimbursement rates for medical products, and while we have no current vaccines available for commercial sale, the impact of such reform could nevertheless adversely affect our business strategy, operations and financial results. For example, the Affordable Care Act ("ACA") contained several cost containment measures that could adversely affect our future revenue, including, for example, increased drug rebates under Medicaid for brand name prescription drugs, extension of Medicaid rebates to Medicaid managed care organizations, and extension of so-called 340B discounted pricing on pharmaceuticals sold to certain healthcare providers. Additional provisions of the healthcare reform laws that may negatively affect our future revenue and prospects for profitability include the assessment of an annual fee based on our proportionate share of sales of brand name prescription drugs to certain government programs, including Medicare and Medicaid. The ACA also established a Medicare Part D coverage gap discount program, in which manufacturers must agree to offer 70% point-of-sale discounts off negotiated prices of applicable branded on drugs (including vaccines) to eligible beneficiaries during their coverage gap period (the so-called "donut hole"), as condition for the manufacturer's outpatient drugs to be covered under Medicare Part D. Other aspects of healthcare reform, such as expanded government enforcement authority and heightened standards that could increase compliance-related costs, could also affect our business.

Further, we face uncertainties because of occasional political, legislative, and administrative efforts to substantially modify or invalidate some or all of the provisions of the ACA. For example, in 2017, the Trump administration withheld the cost-sharing subsidies paid to ACA health insurance exchange plans serving low-income enrollees. The Tax Cut and Jobs Act ("TCJA") was also enacted at the end of 2017 and included provisions that affected healthcare insurance coverage and payment, such as the elimination of the tax penalty for individuals who do not maintain sufficient health insurance coverage beginning in 2019 (the so-called "individual mandate").

More recently, the Biden administration, through the American Rescue Plan Act of 2021, increased subsidies for coverage purchased through ACA health insurance exchanges and extended eligibility for subsidies to higher income levels. On December 14, 2018, a U.S. District Court Judge in the Northern District of Texas ruled that the individual mandate is a critical and inseverable feature of the ACA, and therefore, because it was repealed as part of the TCJA, the remaining provisions of the ACA are invalid as well. On December 18, 2019, the U.S. Court of Appeals for the 5th Circuit ruled that the individual mandate was unconstitutional but remanded the case back to the District Court to determine whether the remaining provisions of the ACA are invalid as well. On March 2, 2020, the U.S. Supreme Court granted the petitions for writs of certiorari to review the case, and oral arguments were heard on November 10, 2020. On June 17, 2021, the U.S. Supreme Court dismissed the most recent judicial challenge to the ACA brought by several states without specifically ruling on the constitutionality of the ACA. Separately, President Biden issued an Executive Order to initiate a special enrollment period from February 15, 2021 through August 15, 2021 for purposes of obtaining health insurance coverage through the ACA marketplace. The Executive Order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. It is also unclear how these and other healthcare reform measures of the Biden administration or other efforts, if any, to challenge, repeal or replace the ACA, will impact our business.

Other legislative changes have been proposed and adopted since the ACA was enacted. These changes include aggregate reductions to Medicare payments to providers of 2% per fiscal year pursuant to the Budget Control Act of 2011 and subsequent laws, which began in 2013 and, due to subsequent legislative amendments, will stay in effect through 2030 unless additional Congressional action is taken. In January 2013, the American Taxpayer Relief Act of 2012 was signed into law, which, among other things, further reduced Medicare payments to several types of providers, including hospitals, imaging centers and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. New laws may result in additional reductions in Medicare and other healthcare funding, which may materially adversely affect customer demand and affordability for our products and, accordingly, the results of our financial operations. Additionally, the pharmaceutical industry has also been the subject of significant publicity in recent years regarding the pricing of pharmaceutical products, including publicity and pressure resulting from prices charged by pharmaceutical companies for new products as well as price increases by pharmaceutical companies on older products that some people have deemed excessive. As a result, pharmaceutical product prices have been the focus of increased scrutiny by the U.S. government, including certain state attorneys general, members of congress, presidential candidates and the United States Department of Justice. If reforms in the health care industry make reimbursement for our potential products less likely, the market for our potential products will be reduced, and we could lose potential sources of revenue. The existence or threat of cost control measures could cause our corporate collaborators to be less willing or able to pursue research and development programs related to our vaccine candidates. Further, it is also possible that additional governmental action is taken in response to the COVID-19 pandemic. We cannot predict the ultimate content, timing or effect of any healthcare reform legislation or the impact of potential legislation on us.

Table of Contents

Even if we receive regulatory approvals for our vaccine candidates, including NVX-CoV2373, coverage and reimbursement may be subject to unique regulatory policies. For example, under the ACA preventive care mandate, non-grandfathered group health plans and health insurance coverage offered in the individual or group market typically have at least one year before they must provide first-dollar coverage for a newly issued preventive care requirement or guideline. However, pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), non-grandfathered group health plans and health insurance coverage offered in the individual or group market must cover any qualifying coronavirus preventive service 15 business days after the United States Preventive Services Task Force, or Advisory Committee on Immunization Practices (ACIP) designates such service as preventive. Further, third-party reimbursement for providers administering COVID-19 vaccines may affect market acceptance of NVX-CoV2373, if we receive regulatory approval. Currently, the CARES Act and its implementing regulations state that (i) providers that participate in the U.S. Centers for Disease Control and Prevention's COVID-19 Vaccination Program must administer a COVID-19 immunization regardless of an individual's ability to pay or health insurance coverage status, (ii) providers may not seek any reimbursement, including through balance billing, from an immunization recipient, (iii) coverage is required, without cost-sharing, for the administration of the immunization even if a third party, such as the federal government, pays for the cost of the immunization, and (iv) private health insurance plans must cover COVID-19 immunizations and their administration even when provided by out-of-network providers for the duration of the public health emergency for COVID-19. Even if we receive regulatory approvals for NVX-CoV237, there is no guarantee payors will provide coverage and reimbursement for our product after the termination of the public health emergency, nor can we guarantee that even if coverage is provided, the reimbursement amount will be high enough to allow us to establish or maintain pricing sufficient to realize a sufficient return on our investment. We cannot predict continued prevalence of COVID-19, whether herd immunity will be achieved (which would affect the need for future administration of COVID-19 vaccines), or whether NVX-CoV2373 will be effective against continuing mutations or variants of the SARS-CoV-2 virus.

***We have limited marketing capabilities, and if we are unable to enter into collaborations with marketing partners or develop our own sales and marketing capability, we may not be successful in commercializing any approved products.***

Although we have initiated preliminary activities in anticipation of commercialization of our vaccine candidates, we currently have limited dedicated sales, marketing or distribution capabilities. As a result, we depend on collaborations with third-parties that have established distribution systems and sales forces, including our collaboration with SIIPL, among others. To the extent that we enter into co-promotion or other licensing arrangements, our revenue will depend upon the efforts of third-parties, over which we may have little or no control. If we are unable to reach and maintain agreements with one or more pharmaceutical companies or collaborators, we may be required to market our products directly. Developing a marketing and sales force is expensive and time-consuming and could delay a product launch. We may not be able to attract and retain qualified sales personnel or otherwise develop this capability.

***Our vaccine candidates may never achieve market acceptance even if we obtain regulatory approvals.***

Even if we receive regulatory approvals for the commercial sale of our vaccine candidates, the commercial success of these vaccine candidates will depend on, among other things, their acceptance by physicians, patients and third-party payers, such as health insurance companies and other members of the medical community, as a vaccine and cost-effective alternative to competing products. If our vaccine candidates fail to gain market acceptance, we may be unable to earn sufficient revenue to continue our business. Market acceptance of, and demand for, any product that we may develop and commercialize will depend on many factors, including:

• our ability to provide acceptable evidence of safety and efficacy (including against emerging COVID-19 variants);

• the prevalence and severity of adverse side effects;

• whether our vaccines are differentiated from other vaccines;

• availability, relative cost and relative efficacy of alternative and competing treatments;

• the effectiveness of our marketing and distribution strategy;

• publicity concerning our products or competing products and treatments; and

• our ability to obtain sufficient third party insurance coverage or reimbursement.

If our vaccine candidates do not become widely accepted by physicians, patients, third-party payers and other members of the medical community, our business, financial condition and results of operations could be materially and adversely affected.

***We may not be able to secure sufficient supplies of a key component of our adjuvant technology.***

Table of Contents

Because an important component of our adjuvant technology is extracted from a species of soap-bark tree (Quillaja saponaria) grown in Chile, we need long term access to quillaja extract with a consistent and sufficiently high quality. We need a secure supply of raw material, as well as back-up suppliers, or our adjuvant products may be delayed and we may not be able to meet our obligations under our various collaboration and supply agreements.

***Current or future regional relationships may hinder our ability to engage in larger transactions.***

We have entered into regional collaborations to develop, manufacture and distribute our vaccine candidates in certain parts of the world, and we anticipate entering into additional regional collaborations. Our relationships with SIIPL, Cadila and BMGF are examples of these regional relationships. These relationships often involve the licensing of our technology to our partner or entering into a distribution agreement, frequently on an exclusive basis. Generally, exclusive agreements are restricted to certain territories. Because we have entered into exclusive license and distribution agreements, larger companies may not be interested, or able, to enter into collaborations with us on a worldwide-scale. Also, these regional relationships may make us an unattractive target for an acquisition.

***Our product candidates are sensitive to shipping and storage conditions, which could subject our vaccine candidates to risk of loss or damage.***

Our vaccine candidates are sensitive to storage and handling conditions. Loss in vaccine candidates could occur if the product or product intermediates are not stored or handled properly. It is possible that our vaccine candidates could be lost due to expiration prior to use. If we do not effectively maintain our supply logistics, then we may experience an unusual number of returned or out of date products. Failure to effectively maintain our supply logistics, by us or third parties, could lead to additional manufacturing costs and delays in our ability to supply required quantities for clinical trials or otherwise.

***Our vaccine candidates could become subject to a product recall which could harm our reputation, business, and financial results.***

The FDA and similar foreign governmental authorities have the authority to require the recall of certain vaccine candidates. Manufacturers may, under their own initiative, recall a product if any material deficiency in a product is found. A government-mandated or voluntary recall by us or our strategic collaborators could occur as a result of manufacturing errors, design or labeling defects or other deficiencies and issues. Recalls of any of our vaccine candidates would divert managerial and financial resources and have an adverse effect on our financial condition and results of operations. A recall announcement could harm our reputation with customers and negatively affect our sales, if any.

**Risks Related to Our Industry and Competition**

***Many of our competitors have significantly greater resources and experience, which may negatively impact our commercial opportunities and those of our current and future licensees.***

The biotechnology and pharmaceutical industries are subject to intense competition and rapid and significant technological change. We have many potential competitors, including major pharmaceutical companies, specialized biotechnology firms, academic institutions, government agencies and private and public research institutions. Many of our competitors have significantly greater financial and technical resources, experience and expertise in:

•research and development;

•preclinical testing;

•designing and implementing clinical trials;

•regulatory processes and approvals;

•production and manufacturing; and

•sales and marketing of approved products.

Principal competitive factors in our industry include:

•the quality and breadth of an organization's technology;

Table of Contents

•management of the organization and the execution of the organization's strategy;

•the skill and experience of an organization's employees and its ability to recruit and retain skilled and experienced employees;

•an organization's intellectual property portfolio;

•the range of capabilities, from target identification and validation to drug discovery and development to manufacturing and marketing; and

•the availability of substantial capital resources to fund discovery, development and commercialization activities.

Large and established companies, such as Merck & Co., Inc., GlaxoSmithKline plc, CSL Ltd, Sanofi Pasteur, SA, Pfizer Inc., Johnson & Johnson, AstraZeneca, and Moderna, among others, compete in the vaccine market. In particular, these companies have greater experience and expertise in securing government contracts and grants to support their research and development efforts, conducting testing and clinical trials, obtaining regulatory approvals to market products, manufacturing such products on a broad scale and marketing approved products.

Regardless of the disease, smaller or early-stage companies and research institutions also may prove to be significant competitors, particularly through collaborative arrangements with large and established pharmaceutical companies. As these companies develop their technologies, they may develop proprietary positions, which may prevent or limit our product development and commercialization efforts. We will also face competition from these parties in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and participant registration for clinical trials and in acquiring and in-licensing technologies and products complementary to our programs or potentially advantageous to our business. If any of our competitors succeed in obtaining approval from the FDA or other regulatory authorities for their products sooner than we do or for products that are more effective or less costly than ours, our commercial opportunity could be significantly reduced.

In order to effectively compete, we will have to make substantial investments in development, testing, manufacturing and sales and marketing or partner with one or more established companies. We may not be successful in gaining significant market share for any vaccine. Our technologies and vaccines also may be rendered obsolete or non-competitive as a result of products introduced by our competitors to the marketplace more rapidly and at a lower cost.

***There is significant competition in the development of a vaccine against COVID-19, influenza, and RSV and we may never see returns on the significant resources we are devoting to our vaccine candidates.***

We may be unable to produce a successful COVID-19 vaccine, and establish a competitive market share for our vaccine before the COVID-19 outbreak is contained or significantly diminished. A large number of vaccine manufacturers, academic institutions and other organizations have developed COVID-19 vaccines or are developing COVID-19 vaccine candidates. In particular, Moderna, Pfizer/BioNTech, and Johnson & Johnson have received emergency use authorizations for their COVID-19 vaccines in the U.S. and other countries, and many other companies, including AstraZeneca, Sinovac Biotech, Sinopharm, and Inovio are in various stages of developing and obtaining marketing authorization for COVID-19 vaccine candidates. Despite funding provided to us to date, many of our competitors pursuing vaccine candidates have significantly greater product candidate development, manufacturing and marketing resources than we do. Larger pharmaceutical and biotechnology companies have extensive experience in clinical testing and obtaining regulatory approval for their products and may have the resources to heavily invest to accelerate discovery and development of their vaccine candidates. The success of our COVID-19 vaccine will depend, in part, on its relative safety, efficacy (including against emerging variant strains), side effect profile, convenience, and cost. COVID-19 vaccines approved prior to our vaccine satisfy a portion of the demand for initial vaccinations, and we no longer have access to that opportunity. In addition, COVID-19 vaccines approved prior to our vaccine may develop broad market acceptance that we are challenged to overcome. Furthermore, if any competitors are successful in producing a more efficacious vaccine or other treatment for COVID-19 (including against emerging variant strains), or if any competitors are able to manufacture and distribute any such vaccines or treatments with greater efficiency there may be a diversion of potential governmental and other funding away from us and toward such other parties.

We are allocating significant financial and personnel resources to the development of NVX-CoV2373, which may cause delays in or otherwise negatively impact our other development programs. Our business could be negatively impacted by our allocation of significant resources to combating a global health threat that is unpredictable or against which our vaccine, if commercialized, may ultimately prove unsuccessful or unprofitable.

Many seasonal influenza vaccines are currently approved and marketed. Competition in the sale of these seasonal influenza vaccines is intense. Therefore, newly developed and approved products must be differentiated from existing vaccines

46

Table of Contents

in order to have commercial success. In order to show differentiation in the seasonal influenza market, a product may need to be more efficacious, particularly in older adults, and/or be less expensive or quicker to manufacture. Many competitors are working on new products and new generations of current products, intended to be more efficacious than those currently marketed. Our nanoparticle seasonal influenza vaccine candidate may not prove to be more efficacious than current products or products under development by our competitors. Further, our in-house or third-party manufacturing arrangements may not provide enough savings of time or money to provide the required differentiation for commercial success.

We are also aware that there are multiple companies with active RSV vaccine programs at various stages of development. Thus, while there is no RSV vaccine currently on the market, there is likely to be significant and consistent competition as these active programs mature. Different RSV vaccines may work better for different segments of the population, so it may be difficult for a single RSV vaccine manufacturer to provide vaccines that are marketable to multiple population segments. Geographic markets are also likely to vary significantly, which may make it difficult to market a single RSV vaccine worldwide. Even if a manufacturer brings an RSV vaccine to license, it is likely that competitors will continue to work on new products that could be more efficacious and/or less expensive. Our RSV vaccine candidate may not be as far along in development as other active RSV vaccine programs about which we are not aware, nor as efficacious as products under development by competing companies. Even if our RSV vaccine candidate receives regulatory approval, it may not achieve significant sales if other, more effective vaccines under development by our competitors are also approved.

**Risks Related to Regulatory and Compliance Matters**

*We have not completed the development of vaccine products, and we may not succeed in obtaining the FDA licensure or foreign regulatory approvals necessary to sell such vaccine products.*

The development, manufacture and marketing of our pharmaceutical and biological products are subject to government regulation by the U.S. FDA and regulatory authorities in other jurisdictions, including the European Medicines Agency EMA, the State Institute for Drug Control (SUKL) with respect to our manufacturing facility in the Czech Republic and the Swedish Medical Products Agency (Läkemedelsverket, LV) with respect to our adjuvant product being developed in Sweden, as well as other country authorities into which active pharmaceutical ingredients and excipients are imported and/or manufactured by us or our sub-contracted manufacturers. In the U.S. and most foreign countries, we must complete rigorous preclinical testing and extensive clinical trials that demonstrate the safety and efficacy of a product in order to apply for regulatory approval to market the product. Additionally, we must demonstrate that our manufacturing facilities, processes and controls are adequate with respect to such product to assure safety, purity and potency. None of our vaccine candidates has yet gained regulatory approval in the U.S. or elsewhere. We also have vaccine candidates in clinical trials and preclinical laboratory or animal studies. The steps generally required by the FDA before our proposed investigational products may be marketed in the U.S. include:

•performance of preclinical (animal and laboratory) tests;

•submission to the FDA of an IND, which must become effective before clinical trials may commence;

•performance of adequate and well controlled clinical trials to establish the safety and efficacy of the investigational product in the intended target population;

•performance of a consistent and reproducible manufacturing process at commercial scale capable of passing FDA inspection;

•submission to the FDA of a BLA or a NDA; and

•FDA approval of the BLA or NDA before any commercial sale or shipment of the product.

These processes are expensive and can take many years to complete, and we may not be able to demonstrate the safety, purity, potency and efficacy of our vaccine candidates to the satisfaction of regulatory authorities. The start of clinical trials can be delayed or take longer than anticipated for many and varied reasons, many of which are out of our control. Safety concerns may emerge that could lengthen the ongoing clinical trials or require additional clinical trials to be conducted. Promising results in early clinical trials may not be replicated in subsequent clinical trials. Regulatory authorities may also require additional testing, and we may be required to demonstrate that our proposed products represent an improved form of treatment over existing therapies, which we may be unable to do without conducting further clinical trials. Moreover, if the FDA grants regulatory approval of a product, the approval may be limited to specific indications or limited with respect to its distribution. Expanded or additional indications for approved products may not be approved, which could limit our revenue. Foreign regulatory authorities may apply similar limitations or may refuse to grant any approval. Consequently, even if we believe that preclinical and clinical data are sufficient to support regulatory approval for our vaccine candidates, the FDA and foreign regulatory authorities ultimately may not grant approval for commercial sale in any jurisdiction, or may impose regulatory

47

Table of Contents

requirements that make further pursuit of approval uneconomical in one or more jurisdictions. If our vaccine candidates are not approved, our ability to generate revenue will be limited, and our business will be adversely affected.

***We may fail to obtain regulatory approval for our products on a timely basis or comply with our continuing regulatory obligations after approval is obtained.***

Delays in obtaining regulatory approval can be extremely costly in terms of lost sales opportunities, loss of any potential marketing advantage of being early to market and increased clinical trial costs. The speed with which we begin and complete our preclinical studies necessary to begin clinical trials, clinical trials and our applications for marketing approval will depend on several factors, including the following:

•our ability to scale-up manufacturing capability that reproducibly generates consistent yields of product with required purity, potency and quality; that such scale-up occurs on a timely basis; and that we have access to sufficient quantities of materials for use in necessary preclinical studies and clinical trials;

•regulatory agency review and approval of proposed clinical trial protocols;

•approval of clinical trials protocols and informed consent forms by institutional review boards responsible for overseeing the ethical conduct of the trial;

•the rate of participant enrollment and retention, which is a function of many factors, including the size of the participant population, the proximity of participants to clinical sites, the eligibility criteria for the clinical trial and the nature of the protocol;

•unfavorable test results or side effects experienced by clinical trial participants;

•analysis of data obtained from preclinical and clinical activities, which are susceptible to varying interpretations and which interpretations could delay, limit, result in the suspension or termination of, or prevent further conduct of clinical studies or regulatory approval;

•the availability of skilled and experienced staff to conduct and monitor clinical trials and to prepare the appropriate regulatory applications; and

•changes in the policies of regulatory authorities for drug or vaccine approval during the period of product development.

We have limited experience in conducting and managing the preclinical studies and clinical trials necessary to obtain regulatory marketing approvals. We may not be permitted to continue or commence additional clinical trials. We also face the risk that the results of our clinical trials may be inconsistent with the results obtained in preclinical studies or clinical trials of similar products or that the results obtained in later phases of clinical trials may be inconsistent with those obtained in earlier phases. A number of companies in the biotechnology and product development industry have suffered significant setbacks in advanced clinical trials, even after experiencing promising results in early animal and human testing.

Regulatory agencies may require us or our collaborators to delay, restrict or discontinue clinical trials on various grounds, including a finding that the participants are being exposed to an unacceptable health risk. In addition, we or our collaborators may be unable to submit applications to regulatory agencies within the time frame we currently expect. Once submitted, applications must be approved by various regulatory agencies before we or our collaborators can commercialize the product described in the application. All statutes and regulations governing the conduct of clinical trials are subject to change in the future, which could affect the cost of such clinical trials. Any unanticipated costs or delays in our clinical trials or regulatory submissions could delay our ability to generate revenue and harm our financial condition and results of operations.

***Failure to obtain regulatory approval in foreign jurisdictions would prevent us from marketing our products internationally.***

We intend to have our vaccine candidates marketed outside the U.S. In furtherance of this objective, we have entered into supply agreements with various foreign governments and international distribution agreements with commercial entities. In order to market our products in the European Union, United Kingdom, India, Asia and many other non-U.S. jurisdictions, we must obtain separate regulatory approvals and comply with numerous and varying regulatory requirements. The approval procedure varies among countries and can involve additional testing and data review. The time required to obtain foreign

Table of Contents

regulatory approval may differ from that required to obtain FDA approval. The foreign regulatory approval process may include all of the risks associated with obtaining FDA approval. We may not obtain foreign regulatory approvals on a timely basis, if at all. Approval by one regulatory agency does not ensure approval by regulatory agencies in other jurisdictions. However, a failure or delay in obtaining regulatory approval in one jurisdiction may have a negative effect on the regulatory approval process in other jurisdictions, including approval by the FDA. The failure to obtain regulatory approval in foreign jurisdictions could harm our business.

***The regulatory pathway for NVX-CoV2373 is continually evolving and may result in unexpected or unforeseen challenges.***

The regulatory pathway for NVX-CoV2373 is evolving and failure by us to comply with any laws, rules and standards, some of which may not exist yet or are subject to interpretation and may be subject to change, could result in a variety of adverse consequences, including penalties, fines and delays in vaccine licensure. Efforts to comply with evolving laws, regulations and standards have resulted in, and are likely to continue to result in, increased general and administrative expenses and a diversion of management time and attention to regulatory compliance activities. For example, the rules, regulations and standards governing OWS are uncertain and may evolve as the program progresses. Such rules or standards may adversely affect our plans to develop NVX-CoV2373 and failure by us to comply with any laws, rules or standards, some of which may not exist yet or may change, could result in a range of adverse consequences, such as penalties, fines or failure to receive funding.

The speed at which multiple stakeholders are moving to create, test and approve vaccines for COVID-19 is highly unusual and may increase the risks associated with traditional vaccine development, which typically takes between eight and ten years. Given this accelerated timeline, we and regulators, such as the FDA, the EMA, and the MHRA may make decisions more rapidly than is typical. Evolving or changing plans or priorities at the FDA or other regulatory bodies, including based on new knowledge of COVID-19 and how the disease affects the human body, and new variants of the virus, may significantly affect the regulatory pathway for NVX-CoV2373. Results from clinical testing may raise new questions and require us to redesign proposed clinical trials, including revising proposed endpoints or adding new clinical trial sites or cohorts of subjects. In addition, the FDA's or other regulators' analysis of clinical data may differ from our interpretation, or regulators' requirements and expectations for vaccine authorization or approval may change over time, with the result that the FDA or other regulators may require that we conduct additional clinical trials or non-clinical studies. The evolving regulatory pathway may impede the development, commercialization and/or licensure of NVX-CoV2373.

In addition, because the path to licensure of any vaccine against COVID-19 is unclear, we may have a widely used vaccine in circulation in certain countries as an investigational vaccine or a product authorized for temporary or emergency use prior to our receipt of full marketing approval. Unexpected safety issues in these circumstances could lead to significant reputational damage for Novavax and our technology platform going forward and other issues, including delays in our other programs, the need for re-design of our clinical trials and the need for significant additional financial resources.

***We are conducting, and plan to conduct in the future, a number of clinical trials for NVX-CoV2373 at sites outside the United States and the FDA may not accept data from trials conducted in such locations.***

We are currently conducting several clinical trials of NVX-CoV2373 at sites outside the U.S., including a Phase 3 trial in the U.K., a Phase 2b trial in South Africa, and a Phase 1/2 trial partially in Australia. We also plan in the future to conduct (or collaborate to conduct) a Phase 2/3 trial in India, Phase 2 trial in the Czech Republic, and Phase 1/2 trial in Japan. Although the FDA may accept data from clinical trials conducted outside the U.S., acceptance of these data is subject to conditions imposed by the FDA. For example, the clinical trial must be well designed and conducted and be performed by qualified investigators in accordance with ethical principles. The trial population must also adequately represent the U.S. population, and the data must be applicable to the U.S. population and U.S. medical practice in ways that the FDA deems clinically meaningful. In addition, while these clinical trials are subject to the applicable local laws, FDA acceptance of the data will depend on its determination that the trials also complied with all applicable U.S. laws and regulations. If the FDA does not accept the data from any trial that we conduct outside the U.S., it could result in delay pending completion of our trials conducted in the U.S. or result in the need for additional trials, which would be costly and time-consuming and could delay or permanently halt our development of NVX-CoV2373.

***Even if regulatory approval is received for our vaccine candidates, the later discovery of previously unknown problems with a product, manufacturer or facility may result in restrictions, including withdrawal of the product from the market.***

Even after a product gains regulatory approval, the product and the manufacturer of the product will be subject to continuing regulatory review, including adverse event reporting requirements and the FDA's general prohibition against promoting products for unapproved uses. Failure to comply with any post-approval requirements can, among other things, result in warning letters, product seizures, recalls, substantial fines, injunctions, suspensions or revocations of marketing licenses, operating restrictions and criminal prosecutions. Any such enforcement actions, any unanticipated changes in existing

Table of Contents

regulatory requirements or the adoption of new requirements, or any safety issues that arise with any approved products, could adversely affect our ability to market products and generate revenue and thus adversely affect our ability to continue our business.

We also may be restricted or prohibited from marketing or manufacturing a product, even after obtaining product approval, if previously unknown problems with the product or its manufacture are subsequently discovered. We cannot provide assurance that newly discovered or developed safety issues will not arise following regulatory approval. With the use of any vaccine by a wide patient population, serious adverse events may occur from time to time that did not arise in the clinical trials of the product or that initially appeared to be unrelated to the vaccine itself and only with the collection of subsequent information were found to be causally related to the product. Any such safety issues could cause us to suspend or cease marketing of our approved products, possibly subject us to substantial liabilities, and adversely affect our ability to generate revenue and our financial condition.

***Our ability to produce a successful vaccine may be curtailed by one or more government actions or interventions, which may be more likely during a global health crisis such as COVID-19.***

Given the significant global impact of the COVID-19 pandemic, it is possible that one or more government entities may take actions, including under the U.S. Government under the Defense Production Act of 1950, as amended, that directly or indirectly have the effect of diminishing some of our rights or opportunities with respect to NVX-CoV2373, and the economic value of a COVID-19 vaccine to us could be limited. In addition, during a global health crisis, such as the COVID-19 pandemic, where the spread of a disease needs to be controlled, closed or heavily regulated national borders create challenges and delays in our development, production and distribution activities and may necessitate that we pursue strategies to develop, produce and distribute our vaccine candidates within self-contained national or international borders or with additional safety measures or checks in place, at potentially much greater expense and with longer timeframes for public distribution.

***Inadequate funding for the FDA, the SEC and other government agencies could hinder their ability to hire and retain key leadership and other personnel, or otherwise perform their normal functions on which the operation of our business may rely, which could negatively impact our ability to develop or commercialize new products or services, access capital markets, or otherwise operate our business.***

The ability of the FDA to review and approve new products is affected by a variety of factors, including government budget and funding levels, ability to hire and retain key personnel and accept the payment of user fees, and statutory, regulatory and policy changes. Average review times at the agency have fluctuated in recent years as a result. In addition, government funding of the SEC and other government agencies on which our operations may rely, including those that fund research and development activities, is subject to the political process, which is inherently fluid and unpredictable.

Disruptions at the FDA and other agencies may also slow the time necessary for new drugs to be reviewed and approved by necessary government agencies, which would adversely affect our business. For example, over the last several years, the U.S. government has shut down several times and certain regulatory agencies, such as the FDA and the SEC, have had to furlough employees and stop or slow the pace of critical activities. If a prolonged government shutdown occurs, it could significantly impact the ability of the FDA to timely review and process our regulatory submissions, which could have a material adverse effect on our business. Further, in our operations as a public company, future government shutdowns could impact our ability to access the public markets and obtain necessary capital in order to properly capitalize and continue our operations.

***Fast Track Designation by the FDA or other regulatory acceleration options may not actually lead to a faster development or regulatory review or approval process and does not assure approval.***

If a drug is intended for the treatment of a serious or life-threatening condition and the drug demonstrates the potential to address an unmet medical need for this condition, the drug sponsor may apply for FDA Fast Track Designation or similar fast track processes with other regulatory agencies, such as conditional marketing authorizations from the EMA. However, Fast Track Designation does not ensure that the drug sponsor will receive marketing approval or that approval will be granted within any particular timeframe. The FDA granted Fast Track Designation for NVX-CoV2373 in November 2020 and for NanoFlu™, our recombinant quadrivalent seasonal influenza vaccine candidate, in January 2020. We may also seek Fast Track Designation for more of our other vaccine candidates. If we do seek Fast Track Designation for our other vaccine candidates, we may not receive it, and even if we receive Fast Track Designation, we may not experience a faster development process, review or approval compared to conventional FDA procedures. In addition, the FDA may withdraw Fast Track designation if it believes that the designation is no longer supported by data from our clinical development program. Fast Track Designation alone does not guarantee qualification for the FDA's priority review procedures.

Obtaining a Fast Track Designation does not change the standards for product approval, but may expedite the development or approval process. Even though the FDA has granted such designation for NVX-CoV2373 and NanoFlu™, it

Table of Contents

may not actually result in faster clinical development or regulatory review or approval. Furthermore, such a designation does not increase the likelihood that NVX-CoV2373 or NanoFlu™ will receive marketing approval in the U.S.

***Because we are subject to environmental, health and safety laws, we may be unable to conduct our business in the most advantageous manner.***

We are subject to various laws and regulations relating to safe working conditions, laboratory and manufacturing practices, the experimental use of animals, emissions and wastewater discharges, and the use and disposal of hazardous or potentially hazardous substances used in connection with our research, including infectious disease agents. We also cannot accurately predict the extent of regulations that might result from any future legislative or administrative action. Any of these laws or regulations could cause us to incur additional expense or restrict our operations.

Our facilities in Maryland are subject to various local, state and federal laws and regulations relating to safe working conditions, laboratory practices, the experimental use of animals and the use and disposal of hazardous or potentially hazardous substances, including chemicals, microorganisms and various hazardous compounds used in connection with our research and development activities. In the U.S., these laws include the Occupational Safety and Health Act, the Toxic Test Substances Control Act and the Resource Conservation and Recovery Act. Similar national and local regulations govern our facilities in Sweden and the Czech Republic. We cannot eliminate the risk of accidental contamination or discharge or injury from these materials. Federal, state and local laws and regulations govern the use, manufacture, storage, handling and disposal of these materials. We could be subject to civil damages in the event of an improper or unauthorized release of, or exposure of individuals to, these hazardous materials. In addition, claimants may sue us for injury or contamination that results from our use or the use by third-parties of these materials, and our liability may exceed our total assets. Compliance with environmental laws and regulations may be expensive, and current or future environmental regulations may impair our research, development or production efforts.

Although we have general liability insurance, these policies contain exclusions from insurance against claims arising from pollution from chemicals or pollution from conditions arising from our operations. Our collaborators are working with these types of hazardous materials in connection with our collaborations. In the event of a lawsuit or investigation, we could be held responsible for any injury we or our collaborators cause to persons or property by exposure to, or release of, any hazardous materials. However, we believe that we are currently in compliance with all material applicable environmental and occupational health and safety regulations.

***For our product candidates, we will be subject to additional healthcare laws and our failure to comply with those laws could have a material adverse effect on our results of operations and financial conditions.***

Within the U.S. (and within foreign countries), if we obtain approval for any of our product candidates and begin commercializing them, our operations may be directly, or indirectly through our arrangements with third-party payors and customers, subject to additional healthcare regulation and enforcement by the federal and state governments (or the regulatory bodies or governments of foreign countries), which may constrain the business or financial arrangements and relationships through which we sell, market and distribute our products. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, structuring and commission(s), certain customer incentive programs and other business arrangements generally. Activities subject to these laws also involve the improper use of information obtained in the course of patient recruitment for clinical trials. The applicable U.S. federal and state healthcare laws and regulations (which may be comparable to foreign laws existing in foreign countries) that may affect our ability to operate include:

•the Federal Food, Drug and Cosmetic Act, which among other things, strictly regulates drug product marketing and promotion and prohibits manufacturers from marketing such products for unapproved uses;

•the federal Anti-Kickback Statute, which prohibits, among other things, persons from knowingly and willfully soliciting, receiving or providing remuneration, directly or indirectly, to induce the referral for an item or service or the purchasing or ordering of a good or service, for which payment may be made under federal healthcare programs such as Medicare and Medicaid;

•federal false claims laws, including the FCA, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, information or claims for payment from Medicare, Medicaid, or other third-party payers that are false or fraudulent;

•manufacturers can be held liable under the FCA even when they do not submit claims directly to government payors if they are deemed to "cause" the submission of false or fraudulent claims; the FCA also permits a private individual

51

Table of Contents

acting as whistleblower to bring actions on behalf of the federal government alleging violations of the FCA and to share in any monetary recovery;

• federal laws that require pharmaceutical manufacturers to report certain calculated product prices to the government or provide certain discounts or rebates to government authorities or private entities, often as a condition of reimbursement under government healthcare programs;

• the federal Physician Payment Sunshine Act and its implementing regulations, which require manufacturers of drugs, devices, biologicals, and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to the DHHS information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by physicians and their immediate family members; effective January 1, 2022, these reporting obligations will extend to include transfers of value made to certain non-physician providers such as physician assistants and nurse practitioners;

• the federal law known as HIPAA, which, in addition to privacy protections applicable to healthcare providers and other entities, prohibits executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters;

• federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

• state law equivalents of the above federal laws, such as anti-kickback and false claims laws which may apply to items or services reimbursed by any third-party payer, including commercial insurers, and state gift ban and transparency laws, many of which state laws differ from each other in significant ways and often are not preempted by federal laws, thus complicating compliance efforts; and

• state laws restricting interactions with healthcare providers and other members of the healthcare community or requiring pharmaceutical manufacturers to implement certain compliance standards.

Because of the breadth of these laws and the narrowness of the statutory exceptions and safe harbors available, it is possible that some of our business activities could be subject to challenge under one or more of such laws. If our operations are found to be in violation of any of such laws or any other governmental regulations that apply to us, we may be subject to, on a corporate or individual basis, penalties, including civil and criminal penalties, damages, fines, the curtailment or restructuring of our operations, the exclusion from participation in federal and state healthcare programs and even imprisonment, any of which could materially adversely affect our ability to operate our business and our financial results. In addition, the cost of implementing sufficient systems, controls, and processes to ensure compliance with all of the aforementioned laws could be significant. Any action for violation of these laws, even if successfully defended, could cause us to incur significant legal expenses and divert management's attention from the operation of the company's business. If any of the physicians or other healthcare providers or entities with whom we expect to do business is found not to be in compliance with applicable laws, that person or entity may be subject to criminal, civil or administrative sanctions, including exclusions from government funded healthcare programs. Prohibitions or restrictions on sales or withdrawal of future marketed products could materially affect business in an adverse way.

It is not always possible to identify and deter employee misconduct, and the precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations. Efforts to ensure that our business arrangements will comply with applicable healthcare laws may involve substantial costs. It is possible that governmental and enforcement authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law interpreting applicable fraud and abuse or other healthcare laws and regulations. If any such actions are instituted against us and we are not successful in defending ourselves or asserting our rights those actions, our business may be impaired.

**Risks Related to our Intellectual Property**

***Our success depends on our ability to maintain the proprietary nature of our technology.***

Our success in large part depends on our ability to maintain the proprietary nature of our technology and other trade secrets. To do so, we must prosecute and maintain existing patents, obtain new patents and pursue trade secret and other

Table of Contents

intellectual property protection. We also must operate without infringing the proprietary rights of third-parties or allowing third-parties to infringe our rights. We currently have or have rights to over 450 U.S. patents and corresponding foreign patents and patent applications covering our technologies. However, patent issues relating to pharmaceuticals and biologics involve complex legal, scientific and factual questions. To date, no consistent policy has emerged regarding the breadth of biotechnology patent claims that are granted by the U.S. Patent and Trademark Office ("USPTO") or enforced by the federal courts. Therefore, we do not know whether any particular patent applications will result in the issuance of patents, or that any patents issued to us will provide us with any competitive advantage. We also cannot be sure that we will develop additional proprietary products that are patentable. Furthermore, there is a risk that others will independently develop or duplicate similar technology or products or circumvent the patents issued to us.

There is a risk that third-parties may challenge our existing patents or claim that we are infringing their patents or proprietary rights. We could incur substantial costs in defending patent infringement suits or in filing suits against others to have their patents declared invalid or claim infringement. It is also possible that we may be required to obtain licenses from third-parties to avoid infringing third-party patents or other proprietary rights. We cannot be sure that such third-party licenses would be available to us on acceptable terms, if at all. If we are unable to obtain required third-party licenses, we may be delayed in or prohibited from developing, manufacturing or selling products requiring such licenses.

Although our patent filings include claims covering various features of our vaccine candidates, including composition, methods of manufacture and use, our patents do not provide us with complete protection against the development of competing products. Some of our know-how and technology is not patentable. To protect our proprietary rights in unpatentable intellectual property and trade secrets, we require employees, consultants, advisors and collaborators to enter into confidentiality agreements. These agreements may not provide meaningful protection for our trade secrets, know-how or other proprietary information.

### Third parties may claim we infringe their intellectual property rights.

Our research, development and commercialization activities, including any vaccine candidates resulting from these activities, may be found to infringe patents owned by third-parties and to which we do not hold licenses or other rights. There may be rights we are not aware of, including applications that have been filed, but not published that, when issued, could be asserted against us. These third-parties could bring claims against us, and that may cause us to incur substantial expenses and, if successful against us, could cause us to pay substantial damages. Further, if a patent infringement suit were brought against us, we could be forced to stop or delay research, development, manufacturing or sales of the product or biologic drug candidate that is the subject of the suit.

As a result of patent infringement claims, or in order to avoid potential claims, we may choose or be required to seek a license from the third-party. These licenses may not be available on acceptable terms, or at all. Even if we are able to obtain a license, the license would likely obligate us to pay license fees or royalties or both, and the rights granted to us might be non- exclusive, which could result in our competitors gaining access to the same intellectual property. Ultimately, we could be prevented from commercializing a product, or be forced to cease some aspect of our business operations, if, as a result of actual or threatened patent infringement claims, we are unable to enter into licenses on acceptable terms. All of the issues described above could also impact our collaborators, which would also impact the success of the collaboration and therefore us.

There has been substantial litigation and other proceedings regarding patent and other intellectual property rights in the pharmaceutical and biotechnology industries.

### We may become involved in litigation to protect or enforce our patents or the patents of our collaborators or licensors, which could be expensive and time-consuming.

Competitors may infringe our patents or the patents of our collaborators or licensors. As a result, we may be required to file suit to counter infringement for unauthorized use. This can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover its technology. An adverse determination of any litigation or defense proceeding could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at the risk of not issuing.

Even if we are successful, litigation may result in substantial costs and distraction to our management. Even with a broad portfolio, we may not be able, alone or with our collaborators and licensors, to prevent misappropriation of our proprietary rights, particularly in countries where the laws may not protect such rights as fully as in the U.S.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. In addition, during the course of litigation, there could be public announcements of the results of hearings, motions or

53

Table of Contents

other interim proceedings or developments. If investors perceive these results to be negative, the market price for our common stock could be significantly harmed.

***The scope, validity, and ownership of our patent claims may be challenged in various venues and, if we do not prevail, our ability to exclude competitors may be harmed, potentially reducing our ability to succeed commercially.***

We may be subject to a variety of challenges from third-parties that relate to the scope of the claims or to their validity. Such challenges can be mounted in post-grant review, ex parte re-examination, and inter partes review proceedings before the USPTO, or similar adversarial proceedings in other jurisdictions. If we are unsuccessful in any such challenge, the scope of our claims could be narrowed or could be invalidated. Any such outcome could impair our ability to exclude competitors from the market in those countries, potentially impacting our commercial success.

Our patents may be subject to various challenges related to ownership and inventorship, including interference or derivation proceedings. Third-parties may assert that they are inventors on our patents or that they are owners of the patents. While we perform inventorship analyses to insure that the correct inventors are listed on our patents, we cannot be certain that a court of competent jurisdiction would arrive at the same conclusions we do. If we are unsuccessful in defending against ownership or inventorship challenges, a court may require us to list additional inventors, may invalidate the patent, or may transfer ownership of the patent to a third-party. Any of these outcomes may harm our ability to exclude competitors and potentially impact our commercial success. Further, if ownership is transferred to a third-party we may be required to seek a license to those rights to preserve our exclusive ability to practice the invention. Such a license may not be available on commercially reasonable terms, or at all. If we are unable to obtain a license, we may be required to expend time, effort, and other resources to design around the patent. Any such license may be non-exclusive and if a competitor is able to obtain a license from the third-party, our ability to exclude that competitor from the market may be negatively impacted.

Even if we are ultimately successful, defending any such challenges may cause us to incur substantial expenses and may require us to divert substantial financial and management resources that we would otherwise be able to devote to our business.

***We may need to license intellectual property from third-parties and, if our right to use the intellectual property we license is affected, our ability to develop and commercialize our vaccine candidates may be harmed.***

We have in the past, and we expect in the future to license intellectual property from third-parties and that these licenses will be material to our business. We will not own the patents or patent applications that underlie these licenses, and we may not control either the prosecution or the enforcement of the patents. Under such circumstances, we may be forced to rely upon our licensors to properly prosecute and file those patent applications and prevent infringement of those patents.

While many of the licenses under which we have rights provide us with rights in specified fields, the scope of our rights under these and other licenses may be subject to dispute by our licensors or third-parties. In addition, our rights to use these technologies and practice the inventions claimed in the licensed patents and patent applications are subject to our licensors abiding by the terms of those licenses and not terminating them. Any of our licenses may be terminated by the licensor if we are in breach of a term or condition of the license agreement, or in certain other circumstances.

Further, any disputes regarding obligations in licenses may require us to take expensive and time-consuming legal action to resolve, and, even if we are successful, may delay our ability to commercialize products and generate revenue. Further, if we are unable to resolve license issues that arise we may lose rights to practice intellectual property that is required to make, use, or sell products. Any such loss could compromise our development and commercialization efforts for current or future product candidates and/or may require additional effort and expense to design around.

Our vaccine candidates and potential vaccine candidates will require several components that may each be the subject of a license agreement. The cumulative license fees and royalties for these components may make the commercialization of these vaccine candidates uneconomical.

***If patent laws or the interpretation of patent laws change, our competitors may be able to develop and commercialize our discoveries.***

Important legal issues remain to be resolved as to the extent and scope of available patent protection for biopharmaceutical products and processes in the U.S. and other important markets outside the U.S., such as Europe and Japan. In addition, foreign markets may not provide the same level of patent protection as provided under the U.S. patent system. Litigation or administrative proceedings may be necessary to determine the validity and scope of certain of our and others' proprietary rights. Any such litigation or proceeding may result in a significant commitment of resources in the future and could force us to do one or more of the following: cease selling or using any of our products that incorporate the challenged intellectual property, which would adversely affect our revenue; obtain a license from the holder of the intellectual property right alleged to have been infringed, which license may not be available on reasonable terms, if at all; and redesign our products

54

Table of Contents

to avoid infringing the intellectual property rights of third-parties, which may be time-consuming or impossible to do. In addition, changes in, or different interpretations of, patent laws in the U.S. and other countries may result in patent laws that allow others to use our discoveries or develop and commercialize our products. We cannot provide assurance that the patents we obtain or the unpatented technology we hold will afford us significant commercial protection.

***If we do not obtain patent term extension and/or patent term adjustment in the United States under the Hatch- Waxman Act and similar extensions in foreign countries, our ability to exclude competitors may be harmed.***

In the United States, the patent term is 20 years from the earliest U.S. non-provisional filing date. Extensions of patent term may be available under certain circumstances. Depending upon the timing, duration and conditions of FDA marketing approval of our product candidates, we may be able to extend the term of one patent that covers a marketed product under the Drug Price Competition and Patent Term Restoration Act of 1984, (the "Hatch-Waxman Amendments") and similar legislation in the European Union.

The Hatch-Waxman Amendments permit patent term extension of up to five years for a patent covering an approved product as compensation for effective patent term lost during product development and the FDA regulatory review process. We may not receive any extension if we fail to apply within applicable deadlines, fail to apply prior to expiration of relevant patents or otherwise fail to satisfy applicable requirements. Moreover, the length of the extension could be less than we request. If we are unable to obtain patent term extension or the term of any such extension is less than we request, the period during which we can enforce our patent rights for that product will be shortened and our competitors may obtain approval to market competing products sooner.

Patent term covering our products may also be extended for time spent during the prosecution of the patent application in the USPTO. This extension is referred to as Patent Term Adjustment ("PTA"). The laws and regulations governing how the USPTO calculates the PTA is subject to change and changes in the law can reduce or increase any such PTA. Further, the PTA granted by the USPTO may be challenged by a third-party. If we do not prevail under such a challenge, the PTA may be reduced or eliminated, shortening the patent term, which may negatively impact our ability to exclude competitors.

**Risks Related to Employee Matters, Managing Growth and Information Technology**

***Our business may be adversely affected if we do not successfully execute our business development initiatives.***

We anticipate growing through both internal development projects, as well as external opportunities, which include the acquisition, partnering and in-licensing of products, technologies and companies or the entry into strategic alliances and collaborations. The availability of high quality opportunities is limited, and we may fail to identify candidates that we and our stockholders consider suitable or complete transactions on terms that prove advantageous. In order to pursue such opportunities, we may require significant additional financing, which may not be available to us on favorable terms, if at all. Even if we are able to successfully identify and complete acquisitions, like our business combinations with Novavax CZ (formerly Praha Vaccines) and Novavax AB, strategic transactions involve many risks, including, among others, those related to diversion of management's attention from other business concerns, unanticipated expenses and liabilities, and increased complexity of our operations, which could prevent us from effectively exploiting acquired facilities, successfully integrating the acquired business and personnel, or fully realizing expected synergies.

To effectively manage our current and future potential growth, we will need to continue to enhance our operational, financial and management processes and to effectively expand, train and manage our employee base. Supporting our growth initiatives will require significant expenditures and management resources, including investments in research and development, manufacturing in-house and through third-party manufacturers and other areas of our business. Furthermore, we are in process of implementing a new enterprise resource planning system, which is intended to increase efficiency, but may result in disruptions or delays to our operations during its implementation. If we do not successfully manage our growth and do not successfully execute our growth initiatives, then our business and financial results may be adversely impacted, and we may incur asset impairment or restructuring charges.

***Security breaches and other disruptions could compromise our information and expose us to liability, and our failure to comply with data protection laws and regulations could lead to government enforcement actions, which would cause our business and reputation to suffer.***

In the ordinary course of our business, we and many of our current and future strategic partners, vendors, contractors, and consultants collect and store sensitive data, including intellectual property, our proprietary business information and data about our clinical participants, suppliers and business partners and personally identifiable information. The secure maintenance of this information is critical to our operations and business strategy. Some of this information could be an attractive target of criminal attack by malicious third parties with a wide range of motives and expertise, including nation-states, organized criminal groups, "hacktivists," patient groups, disgruntled current or former employees and others. Hacker attacks are of ever-increasing levels of sophistication, and despite our security measures, our information technology and infrastructure may be

Table of Contents

vulnerable to such attacks or may be breached due to employee error or malfeasance. In 2020, several domestic and foreign security agencies announced that government actors or government-affiliated actors were specifically targeting organizations engaging in COVID-19 vaccine development and research. Our profile as an OWS recipient and progress on NVX-CoV2373 may result in greater risk of cyber attack. Any such breach could compromise our networks, our enterprise resource planning software and the information stored there could be accessed, publicly disclosed, lost or stolen. Furthermore, if our systems become compromised, we may not promptly discover the intrusion. Like other companies in our industry, we have experienced attacks to our data and systems, including malware and computer viruses. Attacks could have a material impact on our business, operations or financial results. Any access, disclosure or other loss of information could result in legal claims or proceedings, liability under laws that protect the privacy of personal information, disrupt our operations, and damage our reputation, which could adversely affect our business. In addition, privacy and data protection laws may be interpreted and applied differently from country to country and may create inconsistent or conflicting requirements, which can increase the costs incurred by us in complying with such laws. The European Union's GDPR, which greatly increases the jurisdictional reach of European Union law and became effective in May 2018, adds a broad array of requirements for handling personal data including the public disclosure of significant data breaches, and imposes substantial penalties for non-compliance of up to the greater of €20 million or 4% of global annual revenue for the preceding financial year. Our efforts to comply with GDPR and other privacy and data protection laws may impose significant costs and challenges that are likely to increase over time, and we could incur substantial penalties or litigation related to violations of existing or future data privacy laws and regulations.

The GDPR imposes strict rules on the transfer of personal data to countries outside the European Economic Area ("EEA"), including the United States and, in response, the EU and United States agreed in 2016 to a transfer framework for data transferred from the European Union to the United States, called the EU-US Privacy Shield. On July 16, 2020, however, the Court of Justice of the European Union issued a decision that declared the Privacy Shield framework, one of the primary mechanisms U.S. companies used to import personal information from Europe, invalid, and raised questions about whether the European Commission's Standard Contractual Clauses ("SCCs"), an alternative to the Privacy Shield, can lawfully be used for cross-border data transfers. On June 4, 2021, the European Commission adopted new SCCs under the GDPR for personal data transfers outside of the EEA. Under this legal mechanism, we may have obligations to conduct transfer impact assessments for such cross-border data transfers and implement additional security measures. As we incorporate the new SCCs into our contractual arrangements, we may be required to expend significant resources to update our contractual arrangements and to comply with such obligations. If we are unable to implement a valid compliance mechanism for cross-border personal information transfers, we may face increased exposure to regulatory actions, substantial fines and injunctions against processing or transferring personal information from Europe. Inability to import personal information from Europe to the United States may significantly and negatively impact our business operations, including by limiting our ability to conduct clinical trials activities in Europe; limiting our ability to collaborate with contract research organizations, service providers, contractors and other companies subject to the GDPR; or requiring us to increase our data processing capabilities in Europe at significant expense.

Additionally, the CCPA, which became effective January 1, 2020, substantially expands privacy obligations of many businesses. The CCPA requires new disclosures to California consumers, imposes new rules for collecting or using information about minors, and affords consumers new abilities, such as the right to know whether the data is sold or disclosed and to whom, the right to request that a company delete personal information collected, the right to opt-out of the sale of personal information and the right to non-discrimination in terms of price or service when a consumer exercises a privacy right. If we fail to comply with these regulations, we could be subject to civil sanctions, including fines and penalties for noncompliance. The CCPA provides for civil penalties for violations, as well as a private right of action for data breaches that is expected to increase data breach litigation. Moreover, a newly passed ballot initiative, the California Privacy Rights Act ("CPRA"), which will become operational in 2023, expands on the CCPA, creating new consumer rights and protections, including the right to correct personal information, the right to opt out of the use of personal information in automated decision making, the right to opt out of "sharing" consumer's personal information for cross-context behavioral advertising, and the right to restrict use of and disclosure of sensitive personal information, including geolocation data to third parties. We will need to evaluate and potentially update our privacy program to ensure compliance with the CPRA and may incur additional costs and expenses in our effort to comply.

***Collaborations and contracts of our wholly owned subsidiaries Novavax AB and Novavax CZ, with regional partners, such as SIIPL and Cadila, as well as with international providers, expose us to additional risks associated with doing business outside the U.S.***

Swedish-based Novavax AB and Czech Republic-based Novavax CZ are wholly owned subsidiaries of Novavax, Inc. We also have established a manufacturing and distribution agreement with SIIPL, formed a joint venture with Cadila in India and have entered into other agreements and arrangements with foreign governments and companies in other countries. We plan to continue to enter into collaborations or partnerships with companies, non-profit organizations and local governments in various parts of the world. Risks of conducting business outside the U.S. include negative consequences of:

Table of Contents

• the costs associated with seeking to comply with multiple regulatory requirements that govern our ability to develop, manufacture and sell products in local markets;

• failure to comply with anti-bribery laws such as the U.S. Foreign Corrupt Practices Act and similar anti-bribery laws in other jurisdictions;

• new or changes in interpretations of existing trade protections measures, including tariffs, embargoes and import and export licensing requirements;

• difficulties in and costs of staffing, managing and operating our international operations;

• changes in environmental, health and safety laws;

• fluctuations in foreign currency exchange rates;

• new or changes in interpretations of existing tax laws;

• political instability and actual or anticipated military or potential conflicts;

• economic instability, inflation, recession and interest rate fluctuations;

• minimal or diminished protection of intellectual property in many jurisdictions; and

• possible nationalization and expropriation.

These risks, individually or in the aggregate, could have a material adverse effect on our business, financial conditions, results of operations and cash flows.

***If we are unable to attract or retain key management or other personnel, our business, operating results and financial condition could be materially adversely affected.***

We depend on our senior executive officers, as well as key scientific and other personnel. The loss of these individuals could harm our business and significantly delay or prevent the achievement of research, development or business objectives. Turnover in key executive positions resulting in lack of management continuity and long-term history with our Company could result in operational and administrative inefficiencies and added costs.

We may not be able to attract qualified individuals for key positions on terms acceptable to us. Competition for qualified employees is intense among pharmaceutical and biotechnology companies, and the loss of qualified employees, or an inability to attract, retain and motivate additional highly skilled employees could hinder our ability to complete clinical trials successfully and otherwise develop marketable products.

We also rely from time to time on outside advisors who assist us in formulating our research and development and clinical strategy. We may not be able to attract and retain these individuals on acceptable terms, which could delay our development efforts.

**Risks Related to Our Convertible Senior Notes**

***Servicing our 3.75% convertible senior unsecured notes due 2023 requires a significant amount of cash, and we may not have sufficient cash flow to pay our debt.***

In 2016, we issued $325 million aggregate principal amount of Notes. Our ability to make scheduled payments of the principal of, to pay interest on, or to refinance our indebtedness, including the Notes, depends on our future performance, which is subject to economic, financial, competitive and other factors beyond our control. We do not expect our business to be able to generate cash flow from operations sufficient to service our debt and make necessary capital expenditures and may therefore be required to adopt one or more alternatives, such as selling assets, restructuring debt or obtaining additional equity capital on terms that may be onerous or highly dilutive. Our ability to refinance our indebtedness, which is non-callable and matures in 2023, will depend on the capital markets and our financial condition at such time. We may not be able to engage in any of these activities or engage in these activities on desirable terms, which could result in a default on our debt obligations, and limit our flexibility in planning for and reacting to changes in our business.

Table of Contents

***We may not have the ability to raise the funds necessary to repurchase the Notes as required upon a fundamental change, and our future debt may contain limitations on our ability to repurchase the Notes.***

Holders of the Notes will have the right to require us to repurchase their Notes for cash upon the occurrence of a fundamental change at a fundamental change repurchase price equal to 100% of the principal amount of the Notes to be repurchased, plus accrued and unpaid interest, if any. A fundamental change may also constitute an event of default or prepayment under, and result in the acceleration of the maturity of, our then-existing indebtedness. We cannot assure that we will have sufficient financial resources, or will be able to arrange financing, to pay the fundamental change repurchase price in cash with respect to any Notes surrendered by holders for repurchase upon a fundamental change. In addition, restrictions in our then existing credit facilities or other indebtedness, if any, may not allow us to repurchase the Notes upon a fundamental change. Our failure to repurchase the Notes upon a fundamental change when required would result in an event of default with respect to the Notes which could, in turn, constitute a default under the terms of our other indebtedness, if any. If the repayment of the related indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay the indebtedness and repurchase the Notes.

***Capped call transactions entered into in connection with our Notes may affect the value of our common stock.***

In connection with our Notes, we entered into capped call transactions (the "capped call transactions") with certain financial institutions. The capped call transactions are expected to generally reduce the potential dilution upon conversion of the Notes into shares of our common stock.

In connection with establishing their initial hedges of the capped call transactions, these financial institutions or their respective affiliates entered into various derivative transactions with respect to our common stock and/or to purchase our common stock. The financial institutions, or their respective affiliates, may modify their hedge positions by entering into or unwinding various derivatives with respect to our common stock and/or purchasing or selling our common stock or other securities of ours in secondary market transactions prior to the maturity of the Notes. This activity could also cause or avoid an increase or a decrease in the market price of our common stock or the Notes, which could affect the value of our common stock.

**Risks Related to Ownership of Our Common Stock**

***Because our stock price has been and will likely continue to be highly volatile, the market price of our common stock may be lower or more volatile than expected.***

Our stock price has been highly volatile. From January 1, 2021 through July 31, 2021, the closing sale price of our common stock has been as low as $112.98 per share and as high as $319.93 per share. The stock market in general and the market for biotechnology companies in particular have experienced extreme volatility that has often been unrelated to the operating performance of particular companies. These broad market fluctuations may cause the market price of our common stock to be lower or more volatile than expected.

Furthermore, given the global focus on the COVID-19 pandemic and our investment in developing a COVID-19 vaccine, information in the public arena on this topic, whether or not accurate, has had and will likely continue to have an outsized impact (positive or negative) on our stock price. Information related to our development, manufacturing, regulatory and commercialization efforts with respect to NVX-CoV2373, or information regarding such efforts by competitors with respect to their COVID-19 vaccines and vaccine candidates, may meaningfully impact our stock price. As a result of this volatility, you may not be able to sell your common stock at or above your initial purchase price. The market price of our common stock may be influenced by many other factors, including:

•future announcements about us or our collaborators or competitors, including the results of testing, technological innovations or new commercial products;

•clinical trial results;

•delays in making regulatory submissions;

•depletion of our cash reserves;

•sale of equity securities or issuance of additional debt;

•announcement by us of significant strategic partnerships, collaborations, joint ventures, capital commitments or acquisitions;

Table of Contents

• changes in government regulations;

• impact of competitor successes and in particular development success of vaccine candidates that compete with our own vaccine candidates;

• developments in our relationships with our collaboration and funding partners;

• announcements relating to health care reform and reimbursement levels for new vaccines and other matters affecting our business and results, regardless of accuracy;

• sales of substantial amounts of our stock by us or existing stockholders (including stock by insiders or 5% stockholders);

• development, spread or new announcements related to pandemic diseases;

• litigation;

• public concern as to the safety of our products;

• significant set-backs or concerns with the industry or the market as a whole;

• regulatory inquiries, reviews and potential action, including from the FDA or the SEC;

• recommendations by securities analysts or changes in earnings estimates; and

• the other factors described in this Risk Factors section.

In the past, following periods of volatility in the market price of a company's securities, securities class-action litigation often has been instituted against that company. Such litigation, if instituted against us, could cause us to incur substantial costs to defend such claims and divert management's attention and resources, which could seriously harm our business, financial condition, and results of operations, and prospects.

***Raising additional capital by issuing securities or through collaboration and licensing arrangements may cause dilution to existing stockholders or require us to relinquish rights to our technologies or vaccine candidates.***

If we are unable to partner with a third-party to advance the development of one or more of our vaccine candidates, we will need to raise money through additional debt or equity financings. To the extent that we raise additional capital by issuing equity securities, our stockholders will experience immediate dilution, which may be significant. There is also a risk that such equity issuances may cause an ownership change under the Internal Revenue Code of 1986, as amended, and similar state provisions, thus limiting our ability to use our net operating loss carryforwards and credits. To the extent that we raise additional capital through licensing arrangements or arrangements with collaborative partners, we may be required to relinquish, on terms that may not be favorable to us, rights to some of our technologies or vaccine candidates that we would otherwise seek to develop or commercialize ourselves. In addition, economic conditions may also negatively affect the desire or ability of potential collaborators to enter into transactions with us. They may also have to delay or cancel research and development projects or reduce their overall budgets.

***Provisions of our Second Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws and Delaware law could delay or prevent the acquisition of the Company, even if such acquisition would be beneficial to stockholders, and could impede changes in our Board.***

Provisions in our organizational documents could hamper a third-party's attempt to acquire, or discourage a third-party from attempting to acquire control of, the Company. Stockholders who wish to participate in these transactions may not have the opportunity to do so. Our organizational documents also could limit the price investors are willing to pay in the future for our securities and make it more difficult to change the composition of our Board in any one year. For example, our organizational documents provide for a staggered board with three classes of directors serving staggered three-year terms and advance notice requirements for stockholders to nominate directors and make proposals.

As a Delaware corporation, we are also afforded the protections of Section 203 of the Delaware General Corporation Law, which will prevent us from engaging in a business combination with a person who acquires at least 15% of our common

59

Table of Contents

stock for a period of three years from the date such person acquired such common stock, unless advance board or stockholder approval was obtained.

Any delay or prevention of a change of control transaction or changes in our Board or management could deter potential acquirers or prevent the completion of a transaction in which our stockholders could receive a substantial premium over the then current market price for their shares.

***We have never paid dividends on our capital stock, and we do not anticipate paying any such dividends in the foreseeable future.***

We have never paid cash dividends on our common stock. We currently anticipate that we will retain all of our earnings for use in the development of our business and do not anticipate paying any cash dividends in the foreseeable future. As a result, capital appreciation, if any, of our common stock would be the only source of gain for stockholders until dividends are paid, if at all.

**General Risk Factors**

***Litigation could have a material adverse impact on our results of operation and financial condition.***

In addition to intellectual property litigation, from time to time, we may be subject to other litigation. Regardless of the merits of any claims that may be brought against us, litigation could result in a diversion of management's attention and resources and we may be required to incur significant expenses defending against these claims. If we are unable to prevail in litigation, we could incur substantial liabilities. Where we can make a reasonable estimate of the liability relating to pending litigation and determine that it is probable, we record a related liability. As additional information becomes available, we assess the potential liability and revise estimates as appropriate. However, because of uncertainties relating to litigation, the amount of our estimates could be wrong.

***We or the third parties upon whom we depend may be adversely affected by natural or man-made disasters or public health emergencies, such as the COVID-19 pandemic.***

Our operations, and those of our clinical research organizations, contract manufacturing organizations, vendors of materials needed in manufacturing, collaboration partners, distributors and other third parties upon whom we depend, could be subject to fires, extreme weather conditions, earthquakes, power shortages, telecommunications failures, water shortages, floods, hurricanes, typhoons, war, political unrest, sabotage or terrorism and other natural or man-made disasters, as well as public health emergencies, such as the COVID-19 pandemic. The occurrence of any of these business disruptions could prevent us from using all or a significant portion of our facilities and it may be difficult or impossible for us to continue certain activities for a substantial period of time. The disaster recovery and business continuity plans we have in place may prove inadequate in the event of a serious disaster or similar event and we may incur substantial expenses and delays as a result. Our ability to manufacture our product candidates and obtain necessary clinical supplies for our product candidates could be disrupted if the operations of our contract manufacturing organizations or suppliers are affected by a natural or man-made disaster, or a public health emergency.

***The outbreak of COVID-19 may materially and adversely affect our business and our financial results.***

The COVID-19 pandemic continues to present substantial global economic and public health challenges, which may materially and adversely impact our business, financial condition and results of operations. In response to COVID-19, various aspects of our business operations have been, and could continue to be, disrupted. We continue to implement a work from home policy, with our administrative employees working outside of our offices, and on-site staff restricted to only those required to execute certain laboratory and related support activities. Working remotely could increase our cybersecurity risk, create data accessibility concerns, and make us more susceptible to communication disruptions, any of which could adversely impact our business operations. In addition, as a result of state or local restrictions, our on-site staff conducting research and development may not be able to access our laboratories, and these core activities may be significantly limited or curtailed, possibly for extended periods of time. Travel restrictions and other governmental measures may also result in a disruption or delay in the performance of our third-party contractors and suppliers. If such third parties are unable to adequately satisfy their contractual commitments to us in a timely manner, our business could be adversely affected. Furthermore, while some jurisdictions have recently started to phase out restrictions imposed on commercial activities at varying degrees, a resurgence of COVID-19, coupled with a potential surge in variant strains of COVID-19, in certain geographies could result in restrictions being reinstated.

Our clinical trials, whether planned or ongoing, may be affected by the COVID-19 pandemic. Study procedures (particularly any procedures that may be deemed non-essential), site initiation, participant recruitment and enrollment, participant dosing, shipment of our product candidates, distribution of clinical trial materials, study monitoring, site inspections and data analysis may be paused or delayed due to changes in hospital or research institution policies, federal, state or local

Table of Contents

regulations, prioritization of hospital and other medical resources toward efforts to treat or prevent COVID-19, or other reasons related to the pandemic. In addition, there could be a potential effect of COVID-19 to the operations of the FDA or other health authorities, which could result in delays of reviews and approvals, including with respect to our product candidates. Any prolongation or de-prioritization of our clinical trials or delay in regulatory review resulting from such disruptions could materially affect the development and study of our product candidates.

The trading prices for our common stock and that of other biopharmaceutical companies have been highly volatile due to the COVID-19 pandemic, especially as a result of investor concerns and uncertainty related to the impact of the outbreak on the economies of countries worldwide. These broad market and industry fluctuations, as well as general economic, political and market conditions, may negatively impact the market price of shares of our common stock.

The COVID-19 pandemic continues to rapidly evolve. The extent to which the outbreak impacts our business, preclinical studies and clinical trials will depend on future developments, which are highly uncertain and cannot be predicted with confidence, such as the ultimate geographic spread of the disease, the emergence of variant strains, the duration of the pandemic, travel restrictions and social distancing in the U.S. and other countries, business closures or business disruptions and the effectiveness of actions taken in the U.S. and other countries to contain and treat the disease.

***The United Kingdom's withdrawal from the European Union could result in increased regulatory and legal complexity, which may make it more difficult for us to do business in the UK and/or Europe and impose additional challenges in securing regulatory approval of our product candidates in the UK and/or Europe.***

The United Kingdom's exit from the European Union as of January 31, 2020, with a transitional period up to December 31, 2020, commonly referred to as "Brexit", has caused political and economic uncertainty, including in the regulatory framework applicable to our operations and vaccine candidates in the United Kingdom and the European Union, and this uncertainty may persist for years. Brexit could, among other outcomes, disrupt the free movement of goods, services and people between the United Kingdom and the European Union, and result in increased legal and regulatory complexities, as well as potential higher costs of conducting business in Europe. As one of the Brexit consequences, the EMA has relocated from the United Kingdom to the Netherlands. This has led to a significant reduction of the EMA workforce, which has resulted and could further result in significant disruption and delays in its administrative procedures, such as granting clinical trial authorization or opinions for marketing authorization, disruption of importation and export of active substance and other components of new drug formulations, and disruption of the supply chain for clinical trial product and final authorized formulations. As any European Union marketing authorization for NVX-CoV2373 would be issued after January 1, 2021, if at all, it would not be grandfathered in the UK. We therefore must seek to obtain a separate marketing authorization for the UK, increasing our regulatory burden.

The cumulative effects of the disruption to the regulatory framework may add considerably to the development lead time to marketing authorization and commercialization of products in the European Union and/or the United Kingdom. It is possible that there will be increased regulatory complexities, which can disrupt the timing of our clinical trials and regulatory approvals. In addition, changes in, and legal uncertainty with regard to, national and international laws and regulations may present difficulties for our clinical and regulatory strategy. Any delay in obtaining, or an inability to obtain, any marketing approvals, as a result of Brexit or otherwise, would prevent us from commercializing our product candidates in the United Kingdom and/or the European Union and restrict our ability to generate revenues and achieve and sustain profitability.

In addition, as a result of Brexit, other European countries may seek to conduct referenda with respect to their continuing membership with the European Union. Given these possibilities and others we may not anticipate, as well as the absence of comparable precedent, it is unclear what financial, regulatory and legal implications the withdrawal of the United Kingdom from the European Union will have, how such withdrawal will affect us, and the full extent to which our business could be adversely affected.

***We are increasingly a target for public scrutiny, and our business may be impacted by unfavorable publicity.***

Given that COVID-19 represents an unprecedented urgent public health crisis, that we are developing NVX-CoV2373 as a COVID-19 vaccine candidate, and that we have received significant funding from the U.S. and foreign governments and other sources to support the development and potential commercialization of NVX-CoV2373, we have observed and are likely to continue to face significant public attention and scrutiny over the complex decisions we have made and will be making regarding the development, testing, manufacturing, allocation and pricing of NVX-CoV2373. If we are unable to successfully manage these risks, we could face significant reputational harm, which could negatively affect our stock price. The intense public interest, including speculation by the media, in the development of NVX-CoV2373 has caused significant volatility in our stock price, which we expect to continue as data and other information from our ongoing clinical trials become publicly available. If concerns should arise about the actual or anticipated efficacy or safety of any of our product candidates, such concerns could adversely affect the market's perception of these candidates, which could lead to a decline in investors' expectations and a decline in the price of our common stock.

Table of Contents

***The increasing use of social media platforms presents new risks and challenges to our business.***

Social media is increasingly being used to communicate about pharmaceutical companies' research, product candidates, and the diseases such product candidates are being developed to prevent. Social media practices in the pharmaceutical industry continue to evolve and regulations relating to such use are not always clear. This evolution creates uncertainty and risk of noncompliance with regulations applicable to our business, resulting in potential regulatory actions against us. For example, subjects may use social media channels to comment on their experience in an ongoing blinded clinical trial or to report an alleged adverse event. When such events occur, there is a risk that we fail to monitor and comply with applicable adverse event reporting obligations or we may not be able to defend our business or the public's legitimate interests in the face of the political and market pressures generated by social media due to restrictions on what we may say about our investigational product candidates. There is also a risk of inappropriate disclosure of sensitive information or negative or inaccurate posts or comments about us on any social media or networking website. If any of these events were to occur or we otherwise fail to comply with applicable regulations, we could incur liability, face regulatory actions, or incur reputational or other harm to our business.

Table of Contents

**Item 6. Exhibits**

| | |
|---|---|
| 3.1 | Second Amended and Restated Certificate of Incorporation of the Registrant (Incorporated by reference to Exhibit 3.1 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2015, filed on August 10, 2015 (File No. 000-26770)) |
| 3.2 | Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation of the Registrant (Incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on May 9, 2019 (File No. 000-26770)) |
| 3.3 | Amended and Restated By-Laws of the Registrant (Incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on June 24, 2021 (File No. 000-26770)) |
| 3.4 | Certificate of Designation of Series A Convertible Preferred Stock of the Registrant (Incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed June 19, 2020 (File No. 000-26770)) |
| 10.1* | Employment Agreement, dated April 12, 2021, between Novavax, Inc. and Gregory F. Covino |
| 10.2* | Form of Amendment to Employment Agreement, dated June 17, 2021, between Novavax, Inc. and each of Stanley C. Erck, Gregory M. Glenn, John J. Trizzino and John A. Herrmann, III |
| 10.3 | Amended and Restated Novavax, Inc. 2015 Stock Incentive Plan (Incorporated by reference to Appendix A of the Registrant's Definitive Proxy Statement filed on May 3, 2021 in connection with the Annual Meeting held on June 17, 2021 (File No. 000-26770)) |
| 10.4* | Novavax, Inc. Amended and Restated Change in Control Severance Benefit Plan |
| 10.5*± | Advance Purchase Agreement, dated May 5, 2021, between Novavax, Inc. and the Gavi Alliance |
| 10.6*± | Modification No. 07 to Undefinitized Project Agreement No. 1, dated April 23, 2021, between Novavax, Inc. and Advanced Technology International |
| 10.7*± | Modification No. 08 to Undefinitized Project Agreement No. 1, dated June 4, 2021, between Novavax, Inc. and Advanced Technology International |
| 31.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14(a) or 15d-14(e) of the Securities Exchange Act |
| 31.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14(a) or 15d-14(e) of the Securities Exchange Act |
| 32.1* | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101 | The following financial information from our Quarterly Report on Form 10-Q for the quarter ended June 30, 2021, formatted in Inline Extensible Business Reporting Language (Inline XBRL): (i) the Consolidated Balance Sheets as of June 30, 2021 and December 31, 2020, (ii) the Consolidated Statements of Operations for the three- and six-month periods ended June 30, 2021 and 2020, (iii) the Consolidated Statements of Comprehensive Loss for the three- and six-month periods ended June 30, 2021 and 2020, (iv) the Consolidated Statements of Changes in Stockholders' Equity (Deficit) for the three- and six-month periods ended June 30, 2021 and 2020, (v) the Consolidated Statements of Cash Flows for the six-month period ended June 30, 2021 and 2020, and (vi) the Notes to Consolidated Financial Statements. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

_____

*Filed or furnished herewith.

± Certain portions of this exhibit have been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**NOVAVAX, INC.**

| | | |
|---|---|---|
| Date: August 5, 2021 | By: | /s/ Stanley C. Erck |
| | | Stanley C. Erck |
| | | President and Chief Executive Officer |
| | | (Principal Executive Officer) |
| | | |
| Date: August 5, 2021 | By: | /s/ John J. Trizzino |
| | | John J. Trizzino |
| | | Executive Vice President, Chief Commercial Officer, Chief Business Officer and Interim Chief Financial Officer |
| | | (Principal Financial and Accounting Officer) |

Exhibit 10.1

**EMPLOYMENT AGREEMENT**

This Employment Agreement (this "Agreement") between **Novavax, Inc.**, ("Novavax" or the "Company"), a Delaware corporation having its principal office at 21 Firstfield Road, Gaithersburg, MD 20878, and **Gregory Covino** ("Executive") and is effective as of April 13, 2021 (the "Effective Date"). As of the Effective Date, this Agreement amends and restates in its entirety the Employment Agreement between Novavax and Executive dated October 30, 2020.

WHEREAS, Executive had served as Executive Vice President & Chief Financial Officer of the Company;

WHEREAS, Executive resigned from his position as Executive Vice President & Chief Financial Officer of the Company on April 12, 2021; and

WHEREAS, the Company and Executive desire that Executive's employment with the Company will continue following the Effective Date on the terms and conditions set forth herein and hereby agree as follows:

1.**Employment**. The Company hereby continues to employ Executive and Executive hereby accepts such continued employment as an executive advisor to the Company upon the terms and conditions hereinafter set forth, effective as of the Effective Date. As used throughout this Agreement, "Company" shall mean and include any and all of its present and future subsidiaries and any and all subsidiaries of a subsidiary.

2.**Duties**. During the Term (as hereinafter defined), Executive shall devote his business time to the performance of services as an executive advisor, performing such services, assuming such duties and responsibilities as prescribed by the Company's Executive Vice President, Chief Commercial Officer, Chief Business Officer, and Interim Chief Financial Officer and/or the Company's President and CEO ("CEO"). During the Term, it is expected that, on average, Executive will work approximately thirty (30) hours per week and Executive shall devote such business time, attention and energies to the business of the Company and the duties which the Company shall assign to him from time to time consistent with the foregoing. Executive agrees to perform his services faithfully and to the best of his ability and to carry out the policies and directives of the Company. Notwithstanding the foregoing, it shall not be a violation of this Agreement for the Executive to serve as a director of any company whose products do not compete with those of the Company and to serve as a director, trustee, officer, or consultant to a charitable or non-profit entity; provided that such service does not adversely affect Executive's ability to perform his obligations hereunder. Executive agrees not to take any action that is in bad faith and prejudicial to the interests of the Company during his employment hereunder.

3.**Term**. The term of this Agreement shall be the period of time beginning on the Effective Date and shall continue for so long as Executive shall be an at-will employee of the Company hereunder (such term of employment, the "Term").

4.**Compensation**.

(a)**Base Compensation**. For all Executive's services and covenants under this Agreement, the Company shall pay Executive an annual salary, which is **$262,500** as of the

Effective Date, as established or ratified by the Board of Directors or an authorized committee thereof (in accordance with established management processes), and payable in accordance with the Company's payroll policy as constituted from time to time. The Company may withhold from any amounts payable under this Agreement all required federal, state, city or other taxes and all other deductions as may be required pursuant to any law or government regulation or ruling.

(b)**Bonus Program**. The Company agrees to pay the Executive a performance and incentive bonus in respect of Executive's employment with the Company each year in an amount determined by the CEO and Board of Directors (or any committee of the Board of Directors authorized to make that determination) to be appropriate based upon Executive's, and the Company's, achievement of certain specified goals, with a target bonus of **40%**, or any other percentage determined by the Board of Directors, of Executive's base salary during the year to which the bonus relates. The bonus shall be paid out partly in cash and partly in shares of stock options or restricted stock, at the discretion of the Board of Directors.

5.**Reimbursable Expenses**. Executive shall be entitled to reimbursement for reasonable expenses incurred by him in connection with the performance of his duties hereunder in accordance with such procedures and policies as the Company has heretofore or may hereafter establish. The amount of expenses eligible for reimbursement during any calendar year shall not affect the expenses eligible for reimbursement in any other calendar year, and the reimbursement of an eligible expense shall be made as soon as practicable after Executive submits the request for reimbursement, but not later than December 31 following the calendar year in which the expense was incurred.

**Benefits**. (a) Executive shall be entitled to fifteen (15) days of paid vacation time per year starting from the Effective Date, calculated and administered in accordance with Company policies for employees in effect from time to time. Executive shall be entitled to participate in the Company's benefit plans in accordance with the terms of such plans and with Company policies.

(b) Executive shall be entitled to participate in the Company's Change of Control Severance Benefit Plan adopted on August 10, 2005, as amended and restated on July 26, 2006 and as further amended on December 31, 2008 and June 15, 2011 (the "Change of Control Severance Benefit Plan").

6.**Termination of Employment**.

(a)Notwithstanding any other provision of this Agreement, Executive's employment may be terminated by either the Company or Executive, with or without notice. Upon such termination, except as provided for in the Change of Control Severance Benefit Plan, Executive shall only be entitled to any accrued but unpaid annual salary and accrued but unused vacation, which amounts shall be paid to Executive within thirty (30) days following the date of termination, and to reimbursement of business expenses as provided under Section 5 of this Agreement, so long as Executive submits the request for reimbursement within thirty (30) days following the date of termination.

7.**All Business to be Property of the Company; Assignment of Intellectual Property**.

(a)Executive agrees that any and all business of the Company from and after he commenced employment with the Company and all business developed by him or any other employee of the Company including without limitation all contracts, fees, commissions, compensation, records, customer or client lists, agreements and any other incident of any business developed, earned or carried on by Executive for the Company is and shall be the exclusive property of the Company, and (where applicable) shall be payable directly to the Company.

(b)Executive hereby acknowledges that any plan, method, data, know-how, research, information, procedure, development, invention, improvement, modification, discovery, design, process, software and work of authorship, documentation, formula, technique, trade secret or intellectual property right whatsoever or any interest therein whether patentable or non-patentable, patents and applications therefor, trademarks and applications therefor or copyrights and applications therefor (herein sometimes collectively referred to as "Intellectual Property") made, conceived, created, invested, developed, reduced to practice and/or acquired by Executive solely or jointly with others during the Term is the sole and exclusive property of the Company, as work for hire, and that he has no personal right in any such Intellectual Property. Executive hereby grants to the Company (without any separate remuneration or compensation other than that received by him from time to time in the course of him employment) his entire right, title and interest throughout the world in and to, all Intellectual Property, which is made, conceived, created, invested, developed, reduced to practice and/or acquired by him solely or jointly with others during the Term.

(c)Executive shall cooperate fully with the Company, both during and after his employment with or engagement by the Company, with respect to the procurement, maintenance and enforcement of copyrights, patents and other intellectual property rights (both in the United States and foreign countries) relating to Intellectual Property. Without limiting the foregoing, Executive agrees that to the extent copyrightable, any such original works of authorship shall be deemed to be "works for hire" and that the Company shall be deemed the author thereof under the U.S. Copyright Act, as amended, provided that in the event and to the extent such works are determined not to constitute "works for hire" as a matter of law, Executive hereby irrevocably assigns and transfers to the Company all right, title and interest in such works, including but not limited to copyrights thereof. Executive shall sign all papers, including, without limitation, copyright applications, patent applications, declarations, oaths, formal assignments, assignments of priority rights and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Intellectual Property (at the Company's expense) and agrees that these obligations are binding upon his assigns, executors, administrators and other legal representatives. To that end, Executive shall provide current contact information to the Company including, but not limited to, home address, telephone number and email address, and shall update his contact information whenever necessary.

8.**Confidentiality**. Executive acknowledges his continuing obligation of confidentiality with respect to all proprietary, confidential and non-public information of the

Company, including all Intellectual Property. By way of illustration, but not limitation, confidential and proprietary information shall be deemed to include any plan, method, data, know-how, research, information, procedure, development, invention, improvement, modification, discovery, process, work of authorship, documentation, formula, technique, product, idea, concept, design, drawing, specification, technique, trade secret or intellectual property right whatsoever or any interest therein whether patentable or non-patentable, patents and applications therefor, trademarks and applications therefor or copyrights and applications therefor, personnel data, records, marketing techniques and materials, marketing and development plans, customer names and other information related to customers, including prospective customers and contacts at customers, price lists, pricing policies and supplier lists of the Company, in each case coming into Executive's possession, or which Executive learns, or to which Executive has access, or which Executive may discover or develop (whether or not related to the business of the Company at the time this Agreement is signed or any information Executive originates, discovers or develops, in whole or in part) as a result of Executive's employment by (either full-time or part-time), or retention as a consultant of, the Company. Executive shall not, either during the Term or for a period of ten (10) years thereafter, use for any purpose other than the furtherance of the Company's business, or disclose to any person other than a person with a need to know such confidential, proprietary or non-public information for the furtherance of the Company's business who is obligated to maintain the confidentiality of such information, any information concerning any Intellectual Property, or other confidential, proprietary or non-public information of the Company, whether Executive has such information in his memory or such information is embodied in writing, electronic or other tangible form.

All originals and copies of any of the foregoing, however and whenever produced, shall be the sole property of the Company. All files, letters, memoranda, reports, records, data, sketches, drawings, program listings, or other written, photographic, or other tangible or electronic material containing confidential or proprietary information or Intellectual Property, whether created by Executive or others, which shall come into Executive's custody or possession, shall be and are the exclusive property of the Company to be used by Executive only in the performance of his duties for the Company. All electronic material containing confidential or proprietary information or Intellectual Property will be stored on a computer supplied to Executive by the Company and, under no circumstances, will it be transferred to a personal computer. Executive will promptly deliver to the Company and/or a person or entity identified by the Company all such materials or copies of such materials and all tangible property of the Company in Executive's custody or possession, upon the earlier of (i) a request by the Company or (ii) termination of employment or engagement by the Company. After such delivery, Executive will not retain any such materials or copies or any such tangible property or any summaries or memoranda regarding same.

Executive and the Company are of the belief that the period of time and the area herein specified are reasonable in view of the nature of the business in which the Company is engaged and proposes to engage, the state of its business development and Executive's knowledge of this business; however, if such period or such area should be adjudged unreasonable in any judicial proceeding, then the period of time shall be reduced by such number of months or such area shall be reduced by elimination of such portion of such area, or both, as are deemed unreasonable, so that this covenant may be enforced in such area and during such period of time as is adjudged to be reasonable.

9.**Non-Solicitation Agreement**. Executive agrees and covenants that he will not, unless acting with the Company's express written consent, directly or indirectly, during the Term or during the Non-Competition Period (as defined in Section 9 above) solicit, entice or attempt to entice away or interfere in any manner with the Company's relationships or proposed relationships with any customer, officer, employee, consultant, proposed customer, vendor, supplier, proposed vendor or supplier or person or entity or person providing or proposed to provide research and/or development services to, on behalf of or with the Company.

10.**Notices**. All notices and other communications hereunder shall be in writing and shall be deemed to have been given on actual receipt after having been delivered by hand, mailed by first class mail, postage prepaid, or sent by Federal Express or similar overnight delivery services, as follows: (a) if to Executive, at the address most recently on file with the Company, or to such other person(s) or address(es) as Executive shall have furnished to the Company in writing and, if to the Company, to John A. Herrmann, III, Esq., Senior Vice President, General Counsel and Corporate Secretary, 21 Firstfield Road, Gaithersburg, MD 20878 or to such other person(s) or address(es) as the Company shall have furnished to Executive in writing.

11.**Assignability**. In the event of a change of control (as defined in the Company's Change of Control Severance Benefit Plan), the terms of this Agreement shall inure to the benefit of, and be assumed by, the acquiring person (as defined in the Company's Change of Control Severance Benefit Plan). This Agreement shall not be assignable by Executive, but it shall be binding upon his heirs, executors, administrators and legal representatives.

12.**Entire Agreement**. This Agreement along with (a) the Offer Letter to Executive from the Company dated October 23, 2020, and (b) with the Non-Disclosure, Proprietary Information and Invention Assignment Agreement previously executed by Executive contain the entire agreement between the Company and Executive with respect to the subject matter hereof and there have been no oral or other prior agreements of any kind whatsoever as a condition precedent or inducement to the signing of this Agreement or otherwise concerning this Agreement or the subject matter hereof. Notwithstanding the foregoing, Executive acknowledges his continued obligation to comply at all times with the Company's policies affecting employees, including the Company's published Code of Business Ethics, as in effect from time to time.

13.**Equitable Relief**. Executive recognizes and agrees that the Company's remedy at law for any breach of the provisions of Sections 7, 8, 9 or 10 hereof would be inadequate, and he agrees that for breach of such provisions, the Company shall, in addition to such other remedies as may be available to it at law or in equity or as provided in this Agreement, be entitled to injunctive relief and to enforce its rights by an action for specific performance. Should Executive engage in any activities prohibited by this Agreement, he agrees to pay over to the Company all compensation, remuneration or monies or property of any sort received in connection with such activities; such payment shall not impair any rights or remedies of the Company or obligations or liabilities of Executive which such parties may have under this Agreement or applicable law.

14.**Amendments**. This Agreement may not be amended, nor shall any change, waiver, modification, consent or discharge be effected except by written instrument executed by the Company and Executive.

15.**Severability**. If any part of any term or provision of this Agreement shall be held or deemed to be invalid, inoperative or unenforceable to any extent by a court of competent jurisdiction, such circumstances shall in no way affect any other term or provision of this Agreement, the application of such term or provision in any other circumstances, or the validity or enforceability of this Agreement. Executive agrees that the restrictions set forth in Sections 7, 9, 9 and 10 above (including, but not limited to, the geographical scope and time period of restrictions) are fair and reasonable and are reasonably required for the protection of the interests of the Company and its affiliates. In the event that any provision of Section 9 or 10 relating to time period and/or areas of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time period or areas such court deems reasonable and enforceable, said time period and/or areas of restriction shall be deemed to become and thereafter be the maximum time period and/or areas which such court deems reasonable and enforceable.

16.**Paragraph Headings**. The paragraph headings used in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation hereof.

17.**Governing Law**. This Agreement shall be governed by and construed and enforced in accordance with the law of the State of Maryland, without regard to the principles of conflict of laws thereof.

18.**Resolution of Disputes**. With the exception of proceedings for equitable relief brought pursuant to Section 14 of this Agreement, any disputes arising under or in connection with this Agreement including, without limitation, any assertion by any party hereto that the other party has breached any provision of this Agreement, shall be resolved by arbitration, to be conducted in Baltimore, Maryland, in accordance with the rules and procedures of the American Arbitration Association. The parties shall bear equally the cost of such arbitration, excluding attorneys' fees and disbursements which shall be borne solely by the party incurring the same; provided, however, that if the arbitrator rules in favor of Executive on at least one material component of the dispute, Company shall be solely responsible for the payment of all costs, fees and expenses (including without limitation Executive's reasonable attorneys' fees and disbursements) of such arbitration. The Company shall reimburse Executive for any such fees and expenses incurred by Executive in any calendar year within a reasonable time following Executive's submission of a request for such reimbursement, which in no case shall be later than the end of the calendar year following the calendar year in which such expenses were incurred. Executive shall submit any such reimbursement request no later than the June 30th next following the calendar year in which the fees and expenses are incurred. In the event the arbitrator rules against Executive, Executive shall repay the Company the amount of such reimbursed expenses no later than 180 days following the date as of which such arbitrator's decision becomes final. The provisions of this Section 19 shall survive the termination for any reason of the Term (whether such termination is by the Company, by Executive or upon the expiration of the Term).

19.**Survival**. Sections 7 through 18 shall survive termination of this Agreement for the period and to the extent specified therein.

IN WITNESS WHEREOF, the parties have executed or caused to be executed under seal this Agreement as of the date first above written.

NOVAVAX, INC.


By:_/s/ Joh A. Herrmann III
Name: John A. Herrmann III
Title: Executive Vice President & Chief Legal Officer



EXECUTIVE:

/s/ Gregory F. Covino

Gregory Covino

Exhibit 10.2

## AMENDMENT TO EMPLOYMENT AGREEMENT

This Amendment to Employment Agreement (this "Amendment") amends the Employment Agreement between Novavax, Inc. (the "Company") and [_____] (the "Executive"), dated as of [_____] (the "Employment Agreement"). This Amendment shall be effective as of [_____], 2021 (the "Effective Date"). All capitalized terms used in this Amendment shall have the meanings ascribed to them in the Employment Agreement unless otherwise expressly provided herein.

In consideration of the mutual covenants contained herein and intending to be legally bound hereby, the parties hereto desire, as of the Effective Date, to amend the Employment Agreement on the terms set forth in this Amendment.

1.Section 8(a) of the Employment Agreement is hereby deleted in its entirety and replaced with the following:

"Subject to the Executive's execution and delivery to the Company of the Company's standard form of Separation and Release Agreement, the Company shall pay or provide the Executive with the Separation Pay as defined herein, upon the occurrence of the applicable Separation Event, as defined below. The Separation Pay shall be paid in a single lump sum as soon as administratively practicable following the date the Separation and Release Agreement becomes effective, but not later than the date that is sixty (60) days following the Separation Event. 'Separation Pay' shall mean (i) an amount equal to [ ] months of the Executive's then effective base salary and (ii) an amount equal to one hundred percent (100%) of the monthly COBRA premiums, including the two percent (2%) administration fee, as in effect as of the date of termination for the Company's group medical, dental, vision and hospitalization insurance benefits in which the Executive is enrolled as of the date of termination for the Executive and his or her eligible dependents for [ ] months, subject to the Executive's timely and proper election of coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ('COBRA'). The Separation Pay shall be subject to withholding of all applicable federal, state and local taxes and any other deductions required by applicable law."

2.Section [8(b)] [8(c)] of the Employment Agreement is hereby deleted in its entirety and replaced with the following:

"Reserved."

3.Except as expressly modified herein, the Employment Agreement, and all of its terms and provisions, shall remain in full force and effect. This Amendment embodies the entire agreement between the parties with respect to amending the Employment Agreement and supersedes all prior communications, agreements and understandings, whether written or oral, with respect to the same. This Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument. This Amendment may not be

amended, nor shall any change, waiver, modification, consent or discharge be effected, except by a written instrument executed by the Company and the Executive. This Amendment shall be governed by and construed and enforced in accordance with the law of the State of Delaware, without regard to the principles of conflict of laws thereof.

*[Remainder of page intentionally left blank.]*

2

IN WITNESS WHEREOF, the parties have executed or caused to be executed under seal this Amendment as of the date first above written.

NOVAVAX, INC.

By:
Name:
Title:

Accepted and agreed:

Signature: _____
[Executive Name]

Date: _____

3

Exhibit 10.4

**NOVAVAX, INC.**

**AMENDED AND RESTATED CHANGE IN CONTROL SEVERANCE BENEFIT PLAN**

**Amended and Restated Effective June 17, 2021**

**Section 1.Introduction.**

The **Novavax, Inc. Amended and Restated Change in Control Severance Benefit Plan** (the "**Plan**") was originally approved by the Board of Directors (the "**Board**") of Novavax, Inc. (the "**Company**"), and became effective, on August 10, 2005, and was subsequently amended and restated on July 26, 2006, December 31, 2008 and June 15, 2011. The Board approved an amendment and restatement of the Plan as set forth herein, effective June 17, 2021 (the "**Effective Date**"). The purpose of the Plan is to provide severance benefits to certain eligible employees of the Company in the event of their termination of employment under certain circumstances in connection with a Change in Control. This Plan document is also the Summary Plan Description for the Plan. Nothing in the Plan will be construed to give any employee the right to receive severance payments or benefits upon a termination of employment, except as expressly provided in and subject to the conditions set forth in the Plan. The Plan is unfunded and is intended to be an "employee welfare benefit plan" (within the meaning of Section 3(1) of the Employee Retirement Security Act of 1974, as amended ("**ERISA**")), maintained for the purpose of providing benefits to a select group of management or highly compensated employees and shall be administered and construed accordingly. The Plan is intended to ensure that the severance benefits payable under the plan are exempt from or compliant with the requirements of Section 409A.

Certain capitalized terms used in the Plan are defined in Section 6.

**Section 2.Eligibility for Benefits.**

**(a)**Subject to the requirements set forth in this Section 2, the Company shall grant benefits under the Plan to Eligible Employees. "**Eligible Employees**" include all employees of the Company at the level of Executive Vice President or above. At any time, the Plan Administrator may select additional employees to be designated as Eligible Employees.

**(b)**Subject to Section 2(c)(ii), if (i) an Eligible Employee's employment with the Company terminates due to an Involuntary Termination (for the avoidance of doubt, other than due to the Eligible Employee's death or Disability), or as a result of a Constructive Termination, which in either case occurs: (A) within the one year period prior to the consummation of a Change in Control, but after the first date on which the Board and/or senior management of the Company has entered into formal negotiations with a potential acquirer that results in the consummation of a Change in Control, or (B) during such Eligible Employee's Tail Period, and, in either case, during the term of the Plan as specified in Section 5(b) and (ii) the Eligible Employee executes a general waiver and release of all claims against the Company and its Affiliates and their representatives on a form satisfactory to the Company in accordance with the provisions of Section 4 (a "**Qualifying Termination**"), the Eligible Employee will be eligible for severance payments and benefits as set forth in the Plan.

1

Exhibit 10.4

**(c)Exceptions.** Notwithstanding the foregoing:

**(i)**Change in Control severance payments and benefits provided under the Plan will be in lieu of any severance payments and benefits provided under any individual employment contract or agreement between the Eligible Employee and the Company to the extent the payments or benefits provided hereunder are greater than those provided in such employment contract or agreement (unless expressly provided otherwise by the Plan Administrator in a manner that does not violate the requirements of Section 409A of the Code), it being understood that, in the event an Eligible Employee's employment terminates under circumstances entitling such Eligible Employee to severance under his or her employment contract or agreement and a Change in Control occurs within one year after such termination (but after the first date on which the Board and/or senior management of the Company has entered into formal negotiations with a potential acquirer that results in the consummation of a Change in Control), subject to the terms and conditions of the Plan, the Eligible Employee will be eligible to receive such greater or additional benefits provided hereunder, but without duplication.

**(ii)**An Eligible Employee shall not be eligible to receive benefits under the Plan (and the Eligible Employee's participation in the Plan shall terminate) if employment was terminated:

•by the Company for Cause at any time;

•voluntarily by the Eligible Employee other than a Constructive Termination;

•for any reason, whether initiated by the Eligible Employee or the Company, after expiration of the Eligible Employee's Tail Period;

•for any reason before the first date on which the Board and/or senior management of the Company has entered into formal negotiations with a potential acquirer of the Company's business; or

•for any reason, more than one year before the date of the consummation of a Change in Control.

**Section 3.Amount and Type of Benefits; Limitations and Exceptions.**

**(a)**Benefits payable under the Plan to an Eligible Employee are as follows and are subject to the following limitations and exceptions:

**(i)**The Company shall pay to the Eligible Employee an amount, in a single cash payment, equal to the sum of (A) any Accrued Compensation, (B) the Eligible Employee's Pay for the number of months in the Eligible Employee's Severance Benefit Period, as set forth on Exhibit A and (C) the Eligible Employee's Bonus Amount, multiplied by a fraction, the numerator of which is the number of months in the Eligible Employee's Severance Benefit Period and the denominator of which is twelve. In the case of an Eligible Employee whose Qualifying Termination precedes a Change in Control, the amount payable to the Eligible Employee pursuant to this Section 3(a)(i) shall be reduced by any severance payments or benefits provided as of the date of the Change in Control pursuant to the Eligible Employee's

2

Exhibit 10.4

employment agreement or contract with the Company and, for the avoidance of doubt, no further payments under such employment agreement or contract will be made to the Eligible Employee.

**(ii)** The Company shall pay to the Eligible Employee an amount equal to the number of months in the Eligible Employee's Severance Benefit Period, as set forth on Exhibit A, multiplied by one hundred percent (100%) of the monthly COBRA premiums, including the two percent (2%) administration fee, as in effect as of the Termination Date for the Company's group medical, dental, vision and hospitalization insurance benefits for the Eligible Employee and his or her eligible dependents in which the Eligible Employee is enrolled as of the Termination Date to the extent the Eligible Employee timely and properly elects coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"). If an Eligible Employee whose Qualifying Termination precedes a Change in Control did not timely elect COBRA coverage prior to becoming eligible for benefits under the Plan, no payments described in this Section 3(a)(ii) will be made by the Company under the Plan.

**(iii)** Notwithstanding any provision in any equity or equity-based award agreement to the contrary, all equity or equity-based awards, the vesting of which is based only on the passage of time ("**Time-Based Awards**"), held by the Eligible Employee that are outstanding immediately prior to the Termination Date will become fully vested and will remain exercisable, as applicable, for a number of months equal to the number of months in the Severance Benefit Period (or for the original term of the equity award, if shorter). Unless otherwise determined by the Plan Administrator, all equity or equity-based awards, the vesting of which is based on the satisfaction of specified performance criteria ("**Performance-Based Awards**"), held by the Eligible Employee that are outstanding immediately prior to the Termination Date will become vested as to the number of shares (or units with respect to shares) that would have vested based on the greater of (A) assumed achievement of the applicable performance goals at the target level of performance and (B) actual achievement of the applicable performance goals through the date of the Change in Control, as determined by the Board or the Compensation Committee of the Board, in either case determined as if any applicable service-based vesting requirement had been met and such Performance-Based Awards will remain exercisable, as applicable, for a number of months equal to the number of months in the Severance Benefit Period (or for the original term of the equity award, if shorter). For the avoidance of doubt, any portion of such outstanding Performance-Based Award that fails to vest on the Termination Date pursuant to the preceding sentence shall be immediately forfeited without consideration therefor. Prior to a Change in Control, in the event of the termination of an Eligible Employee's employment that constitutes an Involuntary Termination or a Constructive Termination meeting the requirements hereunder, any equity or equity-based awards that would otherwise be forfeited upon such Termination Date shall not be forfeited, shall remain outstanding at their vested percentages as of such Termination Date and, to the extent unvested as of such Termination Date, shall be eligible to vest in full (in the case of Time-Based Awards) or at the greater of target or actual achievement of the applicable performance goals (in the case of Performance-Based Awards) in the event a Change in Control occurs within the one-year period following such Involuntary Termination or Constructive Termination.

**(b)** All fringe benefits not otherwise covered by the Plan (including, but not limited to, pension/retirement, life insurance, disability coverage and other welfare benefits) shall

3

Exhibit 10.4

terminate as of the employee's Termination Date (except to the extent that the specific plans or programs provide for extended coverage or if any conversion privilege is available thereunder).

(c)Notwithstanding anything to the contrary in the Plan, if any payment or benefit that an Eligible Employee may receive, whether or not payable or provided under the Plan ("**Payment**"), would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code, and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "**Excise Tax**"), then such Payment shall be reduced to the Reduced Amount. The "**Reduced Amount**" shall be either (A) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax or (B) the largest portion, up to and including the total amount, of the Payment, whichever of the amounts determined under (A) and (B), after taking into account all applicable federal, state and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in the Eligible Employee's receipt, on an after-tax basis, of the greater amount of the Payment notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in payments or benefits constituting "parachute payments" is necessary so that the Payment equals the Reduced Amount, reduction shall occur in the following order: reduction of cash payments; reduction of employee benefits; and cancellation of accelerated vesting of outstanding equity awards. In the event that acceleration of vesting of outstanding equity awards is to be reduced, such acceleration of vesting shall be undertaken in the reverse order of the date of grant of the Eligible Employee's outstanding equity awards. All calculations and determinations made pursuant this Section 3(c) will be made by an independent accounting or consulting firm or independent tax counsel appointed by the Company (the "**Tax Counsel**") whose determinations shall be conclusive and binding on the Company and the Eligible Employee for all purposes. For purposes of making the calculations and determinations required by this Section 3(c), the Tax Counsel may rely on reasonable, good faith assumptions and approximations concerning the application of Section 280G of the Code and Section 4999 of the Code. The Company shall bear all costs the Tax Counsel may reasonably incur in connection with its services.

(d)Any provisions contained in the Company's equity plans, or contained in an Eligible Employee's individual equity or equity-based award agreement with the Company, regarding the accelerated vesting or exercisability of equity or equity-based awards upon a Change in Control shall continue to apply to the extent such equity plan or equity or equity-based award agreement contains more favorable terms and may be supplemented by, but shall not be superseded by, the terms of the Plan.

**Section 4.Time of Payment and Form of Benefit; Indebtedness.**

(a)Cash benefits under the Plan, less applicable tax withholdings, shall be paid to an Eligible Employee in a lump sum. The provision of severance payments and benefits (including accelerated vesting of equity or equity-based awards) under the Plan (for the avoidance of doubt, other than Accrued Compensation) is conditioned on the Eligible Employee signing a general waiver and release of claims in the form provided by the Company (the "**Release**") following termination of his or her employment within a period of time not to exceed forty-five (45) days from the date the Eligible Employee receives the Release and on the Eligible Employee not revoking the Release within the revocation period provided therein following his or her

4

Exhibit 10.4

execution of the Release. Any payment under Section 3(a)(i) or Section 3(a)(ii) hereof will be due and payable as soon as administratively practicable following the date the Release becomes effective, but not later than the date that is sixty (60) days following the later of the Termination Date or the Change in Control. For the avoidance of doubt, if the Eligible Employee does not execute the Release within the period specified in this Section 4(a) or if the Eligible Employee revokes the Release within the time period permitted by law, the Eligible Employee will not be entitled to any severance payments or benefits (including the accelerated vesting and extended exercisability of equity or equity-based awards) set forth in Section 3(a), any equity or equity-based awards that vested on account of such termination as provided herein will be cancelled for no consideration due to the Eligible Employee, and neither the Company nor any of its Affiliates will have any further obligations to the Eligible Employee under the Plan or otherwise.

**(b)**If an Eligible Employee is indebted to the Company at his or her payment date, the Company reserves the right to offset any payments under the Plan by the amount of such indebtedness.

**Section 5.Right to Interpret Plan; Amendment and Termination; Binding Nature of Plan.**

**(a)Exclusive Discretion.** The Plan Administrator shall have the exclusive discretion and authority to establish rules, forms, and procedures for the administration of the Plan, and to construe and interpret the Plan and to decide any and all questions of fact, interpretation, definition, computation or administration arising in connection with the operation of the Plan, including, but not limited to, the eligibility to participate in the Plan and the amount of benefits paid under the Plan. The rules, interpretations, computations and other actions of the Plan Administrator shall be binding and conclusive on all persons.

**(b)Term of Plan; Amendment or Termination.**

**(i)**The Plan Administrator reserves the right to amend or modify the terms of the Plan or the benefits provided hereunder at any time, provided, however, that any such amendment or modification that diminishes or otherwise adversely affects the rights or benefits of an Eligible Employee under the Plan shall only become effective upon the written consent of any such affected Eligible Employee. The Plan Administrator may terminate the Plan at any time with the written consent of the Eligible Employees, or may terminate a particular Eligible Employee's participation in the Plan or entitlement to benefits with the written consent of such Eligible Employee; provided, however, that during the twenty-four (24)-month period following the consummation of a Change in Control, (a) the Plan may not be terminated and (b) the Plan may not be amended if such amendment would in any manner be adverse to the interests of an Eligible Employee. Notwithstanding the above, the Plan may be terminated by the Plan Administrator in its discretion, without the consent of any Eligible Employee, at any time after the expiration of each Eligible Employee's Tail Period, provided that all unpaid severance benefits related to such Change in Control have been paid to Eligible Employees whose Termination Date occurred prior to the termination of the Plan.

**(ii)**Eligible Employees shall have the right to be promptly notified that any action amending or terminating the Plan has been taken.

5

Exhibit 10.4

**(c)Binding Effect on Successor to Company.** The Plan shall be binding upon any successor or assignee, whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all the business or assets of the Company, or upon any successor to the Company as the result of a Change in Control, and any such successor or assignee shall be required to perform the Company's obligations under the Plan, in the same manner and to the same extent that the Company would be required to perform if no such succession or assignment or Change in Control had taken place. In such event, the term "Company," as used in the Plan, shall mean the Company as hereinafter defined and any successor or assignee as described above which by reason hereof becomes bound by the terms and provisions of the Plan, and the term "Board" shall refer to the Board of Directors of any such surviving or continuing entity.

## Section 6.Definitions.

Capitalized terms used in the Plan, unless defined elsewhere in the Plan, shall have the following meanings:

**(a)Accrued Compensation** means an amount which includes all amounts earned or accrued through the Termination Date but not paid as of the Termination Date, including (i) Pay, (ii) reimbursement for reasonable and necessary expenses incurred by the Eligible Employee on behalf of the Company during the period ending on the Termination Date, (iii) unused vacation pay, and (iv) any earned but unpaid bonuses and incentive compensation as of the Termination Date (but not including the Bonus Amount payable pursuant to Section 3(a)(i)(C)).

**(b)Affiliate** means any parent corporation or subsidiary corporation of the Company, whether now or hereafter existing, as those terms as defined in Sections 424(e) and (f), respectively, of the Code.

**(c)Bonus Amount** means one hundred percent (100%) of the target annual performance bonus amount that an Eligible Employee is eligible to receive for the period that includes the Termination Date. If an Eligible Employee's bonus is calculated on a monthly or quarterly basis, the maximum bonus award for these purposes shall be the amount determined by annualizing the maximum monthly or quarterly payment.

**(d)Cause** shall have the meaning set forth in an employment agreement between the Eligible Employee and the Company as in effect as of the Termination Date or, if no such agreement exists, (i) conviction of, a guilty plea with respect to, or a plea of *nolo contendere* to a charge that the Eligible Employee has committed a felony under the laws of the United States or of any state or a crime involving moral turpitude, including, but not limited to, fraud, theft, embezzlement or any crime that results in or is intended to result in personal enrichment at the expense of the Company; (ii) material breach of any agreement entered into between the Eligible Employee and the Company that impairs the Company's interest therein; (iii) willful misconduct, significant failure to perform the Eligible Employee's duties, or gross neglect by the Eligible Employee of the Eligible Employee's duties; or (iv) engagement in any activity that constitutes a material conflict of interest with the Company. The Eligible Employee shall be considered to have been discharged "for cause" if the Plan Administrator determines, within thirty (30) days after the termination of the Eligible Employee's employment or other service relationship with the Company for any other purported reason, that discharge for cause was warranted.

6

Exhibit 10.4

**(e)Change in Control** means (i) a sale, lease, license or other disposition of all or substantially all of the assets of the Company, (ii) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, in which the shares held immediately after such consolidation, merger or reorganization by the shareholders of the Company immediately prior to such consolidation, merger or reorganization, represent less than fifty percent (50%) of the outstanding voting power of the surviving entity and its parent following the consolidation, merger or reorganization, or (iii) any transaction or series of related transactions involving a person or entity, or a group of affiliated persons or entities (but excluding any employee benefit plan or related trust sponsored or maintained by the Company or an Affiliate) in which such persons or entities that were not shareholders of the Company immediately prior to their acquisition of Company securities as part of such transaction become the owners, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities other than by virtue of a merger, consolidation or similar transaction and other than as part of a private financing transaction by the Company, or (iv) a Change in the Incumbent Board. For purposes of the Plan, a Change in the Incumbent Board shall occur if the existing members of the Board on the date the Plan is initially adopted by the Board (the "**Incumbent Board**") cease to constitute at least a majority of the members of the Board, provided, however, that any new Board member shall be considered a member of the Incumbent Board for this purpose if the appointment or election (or nomination for such election) of the new Board member was approved or recommended by a majority vote of the members of the Incumbent Board who are then still in office.

**(f)Code** means the Internal Revenue Code of 1986, as amended.

**(g)Company** means Novavax, Inc., a Delaware corporation, and any successor as provided in Section 5(c) hereof.

**(h)Constructive Termination** means a resignation by an Eligible Employee due the occurrence of any of the events or conditions set forth in this Section 6(h) without the consent of the Eligible Employee if (x) the Eligible Employee has given written notice to the Company of the event or condition giving rise to the purported Constructive Termination no later than ninety (90) days following the occurrence of the event or condition, (y) the Company has not remedied the condition within thirty (30) days following receipt of such notice and (z) the Eligible Employee terminates employment within thirty (30) days thereafter if the Company fails to remedy the condition.

**(i)**a change in the Eligible Employee's position or responsibilities (including reporting responsibilities) which represents a material adverse change from the Eligible Employee's position or responsibilities as in effect immediately preceding the change; the assignment to the Eligible Employee of any duties or responsibilities which are materially and adversely inconsistent with the Eligible Employee's position or responsibilities as in effect immediately preceding such assignment; in each case, except in connection with the termination of the Eligible Employee's employment by the Company for Cause or the termination of an Eligible Employee's employment due to the Eligible Employee's Disability or death, or a voluntary termination by the Eligible Employee other than as a result of a Constructive Termination;

Exhibit 10.4

**(ii)** a material reduction in the Eligible Employee's Pay or any material failure to pay the Eligible Employee any compensation or benefits to which the Eligible Employee is entitled within five (5) days of the date due;

**(iii)** the Company's requiring the Eligible Employee to relocate his or her principal worksite to any place outside a fifty (50) mile radius of the Eligible Employee's current worksite, except for reasonably required travel on the business of the Company or its Affiliates which is not materially greater than such travel requirements prior to the Change in Control;

**(iv)** the failure by the Company to continue in effect (without reduction in benefit level and/or reward opportunities) any material compensation or employee benefit plan in which the Eligible Employee was participating immediately preceding such discontinuation, unless such plan is replaced with a plan that provides substantially equivalent compensation or benefits to the Eligible Employee;

**(v)** any material breach by the Company of any provision of the Plan; or

**(vi)** the failure of the Company to obtain an agreement, from any successors and assigns to assume and agree to perform the obligations created under the Plan as a result of a Change in Control, as contemplated in Section 5 hereof.

**(i)Disability** means having become disabled within the meaning of Section 409A(a)(2)(C) of the Code and the regulations thereunder.

**(j)Eligible Employee** means an individual described in Section 2(a).

**(k)Involuntary Termination** means the termination by the Company of an Eligible Employee's employment for a reason other than Cause.

**(l)Pay** means the Eligible Employee's base salary (excluding incentive pay, premium pay, commissions, overtime, bonuses and other forms of supplemental or variable compensation) at the rate in effect during the regularly scheduled payroll period coincident with the Change in Control or with the Termination Date, whichever is greater.

**(m)Plan** means this Novavax, Inc. Amended and Restated Change in Control Severance Benefit Plan, as amended from time to time.

**(n)Plan Administrator** means the Compensation Committee of the Board (or such other committee appointed by the Board to administer the Plan), or such committee's designee.

**(o)Section 409A** means Section 409A of the Code and the regulations thereunder.

**(p)Severance Benefit Period** means the period of time equal to the number of months specified for an Eligible Employee on Exhibit A hereto.

**(q)Tail Period** refers to the period of time set forth on Exhibit A, which begins on the date of the consummation of a Change in Control and ends on the last day of the period set forth on such Exhibit A.

Exhibit 10.4

**(r)Termination Date** means the last date on which the Eligible Employee is in active pay status as an employee with the Company. A holiday cannot constitute a Termination Date unless the Eligible Employee actively provided services for the Company on such holiday.

### Section 7.No Implied Employment Contract.

The Plan shall not be deemed (i) to give any employee or other person any right to be retained in the employ of the Company, or (ii) to interfere with the right of the Company to discharge any employee or other person at any time and for any reason, which right is hereby reserved.

### Section 8.Legal Construction.

The Plan is intended to be governed by and shall be construed in accordance with the ERISA and, to the extent not preempted by ERISA, the laws of the State of Delaware.

### Section 9.Section 409A.

It is intended that payments and benefits under the Plan be exempt from, or comply with, the provisions of Section 409A and the Plan shall be interpreted and administered accordingly. To the extent required to comply with or be exempt from Section 409A, an Eligible Employee will not be considered to have terminated employment with the Company or its subsidiaries for purposes of the Plan, and no payment will be due under the Plan, until he or she has incurred a "separation from service" from the Company and its subsidiaries within the meaning of Section 409A (after giving effect to the presumptions set forth therein). If an Eligible Employee is determined to be a "specified employee" at the time of his or her separation from service then, to the extent necessary to prevent any accelerated or additional tax under Section 409A, payment of the amounts payable under the Plan will be delayed until the earlier of (i) the date that is six months and one day following the Eligible Employee's separation from service or (ii) the Eligible Employee's death. Each amount paid pursuant to the Plan shall be treated as a separate payment for purposes of Section 409A and the right to a series of installment payments under the Plan shall be treated as the right to a series of separate payments. To the extent required by Section 409A, if the period available to execute (and not revoke) the Release spans two calendar years, any payments or benefits provided to the Eligible Employee under the Plan will be paid in the second calendar year. To the extent required to comply with Section 409A, a Change in Control will not be deemed to occur for purposes of the Plan unless it is a "change in control event" as defined in Section 1.409A-3(i)(5)(i) of the Treasury Regulations (or a subset of a "change in control event", as applicable). Notwithstanding the foregoing or anything to the contrary in the Plan, neither the Company nor any of its Affiliates will be liable to an Eligible Employee by reason of any acceleration of income, or any additional tax (including any interest and penalties), asserted with respect to any of the payments under the Plan, including by reason of the failure of the Plan to satisfy the applicable requirements of Section 409A in form or in operation. To the extent required to avoid an accelerated or additional tax under Section 409A, amounts reimbursable to an Eligible Employee under the Plan shall be paid to the Eligible Employee on or before the last day of the year following the year in which the expense was incurred and the amount of expenses eligible for reimbursement (and in-kind benefits provided to

Exhibit 10.4

the Eligible Employee) during any one year may not affect amounts reimbursable or provided in any subsequent year and may not be liquidated or exchanged for any other benefit.

**Section 10.Claims, Inquiries and Appeals.**

**(a)Claims for Benefits and Inquiries.** Any claim for benefits, request for review, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing by an Eligible Employee (or his or her authorized representative) at the following address:

Novavax, Inc.
21 Firstfield Road
Gaithersburg, MD 20878
Attn: Chairman of the Compensation Committee of the Board

**(b)Denial of Claims.** In the event that any claim for benefits is denied in whole or in part, the Plan Administrator must provide the claimant with written or electronic notice of the denial of the claim, and of the claimant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the claimant and will include the following:

**(i)**the specific reason or reasons for the denial;

**(ii)**references to the specific Plan provisions upon which the denial is based;

**(iii)**a description of any additional information or material that the Plan Administrator needs to complete the review and an explanation of why such information or material is necessary; and

**(iv)**an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following a denial on review of the claim, as described in Section 10(d) below.

This notice of denial will be given to the claimant within ninety (90) days after the Plan Administrator receives the claim, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional ninety (90) days for processing the claim. If an extension of time for processing is required, written notice of the extension will be furnished to the claimant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the claim.

**(c)Request for a Review.** Any person (or that person's authorized representative) for whom a claim for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within sixty (60) days after the claim is denied. A request for a review shall be in writing and shall be sent to the address set forth above. A

Exhibit 10.4

request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the claimant feels are pertinent. The claimant (or his or her representative) shall have the opportunity to submit (or the Plan Administrator may require the claimant to submit) written comments, documents, records, and other information relating to his or her claim. The claimant (or his or her representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim. The review shall take into account all comments, documents, records and other information submitted by the claimant (or his or her representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

**(d)Decision on Review.** The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the claimant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the review. The Plan Administrator will give prompt, written or electronic notice of its decision to the claimant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Plan Administrator confirms the denial of the claimant for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the claimant, the following:

**(i)**the specific reason or reasons for the denial;

**(ii)**references to the specific Plan provisions upon which the denial is based;

**(iii)**a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim; and

**(iv)**a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA.

**(e)Rules and Procedures.** The Plan Administrator will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Plan Administrator may require a claimant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the claimant's own expense.

**(f)Exhaustion of Remedies.** No legal action for benefits under the Plan may be brought until the claimant (i) has submitted a written claim for benefits in accordance with the procedures described by Section 10(a) above, (ii) has been notified by the Plan Administrator that the claim is denied, (iii) has filed a written request for a review of the claim in accordance with the appeal procedure described in Section 10(c) above, and (iv) has been notified that the Plan Administrator has denied the appeal. Notwithstanding the foregoing, if the Plan Administrator does not respond to an Eligible Employee's claim or appeal within the relevant

Exhibit 10.4

time limits specified in this Section 10, the Eligible Employee may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA. In no event may any legal proceeding regarding entitlement to benefits or any aspect of benefits under the Plan be commenced later than the earlier of: (i) one year after the date on which the claimant receives a decision from the Plan Administrator regarding his or her appeal; and (ii) the date otherwise prescribed by applicable law.

**Section 11.Basis of Payments under the Plan.**

All benefits under the Plan shall be paid by the Company. The Plan shall be unfunded, and benefits hereunder shall be paid only from the general assets of the Company.

Exhibit 10.4

**EXHIBIT A**

| Title | Severance Benefit Period | Tail Period |
|---|---|---|
| CEO | 24 months* | 24 months |
| Executive Vice President and above (other than the CEO) | 12 months | 12 months |

*For purposes of Section 3(a)(ii), the Severance Benefit Period for the CEO is 18 months.

**Exhibit 10.5**

CERTAIN INFORMATION IDENTIFIED WITH [***] HAS BEEN EXCLUDED FROM THIS EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL AND (II) IS THE TYPE THAT THE REGISTRANT TREATS AS PRIVATE OR CONFIDENTIAL.

EXECUTION VERSION

Dated May 5, 2021

**GAVI ALLIANCE**

and

**NOVAVAX, INC.**

ADVANCE PURCHASE AGREEMENT

for purchase of Covid-19 vaccines

Linklaters LLP
One Silk Street
London EC2Y 8HQ

Telephone (+44) 20 7456 2000

Facsimile (+44) 20 7456 2222
Ref L-300770

97694998_9

**Table of Contents**

**Contents Page**

1 Definitions                                                                            3
2 Gavi Advance Purchase Commitment                                                       11
3 Vaccine Variation                                                                      11
4 Novavax Supply                                                                         12
5 Allocation of COVAX Doses                                                              14
6 Purchase Price and Balancing Payment                                                   15
7 Novavax Commitments                                                                    17
8 Order and Supply of COVAX Doses                                                        20
9 Provision of Information                                                               21
10 Audit                                                                                 22
11 Representations, Warranties and Undertakings                                          23
12 Liability, Insurance, Indemnification                                                 25
13 Term and Termination                                                                  26
14 Disputes, Arbitration, Expert Determination                                           29
15 Force Majeure                                                                         30
16 General                                                                               31
Schedule 1 Price Tiers and Eligible Country List                                         37
Schedule 2 Interim Delivery Schedule                                                     38
Schedule 3 Pricing Tier                                                                  39
Schedule 4 Supply Terms                                                                  40
Schedule 5 Information Requirements                                                      41
Schedule 6 [***] Indemnity                                                               42
                                                                                    [***]
                                                                                    [***]
                                                                                    [***]
                                                                                    [***]
                                                                                    [***]
                                                                                    [***]
Schedule 7 - [***] Novavax Indemnity                                                     43
Schedule 8 Covovax Schedule                                                              44

This Advance Purchase Commitment Agreement (the "**Agreement**") is made as of May 5, 2021 (the "**Effective Date**") by and between:

(1)**Gavi Alliance**, an independent non-profit foundation within the meaning of Articles 80 to 89 of the Swiss Civil Code with a registered office at Chemin du Pommier 40, 1218 Le Grand-Saconnex, Geneva, Switzerland ("**Gavi**"); and

(2)**Novavax, Inc.**, an entity organized and doing business under the laws of Delaware, which maintains its headquarters at 21 Firstfield Road, Gaithersburg, MD 20878, U.S.A. ("**Novavax**"),

each a "**Party**" and, collectively, the "**Parties**".

**Whereas**

(A)Gavi's mission is to save lives and protect people's health by increasing the equitable use of vaccines globally, in particular in lower income and lower-middle income countries, by providing support to eligible countries to introduce new and underutilized vaccines and strengthen health systems to enable better delivery of vaccines.

(B)Gavi, together with the Coalition for Epidemic Preparedness Innovations ("**CEPI**") and the World Health Organization (the "**WHO**") lead the vaccine pillar of the Access to COVID-19 Tools (ACT) Accelerator (the "**ACT Accelerator**"), a global collaboration of global health organisations created to accelerate the development, production and equitable access to new COVID-19 technologies.

(C)The ACT Accelerator's vaccines pillar has created a Global COVID-19 Vaccine Facility (the "**COVAX Facility**") through which countries can work together to share risk by accessing a wide portfolio of vaccine candidates.  The COVAX Facility is speeding up the search for effective vaccines for all countries and, at the same time, is supporting the building of manufacturing capabilities. By entering into various agreements that invest in vaccine production capacity across several candidates and secure their later supply, the COVAX Facility aims to ensure that two (2) billion doses can be distributed fairly in the places of greatest need, worldwide, by the end of 2021.

(D)Novavax proposes to manufacture and clinically evaluate a vaccine against SARS-CoV-2 for the prevention of COVID-19 that incorporates NVX-CoV2373, which will be labelled as a two-dose regimen (and which, for the avoidance of doubt, does not include the Covovax Vaccine) (the "**Vaccine**").

(E)The Parties acknowledge that Novavax and SII (as defined below) have entered into a Supply and License Agreement ("**SII License**") under which Novavax has licensed Novavax Intellectual Property Rights (as defined below) to SII and SII will thereafter produce the Vaccine, which SII intends to sell under SII's brand

name 'Covovax' (any such vaccine produced by SII under such rights, the "**Covovax Vaccine**"). Gavi acknowledges that, consistent with equitable access principles and Novavax's obligations under its agreement with CEPI, Novavax licensed its proprietary technology to SII with no traditional upfront or milestone benefit to Novavax (but with Novavax sharing in some of the revenue made by SII from Covovax Vaccine sales) and further that SII is well-suited to provide primary sale and distribution of the Covovax Vaccine into LICs, LMICs and UMICs, including through the COVAX Facility.

(F)The Parties also acknowledge that Gavi has entered into the SII Procurement Prepayment Agreement (as defined below) which provides for purchase of Covovax Vaccines manufactured by SII (or its Affiliates) at a maximum price of $[***] per dose to be supplied to certain eligible countries. The Parties further acknowledge that an additional agreement is under discussion between Gavi and SII in relation to the procurement of additional doses of Covovax Vaccines (the "**Covovax APA**"). The Parties acknowledge that the total volume of Novavax Doses (as defined below) and Covovax Vaccine (to be provided pursuant to the SII Procurement Prepayment Agreement and the Covovax APA) is expected to equal the NVSN Cumulative Volume (as defined below).

(G)Novavax, CEPI and Gavi aim to collaborate to ensure a fair allocation and distribution of the Vaccine around the world.

(H)To this end, Novavax and CEPI entered into outbreak response funding agreements on 8 March 2020 and 11 May 2020 (each as amended from time to time and together, the "**CEPI Funding Agreement**").

(I)The Parties acknowledge that Gavi will not enter into a supply agreement with Novavax for Vaccine, but rather, Gavi's role will be limited to providing certainty to Novavax as to the demand for Vaccine and securing doses for the COVAX Participants (as defined below). The Parties further acknowledge that the terms relating to the supply of Vaccine will be agreed between Novavax and such COVAX Participants. Gavi has additionally indicated its willingness to use Commercially Reasonable Endeavours to facilitate the contracting process between Novavax and COVAX Participants and establish processes and conditions regarding terms of supply under the COVAX Facility, which may include streamlined regulatory, packaging, labelling, pharmacovigilance, distribution approaches and contracting timelines.

(J)Considering Gavi's and Novavax's desire to secure access to three hundred and fifty (350) million doses of the Vaccine for distribution to COVAX Participants through the mechanism designated by the ACT Accelerator, the Parties wish to enter into this Agreement for the procurement of the Vaccine by COVAX Participants.

**Now, therefore**, in consideration of the mutual promises, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

**1 Definitions**

"**ACT Accelerator**" has the meaning set forth in Recital (B);

"**Additional Discretionary Doses**" has the meaning set forth in Clause 4.3.2;

"**Advance Payment Amount**" has the meaning set forth in Clause 6.2.1;

"**Advance Payment Credit**" means an amount equal to the Advance Payment Amount divided by the total Novavax Doses, which shall be USD [***] per Novavax Dose unless notice is given by Gavi pursuant to Clause 2.2;

"**Affiliate**" means with respect to a Person, any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such first Person. "**Control**" and, with correlative meanings, the terms "**controlled by**" and "**under common control with**" mean (i) the power to direct the management or policies of a Person, whether through ownership of voting securities or by contract relating to voting rights or corporate governance, resolution, regulation or otherwise, or (ii) to own more than 50 per cent of the outstanding voting securities or other ownership interest of such Person;

"**Agency-Procuring Countries**" means all Self-Financing Participants who choose to procure Vaccine via a Designated Procurement Agency;

"**Allocation Framework**" means the terms of the COVAX Facility and the WHO allocation framework allocating available supply capacities of a certain vaccine to COVAX Participants;

"**AMC92**" means the countries listed as such in Schedule 1;

"**Availability Window**" has the meaning set forth in Schedule 2;

"**Backstop Supply**" has the meaning set forth in Clause 4.4;

"**Backstop Volume**" means the NVSN Cumulative Volume less the Novavax Doses;

"**Balancing Doses**" has the meaning set forth in Clause 6.4.2;

"**Balancing Payment**" has the meaning set forth in Clause 6.4.2;

"**Binding Purchase Order**" has the meaning set forth in Clause 8.2.1;

"**Business Day**" means any day other than a Saturday or Sunday or a day which is a public holiday in Geneva, Switzerland or Maryland, USA;

"**Cancelled Doses**" has the meaning set forth in Clause 7.2.4;

"**CEPI Funding Agreement**" has the meaning set forth in Recital (H);

"**CFN**" means, for the purposes of this Agreement, the following manufacturing facilities funded in whole or part by CEPI under the CEPI Funding Agreement in which CFN Drug Substance is made: [***];

"**CFN Drug Substance**" means any drug substance manufactured using the CFN;

"**CFN Vaccine**" means any Vaccine that contains CFN Drug Substance;

"**Coercive Practice**" means impairing or harming, or threatening to impair or harm, directly or indirectly, any party or the property of the party to influence improperly the actions of a party;

"**Collusive Practice**" means an arrangement between two or more parties designed to achieve an improper purpose, including to influence improperly the actions of another party;

"**Commercially Reasonable Endeavours**" means [***];

"**Confidential Information**" means any and all (i) information or material, including any documents, notes, analyses, studies, financial summaries, samples, drawings, diagrams, designs, flowcharts, databases, models and plans, that at any time on or after or prior to the Effective Date has been or is provided or communicated by or on behalf of one Party (such Party in such capacity, the "**Disclosing Party**") or any of its Representatives to the other Party (such Party in such capacity, the "**Receiving Party**") or any of its Representatives in connection with this Agreement, including any discussions or negotiations with respect thereto and any data, ideas, concepts or techniques contained therein and (ii) modifications thereof or derivations therefrom, including documents, memoranda, notes, studies and analyses prepared by the Receiving Party or its Representatives that contain, incorporate or are derived from the Disclosing Party's Confidential Information, in each case, to the extent containing any information or material described in sub-section (i) above. Confidential Information may be disclosed either orally, visually, electronically, in writing, by delivery of materials containing Confidential Information or in any other form now known or hereafter invented;

"**Consultation Period**" has the meaning set forth in Clause 13.2.3(i);

"**Corrupt Practice**" means the offering, giving, receiving or soliciting, directly or indirectly, of anything of value to influence improperly the actions of another party;

"**COVAX Buyers**" means Designated Procurement Agencies (acting on behalf of AMC92 and Agency-Procuring Countries) and Self-Procuring Countries, and a

"**COVAX Buyer**" means any one of such Designated Procurement Agencies or Self-Procuring Countries;

"**COVAX Doses**" means the Novavax Doses and any additional doses provided as part of Backstop Supply;

"**COVAX Facility**" has the meaning set forth in Recital (C);

"**COVAX Participant Price**" means an amount equal to the applicable Purchase Price (including where reduced pursuant to Clause 6.5) less the Advance Payment Credit, as credited towards the Purchase Price pursuant to Clause 6.2;

"**COVAX Participant Tiers**" means each of the tiers relating to Tier 1 COVAX Participants, Tier 2 COVAX Participants, and Tier 3 COVAX Participants;

"**COVAX Participants**" means AMC92 and Self-Financing Participants;

"**COVAX Partners**" means CEPI, Gavi and the WHO;

"**COVAX Procurement Coordinator**" means the entity appointed by Gavi (currently, UNICEF) to facilitate the establishment of procurement arrangements between manufacturers, with whom the COVAX Facility has entered into advance purchase commitment agreements, and COVAX Buyers;

"**Covovax APA**" has the meaning set forth in Recital (F);

"**Covovax Schedule**" means the delivery schedule set out in Schedule 8;

"**Covovax Scheduled Doses**" means the doses of Covovax Vaccine scheduled to be delivered in accordance with the Covovax Schedule;

"**Covovax Vaccine**" has the meaning set forth in Recital (E);

"**Delivery Period**" means from the date of this Agreement until the end of Q2 of 2022;

"**Designated Procurement Agency**" means any procurement agency designated by Gavi and notified to Novavax as an agency acting on Gavi's behalf when procuring COVAX Doses under this Agreement. Designated Procurement Agencies may include UNICEF, PAHO, or any procurement agency as designated by Gavi;

"**Disclosing Party**" has the meaning set forth in the definition of Confidential Information;

"**Early Supply Period**" means the period from the date of this Agreement until the last day of the month when each of the following events has occurred:

(a) the Covovax Vaccine receives Emergency Use Listing by the WHO or WHO Prequalification;

(b) the Minimum Level Doses have been delivered to Gavi (or one or more relevant COVAX Buyers) by Novavax pursuant to this Agreement; and

(c) SII has delivered in [***], such period starting no earlier than [***], no less than [***] of the Covovax Scheduled Doses for such month in accordance with the Covovax Schedule;

"**Effective Date**" has the meaning set forth in the Preamble;

"**Emergency Use Authorisation**" means a risk-based procedure developed by a Stringent Regulatory Authority to approve the use of a vaccine under development for use during a public health emergency;

"**Emergency Use Listing**" means a risk-based procedure developed by the WHO for assessing and listing candidate in vitro diagnostics, therapeutics and vaccines for use during public health emergencies;

"**Excess Leakage**" means any CFN Vaccine Novavax delivers to Novavax Buyers in excess of:

(a) [***] ([***]) during the Early Supply Period; and

(b) [***] ([***]) (and as adjusted pursuant to Clause 4.3) during the Novavax Routine Supply Period. For avoidance of doubt, Additional Discretionary Doses sold pursuant to Clause 4.3.2 shall not count toward Excess Leakage;

"**Expert**" means a person having appropriate qualifications and practical experience to resolve a particular dispute arising between the Parties under this Agreement, appointed in accordance with Clause 14.2;

"**Expiry**" means the end of the Term of this Agreement;

"**Expiring CFN Vaccine**" means any doses of CFN Vaccine which, at any point in time, have an expiry date of [***] or less. Expiring CFN Vaccine shall not constitute Novavax Doses (unless otherwise agreed in writing and in advance by the Parties);

"**Firm Order Commitment**" has the meaning set forth in Clause 2.1;

"**Force Majeure Event**" has the meaning set forth in Clause 15.1;

"**Fraudulent Practice**" means any act or omission, including a misrepresentation, that knowingly or recklessly misleads, or attempts to mislead, a party to obtain a financial or other benefit or to avoid an obligation;

"**Funds**" has the meaning set forth in Clause 9.5;

"**Gavi**" has the meaning set forth in the Preamble;

"**HIC**" means the countries listed as such in Schedule 1;

"**Humanitarian Buyer**" means any non-governmental organisation (or such other persons [***]) which procures COVAX Doses on behalf of refugees, asylum seekers or other vulnerable populations or missed communities;

"[***]" has the meaning set forth in Clause 14.1;

"[***]" has the meaning set forth in Clause 14.1;

"**Indirect Taxes**" means value added, sales, consumption, goods and services taxes or other similar taxes including, for the avoidance of doubt: (a) any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112) applied in any Member State of the European Union; and (b) any other value added, goods and services, or similar turnover, sales or purchase tax or duty levied by any other jurisdiction whether central, regional or local;

"**Intellectual Property Rights**" means trade marks, service marks, rights in trade names, business names, logos and get-up and any goodwill attaching to the same, patents, rights in inventions, design rights, copyrights (including copyrights in software), database rights, rights in domain names and URLs, rights in Know-how, and all other similar rights in any part of the world including, where such rights are obtained or enhanced by registration, any registration of such rights and applications and rights to apply for such registrations;

"**Interim Delivery Schedule**" means the supply plan set out in Schedule 2;

[***]

"**Know-how**" means industrial and commercial information and techniques, in each case, in any form and which is not in the public domain, and including instruction, operational and training manuals, reports, drawings, tables of operating conditions, market forecasts, and lists and particulars of customers and suppliers;

"[***]", "[***]" and "[***]" each have the meaning set forth in Clause 6.5;

"**Marketing Authorisation Approval**" means, in relation to the Vaccine and a country, an approval (excluding any emergency use approvals or any equivalent in any country) granted by such country's regulatory authority to offer for sale and to sell the Vaccine in that country;

"**Minimum Level Doses**" means [***] ([***]) of the initial [***] ([***]) doses of CFN Vaccine delivered by Novavax;

"**Misappropriation**" means the use of Gavi financing or resources for an improper or unauthorized purpose, committed either intentionally or through reckless disregard;

"**Misuse of Funds**" has the meaning set forth in Clause 9.5;

"[***] Indemnity" has the meaning set forth in Clause 12.3.1;

"**Novavax**" has the meaning set forth in the Preamble;

"**Novavax Buyer**" means any country (or purchasing entity that represents multiple countries) that has executed a written agreement with Novavax to purchase CFN Vaccine outside of the COVAX Facility;

"**Novavax Doses**" means three hundred and fifty (350) million doses of CFN Vaccine as adjusted pursuant to Clause 2.2 (as applicable);

"**Novavax Routine Supply Period**" means the period from the expiry of the Early Supply Period to the expiry of the Term (or Termination, if earlier);

"**NVSN Cumulative Volume**" means the cumulative volume of one billion and ninety-two million (1,092,000,000) doses of Novavax Doses and Covovax Vaccine to be supplied by Novavax and SII respectively;

"**Obstructive Practice**" means: (i) deliberately destroying, falsifying, altering or concealing of evidence material to the investigation or making false statements to investigators in order to materially impede Gavi's investigation into allegations of a Corrupt Practice, Fraudulent Practice, Coercive Practice or Collusive Practice; and/or threatening, harassing or intimidating any party to prevent it from disclosing its knowledge of matters relevant to the investigation or from pursuing the investigation; or (ii) acts intended to materially impede the exercise of Gavi's contractual rights of audit or access to information;

"**PAHO**" means the Pan American Health Organization, the specialized international health agency for the Americas, in its capacity as Designated Procurement Agency for Gavi;

"**Party**" or "**Parties**" has the meaning set forth in the Preamble;

"**Permitted Variance**" has the meaning set forth in Clause 7.2.1;

"**Person**" means an individual, sole proprietorship, partnership, limited partnership, limited liability partnership, corporation, limited liability company, business trust, joint stock company, trust, incorporated association, joint venture or similar entity or organization, including a government or political subdivision, department or agency of a government;

[***]

"**Prohibited Practice**" has the meaning set forth in Clause 9.5;

"**Purchase Condition**" means the Vaccine having received one of the following: (i) Regulatory Approval; (ii) Emergency Use Listing by the WHO; or (iii) where reasonably agreed to by Gavi, Emergency Use Authorisation;

"**Purchase Price**" has the meaning set forth in Clause 6.1.1;

"[***] **Notification**" has the meaning set forth in Clause 4.3.1;

"**Receiving Party**" has the meaning set forth in the definition of Confidential Information;

"**Regulatory Approval**" means:

(a)Marketing Authorisation Approval from a Stringent Regulatory Authority; or

(b)WHO Prequalification;

"**Regulatory Submission Plan**" means the plan prepared and submitted by Novavax that will include timelines of required clinical and regulatory submission activities to facilitate approval of the Vaccine by the WHO for Emergency Use Listing and for Emergency Use Authorisation and Regulatory Approval;

"**Remaining Doses**" has the meaning set forth in Clause 6.4.1;

"**Remedial Plan**" has the meaning set forth in Clause 7.2.2;

"**Representatives**" means, with respect to any Party, such Party's attorneys, accountants and other experts and advisers that are not Affiliates;

"[***]" has the meaning set forth in Clause 4.3;

"**Safety Notice**" has the meaning set forth in Clause 13.2.3;

"**Self-Financing Participants**" means all participants in the COVAX Facility who have signed a commitment agreement with Gavi and are financing their own purchase of Vaccine. For clarity, this excludes the AMC92;

"**Self-Procuring Countries**" means countries which choose to procure Vaccine by entering into a Supply Agreement directly with Novavax;

"**SII**" means Serum Institute of India Private Ltd., an entity organized and doing business under the laws of India, which maintains its headquarters at 212/2, Soli Poonawalla Rd, JJC Colony, Suryalok Nagari, Hadapsar, Pune, Maharashtra 411028, India;

"**SII Procurement Prepayment Agreement**" means the agreement for the manufacture and sale of a COVID-19 vaccine entered into between Gavi and SII dated [***] (and as further amended from time to time);

"**Solvency-Related Event**" means any action, legal proceeding or other procedure or step that is taken in relation to any of the following events or any of the following events occurring with respect to one Party: (i) a suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, termination of

existence, insolvent liquidation, administration, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise), bankruptcy, insolvency, judicial management or curatorship; (ii) a settlement, deferred payment, debt restructuring, transfer, restructuring, composition, compromise, assignment or similar arrangement of the relevant Party with any of its creditors; (iii) the appointment of a liquidator, trustee, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the relevant Party or any of its assets; or (iv) any analogous procedure or step that is taken by any governmental authority (excluding any bona fide procedure relating to a solvent liquidation, merger or transformation);

"**[***] Indemnity**" has the meaning set forth in Clause 12.3.1;

"**Stop Criterion**" means the occurrence of an adverse safety signal in any population in which the Vaccine is being or has been tested that a Party, in good faith and in accordance with such Party's medical safety evaluation, believes gives rise to a material risk that the safety profile of Vaccine is not suitable for Regulatory Approval;

"**Stringent Regulatory Authority**" means a stringent regulatory authority (as defined by reference to the WHO's list of stringent regulatory authorities, as updated from time to time);

"**Supply Agreement**" has the meaning set forth in Clause 8.1.1;

"**Supply Failure**" means the occurrence of any of the following:

(a)Novavax fails to deliver Vaccine to a COVAX Buyer in accordance with the terms of the relevant Supply Agreement;

(b)Novavax stops accepting Binding Purchase Orders from COVAX Buyers; or

(c)a COVAX Buyer terminates its Supply Agreement with Novavax other than for reasons of convenience, a Force Majeure Event or force majeure as it may otherwise be defined in any Supply Agreement;

"**Term**" has the meaning set forth in Clause 13.1;

"**Terminating Party**" has the meaning set forth in Clause 13.2.1;

"**Termination**" means a termination of this Agreement by either Party exercising a termination right pursuant to Clause 13.2;

"**Termination Effective Date**" means the date of Expiry of this Agreement or the date on which a Termination takes effect;

"**Tier 1 COVAX Participant**" means a COVAX Participant that is a HIC;

"**Tier 1 Purchase Price**" means the Purchase Price per dose of Novavax Doses (in USD) for a Tier 1 COVAX Participant, as set out in Schedule 3;

"**Tier 2 COVAX Participant**" means a COVAX Participant that is a UMIC;

"**Tier 2 Purchase Price**" means the Purchase Price per dose of Novavax Doses (in USD) for a Tier 2 COVAX Participant, as set out in Schedule 3;

"**Tier 3 COVAX Participant**" means an AMC92 COVAX Participant;

"**Tier 3 Purchase Price**" means the Purchase Price per dose of Novavax Doses (in USD) for a Tier 3 COVAX Participant, as set out in Schedule 3;

"**UMIC**" means the countries listed as such in Schedule 1;

"**UNICEF**" means the United Nations Children's Fund, in its capacity as Designated Procurement Agency for Gavi;

"**Vaccine**" has the meaning set forth in Recital (D);

"**Vaccine Condition**" means the Vaccine being suitable for administration to all persons over the age of 18;

"**Variant Vaccine**" has the meaning set forth in Clause 3.1;

"**Wasted**" means Novavax Doses which have a remaining shelf life of less than [***] at the time when the Vaccine is made available and ready for delivery pursuant to this Agreement;

"**WHO**" has the meaning set forth in the Recitals; and

"**WHO Prequalification**" means listing of the Vaccine on the list of prequalified medicines maintained by the WHO.

**2 Gavi Advance Purchase Commitment**

**2.1** Subject to Clause 2.2 and satisfaction of the Purchase Condition (unless such satisfaction is waived by Gavi in its sole discretion), Gavi agrees to procure the purchase of the Novavax Doses by COVAX Buyers from Novavax for the COVAX Participant Price (the "**Firm Order Commitment**").

**2.2** In the event that the Vaccine Condition is not satisfied, the Parties acknowledge and agree that Gavi may, in its [***] discretion, reduce the Novavax Doses by such number of doses as it deems appropriate (in Gavi's [***] opinion) to reflect any

reduction in projected demand of the Vaccine. Gavi shall notify Novavax of any such reduction no later than [***] after satisfaction of the Purchase Condition.

**3 Vaccine Variation**

**3.1** The Parties acknowledge that Novavax has initiated development of new constructs against the emerging variants of SARS-CoV-2. In the event that Novavax proposes to manufacture a modified or booster version of the Vaccine, or a different vaccine against Covid-19, in order to increase effectiveness against variants of SARS-CoV-2 (in each case referred to as a "**Variant Vaccine**"), Novavax shall [***] notify Gavi. [***].

**1.2** At any time during the Term of this Agreement, Gavi may provide written notice and the Parties will thereafter conduct good faith discussions to execute an addendum to the Agreement related to substitution of doses of Vaccine for doses of Variant Vaccine, which addendum shall reflect factors such as the Variant Vaccine cost, timing and supply amount.

**4 Novavax Supply**

**4.1** During the Early Supply Period, Novavax shall deliver at least [***] ([***) (measured [***]) of all CFN Vaccine to the COVAX Buyers, and in accordance with the Interim Delivery Schedule, at the relevant COVAX Participant Price; and in so doing, give first priority to supplying such COVAX Doses (in relation to prioritising delivery timescales, provision of information and other supply terms). During the Early Supply Period, Novavax shall be entitled to deliver up to [***] ([***)) (measured [***)) of all CFN Vaccine to any Novavax Buyer as it sees fit in its sole discretion.

**4.2** During the Novavax Routine Supply Period (and subject to Clause 4.3) Novavax shall continue to deliver at least [***] ([***]) (measured [***]) of all CFN Vaccine to the COVAX Buyers, and in accordance with the Interim Delivery Schedule, at the COVAX Participant Price; and in so doing, give first priority to supplying such COVAX Doses (in relation to prioritising delivery timescales, provision of information and other supply terms). During the Novavax Routine Supply Period, Novavax shall be entitled to deliver up to [***] ([***]) (measured [***]) of all CFN Vaccine to any Novavax Buyer as it sees fit in its sole discretion.

**4.3** The Parties acknowledge and agree that COVAX Doses delivered pursuant to this Agreement shall be deployed across each of the COVAX Participant Tiers as allocated by Gavi in its sole discretion pursuant to Clause 5. Notwithstanding the previous, Gavi will use Commercially Reasonable Endeavours during the Novavax Routine Supply Period to allocate no more than [***] ([***]) (measured [***) of such COVAX Doses to [***]. The Parties agree that:

**4.3.1**Gavi will use Commercially Reasonable Endeavours to notify Novavax of its allocations:

(i)in relation to deliveries which take place during the first [***] of delivery by Novavax, promptly upon receiving the outcome of the allocation pursuant to the Allocation Framework; and

(ii)in relation to all ongoing deliveries, [***] in advance of the initiation of each [***],

(each, a "[***] **Notification**"). References to "[***]" in this Clause 4.3.1, may not align to a calendar [***] (i.e., a [***] will be a period of [***]).

**4.3.2**In the event that the allocations of COVAX Doses to [***] notified to Novavax in a [***] Notification are expected to exceed the [***] (such excess COVAX Doses, the "**Additional Discretionary Doses**"), Novavax shall be entitled to notify Gavi within [***] of the applicable [***] Notification that it intends to sell a specified quantity of the Additional Discretionary Doses to a Novavax Buyer, in which case such specified quantity of Doses shall not constitute Novavax Doses.

**4.3.3**Notwithstanding the [***], any quantity of Additional Discretionary Doses that are not covered by the notification provided by Novavax pursuant to Clause 4.3.2 above may be deployed by Gavi across any of the COVAX Participant Tiers in its sole discretion and if ordered and so deployed shall constitute Novavax Doses.

**4.4**Where Gavi or SII notifies Novavax in writing that SII is unable to, or is unlikely to be able to, deliver the volume of Covovax Scheduled Doses set out in the Covovax Schedule by an amount in excess of [***], Novavax shall, at Gavi's request, notwithstanding the provisions of this Clause 4, use [***] to deliver all doses of CFN Vaccine at the applicable Purchase Price, up to the same amount by which Gavi or SII has notified Novavax that SII is unable to, or unlikely to be able to, supply (such doses the "**Backstop Supply**"), provided that:

**4.4.1**Novavax will not be expected to redirect any CFN Vaccine that has been packed and labelled in a manner which is unsuitable for the COVAX Participants;

**4.4.2**Backstop Supply shall not include CFN Vaccine for which notice has been provided to the recipient Novavax Buyer that shipment of such CFN Vaccine has been initiated and such shipment must be delivered at that particular time pursuant to a binding legal obligation; and

**4.4.3**Backstop Supply shall not exceed the Backstop Volume.

**4.5**Absent action pursuant to the USA Defense Protection Act or equivalent regional laws or regulations applicable to the CFN Vaccine, Novavax shall not attempt to circumvent or take any steps to prejudice the priority of the COVAX Facility.

**4.6**Without prejudice to any other provision of this Agreement, if the above is insufficient to deliver the COVAX Doses, Novavax shall use [***] to deliver for the COVAX Facility other doses of Vaccine (not COVAX Doses) aligned to its non-US production capacity and taking into account any Novavax Buyers and business priorities.

**4.7**In order to avoid expiration of CFN Vaccine before it can otherwise be delivered and effectively administered, Gavi and Novavax agree to discuss, on a [***] basis (or such other frequency as the Parties may agree), stock and production levels and expiry/shelf-life management of the CFN Vaccine. Provided always that Novavax is meeting its obligations under Clause 7, Gavi and Novavax further agree:

**4.7.1**prior to Emergency Use Listing being granted by the WHO, to discuss in good faith appropriate allocation and delivery of any CFN Vaccines with an expiry date/shelf life of [***] or less; and

**4.7.2**subsequent to Emergency Use Listing being granted by the WHO:

(i)to discuss in good faith appropriate allocation and delivery of any CFN Vaccines with an expiry date/shelf life of [***] or less; and

(ii)upon reasonable prior written notice to Gavi and in the absence of a contrary Gavi written request received within [***] of Gavi's receipt of such notice, Novavax shall be permitted to deliver Expiring CFN Vaccine to a Novavax Buyer or other third party.

**4.8**Within [***] of the first day of each [***], Novavax shall provide Gavi with a [***] report detailing its [***] CFN Vaccine production and the total amount of CFN Vaccine it has delivered or otherwise made available to COVAX Buyers and Novavax Buyers in the previous [***].

## 5 Allocation of COVAX Doses

**5.1**Gavi may allocate COVAX Doses to any COVAX Participant. Decisions as to how the COVAX Doses are allocated between COVAX Participants shall be made in accordance with the terms of the COVAX Facility and the Allocation Framework and in accordance with Clause 4.3. Novavax shall deliver Vaccine to each COVAX Buyer pursuant to the relevant Supply Agreement.

**5.2**Gavi may, in addition to allocating COVAX Doses to COVAX Participants, allocate COVAX Doses to Humanitarian Buyers. Decisions on how such allocations are made shall be made solely by Gavi, it being understood that supply to any Humanitarian Buyer is subject to Novavax's consent, such consent [***].

Novavax shall consider requests to supply COVAX Doses to Humanitarian Buyers in good faith, taking into account factors including: [***].

**5.3**The Parties shall meet once every [***] (or such other frequency as agreed by the Parties) to review past allocations and expected allocations by Gavi of COVAX Doses to any COVAX Participant.

**6Purchase Price and Balancing Payment**

**6.1Purchase Price**

**6.1.1**The Parties agree on a purchase price for the COVAX Doses as set out in Schedule 3 ("**Purchase Price**").

**6.1.2**The Purchase Price shall be [***] of the cost of packaging and delivering such COVAX Doses to the locations set out at Clause 7.2.6 (including the costs of any QA testing required by local import requirements).

**6.1.3**For the avoidance of doubt, the Parties acknowledge and agree that because Novavax will be providing Backstop Supply to COVAX Buyers in its own capacity and not on behalf of SII, COVAX Buyers shall pay the Purchase Price in respect of the Backstop Supply to Novavax upon delivery of Backstop Supply pursuant to Clause 4.4, in accordance with the terms of the relevant Supply Agreement.

**6.2Advance Payment Amount**

**6.2.1**In return for the commitment to supply eligible COVAX Participants with the Firm Order Commitment, Gavi shall pay to Novavax:

(i)USD [***] within [***] of (a) execution of this Agreement, or (b) receipt of the Regulatory Submission Plan, whichever occurs later; and

(ii)USD [***] within [***] of the Vaccine having received Emergency Use Listing by the WHO,

together, the "**Advance Payment Amount**".

**6.2.2**The Advance Payment Amount is calculated as an amount equal to USD [***] for each Novavax Dose (as at the date of this Agreement). Novavax shall reduce the applicable Purchase Price to be paid by a COVAX Buyer in respect of each Novavax Dose by an amount equal to the Advance Payment Credit.

**6.2.3**The COVAX Participant Price is to be paid by COVAX Buyers to Novavax upon delivery of such Novavax Doses, in accordance with the terms of the relevant Supply Agreement.

**6.3 Refund of Advance Payment Amount**

Subject to Clause 13.3.1, the Advance Payment Amount is non-refundable and is a non-transferable prepayment towards the Purchase Price for the Firm Order Commitment.

**6.4 Balancing Payment**

**6.4.1** Gavi shall be entitled to give notice to Novavax at any time that the Novavax Doses (or any part thereof) are not required for allocation under the COVAX Facility (such excess volume of Vaccine, which shall not include the Cancelled Doses, the "**Remaining Doses**"). On receipt of such notification Novavax shall use Commercially Reasonable Endeavours to sell the Remaining Doses outside of the COVAX Facility.

**6.4.2** If Novavax has been unable to sell all of the Remaining Doses, despite using Commercially Reasonable Endeavours to do so, and such Remaining Doses become Wasted, Novavax shall inform Gavi of the number of such Wasted Remaining Doses (the "**Balancing Doses**") and Gavi shall pay to Novavax a balancing payment to be calculated according to Clause 6.4.3 (the "**Balancing Payment**").

**6.4.3** Subject to Clause 6.4.4, the Balancing Payment shall be calculated according to the following formula:

[***]

where:

(i) [***]

(ii) [***]

(iii) [***]

(iv) [***]

**6.4.4** Provided the applicable portion of the Advanced Payment Amount has been received by Novavax pursuant to Clause 6.2, the sum of all Balancing Payments paid and payable shall not exceed:

(i) USD [***]; or

(ii) from date the Vaccine receives Emergency Use Listing by the WHO, USD [***],

(the "**Balancing Payment Cap**"). If the aggregate sum of any Balancing Payments paid and payable would exceed the Balancing Payment Cap, the

amount of any payable Balancing Payment shall be reduced such that the Balancing Payment Cap is not exceeded.

**6.5[\*\*\*]**

[\*\*\*]:

**6.5.1**[\*\*\*]

**6.5.2**[\*\*\*]

**6.5.3**[\*\*\*]

[\*\*\*].

### 6.6Indirect Tax

**6.6.1**Notwithstanding anything to the contrary contained in this Agreement, the following shall apply with respect to Indirect Taxes. All payments are stated exclusive of Indirect Taxes and Indirect Tax will be added to any payments where applicable. If any Indirect Taxes are chargeable in respect of any payments, then the paying Party shall pay such Indirect Taxes at the applicable rate in respect of any such payments following the receipt, where applicable, of an Indirect Taxes invoice issued in the appropriate form by the receiving Party in respect of those payments, such Indirect Taxes to be payable on the due date of the payment of the payments to which such Indirect Taxes relate. The Parties shall issue invoices for all goods and services supplied under this Agreement consistent with applicable Indirect Tax requirements, and to the extent any invoice is not initially issued in an appropriate form or if either Party believes that the Indirect Taxes may not be applicable, the Parties shall cooperate to provide such information or assistance as may be necessary to enable the issuance of such invoice consistent with Indirect Tax requirements.

**6.6.2**The Parties shall use Commercially Reasonable Endeavours to cooperate on Indirect Tax matters to be able to comply with local applicable Indirect Tax law and to allow the relevant Party to recover any applicable Indirect Tax where permissible according to local applicable Indirect Tax law, including but not limited to, providing documentation required by any taxing authority and promptly provide Indirect Tax registration numbers in the relevant jurisdictions where applicable.

### 6.7Payments

Gavi shall make all payments due to Novavax under this Agreement into the following bank account:

[\*\*\*]

**7 Novavax Commitments**

**7.1 Regulatory Approval**

**7.1.1** Novavax shall deliver to Gavi the Regulatory Submission Plan on or before [***], which shall include a timeline for submission for approval of the Vaccine by the WHO for Emergency Use Listing, and for Regulatory Approval.

**7.1.2** Novavax shall:

(i) use best endeavours to obtain Emergency Use Authorisation and Emergency Use Listing for the Vaccine by no later than [***] after the expected date set out in the Regulatory Submission Plan, and in any event by no later than [***] after submission for WHO assessment through the Emergency Use Listing or WHO Prequalification procedure; and shall ensure WHO submission is no later than the time of submission to the Stringent Regulatory Authority which is appointed to be the National Regulatory Authority of Record; and

(ii) use Commercially Reasonable Endeavours to obtain Regulatory Approval for the Vaccine, by no later than [***] after the expected date set out in the Regulatory Submission Plan.

**7.1.3** Novavax shall use Commercially Reasonable Endeavours to obtain such regulatory approvals as are required to enable the Vaccine to be used in each COVAX Participant country where allocated COVAX Doses are intended to be sold pursuant to this Agreement, taking into account cost, complexity of obtaining approval in such COVAX Participant country and the benefit of such regulatory approval.

**7.1.4** Where Novavax receives Emergency Use Authorisation for the Vaccine, but the Vaccine has not yet been granted Regulatory Approval, Novavax shall meet any requirements attached to the Emergency Use Authorisation.

**7.1.5** Gavi recognizes the resource requirements for potentially complex regulatory processes and will [***], through outreach within the COVAX Facility and its partnerships in efforts to promote the use by COVAX Participant countries of either Emergency Use Listing and/or WHO Prequalification (including to the COVAX Partners). However, Novavax recognizes that Gavi cannot compel any regulatory authority to take any particular actions.

**7.2 Delivery, Variance, Short Supply**

**7.2.1** Novavax shall make available the COVAX Doses pursuant to the order and supply process set forth in Clause 8 and Novavax shall use its Commercially Reasonable Endeavours to meet the [***] timelines set out in the Interim Delivery Schedule in relation to the Firm Order Commitment. Gavi hereby acknowledges and agrees that [***] the quantity of Vaccine actually delivered to each COVAX Buyer each [***] may vary by plus/minus [***] of the aggregate amount specified in the Supply Agreement of such COVAX Buyer provided such variance is not caused by any Excess Leakage ("**Permitted Variance**").

**7.2.2** If Novavax reasonably believes that it will not be able to supply a COVAX Buyer with quantities of Vaccine in accordance with this Agreement or the relevant Supply Agreement, taking into account the Permitted Variance, then Novavax shall notify Gavi and the COVAX Buyer in writing of such circumstances [***], including the underlying reasons for such shortage, the date such inability is expected to end and Novavax's remedial plan to enable the Vaccine to be supplied to such COVAX Buyer in accordance with this Agreement (and the relevant Supply Agreement), which plan must reasonably be expected to resolve such short supply (the "**Remedial Plan**"). For the avoidance of doubt, the Parties acknowledge and agree that a Permitted Variance and any action to be taken pursuant to a Remedial Plan shall be without prejudice to Novavax's obligations under Clauses 4.1 and 4.2 (as applicable) to deliver the relevant proportion of CFN Vaccine to COVAX Buyers. Novavax shall in good faith take into account any reasonable changes to the Remedial Plan proposed by Gavi and/or the COVAX Buyer.

**7.2.3** If the actions outlined in the Remedial Plan:

(i) resolve the issue causing such failure to supply to a COVAX Buyer within [***] of the exceeded variance giving rise to the Remedial Plan and Novavax delivers the amount of Vaccine contemplated by the delivery schedule in the Supply Agreement during such period, the COVAX Buyer's purchase obligations shall remain unchanged;

(ii) resolve the issue causing such failure to supply to a COVAX Buyer within [***] of the exceeded variance giving rise to the Remedial Plan, but Novavax does not deliver the amount of Vaccine contemplated by the delivery schedule in the Supply Agreement for such period, the COVAX Buyer may, upon written notice to Novavax, cancel delivery of the COVAX Doses that were scheduled for delivery during the duration of the supply failure that were not delivered; or

(iii)do not resolve the issue causing failure to supply to a COVAX Buyer within [***] of the exceeded variance giving rise to the Remedial Plan, the relevant COVAX Buyer(s) may upon written notice to Novavax cancel delivery of all undelivered Vaccine units (past due deliveries and future deliveries) or terminate the Supply Agreement (or both).

7.2.4If a COVAX Buyer elects to cancel past due and/or future deliveries of Vaccine and/or terminate the Supply Agreement pursuant to Clause 7.2.3, such COVAX Buyer shall be relieved of its obligation to pay the COVAX Participant Price for such undelivered Vaccine units and Novavax shall be relieved of its obligation to deliver such Vaccine units (the "**Cancelled Doses**"). For the avoidance of doubt, the Parties acknowledge and agree that Gavi's obligation to procure the purchase of the Novavax Doses pursuant to this Agreement shall be satisfied notwithstanding any cancellation pursuant to Clause 7.2.3.

7.2.5The Parties intend that the delivery of Vaccine shall be completed during the Delivery Period. To this end, Novavax shall:

(i)adhere to underlying principles of regulatory harmonisation (in relation to its obligations in Clause 7.1) and streamlined logistics requirements, including packaging, labelling, and post-marketing requirements across the COVAX Participants; and

(ii)inform Gavi and the COVAX Procurement Coordinator immediately, but in no event later than [***], after it becomes aware of any circumstances indicating a material deviation from the timelines outlined in Clause 7.2.1 and/or the Interim Delivery Schedule.

7.2.6Novavax shall, at [***] cost, deliver the doses ordered by the COVAX Buyer to a central distribution hub specified in the Supply Agreement, from which the Designated Procurement Agency or COVAX Participant will ensure themselves the further delivery to the sites of use of the Vaccine, in accordance with any procedure set out in the relevant Supply Agreement.

**8Order and Supply of COVAX Doses**

**8.1Agreements with COVAX Buyers**

8.1.1The Parties agree that the terms and conditions of the order, purchase, supply, delivery and payment process for Vaccine shall be regulated in procurement agreements between Novavax and each COVAX Buyer (each a "**Supply Agreement**"). Novavax acknowledges that each Self-Financing Participant may choose to either purchase Vaccine directly from Novavax or

through a Designated Procurement Agency. The Parties acknowledge that a Supply Agreement may itself constitute a Binding Purchase Order where that constitutes a firm order for COVAX Doses to which the COVAX Buyer and Novavax are contractually bound, or that a further purchase order may need to be placed under the terms of a Supply Agreement to constitute a Binding Purchase Order.

8.1.2 Novavax shall use [***] to enter into a Supply Agreement with each Designated Procurement Agency, and [***] to enter into a Supply Agreement with all other COVAX Buyer(s) as soon as [***] to enable Vaccines to be delivered in accordance with the Interim Delivery Schedule. Novavax shall regularly update Gavi on the progress it has made in concluding Supply Agreements with COVAX Buyers.

8.1.3 Novavax shall, at the option of the COVAX Buyer, irrevocably offer to provide the Vaccine on terms which include the key terms set out in Schedule 4, or on the basis of supply terms previously agreed for the supply of the Vaccine between Novavax and the COVAX Buyer.

8.1.4 Where a COVAX Buyer has entered into a bilateral arrangement with Novavax, Novavax shall, at the COVAX Buyer's option, provide to such COVAX Buyer the Vaccine it has been allocated pursuant to the COVAX Facility on the terms of such bilateral arrangement, subject to amendment for number of doses of the Vaccine, purchase price, and delivery schedule.

8.1.5 To facilitate the proper administration of the WHO no-fault compensation scheme, Novavax agrees that it shall not supply Vaccine to any AMC92 COVAX Participant which has the same batch number as Vaccine delivered to the same COVAX Participant pursuant to an alternate purchase arrangement with Novavax outside of the COVAX Facility.

**8.2 Fulfilment of Gavi Obligations**

8.2.1 The process by which a COVAX Buyer shall be entitled to issue orders for the COVAX Doses to which it and Novavax are contractually bound (each a "**Binding Purchase Order**") shall be set out in the Supply Agreements between Novavax and each COVAX Buyer.

8.2.2 Gavi's obligation to procure the purchase of the Novavax Doses pursuant to Clause 2.1 shall be gradually reduced with each Binding Purchase Order made by a COVAX Buyer, and shall be satisfied in full once Binding Purchase Orders are placed for all Novavax Doses.

8.2.3 Upon request by the respective COVAX Buyer or the COVAX Procurement Coordinator, Novavax shall sign a commitment satisfaction certificate (or other similar document confirming the placement of a Binding Purchase

Order) provided to it by the respective COVAX Buyer or the COVAX Procurement Coordinator for each Binding Purchase Order providing conclusive evidence of the further (gradual) fulfilment of Gavi's obligation to procure the purchase of the Novavax Doses.

**9 Provision of Information**

**9.1** Novavax shall provide Gavi on an on-going basis as reasonably requested by Gavi with information in relation to [***].

**9.2** Novavax shall notify Gavi promptly when [***].

**9.3** Novavax shall promptly provide to Gavi all information reasonably required for the effective operation of the WHO no-fault compensation scheme. Novavax acknowledges that Gavi may share such information with the WHO for the purposes of the operation of the WHO no-fault compensation scheme.

**9.4** Novavax shall provide to the COVAX Procurement Coordinator all of the information set out in Schedule 5 in accordance with the terms of that Schedule.

**9.5** Novavax shall inform Gavi upon becoming aware of any credible suspicions of any Misappropriation, Fraudulent Practice, Corrupt Practice, Coercive Practice, Collusive Practice or Obstructive Practice (each, a "**Prohibited Practice**"). Further, if Gavi has reason to suspect that any payments made under this Agreement or any agreements contemplated as part of this Agreement (the "**Funds**") have been used for purposes other than the development, manufacture and making available of the Vaccine, whether due to (i) non-compliance with the terms and conditions of the relevant agreement or (ii) Novavax's engagement in a Prohibited Practice (each a "**Misuse of Funds**"), Gavi may, where permitted by law, inform Novavax. In the event of a Misuse of Funds or Novavax's engagement in a Prohibited Practice, the Parties will consult in good faith with a view to agreeing upon a satisfactory resolution of the matter. If, following such consultation, no resolution is agreed by the Parties, Gavi may undertake an investigation (on its own behalf, or in conjunction with a third party), appoint an independent third party to investigate, or refer the matter to the appropriate authorities. If, following the completion of any investigation, Gavi determines that Novavax has engaged in the Misuse of Funds or a Prohibited Practice, Gavi may suspend all or part of its Funds. If Gavi notifies Novavax of its concern that Novavax has engaged in the Misuse of Funds or a Prohibited Practice, Novavax shall cooperate in good faith with Gavi and its representatives in determining whether such a violation has occurred and shall respond promptly and in reasonable detail to any such notice from Gavi and shall furnish documentary support for such response upon Gavi's request.

**10 Audit**

**10.1** Upon advance written notice and during normal business hours, Novavax shall permit Gavi, and/or its designated representatives, which shall be an internationally recognised accounting firm or an international financial institution (an "**Auditor**"), to audit Novavax and its Affiliates:

**10.1.1** from time to time (but in any case no more than [***]) to confirm Novavax's compliance with this Agreement; and

**10.1.2** [***].

**10.2** Novavax shall ensure it provides all reasonable assistance to, and co-operates with, audits pursuant to Clause 10.1. Novavax shall, and shall procure its Affiliates shall, provide any Auditor with access to its premises, personnel, books, and records of any other relevant information. An Auditor shall not be entitled to access information over which Novavax can assert legal professional privilege. Any Confidential Information an Auditor obtains as a result of the audit shall be subject to Clause 16.1.

**11 Representations, Warranties and Undertakings**

**11.1 Representations and Warranties**

**11.1.1** Each Party represents and warrants upon the Effective Date of this Agreement that:

(i) it is duly established and validly existing under the laws of its place of incorporation and that it has the power and authority to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of this Agreement and the transaction contemplated herein;

(ii) this Agreement is executed by a duly authorised representative of that Party;

(iii) it is in material compliance with all applicable statutes, regulations, directives and requirements of any governmental entity;

(iv) once duly executed, this Agreement will constitute its legal, valid and binding obligations; and

(v) the entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not have any material conflict with (i) any law or regulation, or judicial or official order, applicable to it; (ii) its constitutional documents; or (iii) any agreement or instrument binding upon it or its assets.

**11.1.2** Novavax further represents and warrants upon the Effective Date of this Agreement that:

(i) it is not under any obligation, contractual or otherwise, to any Person or third party in respect of the COVAX Doses contemplated to be procured in connection with this Agreement or that conflicts with or is inconsistent in any material respect with the terms of this Agreement or that would impede the complete fulfilment of its obligations under this Agreement;

(ii) it is not subject to a Solvency-Related Event nor is it likely to be subject to a Solvency-Related Event in the near future;

(iii) it has the requisite rights to manufacture and supply the Vaccine in accordance with the terms of this Agreement; and

(iv) to the best of its knowledge, the manufacture and sale of the COVAX Doses is in accordance with this Agreement and will not infringe any third party Intellectual Property Rights.

**11.1.3** Except for those representations, warranties and covenants expressly set forth in this Clause 11.1, to the fullest extent not prohibited by applicable law, Novavax expressly disclaims all other representations, warranties and covenants of any kind, whether express or implied, written or oral, by fact or law, including any implied representations, warranties and covenants of merchantability, fitness for a particular purpose, satisfactory quality, non-infringement and any representations or warranties or conditions or guarantees arising from statute, course of dealing or usage of trade. Further, the Parties hereby acknowledge and agree that nothing contained in this Agreement shall be construed as a warranty, either express or implied, that Novavax will obtain a positive clinical outcome or that the product will receive regulatory approval.

**11.2 Novavax Undertakings**

During the Term of this Agreement, Novavax undertakes to:

**11.2.1** notify Gavi [***] if it becomes aware that any actions are likely or have already been taken by the government of any country in which Novavax shall perform activities to procure COVAX Doses that may adversely affect Novavax's commitments under this Agreement. For clarity, such government actions may relate, for example, to the exercise of eminent domain or sovereign rights over Vaccine doses contemplated to be procured as COVAX Doses under this Agreement;

11.2.2comply with the laws and regulations that are applicable to its activities and operations under this Agreement;

11.2.3inform Gavi of any [***];

11.2.4not knowingly prevent or hinder, or otherwise intentionally cause the failure of, through any act or omission, SII from entering into the Covovax APA or from performing its obligations under the Covovax APA or the SII Procurement Prepayment Agreement. The foregoing undertaking shall not prevent or limit Novavax from: (a) exercising its rights under, or enforcing the terms of, the SII License or any other agreement it has with SII, in each case to the extent SII is in actual, or has threatened, breach of such agreement(s); or (b) entering into agreements with third parties and exercising its rights under, or enforcing the terms of, such third party agreements, to the extent such actions are in connection with its legitimate business interests and not for the purpose of breaching the foregoing undertaking;

11.2.5inform Gavi of any [***]; and

11.2.6keep Gavi informed of the supply of CFN Vaccine pursuant to its supply agreements with third parties pursuant to Clause 4.8.

## 12 Liability, Insurance, Indemnification

### 12.1 Liability

With the exception of cases of [***] or otherwise for losses that cannot be excluded or limited at law:

12.1.1neither Party shall be liable to the other or to any third party, whether in contract (including under any indemnity), in tort (including negligence), under any statute or otherwise under or in connection with this Agreement for or in respect of any:

(i)[***]; or

(ii)[***];

12.1.2[***] total aggregate liability under this Agreement shall be limited to [***]; and

12.1.3without prejudice to [***], [***] total aggregate liability under this Agreement shall be limited to [***].

### 12.2 Insurance

During the Term and for a period of not less than [***] following the Expiry or Termination of this Agreement, Novavax and its Affiliates shall procure and

maintain, either through a third party insurer or through self-insurance, a liability insurance (which shall include products liability), with a limit of not less than USD [***] per occurrence and per year. All deductibles for such insurance policies shall be assumed by Novavax.

**12.3 Indemnification**

**12.3.1** [***]. Novavax and Gavi have agreed a [***]

**12.3.2** Novavax shall not, and shall ensure that the other members of Novavax's Group shall not, bring any claim against Gavi nor any of the COVAX Partners in respect of any Losses arising out of or in connection with the administration or use of the Vaccine. Novavax shall indemnify Gavi and any of the COVAX Partners for any Losses suffered by them as a result of breach of this Clause 12.3.2.

**12.3.3** Gavi shall inform [***] that it has agreed [***] with Novavax and that, subject to Clause 12.3.5, such [***].

**12.3.4** Subject to Clause 12.3.5, Gavi shall inform [***]

**12.3.5** Where a COVAX Participant has entered into a bilateral arrangement with Novavax for the purchase of the Vaccine, Novavax shall, at the relevant COVAX Participant's option, provide to such COVAX Participant the Vaccine doses it has been allocated pursuant to the COVAX Facility on the same terms as the [***].

**13 Term and Termination**

**13.1 Term**

The term of this Agreement shall commence on the Effective Date and shall continue until the later of: (i) the expiry of the Delivery Period; or (ii) thirty (30) days after the date on which Binding Purchase Orders have been placed for all COVAX Doses or the final Balancing Payment has been made (the "**Term**"), unless terminated earlier in accordance with this Clause 13.

**13.2 Termination Rights**

**13.2.1** Either Party (the "**Terminating Party**") shall be entitled to terminate this Agreement at any time and with immediate effect by giving notice in writing to the other Party:

(i) in the event of a material breach by the other Party of any of its material obligations under this Agreement, provided that: (i) the material breach is not capable of remedy; or (ii) the Party being in material breach of its obligations fails to [***] within [***] or to

[***] within [***] after being given written notice by the Terminating Party requiring such remedy;

(ii)if a Solvency-Related Event occurs in respect of the other Party; or

(iii)notwithstanding Clause 15, in the event that a Force Majeure Event continues for a period of at least [***] resulting in a non-performance or delay of the other Party's performance under this Agreement due to the Force Majeure Event.

**13.2.2**Gavi shall be entitled to terminate this Agreement at any time and with immediate effect by giving notice in writing to Novavax in the following circumstances:

(i)if the Purchase Condition is not satisfied by 31 December 2021;

(ii)if all Novavax Doses are not delivered to COVAX Buyers by 31 December 2022;

(iii)if Novavax withdraws any Emergency Use Authorisation or Regulatory Approval (or any application for Emergency Use Authorisation or Regulatory Approval), or if Novavax's Emergency Use Authorisation or Regulatory Approval is revoked, or materially changed;

(iv)if Novavax ceases the manufacturing of Vaccine due to material safety, regulatory or ethical issues and does not restart such activity within [***];

(v)if there is a Supply Failure that cannot be remedied by the Remedial Plan in the timeline specified in Clause 7.2.3;

(vi)if Novavax is in breach of its obligations pursuant to Clause 7.1, provided that if the Parties disagree whether Novavax has used best endeavours or Commercially Reasonable Endeavours (as applicable), this shall be determined by an Expert pursuant to Clause 14.2;

(vii)if Novavax is in breach of its obligations pursuant to Clause 4;

(viii)if an audit conducted pursuant to Clause 10 has confirmed a Misuse of Funds or Prohibited Practice; or

(ix)if it has been established by a final judgment or a final administrative decision that Novavax has been guilty of a Prohibited Practice, involvement in a criminal organisation, money laundering or terrorist financing, terrorist related offences, child labour or other forms of trafficking in human beings or circumventing fiscal, social or any

other applicable legal obligations, including through the creation of an entity for this purpose.

13.2.3If a Party, in good faith, considers the conditions of a Stop Criterion to be met, it shall notify the other Party thereof (the "**Safety Notice**").

(i)Following the submission of the Safety Notice, and upon the written request of the other Party, the Parties shall confer within a period of [***] (the "**Consultation Period**") to review and discuss the existence of a Stop Criterion.

(ii)If the Parties, after expiry of the Consultation Period, disagree on the existence of a Stop Criterion, an Expert shall determine pursuant to Clause 14.2 whether the conditions of a Stop Criterion are met.

(iii)Within [***] after the Parties have reached agreement on the existence of a Stop Criterion or the Expert determination was rendered confirming the existence of a Stop Criterion, Gavi shall be entitled to terminate this Agreement [***] by giving notice in writing to Novavax.

### 13.3Effects of Expiry and Termination

13.3.1Where Gavi terminates this Agreement pursuant to Clause 13.2, Novavax shall promptly refund Gavi any portion of the Advance Payment Amount which has not already been credited against the Purchase Price for a Binding Purchase Order placed by a COVAX Buyer.

13.3.2Expiry or Termination of this Agreement shall not release either Party from any commitment under this Agreement or any liability that, at the Termination Effective Date, has already accrued to the other Party, or release Novavax from any obligations under a Supply Agreement.

13.3.3Subject to Clause 13.3.2, the Parties acknowledge and agree that the Parties' rights and obligations under this Agreement shall terminate conclusively from and after the Termination Effective Date. For clarity, in the event of a Termination by Gavi under Clause 13.2.1 or Clause 13.2.2 of this Agreement, Gavi shall not be obliged to make any Balancing Payments for Remaining Doses.

13.3.4A Party shall not be entitled to any compensation for any loss, damage, liability or expense incurred as a result of the proper exercise by the other Party of any right to terminate this Agreement.

**13.4Survival of Clauses**

Any other term of this Agreement by its nature intended to survive Termination of this Agreement survives Termination of this Agreement, including this Clause 13.4 (*Survival of Clauses*) and Clauses 3 (*Vaccine Variation*), 4.4 (*Novavax Supply*), 7.2 (*Delivery, Variance, Short Supply*), 8.2 (*Fulfilment of Gavi Obligations*), 9 (*Provision of Information*), 10 (*Audit*), 12 (*Liability, Insurance, Indemnification*), 13.3 (*Effects of Expiry and Termination*), 13.5 (*Public Health License*), 14 (*Disputes, Arbitration, Expert Determination*), and 16 (*General*).

**13.5Public Health License**

Without prejudice to Clauses 13.1 to 13.4, in the event of a material breach by Novavax of any of its material obligations under this Agreement, provided that (i) the material breach is not capable of remedy; or (ii) the material breach is not remedied within [***] after being given written notice by Gavi requiring such remedy, such breach shall constitute a 'Public Health License Trigger' pursuant to clause 13.5(c) of the CEPI Funding Agreement. CEPI shall have the benefit of and may in its own right enforce the provisions of this Clause subject to, and in accordance with, the Contracts (Rights of Third Parties) Act 1999, and shall be entitled to exercise its rights under clause 13 of the CEPI Funding Agreement, provided the additional conditions set out in clauses 13.4(a) and (b) therein are also met.

**14Disputes, Arbitration, Expert Determination**

**14.1**Subject to Clause 14.2, all disputes arising out of or in connection with this Agreement, including disputes as to its conclusion, validity, existence, binding effect, amendment and termination, including a dispute as to the validity and existence of this Clause 14.1, which cannot be resolved by the CEOs of the Parties within [***] after notice of such dispute is first given by a Party to the other Party, shall be resolved by arbitration, in accordance with the [***] (the [***]) (the [***]). The number of arbitrators shall be [***], [***] appointed by or on behalf of each Party and the [***] arbitrator, who shall act as president of the tribunal, shall be appointed by the [***] arbitrators appointed by or on behalf of the Parties. If the [***] arbitrator is not chosen and nominated to the [***] for appointment within [***] of the date of confirmation of the later of the [***] party-appointed arbitrators to be confirmed by the [***], he/she shall be chosen by the [***]. No arbitrator shall be of the same nationality as any Party. The tribunal shall draw up, and submit to the Parties for signature, the terms of reference within [***] of receiving the file. The terms of reference shall not include a list of issues to be determined. The seat (or legal place) shall be in [***]. The language of the arbitration shall be English. The Parties agree to be bound by any award made by the tribunal. The Parties further agree to comply with any orders (including interim

orders) in accordance with the terms of such orders. The Parties waive their right to any form of appeal, review or recourse to any state court or other legal authority, insofar as such waiver shall not be prohibited under any applicable law. For the avoidance of doubt, the Parties do not agree to opt out of the [***] (as defined in the [***]). The Parties undertake to fully comply with any order rendered by the emergency arbitrator in accordance with the terms of such order, to the extent that such order is not terminated or annulled by the emergency arbitrator or by the tribunal.

**14.2**Where this Agreement refers to a determination by an Expert, the Parties shall, within [***] of either Party serving details of a suggested expert on the other, agree the identity of the Expert and the proposed terms of his or her appointment.

**14.2.1**If the Parties are unable to agree the identity and/or terms of his or her appointment within that period, either Party shall be entitled to request the [***] to appoint a suitable Expert and for the [***] to agree with the Expert the terms of his or her appointment.

**14.2.2**The Parties shall be entitled to make submissions to the Expert. The Parties shall promptly provide to the Expert (imposing appropriate obligations of confidence with regard to third parties) all information reasonably requested by the Expert relating to the particular dispute.

**14.2.3**The Parties shall require the Expert to prepare a written decision and to give notice (including a copy) of the decision to the Parties within a [***] of the matter being referred to the Expert (or such shorter time as the Parties may agree), and the Parties shall provide all reasonable co-operation to the Expert to achieve this objective.

**14.2.4**The Expert will act as an Expert and not as an arbitrator and his or her decision will, except in the case of fraud, be final and binding on the Parties. Each Party will bear its own costs, [***]. All matters concerning the process and results of the determination by the Expert shall be kept confidential among the Parties and the Expert and shall be deemed Confidential Information hereunder.

**15Force Majeure**

**15.1Failure or Delay in Performance**

No Party shall be liable to the other for any failure to comply with this Agreement to the extent such failure is due to any causes that are beyond its reasonable control, including natural disasters, epidemics and pandemics (but excluding those in existence at the date of this Agreement), fire, flood, severe storm, earthquake, civil disturbances, riot, war (whether or not declared) and acts of terrorism, where such

events are beyond the reasonable control of either Party (each a "**Force Majeure Event**"). The Parties acknowledge and agree that the pandemic declared in respect of SARS-CoV-2 shall not be a Force Majeure Event, with the exception that an act or order of government issued in response to this pandemic, or a material worsening of the pandemic, in each case to the extent it could not have been reasonably foreseen or planned for, may nevertheless constitute a Force Majeure Event.

**15.2 Notification and Mitigation**

In the event of a Force Majeure Event, the Party prevented from complying with this Agreement shall promptly give notice to the other Party and shall use Commercially Reasonable Endeavours to mitigate the consequences of the Force Majeure Event.

**15.3 Suspension, Cancellation, Termination**

In the event the delay continues for a period of at least [***], the Party affected by the other Party's non-performance or delay may elect to:

15.3.1 suspend performance or extend the time for performance for the duration of the Force Majeure Event;

15.3.2 cancel all or part of the unperformed part of this Agreement; or

15.3.3 terminate this Agreement in accordance with Clause 13.2.1(iii).

**16 General**

**16.1 Confidentiality**

16.1.1 Each Party shall treat as strictly confidential and not disclose or use any Confidential Information, including this Agreement and its terms, unless the disclosing Party has given prior written approval to the disclosure or use.

16.1.2 The provisions of Clause 16.1.1 shall not prohibit disclosure or use of Confidential Information if and to the extent:

(i) necessary for the performance of either Party's obligations under this Agreement;

(ii) that Gavi discloses to:

(a) [***]

(b) [***]

(c) [***]

(d) [***]

(e)[***]

(f)[***]

(g)[***]

(h)[***]

(i)[***]

(iii)that Novavax discloses to [***]

(a)[***]

(b)[***]

(iv)in the reasonable opinion of the receiving Party's counsel, is required by law (including the rules of any stock exchange) or a valid order of a court of competent jurisdiction or for the purpose of any judicial proceedings arising out of this Agreement or any other agreement entered into under or pursuant to this Agreement;

(v)the disclosure is required to fulfil reporting obligations to financial institutions providing funding relating to this Agreement;

(vi)the disclosure is made to a tax authority in connection with the tax affairs of the disclosing Party;

(vii)the disclosure is to the professional advisers or experts of a Party (including a Party's insurers, financial advisors or any Auditor) and those advisers are subject to confidentiality obligations broadly equivalent to those set out in this Clause 16.1 (*Confidentiality*);

(viii)it becomes publicly available other than as a result of a breach of an obligation of confidentiality; or

(ix)the information is already in the possession of that Party and is not subject to an obligation of confidentiality or a restriction on use.

**16.2Intellectual Property**

No rights or obligations in respect of a Party's Intellectual Property Rights are granted, or are implied to be granted, to the other Party by this Agreement. In particular, Novavax will be the sole owners of all Intellectual Property Rights generated during the development, manufacture and supply of the Vaccine or otherwise related to the Vaccine, and nothing in this Agreement shall affect Novavax's ownership of such rights.

### 16.3 Press Release

Each Party may issue press releases on Gavi's advance purchase commitment and the Parties' related collaboration according to this Agreement. The Parties shall discuss and align the form and content of such press releases and a Party shall not make or authorise a press release or other public statement relating to the collaboration of the Parties or the terms of this Agreement unless it has the prior written approval of the other Party. The Parties agree that after a disclosure pursuant to this Clause, whether it be issuance of a press release or other public announcement pursuant to this Clause that has been reviewed and approved by the other Party, the disclosing Party may make subsequent public disclosures reiterating such information without having to obtain the other Party's prior consent and approval, so long as the information in such press release or other public announcement remains true, correct, and the most current information with respect to the subject matters set forth therein.

### 16.4 Assignment

Neither Party may assign its rights and obligations under this Agreement, whether by operation of law or otherwise, in whole or in part without the prior written consent of the other Party, such consent not to be unreasonably withheld or delayed. [***].

### 16.5 Third Party Rights

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement except for CEPI in respect of Clause 13.5 only.

### 16.6 Specific Performance

[***]

### 16.7 Compliance

The Parties shall and shall cause their Affiliates to abide by all applicable laws and to ensure compliance with all applicable laws in relation to the matters set out in this Agreement.

### 16.8 Costs

Each Party shall bear its own costs arising out of the negotiation, preparation and execution of this Agreement.

### 16.9 Several Obligations

Neither Party to this Agreement is responsible for the obligations of the other Party to this Agreement. The rights and obligations of each Party under or in connection with this Agreement are separate and independent.

**16.10Relationship of the Parties**

Neither Party shall by reason of this Agreement be empowered to act as agent for the other Party or to pledge the credit of the other Party. Neither Party shall be held liable for or incur liability in respect of the acts or defaults of the other Party.

**16.11Entire Agreement**

This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement. This Agreement supersedes all prior agreements, whether written or oral, with respect to the subject matter of this Agreement. Each Party confirms that, with respect to the subject matter of this Agreement, it is not relying on any representations, warranties or covenants of the other Party except as specifically set out in this Agreement.

**16.12Construction**

Except where the context requires otherwise, whenever used, the singular includes the plural, the plural includes the singular, the use of any gender is applicable to all genders and the word "or" has the inclusive meaning represented by the phrase "and/or". The headings of this Agreement are for convenience of reference only and do not define, describe, extend or limit the scope or intent of this Agreement or the scope or intent of any provision contained in this Agreement. The term "including" or "includes" as used in this Agreement means including, without limiting the generality of any description preceding such term. The wording of this Agreement shall be deemed to be the wording mutually chosen by the Parties and no rule of strict construction shall be applied against either Party. The terms "hereof" or "herein" or any variation are intended to apply to this Agreement as a whole. The references to any applicable law, rule or regulation, or article, section or other division thereof, will be deemed to include the then-current amendments thereto or any replacement or successor applicable law, rule or regulation thereof. The word the word "will" shall be construed to have the same meaning and effect as the word "shall".

**16.13Amendment**

No variation of this Agreement shall be valid unless it is in writing and signed by or on behalf of each of the Parties to it.

**16.14Counterparts**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall be deemed to constitute one and the same agreement. The Parties agree that execution of this Agreement by industry standard electronic signature software and/or by exchanging executed signature pages in .pdf format via email shall have the same

legal force and effect as the exchange of original signatures, and that in any proceeding arising under or related to this Agreement, each Party hereby waives any right to raise any defence or waiver based upon execution of this Agreement by means of such electronic signatures or maintenance of the executed agreement electronically.

### 16.15 Notice

16.15.1 Any notice, request, or other communication permitted or required under this Agreement shall be in writing, shall refer specifically to this Agreement and shall be deemed given only if hand delivered or sent by an internationally recognized overnight delivery service, costs prepaid, addressed to the applicable Party at its address first set forth above (or to such other address as the Party to whom notice is to be given may have provided to the other Party in accordance with this Clause 16.15.1), and sent to the attention of [***], Novavax, Inc., 21 Firstfield Road, Gaithersburg, MD 20878 (with respect to Novavax), or to Office of the COVAX Facility, Attn: [***], Global Health Campus, Chemin du Pommier 40, 1218 Grand-Saconnex, Geneva, Switzerland (with respect to Gavi). A copy of the communication shall also be emailed to Novavax at [***], or to Gavi at [***]. Such notice shall be deemed to have been given as of the date delivered by hand, or on the [***] after deposit with an internationally recognized overnight delivery service, whichever is the earlier.

16.15.2 The Parties agree to send CEPI a copy of all communications in relation to any breach (or alleged breach) of the terms of this Agreement at [***] and, for the avoidance of doubt, such notice shall not be deemed valid notice to the other Party unless it is also provided in accordance with Clause 16.15.1.

### 16.16 Invalidity

16.16.1 If any provision in this Agreement shall be held to be illegal, invalid or unenforceable, in whole or in part, the provision shall apply with whatever deletion or modification is necessary so that the provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties.

16.16.2 To the extent it is not possible to delete or modify the provision, in whole or in part, under Clause 16.16.1 (*Invalidity*) then such provision or part of it shall, to the extent that it is illegal, invalid or unenforceable, be deemed not to form part of this Agreement and the legality, validity and enforceability of the remainder of this Agreement shall, subject to any deletion or modification made under Clause 16.16.1 (*Invalidity*), not be affected.

**16.17 Waiver**

A Party's failure to enforce, at any time or for any period of time, any provision of this Agreement, or to exercise any right or remedy, shall not constitute a waiver of that provision, right or remedy or prevent such Party from enforcing any or all provisions of this Agreement and exercising any rights or remedies. To be effective any waiver must be in writing. The rights and remedies provided herein are cumulative and do not exclude any other right or remedy provided by law or otherwise available except as expressly set forth herein.

**16.18 Governing Law**

This Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by [***] law.

**16.19 Binding Effect**

This Agreement will be binding upon and will inure to the benefit of Novavax and Gavi, and Novavax's and the Gavi's respective successors and permitted assigns.

**16.20 English Language**

This Agreement is written and shall be executed in, and all other communications under or in connection with this Agreement shall be in, the English language. Any translation into any other language shall not be an official version thereof, and in the event of any conflict in interpretation between the English version and such translation, the English version shall control.

*[intentionally left blank; signature page to follow]*

**In witness** whereof this Agreement has been duly executed.

EXECUTED

by **THE GAVI ALLIANCE**,

By /s/ Seth Berkley
Name: Seth Berkley
Title: Chief Executive Officer
Date: 03 May 2021

**Schedule 1**
**Price Tiers and Eligible Country List**

[Pursuant to Regulation S-K, Item 601(a)(5), this Schedule 1 setting forth the Price Tiers and Eligible Country List has not been filed. The Registrant agrees to furnish supplementally a copy of any omitted schedules to the Securities and Exchange Commission upon request; provided, however, that the Registrant may request confidential treatment of omitted items.]

[***]

38
97694998_9

**Schedule 2**
**Interim Delivery Schedule**

[Pursuant to Regulation S-K, Item 601(a)(5), this Schedule 2 setting forth the Interim Delivery Schedule has not been filed. The Registrant agrees to furnish supplementally a copy of any omitted schedules to the Securities and Exchange Commission upon request; provided, however, that the Registrant may request confidential treatment of omitted items.]

[***]

**Schedule 3**
**Pricing Tier**

[Pursuant to Regulation S-K, Item 601(a)(5), this Schedule 3 setting forth the Pricing Tier has not been filed. The Registrant agrees to furnish supplementally a copy of any omitted schedules to the Securities and Exchange Commission upon request; provided, however, that the Registrant may request confidential treatment of omitted items.]

[***]

40

97694998_9

**Schedule 4**
**Supply Terms**

[Pursuant to Regulation S-K, Item 601(a)(5), this Schedule 4 setting forth the Supply Terms has not been filed. The Registrant agrees to furnish supplementally a copy of any omitted schedules to the Securities and Exchange Commission upon request; provided, however, that the Registrant may request confidential treatment of omitted items.]

[***]

41

97694998_9

**Schedule 5**
**Information Requirements**

[Pursuant to Regulation S-K, Item 601(a)(5), this Schedule 5 setting forth the Information Requirements has not been filed. The Registrant agrees to furnish supplementally a copy of any omitted schedules to the Securities and Exchange Commission upon request; provided, however, that the Registrant may request confidential treatment of omitted items.]

[***]

42

97694998_9

**Schedule 6**

**[\*\*\*] Indemnity**

[Pursuant to Regulation S-K, Item 601(a)(5), this Schedule 6 setting forth the Indemnity has not been filed. The Registrant agrees to furnish supplementally a copy of any omitted schedules to the Securities and Exchange Commission upon request; provided, however, that the Registrant may request confidential treatment of omitted items.]

[\*\*\*]

43

97694998_9

**Schedule 7 - [***] Indemnity**

[Pursuant to Regulation S-K, Item 601(a)(5), this Schedule 7 setting forth the Indemnity has not been filed. The Registrant agrees to furnish supplementally a copy of any omitted schedules to the Securities and Exchange Commission upon request; provided, however, that the Registrant may request confidential treatment of omitted items.]

[***]

44

97694998_9

**Schedule 8**

**Covovax Schedule**

[Pursuant to Regulation S-K, Item 601(a)(5), this Schedule 8 setting forth the Covovax Schedule has not been filed. The Registrant agrees to furnish supplementally a copy of any omitted schedules to the Securities and Exchange Commission upon request; provided, however, that the Registrant may request confidential treatment of omitted items.]

[***]

45

97694998_9

**Exhibit 10.6**

**CERTAIN INFORMATION IDENTIFIED WITH [\*\*\*] HAS BEEN EXCLUDED FROM THIS EXHIBIT BECAUSE IT IS BOTH (i) NOT MATERIAL AND (ii) IS OF THE TYPE THAT THE REGISTRANT TREATS AS PRIVATE OR CONFIDENTIAL.**

April 23, 2021

Novavax, Inc.
21 Firstfield Road
Gaithersburg, MD 20878

Attention: [\*\*\*]

Subject: Modification No. 07 to Project Agreement No. 01; MCDC2011-001

Reference: MCDC Base Agreement No. 2020-530

Dear [\*\*\*]:

In accordance with the terms and conditions of the referenced MCDC Base Agreement, Modification No. 07 hereby amends the Project Agreement No. 01 as follows:

<u>**DESCRIPTION OF MODIFICATION**</u>

**1) The Incremental Funding clause of the Project Agreement is hereby amended to read as indicated in bold below:**

**5. INCREMENTAL FUNDING**
The total amount of funding currently available for payment and allotted to this Project Agreement is **$1,747,689,328** *(this is an increase of $147,349,805)*. The amount specified, or as such amount may be increased from time to time, shall apply irrespective of any other provisions of this Project Agreement and any work performed in excess thereof shall be at the Project Agreement Holder's risk. This amount covers all allowable direct and indirect costs as well as the associated fixed fee. If at any time the Project Agreement Holder has reason to believe that the Total Estimated Cost which will accrue in the performance of this Project Agreement in the next succeeding [\*\*\*], when added to all other payments previously accrued, will exceed [\*\*\*] of the then current total authorized funding, the Project Agreement Holder shall notify the MCDC CMF to that effect, advising the estimate of additional funds required for the period specified. The Project Agreement Holder is not obligated to continue performance under this Project Agreement (including actions under the Termination clause of the MCDC Base Agreement) or otherwise incur costs in excess of the amount allotted to the Project Agreement by the MCDC CMF.

Except as provided herein, all Terms and Conditions of the referenced MCDC Base Agreement, Project Agreement and preceding modifications remain unchanged and in full force and effect.

This modification is issued unilaterally. The Project Agreement Holder is not required to sign to finalize this action.

**Advanced Technology International**

By: <u>/s/</u> [\*\*\*]

99315055_4

Name: [***]

Title: Advanced Technology International Director, Contracts & Procurement

Date: April 23, 2021

-2-
99315055_4

**Exhibit 10.7**

CERTAIN INFORMATION IDENTIFIED WITH [***] HAS BEEN EXCLUDED FROM THIS EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL AND (II) IS OF THE TYPE THAT THE REGISTRANT TREATS AS PRIVATE OR CONFIDENTIAL.

June 4, 2021

Novavax, Inc.
21 Firstfield Road
Gaithersburg, MD 20878

Attention: [***]

Subject: Modification No. 08 to Project Agreement No. 01; MCDC2011-001

Reference: MCDC Base Agreement No. 2020-530

Dear [***]:

This purpose of this modification is to memorialize the Department of Health and Human Services' rescission of the Health Resources Priority and Allocations System (HRPAS) rating for the subject Project Agreement.

In accordance with the terms and conditions of the referenced MCDC Base Agreement, Modification No. 08 hereby amends Project Agreement No. 01 as follows:

<u>**DESCRIPTION OF MODIFICATION**</u>

**1) The Health Resource Priority and Allocations Systems (HRPAS) clause of the Project Agreement is hereby removed and RESERVED as indicated below:**

**18. RESERVED**

~~Health Resource Priority and Allocations Systems (HRPAS)~~

~~In order to ensure the success of the Project Agreement Holder's efforts, a priority rating is incorporated into the project agreement for the procurement of raw materials, consumables, repair parts, and major end item assemblies by the Project Agreement Holder under Title I of the HRPAS.~~

~~Priority Rating: Defense Production Act (DPA) Title I - "DO-HR"~~

~~Each rated order executed by the Project Agreement Holder must include the following:~~

~~(a) The priority rating: DPA Title I - "DO-HR";~~
~~(b) A required delivery date or dates. The words "immediately" or "as soon as possible" do not constitute a delivery date;~~
~~(c) The written signature on a manually placed order, or the digital signature or name on an electronically placed order, of an individual authorized to sign rated orders for the person placing the order; and~~
~~(d) A statement that reads in substance:~~

100276218_4

(1) This is a rated order certified for national defense use, and you are required to follow all the provisions of the Health Resources Priorities and Allocations System regulation at 45 CFR part 101.
(2) If the rated order is placed in support of emergency preparedness requirements and expedited action is necessary and appropriate to meet these requirements, the following sentences should be added following the statement set forth in paragraph (d)(1) of this section:

i. This rated order is placed for the purpose of emergency preparedness. It must be accepted or rejected within two (2) days after receipt of the order if:
A. The order is issued in response to a hazard that has occurred; or
B. If the order is issued to prepare for an imminent hazard, as specified in HRPAS § 101.33(e).

Except as provided herein, all Terms and Conditions of the referenced MCDC Base Agreement, Project Agreement, and preceding modifications remain unchanged and in full force and effect.

The Project Agreement Holder is required to sign this document and return to Advanced Technology International to finalize this action.


**Novavax, Inc.**                                           **Advanced Technology International**

**By:** /s/ John A. Herrmann III                            **By:** /s/ [***]

**Name:** John A. Herrmann III                              **Name:** [***]

**Title:** EVP, CLO                                         **Title:** Contracts Administrator

**Date:** 06/09/2021                                        **Date:** Jun 10, 2021


100276218_4

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

I, Stanley C. Erck, certify that:

1.I have reviewed this Quarterly Report on Form 10-Q of Novavax, Inc.;

2.Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    August 5, 2021

By:    /s/ Stanley C. Erck
Stanley C. Erck
President and Chief Executive Officer

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**

I, John J. Trizzino, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Novavax, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    August 5, 2021                                      By:    /s/ John J. Trizzino

                                                                   John J. Trizzino
                                                                   Executive Vice President,
                                                                   Chief Commercial Officer,
                                                                   Chief Business Officer and Interim Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO 18**
**UNITED STATES CODE §1350**
**(SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002)**

In connection with the Quarterly Report of Novavax, Inc. (the "Company") on Form 10-Q for the fiscal period ended June 30, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Stanley C. Erck, President and Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1)The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2)The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the dates and periods covered by this Report.

Date:   August 5, 2021                                   By:   /s/ Stanley C. Erck

                                                               Stanley C. Erck
                                                               President and Chief Executive Officer

This certification accompanies the Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such act, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, except to the extent that the Company specifically incorporates it by reference.

**Exhibit 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO 18 UNITED STATES CODE §1350**
**(SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002)**

In connection with the Quarterly Report of Novavax, Inc. (the "Company") on Form 10-Q for the fiscal period ended June 30, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John J. Trizzino, Executive Vice President, Chief Business Officer, Chief Commercial Officer and Interim Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

1)The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2)The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the dates and periods covered by this Report.

Date:    August 5, 2021

By:    /s/ John J. Trizzino

John J. Trizzino
Executive Vice President,
Chief Commercial Officer,
Chief Business Officer and Interim Chief Financial Officer

This certification accompanies the Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such act, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, except to the extent that the Company specifically incorporates it by reference.