# EXHIBIT B

Pages: 1-236

Exhibits: 1-3

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - x

SOTHINATHAN SINNATHURAI,

Individually and on Behalf of All Others

Similarly Situated,

                Plaintiffs,

   v.          Civil Action No. TDC-21-2910

NOVAVAX, INC., et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION of SRIPRAKASH P. KOTHARI

Tuesday, October 31, 2023 - 9:13 a.m.

Ropes & Gray LLP

800 Boylston Street

Boston, Massachusetts

Court Reporter:  Katherine A. Tevnan, CSR #129093

Registered Merit Reporter

A moment ago in your answer you said a lot of trading by individuals or some others. What did you mean by "or some others?"

Can you describe that?

A.   There could be others meaning hedge funds or -- so I'm saying that it's not -- exclusively individuals.  It doesn't have to be.

Q.   So noise trading can be caused by individuals or by institutions is your testimony?

A.   Generally institutions are thought of as -- thought of as not noise traders but all I'm saying is I'm allowing -- it's not like people wear a badge on their or -- you know, they tape it on their forehead saying that I'm a noise trader or I'm not a noise trader.

So this is necessarily based on some behavior that is associated with noise traders, and it is conceivable that some are trading in an institution is a noise trader.  There is recent news report on Two Sigma hedge fund and some trader in that deviated from their trading

strategy and that resulted in several hundred million dollars.

Now, I don't know if that is -- that individual, even though he is part of an institutional investor community, but whether his behavior might be akin to noise trading.  It's entirely possible, at least.

Q.  Okay.  So you gave a -- sort of an obviously glib example of, you know, no one is putting the noise trader label on their head. And I appreciate that.  It's a funny image.

But on a more serious note, how do you identify a noise trader?

MR. BROWN:  Object to form.

A.  The focus is not as much on identifying individual traders as noise versus not noise. But the focus is, is the behavior of security prices suggestive of noise trading.

Q.  What makes something suggestive of noise trading?

A.  So in this case, during that period, a

lot of intense, not only investor interest but general public interest.  There was, at a frenetic pace, an attempt to develop vaccine that would combat COVID.

There is also along the lines of political affiliation, or in general, there were some trust issues with respect to the development of vaccines and some saying that that process is political and it is not entirely scientific.

There was a lot of individuals trading and some of that was alleged to be coordinated trading with Reddit or some others providing that coordination.  And there were restrictions on short selling such that some of the arbitrages had -- even though they thought otherwise -- they had difficulty arbitraging away prices if they believed they were deviating from fundamentals.

So that collective environment led to injecting noise in security prices for that, during some of that period, COVID period, 2021.  And there are reports by the SEC that are

out" or "to dummy out some data"?

A.  Of course.

Q.  What does that mean?

A.  That means you include an independent variable that takes value one on the day that you believe, like an earnings announcement has taken place.  And on all other days that dummy variable has the value of zero.  And that, in a regression thing, is called dummy out.

Q.  Now explain to me if you will, and I am sure you will, why that is not exactly what Mr. Coffman did with his exclusion dates?

MR. BROWN:  Object to form.

A.  The question is not about whether mathematically it is identical to dummying out.

Q.  I'm sorry, the last word again?

A.  Mathematically is his process identical to dummying out.

Q.  Got it.  Thank you.

A.  What I'm questioning is how he selected those observations to dummy out or to exclude.

Q.  I believe he dummied out or excluded press releases, for example, correct?

MR. BROWN:  Object to form.

A.  I -- I'm not so sure that -- you know, I think some of those, there may be press release, there may not be.  But I think the biggest reason, as far as I can recall, was that those were extreme return observations.

Q.  Were those extreme returns on earning announcements?

A.  I don't know that.

Q.  And do you recall -- have you ever created an estimation window where you also applied a value of zero to press releases?

A.  Yes.  Whether it is press releases or not, I cannot recall.  But I have dummied out observations, yes.

Q.  So -- and you -- and what did you conclude in those cases?  Do you recall?

MR. BROWN:  Object to form.

A.  Conclude about what?

Q.  Market efficiency.

A.  In those cases, I think the conclusion, at least some of those tests, I recall market was efficient.

Q.  And do you recall ever opining on the efficiency in the case where you used an estimation window that was only during the class period?

MR. BROWN:  Object to form.

A.  I don't recall one way or the other.  I mean, it is possible, but it is not possible, so.

Q.  Again, leaving aside any reports you might have worked on before you withdrew or that IPO case, you know, you had your handful of times when you testified as a plaintiff's expert.  You said it was about six.

In any of those six cases, do you recall that you used an estimation window that was commensurate with the class period?

MR. BROWN:  Object to form.

A.  It is quite possible that it was

overlapping with the class period.

Q.  And do you recall that you concluded that
the stock was trading efficiently in that case
where it was overlapping with the class period?

MR. BROWN:  Object to form.

A.  It is quite possible, yes.

MR. ROGERS:  I know it hasn't been
quite an hour, but this would be a good breaking
point to have a very short break and I do mean
short.

MR. BROWN:  Five minutes?

MR. ROGERS:  Yeah.  Normally I like
to do it about once an hour, but this is a nice
breaking point.

MR. BROWN:  Okay.  That's fine.

THE VIDEOGRAPHER:  The time is 9:54.
We are off the record.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the
record.  The time is 10:09.

BY MR. ROGERS:

Q.  Good morning again, Dr. Kothari.

A.  Good morning.

Q.  Just briefly before we jump into -- into a report.  I'm sure you're familiar with the Cammer factors and the Krogman factors, right?

A.  Correct.

Q.  Okay.  Did you conduct a full analysis of the Cammer factors other than Cammer Factor 5 in coming to your opinion in this case?

A.  I might have done one or two others, but basically I focused on Cammer Factor 5, which was, in my opinion, in Mr. Coffman's analysis was deficient.

Q.  But you didn't make any effort to analyze the other four Cammer factors in coming to your conclusion regarding Novavax's efficiency during the class period?

          MR. BROWN:  Object to form.

A.  I was not asked to do that.  I wasn't asked to -- I was asked to comment on Coffman's report.  I wasn't asked to affirmatively test

whether market is efficient or not in Novavax.

Q.  I think you will agree, will you not, that Mr. Coffman's report conducted a full-throated analysis of all five Cammer factors, correct?

MR. BROWN:  Object to form.

A.  I don't know what "full throated" means.

Q.  What do you understand "full throated" to mean?

A.  Well --

MR. BROWN:  Objection.

Q.  You can answer.

MR. BROWN:  Go ahead.

Q.  I think you know what it means.  So just tell me what you think it means.

MR. BROWN:  He just said he didn't.

A.  You know, if -- if -- if full-throated means thorough or extensive analysis.  I think given the deficiency, I cannot agree that it was full throated.  But if full throated means something else, I don't know.

Q.  When we get to your report later, I will ask you to show me where you made an effort to look at the other four other Cammer factors.  I don't think I saw it in your report.

So did you -- did you make an effort to include the other four Cammer factors in your analysis?

MR. BROWN:  Object to the form.

A.  I comment on what are some of the direct indicators of efficiency and indirect.  And I briefly comment on the other factors that Mr. Coffman has looked at.  But I didn't because my purpose was not to write an efficiency report on Novavax.

My assignment was to comment on Coffman's report.  So, therefore, I did the analysis that included in the report.

Q.  I know you are not a lawyer, but you might be --

MR. BROWN:  Oh, shoot.

MR. ROGERS:  Do you want to go off

possibility that how were they selected?  And I comment on some of those.

And why did he exclude so many of these observations?  So there is that subjectivity that has been injected into it.  And that's what I'm objecting to, that test not being conducted without any flaws.

Q.  Thank you.

My question simply was:  In your directionality test, you chose 9 events out of a 500-day period, correct?

A.  Yes.

Q.  That's a higher -- that's a smaller percentage than the number of events Mr. Coffman used for what you consider the wrong test, I got that part, but Mr. Coffman's test, he used a higher percentage than you used for your directionality test in Mattel, correct?

MR. BROWN:  Object to form.

A.  Directionality tests are based on quarterly earning announcements.  And that is the

common way, and I explain why.  That is the maximum one could use.

And I used all of them.  And I performed a statistical test and that statistical test lead to the conclusion that there is positive corresponding.

I would not have objected if Mr. Coffman had used that few observations, but had performed a statistical directional test.  So he didn't perform a statistical test and he didn't perform a directional test.  What am I going to say?  Of course I'm going to say that those are flawed.

Q.  That's -- I am not sure that answered my question.

A.  I was -- I was working for plaintiff here.  I wasn't expert at that time.  You are really happy with that.  You know?  So I just want to remind you of that.  You know?

Q.  There was a date where you discovered that it didn't move the direction you expected, and you explained why the way it moved actually

made sense, correct?

A. Well, that is perfectly fine.

Q. Mr. Coffman did the same for March 2nd, right?

MR. BROWN: Object to form.

A. But the point is that he did not establish -- I did not use that observation in my statistical test to say that hey, no, I'm going to -- this is inconsistent, so I'm not going to use it or I'm going to massage it or anything.

No, I used the observations as-is and conducted the statistical test.

If Mr. Coffman had done that, I would have said fine. You know? But he did not do that.

Q. Did you rerun his event study doing it the way that you just said he should have done it and conclude that the market was indeed efficient?

A. No, I did not -- I'm saying that I was not asked to demonstrate market efficiency or

Snuperakash P. Kothari
October 31, 2023

not.  I was asked to comment on Mr. Coffman's analysis.

Q.  You seem very, very confident as you sit here today that there is a right way to do the Cammer 5 test, correct?

MR. BROWN:  Object to form.

A.  It is not me who says that.  It is --

Q.  Okay.  Did you run -- did you run the numbers through your Cammer 5 test and discover whether the results were significant?

A.  I did not run it.

Q.  Did you think of doing that?

A.  Now that you mention, yes.

Q.  Do you wish -- would you like to take some time to go do that?

A.  No.  By the way, you are focusing on six observations.  There are ten observations that he had, just for the record.  And the statistical test, you had to use all ten to get --

THE COURT REPORTER:  To get what test?

you call the indirect factors.  It says, "Thus,

Mr. Coffman's analyses of these indirect factors

do not prove that Novavax's common stock traded

in an efficient market during the Class Period."

Is it your testimony that Mr. Coffman

needed to use those other Cammer factors to,

quote/unquote, prove that the stock was traded in

an efficient market?  Is that your understanding

of how that works?

A.  Evidence supports the hypothesis, that

sort of scientific language.  And in colloquial

terms -- not that I'm trying to use colloquial

terms -- but less scientific terms it is saying

that it proves market efficiency.

Q.  And you say here that Mr. Coffman's

analysis of Cammer factors, one -- actually,

let's be more specific.

When you say 9 of the 11 factors, you

mean the factors that do not include Cammer 5 and

the auto-correlation test, correct?

A.  Well, I comment on auto-correlation test

directly not establishing market efficiency of

semi-strong form.  Because even if it is weak

form, the auto-correlation can be zero.  So it's

a little bit ambiguous saying that

auto-correlation test, yeah.

Q.  I just want to make sure for the sake of

the record.  When you talk about the 9 of the 11

factors -- I don't want to make you list them --

you are talking about Cammer 1 through 4 and then

the -- certain of the Krogman?

I just want to make sure we are creating

a record.  What nine factors are you referring to

here?

A.  Well, we can go through Coffman report

one by one and say that, you know, those are the

nine factors.  But all I'm trying to -- Cammer

Factor 5 certainly is excluded from the 11.  I

mean, it's not in the 9.  And ambiguous are the

institutional ownership and auto-correlation.

Q.  I notice you left out option trading.

A.  Oh, yes.  That too, but...

Q. Do you agree that option trading can often be an indication of an efficient market?

A. Generally all these are, if there is decent amount, they are indicative of efficiency.

But they are not proof-positive of efficiency.

Q. So therefore I would like to go back into that -- that final sentence at paragraph 27, and you say "Thus, Mr. Coffman's analyses of these indirect factors do not prove that Novavax's common stock traded in an efficient market during the Class Period."

What's your basis for that conclusion?

A. My economic expertise and looking at all of the research, scientific research, also it points to efficiency implied and that is that market has reacted favorably to good news and unfavorably to bad news.

And to the extent that you don't perform that test, you haven't established that market is efficient.

Q.  Now, are you testifying today that Cammer Factor 5 applied under the test that you think is appropriate, trumps all the other factors combined?

A.  I'm not saying that, per se.  What I'm saying is that it is necessary, it is helpful to have other factors.  And in most cases when the market one concludes is efficient to other factors, generally speaking, maybe one or two exceptions, but generally are in the -- point in the direction of efficiency.

But in addition, Cammer Factor 5 directionality test is necessary to establish that a stock was traded in an efficient market.

Q.  Okay.  So it sounds actually you are saying something a tad even more extreme than what I just asked you.

Correct me if I'm wrong, it sounds that you are saying that the directionality test, as part of the Cammer 5 test, by itself trumps all other analyses of market efficiency?  Is that

that well, a particular case, in that case why?
And I can't recall why I focused on that.  It
must be an important one or whatever -- whatever
reason.

And then where it didn't go, I probed and
said, you know, there are some extraneous
reasons.  But the test did not hinge on that
inconsistency.  In spite of that inconsistency,
the test showed a positive association.

Q.  Well, if that inconsistency didn't
undermine your results in Mattel, why did you
feel the need to explain why it was directionally
inconsistent with what you would have expected?

A.  As I said, I do not recall all the
details sitting here.

Q.  But you did do that?

A.  Oh, yeah, of course.  You pointed out to
me, and I agree that I did that.  I'm not --
that's why I'm saying that it must be -- there
might be some context relevance of that and
that's why I did it.

I cannot recall the context and relevance sitting here today.  Whatever was done, 2000, whenever it was.  Yeah.

Q.  But with the March 2nd date that we went through, you concluded that that -- you didn't only say that Mr. Coffman didn't apply the directionality test.

You called out March 2nd as an example of where it didn't go in the right direction, correct?

A.  Yeah.  Same way I did in Mattel.

Q.  No.  Because in this case you didn't look at the announcement and notice that there was bad news that could potentially confound the earnings.

MR. BROWN:  Object to form.

A.  It is possible.  I was not asked to do those things in this case.  It is possible that it is consistent if I account for all those things.  I haven't done that analysis.  I thought it was Mr. Coffman's job to perform the

directionality test.  And if there is some
inconsistency or anything, if he feels necessary
to probe that, he should have done that.

Q.  But you pointed out in March 2nd going in
the wrong direction, didn't you?

MR. BROWN:  Object to form.

A.  Yes.  I mean, because -- at least that's
what my statement is, yes.

Q.  I thought your opinion is that the simple
fact of not doing the directionality test is
dispositive and meaning you didn't do it
correctly.

So why bother going further to an example
of where it went in the wrong direction?  Why did
you do that?

A.  To give more color to that.

Q.  Color that went against Mr. Coffman's
conclusions, right?

A.  Of course.  That is the job of, you know,
in any -- and Mr. Coffman is also giving color
that is supportive of it.  So that -- I mean, let

us not be naive about it.

Q. No, we are not being naive.

A. Yes.

Q. Mr. Coffman is being tasked to establish something, and you are being retained to rebut Mr. Coffman's conclusions.

So everything in your report is in an effort to rebut his conclusions, correct?

MR. BROWN: Object to form.

A. I don't know. I mean, I'm giving an honest opinion. It also happened to rebut, you know, Mr. Coffman's analysis.

Q. So which is it then? Is it the fact that you think he should have done directionality analysis? Or is it the fact that on March 2nd, as you conclude, the price isn't going in the right direction?

A. The directionality test is essential. March 2nd is just -- it's an example.

Q. An example where you said it went the wrong way?

A.  Yeah.

Q.  And I am not even Mr. Coffman.  I am reading the news, and I pointed out that there was a, quote/unquote, unexpected missing in net.  The net loss was larger than expected.

That, to me, seems to suggest that there was bad news that confounded the otherwise positive earnings.  Did you consider that?

A.  As I said sitting here now, if you disagree with my analysis, well, so be it.  But the point is that the basic fact that directionality test was not performed is there.  And my read of the March 2nd is that it goes in the wrong direction, but you might have a different opinion on that.

Q.  It is not an opinion.  It was unexpected larger than expected -- larger than expected losses, correct?

A.  Well, that will require a little more analysis.  And we can, or at least my reading, and I'm happy to do that.

Q.  You can go back to that exhibit.  You saw that it said larger than -- it is right in front of you.

A.  Okay.  So, can you point where I'm saying in the report March 2nd?

Q.  I am talking about the news --

A.  No, I know what you are talking about.  I will go to that also.

Q.  We will get to that.  If you could pick up the exhibit in front of you, sir.  I want you to look at the language in that press release.

A.  Okay.

Q.  I think you will agree -- once again, we discussed this earlier -- that it was described as an unexpectedly large miss, right?  It says "a wider-than-expected fourth-quarter loss."

A.  But its sales beat Wall Street expectations.

Q.  I understand that.

A.  So I think it was ambiguous.  And that -- and, you know, so.

Q.  I think you said earlier in the deposition that unexpected negative news, you would expect that to lead to a price decline, right?

A.  News, yes.

Q.  Well, this news about the wider than -- the wide fourth-quarter loss, that was not expected news, was it?

A.  Nor was it to beat sales expectations. So I think -- I think there are two new pieces of news.  I am not trying to be cute here, okay? There are two pieces of news and in the one sentence.

So I think it is ambiguous.

Q.  Your testimony is that when a company reports, and I quote, "Wider than expected losses," that in and of itself is not negative news?

MR. BROWN:  Object to form.

A.  Now you are saying in of itself -- in and of itself.  Yeah, if you focus only on that, we

call it partial.  So -- but, you know, if in the same sentence, some other news is provided, then it is less obvious that it is what you're saying.

Q.  I'm looking for where in your report you talked about March 2nd.  I don't remember you pointing that fact out.  Yeah, I think it starts on the bottom of page 17 and continues to the top of page 18.

"Specifically, on March 2, 2021, following the release of the Company's Q4 2020 results, Novavax's abnormal return was statistically significantly negative.  However, the unexpected 'surprise' components of the quarterly earnings per share and revenue releases were positive and, i.e., they exceeded analysts' consensus estimates."

A.  So I will --

Q.  I haven't asked a question yet, sir.

So can you point out where in this discussion right here, about March 2nd, where did you note in your report that there was also some

Suprakash P. Kothari
October 31, 2023

confounding negative news about larger than expected losses?

A.  The revenue releases were positive, right?

Q.  That wasn't my question, sir.  My question was, you and I just looked at the press release, and you acknowledged that there was some confounding negative information.

THE COURT REPORTER:  Slow down a little bit.  "You and I just looked at the press release -- "

Q.  And there was some unexpected --

A.  So --

Q.  I'm not done yet -- negative confounding information.

A.  Okay.

Q.  You --

A.  I --

MR. BROWN:  Let him finish his question.

Q.  Tom is going to object.  I have a long

preamble.

So earlier today I think you said that you put this March 2, 2021, news in as an example for context, that it was not a dispositive factor in your conclusion. You put it in your report as an example, ostensibly to benefit the court, right?

A. Yes.

Q. So why didn't you mention that there was confounding negative information? You were only adding context for the court.

A. All right. So here it says it is not -- first, let us establish the abnormal return was statistically negative. All right?

Q. No one is debating that.

A. Okay. However, the unexpected components of quarterly earnings per share and revenue releases were positive.

So revenue is the confounding part. That was positive. Right? And that's what this press release also says (indicating). That reported

wider than expected fourth-quarter loss, but its sales beat Wall Street expectations.

Q. Yeah. But you are taking this a little out of context, with all due respect, sir.

You said right here: The abnormal return -- "the statically significant abnormal return, was not in the right direction."

You didn't say it was in the negative direction. You said it is in the wrong direction, correct?

A. Yes.

Q. Okay. Now, how can you give context to the court in your duly-signed report here and not mention that there was some significant negative information on that date? You don't say that here, and I am wondering, why didn't you say that?

MR. BROWN: Object to form.

A. Maybe I am missing something here, obviously. I'm saying that there were two pieces of information that came. One was earnings and

one was sales.  There could be more.  But at least those two came.

Q.  I think you and I just spent a lot of time on that document, sir.  There certainly was something else.  It was reported as "wider than expected losses."

Now, it's funny that in this report you seem to look to the fact that they beat expectations.  You did that.  Now you just explained that you also looked to sales, but you very conveniently missed the clause right between them.

I'm just asking you, you told me the reason you mentioned March 2nd was to give context to the court.  I am giving you a chance to explain what seems to me to be a little hard to understand.

Why didn't you inform the court for context that there was some very significant negative news on that date?

MR. BROWN:  Object to form.

A.  You know, there was -- the news was about earnings, which was -- you know, in this case it seemed negative.  Revenues was positive.

Q.  Is it your testimony that wider than --

MR. BROWN:  Wait.  Did you finish?

Q.  -- expected fourth-quarter loss is not negative news?  I believe you said earlier that it was.

A.  Analyst reports said soon after this earnings announcement were also positive, inconsistent with the direction of --

So, you know, look, my assessment is on that day it could have been positive because sales were going in the right direction.  And analysts' reports subsequently were also pointing in the right direction, a favorable direction. But the market reaction was negative.

And that seemed directionally inconsistent.  Now, there could be additional things that explain that.  I'm not disputing that.  And that's what I'm commenting.

In any case, this is only one observation and it doesn't constitute a directionality test.

Q. You just said there could have been additional things that explained that. "That" is a statistically significant move in the negative direction, which you classify in your report as wrong.

So yes, I would agree with you. There could be some other information. The quotation that says: "There was a wider-than-expected fourth-quarter loss." But you didn't put that in your report. I am just struggling to understand why would you skip that clause in this very short news release.

A. Look, I'm just saying that the components of earnings per share and revenue releases were positive. That's what I'm saying.

Q. I agree with you.

A. So there is -- you know, and then I'm commenting on analyst's reports.

So I cannot, sitting here, resolve what

you are claiming to be the inconsistency between the -- this thing (indicating) and what I have paraphrased there.

Q.   Now that we are in the deposition and we are looking at this press release, would you like to reconsider your statement that the nominal return was not in the right direction?  Does this --

A.   It seems ambiguous at the minimum.

Q.   You didn't say that in your report.

A.   I did not.  I agree with you.

Q.   Would you like to change it to ambiguous?

A.   I will have to wait and maybe we can provide a supplement after the thing, which would be part of the record, one page or half a page, if that is what is needed.

But my read of it is that the earning news was positive and sales news was positive but the stock returns were negative.  That's what I've said in the report.

What is in the -- this press report it

says, "wider than expected loss" and -- "but
beats sales expectations."

So it's ambiguous here (indicating).
It's -- in one direction and then the analyst's
reports are indicating positive.

Q.  All right.  Well --

A.  But I think we are spending a lot of time
on -- and it is your call, you can do whatever
you want.  But it seems to me that regardless of
this (indicating), it does not establish that a
directionality test has been performed.

Q.  As to the questions of whether you will
or will not put in a supplement or whether, as
you said, "if that's what is needed."  Let me
begin by citing for the record, it's -- your
testimony is that the news may have been
ambiguous as opposed to your report which says it
was "not in the right direction," that's between
you and your counsel whether you decide to do
that.

So on page 9 you say that:  "The mere

wasn't -- the four observations, to the best of my understanding, they were the largest stock return observations.  Or you know, the methodology was not consistently applied throughout that these were the news days and all news days I would.  No, they were large stock price reaction.

And I don't think as an economist or an econometrician you do that.  No, I don't like this.  It's to give you -- anyway, I don't want to get into an NBA analogy but that's what comes to mind.

Q.  Well, what is your methodology and your technique -- again, I understand this is part of your directionality test.  You don't have to say I understand it, but in your technique you acknowledge that you dummy out certain dates.  Do you your 1s and 0s.

What is the difference between your dummying out and what you seem to be suggesting is an artificial exclusion?

A. Yeah. The dummying out, if it is based on not just one observation but several, you apply, you specify consistent rule. And you say okay, without looking at what was the stock price reaction, I'm going to dummy out that. Those were like earning announcement dates. I don't have any problem with Mr. Coffman dummying out or excluding the earnings announcement dates.

But if you say that, well, large observation, I exclude them, it's equal to dummying out those large observation. That, I think, is econometrically problematic.

Q. Did do you -- did you -- ask this properly.

Did you engage in any effort to analyze what the news was on January 29th that created, at least ostensibly created, this large stock movement?

A. I did.

Q. What was that news?

A. There was some -- I don't -- I have

discussion of that, and 65 percent, I think that is the amount, stock price reaction.  And price targets were revised by maybe 10 percent or so. So fundamentals -- I was trying to see if the fundamentals would explain a large chunk of it, and they did not.  I looked at it for next few days also.  Even then, there wasn't any evidence of that.

And it did seem that this was a lot of it, at least, was random movement in stock prices that during this period, we were witnessing for Novavax -- I mean, it is really uncommon to come across routinely 10, 20, 30 percent stock return days.  The standard deviations are off the chart high.

Q.  I --

A.  And then to say that, well, you know, let me know this high observation.  It is -- let me use the NBA analogy.

The average height -- they are only 1 percent people from the population more than 6,

yeah, it is okay.  Whatever the conclusion is, I could have rendered my, as an expert, some opinion on that.  But that's not what he did.

Q.  I think I asked you this before.  I am not sure you answered it.

If you apply your prescribed Cammer test and your analysis of the significance of the two-drop dates, the only change you make is that you exclude January 29th the way Mr. Coffman did, your results would be statistically significant, wouldn't they be?

MR. BROWN:  Object to form.

You can answer, if you know.

A.  I don't -- sitting here, I don't know the answer to that.  Your know, it is possible, but I don't know that.

(Discussion off the record)

THE VIDEOGRAPHER:  Time is 12:55.  We are off the record.

(Lunch recess taken)

A F T E R N O O N   S E S S I O N

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:38.

BY MR. ROGERS:

Q.  Good afternoon.

A.  Good afternoon.

Q.  I want to continue on back into your report.  I want you to look to paragraph 70 on the top of page 28.

A.  Okay.

Q.  We are dealing with the estimation period there, do you see?  You say that, "First, Mr. Coffman's estimation period for analyzing cause and effect on News Days within the Class

Period includes other earlier days in the Class

Period, i.d. -- i.e. -- excuse me -- days when

Novavax's returns were allegedly tainted by the

Defendant's purported misrepresentations.

Expected returns [based] on such a

tainted sample cannot reliably predict the

stock's return absent the alleged fraud."

Do you see that, sir?

A.  I do.

Q.  Wouldn't that suggest that your

estimation period in Mattel, quote/unquote, could

not reliably predict the stock's return?

A.  This is one of the factors, and as I

said, there is a tradeoff between use of the

class period and the recency of the class period

where there is an earlier period that's outside

of the class.

Q.  And then you went on -- excuse me -- and

you said, "it is customary to consider a pre-

class period estimation period in conducting an

event study."

You didn't mention here that you would use just such an estimation period in one of your other cases, did you?

A.  Well, as I said, in terms of the event study, other things equal, you want to use a pre-class period.  So not every time one has the luxury of using pre-class versus class.

And as I said, there are tradeoffs.  And you find use of in-class or as well as pre-class from time to time.

Q.  But here you didn't include any such qualifiers in this report, which is attached as an exhibit to Mr. Brown's class certification opposition submitted to the Court.  You said "Expected returns based on such a tainted sample cannot reliably predict the stock's return absent the allegedly fraud."

Were you concerned that that might be a bit misleading?

A.  I don't know if it is misleading, but it doesn't have all the qualifiers, yes, you know,

if that's what the point is.  But it is -- you
know, when the class period is short, you have
the ability to use pre-class period and that has
the luxury of not having returns affected.

That doesn't mean necessarily the
conclusions would be wrong.  They can be tainted.
They can be affected.  They potentially effected.
And that's what I think I'm getting at here.

Q.  Well, that's a level of -- you just kind
of used the subjunctive there that you don't
really use in your report.  You don't say what
you just said.  You said "expected returns based
on such a tainted sample cannot reliably
predict."

Do you want to walk back what you wrote
in your report there?

MR. BROWN:  Object to form.

A.  I wrote in the report here and it is what
is tainted here.  And all I'm trying to give is
providing additional color in this question.
Just as, you know, as it is expected.  At least

that's what I think it is expected in these depositions.

Q.  And in doing that color, I think we have established that you signed your report, right?

A.  Yes.

Q.  You are giving sworn testimony today?

A.  Always.

Q.  You've testified in court, I imagine?

A.  I have.

Q.  Duty of candor is very important, right?

A.  Pardon?

Q.  The duty of candor when you testify in front of a judge, that's important, right?

A.  Honesty, candor, yes.

Q.  You understand the Daubert standards.  We talked about that?

A.  Yes.

Q.  And you know from experience that your credibility as an expert is always in question.  You understand that, right?

A.  Of course.

Q.  Does that concern you, that you said to the judge, to avoid that problem, meaning the tainting of that estimation period, it is customary to consider a pre-class period estimation period, but you neglected to give the context to the court that in another report four or five years ago you used exactly that methodology?

MR. BROWN:  Object to form.

A.  Well, I don't, sitting here, recall all the details of the time period of that Mattel.  But it is the case that there I have used similar methodology as -- in class time period.

And maybe the -- I mean, it's -- it's -- whether it is affected or not, I don't know that, whether it would have been made a difference there.  Sitting here, I certainly cannot state that.

Q.  Do you understand now, your testimony today, and ostensibly Mr. Coffman's rebuttal report, is going to mention to the court that you

did use the estimation window that you say here

cannot rely upon -- that's going to be part of

the record, you understand that, sir, right?

MR. BROWN:  Object to form.

A.  Well, yes.  All I'm trying to say here

is -- which is also part of the record, is that

there is a tradeoff.  It is not that one is

unambiguously better than the other.  But there

is a tradeoff.

Q.  And I'm not smart enough to debate where

that tradeoff should end.  That's why I was

asking you questions.  I am asking a different

question.  I'm giving you an opportunity to

testify in a way that -- and establish your

credibility, I am giving you an opportunity to

sort of correct or modify what you said in

paragraph 70.  If it is your choice you don't

want to, we can move on.

A.  It is not a matter of choice or what I

want to do.  I'm giving you a full answer that

there is a tradeoff.  That is part of the record

then.

Q. It is a tradeoff that when you were working as a plaintiff's expert, you took the trade on the side that Mr. Coffman took in this report. In this report where you are on the defense side, you are taking the opposite tradeoff. There is a little inconsistency there. I am trying to give you the opportunity to --

MR. BROWN: Object to form. Go ahead.

A. Well, looking at only that particular, it might seen inconsistent. But the point is that the two cases are very different. And the heart of the matter here is relying on the directionality test, and it is also on the fact that this time period is characterized by very unusual circumstances.

Q. You are making an absolute statement in paragraph 70, though. You are not saying because of X and because of Y in this case. You are saying something that expected returns based on a

tainted sample.  You define tainted as being during the class period, when the misstatements were made.  Cannot reliably predict, and then you go on to say it's customary.  What does the word customary mean to you?

A.  Customary means it is often or common practice.

Q.  And you've used that class period estimation window in at least one of your reports.  How about the other five or so times you worked for the plaintiffs, where you testified.  Do you recall where you used a class period estimation window or did you avoid the taint by going earlier?

MR. BROWN:  Object to form.

A.  As I said, you know, each setting is somewhat different.  And if there is an opportunity without any problem to use an earlier period, I think that -- other things equal, that is preferable.  That's all -- and perhaps it can be stated that way, if you --

Q.  So all things being equal, it is better to use the earlier one, you're saying?

A.  Yup.

Q.  But you didn't do that in Mattel.  How come?

A.  I don't know all the circumstances in Mattel sitting here.  I will have to go back and look at it.

MR. ROGERS:  Can we go off the record for a second?  I'm sorry.

THE VIDEOGRAPHER:  The time is 1:47. We are off the record.

(Discussion off the record)

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:48.

MR. ROGERS:  I apologize for that.

BY MR. ROGERS:

Q.  So you just made a comment about Mattel. Again, to the best of your recollection, on your plaintiff's case, we'll start with those.  Do you recall any instances where you used an estimation

period that included the class period, as

Mr. Coffman did in Novavax?

A.   There have been instances where I think the class period was really long and there really was not much choice.  And I might have used the in-class period.  But I cannot, sitting here, recall case by case what has been the choice.

Q.   I will ask this one more time, then we can move on.

Would you like to modify your report so you no longer say:  "It is customary to consider a pre-class period estimation period"?

A.   Well, it is customary to consider.  I mean, it is not to actually use, to at least entertain the possibility.  That's what I'm saying there.

Q.   At the top of page 29, at the end of -- let's go to the bottom of page 28, actually.  It is March 2nd.

Actually, go to paragraphs 73 and 74.  I think I might have asked this before, but I will

ask it again.  If you had excluded January 29,

2021, as Mr. Coffman did, would you also have

found that the returns on August 5th -- excuse

me, on August 6, 2021, were statistically

significant?

    A.  I don't know for a fact, so I would be

speculating here.

    Q.  You are saying that you don't know for a

fact suggests to me you have a suspicion what the

answer is.

    A.  Well, because of the magnitude, if you're

excluding an outlier, a standard error -- as I

said to you, in a short period, the standard

error would be mechanically lower, and that has

the potential to make the given abnormal return

statistically significant.

        And coupled with that is Mr. Coffman

concluding that it was significant.  So that's

why I am saying it would be speculation.  I

haven't -- I don't know for a fact.

    Q.  Same question about October --

downgrade perhaps smaller amount, but nonetheless, other things equal, I would expect them to downgrade.  And none of that happened and the stock price bounced back.

Q.  You have never seen a situation where a company made a negative announcement or some kind of admission of wrong doing, and analysts concluded that all the artificial inflation is out of the stock and now might be a great time to buy?

Did you consider that in this or any other case?

MR. BROWN:  Object to form.

A.  But that's not what they said here.

Q.  Well, I'm asking if you considered that very possibility.

A.  Well, I'm looking at, A, this is not a direct test.  This is, is there corroborative evidence?  And I looked at -- I am looking at what they said.  What they actually, did they down -- did they revise price target down?  And

the answer is no.  Did the stock price bounce back?  Answer is yes.

So the corroborating evidence was in line with the alleged corrective disclosure not being as evidenced, my evidence at least suggests not being significant and maybe a result of some -- whatever the magnitude was.

There were a lot of noise in the stock price, and that's what -- it was consistent with that.

Q.  Now, you have served as an expert on multiple occasions in federal securities cases, both plaintiff and defense side, correct?

A.  Yes.

Q.  You've analyzed partial corrective disclosures, I'm going to imagine, where you concluded that the returns were statistically significant, correct?

A.  I don't know.  But I have also tried to parse out the effect due to the corrective disclosure and confounding effect, so try to

disentangle the two.

Q. I am not talking about lost causation, so let's not worry about confounding for the moment.

I'm just saying that in your work -- let me be more specific. In your work as a market efficiency expert in federal securities cases, have there been any cases, plaintiff or defendant, where you concluded that the return in response to an alleged partial corrective disclosure was statistically significant?

A. I can't sitting here recall that. Probably I have. But probably I have also concluded that it is not significant, but --

Q. Of course. I am just saying: Have there been times, even once -- Mattel seems to be one -- where you did conclude that it was statistically significant? Just a predicate question.

A. If I recall correctly, you know, in Mattel's case, it was actually that it might not have been significant. But when we parsed out,

a few more questions.  I want to kind of get my head together.  It is not going to be much longer.  Let's take a short break.

MR. BROWN:  Do you want to take a break?

MR. ROGERS:  Yeah.  Let's take a break, get our stuff together.  I don't want to waste anyone's time if it takes 20.  I'd rather not take a half hour, but --

THE WITNESS:  No worries.  Take your time.

MR. BROWN:  How much do you want, ten minutes?

MR. ROGERS:  Yeah.  Why don't we make 10 or 15 just to make sure we're not going to, like, have to do it twice.

THE VIDEOGRAPHER:  The time is 2:21.  We are off the record.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:49.

BY MR. ROGERS:

Q.  Good afternoon again, Dr. Kothari.

A.  Good afternoon.

Q.  Just a couple of questions, then I think we will be done.

Earlier today we were talking about just the general definition and the notion of noise and noise trading.

Do you recall that?

A.  I do.

Q.  And you used a couple of terms or a couple of explanations.  I just want to go and take a look at those.

I think one is -- you said that one of the markers of noise trading was trading on rumors.  Is that one of the examples you gave?

A.  I said that.

Q.  How do you distinguish when you are looking at news, what is a rumor versus to what might be something that you deem more value relevant among the news?  How do you make that

distinction?

MR. BROWN:  Object to form.

Go ahead.

A.  There isn't a magic wand that differentiates the two.  Chances are, you know, that if the source is places like Wall Street Journal, we would say less likely that it would be a rumor.  But there might be some other outliers or word of mouth or just some -- on some social media, something being said.

That has little more likelihood that it might be a rumor, unfounded rumor also.  So that's -- that's the kind of distinction.  And if you have a large number of retail traders who are perhaps following social media or some of these rumors, then it is conceivable that the pricing is affected because of their trading.  And that's what people call it noise trading.  That is one of the markers as you correctly pointed out.

Q.  In your capacity as an expert, are there scenarios that you can think of where a rumor is

value relevant information that should be part of your analysis?

A. I mean, all of these are part of the analysis in the sense that whether it is valued relevant or not, it is value relevant in the sense that rumor moves prices. So in that sense, it is value relevant.

But it is not value relevant in the sense that it might not be related to fundamentals.

So all of these are going to effect prices, and the analysis that we are conducting is how much of the price movement is due to the market, due to industry, due to news about -- fundamental news about perform and how much of it is -- in this kind of a scenario, it is not normal, but it is unusual, this period and the securities, that is it conceivable that it is because of noise.

Q. Are you aware that there has been situations where rumors are based upon fundamentals or rumors that are about

Surrebuttal P. Kothari
October 31, 2023

fundamentals?

A.   Yeah.  It is possible, I guess.

Q.   More than possible?  Can you recall any examples where a rumor was based upon fundamentals?

MR. BROWN:  Object to form.

A.   If it is based on fundamentals, we normally don't call it a rumor.  But yes, it is possible.

Q.   If it's true that a rumor moves prices, would that not also create an opportunity for investors who are relying on fundamentals to profit by trading on that rumor?

A.   Well, of course.  That is the whole idea of arbitrage.  And -- but what it is, you know -- there is a whole literature on limited arbitrage. And the idea is that either because of friction, like short sale restrictions or because the capital that any unusual arbitrager has access to might be limited either because of accountability reasons or monitoring or performance-related

Sriprakash P. Kothari

reasons, or risk-related reasons, that some of the arbitrage opportunity might go untapped for periods of time.

And that's -- that's the whole theory behind an economic argument behind noise and how noise might influence security prices.

Q.  So assuming a semi-strong market, how long would that noise be expected to remain in the share price?

A.  And then there are different people who have different views on that.  And it is also contextual.  It is circumstantial.  So I don't think one can say it is a day or a week or a month or, you know.

If you ask Bob Shiller, now he's a Nobel Laureate and he might say it goes for years also. So -- so there are people in the entire spectrum, I -- my own belief is that this was a few month -- this was characterized by a few stocks that were politically ripe for that kind of an explanation during this time period.  And the

COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS.                     )

I, Katherine A. Tevnan, Registered Merit Reporter, Certified Shorthand Reporter No. 129093 and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that SRIPRAKASH P. KOTHARI, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 1st day of November, 2023.

_____
Katherine A. Tevnan, RMR
CSR # 129093

Notary Public
My commission expires March 10, 2028