# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NOVAVAX, INC., STANLEY C. ERCK, GREGORY F. COVINO, JOHN J. TRIZZINO, and GREGORY M. GLENN, <br><br> Defendants. | Civil Action No. TDC-21-2910 |

**EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA**

**November 13, 2023**

# Table of Contents

I.  INTRODUCTION ....................................................................................................... 3

II.  SUMMARY OF OPINIONS ...................................................................................... 4

III.  PROFESSOR KOTHARI'S UNDERSTATEMENT OF THE RELEVANCE OF TEN OUT OF THE ELEVEN EFFICIENCY FACTORS ANALYZED IN THE COFFMAN REPORT IS INCONSISTENT WITH LOGIC AND PRECEDENT ................................. 9

IV.  PROFESSOR KOTHARI FAILS TO PROVIDE ANY RELIABLE STATISTICAL CHALLENGE TO MY ANALYSIS OF CAMMER FACTOR 5 AND MY METHODOLOGY TO DEMONSTRATE CAUSE AND EFFECT IS WELL-ACCEPTED AND ACCURATELY IMPLEMENTED ...................................................... 16

   A.  PROFESSOR KOTHARI AND DEFENDANTS MISLEADINGLY FOCUS ON THE PROPORTION OF DAYS THAT I CONSIDER IN MY CAMMER FACTOR 5 ANALYSIS .................................................................................................. 19

   B.  PROFESSOR KOTHARI INCORRECTLY ASSERTS THAT TWO OF MY CAUSE-AND-EFFECT TESTS DO NOT EXAMINE THE EFFECT OF NEWS ON NOVAVAX'S STOCK PRICE ................................................................................................ 24

   C.  PROFESSOR KOTHARI MISTAKENLY CLAIMS I DID NOT CONSIDER THE DIRECTIONALITY OF NOVAVAX'S PRICE REACTION FOLLOWING NEWS ......... 28

   D.  PROFESSOR KOTHARI'S OPINIONS RELATED TO OUTLIERS ARE MISGUIDED AND HAVE NO BEARING ON MY EFFICIENCY ANALYSIS ...................................... 35

      i.  REMOVING OUTLIERS FROM THE ESTIMATION WINDOW DUE TO CLEARLY NEWS-DRIVEN PRICE MOVEMENTS IS STANDARD PRACTICE  36

      ii.  PROFESSOR KOTHARI'S IDENTIFICATION OF NOISE TRADING AND VOLATILITY IN NOVAVAX COMMON STOCK DOES NOT DISTURB MY ANALYSES .......................................................................................... 41

   E.  USING AN ESTIMATION WINDOW DURING THE CLASS PERIOD IS STANDARD 57

   F.  PROFESSOR KOTHARI'S CONCLUSIONS REGARDING STATISTICAL SIGNIFICANCE ARE ERRONEOUS AND DEPENDENT ON A FLAWED MEASURE OF VOLATILITY ................................................................................................ 60

      i.  MY EVENT STUDY RESULTS ARE ROBUST TO INCLUSION OF AN INDEX OF OPERATION WARP SPEED VACCINE MANUFACTURER COMPANIES .. 61

   G.  PROFESSOR KOTHARI'S ALTERNATIVE NEWS TESTS ARE FLAWED AND DO NOT CHANGE MY CONCLUSIONS .................................................................. 62

V.  THERE IS CLEAR EVIDENCE OF PRICE IMPACT ON THE TWO ALLEGED CORRECTIVE DISCLOSURE DATES ........................................................................ 67

   A.  AUGUST 6, 2021 ...................................................................................... 69

   B.  OCTOBER 20, 2021 .................................................................................. 77

## I.  INTRODUCTION

1.    I, Chad Coffman, am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of securities litigation.

2.    On March 16, 2023, I submitted an expert report in this matter (my "Report" or the "Coffman Report") in which I opined that the market for Novavax Common Stock[1] was efficient throughout the Class Period[2] and that damages in this action can be calculated on a class-wide basis using a common methodology consistent with Lead Plaintiffs' theory of liability.[3]  Following the submission of my Report, counsel for Lead Plaintiffs provided me with the September 22, 2023 Expert Report of Professor S.P. Kothari (the "Kothari Report") which was filed in connection with Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification (the "Motion" or "Defendants' Motion").[4]  I have been asked by counsel for Lead Plaintiffs to review and respond to the Kothari Report and the contentions in Defendants' Motion that bear upon my analysis.

3.    My responses to the Kothari Report and Defendants' Motion are set forth in this document (my "Rebuttal Report").

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings given to them in my Report.

[2] The Class Period is from May 11, 2021 through October 19, 2021, inclusive.

[3] Coffman Report ¶¶ 6 – 7, 84.

[4]  Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel filed September 22, 2023, *in Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, v. Novavax, Inc., et al.,* Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland.

4.      In formulating my opinions set forth in this Rebuttal Report, I have relied upon the analysis already described in my Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics in addition to the allegations and facts set forth in this lawsuit.  In performing the analyses set forth in this Rebuttal Report, I have also considered the Kothari Report, the Kothari Deposition,[5] and other relevant materials and information.  The materials that I relied upon and considered in reaching my opinions in this Rebuttal Report are identified in **Appendix A**, which are in addition to the materials that I identified in Appendix A of my Report.

5.      My qualifications and rate of compensation for work in this matter were identified in my Report and I do not repeat them here.  I have attached an updated version of my curriculum vitae as **Appendix B**.

6.      I reserve the right to amend this Rebuttal Report to reflect new information that becomes available to me, including from the discovery process and/or future rulings from the Court.

## II. SUMMARY OF OPINIONS

7.      In summary, nothing in the Kothari Report or Defendants' Motion disturbs my opinions that the market for Novavax Common Stock was efficient during the Class Period and that economic damages in this matter can be calculated on a class-wide basis using a common methodology.  Furthermore, there is evidence of price impact on the two alleged corrective disclosure dates.

---

[5] Counsel for Lead Plaintiffs provided me with a copy of the transcription of the deposition of Professor S.P. Kothari in connection with this matter, dated October 31, 2023 (the "Kothari Deposition").

4

8.      There are a number of important elements of my analysis and opinions that Professor Kothari does not dispute.  First, my Report empirically analyzes eleven well-established factors to evaluate the efficiency of Novavax Common Stock, which supports a finding of market efficiency.[6]  While Professor Kothari understates the relevance of ten of these factors, he does not dispute the results I presented for those ten analyses.[7]  Furthermore, Professor Kothari does not reliably dispute my findings regarding days on which the price of Novavax Common Stock exhibited statistically significant returns during the Class Period.[8]  Second, Professor Kothari does not dispute that the "out-of-pocket" methodology is a well-accepted measure of damages in Section 10(b) securities cases and is measured as the artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale.

9.      Taken together and relevant to my analysis, the Kothari Report and Defendants' Motion offer four overarching opinions: (1) ten of the eleven factors I analyzed (i.e., all but *Cammer* Factor 5) are not direct tests of market efficiency;[9] (2) my analysis of *Cammer* Factor 5 is flawed and does not establish market efficiency;[10] (3) there is a lack of price impact on both

---

[6] Coffman Report Section VII.

[7] The only results that Professor Kothari disagrees with are for *Cammer* Factor 5 (*see,* Kothari Report Section IV). I address this flawed argument below in **Section IV**.

[8] As I discuss in more detail below in **Section IV**, Professor Kothari's supposed corrections to my event study are unreliable and inconsistent with well-established and commonly accepted methodology in both academia and the courts.

[9] Kothari Report Section III.

[10] Kothari Report Section IV, Defendants' Motion Section I.A.

the August 6, 2021 and October 20, 2021 alleged corrective disclosures;[11, 12, 13] and (4) Plaintiffs' trading history shows that they did not suffer any damages in this matter.[14]  I have been asked by Counsel for Lead Plaintiffs to respond to opinions (1) through (3).[15]  As discussed in this Rebuttal Report, Professor Kothari's and Defendants' assertions (1) through (3) are flawed.

10.    First, Professor Kothari never claims that the market for Novavax Common Stock was *inefficient* during the Class Period.  His opinion is instead based in part on an understatement of the relevance of all the market efficiency factors I analyze except for *Cammer* Factor 5.  However, Professor Kothari's understatement of ten of the efficiency factors (simply because none of those factors provide "direct" evidence of market efficiency) has no scientific basis and is inconsistent with logic and precedent.  The reason the *Cammer* Court focused on a series of factors in the first place is that there *is no* bright line test for market efficiency and no single factor can or should be dispositive.

11.    Second, Professor Kothari and Defendants criticize the methodology I employed to evaluate whether there is evidence of a cause-and-effect relationship between new company-specific information and movements in the market price of Novavax Common Stock (*i.e.,*

---

[11] Kothari Report Sections IV.C.6, V; Defendants' Motion Section II.

[12] The alleged corrective information was released after market hours on August 5, 2021 and October 19, 2021. Thus, I refer to the news and corresponding decline in Novavax Common Stock on the following market date for each disclosure (i.e., August 6, 2021 and October 20, 2021).  *See*, Complaint Section VI; "Novavax Reports Second Quarter 2021 Financial Results and Operational Highlights," *PR Newswire*, August 5, 2021, 4:05 PM; "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," *Politico*, October 19, 2021, 6:37 PM.  I understand the Professor Kothari may also refer to these as the August 5, 2021 or October 19, 2021 alleged corrective disclosures, in which case we are referring to the same two alleged corrective disclosure events.

[13] All times in this report refer to Eastern Time unless otherwise stated.

[14] Kothari Report Section VI, Defendants' Motion Section III.

[15] Throughout this report, when I refer to Professor Kothari's and/or Defendants' opinions or assertions, I am not referring to opinion (4).  However, this does not necessarily mean I agree with opinion (4); I was simply not asked to analyze or respond to it.

*Cammer* Factor 5, the only factor that they deem relevant in evaluating market efficiency).[16]  In his attempt to pick apart my analysis of *Cammer* Factor 5, Professor Kothari inappropriately focuses on my use of a supposed small subset of days, raises a flawed argument regarding "noise trading," and suggests that I ignored the directionality of price movements, among other arguments discussed in detail below.  All of his criticisms of my cause-and-effect analyses are meritless.  The scientific method I employ to analyze cause and effect has been accepted as valid evidence on many occasions.

12.    Third, Professor Kothari and Defendants claim to provide evidence rebutting the price impact of the alleged misstatements.  Professor Kothari claims the price declines on the two alleged corrective disclosure dates are not significant when he "corrects" my event study, but because his event study is flawed, this argument fails.  Professor Kothari and Defendants further attempt to dismiss the price impact of both alleged corrective disclosure events due to price increases on the trading days following each event.[17]  This conclusion is flawed and ignores fundamental facts.

13.    Specifically, as it relates to the first alleged corrective disclosure, Professor Kothari and Defendants suggest analyzing the four trading days following August 6, 2021 (i.e., August 9, 2021 through August 12, 2021).[18]  However, in making this claim, Kothari and Defendants fail to consider industry news on August 9, 2021.  Given the confounding positive industry news and lack of a clear statistically significant continuing reaction, it is inappropriate to include August 9, 2021 through August 12, 2021 as part of the relevant event window when evaluating the price impact of the first alleged corrective disclosure.

---

[16] Kothari Report Section IV.C and Defendants' Motion Section I.A.

[17] Kothari Report ¶¶ 76 – 77, 88; Defendants' Motion Section II.

[18] Kothari Report ¶ 88; Defendants' Motion Section II.B.

14.    Related to the second and final alleged corrective disclosure date, October 20, 2021, Professor Kothari similarly proposes analyzing a multi-day event window (i.e., October 21, 2021 through November 5, 2021).[19]  His findings related to this arbitrarily long 12 trading day window do not establish a lack of price impact.  Defendants further attempt to rebut price impact related to the October 20, 2021 alleged corrective disclosure by arguing that the alleged corrective information released on this date was "based on misleading, incomplete, and anonymously sourced information that the market did not view as corrective."[20]  This criticism amounts to no more than an identification of potentially confounding information, which is a premature loss causation question and does not establish a lack of price impact.

15.    Furthermore, I find that there were statistically significant negative price reactions on both of the alleged corrective disclosure events at beyond the 95% confidence level that can be reasonably attributed to corrective information released on those days.  There is clearly price impact on both alleged corrective disclosure dates and Professor Kothari and Defendants' flawed arguments do not establish otherwise.

16.    As it relates to damages, Professor Kothari does not dispute that the general damages framework/methodology that I detailed in the Coffman Report is standard and virtually always used in securities class action matters alleging fraud claims under Section 10(b) of the Exchange Act to calculate "out-of-pocket" damages on a class wide basis, and does not present a different approach that would be more appropriate here.  Indeed, Professor Kothari offers no criticism of my damages methodology in his report.

---

[19] Kothari Report ¶¶ 76 – 77; Defendants' Motion Section II.A.

[20] Defendants' Motion p. 18.

17.    In summary, nothing in the Kothari Report or Defendants' Motion disturbs the opinions expressed in my Report.

### III. PROFESSOR KOTHARI'S UNDERSTATEMENT OF THE RELEVANCE OF TEN OUT OF THE ELEVEN EFFICIENCY FACTORS ANALYZED IN THE COFFMAN REPORT IS INCONSISTENT WITH LOGIC AND PRECEDENT

18.    Professor Kothari never even purports to claim that the market for Novavax Common Stock was *inefficient* during the Class Period.  The Kothari Report is instead limited to attempts to discredit my opinion, despite the fact that it is based on economic analysis consistent with precedent.  As I will describe in greater detail below, Professor Kothari's arguments are flawed and therefore do not disturb the opinions I expressed in my Report.

19.    In my Report, I empirically analyzed the specific eleven factors related to market efficiency, that courts have previously examined, during the Class Period for Novavax Common Stock.  Specifically, my Report demonstrated that: (1) the average weekly trading volume of Novavax Common Stock during the Class Period was 23.06 million shares, which represents 30.98% turnover per week, easily exceeding the *Cammer* threshold and comparing favorably against other exchange-traded securities (*Cammer* Factor 1);[21] (2) a large number of securities analysts followed Novavax (at least 161 reports from 26 different firms during the Class Period), and there was also substantial press coverage among other sources of publicly available information regarding the Company (*Cammer* Factor 2);[22] (3) Novavax Common Stock traded on the NASDAQ, thus satisfying the "market maker" factor (*Cammer* Factor 3);[23] (4) Novavax filed Form S-3ASRs before and after the Class Period and I have found no evidence that

---

[21] Coffman Report ¶¶ 26 – 30.

[22] Coffman Report ¶¶ 31 – 36.

[23] Coffman Report ¶¶ 37 – 41.

Novavax was not S-3 eligible throughout the Class Period (*Cammer* Factor 4);[24] and (5) there was a clear cause-and-effect relationship between new Company-specific information and the market price of Novavax Common Stock during the Class Period (*Cammer* Factor 5).[25] The analysis in my Report also demonstrates that (6) Novavax Common Stock had a market capitalization that was higher than the majority of NYSE and NASDAQ stocks during the Class Period, a factor associated with larger institutional ownership and greater analyst coverage, and is therefore correlated with a finding of market efficiency (*Krogman* Factor 1);[26] and (7) Novavax Common Stock also had an average bid-ask spread well below the mean and median bid-ask spread of a random sample of 100 common stocks trading on the NYSE and NASDAQ (*Krogman* Factor 2).[27] My Report further shows that (8) insiders held only 0.47% of all outstanding shares of Novavax Common Stock, meaning that approximately 99.5% of Novavax shares were held by non-insiders (*Krogman* Factor 3)[28] and (9) Novavax Common Stock was traded by sophisticated traders, with an average of 45.77% of its public float held by institutions during the Class Period (Additional Factor 1).[29] Finally, (10) there was no evidence of autocorrelation for Novavax Common Stock during the Analysis Period (Additional Factor 2);[30] and (11) there was considerable options trading during the Class Period, which is associated with the underlying security trading in an efficient market (Additional Factor 3).[31] Taken

---

[24] Coffman Report ¶¶ 42 – 44, Exhibit 1.

[25] Coffman Report ¶¶ 45 – 64.

[26] Coffman Report ¶¶ 65 – 68.

[27] Coffman Report ¶¶ 69 – 70.

[28] Coffman Report ¶ 71.

[29] Coffman Report ¶ 72.

[30] Coffman Report ¶¶ 73 – 76.

[31] Coffman Report ¶ 77.

together, these metrics provide strong economic evidence that support my opinion that Novavax

Common Stock traded in an efficient market throughout the entire Class Period.

20.     First and foremost, Professor Kothari has previously analyzed at least nine of the

same factors in 3 other matters to support his own finding of market efficiency in the past.[32, 33]

Now, after telling other courts that analysis of these factors supports his own opinion that

markets for at least three other securities were efficient, he is telling this Court that my analysis

of at least nine of the same factors is in part flawed because none of those factors are direct tests

of efficiency.  This is blatantly hypocritical.  Second, while Professor Kothari claims that ten

out of the eleven factors I used to evaluate the efficiency of the market for Novavax Common

Stock cannot *establish* semi-strong form market efficiency (all but *Cammer* Factor 5),[34] he does

not address the fact that these factors *support* a finding of market efficiency throughout the

---

[32] In fact, in his Mattel Report, Alere Report, and Wilmington Trust Report, Professor Kothari opined for Plaintiffs that during the respective class periods, the markets for the common stocks of interest were efficient (*see*, Expert Report of Professor S.P. Kothari filed April 30, 2021, *in re Mattel Inc. Securities Litigation*, Case 2:19-cv-10860-MCS-PLA, (the "Mattel Report," attached to this Rebuttal Report as **Appendix C**); Expert Report of Professor S.P. Kothari attached as Exhibit E to Declaration of Vincent R. Cappucci In Support of Plaintiffs' Motion for Class Certification, filed March 19, 2018, in *JUDITH GODINEZ, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. ALERE INC., et al., Defendants*, Case 1:16-cv-10766-PBS (the "Alere Report," attached to this Rebuttal Report as **Appendix D**); and Expert Report of Professor S.P. Kothari filed September 12, 2014, *in re Wilmington Trust Securities Litigation*, Case 1:10-cv-00990-ER-SRF (the "Wilmington Trust Report," attached to this Rebuttal Report as **Appendix E**).  In his Mattel Report, Professor Kothari states that he came to these conclusions by analyzing the following nine different factors to evaluate market efficiency (all of which I analyzed in my Report): the stock's average weekly trading volume; the number of security analysts following the stock; the presence of market makers and arbitrageurs; eligibility to file an S-3 registration statement; stock price reaction to unexpected corporate events or financial releases; market capitalization; stock liquidity (bid-ask spread); public float; and serial correlation in returns.  In his Wilmington Trust and Alere Reports, Professor Kothari states that he came to his market efficiency conclusion by analyzing those same nine factors, and additionally includes an analysis of institutional ownership (which I also analyzed in my Report) within his analysis of market makers and arbitragers.

[33] The two factors that I formally analyzed in my Report that Professor Kothari did not analyze in his Mattel Report and other matters are options trading and institutional ownership.  Professor Kothari did analyze institutional ownership in his Wilmington Trust and Alere Reports, but it is within his analysis of market makers and arbitrageurs rather than within its own section.  I address options trading and institutional ownership below within this section.

[34] Kothari Report ¶ 20.

entire Class Period as he has opined himself in the Mattel Report, the Alere Report, the Wilmington Trust Report, and during the Kothari Deposition related to this matter.[35]

21.    I stated in my Report that there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient," and in my deposition I testified that I formed my opinion taking into account all factors together.[36, 37]  In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory.  I also considered a number of other factors that courts have utilized beyond the *Cammer* factors.  However, since there is not one unequivocal test for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.[38]  It is my understanding that courts analyzing market efficiency examine all of the factors I have analyzed.  Furthermore, Professor Kothari does not challenge the results I reported for any of ten out of eleven factors (all but *Cammer* Factor 5), suggesting that he at least agrees with them computationally.[39, 40]

22.    Interestingly, although Professor Kothari tries to claim that *Cammer* Factor 5 is the only relevant factor to analyze in the context of Novavax's Class Period market efficiency, he does not put forth any specific arguments related to *Cammer* factors 2 through 4, or any of the three *Krogman* factors.  Professor Kothari's arguments related to market efficiency outside of

---

[35] Kothari Deposition 72:19 – 74:9; Mattel Report ¶ 116; Alere Report ¶ 118; Wilmington Trust Report ¶ 108.

[36] Coffman Report ¶ 22.

[37] "I'm considering and relying on all of them...".  Coffman Deposition 114:14 – 15.

[38] Coffman Report ¶ 22.

[39] Professor Kothari suggests alternative analyses for institutional ownership and *Cammer* Factor 5, both of which are flawed for reasons I describe in more detail below (*See*, **Sections IV.D.** and **IV.F**, respectively).

[40] Professor Kothari also suggests a supplementary and irrelevant finding related to *Cammer* Factor 1 (*See*, **Section IV.D**).

*Cammer* Factor 5 are limited to *Cammer* Factor 1 and the three "additional factors" I considered in my assessment of market efficiency (i.e., institutional ownership, autocorrelation, and options).

23.    First, as it relates to *Cammer* Factor 1, Professor Kothari only suggests that the high weekly trading volume was somehow a result of noise trading and therefore not supportive of market efficiency.[41]  Again, he does not dispute my calculation that the average weekly trading volume of Novavax Common Stock during the Class Period was 23.06 million shares, which represents 30.98% turnover per week.[42]  His point is merely supplementary and irrelevant to my finding of market efficiency.[43]  I note that Professor Kothari has similarly analyzed *Cammer* Factor 1 to support his market efficiency opinions in the Mattel Report, the Alere Report, and the Wilmington Trust Report.[44]

24.    Second, as it relates to institutional ownership (Additional Factor 1), Professor Kothari claims that the "mere ownership of shares by institutional investors…does not prove market efficiency."[45]  Rather, Professor Kothari claims, "it is institutional investors' trading that may render [*sic*] market efficient."[46]  First, Professor Kothari does not dispute my findings regarding this factor, that is, that institutions held on average 45.77% of Novavax Common Stock's public float during the quarters throughout the Class Period.[47]  In addition, academic literature supports that higher levels of institutional ownership support a conclusion of market

---

[41] Kothari Report ¶¶ 64 – 68.

[42] Coffman Report ¶¶ 25 – 30.

[43] I address Professor Kothari's arguments related to supposed noise trading in greater detail below in **Section IV.D**.

[44] Mattel Report ¶ 40; Alere Report ¶ 32; Wilmington Trust Report ¶ 35.

[45] Kothari Report ¶ 28.

[46] Kothari Report ¶ 28.

[47] Coffman Report ¶¶ 25, 72.

efficiency.[48]  Professor Kothari ignores this and proposes his own flawed analysis of institutional trading, suggesting that institutions made up a small portion of Novavax's trading volume.[49]  As I address in more detail below (*see* **Section IV.D**), Professor Kothari's analysis of institutional volume is flawed and regardless, the relevant metric is the level of institutional ownership, my calculation of which he does not dispute.  Furthermore, Professor Kothari has similarly analyzed the level of institutional ownership (rather than the institutional portion of trading volume) to support his market efficiency opinions in the Wilmington Trust and Alere Reports.[50]  Professor Kothari also ignores that I repeatedly stated in my Report that there is no bright-line test to prove market efficiency.[51]  Professor Kothari acknowledges the same in his deposition, specifically expressing that "[g]enerally, all these [factors, with the exception of *Cammer* Factor 5,] are…indicative of efficiency.  But they are not proof-positive of efficiency."[52]  As a result, my findings related to institutional ownership, *taken together* with the other ten factors I analyzed, support a finding of market efficiency.

25.    Third, Professor Kothari understates the relevance of my analysis of options trading (Additional Factor 3) and claims that the considerable volume of option trading I identify in Novavax Common Stock during the Class Period does not "necessarily 'support'" my assertion that Novavax Common Stock traded in an efficient market throughout the Class

---

[48] *See,* e.g., Ekkehart Boehmer and Eric K. Kelley, "Institutional Investors and the Informational Efficiency of Prices," *The Review of Financial Studies,* Sep., 2009, Vol. 22, No. 9 (Sep., 2009), pp. 3563-3594 at 3592 ("We find that greater institutional holdings are associated with improved efficiency, and this result is robust across different measures of efficiency, different econometric specifications, and a variety of controls.  We provide evidence that reverse causality or variation in liquidity cannot easily explain this result.  Overall, our findings imply that the presence of institutional investors improves the information environment of a firm.").

[49] Kothari Report ¶ 67, footnote 100.

[50] Alere Report ¶ 47; Wilmington Trust Report ¶ 53.

[51] Coffman Report ¶ 22.

[52] Kothari Deposition 116:14 – 117:6.

Period.[53]  Instead, Professor Kothari claims that my "assertion is speculative" because I have

not "specified any objective metric for what counts as 'considerable' option trading volume,"

nor have I "specified the level of option trading needed to 'improve' the market efficiency of

the underlying stock."[54]  Professor Kothari is missing the mark.  As I stated in my Report, the

very presence of options can improve market efficiency.[55]  Professor Kothari does not dispute

my findings related to this factor, that is, that the volume for Novavax Common Stock put

contracts and call contracts during the Class Period was 1,262,039 and 2,571,467, respectively,

which amounts to 3,833,506 in total volume.[56]  In my view, this establishes there was an active

options market.  Professor Kothari offers no 'objective metric' or 'level' of option trading I

should have considered related to this factor.  Taken together with the other ten factors I

analyzed, the presence of an active options market supports a finding of market efficiency.

26.    Fourth, in regard to autocorrelation (Additional Factor 2), Professor Kothari argues

that autocorrelation "is a direct test, only of weak-form efficiency" and "the absence of

autocorrelation…does not mean it traded in a semi-strong form efficient market."[57]  However,

Professor Kothari does not dispute my finding that there is no evidence of autocorrelation in the

trading of Novavax Common Stock during the Analysis Period.[58]  In addition, Professor Kothari

has similarly used an analysis of autocorrelation to argue in support of market efficiency in the

---

[53] Kothari Report ¶ 28.

[54] Kothari Report ¶ 28.

[55] *See,* Coffman Report ¶ 77: ("Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.  Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.").

[56] Coffman Report footnote 86, Exhibit 1.

[57] Kothari Report ¶ 29.

[58] Coffman Report ¶ 76.

Mattel Report, the Alere Report, and the Wilmington Trust Report.[59]  While not dispositive evidence of semi-strong market efficiency, my finding of no evidence of autocorrelation during the Analysis Period is inconsistent with the notion that that an investor could consistently predict abnormal movements and earn arbitrage profits and therefore supports the conclusion that Novavax Common Stock traded in an efficient market throughout the Analysis Period.[60, 61]

27.    In making his claims, Professor Kothari does not argue that my analysis of any factors demonstrates that the market for Novavax Common Stock was *inefficient*.  He is merely pointing out that each factor is not definitive proof of semi-strong market efficiency, but in doing so he is ignoring precedent that these factors *do* add supporting evidence to the conclusion that the market was efficient (and contradicting his previous analysis of at least nine of these same factors in his own expert reports).  Therefore, Professor Kothari's claims related to the ten of the factors I analyzed in my Report (all but *Cammer* Factor 5) do not disturb my opinion that Novavax Common Stock traded in an efficient market during the Class Period.

## IV. PROFESSOR KOTHARI FAILS TO PROVIDE ANY RELIABLE STATISTICAL CHALLENGE TO MY ANALYSIS OF CAMMER FACTOR 5 AND MY METHODOLOGY TO DEMONSTRATE CAUSE AND EFFECT IS WELL-ACCEPTED AND ACCURATELY IMPLEMENTED

28.    My analysis of *Cammer* Factor 5 – empirical evidence of a cause-and-effect relationship between new, unexpected, company-specific information and the price of Novavax

---

[59] *See*, Mattel Report ¶ 114 ("The insignificant autocorrelation is consistent with the market for Mattel's stock behaving efficiently."); Alere Report ¶116 ("The insignificant autocorrelation is consistent with the market for Alere's stock behaving efficiently."); Wilmington Trust Report ¶ 103 ("The insignificant autocorrelation…is consistent with Wilmington's stock being traded in an efficient market.").

[60] Coffman Report ¶¶ 73 – 76.

[61] I acknowledged the importance of autocorrelation in my deposition as well.  *See*, Coffman Deposition 37:12 – 17 ("And then I think autocorrelation is a, you know, a good, direct test of weak form efficiency, which is, obviously, a predicate to semi-strong form efficiency.  So, again, I think that's an empirical test that would weigh more than some of the others.")

Case 8:21-cv-02910-TDC    Document 122-4    Filed 11/13/23    Page 18 of 309

Common Stock – provides scientific evidence of a cause-and-effect relationship between new firm-specific news and changes in the market price of Novavax Common Stock.  Notably, there are key elements of my *Cammer* Factor 5 that Professor Kothari does not challenge, including my selection of market and industry indices for which to control,[62] my identification of earnings announcement days, and how I calculated the unexpected or abnormal firm-specific return on each day.  These elements and the overall event study methodology I employed for my Report follow the economic literature and are a standard approach accepted by courts for purposes of establishing *Cammer* Factor 5.

29.    As I have done in many other expert reports, to analyze *Cammer* Factor 5 in my Report, I compared the price response to Novavax earnings announcements during the Analysis Period to the price movements on days during the Analysis Period where I identified little or no Novavax-related news ("no news" days).[63]  I found that the earnings announcement days have a greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news.[64] Professor Kothari does not reliably dispute this finding.

30.    Professor Kothari does not challenge, given the methodology I have chosen, (1) that earnings announcements represent an objective set of dates to test; (2) that I accurately identified the earnings announcements; (3) that academic literature and professional experience both support that earnings announcements contain important firm-specific news; (4) that I accurately defined and identified a set of days without Novavax news; (5) that I accurately

---

[62] Defendants challenge why I did not test alternate controls in their motion, and I respond in **Section IV.F**.  *See*, Defendants' Motion p. 7.  Professor Kothari does not make this argument.

[63] No news days is interchangeable with "least news" days as defined in my Report: "Days with the least amount of news were days that had 5 or less news articles via the Factiva database, and no analyst reports or SEC filings were issued."  *See*, Coffman Report Exhibit 8.

[64] Coffman Report ¶¶ 58 – 63.

conducted an event study that measured the magnitude of abnormal returns on earnings announcements and "no news" days and computed each day's corresponding statistical significance; and (6) that I accurately assessed whether there was a statistically significant difference in the prevalence of statistically significant returns and the magnitude of abnormal returns on earnings announcements versus the "no news" days.  In other words, Professor Kothari does not challenge that I accurately conducted a cause-and-effect test that has been accepted numerous times as scientific evidence supporting a finding of market efficiency.  His remaining assertions and arguments do nothing to disturb that uncontested result.

31.    While Professor Kothari claims my analysis for *Cammer* Factor 5 is supposedly flawed and cannot reliably assess whether Novavax Common Stock traded in an efficient market, his criticisms are unfounded and do not disturb my opinions.  Professor Kothari presents the following seven general arguments for his conclusion that my analysis of *Cammer* Factor 5 does not establish market efficiency:

      a.   that my analysis is restricted to a small subset of days when compared to the total trading days in both the Analysis and Class Period;

      b.   that my comparisons of trading volume and average absolute abnormal returns between news days and no news days does not examine the effect of news on the stock price;

      c.   that I ignored the directionality of Novavax's price reaction following news;

      d.   that I failed to consider the possibility that Novavax's large price changes on certain dates I considered "outliers" were caused by noise, not news;

      e.   that my event study is flawed because my 120-trading day rolling estimation period includes Novavax's returns on days within the Class Period;

18

f.   that "correcting" my event study's methodology fundamentally changes my result, and lastly;

g.   that my news vs. no news test is flawed and does not show that Novavax traded in an efficient market during the Class Period.[65]

32.   In their motion, Defendants' counsel made an additional claim against my *Cammer* Factor 5 analysis, that I did not account for "Novavax's unique position … [and] did not, for example, consider alternative industry indexes that were more targeted to the unique Covid [v]accine manufacturers rather than to biotechnology companies generally."[66]

33.   Below, I explain why all of Professor Kothari and Defendants' arguments related to *Cammer* Factor 5 are flawed and do not disturb my opinion that there was a strong cause-and-effect relationship between new Company-specific information and the market price of Novavax Common Stock during the Class Period.

### A. PROFESSOR KOTHARI AND DEFENDANTS MISLEADINGLY FOCUS ON THE PROPORTION OF DAYS THAT I CONSIDER IN MY CAMMER FACTOR 5 ANALYSIS

34.   Professor Kothari argues that "Mr. Coffman's tests focus on either a small set of 10 News Days, or a comparison of two small subsets of days, and disregard the vast majority of days over the relevant periods."[67]  Defendants then rely on Professor Kothari's erroneous opinion to argue that my analysis of *Cammer* Factor 5 is unreliable because I supposedly used a "small sample of cherry-picked days."[68]  Professor Kothari and Defendants are both simply wrong.

---

[65] Kothari Report Section IV.C.

[66] Defendants' Motion p. 7.

[67] Kothari Report ¶ 41.

[68] Defendants' Motion p. 8; Kothari Report ¶¶ 41 – 44.

19

35.     Professor Kothari's claim that I "disregard the vast majority of days" and ignore "581 days (or 91%) in [my] Analysis Period" is misleading.[69]  I considered each day within the Analysis Period when selecting an objective set of days with news to test.  Through my process of identifying Novavax-related news items on ALL days from the Factiva database and identifying when analyst reports or SEC filings were issued, I created a statistically robust control and test group for my analysis.[70]

36.     Professor Kothari's argument that my analysis should be discredited because the final number of days included in my analysis is "small" relative to the total is the promotion of a statistical fallacy.  The proportion of days that enter my final comparison is an irrelevant statistic.  The appropriate question is whether there is enough data to obtain a statistically powerful test between the earnings announcement days and the "no news" days, which is explicitly considered and embedded in the statistical test I perform.  In other words, are there enough total observations in order to statistically infer something from the sample about the

---

[69] Kothari Report ¶ 41.

[70] Coffman Report ¶¶ 55, 59.

effect of interest?[71, 72, 73]   I find that yes, there are, and Professor Kothari does not dispute this.

Indeed, Professor Kothari does not go as far as affirmatively opining that the sample I analyzed

is too small to statistically evaluate cause and effect.  Importantly, Professor Kothari also does

not dispute that given the methodology I have chosen, I find a statistically significant difference

between the rate of statistical significance of news and no news days.  Therefore, Professor

Kothari has no basis to say that I have not evaluated enough days within the Analysis Period.

37.     Interestingly, Professor Kothari has also performed cause-and-effect tests in other

matters where he analyzed "unexpected corporate events" (comprised of earnings

---

[71] Academic literature demonstrates that it is common and valid in statistics to draw conclusions from a sample about a population.  This is referred to as "Inferential Statistics" and it is the method I employed in my Report; I arrived at a conclusion about the Analysis Period (the population) based on the dates used in my *Cammer* Factor 5 analysis (the sample).  Professor Kothari himself lists a textbook in Appendix C, Materials Considered, of the Kothari Report detailing this exact concept.  *See*, Neil A. Weiss, "Introductory Statistics," 9th Edition, *Addison-Wesley*, 2012, p. 4: ("***Political polling provides an example of inferential statistics.  Interviewing everyone of voting age in the United States on their voting preferences would be expensive and unrealistic.  Statisticians who want to gauge the sentiment of the entire population of U.S. voters can afford to interview only a carefully chosen group of a few thousand voters.  This group is called a sample of the population.  Statisticians analyze the information obtained from a sample of the voting population to make inferences (draw conclusions) about the preferences of the entire voting population.  Inferential statistics provides methods for drawing such conclusions.***")

Professor Kothari incorrectly claims that the sample as a proportion of the population is relevant when utilizing Inferential Statistics.  He is wrong.  Indeed, academic literature explains this "common misconception."  *See,* Roxy Peck, Chris Olsen, and Jay Devore, "Introduction to Statistics & Data Analysis," 3rd Edition, *Thomson Brooks/Cole*, 2008, p. 37: ("It is a common misconception that if the size of a sample is relatively small compared to the population size, the sample can't possibly accurately reflect the population.  […] Although it is possible to obtain a simple random sample that does not do a reasonable job of representing the population, this is likely only when the sample size is very small, and unless the population itself is small, ***this risk does not depend on what fraction of the population is sampled***.").

[72] Unless otherwise noted, all emphasis in this report is added.

[73] I discussed this in my deposition as well.  *See*, Coffman Deposition 83:18 – 84:16 ("When polls are done of the electorate, you know, it's not a matter of what percentage of the population you're sampling, it's that you have enough of the sample.  So the fact that you're sampling, say, a thousand voters out of, you know, 400 million, that's not the relevant comparison.  It's do you have a large enough sample that the law of large numbers kicks in and you can draw relevant conclusions from the size of your sample.  So in terms of running this sort of statistical test, I mean, yes, you need practically more than two or three data points, and obviously, the larger sample you have, you know, the more powerful the statistical test can be, but there's no specific minimum you need.  And, certainly, in my view, having 10 earnings announcements and 25 least news dates certainly is a reasonably sized sample from which to draw the -- and the parameters that I'm calculating, the statistical tests and how powerful they are, you know, the sample size is taken into account in doing -- in performing those tests. So what I've selected is certainly enough, in my opinion.")

announcements, alleged corrective disclosures dates, and a merger date in the Alere Report) against all other days during a putative Class Period.[74]  The key difference between Professor Kothari's alternative analyses presented in these other matters compared to my own is that I choose to compare against a control group of days where I have determined there was very little or no news, whereas Professor Kothari uses all other days as the control group, regardless of whether there was news or not.[75]  In my view, Professor Kothari's method is biased and flawed because there are clearly many days on which there can be relevant news that are not earnings announcements.  Therefore, his control group could be contaminated with relevant news.  Therefore, while my statistical test may contain less data in the control group, it is incorrect that I "ignored" the other days, that I used insufficient data, or that the proportion of days included is even a relevant metric.  Thus, Professor Kothari and Defendants' arguments fail and are a misleading attempt to discredit my opinion by skewing a fundamental principle in statistics.[76, 77]

---

[74] Mattel Report ¶ 90, Exhibit 11; Alere Report ¶ 94, Exhibit 12; Wilmington Trust Report ¶ 74, Exhibit 11.

[75] *See*, **Section IV.G**; Mattel Report Exhibit 11; Alere Report Exhibit 12; Wilmington Trust Report Exhibit 11.

[76] With respect to the Insys and PolyMedica cases cited in Defendants' Motion and the Kothari Report, I note that in Insys the Court credited all others factors and certified the class and in PolyMedica the comparison between my analysis and plaintiffs' expert is irrelevant and out of place, as plaintiffs' expert did not use a control group as a part of his news test, nor did he use an event study for his cause-and-effect analysis.  *See*, Defendants' Motion p. 8; Kothari Report footnote 53; Order filed September 20, 2019, in *Di Donato v. Insys Therapeutics*, No. CV-16-00302-PHX-NVW, pp. 10, 19; Memorandum and Order filed September 28, 2006, *In re Polymedica Corporation Securities Litigation*, Civil Action No. 00-12426-WGY, pp. 6 – 7.

[77] Professor Kothari cites to academic literature in support of his flawed argument (*see*, Kothari Report footnote 54).  However, his citation to this article only serves the purpose of further supporting my opinion.  Indeed, Professor Kothari conveniently omits the remainder of the paragraph he points to, which continues on to describe that an appropriate test to satisfy *Cammer* Factor 5 would be one that measures whether price movements on dates with news and dates without news are distinguishable, which is precisely the methodology I have employed in this matter.  *See,* Ferrillo, Paul A., Frederick C. Dunbar, David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review* 78 (1), (2004), pp. 128 – 129: "***One such scientific approach is to examine both a control group and a treatment group and, applying the identical test to both, see whether there is a significant difference in the results.  In the case of testing whether there is a cause and effect relationship between news and movements in a stock price, this means not simply finding a case where there was news and a stock price movement, but finding two samples of defendant's stock prices-one with news and one without-and testing whether the price movements for the two samples are distinguishable. Though one may argue as to how such a price reaction study ought to be performed and what criteria of stock price movement should be deemed significant, as noted by the Cammer***

38.    Further, Professor Kothari argues that "[f]inding that the stock's price reacted to news prior to, or after, the Class Period does not directly prove that the Novavax stock's price reacted to news *during* the Class Period."[78]  Professor Kothari offers no statistical or economic rationale for restricting a cause-and-effect analysis to the Class Period, and there is none.  As I described in my Report[79] and at my deposition,[80] the use of the Analysis Period as opposed to the Class Period allows me to increase the power of my statistical tests.  Professor Kothari does not address this.  As I testified in my deposition, and from the standpoint of financial economics, there is no reason to believe (and Professor Kothari offers none) that the efficiency of the market for Novavax Common Stock is any different before, during, or after the Class Period.[81]

39.    Additionally, I have used expanded Analysis Periods in a number of other cases, where the Court has ruled on class certification, the Court certified the putative Class and my use of an "Analysis Period" that extended beyond the Class Period was either not challenged at all or any challenges presented did not result in a denial of Class Certification.[82]

---

**court, this would be a scientific test of what that Court called 'the essence of an efficient market and the foundation of the fraud on the market theory.'"**

[78] Kothari Report ¶ 42 (emphasis in original).

[79] Coffman Report footnotes 28, 62.

[80] Coffman Deposition 60:7 – 60:21.

[81] Coffman Deposition 61:18 – 61:20.

[82] *See*, for example, Memorandum Opinion filed January 29, 2020, Weiner, v. Tivity Health, Inc., Case No.: 3:17-cv-01469 United States District Court Middle District of Tennessee Nashville Division; Order Re Motion to Certify Class, Appoint Class Representatives, And Appoint Class Counsel filed April 2, 2022, Junge v. Geron Corp., C 20-00547-WHA, United States District Court, Northern District of California; Order Granting Motion for Class Certification filed September 4, 2018, *In Re: SanDisk LLC Securities Litigation*, Case 3:15-cv-01455-VC, United States District Court for the Northern District of California.

40.    For the reasons discussed above, Professor Kothari's opinions regarding my

analysis of a small subset of days within the broader Analysis Period are meritless, wrong, and

do not disturb my opinions.

### B.  PROFESSOR KOTHARI INCORRECTLY ASSERTS THAT TWO OF MY CAUSE-AND-EFFECT TESTS DO NOT EXAMINE THE EFFECT OF NEWS ON NOVAVAX'S STOCK PRICE

41.    Professor Kothari understates the relevance of my findings regarding average

volume and average absolute abnormal returns on news vs no news days and argues that these

"two of [my] cause-and-effect tests do not even consider whether there was an 'effect' (i.e.,

whether Novavax's abnormal return was statistically significant in the sample of days

considered)."[83]  Specifically, Professor Kothari states:

> Yet, Mr. Coffman's conclusion from this test is, at least implicitly, based
> on a fundamentally flawed premise that Novavax's abnormal returns on *all*
> News Days was caused by the release of company-specific information,
> even if the abnormal return was *not* statistically significant.[84]

42.    Professor Kothari is incorrectly interpreting the results of my tests.  As I discuss

within (see **Section IV.A** above and **Section IV.D** below), Professor Kothari does not dispute

that earnings represent an objective set of dates to test and I do not expect each earnings date to

be statistically significant.[85, 86]  Therefore, I choose to analyze trading volume and abnormal

returns on earnings announcements regardless of whether the announcement was significant

precisely because such dates are objective and well-suited to analyzing cause and effect.

---

[83] Kothari Report ¶ 45.

[84] Kothari Report ¶ 48 (emphasis in original).

[85] Coffman Report ¶ 56, footnote 67; Coffman Deposition 94:10 – 16 ("Obviously, for any given earnings announcement, you might not expect the price to move very much because there's really -- you know, either they were just meeting expectations or there was a mix of positive and negative news.  So it doesn't mean I expect each one of these to have a significant reaction.").

[86] Professor Kothari does not dispute in his deposition that I find that 6 earnings announcements are statistically significant.  Kothari Deposition p. 60:17 – 20.

Furthermore, the results show a statistically significant difference between the two groups along the three different measures (percentage of significant returns, absolute price movements, and volume of trading), thus leading to an inference of a cause-and-effect relationship. This is the hallmark of the application of the scientific method in this context.[87] Nevertheless, I explain below the relevance of the two tests Professor Kothari takes issue with.

43.    Regarding trading volume, Professor Kothari argues "Mr. Coffman's trading volume test simply compares Novavax stock's average trading volume across News and No News days" which "does not demonstrate cause and effect in how Novavax's stock *price* quickly impounded news…"[88] This is yet again a misleading analysis of my results. I do analyze how Novavax stock's price "quickly impounded news"[89] in my calculation of average trading volume across news and no news days.[90] For example, observing higher trading volume on average, on an objective set of news days compared to an objective set of no news days is supportive of the idea that there is increased market activity when the market is absorbing widely disseminated information on the Company. Professor Kothari does not dispute that I find a statistically significant difference between the average volume of 18.7 million shares on news days compared to 4.8 million on no news days at the 99% confidence level.[91]

---

[87] Alan Agresti, Categorical Data Analysis, *Wiley*, 1990 pp. 42 – 62; David Freedman, Robert Pisani, and Roger Purves, Statistics, *W.W. Norton and Co.,* 1978; James E. De Muth, "Research Fundamentals: Overview of Biostatistics Used in Clinical Research," *American Journal of Health System Pharmacists*, 70 – 81, (Vol 66 2009); Michael D. Green, D. Michal Freedman, and Leon Gordis, "Reference Guide on Epidemiology," in *Reference Manual on Scientific Evidence* (Second Edition), Federal Judicial Center, 2000.

[88] Kothari Report ¶ 46 (emphasis in original).

[89] I elaborated on my understanding of quickly in my Deposition. *See*, Coffman Deposition 33:16 – 24 ("I think I use the word 'rapidly.' I think I might have said 'quickly' as well. But, generally, when I think of rapidly or quickly, and in terms of how the analyses are normally performed by other financial economists looking at this question, it's usually in a matter of -- certainly within a matter of a day or some small number of days is what's generally being discussed.").

[90] Kothari Report ¶ 46.

[91] Coffman Report ¶ 62, Exhibit 8.

44.    Regarding abnormal returns, Professor Kothari argues that "[t]he difference between Novavax's average (absolute) abnormal returns on all News Days versus all No News Days, *regardless of the statistical significance of these abnormal returns*" does not demonstrate that on days when important company-specific information is released to the market, the stock price moves much more than on days where there is no company-specific news as I state in my Report.[92, 93]  Specifically, Professor Kothari argues:

> The difference between Novavax's average (absolute) abnormal returns on all News Days versus all No News Days, *regardless of the statistical significance of these abnormal returns* (one of Mr. Coffman's cause-and-effect tests) also does not "demonstrate[s] that on days when important company-specific information is released to the market, the stock price moves much more than on days where there is no company-specific news" as he claims.  This is because if a stock's abnormal return is not statistically significant, then its observed price change is not distinguishable from zero with an acceptable degree of certitude.  According to well-accepted economic principles, in such instances, it is incorrect to assert that the abnormal return following some news release was attributable to that news release rather than noise *per se*.[94]

45.    Professor Kothari's criticism is simply wrong as a matter of statistical principles and stunningly hypocritical given that he performed effectively the same test in at least three other matters to show cause and effect.[95]  For example, in the financial economics literature, when academics are testing for causal relationships amongst different types of information, they take an average impact across numerous events and evaluate whether there is a statistically

---

[92] Kothari Report ¶ 47 (emphasis in original); Coffman Report ¶ 60.

[93] Likewise, Professor Kothari presents his method for a directionality test in deposition which is done regardless of statistical significance.  Kothari Deposition 129:15 – 21 ("·So the problem is a directionality test you can take returns on those ten days, *significant or not*, and regress on earning surprise and test whether the slope coefficient on that regression is statistically significant or not.  That would be one statistical test of directionality.").

[94] Kothari Report ¶¶ 47 – 48 (emphasis in original).

[95] Mattel Report Section VI.E; Alere Report Section VI.E; Wilmington Trust Report Section VI.E.

significant difference between those events and what would be expected absent those events.[96]

In these studies, there is no attempt to filter out individually insignificant days before

performing these tests. It is simply not part of the proper way to perform such tests. Indeed, in

the Mattel matter, for example, where Professor Kothari gave an opinion that the market was

efficient, he performed an "unsigned" [97] event study test indicating that he compared the

absolute value of price changes from earnings announcement days to all other days during a

putative class period. [98] While he used a slightly different statistical procedure to make the

comparison, it is effectively the same test he is now criticizing, and as part of that analysis,

Kothari made no effort to first filter out individually insignificant earnings announcements,

even though he found half of the earnings announcements were not statistically significant.[99]

And there is nothing wrong with that, because it is *entirely appropriate* to compare the average

of the two samples without first filtering between significant and insignificant dates. Professor

Kothari's criticisms of my approach are simply wrong as a matter of statistics and inconsistent

with his other work and testimony. In sum, my findings regarding a higher absolute abnormal

---

[96] *See*, for example, A. Craig MacKinlay, Event Studies in Economics and Finance, 35 J. ECON. LITERATURE, 13 (1997), pp. 25 – 26: ("The results of this example are largely consistent with the existing literature on the information content of earnings. The evidence strongly supports the hypothesis that earnings announcements do indeed convey information useful for the valuation of firms. Focusing on the announcement day (day 0) the sample average abnormal return for the good news firm using the market model is 0.965 percent. Given the standard error of the one day good news average abnormal return is 0.104 percent, the value of $\theta_1$ is 9.28 and the null hypothesis that the event has no impact is strongly rejected. The story is the same for the bad news firms. The event day sample abnormal return is -0.679 percent, with a standard error of 0.098 percent, leading to $\theta_1$ equal to -6.93 and again strong evidence against the null hypothesis. As would be expected, the abnormal return of the no news firms is small at -0.091 percent and with a standard error of 0.098 percent is less than one standard error from zero.").

[97] Mattel Report ¶¶ 90 – 93, Exhibit 11. "Unsigned" is a term used by Professor Kothari reflecting his use of the absolute value of abnormal returns, rather than negative and positive values. I also examine "unsigned" abnormal returns in my Report when I analyze the absolute abnormal returns.

[98] Kothari Deposition 91:4 – 14.

[99] Again, the only meaningful difference between his tests and my own is that I use a smaller set of "no news" days to avoid biasing the control group with news days that are not earnings announcements. Other than that, our tests are methodologically equivalent. Mattel Report Exhibit 11; Alere Report Exhibit 12; Wilmington Trust Report Exhibit 11.

return and higher volume on average on news days compared to no news days are supportive of

a cause-and-effect relationship between new company-specific information and movements in

the market price of Novavax Common Stock and thus market efficiency.

## C. PROFESSOR KOTHARI MISTAKENLY CLAIMS I DID NOT CONSIDER THE DIRECTIONALITY OF NOVAVAX'S PRICE REACTION FOLLOWING NEWS

46.    Professor Kothari continues to critique my analysis of *Cammer* Factor 5 by

claiming that I did not consider the directionality of price movements and "statistical

significance…does not, by itself, demonstrate cause and effect."[100]  First, he argues:

> An abnormal return can be either positive or negative.  Its statistical significance (a mathematical result) does not, by itself, demonstrate cause and effect, *i.e.*, prove that the abnormal return can be reliably attributed to some contemporaneous news release.  For example, there are several days when Novavax's abnormal return is statistically significant according to Mr. Coffman's event study, but he does not label these as News Days in his report, and I too have confirmed that there was no new company-specific information released on those days.  On such days, Novavax's abnormal returns, even if statistically significant, are reasonably attributable to noise, not news.[101]

47.    Professor Kothari's argument that there are days that I did not label as news days

where Novavax Common Stock experienced a statistically significant price reaction is

irrelevant.  The mere presence of statistically significant dates during the Analysis Period that I

did not consider as a news or no news date does not disturb my conclusions.[102]  Professor

Kothari provides no explanation for how these dates impact my analysis of *Cammer* Factor 5

---

[100] Kothari Report ¶ 49.

[101] Kothari Report ¶ 49.

[102] Professor Kothari identifies February 27, 2020, March 17, 2020, and July 19, 2021 as having statistically significant abnormal returns and no new information released.  *See*, Kothari Report footnote 58.  These dates did not fit the objective criteria I chose to analyze in my Report to be considered a no news date.  Therefore, I did not analyze them in my cause-and-effect test (outside of identifying February 27, 2020 as an outlier, which I discuss in more detail in **Section IV.D**).

28

and he does not go as far as stating that I should have considered them news dates. Indeed, Professor Kothari does not consider these dates to be news dates in his alternative analysis of *Cammer* Factor 5.[103] By chance alone, one would expect around 5% of days to be statistically significant in the absence of news. His argument is irrelevant.

48.    Next, Professor Kothari argues that for a cause-and-effect analysis to be valid, the stock price movements must be in the "right direction", stating:

> Even if Novavax's abnormal return was statistically significant on a News Day, that does not prove cause and effect. As courts and studies have noted, cause and effect can only be established if the "effect" is in the right direction, *i.e.*, if the statistically significant abnormal return following a news release is positive following good news, and negative following bad news.[104]

49.    This argument is also flawed because it assumes (incorrectly) that I did not consider the directionality of the price movement. In fact, I did not identify any directionally inconsistent price movements on the earnings dates.[105] I considered the direction of price movements on the earnings announcement dates to confirm that the price movement observed on each date was not in obvious conflict with the nature of the information released (i.e., if all the news was objectively positive but the price declined, I would not have considered that price movement as relevant evidence).[106]

---

[103] NVAX_KOTHARI_00003551.

[104] Kothari Report ¶ 50.

[105] Professor Kothari testified during his deposition to having performed a similar directionality analysis as I did in this case in Mattel. (See Kothari Deposition 95:19 – 96:2; "Q. There was a date where you discovered that it didn't move the direction you expected, and you explained why the way it moved actually made sense, correct? [Professor Kothari answering] Well, that is perfectly fine.").

[106] Interestingly, despite claiming this is a requirement, Professor Kothari does not test the directionality of all 174 of his news days when he presents his alternative analysis. *See* **Section IV.G**.

50.    Professor Kothari[107] and Defendants[108] provide only one example of an earnings announcement that was associated with a supposedly directionally inconsistent price response (i.e., March 1, 2021, when Novavax released Q4 2020 earnings results after hours).[109]  Professor Kothari argues that despite releasing positive results, on March 2, 2021 (the market date of the earnings release) Novavax's abnormal return was statistically significantly negative and thus the abnormal return was not in the right direction.[110]  This conclusion is based on an incomplete analysis.  Interestingly, Professor Kothari acknowledged in his deposition testimony that directionality on this date is "ambiguous at the minimum," not positive, as he initially stated in his report.[111]  In making his claim, Professor Kothari ignores a reasonable explanation for Novavax's statistically significant negative abnormal return on March 2, 2021, that Novavax reported larger than expected net loss, missed revenue expectations and continued to not complete its U.S. EUA filing.  Specifically, the Company's earnings press release on this date included the following:

> Novavax reported a net loss of $177.6 million, or $2.70 per share, for the fourth quarter of 2020, compared to a net loss of $31.8 million, or $1.13 per share, for the fourth quarter of 2019.  For the twelve months ended December 31, 2020, the net loss was $418.3 million, or $7.27 per share, compared to a net loss of $132.7 million, or $5.51 per share, for the same period in 2019.

> Novavax revenue in the fourth quarter of 2020 was $279.7 million, compared to $8.8 million in the same period in 2019.  The significant increase in revenue was comprised of revenue for services performed under the CEPI agreement and participation in OWS.

---

[107] Kothari Report ¶ 51.

[108] Defendants' Motion p. 10.

[109] "Novavax Reports Fourth Quarter and Full Year 2020 Financial Results and Operational Highlights," *GlobeNewswire*, March 1, 2021, 4:02 PM.

[110] Kothari Report ¶ 51.

[111] Kothari Report ¶ 51, Kothari Deposition 142:20, 151:9.

> Research and development expenses increased to $401.2 million in the fourth quarter of 2020, compared to $29.3 million in the same period in 2019. The increase was primarily due to increased development activities relating to NVX-CoV2373 and increased employee-related costs, including stock-based compensation expense.[112]

51.    Novavax also hosted an earnings conference call after hours on March 1, 2021 during which Defendant Glenn gave an update on the regulatory pathway for the vaccine in the U.S., specifically that the Company expected to complete its EUA in second quarter, stating:

> Regarding our regulatory pathway in the U.S., we are in ongoing discussions with the FDA to align on the data required for initiation of EUA, and continue to provide information to our open IND application. ***At this time, we expect to complete our EUA filing in the second quarter.*** Overall, we are very busy on the regulatory front, and we've also began enrolling submission process with multiple other regulatory authorities, including European Medicines Agency, Health Canada, the Australian Therapeutic Goods Administration and New Zealand's MedSafe. We will continue to engage in dialogue with respective regulators as we complete our pivotal Phase III clinical trials in the U.K. and U.S., ensuring that we fully address all safety, efficacy and quality elements required for authorization.[113]

52.    News headlines highlighted both regulatory updates[114] and the earnings results, including a number of articles which highlighted the larger than expected net loss and missed revenue estimates.[115] For example, *Associated Press Newswires* noted that "[t]he results missed

---

[112] "Novavax Reports Fourth Quarter and Full Year 2020 Financial Results and Operational Highlights," *GlobeNewswire*, March 1, 2021, 4:02 PM, p. 4.

[113] "FQ4 2020 Earnings Call Transcripts," *S&P Capital IQ*, March 1, 2021, 4:30 PM, p. 7.

[114] "Novavax COVID-19 shot could be cleared for U.S. use as early as May -CEO," *Reuters News*, March 1, 2021, 4:03 PM; "BRIEF-Novavax Says Expectation Is For Plants Manufacturing Covid-19 Vaccine To Be At Full Scale By April," *Reuters News*, March 1, 2021, 6:08 PM; "BRIEF-Novavax CEO Says Covid-19 Vaccine Could Be Cleared For U.S. Use As Early As May – Interview," *Reuters News*, March 1, 2021, 6:40 PM.

[115] "*Novavax 4Q Loss/Shr $2.70 >NVAX," *Dow Jones Institutional News*, March 1, 2021, 4:02 PM; "Novavax Logs 4Q Rev Growth, Steeper Loss Amid Covid-19 Vaccine Effort," *Dow Jones Institutional News*, March 1, 2021, 4:23 PM; "BRIEF-Novavax Posts Qtrly Loss Per Share Of $2.70," *Reuters News*, March 1, 2021, 6:39 PM.

Wall Street expectations" and *Bloomberg* reported on "negative" Novavax sentiment on social

media and investors growing impatient regarding the Company filing its EUA.[116]

> *Dow Jones Institutional News:* Shares of Novavax Inc. (NVAX) wavered between gains and losses in the extended session Monday after **the biotech company reported a wider-than-expected fourth-quarter loss** but its sales beat Wall Street expectations.  Novavax said it lost $177.6 million, or $2.70 a share, in the quarter, compared with a net loss of $31.8 million, or $1.13 a share, for the fourth quarter of 2019.  Revenue rose to $279.7 million, from $8.8 million a year ago.  The revenue jump was thanks to services rendered in connection with the pandemic, including the U.S.'s Operation Warp Speed, the company said.  Analysts polled by FactSet expected Novavax to report a loss of $2.23 a share on sales of $202 million.[117]

> *Benzinga:* Shares of Novavax…fell in after-market trading after the company reported Q4 results…Earnings per share decreased 138.94% over the past year to ($2.70), which missed the estimate of ($1.49).  Revenue of $276,659,000 up by 3038.15% from the same period last year, which missed the estimate of $304,880,000.[118]

> *Associated Press Newswires*: Novavax Inc. (NVAX) on Monday reported a loss of $177.6 million in its fourth quarter.  The Gaithersburg, Maryland-based company said it had a loss of $2.70 per share.  The results missed Wall Street expectations.  The average estimate of four analysts surveyed by Zacks Investment Research was for a loss of $1.53 per share.  The vaccine maker posted revenue of $279.7 million in the period, which topped Street forecasts.  Four analysts surveyed by Zacks expected $211.9 million.  For the year, the company reported that its loss widened to $418.3 million, or $7.27 per share.[119]

> *Bloomberg*: Novavax shares dropped 11% on Tuesday as investors grew impatient to the biotech file its Covid-19 vaccine for emergency use during the pandemic.[120]

---

[116] "Novavax: 4Q Earnings Snapshot," *Associated Press Newswires*, March 1, 2021, 4:50 PM; "Novavax Social Media Volume Quadruples; Sentiment Is Negative," *Bloomberg*, March 2, 2021, 12:29 PM; Novavax Slides as Market Grows Impatient for Next Covid Vaccine," *Bloomberg*, March 2, 2021, 1:00 AM.

[117] "Novavax Posts Wider Quarterly Loss, Sales Jump Due To Pandemic-related Services – MarketWatch," *Dow Jones Institutional News*, March 1, 2021, 4:20 PM.

[118] "Novavax: Q4 Earnings Insights," *Benzinga*, March 1, 2021, 4:28 PM.

[119] "Novavax: 4Q Earnings Snapshot," *Associated Press Newswires*, March 1, 2021, 4:50 PM.

[120] "Novavax Slides as Market Grows Impatient for Next Covid Vaccine," *Bloomberg*, March 2, 2021, 1:00 AM.

> *Bloomberg:* Social media postings about Novavax Inc. more than quadrupled in the past half hour, and Twitter sentiment about Novavax is somewhat negative.[121]

53.     Analyst reaction was largely neutral, and consistent with the mixed results. *Cantor Fitzgerald* reiterated its rating and price target for the Company, while *J.P. Morgan* highlighted the loss per share and *Jefferies* analysts took a more positive position while acknowledging "share weakness."[122]

> *Cantor Fitzgerald.*: We reiterate our Overweight rating and $338 PT on NVAX shares.  On Monday 3/1, Novavax held a conference call to discuss 4Q20 financials, ending the period with cash of ~$806M, not including ~$565M raised in 1Q21 using an ATM equity distribution.  The company also provided updates on its pipeline, including for NVX-CoV2373 ('2373) clinical trials and manufacturing capabilities, and newly, the advancement of its NanoFlu program, including potential for developing a combined NanoFlu/NVX-CoV2373 vaccine.[123]
>
> *J. P. Morgan*: Novavax reported a 4Q loss per share of $2.70.  Incremental takeaways from the print/call were centered on regulatory progress with '2373 following interim phase 3 efficacy data announced in January, as well as next steps toward the development of new standalone and bivalent vaccine candidates against new/emerging variant strains.  Having met its primary endpoint, the company notes that accrual of additional cases and final data from the UK trial is anticipated in the coming weeks.  As it relates to potential EUA in the US, the company maintains line of sight toward a submission on the basis of the UK phase 3 data, with PREVENT-19 being supplementary to the filing.  On the call, mgmt noted that FDA is primarily interested in safety from PREVENT-19, and, in particular 60-day follow up from the second injection. To the extent this is indeed the key gating item, we would anticipate a regulatory update/potential EUA submission in the May timeframe.[124]

---

[121] "Novavax Social Media Volume Quadruples; Sentiment Is Negative," *Bloomberg*, March 2, 2021, 12:29 PM.

[122] "4Q20 – What a Difference a Year Makes, Driven by COVID-19, Company is Now 'Real,'" *Cantor Fitzgerald*, March 2, 2021; "Anticipating 2Q Rich with Reg Updates, Potential EUA filing; 4Q Takeaways & Model Update," *J.P. Morgan*, March 2, 2021; "Q4 Update and Thoughts on Catalyst Path From Here - Reiterate BUY," *Jefferies*, March 2, 2021.

[123] "4Q20 – What a Difference a Year Makes, Driven by COVID-19, Company is Now 'Real,'" *Cantor Fitzgerald*, March 2, 2021.

[124] "Anticipating 2Q Rich with Reg Updates, Potential EUA filing; 4Q Takeaways & Model Update," *J.P. Morgan*, March 2, 2021.

> *Jefferies*: NVAX provided updates on its CV-19 vaccine.  UK/US filings
> for EUA to start in early Q2 w/ quick rollout on approval as NVAX is
> scaling to 150M doses/month in Q2.  Version 2.0 of its CV-19 vaccine
> containing the original and SA strain to enter the clinic by mid:21, but impt
> and highly predictive non-human primate data expected in Q2.  With
> several impt events expected for NVAX, we think there is room for stock
> appreciation and would be buyers on share weakness.[125]

54.    During the week following the earnings release on March 2, 2021, one analyst
continued to discuss Novavax's earnings conference call from the week prior.  Specifically, he
attributed the decline in Novavax Common Stock to Defendant Glenn's comments regarding the
timing of the U.S. EUA:

> In my opinion, this timeline was likely what caused the stock to sell off.
> My interpretation was that U.K. regulatory approval could happen next
> month and a U.S. EUA filing could happen some time thereafter.  Either
> event could send NVAX even higher.  However, the window of
> opportunity to secure supply deals in 2021 could be closing.  […] If the
> vaccine market hits $39 billion in 2021 then that could leave about $6
> billion in revenue for JNJ, Novavax an[d] AstraZeneca (AZN).  That could
> mean Novavax may not generate $4 billion in 2021 vaccine sales like
> Bernstein previously estimated.[126]

55.    As a result, the price decline on March 2, 2021 is not directionally inconsistent,
and Professor Kothari's and Defendants' suggestion otherwise is misleading.  Simply because
there was some positive and some negative news announced on March 2, 2021 (the negative
portions of which Professor Kothari ignores) in no way demonstrates that my analysis of
Cammer Factor 5 is unreliable.[127]  Indeed, in my Report and during my deposition, I
acknowledged that earnings announcements often contain a great deal of information that may

---

[125] "Q4 Update and Thoughts on Catalyst Path From Here - Reiterate BUY," *Jefferies*, March 2, 2021.

[126] "Novavax: Uncertain COVID-19 Vaccine Approval Triggers Violent Sell-Off," *Seeking Alpha*, March 10, 2021.

[127] Even though there is plenty of justification for including March 2, 2021 in my analysis, even if I removed this date from the sample my results still show a statistically significant difference at the 99% confidence level in the rate of statistically significant earnings announcement days (50%) compared to the rate of statistically significant no news days (0%).

be value relevant, and often the news is not all good or all bad.[128]  Professor Kothari's assertion that I needed to, ex ante, apply some subjective approach to predict which direction the stock price would move is a red herring.  I am not aware of any authority to suggest that is necessary in this context.  This is not something I have done in the many cases in which I have presented cause-and-effect analyses and for which the court certified the putative class.

56.    In sum, not only was there new, value-relevant information released on all 10 of the earnings announcements during the Analysis Period, but there is also a reasonable and economically rational explanation for the stock price movements each day.  In my Report, I provided direct evidence that earnings announcements are associated with greater incidence of statistically significant abnormal stock price movements, larger magnitudes of price movements, and greater trading volume than days with no news.  Thus, Professor Kothari's critiques regarding directionality and attributing statistically significant reactions on earnings dates to corresponding information released on those days does not disturb my opinions.

### D. PROFESSOR KOTHARI'S OPINIONS RELATED TO OUTLIERS ARE MISGUIDED AND HAVE NO BEARING ON MY EFFICIENCY ANALYSIS

57.    I described in my Report how I removed earnings announcements, the alleged corrective disclosure dates, and four outliers from estimation when conducting my event study.[129]  Professor Kothari does not take issue with my exclusion of the earnings announcements and the alleged corrective disclosure dates and only critiques my exclusion of

---

[128] Coffman Report footnote 67, Coffman Deposition 94:10-16.

[129] *See*, Coffman Report Exhibit 5, Exhibit 6, and Exhibit 7: ("Earnings announcements, the alleged corrective disclosure dates, and four outlier dates have been removed from the estimation.  The outliers include the following dates: 1/21/2020: due to news reports of Covid-19's spread and Novavax Covid-19 vaccine news, 2/27/2020 - 2/28/2020: due to Covid-19 vaccine development news, and 1/29/2021: due to the Company announcing Covid-19 vaccine effectiveness results in a U.K. study.").

outliers.[130]  Professor Kothari provides two overarching arguments related to my exclusion of outliers: 1) that I supposedly cherry-picked them and 2) I have not considered that the price movement on the outlier dates could have been due to "noise" instead of news.[131]  Both of Professor Kothari's claims are meritless and I address them in turn below.

### i.    REMOVING OUTLIERS FROM THE ESTIMATION WINDOW DUE TO CLEARLY NEWS-DRIVEN PRICE MOVEMENTS IS STANDARD PRACTICE

58.    Importantly, Professor Kothari does not go as far as opining that I should *not* have excluded any of the four outliers I identified.  Further, it is not unusual to exclude from or otherwise control for outlier dates in a market model regression.  Professor Kothari does not suggest otherwise, and he relied on academic literature in his report that details the importance of identifying outliers and removing them from estimation if it can be determined that they do not belong in the dataset.[132]  Despite this, Professor Kothari claims I "cherry-picked" which outlier dates to exclude:

---

[130] Professor Kothari does not exclude any dates from estimation when he performs an event study.  *See,* Kothari Report ¶ 71: ("Below, when assessing the robustness of Mr. Coffman's conclusions of cause and effect, in estimating Novavax's abnormal returns on specific dates, I do not exclude any date from my alternative pre-Class Period estimation period").  Earnings announcements, preannouncements, and corrective disclosure dates are typically associated with larger returns and therefore do not reflect the normal volatility of movements in a company's stock prices.  For this very reason, I consistently excluded from my event study an objective set of dates across my entire analysis and throughout my Report, which is consistent with standard and well-accepted practice.

Professor Kothari does not go as far as stating that it was inappropriate for me to exclude earnings dates and the alleged corrective disclosure dates from estimation.  To the contrary, during his deposition Professor Kothari explicitly stated: "I don't have any problem with Mr. Coffman dummying out or excluding the earnings announcement dates" (*see,* Kothari Deposition 178:6 – 8).  As a result, I do not address my exclusion of earnings announcements and the alleged corrective disclosure dates further, and the remainder of this Rebuttal Report will address the exclusion of outliers.

[131] Kothari Report ¶¶ 52 – 53.

[132] Indeed, Professor Kothari himself lists a textbook in Appendix C, Materials Considered, of the Kothari Report detailing this exact concept.  *See*, Neil A. Weiss, "Introductory Statistics," 9th Edition, *Addison-Wesley*, 2012, pp. 118 – 119: ("***In data analysis, the identification of outliers–observations that fall well outside the overall pattern of the data–is important.  An outlier requires special attention***.  It may be the result of a measurement or recording error, an observation from a different population, or an ***unusual extreme observation***.  Note that an extreme observation need not be an outlier; it may instead be an indication of skewness.  As an example of an outlier, consider the data set consisting of the individual wealths (in dollars) of all U.S. residents.  For this data set,

Mr. Coffman uses a prior 120-trading-day rolling estimation window, and removes four dates as "outliers" (as well as any earnings announcement dates and alleged corrective disclosure dates) that fall within the 120-trading-day window, claiming that Novavax's price changes on those "outlier" dates were "due to" some news releases. In his deposition, Mr. Coffman testified that he had no systematic methodology for identifying these "outlier" dates, and referred to the news releases on these outlier dates as "something obvious […] [that had a] big impact on what [he was] estimating." In my review of hundreds of event studies, I have never seen such an arbitrary removal of cherry-picked dates from an estimation period.[133]

59.    It is disingenuous for Professor Kothari to make this claim.  Indeed, he misleadingly only cites to a portion of my deposition testimony; had he included my full response, it would have shown that I provided a clear explanation for my identification of outliers.[134, 135]  To be clear, I identified the four additional outlier dates (i.e., dates other than the

---

the wealth of Bill Gates is an outlier--in this case, an unusual extreme observation. ***Whenever you observe an outlier, try to determine its cause***.  If an outlier is caused by a measurement or recording error, or if ***for some other reason it clearly does not belong in the data set, the outlier can simply be removed***.  However, if no explanation for the outlier is apparent, the decision whether to retain it in the data set can be a difficult judgment call.").

Additionally, a chapter in a textbook both cited and authored by Professor Kothari acknowledges that the goal of an event study is to model normal returns, which I have done by excluding certain dates from my analysis.  *See*, Kothari, S. P., and Jerold B. Warner, "Chapter 1 – Econometrics of Event Studies," *Handbook of Corporate Finance, Volume 1 Elsevier B.V.*, (2007), p. 9: "A model of normal returns (i.e., expected returns unconditional on the event but conditional on other information) must be specified before an abnormal return can be defined."

[133] Kothari Report ¶ 52.

[134] *See*, Kothari Report footnote 68; Coffman Deposition 110:20 – 111:18 ("No. It's one of those things where it sort of smacks you in the face and it's obvious.  So, for example, where you would normally see if there was an outlier really impacting the regression in such a way that it created an issue, if you were looking at Exhibit 5, for example, and all of a sudden the purple line jumps up, you know, from two to three and a half and then exactly 120 days later, it jumps back down from 3 and a half to wherever it is, like, there's an obvious outlier effect on the regression estimation. That's when we would identify something and go follow up and say, 'Okay.  This looks like one day is having some enormous impact on the output here.  Let's go see what that is.'  And that's what resulted in reviewing those four days and eliminating them.  So it's not a specific percentage threshold.  It's a – it's sort of the question of is there something obvious here that that there's – there's one day that's having a big impact on what we're estimating, and, again, estimating in terms of relationship, not the outcome of my analysis but just the relationship amongst the variables.").

[135] Coffman Deposition 109:23 – 110:15 ("So it's a fairly standard thing to do. So the idea is -- again, the whole purpose of running these regressions is to establish in the absence of sort of fundamental news, what's the relationship between the security of interest, in this case, Novavax, and these control indices. And so those estimates of how sensitive they are to each other and what the total volatility is in the absence of news can be very sensitive if you have a large outlier.  So part of the process of performing this study was to identify were there any outliers where the returns were so large and there was specific news on those days that easily explained them, that

alleged corrective disclosures, earnings announcements, and pre-announcements) to exclude from my event study because they represented clearly defined dates with Novavax-specific news that I would expect to be associated with uncharacteristically large returns in Novavax Common Stock, therefore biasing the normal volatility measure during the corresponding period. Professor Kothari suggests no reliable alternate methodology that I should have implemented to identify outlier dates. As a result of the foregoing, it is incorrect for Professor Kothari to argue that I "had no systematic methodology for identifying" the outlier dates. [136]

60. First, there is ample support in academic literature to exclude anomalous data points that clearly have an impact on the regression's parameters:

> Estimated regression coefficients can be highly sensitive to certain data points. Suppose, for example, that one data point deviates greatly from its expected value, as indicated by the regression equation, while the remaining data points show little deviation. It would not be unusual in this situation for the coefficients in a multiple factor regression to change substantially if the data point in question were removed from the sample. [137]

61. Further, "[o]ne generally useful diagnostic technique is to determine to what extent the estimated parameter changes as each data point in the regression analysis is dropped from the sample." [138] As shown in **Exhibit 1**, the inclusion and exclusion of January 29, 2021 (a date I have identified as an outlier and thus excluded from estimation, but Professor Kothari includes in his pre-Class Period estimation window) has a noticeable impact on the regression parameters. The only way Professor Kothari's conclusions are possible are by fundamentally

---

needed to be removed because they were having an undue influence on the estimation of these relationships, and on those four days, I concluded there were.").

[136] Kothari Report ¶ 52.

[137] The National Academies Press, Reference Manual on Scientific Evidence, Third Edition, 2011 at pp. 326 – 327.

[138] The National Academies Press, Reference Manual on Scientific Evidence, Third Edition, 2011 at p. 327.

and unscientifically changing my methodology.[139] When the January 29, 2021 outlier is excluded from estimation (as I did in my Report), there is a much more consistent measure of relationship between the Company and each of the control indices, whereas when the outlier is included in the estimation (as Professor Kothari is suggesting), it creates a clear disturbance that lasts exactly 120 trading-days, the length of my rolling estimation window (see **Exhibit 1**). This makes clear that it is the outlier having the impact on the regression, and not the underlying return generating process that is producing the outlier. This further supports that January 29, 2021 is an outlier that should be excluded from estimation.

62.    Furthermore, the existence of such extreme returns on the outlier dates I identified are consistent with common sense in the context of Novavax operating as a vaccine development company during the Covid-19 pandemic. January 29, 2021, the outlier date that I identify, and that Professor Kothari wants to characterize as potentially due to "noise," is the announcement that Novavax's vaccine was 89.3% effective in preventing Covid-19 in its Phase 3 clinical trial in the U.K., thus giving the market confidence that it had a workable vaccine which could help end the pandemic and drive demand for millions (if not billions) of doses.[140, 141] Of course this was a monumentally significant event for the company and its prospects and

---

[139] In his deposition Professor Kothari explained robustness as "if you have made some change in the recent design do the findings change? Okay? Almost every academic research paper that we have, one of generally toward the end, but there is an important section devoted to robustness. And are the findings robust to a variety of tweaks. And that is part of the scientific process." (See Kothari Deposition 39:2 – 10). Given the context of Kothari Report Sections IV.C.5 and IV.C.6, Professor Kothari is seemingly trying to imply my event study was not robust. However, Professor Kothari's flawed approach goes against his very own definition of robustness, as the only way he could draw the conclusions he did is by making fundamental and unscientific changes to my model.

[140] Kothari Report ¶¶ 60-62; "Press Release: Novavax COVID-19 Vaccine Demonstrates 89.3% Efficacy inUK Phase 3 Trial," *Dow Jones Institutional News*, January 28, 2021, 4:05 PM.

[141] "New Vaccine Supply Charts: Plenty Still Coming in USA and Tons by Summer," *Jefferies*, January 29, 2021, Exhibits 3 – 4; "Visibility on ex-US Emergency Use, Manufacturing, and US PREVENT-19 Progress Bodes Well for New 'Jab' Option," *Cantor Fitzgerald*, February 4, 2021 ("we increase our projection for the number of doses sold yet in 2021 (to 350M from 200M, previously), which we view as having the potential to prove conservative given that the company has guided for manufacturing capacity to be 2B doses annually by mid'21.").

the market price of Novavax common stock soared.  The price movement on this day (a 63.41% abnormal return) is even more evidence of the obvious cause-and-effect relationship between news related to Novavax and changes in its stock price.  There was substantial interest in vaccine companies during the relevant periods because there was great potential demand for their vaccine along with increases in their market value as a result of the global Covid-19 pandemic.

63.    As a result of the foregoing, it is incorrect for Professor Kothari to argue that I "arbitrarily" chose the exclusion dates, and for Defendants to argue in their Motion that I "apparently excluded dates as 'outliers' simply because they significantly impacted the analysis of Novavax's market efficiency."[142]  Importantly, the outcome of my efficiency analyses for Novavax Common Stock are *not* impacted by whether or not the four outlier dates are included in my analysis.  Professor Kothari also claims he has "never seen such an arbitrary removal of cherry-picked dates from an estimation period," which Professor Kothari elaborates on in his deposition.[143]  Specifically, Professor Kothari claims that in excluding outliers, I have not done so in a consistent, scientific manner.[144]  He is wrong.  I applied the methodology described above to each of the four outliers I identified in my Report, and I chose to exclude those dates based upon analysis done *before* I knew the outcome of the cause-and-effect analysis.  As described in the literature, "[i]t is important to at least informally identify outliers and to reestimate models with the suspected outliers excluded."[145]  Courts routinely credit expert

---

[142] Defendants' Motion p. 13; Kothari Report ¶ 71.

[143] Kothari Report ¶ 52.

[144] Kothari Deposition 177:3 – 7; 183:5 – 10.

[145] Wooldridge, J., *Introductory Econometrics: A Modern Approach*, Fifth Edition, 2012 at p. 334.

reports that remove outliers on clearly news-driven price movements.[146]  As a result of the foregoing, Professor Kothari's claim that I have supposedly cherry-picked which outliers to exclude is false and it was statistically reasonable for me to exclude the four outlier dates from estimation when conducting my event study.

### ii.    PROFESSOR KOTHARI'S IDENTIFICATION OF NOISE TRADING AND VOLATILITY IN NOVAVAX COMMON STOCK DOES NOT DISTURB MY ANALYSES

64.    Professor Kothari further claims that I fail to consider the possibility that large price changes on these outlier dates were caused by noise, not news.[147]

65.    Kothari's first premise, that "even if a stock's price change following some news release is large…[t]he possibility that a stock's return was due to noise, not news, can never be ruled out," and in a corresponding footnote that "even if a stock's abnormal return is statistically significant at the conventional 95% confidence level, there remains a 5% chance that the abnormal return was due to noise alone," is wrong and misleading.[148]  This 5% chance cited by Professor Kothari is only true for dates for which the significance is on the border of the threshold.  Professor Kothari ignores the fact that these dates are significant well beyond the 99% confidence level with corresponding p-values which are very small.  The threshold for statistical significance of 99% is a p-value of less than or equal to 0.01.  **Exhibit 2** shows that the p-value was virtually zero for each outlier.  For example, the January 29, 2021 outlier has a p-value of 7.52E-.22 (see **Exhibit 2**), which represents statistical significance beyond the

---

[146] *See*, Memorandum Opinion and Order, *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *7 (crediting expert report that removed "atypical days" to "control for potentially abnormal returns related to earnings announcements" and a day "contemporaneously described as atypical by the news media").

[147] Kothari Report Section IV.C.4.

[148] Kothari Report ¶ 53, footnote 70.

99.99% confidence level.  Accordingly, the most Professor Kothari can tell the Court related to that outlier is that there is less than a 0.0000000000000000000001% chance that the abnormal return was due to noise alone.  This is far smaller than the 5% chance Professor Kothari claims in his report.[149]

66.    Professor Kothari then presents academic articles on noise trading and argues that securities "in which the investor base comprises largely of retail traders" are "particularly vulnerable" to noise trading.[150]  Specifically, Professor Kothari argues:

> In short, if a stock's returns display high volatility and if a large share of the stock's investor base comprises of retail traders, then the stock's price changes are less likely to be tied to company-specific news and more likely to be driven by noise.  Novavax's stock displayed such characteristics, as I discuss below.[151]

67.    Professor Kothari likewise defines his understanding of noise trading in his deposition as "movement in stock prices as a result of what are called noise traders…who are not necessarily acting on fundamental information…and they are influencing stock prices, sometimes because of their coordinated trading behavior and based on rumors, perhaps."[152] However, academic literature cited to by Professor Kothari acknowledges that noise trading can be related to some market fundamentals.[153]  Indeed, Professor Kothari ignores fundamental industry and/or company-specific information released by Novavax on the outlier dates I have identified, and does not provide evidence of coordinated trading in Novavax Common Stock or such "rumors" noise traders could be acting on.

---

[149] Kothari Report footnote 70.

[150] Kothari Report ¶ 59.

[151] Kothari Report ¶ 59.

[152] Kothari Deposition 13:13 – 19.

[153] Ramiah, Vikash, Xiaoming Xu, and Imad A. Moosa, "Neoclassical finance, behavioral finance and noise traders: A review and assessment of the literature*," International Review of Financial Analysis* 41, (2015), pp. 89 – 100 at p. 89 ("…demonstrate[s] how noise trading is related to some market fundamentals…").

68.    In my Report[154] and above (see, **Section III**) I show that institutional investors held nearly half of Novavax public float during the Class Period, a fact which Professor Kothari does not dispute computationally, and does not dispute is an indicia supportive of efficiency in his deposition.[155]  Further, the literature Professor Kothari cites to on noise trading is largely theoretical in nature, and those articles which are empirical focus on non-U.S. stocks or non-equity securities.[156]  This literature cited by Professor Kothari also does not offer conclusive results regarding the presence or identification of noise, much less in a context relevant here.[157] I am not aware of any study cited to by Professor Kothari that demonstrates that noise trading seriously impacts the efficiency of stocks trading on major U.S. exchanges.  In his report, Professor Kothari does not prove the existence of noise traders in Novavax, nor does he actually demonstrate there is noise which would affect the price of Novavax Common Stock.  Even in the case where there was some proof of noise impacting the efficiency of Novavax, all other factors remain supportive of Novavax trading in an efficient market during the Class Period.

---

[154] Coffman Report Section VII.J, Exhibit 12.

[155] Kothari Deposition 152:21 – 153:7; 155:1 – 6.

[156] Kothari Report Section IV.C.4.a; *See*, for example, Black, Fischer, "Noise," *Journal of Finance* 41 (3), (1986), pp. 528 – 543 at p. 532 (is highly theoretical and acknowledges "[t]here will always be a lot of ambiguity about who is an information trader and who is a noise trader."); Tetlock, Paul C., "Does Noise Trading Affect Securities Market Efficiency?" *Columbia University Working Paper*, (2006), pp. 1 – 43 at p. 2 ("Many theoretical models of securities prices incorporate agents who have hedging motives or irrational reasons to trade, which I call noise traders throughout the paper.  Although the direct effect of adding such noise traders to a securities market is to reduce informational efficiency, standard models feature strong countervailing effects.  Greater noise trade in a securities market motivates rational agents to trade more aggressively on their existing information and provides them with incentives to acquire better information.  For these reasons, two of the most widely used models in finance, Grossman and Stiglitz (1980) and Kyle (1985), predict that an increase in noise trading will not harm informational efficiency. […] I use data from Arrow-Debreu securities based on one-day sports and financial events traded on an online exchange, TradeSports.com.").

[157] Kothari Report Section IV.C.4.a; Ramiah, Vikash, Xiaoming Xu, and Imad A. Moosa, "Neoclassical finance, behavioral finance and noise traders: A review and assessment of the literature," *International Review of Financial Analysis* 41, (2015), pp. 89 – 100 at p. 98 ("This paper has outlined some major market anomalies that *may* indicate irrational trading.  One *possible* cause of these anomalies is noise trader risk…"); Tetlock, Paul C, "Does Noise Trading Affect Securities Market Efficiency?" *Columbia University Working Paper*, (2006), pp. 1 – 43 at p. 27 ("Although these results are unlikely to generalize without modification to real-world financial markets with long-horizon securities, they do suggest three interesting directions for future research.").

69.    Thus, in both his report and his deposition, Professor Kothari points to a phenomenon that in theory could impact market efficiency in general to some degree, an argument which Defendants also adopt in their Motion.[158, 159]   However, none of the literature he points to shows that the mere presence of retail traders or retail trading renders the market for Novavax Common Stock during the Class Period inefficient, and Professor Kothari has certainly provided no evidence of this.  Professor Kothari's apparent suggestion that because a vaccine company's stock was heavily traded and volatile during a global pandemic somehow suggests the market was inefficient (despite all the evidence to the contrary) is unpersuasive and unscientific.  The volatility of Novavax common stock is explicitly addressed and considered in my analysis and statistical tests.

70.    Professor Kothari continues his flawed critiques by analyzing three of my four outliers in the context of his argument regarding noise trading.[160, 161]   Regarding February 27 and 28, 2020 Professor Kothari claims there is "no *new* Novavax-specific information" released,[162] arguing that news articles simply repeat information previously released on February 26, 2020.[163]   However, it is not unusual for the market to continue to digest

---

[158] Defendants' Motion pp. 10 – 12.

[159] Defendants' assertion that I did not know what noise trading was is inaccurate and disingenuous (*see*, Defendants' Motion p. 11).  One of the articles listed by Professor Kothari has at least ten distinct potential definitions of what noise trading is (*see*, Ramiah, Vikash, Xiaoming Xu, and Imad A. Moosa, "Neoclassical finance, behavioral finance and noise traders: A review and assessment of the literature," *International Review of Financial Analysis* 41, (2015), pp. 89 – 100 at p. 95, Table 4).  My deposition testimony reflects the lack of clarity surrounding the exact meaning of noise trading has (*see*, Coffman Deposition 44:8 – 14, "Without knowing exactly what you mean by 'noise trading,' I think it's fair to say I did not undertake any specific analysis of whether there was or wasn't what you're calling 'noise trading' because I simply didn't do it, but it's not clear exactly to me what you mean by 'noise trading.'").

[160] Kothari Report ¶¶ 55 – 56.

[161] Professor Kothari does not specifically critique my exclusion of January 21, 2020; therefore, I do not address this outlier date in detail.  However, I stand by the analysis in my Report and my exclusion of this date as a news-driven outlier.

[162] Kothari Report ¶ 55 (emphasis in original).

[163] Kothari Report ¶ 55.

44

information announced the day prior; in this instance news articles on February 27, 2020

continued to discuss news related to vaccine progress issued in a press release on February 26,

2020.[164, 165]

71.    Additionally, there was positive industry related news on February 27, 2020 and

February 28, 2020, including other biotech stocks developing Covid-19 vaccines and repeated

mention of rapid development of a vaccine in a White House press conference.[166]  All of this

demonstrates there was clear news impacting Novavax and other vaccine manufacturers on

these days.  See, for example:

> *CNN Wire*: Gilead Sciences stock was up slightly on Thursday, even as the
> Dow plunged into correction status.  The reason?  The biotech company is
> moving closer to finding a potential treatment for the deadly coronavirus.
> It plans to start administering its remdesivir drug to patients next month.
> Shares of Gilead Sciences have risen more than 10% in the past five days
> as the race to find an effective treatment for the outbreak continues***.  It's
> not alone.  The stocks of two smaller biotechs working on coronavirus
> vaccines -- Moderna and Novavax -- have both soared in the past few
> days… on hopes that their treatments may show some success… as
> well.***[167]
>
> *Boy Genius Report (BGR)*: It was only a few days ago that a US company
> announced it had developed a coronavirus vaccine candidate and was
> rapidly approaching the human testing phase.  That company, Moderna,
> says it has already provided the US government with samples of the
> vaccine for further evaluation and could move to human testing soon with
> results coming by July.  Now, with the entire world scrambling to come up
> with solutions to stop the spread of the virus, another company is throwing

---

[164] On February 26, 2020 Novavax issued a press release announcing "progress in its efforts to develop a novel vaccine to protect against coronavirus disease COVID-19."  Specifically, Novavax announced it "has produced and is currently assessing multiple nanoparticle vaccine candidates in animal models prior to identifying an optimal candidate for human testing, which is expected to begin by the end of spring 2020."  *See,* "Novavax Advances Development of Novel COVID-19 Vaccine," *GlobeNewswire*, February 26, 2020, 9:26 AM.

[165] "US Novavax shares rise on coronavirus vaccine progress," *SeeNews Pharmaceuticals*, February 27, 2020, 9:14 AM; "Novavax is working to advance a potential coronavirus vaccine. So are competitors.," *Baltimore Business Journal Online*, February 27, 2020; "CDOX On Fire, MNLO Plunges On Serlopitant Data, VIR Enters Covid-19 Vaccine Race," *CE NoticiasFinancieras,* February 27, 2020.

[166] "Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference," *James S. Brady Press Briefing Room*, February 26, 2020, 6:37 PM.

[167] "Drug companies race to test coronavirus vaccines," *CNN Wire*, February 27, 2020, 1:26 PM.

its hat into the vaccine ring.  *Novavax, a small biotech company based out of Maryland, says it is making significant progress on its own version of a COVID-19 vaccine and plans to begin human testing within months*.[168]

*President Trump*: *We're rapidly developing a vaccine*, and they can speak to you —the professionals can speak to you about that.  The vaccine is coming along well.  And in speaking to the doctors, *we think this is something that we can develop fairly rapidly, a vaccine for the future*, and coordinate with the support of our partners.

[…]

*Dr. Fauci*: *we have a number of vaccine candidates and one prototype*, to give you a feel for the timeframe of a vaccine and what its impact might be now and in subsequent years — is that I told you *we would have a vaccine that we would be putting into trials, to see if it's safe and if it induces a response that you would predict would be protective in about three months.  I think it's going to be a little bit less than that*.[169]

*Bloomberg*: B. Riley FBR […] raised the firm's price target on Novavax to $15 from $12 and keeps a Buy rating on the shares.  The company on Wednesday reported progress in its development of a novel vaccine to protect against coronavirus disease … [B. Riley FBR] *believes Novavax is among the leading biopharma companies with appropriate R&D capabilities to respond to this emerging medical need*…[170]

*Associated Press Newswires*: U.S. markets are heading for their worst week since the financial crisis with the final tally of economic damage from a spreading virus still unknown.  *That doesn't mean there isn't potential promise in a select group of companies*…because *their products may [be] needed to combat the novel coronavirus*.  […] *Shares of vaccine maker Novavax Inc. are up more than 38% midday*…[171]

Benzinga: Novavax, Inc … rose 38.6% to $16.35 after gaining around 28% on Thursday.  Shares of several vaccine companies are trading higher on growing global coronavirus fears.[172]

---

[168] "Another company claims to have a coronavirus vaccine in the works," *Boy Genius Report (BGR),* February 27, 2020.

[169] "Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference," *James S. Brady Press Briefing Room*, February 26, 2020, 6:37 PM.

[170] "NVAX: Novavax price target raised to $15 from $12 at B. Riley FB," *Bloomberg*, February 28, 2020, 9:05 AM.

[171] "Carnage on Wall Street, but some companies thrive or recover," *Associated Press Newswires*, February 28, 2020, 1:24 PM.

[172] "86 Stocks Moving In Friday's Mid-Day Session," *Benzinga*, February 28, 2020, 12:19 PM.

> *Investor's Business Daily*: **Coronavirus Vaccine, Drugs Stocks Rally As broader coronavirus worries slammed the stock market**, shares of Moderna mostly popped last week.  An official with the World Health Organization praised a failed Ebola virus treatment by Gilead Sciences as the best potential candidate to treat the virus now known as Covid-19.  […] Shares skyrocketed to a record high, then came way off high but still surged for the week.  Other companies, including Johnson & Johnson, Sanofi, Regeneron Pharmaceuticals, Inovio Pharmaceuticals, Vir Biotechnology, Novavax and Vaxart are working to target Covid-19.[173]

72.     Professor Kothari ignores positive news that is highly specific to Covid-19 vaccine manufacturers on these dates.  Therefore, his argument does not disturb my opinion that it is appropriate to consider February 27, 2020, and February 28, 2020, news-driven outliers.

73.     Regarding the January 29, 2021 outlier, Professor Kothari attempts to link the high level of Novavax trading and price movements to what he calls a "noise trading frenzy" seen in certain stocks during January 2021.[174]  In doing this, Professor Kothari leaves the impression that Novavax fell into the same category as certain "meme stocks" such as Game Stop that were also very heavily traded around the same time.[175]  However, there is a critical distinction that is glossed over by Professor Kothari.  Novavax was a vaccine company during a global pandemic developing a vaccine that could help shorten the pandemic and save millions of lives.  It is not remotely surprising that it was heavily traded or volatile as the market was assessing the extent to which the Company could capitalize on the unique market opportunity it was facing.  The only thing Novavax had in common with the "meme stocks" was that it had high trading volume and potentially high retail trading volume.

---

[173] "Coronavirus Stock Market Correction Takes Hold As Dow Jones Suffers Worst Week Loss In Years; Microsoft, Mastercard Warn, Disney CEO Bob Iger Out," *Investor's Business Daily*, February 28, 2020.

[174] Kothari Report ¶ 60.

[175] Kothari Report ¶¶ 60 – 62.

74. As already discussed above at the beginning of **Section IV.D.**, January 29, 2021 represents a clearly news-driven outlier. To add more detail, on January 28, 2021 after market hours, Novavax announced results of its vaccine's effectiveness in its trials conducted in the U.K. and South Africa.

> *Dow Jones*: Novavax, Inc. … a biotechnology company developing next-generation vaccines for serious infectious diseases, today announced that NVX-CoV2373, its protein-based COVID-19 vaccine candidate, met the primary endpoint, with a vaccine efficacy of 89.3%, in its Phase 3 clinical trial conducted in the United Kingdom (UK). The study assessed efficacy during a period with high transmission and with a new UK variant strain of the virus emerging and circulating widely. It was conducted in partnership with the UK Government's Vaccines Taskforce. Novavax also announced successful results of its Phase 2b study conducted in South Africa. [176]

75. Following the successful trial results from Novavax, several news outlets continued to report on the newly available data, as well as the jump in Novavax's stock price:

> *Reuters*: Novavax Inc. said on Thursday its coronavirus vaccine was 89.3% effective in preventing COVID-19 in a trial conducted in the United Kingdom, and was nearly as effective in protecting against the more highly contagious variant first discovered in the UK, according to a preliminary analysis. […] Executives on the call said the company was discussing with the U.S. Food and Drug Administration whether the UK and South Africa data was enough to apply for a U.S. emergency use authorization. […] John Moore, a professor of microbiology and immunology at Weill Cornell Medical College in New York, said the Novavax UK data are essentially the same as results from Pfizer and Moderna. [177]

> *Dow Jones Institutional News*: Shares of biotechnology company Novavax Inc. leaped on the Nasdaq Friday, a day after the company said its Covid-19 vaccine candidate was effective. […] At 12:04 p.m. EST, Novavax shares jumped 66.3% to $222.86. [178]

---

[176] "Press Release: Novavax COVID-19 Vaccine Demonstrates 89.3% Efficacy inUK Phase 3 Trial," *Dow Jones Institutional News*, January 28, 2021, 4:05 PM.

[177] "Novavax says COVID-19 vaccine 89% effective in UK trial, less in South Africa, shares jump," *Reuters*, January 28, 2021, 8:04 PM.

[178] "Novavax Shares Soar 66% on Positive Covid-19 Vaccine Trial Results," *Dow Jones Institutional News*, January 29, 2021, 12:17 PM.

76.    Professor Kothari completely ignores this obvious value relevant news impacting the price of Novavax Common Stock on January 29, 2021 and tries to attribute this price movement to noise trading.  Specifically, he identifies a supposedly "well-documented…noise trading frenzy in … Novavax, and certain other Covid-19 vaccine manufacturers (Moderna and Inovio Pharmaceuticals) …in January 2021, and specifically on January 29, 2021."[179] According to Professor Kothari, Novavax was one of 50 stocks on an expanded list of stocks restricted by Robinhood on January 29, 2021.[180]  Kothari continues to cite to testimony by Robinhood's CEO regarding their decision to halt buying activity on GameStop; these are broad points with no relevance to Novavax.[181]  Professor Kothari fails to provide any meaningful evidence of noise trading in Novavax on January 29, 2021 and ignores company specific news which could be reasonably attributed to the price movement on that date.  Even so, temporary restrictions on trading at one brokerage firm of many do not provide evidence of market inefficiency.[182]  Professor Kothari also fails to acknowledge that the restriction on Novavax was lifted by the next trading day, February 1, 2021.[183]  The articles cited by Professor Kothari do not suggest in any way that these restrictions imply market inefficiency, and in fact Novavax is not even mentioned in the primary source Professor Kothari cites from the SEC.[184]

---

[179] Kothari Report ¶ 60.

[180] Kothari Report ¶¶ 60 – 61.

[181] Kothari Report ¶ 62.

[182] While there is evidence of other brokerage firms restricting stocks during this period, I have found no evidence that that any other firm restricted trading in Novavax.  *See*, "Robinhood, Other Brokerages Restrict Trading on GameStop, AMC," *Dow Jones Newswires Chinese (English)*, January 28, 2021, 10:27 PM; "Robinhood, Webull, M1 and these other platforms have resumed trading of GameStop and AMC shares," *Business Insider*, January 29, 2021, 12:32 PM.

[183] "Robinhood users are still limited to one GameStop share," *The Cointelegraph*, February 1, 2021.

[184] "Staff Report on Equity and Options Market Structure Conditions in Early 2021," *SEC*, October 14, 2021.

77.    Professor Kothari also seems to suggest my characterization of January 29, 2021 as an outlier is flawed because "analysts' consensus price target for the stock rose only 10% that day" and that such "muted changes in the analysts' consensus price target for Novavax's stock" following the Company news on this date "indicate[s] that the 65% price increase on January 29 cannot be reasonably attributed to the news entirely, contrary to Mr. Coffman's claim, and thus the possibility that the return was due to noise cannot be ruled out."[185]  Professor Kothari's analysis is wrong because analysts' price targets already incorporated future sales of a successful Novavax Covid-19 vaccine, implicitly assuming that Novavax would be able to successfully manufacture the vaccine and show positive clinical results.  Because analyst price targets already incorporate expectations of future revenue, I would not expect analyst price targets to increase in the same way that Novavax's stock price did, contrary to what Professor Kothari seems to suggest.[186]  This is confirmed by analysts' descriptions of their valuation methodologies for Novavax, for example:

> *J.P. Morgan*: Our Dec-21 price target of $295 is derived through a combination of DCF ($314/share) and NPV sum-of-the-parts (SOTP) ($278/share) analyses.  Both methodologies reflect peak revenue opportunities of ~$500M for NanoFlu (including US sales and Ex-US royalties) and *~$4B in peak sales for NVX-CoV2373 (POS of 85%).*  For reference, both our SOTP and DCF analyses assume a 12% discount rate and 0% terminal growth.[187]
>
> *Jefferies*: Our PT is based on an NPV of the probability-adjusted indications….[188]
>
> *H.C. Wainwright:* We derive our price target of $207 with a DCF methodology, a 15% discount rate of cash flows from sales of Novavax'

---

[185] Kothari Report ¶¶ 56 – 57, footnotes 77 – 78.

[186] Kothari Report ¶ 56.

[187] "UK Efficacy Support '2373 as Best-In-Class, while SA Data Point to Widening Market Opp'y; Raising PT to $295," *J.P. Morgan*, January 29, 2021.

[188] "NVAX Clears The Bar... Strong 90%+ CV-19 Vaccine Results," *Jefferies*, January 28, 2021.

50

vaccines for infectious diseases, a 2% terminal growth rate, and an 83% clinical program probability-of-success.[189]

*Cantor Fitzgerald*: As a result of the positive P3 UK data, we increase the PoS for NVX-CoV2373 to 75% from 70%. In addition, we adjusted our base year to 2021. Lastly, if the data from the US/Mexico P3 PREVENT-19 study are positive, or if an EUA is granted by the FDA as a result of the P3 UK data, we anticipate an equity raise and therefore incorporate 2.5M shares into the 2021 share count ($500M raise at $200 a share) to guestimate a 'diluted' share-price value.[190]

*B Riley*: Our 12-month price target of $334 per share is based on a DCF analysis of revenues and cash flows projected into 2030. We adjust FCFF by a revenue-weighted approval probability factor that estimates the probability of each of Novavax's vaccine candidates gaining regulatory approval...[191]

78.    Thus, Professor Kothari's concern regarding noise in Novavax Common Stock price being somehow supported by muted changes in analyst consensus target prices is unfounded. I do not expect analyst consensus target prices (which are often expectations a year in the future) to correspond with daily stock price movements in response to specific news. This is especially true if the target prices already assume future positive developments.

79.    Finally, it is Defendants and Professor Kothari who suggest using the period encompassing January 2021, which ironically contains the noise Professor Kothari takes issue with, as the appropriate benchmark for estimating volatility at the time of the alleged corrective disclosures and over news dates during the Class Period.[192] Professor Kothari is simply

---

[189] "After Traveling at Warp Speed, NVX-CoV2373 Has Now Arrived; Reiterate Buy and $207 PT," *H.C. Wainwright & Co.*, January 29, 2021.

[190] "UK P3 Results with '2373 Point to Best-In-Class Profile, EUA in 1H21," *Cantor Fitzgerald*, January 29, 2021.

[191] NVAX_KOTHARI_00000024 at NVAX_KOTHARI_00000028.

[192] Kothari Report ¶ 71, footnotes 105, 107; Defendants' Motion p. 13 – 14.

51

providing evidence that using a 120-day rolling estimation period during the Class Period where there is less evidence of "noise trading" is a more reasonable approach.[193]

80.    Professor Kothari argues broadly that "Novavax's stock returns were exceptionally volatile from January 2020 (when Novavax announced the launch of its Covid-19 vaccine development) through the end of the Class Period (October 19, 2021)." and that such "high volatility can be due to noise trading."[194]    Importantly, Professor Kothari is not providing an affirmative opinion regarding noise trading, rather he is simply claiming without basis that I fail to consider the possibility of noise trading.  Professor Kothari then presents a number of flawed analyses related to Novavax trading and volatility.[195]

81.    First, Professor Kothari computes Novavax's return volatility and compares that to his own set of Peer Biotech Companies.

> My analysis confirms that Novavax's return volatility (measured by the standard deviation of daily returns) was significantly greater than that of a set of biotech companies that did not report any Covid-19 vaccine initiatives (the "Peer Biotech Companies"), and was comparable to Moderna and Inovio Pharmaceuticals that were also subject to noise trading pressures in January 2021, and, like Novavax, had been put on Robinhood's list of restricted stocks as discussed above.[196]

82.    While Professor Kothari seems to suggest this makes it more likely that there was "noise trading," there is a far simpler and much more rational explanation.  Just like Novavax, Moderna and Inovio were also vaccine companies in a very unique time period of a global pandemic that offered huge potential returns.  It would be shocking if these companies did not

---

[193] Professor Kothari notably uses 120-day rolling standard deviation to measure volatility.  *See*, Kothari Report Exhibit 2A and Exhibit 2B.

[194] Kothari Report ¶ 63.

[195] Kothari Report ¶¶ 63 – 68.

[196] Kothari Report ¶ 63.

have higher trading and higher volatility in such an environment. This higher volatility relative to other biotech companies is entirely consistent with what a financial economist would expect.

83.    Second, Professor Kothari argues the following regarding trading volume:

> Novavax's high volatility was accompanied by high trading volume… Novavax's weekly trading volume (as a percentage of shares outstanding)—weekly turnover—was significantly greater than that of the Peer Biotech Companies and was comparable to Moderna and Inovio Pharmaceuticals. Mr. Coffman also found that Novavax's trading volume as a percentage of shares outstanding was relatively high (more than 14 times higher than the average trading volume of all other stocks in the NYSE and NASDAQ exchanges), but asserts that the finding "supports the conclusion that the market for Novavax Common Stock was efficient." He fails to provide any explanation or support for his assertion… there were several weeks during which the weekly turnover of Novavax's stock was close to or greater than 100%. For example, the weekly trading volume for the week that includes January 29, 2021 was 86%. This implies within that one week, 86% of Novavax's shares outstanding changed hands. From an economic perspective, there is no basis to assume that all this high level of trading volume and the associated price effect was due to some news.[197]

84.    Professor Kothari mischaracterizes my analysis of average weekly trading. Specifically, he states that since "the weekly trading volume for the week that includes January 29, 2021 was 86%[,] [t]his implies within that one week, 86% of Novavax's shares outstanding changed hands."[198] First, volume equal to 86% of the shares outstanding does *not* imply that 86% of shares changed hands. The same share can be traded multiple times and it could be that a far smaller percentage of shares actually changed hands. One cannot infer the percentage of shares that changed hands from volume alone. Indeed, approximately 50% of Novavax's public float was held by institutions during the Class Period, and as documented by Professor Kothari, there were not huge changes in those holdings relative to volume.[199] Thus, the idea in the

---

[197] Kothari Report ¶¶ 64 – 65.

[198] Kothari Report ¶ 65.

[199] Coffman Report ¶¶ 25, 72, Exhibit 12; Kothari Report ¶ 67, footnote 100.

Defendants' Motion and the Kothari Report that each and every share of Novavax Common Stock was traded when the trading volume as a percent of shares outstanding approaches 100% is simply incorrect. [200]  Indeed, I would expect Novavax to have high trading volume due to the Company's development of a Covid-19 vaccine during a global pandemic.

85.    Second, Professor Kothari analyzes "odd lot trades," defined in his report as "transactions of less than 100 shares of stock" to assess retail trading in Novavax Common Stock.[201]  Professor Kothari then calculates the amount of "odd lot trades" as a percentage of shares outstanding to obtain a measure of retail trading (which Professor Kothari claims could be noise traders) for Novavax and compares this to the same measure for a set of "Peer Biotechnology Companies" he identified, Moderna, and Inovio Pharmaceuticals.[202]  He concludes that "Novavax's odd lot trading volume (as a percentage of shares outstanding) was significantly greater than that of the Peer Biotech Companies and comparable to Moderna and Inovio Pharmaceuticals."[203]  This analysis is flawed and irrelevant for the same reasons I have discussed directly above.[204]  That is, it is not surprising that Novavax odd lot trading volume was higher (similar to Professor Kothari's findings regarding weekly turnover, above) than the "Peer Biotech Companies," or companies that were not under public scrutiny due to the high interest in the Covid-19 vaccine development, while finding that Novavax was more

---

[200] Kothari Report ¶ 65; Defendants' Motion p. 11.

[201] Kothari Report ¶ 66, footnote 98.

[202] *See*, Kothari Report footnote 94.  Professor Kothari defines his set of "Peer Biotechnology Companies" as 14 companies that during the period January 1, 2020 and October 19, 2021 were a part of the Industry Index I used (the Nasdaq Biotechnology Total Return Index), had a market capitalization in the range of 80% to 120% of Novavax's average market capitalization over the same period, and lastly, that were not involved in any Covid-19 vaccine development.

[203] Kothari Report ¶ 66.

[204] Professor Kothari recreated this analysis using "odd lot trades" as a percent of public float with the same findings.  My opinion that this analysis is flawed is the same whether Professor Kothari uses shares outstanding or public float to make this claim.

comparable to Moderna and Inovio, two Covid-19 vaccine manufacturers.[205] The presence of retail traders has no bearing on my analyses or opinions and Professor Kothari's analysis of "odd lot trades" does not disturb my opinions.

86.     Third, Professor Kothari also finds that "over the Analysis Period, and during the Class Period, institutional trading comprised a small portion of Novavax's trading volume."[206] However, this conclusion is based on an incomplete analysis.  To calculate "aggregate institutional trading in Novavax over the quarter" as Professor Kothari calls it, he merely takes the difference in institutional holdings data for every institution between quarters and assumes that was the only trading carried out by those institutions each quarter.  This flawed approach by Professor Kothari assumes that there is no institutional trading within each quarter.  For example, Professor Kothari reports that Vanguard increased its holdings of Novavax Common Stock from Q2 2021 to Q3 2021 by 126,338 shares.[207]  Professor Kothari's approach thus implies that Vanguard only traded 126,338 shares of Novavax Common Stock that quarter.[208] However, Vanguard could have purchased 1,126,388 shares and then sold 1,000,000 shares of Novavax Common Stock mid-quarter, which would still result in a 126,338 share increase between quarters, but a much higher volume of 2,126,388 shares traded.  This example illustrates that quarterly holdings data are not a reliable measure of aggregate institutional volume.  Further, Professor Kothari provides no benchmark for what he considers to be low institutional trading and he only analyzes Q1 and Q3 2021, despite his assertion that he

---

[205] Kothari Report ¶ 66.

[206] Kothari Report ¶ 67, footnote 100.

[207] NVAX_KOTHARI_00003537.

[208] Kothari Report ¶ 67, footnote 100.

supposedly considered the Analysis Period.[209]  Regardless, it is *level* of institutional holdings that is indicative of market efficiency (as I described in my Report), not the portion of total trading volume attributable to institutions (as Professor Kothari seems to be suggesting).  As I have already stated above and in my Report, the level of institutional ownership in Novavax Common Stock is supportive of efficiency, and Professor Kothari continues to ignore that here.

87.    Professor Kothari's arguments ultimately boil down to the idea that the level of trading present in Novavax is indicative of "noise trading," which according to him can render the market less efficient.  Professor Kothari has offered no reliable proof or evidence that there was noise trading that would render the market less efficient, much less inefficient altogether. In sum, Professor Kothari's argument that certain stock price reactions during the Analysis Period are "highly likely" due to noise trading is based on highly flawed and irrelevant analyses that are out of touch with the context of Novavax being an experimental vaccine company as the world was experiencing a global pandemic.[210]  Thus, his critiques regarding noise trading do not disturb my opinions and I stand by my reasonable attribution of the stock price reaction to company and industry news on the four outlier dates I identified and removed from my event study analysis.

88.    All-together, the points raised by Professor Kothari and Defendants regarding outliers and "noise" trading are irrelevant and most importantly, wrong.  As I explained above, the exclusion of clearly news-driven dates is a well-accepted methodology.  Therefore, my opinions are not disturbed.

---

[209] NVAX_KOTHARI_00003537, Kothari Report ¶ 67.

[210] Kothari Report ¶ 68.

### E.  USING AN ESTIMATION WINDOW DURING THE CLASS PERIOD IS STANDARD

89.    I described in my Report how a well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[211]  I have performed such an analysis in this matter where I evaluate the relationship between Novavax Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return Index (the "Market Index") and the NASDAQ Biotechnology Total Return Index, hereafter referred to as the "Industry Index."[212]  The event study methodology I utilized follows the economic literature.  I also understand that it is a standard approach accepted by courts for purposes of establishing *Cammer* Factor 5.

90.    Additionally, and as I have mentioned above (see **Section IV**).  There are key elements of my event study that Professor Kothari does not challenge, including my decision to analyze a daily event window, and my selection of the market and industry indices for which to control.

91.    Instead, Defendants and Professor Kothari argue my rolling estimation window creates unreliable results because it includes days within the Class Period.[213]  In the distant past, the use of a pre-Class Period estimation window may have been a more common approach, and was sought out due to concerns that data during the Class Period was purportedly "biased."  However, the idea that data within Class Period cannot be used in a market model regression has long been abandoned as a concern.

---

[211] Coffman Report ¶ 49.

[212] Coffman Report ¶ 49.

[213] Defendants' Motion p. 14; Kothari Report ¶ 70.

92.     The purpose of the event study estimation window is to determine the relationship with the relevant controls and underlying volatility *at the time of the relevant news disclosure*, an issue, as Defendants and Professor Kothari point out, which is especially relevant here.[214] The presence of alleged misstatements during the Class Period is a given.  Rather, the relevant question is whether the price movement observed on any date in question can be distinguished from random noise.  Since the measurement of the degree of random noise depends on the contemporaneous relationship with the control variables and the contemporaneous expected volatility, a rolling window taking these factors into account in the appropriate context of a given window of time is ideal and up to date with current practice, not some fixed pre-period relationship and volatility.[215, 216, 217]  There is no valid scientific reason to suggest such an approach like the one Professor Kothari is suggesting.  For example, using an estimation window that includes a period prior to the Company disclosing the effectiveness of its vaccine could substantially bias the estimate of normal volatility at a later date after such effectiveness had been disclosed.  Further, I have used Class Period estimation windows in dozens of reports without challenge from Defendants and courts routinely accept or refuse to strike expert reports that use control periods or estimation windows that overlap with class periods.[218]

---

[214] Defendants' Motion p. 14; Kothari Report ¶ 69.

[215] Furthermore, and as I will explain in **Section V** and demonstrate in **Exhibit 4**, even when using the erroneous fixed pre-period estimation, the results are comparable to my own.

[216] In fact, Professor Kothari himself uses a 120-day rolling estimation period to calculate annualized volatility. *See*, Kothari Report Exhibits 2A, 2B.

[217] Professor Kothari acknowledges the benefits of a rolling estimation window in his deposition.  Kothari Deposition 36:8 – 11 ("one tradeoff is on one hand you want to use as recent a period as possible in event study because parameters get changed.")  Furthermore, by using a non-customary pre-Class Period estimation window in his report, Professor Kothari fails to consider the state of the Company at the current time which would more accurately capture relevant Class Period events and volatility.

[218] *See*, Order Granting Motion For Class Certification filed January 5, 2017, in *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *10 (accepting report that used "year leading up to the last day of the class period … as a control period"); Order (1) Denying Defendants' Motion To Exclude Expert Testimony Of Bjorn Steinholt and (2)

93.    Thus, Defendants' arguments that I "make no attempt to consider, much less account for, unique features of Novavax and its trading environment," use a "cookie-cutter template to construct [my] event study," and that I "took that approach even though Novavax was operating in a historically unprecedented market environment in 2021…" are entirely false.[219]  As I explain in further detail below, Defendants' arguments do not disturb my opinion regarding my analysis of *Cammer* Factor 5, and rather supports my use of a rolling estimation window, as opposed to Defendants' and Professor Kothari's proposed pre–Class Period window, precisely in order to more accurately account for changing volatility in the price of Novavax Common Stock during the Analysis Period.

94.    Professor Kothari's position that it is inappropriate to use an estimation window during the Class period is wrong, unsupported by any relevant authority, at odds with standard practice, and irrelevant if one properly identifies and removes the outlier return on January 29, 2021 (see **Section IV.D**).  Importantly, Professor Kothari's criticism is especially hypocritical and contradicts his analysis in his prior export reports.  In each of those reports, not only did he use a class period estimation window, but he specifically relied on those results to conclude that there was a statistically significant price movement on corrective disclosures and to support his opinion that the market demonstrated cause and effect.[220]

Amending Plaintiffs' Complaint filed December 14, 2012, *In re Novatel Wireless Sec. Litig.*, 910 F. Supp. 2d 1209 (S.D. Cal. 2012), (adopting expert report using 120-day rolling control period and noting that "Defendants' expert Tabak acknowledges that a control period close to the event being analyzed should be used generally."); Memorandum Opinion and Order filed February 17, 2011, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, (S.D.N.Y. 2011), (rejecting objection to control period inside the class period because expert testified that "Vivendi was a different company both before and after the Class Period, such that he felt it would be better to use a control period inside the Class Period and noting that the period he chose was 'conservative'").

[219] Defendants' Motion pp. 1, 6 – 7.

[220] Mattel Report ¶ 13, Exhibit 10 ("… during the Class Period, August 2, 2017 through August 8, 2019."  And "I estimate the following model using 509 trading observations during the period August 7, 2017 – August 9, 2019…"); Alere Report ¶ 7, Exhibit 12 ("the Class Period, which for the purpose of this report I define as January 11, 2016 to December 7, 2016."  And "I estimate the following model using 275 trading observations during the

59

## F.  PROFESSOR KOTHARI'S CONCLUSIONS REGARDING STATISTICAL SIGNIFICANCE ARE ERRONEOUS AND DEPENDENT ON A FLAWED MEASURE OF VOLATILITY

95.    Professor Kothari claims that using his alternative pre-Class Period estimation window and adding back the excluded dates I specified in my Report, supposedly corrects "flaws" in my own analysis and causes both the August 6, 2021[221] and October 20, 2021 alleged corrective disclosures and March 2, 2021 (a pre-Class Period earnings announcement, and one of my news days) to be not statistically significant.[222]  As discussed above, Professor Kothari's supposed corrections are unsubstantiated.[223]  My event study methodology is standard, the exclusion of certain dates is justified, and my use of a rolling estimation window is especially necessary in accounting for changing volatility during the Analysis Period.

96.    In fact, even when I employ Professor Kothari's flawed "corrections," I find that the statistical significance of the events he highlights falls under the 95% significance level only when January 29, 2021 (a date I excluded because I identified it as an outlier) is included in the estimation window.  As discussed above, it is economically appropriate and reasonable to exclude January 29, 2021 (the announcement that Novavax's vaccine was 89.3% effective in

---

period from November 5, 2015 to December 7, 2016…"); Wilmington Trust Report Exhibit 10 ("I estimate the following model using 703 trading observations during the Class Period…").

[221] Note, August 6, 2021 is also an earnings announcement and alleged misstatement.  *See*, Complaint Section V.D and VI.B; "Novavax Reports Second Quarter 2021 Financial Results and Operational Highlights," *PR Newswire*, August 5, 2021, 4:05 PM; "Novavax again delays seeking U.S. approval for COVID-19 vaccine," *Reuters News*, August 5, 2021, 4:05 PM.

[222] Kothari Report ¶¶ 72, 74, 76.

[223] Professor Kothari describes in his deposition that the choice of an estimation window involves "tradeoffs," and "you find use of in-class or as well as pre-class…," conceding that his estimation window is not correcting my methodology, as he suggests in his report.  Kothari Report Section IV.C.5; Kothari Deposition 188:8 – 10.

preventing Covid-19) from estimation and Professor Kothari's suggestion otherwise is a weak attempt to manipulate the statistical significance of the alleged corrective disclosure dates.[224]

### i.   MY EVENT STUDY RESULTS ARE ROBUST TO INCLUSION OF AN INDEX OF OPERATION WARP SPEED VACCINE MANUFACTURER COMPANIES

97.   Relatedly, Defendants proposed another supposed flaw in my event study by arguing in their Motion that I "never considered alternative parameters" for my event study or "for example, consider[ed] alternative industry indexes that were more targeted to the unique Covid [v]accine manufacturers rather than to biotechnology companies generally."[225] First of all, I stated in my Report how I did test an alternate Industry Index for robustness.[226]

98.   Second, the purpose of including an industry index is to determine to what extent price movements in Novavax's industry can explain movements in Novavax's stock price. Importantly, Professor Kothari does not dispute my selection of an industry index for purposes of my event study.  He even selects peer companies to compare to Novavax from the Industry Index I used.[227]

99.   Nonetheless, for purposes of this report and to address Defendants' above critique, I test an alternate event study model controlling for a peer index comprised of the companies

---

[224] *See* **Exhibit 4**.  Note that even where the alleged corrective disclosures are not statistically significant at the 95% level, they are still statistically significant at the 90% level.  Academic literature in financial economics routinely draws inferences from studies that demonstrate significance at the 90% confidence level or greater.  *See* DeFusco, Richard A., Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, Quantitative Methods for Investment Analysis, *Association for Investment Management and Research*, 292 (2001).

[225] Defendants' Motion p. 7.

[226] *See*, "For robustness, however, I also used a regression model using the Russell 2000 Growth Biotechnology Total Return Index as the Industry Index.  Novavax compares its stock price performance to the Russell 2000 Growth Biotechnology Index in its 10-Ks for the FYE 2019, 2020 and 2021.  Evaluating the relationship between Novavax and the Russell 2000 Growth Biotechnology Index did not alter the predictive power of the model and did not change any conclusions."  Coffman Report footnote 54.

[227] Kothari Report footnote 94.

that participated in Operation Warp Speed as of January 2021,[228] in addition to the Market and

Industry Indices I described in my Report.[229, 230]  The results of this event study using an

additional alternate industry index do not have a material impact on the results of either cause

and effect or on the alleged corrective disclosure events (see **Exhibit 3**).

100.  As a result of the foregoing, Professor Kothari and Defendants' arguments related

to statistical significance and my supposed failure to test alternate parameters in my event study

are unsupported, and do not disturb my opinions.

### G.  PROFESSOR KOTHARI'S ALTERNATIVE NEWS TESTS ARE FLAWED AND DO NOT CHANGE MY CONCLUSIONS

101.  Professor Kothari argues that my news tests are "ad hoc and unreliable" with no

basis and in part by reiterating his arguments that I address above in **Section IV.A**.[231]  Professor

Kothari also repeatedly applies his arguments and the conclusions of my test to the Class

Period, intentionally misrepresenting and misleadingly reducing the statistical power of the test,

which I chose to perform over the Analysis Period precisely in order to avoid the critiques

Professor Kothari focuses on.[232]

102.  Specifically, Professor Kothari critiques my methodology for selecting no news

days.  He argues that by my own reasoning "a day with 5 or more Novavax-related news items

from the Factiva database, or days when there were analyst reports or SEC filings issued, could

---

[228] I selected a peer index comprised of the companies that participated in the Operation Warp Speed, as those companies were focused on Covid-19 vaccine production.  See **Exhibit 3**.

[229] *See*, "Report to Congressional Addressees: OPERATION WARP SPEED: Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges," *United States Government Accountability Office*, February 2021, pp. 13 – 15 (https://www.gao.gov/assets/gao-21-319.pdf).

[230] Coffman Report ¶ 49.

[231] Kothari Report ¶¶ 78 – 80.

[232] Kothari Report ¶¶ 78 – 80.

be considered days with news… [y]et [I] ignore[] all such potential news days" in my analysis of cause and effect."[233]  Again, Professor Kothari is misleading and wrong.  I chose an objective set of news days to test.  Professor Kothari likewise characterizes the use of earnings announcements in this context as an "ideal financial release for tests of whether market participants incorporate information into the stock price quickly" in his work for Plaintiffs in past matters.[234]  I further analyzed the news released on each of my no news days as defined in my Report, and I only found one date which had at least one news article which I could not dismiss as immaterial.[235]  I testified to these facts in my deposition and explained my methodology for selecting no news days.[236]

103.  Professor Kothari continues to present a flawed alternative approach to my Cammer Factor 5 analysis.  Specifically, he describes:

> To demonstrate the *ad hoc* and unreliable nature of Mr. Coffman's analysis given his limited set of News and No News Days, I conducted an alternative version of his Difference of Proportions Test, using the same abnormal returns and t-statistics he calculated for each day during the Analysis Period, but considering a broader set of News and/or No News Days than those analyzed by Mr. Coffman.  In particular, I defined News Days for this test to include: all days when Novavax issued press releases, and/or the earnings release days that Mr. Coffman considers to be News Days. I defined the remaining days of the relevant period (Analysis Period or Class Period) to be No News Days.[237]

---

[233] Kothari Report ¶ 80.

[234] Mattel Report ¶ 72; Alere Report ¶ 60.

[235] Coffman Report Exhibit 8; "Press Release: Novavax to Participate in Upcoming Conferences," *Dow Jones Institutional News*, October 5, 2020, 9:00 AM ("Goldman Sachs Virtual Event: Inoculating the Recovery --A Discussion on COVID-19 Vaccines, Treatments, Testing of the Economy Date: Thursday, October 8, 2020 Time: 12:00 - 12:55 p.m. ET").

[236] Coffman Deposition 88:13 – 24 ("That was a bit of an iterative process.  I mean, as I'm sure you're well aware, during this period, during COVID, you know, coverage of the vaccine companies and vaccines and what was going on was just -- you know, there was incredible interest, obviously, and there was lots of news.  And so in many cases, I can set that threshold at zero and just say, you know, it can really be a no news analysis where there's nothing.  Here, during this period, there were so few days that there wasn't at least some article that mentioned Novavax in some context…").

[237] Kothari Report ¶ 81.

104. Professor Kothari adopts my event study and presents a test which is biased and poorly designed for detecting cause and effect. All he is demonstrating is that days with no news are associated with similar price responses to the price responses on a diluted set of both material and non-material news days, which is not surprising or evidence of a lack of cause-and-effect relationship. Indeed, Professor Kothari offers a misleading opinion as to what this test demonstrates and does not suggest that the market for Novavax Common Stock was inefficient.

105. First, Professor Kothari's alternative cause and effect test is flawed because there are a number of press releases on dates that Professor Kothari considers "new dates" for which there is not clearly material news. For instance:

> June 16, 2020: Novavax issues a press release announcing a new appointment to the Board of Directors titled "Novavax Appoints Biotechnology Veteran David Mott to Board of Directors."[238]

> June 9, 2021: Novavax issues a press release announcing a visit from the governor of Maryland titled "Novavax to Host Maryland Governor Larry Hogan at Site of Future Novavax Vaccines Innovation Campus and Global Headquarters."[239]

> October 5, 2021: Novavax issues a press release announcing leadership changes titled "Novavax Announces Leadership Appointment and Updates."[240]

106. Particularly, Professor Kothari does not explain how press releases constitute value-relevant information or why he would expect this information to impact the value of the Company and therefore move the price of Novavax Common Stock in a statistically significant

---

[238] "Press Release: Novavax Appoints Biotechnology Veteran David Mott to Board of Directors," *Dow Jones Institutional News*, June 16, 2020, 8:00 AM.

[239] "Press Release: Novavax to Host Maryland Governor Larry Hogan at Site of Future Novavax Vaccines Innovation Campus and Global Headquarters," *Dow Jones Institutional News*, June 9, 2021, 9:03 AM.

[240] "Press Release: Novavax Announces Leadership Appointment and Updates," *Dow Jones Institutional News*, October 4, 2021, 4:05 PM.

manner.  By including dates such as these in his approach, he is inappropriately diluting his group of "news days" with dates that do not contain any value-relevant information.

107.  Similarly, Professor Kothari identified days as "no news" days where clearly material information was released.  For example:

August 14, 2020: Novavax announces an agreement with the government of the United Kingdom to purchase 60 million doses of Novavax's Covid-19 vaccine and collaborate on a Phase 3 clinical trial to assess its efficacy.[241]

March 25, 2021: Novavax delays signing a contract to supply its Covid-19 vaccine to the European Union due to production problems and issues sourcing raw materials.[242]

October 20, 2021: Reports issued claiming that the authorization of Novavax's vaccine is being delayed due to concerning issues with manufacturing and the purity of the vaccine.[243]

February 8, 2022: Novavax acknowledges that only 10 million doses of its Covid-19 vaccine have been delivered – far fewer than expected.[244]

June 3, 2022: The U.S. Food and Drug Administration warns that Novavax's Covid-19 vaccine poses a risk of possible heart inflammation, as cases of myocarditis and pericarditis were reported following the administration of the vaccine.[245]

108.  Professor Kothari once again fails to explain how he determined that there was no material information released on his no news days.  Similar to the consequences I mentioned

---

[241] "Novavax and UK Government Announce Collaboration and Purchase Agreement for Novavax' COVID-19 Vaccine Candidate," *GlobeNewswire*, August 14, 2020, 1:07 AM.

[242] "Exclusive: Novavax delays EU vaccine supply deal amid production problems - source," *Reuters News*, March 25, 2021, 11:56 AM.

[243] "Novavax Shares Plunge To Lows Since Mid-May As COVID-19 Vaccine Woes Continue," *Benzinga*, October 20, 2021, 5:44 AM.

[244] "Novavax Stock Tumbles on Report That Vaccine Deliveries Are Lagging," *Barron's*, February 8, 2022, 10:36 AM.

[245] "Novavax Covid-19 Vaccine Linked to Heart Inflammation, FDA Says. The Stock Is Sliding. -- Barrons.com," *Dow Jones Institutional News*, June 3, 2022, 11:09 AM.

above, by including dates such as these in his group of "no news days," meaning dates that do contain value-relevant information. His test is fundamentally flawed and biased.

109.  As I stated in my Report, there are many academic articles and financial treatises supporting the fact that earnings announcements have a significant impact in investor's beliefs regarding the value of a security, making them an objective set of news to test for market efficiency.[246]  I have undertaken this methodology of analyzing earnings announcements across cases in which I am asked to opine on market efficiency precisely to avoid the argument that I am selecting events in an arbitrary or subjective manner.  The general method that I detailed in my Report to analyze *Cammer* Factor 5 (i.e., comparing earnings announcements dates to no news dates) is an approach I have used in many securities matters where the class has been certified.

110.  Professor Kothari is suggesting instead of testing an objective set of dates (the identification of which he does not dispute) that are typically associated with new, value-relevant information, that I should have considered a much larger set of dates that are not necessarily associated with new value-relevant information.  Professor Kothari has no basis in economics for making this claim and the results of his alternative approach are irrelevant. Rather, the analysis of *Cammer* Factor 5 I presented in my Report provides direct scientific evidence of a cause-and-effect relationship between new firm-specific news and changes in the market price of Novavax Common Stock.

111.  In sum, Professor Kothari's alternative news tests create far more biased control and treatment groups, therefore not only does his analysis not change my results, his analysis is simply a less powerful and precise test of the hypothesis.

---

[246] Coffman Report ¶ 56.

112.   As a result of the foregoing, Professor Kothari's and Defendants' arguments related to my analysis of *Cammer* Factor 5 are flawed and my opinion that Novavax Common Stock traded in an efficient market throughout the Class Period remains unchanged.

## V.   THERE IS CLEAR EVIDENCE OF PRICE IMPACT ON THE TWO ALLEGED CORRECTIVE DISCLOSURE DATES

113.   I understand that Professor Kothari was asked to "[a]ssess the impact of the August 5, 2021 alleged corrective disclosure on the price of Novavax stock."[247]  Interestingly, Professor Kothari did not assess the impact of the October 20, 2021 alleged corrective disclosure.[248] However, he still makes statements related to both alleged corrective disclosures, including the following:

> Once certain flaws in Mr. Coffman's event study analyses are corrected… Novavax stock's abnormal returns on the alleged corrective disclosure dates (August 5, 2021 and October 19, 2021) are not statistically significant.[249]

114.   To be clear, while Professor Kothari does not provide an affirmative opinion related to this statement, it appears as a suggestion that there is a lack of price impact on the two alleged corrective disclosure dates.  In **Section IV** above, I discussed at length how Professor Kothari's event study is unreliable because it relies on a flawed measure of volatility. Specifically, as **Exhibit 4** shows, both alleged corrective disclosure dates are statistically significant whether one uses my standard estimation window or Professor Kothari's proposed estimation window.  It is rather Professor Kothari's incorrect inclusion of January 29, 2021 in his estimation window alone that causes him to overstate the volatility of Novavax Common

---

[247] Kothari Report ¶ 15.

[248] *See,* Kothari Deposition, 105:11 – 18: ("Q. Right here in your summary of your assignment you said you were asked by counsel to assess the impact of August 5, 2021, right?  A. Yes.  Q. You don't say here that you were asked by counsel to assess the stock price on October 19th, do you?  A. Nor did counsel say do not assess.").

[249] Kothari Report ¶ 21.

Stock and artificially dilute the significance of August 6, 2021 and October 20, 2021.

Therefore, his conclusion of no statistically significant decline on the alleged corrective

disclosure dates has no basis because it is based on a faulty event study (more specifically, the

inappropriate inclusion of one outlier alone).

115.   Furthermore, even if Professor Kothari's event study was valid, it demonstrates

that the abnormal price declines on August 6, 2021 and October 20, 2021 were associated with

p-values of 0.063 and 0.067, respectively, both of which represent statistical significance at the

90% confidence level.[250, 251]   In other words, as an economist, the most that Professor Kothari

can tell the Court if he uses his faulty event study, is that there is a 6.3% and 6.7% chance,

respectively, that the Court would be erring in concluding evidence of price impact on these

dates.  That finding falls far short of constituting definitive evidence of a lack of price impact.

Regardless, Professor Kothari's event study cannot be relied upon for the reasons I have already

discussed at length, and my event study demonstrates that there were statistically significant

price declines at the 95% confidence level or greater on both August 6, 2021 and October 20,

2021.  Therefore, Professor Kothari has not provided any reliable evidence of a lack of price

impact on the two alleged corrective disclosure dates based on his assertion that there are no

statistically significant price declines on the dates.

116.   Professor Kothari and Defendants present further arguments in an attempt to

establish a lack of price impact on the alleged corrective disclosures (August 6, 2021 and

October 20, 2021).  However, Professor Kothari and Defendants' arguments erroneously rely on

---

[250] NVAX_KOTHARI_00003548.

[251] Academic literature in financial economics routinely draws inferences from studies that demonstrate significance at the 90% confidence level or greater.  *See,* DeFusco, Richard A., Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, Quantitative Methods for Investment Analysis, *Association for Investment Management and Research*, 292 (2001).

the consideration of arbitrary multi-day event windows or the suggestion that I should be prematurely assessing loss causation at this stage of the litigation. I address this in greater detail below in turn for each alleged corrective disclosure date. In sum, none of Professor Kothari's or Defendants' faulty arguments diminish the clearly present price impact on the alleged corrective disclosure events.

## A. AUGUST 6, 2021

117. Novavax issued an earnings announcement press release after market hours on August 5, 2021 and Lead Plaintiffs allege that this press release contained corrective information.[252, 253] Importantly, Professor Kothari does not provide any opinion that information contained in that press release *did not* contribute to the price decline on August 6, 2021. Furthermore, he does not provide any other explanation for the price decline on August 6, 2021 outside of the alleged corrective information. In other words, this suggests there is no dispute that the alleged corrective information at least contributed to the price decline in Novavax Common Stock on the alleged corrective disclosure date. Indeed, Professor Kothari does not provide any arguments related to the alleged corrective disclosure date itself (i.e., August 6, 2021). Rather, his opinions are limited to trading dates *after* the alleged corrective disclosure.

118. Professor Kothari claims that the August 6, 2021 alleged corrective disclosure is followed by a rebound in the price of Novavax Common Stock.[254] Defendants reiterate this

---

[252] *See*, "Novavax Reports Second Quarter 2021 Financial Results and Operational Highlights," *PR Newswire,* August 5, 2021, 4:05 PM

[253] Complaint ¶¶ 234 – 243.

[254] Kothari Report ¶ 88.

argument based on Professor Kothari's claims.[255]  Specifically, Professor Kothari focuses on the four trading days following this alleged corrective disclosure, stating:

> …Novavax's closing stock price increased on each of the next four trading days.  In fact, on the very next trading day, August 9, 2021, Novavax's stock price recovered more than half of the previous day's decline, increasing by $23.24, or 12.24%, to close at $213.13.  […]  Novavax's closing price on August 12, 2021 ($247.24) was higher than its closing price on August 5, 2021 ($236.20).  Further, adjusting for contemporaneous changes in the market and industry indices, Novavax's cumulative abnormal return from August 5 to August 12, 2021 was not statistically significant, i.e., indistinguishable from zero. I have not identified any new positive company-specific information released over this period that could explain this rebound.[256]

119.  First and foremost, Professor Kothari provides no explanation for his decision to arbitrarily analyze four trading days following the disclosure, as opposed to one, two, or five, for example.  He also does not explain why it is appropriate or relevant to calculate a "cumulative abnormal return" over the five-trading day window that he analyzes.  This alone calls his analysis into question.  Second, if there were a true "rebound" as Professor Kothari claims, one would expect to observe a statistically significant price increase in Novavax Common Stock on August 9, 2021, the trading day immediately following the alleged corrective disclosure.  However, the price increase on August 9, 2021 is not statistically significant, even at the 90% confidence level, according to both my event study and Professor Kothari's flawed event study.[257]  This scientific finding, combined with Professor Kothari's failure to explain why it is relevant to examine any dates past August 6, 2021, show that it is

---

[255] Defendants' Motion pp. 23 – 24.

[256] Kothari Report ¶ 88.

[257] My event study indicates an abnormal return of 4.57% with a t-statistic of 0.93 on August 9, 2021.  Professor Kothari's flawed event study indicates an abnormal return of 1.57% with a t-statistic of 0.20 on August 9, 2021.  *See*, NVAX_KOTHARI_00003548.

economically irrelevant to analyze the individual price movements, or the cumulative price movement on August 9, 2021 through August 12, 2021.

120. Importantly, there is also a clear explanation for the price increase on August 9, 2021, which is unrelated to the alleged corrective information, and therefore cannot be used to establish a lack of price impact. Indeed, Professor Kothari misleadingly ignores the presence of generally positive news and corresponding stock price movements in Covid-19 vaccine manufacturers, as shown by the example companies in Table 1 below. Because the companies shown below were members of the NASDAQ Biotechnology Index during the Class Period, and I controlled for the NASDAQ Biotechnology Index in my event study, the price increases below are controlled for in my event study model. As a result, I observe an expected increase of 7.67% in Novavax Common Stock on August 9, 2021 based on market and industry factors alone. Professor Kothari finds an even higher expected increase of 10.66% on August 9, 2021 based on market and industry factors alone according to his flawed event study.[258] This explains why Novavax's raw return of 12.24% is not statistically significant according to either my event study or Professor Kothari's flawed event study.[259] In other words, because both of our models already predicted such high expected returns on August 9, 2021 (due to non-company-specific factors), the increase in Novavax Common Stock was not large enough to establish that it was due to company-specific information alone.

---

[258] NVAX_KOTHARI_00003548.

[259] NVAX_KOTHARI_00003548.

## Table 1: Industry Companies on August 9, 2021

| Company | Raw Return | News |
|---|---|---|
| Novavax Inc (NVAX) | 12.24% | Phillipines FDA starts evaluating EUA application of Novavax's COVID-19 vaccine. -*Manila Bulletin*<br>New York State Common Retirement Fund increased its exposure to Novavax and other related stocks. -*Benzinga*<br>Novavax Stock: A Great Opportunity To Buy On Post-Earnings Weakness -*Seeking Alpha* |
| Moderna Inc (MRNA) | 17.10% | Australian Prime Minister expects the first million doses of the Moderna vaccine will arrive next month. - *Australian Associated Press* (August 8, 2021)<br>Moderna vaccine gets green light from Australia's medicine regulator - *Australian Associated Press*<br>Moderna COVID-19 Vaccine Maintains Efficacy 6 Months After Second Dose -*Clinical Advisor*<br>USA will send to Mexico vaccines against Covid-19 from AstraZeneca and Moderna -*CE NoticiasFinancieras*<br>Moderna spikes 19% amid a flood of encouraging vaccine news - *Business Insider* |
| BioNTech SE (BNTX) | 14.97% | BioNTech reports Q2 EPS EUR 10.77 vs EUR 0.38 last year. -*The Fly on the Wall*<br>Revenue of $6.4b beat the estimate of $3.8b -*Benzinga*<br>BioNTech Swung to 2Q Net Profit as Revenue Surged on Vaccine Supply -*Dow Jones Newswires* |
| VaxartInc (VXRT) | 12.00% | BUZZ-U.S.-listed shares of BioNTech rise after upbeat results -*Reuters*<br>Vaxart Social Media Volume Rises: 5 Signals Since July 28 - *Bloomberg*<br>Vaxart call volume above normal and directionally bullish -*The Fly* |
| Inovio Pharmaceuticals Inc (INO) | 5.38% | Inovio receives regulatory allowance for INO-4800 clinical trials -*The Fly On The Wall*<br>Inovio reports Q2 EPS (39c), consensus (25c) -T*he Fly On The Wall* (after-hours) |

Sources: S&P Capital IQ, Factiva, Bloomberg

Note: August 8, 2021 was a Sunday, therefore the market date for any news released on this date would be August 9, 2021.

121.    In making his argument related to a price rebound, Professor Kothari is misleadingly suggesting that price increase on August 9, 2021 was somehow due to investors reversing their initially negative views about the alleged corrective information revealed after-market hours on August 5, 2021.  However, he has not proven to any reasonable degree that the price movement on the alleged corrective disclosure of August 6, 2021 was due to anything other than the alleged corrective information or that any rebound dates on August 9, 2021

72

through August 12, 2021 should appropriately be included in the event window.  In stark contrast, I find a statistically significant decline in the price of Novavax Common Stock on August 6, 2021 at beyond the 95% confidence level following the news that Novavax would file its EUA in fourth quarter of 2021, delayed from third quarter 2021, which Plaintiffs allege as the corrective information released on this date.[260]  Indeed, neither Professor Kothari nor Defendants have provided any other explanation for the price decline on August 6, 2021.

122.  Professor Kothari also argues "Novavax's stock price recovery is consistent with analysts' commentary and lack of any downward adjustment in analysts' price targets for Novavax following the disclosure."[261]  Specifically, Professor Kothari states that "[he] reviewed 6 analyst reports on Novavax Stock issued by 5 analysts on August 5 and 6, 2021" where none of the analysts lowered "their price targets for Novavax and a few even increased their price targets after the disclosure."[262]

123.  First, this argument does not counteract the statistically significant price decline in response to the alleged corrective information for which Professor Kothari has provided no other explanation.  Second, as I have discussed above in **Section IV.D** and reiterate here, analyst price targets are calculated based on a number of longer-term factors including Novavax's expected revenue from a successful vaccine.  Thus, I do not expect analysts to change their forecasts as dramatically while still expecting future regulatory approvals and future sales of the vaccine.  Analyst commentary corresponds to this idea and suggests analysts were encouraged by Novavax's continued positive developments reported regarding the

---

[260] Complaint ¶ 234; "Novavax Reports Second Quarter 2021 Financial Results and Operational Highlights," *PR Newswire*, August 5, 2021, 4:05 PM.

[261] Kothari Report ¶ 89.

[262] Kothari Report ¶ 89.

vaccine's efficacy, and regulatory submissions in India, Indonesia and the Philippines, explaining the positive trend in target prices.[263]  This is irrelevant to and separate from the negative stock price reaction on this date, and thus does not call into question price impact.

124.  As a result of the foregoing, Professor Kothari and Defendants' arguments related to a price rebound following the first alleged corrective disclosure fail.  I thus stand by my reasonable conclusion that August 6, 2021 is associated with a statistically significant price decline and there is no economic basis to consider August 9, 2021 through August 12, 2021 in the event window.[264]

125.  Separate and apart from the alleged corrective information, Professor Kothari makes an additional argument related to the allegedly false and misleading statement that was also made on August 6, 2021 (i.e., Defendant Erck stating: "We appear to have got past (certain) supply issues and are now being able to produce at scale").[265]  Specifically, Professor Kothari claims the false and misleading statement on August 6, 2021 had no price impact because "there is no evidence that this article caused any price impact after market on August 5, 2021 or on August 6, 2021."[266]  Professor Kothari is simply wrong.  As an initial matter, an analysis of whether or not there was a price increase following a false and misleading statement is not sufficient to conclude that Novavax Common Stock was somehow unaffected by the alleged misstatements and omissions.  Indeed, Professor Kothari does not explain why he would

---

[263] "Novavax Reports Second Quarter 2021 Financial Results and Operational Highlights," *PR Newswire*, August 5, 2021, 4:05 PM; "2Q21: Cash, Good Variant & Booster Data and, Finally, (exUS) EUA Filing," *Cantor Fitzgerald*, August 6, 2021; "Q2: US Filing Slightly Delayed, But Solid Progress on RoW Vaccine Rollout," *Jefferies*, August 6, 2021; "Regulatory Action and Vaccine Rollouts for LMICs on Deck in 2H21; 2Q Takeaways & Model Update," *J.P. Morgan*, August 6, 2021.

[264] Should the Court or the finder of facts determine any findings with respect to different levels of inflation, and as I opined in my Report, the out-of-pocket methodology is flexible enough to accommodate to these changes.

[265] Complaint ¶ 198.

[266] Kothari Report footnote 117.

expect this statement by the CEO that they are past certain supply issues to cause a statistically significant increase in the price of Novavax Common Stock.  For this very reason, establishing a lack of price impact would also require a showing that there was also no market response to any of the alleged corrective disclosures, which Professor Kothari has not done.  Regardless, Professor Kothari mistakenly claims that the misstatement was revealed to the market at 6:36 PM.[267]  In fact, it was released for the first time at 4:05 PM at the same time that Novavax released its earnings, and at which time according to Professor Kothari's own Exhibit 6, there was also a large increase in the price of Novavax Common Stock.[268]  Professor Kothari points to an online version of the Reuters article in question, which appears to have been updated following its initial publication.[269]

126.  Professor Kothari's above analyses related to the first alleged corrective disclosure are wrong and unsupported.  His identification of a rebound in the price of Novavax Common Stock on August 9, 2021 following the disclosure on August 6, 2021 and identification of an incorrect piece of evidence released at 6:36 PM on August 5, 2021, have no relevance to my analyses presented in my Report or to the ability to calculate damages in this case, and thus do not disturb my opinions.  Furthermore, it is only when Professor Kothari erroneously includes January 29, 2021 in his estimation window that August 6, 2021 is not statistically significant at least at the 95% level (see **Exhibit 4**).  Thus, for all the reasons above, Professor Kothari's flawed analyses and Defendants' opinions that flow from them do not establish a lack of price impact and do not disturb my finding of a statistically significant decline in the price of

---

[267] Kothari Report Exhibit 6.

[268] "Novavax again delays seeking U.S. approval for COVID-19 vaccine," *Reuters News*, August 5, 2021, 4:05 PM.

[269] Kothari Report footnote 117 and Exhibit 6.

Novavax Common Stock on August 6, 2021 in response to the corrective information released on that date.

127. Defendants make an additional argument related to the first alleged corrective disclosure that "Plaintiffs thus must show that the August 5 disclosure permits an inference of a front-end price impact from those May 10 statements."[270]

128. I understand Defendants are attempting to claim that the alleged corrective disclosure on August 6, 2021, and the misstatement made on May 11, 2021 are so generalized that they would fall under the *Goldman* opinion. While I am not an attorney, nor do I offer a legal opinion, from the point of view of a financial economist, the failure to disclose manufacturing problems that would render the Company unable to deliver its Covid-19 vaccine on the timeline previously established, is not a generalized statement.[271] The Company was providing specific information and guidance related to how many doses it would produce and by when, providing evidence against an argument of generalized misstatements.[272] Likewise, it my understanding that the alleged corrective disclosures in this matter relate specifically to production problems and delays in approval from the corresponding agencies have a direct relationship with the alleged misstatements made on May 11, 2021.[273] Thus, this argument made by Defendants does not disturb my opinions.

---

[270] Defendants' Motion p. 23.

[271] Complaint ¶¶ 174 – 189, 194.

[272] "FQ1 2021 Earnings Call Transcripts," *S&P Capital IQ*, May 10, 2021, 4:30 PM ("…we were happy to announce last week the finalization of an advanced purchase agreement with Gavi, expanding upon our memorandum of understanding announced in February. Under the agreement, we have committed cumulative 1.1 billion doses…we expect to begin delivery of doses in the third quarter of 2021, dependent on the appropriate regulatory authorizations."); "FQ2 2021 Earnings Call Transcripts," *S&P Capital IQ*, August 5, 2021, 4:30 PM ("Today, we remain on track to achieve manufacturing capacity of 100 million doses per month by the end of the third quarter of '21 and 150 million doses per month by the end of the fourth quarter of '21.").
[273] Complaint ¶¶ 174 – 189, 194.

129.  As a result of the foregoing, I am not aware of any evidence, and Professor Kothari and Defendants have not provided any, to reliably establish a lack of price impact on the first alleged corrective disclosure date, August 6, 2021.

**B.  OCTOBER 20, 2021**

130.  After market hours on October 19, 2021, *Politico* published an article titled "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," which Lead Plaintiffs allege contained corrective information.[274, 275]  For example, Lead Plaintiffs allege that the *Politico* article revealed, among other things, that Novavax rushed the vaccine manufacturing process and discarded batches of the vaccine, stating:

> "They rushed the process," one of the people with knowledge of the matter said. "It's hard to make. And they can't make it.'"
>
> […]
>
> And even as the company begins to seek regulatory approval in other countries, there remains doubt in the U.S. that it has solved the fundamental vaccine purity flaws that the people with knowledge said have affected its ability to make doses at plants around the world. Several vaccine batches have already been discarded, and four people with knowledge of the matter say U.S. officials now no longer expect the company to win FDA sign-off on the vaccine until next year at the earliest.[276]

131.  Lead Plaintiffs allege that Defendants misled investors regarding "Novavax's underlying manufacturing issues, Novavax's alignment with FDA criteria, and Novavax's ability to file its EUA with the FDA."[277]  As a result, the new information contained in the

---

[274] "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," *Politico,* October 19, 2021, 6:37 PM.

[275] Complaint ¶¶ 244 – 253.

[276] "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," *Politico,* October 19, 2021, 6:37 PM.

[277] Complaint ¶ 251.

77

*Politico* article that Novavax had rushed the manufacturing process and had to discard batches of the vaccine reflects a clear and logical causal connection to the alleged misstatements and omissions.  Combined with the observed price decline, this provides clear economic evidence of price impact of the alleged misstatements and omissions.

132.  Importantly, Professor Kothari does not dispute that the *Politico* article at least contributed to the price decline in Novavax Common Stock on October 20, 2021.  Furthermore, he does not provide any other explanation for the price decline on October 20, 2021 outside of the alleged corrective information.  Rather, Professor Kothari's first argument regarding this date relates specifically to a premature loss causation question, that is, whether the *Politico* article constitutes corrective information in the first place.

133.  As discussed above, Professor Kothari stated that he was asked to analyze price impact only for the first alleged corrective disclosure, August 6, 2021.  Regardless, he attempts to argue that the contents of the *Politico* article do not constitute corrective information because they were "incorrect and misleading."[278]  Specifically, he states the following:

> …I understand from Counsel that certain company statements, media reports, and analyst commentary subsequent to the publication of the *Politico* article on October 19, 2021 suggest that the contents of the *Politico* article that Plaintiffs claim to be a corrective disclosure were themselves incorrect and misleading, and were corrected by information released from October 20 through November 4, 2021 (when Novavax issued its Q3 2021 earnings release after hours).[279]

134.  Defendants claim that the *Politico* article "was based on misleading, incomplete, and anonymously sourced information that the market did not view as corrective of Defendants' prior manufacturing-related statements," and thus "[f]ar from 'materializing the risk' that

---

[278] Kothari Report ¶ 77.

[279] Kothari Report ¶ 77.

Novavax was far from resolving its manufacturing challenges, the *Politico* article reported risks that were already disclosed or *did not even exist*."[280]  "Novavax's purported manufacturing difficulties were thus baked into Novavax's stock price well before the *Politico* article broke."[281]

135.  It is my understanding that Defendants arguments regarding the accuracy of the allegations within the *Politico* article are premature at the class certification stage of litigation.  I have not been asked to analyze loss causation, and my understanding is that this is typically done at the merits stage with time to consider appropriate discovery.  Furthermore, to the extent that the finder of fact does ultimately determine that there are elements of the *Politico* article which are "incorrect and misleading," this amounts only to an identification of confounding information which my damages methodology can take into account.  However, such a determination has no effect on my opinions in my prior report that Novavax Common Stock traded in an efficient market during the Class Period[282] and damages in this matter are subject to a common methodology.  Furthermore, while Professor Kothari adopts Defendants' understanding in this respect, he does not provide any affirmative opinion claiming there is an absence of corrective information.[283]  As stated above, there was clearly new information released in the *Politico* article that is causally connected to Lead Plaintiff's alleged misstatements and omissions.  As a result, Professor Kothari and Defendants' attempt to portray the *Politico* article as not revealing corrective information is a premature loss causation question

---

[280] Defendants' Motion p. 18 (emphasis in original).

[281] Defendants' Motion p. 18.

[282] Coffman Deposition 117:23 – 118:2.

[283] Kothari Report ¶ 77.

that will be addressed at the merits stage, and more importantly, does not establish a lack of price impact on this alleged corrective disclosure.

136.   Professor Kothari and Defendants further attempt to critique this alleged corrective disclosure by analyzing a multi-day window, over which the contents of the *Politico* article were supposedly "corrected."[284]  Specifically, he states:

> To assess the price impact of these information releases in aggregate, I calculated Novavax's cumulative abnormal returns ("CAR") from market close on October 19, 2021 through market close on November 5, 2021, using the daily abnormal returns from Mr. Coffman's own event study model. Novavax's CAR over this period is not statistically significant at the 95% confidence level, *i.e.*, the stock's price change over this period, adjusted for market and industry effects, is indistinguishable from zero. Further, by the close of November 1, 2021, Novavax's stock price had returned to its level prior to the publication of the October 19, 2021 *Politico* article.[285]

137.   Professor Kothari's use of an arbitrarily long 13-trading day event window through November 5, 2021 to draw conclusions about price impact is inappropriate.  Meanwhile, my event study shows a statistically significant negative decline on October 20, 2021 and analyzes an appropriate event window utilizing the standard event study methodology.  Professor Kothari's irrelevant observation is a mere statement about the overall price movement over a more than two-week period, which is far from establishing a lack of price impact on the alleged corrective disclosure date.  This finding does not counteract the statistically significant price decline in response to the alleged corrective information for which Professor Kothari has provided no other explanation.

138.   In addition, the four trading days immediately following October 20, 2021 (i.e., October 21, 2021; October 22, 2021; October 25, 2021, and October 26, 2021) were all

---

[284] Kothari Report ¶ 77.

[285] Kothari Report ¶ 77.

associated with statistically insignificant price movements according to my event study, which is inconsistent with the idea that the price was somehow rebounding on these dates. Furthermore, even if there is news in the 13-trading day period that "corrects" information in the *Politico* article, this is a determination that will be made at the loss causation stage. Such a finding can easily be incorporated into the damages methodology, and this has no bearing on my opinion that Novavax Common Stock traded in an efficient market. Thus, Professor Kothari and Defendants' arguments regarding the 13-trading day period following the October 20, 2021 alleged corrective disclosure are irrelevant and do not establish a lack of price impact on this date.

139. Defendants also argue that "[p]rominent analysts covering Novavax also viewed the article as not value-relevant"[286] Notably, Professor Kothari does not make this claim. Defendants' point is irrelevant to my finding of price impact on the final alleged corrective disclosure for the same reasons I have discussed above with regard to analyst reports concerning the August 6, 2021 alleged corrective disclosure above in **Section V.A**.

140. Defendants also make the same argument related to *Goldman* for the October 20, 2021 alleged corrective disclosure as they did for the August 6, 2021 alleged corrective disclosure, specifically:

> Because the *Politico* article was not a corrective disclosure that somehow set right Defendants' earlier statements, the stock price decline that followed the article's release cannot support an inference that Defendants' alleged misstatements had any front-end price impact. By its very nature, the inaccurate and misleading information in the report could not correct Novavax's prior manufacturing-related statements and thus could not "match" those statements under *Goldman*.[287]

---

[286] Defendants' Motion p. 21.

[287] Defendants' Motion p. 22.

141.  From the point of view of economics, the relationship between the *Politico* article and the alleged misstatements is clear and direct.  The *Politico* article brought to light the extent of manufacturing problems Novavax had in regard to its vaccine.[288]  This corrective information relates to the ability of the Company to produce the amount of doses on the timeline for which Company had given thorough guidance, and further the possibility of the vaccine being approved.  Therefore, I would not consider the information released in the *Politico* article to be so generalized that it would fall under *Goldman*.

142.  In sum, my event study shows statistically significant negative declines on both alleged corrective disclosure dates and analyzes an appropriate event window utilizing a standard event study methodology.  Furthermore, to the extent that the Kothari Report is being used to demonstrate a lack of price impact, it is entirely dependent on his flawed event study which uses both a pre–Class Period estimation window and fails to exclude important outliers thus relying on a flawed estimate of volatility.[289]  Professor Kothari and Defendants' further arguments related to arbitrary multi-day event windows, potential price rebounds, a premature loss causation question, or the insinuation that the alleged false and misleading statements are generic and do not establish a lack of price impact for the reasons described above.  Thus, Professor Kothari and Defendants arguments related to price impact fail.  There is clearly evidence of price impact on both of the alleged corrective disclosure dates.

Executed on November 13, 2023

_Chad Coffman_
Chad Coffman

---

[288] Complaint ¶¶ 207 – 210.

[289] *See,* Section IV.

# Exhibit 1
# The Parameters of the Event Study are Sensitive to Outliers







◆ Model Including 1/29/2021       ◆ Model Excluding 1/29/2021

Sources: Complaint, Coffman Report, NVAX_KOTHARI_00003546, and S&P Capital IQ.

Notes:
1) The results are based on a rolling regression from the 120 previous trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (i.e. the NASDAQ Biotechnology Total Return Index, of which Novavax is a member). The returns of the Industry Index are net of the S&P 500 Total Return Index.

**Exhibit 2**
**Event Study Analysis of Novavax Outliers**

| # | Market Date | Event | Headline | Closing Price | Raw Return | Rolling Regression Model (120-day window)[1] | | | | | Sig Level[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Abnormal Return | Abnormal Dollar Change | t-Stat | P-Value | | |
| 1 | 1/21/2020 | Outlier | Experimental Vaccine Stocks Jump on Concerns About New Virus in China -- MarketWatch<br>*Source - Dow Jones Institutional News* | $9.82 | 71.08% | 71.38% | $4.10 | 10.51 | 1.58E-18 | | *** |
| 2 | 2/27/2020 | Outlier | Drug companies race to test coronavirus vaccines<br>Source - *CNN Wire* | $11.80 | 27.98% | 25.00% | $2.31 | 3.85 | 1.91E-04 | | *** |
| 3 | 2/28/2020 | Outlier | Novavax Shares Hit 52-Week High Following Covid-19 Vaccine Progress<br>*Source - Dow Jones Institutional News* | $16.00 | 35.59% | 34.27% | $4.04 | 5.27 | 6.58E-07 | | *** |
| 4 | 1/29/2021 | Outlier | Novavax Shares Soar 66% on Positive Covid-19 Vaccine Trial Results<br>*Source - Dow Jones Institutional News* | $220.94 | 64.87% | 63.41% | $84.97 | 11.93 | 7.52E-22 | | *** |

Sources: S&P Capital IQ and Factiva.
Notes:
(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (i.e. the NASDAQ Biotechnology Total Return Index, of which Novavax is a member). The Industry Index is a modified market capitalization weighted index using the returns of select Nasdaq-listed biotechnology and pharmaceutical companies. The returns of Novavax have not been removed from the Industry Index. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure dates, and four outlier dates have been removed from the estimation. The outliers include the following dates: 1/21/2020: due to news reports of Covid-19's spread and Novavax Covid-19 vaccine news, 2/27/2020 - 2/28/2020: due to Covid-19 vaccine development news, and 1/29/2021: due to the Company announcing Covid-19 vaccine effectiveness results in a U.K. study.
(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 3**
**Comparison of Summary Statistics for Novavax Common Stock on**
**Key Events Using Alternative Event Study**

| Market Date | Event | NVAX Common Stock | | | Nasdaq Biotechnology Index Event Study Results [1] | | | | Nasdaq Biotechnology Index and Operation Warp Speed Participants Index Event Study Results [2] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Closing Price | Volume (millions) | Raw Return | Abn. Return | Abn. Dollar Change | t-Stat | Sig Level [3] | Abn. Return | Abn. Dollar Change | t-Stat | Sig Level [3] |
| 1/21/2020 | Outlier | $9.82 | 55.3 | 71.08% | 71.38% | $4.10 | 10.51 | *** | 71.96% | $4.13 | 10.59 | *** |
| 2/27/2020 | Outlier | $11.80 | 27.5 | 27.98% | 25.00% | $2.31 | 3.85 | *** | 24.84% | $2.29 | 3.81 | *** |
| 2/28/2020 | Outlier | $16.00 | 36.4 | 35.59% | 34.27% | $4.04 | 5.27 | *** | 34.10% | $4.02 | 5.22 | *** |
| 5/12/2020 | Q1 2020 Earnings | $39.82 | 74.6 | 62.53% | 64.38% | $15.77 | 7.33 | *** | 64.75% | $15.86 | 7.44 | *** |
| 8/11/2020 | Q2 2020 Earnings | $149.48 | 15.2 | -16.26% | -13.14% | -$23.45 | -1.52 | | -12.59% | -$22.48 | -1.50 | |
| 11/10/2020 | Q3 2020 Earnings | $78.74 | 6.9 | -12.81% | -13.98% | -$12.63 | -2.23 | ** | -16.52% | -$14.92 | -2.72 | *** |
| 1/29/2021 | Outlier | $220.94 | 36.7 | 64.87% | 63.41% | $84.97 | 11.93 | *** | 62.34% | $83.54 | 12.06 | *** |
| 3/2/2021 | Q4 2020 Earnings | $205.99 | 6.3 | -14.27% | -10.42% | -$25.05 | -2.08 | ** | -9.93% | -$23.85 | -2.01 | ** |
| 5/11/2021 | Q1 2021 Earnings | $138.18 | 8.4 | -13.91% | -16.27% | -$26.11 | -2.97 | *** | -15.49% | -$24.86 | -2.83 | *** |
| 08/06/21 | Q2 2021 Earnings/Alleged Corrective Disclosure | $189.89 | 15.2 | -19.61% | -15.49% | -$36.59 | -3.15 | *** | -15.09% | -$35.64 | -3.08 | *** |
| 10/20/21 | Alleged Corrective Disclosure | $136.86 | 30.5 | -14.76% | -14.45% | -$23.20 | -3.13 | *** | -15.23% | -$24.45 | -3.33 | *** |
| 11/05/21 | Q3 2021 Earnings | $159.19 | 12.5 | -11.27% | -4.19% | -$7.51 | -0.92 | | -2.17% | -$3.89 | -0.50 | |
| 03/01/22 | Q4 2021 Earnings | $83.74 | 7.2 | 0.44% | -0.77% | -$0.65 | -0.16 | | 1.43% | $1.19 | 0.31 | |
| 05/10/22 | Q1 2022 Earnings | $53.86 | 13.8 | 1.13% | -7.93% | -$4.22 | -1.56 | | -6.74% | -$3.59 | -1.41 | |
| 8/9/2022 | Q2 2022 Earnings | $40.28 | 27.3 | -29.64% | -24.85% | -$14.23 | -4.53 | *** | -23.50% | -$13.46 | -4.44 | *** |

Sources: Complaint, U.S. Government Accountability Office, S&P Capital IQ, and Factiva.
Notes:
(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (i.e. the NASDAQ Biotechnology Total Return Index, of which Novavax is a member). The Industry Index is a modified market capitalization weighted index using the returns of select Nasdaq-listed biotechnology and pharmaceutical companies. The returns of Novavax have not been removed from the Industry Index. The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure dates, and four outlier dates have been removed from the estimation. The outliers include the following dates: 1/21/2020: due to news reports of Covid-19's spread and Novavax Covid-19 vaccine news, 2/27/2020 - 2/28/2020: due to Covid-19 vaccine development news, and 1/29/2021: due to the Company announcing Covid-19 vaccine effectiveness results in a U.K. study.
(2) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and two Industry Indices (i.e. the NASDAQ Biotechnology Total Return Index, of which Novavax is a member and the Operation Warp Speed Participants Index). The Nasdaq Biotechnology Index is a modified market capitalization weighted index using the returns of select Nasdaq-listed biotechnology and pharmaceutical companies. The Operation Warp Speed Participants Index is equal weighted using the returns of the companies that were developing a Covid-19 vaccine for the operation as of January 2021 (includes Moderna, Pfizer, BioNTech, Johnson & Johnson, AstraZeneca, Sanofi, and GSK). The returns of each Industry Index are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure dates, and four outlier dates have been removed from the estimation. The outliers include the following dates: 1/21/2020: due to news reports of Covid-19's spread and Novavax Covid-19 vaccine news, 2/27/2020 - 2/28/2020: due to Covid-19 vaccine development news, and 1/29/2021: due to the Company announcing Covid-19 vaccine effectiveness results in a U.K. study.
(3) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

## Exhibit 4
## Comparison of Abnormal Returns and Statistical Significance Under Different Methodologies

| # | Estimation Period | Treatment of Earnings Announcements and Corrective Disclosures | Treatment of January 29, 2021 | Results on Dates Highlighted By Professor Kothari[1] | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | March 2, 2021 | August 6, 2021[2] | October 20, 2021[2] |
| 1 | Coffman 120 Trading Days Prior to Event | Excluded from regression | Excluded from regression | Abnormal Return: -10.42% Significance Level: 95% | Abnormal Return: -15.49% Significance Level: 99% | Abnormal Return: -14.45% Significance Level: 99% |
| | | | Included in regression | Abnormal Return: -10.86% Significance Level: -- | | |
| | | Included in regression | Excluded from regression | Abnormal Return: - 10.31% Significance Level: 95% | Abnormal Return: - 15.36% Significance Level: 99% | Abnormal Return: -14.21% Significance Level: 99% |
| | | | Included in regression | Abnormal Return: - 10.74% Significance Level: -- | | |
| 2 | Professor Kothari's 120 Trading Days Prior to Class Period | Excluded from regression | Excluded from regression | N/A[3] | Abnormal Return: -15.67% Significance Level: 99% | Abnormal Return: -14.65% Significance Level: 99% |
| | | | Included in regression[4] | | Abnormal Return: -14.92% Significance Level: 90% | Abnormal Return: -14.58% Significance Level: 90% |
| | | Included in regression | Excluded from regression | N/A[3] | Abnormal Return: -15.44% Significance Level: 99% | Abnormal Return: -14.54% Significance Level: 99% |
| | | | Included in regression[4] | | Abnormal Return: -14.63% Significance Level: 90% | Abnormal Return: -14.45% Significance Level: 90% |

Sources: Complaint, Coffman Report, Kothari Report, NVAX_KOTHARI_00003549, NVAX_KOTHARI_00003548, and S&P Capital IQ.

Notes:

1) The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (i.e. the NASDAQ Biotechnology Total Return Index, of which Novavax is a member). The returns of the Industry Index are net of the S&P 500 Total Return Index.

2) Under Coffman's estimation period January 29, 2021, falls outside the 120 trading days prior to each Corrective Disclosure, and thus, has no impact on the results.

3) Professor Kothari's estimation period contains March 2, 2021, thus results are not estimated for March 2, 2021.

4) Inclusion of January 29, 2021, using Professor Kothari's estimation period yields results which are statistically significant for both corrective disclosures only at the 90% level, while all other models yield statistically significant results at the 99% level.

# Appendix A
# Documents Considered

## Prior Reports and Depositions in this Matter

- Market Efficiency Report of Chad Coffman, CFA, dated March 16, 2023, including all data and all documents included in the Appendices of that report.
- Deposition of Chad Coffman, September 14, 2023.
- Expert Report of Professor S.P. Kothari, dated September 22, 2023, including all data and documents included in that report.
- Deposition of Professor S.P. Kothari, October 31, 2023.

## Court Documents

- Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws filed March 11, 2022, in *Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, v. Novavax, Inc., et al.,* Case 8:21-cv-02910-TDC, United States District Court For The District of Maryland.
- Memorandum Opinion on Motion to Dismiss filed December 12, 2022, in *Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, v. Novavax, Inc., et al.*, Case 8:21-cv-02910-TDC, United States District Court District of Maryland.
- Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel filed September 22, 2023, in *Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, v. Novavax, Inc., et al.,* Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland.

## Other Securities Cases and Documents

- Order filed September 20, 2019, in *Di Donato v. Insys Therapeutics*, No. CV-16-00302-PHX-NVW.

- Memorandum and Order filed September 28, 2006, *In re Polymedica Corporation Securities Litigation*, Civil Action No. 00-12426-WGY.

- Expert Report of Professor S.P. Kothari filed September 12, 2014, *in re Wilmington Trust Securities Litigation*, Case 1:10-cv-00990-ER-SRF.

- Expert Report of Professor S.P. Kothari attached as Exhibit E to Declaration of Vincent R. Cappucci In Support of Plaintiffs' Motion for Class Certification, filed March 19, 2018, in *JUDITH GODINEZ, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. ALERE INC., et al., Defendants*, Case 1:16-cv-10766-PBS.

- Expert Report of Professor S.P. Kothari filed April 30, 2021, *in re Mattel Inc. Securities Litigation*, Case 2:19-cv-10860-MCS-PLA.

- Memorandum Opinion filed January 29, 2020, Weiner, v. Tivity Health, Inc., Case No.: 3:17-cv-01469 United States District Court Middle District of Tennessee Nashville Division.

- Order Re Motion to Certify Class, Appoint Class Representatives, And Appoint Class Counsel filed April 2, 2022, Junge v. Geron Corp., C 20-00547-WHA, United States District Court, Northern District of California.

- Order Granting Motion for Class Certification filed September 4, 2018, *In Re: SanDisk LLC Securities Litigation*, Case 3:15-cv-01455-VC, United States District Court for the Northern District of California.

- Memorandum Opinion and Order, *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321.

- Order Granting Motion For Class Certification filed January 5, 2017, in *Todd v. STAAR Surgical Co.,* 2017 WL 821662.

- Order (1) Denying Defendants' Motion To Exclude Expert Testimony Of Bjorn Steinholt and (2) Amending Plaintiffs' Complaint filed December 14, 2012, *In re Novatel Wireless Sec. Litig.,* 910 F. Supp. 2d 1209, (S.D. Cal. 2012).

- Memorandum Opinion and Order filed February 17, 2011, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, (S.D.N.Y. 2011).

## Security Data

- Historical data for Novavax, Inc. Common Stock, companies taking part in Operation Warp Speed as of January 2021, industry companies in Table 1 of this Report, the NASDAQ Biotechnology Total Return Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.

## Bates Stamped Documents

- NVAX_KOTHARI_00000024.

- NVAX_KOTHARI_00003537.

- NVAX_KOTHARI_00003548.

- NVAX_KOTHARI_00003549.

- NVAX_KOTHARI_00003551.

## News

- "Novavax Advances Development of Novel COVID-19 Vaccine," *GlobeNewswire*, February 26, 2020, 9:26 AM.

- "US Novavax shares rise on coronavirus vaccine progress," *SeeNews Pharmaceuticals*, February 27, 2020, 9:14 AM.

- "Novavax is working to advance a potential coronavirus vaccine. So are competitors.," *Baltimore Business Journal Online*, February 27, 2020.

- "CDOX On Fire, MNLO Plunges On Serlopitant Data, VIR Enters Covid-19 Vaccine Race," *CE NoticiasFinancieras,* February 27, 2020.
- "Drug companies race to test coronavirus vaccines," *CNN Wire*, February 27, 2020, 1:26 PM.
- "Another company claims to have a coronavirus vaccine in the works," *Boy Genius Report (BGR),* February 27, 2020.
- "NVAX: Novavax price target raised to $15 from $12 at B. Riley FB," *Bloomberg*, February 28, 2020, 9:05 AM.
- "86 Stocks Moving In Friday's Mid-Day Session," *Benzinga*, February 28, 2020, 12:19 PM.
- "Carnage on Wall Street, but some companies thrive or recover," *Associated Press Newswires*, February 28, 2020, 1:24 PM.
- "Novavax Shares Hit 52-Week High Following Covid-19 Vaccine Progress," *Dow Jones Institutional News*, February 28, 2020, 1:26 PM.
- "Coronavirus Stock Market Correction Takes Hold As Dow Jones Suffers Worst Week Loss In Years; Microsoft, Mastercard Warn, Disney CEO Bob Iger Out," *Investor's Business Daily*, February 28, 2020.
- "Press Release: Novavax Appoints Biotechnology Veteran David Mott to Board of Directors," *Dow Jones Institutional News*, June 16, 2020, 8:00 AM.
- "Novavax and UK Government Announce Collaboration and Purchase Agreement for Novavax' COVID-19 Vaccine Candidate," *GlobeNewswire*, August 14, 2020, 1:07 AM.
- "Press Release: Novavax to Participate in Upcoming Conferences," *Dow Jones Institutional News*, October 5, 2020, 9:00 AM.
- "Press Release: Novavax COVID-19 Vaccine Demonstrates 89.3% Efficacy inUK Phase 3 Trial," *Dow Jones Institutional News*, January 28, 2021, 4:05 PM.
- "Novavax says COVID-19 vaccine 89% effective in UK trial, less in South Africa, shares jump," *Reuters*, January 28, 2021, 8:04 PM.
- "Robinhood, Other Brokerages Restrict Trading on GameStop, AMC," *Dow Jones Newswires Chinese (English)*, January 28, 2021, 10:27 PM.
- "Robinhood, Webull, M1 and these other platforms have resumed trading of GameStop and AMC shares," *Business Insider*, January 29, 2021, 12:32 PM.
- "Novavax Shares Soar 66% on Positive Covid-19 Vaccine Trial Results," *Dow Jones Institutional News*, January 29, 2021, 12:17 PM.
- "Robinhood users are still limited to one GameStop share," *The Cointelegraph*, February 1, 2021.
- "Novavax Reports Fourth Quarter and Full Year 2020 Financial Results and Operational Highlights," *GlobeNewswire*, March 1, 2021, 4:02 PM.
- "*Novavax 4Q Loss/Shr $2.70 >NVAX," *Dow Jones Institutional News*, March 1, 2021, 4:02 PM.

- "Novavax COVID-19 shot could be cleared for U.S. use as early as May -CEO," *Reuters News*, March 1, 2021, 4:03 PM.
- "Novavax Posts Wider Quarterly Loss, Sales Jump Due To Pandemic-related Services – MarketWatch," *Dow Jones Institutional News*, March 1, 2021, 4:20 PM.
- "Novavax Logs 4Q Rev Growth, Steeper Loss Amid Covid-19 Vaccine Effort," *Dow Jones Institutional News*, March 1, 2021, 4:23 PM.
- "Novavax: Q4 Earnings Insights," *Benzinga*, March 1, 2021, 4:28 PM.
- "FQ4 2020 Earnings Call Transcripts," *S&P Capital IQ*, March 1, 2021, 4:30 PM.
- "BRIEF-Novavax Says Expectation Is For Plants Manufacturing Covid-19 Vaccine To Be At Full Scale By April," *Reuters News*, March 1, 2021, 6:08 PM.
- "BRIEF-Novavax Posts Qtrly Loss Per Share Of $2.70," *Reuters News*, March 1, 2021, 6:39 PM.
- "Novavax: 4Q Earnings Snapshot," *Associated Press Newswires*, March 1, 2021, 4:50 PM.
- "BRIEF-Novavax CEO Says Covid-19 Vaccine Could Be Cleared For U.S. Use As Early As May – Interview," *Reuters News*, March 1, 2021, 6:40 PM.
- "Novavax Slides as Market Grows Impatient for Next Covid Vaccine," *Bloomberg*, March 2, 2021, 1:00 AM.
- "Novavax Social Media Volume Quadruples; Sentiment Is Negative," *Bloomberg*, March 2, 2021, 12:29 PM.
- "Exclusive: Novavax delays EU vaccine supply deal amid production problems - source," *Reuters News*, March 25, 2021, 11:56 AM.
- "Press Release: Novavax to Host Maryland Governor Larry Hogan at Site of Future Novavax Vaccines Innovation Campus and Global Headquarters," *Dow Jones Institutional News*, June 9, 2021, 9:03 AM.
- "FQ1 2021 Earnings Call Transcripts," *S&P Capital IQ*, May 10, 2021, 4:30 PM.
- "Novavax Reports Second Quarter 2021 Financial Results and Operational Highlights," *PR Newswire*, August 5, 2021, 4:05 PM.
- "Novavax again delays seeking U.S. approval for COVID-19 vaccine," *Reuters News*, August 5, 2021, 4:05 PM.
- "FQ2 2021 Earnings Call Transcripts," *S&P Capital IQ*, August 5, 2021, 4:30 PM.
- "Moderna on its way in September: Hunt," *Australian Associated Press*, August 8, 2021.
- "BioNTech reports Q2 EPS EUR 10.77 vs (EUR 0.38) last yearReports Q2…," *theflyonthewall*, August 9, 2021, 7:04 AM.
- "Recap: BioNTech Q2 Earnings," *Benzinga*, August 9, 2021, 7:13 AM.
- "Inovio receives regulatory allowance for INO-4800 clinical…," *theflyonthewall*, August 9, 2021, 8:09 AM.
- "BioNTech Swung to 2Q Net Profit as Revenue Surged on Vaccine Supply," *Dow Jones Newswires Chinese (English)*, August 9, 2021, 8:41 AM.

- "Vaxart Social Media Volume Rises: 5 Signals Since July 28," *Bloomberg*, August 9, 2021, 10:20 AM.
- "FDA starts evaluating EUA application of Novavax's COVID-19 vaccine," *Manila Bulletin*, August 9, 2021, 11:31 AM.
- "BUZZ-U.S.-listed shares of BioNTech rise after upbeat results," *Reuters News*, August 9, 2021, 12:15 PM.
- "VXRT: Vaxart call volume above normal and directionally bullish," *The Fly*, August 9, 2021, 12:45 PM.
- "What's Up With Novavax Stock?" *Benzinga*, August 9, 2021, 11:35 PM.
- "Moderna vaccine gets regulator green light," *Australian Associated Press*, August 9, 2021.
- "Moderna spikes 19% amid a flood of encouraging vaccine news, surpassing Merck in market value (MRNA)," *Business Insider*, August 9, 2021, 4:14 PM.
- "USA will send to Mexico vaccines against Covid-19 from AstraZeneca and Moderna," *CE Noticias Financieras*, August 9, 2021.
- "Inovio reports Q2 EPS (39c), consensus (25c)," *theflyonthewall*, August 9, 2021.
- "Press Release: Novavax Announces Leadership Appointment and Updates," *Dow Jones Institutional News*, October 4, 2021, 4:05 PM.
- "'They rushed the process': Vaccine maker's woes hamper global inoculation campaign," *Politico*, October 19, 2021, 6:37 PM.
- "Novavax Shares Plunge To Lows Since Mid-May As COVID-19 Vaccine Woes Continue," *Benzinga*, October 20, 2021, 5:44 AM.
- "Novavax Stock Tumbles on Report That Vaccine Deliveries Are Lagging," *Barron's*, February 8, 2022, 10:36 AM.
- "Novavax Covid-19 Vaccine Linked to Heart Inflammation, FDA Says. The Stock Is Sliding. -- Barrons.com," *Dow Jones Institutional News*, June 3, 2022, 11:09 AM.
- "Moderna COVID-19 Vaccine Maintains Efficacy 6 Months After Second Dose," *Clinical Advisor*, August 9, 2021.

**Analyst Reports**

- "NVAX Clears The Bar... Strong 90%+ CV-19 Vaccine Results," *Jefferies*, January 28, 2021.
- "UK P3 Results with '2373 Point to Best-In-Class Profile, EUA in 1H21," *Cantor Fitzgerald*, January 29, 2021.
- "After Traveling at Warp Speed, NVX-CoV2373 Has Now Arrived; Reiterate Buy and $207 PT," *H.C. Wainwright & Co.*, January 29, 2021.
- "New Vaccine Supply Charts: Plenty Still Coming in USA and Tons by Summer," *Jefferies*, January 29, 2021.

- "UK Efficacy Support '2373 as Best-In-Class, while SA Data Point to Widening Market Opp'y; Raising PT to $295," *J.P. Morgan*, January 29, 2021.
- "Visibility on ex-US Emergency Use, Manufacturing, and US PREVENT-19 Progress Bodes Well for New 'Jab' Option," *Cantor Fitzgerald*, February 4, 2021.
- "4Q20 –What a Difference a Year Makes, Driven by COVID-19, Company is Now 'Real,'" *Cantor Fitzgerald*, March 2, 2021.
- "Anticipating 2Q Rich with Reg Updates, Potential EUA filing; 4Q Takeaways & Model Update," *J.P. Morgan*, March 2, 2021.
- "Q4 Update and Thoughts on Catalyst Path From Here - Reiterate BUY," *Jefferies*, March 2, 2021.
- "Novavax: Uncertain COVID-19 Vaccine Approval Triggers Violent Sell-Off," *Seeking Alpha*, March 10, 2021.
- "2Q21: Cash, Good Variant & Booster Data and, Finally, (exUS) EUA Filing," *Cantor Fitzgerald*, August 6, 2021.
- "Q2: US Filing Slightly Delayed, But Solid Progress on RoW Vaccine Rollout," *Jefferies*, August 6, 2021.
- "Regulatory Action and Vaccine Rollouts for LMICs on Deck in 2H21; 2Q Takeaways & Model Update," *J.P. Morgan*, August 6, 2021.
- "Novavax Stock: A Great Opportunity To Buy On Post-Earnings Weakness," *Seeking Alpha*, August 9, 2021, 11:00 AM.

## Federal Documents

- "Report to Congressional Addressees: OPERATION WARP SPEED: Accelerated COVID-19 Vaccine Development Status and Efforts to Address Manufacturing Challenges," *United States Government Accountability Office*, February 2021, pp. 13-15 (https://www.gao.gov/assets/gao-21-319.pdf).
- "Staff Report on Equity and Options Market Structure Conditions in Early 2021," *SEC*, October 14, 2021.
- "Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference," *James S. Brady Press Briefing Room*, February 26, 2020, 6:37 PM.

## Academic Literature

- A. Craig MacKinlay, Event Studies in Economics and Finance, 35 J. ECON. LITERATURE, 13 (1997).
- Alan Agresti, Categorical Data Analysis, *Wiley*, 1990.
- Black, Fischer, "Noise," *Journal of Finance* 41 (3), (1986).

- Ferrillo, Paul A., Frederick C. Dunbar, David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review* 78 (1), (2004).
- David Freedman, Robert Pisani, and Roger Purves, Statistics, *W.W. Norton and Co.*, 1978.
- DeFusco, Richard A., Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, Quantitative Methods for Investment Analysis, *Association for Investment Management and Research,* (2001).
- Ekkehart Boehmer and Eric K. Kelley, "Institutional Investors and the Informational Efficiency of Prices," *The Review of Financial Studies*, Sep., 2009, Vol. 22, No. 9 (Sep., 2009).
- James E. De Muth, "Research Fundamentals: Overview of Biostatistics Used in Clinical Research," *American Journal of Health System Pharmacists*, (Vol 66 2009).
- Kothari, S. P., and Jerold B. Warner, "Chapter 1 – Econometrics of Event Studies," *Handbook of Corporate Finance, Volume 1, Elsevier B.V.*, (2007).
- Michael D. Green, D. Michal Freedman, and Leon Gordis, "Reference Guide on Epidemiology," in *Reference Manual on Scientific Evidence* (Second Edition), Federal Judicial Center, 2000.
- Neil A. Weiss, "Introductory Statistics," 9th Edition, *Addison-Wesley*, 2012.
- Ramiah, Vikash, Xiaoming Xu, and Imad A. Moosa, "Neoclassical finance, behavioral finance and noise traders: A review and assessment of the literature," *International Review of Financial Analysis* 41, (2015), pp. 89 – 100.
- Roxy Peck, Chris Olsen, and Jay Devore, "Introduction to Statistics & Data Analysis," 3[rd] Edition, *Thomson Brooks/Cole*, 2008.
- Tetlock, Paul C, "Does Noise Trading Affect Securities Market Efficiency?" *Columbia University Working Paper*, (2006), pp. 1 – 43.
- The National Academies Press, Reference Manual on Scientific Evidence, Third Edition, 2011.
- Wooldridge, J., *Introductory Econometrics: A Modern Approach*, Fifth Edition, 2012.

# APPENDIX B

## CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:         (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com


**EMPLOYMENT:**

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


**EDUCATION:**

**CFA**    Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing: Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

    o In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation. Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
    o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court for the Western District of Washington at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed expert rebuttal report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2011**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court for the Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD, United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court for the Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc. and Apple Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018. Filed expert rebuttal report February 22, 2019. Filed expert report June 7, 2019. Deposition September 6, 2019.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>In Re Genworth Financial, Inc. Securities Litigation, Civ. A. No. 3:14-cv-00682-JAG, United States District Court for the Eastern District of Virginia, Richmond Division</u>. Filed declaration re: Plan of Allocation June 2, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts</u>. Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois</u>. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017. Filed expert report November 11, 2020. Filed expert rebuttal report December 14, 2020. Deposition January 29, 2021.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert report May 19, 2017. Deposition July 20, 2017. Filed expert rebuttal report September 14, 2017. Filed expert report January 22, 2019. Filed expert rebuttal report March 1, 2019. Deposition March 26, 2019.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018. Deposition January 31, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018. Filed declaration re: Plan of Allocation and calculation of aggregate damages May 6, 2019.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in <u>Kevin Murphy, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Precision Castparts Corp., Mark Donegan, and Shawn R. Hagel, Defendants, No. 3:16-cv-00521-SB, United States District Court for the District of Oregon, Portland Division</u>. Filed expert report March 2, 2018. Filed expert report March 22, 2019. Filed expert reply report June 19, 2019. Deposition July 19, 2019.

- Testifying expert in <u>In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division</u>. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in <u>Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois</u>. Filed expert report July 13, 2018. Deposition September 21, 2018. Filed rebuttal reply report May 17, 2019.

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018.

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018. Filed expert report December 14, 2018. Filed expert report March 8, 2019. Filed declaration re: Plan of Allocation July 19, 2019.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018. Filed expert report July 26, 2019. Filed expert report November 1, 2019.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division.</u> Filed expert report September 20, 2018.

- Testifying expert in <u>City of Sunrise General Employees' Retirement Plan, Plaintiff vs. FleetCor Technologies, Inc., et al., Defendants, No. 1:17-CV-02207-LMM, United States District Court for the Northern District of Georgia Atlanta Division</u>. Filed expert report January 4, 2019. Deposition March 20, 2019. Filed expert report May 6, 2019.

- Testifying expert in <u>Guevoura Fund LTD., On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., Defendants, Case No. 1:15-cv-07192-CM, Case No. 1:18-cv-09784-CM,</u>

United States District Court for the Southern District of New York. Filed expert report January 18, 2019.

- Testifying expert in <u>Leon D. Milbeck On Behalf of Himself and All Others Similarly Situated, v. TrueCar, Inc, et al., Defendants, No. 2:18-cv-02612-SVW, United States District Court for the Central District of California</u>. Filed expert report March 8, 2019. Deposition April 8, 2019.

- Testifying expert in <u>Lewis Cosby, Kenneth R. Martin, as Beneficiary of the Kenneth Ray Martin Roth IRA, and Martin Weakly On Behalf of Themselves and All Others Similarly Situated, vs. KPMG, LLP, Case No. 3:16-cv-00121, United States District Court for the Eastern District of Tennessee, Knoxville Division</u>. Filed expert report March 15, 2019. Deposition April 12, 2019. Filed supplemental expert report April 19, 2019. Deposition April 25, 2019. Filed rebuttal reply report June 14, 2019.

- Testifying expert in <u>Shawn Sanawaz, Individually and On Behalf of All Other Similarly Situated, v. Intellipharmaceutics International Inc., Isa Odidi, and Domenic Della Penna, Defendants, No. 1:17-cv-05761-JPO, United States District Court for the Southern District of New York.</u> Filed expert report May 06, 2019.

- Testifying expert in <u>Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan</u>. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying expert in <u>West Virginia Investment Management Board, Stichting Blue Sky Global Equity Active Low Volatility Fund, and Stitching Blue Sky Active Large Cap Equity USA Fund vs. SCANA Corporation., et al., Civ. A. No. 3:17-cv-2616-MBS, United States District Court for the District of South Carolina.</u> Filed expert report June 28, 2019. Deposition August 16, 2019.

- Testifying expert in <u>Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee.</u> Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying expert in <u>In Re Dr. Reddy's Laboratories Limited Securities Litigation, No. 3:17-cv-06436-PGS-DEA, United States District Court for the District of New Jersey.</u> Filed expert report July 19, 2019. Deposition September 10, 2019.

- Testifying expert in <u>Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado.</u> Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in <u>In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York.</u> Filed expert report February 13, 2020.

- Testifying Expert in <u>In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey</u>. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert declaration in <u>Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York</u>. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert declaration in <u>In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division.</u> Filed declaration September 28, 2020.

- Testifying Expert in <u>Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York</u>. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in <u>John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021.

- Testifying Expert in <u>City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York</u>. Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in <u>Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey.</u> Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in <u>The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California.</u> Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in <u>Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York.</u> Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in <u>Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois.</u> Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021. Filed expert report on July 6, 2023.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey.</u> Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in <u>In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York</u>. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in <u>Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022. Filed expert report on September 15, 2023.

- Testifying Expert in <u>Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in <u>In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York</u>. Filed expert report on October 15, 2021.

- Testifying Expert in <u>Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division</u>. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in <u>In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division</u>. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in <u>David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey</u>. Filed expert report on November 1, 2021.

- Testifying expert in <u>In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York</u>. Filed expert report December 1, 2021.

- Expert declaration in <u>Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division.</u> Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in <u>Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut</u>. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert <u>In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York.</u> Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in <u>Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals</u>

International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey. Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York. Filed expert report July 15, 2022.

- Testifying Expert in BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.),  et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal. Filed expert report September 30, 2022. Filed expert rebuttal report on July 10, 2023.

- Testifying Expert in Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division. Filed expert report October 28, 2022. Deposition December 21, 2022. Filed expert rebuttal report on March 21, 2023.

- Testifying Expert in In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara. Filed expert report December 12, 2022.

- Testifying Expert in In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California. Filed expert report January 27, 2023. Deposition April 4, 2023.

- Testifying Expert in Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs,

v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah. Filed expert report March 3, 2023.

- Testifying Expert in Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland. Filed expert report March 16, 2023. Deposition September 14, 2023.

- Testifying Expert in Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee, and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division. Filed expert report March 20, 2023.

- Testifying Expert in In Re Boston Scientific Corporation Securities Litigation, Case No. 1:20-cv-12225-DPW, United States District Court District of Massachusetts. Filed expert report April 21, 2023. Filed declaration June 22, 2023.

- Testifying Expert in In Re Okta, Inc. Securities Litigation, Case 3:22-cv-02990-SI, United States District Court Northern District of California. Filed expert report August 18, 2023.

- Testifying Expert in Carl Shupe and Matthew Pearlman, Individually and on Behalf of All Others Similarly Situated, vs. Rocket Companies, Inc., Jay D. Farner, Julie R. Booth, Robert Dean Walters, Daniel Gilbert, and Rock Holdings Inc., Civ. No. 1:21-cv-11528, United States District Court Eastern District of Michigan, Southern Division. Filed expert report August 30, 2023. Deposition November 8, 2023.

- Testifying Expert in Richard R. Weston, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. DocuSign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff, Defendants, Case No. 3:22-cv-0084-WHO, United States District Court, Northern District of California, San Francisco Division. Filed expert report September 15, 2023.

- Testifying Expert in John Brazinsky, Individually and on behalf of all other similarly situated, Plaintiff, vs. AT&T Inc., Randall L. Stephenson, John T. Stankey, Pascal Desroches, and John Stephens, Defendants, Case No. 2:23-cv-04064-KM-JBC, United States District Court for the District of New Jersey. Filed declaration October 23, 2023.


Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in <u>Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York</u>. Filed expert report May 29, 2018. Deposition July 24, 2018.


<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.

# Appendix C: The Mattel Report

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 1 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 115 of 309
#:1789

# Exhibit A

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 2 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 116 of 309
#:1790

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

IN RE Mattel Inc. Securities Litigation

**Case No. 19-CV-10860-MCS (PLAx)**

**EXPERT REPORT OF PROFESSOR S.P. KOTHARI**

Professor S.P. Kothari
MIT Sloan School of Management
100 Main Street, E62-662
Cambridge, MA 02142

Exhibit A
Page 2

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 3 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 117 of 309
#:1791

# TABLE OF CONTENTS

**Page**

I.    RULE 26 EXPERT DISCLOSURES..................................................................................1

II.   MATERIALS REVIEWED OR CONSIDERED ..............................................................2

III.  ASSIGNMENT AND SUMMARY OF CONCLUSIONS..................................................2

IV.   BACKGROUND ON MATTEL........................................................................................4

V.    BACKGROUND ON MARKET EFFICIENCY ...............................................................5

VI.   *CAMMER* MARKET EFFICIENCY METRICS ...............................................................7

    A. WEEKLY TRADING VOLUME...............................................................................7

    B. NUMBER OF ANALYSTS PROVIDING COVERAGE.........................................9

    C. MARKET MAKERS AND ARBITRAGEURS .....................................................11

    D. ELIGIBILITY TO FILE AN S-3 REGISTRATION STATEMENT...............................13

    E. STOCK PRICE REACTION TO NEWS ..............................................................15

VII.  ADDITIONAL MARKET EFFICIENCY METRICS.......................................................23

    A. MARKET CAPITALIZATION..............................................................................23

    B. STOCK LIQUIDITY AND BID-ASK SPREADS..................................................24

    C. PUBLIC FLOAT ....................................................................................................25

    D. AUTOCORRELATION OF STOCK RETURNS...................................................27

VIII. CONCLUDING ASSESSMENT OF MARKET EFFICIENCY........................................27

IX. ABILITY TO CALCULATE DAMAGES ON A CLASSWIDE BASIS.............................28

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 4 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 118 of 309
#:1792

## I.   RULE 26 EXPERT DISCLOSURES

1.   I, S.P. Kothari, am the Gordon Y Billard Professor of Accounting and Finance at the Sloan School of Management of Massachusetts Institute of Technology ("MIT").  Since my arrival at MIT, in 1999, I have served in a variety of different roles, including Deputy Dean for the Faculty, and Head of the Department of Economics, Finance and Accounting.

2.   I have recently returned to MIT after serving as the Chief Economist and Director of the Division of Economic and Risk Analysis at the U.S. Securities and Exchange Commission, Washington, D.C. for two years from 2019-2021. As the SEC's Chief Economist and Division Director, I had a variety of different responsibilities, including economic analysis of regulations for corporation finance, securities markets, and investment management; litigation economics in support of the Enforcement Division and the Office of Compliance and Examinations; and analysis of securities and macroeconomic risk for the domestic and international jurisdictions.

3.   During my tenure at MIT, I also took a leave of absence and served as the Global Head of Equity Research for Barclays Global Investors, San Francisco (a subsidiary of the Barclays Bank), for one-and-one-half years from July 2008 to December 2009.

4.   From 1986 to 1999, I served on the faculty of the University of Rochester, first as an Assistant Professor, then as an Associate Professor, and finally as Professor and Accounting Area Coordinator.  During this time, I also held visiting positions at MIT, the University of Technology in Sydney, Australia, Baruch College of the City University of New York, and the City University Business School in London.

5.   I received my B.E. degree in Chemical Engineering from the Birla Institute of Technology and Science in India in 1979, my M.B.A. in Accounting and Finance at the Indian Institute of Management, Ahmedabad, in 1982, and my Ph.D. in Accounting at the University of Iowa in 1986.

6.   I have published numerous academic articles in the areas of accounting, finance, and economics and co-edited two books titled *Financial Statement Analysis*, published by McGraw-Hill, and *Contemporary Accounting Research*, published by North-Holland Publishing.  My research has primarily focused on the informational efficiency of stock prices, valuation of equities and bonds, the relation between accounting accruals and cash flows, the effect of institutions on the properties of accounting numbers internationally, and corporate uses of financial derivatives, among other topics.

7.   I have served as an editor or associate editor for several academic journals, including the *Journal of Accounting & Economics* and *The Accounting*

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 5 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 119 of 309
#:1793

*Review*, and as a referee for professional journals such as the *Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Accounting Research*, *Contemporary Accounting Research*, and the *British Accounting Review*.

8. In addition to conducting rigorous research and serving as an editor for academic journals, I have been active in my profession. I have been the keynote speaker and distinguished faculty speaker at a number of accounting association annual meetings and doctoral consortia.

9. I have served in various policy and management committees at MIT and the University of Rochester.

10. Finally, I have supervised or served on the dissertation committees of more than 45 doctoral students over the past 25 years. A detailed copy of my curriculum vita is attached as Appendix A hereto.

11. I bill at my customary rate of $1,300 per hour for my work on this matter, and the rates of those working under my supervision and direction range from $175 to $1050. I have no financial interest in the outcome of this litigation. Payment for my work and those working under my supervision and direction on this matter is not contingent on the opinions I express or the outcome of this matter.

## II.   MATERIALS REVIEWED OR CONSIDERED

12. For the purpose of preparing this report, I reviewed or considered the data and other information identified in Appendix B hereto, as well as all data and articles referenced in this report.

## III.   ASSIGNMENT AND SUMMARY OF CONCLUSIONS

13. I have been retained by counsel for Lead Plaintiffs to provide expert testimony on whether the market for Mattel's common stock was efficient during the Class Period, August 2, 2017 through August 8, 2019.[1]

14. I have performed economic, financial, and statistical analyses to form an opinion on whether Mattel's common stock traded in an efficient market. I have made no investigation of the issues surrounding liability in this case.

15. I form the following opinions on this matter.

---

[1] I use the terms "stock" and "common stock" interchangeably.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 6 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 120 of 309
#:1794

    a.     During the Class Period, the market for Mattel's stock was efficient. That is, the price of Mattel's stock could be relied upon to reflect publicly available information.

    b.     I came to this conclusion after analyzing the five *Cammer*[2] factors used for evaluating market efficiency and four additional factors considered by the courts as measures of market efficiency.[3] These factors are:

      i.   The stock's average weekly trading volume;
      ii.   The number of security analysts following the stock;
      iii.  The presence of market makers and arbitrageurs;
      iv.  Eligibility to file an S-3 registration statement;
      v.   Stock price reaction to unexpected corporate events or financial releases;
      vi.  Market capitalization;
      vii.  Stock liquidity;
      viii. Public float; and
      ix.   Serial correlation in returns.

    c.     Exhibit 1 summarizes the evidence on each of the factors examined. Every factor analyzed supports my opinion that Mattel's common stock traded in an efficient market.

16.     The Court also held in *Halliburton v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014) ("Halliburton II") that defendants may rebut the presumption of reliance by establishing a lack of price impact by showing that "an alleged misrepresentation did not actually affect the market price of the stock." My analysis indicates that there is no evidentiary basis to conclude a lack of price impact on the corrective disclosure date.

17.     I have been asked to provide an opinion on whether damages are capable of measurement on a class-wide basis. As set forth herein, it is my opinion that damages can be measured on a class-wide basis using a standard and well-settled method for assessing damages for each class member under Section 10(b) of the Securities Exchange Act of 1934.

18.     The remainder of my report develops the arguments and analyses in support of these opinions.

---

[2]  *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989).

[3]  For example, *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) or *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 7 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 121 of 309
#:1795

## IV.     BACKGROUND ON MATTEL

19.     Mattel is a children's entertainment company that specializes in the design and production of toys and consumer products. Mattel's products are among the most widely recognized toy products in the world. Mattel's stated mission is to "create innovative products and experiences that inspire, entertain, and develop children through play."[4]

20.     Exhibit 2 provides an overview of the daily price and the trading volume of the shares of Mattel's stock during the Class Period. On August 2, 2017, the beginning of the Class Period, Mattel's stock was trading at $19.62 per share. Mattel had approximately 342.7 million shares outstanding on August 2, 2017, and thus at the start of the Class Period the market capitalization for Mattel was $6.724 billion.[5]  During the Class Period the stock price declined and closed at $11.31 on August 9, 2019, following the last day of the Class Period,[6] yielding an ending market capitalization of $3.908 billion.  The number of shares traded on any given day during the Class Period ranged from 1.2 to 89.2 million.  Exhibit 2 and these statistics provide preliminary evidence that Mattel's stock was actively traded.

21.     On October 26, 2017, Mattel issued a press release and published a Form 10-Q ("10-Q") reporting its 2017 third quarter financial results to investors. In the earnings release, Mattel reported a loss of $603 million. One of the more significant components of this loss was a $562 million valuation allowance that reduced the value of its deferred tax assets.[7]

22.     On August 8, 2019, Mattel disclosed to its investors that it had learned of a whistleblower letter, and that as a result of this whistleblower letter, Mattel was canceling its planned debt offering (scheduled to close August 8, 2019) as it investigated the allegations provided in the letter.[8]

23.     On October 29, 2019, Mattel announced favorable financial results for the third quarter of 2019 and at the same time filed a Form 8-K to address the results of the whistleblower investigation.[9]  In the Form 8-K, Mattel indicated that the financial results reported in the third and fourth quarters

---

[4]  *See* Mattel's 2019 Form 10K filed on Feb. 25, 2020, p. 4.

[5]  I obtained Mattel's daily stock price and the number of shares outstanding from the Center for Research in Security Prices (CRSP) database.

[6]  I include August 9, 2019 in Exhibit 2 to show the price and volume impact of a Form 8-K Mattel filed to acknowledge the receipt of the whistleblower letter on August 8, 2019 after the market closed (5:01 p.m.). Therefore, August 9, 2019 was the date on which the market reacted to the disclosure on August 8, 2019.

[7]  *See* Press Release, PR Newswire, *Mattel Reports Third Quarter 2017 Financial Results* (Oct. 26, 2017).

[8]  *See* Mattel's Form 8-K filed on Aug. 8, 2019.

[9]  *See* Press Release, Business Wire, *Mattel Reports Third Quarter 2019 Financial Results* (Oct. 29, 2019), and Mattel SEC Form 8-K filed on Oct. 29, 2019.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 8 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 122 of 309
#:1796

of 2017 had been materially misstated.  Mattel also disclosed that its internal controls suffered from multiple material weaknesses, and it would restate its financial results to correct these errors.

24.    In their Complaint, Plaintiffs allege that Mattel was plagued with serious internal control deficiencies, and these internal control deficiencies contributed to the material misstatement in the 2017 third quarter 2017 financial reports.[10]  Plaintiffs allege that Mattel knew about the material misstatement and related internal control weaknesses, but withheld those facts from market participants during the Class Period.[11]

## V.    BACKGROUND ON MARKET EFFICIENCY

25.    In the Complaint, Plaintiffs allege that the "fraud-on-the-market" theory is applicable to this case. Under this theory, class members who buy a security rely on the integrity of the stock price set by the market.  Therefore, investors are also assumed to have incorporated a corporation's omissions and misrepresentations in setting the corporation's stock price, which would be set too high or too low depending on the nature of information omitted or misrepresented.   The omissions and misrepresentations are thus incorporated into each class member's purchase price.[12]

26.    In this case, Mattel is alleged to have omitted unfavorable (negative) facts and made misrepresentations that artificially inflated or maintained the price of Mattel's stock, which was purchased by Plaintiffs and class members during the Class Period.  These investors are alleged to have ultimately suffered losses when the market reacted to subsequent company-specific disclosures. As stated in *Basic*:

> "Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."[13]

27.    Underlying the fraud-on-the-market theory is the assumption that Mattel's stock price reflected an open and developed market. As stated by the U.S. Supreme Court in *Basic*:

---

[10] Amended Class Action Complaint (hereafter Complaint) ¶¶9–10, 56.

[11] Complaint ¶¶8–22.

[12] *Basic, Inc. v. Levinson*, 485 U.S. 224, 225 (1988).

[13] *Basic, Inc. v. Levinson*, 485 U.S. 224, 241–2 (1988).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 9 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 123 of 309
#:1797

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business..."[14]

28.     The U.S. Supreme Court reaffirmed this understanding of market efficiency in *Halliburton II*.

29.     The notion of a market being open and developed in *Basic* (and affirmed in *Halliburton II*) is consistent with economists' view of a semi-strong form of market efficiency. A stock market is efficient (in a semi-strong form) if it promptly reflects all publicly available information in stock prices and the incorporation of the information is unbiased, *i.e.,* the price is not set systematically too high or too low. Underlying this definition is the notion that, in such a market, a large number of investors trade in the stock such that new publicly available information is promptly incorporated into the stock price.[15]

30.     In my analyses, I identify factors that are closely linked to the above definition of market efficiency. I start with the five *Cammer* factors used by the courts for evaluating market efficiency. The five *Cammer* factors are: (1) the stock's average weekly trading volume; (2) the number of security analysts who followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file an S-3 registration statement; and (5) the stock price reaction to unexpected corporate events or financial releases.[16] As I explain below, the *Cammer* factors are economic attributes of a firm or the market in which the firm's stock is traded.  These factors are based on economic theories of market efficiency and have also been used in the academic literature when analyzing market efficiency.[17, 18] In addition to these factors, I also consider four additional factors that courts have considered as measures of market efficiency: market capitalization, stock liquidity, public float, and the serial correlation of returns.

31.     The market efficiency metrics for Mattel are computed and, whenever applicable, benchmarked against the metrics of companies on the Nasdaq, the stock exchange on which Mattel's stock traded. Historical data necessary to compute these market efficiency metrics are collected from Bloomberg, the Center for Research in Security Prices database (CRSP),

---

[14]  *Basic, Inc. v. Levinson*, 485 U.S. 224, 241 (1988).

[15]  Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 *J. of Fin.* 383, 383–388 (1970).

[16]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1285–87 (D.N.J. 1989).

[17]  I provide specific academic citations below when I review each market efficiency factor.

[18]  Throughout the report, I use the terms "market efficiency", "the market Mattel's stock was efficient", and "efficient market for Mattel's stock" interchangeably.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 10 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 124 of 309
#:1798

the S&P Compustat database (Compustat), the Institutional Brokers Estimate System database (I/B/E/S), the Thomson One Financial database (Thomson), and the Dow Jones Factiva database (Factiva).

32. In the *Halliburton II* case, the Court determined that defendants:

> "[have an opportunity to] rebut the presumption by showing, among other things, that the particular misrepresentation at issue did not affect the stock's market price."[19]

33. The notion of whether a particular corporate event affected a firm's stock price is related to the concept of market efficiency that I discuss above. If the market in a firm's stock is efficient, then the firm's stock price will reflect unexpected news in the corporate event. In this case, the Complaint alleges that on August 8, 2019 market participants learned that Mattel filed a Form 8-K with the SEC disclosing that it had received an anonymous whistleblower letter and that it would initiate an investigation. The company also announced that because of the investigation it would terminate a previously scheduled issuance of 6% Senior Notes, a debt instrument. This unexpected news is likely to be salient to investors. Therefore, evidence that the market reacted to this disclosure is inconsistent with a lack of price impact for a significant corporate event. Thus, as part of my market efficiency analysis, I also examine whether the corrective disclosure made on August 8, 2019 impacted Mattel's stock price.

## VI.   *CAMMER* MARKET EFFICIENCY METRICS

## A.   WEEKLY TRADING VOLUME

34. The first *Cammer* factor is the average weekly trading volume of a security. As discussed in *Cammer*,

> "[t]he reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[20]

35. Several studies in the academic literature examine the implications of trading volume on the behavior of asset pricing. These studies find that higher trading volume is associated with more efficient prices, lower transaction costs, and greater liquidity, both at the individual security level

---

[19] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014).

[20] *Cammer v. Bloom*, 711 F.Supp. 1264, 1286 (D.N.J. 1989).

as well as the aggregate level.[21] Thus, a security with a large trading volume closely captures the notion of an "open" market, one in which a large number of individuals can buy or sell the stock.[22]

36.     As discussed in *Cammer*:

"[t]urnover measured by average weekly trading volume of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[23]

37.     In Exhibits 3 and 4, I analyze the weekly variation in the share turnover of Mattel's stock.[24] I define a week both as a *trading* week (Exhibit 3) and a *calendar* week (Exhibit 4). Share turnover in a *trading* week measures total trading volume over five consecutive trading days as a percentage of the average number of shares outstanding over those days. An analysis based on trading weeks ensures that variation in weekly trading volume is not confounded by calendar weeks with fewer trading days (e.g., holidays). Share turnover in a *calendar* week measures trading volume from Monday to Friday of each week (regardless of whether the market was closed on one or more days of the week) as a percentage of the average number of shares outstanding for the week. Given that the inferences based on trading week are similar to those based on calendar week, I limit the discussion in the text to the trading week analysis.[25]

38.     Exhibit 3 shows that the average weekly turnover for Mattel's stock was 9.35% (median turnover of 7.51%) per trading week for this time period. This number is well above the 2% cutoff cited by the *Cammer* court. Further, share turnover for Mattel's stock is above the 2% benchmark in every week.  Relative to the firms on Nasdaq, the share turnover for Mattel is greater than the median turnover for the firms on Nasdaq in all of the

---

[21]  *See, e.g.*, Tarun Chordia et al., *Market Liquidity and Trading Activity*, 56 *J. of Fin.* 501, 501–530 (2001) (for evidence on the relation between trading volume and liquidity), and Tarun Chordia et al., *Liquidity and market efficiency*, 87 *J. of Fin. Econ.* 249, 249–268 (2008) (for evidence on the relation between liquidity and market efficiency).

[22]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1276 (D.N.J. 1989), (citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6 n.17 (Aug. 1988)).

[23]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1293 (D.N.J. 1989).

[24]  I calculate the share turnover by aggregating the total shares traded during the week and dividing by the weekly average number of shares outstanding.

[25]  Exhibit 4 presents the results from the analysis using calendar weeks. There are no notable differences across the two analyses, in the sense that any differences that do exist do not affect the conclusion I draw from the trading week analysis, that the market for Mattel's stock was efficient.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 12 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 126 of 309
#:1860

trading weeks during the Class Period.[26]  These statistics confirm that Mattel's trading volume was high in both absolute and relative standards.

39.     In addition to having a large trading volume, during most of the Class Period Mattel's stock was part of the S&P 500.[27] Mattel stock's inclusion in the S&P 500 is an indication that the stock was salient in the marketplace, subject to large investor attention, and followed actively by market participants.[28]

40.     In my view, the large trading volume in absolute and relative terms, as well as Mattel stock's inclusion in the S&P 500, support my conclusion that the market for Mattel's stock was efficient.

## B.     NUMBER OF ANALYSTS PROVIDING COVERAGE

41.     The second *Cammer* factor is the number of security analysts who followed and reported on Mattel's stock. As discussed in *Cammer*,

> "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[29]

42.     The rationale behind this factor is that the presence of security analysts (and other information intermediaries, such as the press) would indicate that information concerning Mattel's stock was closely followed, analyzed, and disseminated by investment professionals.

43.     During the Class Period there were over a dozen different security analysts following Mattel's stock. These analysts were employed by major firms, including, but not limited to: Barclays Bank, Bank of America - Merrill Lynch, BMO, CFRA, Morningstar, Jefferies Research Services, SunTrust Robinson Humphrey, Inc., UBS Securities, and Wells Fargo Securities.[30]

44.     To provide a perspective on how closely security analysts were following Mattel's stock, Exhibit 5 presents the number of analyst reports issued each quarter during the Class Period as reported on the Thomson One Analytics

---

[26] To determine the share turnover for the median firm on Nasdaq, each week I calculate weekly share turnover for all Nasdaq listed firms on the CRSP, and then take the median for the week.

[27] Source: Bloomberg.

[28] *See, e.g.*, Andrei Shleifer, *Do Demand Curves for Stocks Slope Down?*, 41 *J. of Fin.* 579, 579–590 (1986) (for evidence from changes in the composition of the S&P 500 index).

[29] *Cammer v. Bloom*, 711 F.Supp. 1264, 1286 (D.N.J. 1989).

[30] Source: Thomson One Analytics database.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 13 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 127 of 309
#:1601

Database.[31] In total, there were 361 analyst reports concerning Mattel released between October 1, 2017 and June 30, 2019. More specifically, on average, there were 51.6 reports (a median of 57 reports) issued during each full calendar quarter during the Class Period concerning Mattel.[32] As Exhibit 5 shows, the number of reports on Mattel during each quarter during the Class Period ranged from 66 reports (during 2017 Q4) and 33 reports (during 2018 Q3).

45.     To provide additional perspective on how closely security analysts were following Mattel's stock, Exhibit 6 presents the number of analysts providing a financial forecast for Mattel compared to the median analyst following of firms on Nasdaq during each quarter of the Class Period, as reported on I/B/E/S Database.[33]  For each full calendar quarter during the Class Period there were between 12 and 15 analysts following Mattel. In contrast Nasdaq firms had a median analyst coverage of 2 during the same period.[34]  Thus, relative to the firms traded on Nasdaq, there were many more analysts following Mattel.

46.     The intensive coverage of Mattel's stock by analysts can also be seen in analysts' participation in conference calls held by Mattel.[35] During the Class Period, Mattel held 11 conference calls, of which eight were related to periodic financial results; three on other matters. In the eight earnings related calls, numerous analysts and other investors participated and asked questions on such issues as the performance of Mattel.

47.     In addition to being followed by security analysts, Mattel's stock was also closely followed by other information intermediaries. For example, the three major credit rating agencies – Moody's, Standard and Poor's and Fitch – provided credit ratings for Mattel.[36] Apart from equity analysts and credit

---

[31] By referring only to the Thomson One Analytics database, I am being conservative in describing the extent to which Mattel was followed by analysts.  There are additional analysts that follow Mattel during the Class Period that do not write reports, and there are analysts that follow Mattel that write reports, but do not make them available to Thomson One.

[32] The Class Period only spans about half of the first and last calendar quarters.  We excluded these quarters in the calculation of the statistics discussed in this paragraph.   If we expand the analysis beyond the Class Period, there were 23 reports issued between 8/2/2017 and 9/30/2017 and 24 reports issued between 7/1/2019 and 8/8/2019.

[33] I use the I/B/E/S database for this analysis as it provides data on analyst following for both Mattel and all firms on Nasdaq in a machine-readable format.

[34] In Exhibit 6 I define analysts following as the number of analysts issuing any forecast for a firm during a calendar quarter. To compute the median analyst following for Nasdaq firms, I first identify the number of analysts issuing any forecast according to the I/B/E/S database for each firm traded on the Nasdaq during each calendar quarter, and then report the median across all Nasdaq firms for the quarter.

[35] The information on conference call participation was obtained from the transcripts of these calls, which are included in the Thomson One Analytics database (also known as Investex).

[36] See, e.g., Press Release, S&P Global Ratings, S&PGR rts Mattel's $250MM Sr Unscd Guarantd Nts 'BB-' (RR: '3') (Aug. 1, 2019); Press Release, Fitch Ratings, Fitch Rates Mattel's Senior Notes 'B+/RR2' Outlook Negative (Aug. 1, 2019); Press Release, Moody's Investor Services, Moody's Assigns B1 rating to Mattel's $250 million bonds; outlook stable (Aug. 1, 2019).

Case 2:19-cv-10860-MCS-PLA Document 90-2 Filed 04/30/21 Page 14 of 63 Page ID
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 128 of 309
#:1802

rating agencies, there was also extensive media coverage on Mattel. During the Class Period, 4,549 media articles related to Mattel (including Mattel's own press releases) can be found in the Dow Jones Factiva Database.

48. In my opinion, the large number of analysts following the stock and participating in conference calls, the three major credit rating agencies following Mattel and issuing reports, as well as the extensive press coverage for Mattel stock, constitute clear evidence that information about Mattel was closely followed, analyzed, and disseminated by investment professionals and other market participants. This supports my conclusion that the market for Mattel's stock was efficient.

## C. MARKET MAKERS AND ARBITRAGEURS

49. The third *Cammer* factor is the presence of market makers and arbitrageurs. As discussed in *Cammer*,

> "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[37]

50. *Cammer*'s decision on market makers was particularly relevant because the security in question in *Cammer* traded on over-the-counter markets. In such a market, the market makers play a key role in supplying liquidity.[38] In the case of Mattel, its stock traded on the Nasdaq Exchange throughout the whole Class Period.

51. As background information, the Nasdaq exchange was founded in 1971.[39] The exchange currently has three listing tiers: The Nasdaq Global Select Market, The Nasdaq Global Market and The Nasdaq Capital Market. As of December 31, 2019, a total of 3,140 companies listed securities on The Nasdaq Stock Market, with 1,420 listings on The Nasdaq Global Select Market, 870 on The Nasdaq Global Market and 850 on The Nasdaq Capital Market.[40]

52. Mattel is a member of the Nasdaq Global Select Market.[41] The initial financial and liquidity listing requirements for the Nasdaq Global Select Market are more stringent than the other two markets.[42] The minimum

---

[37] *Cammer v. Bloom*, 711 F.Supp. 1264, 1286–87 (D.N.J. 1989).

[38] Darrell Duffie et al., *Over-the-Counter Markets*, 73 *Econometrica* 6, 1815–1847 (2005).

[39] *See* Nasdaq SEC Form 10-K, filed Feb. 25, 2020, p.2.

[40] *See* Nasdaq SEC Form 10-K, filed Feb. 25, 2020, p. 4.

[41] *See* Mattel SEC Form 10-K, filed on Feb. 22, 2019, p. 1.

[42] *See* pp. 6–10 of "Initial Listing Guide – Nasdaq", Dated December 2020.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 15 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 129 of 309
#:1803

requirements for a company to be listed on the Nasdaq Global Select Market are as follows: 450 round lot shareholders; public shares of 1,250,000 outstanding; and market value of unrestricted publicly held stock of $45 million.[43]  The company must also meet one of several financial criteria, including such factors as earnings, capitalization, revenues, cash flows, and stockholders' equity.[44]  Finally, depending on the firm's financial position at the time of its IPO, Nasdaq requires firms trading on the Global Select Market to have a minimum of either 3 or 4 market makers.[45]

53.    Nasdaq defines a market maker as "a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."[46] I obtained Nasdaq market maker activity in Mattel's stock from Bloomberg.  During the Class Period, there were 156 active market makers that traded Mattel stock.[47]

54.    I note that the role and concept of "market makers" has changed dramatically since the original *Cammer* case. Regardless, the fact that Mattel's stock is listed on the Nasdaq Global Select Market, which requires firms that IPO on the Global Select Market to have 3-4 market makers, and that more than 150 Nasdaq market makers traded in Mattel's stock throughout the Class Period, easily satisfy this *Cammer* factor.

55.    In addition to the characteristics of the exchange, a key component behind the decision to consider market makers and arbitrageurs in *Cammer* was:

> "The issue here is whether market makers in the over-the-counter market, specifically the market for Coated Sales stock, provided a sufficiently fluid and informed trading environment so that when material information about Coated Sales was disseminated, investors had available to them an opportunity to

---

[43] *See* p. 8 of "Initial Listing Guide – Nasdaq", Dated December 2020.  While the version of the listing guide is dated after the end of the Class Period, it does discuss recent changes to listing rules, which mitigates any concern that the listing rules were materially different during the Class Period.  Specifically, Nasdaq indicates that, "[e]ffective August 2019 Nasdaq's initial listing criteria were revised to exclude securities subject to resale restrictions for any reason from the calculation of publicly held shares, market value of publicly held shares and round lot shareholders. In addition, the round lot shareholder requirements were revised to also require that at least half of the minimum required number of round lot holders must each hold unrestricted securities with a minimum value of $2,500."

[44] *See* pp. 6–10 of "Initial Listing Guide – Nasdaq", Dated December 2020.

[45] *See* pp. 6–10 of "Initial Listing Guide – Nasdaq", Dated December 2020.

[46] *How to Become a Market Maker*, Nasdaq Trader, http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess (last visited Apr. 28, 2021).

[47] Monthly data are reported from August 2017 through August 2019, inclusive.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 16 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 130 of 309
#:1864

trade at informed, and therefore appropriate, bid and asked prices."[48]

56.    To measure the presence of informed trading and arbitrageurs in the market for Mattel's stock, I focus on short sellers. Short sellers include sophisticated investors who earn returns when stock prices decline. In the process, they enable negative information to be incorporated more quickly into security prices and thus enhance the efficiency of the firm's stock price.[49]

57.    Exhibit 7 provides an analysis that compares the percentage of outstanding shares of Mattel's common stock sold short at the end of each calendar quarter during the period Q3 2017 through Q2 2019 to the median percentage of shares shorted for firms on Nasdaq during the same time period.[50, 51] Exhibit 7 shows that, at the end of each full calendar quarter in the Class Period, short sellers had sold short at least 15% of Mattel's shares. This was greater than the median short position of the firms on Nasdaq at the end of each quarter during the Class Period.

58.    In my view, the fact that Mattel's stock was traded on the Nasdaq Global Select Market, was traded by more than 150 active Nasdaq market makers, and had a significant number of shares sold short both on an absolute and relative basis support my conclusion that the market for Mattel's stock was efficient, and easily satisfies this *Cammer* factor.

**D.    ELIGIBILITY TO FILE AN S-3 REGISTRATION STATEMENT**

59.    The fourth *Cammer* factor concerns the SEC registration status of a firm, in particular, whether the firm is eligible to file an S-3 form. Specifically, *Cammer* states:

> "…it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public

---

[48]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1282–83 (D.N.J. 1989).

[49]  *See* Patricia M. Dechow, et al., *Short-sellers, fundamental analysis, and stock returns*, 61 J. of Fin. Econ. 77, 77–106 (2001); Hemang Desai, et al., *An Investigation of the Information Role of Short Interest in the Nasdaq Market*," 57 J. of Fin. 2263, 2263–2287 (2002); Michael S. Drake, et al., *Should Investors Follow the Prophets or the Bears? Evidence on the Use of Public Information by Analysts and Short Sellers*, 86 Acct. Review 101, 101–130 (2011); Joseph E. Engelberg, et al., *How are shorts informed? Short sellers, news, and information processing*, 105 J. of Fin. Econ. 260, 260–278 (2012); Ekkehart Boehmer & Juan Wu, *Short Selling and the Price Discovery Process* 26 Rev. of Fin. Stud. 287, 287–322 (2013).

[50]  Different from Exhibits 5 and 6, which show the extent of analyst coverage *during* each full calendar quarter, Exhibit 7 plots the shares shorted *at the end* of each calendar quarter. I include Q3 2017 in this Exhibit because the percentage of short interest as of September 30, 2017 is within the Class Period.

[51]  The percentage of short interest is calculated by dividing the number of common shares sold short by investors as reported on the last trading day of each calendar quarter, obtained from the S&P Compustat Short Interest database, by the number of outstanding shares at the end of the quarter obtained from the CRSP database.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 17 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 131 of 309
#:1805

offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met."[52]

60.     The rationale behind this *Cammer* factor is that registrants with the SEC are required to comply with the disclosure requirements in the SEC's Exchange Act and thus are subject to periodic public reporting. Specifically, in order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.[53] The reports filed with the SEC can then be analyzed free of cost by professional analysts and investors, by financial press, as well as by any other individual interested in obtaining information about a company's stock.

61.     The significance of this particular *Cammer* factor is underscored by the SEC's explanation that: "[t]his form [the Form S-3] is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place."[54]

62.     Both prior to the beginning of the Class Period, August 2, 2017, and during the Class Period, Mattel was eligible to file, and did file, Form S-3ASR's with the SEC.[55] In addition, during the Class Period, Mattel filed 73 documents with the SEC, including periodic filings on Forms 10-Q and 10-K.[56]

63.     In my view, the fact that Mattel was a public company eligible to file a Form S-3 and subject to periodic filing requirements of the SEC supports my conclusion that the market for Mattel's stock was efficient.

---

[52] *Cammer v. Bloom*, 711 F.Supp. 1264, 1287 (D.N.J. 1989).

[53] For additional information, *see* http://www.sec.gov/about/forms/forms-3.pdf.

[54] *Cammer v. Bloom*, 711 F.Supp. 1264, 1284 (D.N.J. 1989) (citing SEC Securities Act Release No. 6331 (Aug. 13, 1981)).

[55] An S-3ASR is automatic shelf registration statement of securities for well-known seasoned issuers (https://www.sec.gov/info/edgar/forms/edgform.pdf). Mattel filed two Form S-3ASR Registration Statements on March 7, 2014 and October 3, 2017, respectively.

[56] Source: www.sec.gov/edgar.shtml. This number excludes SEC Forms 3, 4 and 5, which are related to change in beneficial ownership of officers, directors, and significant shareholders, Form 11-K which is related to employee stock ownership and Schedule 13G and Form 13F which are related to security ownership of active investors and institutional investors, respectively.

[14] Exhibit A

Page 17

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 18 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 132 of 309
#:1806

## E.   STOCK PRICE REACTION TO NEWS

64.   The fifth *Cammer* factor is the existence of a causal relation between unexpected corporate events or financial releases and the stock price response to such events. As stated in *Cammer*, it would be helpful to demonstrate:

> "[e]mpirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[57]

65.   I perform an event study to provide evidence on whether Mattel's stock price reacted promptly to new information and to assess the significance of the reaction. In academic research, event studies are a commonly used and well-established statistical tool for examining the impact of a variety of different types of firm-specific events on the price of the firm's stock.[58] As discussed in the classic study by Brown and Warner (1980):

> "[t]o the extent that the event is unanticipated, the magnitude of abnormal performance at the time the event actually occurs is a measure of the impact of that type of event on the wealth of the firms' claimholders… such abnormal performance is consistent with market efficiency."[59]

66.   In other words, event studies allow one to measure the impact of unanticipated events on the firm's stock price and to infer whether abnormal price movement surrounding an event is consistent with the stock price reacting to news efficiently, i.e., whether the reaction is prompt and unbiased.

67.   A researcher conducting an event study begins by specifying a model of what price movements are "expected" based on a set of market factors and then calculates abnormal returns based on the parameters of this model. These abnormal returns are the basis of tests investigating whether the deviations from expected price movements on a set of event dates of interest are sufficiently large that simple random movement can be rejected as the cause. An event study that demonstrates significant stock price reactions to those events lends support to the conclusion that the market in that security is efficient.

---

[57]   *Cammer v. Bloom*, 711 F.Supp. 1264, 1287 (D.N.J. 1989).

[58]   For a review of this literature, *see* S.P. Kothari, *Capital markets research in accounting*, 31 *J. of Acct. and Econ.* 105, 105–231 and S.P. Kothari & Jerold B. Warner, 1 Handbook of Empirical Corporate Finance, Ch. 1 at 3–36 (2007).

[59]   Stephen Brown & Jerold Warner, *Measuring Security Price Performance*, 8 J. of Fin. Econ. 205, 205 (1980).

68.    An event study can be performed using two different measures of stock price reactions to corporate events or information releases. These measures are:

    a.    Stock return as observed, i.e., the signed price reaction, which captures the direction in addition to the magnitude of price movements in response to a corporate event.

    b.    The "absolute value" of the stock return (or unsigned price reaction) which captures the magnitude of the market's reaction to a corporate event.

69.    When using signed returns, I am investigating whether, on a particular event date, market participants responded in the same direction as the unexpected news released on that date. A significant price reaction on an event date in the same direction as unexpected news would indicate that market participants not only reacted to the corporate event, but that their reaction is in line with the hypothesized nature of the information releases. A key element in a test using signed returns is my ability to identify the sign of the unexpected news.

70.    An event study using absolute values has the advantage that it does not require me to specify the direction of the unexpected news.[60] In addition, an analysis that uses absolute returns allows me to aggregate the price reaction across all event dates and calculate the average absolute price reaction on all event dates (i.e., event dates with both good and bad news). A large and statistically significant reaction would suggest that market participants paid attention to the information releases on the event dates, processed the information, and reacted to it as manifested in the absolute price reaction.

71.    In the *Cammer* case the court indicated that, in an efficient market, when a firm makes a financial release or engages in some other unexpected corporate event there should be a prompt response in stock price.[61] I focus my event study analysis on eight earnings announcements and one corrective disclosure that were made by Mattel during the Class Period.

72.    Earnings announcements are an ideal financial release for tests of whether market participants incorporate information into the stock price quickly. Earnings announcements are one of the most important corporate disclosures. A large academic literature studies the stock price behavior

---

[60]  William H. Beaver, *The Information Content of Annual Earnings Announcements,* 6 J. of Acct. Rsch. 67, 67–92 (1968).

[61]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1287 (D.N.J. 1989).

Case 2:19-cv-10860-MCS-PLA  Document 90-2  Filed 04/30/21  Page 20 of 63  Page ID
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 134 of 309
#:1808

around earnings announcements.[62] In addition, firms announce earnings every quarter, so I can test whether investors of Mattel were impounding information into the stock price each quarter during the Class Period. Finally, for every earnings announcement made during the Class Period there were analyst forecasts of the upcoming earnings announcement. I can use the analyst forecasts to gauge whether there is unexpected news, and identify the news as positive, negative or indeterminate.

73.     In addition to the eight earnings announcements during the Class Period, I also include Mattel's disclosure on August 8, 2019 in my event study, since this is an unexpected news event that is likely to be salient to investors. On that date, Mattel filed a Form 8-K with the SEC disclosing that it had received an anonymous whistleblower letter and that it would initiate an investigation. The company also announced that because of the investigation it would terminate a previously scheduled issuance of 6% Senior Notes, a debt instrument.

74.     Exhibit 8 lists the eight earnings announcements Mattel made throughout the Class Period. For each earnings announcement date listed I identified the time stamp at which the corporate press release of the earnings news became publicly available, the actual earnings and sales realized by the firm, the analysts' consensus forecasts, and my assessment of whether there was unexpected news, and if there was, whether the news was positive or negative.

75.     Identifying the timing of the earnings news announcement is important for defining whether the news was released before, during, or after trading hours within a given day. The event study methodology relies on properly identifying the date on which information was made available to market participants.  All of Mattel's quarterly earnings announcements during the Class Period, as well as the disclosure of the whistleblower letter on August 8, 2019, were released after the market-close at 4:00 p.m. EST.  Thus, for the purpose of my event study, the event day was defined to be the next trading day after the earnings announcement/disclosure was made.

76.     Determining whether there is unexpected news contained in an earnings announcement is also an important issue when conducting an event study using signed abnormal returns. For example, when Mattel announced an EPS of 9 cents per share on October 26, 2017,[63] if the market were expecting earnings to be 9 cents per share, I would not expect the market to react to this earnings announcement, as there was no unexpected news. Market participants expected the information contained in the earnings

---

[62]  For a review of this literature, *see* S.P. Kothari, *Capital markets research in accounting*, 31 J. of Acct. and Econ. 105, 105–231 (2001).

[63]  *See* Press Release, PR Newswire, *Mattel Reports Third Quarter 2017 Financial Results* (Oct. 26, 2017).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 21 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 135 of 309
#:1809

report, and consequently there was no new information to be impounded in price on the event date.

77. To determine whether the earnings announcement contained unexpected news, and whether the unexpected news is positive, negative or indeterminate, I compare Mattel's realized earnings per share (EPS) as reported on the I/B/E/S database[64] with the analyst consensus EPS forecast prior to the earnings announcement, which is obtained from the I/B/E/S database. [65] I also compare Mattel's realized sales with the analyst consensus sales forecast prior to the earnings announcement, both of which are also obtained from the I/B/E/S database. If both the earnings realization and sales as reported on the I/B/E/S database are below the consensus forecasts, then I characterize the earnings release as containing negative news. If both metrics beat the analyst consensus, I characterize that earnings release as having positive news.[66] If the actual EPS exceeded the analyst consensus but the actual sales was below the analyst consensus, or vice versa, I classify that announcement as conveying mixed news.

78. Out of the eight earnings announcements during the Class Period, I classify four as having negative news, three as having positive news, and one as having mixed news. I also classify the disclosure of the whistleblower letter as conveying negative news because whistleblowing may expose a company's wrongdoing.[67] In Exhibit 9, I list the sources of news for each earnings announcement and for the corrective disclosure on August 8, 2019.

79. My first event study uses signed abnormal returns to investigate whether the market impounded unexpected news into the stock price on the event dates. If the market were efficient with respect to unexpected news, then I would expect to observe statistically significant abnormal returns on the dates when unexpected news was released and no reaction on dates when news

---

[64] I use the earnings realization as reported on the I/B/E/S database as analysts are often forecasting an earnings number other than the EPS reported on the income statement. For a discussion of the adjustments that analysts make and the potential biases that arise from using an EPS number other than the metric forecasted by analysts, *see* Mark Bradshaw & Richard Sloan, *GAAP versus the street: An Empirical Assessment of Two Alternative Definitions of Earnings*, 40 J. of Acct. Rsch. 41, 41–66 (2002).

[65] I/B/E/S Summary database gathers individual analyst forecasts and reports the summary statistics on a monthly basis. I define the analyst consensus to be the most recent median analyst forecasts issued prior to the earnings announcement date.

[66] For earnings announcement with EPS realization no more than 2 cents above the consensus forecast, it is normally classified as containing no news (*See, e.g.*, Jeff Payne & Wayne Thomas, *The Torpedo Effect: Myth or Reality*, 26 J. of Acct., Auditing, and Fin. 255, 255–278 (2011)). However, none of Mattel's earnings releases during the Class Period fell into this classification.

[67] According to a 2007 study conducted by PricewaterhouseCoopers, whistleblowers revealed 43% of fraud in the private sector, higher than 19% detected by auditors (Corporate Whistleblowers, National Whistleblower Center, https://www.whistleblowers.org/know-your-rights/corporate-whistleblowers/ (last visited Apr. 28, 2021)).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 22 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 136 of 309
#:1810

was not released.  I also would expect the market to react (positively or negatively) in the same direction as the news (positive or negative).

80.     A central issue in an event study is "to assess the extent to which security price performance around the time of the event has been abnormal."[68] I estimate abnormal returns for each earnings announcement in the Class Period by using a "rolling regression" approach.  Specifically, for each earnings announcement in the Class Period, I estimate a market model using a 120-trading-day window ending one day prior to the earnings announcement to determine expected returns on Mattel's stock.  To derive the parameters of the market model, I run a regression, which uses Mattel's daily stock returns as the dependent variable.  I include the returns of the S&P 500 Composite Index (*RET_SP500*) as an independent variable to control for the market return associated with large and mid-sized publicly traded corporations.[69]  I also include the returns on the S&P 1500 Leisure Product Index (*RET_SP1500LP*), with Mattel being removed from the index,[70] as an independent variable to control for the return for the stocks in Mattel's industry sector.  I also control for corporate events that occurred during the 120-day estimation period by including a series of indicator variables, *Corporate Events*, which are coded as "1" if an earnings announcement or other important event falls in a given day during the estimation window, and coded as "0" otherwise.[71]

81.     For each event identified in Exhibit 9 (eight earnings announcements and one corporate disclosure on August 8, 2019) I estimate a regression over a

---

[68]  Stephen Brown & Jerold Warner, 1980, "Measuring Security Price Performance," 8 J. of Fin. Econ. 205, 205 (1980).

[69]  I focus on the returns of the S&P 500 as a proxy for the whole market return because Mattel was a member of the S&P 500 index since the start of the Class Period until June 7, 2019.  It was moved from S&P 500 to S&P Mid Cap 400 on June 7, 2019 (Press Release, S&P Dow Jones Indices, *Bemis Set to Join S&P 500; Mattel to join S&P MidCap 400* (Jun. 3, 2019)). I investigate the sensitivity of my event study results by adding the returns on the S&P Mid Cap 400 as an additional control (unreported) for any trading day in the regression falling between June 7, 2019 and August 9, 2019.  My conclusions from my event study analysis, that the market efficiently impounded unexpected news into Mattel's stock price, are not affected by the use of returns of S&P Mid Cap 400 as an additional control for market.

[70]  The reasoning behind the exclusion of Mattel from the index is to remove a potential mechanical correlation between Mattel stock and the index. When an index, like the S&P 1500 Leisure Product Index, is used to measure the market return and there are relatively few firms in the index (8-9 firms specifically in the Leisure Product Index during the Class Period), the inclusion of the returns of Mattel in the measure of market return can induce a mechanical correlation between the dependent and independent variables.  Removing the return of Mattel from the index return eliminates this problem.  To determine the return on the S&P 1500 Leisure Product Index without Mattel, I first obtain the membership of the S&P 1500 Leisure Product Index over the Class Period from Bloomberg.  I then value-weight the daily individual stock returns for the firms on the index (without including Mattel) to obtain the daily index returns during the Class Period.

[71]  For example, for the rolling window estimation on the October 27, 2017 event date, I also control for a prior earnings announcement by Mattel on July 27, 2017 (announced after hours so I control for the following trading day – July 28, 2017) and a dividend cut on June 14, 2017.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 23 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 137 of 309
#:1811

120-trading-day period ending the day prior to the event. I obtain the intercept and slope coefficient parameters from this market model, and calculate the expected returns (*EXPRET*) on the K event dates as follows:

$$EXPRET_K = \hat{\alpha}_K + \hat{\beta}_K \times RET\_SP500_K + \hat{\gamma}_K \times RET\_SP1500LP_K,$$
$$K = 1, 2, ..., 9$$

Where $\hat{\alpha}_K$ is the estimated intercept from the regression for event K, $\hat{\beta}_K$ is the estimated slope coefficient for the return on the S&P 500 and $\hat{\gamma}_K$ is the estimated slope coefficient for the return on the S&P 1500 Leisure Product Index. For each event, I then deduct the expected return from Mattel's realized return on the event date, to obtain a signed measure of the abnormal return.

82.     Exhibit 10 presents the results from this analysis. In this Exhibit, I report separately the nine event dates. On each event date, I report the abnormal return and a t-statistic from a t-test on whether the abnormal return is different from zero.[72]

83.     In a t-test, the t-value measures the number of standard deviations between an actual observation and a prediction. For example, the abnormal return of -9.06% on October 27, 2017 (as shown in Exhibit 10) has a t-value of -6.01. This means, in this case -9.06% is six standard deviations away from zero. The p-value associated with this test statistic measures the probability that this test statistic would be randomly observed. In this case the p-value of less than 0.0001 associated with this t-statistic suggests that, based on randomness alone, there is less than one in ten thousand chance of observing an abnormal stock return of -9.06%.[73] Given this low probability, one can reject randomness as the explanation for the abnormal stock return and conclude that the price impact on the event date was driven by the news contained in Mattel's earnings release.

84.     Exhibit 10 indicates that there were statistically significant returns on five of the nine event dates for which I expect the market to react to the news in the earnings announcement or corporate disclosure. For four of the significant market reactions, the sign of the market reaction (positive or negative) is consistent with the sign of the news (positive or negative).

85.     I note that on one date, February 2, 2018, there is a positive and statistically significant market reaction, which is contrary to the earnings news (91 cents below the market expectation) and sales news ($80 million below market

---

[72]  I use the data from the market model estimation that was used to derive the abnormal return to calculate the t-statistic. Specifically, I divide the abnormal return by the Root Mean Squared Error from the 120-day regression to derive the t-statistic.

[73]  Throughout the event study portion of this report I consider a two-sided p-value of less than 5% to be statistically significant.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 24 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 138 of 309
#:1812

expectations). Given this unexpected result and the large positive reaction to this news, I investigated whether other news was disclosed on that date that would cause the market's reaction to differ from expectations. After Mattel released their earnings news, they had a conference call with analysts. During the conference call, Mattel emphasized that the poor performance was attributable to actions taken to turn-around the business and reset the firm's economic model.[74] These actions included write-offs, which are one-time expenses, and right sizing retail inventory, which should boost future revenue and profits. Management also indicated that as a result of these actions, fiscal performance for 2018 would reflect revenue stabilization, improved gross margins, and faster realizations of savings from its cost-cutting program.[75] These disclosures were likely to be perceived as positive news by market participants.

86.     Exhibit 10 also shows that there was a statistically significant negative market reaction on August 9, 2019, the corrective disclosure date. Specifically, the abnormal return of -14.54% on August 9, 2019 has a t-value of -7.34.  In this case, -14.54% is more than seven standard deviations from zero.  The p-value of less than 0.0001 associated with this t-statistic suggests that, based on randomness alone, there is less than one in ten thousand chance of observing an abnormal stock return of -14.54%.  Given this low probability, one can reject the hypothesis that there was a lack of price impact on the corrective disclosure date.

87.     These results illustrate that significant stock price reaction took place on the nine event dates. Specifically, the stock price reaction on 55.6% (i.e., 5 out of 9) of the event dates with news is statistically significant and, in 4 out of 9 cases (44.4%), in the same direction of the news. To put this number in perspective, I conduct a Fisher Exact Test to examine whether the proportion of statistically significant abnormal returns on event dates on which there is unexpected news is statistically different than the proportion of abnormal returns observed on non-event days during the Class Period.[76] The results from this test indicate that the proportion of statistically significant abnormal returns on the event dates with unexpected news is statistically larger than the proportion of statistically significant (5.4%) abnormal returns for non-event days during the Class Period.[77]

---

[74]  *See*, *e.g.*, p. 3 of the earnings call transcript as provided by Thomson Reuters on February 1, 2018.

[75]  *See, e.g.*, the earnings call transcript as provided by Thomson Reuters on February 1, 2018 for management discussions of stabilization (pp. 11–13), margins (p. 16), and cost savings (p. 9).

[76]  To conduct this test, I calculate abnormal returns for every date in the Class Period using the same approach that I used for the nine event dates (i.e., estimating a market model over the 120-day prior period).  I then determine the proportion of abnormal returns that are statistically significant on non-corrective disclosure and non-earnings announcement dates to conduct the Fisher Exact Test.

[77]  Even if I exclude the event date August 9, 2019 from this analysis, the proportion of statistically significant abnormal returns on the eight earnings announcement dates (50%) is still statistically higher than 5.4%, the proportion of statistically significant abnormal returns on non-event dates during the Class Period.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 25 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 139 of 309
#:1813

88.   Overall, the results reported in Exhibit 10 are consistent with the market incorporating the unexpected news that was delivered on corporate event dates into Mattel's stock price in an efficient manner. Based on the results from this event study, I conclude that there is a clear cause-and-effect relationship between new material public information about Mattel and the price movement of its common stock.

89.   I supplement my signed event study analysis with a second test that utilizes the absolute value of abnormal returns to assess whether Mattel's stock price efficiently reflected unexpected news.   As I mentioned above, a test that uses signed abnormal returns requires me to specify the direction of unexpected news (positive or negative). By using a model that includes the absolute value of abnormal returns as the dependent variable, I no longer need to identify the sign of the earnings news.  In addition, an analysis that uses absolute returns allows me to aggregate the price reaction across event dates and determine the average absolute price reaction on dates when earnings reports or the corrective disclosure are released.

90.   To calculate unsigned abnormal returns for this analysis I adopt the same approach to the one that I used in my signed returns tests. Specifically, for each day in the Class Period I estimate a market model using Mattel's stock returns for the previous 120 days as the dependent variable.  I include the returns on the S&P 500 as an independent variable to control for the return on the whole market, and the returns on the S&P 1500 Leisure Product Index as an independent variable to control for the market returns for firms in Mattel's sector (again excluding Mattel from the index return).  I also control for lagged corporate events that occurred during the estimation period by including a series of indicator variables, *Corporate Events*, which are coded as "1" if an earnings announcement or other important event falls in a given day during the estimation window, and coded as "0" otherwise. I obtain the parameters from this model to derive an expected market return and deduct the expected return from the realized return of Mattel to obtain an abnormal return for each trading day in the Class Period. I then take the absolute value of these abnormal returns to obtain an unsigned measure of abnormal returns.

91.   I regress the absolute value of abnormal returns on a single indicator variable, *Corporate Event*, which is coded as "1" for each of the nine event dates in the Class Period, and coded as "0" otherwise.  The results of this regression are reported in Exhibit 11.

92.   The main statistics of interest in this exhibit are the p-values and t-statistics associated with the coefficient on the *Corporate Event* indicator variable. The coefficient of 0.0649 indicates that the average absolute value of the abnormal returns earned on corporate event dates is 6.49% larger than the average absolute value of the abnormal returns on the other days during the Class Period.   The t-statistic of 9.27 (and p-value of less than 0.0001)

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 26 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 140 of 309
#:1814

indicates that there is less than one in ten thousand chance that this result would occur by chance alone.

93. The results reported in Exhibit 11 are consistent with the market impounding the unexpected news that was delivered on corporate event dates into the stock price in an efficient manner.

94. Overall, my event study analyses support my opinion that there is a clear causal relation between unexpected corporate events and Mattel's stock price response to such events. These results support my conclusion that the market for Mattel's stock was efficient. In addition, the significantly negative market reaction on August 9, 2019 also supports my opinion that there is no evidence of a lack of price impact on the corrective disclosure date.[78]

## VII.   ADDITIONAL MARKET EFFICIENCY METRICS

95. In addition to the *Cammer* factors listed above, I have also analyzed additional operational market efficiency factors that have been considered by the courts. As with the *Cammer* factors, these other operational factors all support my conclusion that Mattel's common stock traded in an open, developed and efficient market throughout the Class Period.

## A.   MARKET CAPITALIZATION

96. In *Krogman v. Sterritt* the court suggested that:

> "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[79]

97. As I discussed above, market capitalization is also an important factor in complying with the Nasdaq's listing requirements. Academic research also establishes that market capitalization is highly correlated with other market efficiency factors considered in *Cammer*, including: trading volume, analyst following, and press coverage.[80]

98. Exhibit 12 presents the market capitalization for Mattel, relative to the median of firms on the Nasdaq during the Class Period.   Market

---

[78] In any opposition to class certification, Defendants may offer certain arguments in an effort to contest market efficiency, or to demonstrate that there was no price impact related to the allegedly omitted and misrepresented information. Should Defendants do so, I will analyze and respond to such arguments in my reply report.

[79] *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[80] For examples of papers demonstrating these correlations, *see* Darren Roulstone, *Analyst Following and Market Liquidity*, 20 Contemporary Accounting Research 552, 552–578 (2003), and Lily Fang & Joel Peress, *Media Coverage and the Cross-section of Stock Returns*, 64 J. of Fin. 64 2023, 2023–2052 (2009).

[23] Exhibit A

Page 26

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 27 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 141 of 309
#:1815

capitalization is computed as the daily closing price of Mattel common stock times the daily number of outstanding shares. The data points in Exhibit 12 represent the average daily market capitalization for Mattel and the median market capitalization of firms on Nasdaq, over each month of the Class Period.

99.   Mattel's market capitalization ranged from a high of $5.9 billion in August 2017 to a low of $3.8 billion in June 2019. Mattel's market capitalization was greater than the median of firms on the Nasdaq exchange for every month during the Class Period. This suggests that Mattel was a relatively large firm, both in an absolute and relative sense.

100.   In my opinion, Mattel's relatively large market capitalization supports my conclusion that the market for Mattel's stock was efficient.

## B.   STOCK LIQUIDITY AND BID-ASK SPREADS

101.   My next efficiency metrics are proxies for stock price liquidity. When applying the fraud-on-the-market theory, an important aspect is that the market for the stock is "open, efficient and well developed." Here I focus on the "developed" component of the definition. As discussed in *Cammer*, a developed market is:

> "one which has a relatively high level of activity… [i]t usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes)."[81]

102.   While my earlier analysis of trading volume is consistent with the market for Mattel's stock being developed, I supplement my analysis with direct evidence on traditional proxies for liquidity—namely the Amihud (2002) measure of stock illiquidity and bid-ask spreads.[82] Stock liquidity is a fundamental tenet of market efficiency, and these metrics are among the most classic measures of stock liquidity.[83] Lower illiquidity and lower bid-ask spreads indicate less uncertainty regarding valuation and greater ability to trade without moving the market price.[84] Further, the *Krogman* court

---

[81] *Cammer v. Bloom*, 711 F.Supp. 1264, 1276 (D.N.J. 1989) (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 n.17 (Aug. 1988)).

[82] *See* Yakov Amihud, *Illiquidity and stock returns: cross-section and time-series effects* 5 J. of Fin. Mkt. 31, 31–56 (2002).

[83] I note that both the Amihud measure and the bid-ask spreads are an inverse measure of liquidity, meaning that larger amounts reflect lower liquidity.

[84] *See* Albert S. Kyle, *Continuous auctions and insider trading*, 53 *Econometrica* 1315, 1315–1335 (1985), and Lawrence Glosten & Paul Milgrom, *Bid, ask, and transaction prices in a specialist market with heterogeneously informed traders*, 14 *J. of Fin. Econ.* 71, 71–100 (1985).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 28 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 142 of 309
#:1816

suggested, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."

103.   Exhibit 13 presents Amihud's (2002) illiquidity measure (hereafter "illiquidity") of Mattel common stock, relative to the median illiquidity of firms on the Nasdaq over the Class Period.  Following Amihud (2002), I compute daily illiquidity as the ratio of the absolute return of Mattel's stock to the dollar value of trading volume (in millions).[85]  I then average these daily ratios for each month in the Class Period.  Illiquidity measures the extent to which the firm's stock price reacts per million dollars of trading volume.

104.   Illiquidity for Mattel stock ranged from a low of 0.007% to a high of 0.051% during the Class Period.  Mattel's illiquidity was below the median illiquidity for firms on the Nasdaq during every month of the Class Period (i.e., stock liquidity was *above* the median of Nasdaq firms since illiquidity is an inverse indicator of liquidity).  These results confirm that the liquidity for Mattel's stock was relatively high.

105.   Exhibit 14 presents Mattel's daily average bid-ask spread—an inverse measure of liquidity—relative to the median bid-ask spread of firms on the Nasdaq during the Class Period.  For each trading day, bid-ask spread is computed as the difference between closing ask price and closing bid price divided by the average of the ask price and bid price.  The closing ask and bid prices were obtained from the CRSP database. The data points in Exhibit 14 represent the monthly average of the daily bid-ask spreads (as a percentage) over the Class Period.

106.   The monthly average of the Mattel's daily bid-ask spread ranged from 0.058% to 0.091% during the Class Period.  Mattel's average bid-ask spread was smaller than the median of firms on the Nasdaq during every month of the Class Period (i.e., stock liquidity was *above* the median of Nasdaq firms since bid-ask spread is an inverse indicator of liquidity).  These results confirm, both in an absolute and a relative sense, that the liquidity for Mattel's stock was high during this period.

107.   In my view, Mattel's high stock liquidity supports my conclusion that the market for Mattel's stock was efficient.

C.   **PUBLIC FLOAT**

108.   The next efficiency metric I examine is public float. Public float refers to the amount of outstanding securities that are not held by insiders of a given

---

[85]   *See* Yakov Amihud, "*Illiquidity and stock returns: cross-section and time-series effects*, 5 *Journal of Financial Markets* 31, 31–56 (2002).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 29 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 143 of 309
#:1817

corporation.[86] In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders.[87] *Krogman* further states:

> "[b]ecause insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."[88]

109. Public float indicates the amount of securities available to non-insiders, who are able to trade freely and profit by trading on new information in the marketplace. Exhibit 15 compares Mattel's quarterly public float to the median public float of firms on the Nasdaq by calendar quarter over the Class Period. To calculate public float, I obtain the number of outstanding shares on the last trading day of the quarter from the CRSP database. I add to the shares outstanding the number of shares shorted as reported on the last day of the quarter in the Compustat database. From this sum I deduct the number of shares held by insiders, obtained from the Thomson Financial dataset.[89]

110. Exhibit 15 indicates that Mattel's public float ranged from 394 million shares in the fourth quarter of 2017 to 417 million shares in the first quarter of 2019, with an average quarterly public float of 405 million shares during the Class Period.[90] For the firms on Nasdaq the median public float ranged from 22.4 million to 24.1 million shares with an average of 23.6 million shares during the same time period.[91] In every calendar during the Class Period, Mattel had a greater float than the median of firms on the Nasdaq. These statistics suggest that there were a substantial number and proportion of shares that could be traded by investors or lent to short holders.

---

[86] Insiders are not allowed to freely trade in the stock of their firm based on their privileged, nonpublic information. They are subject to both trading restrictions (blackout periods and restrictions under Exchange Act §§ 10b-5, 16(b), and 16(c)) and reporting requirements under § 16(a).

[87] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

[88] *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[89] To determine the number of shares held by insiders, I begin by calculating the stock holdings of each insider using the stock holdings and the transactions data that is included in the database. Then for each firm I add up the holdings of all insiders as of the end of the quarter.

[90] Public float presented in Exhibit 15 is higher than the number of shares outstanding because we define float to be the sum of shares outstanding and shares shorted (as reported in Exhibit 7), less the number of shares held by insiders.

[91] When calculating these statistics, the data point of 2019 Q3 reflects public float on August 8, 2019, the end of the Class Period, rather than September 30, 2019. If I exclude this quarter from the analysis, it has no impact on the inferences I draw from these tests.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 30 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 144 of 309
#:1818

111.  The large float for Mattel's stock provides evidence supporting my conclusion that Mattel's common stock traded in an open, developed, and efficient market throughout the Class Period.

## D.   AUTOCORRELATION OF STOCK RETURNS

112.  The final market efficiency metric I examine is the extent to which Mattel's stock returns were serially correlated during the Class Period, i.e., the autocorrelation factor.  If a firm's stock returns are serially correlated, it means that the stock's return today can predict the stock's return tomorrow. If the return on a firm's stock today can predict the return on the firm's stock tomorrow, and this relationship is economically significant, it would be inconsistent with market efficiency as traders could use the information in a firm's stock price and earn profits beyond transaction costs. Alternatively, a stock that has a low return autocorrelation is consistent with the market for this stock behaving efficiently because, in an efficient market, past stock returns cannot predict future returns and traders cannot profit from exploiting information in past stock prices.[92] As *Lehocky* states:

> "[i]n an efficient market, there should be no trends because the market should be reacting quickly to new information, and new prices are being set quickly based upon the new information. Thus, if there is a serial correlation in the stock prices, it lends to a finding of market inefficiency."[93]

113.  To determine whether Mattel's returns were serially correlated I run a regression of Mattel's daily stock return on the daily stock return of the previous trading day for each day over the Class Period. If the estimated coefficient of the previous day's return is sufficiently small or statistically insignificant, then there would be no evidence of return predictability, which would be consistent with Mattel's stock price being efficient.

114.  Exhibit 16 presents Mattel's stock return autocorrelation. I find that the coefficient on lagged returns (0.0590) is not significant at the 95% confidence level. The insignificant autocorrelation is consistent with the market for Mattel's stock behaving efficiently.

115.  Overall, the results of my analysis on the extent to which Mattel's stock exhibits serial correlation support my view that the market for Mattel's stock was efficient.

## VIII.   CONCLUDING ASSESSMENT OF MARKET EFFICIENCY

---

[92] For evidence on the relation between autocorrelation and market efficiency, *see* Doron Avramov et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 *J. of Fin.* 2365, 2365–2394 (2006), and Tarun Chordia et al., *Liquidity and market efficiency*, 87 *Journal of Financial Economics* 249, 249–268 (2008).

[93] See *Lehocky v. Tidel Techs., Inc.*, 506–7 (S.D. Tex. 2004).

[27] Exhibit A

Page 30

Case 2:19-cv-10860-MCS-PLA    Document 90-2    Filed 04/30/21    Page 31 of 63    Page ID
Case 8:21-cv-02910-TDC    Document 132-4    Filed 11/13/23    Page 145 of 309
#:1819

116. Based on the analyses above, every factor analyzed supports my opinion that Mattel's common stock traded in an efficient market.

## IX.   ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

117. Plaintiffs' counsel also asked me to provide an opinion on whether damages are capable of measurement on a class-wide basis. That is, to provide an opinion on whether, under Section 10(b) of the Exchange Act, per share damages could be measured for each class member using a common methodology for all class members in a manner consistent with Plaintiffs' theory of liability.

118. In my opinion, there is a straightforward method which can be used to measure per share damages on a class-wide basis using a common approach for all class members. The standard formula under Section 10(b) for assessing damages for each class member is the "out-of-pocket" method. The out-of-pocket method measures damages as the artificial inflation in per share prices at the time of purchase less the artificial inflation at the time of sale.

119. The out of pocket method can be measured class-wide, as it allows for the calculation of the artificial inflation per share in the market price on each day of the Class Period. In particular, the most common approach used for measuring artificial inflation is to perform an event study that calculates the price reaction to a corrective disclosure concerning the information allegedly obscured or concealed by the alleged material omissions and/or misrepresentations. This analysis would be common to the class and not rely on any individualized considerations.

120. By way of background, in a typical case under Section 10(b) of the Exchange Act, an investor suffers damages when they acquire a security at a price that is artificially inflated (or maintained) as a result of false or misleading statements or omissions, and hold the security over a corrective disclosure or the materialization of a concealed risk. Price inflation can be the result of a material misrepresentation or omission made either on or before the date of purchase so long as the misrepresentation or omission continues to be uncorrected at the time of purchase. The artificial inflation is subsequently "corrected" by a later disclosure (which I refer to as a "corrective disclosure") or the materialization of a concealed risk.

121. Price inflation can be calculated on a class-wide basis by computing the decline in a security's price caused by the corrective disclosure or the materialization of a concealed risk. This decline reflects the dissipation of the price inflation or maintenance created by the earlier false or misleading statements and/or omissions.

122. Specifically, an event study can be used to isolate the company-specific price movement or price impact caused by a corrective disclosure and/or the

Case 2:19-cv-10860-MCS-PLA    Document 90-2    Filed 04/30/21    Page 32 of 63    Page ID
Case 8:21-cv-02910-TDC    Document 132-4    Filed 11/13/23    Page 146 of 309
#:1820

materialization of a concealed risk from price movement caused by other factors.

123.    Thus, one can estimate the price inflation due to the alleged false or misleading statements and/or omissions for each day during the Class Period. This is called an inflation ribbon, which is a time series of the difference between the actual stock price and the estimated price that the stock would have traded at each day of the Class Period had the truth been disclosed at the beginning of the Class Period.

124.    Using the inflation ribbon, one can then mechanically calculate each class member's damages on an individual basis. The information from each class member, including their purchase and sale history, can be acquired through the claims process.  For each class member who acquired a security during the Class Period and held the security through the end of the Class Period, their damages would equal the amount of inflation at the time of purchase. Class members' damages per share are limited to the losses actually sustained.

125.    Finally, a class member's damages would also be subject to the PSLRA's "90-day lookback" provision.  This provision provides for a formulaic damages cap that incorporates changes in prices after the end of the Class Period and it applies class-wide.[94]  Under this provision, losses on a security purchased during the Class Period and still held after the 90-day period immediately following the Class Period (the "lookback period") cannot be greater than the purchase price of the security less the average price of the security during the 90-day lookback period.  Similarly, the losses a class member suffers from a security purchased during the Class Period and sold during the 90-day lookback period cannot be greater than the purchase price less the rolling average price of the security during the portion of the 90-day lookback period that occurred as of the date of the sale.

126.    Based on my experience and understanding of the nature of the claims in this case, I conclude that damages in this action can be computed in the same way, common to all class members, using the "out-of-pocket" method described above. This methodology is a well-settled, common methodology used for calculating damages under Section 10(b) class action lawsuits on a class-wide basis.

127.    This per-share damage calculation using the "out-of-pocket" methodology described above is also consistent with Plaintiffs' theory of liability. In this

---

[94]    Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act dated December 22, 1995, 109 STAT. 748 and 749.

[29] Exhibit A
Page 32

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 33 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 147 of 309
#:1821

case, Plaintiffs allege that this securities class action concerns "a cover-up of known, material misstatements in Mattel's financial results and known, severe weaknesses in its internal controls."[95] Plaintiffs further allege that: (i) "Defendants' misstatements and omissions concerning Mattel's internal controls, disclosure controls and procedures, and financial results artificially inflated and/or maintained the price of Mattel's stock"; and (ii) this inflation was removed from the stock price "when the conditions and risks misstated and omitted by Defendants were revealed to the market and/or materialized" on August 8, 2019.[96]

128.   This report represents my current opinions, based on the materials I have reviewed and analyzed to date.  If additional relevant material or information comes to my attention, I reserve the right to revise or supplement this report.  I also reserve the right to respond to the opinions of other expert witnesses in this matter and to modify or supplement my opinions accordingly.

I declare under the penalty of the perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED THIS 30ᵗʰ DAY of APRIL 2021*

_____

                              S.P. Kothari, Ph.D.

---

[95] Complaint ¶1. *See also* Order Denying Motions to Dismiss, filed on January 26, 2021, Document 74.
[96] Complaint ¶¶434–45.

**Appendix A**



## S.P. KOTHARI

Gordon Y Billard Professor of Accounting and Finance
MIT Sloan School of Management
E-mail: Kothari@MIT.edu
Web: http://web.mit.edu/kothari/www/
O: (617) 253-0994 | M: (585) 820-8046

Exec. Assistant: Michael Brockett
617.258.6550 brockett@mit.edu

http://scholar.google.com/citations?user=1YTXJkoAAAAJ&hl=en
Papers: http://ssrn.com/author=17425

**MIT Sloan Office Address**
Sloan School of Management
Massachusetts Institute of Technology
100 Main Street, E62-662
Cambridge, MA  02142-1347

**SELECTED AWARDS**

**Padmashri**, Government of India, January 2020
**Honorary Doctorate**, London Business School, 2019
AAA Presidential Scholar, 2017-18
**Doctor Honoris Causa**, University of Cyprus, 2016
AAA Notable Contributions to Accounting Literature Award, 2014
**Doctor Honoris Causa**, University of Technology, Sydney, 2013
Distinguished Alumnus Award, Birla Institute of Technology & Science, Pilani, India, 2013

**EMPLOYMENT**

**US Securities and Exchange Commission, Washington, D.C.**
2019- 2021    Chief Economist and Director of the Division of Economic and Risk
Analysis

**Massachusetts Institute of Technology, Sloan School of Management**
2015- Present  Gordon Y Billard Professor of Accounting and Finance
2010 –2015    Deputy Dean
2007 – 2008    Deputy Dean
2006 – 2007    Head of the Department of Economics, Finance, and Accounting
2003 – 2005    Head of the Department of Economics, Finance, and Accounting
1999 – 2003    Gordon Y Billard Professor and Head of the Accounting Group
1997 – 1998    Visiting Professor

**University of Rochester, Simon School of Business**
1998 – 1999    Professor and Accounting Area Coordinator
1996 – 1997    Professor and Accounting Area Coordinator
1991 – 1996    Associate Professor & Accounting Area Coordinator
1988 – 1991    Assistant Professor and Accounting Area Coordinator
1986 – 1988    Assistant Professor, University of Rochester

**Harvard University, Harvard Business School**
2005 – 2006    Thomas Henry Carroll-Ford Visiting Professor of Business Administration,

[31] Exhibit A
Page 34

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 35 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 149 of 309
#:1823

Harvard Business School

**Barclays Bank**
2008 – 2009    Global Head of Equity Research, Barclays Global Investors


## BOARD OF DIRECTORS APPOINTMENTS

2021 – Present Velan Studios https://www.velanstudios.com/
2015 – 2019    **BSE** (Bombay Stock Exchange) http://www.bseindia.com/
2014 – 2016    FIA Technology Services http://www.fiaglobal.com/index.php
2008 – 2019    Monsoon Kitchens http://www.monsoonkitchens.com/
1998 – 2004    Vicarious Visions
2016 – 2019    Trillium Asset Management
2017 -- 2019   Velan Studios https://www.velanstudios.com/


## OTHER APPOINTMENTS

2018-19        Co-Chair, Board of Governors, Asia School of Business http://www.asb.edu.my/
2010-19        Director, MIT India Program http://web.mit.edu/misti/mit-india/
2001 – 2003    Honorary Visiting Professor, Cranfield University
2001, Winter   Visiting Professor, London Business School
1997, Summer   Visiting Professor at the University of Technology in Sydney, Australia
1996, Fall     Weinstein Distinguished Visiting Professor, Baruch CUNY, New York
1994 – 1997    Honorary Visiting Professor, City University Business School, London
1979 – 1980    Officer, DCM's Shriram Fertilizers and Chemicals, Mumbai

## EDUCATION

**Ph.D.** Accounting, University of Iowa, 1986

**M.B.A.** (PGDM) Accounting and Finance, Indian Institute of Management, Ahmedabad, India, 1982

**B.E.** Chemical Engineering, Birla Institute of Technology and Science, Pilani, India, 1979


## RESEARCH

1. DeFranco, G., Kothari, S., Verdi, R., 2011, The Value of Earnings Comparability, *Journal of Accounting Research* 49, 895-931.

2. Guay, W., Kothari, S., Shu, S., 2011, Properties of Implied Cost of Capital Using Analysts' Forecasts, *Australian Journal of Management* 36, 125-149.

3. Kothari, S., Loutskina, E., Nikolaev, V., 2011, Agency Theory of Overvalued Equity as an Explanation for the Accrual Anomaly, working paper, MIT Sloan School of Management.

4. Ball, R., Kothari, S., Nikolaev, V., 2013, On Estimating Conditional Conservatism, *The Accounting Review* 88, 755-787.

5. Ball, R., Kothari, S., Nikolaev, V., 2013, Econometrics of the Basu Asymmetric Timeliness Coefficient and Accounting Conservatism, *Journal of Accounting Research*, 51, 1071-1097.

6. Kothari, S., Mizik, N., Roychowdhury, S., 2016, Managing for the Moment: The Role of Real Activity versus Accrual Earnings Management in SEO Valuation, *The Accounting Review,* 91, 559-586.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 36 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 150 of 309
#:1824

7.  Jayaraman, S., Kothari, S., 2016, The Effect of Corporate Transparency on Bank Risk-Taking and Banking System Fragility, *The Accounting Review*, 91, 535-558.

8.  Kothari, S., So, E., Verdi, R., 2016, Analysts' Forecasts and Asset Pricing: A Survey, *Annual Review of Financial Economics,* 8, 197-219.

9.  He, X., Kothari, S., Xiao, T., Zuo, L., 2018, Long-Term Impact of Business Cycles on Auditors' Judgment, *The Accounting Review*, 93*,* 203-229.

10. Del Viva, L., Kothari, S., Lambertides, N., Trigeorgis, L., 2021, Asymmetric Returns and the Economic Content of Accruals and Investment, Management Science, forthcoming.

11. Kothari, S., Lewellen, J., Warner, J., 2016, The Behavior of Aggregate Corporate Investment, working paper, MIT Sloan School of Management.

12. Jayaraman, S., Kothari, S., Ramanna, K. 2017, Capture and Competition: The Role of Product Market Competition in Reallocating Rents from Regulatory Capture, working paper, MIT Sloan School of Management.

13. Frankel, R., Kothari, S., Zuo, L., 2018, Why shareholder wealth maximization despite other objectives, working paper, MIT Sloan School of Management.

14. Guest, N., Kothari, S., So, E., 2021, Flight-to-Dividends: The Role of Earnings in Periods of Capital Scarcity, working paper, MIT Sloan School of Management.

15. Guest, N., Kothari, S., Pozen, R., 2021, High Non-GAAP Earnings Predict Abnormally High CEO Pay, working paper, MIT Sloan School of Management.

16. He, X, Kothari, S., Xiao, T., Zuo, L., 2021, Knowledge Transfer in Audit Firms, working paper, MIT Sloan School of Management.

17. Elavia, T., Kothari, S., Li, X., You, H., 2021, Gains from Markowitz Optimization: Evidence from Re-optimization of Mutual Fund Holdings, Journal of Portfolio Management, forthcoming.

**DISCUSSIONS and RESEARCH IN PROFESSIONAL JOURNALS, BOOKS, AND MONOGRAPHS**

1.  Kothari, S., Lester, R., 2012, The Role of Accounting in the Financial Crisis: Lessons for the Future, *Accounting Horizons* 26, 335-351.

2.  Kothari, S., Swamy, G., Danilov, K., 2012, Generating Superior Performance in Private Equity: A New Investment Methodology, *Journal of Investment Management* 11, 28-41.

3.  Pozen, R., Kothari, S., 2017, Decoding CEO Pay, *Harvard Business Review*, July-August, 78-84.

4.  Kothari, S., Blass, D., Cohen, A., Rajpal, S., 2020, U.S. Credit Markets: Interconnectedness and the Effects of the COVID-19 Economic Shock, US Securities and Exchange Commission, Washington, D.C.

**BOOKS**

*Financial Statement Analysis*, Edited by Ray Ball and S.P. Kothari, McGraw-Hill, 1994.

Case 2:19-cv-10860-MCS-PLA  Document 90-2  Filed 04/30/21  Page 37 of 63  Page ID
#:1825
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 151 of 309

*Contemporary Accounting Research: Synthesis and Critique*, Edited by S.P. Kothari, Thomas Z. Lys, Douglas J. Skinner, Ross L. Watts, and Jerold L. Zimmerman, North-Holland Publishing, 2002.


**FINANCIAL PRESS WRITINGS**

Opinion-page editorials in *The Hindu Business Line,* Madras, New Delhi, and other cities in India from January 1994 to August 1994. Wrote about 20 articles.

Opinion-page editorials in *The Economic Times,* India. (Circulation >500,000). About 35 articles from August 1994 to September 1996. A listing of selected articles from the Economic Times and other publications follows:

- Badla: Let it compete to survive, April 12, 1995.
- Lessons from MS Shoes scandal, April 23, 1995.
- An ethical reason to privatize, May 5, 1995.
- Needed, a free food grain market, June 9, 1995.
- Economics of investment in power, June 23, 1995.
- What explains the stock market fall? July 31, 1995.
- Value lies in future as well, August 7, 1995, with Clifford W. Smith, Jr.
- A hundred states within, August 31, 1995.
- A bourse for forward trading, September 15, 1995.
- Making the public FDI friendly, October 7, 1995.
- Rational expectations from Indian policy makers, October 17, 1995.
- RBI intervention: A bad idea, November 4, 1995, with Clifford W. Smith, Jr.
- Telecom: The ring is missing, December 1, 1995.
- Switch institutions, not shares, January 1, 1996.
- Change campaign finance laws, February 12, 1996.
- Lift all restrictions on rupee, February 24, 1996.
- Need to privatise telecom industries, March 19, 1996.
- A minimum utility tax, August 5, 1996.
- Derivatives & regulatory roadblocks, August 19, 1996, with Clifford W. Smith, Jr.
- The Importance of Being Open, September 1, 1996, with Clifford W. Smith, Jr.
- Let a private cricket league bloom, The Economic Times, October 15, 2007
  - http://economictimes.indiatimes.com/opinion/view-point/let-a-private-cricket-league-bloom/articleshow/2458359.cms
- On Section 377, a call to leadership, Mid-Day, January 31, 2014
  - http://www.mid-day.com/articles/on-section-377-a-call-to-leadership/15061007
- Narendra Modi and Arun Jaitley should strive to improve profit outlook for investment, The Economic Times, September 5, 2014
  - http://economictimes.indiatimes.com/opinion/comments-analysis/narendra-modi-and-arun-jaitley-should-strive-to-improve-profit-outlook-for-investment/articleshow/41746037.cms
- Bigger student loans for STEM students, *Wall Street Journal*, August 14, 2016
  - https://www.wsj.com/articles/bigger-loans-for-stem-students-1471210878
- President Trump should say no to the Paris climate accord, *The Daily Caller*, May 29, 2017
  - http://dailycaller.com/2017/05/29/president-trump-should-say-no-to-paris-climate-accord/
- If the CEO is overpaid, blame the compensation committee, with Bob Pozen, *Wall Street Journal*, August 21, 2017

- - https://www.wsj.com/articles/if-the-ceo-is-overpaid-blame-the-compensation-committee-1503355104
  - Why regulators shouldn't get trigger-happy in trying to rein in GameStop's stock mania? with Eric So, MarketWatch, January 30, 2021
    - https://www.marketwatch.com/story/why-regulators-shouldnt-get-trigger-happy-in-trying-to-rein-in-gamestops-stock-mania-11611939882
  - View: Don't shy away from running a larger fiscal deficit, with Karthik Ramanna, The Economic Times, February 8, 2021
    - https://economictimes.indiatimes.com/news/economy/indicators/view-dont-shy-away-from-running-a-larger-fiscal-deficit/articleshow/80739338.cms
  - View: Do CEOs spread themselves too thin because of their social and political objectives, The Economic Times, April 20, 2021
    - https://economictimes.indiatimes.com/news/company/corporate-trends/profit-alone-is-profitable/articleshow/82132593.cms

## CONSULTING ACTIVITIES

2017 and 2018: Expert report, deposition, and testimony on behalf of Defendants IN THE MATTER OF THE ARBITRATION OF Freestone Insurance Company, in Liquidation Claimant, v. Ernst & Young, LLP, Respondent. CPR File G-16-52-C at Wilmington, Delaware.

2018: Expert report and deposition on behalf of plaintiffs in re Alere Inc., United States District Court of Massachusetts, Case No. 1:16-cv-10766-PBS.

## PROFESSIONAL ACTIVITIES

**Editor**, *Journal of Accounting & Economics,* 1997-2019.
Associate Editor, *Journal of Contemporary Accounting & Economics*, 2005-2010.
Associate Editor, *Asia-Pacific Journal of Accounting & Economics,* 2000-2004.
Associate Editor, *Journal of Accounting & Economics,* 1990-1996.
Editorial Board Member, *The Accounting Review,* 1989-1992.

Referee for: *The Journal of Finance, Journal of Financial Economics, Journal of Accounting Research, The Accounting Review, Journal of Financial and Quantitative Analysis, Contemporary Accounting Research, Journal of Business, The Review of Financial Studies, Review of Economics and Statistics, British Accounting Review.*

**Keynote Speaker** at British Accounting Association Annual Meetings, April 1995, Accounting Association of Australia and New Zealand Annual Meetings, July 1996, HKUST Summer Symposium on Accounting Research, June 2001 and July 2012, Accounting Research Consortium, University of Technology, Sydney, Australia, January-February 2012, Ontario Universities Accounting and Finance Symposium, October 2016; Corporate Finance, Governance & Sustainability Conference at Delhi School of Business, October 2016, Distinguished Faculty Speaker at the British Accounting Association Doctoral Consortium, April 1995, Distinguished Faculty Speaker at the Accounting Association of Australia and New Zealand Doctoral Consortium, July 1996, Doctoral Consortium speaker at the *Asia-Pacific Journal of Accounting & Economics* Conference in Shanghai, January 2003, *AAA Financial Accounting Reporting Section* Doctoral Consortium in Orlando, January 2003, AAA Doctoral Consortium speaker at Lake Tahoe, June 2004.

## INVITED PRESENTATIONS AT SCHOOLS AND CONFERENCES

1986    SUNY at Buffalo, University of Michigan, University of Rochester, University of Chicago, Wharton School, Northwestern University, Washington University at St. Louis, University of Texas at Austin, and Carnegie Mellon University.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 39 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 153 of 309
#:1827

1987    University of Michigan, Massachusetts Institute of Technology, SUNY at Buffalo, International Conference on Forecasting at Boston, and AAA Meetings.

1988    University of Chicago, Cornell University, University of Washington at Seattle, SUNY at Buffalo, and Michigan State University.

1989    Columbia University Research Conference, Duke University, University of Iowa, Stanford University, University of California at Berkeley, University of Minnesota, New York University, and University of Pennsylvania at College Park.

1990    Harvard University, Northwestern University, Ohio State University, University of Arizona, University of Southern California, Temple University, Washington University at St. Louis, AAA meetings at Toronto, European Finance Association meetings, and Contemporary Accounting Research Conference.

1991    Arizona State University, Indiana University, and University of Michigan.

1992    Cornell University, Vanderbilt University, University of Wisconsin at Madison, University of Illinois, University of Nebraska, Stanford University Summer Camp, AAA Meetings at Washington D.C., Duke University, Michigan State University, Wharton School at the University of Pennsylvania, SUNY at Buffalo, University of Missouri at Columbia, and JAAF-Peat Marwick Conference.

1993    Baruch CUNY at New York, Pennsylvania State University, City University Business School at London, Institute for Quantitative Investment Research at Cambridge, Accounting and Finance Conference at St. Louis, International Seminar on Futures and Options in Mumbai, India, University of Iowa, and Iowa State University.

1994    University of Manchester, University of Glasgow, Carnegie Mellon University, Harvard Business School, London Business School, and Baruch CUNY.

1995    City University Business School at London, Western Finance Association Meeting at Aspen, Colorado, AAA Meetings at Orlando, SUNY at Buffalo, Syracuse University, and Rice University.

1996    Northwestern University, City University Business School, KOC University at Istanbul, University of New South Wales at Sydney, JAR Conference at Chicago, Michigan, ISDA Conference, Washington DC, Arizona, AAA meetings at Chicago, Boston College, and University of Maryland.

1997    University of Southern California, Tulane University, Ibbotson Associates Cost of Capital Conference at Chicago, London School of Economics, City University Business School at London, National Association of Pension Funds at London, University of Technology at Sydney, Harvard University, University of Rochester, Washington University at St. Louis, Cornell University, and Columbia University.

1998    Stanford University, Morningstar Inc. at Chicago, New Faculty Consortium at St. Charles, University of Notre Dame, University of Alberta, University of Technology at Sydney, University of Iowa, University of California at Berkeley, *Contemporary Accounting Research* Conference at Vancouver, and University of California at Los Angeles.

1999    AAA-KPMG International Accounting Conference at Montvale, NJ, University of British Columbia, University of Tilburg in Holland, INSEAD in France, University of Colorado at Denver, University of Michigan, University of Oklahoma, Financial Economics and

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 40 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 154 of 309
#:1828

Accounting Conference at the University of Texas at Austin, and Boston Area Research Colloquium at Boston University.

2000    Australian Graduate School of Management, University of Technology at Sydney, University of Sydney, Syracuse University, Boston Federal Reserve Annual Research Conference, Stanford University, Harvard University, AAA-BAA conference at Cambridge University, European Financial Association Conference in London, University of Chicago, American Accounting Association meetings in Philadelphia, and MIT Sloan School of Management.

2001    Cranfield University, Yale University, University of Rochester, HKUST, University of Technology at Sydney, University of Chicago, Pennsylvania State University, University of Texas at Dallas, MIT, and Duke University.

2002    Georgetown University, London Business School Donor Seminar, University of Pittsburgh, London Business School Symposium, Cornell University, Oklahoma State University, University of Rochester, New York University, Arizona State University, and Wharton School at the University of Pennsylvania.

2003    FARS Conference, APJAE Conference in Shanghai, University of Southern California, and University of Technology at Sydney.

2004    APJAE Conference in Kuala Lumpur, Emory University, AAA Doctoral Consortium, Harvard University, Fed-JFE Conference at Ohio State University, the U.S. Securities & Exchange Commission, Case Western Reserve University, University of Maryland, and Financial Economics and Accounting Conference at USC.

2005    Journal of Accounting, Auditing, and Finance Conference at NYU, Harvard University, Carnegie Mellon University, Samsung School of Business, S. Korea, and University of Texas at Dallas.

2006    Stanford University, Southern Methodist University, University of Georgia, Rutgers University, University of Chicago, Ohio State University, University of Minnesota, Michigan State University, Indian Institute of Technology, Bombay, BSI Gamma Foundation, Switzerland, and Cornell University.

2007    Indian Institute of Management, Calcutta, Brigham Young University, University of California, Riverside, University of Edinburgh, University of Southern California, University of Texas at Austin, Tuck at Dartmouth College, University of California, Los Angeles, Washington University in St. Louis, University of Massachusetts at Amherst, BARC Seminar at Boston University, Association of Finance Professionals, Boston, and London Business School.

2008    Lancaster University and University of Manchester.

2009    Temple University, London Business School, University of Rochester, Stanford University, American Accounting Association meetings in New York, Georgetown University, JAE Conference at MIT, and BITS Pilani.

2010    University of Chicago, University of Texas at San Antonio, and Sabanci University, Istanbul.

2011    Canadian Accounting Association, London School of Economics, Fudan University, and Xi'an Jiaotong University.

2012    Harvard Business School, Tsinghua University, Sun Yat-Sen University, and HKUST.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 41 of 63   Page ID
#:1829
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 155 of 309

2013    USC, NY Federal Reserve Bank

2014    Louisiana State University, National Taiwan University

2015    Lehigh University, University of California, Irvine, Ohio State University, University of Cyprus, MIT Club of Cyprus, Indian School of Business National Conclave

2016    Hong Kong Polytechnic University, IIT, Bombay, Texas Christian University, Chinese University of Hong Kong, London Business School, University of Iowa, City University London

2017    Oxford University Blavatnik School, MIT, Indian Institute of Management, Ahmedabad, Tulane University.

2018    MIT Sloan, PCAOB in Washington DC, SEC in Washington DC, Keynote speech at the Conference on Financial Economics and Accounting at Tulane University.


**TEACHING**

Corporate Financial Accounting, MBA core course
Financial Statement Analysis, MBA elective course
Empirical Accounting Research, PhD seminar
Positive Accounting Theories, MBA elective course
Cases in Finance, MBA elective course
Introduction to Financial Accounting, Undergraduate course
Corporate Financial Accounting: Simon School's Executive MBA programs in Holland and Switzerland

Intensive doctoral research courses in Accounting and Finance to faculty and students in:
Finland (1991, 1992), University of Alberta, Canada (1991), European Institute for Advanced Studies in Management, Brussels (1993), Baruch College, City University of New York, NY (1996), University of Technology at Sydney, Australia (1997, 1998, 2000, 2001, 2003), London Business School (2001).

**DISSERTATIONS**

On the Ph.D. dissertation committees of (initial placement in parentheses):

**As Chairperson**
1. Christopher Noe (Harvard Business School)
2. Glen Hansen (Pennsylvania State University)
3. Wayne Guay (Wharton University of Pennsylvania)
4. Peter Wysocki (University of Michigan)
5. Yong Chul Shin (Tulane University)
6. Ying Li (Baruch College, CUNY)
7. Wesley Chan (Alpha Simplex)
8. Xu Li (University of Texas at Dallas)
9. Yanfeng Xue (University of Texas at Austin)
10. Jieying Zhang (University of Southern California)
11. Volkan Muslu (University of Texas at Dallas)
12. Adam Kolasinski (University of Washington)
13. Valeri Nikolaev (University of Chicago)
14. George Papadakis (Boston University)
15. Amit Koshal (Industry)

Case 2:19-cv-10860-MCS-PLA Document 90-2 Filed 04/30/21 Page 42 of 63 Page ID
#:1830
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 156 of 309

16. Jeri Seidman (University of Texas at Austin)
17. Konstantin Rozanov (London Business School)
18. Yuri Loktionov (University of Southern California)
19. Mihir Mehta (Temple University)
20. Nicholas Guest (Cornell University)

**As Committee member**
21. Gita Rao (Illinois)
22. Richard Sloan (Wharton)
23. Tony Greig (Purdue)
24. Anwer Ahmed (Florida)
25. Patty Dechow (Wharton)
26. Sudipta Basu (CUNY, Baruch)
27. Michele Daley (Rice)
28. Paul Irvine (Emory)
29. Roger Edelen (Wharton)
30. Mingyi Hung (University of Southern California)
31. Mary Ellen Carter (Columbia)
32. Eric Wolff (Carnegie Mellon University)
33. Susan Shu (Boston College)
34. Elizabeth Keating (Northwestern University)
35. Laurence van Lent (University of Tilburg)
36. Gans Narayanamoorthy (Yale University)
37. Kevin Chan (HKUST, Hong Kong)
38. Karthik Ramanna (Harvard University)
39. Kexin Zheng (University of Connecticut)
40. Rebecca Lester (Stanford University)
41. Jinwan Kim (Stanford University)


**COMMITTEE / ADMINISTRATION**

MIT 401(k) Oversight Committee, 2014-2019.
MIT Committee on Graduate Programs, 2017-2019.
MIT International Advisory Committee
MITx Faculty Advisory Committee
MIT Sloan: International Initiatives Committee, Co-Chair of Space Committee, Chair of Load Committee, and Member of various standing committees, MIT Sloan School of Management, 2011-2015.
Policy Committee and Personnel Committee, MIT Sloan School of Management, 1999-Present.
Head of the Department of Economics, Finance, and Accounting, MIT Sloan School of Management, 2003-2005, 2006-2007.
Head of the Accounting group, MIT Sloan School of Management, 1999-2003.
Sloan Fellows Program Committee, MIT Sloan School of Management, 2001-2005.
Sloan Research Productivity Committee, MIT Sloan School of Management, 2001-2002.
Sloan Fellows/MOT Program Restructuring Committee, MIT Sloan School of Management, 2002.
Management Programs Committee, MIT Sloan School of Management, 2000-2001.
Promotion and Tenure Committee, University of Rochester, 1996 -1999.
Accounting Area Coordinator, University of Rochester, 1988-1999.
Ph.D. committee, University of Rochester, 1989-1995.
MBA committee, University of Rochester, 1989-1994.
University of Rochester Senate, 1994-1996.
Committee on Teaching Excellence, University of Rochester, 1995-1996.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 43 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 157 of 309
#:1831

**Appendix B – Materials Reviewed or Considered**

**Court Documents**

- Amended Class Action Complaint, filed on May 29, 2020
- Order Denying Motions to Dismiss and Granting Leave to File Surreply, filed on January 26, 2021

**Court Decisions and Securities Law**

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)
- *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989)
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 134 S.Ct. 2398 (2014)
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)
- *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004)

**SEC Filings/Forms**

- Mattel's Form 8-K, dated August 8, 2019
- Mattel's Form 8-K, dated October 29, 2019
- Mattel's Form 10-Q, dated October 26, 2017
- Mattel's Form 10-K, dated February 22, 2019
- Mattel's Form 10-K, dated February 25, 2020
- Nasdaq's Form 10-K, dated February 25, 2020

**Press Articles**

- Press release, PRNewswire, *Mattel Reports Third Quarter 2017 Financial Results* (Oct. 26, 2017).
- Press release, S&P Dow Jones Indices, *Bemis Set to join S&P 500; Mattel to Join S&P MidCap 400* (Jun. 3, 2019).
- Press release, S&P Global Ratings, *Mattel Inc: S&P Rates $250MM Sr. Unsecured Guaranteed Notes 'BB-'* (Aug. 5, 2019).
- Press release, Fitch Ratings, *Fitch Rates Mattel's Senior Notes 'B+/RR2'; Outlook Negative* (Aug. 1, 2019).
- Press release, Moody's Investors Service, *Moody's assigns B1 rating to Mattel's $250 million bonds; outlook stable* (Aug. 1, 2019).

**Conference Call Transcripts**

- Conference Call Transcript, Thomson Reuters StreetEvents, *MAT – Q4 2017 Mattel Inc Earnings Call* (Feb. 1, 2018).

**Databases**

- Historical data on market capitalization, trading volume, price, bid-ask spreads, and returns from the Center for Research in Security Prices database (CRSP) and Bloomberg
- Historical data on analyst forecast from the Institutional Brokers Estimate System (I/B/E/S)
- Historical data on short interest from S&P Compustat Security database
- Historical data on S&P 500 membership, S&P 400 membership, S&P 1500 Leisure Product membership, and Mattel's active Nasdaq market makers from Bloomberg
- Mattel's SEC filings and forms downloaded from EDGAR
- Mattel's news headlines and articles downloaded from the Dow Jones Factiva Database
- Mattel's earnings press release articles published by Business Wire
- Mattel's earnings press release articles published by PR Newswire
- Mattel's conference call transcripts from Thomson One Analytics
- Mattel's Analyst reports from Thomson One Analytics

**Websites/Webpages**

- Nasdaq website for Nasdaq's listing requirements and market structure
- SEC website for SEC form descriptions and filing requirements
- National Whistleblowers Center discussion of the PricewaterhouseCoopers 2007 Survey

**Textbooks**

- Espen Eckbo, "Handbook of Empirical Corporate Finance," Elsevier/North-Holland, 2007.

**Academic Articles**

- Yakov Amihud, 2002, "Illiquidity and stock returns: cross-section and time-series effects," *Journal of Financial Markets* 5: 31–56.

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61 (5), 2365–2394.

- William Beaver, 1968, "The Information Content of Annual Earnings Announcements." *Journal of Accounting Research* 6, 67–92.

- Ekkehart Boehmer and Juan Wu, 2013, "Short Selling and the Price Discovery Process," *Review of Financial Studies* 26 (2): 287–322.

- Mark Bradshaw and Richard Sloan, 2002, "GAAP versus the street: an empirical assessment of two alternative definitions of earnings." *Journal of Accounting Research* Vol. 40, 41–66.

- Stephen Brown and Jerold Warner, 1980, "Measuring Security Price Performance," *Journal of Financial Economics* 8, 205–258.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 45 of 63   Page ID
#:1835
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 159 of 309

- Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2001, "Market Liquidity and Trading Activity," *Journal of Finance* 56, 501–530.

- Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2008, "Liquidity and market efficiency," *Journal of Financial Economics* 87 (2), 249–268.

- Patricia M. Dechow, Amy P Hutton, Lisa Meulbroek, and Richard G. Sloan, 2001, "Short-sellers, fundamental analysis, and stock returns," *Journal of Financial Economics* 61 (1), 77–106.

- Hemang Desai, K. Ramesh, S. Ramu Thiagarajan, and Bala V. Balachandrab, 2002, "An Investigation of the Information Role of Short Interest in the Nasdaq Market," *The Journal of Finance* 57 (5), 2263–2287.

- Michael S. Drake, Lynn Rees, and Edward P. Swanson, 2011, "Should Investors Follow the Prophets or the Bears? Evidence on the Use of Public Information by Analysts and Short Sellers," *The Accounting Review* 86 (1), 101–130.

- Darrell Duffie, Nicolae Gârleanu, and Lasse Pedersen, 2005, "Over-the-Counter Markets," *Econometrica* 73 (6), 1815-1847.

- Joseph E. Engelberg, Adam V. Reed, and Matthew C. Ringgenberg, 2012, "How are shorts informed? Short sellers, news, and information processing," Journal of Financial Economics 105 (2), 260–278.

- Eugene Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, 383–388.

- Lily Fang and Joel Peress, 2009, "Media Coverage and the Cross-section of Stock Returns," *The Journal of Finance* 64 (5), 2023–2052.

- Lawrence Glosten and Paul Milgrom, 1985, "Bid, ask, and transaction prices in a specialist market with heterogeneously informed traders," *Journal of Financial Economics* 14, 71–100.

- SP Kothari, 2001, "Capital markets research in accounting," *Journal of Accounting and Economics* 31, 105–231.

- Albert Kyle, 1985, "Continuous auctions and insider trading," *Econometrica* 53, 1315–1335.

- Jeff Payne and Wayne Thomas, 2011, "The Torpedo Effect:  Myth or Reality." *Journal of Accounting, Auditing, and Finance* 26, 255–278.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 46 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 160 of 309
#:1834

- Darren Roulstone, 2003, "Analyst Following and Market Liquidity," *Contemporary Accounting Research* 20 (3), 552–578 (2003).

- Andrei Shleifer, 1986, "Do demand curves for stocks slope down?" *Journal of Finance* 41, 579–590.

**Exhibit 1**
**Summary of Market Efficiency Factors for Mattel Inc.'s Common Stock during the Class Period**
**August 2, 2017 – August 8, 2019**

| Factor | Summary of Factor | Mattel's Common Stock |
|---|---|---|
| Weekly Trading Volume (*Cammer* I) | "Turnover measured by average weekly trading volume of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." (*Cammer*) | • Average weekly share turnover of 9.35% (median of 7.51%). This number is well above the 2% cutoff cited by the *Cammer* court.<br>• Mattel's turnover is greater than the median turnover of firms traded on the Nasdaq in all trading weeks during the Class Period.<br>• Mattel was included in the S&P 500 index during most of the Class Period (August 2, 2017 through June 6, 2019). |
| Number of Analysts Providing Coverage (*Cammer* II) | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the Class Period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." (*Cammer*) | • Total of 408 publicly available analyst reports were issued during the Class Period, with an average (median) of 51.6 (57.0) reports being issued in each full calendar quarter during the Class Period.<br>• An average (median) of 13.9 (14.0) analysts made forecasts for Mattel per full calendar quarter during the Class Period, compared to a median of 2 analysts making forecasts for Nasdaq firms.<br>• During the Class Period, 4,549 media articles referring to Mattel (an average of 6.2 articles per day) can be found in the Dow Jones Factiva Database. |
| Market Makers & Arbitrageurs (*Cammer* III) | "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." (*Cammer*) | • Traded on Nasdaq, a large national exchange with substantial listing requirements and market makers.<br>• Over 150 active market makers traded in Mattel's stock during the Class Period.<br>• Mattel's shares shorted, as reported at the end of each full calendar quarter during the Class Period, range from 16.1% to 22.4 %. The percentages of Mattel's shares shorted are higher than the median of Nasdaq firms during the same period. |
| Eligibility to File an S-3 Registration Statement (*Cammer* IV) | "…it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met." (*Cammer*) | • Mattel filed Forms S-3ASR with the SEC both before and during the Class Period.<br>• Mattel filed a total of 73 documents with the SEC during the Class Period, including periodic reports on Forms 10-Q and 10-K, and current reports on Form 8-K. |

**Continued on the next page**

44

Exhibit A
Page 47

Case 2:19-cv-10860-MCS-PLA Document 90-2 Filed 04/30/21 Page 48 of 63 Page ID
Case 8:21-cv-02910-TDC Document 123-4 Filed 11/13/23 Page 162 of 309
#:1836

**Exhibit 1 (Continued)**
**Summary of Market Efficiency Factors for Mattel Inc.'s Common Stock during the Class Period**
**August 2, 2017 – August 8, 2019**

| Factor | Summary of Factor | Mattel's Common Stock |
|---|---|---|
| Stock Price Reaction to News (*Cammer* V) | "Empirical facts showing cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." (*Cammer*) | • Event study analyses show strong statistically significant market reactions on 4 out of 8 earnings announcement dates with unexpected news, and the reactions are in the same direction of the news on 3 of the 8 dates. I also find insignificant reaction to one earnings announcement that likely contains mixed news.<br>• I find significantly negative market reaction on the corrective disclosure date.<br>• Using an unsigned returns test, I find that the average market reaction on the 9 corporate event dates is 6.49% higher than the market reaction on other days. |
| Market Capitalization (*Krogman*) | "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." (*Krogman*) | • Daily average market capitalization was a high of $5.93 billion and a low of $3.82 billion.<br>• Mattel's daily market capitalization was greater than the median market capitalization of Nasdaq firms during every month of the Class Period. |
| Stock Liquidity (*Krogman*) | Low measures of market illiquidity and narrow bid-ask spread indicate less uncertainty regarding valuation and greater ability to trade without moving the market price. (*Krogman*) | • The daily Amihud measure of illiquidity for Mattel's stock ranged from a low of less than 0.01% to a high of 0.05%, while daily average bid-ask spread ranged from 0.06% to 0.09% during the Class Period.<br>• Mattel's market illiquidity measure and bid-ask spread were below the median of Nasdaq firms during every month of the Class Period. |
| Public Float (*Krogman*) | "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security." (*Krogman*) | • Mattel's quarterly public float ranged from 393.7 million shares to 417.0 million shares during the Class Period.<br>• The public float of Mattel was greater than the median float of Nasdaq firms during every quarter spanning the Class Period. |
| Serial Correlation of Returns (*Lehocky*) | "In an efficient market, there should be no trends because the market should be reacting quickly to new information, and new prices are being set quickly based upon the new information. Thus, if there is a serial correlation in the stock prices, it lends to a finding of market inefficiency." (*Lehocky*) | • The coefficient of first-order autocorrelation for Mattel's daily stock returns was statistically insignificant during the Class Period. |

Exhibit A
Page 48

Case 2:19-cv-10860-MCS-PLA Document 90-2 Filed 04/30/21 Page 49 of 63 Page ID
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 163 of 309
#:1837



**Exhibit 2**
**Mattel Inc.'s Common Stock Daily Closing Price & Trading Volume**
**August 2, 2017 - August 9, 2019**

The blue bar plots the daily trading volume (in millions of shares) and the red line plots the daily closing price (in US dollars) of Mattel during August 2, 2017 – August 9, 2019. Data on stock price and volume are obtained from the CRSP database.

Exhibit A
Page 49

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 50 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 183-4   Filed 11/13/23   Page 164 of 309
#:1838

**Exhibit 3**
**Mattel Inc.'s Common Stock Weekly Turnover - Trading Week**
**August 2, 2017 – August 8, 2019**

This chart plots the weekly share turnover (on a *trading* week basis) of Mattel's common stock (red line) and the median turnover of Nasdaq firms. Weekly turnover is calculated as the summation of the shares traded during each trading week divided by the weekly average outstanding shares. The median turnover of Nasdaq firms is determined by calculating weekly turnover of all firms traded on the Nasdaq, and then taking the median for the trading week. A firm is excluded from the weekly median if it has less than five trading day data in a trading week. Each trading week is defined as five consecutive trading days. The last trading week during the Class Period consists of only three trading days (August 6, 2019 – August 8, 2019) and is therefore excluded from this Exhibit.



Weekly Share Turnover:
Mean: 9.35%
Median: 7.51%

Mattel's Turnover — — Median of Nasdaq firms

Exhibit A
Page 50

47

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 51 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 165 of 309
#:1839

**Exhibit 4**
**Mattel Inc.'s Common Stock Weekly Turnover - Calendar Week**
**August 2, 2017 – August 8, 2019**

This chart plots the weekly share turnover (on a *calendar* week basis) of Mattel's common stock (red line) and the median turnover of Nasdaq firms during the Class Period. Weekly turnover is calculated as the summation of the shares traded during each calendar week divided by the weekly average outstanding shares. The median turnover of Nasdaq firms is determined by calculating weekly turnover of all firms traded on the Nasdaq, and then taking the median for the calendar week. Each calendar week consists of 4 to 5 trading days. The first calendar week of the Class Period consists of only three trading days (August 2, 2017 – August 4, 2017) and therefore is excluded from this Exhibit.



**Weekly Share Turnover:**
Mean: 8.95%
Median: 6.72%

48

Exhibit A
Page 51

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 52 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 132-4    Filed 11/13/23    Page 166 of 309
#:1840

**Exhibit 5**
**Analyst Reports on Mattel Inc. Released During Each Full Calendar Quarter of the
Class Period**
**2017 Quarter 4 - 2019 Quarter 2**

The red bar chart reflects the number of analyst reports of Mattel that were released in each calendar quarter over the seven full calendar quarters during the Class Period (i.e., October 1, 2017 to June 30, 2019). Data on the number of analyst reports made during a calendar quarter were obtained from the Thomson One database.



49

Exhibit A
Page 52

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 53 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 167 of 309
#:1841

**Exhibit 6**
**Analyst Following of Mattel Inc. during Each Full Calendar Quarter of the Class Period**
**2017 Quarter 4 - 2019 Quarter 2**

This chart compares analyst following of Mattel (red bar) to the median analyst following of Nasdaq firms (blue bar) during each full calendar quarter of the Class Period (i.e., from October 1, 2017 to June 30, 2019). Analysts following is calculated as the number of analysts issuing any forecast for a firm during a calendar quarter. I use the I/B/E/S database for this analysis as it provides data on analyst following for both Mattel and firms on Nasdaq in a machine-readable format. However, I acknowledge that the number of analysts covered by the I/B/E/S database is higher than the number of analyst reports from the Thomson One Analytics database, because not all analysts issuing forecasts write reports or make their reports available to Thomson One. Median analyst following of Nasdaq firms is determined by first calculating analyst following for all firms traded on the Nasdaq during each calendar quarter, and then taking the median.



50

Exhibit A
Page 53

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 54 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 122-4    Filed 11/13/23    Page 168 of 309
#:1842



**Exhibit 7**

**Percentage of Mattel Inc.'s Short Interest at the End of Each Calendar Quarter of the Class Period**

**2017 Quarter 3 - 2019 Quarter 2**

This chart compares the short interest (%) of Mattel stock (red bar) to the median of Nasdaq firms (blue bar) at the end of each calendar quarter during the Class Period (i.e., September 30, 2017 to June 30, 2019). The percentage of short interest is calculated by dividing the number of common shares sold short by investors as reported at the end of each calendar quarter, obtained from the S&P Compustat Short Interest database, by the number of shares outstanding at the end of the calendar quarter, obtained from the CRSP database. The median short interest of Nasdaq firms is determined by first calculating short interest at the end of each calendar quarter for all firms traded on the Nasdaq, and then taking the median. A firm is excluded from the median if it is not covered by the Compustat Short Interest database at the end of the quarter. The data point of 2017 Quarter 3 reflects the percentage of short interest as of September 30, 2017 and is therefore included in this Exhibit.

51

Exhibit A
Page 54

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 55 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 122-4    Filed 11/13/23    Page 169 of 309
#:1843

**Exhibit 8**
**Mattel Inc.'s Earnings Announcements During the Class Period**
**August 2, 2017 – August 8, 2019**

The following is a list of Mattel's earnings announcements during the Class Period (August 2, 2017 – August 8, 2019). For each earnings announcement the table provides information on the date and time of the earnings announcement, the analysts' earnings and sales consensus forecasts, realized earnings and sales, and a description of whether the earnings announcement contains negative news, positive news, or mixed news. If the actual EPS and sales both beat the analyst consensus forecasts, I classify that announcement as having positive news. If both the actual EPS and sales metrics fall below the analyst consensus, I classify that announcement as having negative news. If one of the actual metrics beats the analyst consensus while the other falls below the analyst consensus, I classified that earnings announcement as having mixed news.

| Date | Time (EST)[a] | Actual EPS[b] (Per Share) | Analyst Consensus EPS[b] (Per Share) | Actual Sales[b] (in Millions) | Analyst Consensus Sales[b] (in Millions) | Characterization of Earnings News |
|---|---|---|---|---|---|---|
| October 26, 2017 (2017 Q3) | 4:05 p.m. | $0.09 | $0.60 | $1,604.0 | $1,829.6 | Negative News |
| February 1, 2018 (2017 Q4) | 4:05 p.m. | -$0.72 | $0.19 | $1,610.9 | $1,690.6 | Negative News |
| April 26, 2018 (2018 Q1) | 4:05 p.m. | -$0.60 | -$0.39 | $737.9 | $683.2 | Mixed News |
| July 25, 2018 (2018 Q2) | 4:05 p.m. | -$0.56 | -$0.26 | $840.7 | $856.5 | Negative News |
| October 25, 2018 (2018 Q3) | 4:05 p.m. | $0.18 | $0.22 | $1,437.5 | $1,480.8 | Negative News |
| February 7, 2019 (2018 Q4) | 4:45 p.m. | $0.04 | -$0.14 | $1,524.3 | $1,435.9 | Positive News |
| April 25, 2019 (2019 Q1) | 4:12 p.m. | -$0.44 | -$0.56 | $689.2 | $645.6 | Positive News |
| July 25, 2019 (2019 Q2) | 4:05 p.m. | -$0.25 | -$0.40 | $860.1 | $819.5 | Positive News |

---

[a] I obtained a copy of the press releases from the Factiva database to identify the date/time stamp of Mattel's earnings announcements.

[b] Both Analyst consensus and actual EPS are obtained from I/B/E/S adjusted summary history database. I used the median forecast immediately prior to earnings announcement for the consensus forecast.

Exhibit A
Page 55

Case 2:19-cv-10860-MCS-PLA  Document 90-2   Filed 04/30/21   Page 56 of 63   Page ID
#:1844
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 170 of 309

**Exhibit 9**
**Mattel Inc.'s Earnings and Dividend Announcements and Corrective Disclosure**

The following is a list of Mattel Inc.'s earnings and dividend announcements during the Class Period, as well as Mattel Inc.'s corrective disclosure on August 8, 2019. For each event, I identify the date/time stamp from the source of the news that was first made available to market participants. For the earnings announcements, I obtained the date/time stamp of the press releases from the Factiva database. For the dividend announcement and the corrective disclosure, I obtained the acceptance date/time of the Form 8-Ks from EDGAR.

| Date & Time (EST) | Event | Source of News |
|---|---|---|
| June 14, 2017 1:54 p.m. | Mattel announced to cut its 2017 Q3 dividends from $0.38 per share to $0.15 per share. | Form 8-K |
| October 26, 2017 4:05 p.m. | Mattel announced 2017 Q3 earnings and suspended quarterly dividends starting from 2017 Q4 to increase financial flexibility. | PR Newswire |
| February 1, 2018 4:05 p.m. | Mattel announced 2017 Q4 and full year results. | PR Newswire |
| April 26, 2018 4:05 p.m. | Mattel announced 2018 Q1 earnings. | PR Newswire |
| July 25, 2018 4:05 p.m. | Mattel announced 2018 Q2 earnings. | PR Newswire |
| October 25, 2018 4:05 p.m. | Mattel announced 2018 Q3 earnings. | PR Newswire |
| February 7, 2019 4:45 p.m. | Mattel announced 2018 Q4 and full year results. | PR Newswire |
| April 25, 2019 4:12 p.m. | Mattel announced 2019 Q1 earnings. | PR Newswire |
| July 25, 2019 4:05 p.m. | Mattel announced 2019 Q2 earnings. | Business Wire |
| August 8, 2019 5:01 p.m. | Mattel announced its receipt of an anonymous whistleblower letter, the need to investigate the issues set forth in the letter, and the resulting termination of its offering of 6.00% Senior Notes. | Form 8-K |

Case 2:19-cy-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 57 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 171 of 309
#:1845

**Exhibit 10**

**Regression Results of the Market Reaction to Mattel Inc.'s Unexpected Events**
**Assessment of Mattel's Abnormal Stock Return on Mattel's Individual Earnings**
**Announcement and Corrective Disclosure Days**

I perform an event study using rolling regressions. Specifically, for each of the eight earnings announcements and one corrective disclosure released during the Class Period, I estimate the following regression model using a 120-trading-day window prior to the event:

$$RET_{K,t} = \alpha_K + \beta_K \times RET\_SP500_{K,t} + \gamma_K \times RET\_SP1500LP_{K,t} + \Sigma(\delta_{K,\,i=1\,to\,2} \times Corporate\,Events_{K,\,i=1\,to\,2}) + \varepsilon_{K,t},$$
$$t = -120, -119\ldots, -1, K = 1, 2,\ldots, 9$$

$RET_{K,t}$ is Mattel's stock return on day t. $RET\_SP500_{K,t}$ is the return of the market portfolio on day t, as proxied by the S&P 500 Index, while $RET\_SP1500LP_{K,t}$ is the return of the industry portfolio on day t, as proxied by the S&P 1500 Leisure Product Index excluding Mattel.[a] In addition, I control for any prior corporate events that occur during the estimation window. Specifically, I define a series of indicator variables $Corporate\,Events_{K,i=1\,to\,2}$ to be "1" if any earnings or dividend announcement i, as identified in Exhibit 9, falls in a given day during the estimation window, and define $Corporate\,Events$ to be "0" otherwise. I then compute abnormal return ($ABRET$) on event date as:

$$ABRET_K = RET_K - (\hat{\alpha}_K + \hat{\beta}_K \times RET\_SP500_K + \hat{\gamma}_K \times RET\_SP1500LP_K), K = 1, 2,\ldots, 9$$

where $\hat{\alpha}$, $\hat{\beta}$, and $\hat{\gamma}$ are estimated parameters obtained from the 120-trading-day rolling regression for each event.[b] This exhibit presents $ABRET$ for each of the nine corporate events and t-value, which is computed as $ABRET$ divided by the root mean squared error of the 120-trading-day estimation window. I use the degrees of freedom from the 120-day rolling regression to derive the p-value and consider two-tailed p-value of less than or equal to 5% to be statistically significant. * and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

| Date | News | ABRET | t-statistic | Two-sided p-value | 5% Significance |
|------|------|-------|-------------|-------------------|-----------------|
| October 27, 2017 | Negative News | -0.0906 | -6.01** | <0.0001 | ✓ |
| February 2, 2018 | Negative News | 0.0719 | 2.26** | 0.0259 | ✓ |
| April 27, 2018 | Mixed News | 0.0019 | 0.06 | 0.9517 | |
| July 26, 2018 | Negative News | -0.0226 | -0.96 | 0.3374 | |
| October 26, 2018 | Negative News | -0.0102 | -0.67 | 0.5036 | |
| February 8, 2019 | Positive News | 0.2412 | 13.86** | <0.0001 | ✓ |
| April 26, 2019 | Positive News | -0.0293 | -1.10 | 0.2722 | |
| July 26, 2019 | Positive News | 0.1256 | 4.82** | <0.0001 | ✓ |
| August 9, 2019 | Negative News | -0.1454 | -7.34** | <0.0001 | ✓ |

---

[a] Since there were only 8-9 constituents in the S&P 1500 Leisure Product Index during the Class Period, including Mattel's stock in the index can induce a mechanical correlation between the dependent and independent variables in the event study. I remove the stock of Mattel from the index to eliminate this problem. To determine the return on the S&P 1500 Leisure Product Index without Mattel, I first obtain the constituents of the S&P 1500 Leisure Product Index over the Class Period from Bloomberg. I then value-weight each constituent's (without Mattel's) daily individual stock returns obtained from CRSP to calculate the daily index returns during the Class Period.

[b] For the rolling window estimation on the October 27, 2017 event date, I also control for a prior earnings announcement by Mattel on July 27, 2017 (announced after hours so I control for the following event date – July 28, 2017) and the dividend cut on June 14, 2017.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 58 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 172 of 309
#:1846

**Exhibit 11**
**Regression Results of the Market Reaction to Mattel Inc.'s Unexpected Events**
**Assessment of the Absolute Value of Mattel's Abnormal Stock Return on Mattel's Corporate Event Days**

To test whether Mattel's stock reacted significantly to unexpected corporate events, I estimate the following model using 509 trading observations during the period August 2, 2017 – August 9, 2019[a]:

$$ABS\ (ABRET)_D = \alpha + \beta \times Corporate\ Event_D + \varepsilon_D,\ T = 1, 2, \ldots, 509.$$

*Corporate Event*$_D$ is an indicator coded as "1" for the eight earnings announcements and one corrective disclosure during the Class Period (August 2, 2017 to August 8, 2019), and coded as "0" otherwise. *ABS(ABRET)*$_D$ is the absolute value of abnormal return *ABRET* of day D. To obtain abnormal return, I perform an event study using rolling regressions. Specifically, for each day D in this period, I estimate the following regression model using a 120-trading-day window prior to day D:

$$RET_{D,t} = \alpha_T + \beta_D \times RET\_SP500_{D,t} + \gamma_D \times RET\_SP1500LP_{D,t} + \Sigma(\delta_{D,\ i=1\ to\ 3} \times Corporate\ Events_{D,\ i=1\ to\ 3}) + \varepsilon_{D,t},$$
$$t = -120, -119, \ldots, -1, D = 1, 2, \ldots, 509$$

*RET*$_{D,t}$ is Mattel's stock return on day t. *RET_SP500*$_{D,t}$ is the return of the market portfolio on day t, as proxied by the S&P 500 Index, while *RET_SP1500LP*$_{D,t}$ is the return of the industry portfolio on day t, as proxied by the S&P 1500 Leisure Product Index excluding Mattel. In addition, I control for any prior corporate events that occur during the estimation window. Specifically, I define *Events*$_{D,i=1\ to\ 3}$ as a series of indicator variables coded as "1" if an earnings announcement or other corporate event i falls in a given day during the estimation window, and coded as "0" otherwise. I then compute abnormal return (*ABRET*) on event date as:

$$ABRET_D = RET_D - (\hat{\alpha}_D + \hat{\beta}_D \times RET\_SP500_D + \hat{\gamma}_D \times RET\_SP1500LP_D),\ D = 1, 2, \ldots, 509$$

where $\hat{\alpha}$, $\hat{\beta}$, and $\hat{\gamma}$ are estimated parameters obtained from the 120-trading-day rolling regression. * and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

| | |
|---|---|
| **Time Period:** | 8/2/2017 to 8/9/2019 |
| **Number of Observations:** | 509 |
| **Adjusted R-Squared:** | 14.31% |

| Variables | Coefficient | t-Value |
|---|---|---|
| Intercept | 0.0172 | 18.40** |
| Corporate Event | 0.0649 | 9.27** |

---

[a] I include August 9, 2019 in this analysis because the August 8, 2019 Form 8-K was filed after the market closed.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 59 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 182-4   Filed 11/13/23   Page 173 of 309
#:1847



**Exhibit 12**
**Daily Average Market Capitalization of Mattel Inc. over Each Month of the Class Period**
**August 2017 - August 2019**

This chart compares Mattel's daily average market capitalization to the median market capitalization of Nasdaq firms over each month of the Class Period. Market capitalization is calculated by multiplying the daily closing price with the number of shares outstanding. The resulting daily market capitalizations are then averaged by month. The median market capitalization of Nasdaq firms is determined by first calculating daily average market capitalization of each month for all firms traded on the Nasdaq, then taking the median for the month. The average market capitalization for August 2019 reflects the daily value from August 1, 2019 to August 8, 2019 (the last day of the Class Period).

Exhibit A
Page 59

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 60 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-4   Filed 11/13/23   Page 174 of 309
#:1848

**Exhibit 13**

**Amihud's Illiquidity Measure of Mattel Inc.'s Stock over Each Month of the Class Period**

**August 2017 - August 2019**

This chart compares Mattel's illiquidity (in %) to the median illiquidity of Nasdaq firms over each month of the Class Period. Daily illiquidity is calculated as the daily ratio of the absolute return of Mattel's stock to the dollar value of trading volume (in millions), then averaged over each month. The median illiquidity of Nasdaq firms is determined by first calculating daily average illiquidity of each month for all firms traded on the Nasdaq, and then taking the median for the month. The average daily illiquidity for August 2019 is averaged from August 1, 2019 to August 8, 2019 (the last day of the Class Period).



57

Exhibit A

Page 60

Case 2:19-cv-10860-MCS-PLA    Document 90-2    Filed 04/30/21    Page 61 of 63    Page ID
Case 8:21-cv-02910-TDC    Document 182-4    Filed 11/13/23    Page 175 of 309
#:1849



**Exhibit 14**
**Daily Average Closing Bid-Ask Spread of Mattel Inc.'s Common Stock over Each**
**Month of the Class Period**
**August 2017 - August 2019**

This chart compares Mattel's daily average bid-ask spread (in %) to median bid-ask spread of Nasdaq firms over each month of the Class Period. The daily bid-ask spread is calculated each day using the closing bid and ask prices obtained from CRSP. I then calculate the daily spread as (Ask - Bid)/[(Ask + Bid)/2], and then averaged over each month. The median bid-ask spread of Nasdaq firms is determined by first calculating daily average bid-ask spread of each month for all firms traded on the Nasdaq, and then taking the median for the month. The daily bid-ask spread for August 2019 is averaged from August 1, 2019 to August 8, 2019 (the last day of the Class Period).

Exhibit A
Page 61

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 62 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 176 of 309
#:1850



**Exhibit 15**
**Public Float of Mattel Inc.**
**2017 Quarter 3 - 2019 Quarter 3**

This chart compares stock float (in millions) of Mattel (red bar) to the median float of Nasdaq firms (blue bar) at the end of each calendar quarter of the Class Period (i.e., from 2017 Q3 to 2019 Q3). The data point of 2019 Q3 reflects the balance on August 8, 2019, the last day of the Class Period. To calculate public float, I obtain the number of shares outstanding on the last trading day of the quarter from the CRSP database. I add to the shares outstanding the number of shares shorted reported at the end of the quarter from the COMPUSTAT Short Interest database. From this sum I deduct the number of shares held by insiders, obtained from the Thomson Reuters Insider database. The number of shares outstanding, the number of short interest, and the number of shares held by insiders are all measured in millions. The median float of Nasdaq firms is determined by first calculating public float for all firms traded on the Nasdaq at the end of each calendar quarter, and then taking the median. A firm is excluded from the median if it is not covered by the Compustat Short Interest database or the Thomson Reuters Insider database at the end of the quarter.

Exhibit A
Page 62

Case 2:19-cv-10860-MCS-PLA Document 90-2 Filed 04/30/21 Page 63 of 63 Page ID
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 177 of 309
#:1851

**Exhibit 16**
**Autocorrelation for Mattel Inc.'s Daily Stock Returns**

I perform a regression of Mattel's daily stock return as the dependent variable and the previous trading day's return as the independent variable over the period from August 2, 2017 to August 8, 2019. The first-order autocorrelation is measured by the coefficient of the independent variable.

| | |
|---|---|
| **Time Period:** | 8/2/2017 – 8/8/2019 |
| **Number of Observations:** | 508 |
| **Adjusted R-Squared:** | 0.15% |

| Variables | Coefficient | t-Value |
|---|---|---|
| Intercept | -0.0002 | -0.17 |
| Previous Trading Day's Stock Return | 0.0590 | 1.33 |

\* and \*\* represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

# Appendix D: The Alere Report

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JUDITH GODINEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALERE INC., *et al.*,<br><br>Defendants. | Civil Action No. 1:16-cv-10766 (PBS) |

## DECLARATION OF VINCENT R. CAPPUCCI IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Vincent R. Cappucci, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am a senior partner at the law firm of Entwistle & Cappucci LLP, court-appointed Co-Lead Counsel in the above-captioned action. I am admitted to practice law in the State of New York and before this Court *pro hac vice*.

2.     I respectfully submit this declaration in support of Plaintiffs' Motion for Class Certification.[1]

3.     Attached hereto as Exhibit A is a true and correct copy of the Alere 2015 Investment Community Meeting Presentation by Daniella Cramp.

4.     Attached hereto as Exhibit B is a true and correct excerpt of the September 17, 2015 Morgan Stanley Conference Transcript.

---

[1] Plaintiffs are (i) Glazer Capital Management, L.P., Glazer Enhanced Fund L.P., Glazer Enhanced Offshore Fund, Ltd., Glazer Offshore Fund, Ltd., Highmark Limited, in respect of its Segregated Account Highmark Multi-Strategy 2; (ii) OFI Asset Management; and (iii) NECA-IBEW Pension Trust Fund.

5. Attached hereto as Exhibit C is a true and correct copy of the January 12, 2016 article in the Boston Business Journal, titled: *Amid biotech bloodbath, Alere attracts investors at JP Morgan Conference.*

6. Attached hereto as Exhibit D is the Public Version of the Complaint in *Abbott Laboratories v. Alere, Inc.*, C.A. No. 12963-VCG, publicly filed on December 12, 2016.

7. Attached hereto as Exhibit E is a true and correct copy of the Expert Report of Professor S.P. Kothari, with attached exhibits and appendices.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 19th day of March 2018

Vincent R. Cappucci

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 19, 2018.

**/s/ Adam M. Stewart**
Adam M. Stewart

# EXHIBIT E

**UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| JUDITH GODINEZ, on behalf of herself and all others similarly situated, Plaintiffs, vs. ALERE INC., et al., Defendants. | Case No.: 1:16-cv-10766-PBS |

## <u>EXPERT REPORT OF PROFESSOR S.P. KOTHARI</u>

Professor S.P. Kothari
MIT Sloan School of Management
100 Memorial Drive, E62-662
Cambridge, MA 02142

**TABLE OF CONTENTS**

**Page**

I.     RULE 26 EXPERT DISCLOSURES.................................................................2

II.    MATERIALS REVIEWED OR CONSIDERED ...............................................3

III.   ASSIGNMENT AND SUMMARY OF CONCLUSIONS....................................3

IV.   BACKGROUND ON ALERE ........................................................................4

V.    BACKGROUND ON MARKET EFFICIENCY ...............................................5

VI.   *CAMMER* MARKET EFFICIENCY METRICS ..............................................7

      A. WEEKLY TRADING VOLUME.............................................................7

      B. NUMBER OF ANALYSTS PROVIDING COVERAGE.............................8

      C. MARKET MAKERS AND ARBITRAGEURS .........................................10

      D. ELIGIBILITY TO FILE AN S-3 REGISTRATION STATEMENT...............12

      E. STOCK PRICE REACTION TO NEWS .................................................13

VII.  ADDITIONAL MARKET EFFICIENCY METRICS...........................................24

      A. MARKET CAPITALIZATION................................................................24

      B. STOCK LIQUIDITY & BID ASK SPREADS .........................................24

      C. PUBLIC FLOAT .............................................................................26

      D. AUTOCORRELATION OF STOCK RETURNS.........................................26

VIII. CONCLUDING ASSESSMENT OF MARKET EFFICIENCY.........................27

IX.   ABILITY TO CALCULATE DAMAGES ON A CLASSWIDE BASIS..............27

X.    RESERVATION OF PREROGAITIVE TO SUPPLEMENT AND AMEND………………28

1

## I.     RULE 26 EXPERT DISCLOSURES

1.     I am the Gordon Y Billard Professor of Accounting & Finance at the Sloan School of Management of the Massachusetts Institute of Technology ("MIT").  I have been at MIT since 1999.  During that period, I served as the Deputy Dean of the Sloan School of Management from 2007-2008 and 2010-2015.  In 2008-2009, I was with Barclays Global Investors, a unit of Barclays Plc., for one-and-a-half years as Global Head of Equity Research.  From 1986 to 1999, I served on the faculty of the University of Rochester, first as an Assistant Professor, then as an Associate Professor, and finally as Professor and Accounting Area Coordinator.  During my academic career, I have also held visiting positions at Harvard Business School, MIT, the University of Technology in Sydney, Australia, Baruch College of the City University of New York, and the City University Business School in London.

2.     I received my B.E. degree in Chemical Engineering from the Birla Institute of Technology and Science in India in 1979, my M.B.A. in Accounting and Finance at the Indian Institute of Management in 1982, and my Ph.D. in Accounting at the University of Iowa in 1986.

3.     I have published numerous academic articles in the areas of accounting, finance, and economics and have co-edited two books titled Financial Statement Analysis, published by McGraw-Hill, and Contemporary Accounting Research, published by North-Holland Publishing.  My research has primarily focused on the informational efficiency of stock prices, valuation of equities and bonds, the relation between accounting accruals and cash flows, the effect of institutions on the properties of accounting numbers internationally, and corporate uses of financial derivatives, among other topics.  I am currently an Editor of the Journal of Accounting & Economics, a leading academic journal in the field of accounting, and have been an editor of this journal since 1997.  I have also served as an associate editor for other academic journals, including the Journal of Accounting & Economics and The Accounting Review, and as a referee for academic journals such as The Journal of Finance, the Journal of Financial Economics, the Journal of Accounting Research, Contemporary Accounting Research, and the British Accounting Review.

4.     I have been active in my profession beyond conducting rigorous research and serving as an editor for many leading academic journals.  I have been the keynote speaker and distinguished faculty speaker for a number of accounting association meetings and doctoral consortiums.  I have also served in various policy and management committees at MIT and the University of Rochester.  Finally, I have supervised or served on the dissertation committees of more than 35 doctoral students over the past 30 years. A detailed copy of my curriculum vita is attached as Appendix A hereto.

5.     I bill at my customary rate of $1,300 per hour for my work on this matter, and the rates of those working under my supervision and direction range from $175 to $1050. I have no financial interest in the outcome of this litigation. Payment for my work and those working under my supervision and direction on this matter is in no way contingent on the opinions I express, or the outcome of this matter.

## II.  MATERIALS REVIEWED OR CONSIDERED

6.  For the purpose of preparing this report, I reviewed or considered the data and other information identified in Appendix B hereto, as well as all data and articles referenced in this report.

## III.  ASSIGNMENT AND SUMMARY OF CONCLUSIONS

7.  I have been retained by counsel for Lead Plaintiffs to provide expert testimony on whether the market for Alere common stock was efficient during the Class Period, which for the purpose of this report I define as January 11, 2016 to December 7, 2016.[1]

8.  My report applies economic, financial, and statistical analyses to determine whether Alere's common stock traded in an efficient market. I have made no investigation of the issues surrounding liability in this case.

9.  I form the following opinions on this matter.

   a.  During the Class Period, the market for Alere's stock was efficient. That is, the price of Alere's stock could be relied upon to reflect publicly available information.

   b.  I reached this conclusion after analyzing the five *Cammer*[2] factors used for evaluating market efficiency and four additional factors considered by the courts as measures of market efficiency.[3]  These factors are:

   i.  The stock's average weekly trading volume;
   ii.  The number of security analysts following the stock;
   iii.  The presence of market makers or the listing on a major exchange and the existence of arbitrageurs;
   iv.  Eligibility to file an S-3 registration statement;
   v.  Stock price reaction to unexpected corporate events or financial releases;
   vi.  Market capitalization;
   vii.  Stock liquidity;
   viii.  Public float; and
   ix.  Serial correlation in returns

   c.  Exhibit 1 summarizes the evidence on each of the factors examined. Every factor analyzed supports my opinion that Alere's common stock traded in an efficient market throughout the Class Period.

---

[1]  I use the terms "stock" and "common stock" interchangeably.  "Alere" means Alere Inc.

[2]  *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[3]  See, e.g., *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).

3

     d.     The Court also held in *Halliburton Co v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014) ("*Halliburton II*") that defendants may rebut the presumption of reliance by establishing a lack of price impact by showing that "an alleged misrepresentation did not actually affect the market price of the stock."[4] My analysis indicates that there is evidence of price impact, and my analysis indicates that there is no evidence of a lack of price impact.

10.     I have made no attempt to calculate damages on a class wide basis for this case, but I have been asked to provide an opinion on whether "damages are capable of measurement on a class wide basis." As set forth herein, it is my opinion that damages can be measured on a class wide basis using a standard and well-settled method for assessing damages for each class member under Section 10(b) of the Securities and Exchange Act of 1933.

11.     The remainder of my report details the analyses that support these opinions.

## IV.    BACKGROUND ON ALERE

12.     Alere's business focuses on providing health information through rapid diagnostic tests to its customers, with the goal of obtaining better clinical and economic healthcare outcomes globally.[5] It has manufacturing facilities in North America, Europe, and Asia, and its distribution network is global, with offices in thirty-two countries. One of Alere's products was INRatio – a handheld device used to monitor blood clotting time as measured by PT/INR values intended for both health care professional and home use.[6]

13.     The Complaint alleges that during the Class Period, Alere made public statements in SEC filings and elsewhere that allegedly contained materially false and misleading statements and omissions concerning, among other things, i) the quality of its internal controls related to revenue recognition; ii) the need to recall INRatio products; iii) the failure to disclose billing "improprieties" in two of its divisions; and iv) that Alere's foreign offices regularly engaged in conduct that violated the Foreign Corrupt Practices Act (FCPA). Since this allegedly false and misleading information is publicly available, in an efficient market investors would rely on such information in establishing Alere's stock price.[7]

14.     Plaintiffs claim that the relevant truth was revealed to the market in a series of partial disclosures from March through December 2016.[8]

15.     Defendants filed a Motion to Dismiss on February 6, 2017. On August 23, 2017, the Court denied the Motion to Dismiss with respect to the Plaintiffs' claims related to the alleged materially false and misleading statements and omissions related to INRatio.[9]

---

[4] *Halliburton Co v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 134 S.Ct. 2398, 2414 (2014).

[5] *See* Alere, Annual Report (Form 10-K) at 2 (March 5, 2015).

[6] *See* Memorandum and Order, ECF. 103 at 2–3.

[7] *See* Supplemental and Amended Consolidated Class Action Complaint ("Complaint") at ¶¶ 1–7.

[8] *See id.* at ¶¶ 78–139.

4

16. Exhibit 2 provides an overview of the price and the dollar value of the shares of Alere's stock during the Class Period. On January 11, 2016, the beginning of the Class Period, Alere's stock was trading at $39 per share. Alere had approximately 86.257 million shares outstanding on January 11, 2016 and thus at the start of the Class Period the market capitalization for Alere was approximately $3.4 billion.[10] During the Class Period the stock price reached a high of $54.11 on February 1, 2016 and closed at $36.67 on December 7, 2016, the last day of the Class Period, yielding an ending market capitalization of approximately $3.2 billion. The number of shares traded on any given day during the Class Period ranged from 0.174 million to 32.045 million shares. Jointly this exhibit and these statistics provide preliminary evidence that Alere is a large entity and its stock was actively traded.

## V.   BACKGROUND ON MARKET EFFICIENCY

17. In the Complaint, Plaintiffs allege that the "fraud-on-the-market" theory is applicable to this case.[11] Under this theory, class members who buy a security rely on the integrity of the stock price set by the market. Therefore, investors are also assumed to have incorporated a corporation's omissions and misrepresentations in setting the corporation's stock price, which would be set too high or too low depending on the nature of information omitted or misrepresented. The omissions and misrepresentations are thus incorporated into each class member's purchase price.[12]

18. In this case, Alere is alleged to have omitted facts and made misrepresentations that artificially inflated the price of Alere's stock, which was purchased by Plaintiffs and class members during the Class Period. These investors ultimately suffered losses when the market reacted to subsequent Company-specific disclosures, which partially revealed the truth. As stated in *Basic*:

> "*Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.*" [13]

19. Underlying the fraud-on-the-market theory is the assumption that Alere's stock price reflected an open and developed market. As stated by the U.S. Supreme Court in *Basic*:

> "*The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined*

---

[9] *See* Memorandum and Order, ECF. 103 at 40–41.

[10] I obtained both the share price and the number of shares outstanding from the CRSP database.

[11] *See* Complaint at ¶¶ 258–262

[12] *Basic v. Levinson*, 485 U.S. 224, 225 (1988).

[13] *Id*. at 241–242.

> *by the available material information regarding the company and its business...*"[14]

20. The U.S. Supreme Court recently reaffirmed this understanding of market efficiency in *Halliburton II*.

21. The notion of a market being open and developed in *Basic* (and affirmed in *Halliburton II*) is consistent with economists' view of a semi-strong form of market efficiency. A stock market is efficient (in a semi-strong form) if it promptly incorporates all publicly available information into stock prices and that the incorporation of the information is unbiased, *i.e.,* the price is not set systematically too high or too low. Underlying this definition is the notion that, in such a market, a large number of investors trade in the stock such that new publicly available information is promptly incorporated into the stock price.[15]

22. In my analyses, I identify factors that are closely linked to the above definition of market efficiency. I start with the five *Cammer* factors used by the courts for evaluating market efficiency. The five *Cammer* factors are: (1) the stock's average weekly trading volume; (2) the number of security analysts who followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file an S-3 registration statement; and (5) the stock price reaction to unexpected corporate events or financial releases.[16] As I explain below, the *Cammer* factors are economic attributes of a firm or the market in which the firm's stock is traded. These factors are based on economic theories of market efficiency and have also been used in the academic literature when analyzing market efficiency.[17,18] In addition to these factors I also consider four additional factors that courts have considered as measures of market efficiency: (1) market capitalization; (2) measures of liquidity; (3) public float; and (4) the serial correlation of returns.

23. The market efficiency metrics for Alere are computed and, whenever possible and applicable, benchmarked against the metrics of companies in the NYSE, the stock exchange on which Alere's stock traded.[19]

24. In *Halliburton II*, the court determined that defendants:

> "*can rebut presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the*

---

[14] *Id.*

[15] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1991).

[16] *Cammer,* 711 F. Supp. at 1286–87.

[17] I provide specific academic citations below when I review each market efficiency factor.

[18] Throughout the report, I use the terms "market efficiency," "the market for Alere's stock was efficient," and "efficient market for Alere's stock" interchangeably.

[19] According to CRSP database and Bloomberg Alere traded on NYSE during the Class Period.

6

*misrepresentation, by showing, among other things, that the particular misrepresentation at issue did not affect the stock's market price.*"[20]

25.     The notion of whether a particular misrepresentation affected a firm's stock price is related to the concept of market efficiency that I discuss above. If the market in a firm's stock is efficient, then the firm's stock price will reflect publicly available information when the information is disclosed. In this case, the Plaintiffs allege that between March and December 2016 several public corrective disclosures were made and that as a result of these disclosures, market participants began to learn the truth concerning Alere's omissions and misrepresentations. Evidence that the market reacted to a corrective disclosure is inconsistent with a lack of price impact for the alleged omissions and misrepresentations.[21] Thus, as a part of my market efficiency analysis, I also examine whether the corrective disclosures made during the Class Period impacted Alere's stock price.

26.     Historical data necessary to compute these market efficiency metrics are collected from Bloomberg, the Center for Research in Security Prices database (CRSP), the S&P Compustat database (Compustat), the Institutional Brokers Estimate System database ("I/B/E/S"), the Thomson One Financial database (Thomson), Thomson Reuters Institutional Holdings (13F) database, Thomson Reuters Insider Filings database, and the Dow Jones Factiva database (Factiva).

## VI.     *CAMMER* MARKET EFFICIENCY METRICS

### A.     WEEKLY TRADING VOLUME

27.     The first *Cammer* factor is the average weekly trading volume of a security. As discussed in *Cammer*:

> "*[t]he reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.*"[22]

28.     Several studies in the academic literature examine the implications of trading volume for asset pricing. These studies find that higher trading volume is associated with more efficient prices, lower transaction costs, and greater liquidity, both at the individual security level as well as the aggregate level.[23] Thus, a security with a large trading

---

[20] *Halliburton II*, 134 S.Ct. at 2414.

[21] *Id.*

[22] *Cammer,* 711 F. Supp. at 1286.

[23] *See*, *e.g.,* Tarun Chordia, Richard Roll, & Avanidhar Subrahmanyam, *Market Liquidity and Trading Activity*, 56 J. Fin. 501 (2001) (for evidence on the relation between trading volume and liquidity); Tarun Chordia, Richard Roll, & Avanidhar Subrahmanyam, *Liquidity and Market Efficiency*, 87 J. Fin. Econ. 249 (2008) (for evidence on the relation between liquidity and market efficiency).

volume closely captures the notion of an "open" market, one in which a large number of individuals can buy or sell the stock.[24]

29.   As discussed in *Cammer*:

> "*…2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption.*"[25]

30.   In Exhibits 3 and 4 I provide an analysis of the weekly variation in the share turnover of Alere's stock.[26] I define a week both as a *trading* week (Exhibit 3) and a *calendar* week (Exhibit 4). Share turnover in a *trading* week measures total trading volume over five consecutive trading days as a percentage of the average number of shares outstanding over those days. An analysis based on trading weeks ensures that variation in weekly trading volume is not confounded by calendar weeks with fewer trading days (e.g., holidays).  Share turnover in a *calendar* week measures trading volume from Monday to Friday of each week (regardless of whether the market was closed on one or more days of the week) as a percentage of the average number of shares outstanding for the week. Given that the inferences based on trading weeks are similar to those based on calendar weeks, I limit the discussion in the text to the trading week analysis.[27]

31.   Exhibit 3 shows that the average number of shares traded per week was 7.155 million shares (median number of shares traded per week was 4.713 million).  These statistics correspond to a weekly turnover for Alere stock of 8.27% (median turnover of 5.45%) per trading week for this time period. This number is well above the 2% cutoff cited by the *Cammer* factor for trading volume. Further, share turnover is above the 2% benchmark in 43 of 46 (93%) trading weeks during the Class Period.  Relative to the firms on NYSE, the share turnover for Alere is greater than the median turnover for the firms on NYSE in over 87% of the trading weeks during the Class Period.[28]  These statistics confirm that Alere's trading volume was high in both absolute and relative terms.

32.   In my view, the large trading volume in absolute and relative terms supports my conclusion that the market for Alere's stock was efficient.

   **B.   NUMBER OF ANALYSTS PROVIDING COVERAGE**

---

[24]  *Cammer*, 711 F. Supp. at 1291 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988)).

[25]  *Id.* at 1286.

[26]  I calculate the share turnover by aggregating the total shares traded during the week and dividing by the average number of shares outstanding for the week.

[27]  Exhibit 4 presents the results from the analysis using calendar weeks. There are no notable differences across the two analyses, in the sense that any differences that do exist do not affect the conclusion that the market for Alere's stock was efficient.

[28]  To determine the median share turnover of firms on NYSE, each week I calculate weekly share turnover for all the NYSE listed firms on the CRSP database.  I then take the median for the week.

33.     The second *Cammer* factor is the number of security analysts who followed and reported on Alere's stock. As discussed in *Cammer*:

> "...*it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the Class Period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.*"[29]

34.     The argument behind this factor is that the presence of security analysts (and other information intermediaries, such as the press) would indicate that information on Alere's stock was closely followed, analyzed, and disseminated by investment professionals.

35.     During the Class Period there were at least 14 different security analysts following Alere's stock.[30] These analysts were employed by major firms, including, but not limited to: Morning Star, Jefferies & Company, Inc., BTIG, and Canaccord Genuity.[31]

36.     To provide a perspective on how closely security analysts were following Alere's stock, in Exhibit 5, I examine the number of analyst reports issued each quarter during the Class Period as reported on the Thomson One Analytics Database.[32] In total, there are 114 analyst reports released between January 11, 2016 and December 7, 2016, which is approximately an average of 10 reports per month, and more than 2 per week. In addition, during the four full calendar quarters that encompass the Class Period (i.e., from January 1, 2016 to December 31, 2016), additional analyst reports were released resulting in an average (a median) of 30.3 (30.5) analyst reports released in each full quarter.

37.     To provide additional perspective on how closely security analysts followed Alere's stock, I compare the number of analysts providing any forecasts for Alere's stock to the median analyst following of firms on NYSE during the Class Period as reported on the I/B/E/S database.[33] According to I/B/E/S, during the entire Class Period, there were 8 analysts following Alere. The median analyst coverage for firms on NYSE was also 8 during the same period.[34] Thus, the analyst following of Alere is comparable to the median of firms on NYSE.

---

[29] *Cammer* 711 F. Supp. at 1286.

[30] I obtained information on the number of security analysts following Alere from the Thomson One Analytics database.

[31] I obtained the firms in which the security analysts were employed from the Thomson One Analytics database.

[32] By using the Thomson One Analytics database I am being conservative and understating the extent to which Alere was followed by analysts. There are additional analysts that follow Alere during the class period that do not write reports, and there are analysts that follow Alere that write reports, but do not make them available to Thomson One.

[33] I use the I/B/E/S database for this analysis as it provides data on analyst following for both Alere and all firms on NYSE in a machine-readable format. This likely understates the number of analysts following Alere, as not all analysts that follow Alere provide their forecasts to the providers of the I/B/E/S database.

[34] The median analyst following of firms on NYSE is determined by first calculating analyst coverage of all firms on NYSE during the Class Period, then determining the median.

38.     In addition to being followed by security analysts, Alere's stock was also closely followed by other information intermediaries. For example, the two major credit rating agencies – Moody's and Standard and Poor's Global Ratings – provided credit ratings for Alere.[35] Apart from equity analysts and credit rating agencies, there was also extensive media coverage on Alere. During the Class Period, 800 media articles related to Alere (excluding 27 press releases issued by Alere) can be found in the Dow Jones Factiva Database.

39.     In my opinion, the large number of analysts following the stock, as well as, the extensive press coverage for Alere's stock, constitute clear evidence that information about Alere was closely followed, analyzed, and disseminated by investment professionals and other market participants. This supports my conclusion that the market for Alere's stock was efficient.

## C.     MARKET MAKERS AND ARBITRAGEURS

40.     The third *Cammer* factor is the presence of market makers and arbitrageurs. As discussed in *Cammer*:

> "*[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.*"[36]

41.     The *Cammer* decision on market makers was particularly relevant because the security in question in *Cammer* traded on over-the-counter markets. In such a market the market makers play a key role in supplying liquidity.[37] In the case of Alere, its stock traded on the New York Stock Exchange (NYSE) throughout the whole Class Period, NYSE is a largely electronic market with publicly available information.

42.     As background information, the NYSE is the world's largest and most liquid security exchange.[38]  The minimum requirements for a U.S. company to be listed on the NYSE are that the company has 400 public board lot holders; public shares of 1,100,000 outstanding; market value of publicly held stock of $100 million (or $40 million in the case of IPOs, spin-offs, carve-outs, and affiliates); and stock price of at least $4 at the time of listing.  The company must also meet one of several financial criteria, including

---

[35] My review of the press articles on Factiva indicated that there was a Dow Jones article on S&P's credit ratings on May 6, 2016 entitled *S&PGR Keeps Alere Inc. Ratings On Watch Positive* and Moody's had a press release on March 16, 2016 entitled *Alere's delayed 10K filing and DOJ investigation are credit negative; ratings currently unaffected*.

[36]  *Cammer,* 711 F. Supp. at 1287.

[37] Darrell Duffie, Nicolae Gârleanu, & Lasse Heje Pedersen, *Over-the-Counter Markets*, 73 ECONOMETRICA 1815 (2005).

[38] *See* NYSE description of their exchange at *International Listings*, NYSE, https://www.nyse.com/make-the-move/international-listings.

10

such factors as pre-tax income, global market capitalization, revenues, adjusted cash flows, and stockholders' equity.[39]

43.    Furthermore, the structure of the NYSE ensures that it is able to maintain an orderly market in a security.  To do so, the NYSE uses an advanced technology to operate its markets electronically. It also utilizes the following people on its "trading" floor: Designated Market Makers (DMMs), Floor Brokers, and Supplemental Liquidity Providers (SLPs).  DDMs operate both manually and electronically in order to maintain "fair and orderly" markets for their assigned securities, while Floor Brokers are physically present on the trading floor, executing trades on behalf of their firms' clients. SLPs, on the other hand, are electronic, high-volume members that are incented to add liquidity on the NYSE.[40] The combination of an auction system and electronic trading enables the NYSE to provide liquidity, transparency, and to maintain an orderly market in a security without relying only on the less efficient mechanism of decentralized market makers to provide liquidity. Therefore, in my opinion, the number of "market makers" itself is not a relevant metric in gauging liquidity in a NYSE-traded security. However, the simple fact that Alere's stock traded on the NYSE, a large national exchange with substantial listing requirements, is itself a strong indication of market efficiency in Alere's stock, and easily satisfies this *Cammer* factor throughout the Class Period.

44.    In addition to characteristics of the exchange, a key component behind the decision to consider market makers and arbitrageurs in *Cammer* was whether:

> "*[T]he market for [the corporation's] stock, provided a sufficiently fluid and informed trading environment so that when material information about [ the corporation] was disseminated, investors had available to them an opportunity to trade at informed, and therefore appropriate, bid and asked prices.*"[41]

45.    To measure the presence of informed trading and arbitrageurs in the market for Alere's stock, I focus on institutional investors. Institutional investors are sophisticated and informed. Academic literature shows that institutional investors perform an important function in enhancing the price adjustment to new information, and thus, enhance the information efficiency of stock price.[42] Examples of institutional investors include investment banks, mutual and pension funds, and other financial institutions that hold a large amount of assets under management.

46.    Exhibit 6 compares the percentage of outstanding shares of Alere's common stock held by institutional investors at the end of two calendar quarters during the Class Period (2016 Q1 and 2016 Q2) to the median percentage institutional ownership for firms on

---

[39] The NYSE Listed Company Manual provides an overview of the listing process. *Section 1: The Listing Process*, NYSE, Mar. 10, 2018, http://wallstreet.cch.com/LCMTools/PlatformViewer.asp?selectednode=chp_1 2&manual=%2Flcm%2Fsections%2Flcm-sections%2F.

[40]  *The NYSE Market Model*, NYSE, https://www.nyse.com/market-model/overview.

[41]  *Cammer,* 711 F. Supp. 1282–83.

[42]  Ekkehart Boehmer & Eric Kelley *Institutional Investors and the Informational Efficiency of Prices*, 22 REV. OF FIN. STUD. 3563 (2009).

11

NYSE during the same time period.[43,44] For Alere, the percentage of outstanding shares held by institutional owners ranged from 76% to 83% for the calendar quarters within the Class Period. Institutional investors in total held at least 75% of Alere's common shares for each of the calendar quarters analyzed, highlighting that institutions owned the majority of all of Alere's common stock during the Class Period. In addition, the percentage of outstanding shares held by institutional investors for Alere was above the median of firms on the NYSE for every quarter analyzed.

47.    In my view, the facts that Alere's stock was traded on the NYSE and was largely held by institutional investors both on an absolute and relative basis support my conclusion that the market for Alere's stock was efficient, and easily satisfies this *Cammer* factor.

## D.    ELIGIBILITY TO FILE AN S-3 REGISTRATION STATEMENT

48.    The fourth *Cammer* factor concerns the SEC registration status of a firm, in particular, whether the firm is eligible to file an S-3 form. Specifically, *Cammer* states:

> "…*it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met.*"[45]

49.    The rationale behind this *Cammer* factor is that registrants with the SEC are required to comply with the disclosure requirements in the SEC's *Exchange Act* and thus are subject to periodic public reporting. Specifically, in order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.[46] The reports filed with the SEC can then be analyzed free of cost by professional analysts and investors, by financial press, as well as by any other individual interested in obtaining information about Alere's stock.

50.    The significance of this particular *Cammer* factor is underscored by the SEC's explanation that:

---

[43]   This percentage is calculated on the last day of each calendar quarter by dividing the number of shares held by institutional investors according to the Thomson Reuters Institutional Holding database by the number of outstanding shares as reported on the CRSP database.

[44]   Due to some data issue with the S&P Feed of Thomson Reuters, the institutional holding data after June 30, 2016 are incomplete. Thus, I restrict my analysis through June 30, 2016. Given the magnitude of institutional holdings during the first two quarters of the Class Period, in my opinion, the missing data are unlikely to affect my overall conclusions regarding market efficiency as it relates to this *Cammer* factor.

[45]   *Cammer,* 711 F. Supp. at 1287.

[46]   For additional information, *see Form S-3*, U.S. Securities and Exchange Commission, http://www.sec.gov/about/forms/forms-3.pdf.

> *"[t]his form is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place."*[47]

51.     Prior to the class action period, Alere filed 22 S-3's and S-3ASRs with the SEC.[48] In addition, during the Class Period Alere filed 47 documents with the SEC.[49] During the first few months of the Class Period, it appears that Alere was eligible to file an S-3. According to the SEC's S-3 requirements, Alere became ineligible to file an S-3 when it failed to file its 10-K in a timely manner in March 2016.   For the portion of the Class Period that Alere was ineligible to file an S-3, it appears that restriction was due to a technical timing factor as opposed to the minimum stock requirement (which the Cammer court consider to be significant as indicated in paragraph 48 above).  Thus, in my opinion, the fact that Alere was ineligible to file an S-3 during a portion of the Class Period because of its delayed filings is not indicative of the market for Alere's stock being inefficient.

52.     Consistent with this opinion, the court noted in the *Cammer* case that the Form S-3 test is not a bright line test.[50]  They suggest that the important part of the S-3 requirement is that the company meet the minimum stock requirements, and a firm's stock could very well trade in an efficient market even if it recently failed to meet the qualification for Form S-3 registrants.

53.     In my view, the facts that Alere was a public company, was subject to periodic filing requirements of the SEC, was eligible to file a Form S-3 during the first part of the Class Period, and it became ineligible to file an S-3 because of a technical requirement as opposed to the minimum stock requirements support my conclusion that the market for Alere's stock was efficient.

## E.     STOCK PRICE REACTION TO NEWS

54.     The fifth *Cammer* factor is the existence of a causal relation between unexpected corporate events or financial releases and the stock price response to such events. As stated in *Cammer*:

> *"[e]mpirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response*

---

[47] *See Cammer*, 711 F. Supp. at 1284.

[48]  A list of the S-3 filings that Alere entered into can be found on the SEC's website at *Edgar Search Results: Alere*, U.S. Securities and Exchange Commission, Mar. 16, 2018, https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001145460&type=S-3&dateb=&owner=exclude&count=40.

[49]  *See id*. This number excludes SEC Forms 3, 4 and 5, which are related to change in beneficial ownership of officers, directors, and significant shareholders, Form 11K which is related to employee stock ownership and Forms 13G and 13F which are related to security ownership.

[50]  *Cammer,* 711 F. Supp. at 1287.

13

*in stock price [...] is the essence of an efficient market and the foundation for the fraud on the market theory.*"[51]

55.     I perform an event study to provide evidence on whether, during the Class Period, Alere's stock price reacted promptly to new information and to assess the significance of the reaction. In academic research, event studies are a commonly used and well-established statistical tool for examining the impact of variety of different types of firm-specific events on the price of the firm's stock.[52] As discussed in the classic study by Brown and Warner (1980):

> "*To the extent that the event is unanticipated, the magnitude of abnormal performance at the time the event actually occurs is a measure of the impact of that type of event on the wealth of the firms' claimholders… such abnormal performance is consistent with market efficiency.*"[53]

In other words, event studies allow one to measure the impact of unanticipated events on the firm's stock price and to infer whether abnormal price movement surrounding an event is consistent with the stock price reacting to news efficiently, i.e., whether the reaction is prompt and unbiased. A researcher conducting an event study begins by specifying a model of "expected" price movements based on a set of market factors and then calculates abnormal returns based on the parameters of this model.  These abnormal returns are the basis of tests investigating whether the deviations from expected price movements on a set of event dates of interest are sufficiently large that simple chance can be rejected as the cause.  An event study that demonstrates significant stock price reactions to those events is consistent with the conclusion that the market in that security is efficient.

56.     An event study can be performed using two different measures of stock price reactions to corporate events or information releases. These measures are:

   a)  Stock returns as observed, i.e., the signed price reaction, which captures the direction in addition to the magnitude of price movements in response to corporate events.

   b)  The "absolute value" of the stock market reaction (or unsigned price reaction), which captures the magnitude of the market reaction to a corporate event.

57.     When using signed returns, I am investigating whether on a particular event date market participants respond in the same direction as the unexpected news released on that date. A significant price reaction on an event date in the same direction as unexpected news would indicate that market participants not only react to the corporate event, but that their reaction is in line with the hypothesized nature of the information releases. A key

---

[51]  *Id.*

[52]  For a review of this literature, *see* S.P. Kothari, *Capital Markets Research in Accounting*, 31 J. OF ACCT. & ECON. 105 (2001); S.P. Kothari & Jerold Warner, *Econometrics of Event Studies, in* HANDBOOK OF EMPIRICAL CORPORATE FINANCE  4 (2007).

[53]  Stephen Brown & Jerold Warner, *Measuring Security Price Performance*, 8 J. OF FIN. ECON. 205 (1980).

14

challenge, however, in a test using signed returns is my ability to identify the sign of the unexpected news.

58.     To complement my event study using signed returns, I also conduct an event study using absolute values of returns. The key advantage of using the absolute value of returns ("unsigned returns") is that I am able to measure the magnitude of the market's response without consideration of the direction of the unexpected news.[54] Specifically, by using the absolute value of returns to measure unsigned returns, I can aggregate the price reaction across all event dates (i.e. event dates with both good and bad news) and calculate the average absolute price reaction to all events. A large and statistically significant reaction would suggest that market participants paid attention to the information releases on the event dates, processed the information, and reacted to it as manifested in the absolute price reaction.

59.     In *Cammer*, the court indicated that in an efficient market, when a firm makes a financial release or engages in some other unexpected corporate event, there should be a prompt response in stock price.[55] I focus my event study analysis on two types of corporate events: earnings announcements and the merger announcement between Abbott and Alere.

60.     Earnings announcements are an ideal financial release for tests of whether market participants incorporate information into stock price quickly. Earnings announcement are one of the most important corporate disclosures and a large academic literature studies the stock price behavior around those events.[56] In addition, for every earnings announcement I examine, there are analyst forecasts of the upcoming earnings announcement. I can use the analyst forecasts to measure whether there is unexpected news, and if there is, the sign of the news.

61.     Alere made four earnings announcements during the Class Period. Three of these earnings announcements (August 8, 2016, August 17, 2016, and September 6, 2016), however, were delayed. These delays were due in part because the Company was conducting an analysis of certain aspects of its revenue recognition policies in Africa and China and the implications of those policies on its evaluation of internal controls.[57] The earnings announcements were also delayed in part because of the effort Alere spent resolving these accounting issues, which diverted resources away from the timely filing of the 10Q for the second quarter of 2016.[58] As I explain below, delayed announcements are not ideal for an event study. As a result, I focus on the stock market's reaction to the earnings announcement that was made by Alere just prior to the start of the Class Period and the one earnings announcement during the Class Period that was not delayed.

---

[54]  William Beaver, *The Information Content of Annual Earnings Announcements.* 6 J. of Acct. Res. 67 (1968).

[55]  *Cammer* 711 F. Supp. at 1287.

[56]  For a review of this literature, *see* Kothari, *supra*.

[57]  *See* Alere, Notification of Late Filing (Form 12b-25) (Feb. 26, 2016); Alere, Notification of Late Filing (Form 12b-25) (May 11, 2016).

[58]  *See* Alere, Notification of Late Filing (Form 12b-25) (Aug. 10, 2016).

15

62. In my opinion, Alere's delayed earnings announcements are not ideal events for a test of market efficiency because there is likely to be information leakage prior to the event, and there is also likely to be more difficulty in determining the market's expectations for upcoming earnings. I base this opinion off of the following observations.

63. First, Alere released a press release and an 8-K on July 14, 2016 disclosing its expectations of 2015 annual earnings, and first quarter earnings for 2016. This disclosure, made well after the end of the fiscal year and the end of the first quarter, likely influenced the market's assessment of expected earnings and therefore also likely diluted the market's reaction to subsequent earnings announcements.[59]

64. In addition, Alere filed multiple Form 12b-25's (which are filings required by the SEC in the event of a delay in announcing quarterly or annual earnings) and other press releases informing the market that they would delay the filing of their financial statements and delay announcing earnings. Existing research establishes that the market anticipates bad news when firms file a form 12b-25 seeking permission from the SEC for an extension of the deadline for filing financial statements.[60] Similarly, researchers have found that the market reacts negatively when firms delay their earnings announcements.[61] Thus, the press releases and the SEC filings are an additional source of information leakage that would likely dilute the market's reaction to the subsequent earnings release.

65. Finally, researchers have also found that analysts seldom update their forecasts after a delayed earnings announcement, resulting in stale forecasts.[62] Stale forecasts make it difficult to develop an estimate of the market's expectations for upcoming earnings, and thus make it difficult to evaluate whether an earnings release contains unexpected news.[63]

---

[59] *See* Alere, Current Report (Form 8-K) (July 14, 2014) (The press release included therein discloses Alere's expectations for 2015 annual earnings, 2016 quarterly earnings, updates on when it expects to disclose earnings, details regarding its revenue misstatements, details on its cash balances, and a discussion of the consent solicitation with their debt holders.)

[60] For example, Bartov and Konchitchki find that the market reacts negatively to the filing of forms 12b-25 and this reaction is magnified when firm cite accounting reasons for the delay and they also find that Return-on-Assets is significantly negative for late filers. They indicate that this evidence is consistent with the negative market response to the NT announcements being at least partially due to the NT filings conveying information about deeper problems, including poor future operating performance, and not simply due to the firm missing an SEC filing deadline." Eli Bartov & Yaniv Konchitchki*, SEC Filings, Regulatory Deadlines, and Capital Market Consequences*, 31 ACCT. HORIZONS 109, 111 (2017).

[61] *See* Tiago Duarte-Silva, Huijing Fu, & Christopher F. Noe, *How Do Investors Interpret Announcements of Earnings Delays?,* 25 J. OF APP. CORP. FIN. 64 (2013); Mark Bagnoli, William Kross & Susan G. Watts, *The Information in Management's Expected Earnings Report Date: A Day Late, a Penny Short*, 40 J. OF ACCT. RES. 1275 (2002).

[62] *See* id.

[63] This problem is further confounded by the rapid release of earnings news over a short time period. Normally, earnings releases occur roughly 90 days apart, and the market can use the information in the most recent earnings release to help develop expectations for the next quarter's earnings. In this case, the market did not receive any earnings announcement for over 8 months and then received three earnings announcements in a month. This abnormal flow of earnings related information makes it difficult to assess the market's expectation for earnings news.

66.     In addition to earnings announcements, I also examine whether the market reacts to the announcement made during the Class Period, February 1, 2016, that Alere had entered into a definitive agreement with Abbott, whereby Abbott would acquire Alere at a price of $56 per common share.[64] In an efficient market place, disclosures about a target being acquired at a price above the current market price should be impounded into the stock price, so long as the market did not anticipate the merger.

67.     In summary, my first event study analyzes the market reaction to two earnings announcements and the announcement of the merger agreement.

68.     I also conduct a second event study focusing on the alleged corrective disclosures made during the Class Period.  Specifically, Plaintiffs allege that on seven different dates during the Class Period the Defendants provided news to the market place regarding the alleged misrepresentations.[65]  In an efficient market, if these disclosures were not anticipated, they should be impounded into stock price upon their announcement.

69.     The results of this analysis, discussed in more detail below, indicate that the market did react to the earnings announcements, to the merger announcement, and to the corrective disclosures. These results provide additional evidence that Alere's stock price was efficient during the Class Period, and that during the Class Period the alleged omissions and misrepresentations impacted Alere's stock price.

70.     As I discuss below, based on the results from the event studies I perform, I conclude that there is a clear cause and effect relationship between new material public information about Alere and the market price of its common stock.

    1.    **Event Study on Earnings Announcement Dates**

    1.1   **Identification of Event Dates, Unexpected News, and the Direction of the Unexpected News.**

71.     Exhibit 7 provides details on the two earnings announcements that I use for my event study. For the earnings announcements listed in this exhibit, I identify the time stamp at which the corporate press release of the earnings news became publicly available, the actual earnings realized by the firm, the analysts' consensus forecast, and my assessment of whether there was unexpected earnings news, and if there was, whether the unexpected portion of the earnings news was positive or negative.

72.     Identifying the timing of the earnings news announcement is important for defining whether the news was released before, during, or after trading hours within a given day, as the event study methodology relies on properly identifying the date on which information was made available to market participants. Alere's earnings announcement

---

[64] *See Abbott to Acquire Alere, Becoming Leader in Point of Care Testing and Significantly Advancing Global Diagnostics Presence*, PR NEWSWIRE, Feb. 1, 2016.

[65] I note that November 4, 2016 is both an earnings announcement date as well as a corrective disclosure date resulting in nine independent event dates (two earnings announcements, the merger announcement and seven additional corrective disclosure dates.)

17

on November 4, 2015, was released after 4:30 P.M. EST, which is after the close of the stock market.[66] Thus, the appropriate event date for that announcement is November 5, 2015. The announcement made on November 4, 2016 occurred at 9:54 A.M. EST right after the market opening, and thus November 4, 2016 is the appropriate event date.[67]

73. Determining whether an earnings announcement contains unexpected news is also an important issue when conducting an event study using signed abnormal returns. To determine whether the earnings announcement contains unexpected news, and the sign of the unexpected news, I compare Alere's realized earnings per share (EPS) as reported on the I/B/E/S database[68] with the analyst consensus EPS forecast the day prior to the earnings announcement, which I also obtain from the I/B/E/S (Institutional Brokers Estimate System) database.[69] If the earnings realization as reported on the Thomson Reuters I/B/E/S database is below the consensus forecast, then I characterize the earnings release as bad news. If the EPS realization is greater than 2 cents above the earnings forecast I characterize the forecast as good news. If the EPS realization is equal to the consensus forecast or no more than 2 cents above the consensus forecast, I define the event date to contain neutral news.[70]

74. The results of this analysis indicate that on the evening of November 4, 2015, Alere announced a net income of 54 cents per share. At that time, the market's consensus earnings expectation was 61 cents per share according to the I/B/E/S Summary History database. That is, realized earnings per share (EPS) as reported on the I/B/E/S database is 54 cents per share, and the median analyst forecast just prior to this earnings realization was 61 cents per share. The unexpected news therefore is negative, i.e., actual earnings are below expected earnings. Thus, I would expect the market to react negatively to this earnings announcement.

75. Similarly, on the morning of November 4, 2016, Alere announced a net income of 46 cents per share. At that time, the market's consensus earnings expectation was 52 cents per share according to the I/B/E/S Summary History database. Thus, I would also expect the market to react negatively to this earnings announcement, as there is negative unexpected news.

---

[66] *See Alere Reports Third Quarter 2015 Financial Results,* PR NEWSWIRE, Nov. 4, 2015.

[67] *See Alere Reports Third Quarter 2016 Financial Results*, PR NEWSWIRE, Nov. 4, 2016.

[68] I use the earnings realization as reported on the I/B/E/S database as analysts are often forecasting an earnings number other than the EPS reported on the income statement. For a discussion of the adjustments that analysts make, and the potential biases that arise from using an EPS number other than the metric forecasted by analysts *see* Mark Bradshaw & Richard Sloan, *GAAP versus The Street: an Empirical Assessment of Two Alternative Definitions of Earnings*, 40 J. OF ACCT. RES. 41 (2002).

[69] I/B/E/S gathers individual analyst forecasts and reports the mean and median analyst forecast on a monthly basis. I define the analyst consensus to be the most recent median analyst forecasts issued closest to the earnings announcement date.

[70] I use these cutoffs based on the analysis in Jeff Payne & Wayne Thomas, *The Torpedo Effect: Myth or Reality*, 26 J. of Acct., Auditing, & Fin. 255 (2011). Table 3 in that paper indicates that the average (median) 3-day market adjusted abnormal returns to firms that just meet analyst forecasts (i.e. actual earnings is either equal to or does not exceed the consensus forecast by more than 2 cents) is .14% (.03%). This is economically insignificant. The market's reaction to firms just missing analyst forecasts is ten times larger (-1.46%).

18

76.     I also examine the market's reaction to the announcement on February 1, 2016 that Abbott and Alere had signed a definitive agreement, whereby Abbott agreed to purchase all the outstanding shares of Alere at a price of $56 per share.  On the day prior to the merger, Alere's stock was trading at 37.20 per share.  The timestamp, news source, and a description of the merger announcement are summarized in Exhibit 8.  In an efficient market, I would expect the good news, that Abbott was willing to pay a substantial premium to purchase Alere, to be impounded in price on the day of the announcement.

## 1.2    Analysis of Signed Price Reaction to Earnings Announcements and the Merger Announcement

77.     My first event study uses signed daily abnormal stock returns to investigate whether the market impounded unexpected news into stock price on dates that earnings announcements contained news and on the day of merger announcement. If the market were efficient with respect to unexpected news, then I would expect to observe statistically significant abnormal returns on the dates when unexpected news is released and no reaction on dates when news is not released.  I also expect the direction of the market's reaction (positive or negative) to be the same as the direction of the news (positive or negative).

78.     A central issue in an event study is "to assess the extent to which security price performance around the time of the event has been abnormal."[71] I estimate abnormal returns for each earnings announcement by using a "rolling regression" approach.  For each earnings announcement, I estimate a market model to determine the expected returns on Alere's stock.   To derive the parameters of the market model, I run a regression, which uses the daily stock returns for Alere as the dependent variable.  I include the returns of the S&P 500 as an independent variable to control for the market return associated with large publicly traded corporations.  I also include the returns on the S&P 500 Health Care index as an independent variable to control for the market return for the stocks of firms in the same industry.[72]  I also control for lagged corporate events that occur during the 120-day estimation period by including an indicator variable, *Corporate Events*, which is one if an earnings announcement, corrective disclosure, or merger announcement falls in the estimation window.

79.     I estimate each regression over a 120-trading day period ending the day prior to the event.  I obtain the intercept and slope coefficient parameters from this market model, and calculate the expected returns for the earnings announcement date as follows:

$$ABRET_K = RET_K - (\hat{\alpha} + \hat{\beta}_K \times RET\_SP500_{K,t} + \hat{\gamma}_K \times RET\_SP500HC_{K,t})$$

---

[71] Brown & Warner, *supra*, at 205.

[72]  I focus on the S&P 500 as a proxy for the whole market return as the S&P 500 tracks the return of the largest firms in the U.S. economy.  I use S&P 500 Health Care Index to control for Alere's industry as it comprises the largest companies classified as members of the GICS health care.

Where $\hat{\alpha}$ is the estimated intercept, $\hat{\beta}$ is the estimated slope coefficient for the return on the S&P 500 and $\hat{\gamma}$ is the estimated slope coefficient for the return on the S&P 500 health care sector.[73] I then deduct the expected return from Alere's realized return on the earnings announcement date, to obtain a signed measure of the abnormal return. I perform this procedure for each event date.

80. Exhibit 9 presents the results from this analysis. In this exhibit, I report the abnormal return and a t-statistic from a t-test on whether the abnormal return is different from zero.[74] In a t-test, the t-value measures the number of standard deviations between an actual observation and a prediction. For example, the coefficient of -8.94% (as shown in Exhibit 9) has a t-value of -5.95. In this case -8.94% is 5.95 standard deviations from zero. The p-value associated with this test statistic measures the probability that I would observe this test statistic by chance. In this case, the p-value of less than 0.0001 associated with this t-statistic suggests that there is less than one in one thousand chance of observing an abnormal stock return of -8.94%.[75] Given this low probability, I can reject an explanation that the abnormal stock return is simply observed by chance and conclude that the stock returns on the event date is driven by the news contained in Alere's earnings release.

81. Exhibit 9 indicates that there are statistically significant market reactions on the dates on which I expect the market to react to the news in the earnings announcements.[76] That is, on November 5, 2015 and November 4, 2016, there is a statistically significant and negative market reactions to the unexpected bad news contained in the earnings reports. Last, on February 1, 2016, the date of the merger announcement, there is a statistically significant and positive market reaction of 45.50%.

82. Overall, the results of the market's reaction to unexpected news, which are reported in Exhibit 9, are consistent with the market impounding the unexpected news delivered on earnings announcement dates and on the merger announcement date into Alere's stock price efficiently.

---

[73] I examine the extent to which my analysis is sensitive to my choice of the S&P Health Care Index as an industry control. I replicate all of my market reaction tests (unreported), replacing the S&P Health Care Index with the S&P Health Care Equipment Special Industry Index and find my opinion that the market is efficient with respect to Alere's stock to be unaffected by the choice of industry control.

[74] I use the data from the market model that was used to derive the abnormal return to calculate the t-statistics. Specifically, I divide the abnormal return by the Root Mean Squared Error from the market model to derive the t-statistic.

[75] Throughout the event study portion of this report I consider a two-sided p-value of less than 5% to be statistically significant. In a two-tailed test, I am testing for statistical significance of the market's reaction to news and allowing for the possibility that the reaction could be either positive or negative.

[76] I focus on the sign of the abnormal return and the sign of the unexpected news without consideration of the magnitude of the abnormal return. Generally speaking one would expect the magnitude of abnormal returns to be larger when there is more unexpected news, and the magnitude to be smaller when there is less unexpected news but the relationship is not deterministic. The magnitude of the market's reaction will depend on a number of factors, including whether the unexpected news represents permanent innovations and whether confounding news is released which may dampen the market's reaction.

### 1.3.    Analysis of signed reactions to Corrective Disclosure Dates

83.    In this section I extend my market efficiency tests by conducting an event study analysis on the seven corrective disclosures that are alleged in the Complaint to occur during the Class Period. These corrective disclosures represent the gradual release of financial news to market participants regarding the alleged omissions and misrepresentations.   By investigating whether the market reacted to these disclosures, I can both form an opinion on whether Alere's stock price was efficient during the Class Period and on whether Alere's stock price was impacted by the alleged omissions and misrepresentations.

84.    As I discuss above, in an efficient market, a company's stock price should respond promptly to unexpected news (*i.e.*, unexpected news should impact the firm's stock price). The Complaint alleges that during the end of the Class Period Alere made a series of partial corrective disclosures, which informed market participants about the omissions and misrepresentations alleged in the Complaint.[77]  If these releases contain unexpected news, and the market for Alere's stock is efficient, then I should observe a market response (*i.e.* an abnormal return) to these releases.

85.    For each of the seven corrective disclosures, I identify the time of the disclosure to determine the event date on which the unexpected news was released to market participants.   Similar to my analysis above, if the date stamp occurs after the close of trading, I use the next day as the event date. The timestamps and news sources of the alleged corrective disclosures are summarized in Exhibit 10.

86.    Using the seven corrective disclosures as event dates I perform an event study analysis to determine whether the market reacts to the news disclosed on the corrective disclosure dates. Using the same approach I discuss above, I calculate signed abnormal returns for each corrective disclosure date.   If the market is efficient and the news is material, I would expect to observe negative abnormal returns on the dates for which unexpected news included in the corrective disclosure is released to market participants.

87.    Exhibit 11 reports my estimates of the abnormal returns on the seven corrective disclosure dates as well as the t-statistics associated with these abnormal returns.[78] Each one of the alleged corrective disclosures represents the release of negative unexpected news about the omissions and misrepresentations Alere made during the Class Period. Thus, these seven event dates represent the successive leakage of negative unexpected news.

88.    The results in Exhibit 11 indicate a statistically significant and negative abnormal return on six of the seven corrective disclosure dates. The one date without a statistically significant market reaction is August 26, 2016, which represents the date that Alere announced it will sue Abbott to force the merger.   Specifically, Alere declared that the company filed a complaint "to compel Abbott to fulfill its obligations under the terms of

---

[77]   Complaint at ¶¶ 3, 78–95.

[78]    I use the data from the market model that was used to derive the abnormal return to calculate the t-statistics. Specifically, I calculate the standard deviation of the residuals from this market model, and divide the abnormal return by this standard deviation to derive the t-statistic.

21

the merger agreement..."[79] It is unclear how investors would react to such announcement. While it added to concerns that Alere had misrepresented during the merger negotiation, the complaint may push Abbott to move forward and complete the deal, and earlier announcements of hesitation from Abbott regarding the merger would lessen the overall impact of such information.

89.   Summarizing, the results of my analysis of the market's reaction to the corrective disclosures that occur during the Class Period are consistent with the market incorporating the unexpected news that was delivered on corrective disclosure dates into stock price in an efficient manner.

90.   Exhibit 11 also reports that the sum of the abnormal returns on the corrective disclosure dates that occur during the Class Period equals -58.87%.[80] This sum is economically meaningful, and I also assess whether it is statistically significant using a bootstrap analysis. [81] I find that the joint return of -58.87% on the seven corrective disclosure dates is in the extreme 1% of the bootstrapped distribution suggesting that the joint abnormal return is significant at the 1% level.

91.   The statistical significance of the combined returns (in conjunction with the individual abnormal returns) is consistent with these events representing partial disclosures of Alere's omissions and misrepresentations that cumulated to an economically meaningful and statistically significant reduction in Alere's stock price on the corrective disclosure dates.  They are also consistent with my opinion that the corrective disclosures did have an impact on Alere's stock price. This supports my opinion that there is no evidence of a lack of price impact of the omissions and misrepresentations alleged in the Complaint.

92.   Finally, for my analysis using signed returns, I examine the totality of the evidence provided in Exhibit 11. I note that there is a statistically significant market reaction on six of the seven individual corrective disclosure dates (85.7%) in which unexpected news is delivered to market participants.  To put this number in perspective, I conduct a Fisher Exact Test to examine whether the proportion of statistically significant abnormal returns on these event dates is statistically different than the proportion of abnormal returns I observe on the non-event days during the Class Period. The results from this test indicate that the proportion of statistically significant returns on corrective disclosure dates is

---

[79] *See Alere Issues Statement*, PR NEWSWIRE, Aug. 26, 2016.

[80] Several academic articles examine the cumulative market reaction to events that are revealed to the market over time. *See* Christopher Armstrong, Mary Barth, & Alan Jagolinzer, *Market Reaction to the Adoption of IFRS in Europe*, 85 The Acct. Rev. 31 (2010); Ivy Zhang, *Economic consequences of the Sarbanes–Oxley Act of 2002*, 44 J. of Acct. & Econ. 74 (2007).

[81]  I conduct a bootstrap analysis to determine whether this summation of returns is statistically significant.  To implement the bootstrap approach, I randomly select seven days, one from each of the 120-day window used to estimate the market model for each given event date, excluding February 1, 2016.  I then sum up the abnormal returns for these seven observations.  I repeat this process 1,000 times to derive an empirical distribution of summed returns.  I then assess how the sum of the abnormal returns in the seven corrective disclosures dates compares to the distribution of the 1,000 summed returns.

statistically larger than the proportion of abnormal statistically significant returns on non-event days during the Class Period.[82]

### 2. Analysis of Unsigned Price Reaction to news releases

93.     I supplement my signed event study analysis with a second test that utilizes the absolute value of abnormal returns to assess whether Alere's stock price efficiently reflects unexpected news.  As I mention above, a test that uses signed abnormal returns requires me to specify the direction of unexpected news (positive or negative). By using a model that includes the absolute value of abnormal returns as the dependent variable, I no longer need to identify the sign of the news.  In addition, an analysis that uses absolute returns allows me to aggregate the price reaction across event dates.  Thus, I can calculate the average absolute price reaction on dates when news is released.

94.     To calculate unsigned abnormal returns for this analysis I adopt the same approach to the one that I used in my signed returns tests. Specifically, for each day in the Class Period I estimate a market model using Alere's stock returns for the previous 120 days as the dependent variable.  I include the returns on the S&P 500 as an independent variable to control for the return on the whole market and the S&P 500 Health Care Index as an independent variable to control for industry returns.  I also control for lagged corporate events that occur during the estimation period by including an indicator variable, *Corporate Events*, which is one if an earnings announcement, merger announcement, or corrective disclosure falls in the estimation window.  I obtain the parameters from this model to derive an expected market return and deduct the expected return from the realized return to obtain an abnormal return for each date in the Class Period. I then take the absolute value of these abnormal returns to obtain an unsigned measure of abnormal returns.

95.     I regress the absolute value of abnormal returns on a single indicator variable, *Event*, which is one for each of the nine event dates in which earnings news, the merger announcement, and the corrective disclosures were made. The results of this regression are reported in Exhibit 12.

96.     The main statistics of interest in this exhibit are the p-value and t-statistic associated with the coefficient on the *Event* indicator variable.  The coefficient of *Event* indicates that the average absolute value of the abnormal return earned on event dates is 11.37% larger than the average absolute value of the abnormal return during the non-event days during the event period.  The t-statistic of 10.63 and p-value of less than 0.001 indicate that there is less than one in one thousand chance that this result would occur by chance alone.

97.     Overall the results reported in Exhibit 12 are consistent with the market impounding the unexpected news that was delivered on event dates into stock price in an efficient manner.

---

[82]   I determine the abnormal returns for every date in the Class Period using the same approach that I used for the corrective disclosure dates (i.e. using a market model over the 120-day prior period). I then determine the proportion of abnormal returns that are statistically significant on non-event dates and test whether this proportion differs from the proportion of the nine events that are significant using the Fisher Exact Test.

## VII. ADDITIONAL MARKET EFFICIENCY METRICS

98. In addition to the *Cammer* factors listed above, I have also considered additional operational market efficiency factors that have been considered by the courts. As with the *Cammer* factors, these other operational factors all support my conclusion that Alere's common stock traded in an open, developed and efficient market throughout the Class Period.

### A. MARKET CAPITALIZATION

99. In *Krogman v. Sterritt* the court suggested that:

> "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[83]

100. As I discuss above, market capitalization is also an important factor in complying with the NYSE's listing requirements. Academic research also establishes that market capitalization is highly correlated with other market efficiency factors considered in *Cammer* including: trading volume, analyst following, and press coverage.[84]

101. Exhibit 13 presents the market capitalization for Alere relative to the median firm on the NYSE during the Class Period. Market capitalization is computed on a monthly basis by taking the monthly average of the product of the daily closing price of Alere's common stock times the daily number of outstanding shares. The data points in Exhibit 13 represent the monthly average of the daily market capitalization, by month, for Alere and the median market capitalization of firms on NYSE, over each month of the Class Period.

102. Alere's market capitalization reached a high of $4.6 billion in February 2016 and a low of $3.2 billion in January 2016. Alere's market capitalization was greater than the median of firms on the NYSE exchange for every month during the Class Period. This suggests that Alere was a relatively large firm, both in an absolute and relative sense.

103. In my opinion, Alere's relatively large market capitalization supports my conclusion that the market for Alere's stock was efficient.

### B. STOCK LIQUIDITY & BID ASK SPREADS

104. My next efficiency metrics are proxies for stock price liquidity. When applying the fraud-on-the-market theory, an important aspect is that the market for the stock is "open, efficient and well developed." Here I focus on the "developed" component of the definition. As discussed in *Cammer*, a developed market is:

---

[83] *Krogman*, 202 F.R.D. at 478.

[84] For examples of papers demonstrating these correlations, *see* Darren Roulstone, *Analyst Following and Market Liquidity*, 20 Contemp. Acct. Res. 551 (2003); Ekkehart Boehmer & Eric Kelley, *Institutional Investors and the Informational Efficiency of Prices*, 22 REV. OF FIN. STUD. 3563 (2009).

> "*[o]ne which has a relatively high level of activity [...] [i]t usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).*"[85]

105. While my earlier analysis of trading volume is consistent with the market for Alere's stock being developed, I supplement my analysis with direct evidence on traditional proxies for liquidity—namely the Amihud (2002) measure of stock illiquidity and bid-ask spreads.[86] Stock liquidity is a fundamental tenet of market efficiency and these metrics are among the most classic measures of (the lack of) stock liquidity. Lower illiquidity and lower bid-ask spreads indicate less uncertainty regarding valuation and greater ability to trade without moving the market price.[87] Further, the *Krogman* court suggested, "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."

106. Exhibit 14 presents Alere's illiquidity measure (here after "illiquidity") for Alere's common stock, relative to the median illiquidity of firms on the NYSE over the Class Period. Following Amihud (2002), I compute daily illiquidity as the ratio of the absolute return of Alere's stock to the dollar value of trading volume (in millions).[88] I then average these daily ratios for each month in the Class Period. Illiquidity measures the extent to which the firm's stock price reacts per million dollars of trading volume.

107. Illiquidity for Alere's stock ranged from a low of 0.004% to a high of 0.06% during the Class Period. Alere's illiquidity was below the median illiquidity for firms on the NYSE during every month of the Class Period (i.e., stock liquidity was *above* the median of NYSE firms since illiquidity is an inverse indicator of liquidity). These results confirm that the liquidity for Alere's stock was relatively high.

108. Exhibit 15 presents Alere's daily average bid-ask spread—an inverse measure of liquidity—relative to the median bid-ask spread of firms on the NYSE during the Class Period. For each trading day, bid-ask spread is computed as the difference between closing ask price and closing bid price divided by the average of the ask price and bid price. The closing ask and bid prices were obtained from CRSP database. The data points in Exhibit 15 represent the monthly average of the daily bid-ask spreads (as a percentage) over the Class Period.

109. The monthly average of Alere's daily bid-ask spread ranged from 0.02% to 0.05% during the Class Period. Alere's average bid-ask spread was smaller than the median of firms on NYSE during every month of the Class Period (i.e., stock liquidity was *above* the median of NYSE firms since bid-ask spread is an inverse indicator of liquidity). These results

---

[85] *Cammer* 711 F. Supp. at 1276, n.17 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6).

[86] *See* Yakov Amihud, *Illiquidity and Stock Returns: Cross-Section and Time-Series Effects*, 5 J. of Fin. Markets 31 (2002).

[87] *See* Albert Kyle, *Continuous Auctions and Insider Trading*, 53 ECONOMETRICA 1315 (1985); Lawrence Glosten & Paul Milgrom, *Bid, Ask, and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders*, 14 J. of Fin. Econ. 71 (1985).

[88] *See* Amihud, *supra*.

confirm, both in an absolute and a relative sense, that the liquidity for Alere's stock was high during this period.

110. In my view, Alere's high stock liquidity supports my conclusion that the market for Alere's stock was efficient.

## C.    PUBLIC FLOAT

111. My next efficiency metric is public float. Public float refers to the amount of outstanding securities that are not held by insiders of a given corporation.[89] In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders.[90] *Krogman* further states:

> "*Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security.*"[91]

112. Public float indicates the amount of securities available to non-insiders, who are able to trade freely and profit by trading on new information in the marketplace. Exhibit 16 compares Alere's quarterly public float to the median public float of firms on the NYSE by calendar quarter over the event period. To calculate public float I obtain the number of outstanding shares on the last trading day of the quarter from the CRSP database. I add to the shares outstanding the number of shares shorted as reported on the last day of the quarter in the COMPUSTAT database. From this sum I deduct the number of shares held by insiders, obtained from the Thomson Reuters Insider Filings dataset.[92]  Exhibit 16 indicates that Alere's public float was within the range of 81 million to 82 million shares at the end of each quarter within the Class Period.[93]  For the firms on NYSE the median public float ranged from 50.1 million to 51.5 million shares. In every calendar quarter during the Class Period, Alere had a greater float than the median of firms on the NYSE. These statistics suggest that there were a substantial number and proportion of shares that could be traded by investors or lent to short holders.

113. The large float for Alere's stock provides evidence supporting my conclusion that Alere's common stock traded in an open, developed, and efficient market throughout the Class Period.

## D.    AUTOCORRELATION OF STOCK RETURNS

---

[89]  Insiders are not allowed to freely trade in the stock of their firm based on their privileged, nonpublic information. They are subject to both trading restrictions (blackout periods and restrictions under Exchange Act §§ 10b-5, 16(b), and 16(c)) and reporting requirements under § 16(a).

[90]  *Krogman*, 202 F.R.D. 467.

[91]  *Krogman*, 202 F.R.D. at 478 (citing defendant's expert's affidavit).

[92]  To determine the number of shares held by insiders I begin by calculating the stock holdings of each insider using the stock holdings and the transactions data that is included in the database. Then for each firm I add up the holdings of all insiders as of the end of quarter.

[93]  In this exhibit, 2016 Q4 ends on December 7, 2016, the last day of the Class Period.

26

114.    The final market efficiency metric I examine is the extent to which Alere's stock returns are serially correlated (I also refer to this as autocorrelation).  If a firm's stock returns are serially correlated, it means that the stock's return today can anticipate the stock's return tomorrow.  If the return on a firm's stock today can predict the return on the firm's stock tomorrow, and this relationship is economically significant, this would be inconsistent with market efficiency as traders could use the information in a firm's stock price today and earn profits the following day beyond transaction costs. Alternatively, a stock that has a lower return autocorrelation is consistent with the market for this stock behaving efficiently because, in an efficient market, past stock returns cannot predict future returns and traders cannot profit from exploiting information in past stock prices.[94] As *Lehocky* states:

> "*In an efficient market, there should be no trends because the market should be reacting quickly to new information, and new prices are being set quickly based upon the new information. Thus, if there is a serial correlation in the stock prices, it lends to a finding of market inefficiency.*" [95]

115.    To determine whether Alere's returns are serially correlated I run a regression of Alere's daily stock return on the daily abnormal stock return of the previous trading day for each day over the Class Period. If the estimated coefficient of the previous day's return is sufficiently small or statistically insignificant, then there would be no evidence of return predictability, which would be consistent with Alere's stock price being efficient.

116.    Exhibit 17 presents Alere's autocorrelation. I find that the coefficient on lagged returns (-0.0798) is not significant at the 95% confidence level. The insignificant autocorrelation is consistent with the market for Alere's stock behaving efficiently.

117.    Overall, the results of my analysis on the extent to which Alere's stock exhibits serial correlation support my view that the market for Alere's stock is efficient.

## VIII.   CONCLUDING ASSESSMENT OF MARKET EFFICIENCY

118.    Based on the analyses above, every factor analyzed supports my opinion that Alere's common stock traded in an efficient market.

## IX.   ABILITY TO CALCULATE DAMAGES ON A CLASSWIDE BASIS

119.    Damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale. If the share is held through the end of the Class Period, damages are measured as the artificial inflation at the time of purchase, subject to the PSLRA's "90-

---

[94]  For evidence on the relation between autocorrelation and market efficiency *see* Doron Avramov, Tarun Chordia, & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. of Fin. 2365 (2006); Chordia, Roll, & Subrahmanyam, *Liquidity and Market Efficiency*, *supra*.

[95]  *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506 (S.D. Tex. 2004).

day look back" provision, a formulaic cap on damages that also can be applied class-wide.[96]

120. The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth regarding the facts and subject matter allegedly obscured or concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class and not rely on individualized considerations. Accordingly, although I have not been asked to calculate class-wide damages, based on my experience and understanding of the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

## X.   RESERVATION OF PREROGAITIVE TO SUPPLEMENT AND AMEND

121. This report represents my current opinions, based on the materials I have reviewed and analyzed to date. If additional relevant material or information comes to my attention, I reserve the right to revise or supplement this report. I also reserve the right to respond to the opinions of other expert witnesses in this matter and to modify or supplement my opinions accordingly.

I have signed the above report in Cambridge, Massachusetts on this 18th day of March, 2018.

S.P. Kothari

---

[96] Specifically, the PSLRA states: "…in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u–4(e)(1).

28

**Exhibit 1**
**Summary of Market Efficiency Factors for Alere Inc.'s Common Stock during the Class Period**
**January 11, 2016 – December 7, 2016**

| Factor | Summary of Factor | Alere's Common Stock |
|---|---|---|
| Weekly Trading Volume (*Cammer* I) | "…2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption" (*Cammer*) | • Average weekly share turnover of 8.27% (median of 5.45%). This number is well above the 2% cutoff cited by the *Cammer* court.<br>• Alere's turnover is greater than the median turnover of firms traded on the NYSE in 40 out of 46 (87%) trading weeks during the Class Period. |
| Number of Analysts Providing Coverage (*Cammer* II) | "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the Class Period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." (*Cammer*) | • Total of 114 publicly available analyst reports were issued during the Class Period, with approximately 10 (2) reports being issued per month (week) during the Class Period.<br>• During the Class Period, according to the I/B/E/S database, 8 analysts made forecasts for Alere, compared to a median of 8 analysts making any forecasts for NYSE firms.<br>• During the Class Period 800 media articles referring to Alere (approximately 2.4 articles per day) can be found in the Dow Jones Factiva Database. |
| Market Makers & Arbitrageurs (*Cammer* III) | "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." (*Cammer*) | • Traded on NYSE, a large national exchange with substantial listing requirements and market makers.<br>• Institutional investors in total held 76-83% of Alere's common shares, more than the 50-51% median of NYSE firms during the Class Period. |
| Eligibility to File an S-3 Registration Statement (*Cammer* IV) | "…it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met." (*Cammer*) | • Alere did not file a Form S-3 with the SEC during the Class Period. However, it filed more than 20 Form S-3 and Form S-3ASR during 2002-2009.<br>• Alere filed a total of 47 documents with the SEC during the Class Period.<br>• Alere was eligible to file an S-3 during the first part of the Class Period. About 1/3 of the way through the Class Period, Alere became ineligible to file an S-3 because of a technical requirement, as opposed to the minimum stock threshold requirement. |

29

**Exhibit 1 (Continued)**
**Summary of Market Efficiency Factors for Alere Inc.'s Common Stock during the Class Period**
**January 11, 2016 – December 7, 2016**

| Factor | Summary of Factor | Alere's Common Stock |
|---|---|---|
| Stock Price Reaction to News (*Cammer* V) | "Empirical facts showing cause and effect relationship between unexpected corporate events or financial releases and immediate response in stock price is relevant to determination of whether stock was traded on efficient market." (*Cammer*) | • Event study analyses show strong statistically significant market reactions on two earnings announcement dates with unexpected bad news and one merger announcement date, and the reactions are in the same direction of the news.<br>• I find significantly negative market reactions on six out of seven corrective disclosures dates. The sum of the abnormal returns (-58.87%) for the seven corrective disclosure dates is statistically significant.<br>• Using an unsigned returns test, I find a statistically significant average market reaction of 11.37% to the 9 event dates. |
| Market Capitalization (*Krogman*) | "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." (*Krogman*) | • Daily average market capitalization reached a high of $4.61 billion and a low of $3.23 billion.<br>• On average, Alere's daily market capitalization was greater than the median market capitalization of NYSE firms during every month of the Class Period. |
| Stock Liquidity (*Krogman*) | Low measures of market illiquidity and narrow bid-ask spread indicate less uncertainty regarding valuation and greater ability to trade without moving the market price. (*Krogman*) | • The daily illiquidity for Alere's stock ranged from a low of 0.004% to a high of 0.06%, while daily average bid-ask spread ranged from 0.02% to 0.05% during the Class Period.<br>• Alere's market illiquidity measure and bid-ask spread were below the median of NYSE firms for the entire Class Period. |
| Public Float (*Krogman*) | "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security." (*Krogman*) | • Alere's quarterly public float ranged from 81 million shares to 82 million shares during the Class Period.<br>• The public float of Alere was greater than the median float of NYSE firms during every quarter spanning the Class Period. |
| Serial Correlation of Returns (*Lehocky*) | "In an efficient market, there should be no trends because the market should be reacting quickly to new information, and new prices are being set quickly based upon the new information. Thus, if there is a serial correlation in the stock prices, it lends to a finding of market inefficiency." (*Lehocky*) | • The coefficient of first-order autocorrelation for Alere's daily stock returns was statistically insignificant during the Class Period. |

30

Case 1:16-cv-10766-PBS Document 177-5 Filed 03/19/18 Page 33 of 65
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 213 of 309

# Exhibit 2
## Alere Inc. Common Stock Closing Price & Volume
### January 11, 2016 - December 7, 2016

This exhibit provides an overview of the price and the dollar value of the shares of Alere's stock during the Class Period. The blue bar plots the daily share volume (in millions) and the red line plots the daily closing price (in US dollars) of Alere during the Class Period. Data on stock price and volume are obtained from the CRSP database.



Case 1:16-cv-10766-PBS Document 147-5 Filed 03/19/18 Page 34 of 65

Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 214 of 309

# Exhibit 3
## Alere Inc.'s Common Stock Weekly Turnover - Trading Week
### January 11, 2016 - December 7, 2016

This chart plots the weekly share turnover (on a *trading* week basis) of Alere's common stock (red line) and the median turnover of NYSE firms. Weekly turnover is calculated as the summation of the shares traded during each trading week divided by the weekly average outstanding shares. The median turnover of NYSE firms is determined by calculating weekly turnover of all firms traded on the NYSE, and then taking the median for the trading week. Each trading week is defined as five consecutive trading days. The last trading week during the Class Period consists of only one trading day (December 7, 2016) and is excluded from this Exhibit.



Weekly Share Turnover:
Mean: 8.27%
Median: 5.45%

Weekly Volume:
Average: 7.155 million shares
Median: 4.713 million shares

32



**Exhibit 4**
**Alere Inc.'s Common Stock Weekly Turnover - Calendar Week**
**January 11, 2016 - December 7, 2016**

33

# Exhibit 5
## Analyst Reports on Alere Inc. Released Each Quarter during the Class Period
### January 11, 2016 - December 7, 2016

The blue bar chart reflects the number of analyst reports of Alere that were released in each calendar quarter over the four calendar quarters that encompass the Class Period (i.e., January 1, 2016 to December 31, 2016). The red line plots the number of analyst reports released during the Class Period (i.e., from January 11, 2016 to December 7, 2016). Data on the number of analyst reports made during a calendar quarter were



Case 1:16-cv-10766-PBS  Document 177-5  Filed 03/19/18  Page 36 of 65
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 216 of 309



**Exhibit 6**
**Percentage of Alere Inc.'s Shares Owned by Institutional Investors at the End of the**
**First Two Calendar Quarters during the Class Period**
**2016 Quarter 1 - 2016 Quarter 2**

This chart compares the institutional ownership in (%) of Alere stock to the median of NYSE during the first two calendar quarters of the Class Period (i.e., from March 31, 2016 and June 30, 2016). Data for the remaining quarters is currently unavailable. The percentage of institutional ownership is calculated by dividing the number of common shares held by insititutional investors as reported at the end of each calendar quarter by the number of shares outstanding at the end of the calendar quarter. The median institutional ownership of NYSE firms is determined by first calculating instutitional ownership for all firms traded on the NYSE at the end of each calendar quarter, and then taking the median.

35

**Exhibit 7**
**Alere Inc.'s Earnings Announcements**

The following is a list of Alere's earnings announcements that I use for my event study.  These earnings announcements were made either immediately before or during the Class Period. For each earnings announcement the table provides information on the date and time of the earnings announcement, the analysts' earnings expectation, realized earnings, and a description of whether the earnings announcement contains bad news, good news, or neutral news. If the actual EPS beat the analyst consensus by more than two cents, I classify that announcement as having good news.  If the actual EPS metrics fell below the analyst consensus, I classify that announcement as having bad news. If the actual EPS metric beats or exceed the analyst consensus by less than or equal to two cents, I classified that earnings announcement as having neutral news.

| Date | Time (EST)[a] | Actual EPS[b] | Analyst Consensus[b] | Characterization of Earnings news |
|---|---|---|---|---|
| November 4, 2015 (2015 Q3) | 4:30 p.m. | $0.54 | $0.61 | Bad News |
| November 4, 2016 (2016 Q3) | 9:54 a.m. | $0.46 | $0.52 | Bad News |

---

[a]  I obtained a copy of the press releases from the Factiva database to identify the date/time stamp of Alere's earnings announcements.

[b]  Both Analyst consensus and actual EPS are obtained from I/B/E/S adjusted summary history database. I used the median forecast immediately prior to earnings announcement for the consensus forecast.

**Exhibit 8**
**Alere Inc.'s Merger Announcement**

Below is a description of the merger announcement, its date and time, and the source of news. I use the timestamp when the news was first made available to market participants.

| Date | Event | Source of News |
|---|---|---|
| **February 1, 2016** | Abbott announced to acquire Alere for a total equity value of $5.8 billion. Abbott agreed to pay $56 per Alere's share or a 50% premium over the closing price of the prior trading day. | PR Newswire, 8:00 a.m. |

# Exhibit 9
## Regression Results of the Market Reaction to Alere Inc.'s Unexpected Events
### Assessment of Stock Return Reaction to Alere's Individual Earnings Announcements and Merger Announcement

I perform an event study using rolling regressions. Specifically, for each of the two earnings announcements and the merger announcement, I estimate the following regression model using a 120-trading-day window prior to the event:

$$RET_{K,t} = \alpha + \beta_K \times RET\_SP500_{K,t} + \gamma_K \times RET\_SP500HC_{K,t} + \Sigma(\delta_{K,\,i=1\,to\,5} \times Corporate\,Events_{K,\,i=1\,to\,5}) + \varepsilon_{K,t}, \text{ t} = -120, -119\ldots, -1, K = 1, 2, 3$$

$RET_{K,t}$ is Alere's stock return on day t. $RET\_SP500_{K,t}$ is the return of the market portfolio on day t, as proxied by the S&P 500 Index, while $RET\_SP500HC_{K,t}$ is the return of the industry portfolio on day t, as proxied by the S&P 500 Health Care Index. In addition, I control for any prior corporate events that occur during the estimation window. Specifically, I define the indicator variable $Corporate\,Event_{K,i=1\,to\,5}$ to be one if an earnings announcement or corporate event i occurs during the estimation window. I then compute abnormal return (*ABRET*) on event date as:

$$ABRET_K = RET_K - (\hat{\alpha} + \hat{\beta}_K \times RET\_SP500_{K,t} + \hat{\gamma}_K \times RET\_SP500HC_{K,t}), K = 1, 2, 3$$

where $\hat{\alpha}$, $\hat{\beta}$ and $\hat{\gamma}$ are estimated parameters obtained from the 120-trading-day rolling regression. This exhibit presents *ABRET* for each of the three event dates and t-value, which is computed as *ABRET* divided by the root mean squared error of the 120-trading-day estimation window. I use the degrees of freedom from the 120-day rolling regression to derive the p-value and consider two-tailed p-value of less than or equal to 5% to be statistically significant.

| Event | Date | News | ABRET | t-statistic | Two-sided p-value | 5% Significance |
|---|---|---|---|---|---|---|
| Earnings Announcement | November 5, 2015 | Bad News | -0.0894 | -5.95** | 0.0000 | ✓ |
| Earnings Announcement | November 4, 2016 | Bad News | -0.1381 | -4.03** | 0.0001 | ✓ |
| Merger Announcement | February 1, 2016 | Good News | 0.4550 | 23.78** | 0.0000 | ✓ |

\* and \*\* represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

**Exhibit 10**
**Summary of Alleged Corrective Disclosures that Occurred During the Class Period**

Below are descriptions of the seven alleged corrective disclosures, the associated dates and times, and the sources of news. I use the timestamp when each news was first made available to market participants.

| Date | Event | Source of News |
|---|---|---|
| **March 15, 2016** | Alere announced that it delayed Form 10-K filing due to its continuing analysis of certain accounting issue; and Alere received a grand jury subpoena from the DOJ. | Dow Jones Institutional News, 6:01 a.m. |
| **April 20, 2016** | Abbott's CEO refused to publicly commit to the merger. | Dow Jones Institutional News, 11:34 a.m. |
| **April 28, 2016** | Alere rejected Abbott's offer to cancel the merger transaction. | PR Newswire, 9:37 p.m. |
| **July 11, 2016** | Alere announced to voluntarily withdraw INRatio products. | PR Newswire, 5:00 p.m. |
| **August 26, 2016** | Alere sued Abbott to compel compliance with the merger agreement. | PR Newswire, 11:00 a.m.[a] |
| **November 4, 2016** | Alere announced disappointing 2016 Q3 financial results; A subsidiary of Alere, Arriva Medical, received a notice that the CMS revoked Arriva's Medicare enrollment. | PR Newswire, 9:54 a.m. |
| **December 7, 2016** | Abbott filed a complaint to terminate the proposed merger of Alere. | PR Newswire, 11:14 a.m. |

---

[a] Alere filed the complaint on August 25, 2016 but made a public announcement on August 26, 2016.

39

## Exhibit 11
### Regression Results of the Market's Reaction to Corrective Disclosures
**Assessment of Stock Return Reaction to Alere's Individual Corrective Disclosures**

I perform an event study using rolling regressions. Specifically, for each of the seven alleged dates of corrective disclosures during the Class Period, I estimate the following regression model using a 120-trading-day window prior to the date of misrepresentations:

$$RET_{K,t} = \alpha + \beta_K \times RET\_SP500_{K,t} + \gamma_K \times RET\_SP500HC_{K,t} + \Sigma(\delta_{K,\,i=1\,to\,5} \times Corporate\ Events_{K,\,i=1\,to\,5}) + \varepsilon_{K,t},$$
$$t = -120, -119\ldots, -1, K = 1, 2,\ldots, 7$$

$RET_{K,t}$ is Alere's stock return on day t. $RET\_SP500_{K,t}$ is the return of the market portfolio on day t, as proxied by the S&P 500 Index, while $RET\_SP500HC_{K,t}$ is the return of the industry portfolio on day t, as proxied by the S&P 500 Health Care Index. In addition, I control for any prior corporate event that occurs during the estimation window. Specifically, I define the indicator variable $Corporate\ Event_{K,\,i=1\,to\,5}$ to be one if an earnings announcement or corporate event i occurs during the estimation window. I then compute abnormal return ($ABRET$) on each earnings announcement date as:

$$ABRET_K = RET_K - (\hat\alpha + \hat\beta_K \times RET\_SP500_{K,t} + \hat\gamma_K \times RET\_SP500HC_{K,t}), K = 1, 2, \ldots, 7,$$

where $\hat\alpha$, $\hat\beta$ and $\hat\gamma$ are estimated parameters obtained from the 120-trading-day rolling regression. This exhibit presents $ABRET$ for each of the alleged dates of misrepresentations during the Class Period and t-value, which is computed as $ABRET$ divided by the root mean squared error of the 120-trading-day estimation window. I use the degrees of freedom from the 120-day rolling regression to derive the p-value and consider two-tailed p-value of less than or equal to 5% to be statistically significant.

| | ABRET | t-statistic | Two-sided p-value | 5% Significance |
|---|---|---|---|---|
| March 15, 2016 | -0.0641 | -3.63** | 0.0004 | ✓ |
| April 20, 2016 | -0.1238 | -7.89** | 0.0000 | ✓ |
| April 29, 2016 | -0.0972 | -6.13** | 0.0000 | ✓ |
| July 12, 2016 | -0.0367 | -3.15** | 0.0021 | ✓ |
| August 26, 2016 | -0.0241 | -0.71 | 0.4789 | x |
| November 4, 2016 | -0.1381 | -4.03** | 0.0001 | ✓ |
| December 7, 2016 | -0.1046 | -3.00** | 0.0033 | ✓ |
| Sum of abnormal returns associated with the seven alleged corrective disclosures[a] | -0.5887 | -9.25** | 0.0000 | ✓ |

\* and \*\* represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

---

[a] I conduct a bootstrap analysis to determine whether this summation of returns is statistically significant. To implement the bootstrap approach, I randomly select seven days, one from each of the 120-day windows (excluding February 1, 2016) used to estimate the regression model for each corrective disclosure date. I then sum up the abnormal returns for these seven observations. I repeat this process 1,000 times to derive an empirical distribution of summed abnormal returns. I next assess how the sum of the abnormal returns on the seven corrective disclosures dates compares to the distribution of the 1,000 summed abnormal returns. I find that the joint abnormal return of -58.87% of the seven corrective disclosure dates is in the extreme 1% of the bootstrapped distribution, consistent with the joint abnormal return being statistically significant at the 1% level.

40

## Exhibit 12
## Regression Results of the Market Reaction to Alere Inc.'s Unexpected Events
### Assessment of the Absolute Value of Alere's Abnormal Stock Return to Alere's Corporate Events Aggregated

To test whether Alere's stock reacted significantly to unexpected corporate events, I perform an event study by regressing the absolute value of Alere's abnormal returns on an indicator for the nine corporate events, including earnings announcements, corrective disclosure dates, and the merger announcement.[a] I estimate the following model using 275 trading observations during the period from November 5, 2015 to December 7, 2016:

$$ABS(ABRET_T) = \alpha + \beta \times Event_T + \varepsilon_T, \ T = 1, 2, \ldots, 275.$$

$ABRET_T$ is the abnormal return of day T estimated from 120-trading-day rolling regressions. Specifically, for each day T in this period, I estimate the following market model over the 120-trading-day window prior to date T:

$$RET_{T,t} = \alpha + \beta_T \times RET\_SP500_{T,t} + \gamma_T \times RET\_SP500HC_{T,t} + \Sigma(\delta_{T,\ i=1\ to\ 5} \times Corporate\ Events_{T,\ i=1\ to\ 5}) + \varepsilon_{T,t},$$
$$t = -120, -119\ldots, -1, T = 1, 2, \ldots, 275.$$

$RET_{T,t}$ is Alere's stock return on day t. $RET\_SP500_{T,t}$ is the return of the market portfolio on day t, as proxied by the S&P 500 Index, while $RET\_SP500HC_{T,t}$ is the return of the industry portfolio on day t, as proxied by the S&P 500 Health Care Index. In addition, I control for any prior corporate events that occur during the estimation window. Specifically, I define the indicator variable $Corporate\ Event_{T,\ i=1\ to\ 5}$ to be one if an earnings announcement or corporate event i occurs during the estimation window. I then compute abnormal return ($ABRET$) on each date as:

$$ABRET_T = RET_T - (\hat{\alpha} + \hat{\beta}_T \times RET\_SP500_{T,t} + \hat{\gamma}_T \times RET\_SP500HC_{T,t}), \ T=1, 2, \ldots, 275,$$

where $\hat{\alpha}$, $\hat{\beta}$ and $\hat{\gamma}$ are estimated parameters obtained from the 120-trading-day rolling regression. $ABS(ABRET_T)$ is the absolute value of $ABRET_T$. $Event_T$ is an indicator for the nine event dates.

| Time Period | 11/5/2015 – 12/7/2016 | |
|---|---|---|
| Number of Observations | 275 | |
| Adjusted R-squared | 0.2900 | |

| | Coefficient | t-statistic |
|---|---|---|
| Intercept | 0.0122 | 6.31** |
| Event | 0.1137 | 10.63** |

\* and \*\* represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

---

[a] November 4, 2016 is both an earnings announcement and an alleged corrective disclosure date.

41

# Exhibit 13
## Daily Average Market Capitalization of Alere Inc. over Each Month of the Class Period
### January 11, 2016 - December 7, 2016

This chart compares Alere's daily average market capitalization to the median market capiralization for NYSE firms over each month of the Class Period. Market capitalization is calculated by multiplying the daily closing price with the number of shares outstanding. The resulting daily market capitalizations are then averaged by month. The median market capitalization of NYSE firms is determined by first calculating daily average market capitalization of each month for all traded on the NYSE, then taking the median for the month. The average market capitalization for January 2016 only reflects the daily value from January 11, 2016 (the first day of the Class Period) to January 31, 2016. The market capitalization for December 2016 is the daily market capitalization averaged from December 1, 2016 to Decemer 7, 2016 (the last day of the Class Period).



Case 1:16-cv-10766-PBS  Document 177-5  Filed 03/19/18  Page 44 of 65
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 224 of 309

42

Case 1:16-cv-10766-PBS  Document 177-5  Filed 03/19/18  Page 45 of 65
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 225 of 309

**Exhibit 14**

**Amihud's Illiquidity Measure of Alere Inc.'s Stock over Each Month of the Class Period**

**January 11, 2016 - December 7, 2016**

This chart compares Alere's illiquidity (in %) to the median illiquidity of NYSE firms over each month of the Class Period. Daily illiquidity is calculated as the daily ratio of the absolute return of Alere's stock to the dollar value of trading volume (in millions), then averaged over each month. The median illiquidity of NYSE firms is determined by first calculating daily average illiquidity of each month for all firms traded on the NYSE, and then taking the median for the month. The average daily illiquidity for January 2016 only reflects the daily value from January 11, 2016 (the first day of the Class Period) to January 31, 2016. The average daily illiquidity for December 2016 is averaged from December 1, 2016 to December 7, 2016 (the last day of the Class Period).

Case 1:16-cv-10766-PBS   Document 177-5   Filed 03/19/18   Page 46 of 65
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 226 of 309

# Exhibit 15
# Daily Average Closing Bid-Ask Spread of Alere Inc.'s Common Stock over Each
# Month of the Class Period
## January 11, 2016 - December 7, 2016

This chart compares Alere's daily average bid-ask spread (in %) to median bid-ask spread of NYSE firms over each month of the Class Period. The daily bid-ask spread is calculated each day using the closing bid and ask prices obtained from CRSP. I then calculate the daily spread as (Ask - Bid)/[(Ask + Bid)/2], and then average daily spreads over each month. The median bid-ask spread of NYSE is determined by first calculating daily average bid-ask spread of each month for all firms traded on the NYSE, and then taking the median for the month. The average daily bid-ask spread for January 2016 only reflects the daily value from January 11, 2016 (the first day of the Class Period) to January 31, 2016. The daily bid-ask spread for December 2016 is averaged from December 1, 2016 to December 7, 2016 (the last day of the Class Period).



**Exhibit 16**
**Public Float of Alere Inc.**
**2016 Quarter 1 - 2016 Quarter 4**

This chart compares stock float (in millions) of Alere to the median float of NYSE firms at the end of each calendar quarter of the Class Period (i.e., from 2016 Q1 to 2016 Q4). The data point of 2016 Q4 reflects the balance on December 7, 2016, the last day of the Class Period. To calculate public float, I obtain the number of shares outstanding on the last trading day of the quarter from the CRSP database. I add to the shares outstanding the number of shares shorted reported at the end of the quarter from the COMPUSTAT database. From this sum I deduct the number of shares held by insiders, obtained from the Thomson Financial Insider database. The number of shares outstanding, the number of short interest and the number of shares held of insiders are all measured in millions. The median float of NYSE firms is determined by first calculating public float for all firms traded on the NYSE at the end of each calendar quarter, and then taking the median.



45

Case 1:16-cv-10766-PBS  Document 177-5  Filed 03/19/18  Page 47 of 65
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 227 of 309

**Exhibit 17**
**Autocorrelation for Alere Inc.'s Daily Abnormal Stock Returns**

I perform a regression of Alere's daily stock return as the dependent variable and the previous trading day's return as the independent variable over the period from January 11, 2016 to December 7, 2016. The first-order autocorrelation is measured by the coefficient of the independent variable.

| | |
|---|---|
| **Time Period:** | 1/11/20165 to 12/7/2016 |
| **Number of Observations:** | 231 |
| **Adjusted R-Squared:** | 0.19% |

| Variables | Coefficient | t-Value |
|---|---|---|
| Intercept | 0.0011 | 0.37 |
| Previous Trading Day's Stock Return | -0.0798 | -1.20 |

\* and \*\* represent statistical significance at one-tailed 0.05 and 0.01 levels, respectively.%

46

**Appendix A – S.P. Kothari's Vitae**



## S.P. KOTHARI
Gordon Y Billard Professor of Accounting and Finance
Director, MIT India Program http://web.mit.edu/misti/mit-india/

MIT Sloan School of Management
E-mail: Kothari@MIT.edu
Web: http://web.mit.edu/kothari/www/
Phone: Direct (617) 253-0994

Exec. Assistant: Laura Brentrup (617) 715-2845 brentrup@mit.edu

http://scholar.google.com/citations?user=1YTXJkoAAAAJ&hl=en
Papers: http://ssrn.com/author=17425

**MIT Sloan Office Address**
Sloan School of Management
Massachusetts Institute of Technology
100 Main Street, E62-662
Cambridge, MA  02142-1347

**SELECTED AWARDS**

AAA Presidential Scholar, 2017-18
**Doctor Honoris Causa**, University of Cyprus, 2016
AAA Notable Contributions to Accounting Literature Award, 2014
**Doctor Honoris Causa**, University of Technology, Sydney, 2013
Distinguished Alumnus Award, Birla Institute of Technology & Science, Pilani, India, 2013

**EMPLOYMENT**

| | |
|---|---|
| 2015- Present | Gordon Y Billard Professor of Accounting and Finance, Sloan School of Management, Massachusetts Institute of Technology |
| 2010 –2015 | Deputy Dean and Gordon Y Billard Professor of Accounting and Finance, Sloan School of Management, Massachusetts Institute of Technology |
| 2008 – 2009 | Global Head of Equity Research, Barclays Global Investors, Barclays Bank. |
| 2007 – 2008 | Deputy Dean and Gordon Y Billard Professor in Management, Sloan School of Management, Massachusetts Institute of Technology |
| 2006 – 2007 | Head of the Department of Economics, Finance, and Accounting, and Gordon Y Billard Professor in Management, Sloan School of Management, Massachusetts Institute of Technology |
| 2005 – 2006 | Thomas Henry Carroll-Ford Visiting Professor of Business Administration, Harvard Business School |
| 2003 – 2005 | Head of the Department of Economics, Finance, and Accounting, and Gordon Y Billard Professor in Management, Sloan School of Management, Massachusetts Institute of Technology |
| 1999 – 2003 | Gordon Y Billard Professor in Management and Head of the Accounting Group, Sloan School of Management, Massachusetts Institute of Technology |
| 1998 – 1999 | Professor and Accounting Area Coordinator, University of Rochester |
| 1997 – 1998 | Visiting Professor, Sloan School of Management, Massachusetts Institute of Technology |
| 1996 – 1997 | Professor and Accounting Area Coordinator, University of Rochester |
| 1991 – 1996 | Associate Professor & Accounting Area Coordinator, University of Rochester |
| 1988 – 1991 | Assistant Professor and Accounting Area Coordinator, University of Rochester |
| 1986 – 1988 | Assistant Professor, University of Rochester |

*1*

## BOARD OF DIRECTORS APPOINTMENTS

2015 – Present  **BSE** (Bombay Stock Exchange) http://www.bseindia.com/
2014 – 2016      FIA Technology Services http://www.fiaglobal.com/index.php
2008 – present  Monsoon Kitchens http://www.monsoonkitchens.com/
1998 – 2004      Vicarious Visions http://www.vvisions.com/
2016 – Present  Trillium Asset Management  www.trilliumivest.com

## OTHER APPOINTMENTS

2001 – 2003      Honorary Visiting Professor, Cranfield University
2001, Winter     Visiting Professor, London Business School
1997, Summer  Visiting Professor at the University of Technology in Sydney, Australia
1996, Fall          Weinstein Distinguished Visiting Professor, Baruch CUNY, New York
1994 – 1997      Honorary Visiting Professor, City University Business School, London
1979 – 1980      Officer, DCM's Shriram Fertilizers and Chemicals, Mumbai

## EDUCATION

Ph.D. Accounting, University of Iowa, 1986

M.B.A. (PGDM) Accounting and Finance, Indian Institute of Management, Ahmedabad, India, 1982

B.E. Chemical Engineering, Birla Institute of Technology and Science, Pilani, India, 1979

## RESEARCH

1. Collins, D, W., Kothari, S., Rayburn J., 1987, Firm Size and the Information Content of Prices with Respect to Earnings, *Journal of Accounting and Economics* 9, 111-138.

2. Kothari, S., Lys, T., Smith, C., and Watts, R., 1988. Auditor Liability and Information Disclosure, *Journal of Accounting, Auditing and Finance* 3, 307-339.

3. Handa, P., Kothari, S., and Wasley, C., 1989, The Relation Between the Return Interval and Betas: Implications for the Size-Effect, *Journal of Financial Economics* 23, 79-100.

4. Kothari, S., Wasley, C., 1989, Measuring Security Price Performance in Size Clustered Samples, *The Accounting Review* 64, 228-249.

5. Collins, D., Kothari, S., 1989, An Analysis of the Cross-sectional and Intertemporal Determinants of Earnings Response Coefficients, *Journal of Accounting and Economics* 11, 143-181.

6. Ball, R., Kothari, S., 1989, Nonstationary Expected Returns: Implications for Tests of Market Efficiency and Serial Correlation in Returns, *Journal of Financial Economics* 25, 51-74.

7. Ball, R., Kothari, S., 1991, Security Returns Around Earnings Announcements, *The Accounting Review* 66, 718-738.

8. Kothari, S., Sloan, R., 1992, Information in Prices About Future Earnings: Implications for Earnings Response Coefficients, *Journal of Accounting and Economics* 15, 143-171.

9. Kothari, S., Shanken, J., 1992, Stock Return Variation and Expected Dividends: A Time-Series and Cross-Sectional Analysis, *Journal of Financial Economics* 31, 177-210.

10. Kothari, S., 1992, Price-Earnings Regressions in the Presence of Prices Leading Earnings: Earnings Level versus Change Specification and Alternative Deflators, *Journal of Accounting & Economics* 15, 173-202.

11. Ball, R., Kothari, S., and Watts, R., 1993, The Economics Determinants of the Relation Between Earnings Changes and Stock Returns, *The Accounting Review* 68, 622-638.

12. Handa, P., Kothari, S., Wasley, C., 1993 Sensitivity of Multivariate Tests of the CAPM to the Return Measurement Interval, *Journal of Finance* 48, 1543-1551.

13. Collins, D., Kothari, S., Shanken, J., and Sloan, R., 1994, Lack of Timeliness and Noise as Explanations for Low Contemporaneous Return-Earnings Association, *Journal of Accounting & Economics* 18, 289-324.

14. Ball, R., Kothari, S., Wasley, C., 1995, Can We Implement Research on Stock Trading Rules? *Journal of Portfolio Management* 21, 54-63.

15. Ball, R., Kothari, S., Shanken, J., 1995, Problems in Measuring Portfolio Performance: An Application to Contrarian Investment Strategies, *Journal of Financial Economics* 38, 79-107.

16. Kothari, S., Shanken, J., Sloan, R., 1995, Another Look at the Cross-Section of Expected Stock Returns, *Journal of Finance* 50, 185-224.

17. Kothari, S., Zimmerman, J., 1995, Price and Return Models, *Journal of Accounting and Economics* 20, 155-192.

18. Guay, W., Kothari, S., Watts, R., 1996, A Market-based Evaluation of Discretionary-Accrual Models, *Journal of Accounting Research Supplement* 34, 83-115.

19. Kothari, S., Warner, J., 1997, Measuring Long-Horizon Security Price Performance, *Journal of Financial Economics* 43, 301-339.

20. Kothari, S., Shanken, J., 1997, Book-to-Market, Dividend Yield, and Expected Market Returns: a Time-Series Analysis, *Journal of Financial Economics* 44, 169-203.

21. Dechow, P., Kothari, S., Watts, R., 1998, The Relation Between Earnings and Cash Flows, *Journal of Accounting & Economics* 25, 133-168.

22. Ball, R., Kothari, S., Robin, A., 2000, The Effect of International Institutional Factors on Properties of Accounting Earnings, *Journal of Accounting & Economics* 29, 1-51.

23. Kothari, S., Warner, J., 2001, Evaluating Mutual Fund Performance, *Journal of Finance* 56, 1985-2010.

24. Hentschel, L., Kothari, S., 2001, Are Corporations Reducing or Taking Risks with Derivatives? *Journal of Financial and Quantitative Analysis* 36, 93-118.

25. Kothari, S., 2001, Capital Markets Research in Accounting, *Journal of Accounting & Economics* 31, 105-231.

26. Kothari, S., Laguerre, T., Leone, A., 2002, Capitalization versus Expensing: Evidence on the Uncertainty of Future Earnings from Capital Expenditures versus R&D Outlays, *Review of Accounting Studies* 7, 355-382.

27. Core, J., Guay, W., Kothari, S., 2002, The Economic Dilution of Employee Stock Options: Diluted EPS for Valuation and Financial Reporting, *The Accounting Review* 77, 627-652.

28. Guay, W., Kothari, S., 2003, How Much Do Firms Hedge with Derivatives? *Journal of Financial Economics* 70, 423-461.

29. Guay, W., Kothari, S., Sloan, R., 2003, Accounting for Employee Stock Options, *American Economic Review* 93, 405-409.

30. Kothari, S., Shanken, J., 2004, Asset Allocation with Inflation-Protected Bonds, *Financial Analysts Journal* 60, 54-70.

31. Chan, W., Kothari, S., Frankel, R., 2004, Testing Behavioral Finance Theories Using Trends and Consistency in Financial Performance, *Journal of Accounting & Economics* 38, 3-50.

32. Kothari, S., Sabino, J., Zach, T., 2005, Implications of Survival and Data Trimming for Tests of Market Efficiency, *Journal of Accounting & Economics* 39, 129-161.

33. Kothari, S., Leone, A., Wasley, C., 2005, Performance Matched Discretionary Accrual Measures, *Journal of Accounting & Economics* 39, 163-197.

34. Barclay, M., Gode, D., Kothari, S., 2005, Matching Delivered Performance, *Journal of Contemporary Accounting & Economics* 1, 1-25.

35. Frankel, R., Kothari, S., Weber, J., 2006, Determinants of the Informativeness of Analyst Research, *Journal of Accounting & Economics* 41, 29-54.

36. Kothari, S., Lewellen, J., Warner, J., 2006, Stock Returns, Aggregate Earnings Surprises, and Behavioral Finance, *Journal of Financial Economics* 79, 537-568.

37. Kolasinski, A., Kothari, S., 2008, Investment Banking and Analyst Objectivity:  Evidence from Analysts Affiliated with M&A Advisors, *Journal of Financial and Quantitative Analysis* 43, 817-842*.*

38. Jin, L., Kothari, S., 2008, Effect of Personal Taxes on Managers' Decision to Sell Unrestricted Equity, *Journal of Accounting & Economics* 46, 23-46.

39. Kothari, S., Li, X., Short, J., 2009, The Effect of Disclosures by Management, Analysts, and Financial Press on the Equity Cost of Capital: A Study Using Content Analysis, *The Accounting Review* 84, 1639-1670.

40. Kothari, S., Shu, S., Wysocki, P., 2009, Do managers withhold bad news?  *Journal of Accounting Research* 47, 241-276.

41. Kothari, S., Ramanna, K., Skinner, D., 2010, Implications for GAAP from an Analysis of Positive Research in Accounting, *Journal of Accounting & Economics* 50, 246-286.

42. DeFranco, G., Kothari, S., Verdi, R., 2011, The Value of Earnings Comparability, *Journal of Accounting Research* 49, 895-931.

43. Guay, W., Kothari, S., Shu, S., 2011, Properties of Implied Cost of Capital Using Analysts' Forecasts, *Australian Journal of Management* 36, 125-149.

44. Ball, R., Kothari, S., Nikolaev, V., 2013, On Estimating Conditional Conservatism, *The Accounting Review* 88, 755-787.

45. Ball, R., Kothari, S., Nikolaev, V., 2013, Econometrics of the Basu Asymmetric Timeliness Coefficient and Accounting Conservatism, *Journal of Accounting Research*, 51, 1071-1097.

46. Kothari, S., Mizik, N., Roychowdhury, S., 2016, Managing for the Moment: The Role of Real Activity versus Accrual Earnings Management in SEO Valuation, *The Accounting Review,* 91, 559-586.

47. Jayaraman, S., Kothari, S., 2016, The Effect of Corporate Transparency on Bank Risk-Taking and Banking System Fragility, *The Accounting Review*, 91, 535-558.

48. Kothari, S., So, E., Verdi, R., 2016, Analysts' Forecasts and Asset Pricing: A Survey, *Annual Review of Financial Economics,* 8, 197-219.

49. Kothari, S., Lewellen, J., Warner, J., 2016, The Behavior of Aggregate Corporate Investment, working paper, MIT Sloan School of Management.

50. Jayaraman, S., Kothari, S., Ramanna, K. 2017, Capture and Competition: The Role of Product Market Competition in Reallocating Rents from Regulatory Capture, working paper, MIT Sloan School of Management.

51. He, X, Kothari, S., Xiao, T., Zuo, L., 2018, Long-Term Impact of Business Cycles on Auditors' Judgment, forthcoming in *The Accounting Review.*

52. Guest, N., Kothari, S., So, E., 2017, Flight-to-Dividends: The Role of Earnings in Periods of Capital Scarcity, working paper, MIT Sloan School of Management.

53. Guest, N., Kothari, S., Pozen, R., 2017, High Non-GAAP Earnings Predict Abnormally High CEO Pay, working paper, MIT Sloan School of Management.

54. Kothari, S., Loutskina, E., Nikolaev, V., 2011, Agency Theory of Overvalued Equity as an Explanation for the Accrual Anomaly, working paper, MIT Sloan School of Management.

55. Guay, W., Kothari, S., Loktionov, Y., 2008, Accounting for Derivatives in Emerging Market Economies, working paper, MIT Sloan School of Management.

**DISCUSSIONS and RESEARCH IN PROFESSIONAL JOURNALS, BOOKS, AND MONOGRAPHS**

1. Kothari, S., Shanken, J., 1993. Fundamentals Largely Explain Stock Price Volatility. *Journal of Applied Corporate Finance* 6, 81-87.

2. Kothari, S., Shanken, J., 1993. Growth Rates, Not Levels. *Journal of Applied Corporate Finance* 6, 111-112*.*

3. Kothari, S., Shanken, J., 1995.  In Defense of Beta. *Journal of Applied Corporate Finance* 8, 53-58.

4. Kothari, S., Shanken, J., 1999.  Beta and Book-to-Market: Is the Glass Half Full or Half Empty, in: D. B. Keim and W.T. Ziemba, eds.: *Security Market Imperfections in Worldwide Equity Markets* (Cambridge, U.K.: Cambridge University Press).

5. Kothari, S., 2000, Discussion of "The Relation Between Analysts' Forecasts of Long-Term Earnings Growth and Stock Price Performance Following Equity Offerings," *Contemporary Accounting Research* 17, 33-39.

6. Kothari, S., 2000, Role of Financial Reporting in Reducing Financial Risks in the Market, in Eric Rosengren and John Jordan, eds.: Building an Infrastructure for Financial Stability (Federal Reserve Bank of Boston, pp. 89-102).

7. Kothari, S., Shanken, J., 2002. Anomalies and Efficient Portfolio Formation. Association of Investment Management Research, Charlottesville, VA.

*5*

8. Kothari, S., Shanken, J., 2003, Time-Series Coefficient Variation in Value-Relevance Regressions: A Discussion of Core, Guay, and Van Buskirk and New Evidence, *Journal of Accounting & Economics* 34, 69-87.

9. Kothari, S., Warner, J., 2007, Econometrics of Event Studies, in Espen Eckbo, Ed., Handbook of Empirical Corporate Finance (Elsevier/North-Holland).

10. Kothari, S., Lester, R., 2012, The Role of Accounting in the Financial Crisis: Lessons for the Future, *Accounting Horizons* 26, 335-351.

11. Kothari, S., Swamy, G., Danilov, K., 2012, Generating Superior Performance in Private Equity: A New Investment Methodology, *Journal of Investment Management* 11, 28-41.

12. Pozen, R., Kothari, S., 2017, Decoding CEO Pay, *Harvard Business Review*, July-August, 78-84.

**BOOKS**

*Financial Statement Analysis*, Edited by Ray Ball and S.P. Kothari, McGraw-Hill, 1994.

*Contemporary Accounting Research: Synthesis and Critique*, Edited by S.P. Kothari, Thomas Z. Lys, Douglas J. Skinner, Ross L. Watts, and Jerold L. Zimmerman, North-Holland Publishing, 2002.

**CONSULTING ACTIVITIES**

September 2000: Report and Testimony for the United States International Trade Commission Investigation Nos. AA1921-197 (Review), etc., involving Certain Carbon Steel Products from Australia, etc., on behalf of domestic producers.

October 2001: Report and Testimony for the United States International Trade Commission Steel Global Safeguards 201 Investigation on behalf of domestic producers.

September 2002: Report and Deposition on behalf of Department of Justice in United States of America, Plaintiff, vs. Philip Morris Incorporated, et al, Defendants. Case No. 99-CV-02496 (GK).

April 2003: Acacia Mutual Life Insurance Company, et al, Plaintiffs, vs. BAA plc, et al, Defendants. Case No. C-2002-79742OT.

September 2004: Report and Deposition, In re: WorldCom, Inc. Securities Litigation, United States District Court, Southern District New York, Master File No. 02 Civ. 3288 (DLC).

November 2004: Fyffes, Plc., and DCC Plc., S&L Investments Limited, James Flavin and Lotus Green Limited, The High Court, Dublin, Ireland, 2002 No. 1183P. Trial testimony in May 2005.

2005: Report on behalf of PBL and ORS against Seven Network Limited and C7 PTY Limited, Australia, Federal Court Proceedings N1223 of 2002.

2006: Report and Deposition on behalf of UBS Paine Webber and UBS Warburg against Lampkin et al., in Civil Action H-02-0851 in the U.S. District Court, Houston Division.

2006: Report and Deposition on behalf of Ernst & Young against Cendant Corporation Securities Litigation, in Civil Action 98-CV-1664 (WHW) in the U.S. District Court of New Jersey.

2007: Report on behalf of Ernst & Young against Cendant Corporation Securities Litigation, in Civil Action 98-CV-1664 (WHW) in the U.S. District Court of New Jersey.

*6*

2012: Report on behalf of Micron Technology, Inc. and Micron Semiconductor Products, Inc. against Oracle America, Inc., in Civil Action 10-cv-04340 in the U.S. Northern District of California, Oakland Division.

2013: Rebuttal report on behalf of Brookfield Asset Management Et Ano. v. AIG Financial Products Corp. Et Ano., in Civil Action 09-CV-8285 in the U.S. Southern District Court of New York.

2013: Report and Deposition testimony in re: Residential Capital, LLC et al., Debtors, United States Bankruptcy Court Southern District of New York, Case No. 12-12020 (MG)

2013: Declaration report on behalf of The Blackstone Group L.P. et al., Defendants, United States District Court Southern District of New York, Civil Action No. 08-CV-03601-HB

2014: Report, Rebuttal report and Deposition on behalf of Deutsche Bank National Trust Company, as Trustee for the Trustees, Plaintiff, United States District Court for the District of Columbia, Case No. 09-CV-1656-RMC

2014: Report, Rebuttal report, Deposition and Trial Testimony on behalf of Starr International Company, Inc., Plaintiff, in The United States Court of Federal Claims, No. 11-CV-00779 (TCW).

2014: Declaration report on behalf of Keurig Green Mountain, Defendant, in opposition to JBR's motion for a preliminary injunction, United States District Court, Southern District of New York, No 1:14-md-02542 (VSB), Applies to No. 14 Civ. 4242.

2014: Report and Deposition on behalf of Lead Plaintiffs in re Wilmington Trust Securities Litigation, United States District Court, District of Delaware, Case No. 10-cv-00990-SLR.

2014: Report on behalf of Ernst & Young LLP, Defendant, in Michael Courtney, et. al. v. Avid Technology, Inc., et. al., United States District Court, District of Massachusetts, Civil Action No. 1:13-cv-10686-WGY.

2015: Report and Deposition on behalf of Lead Plaintiffs in re Bank of New York Mellon Corp. Forex Transaction Litigation, United States District Court, Southern District of New York, Civil Action Master File No. 12-md-2335 (LAK).

2015: Report on behalf of Respondent in re Hulley Enterprises Ltd, Yukos Universal Ltd, and Veteran Petroleum Ltd. v. The Russian Federation, United States District Court for the District of Columbia, Case No. 1:14-cv-01996-ABJ.

2015 and 2016: Report, Supplemental Report and Deposition on behalf of Plaintiff in re Freeman Investment Management Co. LLC., United States District Court for the Southern District of California, Case No. 13-cv-2856 JLS (RBB).

2016 and 2017: Report and Rebuttal report and deposition on behalf of Plaintiffs in re FACEBOOK, INC. IPO Securities and Derivative Litigation, United States District Court for the Southern District of New York, Case No. MDL No. 12-2389 (RWS).

2016: Report on behalf of Lead Plaintiffs in re The Trustees of the Drywall Acoustic Lathing and Insulation Local 675 Pension Fund and 0793094 B.C. Ltd. v. SNC-Lavalin Group et al., Court File Number: CV-12-453236CP, Toronto, Ontario, Canada.

2017: Expert report on behalf of Defendants in re SanDisk et al. v. Toshiba in the INTERNATIONAL COURT OF ARBITRATION, ICC Case 22815/MK.

2017 and 2018: Expert report, deposition, and testimony on behalf of Defendants IN THE MATTER OF THE ARBITRATION OF Freestone Insurance Company, in Liquidation Claimant, v. Ernst & Young, LLP, Respondent. CPR File G-16-52-C at Wilmington, Delaware.

## PROFESSIONAL ACTIVITIES

**Editor**, *Journal of Accounting & Economics,* 1997-Present.
Associate Editor, *Journal of Contemporary Accounting & Economics*, 2005-Present.
Associate Editor, *Asia-Pacific Journal of Accounting & Economics,* 2000-2004.
Associate Editor, *Journal of Accounting & Economics,* 1990-1996.
Editorial Board Member, *The Accounting Review,* 1989-1992.

Referee for: *The Journal of Finance, Journal of Financial Economics, Journal of Accounting Research, The Accounting Review, Journal of Financial and Quantitative Analysis, Contemporary Accounting Research, Journal of Business, The Review of Financial Studies, Review of Economics and Statistics, British Accounting Review.*

**Keynote Speaker** at British Accounting Association Annual Meetings, April 1995, Accounting Association of Australia and New Zealand Annual Meetings, July 1996, HKUST Summer Symposium on Accounting Research, June 2001 and July 2012, Accounting Research Consortium, University of Technology, Sydney, Australia, January-February 2012, Ontario Universities Accounting and Finance Symposium, October 2016; Corporate Finance, Governance & Sustainability Conference at Delhi School of Business, October 2016, Distinguished Faculty Speaker at the British Accounting Association Doctoral Consortium, April 1995, Distinguished Faculty Speaker at the Accounting Association of Australia and New Zealand Doctoral Consortium, July 1996, Doctoral Consortium speaker at the *Asia-Pacific Journal of Accounting & Economics* Conference in Shanghai, January 2003, *AAA Financial Accounting Reporting Section* Doctoral Consortium in Orlando, January 2003, AAA Doctoral Consortium speaker at Lake Tahoe, June 2004.

## INVITED PRESENTATIONS AT SCHOOLS AND CONFERENCES

1986   SUNY at Buffalo, University of Michigan, University of Rochester, University of Chicago, Wharton School, Northwestern University, Washington University at St. Louis, University of Texas at Austin, and Carnegie Mellon University.

1987   University of Michigan, Massachusetts Institute of Technology, SUNY at Buffalo, International Conference on Forecasting at Boston, and AAA Meetings.

1988   University of Chicago, Cornell University, University of Washington at Seattle, SUNY at Buffalo, and Michigan State University.

1989   Columbia University Research Conference, Duke University, University of Iowa, Stanford University, University of California at Berkeley, University of Minnesota, New York University, and University of Pennsylvania at College Park.

1990   Harvard University, Northwestern University, Ohio State University, University of Arizona, University of Southern California, Temple University, Washington University at St. Louis, AAA meetings at Toronto, European Finance Association meetings, and Contemporary Accounting Research Conference.

1991   Arizona State University, Indiana University, and University of Michigan.

1992   Cornell University, Vanderbilt University, University of Wisconsin at Madison, University of Illinois, University of Nebraska, Stanford University Summer Camp, AAA Meetings at Washington D.C., Duke University, Michigan State University, Wharton School at the

*8*

University of Pennsylvania, SUNY at Buffalo, University of Missouri at Columbia, and JAAF-Peat Marwick Conference.

1993    Baruch CUNY at New York, Pennsylvania State University, City University Business School at London, Institute for Quantitative Investment Research at Cambridge, Accounting and Finance Conference at St. Louis, International Seminar on Futures and Options in Mumbai, India, University of Iowa, and Iowa State University.

1994    University of Manchester, University of Glasgow, Carnegie Mellon University, Harvard Business School, London Business School, and Baruch CUNY.

1995    City University Business School at London, Western Finance Association Meeting at Aspen, Colorado, AAA Meetings at Orlando, SUNY at Buffalo, Syracuse University, and Rice University.

1996    Northwestern University, City University Business School, KOC University at Istanbul, University of New South Wales at Sydney, JAR Conference at Chicago, Michigan, ISDA Conference, Washington DC, Arizona, AAA meetings at Chicago, Boston College, and University of Maryland.

1997    University of Southern California, Tulane University, Ibbotson Associates Cost of Capital Conference at Chicago, London School of Economics, City University Business School at London, National Association of Pension Funds at London, University of Technology at Sydney, Harvard University, University of Rochester, Washington University at St. Louis, Cornell University, and Columbia University.

1998    Stanford University, Morningstar Inc. at Chicago, New Faculty Consortium at St. Charles, University of Notre Dame, University of Alberta, University of Technology at Sydney, University of Iowa, University of California at Berkeley, *Contemporary Accounting Research* Conference at Vancouver, and University of California at Los Angeles.

1999    AAA-KPMG International Accounting Conference at Montvale, NJ, University of British Columbia, University of Tilburg in Holland, INSEAD in France, University of Colorado at Denver, University of Michigan, University of Oklahoma, Financial Economics and Accounting Conference at the University of Texas at Austin, and Boston Area Research Colloquium at Boston University.

2000    Australian Graduate School of Management, University of Technology at Sydney, University of Sydney, Syracuse University, Boston Federal Reserve Annual Research Conference, Stanford University, Harvard University, AAA-BAA conference at Cambridge University, European Financial Association Conference in London, University of Chicago, American Accounting Association meetings in Philadelphia, and MIT Sloan School of Management.

2001    Cranfield University, Yale University, University of Rochester, HKUST, University of Technology at Sydney, University of Chicago, Pennsylvania State University, University of Texas at Dallas, MIT, and Duke University.

2002    Georgetown University, London Business School Donor Seminar, University of Pittsburgh, London Business School Symposium, Cornell University, Oklahoma State University, University of Rochester, New York University, Arizona State University, and Wharton School at the University of Pennsylvania.

2003    FARS Conference, APJAE Conference in Shanghai, University of Southern California, and University of Technology at Sydney.

2004    APJAE Conference in Kuala Lumpur, Emory University, AAA Doctoral Consortium, Harvard University, Fed-JFE Conference at Ohio State University, the U.S. Securities & Exchange

*9*

Commission, Case Western Reserve University, University of Maryland, and Financial Economics and Accounting Conference at USC.

2005    Journal of Accounting, Auditing, and Finance Conference at NYU, Harvard University, Carnegie Mellon University, Samsung School of Business, S. Korea, and University of Texas at Dallas.

2006    Stanford University, Southern Methodist University, University of Georgia, Rutgers University, University of Chicago, Ohio State University, University of Minnesota, Michigan State University, Indian Institute of Technology, Bombay, BSI Gamma Foundation, Switzerland, and Cornell University.

2007    Indian Institute of Management, Calcutta, Brigham Young University, University of California, Riverside, University of Edinburgh, University of Southern California, University of Texas at Austin, Tuck at Dartmouth College, University of California, Los Angeles, Washington University in St. Louis, University of Massachusetts at Amherst, BARC Seminar at Boston University, Association of Finance Professionals, Boston, and London Business School.

2008    Lancaster University and University of Manchester.

2009    Temple University, London Business School, University of Rochester, Stanford University, American Accounting Association meetings in New York, Georgetown University, JAE Conference at MIT, and BITS Pilani.

2010    University of Chicago, University of Texas at San Antonio, and Sabanci University, Istanbul.

2011    Canadian Accounting Association, London School of Economics, Fudan University, and Xi'an Jiaotong University.

2012    Harvard Business School, Tsinghua University, Sun Yat-Sen University, and HKUST.

2013    USC, NY Federal Reserve Bank

2014    Louisiana State University, National Taiwan University

2015    Lehigh University, University of California, Irvine, Ohio State University, University of Cyprus, MIT Club of Cyprus, Indian School of Business National Conclave

2016    Hong Kong Polytechnic University, IIT, Bombay, Texas Christian University, Chinese University of Hong Kong, London Business School, University of Iowa, City University London

2017    Oxford University Blavatnik School, MIT, Indian Institute of Management, Ahmedabad.


**TEACHING**

Corporate Financial Accounting, MBA core course
Financial Statement Analysis, MBA elective course
Empirical Accounting Research, PhD seminar
Positive Accounting Theories, MBA elective course
Cases in Finance, MBA elective course
Introduction to Financial Accounting, Undergraduate course
Corporate Financial Accounting: Simon School's Executive MBA programs in Holland and Switzerland

Intensive doctoral research courses in Accounting and Finance to faculty and students in:

*10*

Finland (1991, 1992), University of Alberta, Canada (1991), European Institute for Advanced Studies in Management, Brussels (1993), Baruch College, City University of New York, NY (1996), University of Technology at Sydney, Australia (1997, 1998, 2000, 2001, 2003), London Business School (2001).

## DISSERTATIONS

On the Ph.D. dissertation committees of (initial placement in parentheses):

### As Chairperson
1. Christopher Noe (Harvard Business School)
2. Glen Hansen (Pennsylvania State University)
3. Wayne Guay (Wharton University of Pennsylvania)
4. Peter Wysocki (University of Michigan)
5. Yong Chul Shin (Tulane University)
6. Ying Li (Baruch College, CUNY)
7. Wesley Chan (Alpha Simplex)
8. Xu Li (University of Texas at Dallas)
9. Yanfeng Xue (University of Texas at Austin)
10. Jieying Zhang (University of Southern California)
11. Volkan Muslu (University of Texas at Dallas)
12. Adam Kolasinski (University of Washington)
13. Valeri Nikolaev (University of Chicago)
14. George Papadakis (Boston University)
15. Amit Koshal (Industry)
16. Jeri Seidman (University of Texas at Austin)
17. Konstantin Rozanov (London Business School)
18. Yuri Loktionov (University of Southern California)
19. Mihir Mehta (Temple University)
20. Nicholas Guest

### As Committee member
21. Gita Rao (Illinois)
22. Richard Sloan (Wharton)
23. Tony Greig (Purdue)
24. Anwer Ahmed (Florida)
25. Patty Dechow (Wharton)
26. Sudipta Basu (CUNY, Baruch)
27. Michele Daley (Rice)
28. Paul Irvine (Emory)
29. Roger Edelen (Wharton)
30. Mingyi Hung (University of Southern California)
31. Mary Ellen Carter (Columbia)
32. Eric Wolff (Carnegie Mellon University)
33. Susan Shu (Boston College)
34. Elizabeth Keating (Northwestern University)
35. Laurence van Lent (University of Tilburg)
36. Gans Narayanamoorthy (Yale University)
37. Kevin Chan (HKUST, Hong Kong)
38. Karthik Ramanna (Harvard University)
39. Kexin Zheng (University of Connecticut)
40. Rebecca Lester (Stanford University)

## COMMITTEE / ADMINISTRATION

*11*

MIT 401(k) Oversight Committee, 2014-present.
MIT International Advisory Committee
MITx Faculty Advisory Committee
MIT Sloan: International Initiatives Committee, Co-Chair of Space Committee, Chair of Load
    Committee, and Member of various standing committees, MIT Sloan School of Management,
    2011-2015.
Policy Committee and Personnel Committee, MIT Sloan School of Management, 1999-Present.
Head of the Department of Economics, Finance, and Accounting, MIT Sloan School of Management,
    2003-2005, 2006-2007.
Head of the Accounting group, MIT Sloan School of Management, 1999-2003.
Sloan Fellows Program Committee, MIT Sloan School of Management, 2001-2005.
Sloan Research Productivity Committee, MIT Sloan School of Management, 2001-2002.
Sloan Fellows/MOT Program Restructuring Committee, MIT Sloan School of Management, 2002.
Management Programs Committee, MIT Sloan School of Management, 2000-2001.
Promotion and Tenure Committee, University of Rochester, 1996 -1999.
Accounting Area Coordinator, University of Rochester, 1988-1999.
Ph.D. committee, University of Rochester, 1989-1995.
MBA committee, University of Rochester, 1989-1994.
University of Rochester Senate, 1994-1996.
Committee on Teaching Excellence, University of Rochester, 1995-1996.

**FINANCIAL PRESS WRITINGS**

Opinion-page editorials in *The Hindu Business Line,* Madras, New Delhi, and other cities in India
    from January 1994 to August 1994.  Wrote about 20 articles.

Opinion-page editorials in *The Economic Times,* Mumbai, New Delhi, Madras, and other cities in
    India.  (Circulation 500,000)  Wrote about 35 articles from August 1994 to September 1996.
    A listing of selected articles from the Economic Times and other publications follows:

- Badla: Let it compete to survive, April 12, 1995.
- Lessons from MS Shoes scandal, April 23, 1995.
- An ethical reason to privatize, May 5, 1995.
- Needed, a free food grain market, June 9, 1995.
- Economics of investment in power, June 23, 1995.
- What explains the stock market fall? July 31, 1995.
- Value lies in future as well, August 7, 1995, with Clifford W. Smith, Jr.
- A hundred states within, August 31, 1995.
- A bourse for forward trading, September 15, 1995.
- Making the public FDI friendly, October 7, 1995.
- Rational expectations from Indian policy makers, October 17, 1995.
- RBI intervention: A bad idea, November 4, 1995, with Clifford W. Smith, Jr.
- Telecom: The ring is missing, December 1, 1995.
- Switch institutions, not shares, January 1, 1996.
- Change campaign finance laws, February 12, 1996.
- Lift all restrictions on rupee, February 24, 1996.
- Need to privatise telecom industries, March 19, 1996.
- A minimum utility tax, August 5, 1996.
- Derivatives & regulatory roadblocks, August 19, 1996, with Clifford W. Smith, Jr.
- The Importance of Being Open, September 1, 1996, with Clifford W. Smith, Jr.
- Let a private cricket league bloom, The Economic Times, October 15, 2007

*12*

- o http://economictimes.indiatimes.com/opinion/view-point/let-a-private-cricket-league-bloom/articleshow/2458359.cms
- On Section 377, a call to leadership, Mid-Day, January 31, 2014
  - o http://www.mid-day.com/articles/on-section-377-a-call-to-leadership/15061007
- Narendra Modi and Arun Jaitley should strive to improve profit outlook for investment, The Economic Times, September 5, 2014
  - o http://economictimes.indiatimes.com/opinion/comments-analysis/narendra-modi-and-arun-jaitley-should-strive-to-improve-profit-outlook-for-investment/articleshow/41746037.cms
- Bigger student loans for STEM students, *Wall Street Journal*, August 14, 2016
  - o https://www.wsj.com/articles/bigger-loans-for-stem-students-1471210878
- President Trump should say no to the Paris climate accord, *The Daily Caller*, May 29, 2017
  - o http://dailycaller.com/2017/05/29/president-trump-should-say-no-to-paris-climate-accord/
- If the CEO is overpaid, blame the compensation committee, with Bob Pozen, *Wall Street Journal*, August 21, 2017
  - o https://www.wsj.com/articles/if-the-ceo-is-overpaid-blame-the-compensation-committee-1503355104

*13*

**Appendix B – Materials Reviewed or Considered**

**Court Documents**

- Supplemental and Amended Consolidated Class Action Complaint, ECF No. 78.
- Memorandum and Order, ECF. 103.

**Court Decisions and Securities Law**

- *Basic v. Levinson*, 485 U.S. 224 (1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)
- *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).

**SEC Filings/Forms**

- Alere SEC filings made during the Class Period available through EDGAR.
- Alere, Annual Report (Form 10-K) at 2 (March 5, 2015).
- Alere, Notification of Late Filing (Form 12b-25) (Feb. 26, 2016).
- Alere, Notification of Late Filing (Form 12b-25) (May 11, 2016).
- Alere, Notification of Late Filing (Form 12b-25) (Aug. 10, 2016).
- Alere, Current Report (Form 8-K) (July 14, 2014).
- Alere's Conference Call Transcripts from Thomson One Analytics.

**Databases**

- Historical data on market capitalization, trading volume, price, bid-ask spreads, returns, and NYSE membership from the Center for Research in Security Prices database (CRSP).
- Historical data on analyst following, analyst consensus forecast of earnings, and actual earnings from the Institutional Brokers Estimate System (I/B/E/S).
- Historical data on institutional holdings from the Thomson Reuters Institutional Holdings (13F) database.
- Historical data on insider holdings from the Thomson Reuters Insider Holdings database.
- Historical data on short interest from S&P Compustat Security database.
- Returns on the S&P 500 Index, the S&P 500 Health Care Index, and the S&P Health Care Equipment Special Industry Index from Bloomberg.

**News**

- Alere news headlines and articles downloaded from the Dow Jones Factiva Database.

- Alere earnings press release articles published by PR Newswire.

*Specific articles cited in text*

- *Abbott CEO Declines to Confirm Commitment to Alere Acquisition*, DOW JONES NEWSWIRES, Apr. 20, 2016.
- *Abbott Seeks to Terminate Alere Acquisition*, PR NEWSWIRE, Dec. 7, 2016.
- *Abbott to Acquire Alere, Becoming Leader in Point of Care Testing and Significantly Advancing Global Diagnostics Presence*, PR NEWSWIRE, Feb. 1, 2016.
- *Alere's delayed 10K filing and DOJ investigation are credit negative; ratings currently unaffected*, MOODY'S INVESTOR SERVICES, Mar. 16. 2016.
- *Alere Files 8K - Other Events*, DOW JONES NEWSWIRES, Mar. 15, 2016.
- *Alere Issues Statement*, PR NEWSWIRE, Aug. 26, 2016.
- *Alere Obtains Requisite Lender Approval for Extension to File Form 10-K; Announces Certain Developments Relating to the Pending Merger Transaction with Abbott Laboratories*, PR NEWSWIRE, Apr. 28, 2016.
- *Alere Reports Third Quarter 2016 Financial Results*, PR NEWSWIRE, Nov. 4, 2016.
- *Alere Reports Third Quarter 2015 Financial Results,* PR NEWSWIRE, Nov. 4, 2015.
- *Alere to Initiate Voluntary Withdrawal of the Alere INRatio(R) and INRatio(R)2 PT/INR Monitoring System.,* PR NEWSWIRE, July 11, 2016.
- *S&PGR Keeps Alere Inc. Ratings On Watch Positive.*, DOW JONES NEWSWIRES, May 6, 2016.

## Alere Analyst Reports

- Analyst reports from Thomson One Analytics.

## Websites/Webpages

- NYSE website for NYSE's listing requirements and market structure (last accessed on January 27, 2018).
    - https://www.nyse.com/market-model/overview
    - https://www.nyse.com/market-model#slps
    - http://wallstreet.cch.com/LCMTools/PlatformViewer.asp?selectednode=chp_1_2&manual=%2Flcm%2Fsections%2Flcm-sections%2F
    - https://www.nyse.com/make-the-move/international-listings

- WRDS discussion of missing institutional data (last accessed on March 15, 2018).
    - (https://wrds-web.wharton.upenn.edu/wrds/news/index.cfm?display=read&news_id=616)

- SEC S-3 filings and other filings (last accessed on March 15, 2018).

2

- o https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001145460&type=S-3&dateb=&owner=exclude&count=40
- o www.sec.gov/edgar.shtml

## Textbooks

- Espen Eckbo, "Handbook of Empirical Corporate Finance," Elsevier/North-Holland, 2007.

## Academic Articles

- Yakov Amihud, *Illiquidity and Stock Returns: Cross-Section and Time-Series Effects*, 5 J. of Fin. Markets 31 (2002).

- Christopher Armstrong, Mary Barth, & Alan Jagolinzer, *Market Reaction to the Adoption of IFRS in Europe*, 85 THE ACCT. REV. 31 (2010).

- Doron Avramov, Tarun Chordia, & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. of Fin. 2365 (2006).

- Mark Bagnoli, William Kross & Susan G. Watts, *The Information in Management's Expected Earnings Report Date: A Day Late, a Penny Short*, 40 J. OF ACCT. RES. 1275 (2002).

- Eli Bartov & Yaniv Konchitchki*, SEC Filings, Regulatory Deadlines, and Capital Market Consequences*, 31 ACCT. HORIZONS 109, 111 (2017).

- William Beaver, *The Information Content of Annual Earnings Announcements*. 6 J. OF ACCT. RES. 67 (1968).

- Ekkehart Boehmer & Eric Kelley, *Institutional Investors and the Informational Efficiency of Prices*, 22 REV. OF FIN. STUD. 3563 (2009).

- Mark Bradshaw & Richard Sloan, *GAAP versus The Street: an Empirical Assessment of Two Alternative Definitions of Earnings*, 40 J. OF ACCT. RES. 41 (2002).

- Stephen Brown & Jerold Warner, *Measuring Security Price Performance*, 8 J. OF FIN. ECON. 205 (1980).

- Tarun Chordia, Richard Roll, & Avanidhar Subrahmanyam, *Market Liquidity and Trading Activity*, 56 J. FIN. 501 (2001).

- Tarun Chordia, Richard Roll, & Avanidhar Subrahmanyam, *Liquidity and Market Efficiency*, 87 J. FIN. ECON. 249 (2008).

3

- Tiago Duarte-Silva, Huijing Fu, & Christopher F. Noe, *How Do Investors Interpret Announcements of Earnings Delays?*, 25 J. OF APP. CORP. FIN. 64 (2013).

- Darrell Duffie, Nicolae Gârleanu, & Lasse Heje Pedersen, *Over-the-Counter Markets*, 73 ECONOMETRICA 1815 (2005).

- Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1991).

- Lawrence Glosten & Paul Milgrom, *Bid, Ask, and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders*, 14 J. OF FIN. ECON. 71 (1985).

- S.P. Kothari, *Capital Markets Research in Accounting*, 31 J. OF ACCT. & ECON. 105 (2001).

- Albert Kyle, *Continuous Auctions and Insider Trading*, 53 ECONOMETRICA 1315 (1985).

- Jeff Payne & Wayne Thomas, *The Torpedo Effect: Myth or Reality*, 26 J. OF ACCT., AUDITING, & FIN. 255 (2011).

- Darren Roulstone, *Analyst Following and Market Liquidity*, 20 CONTEMP. ACCT. RES. 551 (2003).

- Ivy Zhang, *Economic consequences of the Sarbanes–Oxley Act of 2002*, 44 J. OF ACCT. & ECON. 74 (2007).

# Appendix E:
# The Wilmington Trust Report

# EXHIBIT L

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **IN RE WILMINGTON TRUST SECURITIES LITIGATION** | Master File No. 10-cv-00990-SLR |
| | (Securities Class Action) |
| | Hon. Sue L. Robinson |
| This document relates to: ALL ACTIONS | |

## EXPERT REPORT OF PROFESSOR S.P. KOTHARI

Professor S.P. Kothari
MIT Sloan School of Management
30 Memorial Drive, E60-382
Cambridge, MA 02142

**TABLE OF CONTENTS**

<u>Page</u>

I.   RULE 26 EXPERT DISCLOSURES.................................................................2

II.  MATERIALS REVIEWED OR CONSIDERED .............................................3

III. ASSIGNMENT AND SUMMARY OF CONCLUSIONS....................................3

IV.  BACKGROUND ON WILMINGTON.............................................................4

V.   BACKGROUND ON MARKET EFFICIENCY ...............................................5

VI.  *CAMMER* MARKET EFFICIENCY METRICS .............................................7

    A. WEEKLY TRADING VOLUME...............................................................7

    B. NUMBER OF ANALYSTS PROVIDING COVERAGE................................10

    C. MARKET MAKERS AND ARBITRAGEURS .........................................12

    D. ELIGIBILITY TO FILE AN S-3 REGISTRATION STATEMENT................14

    E. STOCK PRICE REACTION TO NEWS ................................................16

        1. ANALYSIS OF UNSIGNED PRICE REACTION................................19

        2. ANALYSIS OF SIGNED PRICE REACTION ...................................21

VII. ADDITIONAL MARKET EFFICIENCY METRICS...........................................24

    A. MARKET CAPITALIZATION...............................................................24

    B. STOCK LIQUIDITY .........................................................................25

    C. PUBLIC FLOAT .............................................................................27

VIII. CONCLUDING ASSESSMENT OF MARKET EFFICIENCY............................28

## I.    RULE 26 EXPERT DISCLOSURES

1.   I, S.P. Kothari, am the Gordon Y. Billard Professor of Management at the Sloan School of Management of Massachusetts Institute of Technology ("MIT").   I am currently Deputy Dean of MIT's Sloan School of Management, with responsibility for Faculty.   I have recently returned to MIT – where I have been since 1999 – after one-and-a-half years as Global Head of Equity Research with Barclays Global Investors, San Francisco. From 1986 to 1999, I served on the faculty of the University of Rochester, first as an Assistant Professor, then as an Associate Professor, and finally as Professor and Accounting Area Coordinator.   During this time, I also held visiting positions at MIT, the University of Technology in Sydney, Australia, Baruch College of the City University of New York, and the City University Business School in London.

2.   I received my B.E. degree in Chemical Engineering from the Birla Institute of Technology and Science in India in 1979, my M.B.A. in Accounting and Finance at the Indian Institute of Management in 1982, and my Ph.D. in Accounting at the University of Iowa in 1986.

3.   I have published numerous academic articles in the areas of accounting, finance, and economics and co-edited two books titled *Financial Statement Analysis*, published by McGraw-Hill, and *Contemporary Accounting Research*, published by North-Holland Publishing.   My research has primarily focused on the valuation of equities and bonds, informational efficiency of stock prices, the relation between accounting accruals and cash flows, the effect of institutions on the properties of accounting numbers internationally, and corporate uses of financial derivatives, among other topics. I am currently an Editor of the *Journal of Accounting & Economics*, a leading academic journal in the field of accounting, and have been an editor of this journal since 1997.  I have also served as an associate editor for other professional journals including the *Journal of Accounting & Economics* and *The Accounting Review*, and as a referee for professional journals such as the *Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Accounting Research*, *Contemporary Accounting Research*, and the *British Accounting Review*.

4.   In addition to conducting rigorous research and serving as an editor for many academic journals, I have been active in my profession.  I have been the keynote speaker and distinguished faculty speaker for a number of accounting association annual meetings and doctoral consortiums.  I have also served in various policy and management committees at MIT and the University of Rochester.   Finally, I have supervised or served on the dissertation committees of more than 35 doctoral students over the past 21 years.  A detailed copy of my curriculum vita is attached as Appendix A hereto.

2

5. I bill at my customary rate of $1,000 per hour for my work on this matter, and the rates of those working under my supervision and direction range from $175 to $750. I have no financial interest in the outcome of this litigation. Payment for my work and those working under my supervision and direction on this matter is in no way contingent on the opinions I express or the outcome of this matter.

## II.  MATERIALS REVIEWED OR CONSIDERED

6. For the purpose of preparing this report, I reviewed or considered the data and other information identified in Appendix B hereto, as well as all data and articles referenced in this report.

## III.  ASSIGNMENT AND SUMMARY OF CONCLUSIONS

7. I have been retained by counsel for Lead Plaintiffs to provide expert testimony on whether the market for Wilmington common stock was efficient during the Class Period, January 18, 2008 to November 1, 2010.[1]

8. I have made no investigation of the issues surrounding liability in this case. My report applies economic, financial, and statistical analyses to determine whether Wilmington Trust traded in an efficient market.

9. I form the following opinions on this matter.

    a. During the Class Period, the market for Wilmington stock was efficient. That is, the price of Wilmington stock could be relied upon to reflect publicly available information.

    b. I came to this conclusion after analyzing the five *Cammer*[2] factors used for evaluating market efficiency and three additional *Krogman*[3] factors closely tied to the definition of market efficiency. These factors are:

        i. The stock's average weekly trading volume;
        ii. The number of security analysts following the stock;
        iii. The presence of market makers and arbitrageurs;
        iv. Eligibility to file an S-3 registration statement;
        v. The stock price reaction to unexpected corporate events or financial releases;
        vi. Market capitalization;
        vii. Stock liquidity; and

---

[1] With respect to Wilmington, I use the terms "stock" and "common stock" interchangeably. I do not consider Wilmington's preferred stock in my analysis.

[2] *Cammer v. Bloom*, Civil Action No. 88-2458, United States District Court for the District of New Jersey (April 19, 1989).

[3] *Krogman v. Sterritt*, 202 F.R.D. 467 United States District Court, N.D. Texas, Dallas Division (March 29, 2001).

3

viii. Public float.

c.      Exhibit 1 summarizes the evidence on each of the factors examined. Every factor analyzed supports my opinion that Wilmington's common stock traded in an efficient market.

10.    The Court also held in *Halliburton v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014) ("*Halliburton II*") that "defendants must be afforded an opportunity before class certification to defeat the presumption [of reliance] through evidence that an alleged misrepresentation did not actually affect the market price of the stock." As will be demonstrated below, there is no evidence of a lack of price impact when one examines the reaction of the securities' prices to corrective disclosures.

11.    The remainder of my report develops the arguments and analyses in support of these opinions.

## IV.    BACKGROUND ON WILMINGTON

12.    Wilmington was a bank holding company, a thrift holding company, and a financial holding company with several subsidiaries, including Wilmington Trust Company ("WTC"). Wilmington had four business segments: Regional Banking, Corporate Client Services, Wealth Advisory Services, and Affiliate Money Managers. Wilmington's Regional Banking segment, whose predominant business was the origination of commercial loans, is the primary focus of the Complaint. Commercial loans constituted a significant portion of Wilmington's assets. As of December 31, 2008, the loan balance for commercial loans totaled over $6.76 billion, 70% of Wilmington's total loan portfolio and 55% of Wilmington's total assets.[4] As of December 31, 2009, the loan balance for commercial loans totaled over $6.70 billion, approximately 72% of Wilmington's total loan portfolio and 60% of Wilmington's total assets.[5]

13.    The credit quality of a bank's loan portfolio is a critical factor for investors and analysts. Among other aspects, including loan underwriting, risk mitigation, and the amount of loan loss reserves, the amount of nonperforming loans is a key credit metric that would be evaluated by investors and analysts to gauge the quality of a bank's loan portfolio.[6] This type of credit information was reported in the Company's SEC filings and conference calls and was discussed in the management discussion and

---

[4] 2008 Wilmington SEC Form 10-K, p. 73.

[5] 2009 Wilmington SEC Form 10-K, p. 65.

[6] See, for example, the financial soundness indicators from the International Monetary Fund (IMF) (http://fsi.imf.org/misc/FSI%20Concepts%20and%20Definitions.pdf) and the guidelines from the Office of the Comptroller of Currency (http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/lpm.pdf).

analysis (MD&A) section of Wilmington's annual report.[7] Since information on loan credit quality is publicly available, in an efficient market investors would rely on such information to establish Wilmington's stock price.

14.  Plaintiffs allege that Wilmington made false and misleading statements about its past due and non-performing loans, as well as its underwriting, asset review, and risk management practices, and issued false and misleading financial statements.

15.  Plaintiffs claim that the relevant truth was revealed to the market in a series of partial disclosures from January through November 2010, culminating in Wilmington announcing that it would be acquired by M&T Bank.

## V.    BACKGROUND ON MARKET EFFICIENCY

16.  In the Complaint, Plaintiffs apply the "fraud-on-the-market" theory. Under this theory, class members who buy a security rely on the integrity of the stock price set by the market. Therefore, omissions and misrepresentations by a corporation are also assumed to have been relied upon by investors in setting the stock price of the corporation, which would be set too high or too low depending on the nature of information omitted or misrepresented. The omissions and misrepresentations are thus incorporated into each class member's purchase price.[8]

17.  In this case, Wilmington is alleged to have omitted facts and made misrepresentations that artificially inflated the price of the Wilmington stock purchased by Plaintiffs (Class Members) during the Class Period. These investors ultimately suffered losses when the market reacted to subsequent Company-specific disclosures, which revealed the truth. As stated in *Basic*:

> "Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." [9]

18.  Underlying the fraud-on-the-market theory is the assumption that Wilmington's stock price reflected an open and developed market. As stated by the U.S. Supreme Court in *Basic v. Levinson*:

---

[7] For instance, see Wilmington's 2008 10-K, p. 42 and Wilmington's 2009 10-K, p. 49.

[8] *Basic v. Levinson*, 485 U.S. 224, 225 (1988).

[9] *Basic v. Levinson*, 485 U.S. 224, 241-242 (1988).

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business..."[10]

19. The U.S. Supreme Court recently reaffirmed this understanding of market efficiency in *Halliburton II*.

20. The notion of a market being open and developed in *Basic* (and affirmed in *Halliburton II*) is consistent with economists' view of a semi-strong form of market efficiency. A stock market is efficient (in a semi-strong form) if it promptly reflects all publicly available information for the stock and that the incorporation of the information is unbiased, i.e., the price is not set systematically too high or too low. Underlying this definition is the notion that, in such a market, a large number of investors trade in the stock such that new publicly available information is promptly incorporated into the stock price.[11]

21. In my analyses, I identify factors that are closely linked to the above definition of market efficiency. I start with the five *Cammer* factors used by the courts for evaluating market efficiency. The five *Cammer* factors are: (1) the stock's average weekly trading volume; (2) the number of security analysts who followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file an S-3 registration statement; and (5) the stock price reaction to unexpected corporate events or financial releases.[12] As I explain below, the *Cammer* factors are economic attributes of a firm or the market in which the firm's stock is traded. These factors are based on economic theories of market efficiency and have also been used in the academic literature when analyzing market efficiency.[13,14] In addition to these factors I also consider three additional factors—market capitalization, measures of liquidity, and measures of public float (explained in Section VII).

22. The market efficiency metrics for Wilmington are computed and, whenever applicable, benchmarked against the metrics of companies in the NYSE— the stock exchange on which Wilmington stock traded—as well as firms in the Keefe, Bruyette & Woods (KBW) 50 Regional Banking Index (also

---

[10] *Basic v. Levinson*, 485 U.S. 224, 241-242 (1988).

[11] Eugene Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, 383-388.

[12] *Cammer v. Bloom*, Civil Action No. 88-2458, United States District Court for the District of New Jersey (April 19, 1989).

[13] I provide specific academic citations below when I review each market efficiency factor.

[14] Throughout the report, I use the terms "market efficiency", "the market for Wilmington's stock was efficient", and "efficient market for Wilmington's stock" interchangeably.

known by its ticker as KRX).[15] In its Form 10-K for the year ended December 31, 2009, Wilmington Trust compared its cumulative stockholder return to the KBW 50 Regional Banking Index and stated that it regards the KBW 50 Regional Banking Index as a benchmark of large banks throughout the United States.[16]

23. Historical data necessary to compute these market efficiency metrics are collected from the Center for Research in Security Prices database (CRSP), the Trade and Quote database (TAQ), the S&P Compustat database (Compustat), the Institutional Brokers Estimate System database (I/B/E/S), the Thomson Financial database (Thomson), and the Dow Jones Factiva database (Factiva).

## VI. *CAMMER* MARKET EFFICIENCY METRICS

## A. WEEKLY TRADING VOLUME

24. The first *Cammer* factor is the average weekly trading volume of a security. As discussed in *Cammer*,

> "[t]he reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[17]

25. Trading volume is a key feature of financial markets. Its importance dates back to the most fundamental notion in economics that prices are determined through an interaction between the supply of and demand for a good, service, or a security, e.g., the stock of Wilmington. Trading volume represents the quantity of shares traded for a given stock—that is, the amount of trading activity that leads to equilibrium price at which demand for the stock equals its supply.[18] Thus, a security with a large trading volume closely captures the notion of an "open" market, one in which a large number of individuals can buy or sell the stock.[19]

26. Several studies in the academic literature have examined the implications of trading volume to the behavior of asset pricing, i.e., prices of stocks.

---

[15] Source: Bloomberg.

[16] 2009 Wilmington SEC Form 10-K, p. 14.

[17] *Cammer v. Bloom*, Civil Action No. 88-2458, p. 1286 United States District Court for the District of New Jersey (April 19, 1989).

[18] See chapter 17 by Andrew Lo and Jiang Wang in "Handbook of Financial Econometrics" by Yacine Ait-Sahalia and Lars peter Hansen, North-Holland, 2009.

[19] *Cammer v. Bloom*, Civil Action No. 88-2458, United States District Court for the District of New Jersey, April 19, 1989, p. 2 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988).

7

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 10 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 256 of 309
21896

These studies find that higher trading volume is associated with more efficient prices, lower transaction costs, and greater liquidity, both at the individual security level as well as the aggregate level.[20]

27. I provide three analyses which utilize the data on trading volume of Wilmington's stock. The first analysis uses the number of shares traded in a week as a percentage of shares outstanding (also known as share turnover); the second analysis uses the number of shares (in millions) traded in a week; and the third uses the U.S. dollar amount (in millions) of shares traded in a week.

28. To measure trading volume, I define a week both as a calendar week and a trading week. Trading volume in a calendar week measures trading volume from Monday to Friday of each week regardless of whether the market was closed on one or more days of the week. Volume in a trading week measures trading volume over five consecutive trading days. An analysis based on trading weeks ensures that variation in weekly trading volume is not confounded by calendar weeks with fewer trading days (e.g., holidays). Given that the inferences based on trading week are similar to that based on calendar week, I limit the discussion below to the trading week analysis.

29. As discussed in *Cammer*:

> "…2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."[21]

30. Exhibit 2 presents the weekly share turnover for Wilmington stock during the Class Period using a trading week classification.[22,23] The average weekly turnover for Wilmington stock was 8.47% (median turnover of 6.80%) for this time period. This number is well above the 2% cutoff cited by the *Cammer* court. Further, share turnover is above the 2% benchmark in every trading week during the Class Period. Relative to firms in the NYSE and KBW 50 Regional Banking Index during the same time period, Wilmington had an average share turnover that would place it in the 75.84

---

[20] See, for example, "Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2001, "Market Liquidity and Trading Activity," *Journal of Finance* 56, 501–530" for evidence on the relation between trading volume and liquidity and "Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2008, "Liquidity and market efficiency," *Journal of Financial Economics* 87 (2), 249–268." for evidence on the relation between liquidity and market efficiency.

[21] *Cammer v. Bloom*, Civil Action No. 88-2458, p. 1286 United States District Court for the District of New Jersey (April 19, 1989), (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988).

[22] Exhibit 3 presents an analogous chart using calendar week.

[23] In Exhibit 2, the last trading week (starting October 28, 2010 and ending November 1, 2010) consists of only three consecutive trading days.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 11 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 257 of 309
21897

and 67.36 percentile on average, respectively, confirming that Wilmington's trading volume was high in both absolute and relative standards.

31.     Exhibit 4 displays Wilmington's weekly trading volume during the Class Period using a trading week classification.[24,25] The weekly trading volume for Wilmington stock ranged from 1.89 million shares during the week starting May 7, 2008 to 60.19 million shares during the week starting October 28, 2010 (and ending November 1, 2010).[26] In terms of the U.S. dollar amount, the weekly trading volume for Wilmington stock ranged from $26.32 million during the week starting December 21, 2009 to $469.84 million during the week starting February 19, 2010.

32.     Exhibit 6 presents the top five trading weeks in terms of the number of shares (in millions) traded and the U.S. dollar amount (in millions) of shares traded. As presented in Exhibit 6, the trading week with the largest trading volume (in millions of U.S. dollars) began February 19, 2010, which corresponds with Wilmington's announcement of the start of its underwritten public offering of 18,875,000 shares of common stock, priced at $13.25 per share, on or about February 22 and 23, 2010.[27,28] However, in terms of millions of shares, the last trading week of the Class Period (consisting of only three trading days and beginning on October 28, 2010) showed the largest trading volume for Wilmington stock. During the last trading week of the Class Period, Wilmington reported a loss of $365.3 million and a loan loss provision of $281.5 million for the third quarter of 2010, as well as its merger agreement with M&T.[29]

33.     In addition to these two weeks, several other trading weeks are characterized by large trading volumes. For example, trading volume crossed ten million shares in 14 trading weeks during the Class Period, indicating intensive investor interest in the company's stock throughout the Class Period.

34.     In addition to having large trading volume, Wilmington stock was also part of the Russell 1000, the S&P Midcap 400, and the KBW 50 Regional

---

[24] Exhibit 5 presents an analogous chart using calendar week.

[25] In Exhibit 4, the last trading week (starting October 28, 2010 and ending November 1, 2010) consists of only three consecutive trading days, while in Exhibit 5, the last calendar week consists of only one trading day (November 1, 2010).

[26] While the Class Period alleged in this action extends up to November 1, 2010, I have included November 1, 2010 in my analysis, because it is a corrective disclosure alleged in the Complaint. Excluding November 1, 2010 from my analysis does not change my conclusions regarding market efficiency.

[27] http://www.businesswire.com/news/home/20100222006882/en/Wilmington-Trust-Announces-Start-Underwritten-Public-Offering#.U-6tx1arHlc

[28] http://www.businesswire.com/news/home/20100223007452/en/Wilmington-Trust-Announces-Pricing-Public-Offering-Common#.U-6t7VarHlc

[29]     http://www.businesswire.com/news/home/20101101006079/en/Wilmington-Trust-Announces-2010-Quarter-Results#.VAFZaUurHlc

9

Case 1:10-cv-00990-ER-SRF Document 261-3 Filed 09/12/14 Page 12 of 63 PageID #:
Case 8:21-cv-02910-TDC Document 123-4 Filed 11/13/23 Page 258 of 309
21898

Banking Indices. Wilmington stock's inclusion in prominent indices is an additional indication that the stock was salient in the marketplace, subject to large investor attention, and followed actively by market participants.[30]

35.   In my view, the large trading volume in absolute and relative terms, as well as the inclusion of Wilmington stock in prominent stock indices, support my conclusion that the market for Wilmington's stock was efficient.

## B.   NUMBER OF ANALYSTS PROVIDING COVERAGE

36.   The second *Cammer* factor is the number of security analysts who followed and reported on Wilmington's stock. As discussed in *Cammer*,

> "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[31]

37.   The argument behind this factor is that the presence of security analysts (and other information intermediaries, such as the press) would indicate that information on Wilmington's stock was closely followed, analyzed, and disseminated by investment professionals.

38.   During the Class Period at least 15 different security analysts followed Wilmington's stock.[32] These analysts were employed by major firms, including Boenning & Scattergood, Inc., Calyon Securities (USA) Inc., Davenport & Company LLC, Keefe, Bruyette & Woods, Inc., Macquarie Capital (USA) Inc., Janney Capital Markets, SunTrust Robinson Murphy, RBC Capital Markets, and Morgan Stanley.[33]

39.   To provide a perspective on how closely security analysts were following Wilmington's stock, Exhibit 7 presents the number of analyst reports issued between consecutive earnings announcement dates (from one earnings announcement date to one day prior to the next earnings announcement date) during the Class Period. In total, there are 208 analyst reports released between January 18, 2008 and November 1, 2010.  More specifically, on

---

[30] See, e.g., Andrei Shleifer, 1986, "Do demand curves for stocks slope down?" *Journal of Finance* 41, 579–590 for evidence from changes in the composition of the S&P 500 index and Ananth Madhavan, 2003, "The Russell Reconstitution Effect," *Financial Analysts Journal* 59 (4), 51-64 for evidence from changes in the Russell indexes.

[31] *Cammer v. Bloom*, Civil Action No. 88-2458, [22] United States District Court for the District of New Jersey (April 19, 1989).

[32] Source: Institutional Brokers Estimate System (I/B/E/S). I/B/E/S only has access to certain analysts in its database. In order to obtain other analyst reports, one has to be a client of the analyst firm.

[33] Source: Thomson One Analytics.

Case 1:10-cv-00990-ER-SRF Document 261-3 Filed 09/12/14 Page 13 of 63 PageID #:
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 259 of 309
21899

average, there are 18.91 reports (a median of 19 reports) between consecutive earnings announcement dates during the Class Period. As Exhibit 7 shows, the maximum number of reports on Wilmington was issued between April 23, 2010 and July 22, 2010, with 26 reports published during that time interval.

40. The intensive coverage of Wilmington's stock by analysts can also be seen in analysts' participation in conference calls held by Wilmington. During the Class Period, Wilmington held 13 conference calls—12 of which were specifically related to quarterly earnings. During these earnings conference calls, there was a median of 9 analysts who participated and asked questions per call, while maximum analyst participation was seen in the 2010 third quarter earnings call on November 1, 2010—during which 13 analysts and 1 media representative asked questions. Furthermore, non-corporate participants posed a median of 39.5 questions (or requests for further information) per call, with a maximum of 83 questions asked during the 2010 second quarter conference call on July 23, 2010.[34]

41. By asking numerous and diverse questions, analysts and other participants would have been able to acquire more detailed insight into Wilmington's financial circumstances. Wilmington's conference calls addressed relevant issues, such as the quality, composition, and growth of Wilmington's loan portfolio; the strengths or weaknesses of their specific business segments; Wilmington's potential expansion into other markets; their provisions for loan losses; expenses faced; etc. For example, during the 2010 second quarter earnings call on July 23, 2010, Patrick O'Brien, an analyst from Brown Advisory, asked about the composition and state of Wilmington's commercial construction loan portfolio.

42. Overall, Wilmington's conference calls covered topics that were relevant to and closely scrutinized by analysts, who had the opportunity to ask detailed questions and in turn disseminate the information gathered throughout the investment community surrounding Wilmington stock.

43. In addition to being followed by security analysts, Wilmington stock was closely followed by other information intermediaries. For example, the three major credit rating agencies – Moody's, Standard and Poor's and Fitch – provided credit ratings for Wilmington.[35] Apart from equity analysts and credit rating agencies, there was also extensive media coverage on Wilmington. During the Class Period, 1,335 media articles related to

---

[34] Any information requested at one time by an analyst without interruption was considered a question. Thus, if an analyst asked two questions back-to-back uninterrupted before receiving an answer, the two questions were counted as one question, or one request for information. Follow-up clarification questions (in response to an answer provided and thus interrupted from previous questions) were considered separate questions.

[35] https://www.wilmingtontrust.com/repositories/wtc_sitecontent/PDF/CreditRatingAgencies.pdf

11

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 14 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 260 of 309
21900

Wilmington (including Wilmington's own press releases) can be found in the Dow Jones Factiva Database.

44.    In my opinion, the large number of analysts following the stock and participating in conference calls, as well as the extensive press coverage for Wilmington stock, constitute clear evidence that information about Wilmington was closely followed, analyzed, and disseminated by investment professionals and other market participants. This supports my conclusion that the market for Wilmington's stock was efficient.

## C.    MARKET MAKERS AND ARBITRAGEURS

45.    The third *Cammer* factor is the presence of market makers and arbitrageurs. As discussed in *Cammer*,

> "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[36]

46.    *Cammer*'s decision on market makers was particularly relevant because the security in question in *Cammer* traded on over-the-counter markets. In such a market, liquidity is lower and market makers play a key role in supplying liquidity.[37] In the case of Wilmington, throughout the whole Class Period, its stock traded on the New York Stock Exchange (NYSE), a largely electronic market with publicly available information.

47.    As background information, the NYSE is the world's largest and most liquid security exchange with "over 60% more liquidity than the next largest exchange."[38] The minimum requirements for a U.S. company to be listed on the NYSE are that the company has 400 public board lot holders; public shares of 1,100,000 outstanding; market value of publicly held stock of $100 million (or $40 million in the case of IPOs, spin-offs, carve-outs, and affiliates); and stock price of at least $4 at the time of listing. The company must also meet one of several financial criteria, which set standards on such factors as pre-tax income, global market capitalization, revenues, adjusted cash flows, and stockholders' equity.[39]

48.    Furthermore, the structure of the NYSE ensures that it is able to maintain an orderly market in a security. To do so, the NYSE—in addition to using

---

[36] *Cammer v. Bloom*, Civil Action No. 88-2458, p. 1287 United States District Court for the District of New Jersey (April 19, 1989).

[37] Darrell Duffie, Nicolae Gârleanu, and Lasse Heje Pedersen, 2005, "Over-the-Counter Markets," *Econometrica* 73 (6), 1815-1847.

[38] https://usequities.nyx.com/cash-trading/newsletter/2014-03/nyse-number-1-in-6-critical-market-quality-metrics-for-price-and-liquidity

[39] http://usequities.nyx.com/regulation/issuer-oversight/listing-standards/us

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 15 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 261 of 309
21961

advanced technology to operate its markets electronically—utilizes the following people on the floor: Designated Market Makers (DMMs), Floor Brokers, and Supplemental Liquidity Providers (SLPs). DDMs operate both manually and electronically in order to maintain "fair and orderly" markets for their assigned securities, while Floor Brokers are physically present on the trading floor in executing trades on behalf of their firms' clients. SLPs, on the other hand, are electronic, high-volume members that are incented to add liquidity on the NYSE and all of whose trading is proprietary.[40] The combination of an auction system and electronic trading enables the NYSE to provide liquidity, transparency, and to maintain an orderly market in a security without relying only on the less efficient mechanism of decentralized market makers to provide liquidity. Therefore, in my opinion, the number of "market makers" itself is not a relevant metric in gauging liquidity in a NYSE-traded security. However, the simple fact that Wilmington stock traded on the NYSE, a large national exchange with substantial listing requirements, is itself a strong indication of market efficiency in Wilmington's stock.

49.   In addition to characteristics of the exchange, a key component behind the decision to consider market makers and arbitrageurs in *Cammer* was whether:

> "the market for corporation's stock, provided sufficiently fluid and informed trading environment so that when material information about corporation was disseminated, investors had available to them opportunity to trade at informed, and therefore appropriate, bid and asked prices."[41]

50.   To measure the presence of informed trading and arbitrageurs in the market for Wilmington's stock, I focus on institutional investors. Institutional investors are sophisticated and informed investors. Academic literature shows that one type of arbitrageur, namely the institutional investor, performs an important function in enhancing the price adjustment to new information, and thus, enhances the information efficiency of stock price.[42] Examples of institutional investors include investment banks, mutual and pension funds, and other financial institutions that hold a large amount of assets under management.

51.   Exhibit 8 presents the percentage of Wilmington's outstanding common stock held by institutional investors at the end of each calendar quarter of

---

[40] https://www.nyse.com/market-model/overview

[41] *Cammer v. Bloom*, Civil Action No. 88-2458, [13] United States District Court for the District of New Jersey (April 19, 1989).

[42] Ekkehart Boehmer and Eric Kelley, 2009, "Institutional Investors and the Informational Efficiency of Prices," *Review of Financial Studies* 22 (9), 3563-3594.

13

Case 1:10-cv-00990-ER-SRF Document 261-3 Filed 09/12/14 Page 16 of 63 PageID #:
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 262 of 309
21902

the years 2008 to 2010.[43] The number of institutional investors holding Wilmington stock ranged from 141 to 222 investors over these three years. In terms of stock holdings, institutional holdings ranged from 58.60% as of March 31, 2008 to 82.40% as of September 30, 2010. Institutional investors in total held at least 50% of Wilmington's common shares for each calendar quarter analyzed, highlighting that institutions owned the majority of all of Wilmington's common stock during the Class Period. In addition, its percentage ownership by institutional investors would place Wilmington above the median of firms in the NYSE and KBW 50 Regional Banking Index over the same time period. This provides evidence that Wilmington's stock was largely held by informed investors both on an absolute and relative basis.

52. Institutional investors holding Wilmington stock were from major investment companies. These investors are sophisticated and better informed than individual investors, and thus contribute to a more informed marketplace. For example, as of December 31, 2008, the top 20 largest holders of Wilmington's stock were Barclays Bank PLC; J.P. Morgan Chase & Co.; State Street Corporation; Vanguard Group, Inc.; T. Rowe Price Associates, Inc.; Security Global Investors, LLC; Capital World Investors; Wilmington Trust Penn; Royce & Associates, LLC; DePrince, Race & Zollo, Inc.; Bank of America Corporation; Ariel Investments, LLC; Nomura Asset Management Co., Ltd.; Buckhead Capital Management, LLC; Wilshire Association, Inc.; Miller/Howard Investments, Inc.; Gamco Investors, Inc.; Putnam Investment Management, LLC; Phoenix/Zweig Advisors, LLC; and Northern Trust Corporation. Their ownership ranged from 0.72% for Northern Trust Corporation to 6.81% for Barclays.[44]

53. In my view, the facts that Wilmington stock was traded on the NYSE and was largely held by institutional investors support my conclusion that the market for Wilmington's stock was efficient.

## D.  ELIGIBILITY TO FILE AN S-3 REGISTRATION STATEMENT

54. The fourth *Cammer* factor concerns the SEC registration status of a firm, in particular, whether the firm is eligible to file an S-3 form. Specifically *Cammer* states:

> "...it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock

---

[43] Source: Thomson Reuters Institutional Holdings (13F) database. Institutional ownership is available at the quarterly frequency.

[44] Source: Thomson Financial.

14

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 17 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 263 of 309
21903

requirements set forth in the instructions to Form S-3 were not met."[45]

55.    The rationale behind this *Cammer* factor is that registrants with the SEC are required to comply with the disclosure requirements in the SEC's *Exchange Act* and thus are subject to periodic public reporting. Such reports can then be analyzed free of cost by professional analysts and investors, by financial press, as well as by any other individual interested in obtaining information about Wilmington's stock. The significance of this particular factor is underscored by the SEC's explanation of the rationale for permitting certain companies to incorporate by reference the companies' other SEC filings in the Form S-3 registration statement: "[t]his form is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place."[46]

56.    In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.[47] Through Form S-3, Wilmington was allowed to incorporate prior SEC filings by reference into current filings and not repeat the information. Behind this decision is the notion that the SEC believes that prior public information is deemed to be widely available.

57.    On February 23, 2010 Wilmington conducted a public offering of common stock. The offering relied on a Form S-3ASR (an automatic shelf registration statement of securities of well-known seasoned issuers) filed with the SEC on November 29, 2007, an amendment (Form POSASR - Post-Effective Amendment) filed on January 12, 2009, a prospectus (Form 424B3) filed on January 12, 2009, and a prospectus supplement (Form 424B5) filed on February 25, 2010.[48] In addition, during the Class Period Wilmington filed 121 documents with the SEC.[49]

---

[45] *Cammer v. Bloom*, Civil Action No. 88-2458, 1287 United States District Court for the District of New Jersey (April 19, 1989).

[46] SEC Securities Act Release No. 6331 (Aug. 13, 1981), as cited in *Cammer*, 711 F. Supp. at 1284.

[47] For additional information, see http://www.sec.gov/about/forms/forms-3.pdf.

[48] Source: www.sec.gov/edgar.shtml

[49] Source: www.sec.gov/edgar.shtml. This number excludes 220 SEC Forms 3, 4 and 5, which are related to change in beneficial ownership of officers, directors, and significant shareholders.

Case 1:10-cv-00990-ER-SRF  Document 261-3  Filed 09/12/14  Page 18 of 63 PageID #:
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 264 of 309
21904

58. In my view, the fact that Wilmington was a public company eligible to file a Form S-3 and subject to periodic filing requirements of the SEC supports my conclusion that the market for Wilmington's stock was efficient.

## E.  STOCK PRICE REACTION TO NEWS

59. The fifth *Cammer* factor is the existence of a causal relation between unexpected corporate events or financial releases and the stock price response to such events. As stated in *Cammer*:

> "[e]mpirical facts showing cause and effect relationship between unexpected corporate events or financial releases and immediate response in stock price is relevant to determination of whether stock was traded on efficient market."[50]

60. To test whether Wilmington's stock reacted promptly to new information and to test for the significance of the reaction, I perform an event study. In academic research, event studies are a commonly used and well established statistical tool for examining the impact of firm-specific events on the stock price. Academic studies have used the event study methodology to assess the impact of a variety of firm-specific disclosures, including earnings announcements, press releases, and SEC filings, as well as to assess the impact of corporate decisions, such as dividend payments, stock splits, mergers, etc.[51] As discussed in the classic study by Brown and Warner (1980):

> "To the extent that the event is unanticipated, the magnitude of abnormal performance at the time the event actually occurs is a measure of the impact of that type of event on the wealth of the firms' claimholders... such abnormal performance is consistent with market efficiency."[52]

In other words, event studies allow one to measure the impact of unanticipated corporate events on the stock price and to infer whether abnormal price movement surrounding an event is consistent with the stock price reacting to news efficiently, i.e., whether the reaction is prompt and unbiased. A researcher conducting an event study begins by specifying a model of what price movements are "expected" based on a set of market factors and then testing whether the deviations from expected price movements on a set of corporate event dates of interest are sufficiently large

---

[50] *Cammer v. Bloom*, Civil Action No. 88-2458, [23] United States District Court for the District of New Jersey (April 19, 1989).

[51] For a review of this literature, see SP Kothari, 2001, "Capital markets research in accounting," *Journal of Accounting and Economics* 31, 105–231 and Chapter 1 titled "Econometrics of Event Studies" by SP Kothari and Jerold Warner in Handbook of Empirical Corporate Finance by Espen Eckbo, Elsevier/North-Holland, 2007.

[52] Stephen Brown and Jerold Warner, 1980, "Measuring Security Price Performance," *Journal of Financial Economics* 8, p. 205.

Case 1:10-cv-00990-ER-SRF  Document 261-3  Filed 09/12/14  Page 19 of 63 PageID #:
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 265 of 309
21905

that simple random movement can be rejected as the cause. An event study that demonstrates significant stock price reactions to those events is consistent with the conclusion that the market in that security is efficient.

61.  An event study can be performed using two different measures of stock price reactions to corporate events or information releases. These measures are:

   a.  The "absolute value" of the stock return (or unsigned price reaction) to a corporate event. The absolute value of stock return means if, for example, the return were -3% on an event day, it would be treated as +3% (i.e., the absolute value of -3%), and if the return were +2% it would be treated as +2%. The absolute value measures the magnitude (as opposed to the direction) of price movement in response to a corporate event;

   b.  Stock returns as observed, i.e., the signed price reaction, which captures the direction in addition to the magnitude of price movements in response to corporate events.

62.  An event study using absolute values has the advantage that it does not require me to specify what investors were expecting in a corporate event or information release.[53] In addition, it allows me to aggregate the price reaction across all event dates and calculate the average absolute price reaction on all events. A large and statistically significant reaction would suggest that market participants paid attention to the information releases on the event dates, processed the information, and reacted to it as manifested in the absolute price reaction.

63.  One potential criticism of an event study using absolute returns is that it cannot inform whether the directional response of the market participants was as expected. To address this criticism, I also perform an event study using signed stock returns and examine the market participants' response on individual corporate event dates. A significant price reaction on an event date would indicate that market participants not only reacted to the corporate event, but that their reaction is in line with the hypothesized nature of the information releases. For example, a positive stock price reaction to the announcement of earnings that exceeds the analysts' forecast for the company's earnings would be consistent with investors rationally responding to new information, and thus consistent with an efficient market in the security.

---

[53] William Beaver, 1968, "The Information Content of Annual Earnings Announcements." *Journal of Accounting Research* 6, 67-92.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 20 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 266 of 309
21906

64.     I identify as corporate events the 12 earnings announcements Wilmington made during the Class Period, as well as six corrective disclosure events highlighted by the plaintiffs in Section IV of the Fourth Amended Complaint. Four of the six corrective disclosure events also occurred on earnings announcement dates. This results in 14 distinct corporate event dates as presented in Exhibit 9.[54]

65.     For each event date, I collected the time stamp at which the corporate press release of each event became publicly available. This is important for defining whether the event was released before, during, or after trading hours within a given day, as the event study methodology relies on properly identifying the date on which information was made available to market participants.[55] For example, all of Wilmington's quarterly earnings results were released at 8:00 am EST during the Class Period.[56] Thus, each earnings announcement was treated in my analysis as an event in which information became public on the same trading day. The resignation of CEO Ted Cecala on June 3, 2010, on the other hand, was publicly announced at 5:44 pm EST when the market was closed and consequently was treated in my analysis as an event in which information became public on the subsequent trading day (i.e., June 4, 2010).[57]

66.     I use a statistical model with a 5% level of significance as a cutoff. Stated differently, I employ a 95% confidence interval, which means that for each day I test, I have 95% confidence that the actual return will be within approximately two standard deviations of the predicted return in the absence of Wilmington-specific news. Under this model one would expect approximately 5% of the trading days during the Class Period to experience significant stock returns at the 5% level of significance. As set forth below, I find that more large stock-price reactions occur on corporate event dates than would be expected by chance alone and that price reactions do not occur on non-event days any more than would be expected by chance.

---

[54] For purposes of my market efficiency analysis, I focus on corrective disclosure events that, like the earnings announcements, were initiated by Wilmington. On October 5, 2010 Bloomberg reported information that Wilmington was seeking a capital infusion from a private equity firm. While this event was associated with a 12% drop in the stock price, I do not include in my analysis because the disclosure of this event was initiated by Bloomberg.

[55] See chapter 1 titled "Econometrics of Event Studies" by S.P. Kothari and Jerold Warner in Handbook of Empirical Corporate Finance by Espen Eckbo, Elsevier/North-Holland, 2007.

[56] One exception is Wilmington's 2009 Q2 earnings announcement dated July 24, 2009. Although Wilmington officially announced its second-quarter results for 2009 on July 24, Wilmington issued an earnings outlook a week earlier on July 17, 2009 to warn the market that it expected its 2009 Q2 earnings to be lower than the Wall Street expectation due to a bigger loan-loss provision and investment write-downs. ("Wilmington Trust Expects Lower 2009 Second Quarter Earnings." Business Wire, July 17, 2009). Thus, I use the July 17, 2009 as the event date as this was the *de facto* earnings announcement date.

[57] "Wilmington Trust Chairman and CEO Ted T. Cecala Retires After 31 Years of Service; Board Elects Donald E. Foley as CEO." Business Wire, June 3, 2010.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 21 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 267 of 309
21907

67.    As discussed below, based on the results from the event study I have performed, I conclude that there is a clear cause and effect relationship between new material public information about Wilmington and the market price of its common stock.

## 1.    Analysis of Unsigned Price Reaction

68.    A central issue in an event study is "to assess the extent to which security price performance around the time of the event has been abnormal."[58] I compute Wilmington's abnormal stock returns relative to the returns of two financial indices - the KBW 50 Regional Banking Index (with Wilmington removed from the index) and the Russell 1000 Financial Services Index on a given day.[59,60] I focus on these two financial indices because Wilmington was a financial institution, and an index consisting of financial institutions best captures aggregate factors influencing the returns of the financial sector. The KBW 50 Regional Banking Index comprises of regional banks, whereas the Russell 1000 Financial Services Index is a broader index of financial institutions in the U.S.[61]

69.    The regression model in this analysis consists of a dependent variable that measures the absolute value of the daily abnormal return for Wilmington stock during the Class Period.  In the regression model, the dependent variable is explained using an intercept and an independent variable which is an indicator variable for all 14 event dates. To obtain the abnormal return for Wilmington stock on a given date, I first regress Wilmington's stock return on the return on the market index (either the KBW 50 Regional Banking Index or the Russell 1000 Financial Services Index) during 2007. I obtain the fitted parameters from this model and apply those to the actual market return for each date during the Class Period to obtain a measure of "expected" return for Wilmington on each day during the Class Period. The

---

[58] Stephen Brown and Jerold Warner, 1980, "Measuring Security Price Performance," *Journal of Financial Economics* 8, p. 205.

[59] The reasoning behind this exclusion is to remove a potential mechanical correlation between Wilmington stock and the index. This is particularly important when an index consists of a small number of stocks and a particular stock represents a substantial component of the index.

[60] In additional analysis, I perform the event study without excluding Wilmington from the KBW Index and find that the inferences, even for the narrower index consisting of 50 stocks, are unchanged. Specifically, the absolute value of the abnormal return caused by corporate events is 10.24% in Exhibit 10, compared to 10.12% when I do not exclude Wilmington from the KBW Index. Thus, when performing the analyses for the broader index of Russell 1000 Financial Services, I present a more conservative estimate by not excluding Wilmington from the index.

[61] I obtain similar results when I compute Wilmington's daily abnormal stock return relative to the return of S&P 500 Financials Index. The similarity in the returns using alternative financial indices is not surprising because they are all highly positively correlated with each other. This is expected because the primary drivers of all these indices are likely to be macroeconomic factors such as interest rates and the performance of the overall economy regardless of where the bank is located.

19

Case 1:10-cv-00990-ER-SRF Document 261-3 Filed 09/12/14 Page 22 of 63 PageID #:
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 268 of 309
21908

abnormal return is then the difference between the actual return for Wilmington stock and the "expected" return for the stock.[62]

70. The regression results reported in Exhibit 10 indicate that Wilmington stock reacted significantly to earnings announcements and corrective disclosures. The "intercept" in the model measures the average abnormal price movement of Wilmington's stock (in absolute value) for all trading days during the Class Period other than the 14 event dates. Thus, the intercept of 1.75% or 1.88% in Exhibit 10 (depending on the financial index used to estimate abnormal return) implies that the average price movement during the Class Period other than the 14 event dates equaled 1.75% or 1.88%.

71. The estimated "coefficient" for the 'Corporate Event' indicator measures the difference between the average stock price response to the 14 corporate events and the average stock price response on the remaining dates during the Class Period. Thus, the estimated coefficient of 10.24% to 10.66% (depending on the financial index used to estimate abnormal return) implies that the average abnormal stock price response to the 14 corporate events was 10.24% to 10.66% higher than that for Wilmington's stock on the remaining dates during the Class Period.

72. When one assesses the "t-value," as well as its corresponding "p-value," associated with these events, one can understand the significance of the abnormal returns. A t-value measures the number of standard deviations between an actual observation and a prediction. For example, an absolute abnormal stock return of 10.24% (as shown in Exhibit 10) represents 16.99 standard deviations, or a t-value of 16.99. The p-value of less than 0.0001 associated with this t-value suggests that, based on randomness alone, there is less than one in ten thousand chance of observing an absolute abnormal stock return of 10.24%. Given this low probability, one can reject randomness as the explanation for the absolute abnormal stock return and conclude that the stock returns on the event dates were driven by Wilmington's corporate events. In sum, the absolute abnormal returns of 10.24% to 10.66% in conjunction with the associated t-value and p-value indicate that the average abnormal stock price return on the 14 corporate event dates was statistically significantly larger than the absolute abnormal stock returns on all other days.

73. As an additional comparison of the average price response on the 14 event dates to the price response on non-event dates, I identify 314 days during the Class Period on which there were no media articles referring to Wilmington according to Dow Jones Factiva. I then run an event study regression comparing the stock price reaction on the 14 event dates and the stock price reaction on dates without media coverage on Wilmington.

---

[62] Exhibit 10 presents the detailed computation of abnormal return.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 23 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 269 of 309
21969

74.     Exhibit 11 shows that the abnormal price movement (in absolute value) on the 14 event dates is 10.14% to 10.52% *higher* than the average response during the Class Period, whereas the market reaction on the 314 non-event dates is 0.22% to 0.30% *smaller* than the average response during the Class Period. I then conduct a test of whether the stock market reaction on event dates is larger than the stock market reaction on dates when no media disclosures were made. The "F-value," like a t-statistic, is an indicator of statistical significance that can be used, as here, in testing differences in regression coefficients. The F-value indicated at the bottom of Exhibit 11 confirms that the market reaction on event dates is significantly larger than the market reaction on days without media coverage on Wilmington.

## 2.     Analysis of Signed Price Reaction

75.     In this section I perform a series of regressions of the signed daily stock returns for Wilmington stock on indicator variables for individual Wilmington-specific events during the Class Period and control variables for the return of the market. I continue to use returns of the KBW 50 Regional Banking Index (with Wilmington removed from the index) or returns of the Russell 1000 Financial Services Index as a measure of the market return for the stock of financial institutions.

76.     A crucial issue when using signed abnormal returns in event studies is to develop an expectation about the direction of the news such that one can predict whether news contained in an event arouses positive or negative market reactions. For example, when Wilmington announced a net income of 29 cents per share on July 18, 2008, the market reaction would depend on whether investors were expecting Wilmington's net income to be above, equal or below 29 cents per share.

77.     In Exhibit 9, I compare the earnings per share (EPS) reported by Wilmington with the analyst consensus EPS forecast, obtained from the news articles on Wilmington's earnings announcement dates as an indicator of whether the news was positive or negative relative to investors expectation. As an illustration, on July 18, 2008, Wilmington's reported a net loss of 29 cents per share for the second-quarter which was lower than the analyst forecast of 58 cents per share profit. This implies that Wilmington released bad news to the market.[63] Out of the 12 earnings announcements during the Class Period, I classify three as beating analyst expectations, two as releasing mixed news, and seven as missing analyst expectations.[64]

---

[63] "Wilmington Trust posts q2 loss on charges." Reuters News, July 18, 2008.

[64] I limit the classification of news to earnings releases for which I obtain an objective measure of how the Company's earnings release compared with analyst consensus EPS. Therefore, I do not classify the CEO resignation on June 3, 2010 and Wilmington's statements regarding its loan practices on June 23, 2010.

Case 1:10-cv-00990-ER-SRF  Document 261-3  Filed 09/12/14  Page 24 of 63 PageID #:
Case 8:21-cv-02910-TDC  Document 122-4  Filed 11/13/23  Page 270 of 309
21910

78. I perform two types of analyses using signed stock returns: (i) an event study using "rolling regressions" and (ii) an event study using the "full period." In the rolling regression approach, I conduct 14 regressions, one for each of the 14 corporate events described above. For each event I use the daily stock returns for Wilmington over a 120 trading day period starting 118 trading days before the event and ending on the date subsequent of the event as the dependent variable. The model controls for the return on the financial index (KBW Regional Banking Index or the Russell 1000 Financial Services Index) as a proxy for the market return. In addition, I include indicator variables for the event of interest as well as any of the 14 event dates that fall within the 120 day window.[65] This rolling regression approach allows for an estimation of parameters for each event over a shorter estimation window, which is particularly important in periods of high volatility in the market.[66]

79. In the full period regression, in contrast, I estimate only one regression model of the daily abnormal return for Wilmington stock during the Class Period on 14 different indicator variables, one for each event date. The abnormal return is as defined in the analysis of unsigned price reaction. The full period regression allows me to gauge the significance of the abnormal stock returns for the 14 event dates by examining the coefficients on the indicator variables that are all included in one model. Notwithstanding the differences in the methodologies, I find that my statistical inferences are similar across the two methods.

80. Exhibit 12 presents the rolling regression results for the event study using signed returns. Wilmington's stock experienced statistically significant price responses on 12 out of the 14 events. In addition, on all earnings announcement dates with a significant market reaction the price movement was in line with the sign of the news as presented in Exhibit 9.

81. For example, on April 18, 2008, the day on which Wilmington announced its first-quarter results for 2008, Wilmington announced first-quarter earnings per share profit of 62 cents which surpassed analysts' expectations of 57 cents per share."[67] Wilmington's stock increased by 6.92%, while the regression model predicted a return of 0.53% based on the KBW index (or 1.42% based on the Russell index). Thus, the abnormal return on April 18, 2008 was 6.39% based on the KBW (or 5.50% based on the Russell). With a t-value of 6.98 or 5.17, respectively, this return is statistically significant.

---

[65] For example, when analyzing the market reaction on April 24, 2009 the 120 trading day window ranges from November 3, 2008 to April 27, 2009. Thus, I include an indicator variable for the date of the event (April 24, 2009) as well as another indicator variable for the previous earnings announcement on January 30, 2009.

[66] See Phillip A. Braun, Daniel B. Nelson, and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *The Journal of Finance* 50 (5): 1575-1603 for description of this alternative methodology.

[67] "Wilmington Trust Q1 Profit Tops Street View Shrs Rise." Reuters News, April 18, 2008.

This rapid price reaction demonstrates that Wilmington's stock price reacted quickly and significantly to new information.

82. On July 23, 2010, the day on which Wilmington announced its second-quarter results for 2010, Wilmington announced a "wider-than-expected" net loss of $120.9 million, with "net charge-offs and loan loss provisions [having risen] four-fold to $131.2 million and $205.2 million, respectively."[68] As a consequence, Wilmington stock experienced a negative return in the magnitude of -10.23 to -11.13%, depending on the benchmark financial index.

83. Exhibit 13 presents the "full period" regression results. The statistical inferences are very similar to the results using "rolling regression" in Exhibit 12. In either case, Wilmington's stock experienced statistically significant price responses on 12 out of the 14 events. Thus, an overwhelming majority of the event dates experienced a significant price reaction.

84. To put these results in perspective, I also investigate the extent to which the market reacted significantly on the 314 days without media coverage of Wilmington. Using a "full period" regression analogous to the specification in Exhibit 13, I find that the stock price reaction was significant on one of the 314 non-event dates when using the KBW Regional Banking Index and it was significant on two out of the 314 days when using the Russell 1000 Financial Services Index.

85. The results in the paragraphs above illustrate that a preponderance of statistically significant stock price reaction took place on the 14 corporate event dates. This finding is consistent with market reacting efficiently to news on the event dates. I find that the stock price reaction on 85.7% (i.e., 12 out of 14) event dates is statistically significant whereas the corresponding frequency is only 0.32% to 0.64% on the 314 non-event dates. This demonstrates that large stock price reactions are far more prevalent during the 14 corporate event dates as opposed to the 314 non-event dates.

86. Given the strong statistical significance of Wilmington's average abnormal return on corporate event dates aggregated, the significant market reaction on individual event dates in the direction of the news, and the significantly stronger market reaction on event vis-à-vis non-event dates, I conclude that Wilmington's stock was responsive to new information during the Class Period. This supports my conclusion that the market for Wilmington's stock was efficient.

87. Furthermore, these results support my opinion that there was significant price impact from the revelation of the omissions and misrepresentations.

---

[68] "Bad Loans Drag Wilmington to Fifth-Straight Qtrly Loss." Reuters News, July 23, 2010.

23

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 26 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 272 of 309
21912

Therefore, there is no "evidence of a lack of price impact" from the revelations that took place between January 29, 2010, and November 1, 2010. Thus, consistent with *Halliburton II*, there is no evidence to rebut the presumption of reliance.

## VII.   ADDITIONAL MARKET EFFICIENCY METRICS

88.   In addition to the operational *Cammer* factors listed above, I have also considered additional operational factors that have been considered by the courts. As with the operational *Cammer* factors, these other operational factors all support my conclusion that Wilmington common stock traded in an open, developed and efficient market throughout the Class Period.

## A.   MARKET CAPITALIZATION

89.   In *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), the court suggested that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[69]

90.   Market capitalization is an important factor in complying with the NYSE's listing requirements as well as highly correlated with trading volume, analyst following, press coverage, and institutional ownership—factors considered in *Cammer*.[70]

91.   Exhibit 14 presents the market capitalization for Wilmington, relative to the median market capitalization for firms in the NYSE and KBW 50 Regional Banking Index, during the Class Period. Market capitalization is computed as the daily closing price of Wilmington common stock times the daily number of outstanding shares. The data points in Exhibit 14 represent the average daily market capitalization for Wilmington over each month of the Class Period.

92.   Wilmington's market capitalization ranged from a high of $2,263 million in May of 2008 to a low of $385 million in November of 2010.[71] Relative to firms in the NYSE and KBW 50 Regional Banking Index, Wilmington had market capitalization that was in the 56.74 and 57.06 percentile on average, respectively, during the Class Period. This suggests that Wilmington was a

---

[69] 202 F.R.D. at 478.

[70] For example, see "Darren Roulstone, 2003, "Analyst Following and Market Liquidity," *Contemporary Accounting Research* 20 (3), 552-578 (2003)." and "Ekkehart Boehmer and Eric Kelley, 2009, "Institutional Investors and the Informational Efficiency of Prices," *Review of Financial Studies* 22 (9), 3563-3594" for correlations between market capitalization, analyst following and institutional ownership.

[71] Since the Class Period ends on November 1, 2010, Wilmington's market capitalization for November 1, 2010 is simply its market capitalization on November 1, 2010—the closing price of Wilmington stock on that day times the number of outstanding shares.

relatively large firm, both when compared to firms in the exchange as well as representative regional banks.

93. As Exhibit 14 illustrates, there was a decline in market capitalization for Wilmington from January 2008 to March 2009, the period of the financial crisis. Other firms in the NYSE and KBW 50 Regional Banking Index also saw a decrease in market capitalization during this period. After the financial crisis, Wilmington and these other firms began to show signs of recovery in their market capitalization.

94. However, after reaching a peak in its recovery in April of 2010, Wilmington began to see a different trend in its market capitalization from that of the other NYSE and KBW 50 Regional Banking Index firms, as Wilmington's market capitalization quickly decreased again, stooping to its lowest value at the end of the Class Period. The differential trend between Wilmington's stock and benchmark firms reflects the adverse news about Wilmington released during the end of the Class Period. Further, the existence of news about Wilmington stimulates interest in the stock and is a supporting factor in ensuring market efficiency.

95. Despite the final decline in Wilmington's market capitalization toward the end of the Class Period, Wilmington still had a market capitalization that was greater than the median of the NYSE and KBW 50 Regional Banking Index firms, on average, over the course of the Class Period. In my view, Wilmington's relatively large market capitalization supports my conclusion that the market for Wilmington's stock was efficient.

## B. STOCK LIQUIDITY

96. My next efficiency metrics are proxies for stock price liquidity. When applying the fraud-on-the-market theory, Plaintiffs characterize the market for Wilmington stock as "open, efficient and well developed." Here I focus on the "developed" component of the definition. As discussed in *Cammer*, a developed market is:

> "one which has a relatively high level of activity… it usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes)."[72]

97. While my earlier analysis of trading volume is consistent with the market for Wilmington's stock being developed, I supplement my analysis with direct evidence on traditional proxies for liquidity—namely price impact, bid-ask spread, and return autocorrelation.

---

[72] *Cammer v. Bloom*, Civil Action No. 88-2458, United States District Court for the District of New Jersey (April 19, 1989), p. 2 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988).

98. These metrics are among the most classic measures of stock liquidity, a fundamental component of market efficiency. Lower price impact and bid-ask spread indicate less uncertainty regarding valuation and greater ability to trade without moving the market price.[73] Further, the *Krogman* court suggested, "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." Meanwhile, lower return autocorrelation is an indicator of market efficiency because, in an efficient market, past stock returns cannot predict future returns such that traders cannot profit from exploiting information in past stock prices.[74]

99. Exhibit 15 presents the daily average price impact—an inverse measure of liquidity—of Wilmington common stock, relative to the median price impact of NYSE and KBW 50 Regional Banking Index firms, over the Class Period. Following Amihud (2002), I compute price impact as the daily ratio of the absolute return of Wilmington stock to the dollar value of trading volume (in millions).[75] That is, price impact measures Wilmington's daily price reaction per million dollars of trading volume. The data points in Exhibit 15 represent the daily average price impact (as a percentage) for Wilmington stock, averaged over each month of the Class Period.

100. The daily price impact measure for Wilmington stock ranged from 0.05% in January of 2008 to 0.59% in March of 2009. Wilmington's daily average price impact would ultimately place Wilmington in the 42.09 and 35.86 percentile on average, relative to other firms in the NYSE and KBW 50 Regional Banking Index, respectively, during the Class Period. That is, the price impact of Wilmington's stock was below that of the median firms in these indices (i.e., stock liquidity was *above* the median since price impact is an inverse indicator of liquidity), confirming that the liquidity for Wilmington's stock was relatively high.

101. Exhibit 16 presents Wilmington's daily average bid-ask spread—an inverse measure of liquidity—relative to the median of firms in the NYSE and KBW 50 Regional Banking Index, during the Class Period. For each trading day, bid-ask spread is computed as the difference between the intraday quoted ask price and bid price divided by the average of the ask price and bid price, averaged over that day. The intraday quoted ask and bid prices of each quote for Wilmington's common stock were obtained

---

[73] See "Albert Kyle, 1985, "Continuous auctions and insider trading," *Econometrica* 53, 1315–1335." and "Lawrence Glosten and Paul Milgrom, 1985, "Bid, ask, and transaction prices in a specialist market with heterogeneously informed traders," *Journal of Financial Economics* 14, 71–100."

[74] See "Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61 (5), 2365–2394." and "Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2008, "Liquidity and market efficiency," *Journal of Financial Economics* 87 (2), 249–268." for evidence on the relation between autocorrelation and market efficiency.

[75] See "Yakov Amihud, 2002, "Illiquidity and stock returns: cross-section and time-series effects," *Journal of Financial Markets* 5: 31-56."

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 29 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 275 of 309
21915

from Trades and Quotes (TAQ) database. The data points in Exhibit 16 represent the daily average bid-ask spread (as a percentage) for Wilmington stock, averaged over each month of the Class Period.

102.  Wilmington's daily average bid-ask spread ranged from 0.10% in March of 2010 to 0.60% in September and October of 2008. Compared to that of other firms traded on the NYSE and in the KBW 50 Regional Banking Index, Wilmington's daily average bid-ask spread would place Wilmington in the 38.91 and 38.09 percentile on average, respectively, during the Class Period (i.e., stock liquidity was *above* the median since bid-ask spread is an inverse indicator of liquidity), confirming that the liquidity for Wilmington's stock was relatively high during this period.

103.  The last measure of stock price liquidity is autocorrelation. Following Avramov et al. (2006),[76] I run a regression of Wilmington's daily stock return on the stock return of the previous trading day over the Class Period to test the existence of autocorrelation. If the estimated coefficient of the previous day's return is sufficiently small or statistically insignificant, then there would be no evidence of return predictability, which is consistent with Wilmington's stock price being efficient. The insignificant autocorrelation reported in Exhibit 17 is consistent with Wilmington's stock being traded in an efficient market.

104.  In my view, Wilmington's high stock liquidity—characterized by low price impact, low bid-ask spread, and low return autocorrelation—supports my conclusion that the market for Wilmington's stock was efficient.

C.   **PUBLIC FLOAT**

105.  My last efficiency metric is public float. Public float refers to the amount of outstanding securities that are not held by insiders of a given corporation.[77] In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders.[78] *Krogman* further states:

> "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."[79]

---

[76] "Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61 (5), 2365–2394."

[77] Insiders are not allowed to freely trade in the stock of their firm based on their privileged, nonpublic information. They are subject to both trading restrictions (blackout periods and restrictions under Exchange Act §§ 10b-5, 16(b), and 16(c)) and reporting requirements under § 16(a).

[78] *Krogman v. Sterritt*, 202 F.R.D. 467 United States District Court, N.D. Texas, Dallas Division (March 29, 2001).

[79] *Krogman v. Sterritt*, 202 F.R.D. 467 United States District Court, N.D. Texas, Dallas Division (March 29, 2001) at 478.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 30 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 276 of 309
21916

106. In turn, float indicates the amount of securities available to non-insiders, who are able to trade freely and profit by trading on new information in the marketplace. As presented in Exhibit 18, Wilmington's quarterly public float (shares outstanding plus short interest less insider holdings) ranged from 68.73 million shares in the first quarter of 2008 to 99.78 million shares in the third quarter of 2010, with an average quarterly public float of 81.03 million shares during the Class Period. By contrast, over the Class Period, insiders on average held 3.57 million shares. Therefore, the average float of 81.03 million shares demonstrates that there was a substantial number and proportion of shares that could be traded by investors or lent to short holders.

107. The large float for Wilmington's stock provides evidence supporting my conclusion that Wilmington's common stock traded in an open, developed, and efficient market throughout the Class Period.

## VIII.  CONCLUDING ASSESSMENT OF MARKET EFFICIENCY

108. Based on the analyses above, every factor analyzed supports my opinion that Wilmington's common stock traded in an efficient market.

109. This report represents my current opinions, based on the materials I have reviewed and analyzed to date. If additional relevant material or information comes to my attention, I reserve the right to revise or supplement this report. I also reserve the right to respond to the opinions of other expert witnesses in this matter and to modify or supplement my opinions accordingly.

28

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 31 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 277 of 309
21917

The above report has been signed by me in Cambridge, Massachusetts on this 12th day of September, 2014.

S.P. Kothari

29

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 32 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 278 of 309
21918

**Appendix A**

**S.P. KOTHARI**
**Deputy Dean and Gordon Y Billard Professor in Management**
**MIT Sloan School of Management**
E-mail: Kothari@MIT.edu
Web: http://web.mit.edu/kothari/www/
Phone: Direct (617) 253-0994
Executive Assistant: Margaret Lo (617) 253-7151
Fax: (617) 258-6617

## SELECTED AWARDS

Doctor Honoris Causa, University of Technology, Sydney, 2013
Distinguished Alumnus Award, Birla Institute of Technology & Science, Pilani, India, 2013
AAA Notable Contributions to Accounting Literature Award, 2014

## EMPLOYMENT

| | |
|---|---|
| 2010 - Present | Deputy Dean and Gordon Y Billard Professor in Management, Sloan School of Management, Massachusetts Institute of Technology |
| 2008 – 2009 | Global Head of Equity Research, Barclays Global Investors, San Francisco |
| 2007 – 2008 | Deputy Dean and Gordon Y Billard Professor in Management, Sloan School of Management, Massachusetts Institute of Technology |
| 2006 – 2007 | Head of the Department of Economics, Finance, and Accounting, and Gordon Y Billard Professor in Management, Sloan School of Management, Massachusetts Institute of Technology |
| 2005 – 2006 | Thomas Henry Carroll-Ford Visiting Professor of Business Administration, Harvard Business School |
| 2003 – 2005 | Head of the Department of Economics, Finance, and Accounting, and Gordon Y Billard Professor in Management, Sloan School of Management, Massachusetts Institute of Technology |
| 1999 – 2003 | Gordon Y Billard Professor in Management and Head of the Accounting Group, Sloan School of Management, Massachusetts Institute of Technology |
| 1998 – 1999 | Professor and Accounting Area Coordinator, University of Rochester |
| 1997 – 1998 | Visiting Professor, Sloan School of Management, Massachusetts Institute of Technology |
| 1996 – 1997 | Professor and Accounting Area Coordinator, University of Rochester |
| 1991 – 1996 | Associate Professor & Accounting Area Coordinator, University of Rochester |
| 1988 – 1991 | Assistant Professor and Accounting Area Coordinator, University of Rochester |

30

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 33 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 279 of 309
21919

1986 – 1988      Assistant Professor, University of Rochester

## OTHER APPOINTMENTS

| | |
|---|---|
| 2001 – 2003 | Honorary Visiting Professor, Cranfield University |
| Winter, 2001 | Visiting Professor, London Business School |
| Summer, 1997 | Visiting Professor at the University of Technology in Sydney, Australia |
| Fall, 1996 | Weinstein Distinguished Visiting Professor, Baruch CUNY, New York |
| 1994 – 1997 | Honorary Visiting Professor, City University Business School, London |
| 1979 – 1980 | Officer, DCM's Shriram Fertilizers and Chemicals, Mumbai |
| 1998 – 2004 | On the Board of Directors of Vicarious Visions http://www.vvisions.com/ |

## EDUCATION

Ph.D. Accounting, University of Iowa, 1986

M.B.A. Accounting and Finance, Indian Institute of Management, Ahmedabad, India, 1982

B.E. Chemical Engineering, Birla Institute of Technology and Science, Pilani, India, 1979

## RESEARCH (over the last ten years)

1. Kothari, S., Sabino, J., Zach, T., 2005, Implications of Survival and Data Trimming for Tests of Market Efficiency, *Journal of Accounting & Economics* 39, 129-161.

2. Kothari, S., Leone, A., Wasley, C., 2005, Performance Matched Discretionary Accrual Measures, *Journal of Accounting & Economics* 39, 163-197.

3. Barclay, M., Gode, D., Kothari, S., 2005, Matching Delivered Performance, *Journal of Contemporary Accounting & Economics* 1, 1-25.

4. Frankel, R., Kothari, S., Weber, J., 2006, Determinants of the Informativeness of Analyst Research, *Journal of Accounting & Economics* 41, 29-54.

5. Kothari, S., Lewellen, J., Warner, J., 2006, Stock Returns, Aggregate Earnings Surprises, and Behavioral Finance, *Journal of Financial Economics* 79, 537-568.

6. Kolasinski, A., Kothari, S., 2008, Investment Banking and Analyst Objectivity: Evidence from Analysts Affiliated with M&A Advisors, *Journal of Financial and Quantitative Analysis* 43, 817-842.

7. Jin, L., Kothari, S., 2008, Effect of Personal Taxes on Managers' Decision to Sell Unrestricted Equity, *Journal of Accounting & Economics* 46, 23-46.

31

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 34 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 280 of 309
21920

8. Kothari, S., Li, X., Short, J., 2009, The Effect of Disclosures by Management, Analysts, and Financial Press on the Equity Cost of Capital: A Study Using Content Analysis, *The Accounting Review* 84, 1639-1670.

9. Kothari, S., Shu, S., Wysocki, P., 2009, Do managers withhold bad news? *Journal of Accounting Research* 47, 241-276.

10. Kothari, S., Ramanna, K., Skinner, D., 2010, Implications for GAAP from an Analysis of Positive Research in Accounting, *Journal of Accounting & Economics* 50, 246-286.

11. DeFranco, G., Kothari, S., Verdi, R., 2011, The Value of Earnings Comparability, *Journal of Accounting Research* 49, 895-931.

12. Guay, W., Kothari, S., Shu, S., 2011, Properties of Implied Cost of Capital Using Analysts' Forecasts, *Australian Journal of Management* 36, 125-149.

13. Ball, R., Kothari, S., Nikolaev, V., 2013, On Estimating Conditional Conservatism, *The Accounting Review* 88, 755-787.

14. Guay, W., Kothari, S., Loktionov, Y., 2008, Accounting for Derivatives in Emerging Market Economies, working paper, MIT Sloan School of Management.

15. Ball, R., Kothari, S., Nikolaev, V., 2013, Econometrics of the Basu Asymmetric Timeliness Coefficient and Accounting Conservatism, *Journal of Accounting Research* 51, 1071-1097.

16. Kothari, S., Loutskina, E., Nikolaev, V., 2008, Agency Theory of Overvalued Equity as an Explanation for the Accrual Anomaly, working paper, MIT Sloan School of Management.

17. Kothari, S., Lewellen, J., Warner, J., 2014, Aggregate Investment, Profits, and Stock Returns, working paper, MIT Sloan School of Management.

18. Jayaraman, S., Kothari, S., 2014, The Effect of Corporate Transparency on Bank Risk-Taking and Banking System Fragility, working paper, MIT Sloan School of Management.

19. Kothari, S., Shivakumar, L., Urcan, O., 2014, Aggregate Earnings Surprises and Inflation Forecasts, working paper, MIT Sloan School of Management.

20. Kothari, S., Mizik, N., Roychowdhury, S., 2014, Managing for the Moment: The Role of Real Activity versus Accrual Earnings Management in SEO Valuation, working paper, MIT Sloan School of Management.

**DISCUSSIONS AND RESEARCH IN PROFESSIONAL JOURNALS, BOOKS, AND MONOGRAPHS (over the last ten years)**

32

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 35 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 281 of 309
21921

1. Kothari, S., Warner, J., 2007, Econometrics of Event Studies, in Espen Eckbo, Ed., Handbook of Empirical Corporate Finance (Elsevier/North-Holland).

2. Kothari, S., Lester, R., 2012, The Role of Accounting in the Financial Crisis: Lessons for the Future, *Accounting Horizons* 26, 335-351.

3. Kothari, S., Swamy, G., Danilov, K., 2012, Generating Superior Performance in Private Equity: A New Investment Methodology, *Journal of Investment Management* 11, 28-41.

## BOOKS

*Financial Statement Analysis*, Edited by Ray Ball and S.P. Kothari, McGraw-Hill, 1994.

*Contemporary Accounting Research: Synthesis and Critique*, Edited by S.P. Kothari, Thomas Z. Lys, Douglas J. Skinner, Ross L. Watts, and Jerold L. Zimmerman, North-Holland Publishing, 2002.

## CONSULTING ACTIVITIES (over the last five years)

2012: Report on behalf of Micron Technology, Inc. and Micron Semiconductor Products, Inc. against Oracle America, Inc., in Civil Action 10-cv-04340 in the U.S. Northern District of California, Oakland Division.

2013: Report and Deposition testimony In re: Residential Capital, LLC et al., Debtors, United States Bankruptcy Court Southern District of New York, Case No. 12-12020 (MG).

2013: Rebuttal report on behalf of Brookfield Asset Management Et Ano. v. AIG Financial Products Corp. Et Ano., in Civil Action 09-CV-8285 in the U.S. Southern District Court of New York.

2013: Declaration report on behalf of The Blackstone Group L.P. et al., Defendants, United States District Court Southern District of New York, Civil Action No. 08-CV-03601-HB.

2014: Report and Rebuttal report on behalf of Deutsche Bank National Trust Company, as Trustee for the Trustees, Plaintiff, United States District Court for the District of Columbia, Case No. 09-CV-1656-RMC.

2014: Report and Rebuttal report on behalf of Starr International Company, Inc., Plaintiff, in The United States Court of Federal Claims, No. 11-CV-00779 (TCW).

2014: Declaration report on behalf of Keurig Green Mountain, Defendant, in opposition to JBR's motion for a preliminary injunction, United States District Court, Southern District of New York, No 1:14-md-02542 (VSB), Applies to No. 14 Civ. 4242.

33

Case 1:10-cv-00990-ER-SRF Document 261-3 Filed 09/12/14 Page 36 of 63 PageID #:
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 282 of 309
21922

## PROFESSIONAL ACTIVITIES

**Editor**, *Journal of Accounting and Economics*, 1997-Present.
Associate Editor, *Journal of Contemporary Accounting & Economics*, 2005-Present.
Associate Editor, *Asia-Pacific Journal of Accounting & Economics*, 2000-2004.
Associate Editor, *Journal of Accounting & Economics*, 1990-1996.
Editorial Board Member, *The Accounting Review*, 1989-1992.

Referee for: *The Journal of Finance, Journal of Financial Economics, Journal of Accounting Research, The Accounting Review, Journal of Financial and Quantitative Analysis, Contemporary Accounting Research, Journal of Business, The Review of Financial Studies, Review of Economics and Statistics, British Accounting Review.*

**Keynote Speaker** at the British Accounting Association Annual Meetings, April 1995.

**Keynote Speaker** at the Accounting Association of Australia and New Zealand Annual Meetings, July 1996.

Speaker at the HKUST Summer Symposium on Accounting Research, June 2001.

Distinguished Faculty Speaker at the British Accounting Association Doctoral Consortium, April 1995.

Distinguished Faculty Speaker at the Accounting Association of Australia and New Zealand Doctoral Consortium, July 1996.

Doctoral Consortium speaker at the *Asia-Pacific Journal of Accounting & Economics* Conference in Shanghai, January 2003.

*AAA Financial Accounting Reporting Section* Doctoral Consortium in Orlando, January 2003.

AAA Doctoral Consortium speaker at Lake Tahoe, June 2004.

**Keynote Speaker** at the Accounting Research Consortium, University of Technology, Sydney, Australia, January-February 2012.

**Keynote speaker** at Hong Kong University of Science & Technology Accounting Research Symposium, July 2012.

## INVITED PRESENTATIONS AT SCHOOLS AND CONFERENCES

1986 SUNY at Buffalo, University of Michigan, University of Rochester, University of Chicago, Wharton School, Northwestern University, Washington University at St. Louis, University of Texas at Austin, and Carnegie Mellon University.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 37 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 283 of 309
21923

1987   University of Michigan, Massachusetts Institute of Technology, SUNY at Buffalo, International Conference on Forecasting at Boston, and AAA Meetings.

1988   University of Chicago, Cornell University, University of Washington at Seattle, SUNY at Buffalo, and Michigan State University.

1989   Columbia University Research Conference, Duke University, University of Iowa, Stanford University, University of California at Berkeley, University of Minnesota, New York University, and University of Pennsylvania at College Park.

1990   Harvard University, Northwestern University, Ohio State University, University of Arizona, University of Southern California, Temple University, Washington University at St. Louis, AAA meetings at Toronto, European Finance Association meetings, and Contemporary Accounting Research Conference.

1991   Arizona State University, Indiana University, and University of Michigan.

1992   Cornell University, Vanderbilt University, University of Wisconsin at Madison, University of Illinois, University of Nebraska, Stanford University Summer Camp, AAA Meetings at Washington D.C., Duke University, Michigan State University, Wharton School at the University of Pennsylvania, SUNY at Buffalo, University of Missouri at Columbia, and JAAF-Peat Marwick Conference.

1993   Baruch CUNY at New York, Pennsylvania State University, City University Business School at London, Institute for Quantitative Investment Research at Cambridge, Accounting and Finance Conference at St. Louis, International Seminar on Futures and Options in Mumbai, India, University of Iowa, and Iowa State University.

1994   University of Manchester, University of Glasgow, Carnegie Mellon University, Harvard Business School, London Business School, and Baruch CUNY.

1995   City University Business School at London, Western Finance Association Meeting at Aspen, Colorado, AAA Meetings at Orlando, SUNY at Buffalo, Syracuse University, and Rice University.

1996   Northwestern University, City University Business School, KOC University at Istanbul, University of New South Wales at Sydney, JAR Conference at Chicago, Michigan, ISDA Conference, Washington DC, Arizona, AAA meetings at Chicago, Boston College, and University of Maryland.

1997   University of Southern California, Tulane University, Ibbotson Associates Cost of Capital Conference at Chicago, London School of Economics, City University Business School at London, National Association of Pension Funds at London, University of Technology at Sydney, Harvard University, University of Rochester, Washington University at St. Louis, Cornell University, and Columbia University.

35

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 38 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 284 of 309
21924

1998   Stanford University, Morningstar Inc. at Chicago, New Faculty Consortium at St. Charles, University of Notre Dame, University of Alberta, University of Technology at Sydney, University of Iowa, University of California at Berkeley, *Contemporary Accounting Research* Conference at Vancouver, and University of California at Los Angeles.

1999   AAA-KPMG International Accounting Conference at Montvale, NJ, University of British Columbia, University of Tilburg in Holland, INSEAD in France, University of Colorado at Denver, University of Michigan, University of Oklahoma, Financial Economics and Accounting Conference at the University of Texas at Austin, and Boston Area Research Colloquium at Boston University.

2000   Australian Graduate School of Management, University of Technology at Sydney, University of Sydney, Syracuse University, Boston Federal Reserve Annual Research Conference, Stanford University, Harvard University, AAA-BAA conference at Cambridge University, European Financial Association Conference in London, University of Chicago, American Accounting Association meetings in Philadelphia, and MIT Sloan School of Management.

2001   Cranfield University, Yale University, University of Rochester, HKUST, University of Technology at Sydney, University of Chicago, Pennsylvania State University, University of Texas at Dallas, MIT, and Duke University.

2002   Georgetown University, London Business School Donor Seminar, University of Pittsburgh, London Business School Symposium, Cornell University, Oklahoma State University, University of Rochester, New York University, Arizona State University, and Wharton School at the University of Pennsylvania.

2003   FARS Conference, APJAE Conference in Shanghai, University of Southern California, and University of Technology at Sydney.

2004   APJAE Conference in Kuala Lumpur, Emory University, AAA Doctoral Consortium, Harvard University, Fed-JFE Conference at Ohio State University, the U.S. Securities & Exchange Commission, Case Western Reserve University, University of Maryland, and Financial Economics and Accounting Conference at USC.

2005   Journal of Accounting, Auditing, and Finance Conference at NYU, Harvard University, Carnegie Mellon University, Samsung School of Business, S. Korea, and University of Texas at Dallas.

2006   Stanford University, Southern Methodist University, University of Georgia, Rutgers University, University of Chicago, Ohio State University, University of Minnesota, Michigan State University, Indian Institute of Technology, Bombay, BSI Gamma Foundation, Switzerland, and Cornell University.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 39 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 285 of 309
21925

2007    Indian Institute of Management, Calcutta, Brigham Young University, University of California, Riverside, University of Edinburgh, University of Southern California, University of Texas at Austin, Tuck at Dartmouth College, University of California, Los Angeles, Washington University in St. Louis, University of Massachusetts at Amherst, BARC Seminar at Boston University, Association of Finance Professionals, Boston, and London Business School.

2008    Lancaster University and University of Manchester.

2009    Temple University, London Business School, University of Rochester, Stanford University, American Accounting Association meetings in New York, Georgetown University, JAE Conference at MIT, and BITS Pilani.

2010    University of Chicago, University of Texas at San Antonio, and Sabanci University, Istanbul.

2011    Canadian Accounting Association, London School of Economics, Fudan University, and Xi'an Jiaotong University.

2012    Harvard Business School, Tsinghua University, Sun Yat-Sen University, and HKUST.

2013    USC, NY Federal Reserve Bank.

2014    Louisiana State University, National Taiwan University.

## TEACHING

Corporate Financial Accounting, MBA core course
Financial Statement Analysis, MBA elective course
Empirical Accounting Research, PhD seminar
Positive Accounting Theories, MBA elective course
Cases in Finance, MBA elective course
Introduction to Financial Accounting, Undergraduate course
Corporate Financial Accounting: Simon School's Executive MBA programs in Holland and Switzerland

Intensive doctoral research courses in Accounting and Finance to faculty and students in: Finland (1991, 1992), University of Alberta, Canada (1991), European Institute for Advanced Studies in Management, Brussels (1993), Baruch College, City University of New York, NY (1996), University of Technology at Sydney, Australia (1997, 1998, 2000, 2001, 2003), London Business School (2001).

## DISSERTATIONS

Case 1:10-cv-00990-ER-SRF    Document 261-3    Filed 09/12/14    Page 40 of 63 PageID #:
Case 8:21-cv-02910-TDC    Document 122-4    Filed 11/13/23    Page 286 of 309
21926

On the Ph.D. dissertation committees of (initial placement in parentheses):

**As Chairperson**
Christopher Noe (Harvard Business School)
Glen Hansen (Pennsylvania State University)
Wayne Guay (Wharton University of Pennsylvania)
Peter Wysocki (University of Michigan)
Yong Chul Shin (Tulane University)
Ying Li (Baruch College, CUNY)
Wesley Chan (Alpha Simplex)
Xu Li (University of Texas at Dallas)
Yanfeng Xue (University of Texas at Austin)
Jieying Zhang (University of Southern California)
Volkan Muslu (University of Texas at Dallas)
Adam Kolasinski (University of Washington)
Valeri Nikolaev (University of Chicago)
George Papadakis (Boston University)
Amit Koshal (Industry)
Jeri Seidman (University of Texas at Austin)
Konstantin Rozanov (London Business School)
Yuri Loktionov (University of Southern California)
Mihir Mehta (Temple University)

**As Committee member**
Gita Rao (Illinois)
Richard Sloan (Wharton)
Tony Greig (Purdue)
Anwer Ahmed (Florida)
Patty Dechow (Wharton)
Sudipta Basu (CUNY, Baruch)
Michele Daley (Rice)
Paul Irvine (Emory)
Roger Edelen (Wharton)
Mingyi Hung (University of Southern California)
Mary Ellen Carter (Columbia)
Eric Wolff (Carnegie Mellon University)
Susan Shu (Boston College)
Elizabeth Keating (Northwestern University)
Laurence van Lent (University of Tilburg)
Gans Narayanamoorthy (Yale University)
Kevin Chan (HKUST, Hong Kong)
Karthik Ramanna (Harvard University)
Kexin Zheng (University of Connecticut)
Rebecca Lester

38

Case 1:10-cv-00990-ER-SRF Document 261-3 Filed 09/12/14 Page 41 of 63 PageID #:
21927
Case 8:21-cv-02910-TDC Document 122-4 Filed 11/13/23 Page 287 of 309

## COMMITTEE / ADMINISTRATION

Co-Chair of International Initiatives Committee, Chair of Space Committee, Chair of Load Committee, and Member of various standing committees, MIT Sloan School of Management, 2011-Present.

Policy Committee and Personnel Committee, MIT Sloan School of Management, 1999-Present.

Head of the Department of Economics, Finance, and Accounting, MIT Sloan School of Management, 2003-2005, 2006-2007.

Head of the Accounting group, MIT Sloan School of Management, 1999-2003.

Sloan Fellows Program Committee, MIT Sloan School of Management, 2001-2005.

Sloan Research Productivity Committee, MIT Sloan School of Management, 2001-2002.

Sloan Fellows/MOT Program Restructuring Committee, MIT Sloan School of Management, 2002.

Management Programs Committee, MIT Sloan School of Management, 2000-2001.

Promotion and Tenure Committee, University of Rochester, 1996 -1999.

Accounting Area Coordinator, University of Rochester, 1988-1999.

Ph.D. committee, University of Rochester, 1989-1995.

MBA committee, University of Rochester, 1989-1994.

University of Rochester Senate, 1994-1996.

Committee on Teaching Excellence, University of Rochester, 1995-1996.


## FINANCIAL PRESS WRITINGS

Narendra Modi and Arun Jaitley should strive to improve profit outlook for investment, The Economic Times, September 5, 2014.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 42 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 288 of 309
21928

## Appendix B – Materials Reviewed or Considered

### Court Documents

- Fourth Amended Consolidated Securities Class Action Complaint, filed June 6, 2013
- Court Decision on Motion to Dismiss the Fourth Amended Complaint, filed March 20, 2014

### Court Decisions and Securities Law

- *Basic v. Levinson*, 485 U.S. 224-225, 241-242 (1988)
- *Cammer v. Bloom*, Civil Action No. 88-2458, United States District Court for the District of New Jersey (April 19, 1989).
- *Halliburton v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 United States District Court, N.D. Texas, Dallas Division (March 29, 2001).

### SEC Filings/Forms

- Wilmington SEC filings made during the Class Period available through EDGAR
- Wilmington's Conference Call Transcripts from Thomson Streetevents

### Databases

- Historical data on market capitalization, trading volume, price, and returns from the Center for Research in Security Prices database (CRSP)
- Historical data on bid and ask prices from the Trade and Quote database (TAQ)
- Historical data on analyst forecast from the Institutional Brokers Estimate System (I/B/E/S)
- Historical data on institutional holdings and insider holding from the Thomson Reuters Institutional Holdings (13F) database
- Historical data on the KBW Regional Banking Index from Bloomberg
- Historical data on short interest from S&P Compustat Security database.

### News
- Wilmington news headlines and articles downloaded from the Dow Jones Factiva Database
- Wilmington earnings press release articles published by Business Wire

### Wilmington Analyst Reports

- Analyst reports from Thomson One Analytics

### Websites/Webpages

- NYSE website for NYSE's listing requirements and market structure

40

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 43 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 289 of 309
21929

## Textbooks

- Yacine Ait-Sahalia and Lars peter Hansen, "Handbook of Financial Econometrics," North-Holland, 2009.

- Espen Eckbo, "Handbook of Empirical Corporate Finance," Elsevier/North-Holland, 2007.

## Academic Articles

- Yakov Amihud, 2002, "Illiquidity and stock returns: cross-section and time-series effects," *Journal of Financial Markets* 5: 31-56.

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61 (5), 2365–2394.

- William Beaver, 1968, "The Information Content of Annual Earnings Announcements." *Journal of Accounting Research* 6, 67-92.

- Ekkehart Boehmer and Eric Kelley, 2009, "Institutional Investors and the Informational Efficiency of Prices," *Review of Financial Studies* 22 (9), 3563-3594.

- Phillip A. Braun, Daniel B. Nelson, and Alain M. Sunier, 1995, "Good News, Bad News, Volatility, and Betas," *The Journal of Finance* 50 (5): 1575-1603

- Stephen Brown and Jerold Warner, 1980, "Measuring Security Price Performance," *Journal of Financial Economics* 8, 205-258.

- Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2001, "Market Liquidity and Trading Activity," *Journal of Finance* 56, 501–530.

- Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2008, "Liquidity and market efficiency," *Journal of Financial Economics* 87 (2), 249–268.

- Darrell Duffie, Nicolae Gârleanu, and Lasse Pedersen, 2005, "Over-the-Counter Markets," *Econometrica* 73 (6), 1815-1847.

- Eugene Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, 383-388.

- Lawrence Glosten and Paul Milgrom, 1985, "Bid, ask, and transaction prices in a specialist market with heterogeneously informed traders," *Journal of Financial Economics* 14, 71–100.

- Ron Kasznik and Baruch Lev, 1995, "To Warn or Not to Warn: Management Disclosures in the Face of an Earnings Surprise," *The Accounting Review* 70 (1), 113-134.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 44 of 63 PageID #:
21930
Case 8:21-cv-02910-TDC   Document 123-4   Filed 11/13/23   Page 290 of 309

- SP Kothari, 2001, "Capital markets research in accounting," *Journal of Accounting and Economics* 31, 105–231.

- SP Kothari, Susan Shu, Peter Wysocki, 2009, "Do managers withhold bad news?" *Journal of Accounting Research* 47, 241-276.

- Albert Kyle, 1985, "Continuous auctions and insider trading," *Econometrica* 53, 1315–1335.

- Ananth Madhavan, 2003, "The Russell Reconstitution Effect," *Financial Analysts Journal* 59 (4), 51-64.

- Darren Roulstone, 2003, "Analyst Following and Market Liquidity," *Contemporary Accounting Research* 20 (3), 552-578 (2003).

- Andrei Shleifer, 1986, "Do demand curves for stocks slope down?" *Journal of Finance* 41, 579–590.

- Douglas J. Skinner, 1994, "Why Firms Voluntarily Disclose Bad News," *Journal of Accounting Research* 32 (1), 38-60.

Case 1:10-cv-00990-ER-SRF  Document 261-3  Filed 09/12/14  Page 45 of 63 PageID #: 21931

# Exhibit 1
## Summary of Market Efficiency Factors for Wilmington Common Stock during the Class Period
### January 18, 2008 – November 1, 2010

| Factor | Summary of Factor | Wilmington Common Stock |
|---|---|---|
| Weekly Trading Volume (*Cammer* I) | "…2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption" (*Cammer*) | • Average weekly share turnover of 8.47% (median of 6.80%). This number is well above the 2% cutoff cited by the *Cammer* court.<br>• Wilmington's turnover is in the 75.84 and 67.36 percentiles compared to the firms in the NYSE and KBW Index, respectively.<br>• Included in the following prominent indices: Russell 1000, S&P Midcap 400, and KBW 50 Regional Banking Indices. |
| Number of Analysts Providing Coverage (*Cammer* II) | "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." (*Cammer*) | • Total of 208 publicly available analyst reports issued during the Class Period, with a median of 19 reports published between consecutive earnings announcement dates.<br>• Median of 9 analysts participated in quarterly earnings conference calls, with a median of 39.5 questions asked per call.<br>• During the Class Period 1,335 media articles related to Wilmington can be found in the Dow Jones Factiva Database. |
| Market Makers & Arbitrageurs (*Cammer* III) | "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." (*Cammer*) | • Traded on NYSE, a large national exchange with substantial listing requirements.<br>• Institutional investors in total held at least 50% of Wilmington's common shares, and institutional holdings ranged from 58.60% to 82.40%. |
| Eligibility to File an S-3 Registration Statement (*Cammer* IV) | "…it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met." (*Cammer*) | • Wilmington filed a Form S-3ASR with the SEC on November 29, 2007, an amendment filed on January 12, 2009, a prospectus filed on January 12, 2009, and a prospectus supplement filed on February 25, 2010.<br>• In addition, Wilmington filed a total of 121 documents with the SEC during the Class Period. |
| Stock Price Reaction to News (*Cammer* V) | "Empirical facts showing cause and effect relationship between unexpected corporate events or financial releases and immediate response in stock price is relevant to determination of whether stock was traded on efficient market." (*Cammer*) | • Event study analyses show strong statistical significance of Wilmington's average abnormal return on corporate event dates aggregated, a significant market reaction on individual event dates in the direction of the news, and a significantly stronger market reaction on event vis-à-vis non-event dates. |
| Market Capitalization | "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." (*Krogman*) | • Market capitalization ranged from a high of $2,263 million to a low of $385 million.<br>• On average, Wilmington's market capitalization was greater than the median of NYSE and KBW firms, with market capitalization in the 56.74 and 57.06 percentiles compared to the NYSE and KBW Index, respectively. |
| Stock Liquidity | Low price impact and narrow bid-ask spread indicate less uncertainty regarding valuation and greater ability to trade without moving the market price, while lower return autocorrelation is an indicator of market efficiency because, in an efficient market, past price movements are reflected in the current price so that current prices cannot predict future returns. (*Krogman*) | • Daily average price impact ranged from 0.05% to 0.59%, while daily average bid-ask spread ranged from 0.10% to 0.60%.<br>• Wilmington's price impact and bid-ask spread (measures of illiquidity) were below those of the median firm in the NYSE and KBW Index.<br>• The coefficient of autocorrelation for Wilmington's stock return was statistically insignificant. |
| Public Float | "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security." (*Krogman*) | • Wilmington's quarterly public float (shares outstanding plus short interest less insider holdings) ranged from 68.73 million shares in the first quarter of 2008 to 99.78 million shares in the third quarter of 2010.<br>• By contrast, over the Class Period, insiders on average held 3.57 million shares. |

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 46 of 63 PageID #: 21932

**Exhibit 2**
**Wilmington Common Stock Weekly Turnover during the Class Period -**
**Trading Week**
**January 18, 2008 - November 1, 2010**

This chart plots the weekly share turnover of Wilmington common stock, which is calculated as the weekly trading volume as a percentage of weekly average outstanding shares, during the Class Period. The dates on the time axis reflect the first day of each trading week during this time period (presented at a regular interval). Each week is defined as five consecutive trading days. The last week during this period (10/28/2010 to 11/1/2010) consists of only three trading days.

Weekly Share Turnover:
Average: 8.47%
Median: 6.80%

"2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one" (*Cammer*).

44

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 47 of 63 PageID #: 21933



**Exhibit 3**
**Wilmington Common Stock Weekly Turnover during the Class Period - Calendar Week**
**January 18, 2008 - November 1, 2010**

This chart plots the weekly stock turnover, which is calculated as the weekly trading volume as a percentage of weekly average outstanding shares, during the Class Period. Each week is a calendar week with 4 to 5 trading days. The first and last calendar weeks of the Class Period consist of only one trading day (January 18, 2008 and November 1, 2010, respectively) and thus are excluded. The dates on the time axis reflect the first day of each calendar week during this time period (presented at a regular interval).

Weekly Share Turnover:
Average: 8.11%
Median: 6.59%

"2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one" (*Cammer*).

45

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 48 of 63 PageID #: 21934

# Exhibit 4
## Wilmington Common Stock Weekly Trading Volume
### during the Class Period - Trading Week
### January 18, 2008 - November 1, 2010

This chart plots the weekly trading volume during the Class Period. The dates on the time axis reflect the first day of each trading week during this time period (presented at a regular interval). Each trading week is defined as five consecutive trading days. The last week during this period (10/28/2010 to 11/1/2010) consists of only three trading days.



46

Case 1:10-cv-00090-ER-SRF   Document 261-3   Filed 09/12/14   Page 49 of 63 PageID #: 21935



**Exhibit 5**
**Wilmington Common Stock Weekly Trading Volume**
**during the Class Period - Calendar Week**
**January 18, 2008 - November 1, 2010**

This chart plots the weekly trading volume during the Class Period. Each week is a calendar week with 4 to 5 trading days. The first and last calendar weeks of the Class Period consist of only one trading day (January 18, 2008 and November 1, 2010, respectively). The dates on the time axis reflect the first day of each calendar week during this time period (presented at a regular interval).

47

Case 1:10-cv-00990-ER-SRF  Document 261-3  Filed 09/12/14  Page 50 of 63 PageID #: 21936

**Exhibit 6**
**Top Five Trading Weeks with the Largest Trading Volume for Wilmington Common Stock during the Class Period – Trading Week**
**January 18, 2008 – December 31, 2010**

This chart shows the top five trading weeks of the Class Period with the greatest trading volume for Wilmington stock in terms of number of shares traded (in millions) and U.S. dollar amount (in $ millions).  Each trading week is defined as five consecutive trading days. The last trading week during the Class Period (10/28/2010 to 11/1/2010) consists of only three trading days.

|  | Trading Volume in Shares (in Millions) & Associated Trading Week | Trading Volume in U.S. Dollar Amount (in $ Millions) & Associated Trading Week |
|---|---|---|
| 1st Largest | 60.19 (Week starting 10/28/2010) | $469.84 (Week starting 2/19/2010) |
| 2nd Largest | 32.86 (Week starting 2/19/2010) | $377.92 (Week starting 9/15/2008) |
| 3rd Largest | 30.08 (Week starting 10/21/2010) | $320.70 (Week starting 7/18/2008) |
| 4th Largest | 14.98 (Week starting 7/21/2010) | $294.05 (Week starting 7/11/2008) |
| 5th Largest | 14.41 (Week starting 6/22/2010) | $276.68 (Week starting 10/28/2010) |

48

Case 1:10-cv-00090-ER-SRF   Document 261-3   Filed 09/12/14   Page 51 of 63 PageID #: 21937

**Exhibit 7**
**Analyst Reports on Wilmington Released between Consecutive Earnings**
**Announcement Dates during the Class Period**
**January 18, 2008 - November 1, 2010**

This chart plots the number of analyst reports on Wilmington that were released between January 18, 2008 and November 1, 2010. The data points in the chart specifically reflect the number of reports published between consecutive earnings announcement dates (from one earnings announcement date to one day prior to the next earnings announcement date) during the Class Period.



49

Case 1:10-cv-00090-ER-SRF    Document 261-3    Filed 09/12/14    Page 52 of 63 PageID #: 21938



**Exhibit 8**
**Wilmington Stock Ownership Held by Institutional Investors at the End**
**of Each Calendar Quarter of 2008 to 2010**
**2008 Quarter 1 - 2010 Quarter 4**

This chart compares the institutional ownership (in %) of Wilmington stock to that of firms in relevant indices during the years covering the Class Period. The dates on the time axis reflect the last day of each calendar quarter of the years 2008 to 2010. The institutional holding was obtained from the Thomson Financial 13F database.

50

**Exhibit 9**
## Wilmington Corporate Events Analyzed in Event Study by Date and Time
### January 18, 2008 – November 1, 2010

Fourteen corporate events, including Wilmington's earnings announcements and corrective disclosures, during the Class Period were included in the event study. Below are descriptions of the events, their associated dates and times, and the type of news provided to the market for these events. (The news are characterized as "beats expectations," "mixed," or "misses expectations," based on whether Wilmington's actual EPS for a given quarter beat Wall Street expectations).

| Date | Time (EST) | Corporate Event | News |
|---|---|---|---|
| January 18, 2008 | 8:00 am | Earnings announcement of 2007 Q4 and 2007 annual results | Beats expectations, as the actual EPS of $0.65 beat the street expectation of $0.64. (Source: "Wilmington Trust Q4 earnings beat Wall Street." Reuters News, January 18, 2008) |
| April 18, 2008 | 8:00 am | Earnings announcement of 2008 Q1 results | Beats expectations, as the actual EPS of $0.62 beat the street expectation of $0.57. (Source: "Wilmington Trust Q1 profit tops Street view, shrs rise." Reuters News, April 18, 2008) |
| July 18, 2008 | 8:00 am | Earnings announcement of 2008 Q2 results | Misses expectations, as the actual EPS of -$0.29 missed the street expectation of $0.58. (Source: "Wilmington Trust posts Q2 loss on charges." Reuters News, July 18, 2008) |
| October 17, 2008 | 8:00 am | Earnings announcement of 2008 Q3 results | Mixed news. Although the actual EPS of $0.34 missed the street expectation of $0.42, the EPS before a write-off of investment was $0.53 which was higher than the street expectation. (Source: "Wilmington Trust's 3rd-qtr profit drops by half, hurt by Fannie, Freddie; results top Street." Associated Press Newswires, October 17, 2008) |
| January 30, 2009 | 8:00 am | Earnings announcement of 2008 Q4 and 2008 annual results | Misses expectations , as the actual EPS of -$1.02 missed the street expectation of $0.12. (Source: "Wilmington Trust posts Q4 loss on charges." Reuters News, January 30, 2009) |
| April 24, 2009 | 8:00 am | Earnings announcement of 2009 Q1 results | Beats expectations, as the actual EPS of $0.26 beat the street expectation of $0.04. (Source: "Wilmington Trust's 1st-quarter profit tops Wall Street view, shares surge." Associated Press Newswires, April 24, 2009) |
| July 17, 2009 | 11:02 am [a] | Earnings outlook of 2009 Q2 results | Misses expectations, as Wilmington announced that it expects earnings per share (on a diluted basis) for the 2009 second quarter to be lower than market expectations. (Source: "Wilmington Trust Expects Lower 2009 Second Quarter Earnings." Business Wire, July 17, 2009) |
| October 23, 2009 | 8:00 am | Earnings announcement of 2009 Q3 results | Mixed news. Although the actual EPS of -$0.15 missed the street expectation of $0.07, the EPS before security losses was $0.19 which was higher than the street expectation. |

(Continued on the next page)

51

(Exhibit 9 Continued)

| January 29, 2010 | 8:00 am | Earnings announcement of 2009 Q4 and 2009 annual results | Misses expectations, as the actual EPS of -$0.23 missed the street expectation of $0.04. (Source: "Investors fret over Willington Trust's surprise Q4 loss." Reuters News, January 29, 2010) |
|---|---|---|---|
| April 23, 2010 | 8:00 am | Earnings announcement of 2010 Q1 results | Misses expectations, as the actual EPS of -$0.44 missed the street expectation of -$0.04. (Source: "Wilmington Trust posts 1st-qtr loss, reversing year-ago profit, missing Street expectations." Associated Press Newswires, April 23, 2010) |
| June 3, 2010 | 5:44 pm [b] | Resignation of CEO Ted Cecala | Alleged corrective disclosure – not an earnings release |
| June 23, 2010 | 10:16 am [c] | SunTrust Robinson Humphrey, "Field Trip Highlights; Downgrading to Neutral" | Alleged corrective disclosure – not an earnings release |
| July 23, 2010 | 8:00 am | Earnings announcement of 2010 Q2 results | Misses expectations, as the actual EPS of -$1.33 missed the street expectation of -$0.30. (Source: "Bad loans drag Wilmington to fifth-straight qtrly loss." Reuters News, July 24, 2009) |
| November 1, 2010 | 8:00 am | Earnings announcement of 2010 Q3 results, announcement of merger with M&T | Misses expectations, as the actual EPS of -$4.06 missed the street expectation of -$0.43. (Source: "Wilmington Trust (WL) Q3 Loss Wider than Views." StreetInsider.com, November 1, 2010) |

a. The time stamp for the event on July 17, 2009 ("Earnings warnings of 2009 Q2 results") is the earliest time the media (Business Wire) released Wilmington's press release to the public that warned the market that Wilmington expected its 2009 Q2 earnings to be lower than the Wall Street expectation due to a bigger loan-loss provision and investment write-downs. ("Wilmington Trust Expects Lower 2009 Second Quarter Earnings." Business Wire, July 17, 2009). Actual earnings for the 2009 Q2 were announced on July 24, 2009.

b. The time stamp for the event on June 3, 2010 ("Resignation of CEO Ted Cecala") represents the earliest time the media (Business Wire) released information to the public on Cecala's retirement. ("Wilmington Trust Chairman and CEO Ted T. Cecala Retires After 31 Years of Service; Board Elects Donald E. Foley as CEO." Business Wire, June 3, 2010)

c. The time stamp for the event on June 23, 2010 ("SunTrust Robinson Humphrey, "Field Trip Highlights; Downgrading to Neutral"") represents the earliest time the media (Dow Jones Newswires) released information to the public that analysts at SunTrust had downgraded Wilmington stock. ("Wilmington Trust Cut to Neutral from Buy by SunTrust." Dow Jones Newswires, June 23, 2010)

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 55 of 63 PageID #: 21941

**Exhibit 10**

**Regression Results of the Market Reaction to Wilmington's Unexpected Events**

**Assessment of the Absolute Value of Wilmington's Abnormal Stock Return on Wilmington's Corporate Event Days Aggregated**

I estimate the following model using 703 trading observations during the Class Period:

$$ABS(ABRET)_t = \alpha + \beta \times Corporate\ Event_t + \varepsilon_t,\ t = 1, 2, \ldots, 703 \text{ during the Class Period.}$$

$Corporate\ Event_t$ is an indicator for the 14 corporate events, as identified in Exhibit 9, during the Class Period (January 18, 2008 to November 1, 2010). $ABS(ABRET)_t$ is the absolute value of abnormal return $ABRET$ of day t. To obtain abnormal return I first estimate the following model using data from year 2007:

$$RET_t = \alpha + \beta \times RETM_t + \varepsilon_t,\ t = 1, 2, \ldots 251 \text{ during the year 2007,}$$

where $RET_t$ is Wilmington's stock return in day t and $RETM_t$ is the return of the market portfolio in day t (KBW 50 Regional Banking Index or Russell 1000 Financial Services Index). I then compute abnormal return ($ABRET$) as

$$ABRET_t = RET_t - (\hat{\alpha} + \hat{\beta} \times RETM_t),$$

where $\hat{\alpha}$ and $\hat{\beta}$ are estimated parameters obtained from the market model above using 251 trading observations in 2007.

| Time Period | 1/18/2008 to 11/1/2010 | | | |
|---|---|---|---|---|
| **Number of Observations** | 703 | | | |
| **Adjusted R-Squared** | 0.2908 | | 0.2891 | |

| Market Index | KBW 50 Regional Banking Index | | Russell 1000 Financial Services Index | |
|---|---|---|---|---|
| **Variable** | **Coefficient** | **t-Value** | **Coefficient** | **t-Value** |
| Intercept | 0.0175 | 20.58** | 0.0188 | 21.13** |
| Corporate Event | 0.1024 | 16.99** | 0.1066 | 16.92** |

* and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

**Exhibit 11**
**Regression Results of the Market Reaction to Wilmington's Unexpected Events**
Assessment of the Absolute Value of Wilmington's Abnormal Stock Return on Wilmington's Corporate Event Days Aggregated and Days with No News Aggregated

I estimate the following model using 703 trading observations during the Class Period:

$$ABS(ABRET)_t = \alpha + \beta \times \text{Corporate Event}_t + \delta \times \text{No News}_t + \varepsilon_t, \quad t = 1, 2, \ldots, 703$$

$ABS(ABRET)_t$ and $Corporate\ Event_t$ are as defined in Exhibit 10. $No\ News_t$ is an indicator for days without news media coverage. Specifically, I identified 314 days during the Class Period without news articles referring to Wilmington according to Dow Jones Factiva.

| Time Period | 1/18/2008 to 11/1/2010 | | | |
|---|---|---|---|---|
| Number of Observations | 703 | | | |
| Adjusted R-Squared | 0.2915 | | 0.2910 | |

| Market Index | KBW 50 Regional Banking Index | | Russell 1000 Financial Services Index | |
|---|---|---|---|---|
| Variable | Coefficient | t-Value | Coefficient | t-Value |
| Intercept | 0.0185 | 16.08** | 0.0202 | 16.76** |
| Corporate Event | 0.1014 | 16.69** | 0.1052 | 16.59** |
| No News | -0.0022 | -1.31 | -0.0030 | -1.71 |
| | Difference | F-Value | Difference | F-Value |
| Corporate Event vs. No News | 0.1036 | 289.13** | 0.1082 | 289.31** |

* and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

**Exhibit 12**
**Rolling Regression Results of the Market Reaction to Wilmington's Unexpected Events**
Assessment of Wilmington's Stock Return to Wilmington's Individual Corporate Event

I perform an event study using rolling regressions. Specifically, for each of the 14 events, I employ a 120 trading day window and estimate the following model:

$$RET_{k,t} = \alpha_k + \beta_k RETM_{k,t} + \delta_k Corporate\ Event_{k,t} + \sum \lambda_k Corporate\ Event_{k-1,2\ or\ 3} + \varepsilon_{k,t}\ ,\ t = -118, -117..., +1, k = 1, 2,..., 14$$

$RET_{k,t}$ is Wilmington's stock return on day t, $RETM_{k,t}$ is the return of the market portfolio (as proxied by the KBW 50 Regional Banking Index with Wilmington being removed, or the Russell 1000 Financial Services Index) of day t, and $Corporate\ Event_{k,t}$ is an indicator for each corporate event date. In addition, I control for one to three prior corporate events during the estimation window as indicated by $Corporate\ Event_{k-1,2\ or\ 3}$ if the event falls within the 120 trading day window.

| Time Period | 1/18/2008 to 11/1/2010 | | | |
|---|---|---|---|---|
| Number of Observations | 703 | | | |

| Market Index | KBW 50 Regional Banking Index | | Russell 1000 Financial Services Index | |
|---|---|---|---|---|
| Variable | Coefficient | t-Value | Coefficient | t-Value |
| January 18, 2008 | 0.0648 | 5.86** | 0.0690 | 6.05** |
| April 18, 2008 | 0.0639 | 6.98** | 0.0550 | 5.17** |
| July 18, 2008 | -0.0658 | -4.59** | -0.0715 | -4.17** |
| October 17, 2008 | 0.0236 | 0.96 | 0.0083 | 0.28 |
| January 30, 2009 | -0.1231 | -4.62** | -0.1364 | -4.50** |
| April 24, 2009 | 0.2722 | 10.02** | 0.3011 | 9.87** |
| July 17, 2009 | -0.1575 | -5.72** | -0.1932 | -6.44** |
| October 23, 2009 | -0.0115 | -0.47 | -0.0150 | -0.58 |
| January 29, 2010 | -0.1254 | -5.19** | -0.1328 | -5.32** |
| April 23, 2010 | -0.0916 | -5.10** | -0.0930 | -4.79** |
| June 4, 2010 | -0.0338 | -2.03* | -0.0578 | -3.00** |
| June 23, 2010 | -0.0987 | -6.30** | -0.1097 | -5.87** |
| July 23, 2010 | -0.1113 | -7.01** | -0.1023 | -5.39** |
| November 1, 2010 | -0.3803 | -14.82** | -0.4036 | -15.31** |

* and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

55

Case 1:10-cv-00990-ER-SRF  Document 261-3  Filed 09/12/14  Page 57 of 63 PageID #: 21943

**Exhibit 13**
**Regression Results of the Market Reaction to Wilmington's Unexpected Events**
Assessment of Wilmington's Stock Return to Wilmington's Individual Corporate Event

I perform an event study by estimating the following model:

$$ABRET_t = \alpha + \sum_{k=1}^{14} \beta_k \times DATE_t + \delta \times RETM_t + \varepsilon_t, \ t = 1, 2, \ldots, 703, k = 1, 2, \ldots, 14$$

$ABRET_t$ and $RETM_t$ are as defined in Exhibit 10. $DATE_t$ are 14 indicators for each of the 14 corporate event dates, as identified in Exhibit 9, during the Class Period (January 18, 2008 to November 1, 2010).

| Time Period | 1/18/2008 to 11/1/2010 | | | |
|---|---|---|---|---|
| Number of Observations | 703 | | | |
| Adjusted R-Squared | 0.3925 | | 0.3862 | |

| Market Index | KBW 50 Regional Banking Index | | Russell 1000 Financial Services Index | |
|---|---|---|---|---|
| Variable | Coefficient | t-Value | Coefficient | t-Value |
| Intercept | -0.0006 | -0.60 | -0.0002 | -0.23 |
| January 18, 2008 | 0.0637 | 2.57* | 0.0674 | 2.58** |
| April 18, 2008 | 0.0638 | 2.57* | 0.0543 | 2.08* |
| July 18, 2008 | -0.0657 | -2.65** | -0.0716 | -2.74** |
| October 17, 2008 | 0.0180 | 0.73 | 0.0110 | 0.42 |
| January 30, 2009 | -0.1281 | -5.17** | -0.1334 | -5.11** |
| April 24, 2009 | 0.2796 | 11.28** | 0.2964 | 11.35** |
| July 17, 2009 | -0.1740 | -7.02** | -0.1990 | -7.62** |
| October 23, 2009 | -0.0203 | -0.82 | -0.0237 | -0.91 |
| January 29, 2010 | -0.1286 | -5.19** | -0.1334 | -5.11** |
| April 23, 2010 | -0.0873 | -3.52** | -0.0878 | -3.36** |
| June 4, 2010 | -0.0516 | -2.08* | -0.0617 | -2.36* |
| June 23, 2010 | -0.1004 | -4.05** | -0.1071 | -4.10** |
| July 23, 2010 | -0.1040 | -4.19** | -0.0990 | -3.79** |
| November 1, 2010 | -0.3897 | -15.72** | -0.4079 | -15.62** |

* and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

56



### Exhibit 14
### Wilmington's Daily Average Market Capitalization
### over Each Month of the Class Period
### January 18, 2008 – November 1, 2010

This chart compares Wilmington's daily average market capitalization to that of firms in relevant indices over each month of the Class Period. The average market capitalization for January 2008 only reflects daily values from January 18, 2008 (the first day of the Class Period) to January 31, 2008. The market capitalization for November 2010 is simply the daily market capitalization for November 1, 2010 since the Class Period

Case 1:10-cv-00990-ER-SRF    Document 261-3    Filed 09/12/14    Page 59 of 63 PageID #: 21945

Case 1:10-cv-00090-ER-SRF   Document 261-3   Filed 09/12/14   Page 60 of 63 PageID #: 21946



**Exhibit 15**
**Daily Average Price Impact for Wilmington Common Stock**
**over Each Month of the Class Period**
**January 18, 2008 - November 1, 2010**

This chart compares Wilmington's daily average price impact (in %) to that of firms in relevant indices over each month of the Class period. Price impact is calculated as the daily ratio of absolute return to the dollar value of trading volume, averaged over each month. The average price impact for January 2008 only reflects daily values from January 18, 2008 (the first day of the Class Period) to January 31, 2008. The price impact for November 2010 is simply the daily price impact for November 1, 2010 since the Class Period ends on that date.

58

Case 1:10-cv-00990-ER-SRF  Document 261-3  Filed 09/12/14  Page 61 of 63 PageID #: 21947

**Exhibit 16**
**Daily Average Intraday Bid-Ask Spread for Wilmington Common Stock**
**over Each Month of the Class Period**
**January 18, 2008 - November 1, 2010**

This chart compares Wilmington's daily average bid-ask spread (in %) to that of firms in relevant indices, averaged over each month of the Class Period. For each trading day, bid-ask spread is calculated as the average of (Ask - Bid)/[(Ask + Bid)/2], where Bid and Ask are the intraday bid price and ask price of each quote for Wilmington Common Stock obtained from TAQ. The average bid-ask spread for January 2008 only reflects daily values from January 18, 2008 (the first day of the Class Period) to January 31, 2008. The bid-ask spread for November 2010 is simply the daily bid-ask spread for November 1, 2010 since the Class Period ends before the open of the market on that date.



59

Case 1:10-cv-00990-ER-SRF  Document 261-3  Filed 09/12/14  Page 62 of 63 PageID #: 21948

# Exhibit 17
## Regression Results of Autocorrelation for Wilmington's Daily Stock Returns

I perform a regression of Wilmington's daily stock return as the dependent variable and the previous trading day's return as the independent variable over the Class Period (from January 18, 2008 to November 1, 2010). The first-order autocorrelation is measured by the coefficient of the independent variable.

| | |
|---|---|
| **Time Period:** | 1/18/2008 to 11/1/2010 |
| **Number of Observations:** | 702 |
| **Adjusted R-Squared:** | 0.0022 |

| Variables | Coefficient | t-Value |
|---|---|---|
| Intercept | -0.0015 | -0.79 |
| Previous Day's Stock Return | -0.0632 | -1.59 |

* and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

Case 1:10-cv-00990-ER-SRF   Document 261-3   Filed 09/12/14   Page 63 of 63 PageID #:
Case 8:21-cv-02910-TDC   Document 122-4   Filed 11/13/23   Page 309 of 309
21949

## Exhibit 18
## Wilmington's Public Float and Insider Holdings at the End of Each Calendar Quarter of 2008 to 2010
### 2008 Quarter 1 - 2010 Quarter 4

This chart presents Wilmington's public float and the components in the calculation of float at the end of each calendar quarter between 2008 and 2010.  All shares are measured in millions.

| Year-Quarter | Shares Outstanding [a] (in Millions) | Short Interest [b] (in Millions) | Shares Held by Insiders [c] (in Millions) | Public Float (in Millions) |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) = (1) + (2) - (3) |
| 2008 Q1 | 67.173 | 5.161 | 3.604 | 68.729 |
| 2008 Q2 | 67.291 | 9.323 | 3.606 | 73.008 |
| 2008 Q3 | 67.366 | 10.779 | 3.275 | 74.869 |
| 2008 Q4 | 68.780 | 8.323 | 3.267 | 73.836 |
| 2009 Q1 | 69.113 | 5.433 | 3.679 | 70.867 |
| 2009 Q2 | 69.305 | 7.136 | 3.856 | 72.585 |
| 2009 Q3 | 69.307 | 9.751 | 3.848 | 75.210 |
| 2009 Q4 | 69.390 | 12.542 | 3.566 | 78.366 |
| 2010 Q1 | 88.328 | 12.413 | 3.614 | 97.127 |
| 2010 Q2 | 91.198 | 9.578 | 3.536 | 97.240 |
| 2010 Q3 | 91.543 | 11.773 | 3.537 | 99.779 |
| 2010 Q4 | 91.483 | 2.711 | 3.460 | 90.734 |
| Average | 75.856 | 8.744 | 3.571 | 81.029 |

a. Source: Center for Research in Security Prices (CRSP).
b. Source: S&P Compustat Security database.
c. Source: Thomson Reuters Insider database.