# EXHIBIT D

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 2 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 2 of 63
#:1790

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| |
|---|
| **IN RE Mattel Inc. Securities Litigation** |
| **Case No. 19-CV-10860-MCS (PLAx)** |

## EXPERT REPORT OF PROFESSOR S.P. KOTHARI

Professor S.P. Kothari
MIT Sloan School of Management
100 Main Street, E62-662
Cambridge, MA 02142

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 3 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 3 of 63
#:1791

**TABLE OF CONTENTS**

                                                                                            **Page**

I.    RULE 26 EXPERT DISCLOSURES.................................................................................1

II.   MATERIALS REVIEWED OR CONSIDERED ...........................................................2

III.  ASSIGNMENT AND SUMMARY OF CONCLUSIONS.............................................2

IV.   BACKGROUND ON MATTEL......................................................................................4

V.    BACKGROUND ON MARKET EFFICIENCY ...........................................................5

VI.   *CAMMER* MARKET EFFICIENCY METRICS ...........................................................7

      A. WEEKLY TRADING VOLUME...........................................................................7

      B. NUMBER OF ANALYSTS PROVIDING COVERAGE.....................................9

      C. MARKET MAKERS AND ARBITRAGEURS ...................................................11

      D. ELIGIBILITY TO FILE AN S-3 REGISTRATION STATEMENT................13

      E. STOCK PRICE REACTION TO NEWS .............................................................15

VII.  ADDITIONAL MARKET EFFICIENCY METRICS....................................................23

      A. MARKET CAPITALIZATION...........................................................................23

      B. STOCK LIQUIDITY AND BID-ASK SPREADS.............................................24

      C. PUBLIC FLOAT ...................................................................................................25

      D. AUTOCORRELATION OF STOCK RETURNS................................................27

VIII. CONCLUDING ASSESSMENT OF MARKET EFFICIENCY......................................27

IX.   ABILITY TO CALCULATE DAMAGES ON A CLASSWIDE BASIS............................28

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 4 of 63   Page ID
#:1792
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 4 of 63

## I.  RULE 26 EXPERT DISCLOSURES

1.  I, S.P. Kothari, am the Gordon Y Billard Professor of Accounting and Finance at the Sloan School of Management of Massachusetts Institute of Technology ("MIT").  Since my arrival at MIT, in 1999, I have served in a variety of different roles, including Deputy Dean for the Faculty, and Head of the Department of Economics, Finance and Accounting.

2.  I have recently returned to MIT after serving as the Chief Economist and Director of the Division of Economic and Risk Analysis at the U.S. Securities and Exchange Commission, Washington, D.C. for two years from 2019-2021. As the SEC's Chief Economist and Division Director, I had a variety of different responsibilities, including economic analysis of regulations for corporation finance, securities markets, and investment management; litigation economics in support of the Enforcement Division and the Office of Compliance and Examinations; and analysis of securities and macroeconomic risk for the domestic and international jurisdictions.

3.  During my tenure at MIT, I also took a leave of absence and served as the Global Head of Equity Research for Barclays Global Investors, San Francisco (a subsidiary of the Barclays Bank), for one-and-one-half years from July 2008 to December 2009.

4.  From 1986 to 1999, I served on the faculty of the University of Rochester, first as an Assistant Professor, then as an Associate Professor, and finally as Professor and Accounting Area Coordinator.  During this time, I also held visiting positions at MIT, the University of Technology in Sydney, Australia, Baruch College of the City University of New York, and the City University Business School in London.

5.  I received my B.E. degree in Chemical Engineering from the Birla Institute of Technology and Science in India in 1979, my M.B.A. in Accounting and Finance at the Indian Institute of Management, Ahmedabad, in 1982, and my Ph.D. in Accounting at the University of Iowa in 1986.

6.  I have published numerous academic articles in the areas of accounting, finance, and economics and co-edited two books titled *Financial Statement Analysis*, published by McGraw-Hill, and *Contemporary Accounting Research*, published by North-Holland Publishing.  My research has primarily focused on the informational efficiency of stock prices, valuation of equities and bonds, the relation between accounting accruals and cash flows, the effect of institutions on the properties of accounting numbers internationally, and corporate uses of financial derivatives, among other topics.

7.  I have served as an editor or associate editor for several academic journals, including the *Journal of Accounting & Economics* and *The Accounting*

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 5 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 5 of 63
#:1795

*Review*, and as a referee for professional journals such as the *Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Accounting Research*, *Contemporary Accounting Research*, and the *British Accounting Review*.

8. In addition to conducting rigorous research and serving as an editor for academic journals, I have been active in my profession. I have been the keynote speaker and distinguished faculty speaker at a number of accounting association annual meetings and doctoral consortia.

9. I have served in various policy and management committees at MIT and the University of Rochester.

10. Finally, I have supervised or served on the dissertation committees of more than 45 doctoral students over the past 25 years. A detailed copy of my curriculum vita is attached as Appendix A hereto.

11. I bill at my customary rate of $1,300 per hour for my work on this matter, and the rates of those working under my supervision and direction range from $175 to $1050. I have no financial interest in the outcome of this litigation. Payment for my work and those working under my supervision and direction on this matter is not contingent on the opinions I express or the outcome of this matter.

## II. MATERIALS REVIEWED OR CONSIDERED

12. For the purpose of preparing this report, I reviewed or considered the data and other information identified in Appendix B hereto, as well as all data and articles referenced in this report.

## III. ASSIGNMENT AND SUMMARY OF CONCLUSIONS

13. I have been retained by counsel for Lead Plaintiffs to provide expert testimony on whether the market for Mattel's common stock was efficient during the Class Period, August 2, 2017 through August 8, 2019.[1]

14. I have performed economic, financial, and statistical analyses to form an opinion on whether Mattel's common stock traded in an efficient market. I have made no investigation of the issues surrounding liability in this case.

15. I form the following opinions on this matter.

---

[1] I use the terms "stock" and "common stock" interchangeably.

Exhibit A

Page 5

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 6 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 6 of 63
#:1794

    a.      During the Class Period, the market for Mattel's stock was efficient.  That is, the price of Mattel's stock could be relied upon to reflect publicly available information.

    b.      I came to this conclusion after analyzing the five *Cammer*[2] factors used for evaluating market efficiency and four additional factors considered by the courts as measures of market efficiency.[3]  These factors are:

        i.   The stock's average weekly trading volume;
        ii.  The number of security analysts following the stock;
        iii. The presence of market makers and arbitrageurs;
        iv. Eligibility to file an S-3 registration statement;
        v.  Stock price reaction to unexpected corporate events or financial releases;
        vi. Market capitalization;
        vii. Stock liquidity;
        viii. Public float; and
        ix.  Serial correlation in returns.

    c.      Exhibit 1 summarizes the evidence on each of the factors examined. Every factor analyzed supports my opinion that Mattel's common stock traded in an efficient market.

16.    The Court also held in *Halliburton v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014) ("Halliburton II") that defendants may rebut the presumption of reliance by establishing a lack of price impact by showing that "an alleged misrepresentation did not actually affect the market price of the stock."  My analysis indicates that there is no evidentiary basis to conclude a lack of price impact on the corrective disclosure date.

17.    I have been asked to provide an opinion on whether damages are capable of measurement on a class-wide basis.  As set forth herein, it is my opinion that damages can be measured on a class-wide basis using a standard and well-settled method for assessing damages for each class member under Section 10(b) of the Securities Exchange Act of 1934.

18.    The remainder of my report develops the arguments and analyses in support of these opinions.

---

[2]  *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989).

[3]  For example, *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) or *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 7 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 7 of 63
#:1795

## IV.     BACKGROUND ON MATTEL

19.     Mattel is a children's entertainment company that specializes in the design and production of toys and consumer products. Mattel's products are among the most widely recognized toy products in the world. Mattel's stated mission is to "create innovative products and experiences that inspire, entertain, and develop children through play."[4]

20.     Exhibit 2 provides an overview of the daily price and the trading volume of the shares of Mattel's stock during the Class Period. On August 2, 2017, the beginning of the Class Period, Mattel's stock was trading at $19.62 per share. Mattel had approximately 342.7 million shares outstanding on August 2, 2017, and thus at the start of the Class Period the market capitalization for Mattel was $6.724 billion.[5]  During the Class Period the stock price declined and closed at $11.31 on August 9, 2019, following the last day of the Class Period,[6] yielding an ending market capitalization of $3.908 billion.  The number of shares traded on any given day during the Class Period ranged from 1.2 to 89.2 million.  Exhibit 2 and these statistics provide preliminary evidence that Mattel's stock was actively traded.

21.     On October 26, 2017, Mattel issued a press release and published a Form 10-Q ("10-Q") reporting its 2017 third quarter financial results to investors. In the earnings release, Mattel reported a loss of $603 million. One of the more significant components of this loss was a $562 million valuation allowance that reduced the value of its deferred tax assets.[7]

22.     On August 8, 2019, Mattel disclosed to its investors that it had learned of a whistleblower letter, and that as a result of this whistleblower letter, Mattel was canceling its planned debt offering (scheduled to close August 8, 2019) as it investigated the allegations provided in the letter.[8]

23.     On October 29, 2019, Mattel announced favorable financial results for the third quarter of 2019 and at the same time filed a Form 8-K to address the results of the whistleblower investigation.[9]  In the Form 8-K, Mattel indicated that the financial results reported in the third and fourth quarters

---

[4] *See* Mattel's 2019 Form 10K filed on Feb. 25, 2020, p. 4.

[5] I obtained Mattel's daily stock price and the number of shares outstanding from the Center for Research in Security Prices (CRSP) database.

[6] I include August 9, 2019 in Exhibit 2 to show the price and volume impact of a Form 8-K Mattel filed to acknowledge the receipt of the whistleblower letter on August 8, 2019 after the market closed (5:01 p.m.). Therefore, August 9, 2019 was the date on which the market reacted to the disclosure on August 8, 2019.

[7] *See* Press Release, PR Newswire, *Mattel Reports Third Quarter 2017 Financial Results* (Oct. 26, 2017).

[8] *See* Mattel's Form 8-K filed on Aug. 8, 2019.

[9] *See* Press Release, Business Wire, *Mattel Reports Third Quarter 2019 Financial Results* (Oct. 29, 2019), and Mattel SEC Form 8-K filed on Oct. 29, 2019.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 8 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 8 of 63
#:1796

of 2017 had been materially misstated. Mattel also disclosed that its internal controls suffered from multiple material weaknesses, and it would restate its financial results to correct these errors.

24. In their Complaint, Plaintiffs allege that Mattel was plagued with serious internal control deficiencies, and these internal control deficiencies contributed to the material misstatement in the 2017 third quarter 2017 financial reports.[10] Plaintiffs allege that Mattel knew about the material misstatement and related internal control weaknesses, but withheld those facts from market participants during the Class Period.[11]

## V.   BACKGROUND ON MARKET EFFICIENCY

25. In the Complaint, Plaintiffs allege that the "fraud-on-the-market" theory is applicable to this case. Under this theory, class members who buy a security rely on the integrity of the stock price set by the market. Therefore, investors are also assumed to have incorporated a corporation's omissions and misrepresentations in setting the corporation's stock price, which would be set too high or too low depending on the nature of information omitted or misrepresented. The omissions and misrepresentations are thus incorporated into each class member's purchase price.[12]

26. In this case, Mattel is alleged to have omitted unfavorable (negative) facts and made misrepresentations that artificially inflated or maintained the price of Mattel's stock, which was purchased by Plaintiffs and class members during the Class Period. These investors are alleged to have ultimately suffered losses when the market reacted to subsequent company-specific disclosures. As stated in *Basic*:

> "Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."[13]

27. Underlying the fraud-on-the-market theory is the assumption that Mattel's stock price reflected an open and developed market. As stated by the U.S. Supreme Court in *Basic*:

---

[10] Amended Class Action Complaint (hereafter Complaint) ¶¶9–10, 56.

[11] Complaint ¶¶8–22.

[12] *Basic, Inc. v. Levinson*, 485 U.S. 224, 225 (1988).

[13] *Basic, Inc. v. Levinson*, 485 U.S. 224, 241–2 (1988).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 9 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 9 of 63
#:1797

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business..."[14]

28. The U.S. Supreme Court reaffirmed this understanding of market efficiency in *Halliburton II*.

29. The notion of a market being open and developed in *Basic* (and affirmed in *Halliburton II*) is consistent with economists' view of a semi-strong form of market efficiency. A stock market is efficient (in a semi-strong form) if it promptly reflects all publicly available information in stock prices and the incorporation of the information is unbiased, *i.e.,* the price is not set systematically too high or too low. Underlying this definition is the notion that, in such a market, a large number of investors trade in the stock such that new publicly available information is promptly incorporated into the stock price.[15]

30. In my analyses, I identify factors that are closely linked to the above definition of market efficiency. I start with the five *Cammer* factors used by the courts for evaluating market efficiency. The five *Cammer* factors are: (1) the stock's average weekly trading volume; (2) the number of security analysts who followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file an S-3 registration statement; and (5) the stock price reaction to unexpected corporate events or financial releases.[16] As I explain below, the *Cammer* factors are economic attributes of a firm or the market in which the firm's stock is traded. These factors are based on economic theories of market efficiency and have also been used in the academic literature when analyzing market efficiency.[17, 18] In addition to these factors, I also consider four additional factors that courts have considered as measures of market efficiency: market capitalization, stock liquidity, public float, and the serial correlation of returns.

31. The market efficiency metrics for Mattel are computed and, whenever applicable, benchmarked against the metrics of companies on the Nasdaq, the stock exchange on which Mattel's stock traded. Historical data necessary to compute these market efficiency metrics are collected from Bloomberg, the Center for Research in Security Prices database (CRSP),

---

[14] *Basic, Inc. v. Levinson*, 485 U.S. 224, 241 (1988).

[15] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 *J. of Fin.* 383, 383–388 (1970).

[16] *Cammer v. Bloom*, 711 F.Supp. 1264, 1285–87 (D.N.J. 1989).

[17] I provide specific academic citations below when I review each market efficiency factor.

[18] Throughout the report, I use the terms "market efficiency", "the market Mattel's stock was efficient", and "efficient market for Mattel's stock" interchangeably.

Exhibit A

Page 9

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 10 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 122-5    Filed 11/13/23    Page 10 of 63
#:1798

the S&P Compustat database (Compustat), the Institutional Brokers Estimate System database (I/B/E/S), the Thomson One Financial database (Thomson), and the Dow Jones Factiva database (Factiva).

32.    In the *Halliburton II* case, the Court determined that defendants:

> "[have an opportunity to] rebut the presumption by showing, among other things, that the particular misrepresentation at issue did not affect the stock's market price."[19]

33.    The notion of whether a particular corporate event affected a firm's stock price is related to the concept of market efficiency that I discuss above.  If the market in a firm's stock is efficient, then the firm's stock price will reflect unexpected news in the corporate event.  In this case, the Complaint alleges that on August 8, 2019 market participants learned that Mattel filed a Form 8-K with the SEC disclosing that it had received an anonymous whistleblower letter and that it would initiate an investigation. The company also announced that because of the investigation it would terminate a previously scheduled issuance of 6% Senior Notes, a debt instrument. This unexpected news is likely to be salient to investors. Therefore, evidence that the market reacted to this disclosure is inconsistent with a lack of price impact for a significant corporate event. Thus, as part of my market efficiency analysis, I also examine whether the corrective disclosure made on August 8, 2019 impacted Mattel's stock price.

## VI.    *CAMMER* MARKET EFFICIENCY METRICS

## A.    WEEKLY TRADING VOLUME

34.    The first *Cammer* factor is the average weekly trading volume of a security. As discussed in *Cammer*,

> "[t]he reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[20]

35.    Several studies in the academic literature examine the implications of trading volume on the behavior of asset pricing. These studies find that higher trading volume is associated with more efficient prices, lower transaction costs, and greater liquidity, both at the individual security level

---

[19]  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014).
[20]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1286 (D.N.J. 1989).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 11 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 11 of 63
#:1799

as well as the aggregate level.[21] Thus, a security with a large trading volume closely captures the notion of an "open" market, one in which a large number of individuals can buy or sell the stock.[22]

36.    As discussed in *Cammer*:

"[t]urnover measured by average weekly trading volume of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[23]

37.    In Exhibits 3 and 4, I analyze the weekly variation in the share turnover of Mattel's stock.[24] I define a week both as a *trading* week (Exhibit 3) and a *calendar* week (Exhibit 4). Share turnover in a *trading* week measures total trading volume over five consecutive trading days as a percentage of the average number of shares outstanding over those days. An analysis based on trading weeks ensures that variation in weekly trading volume is not confounded by calendar weeks with fewer trading days (e.g., holidays). Share turnover in a *calendar* week measures trading volume from Monday to Friday of each week (regardless of whether the market was closed on one or more days of the week) as a percentage of the average number of shares outstanding for the week. Given that the inferences based on trading week are similar to those based on calendar week, I limit the discussion in the text to the trading week analysis.[25]

38.    Exhibit 3 shows that the average weekly turnover for Mattel's stock was 9.35% (median turnover of 7.51%) per trading week for this time period. This number is well above the 2% cutoff cited by the *Cammer* court. Further, share turnover for Mattel's stock is above the 2% benchmark in every week.  Relative to the firms on Nasdaq, the share turnover for Mattel is greater than the median turnover for the firms on Nasdaq in all of the

---

[21]  *See, e.g.*, Tarun Chordia et al., *Market Liquidity and Trading Activity*, 56 *J. of Fin.* 501, 501–530 (2001) (for evidence on the relation between trading volume and liquidity), and Tarun Chordia et al., *Liquidity and market efficiency*, 87 *J. of Fin. Econ.* 249, 249–268 (2008) (for evidence on the relation between liquidity and market efficiency).

[22]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1276 (D.N.J. 1989), (citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6 n.17 (Aug. 1988)).

[23]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1293 (D.N.J. 1989).

[24]  I calculate the share turnover by aggregating the total shares traded during the week and dividing by the weekly average number of shares outstanding.

[25]  Exhibit 4 presents the results from the analysis using calendar weeks. There are no notable differences across the two analyses, in the sense that any differences that do exist do not affect the conclusion I draw from the trading week analysis, that the market for Mattel's stock was efficient.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 12 of 63   Page ID
#:1800
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 12 of 63

trading weeks during the Class Period.[26]  These statistics confirm that Mattel's trading volume was high in both absolute and relative standards.

39.    In addition to having a large trading volume, during most of the Class Period Mattel's stock was part of the S&P 500.[27] Mattel stock's inclusion in the S&P 500 is an indication that the stock was salient in the marketplace, subject to large investor attention, and followed actively by market participants.[28]

40.    In my view, the large trading volume in absolute and relative terms, as well as Mattel stock's inclusion in the S&P 500, support my conclusion that the market for Mattel's stock was efficient.

**B.    NUMBER OF ANALYSTS PROVIDING COVERAGE**

41.    The second *Cammer* factor is the number of security analysts who followed and reported on Mattel's stock. As discussed in *Cammer*,

> "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[29]

42.    The rationale behind this factor is that the presence of security analysts (and other information intermediaries, such as the press) would indicate that information concerning Mattel's stock was closely followed, analyzed, and disseminated by investment professionals.

43.    During the Class Period there were over a dozen different security analysts following Mattel's stock. These analysts were employed by major firms, including, but not limited to: Barclays Bank, Bank of America - Merrill Lynch, BMO, CFRA, Morningstar, Jefferies Research Services, SunTrust Robinson Humphrey, Inc., UBS Securities, and Wells Fargo Securities.[30]

44.    To provide a perspective on how closely security analysts were following Mattel's stock, Exhibit 5 presents the number of analyst reports issued each quarter during the Class Period as reported on the Thomson One Analytics

---

[26]  To determine the share turnover for the median firm on Nasdaq, each week I calculate weekly share turnover for all Nasdaq listed firms on the CRSP, and then take the median for the week.

[27]  Source: Bloomberg.

[28]  *See, e.g.*, Andrei Shleifer, *Do Demand Curves for Stocks Slope Down?*, 41 *J. of Fin.* 579, 579–590 (1986) (for evidence from changes in the composition of the S&P 500 index).

[29]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1286 (D.N.J. 1989).

[30]  Source: Thomson One Analytics database.

Database.[31] In total, there were 361 analyst reports concerning Mattel released between October 1, 2017 and June 30, 2019. More specifically, on average, there were 51.6 reports (a median of 57 reports) issued during each full calendar quarter during the Class Period concerning Mattel.[32] As Exhibit 5 shows, the number of reports on Mattel during each quarter during the Class Period ranged from 66 reports (during 2017 Q4) and 33 reports (during 2018 Q3).

45.   To provide additional perspective on how closely security analysts were following Mattel's stock, Exhibit 6 presents the number of analysts providing a financial forecast for Mattel compared to the median analyst following of firms on Nasdaq during each quarter of the Class Period, as reported on I/B/E/S Database.[33]  For each full calendar quarter during the Class Period there were between 12 and 15 analysts following Mattel. In contrast Nasdaq firms had a median analyst coverage of 2 during the same period.[34]  Thus, relative to the firms traded on Nasdaq, there were many more analysts following Mattel.

46.   The intensive coverage of Mattel's stock by analysts can also be seen in analysts' participation in conference calls held by Mattel.[35] During the Class Period, Mattel held 11 conference calls, of which eight were related to periodic financial results; three on other matters. In the eight earnings related calls, numerous analysts and other investors participated and asked questions on such issues as the performance of Mattel.

47.   In addition to being followed by security analysts, Mattel's stock was also closely followed by other information intermediaries. For example, the three major credit rating agencies – Moody's, Standard and Poor's and Fitch – provided credit ratings for Mattel.[36] Apart from equity analysts and credit

---

[31]   By referring only to the Thomson One Analytics database, I am being conservative in describing the extent to which Mattel was followed by analysts.  There are additional analysts that follow Mattel during the Class Period that do not write reports, and there are analysts that follow Mattel that write reports, but do not make them available to Thomson One.

[32]   The Class Period only spans about half of the first and last calendar quarters.  We excluded these quarters in the calculation of the statistics discussed in this paragraph.   If we expand the analysis beyond the Class Period, there were 23 reports issued between 8/2/2017 and 9/30/2017 and 24 reports issued between 7/1/2019 and 8/8/2019.

[33]   I use the I/B/E/S database for this analysis as it provides data on analyst following for both Mattel and all firms on Nasdaq in a machine-readable format.

[34]   In Exhibit 6 I define analysts following as the number of analysts issuing any forecast for a firm during a calendar quarter. To compute the median analyst following for Nasdaq firms, I first identify the number of analysts issuing any forecast according to the I/B/E/S database for each firm traded on the Nasdaq during each calendar quarter, and then report the median across all Nasdaq firms for the quarter.

[35]   The information on conference call participation was obtained from the transcripts of these calls, which are included in the Thomson One Analytics database (also known as Investex).

[36]   See, e.g., Press Release, S&P Global Ratings, *S&PGR rts Mattel's $250MM Sr Unscd Guarantd Nts 'BB-' (RR: '3')* (Aug. 1, 2019); Press Release, Fitch Ratings, *Fitch Rates Mattel's Senior Notes 'B+/RR2' Outlook Negative* (Aug. 1, 2019); Press Release, Moody's Investor Services, *Moody's Assigns B1 rating to Mattel's $250 million bonds; outlook stable* (Aug. 1, 2019).

rating agencies, there was also extensive media coverage on Mattel. During the Class Period, 4,549 media articles related to Mattel (including Mattel's own press releases) can be found in the Dow Jones Factiva Database.

48.   In my opinion, the large number of analysts following the stock and participating in conference calls, the three major credit rating agencies following Mattel and issuing reports, as well as the extensive press coverage for Mattel stock, constitute clear evidence that information about Mattel was closely followed, analyzed, and disseminated by investment professionals and other market participants. This supports my conclusion that the market for Mattel's stock was efficient.

## C.   MARKET MAKERS AND ARBITRAGEURS

49.   The third *Cammer* factor is the presence of market makers and arbitrageurs. As discussed in *Cammer*,

> "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[37]

50.   *Cammer*'s decision on market makers was particularly relevant because the security in question in *Cammer* traded on over-the-counter markets. In such a market, the market makers play a key role in supplying liquidity.[38] In the case of Mattel, its stock traded on the Nasdaq Exchange throughout the whole Class Period.

51.   As background information, the Nasdaq exchange was founded in 1971.[39] The exchange currently has three listing tiers: The Nasdaq Global Select Market, The Nasdaq Global Market and The Nasdaq Capital Market. As of December 31, 2019, a total of 3,140 companies listed securities on The Nasdaq Stock Market, with 1,420 listings on The Nasdaq Global Select Market, 870 on The Nasdaq Global Market and 850 on The Nasdaq Capital Market.[40]

52.   Mattel is a member of the Nasdaq Global Select Market.[41]   The initial financial and liquidity listing requirements for the Nasdaq Global Select Market are more stringent than the other two markets.[42]   The minimum

---

[37]   *Cammer v. Bloom*, 711 F.Supp. 1264, 1286–87 (D.N.J. 1989).

[38]   Darrell Duffie et al., *Over-the-Counter Markets*, 73 *Econometrica* 6, 1815–1847 (2005).

[39]   *See* Nasdaq SEC Form 10-K, filed Feb. 25, 2020, p.2.

[40]   *See* Nasdaq SEC Form 10-K, filed Feb. 25, 2020, p. 4.

[41]   *See* Mattel SEC Form 10-K, filed on Feb. 22, 2019, p. 1.

[42]   *See* pp. 6–10 of "Initial Listing Guide – Nasdaq", Dated December 2020.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 15 of 63   Page ID
#:1805
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 15 of 63

requirements for a company to be listed on the Nasdaq Global Select Market are as follows: 450 round lot shareholders; public shares of 1,250,000 outstanding; and market value of unrestricted publicly held stock of $45 million.[43]  The company must also meet one of several financial criteria, including such factors as earnings, capitalization, revenues, cash flows, and stockholders' equity.[44]  Finally, depending on the firm's financial position at the time of its IPO, Nasdaq requires firms trading on the Global Select Market to have a minimum of either 3 or 4 market makers.[45]

53.     Nasdaq defines a market maker as "a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."[46] I obtained Nasdaq market maker activity in Mattel's stock from Bloomberg.  During the Class Period, there were 156 active market makers that traded Mattel stock.[47]

54.     I note that the role and concept of "market makers" has changed dramatically since the original *Cammer* case. Regardless, the fact that Mattel's stock is listed on the Nasdaq Global Select Market, which requires firms that IPO on the Global Select Market to have 3-4 market makers, and that more than 150 Nasdaq market makers traded in Mattel's stock throughout the Class Period, easily satisfy this *Cammer* factor.

55.     In addition to the characteristics of the exchange, a key component behind the decision to consider market makers and arbitrageurs in *Cammer* was:

> "The issue here is whether market makers in the over-the-counter market, specifically the market for Coated Sales stock, provided a sufficiently fluid and informed trading environment so that when material information about Coated Sales was disseminated, investors had available to them an opportunity to

---

[43]  *See* p. 8 of "Initial Listing Guide – Nasdaq", Dated December 2020.  While the version of the listing guide is dated after the end of the Class Period, it does discuss recent changes to listing rules, which mitigates any concern that the listing rules were materially different during the Class Period.  Specifically, Nasdaq indicates that, "[e]ffective August 2019 Nasdaq's initial listing criteria were revised to exclude securities subject to resale restrictions for any reason from the calculation of publicly held shares, market value of publicly held shares and round lot shareholders. In addition, the round lot shareholder requirements were revised to also require that at least half of the minimum required number of round lot holders must each hold unrestricted securities with a minimum value of $2,500."

[44]  *See* pp. 6–10 of "Initial Listing Guide – Nasdaq", Dated December 2020.

[45]  *See* pp. 6–10 of "Initial Listing Guide – Nasdaq", Dated December 2020.

[46]  *How to Become a Market Maker*, Nasdaq Trader, http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess (last visited Apr. 28, 2021).

[47]  Monthly data are reported from August 2017 through August 2019, inclusive.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 16 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 132-5    Filed 11/13/23    Page 16 of 63
#:1804

trade at informed, and therefore appropriate, bid and asked prices."[48]

56.   To measure the presence of informed trading and arbitrageurs in the market for Mattel's stock, I focus on short sellers. Short sellers include sophisticated investors who earn returns when stock prices decline. In the process, they enable negative information to be incorporated more quickly into security prices and thus enhance the efficiency of the firm's stock price.[49]

57.   Exhibit 7 provides an analysis that compares the percentage of outstanding shares of Mattel's common stock sold short at the end of each calendar quarter during the period Q3 2017 through Q2 2019 to the median percentage of shares shorted for firms on Nasdaq during the same time period.[50, 51] Exhibit 7 shows that, at the end of each full calendar quarter in the Class Period, short sellers had sold short at least 15% of Mattel's shares. This was greater than the median short position of the firms on Nasdaq at the end of each quarter during the Class Period.

58.   In my view, the fact that Mattel's stock was traded on the Nasdaq Global Select Market, was traded by more than 150 active Nasdaq market makers, and had a significant number of shares sold short both on an absolute and relative basis support my conclusion that the market for Mattel's stock was efficient, and easily satisfies this *Cammer* factor.

## D.   ELIGIBILITY TO FILE AN S-3 REGISTRATION STATEMENT

59.   The fourth *Cammer* factor concerns the SEC registration status of a firm, in particular, whether the firm is eligible to file an S-3 form. Specifically, *Cammer* states:

> "…it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public

---

[48]   *Cammer v. Bloom*, 711 F.Supp. 1264, 1282–83 (D.N.J. 1989).

[49]   *See* Patricia M. Dechow, et al., *Short-sellers, fundamental analysis, and stock returns*, 61 J. of Fin. Econ. 77, 77–106 (2001); Hemang Desai, et al., *An Investigation of the Information Role of Short Interest in the Nasdaq Market*," 57 J. of Fin. 2263, 2263–2287 (2002); Michael S. Drake, et al., *Should Investors Follow the Prophets or the Bears? Evidence on the Use of Public Information by Analysts and Short Sellers*, 86 Acct. Review 101, 101–130 (2011); Joseph E. Engelberg, et al., *How are shorts informed? Short sellers, news, and information processing*, 105 J. of Fin. Econ. 260, 260–278 (2012); Ekkehart Boehmer & Juan Wu, *Short Selling and the Price Discovery Process* 26 Rev. of Fin. Stud. 287, 287–322 (2013).

[50]   Different from Exhibits 5 and 6, which show the extent of analyst coverage *during* each full calendar quarter, Exhibit 7 plots the shares shorted *at the end* of each calendar quarter. I include Q3 2017 in this Exhibit because the percentage of short interest as of September 30, 2017 is within the Class Period.

[51]   The percentage of short interest is calculated by dividing the number of common shares sold short by investors as reported on the last trading day of each calendar quarter, obtained from the S&P Compustat Short Interest database, by the number of outstanding shares at the end of the quarter obtained from the CRSP database.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 17 of 63   Page ID
#:1805
Case 8:21-cv-02910-TDC   Document 132-5   Filed 11/13/23   Page 17 of 63

offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met."[52]

60.    The rationale behind this *Cammer* factor is that registrants with the SEC are required to comply with the disclosure requirements in the SEC's Exchange Act and thus are subject to periodic public reporting. Specifically, in order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.[53] The reports filed with the SEC can then be analyzed free of cost by professional analysts and investors, by financial press, as well as by any other individual interested in obtaining information about a company's stock.

61.    The significance of this particular *Cammer* factor is underscored by the SEC's explanation that: "[t]his form [the Form S-3] is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place."[54]

62.    Both prior to the beginning of the Class Period, August 2, 2017, and during the Class Period, Mattel was eligible to file, and did file, Form S-3ASR's with the SEC.[55] In addition, during the Class Period, Mattel filed 73 documents with the SEC, including periodic filings on Forms 10-Q and 10-K.[56]

63.    In my view, the fact that Mattel was a public company eligible to file a Form S-3 and subject to periodic filing requirements of the SEC supports my conclusion that the market for Mattel's stock was efficient.

---

[52] *Cammer v. Bloom*, 711 F.Supp. 1264, 1287 (D.N.J. 1989).

[53] For additional information, *see* http://www.sec.gov/about/forms/forms-3.pdf.

[54] *Cammer v. Bloom*, 711 F.Supp. 1264, 1284 (D.N.J. 1989) (citing SEC Securities Act Release No. 6331 (Aug. 13, 1981)).

[55] An S-3ASR is automatic shelf registration statement of securities for well-known seasoned issuers (https://www.sec.gov/info/edgar/forms/edgform.pdf). Mattel filed two Form S-3ASR Registration Statements on March 7, 2014 and October 3, 2017, respectively.

[56] Source: www.sec.gov/edgar.shtml. This number excludes SEC Forms 3, 4 and 5, which are related to change in beneficial ownership of officers, directors, and significant shareholders, Form 11-K which is related to employee stock ownership and Schedule 13G and Form 13F which are related to security ownership of active investors and institutional investors, respectively.

14  **Exhibit A**

**Page 17**

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 18 of 63   Page ID
#:1806
Case 8:21-cv-02910-TDC   Document 132-5   Filed 11/13/23   Page 18 of 63

## E.      STOCK PRICE REACTION TO NEWS

64.      The fifth *Cammer* factor is the existence of a causal relation between unexpected corporate events or financial releases and the stock price response to such events. As stated in *Cammer*, it would be helpful to demonstrate:

> "[e]mpirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[57]

65.      I perform an event study to provide evidence on whether Mattel's stock price reacted promptly to new information and to assess the significance of the reaction. In academic research, event studies are a commonly used and well-established statistical tool for examining the impact of a variety of different types of firm-specific events on the price of the firm's stock.[58] As discussed in the classic study by Brown and Warner (1980):

> "[t]o the extent that the event is unanticipated, the magnitude of abnormal performance at the time the event actually occurs is a measure of the impact of that type of event on the wealth of the firms' claimholders… such abnormal performance is consistent with market efficiency."[59]

66.      In other words, event studies allow one to measure the impact of unanticipated events on the firm's stock price and to infer whether abnormal price movement surrounding an event is consistent with the stock price reacting to news efficiently, i.e., whether the reaction is prompt and unbiased.

67.      A researcher conducting an event study begins by specifying a model of what price movements are "expected" based on a set of market factors and then calculates abnormal returns based on the parameters of this model. These abnormal returns are the basis of tests investigating whether the deviations from expected price movements on a set of event dates of interest are sufficiently large that simple random movement can be rejected as the cause. An event study that demonstrates significant stock price reactions to those events lends support to the conclusion that the market in that security is efficient.

---

[57]  *Cammer v. Bloom*, 711 F.Supp. 1264, 1287 (D.N.J. 1989).

[58]  For a review of this literature, *see* S.P. Kothari, *Capital markets research in accounting*, 31 *J. of Acct. and Econ.* 105, 105–231 and S.P. Kothari & Jerold B. Warner, 1 Handbook of Empirical Corporate Finance, Ch. 1 at 3–36 (2007).

[59]  Stephen Brown & Jerold Warner, *Measuring Security Price Performance*, 8 J. of Fin. Econ. 205, 205 (1980).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 19 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-5   Filed 11/13/23   Page 19 of 63
#:1807

68.     An event study can be performed using two different measures of stock price reactions to corporate events or information releases. These measures are:

    a.     Stock return as observed, i.e., the signed price reaction, which captures the direction in addition to the magnitude of price movements in response to a corporate event.

    b.     The "absolute value" of the stock return (or unsigned price reaction) which captures the magnitude of the market's reaction to a corporate event.

69.     When using signed returns, I am investigating whether, on a particular event date, market participants responded in the same direction as the unexpected news released on that date. A significant price reaction on an event date in the same direction as unexpected news would indicate that market participants not only reacted to the corporate event, but that their reaction is in line with the hypothesized nature of the information releases. A key element in a test using signed returns is my ability to identify the sign of the unexpected news.

70.     An event study using absolute values has the advantage that it does not require me to specify the direction of the unexpected news.[60] In addition, an analysis that uses absolute returns allows me to aggregate the price reaction across all event dates and calculate the average absolute price reaction on all event dates (i.e., event dates with both good and bad news). A large and statistically significant reaction would suggest that market participants paid attention to the information releases on the event dates, processed the information, and reacted to it as manifested in the absolute price reaction.

71.     In the *Cammer* case the court indicated that, in an efficient market, when a firm makes a financial release or engages in some other unexpected corporate event there should be a prompt response in stock price.[61]  I focus my event study analysis on eight earnings announcements and one corrective disclosure that were made by Mattel during the Class Period.

72.     Earnings announcements are an ideal financial release for tests of whether market participants incorporate information into the stock price quickly. Earnings announcements are one of the most important corporate disclosures. A large academic literature studies the stock price behavior

---

[60] William H. Beaver, *The Information Content of Annual Earnings Announcements,* 6 J. of Acct. Rsch. 67, 67–92 (1968).

[61] *Cammer v. Bloom*, 711 F.Supp. 1264, 1287 (D.N.J. 1989).

around earnings announcements.[62] In addition, firms announce earnings every quarter, so I can test whether investors of Mattel were impounding information into the stock price each quarter during the Class Period. Finally, for every earnings announcement made during the Class Period there were analyst forecasts of the upcoming earnings announcement. I can use the analyst forecasts to gauge whether there is unexpected news, and identify the news as positive, negative or indeterminate.

73. In addition to the eight earnings announcements during the Class Period, I also include Mattel's disclosure on August 8, 2019 in my event study, since this is an unexpected news event that is likely to be salient to investors. On that date, Mattel filed a Form 8-K with the SEC disclosing that it had received an anonymous whistleblower letter and that it would initiate an investigation. The company also announced that because of the investigation it would terminate a previously scheduled issuance of 6% Senior Notes, a debt instrument.

74. Exhibit 8 lists the eight earnings announcements Mattel made throughout the Class Period. For each earnings announcement date listed I identified the time stamp at which the corporate press release of the earnings news became publicly available, the actual earnings and sales realized by the firm, the analysts' consensus forecasts, and my assessment of whether there was unexpected news, and if there was, whether the news was positive or negative.

75. Identifying the timing of the earnings news announcement is important for defining whether the news was released before, during, or after trading hours within a given day. The event study methodology relies on properly identifying the date on which information was made available to market participants. All of Mattel's quarterly earnings announcements during the Class Period, as well as the disclosure of the whistleblower letter on August 8, 2019, were released after the market-close at 4:00 p.m. EST. Thus, for the purpose of my event study, the event day was defined to be the next trading day after the earnings announcement/disclosure was made.

76. Determining whether there is unexpected news contained in an earnings announcement is also an important issue when conducting an event study using signed abnormal returns. For example, when Mattel announced an EPS of 9 cents per share on October 26, 2017,[63] if the market were expecting earnings to be 9 cents per share, I would not expect the market to react to this earnings announcement, as there was no unexpected news. Market participants expected the information contained in the earnings

---

[62] For a review of this literature, *see* S.P. Kothari, *Capital markets research in accounting*, 31 J. of Acct. and Econ. 105, 105–231 (2001).

[63] *See* Press Release, PR Newswire, *Mattel Reports Third Quarter 2017 Financial Results* (Oct. 26, 2017).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 21 of 63   Page ID
#:1809
Case 8:21-cv-02910-TDC   Document 123-5   Filed 11/13/23   Page 21 of 63

report, and consequently there was no new information to be impounded in price on the event date.

77.    To determine whether the earnings announcement contained unexpected news, and whether the unexpected news is positive, negative or indeterminate, I compare Mattel's realized earnings per share (EPS) as reported on the I/B/E/S database[64] with the analyst consensus EPS forecast prior to the earnings announcement, which is obtained from the I/B/E/S database. [65] I also compare Mattel's realized sales with the analyst consensus sales forecast prior to the earnings announcement, both of which are also obtained from the I/B/E/S database. If both the earnings realization and sales as reported on the I/B/E/S database are below the consensus forecasts, then I characterize the earnings release as containing negative news. If both metrics beat the analyst consensus, I characterize that earnings release as having positive news.[66] If the actual EPS exceeded the analyst consensus but the actual sales was below the analyst consensus, or vice versa, I classify that announcement as conveying mixed news.

78.    Out of the eight earnings announcements during the Class Period, I classify four as having negative news, three as having positive news, and one as having mixed news.  I also classify the disclosure of the whistleblower letter as conveying negative news because whistleblowing may expose a company's wrongdoing.[67] In Exhibit 9, I list the sources of news for each earnings announcement and for the corrective disclosure on August 8, 2019.

79.    My first event study uses signed abnormal returns to investigate whether the market impounded unexpected news into the stock price on the event dates. If the market were efficient with respect to unexpected news, then I would expect to observe statistically significant abnormal returns on the dates when unexpected news was released and no reaction on dates when news

---

[64]  I use the earnings realization as reported on the I/B/E/S database as analysts are often forecasting an earnings number other than the EPS reported on the income statement.  For a discussion of the adjustments that analysts make and the potential biases that arise from using an EPS number other than the metric forecasted by analysts, *see* Mark Bradshaw & Richard Sloan, *GAAP versus the street: An Empirical Assessment of Two Alternative Definitions of Earnings*, 40 J. of Acct. Rsch. 41, 41–66 (2002).

[65]  I/B/E/S Summary database gathers individual analyst forecasts and reports the summary statistics on a monthly basis. I define the analyst consensus to be the most recent median analyst forecasts issued prior to the earnings announcement date.

[66]  For earnings announcement with EPS realization no more than 2 cents above the consensus forecast, it is normally classified as containing no news (*See, e.g.*, Jeff Payne & Wayne Thomas, *The Torpedo Effect: Myth or Reality*, 26 J. of Acct., Auditing, and Fin. 255, 255–278 (2011)). However, none of Mattel's earnings releases during the Class Period fell into this classification.

[67]  According to a 2007 study conducted by PricewaterhouseCoopers, whistleblowers revealed 43% of fraud in the private sector, higher than 19% detected by auditors (Corporate Whistleblowers, National Whistleblower Center, https://www.whistleblowers.org/know-your-rights/corporate-whistleblowers/ (last visited Apr. 28, 2021)).

was not released. I also would expect the market to react (positively or negatively) in the same direction as the news (positive or negative).

80. A central issue in an event study is "to assess the extent to which security price performance around the time of the event has been abnormal."[68] I estimate abnormal returns for each earnings announcement in the Class Period by using a "rolling regression" approach. Specifically, for each earnings announcement in the Class Period, I estimate a market model using a 120-trading-day window ending one day prior to the earnings announcement to determine expected returns on Mattel's stock. To derive the parameters of the market model, I run a regression, which uses Mattel's daily stock returns as the dependent variable. I include the returns of the S&P 500 Composite Index ($RET\_SP500$) as an independent variable to control for the market return associated with large and mid-sized publicly traded corporations.[69] I also include the returns on the S&P 1500 Leisure Product Index ($RET\_SP1500LP$), with Mattel being removed from the index,[70] as an independent variable to control for the return for the stocks in Mattel's industry sector. I also control for corporate events that occurred during the 120-day estimation period by including a series of indicator variables, *Corporate Events*, which are coded as "1" if an earnings announcement or other important event falls in a given day during the estimation window, and coded as "0" otherwise.[71]

81. For each event identified in Exhibit 9 (eight earnings announcements and one corporate disclosure on August 8, 2019) I estimate a regression over a

---

[68] Stephen Brown & Jerold Warner, 1980, "Measuring Security Price Performance," 8 J. of Fin. Econ. 205, 205 (1980).

[69] I focus on the returns of the S&P 500 as a proxy for the whole market return because Mattel was a member of the S&P 500 index since the start of the Class Period until June 7, 2019. It was moved from S&P 500 to S&P Mid Cap 400 on June 7, 2019 (Press Release, S&P Dow Jones Indices, *Bemis Set to Join S&P 500; Mattel to join S&P MidCap 400* (Jun. 3, 2019)). I investigate the sensitivity of my event study results by adding the returns on the S&P Mid Cap 400 as an additional control (unreported) for any trading day in the regression falling between June 7, 2019 and August 9, 2019. My conclusions from my event study analysis, that the market efficiently impounded unexpected news into Mattel's stock price, are not affected by the use of returns of S&P Mid Cap 400 as an additional control for market.

[70] The reasoning behind the exclusion of Mattel from the index is to remove a potential mechanical correlation between Mattel stock and the index. When an index, like the S&P 1500 Leisure Product Index, is used to measure the market return and there are relatively few firms in the index (8-9 firms specifically in the Leisure Product Index during the Class Period), the inclusion of the returns of Mattel in the measure of market return can induce a mechanical correlation between the dependent and independent variables. Removing the return of Mattel from the index return eliminates this problem. To determine the return on the S&P 1500 Leisure Product Index without Mattel, I first obtain the membership of the S&P 1500 Leisure Product Index over the Class Period from Bloomberg. I then value-weight the daily individual stock returns for the firms on the index (without including Mattel) to obtain the daily index returns during the Class Period.

[71] For example, for the rolling window estimation on the October 27, 2017 event date, I also control for a prior earnings announcement by Mattel on July 27, 2017 (announced after hours so I control for the following trading day – July 28, 2017) and a dividend cut on June 14, 2017.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 23 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 23 of 63
#:1811

120-trading-day period ending the day prior to the event. I obtain the intercept and slope coefficient parameters from this market model, and calculate the expected returns (*EXPRET*) on the K event dates as follows:

$$EXPRET_K = \hat{\alpha}_K + \hat{\beta}_K \times RET\_SP500_K + \hat{\gamma}_K \times RET\_SP1500LP_K,$$
$$K = 1, 2, ..., 9$$

Where $\hat{\alpha}_K$ is the estimated intercept from the regression for event K, $\hat{\beta}_K$ is the estimated slope coefficient for the return on the S&P 500 and $\hat{\gamma}_K$ is the estimated slope coefficient for the return on the S&P 1500 Leisure Product Index. For each event, I then deduct the expected return from Mattel's realized return on the event date, to obtain a signed measure of the abnormal return.

82.     Exhibit 10 presents the results from this analysis. In this Exhibit, I report separately the nine event dates. On each event date, I report the abnormal return and a t-statistic from a t-test on whether the abnormal return is different from zero.[72]

83.     In a t-test, the t-value measures the number of standard deviations between an actual observation and a prediction. For example, the abnormal return of -9.06% on October 27, 2017 (as shown in Exhibit 10) has a t-value of -6.01. This means, in this case -9.06% is six standard deviations away from zero. The p-value associated with this test statistic measures the probability that this test statistic would be randomly observed. In this case the p-value of less than 0.0001 associated with this t-statistic suggests that, based on randomness alone, there is less than one in ten thousand chance of observing an abnormal stock return of -9.06%.[73] Given this low probability, one can reject randomness as the explanation for the abnormal stock return and conclude that the price impact on the event date was driven by the news contained in Mattel's earnings release.

84.     Exhibit 10 indicates that there were statistically significant returns on five of the nine event dates for which I expect the market to react to the news in the earnings announcement or corporate disclosure. For four of the significant market reactions, the sign of the market reaction (positive or negative) is consistent with the sign of the news (positive or negative).

85.     I note that on one date, February 2, 2018, there is a positive and statistically significant market reaction, which is contrary to the earnings news (91 cents below the market expectation) and sales news ($80 million below market

---

[72] I use the data from the market model estimation that was used to derive the abnormal return to calculate the t-statistic. Specifically, I divide the abnormal return by the Root Mean Squared Error from the 120-day regression to derive the t-statistic.

[73] Throughout the event study portion of this report I consider a two-sided p-value of less than 5% to be statistically significant.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 24 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 24 of 63
#:1812

expectations). Given this unexpected result and the large positive reaction to this news, I investigated whether other news was disclosed on that date that would cause the market's reaction to differ from expectations. After Mattel released their earnings news, they had a conference call with analysts. During the conference call, Mattel emphasized that the poor performance was attributable to actions taken to turn-around the business and reset the firm's economic model.[74] These actions included write-offs, which are one-time expenses, and right sizing retail inventory, which should boost future revenue and profits. Management also indicated that as a result of these actions, fiscal performance for 2018 would reflect revenue stabilization, improved gross margins, and faster realizations of savings from its cost-cutting program.[75] These disclosures were likely to be perceived as positive news by market participants.

86.     Exhibit 10 also shows that there was a statistically significant negative market reaction on August 9, 2019, the corrective disclosure date. Specifically, the abnormal return of -14.54% on August 9, 2019 has a t-value of -7.34. In this case, -14.54% is more than seven standard deviations from zero. The p-value of less than 0.0001 associated with this t-statistic suggests that, based on randomness alone, there is less than one in ten thousand chance of observing an abnormal stock return of -14.54%. Given this low probability, one can reject the hypothesis that there was a lack of price impact on the corrective disclosure date.

87.     These results illustrate that significant stock price reaction took place on the nine event dates. Specifically, the stock price reaction on 55.6% (i.e., 5 out of 9) of the event dates with news is statistically significant and, in 4 out of 9 cases (44.4%), in the same direction of the news. To put this number in perspective, I conduct a Fisher Exact Test to examine whether the proportion of statistically significant abnormal returns on event dates on which there is unexpected news is statistically different than the proportion of abnormal returns observed on non-event days during the Class Period.[76] The results from this test indicate that the proportion of statistically significant abnormal returns on the event dates with unexpected news is statistically larger than the proportion of statistically significant (5.4%) abnormal returns for non-event days during the Class Period.[77]

---

[74]  *See*, *e.g.*, p. 3 of the earnings call transcript as provided by Thomson Reuters on February 1, 2018.

[75]  *See, e.g.*, the earnings call transcript as provided by Thomson Reuters on February 1, 2018 for management discussions of stabilization (pp. 11–13), margins (p. 16), and cost savings (p. 9).

[76]  To conduct this test, I calculate abnormal returns for every date in the Class Period using the same approach that I used for the nine event dates (i.e., estimating a market model over the 120-day prior period). I then determine the proportion of abnormal returns that are statistically significant on non-corrective disclosure and non-earnings announcement dates to conduct the Fisher Exact Test.

[77]  Even if I exclude the event date August 9, 2019 from this analysis, the proportion of statistically significant abnormal returns on the eight earnings announcement dates (50%) is still statistically higher than 5.4%, the proportion of statistically significant abnormal returns on non-event dates during the Class Period.

Case 2:19-cv-10860-MCS-PLA    Document 90-2    Filed 04/30/21    Page 25 of 63    Page ID
Case 8:21-cv-02910-TDC    Document 122-5    Filed 11/13/23    Page 25 of 63
#:1813

88.     Overall, the results reported in Exhibit 10 are consistent with the market incorporating the unexpected news that was delivered on corporate event dates into Mattel's stock price in an efficient manner. Based on the results from this event study, I conclude that there is a clear cause-and-effect relationship between new material public information about Mattel and the price movement of its common stock.

89.     I supplement my signed event study analysis with a second test that utilizes the absolute value of abnormal returns to assess whether Mattel's stock price efficiently reflected unexpected news.   As I mentioned above, a test that uses signed abnormal returns requires me to specify the direction of unexpected news (positive or negative). By using a model that includes the absolute value of abnormal returns as the dependent variable, I no longer need to identify the sign of the earnings news.  In addition, an analysis that uses absolute returns allows me to aggregate the price reaction across event dates and determine the average absolute price reaction on dates when earnings reports or the corrective disclosure are released.

90.     To calculate unsigned abnormal returns for this analysis I adopt the same approach to the one that I used in my signed returns tests. Specifically, for each day in the Class Period I estimate a market model using Mattel's stock returns for the previous 120 days as the dependent variable.  I include the returns on the S&P 500 as an independent variable to control for the return on the whole market, and the returns on the S&P 1500 Leisure Product Index as an independent variable to control for the market returns for firms in Mattel's sector (again excluding Mattel from the index return).  I also control for lagged corporate events that occurred during the estimation period by including a series of indicator variables, *Corporate Events*, which are coded as "1" if an earnings announcement or other important event falls in a given day during the estimation window, and coded as "0" otherwise. I obtain the parameters from this model to derive an expected market return and deduct the expected return from the realized return of Mattel to obtain an abnormal return for each trading day in the Class Period. I then take the absolute value of these abnormal returns to obtain an unsigned measure of abnormal returns.

91.     I regress the absolute value of abnormal returns on a single indicator variable, *Corporate Event*, which is coded as "1" for each of the nine event dates in the Class Period, and coded as "0" otherwise.  The results of this regression are reported in Exhibit 11.

92.     The main statistics of interest in this exhibit are the p-values and t-statistics associated with the coefficient on the *Corporate Event* indicator variable. The coefficient of 0.0649 indicates that the average absolute value of the abnormal returns earned on corporate event dates is 6.49% larger than the average absolute value of the abnormal returns on the other days during the Class Period.   The t-statistic of 9.27 (and p-value of less than 0.0001)

indicates that there is less than one in ten thousand chance that this result would occur by chance alone.

93.    The results reported in Exhibit 11 are consistent with the market impounding the unexpected news that was delivered on corporate event dates into the stock price in an efficient manner.

94.    Overall, my event study analyses support my opinion that there is a clear causal relation between unexpected corporate events and Mattel's stock price response to such events. These results support my conclusion that the market for Mattel's stock was efficient. In addition, the significantly negative market reaction on August 9, 2019 also supports my opinion that there is no evidence of a lack of price impact on the corrective disclosure date.[78]

## VII. ADDITIONAL MARKET EFFICIENCY METRICS

95.    In addition to the *Cammer* factors listed above, I have also analyzed additional operational market efficiency factors that have been considered by the courts. As with the *Cammer* factors, these other operational factors all support my conclusion that Mattel's common stock traded in an open, developed and efficient market throughout the Class Period.

### A. MARKET CAPITALIZATION

96.    In *Krogman v. Sterritt* the court suggested that:

> "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[79]

97.    As I discussed above, market capitalization is also an important factor in complying with the Nasdaq's listing requirements. Academic research also establishes that market capitalization is highly correlated with other market efficiency factors considered in *Cammer*, including: trading volume, analyst following, and press coverage.[80]

98.    Exhibit 12 presents the market capitalization for Mattel, relative to the median of firms on the Nasdaq during the Class Period. Market

---

[78] In any opposition to class certification, Defendants may offer certain arguments in an effort to contest market efficiency, or to demonstrate that there was no price impact related to the allegedly omitted and misrepresented information. Should Defendants do so, I will analyze and respond to such arguments in my reply report.

[79] *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[80] For examples of papers demonstrating these correlations, *see* Darren Roulstone, *Analyst Following and Market Liquidity*, 20 Contemporary Accounting Research 552, 552–578 (2003), and Lily Fang & Joel Peress, *Media Coverage and the Cross-section of Stock Returns*, 64 J. of Fin. 64 2023, 2023–2052 (2009).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 27 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 27 of 63
#:1815

capitalization is computed as the daily closing price of Mattel common stock times the daily number of outstanding shares. The data points in Exhibit 12 represent the average daily market capitalization for Mattel and the median market capitalization of firms on Nasdaq, over each month of the Class Period.

99.     Mattel's market capitalization ranged from a high of $5.9 billion in August 2017 to a low of $3.8 billion in June 2019. Mattel's market capitalization was greater than the median of firms on the Nasdaq exchange for every month during the Class Period. This suggests that Mattel was a relatively large firm, both in an absolute and relative sense.

100.    In my opinion, Mattel's relatively large market capitalization supports my conclusion that the market for Mattel's stock was efficient.

## B.   STOCK LIQUIDITY AND BID-ASK SPREADS

101.    My next efficiency metrics are proxies for stock price liquidity. When applying the fraud-on-the-market theory, an important aspect is that the market for the stock is "open, efficient and well developed." Here I focus on the "developed" component of the definition. As discussed in *Cammer*, a developed market is:

> "one which has a relatively high level of activity… [i]t usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes)."[81]

102.    While my earlier analysis of trading volume is consistent with the market for Mattel's stock being developed, I supplement my analysis with direct evidence on traditional proxies for liquidity—namely the Amihud (2002) measure of stock illiquidity and bid-ask spreads.[82] Stock liquidity is a fundamental tenet of market efficiency, and these metrics are among the most classic measures of stock liquidity.[83] Lower illiquidity and lower bid-ask spreads indicate less uncertainty regarding valuation and greater ability to trade without moving the market price.[84] Further, the *Krogman* court

---

[81]   *Cammer v. Bloom*, 711 F.Supp. 1264, 1276 (D.N.J. 1989) (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 n.17 (Aug. 1988)).

[82]   *See* Yakov Amihud, *Illiquidity and stock returns: cross-section and time-series effects* 5 J. of Fin. Mkt. 31, 31–56 (2002).

[83]   I note that both the Amihud measure and the bid-ask spreads are an inverse measure of liquidity, meaning that larger amounts reflect lower liquidity.

[84]   *See* Albert S. Kyle, *Continuous auctions and insider trading*, 53 *Econometrica* 1315, 1315–1335 (1985), and Lawrence Glosten & Paul Milgrom, *Bid, ask, and transaction prices in a specialist market with heterogeneously informed traders*, 14 *J. of Fin. Econ.* 71, 71–100 (1985).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 28 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 28 of 63
#:1816

suggested, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."

103.    Exhibit 13 presents Amihud's (2002) illiquidity measure (hereafter "illiquidity") of Mattel common stock, relative to the median illiquidity of firms on the Nasdaq over the Class Period.  Following Amihud (2002), I compute daily illiquidity as the ratio of the absolute return of Mattel's stock to the dollar value of trading volume (in millions).[85]  I then average these daily ratios for each month in the Class Period.  Illiquidity measures the extent to which the firm's stock price reacts per million dollars of trading volume.

104.    Illiquidity for Mattel stock ranged from a low of 0.007% to a high of 0.051% during the Class Period.  Mattel's illiquidity was below the median illiquidity for firms on the Nasdaq during every month of the Class Period (i.e., stock liquidity was *above* the median of Nasdaq firms since illiquidity is an inverse indicator of liquidity).  These results confirm that the liquidity for Mattel's stock was relatively high.

105.    Exhibit 14 presents Mattel's daily average bid-ask spread—an inverse measure of liquidity—relative to the median bid-ask spread of firms on the Nasdaq during the Class Period.  For each trading day, bid-ask spread is computed as the difference between closing ask price and closing bid price divided by the average of the ask price and bid price.  The closing ask and bid prices were obtained from the CRSP database. The data points in Exhibit 14 represent the monthly average of the daily bid-ask spreads (as a percentage) over the Class Period.

106.    The monthly average of the Mattel's daily bid-ask spread ranged from 0.058% to 0.091% during the Class Period.  Mattel's average bid-ask spread was smaller than the median of firms on the Nasdaq during every month of the Class Period (i.e., stock liquidity was *above* the median of Nasdaq firms since bid-ask spread is an inverse indicator of liquidity).  These results confirm, both in an absolute and a relative sense, that the liquidity for Mattel's stock was high during this period.

107.    In my view, Mattel's high stock liquidity supports my conclusion that the market for Mattel's stock was efficient.

C.    **PUBLIC FLOAT**

108.    The next efficiency metric I examine is public float. Public float refers to the amount of outstanding securities that are not held by insiders of a given

---

[85]  *See* Yakov Amihud, "*Illiquidity and stock returns: cross-section and time-series effects*, 5 *Journal of Financial Markets* 31, 31−56 (2002).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 29 of 63   Page ID
#:1817
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 29 of 63

corporation.[86] In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders.[87] *Krogman* further states:

> "[b]ecause insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."[88]

109. Public float indicates the amount of securities available to non-insiders, who are able to trade freely and profit by trading on new information in the marketplace. Exhibit 15 compares Mattel's quarterly public float to the median public float of firms on the Nasdaq by calendar quarter over the Class Period. To calculate public float, I obtain the number of outstanding shares on the last trading day of the quarter from the CRSP database. I add to the shares outstanding the number of shares shorted as reported on the last day of the quarter in the Compustat database. From this sum I deduct the number of shares held by insiders, obtained from the Thomson Financial dataset.[89]

110. Exhibit 15 indicates that Mattel's public float ranged from 394 million shares in the fourth quarter of 2017 to 417 million shares in the first quarter of 2019, with an average quarterly public float of 405 million shares during the Class Period.[90] For the firms on Nasdaq the median public float ranged from 22.4 million to 24.1 million shares with an average of 23.6 million shares during the same time period.[91] In every calendar during the Class Period, Mattel had a greater float than the median of firms on the Nasdaq. These statistics suggest that there were a substantial number and proportion of shares that could be traded by investors or lent to short holders.

---

[86] Insiders are not allowed to freely trade in the stock of their firm based on their privileged, nonpublic information. They are subject to both trading restrictions (blackout periods and restrictions under Exchange Act §§ 10b-5, 16(b), and 16(c)) and reporting requirements under § 16(a).

[87] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

[88] *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[89] To determine the number of shares held by insiders, I begin by calculating the stock holdings of each insider using the stock holdings and the transactions data that is included in the database. Then for each firm I add up the holdings of all insiders as of the end of the quarter.

[90] Public float presented in Exhibit 15 is higher than the number of shares outstanding because we define float to be the sum of shares outstanding and shares shorted (as reported in Exhibit 7), less the number of shares held by insiders.

[91] When calculating these statistics, the data point of 2019 Q3 reflects public float on August 8, 2019, the end of the Class Period, rather than September 30, 2019. If I exclude this quarter from the analysis, it has no impact on the inferences I draw from these tests.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 30 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 30 of 63
#:1818

111.   The large float for Mattel's stock provides evidence supporting my conclusion that Mattel's common stock traded in an open, developed, and efficient market throughout the Class Period.

### D.   AUTOCORRELATION OF STOCK RETURNS

112.   The final market efficiency metric I examine is the extent to which Mattel's stock returns were serially correlated during the Class Period, i.e., the autocorrelation factor.  If a firm's stock returns are serially correlated, it means that the stock's return today can predict the stock's return tomorrow. If the return on a firm's stock today can predict the return on the firm's stock tomorrow, and this relationship is economically significant, it would be inconsistent with market efficiency as traders could use the information in a firm's stock price and earn profits beyond transaction costs. Alternatively, a stock that has a low return autocorrelation is consistent with the market for this stock behaving efficiently because, in an efficient market, past stock returns cannot predict future returns and traders cannot profit from exploiting information in past stock prices.[92] As *Lehocky* states:

> "[i]n an efficient market, there should be no trends because the market should be reacting quickly to new information, and new prices are being set quickly based upon the new information. Thus, if there is a serial correlation in the stock prices, it lends to a finding of market inefficiency."[93]

113.   To determine whether Mattel's returns were serially correlated I run a regression of Mattel's daily stock return on the daily stock return of the previous trading day for each day over the Class Period. If the estimated coefficient of the previous day's return is sufficiently small or statistically insignificant, then there would be no evidence of return predictability, which would be consistent with Mattel's stock price being efficient.

114.   Exhibit 16 presents Mattel's stock return autocorrelation. I find that the coefficient on lagged returns (0.0590) is not significant at the 95% confidence level. The insignificant autocorrelation is consistent with the market for Mattel's stock behaving efficiently.

115.   Overall, the results of my analysis on the extent to which Mattel's stock exhibits serial correlation support my view that the market for Mattel's stock was efficient.

### VIII.   CONCLUDING ASSESSMENT OF MARKET EFFICIENCY

---

[92]   For evidence on the relation between autocorrelation and market efficiency, *see* Doron Avramov et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 *J. of Fin.* 2365, 2365–2394 (2006), and Tarun Chordia et al., *Liquidity and market efficiency*, 87 *Journal of Financial Economics* 249, 249–268 (2008).

[93]   See *Lehocky v. Tidel Techs., Inc.*, 506–7 (S.D. Tex. 2004).

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 31 of 63   Page ID
#:1819
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 31 of 63

116.   Based on the analyses above, every factor analyzed supports my opinion that Mattel's common stock traded in an efficient market.

## IX.   ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

117.   Plaintiffs' counsel also asked me to provide an opinion on whether damages are capable of measurement on a class-wide basis.  That is, to provide an opinion on whether, under Section 10(b) of the Exchange Act, per share damages could be measured for each class member using a common methodology for all class members in a manner consistent with Plaintiffs' theory of liability.

118.   In my opinion, there is a straightforward method which can be used to measure per share damages on a class-wide basis using a common approach for all class members.  The standard formula under Section 10(b) for assessing damages for each class member is the "out-of-pocket" method.  The out-of-pocket method measures damages as the artificial inflation in per share prices at the time of purchase less the artificial inflation at the time of sale.

119.   The out of pocket method can be measured class-wide, as it allows for the calculation of the artificial inflation per share in the market price on each day of the Class Period.  In particular, the most common approach used for measuring artificial inflation is to perform an event study that calculates the price reaction to a corrective disclosure concerning the information allegedly obscured or concealed by the alleged material omissions and/or misrepresentations.  This analysis would be common to the class and not rely on any individualized considerations.

120.   By way of background, in a typical case under Section 10(b) of the Exchange Act, an investor suffers damages when they acquire a security at a price that is artificially inflated (or maintained) as a result of false or misleading statements or omissions, and hold the security over a corrective disclosure or the materialization of a concealed risk.  Price inflation can be the result of a material misrepresentation or omission made either on or before the date of purchase so long as the misrepresentation or omission continues to be uncorrected at the time of purchase.  The artificial inflation is subsequently "corrected" by a later disclosure (which I refer to as a "corrective disclosure") or the materialization of a concealed risk.

121.   Price inflation can be calculated on a class-wide basis by computing the decline in a security's price caused by the corrective disclosure or the materialization of a concealed risk. This decline reflects the dissipation of the price inflation or maintenance created by the earlier false or misleading statements and/or omissions.

122.   Specifically, an event study can be used to isolate the company-specific price movement or price impact caused by a corrective disclosure and/or the

28   Exhibit A

Page 31

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 32 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 122-5    Filed 11/13/23    Page 32 of 63
#:1820

materialization of a concealed risk from price movement caused by other factors.

123.    Thus, one can estimate the price inflation due to the alleged false or misleading statements and/or omissions for each day during the Class Period. This is called an inflation ribbon, which is a time series of the difference between the actual stock price and the estimated price that the stock would have traded at each day of the Class Period had the truth been disclosed at the beginning of the Class Period.

124.    Using the inflation ribbon, one can then mechanically calculate each class member's damages on an individual basis. The information from each class member, including their purchase and sale history, can be acquired through the claims process.  For each class member who acquired a security during the Class Period and held the security through the end of the Class Period, their damages would equal the amount of inflation at the time of purchase. Class members' damages per share are limited to the losses actually sustained.

125.    Finally, a class member's damages would also be subject to the PSLRA's "90-day lookback" provision.  This provision provides for a formulaic damages cap that incorporates changes in prices after the end of the Class Period and it applies class-wide.[94]  Under this provision, losses on a security purchased during the Class Period and still held after the 90-day period immediately following the Class Period (the "lookback period") cannot be greater than the purchase price of the security less the average price of the security during the 90-day lookback period.  Similarly, the losses a class member suffers from a security purchased during the Class Period and sold during the 90-day lookback period cannot be greater than the purchase price less the rolling average price of the security during the portion of the 90-day lookback period that occurred as of the date of the sale.

126.    Based on my experience and understanding of the nature of the claims in this case, I conclude that damages in this action can be computed in the same way, common to all class members, using the "out-of-pocket" method described above. This methodology is a well-settled, common methodology used for calculating damages under Section 10(b) class action lawsuits on a class-wide basis.

127.    This per-share damage calculation using the "out-of-pocket" methodology described above is also consistent with Plaintiffs' theory of liability. In this

---

[94]  Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act dated December 22, 1995, 109 STAT. 748 and 749.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 33 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 33 of 63
#:1821

case, Plaintiffs allege that this securities class action concerns "a cover-up of known, material misstatements in Mattel's financial results and known, severe weaknesses in its internal controls."[95] Plaintiffs further allege that: (i) "Defendants' misstatements and omissions concerning Mattel's internal controls, disclosure controls and procedures, and financial results artificially inflated and/or maintained the price of Mattel's stock"; and (ii) this inflation was removed from the stock price "when the conditions and risks misstated and omitted by Defendants were revealed to the market and/or materialized" on August 8, 2019.[96]

128.    This report represents my current opinions, based on the materials I have reviewed and analyzed to date.   If additional relevant material or information comes to my attention, I reserve the right to revise or supplement this report.  I also reserve the right to respond to the opinions of other expert witnesses in this matter and to modify or supplement my opinions accordingly.

I declare under the penalty of the perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED THIS 30th DAY of APRIL 2021*

_____

S.P. Kothari, Ph.D.

---

[95] Complaint ¶1. *See also* Order Denying Motions to Dismiss, filed on January 26, 2021, Document 74.
[96] Complaint ¶¶434–45.

## Appendix A



### S.P. KOTHARI

Gordon Y Billard Professor of Accounting and Finance
MIT Sloan School of Management
E-mail: Kothari@MIT.edu
Web: http://web.mit.edu/kothari/www/
O: (617) 253-0994 | M: (585) 820-8046

Exec. Assistant: Michael Brockett
617.258.6550 brockett@mit.edu

http://scholar.google.com/citations?user=1YTXJkoAAAAJ&hl=en
Papers: http://ssrn.com/author=17425

**MIT Sloan Office Address**
Sloan School of Management
Massachusetts Institute of Technology
100 Main Street, E62-662
Cambridge, MA  02142-1347

**SELECTED AWARDS**

**Padmashri**, Government of India, January 2020
**Honorary Doctorate**, London Business School, 2019
AAA Presidential Scholar, 2017-18
**Doctor Honoris Causa**, University of Cyprus, 2016
AAA Notable Contributions to Accounting Literature Award, 2014
**Doctor Honoris Causa**, University of Technology, Sydney, 2013
Distinguished Alumnus Award, Birla Institute of Technology & Science, Pilani, India, 2013

**EMPLOYMENT**

**US Securities and Exchange Commission, Washington, D.C.**
2019- 2021      Chief Economist and Director of the Division of Economic and Risk Analysis

**Massachusetts Institute of Technology, Sloan School of Management**
2015- Present   Gordon Y Billard Professor of Accounting and Finance
2010 –2015      Deputy Dean
2007 – 2008     Deputy Dean
2006 – 2007     Head of the Department of Economics, Finance, and Accounting
2003 – 2005     Head of the Department of Economics, Finance, and Accounting
1999 – 2003     Gordon Y Billard Professor and Head of the Accounting Group
1997 – 1998     Visiting Professor

**University of Rochester, Simon School of Business**
1998 – 1999     Professor and Accounting Area Coordinator
1996 – 1997     Professor and Accounting Area Coordinator
1991 – 1996     Associate Professor & Accounting Area Coordinator
1988 – 1991     Assistant Professor and Accounting Area Coordinator
1986 – 1988     Assistant Professor, University of Rochester

**Harvard University, Harvard Business School**
2005 – 2006     Thomas Henry Carroll-Ford Visiting Professor of Business Administration,

Harvard Business School

**Barclays Bank**

2008 – 2009      Global Head of Equity Research, Barclays Global Investors

## BOARD OF DIRECTORS APPOINTMENTS

2021 – Present Velan Studios https://www.velanstudios.com/
2015 – 2019      **BSE** (Bombay Stock Exchange) http://www.bseindia.com/
2014 – 2016      FIA Technology Services http://www.fiaglobal.com/index.php
2008 – 2019      Monsoon Kitchens http://www.monsoonkitchens.com/
1998 – 2004      Vicarious Visions
2016 – 2019      Trillium Asset Management
2017 -- 2019      Velan Studios https://www.velanstudios.com/

## OTHER APPOINTMENTS

2018-19          Co-Chair, Board of Governors, Asia School of Business http://www.asb.edu.my/
2010-19          Director, MIT India Program http://web.mit.edu/misti/mit-india/
2001 – 2003      Honorary Visiting Professor, Cranfield University
2001, Winter      Visiting Professor, London Business School
1997, Summer   Visiting Professor at the University of Technology in Sydney, Australia
1996, Fall        Weinstein Distinguished Visiting Professor, Baruch CUNY, New York
1994 – 1997      Honorary Visiting Professor, City University Business School, London
1979 – 1980      Officer, DCM's Shriram Fertilizers and Chemicals, Mumbai

## EDUCATION

**Ph.D.** Accounting, University of Iowa, 1986

**M.B.A.** (PGDM) Accounting and Finance, Indian Institute of Management, Ahmedabad, India, 1982

**B.E.** Chemical Engineering, Birla Institute of Technology and Science, Pilani, India, 1979

## RESEARCH

1. DeFranco, G., Kothari, S., Verdi, R., 2011, The Value of Earnings Comparability, *Journal of Accounting Research* 49, 895-931.

2. Guay, W., Kothari, S., Shu, S., 2011, Properties of Implied Cost of Capital Using Analysts' Forecasts, *Australian Journal of Management* 36, 125-149.

3. Kothari, S., Loutskina, E., Nikolaev, V., 2011, Agency Theory of Overvalued Equity as an Explanation for the Accrual Anomaly, working paper, MIT Sloan School of Management.

4. Ball, R., Kothari, S., Nikolaev, V., 2013, On Estimating Conditional Conservatism, *The Accounting Review* 88, 755-787.

5. Ball, R., Kothari, S., Nikolaev, V., 2013, Econometrics of the Basu Asymmetric Timeliness Coefficient and Accounting Conservatism, *Journal of Accounting Research*, 51, 1071-1097.

6. Kothari, S., Mizik, N., Roychowdhury, S., 2016, Managing for the Moment: The Role of Real Activity versus Accrual Earnings Management in SEO Valuation, *The Accounting Review,* 91, 559-586.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 36 of 63   Page ID
#:1824
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 36 of 63

7. Jayaraman, S., Kothari, S., 2016, The Effect of Corporate Transparency on Bank Risk-Taking and Banking System Fragility, *The Accounting Review*, 91, 535-558.

8. Kothari, S., So, E., Verdi, R., 2016, Analysts' Forecasts and Asset Pricing: A Survey, *Annual Review of Financial Economics,* 8, 197-219.

9. He, X., Kothari, S., Xiao, T., Zuo, L., 2018, Long-Term Impact of Business Cycles on Auditors' Judgment, *The Accounting Review*, 93, 203-229.

10. Del Viva, L., Kothari, S., Lambertides, N., Trigeorgis, L., 2021, Asymmetric Returns and the Economic Content of Accruals and Investment, Management Science, forthcoming.

11. Kothari, S., Lewellen, J., Warner, J., 2016, The Behavior of Aggregate Corporate Investment, working paper, MIT Sloan School of Management.

12. Jayaraman, S., Kothari, S., Ramanna, K. 2017, Capture and Competition: The Role of Product Market Competition in Reallocating Rents from Regulatory Capture, working paper, MIT Sloan School of Management.

13. Frankel, R., Kothari, S., Zuo, L., 2018, Why shareholder wealth maximization despite other objectives, working paper, MIT Sloan School of Management.

14. Guest, N., Kothari, S., So, E., 2021, Flight-to-Dividends: The Role of Earnings in Periods of Capital Scarcity, working paper, MIT Sloan School of Management.

15. Guest, N., Kothari, S., Pozen, R., 2021, High Non-GAAP Earnings Predict Abnormally High CEO Pay, working paper, MIT Sloan School of Management.

16. He, X, Kothari, S., Xiao, T., Zuo, L., 2021, Knowledge Transfer in Audit Firms, working paper, MIT Sloan School of Management.

17. Elavia, T., Kothari, S., Li, X., You, H., 2021, Gains from Markowitz Optimization: Evidence from Re-optimization of Mutual Fund Holdings, Journal of Portfolio Management, forthcoming.


**DISCUSSIONS and RESEARCH IN PROFESSIONAL JOURNALS, BOOKS, AND MONOGRAPHS**

1. Kothari, S., Lester, R., 2012, The Role of Accounting in the Financial Crisis: Lessons for the Future, *Accounting Horizons* 26, 335-351.

2. Kothari, S., Swamy, G., Danilov, K., 2012, Generating Superior Performance in Private Equity: A New Investment Methodology, *Journal of Investment Management* 11, 28-41.

3. Pozen, R., Kothari, S., 2017, Decoding CEO Pay, *Harvard Business Review*, July-August, 78-84.

4. Kothari, S., Blass, D., Cohen, A., Rajpal, S., 2020, U.S. Credit Markets: Interconnectedness and the Effects of the COVID-19 Economic Shock, US Securities and Exchange Commission, Washington, D.C.


**BOOKS**

*Financial Statement Analysis*, Edited by Ray Ball and S.P. Kothari, McGraw-Hill, 1994.

33   Exhibit A

Page 36

*Contemporary Accounting Research: Synthesis and Critique*, Edited by S.P. Kothari, Thomas Z. Lys, Douglas J. Skinner, Ross L. Watts, and Jerold L. Zimmerman, North-Holland Publishing, 2002.

**FINANCIAL PRESS WRITINGS**

Opinion-page editorials in *The Hindu Business Line,* Madras, New Delhi, and other cities in India from January 1994 to August 1994. Wrote about 20 articles.

Opinion-page editorials in *The Economic Times,* India. (Circulation >500,000). About 35 articles from August 1994 to September 1996. A listing of selected articles from the Economic Times and other publications follows:

- Badla: Let it compete to survive, April 12, 1995.
- Lessons from MS Shoes scandal, April 23, 1995.
- An ethical reason to privatize, May 5, 1995.
- Needed, a free food grain market, June 9, 1995.
- Economics of investment in power, June 23, 1995.
- What explains the stock market fall? July 31, 1995.
- Value lies in future as well, August 7, 1995, with Clifford W. Smith, Jr.
- A hundred states within, August 31, 1995.
- A bourse for forward trading, September 15, 1995.
- Making the public FDI friendly, October 7, 1995.
- Rational expectations from Indian policy makers, October 17, 1995.
- RBI intervention: A bad idea, November 4, 1995, with Clifford W. Smith, Jr.
- Telecom: The ring is missing, December 1, 1995.
- Switch institutions, not shares, January 1, 1996.
- Change campaign finance laws, February 12, 1996.
- Lift all restrictions on rupee, February 24, 1996.
- Need to privatise telecom industries, March 19, 1996.
- A minimum utility tax, August 5, 1996.
- Derivatives & regulatory roadblocks, August 19, 1996, with Clifford W. Smith, Jr.
- The Importance of Being Open, September 1, 1996, with Clifford W. Smith, Jr.
- Let a private cricket league bloom, The Economic Times, October 15, 2007
    - http://economictimes.indiatimes.com/opinion/view-point/let-a-private-cricket-league-bloom/articleshow/2458359.cms
- On Section 377, a call to leadership, Mid-Day, January 31, 2014
    - http://www.mid-day.com/articles/on-section-377-a-call-to-leadership/15061007
- Narendra Modi and Arun Jaitley should strive to improve profit outlook for investment, The Economic Times, September 5, 2014
    - http://economictimes.indiatimes.com/opinion/comments-analysis/narendra-modi-and-arun-jaitley-should-strive-to-improve-profit-outlook-for-investment/articleshow/41746037.cms
- Bigger student loans for STEM students, *Wall Street Journal*, August 14, 2016
    - https://www.wsj.com/articles/bigger-loans-for-stem-students-1471210878
- President Trump should say no to the Paris climate accord, *The Daily Caller*, May 29, 2017
    - http://dailycaller.com/2017/05/29/president-trump-should-say-no-to-paris-climate-accord/
- If the CEO is overpaid, blame the compensation committee, with Bob Pozen, *Wall Street Journal*, August 21, 2017

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 38 of 63   Page ID
#:1826
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 38 of 63

- o https://www.wsj.com/articles/if-the-ceo-is-overpaid-blame-the-compensation-committee-1503355104
- Why regulators shouldn't get trigger-happy in trying to rein in GameStop's stock mania? with Eric So, MarketWatch, January 30, 2021
  - o https://www.marketwatch.com/story/why-regulators-shouldnt-get-trigger-happy-in-trying-to-rein-in-gamestops-stock-mania-11611939882
- View: Don't shy away from running a larger fiscal deficit, with Karthik Ramanna, The Economic Times, February 8, 2021
  - o https://economictimes.indiatimes.com/news/economy/indicators/view-dont-shy-away-from-running-a-larger-fiscal-deficit/articleshow/80739338.cms
- View: Do CEOs spread themselves too thin because of their social and political objectives, The Economic Times, April 20, 2021
  - o https://economictimes.indiatimes.com/news/company/corporate-trends/profit-alone-is-profitable/articleshow/82132593.cms

## CONSULTING ACTIVITIES

2017 and 2018: Expert report, deposition, and testimony on behalf of Defendants IN THE MATTER OF THE ARBITRATION OF Freestone Insurance Company, in Liquidation Claimant, v. Ernst & Young, LLP, Respondent. CPR File G-16-52-C at Wilmington, Delaware.

2018: Expert report and deposition on behalf of plaintiffs in re Alere Inc., United States District Court of Massachusetts, Case No. 1:16-cv-10766-PBS.

## PROFESSIONAL ACTIVITIES

Editor, *Journal of Accounting & Economics,* 1997-2019.
Associate Editor, *Journal of Contemporary Accounting & Economics*, 2005-2010.
Associate Editor, *Asia-Pacific Journal of Accounting & Economics,* 2000-2004.
Associate Editor, *Journal of Accounting & Economics,* 1990-1996.
Editorial Board Member, *The Accounting Review,* 1989-1992.

Referee for: *The Journal of Finance, Journal of Financial Economics, Journal of Accounting Research, The Accounting Review, Journal of Financial and Quantitative Analysis, Contemporary Accounting Research, Journal of Business, The Review of Financial Studies, Review of Economics and Statistics, British Accounting Review.*

**Keynote Speaker** at British Accounting Association Annual Meetings, April 1995, Accounting Association of Australia and New Zealand Annual Meetings, July 1996, HKUST Summer Symposium on Accounting Research, June 2001 and July 2012, Accounting Research Consortium, University of Technology, Sydney, Australia, January-February 2012, Ontario Universities Accounting and Finance Symposium, October 2016; Corporate Finance, Governance & Sustainability Conference at Delhi School of Business, October 2016, Distinguished Faculty Speaker at the British Accounting Association Doctoral Consortium, April 1995, Distinguished Faculty Speaker at the Accounting Association of Australia and New Zealand Doctoral Consortium, July 1996, Doctoral Consortium speaker at the *Asia-Pacific Journal of Accounting & Economics* Conference in Shanghai, January 2003, *AAA Financial Accounting Reporting Section* Doctoral Consortium in Orlando, January 2003, AAA Doctoral Consortium speaker at Lake Tahoe, June 2004.

## INVITED PRESENTATIONS AT SCHOOLS AND CONFERENCES

1986    SUNY at Buffalo, University of Michigan, University of Rochester, University of Chicago, Wharton School, Northwestern University, Washington University at St. Louis, University of Texas at Austin, and Carnegie Mellon University.

1987    University of Michigan, Massachusetts Institute of Technology, SUNY at Buffalo, International Conference on Forecasting at Boston, and AAA Meetings.

1988    University of Chicago, Cornell University, University of Washington at Seattle, SUNY at Buffalo, and Michigan State University.

1989    Columbia University Research Conference, Duke University, University of Iowa, Stanford University, University of California at Berkeley, University of Minnesota, New York University, and University of Pennsylvania at College Park.

1990    Harvard University, Northwestern University, Ohio State University, University of Arizona, University of Southern California, Temple University, Washington University at St. Louis, AAA meetings at Toronto, European Finance Association meetings, and Contemporary Accounting Research Conference.

1991    Arizona State University, Indiana University, and University of Michigan.

1992    Cornell University, Vanderbilt University, University of Wisconsin at Madison, University of Illinois, University of Nebraska, Stanford University Summer Camp, AAA Meetings at Washington D.C., Duke University, Michigan State University, Wharton School at the University of Pennsylvania, SUNY at Buffalo, University of Missouri at Columbia, and JAAF-Peat Marwick Conference.

1993    Baruch CUNY at New York, Pennsylvania State University, City University Business School at London, Institute for Quantitative Investment Research at Cambridge, Accounting and Finance Conference at St. Louis, International Seminar on Futures and Options in Mumbai, India, University of Iowa, and Iowa State University.

1994    University of Manchester, University of Glasgow, Carnegie Mellon University, Harvard Business School, London Business School, and Baruch CUNY.

1995    City University Business School at London, Western Finance Association Meeting at Aspen, Colorado, AAA Meetings at Orlando, SUNY at Buffalo, Syracuse University, and Rice University.

1996    Northwestern University, City University Business School, KOC University at Istanbul, University of New South Wales at Sydney, JAR Conference at Chicago, Michigan, ISDA Conference, Washington DC, Arizona, AAA meetings at Chicago, Boston College, and University of Maryland.

1997    University of Southern California, Tulane University, Ibbotson Associates Cost of Capital Conference at Chicago, London School of Economics, City University Business School at London, National Association of Pension Funds at London, University of Technology at Sydney, Harvard University, University of Rochester, Washington University at St. Louis, Cornell University, and Columbia University.

1998    Stanford University, Morningstar Inc. at Chicago, New Faculty Consortium at St. Charles, University of Notre Dame, University of Alberta, University of Technology at Sydney, University of Iowa, University of California at Berkeley, *Contemporary Accounting Research* Conference at Vancouver, and University of California at Los Angeles.

1999    AAA-KPMG International Accounting Conference at Montvale, NJ, University of British Columbia, University of Tilburg in Holland, INSEAD in France, University of Colorado at Denver, University of Michigan, University of Oklahoma, Financial Economics and

36   Exhibit A

Page 39

Accounting Conference at the University of Texas at Austin, and Boston Area Research Colloquium at Boston University.

2000   Australian Graduate School of Management, University of Technology at Sydney, University of Sydney, Syracuse University, Boston Federal Reserve Annual Research Conference, Stanford University, Harvard University, AAA-BAA conference at Cambridge University, European Financial Association Conference in London, University of Chicago, American Accounting Association meetings in Philadelphia, and MIT Sloan School of Management.

2001   Cranfield University, Yale University, University of Rochester, HKUST, University of Technology at Sydney, University of Chicago, Pennsylvania State University, University of Texas at Dallas, MIT, and Duke University.

2002   Georgetown University, London Business School Donor Seminar, University of Pittsburgh, London Business School Symposium, Cornell University, Oklahoma State University, University of Rochester, New York University, Arizona State University, and Wharton School at the University of Pennsylvania.

2003   FARS Conference, APJAE Conference in Shanghai, University of Southern California, and University of Technology at Sydney.

2004   APJAE Conference in Kuala Lumpur, Emory University, AAA Doctoral Consortium, Harvard University, Fed-JFE Conference at Ohio State University, the U.S. Securities & Exchange Commission, Case Western Reserve University, University of Maryland, and Financial Economics and Accounting Conference at USC.

2005   Journal of Accounting, Auditing, and Finance Conference at NYU, Harvard University, Carnegie Mellon University, Samsung School of Business, S. Korea, and University of Texas at Dallas.

2006   Stanford University, Southern Methodist University, University of Georgia, Rutgers University, University of Chicago, Ohio State University, University of Minnesota, Michigan State University, Indian Institute of Technology, Bombay, BSI Gamma Foundation, Switzerland, and Cornell University.

2007   Indian Institute of Management, Calcutta, Brigham Young University, University of California, Riverside, University of Edinburgh, University of Southern California, University of Texas at Austin, Tuck at Dartmouth College, University of California, Los Angeles, Washington University in St. Louis, University of Massachusetts at Amherst, BARC Seminar at Boston University, Association of Finance Professionals, Boston, and London Business School.

2008   Lancaster University and University of Manchester.

2009   Temple University, London Business School, University of Rochester, Stanford University, American Accounting Association meetings in New York, Georgetown University, JAE Conference at MIT, and BITS Pilani.

2010   University of Chicago, University of Texas at San Antonio, and Sabanci University, Istanbul.

2011   Canadian Accounting Association, London School of Economics, Fudan University, and Xi'an Jiaotong University.

2012   Harvard Business School, Tsinghua University, Sun Yat-Sen University, and HKUST.

Exhibit A

Page 40

2013    USC, NY Federal Reserve Bank

2014    Louisiana State University, National Taiwan University

2015    Lehigh University, University of California, Irvine, Ohio State University, University of Cyprus, MIT Club of Cyprus, Indian School of Business National Conclave

2016    Hong Kong Polytechnic University, IIT, Bombay, Texas Christian University, Chinese University of Hong Kong, London Business School, University of Iowa, City University London

2017    Oxford University Blavatnik School, MIT, Indian Institute of Management, Ahmedabad, Tulane University.

2018    MIT Sloan, PCAOB in Washington DC, SEC in Washington DC, Keynote speech at the Conference on Financial Economics and Accounting at Tulane University.

## TEACHING

Corporate Financial Accounting, MBA core course
Financial Statement Analysis, MBA elective course
Empirical Accounting Research, PhD seminar
Positive Accounting Theories, MBA elective course
Cases in Finance, MBA elective course
Introduction to Financial Accounting, Undergraduate course
Corporate Financial Accounting: Simon School's Executive MBA programs in Holland and Switzerland

Intensive doctoral research courses in Accounting and Finance to faculty and students in:
Finland (1991, 1992), University of Alberta, Canada (1991), European Institute for Advanced Studies in Management, Brussels (1993), Baruch College, City University of New York, NY (1996), University of Technology at Sydney, Australia (1997, 1998, 2000, 2001, 2003), London Business School (2001).

## DISSERTATIONS

On the Ph.D. dissertation committees of (initial placement in parentheses):

### As Chairperson
1.  Christopher Noe (Harvard Business School)
2.  Glen Hansen (Pennsylvania State University)
3.  Wayne Guay (Wharton University of Pennsylvania)
4.  Peter Wysocki (University of Michigan)
5.  Yong Chul Shin (Tulane University)
6.  Ying Li (Baruch College, CUNY)
7.  Wesley Chan (Alpha Simplex)
8.  Xu Li (University of Texas at Dallas)
9.  Yanfeng Xue (University of Texas at Austin)
10. Jieying Zhang (University of Southern California)
11. Volkan Muslu (University of Texas at Dallas)
12. Adam Kolasinski (University of Washington)
13. Valeri Nikolaev (University of Chicago)
14. George Papadakis (Boston University)
15. Amit Koshal (Industry)

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 42 of 63   Page ID
#:1830
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 42 of 63

16. Jeri Seidman (University of Texas at Austin)
17. Konstantin Rozanov (London Business School)
18. Yuri Loktionov (University of Southern California)
19. Mihir Mehta (Temple University)
20. Nicholas Guest (Cornell University)

**As Committee member**
21. Gita Rao (Illinois)
22. Richard Sloan (Wharton)
23. Tony Greig (Purdue)
24. Anwer Ahmed (Florida)
25. Patty Dechow (Wharton)
26. Sudipta Basu (CUNY, Baruch)
27. Michele Daley (Rice)
28. Paul Irvine (Emory)
29. Roger Edelen (Wharton)
30. Mingyi Hung (University of Southern California)
31. Mary Ellen Carter (Columbia)
32. Eric Wolff (Carnegie Mellon University)
33. Susan Shu (Boston College)
34. Elizabeth Keating (Northwestern University)
35. Laurence van Lent (University of Tilburg)
36. Gans Narayanamoorthy (Yale University)
37. Kevin Chan (HKUST, Hong Kong)
38. Karthik Ramanna (Harvard University)
39. Kexin Zheng (University of Connecticut)
40. Rebecca Lester (Stanford University)
41. Jinwan Kim (Stanford University)


## COMMITTEE / ADMINISTRATION

MIT 401(k) Oversight Committee, 2014-2019.
MIT Committee on Graduate Programs, 2017-2019.
MIT International Advisory Committee
MITx Faculty Advisory Committee
MIT Sloan: International Initiatives Committee, Co-Chair of Space Committee, Chair of Load
   Committee, and Member of various standing committees, MIT Sloan School of
   Management, 2011-2015.
Policy Committee and Personnel Committee, MIT Sloan School of Management, 1999-Present.
Head of the Department of Economics, Finance, and Accounting, MIT Sloan School of
   Management, 2003-2005, 2006-2007.
Head of the Accounting group, MIT Sloan School of Management, 1999-2003.
Sloan Fellows Program Committee, MIT Sloan School of Management, 2001-2005.
Sloan Research Productivity Committee, MIT Sloan School of Management, 2001-2002.
Sloan Fellows/MOT Program Restructuring Committee, MIT Sloan School of Management, 2002.
Management Programs Committee, MIT Sloan School of Management, 2000-2001.
Promotion and Tenure Committee, University of Rochester, 1996 -1999.
Accounting Area Coordinator, University of Rochester, 1988-1999.
Ph.D. committee, University of Rochester, 1989-1995.
MBA committee, University of Rochester, 1989-1994.
University of Rochester Senate, 1994-1996.
Committee on Teaching Excellence, University of Rochester, 1995-1996.

## Appendix B – Materials Reviewed or Considered

### Court Documents

- Amended Class Action Complaint, filed on May 29, 2020
- Order Denying Motions to Dismiss and Granting Leave to File Surreply, filed on January 26, 2021

### Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)
- *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989)
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 134 S.Ct. 2398 (2014)
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)
- *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004)

### SEC Filings/Forms

- Mattel's Form 8-K, dated August 8, 2019
- Mattel's Form 8-K, dated October 29, 2019
- Mattel's Form 10-Q, dated October 26, 2017
- Mattel's Form 10-K, dated February 22, 2019
- Mattel's Form 10-K, dated February 25, 2020
- Nasdaq's Form 10-K, dated February 25, 2020

### Press Articles

- Press release, PRNewswire, *Mattel Reports Third Quarter 2017 Financial Results* (Oct. 26, 2017).
- Press release, S&P Dow Jones Indices, *Bemis Set to join S&P 500; Mattel to Join S&P MidCap 400* (Jun. 3, 2019).
- Press release, S&P Global Ratings, *Mattel Inc: S&P Rates $250MM Sr. Unsecured Guaranteed Notes 'BB-'* (Aug. 5, 2019).
- Press release, Fitch Ratings, *Fitch Rates Mattel's Senior Notes 'B+/RR2'; Outlook Negative* (Aug. 1, 2019).
- Press release, Moody's Investors Service, *Moody's assigns B1 rating to Mattel's $250 million bonds; outlook stable* (Aug. 1, 2019).

### Conference Call Transcripts

- Conference Call Transcript, Thomson Reuters StreetEvents, *MAT – Q4 2017 Mattel Inc Earnings Call* (Feb. 1, 2018).

### Databases

- Historical data on market capitalization, trading volume, price, bid-ask spreads, and returns from the Center for Research in Security Prices database (CRSP) and Bloomberg
- Historical data on analyst forecast from the Institutional Brokers Estimate System (I/B/E/S)
- Historical data on short interest from S&P Compustat Security database
- Historical data on S&P 500 membership, S&P 400 membership, S&P 1500 Leisure Product membership, and Mattel's active Nasdaq market makers from Bloomberg
- Mattel's SEC filings and forms downloaded from EDGAR
- Mattel's news headlines and articles downloaded from the Dow Jones Factiva Database
- Mattel's earnings press release articles published by Business Wire
- Mattel's earnings press release articles published by PR Newswire
- Mattel's conference call transcripts from Thomson One Analytics
- Mattel's Analyst reports from Thomson One Analytics

**Websites/Webpages**

- Nasdaq website for Nasdaq's listing requirements and market structure
- SEC website for SEC form descriptions and filing requirements
- National Whistleblowers Center discussion of the PricewaterhouseCoopers 2007 Survey

**Textbooks**

- Espen Eckbo, "Handbook of Empirical Corporate Finance," Elsevier/North-Holland, 2007.

**Academic Articles**

- Yakov Amihud, 2002, "Illiquidity and stock returns: cross-section and time-series effects," *Journal of Financial Markets* 5: 31–56.

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, "Liquidity and Autocorrelations in Individual Stock Returns," *Journal of Finance* 61 (5), 2365–2394.

- William Beaver, 1968, "The Information Content of Annual Earnings Announcements." *Journal of Accounting Research* 6, 67–92.

- Ekkehart Boehmer and Juan Wu, 2013, "Short Selling and the Price Discovery Process," *Review of Financial Studies* 26 (2): 287–322.

- Mark Bradshaw and Richard Sloan, 2002, "GAAP versus the street: an empirical assessment of two alternative definitions of earnings." *Journal of Accounting Research* Vol. 40, 41–66.

- Stephen Brown and Jerold Warner, 1980, "Measuring Security Price Performance," *Journal of Financial Economics* 8, 205–258.

- Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2001, "Market Liquidity and Trading Activity," *Journal of Finance* 56, 501–530.

- Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2008, "Liquidity and market efficiency," *Journal of Financial Economics* 87 (2), 249–268.

- Patricia M. Dechow, Amy P Hutton, Lisa Meulbroek, and Richard G. Sloan, 2001, "Short-sellers, fundamental analysis, and stock returns," *Journal of Financial Economics* 61 (1), 77–106.

- Hemang Desai, K. Ramesh, S. Ramu Thiagarajan, and Bala V. Balachandrab, 2002, "An Investigation of the Information Role of Short Interest in the Nasdaq Market," *The Journal of Finance* 57 (5), 2263–2287.

- Michael S. Drake, Lynn Rees, and Edward P. Swanson, 2011, "Should Investors Follow the Prophets or the Bears? Evidence on the Use of Public Information by Analysts and Short Sellers," *The Accounting Review* 86 (1), 101–130.

- Darrell Duffie, Nicolae Gârleanu, and Lasse Pedersen, 2005, "Over-the-Counter Markets," *Econometrica* 73 (6), 1815-1847.

- Joseph E. Engelberg, Adam V. Reed, and Matthew C. Ringgenberg, 2012, "How are shorts informed? Short sellers, news, and information processing," Journal of Financial Economics 105 (2), 260–278.

- Eugene Fama, 1970, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, 383–388.

- Lily Fang and Joel Peress, 2009, "Media Coverage and the Cross-section of Stock Returns," *The Journal of Finance* 64 (5), 2023–2052.

- Lawrence Glosten and Paul Milgrom, 1985, "Bid, ask, and transaction prices in a specialist market with heterogeneously informed traders," *Journal of Financial Economics* 14, 71–100.

- SP Kothari, 2001, "Capital markets research in accounting," *Journal of Accounting and Economics* 31, 105–231.

- Albert Kyle, 1985, "Continuous auctions and insider trading," *Econometrica* 53, 1315–1335.

- Jeff Payne and Wayne Thomas, 2011, "The Torpedo Effect: Myth or Reality." *Journal of Accounting, Auditing, and Finance* 26, 255–278.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 46 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-5   Filed 11/13/23   Page 46 of 63
#:1834

- Darren Roulstone, 2003, "Analyst Following and Market Liquidity," *Contemporary Accounting Research* 20 (3), 552–578 (2003).

- Andrei Shleifer, 1986, "Do demand curves for stocks slope down?" *Journal of Finance* 41, 579–590.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 47 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-5   Filed 11/13/23   Page 47 of 63
#:1835

**Exhibit 1**
**Summary of Market Efficiency Factors for Mattel Inc.'s Common Stock during the Class Period**
**August 2, 2017 – August 8, 2019**

| Factor | Summary of Factor | Mattel's Common Stock |
|---|---|---|
| Weekly Trading Volume (*Cammer* I) | "Turnover measured by average weekly trading volume of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." (*Cammer*) | • Average weekly share turnover of 9.35% (median of 7.51%). This number is well above the 2% cutoff cited by the *Cammer* court.<br>• Mattel's turnover is greater than the median turnover of firms traded on the Nasdaq in all trading weeks during the Class Period.<br>• Mattel was included in the S&P 500 index during most of the Class Period (August 2, 2017 through June 6, 2019). |
| Number of Analysts Providing Coverage (*Cammer* II) | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the Class Period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." (*Cammer*) | • Total of 408 publicly available analyst reports were issued during the Class Period, with an average (median) of 51.6 (57.0) reports being issued in each full calendar quarter during the Class Period.<br>• An average (median) of 13.9 (14.0) analysts made forecasts for Mattel per full calendar quarter during the Class Period, compared to a median of 2 analysts making forecasts for Nasdaq firms.<br>• During the Class Period, 4,549 media articles referring to Mattel (an average of 6.2 articles per day) can be found in the Dow Jones Factiva Database. |
| Market Makers & Arbitrageurs (*Cammer* III) | "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." (*Cammer*) | • Traded on Nasdaq, a large national exchange with substantial listing requirements and market makers.<br>• Over 150 active market makers traded in Mattel's stock during the Class Period.<br>• Mattel's shares shorted, as reported at the end of each full calendar quarter during the Class Period, range from 16.1% to 22.4 %. The percentages of Mattel's shares shorted are higher than the median of Nasdaq firms during the same period. |
| Eligibility to File an S-3 Registration Statement (*Cammer* IV) | "…it would be helpful to allege the Company was entitled to file an S–3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met." (*Cammer*) | • Mattel filed Forms S-3ASR with the SEC both before and during the Class Period.<br>• Mattel filed a total of 73 documents with the SEC during the Class Period, including periodic reports on Forms 10-Q and 10-K, and current reports on Form 8-K. |

**Continued on the next page**

44

Exhibit A
Page 47

**Exhibit 1 (Continued)**
**Summary of Market Efficiency Factors for Mattel Inc.'s Common Stock during the Class Period**
August 2, 2017 – August 8, 2019

| Factor | Summary of Factor | Mattel's Common Stock |
|---|---|---|
| Stock Price Reaction to News (*Cammer* V) | "Empirical facts showing cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." (*Cammer*) | • Event study analyses show strong statistically significant market reactions on 4 out of 8 earnings announcement dates with unexpected news, and the reactions are in the same direction of the news on 3 of the 8 dates. I also find insignificant reaction to one earnings announcement that likely contains mixed news.<br>• I find significantly negative market reaction on the corrective disclosure date.<br>• Using an unsigned returns test, I find that the average market reaction on the 9 corporate event dates is 6.49% higher than the market reaction on other days. |
| Market Capitalization (*Krogman*) | "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." (*Krogman*) | • Daily average market capitalization was a high of $5.93 billion and a low of $3.82 billion.<br>• Mattel's daily market capitalization was greater than the median market capitalization of Nasdaq firms during every month of the Class Period. |
| Stock Liquidity (*Krogman*) | Low measures of market illiquidity and narrow bid-ask spread indicate less uncertainty regarding valuation and greater ability to trade without moving the market price. (*Krogman*) | • The daily Amihud measure of illiquidity for Mattel's stock ranged from a low of less than 0.01% to a high of 0.05%, while daily average bid-ask spread ranged from 0.06% to 0.09% during the Class Period.<br>• Mattel's market illiquidity measure and bid-ask spread were below the median of Nasdaq firms during every month of the Class Period. |
| Public Float (*Krogman*) | "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security." (*Krogman*) | • Mattel's quarterly public float ranged from 393.7 million shares to 417.0 million shares during the Class Period.<br>• The public float of Mattel was greater than the median float of Nasdaq firms during every quarter spanning the Class Period. |
| Serial Correlation of Returns (*Lehocky*) | "In an efficient market, there should be no trends because the market should be reacting quickly to new information, and new prices are being set quickly based upon the new information. Thus, if there is a serial correlation in the stock prices, it lends to a finding of market inefficiency." (*Lehocky*) | • The coefficient of first-order autocorrelation for Mattel's daily stock returns was statistically insignificant during the Class Period. |

Exhibit A
Page 48

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 49 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 132-5   Filed 11/13/23   Page 49 of 63
#:1837



**Exhibit 2**
**Mattel Inc.'s Common Stock Daily Closing Price & Trading Volume**
**August 2, 2017 - August 9, 2019**

The blue bar plots the daily trading volume (in millions of shares) and the red line plots the daily closing price (in US dollars) of Mattel during August 2, 2017 – August 9, 2019. Data on stock price and volume are obtained from the CRSP database.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 50 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 122-5    Filed 11/13/23    Page 50 of 63
#:1838

**Exhibit 3**
**Mattel Inc.'s Common Stock Weekly Turnover - Trading Week**
**August 2, 2017 − August 8, 2019**

This chart plots the weekly share turnover (on a *trading* week basis) of Mattel's common stock (red line) and the median turnover of Nasdaq firms.  Weekly turnover is calculated as the summation of the shares traded during each trading week divided by the weekly average outstanding shares. The median turnover of  Nasdaq firms is determined by calculating weekly turnover of all firms traded on the Nasdaq, and then taking the median for the trading week. A firm is excluded from the weekly median if it has less than five trading day data in a trading week. Each trading week is defined as five consecutive trading days. The last trading week during the Class Period consists of only three trading days (August 6, 2019 − August 8, 2019) and is therefore excluded from this Exhibit.



**Weekly Share Turnover:**
Mean: 9.35%
Median: 7.51%

Exhibit A
Page 50

47

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 51 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 123-5   Filed 11/13/23   Page 51 of 63
#:1839



**Exhibit 4**
**Mattel Inc.'s Common Stock Weekly Turnover - Calendar Week**
**August 2, 2017 – August 8, 2019**

This chart plots the weekly share turnover (on a *calendar* week basis) of Mattel's common stock (red line) and the median turnover of Nasdaq firms during the Class Period. Weekly turnover is calculated as the summation of the shares traded during each calendar week divided by the weekly average outstanding shares. The median turnover of Nasdaq firms is determined by calculating weekly turnover of all firms traded on the Nasdaq, and then taking the median for the calendar week. Each calendar week consists of 4 to 5 trading days. The first calendar week of the Class Period consists of only three trading days (August 2, 2017 – August 4, 2017) and therefore is excluded from this Exhibit.

**Weekly Share Turnover:**
Mean: 8.95%
Median: 6.72%

Mattel's Turnover          Median of Nasdaq firms

48

Exhibit A
Page 51

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 52 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 52 of 63
#:1846

**Exhibit 5**
**Analyst Reports on Mattel Inc. Released During Each Full Calendar Quarter of the
Class Period**
**2017 Quarter 4 - 2019 Quarter 2**

The red bar chart reflects the number of analyst reports of Mattel that were released in each calendar quarter over the seven full calendar quarters during the Class Period (i.e., October 1, 2017 to June 30, 2019). Data on the number of analyst reports made during a calendar quarter were obtained from the Thomson One database.



Exhibit A
Page 52

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 53 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 53 of 63
#:1841

**Exhibit 6**
**Analyst Following of Mattel Inc. during Each Full Calendar Quarter of the Class Period**
**2017 Quarter 4 - 2019 Quarter 2**

This chart compares analyst following of Mattel (red bar) to the median analyst following of Nasdaq firms (blue bar) during each full calendar quarter of the Class Period (i.e., from October 1, 2017 to June 30, 2019). Analysts following is calculated as the number of analysts issuing any forecast for a firm during a calendar quarter. I use the I/B/E/S database for this analysis as it provides data on analyst following for both Mattel and firms on Nasdaq in a machine-readable format. However, I acknowledge that the number of analysts covered by the I/B/E/S database is higher than the number of analyst reports from the Thomson One Analytics database, because not all analysts issuing forecasts write reports or make their reports available to Thomson One. Median analyst following of Nasdaq firms is determined by first calculating analyst following for all firms traded on the Nasdaq during each calendar quarter, and then taking the median.



Exhibit A
Page 53

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 54 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 122-5    Filed 11/13/23    Page 54 of 63
#:1842



**Exhibit 7**
**Percentage of Mattel Inc.'s Short Interest at the End of Each Calendar Quarter of the Class Period**
**2017 Quarter 3 - 2019 Quarter 2**

This chart compares the short interest (%) of Mattel stock (red bar) to the median of Nasdaq firms (blue bar) at the end of each calendar quarter during the Class Period (i.e., September 30, 2017 to June 30, 2019). The percentage of short interest is calculated by dividing the number of common shares sold short by investors as reported at the end of each calendar quarter, obtained from the S&P Compustat Short Interest database, by the number of shares outstanding at the end of the calendar quarter, obtained from the CRSP database. The median short interest of Nasdaq firms is determined by first calculating short interest at the end of each calendar quarter for all firms traded on the Nasdaq, and then taking the median. A firm is excluded from the median if it is not covered by the Compustat Short Interest database at the end of the quarter. The data point of 2017 Quarter 3 reflects the percentage of short interest as of September 30, 2017 and is therefore included in this Exhibit.

Exhibit A
Page 54

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 55 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 55 of 63
#:1843

**Exhibit 8**
**Mattel Inc.'s Earnings Announcements During the Class Period**
**August 2, 2017 – August 8, 2019**

The following is a list of Mattel's earnings announcements during the Class Period (August 2, 2017 – August 8, 2019). For each earnings announcement the table provides information on the date and time of the earnings announcement, the analysts' earnings and sales consensus forecasts, realized earnings and sales, and a description of whether the earnings announcement contains negative news, positive news, or mixed news. If the actual EPS and sales both beat the analyst consensus forecasts, I classify that announcement as having positive news. If both the actual EPS and sales metrics fall below the analyst consensus, I classify that announcement as having negative news. If one of the actual metrics beats the analyst consensus while the other falls below the analyst consensus, I classified that earnings announcement as having mixed news.

| Date | Time (EST)[a] | Actual EPS[b] (Per Share) | Analyst Consensus EPS[b] (Per Share) | Actual Sales[b] (in Millions) | Analyst Consensus Sales[b] (in Millions) | Characterization of Earnings News |
|---|---|---|---|---|---|---|
| October 26, 2017 (2017 Q3) | 4:05 p.m. | $0.09 | $0.60 | $1,604.0 | $1,829.6 | Negative News |
| February 1, 2018 (2017 Q4) | 4:05 p.m. | -$0.72 | $0.19 | $1,610.9 | $1,690.6 | Negative News |
| April 26, 2018 (2018 Q1) | 4:05 p.m. | -$0.60 | -$0.39 | $737.9 | $683.2 | Mixed News |
| July 25, 2018 (2018 Q2) | 4:05 p.m. | -$0.56 | -$0.26 | $840.7 | $856.5 | Negative News |
| October 25, 2018 (2018 Q3) | 4:05 p.m. | $0.18 | $0.22 | $1,437.5 | $1,480.8 | Negative News |
| February 7, 2019 (2018 Q4) | 4:45 p.m. | $0.04 | -$0.14 | $1,524.3 | $1,435.9 | Positive News |
| April 25, 2019 (2019 Q1) | 4:12 p.m. | -$0.44 | -$0.56 | $689.2 | $645.6 | Positive News |
| July 25, 2019 (2019 Q2) | 4:05 p.m. | -$0.25 | -$0.40 | $860.1 | $819.5 | Positive News |

---

[a] I obtained a copy of the press releases from the Factiva database to identify the date/time stamp of Mattel's earnings announcements.

[b] Both Analyst consensus and actual EPS are obtained from I/B/E/S adjusted summary history database. I used the median forecast immediately prior to earnings announcement for the consensus forecast.

**Exhibit A**
**Page 55**

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 56 of 63   Page ID #:1844
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 56 of 63

## Exhibit 9
## Mattel Inc.'s Earnings and Dividend Announcements and Corrective Disclosure

The following is a list of Mattel Inc.'s earnings and dividend announcements during the Class Period, as well as Mattel Inc.'s corrective disclosure on August 8, 2019. For each event, I identify the date/time stamp from the source of the news that was first made available to market participants. For the earnings announcements, I obtained the date/time stamp of the press releases from the Factiva database. For the dividend announcement and the corrective disclosure, I obtained the acceptance date/time of the Form 8-Ks from EDGAR.

| Date & Time (EST) | Event | Source of News |
|---|---|---|
| June 14, 2017 1:54 p.m. | Mattel announced to cut its 2017 Q3 dividends from $0.38 per share to $0.15 per share. | Form 8-K |
| October 26, 2017 4:05 p.m. | Mattel announced 2017 Q3 earnings and suspended quarterly dividends starting from 2017 Q4 to increase financial flexibility. | PR Newswire |
| February 1, 2018 4:05 p.m. | Mattel announced 2017 Q4 and full year results. | PR Newswire |
| April 26, 2018 4:05 p.m. | Mattel announced 2018 Q1 earnings. | PR Newswire |
| July 25, 2018 4:05 p.m. | Mattel announced 2018 Q2 earnings. | PR Newswire |
| October 25, 2018 4:05 p.m. | Mattel announced 2018 Q3 earnings. | PR Newswire |
| February 7, 2019 4:45 p.m. | Mattel announced 2018 Q4 and full year results. | PR Newswire |
| April 25, 2019 4:12 p.m. | Mattel announced 2019 Q1 earnings. | PR Newswire |
| July 25, 2019 4:05 p.m. | Mattel announced 2019 Q2 earnings. | Business Wire |
| August 8, 2019 5:01 p.m. | Mattel announced its receipt of an anonymous whistleblower letter, the need to investigate the issues set forth in the letter, and the resulting termination of its offering of 6.00% Senior Notes. | Form 8-K |

Exhibit A

53   Page 56

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 57 of 63   Page ID
#:1845
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 57 of 63

**Exhibit 10**
**Regression Results of the Market Reaction to Mattel Inc.'s Unexpected Events**
Assessment of Mattel's Abnormal Stock Return on Mattel's Individual Earnings
Announcement and Corrective Disclosure Days

I perform an event study using rolling regressions. Specifically, for each of the eight earnings announcements and one corrective disclosure released during the Class Period, I estimate the following regression model using a 120-trading-day window prior to the event:

$$RET_{K,t} = \alpha_K + \beta_K \times RET\_SP500_{K,t} + \gamma_K \times RET\_SP1500LP_{K,t} + \Sigma(\delta_{K, i=1 \text{ to } 2} \times Corporate\ Events_{K, i=1 \text{ to } 2}) + \varepsilon_{K,t},$$
$$t = -120, -119\ldots, -1, K = 1, 2,\ldots, 9$$

$RET_{K,t}$ is Mattel's stock return on day t. $RET\_SP500_{K,t}$ is the return of the market portfolio on day t, as proxied by the S&P 500 Index, while $RET\_SP1500LP_{K,t}$ is the return of the industry portfolio on day t, as proxied by the S&P 1500 Leisure Product Index excluding Mattel.[a] In addition, I control for any prior corporate events that occur during the estimation window. Specifically, I define a series of indicator variables $Corporate\ Events_{K,i=1 \text{ to } 2}$ to be "1" if any earnings or dividend announcement i, as identified in Exhibit 9, falls in a given day during the estimation window, and define *Corporate Events* to be "0" otherwise. I then compute abnormal return (*ABRET*) on event date as:

$$ABRET_K = RET_K - (\hat{\alpha}_K + \hat{\beta}_K \times RET\_SP500_K + \hat{\gamma}_K \times RET\_SP1500LP_K), K = 1, 2,\ldots, 9$$

where $\hat{\alpha}$, $\hat{\beta}$, and $\hat{\gamma}$ are estimated parameters obtained from the 120-trading-day rolling regression for each event.[b] This exhibit presents *ABRET* for each of the nine corporate events and t-value, which is computed as *ABRET* divided by the root mean squared error of the 120-trading-day estimation window. I use the degrees of freedom from the 120-day rolling regression to derive the p-value and consider two-tailed p-value of less than or equal to 5% to be statistically significant. * and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

| Date | News | ABRET | t-statistic | Two-sided p-value | 5% Significance |
|---|---|---|---|---|---|
| October 27, 2017 | Negative News | -0.0906 | -6.01** | <0.0001 | ✓ |
| February 2, 2018 | Negative News | 0.0719 | 2.26** | 0.0259 | ✓ |
| April 27, 2018 | Mixed News | 0.0019 | 0.06 | 0.9517 | |
| July 26, 2018 | Negative News | -0.0226 | -0.96 | 0.3374 | |
| October 26, 2018 | Negative News | -0.0102 | -0.67 | 0.5036 | |
| February 8, 2019 | Positive News | 0.2412 | 13.86** | <0.0001 | ✓ |
| April 26, 2019 | Positive News | -0.0293 | -1.10 | 0.2722 | |
| July 26, 2019 | Positive News | 0.1256 | 4.82** | <0.0001 | ✓ |
| August 9, 2019 | Negative News | -0.1454 | -7.34** | <0.0001 | ✓ |

---

[a] Since there were only 8-9 constituents in the S&P 1500 Leisure Product Index during the Class Period, including Mattel's stock in the index can induce a mechanical correlation between the dependent and independent variables in the event study. I remove the stock of Mattel from the index to eliminate this problem. To determine the return on the S&P 1500 Leisure Product Index without Mattel, I first obtain the constituents of the S&P 1500 Leisure Product Index over the Class Period from Bloomberg. I then value-weight each constituent's (without Mattel's) daily individual stock returns obtained from CRSP to calculate the daily index returns during the Class Period.

[b] For the rolling window estimation on the October 27, 2017 event date, I also control for a prior earnings announcement by Mattel on July 27, 2017 (announced after hours so I control for the following event date – July 28, 2017) and the dividend cut on June 14, 2017.

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 58 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 58 of 63
#:1846

**Exhibit 11**
**Regression Results of the Market Reaction to Mattel Inc.'s Unexpected Events**
Assessment of the Absolute Value of Mattel's Abnormal Stock Return on Mattel's Corporate Event Days

To test whether Mattel's stock reacted significantly to unexpected corporate events, I estimate the following model using 509 trading observations during the period August 2, 2017 – August 9, 2019[a]:

$$ABS\,(ABRET)_D = \alpha + \beta \times Corporate\ Event_D + \varepsilon_D,\ T = 1, 2, \ldots, 509.$$

$Corporate\ Event_D$ is an indicator coded as "1" for the eight earnings announcements and one corrective disclosure during the Class Period (August 2, 2017 to August 8, 2019), and coded as "0" otherwise. $ABS(ABRET)_D$ is the absolute value of abnormal return $ABRET$ of day D. To obtain abnormal return, I perform an event study using rolling regressions. Specifically, for each day D in this period, I estimate the following regression model using a 120-trading-day window prior to day D:

$$RET_{D,t} = \alpha_T + \beta_D \times RET\_SP500_{D,t} + \gamma_D \times RET\_SP1500LP_{D,t} + \Sigma(\delta_{D,\ i=1\ to\ 3} \times Corporate\ Events_{D,\ i=1\ to\ 3}) + \varepsilon_{D,t},$$
$$t = -120, -119, \ldots, -1, D = 1, 2, \ldots, 509$$

$RET_{D,t}$ is Mattel's stock return on day t. $RET\_SP500_{D,t}$ is the return of the market portfolio on day t, as proxied by the S&P 500 Index, while $RET\_SP1500LP_{D,t}$ is the return of the industry portfolio on day t, as proxied by the S&P 1500 Leisure Product Index excluding Mattel. In addition, I control for any prior corporate events that occur during the estimation window. Specifically, I define $Events_{D,i=1\ to\ 3}$ as a series of indicator variables coded as "1" if an earnings announcement or other corporate event i falls in a given day during the estimation window, and coded as "0" otherwise. I then compute abnormal return ($ABRET$) on event date as:

$$ABRET_D = RET_D - (\hat{\alpha}_D + \hat{\beta}_D \times RET\_SP500_D + \hat{\gamma}_D \times RET\_SP1500LP_D),\ D = 1, 2, \ldots, 509$$

where $\hat{\alpha}$, $\hat{\beta}$, and $\hat{\gamma}$ are estimated parameters obtained from the 120-trading-day rolling regression. * and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

| | |
|---|---|
| **Time Period:** | 8/2/2017 to 8/9/2019 |
| **Number of Observations:** | 509 |
| **Adjusted R-Squared:** | 14.31% |

| Variables | Coefficient | t-Value |
|---|---|---|
| Intercept | 0.0172 | 18.40** |
| Corporate Event | 0.0649 | 9.27** |

---

[a] I include August 9, 2019 in this analysis because the August 8, 2019 Form 8-K was filed after the market closed.

Exhibit A
55   Page 58

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 59 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 122-5    Filed 11/13/23    Page 59 of 63
#:1847



**Exhibit 12**
**Daily Average Market Capitalization of Mattel Inc. over Each Month of the Class Period**
**August 2017 - August 2019**

This chart compares Mattel's daily average market capitalization to the median market capitalization of Nasdaq firms over each month of the Class Period. Market capitalization is calculated by multiplying the daily closing price with the number of shares outstanding. The resulting daily market capitalizations are then averaged by month. The median market capitalization of Nasdaq firms is determined by first calculating daily average market capitalization of each month for all firms traded on the Nasdaq, then taking the median for the month. The average market capitalization for August 2019 reflects the daily value from August 1, 2019 to August 8, 2019 (the last day of the Class Period).

Exhibit A
Page 59

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 60 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 60 of 63
#:1848



**Exhibit 13**
**Amihud's Illiquidity Measure of Mattel Inc.'s Stock over Each Month of the Class Period**
**August 2017 - August 2019**

This chart compares Mattel's illiquidity (in %) to the median illiquidity of Nasdaq firms over each month of the Class Period. Daily illiquidity is calculated as the daily ratio of the absolute return of Mattel's stock to the dollar value of trading volume (in millions), then averaged over each month. The median illiquidity of Nasdaq firms is determined by first calculating daily average illiquidity of each month for all firms traded on the Nasdaq, and then taking the median for the month. The average daily illiquidity for August 2019 is averaged from August 1, 2019 to August 8, 2019 (the last day of the Class Period).

57

Exhibit A
Page 60

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 61 of 63   Page ID
Case 8:21-cv-02910-TDC   Document 122-5   Filed 11/13/23   Page 61 of 63
#:1849



**Exhibit 14**
**Daily Average Closing Bid-Ask Spread of Mattel Inc.'s Common Stock over Each**
**Month of the Class Period**
**August 2017 - August 2019**

This chart compares Mattel's daily average bid-ask spread (in %) to median bid-ask spread of Nasdaq firms over each month of the Class Period. The daily bid-ask spread is calculated each day using the closing bid and ask prices obtained from CRSP. I then calculate the daily spread as (Ask - Bid)/[(Ask + Bid)/2], and then averaged over each month. The median bid-ask spread of Nasdaq firms is determined by first calculating daily average bid-ask spread of each month for all firms traded on the Nasdaq, and then taking the median for the month. The daily bid-ask spread for August 2019 is averaged from August 1, 2019 to August 8, 2019 (the last day of the Class Period).

Exhibit A
Page 61

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 62 of 63   Page ID
Case 8:21-cv-02910-TDC    Document 122-5    Filed 11/13/23    Page 62 of 63
#:1856

# Exhibit 15
## Public Float of Mattel Inc.
### 2017 Quarter 3 - 2019 Quarter 3

This chart compares stock float (in millions) of Mattel (red bar) to the median float of Nasdaq firms (blue bar) at the end of each calendar quarter of the Class Period (i.e., from 2017 Q3 to 2019 Q3). The data point of 2019 Q3 reflects the balance on August 8, 2019, the last day of the Class Period. To calculate public float, I obtain the number of shares outstanding on the last trading day of the quarter from the CRSP database. I add to the shares outstanding the number of shares shorted reported at the end of the quarter from the COMPUSTAT Short Interest database. From this sum I deduct the number of shares held by insiders, obtained from the Thomson Reuters Insider database. The number of shares outstanding, the number of short interest, and the number of shares held by insiders are all measured in millions. The median float of Nasdaq firms is determined by first calculating public float for all firms traded on the Nasdaq at the end of each calendar quarter, and then taking the median. A firm is excluded from the median if it is not covered by the Compustat Short Interest database or the Thomson Reuters Insider database at the end of the quarter.



Exhibit A
Page 62

Case 2:19-cv-10860-MCS-PLA   Document 90-2   Filed 04/30/21   Page 63 of 63   Page ID
#:1851
Case 8:21-cv-02910-TDC    Document 122-5    Filed 11/13/23    Page 63 of 63

**Exhibit 16**
**Autocorrelation for Mattel Inc.'s Daily Stock Returns**

I perform a regression of Mattel's daily stock return as the dependent variable and the previous trading day's return as the independent variable over the period from August 2, 2017 to August 8, 2019. The first-order autocorrelation is measured by the coefficient of the independent variable.

| | |
|---|---|
| **Time Period:** | 8/2/2017 – 8/8/2019 |
| **Number of Observations:** | 508 |
| **Adjusted R-Squared:** | 0.15% |

| Variables | Coefficient | t-Value |
|---|---|---|
| Intercept | -0.0002 | -0.17 |
| Previous Trading Day's Stock Return | 0.0590 | 1.33 |

* and ** represent statistical significance at two-tailed 0.05 and 0.01 levels, respectively.

60
Exhibit A
Page 63