# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOTHINATHAN SINNATHURAI, :

Individually and on      : Civil Action No.:

Behalf of All Others     : TDC-21-2910

Similarly Situated       :

   Plaintiffs           :

       Vs.             :

NOVAVAX, INC., ET AL     :

   Defendants            :

--------------------

 

Deposition of NUGGEHALLI BALMUKUND NANDKUMAR, was taken via videotape and Zoom on Tuesday, August 1, 2023, commencing at 9:10 a.m. Central Time, at 951 Doral Drive, Bartlett, Illinois, before MICHELE D. LAMBIE, Notary Public.

--------------------

 

Reported By:

      Michele D. Lambie, CSR-RPR

related to a federal securities case?

A.    No.

Q.    How long ago was the last of those two depositions?

A.    One was about 18 years ago.  Another one was about four years, five years ago, almost five.

Q.    So a while?

A.    Yes.

Q.    Okay.  Well, just to review a few ground rules.  I'll be asking questions, and then when I'm done, I'll give you the opportunity to give an answer.

If you have not understood my question, please let me know, and I'll attempt to rephrase.

And if your counsel objects, unless he instructs you not to answer, please give an answer after he's been able to get his objection registered on the record.

If you could make sure to give verbal answers because our court reporter here is transcribing every word that we say, and she can't

Page 14

get down, you know, head nods or hand signals or anything like that.

So I will also do my best to speak clearly and pause and give you the chance to answer so that we don't talk over each other so that she can get a clean record.

Is there any reason, sir, that you'd be unable to give complete and truthful testimony today in response to the questions I'll ask you?

A.   No reason.

Q.   Okay.  Have you ever given testimony at a live trial?

A.   At what trial?

Q.   A live trial in a courtroom.

A.   Yes, one time.

Q.   How long ago was that?

A.   That was 17, 18 years ago.

Q.   Okay.  If you are called to give live testimony in the trial of this case, would you be ready and able to appear?

A.   Yes, sir.

Q.   Okay.  What did you do to prepare for this deposition today?

A.   I just glanced through the Complaint, relied on the Complaint put together by my counsel based on all of the information.

Q.   And without revealing the content of any discussions you might have had with your counsel, did you meet with your counsel in order to prepare for your deposition?

A.   No, I did not meet physically.  No, not physically.

Q.   Okay. Did you meet virtually or by telephone?

A.   By virtually, yes.

Q.   Okay.  And when --

A.   I meant, I'm sorry, by teleconference.

Q.   By teleconference?

A.   Yes.

Q.   Okay.  And was it one teleconference or multiple teleconferences?

A.   One.

Page 23

A.   Concept of what?

Q.   A monitoring agreement.

A.   A monitoring -- no, I don't.

Q.   Okay.  So you don't have any monitoring agreement with a -- with any law firm?

A.   No.

MR. CALANDRA:  And I'll just counsel the witness, you haven't done this so far, but when asked questions about communications with counsel, please do not reveal any communications, the substance of any communications you made with any lawyer.

MR. BROWN:  Yes.  And just to be clear, I'm trying to get at who -- who he spoke with, not what the content was, but fair point.

BY MR. BROWN:

Q.   Are you being compensated in any way for your time here today?

A.   No, sir.

Q.   Have you been compensated in any way for serving as the Lead Plaintiff appointed in this

Page 24

case so far?

A.    No, sir.

Q.    Do you expect to be?

A.    If we win the case, yes.

Q.    Do you mean that in terms of achieving a damages award or some -- something --

A.    That's correct.

Q.    -- other than that?

A.    That's correct.

Q.    Okay.  Why is it that you selected the Pomerantz firm to be your counsel in this case?

A.    When I looked at the Ameritrade notes, I saw the name first.  On that given day, I clicked on that and called them.

Q.    Okay.  Did you consider contacting another firm aside from the Pomerantz firm in connection with this case?

A.    No.

Q.    Do you have an understanding of what it means for a case to proceed as a class action?

A.    Yes, I have a general understanding.

Q.   Okay.  Could you describe your general understanding for me, please?

A.   It's a group of individuals getting together who have lost money or whatever, the -- in the security they invested in, and they are all pulling together to come together to come as a class, a class action suit.

Q.   Separate, again, from any specific advice that your lawyers have given you, do you individually have a general understanding of what the requirements are for a case to proceed as a class action?

A.   General requirements?  Just telling the truth.  That's all I know.

Q.   Are you familiar with the concept of a class period?

A.   Yes.

Q.   And what's your understanding of that concept, sir?

A.   It's the time between when the securities issues have occurred between the two times, time

Page 26

limits.  It's a time limit between two dates.

Q.   Okay.  And what are the -- what are the -- what are the causes of the beginning and ending dates in your understanding?

A.   During those dates, I have lost money and some -- based on information I see.

Q.   Do you have an understanding of whether in this particular case that there is a -- there's a class period that has been defined?

A.   Yes, I have read through the document.

Q.   Okay.  And what's your understanding in this case of what the class period is?

A.   The date is something like February 20- -- 2021 through October 2021, some dates like that.

Q.   And do you have an understanding starting with the first date, February 2021, why -- why it would be that that would be the start date for the class period?

A.   I don't know.  I'm not sure.

Q.   Okay.  And what about the October 2021

Page 27

date?

A.   I don't know.  I'm not sure.  The same answer.  I don't know.

Q.   Okay.  Do you have an understanding of what the proposed membership of the class in this particular case is?

A.   No, I really don't know membership.  I don't know.

Q.   Okay.  After the point at which you were -- so do you recall filing a motion in order to be appointed one of the Lead Plaintiffs in this case?

A.   Yes.

Q.   Okay.  Did you review that motion paper before it was filed?

A.   Yes, I did.

Q.   Okay.  We'll take a look at that in -- in a minute, but I -- I just want to get a few other things out of the way before we get to documents.

So after you were appointed the Lead Plaintiff, did you authorize your attorneys to file

Page 28

a Complaint in this action?

A.    Yes, I did.

Q.    Okay.  Do you know approximately when that Complaint was filed?

A.    It was sometime in 2022.  I don't recall.

Q.    Okay.  Did you participate at all in the -- in the drafting of that Complaint?

A.    No, I did not participate, but whatever the Complaint was, I just looked through.

Q.    Okay.  So that was my next question.  Did you review the amended or, excuse me, review the Complaint before it was filed?

A.    I just glanced through.  There was a lot of legal stuff in there that I'm not really familiar, so I just looked through and then saw what the main Complaint was.

Q.    Okay.  And without pointing to any specific content, do you recall providing any edits or comments on the draft that you were provided to review?

A.    No, I didn't.

Q.    Okay.  So aside from discussions with your lawyers about the -- the content of the Complaint, did you personally separate from them take any steps to investigate the allegations that were made in the Complaint before it was filed?

A.    No.

Q.    Okay.

A.    I did not.

Q.    Do you know who the Defendants are in this action?

A.    Yeah, the company and the CEO as presented in the Complaint.

Q.    Do you know the name of the CEO?

A.    Yes.  Stanley Erck.  In the Complaint, their names are listed, but he's the only person that I relate to.

Q.    Okay.  What's your understanding generally of the nature of the alleged false or misleading statements that were made in connection with the Complaint you filed?

A.    As far as I was concerned from the

Page 30

information and TV news items and stuff like that
I -- I looked at, it looked like it was misleading
information coming out.  So that was my -- that's
what it was, the Complaint was.

Q.   Okay.  And with respect to that
misleading information, any particular topics about
Novavax' business that you recall that allegedly
the misleading information related to?

A.   It was a time when the -- the vaccine was
going to come out in the market.  That was
the -- that was the only thing I remember.

Q.   Do you have any specific recollection,
separate from reviewing the Complaint itself, just
sitting here today of any statements made by
Mr. Erck that are claimed to be false or
misleading?

A.   I don't really recall other than just he
was saying some dates and timeline when it was
going to be coming out, and that's all I recall.

Q.   When you say it was going to be coming
out, do you mean the --

Page 31

A.   The vaccine would be approved by FDA.

Q.   Okay.  Thank you.  Thank you for that clarification.

Who is -- are you familiar with Mr. John Trizzino?

A.   No, I am not.

Q.   Are you familiar with a Mr. Gregory Covino?

A.   No, I am not.

Q.   Other than Mr. Erck, whom you referenced before, are you familiar with the names of any directors of Novavax, Inc.?

A.   I only recall Gregory, Greg, one time somewhere, but I'm not sure how or when.

Q.   The same question, but with respect to any officer in the management of Novavax aside from Mr. Erck?

A.   No, sir, I don't.

Q.   Are you familiar with the concept of a confidential witness?

A.   Confidential witness?

Page 32

Q.   Yes, sir.

A.   I guess, no, I'm not sure exactly what it means, that term.

Q.   Okay.  So do you sitting here right now have any recollection of any allegations that were made based on statements by confidential witnesses that were related in the Complaint?

A.   No.  Other than what I read through the document, I don't know anything.  I've never spoken to anybody.

Q.   Okay.  So is it -- is it fair to say that you relied on your counsel to ensure the accuracy and completeness of the allegations that were made in the Complaint?

A.   That's correct.

Q.   Do you recall -- you -- you referenced a little bit ago seeing an -- an announcement of the possibility of a lawsuit that the Pomerantz firm and that Mr. Portnoy's firm had put up.

Do you -- do you recall, in particular, what the format of that announcement was?  How did

Page 33

you see it first?

A.   Okay.  I -- I have couple of screens in my -- all in my offices wherever I go, so I have -- I've always had CNBC going in the background --

Q.   Um-hmm.

A.   -- and then I have -- I've watched many interviews with Meg Tirrell, the CNBC correspondent, and also on Cramer's on the Mad Money show.

Q.   Yes.

A.   So those are the news -- news things, and I guess maybe the rest of it I've read from different places, including Ameritrade, which I'm -- I'm always looking at those news items.

Q.   So do you -- so do you primarily conduct your personal trading through an Ameritrade account?

A.   That's correct.

Q.   Do you keep securities accounts on any another platform?

Page 34

A.   Yes, and Morgan Stanley.

Q.   Okay.  Are you aware of whether or not you traded at all in Novavax stock in your Morgan Stanley account?

A.   I don't remember.  I don't think so, but I don't do trading there.  But I used to do for a long time back, but I stopped doing it.

Q.   Okay.

A.   They were too expensive.

Q.   When you say they're too expensive, you mean their -- their per-trade fees?

A.   Per-trade fees, correct.

Q.   Okay.  You understand that in connection with the motion for class certification in this case that there was a request that you be appointed as a representative of the -- of the certified class, if it's certified?

A.   Yes.

Q.   Okay.  And why do you -- if you're still appointed, what -- what would you understand your duties to be as a representative of the class?

Page 35

A.    Please can you repeat the question?

Q.    Sure.  If you are appointed in connection with the certification of a class as a representative, what would you understand your duties as that representative to be?

A.    I'll be a potential witness and to be deposed and -- like I am being, I am doing now. Other than that, I don't know anything else.

Q.    Okay.  Do you have any understanding as -- as the representative what your involvement with the counsel prosecuting the case would be?

MR. CALANDRA:  And, Mr. Kumar, just a reminder, do not communicate specific -- the substance of specific conversations you had with me or Mr. Portnoy.

THE WITNESS:  Counsel, can you please repeat the question again?

BY MR. BROWN:

Q.    Yeah.  What, if anything, do you understand your role vis-a-vis the counsel who are prosecuting the case would be if you're the

representative?

A.    Other than talking to them in discussion, other than that, I don't recall any -- I don't know anything I'm going to provide them other than what they already have.

Q.    Okay.  Other than the preparation session that you referenced for this deposition, the telephone call, approximately how many times have you spoken with your counsel about this case?

A.    Maybe two or three times before during the initial couple of initial stages.  After that, when we actually filed and all of those things, and I was just getting a date regarding this case. That's -- other than that, nothing else.

Q.    Other than the Complaint, which we discussed a few moments ago, do you recall reviewing any other filings in this case?

A.    Whatever was filed I -- I believe was -- a copy was sent to me to look at, and I did go through that, glanced through that, and then that's -- that's all I remember.

Page 37

Q.    What's your understanding of the -- of the current status of the -- of the case right now?

A.    The current status is that the suit is proceeding.  That's why the deposition is being taken, so there was no settlement agreement or anything as far as I know.

Q.    Do you know the name of the Judge that's presiding over the case?

A.    I -- I don't remember offhand.

Q.    Okay.  Do you know in what court the -- the case is pending?

A.    I didn't register it in my mind.

Q.    Okay.  Do you know the date on which under the current schedule the discovery in the case is supposed to end?

A.    Is supposed to end?

Q.    Yes, sir.

A.    No, I don't remember, sir.

Q.    What's your general understanding of the business of Novavax, Inc.?

A.    All I know is they're a biotech research

Page 38

company that does -- a company in Maryland, and they came up with this vaccine, to produce this vaccine, and they were trying to go to the market. That's all I know about them.

Q.   And the -- the vaccine, what was the intended target of that vaccine?

A.   It was a COVID vaccine.

Q.   Okay.  So not with reference to this particular lawsuit, but just generally, how is it that you first became aware of Novavax, Inc.?

A.   It was all through CNBC news media.  I knew Moderna and Pfizer brand particularly were around there, so it was Novavax and one more in Germany, CureVac or something, somebody was also coming up, so ...

Q.   Is it fair to say that you paid attention to companies that were working on vaccines for COVID?

A.   That's -- that's correct.

Q.   Okay.  When you decide to invest in a particular public company, do you typically develop

Q.   Are you familiar with a gentleman by the name of Chad Kaufman?

A.   No, I am not.

Q.   Okay.  You never met a Mr. Chad Kaufman before --

A.   No.

Q.   -- or spoken with him by phone?  Okay.

MR. BROWN:  Eileen, if you could send around I guess that would be 3C.

(Whereupon, Nandkumar Deposition Exhibit No. 6, Declaration, marked for identification.)

MR. BROWN:  This will be Exhibit 6 when you get it.  Okay.  Great.  So, folks, let me know when you have it.

THE WITNESS:  I have it.

MR. BROWN:  It's his declaration.

MR. PORTNOY:  I got it.

MR. CALANDRA:  So I am the bottle neck as they say.

MR. BROWN:  That's okay.  You're giving us -- we can have a relaxed pace.

Page 70

MR. CALANDRA:  That's right.

MR. BROWN:  We'll -- we'll store up -- we'll store up speed and conflict for a later deposition.

MR. CALANDRA:  Yes, that's right.  We're banking.

MR. BROWN:  Okay.

MR. CALANDRA:  Got it.

MR. BROWN:  Excellent.  Great.  Thanks.

BY MR. BROWN:

Q.   So, Mr. Kumar, you've been given an exhibit marked Exhibit 6.  This was a document that was filed together with the motion paper that we just looked at.

If you would turn to the first page with writing on it, the one that begins with the description Declaration of -- of you, do you see that?

A.   Yes.  Yes.

Q.   Okay.  Did you draft this document, sir?

A.   No, I did not.

Page 71

Q.    Did you review it at any point?

A.    Yes, I did.

Q.    Okay.  Did you provide comments on a draft of it?

A.    No, I did not.

Q.    Okay.  Who -- who did draft it?

A.    Who did the drafting?

Q.    Who drafted it, yes, please, if you know.

A.    I'm not sure who the counsel was.

Q.    Okay.  But the -- this was a document that was drafted for you by your counsel?

A.    That's correct.

Q.    Okay.  On the second page, I just want to confirm that that is a -- a DocuSign signature that you authorized?

A.    That's correct.

Q.    Okay.  And before you signed that document by DocuSign, did you read its contents?

A.    Yes.

Q.    Okay.  If I could ask you just to look at, back at the first page of that again where it

Page 72

says Declaration.  On the -- on the second line, there's a reference to reply memorandum in further support.  Do you have any idea why it refers to a reply memorandum?

A.    Second line?

Q.    Yes, sir, the second line of the title. It begins with the word, Plaintiffs.

A.    Reply memorandum, I'm -- I'm not sure.  I don't know what it is.

Q.    Okay.  If you would turn over to the second page of this, I'm focused on paragraph, paragraph 5.

A.    Okay.

Q.    The first sentence reads, I've acted to protect my own and the class's interest in this action by retaining counsel -- competent -- competent counsel.  And then the second sentence says, I am well aware of the extensive experience of proposed Class Counsel -- Class Counsel Labaton Sucharow and Pomerantz -- Labaton Sucharow LLP and Pomerantz LLP, excuse me, in protecting shareholder

Page 73

rights in class action litigation.  Do you see that sentence, sir?

A.   Yes.

Q.   What to your knowledge are specific cases in which the Labaton Sucharow firm has been involved aside from this one?

A.   I -- I frequently noticed this name in different securities litigations and all of those things.  Only, like I said, in the Novavax case, this showed up on the first line item, so I picked that.

Q.   Okay.  But can you name, other than the Novavax case, any of the experiences which you describe you frequently see the name of the -- of these firms?

A.   I might have noticed in AstraZeneca thing, and in many other cases, this -- these are -- it's constantly coming around in different areas, so I -- personally, I do not recall exactly which ones.

Q.   The next paragraph, paragraph 6, begins,

Page 74

I have diligently pursued the effective prosecution of this action.  The second sentence, Among other things, I authorized the filing of the motion seeking to be appointed Lead Plaintiff and reviewed the operative Complaint, motions, discovery requests and responses, as well as the Court's related orders and opinions.  I want to just ask you about the last reference there to the Court's orders and opinions.

What orders and opinions of the Court in this case do you recall having reviewed?

A.   I don't remember really -- so, sorry.  Whenever my counsel has asked me to send documents, I've sent them to him.  Besides that, I don't remember anything.

Q.   Do you recall reviewing at any time an order on a Motion to Dismiss that was filed by the Defendants in this case?

A.   Yes, I do.

Q.   Okay.  And when approximately do you recall reviewing that?

Page 75

A.    That was I think sometime last year and -- yeah, sometime last year, and then it didn't go through, so I don't know what the -- the legal -- the legal word is.

Q.    Okay.

A.    It was not agreed upon, so -- and then it's proceeding for court action, so ...

Q.    When you -- when you mean it didn't go through, are you referring to the fact that the motion was denied?

A.    Denied.

Q.    Okay.

A.    Yeah.

Q.    Do you have any understanding sitting here today of what, if any, effect the Motion to Dismiss decision by the Court had on the class period in this case?

A.    No, I don't know it.

Q.    Do you know if any change at all was made to the class period based on the Court's order on the Motion to Dismiss?

A.    I don't recall anything.

Q.    Looking at the next sentence after that, I have also par- -- participated in strategic decisions and have communicated frequently with counsel by firm -- phone and email concerning the status, court order and strategy, including with respect to the pretrial discovery and the collection of potentially relevant hard copy and electric documents -- electronic documents and communications from my files.

Focusing on the first part of that sentence, there's a reference to participating in strategic decisions.  At the time of this -- of this certification, or Declaration, excuse me, 3-16-23, what strategic decisions in the case do you recall having been involved in?

MR. CALANDRA:  And I'll -- I am inclined -- I am objecting on the basis of privilege, and I'm inclined to instruct Mr. Kumar not to answer that question.  But I will say, Mr. Kumar, if you can answer that question without

Q.   Okay.  Separate from any particular recall of, you know, what you might have read or heard on May 11th with regard to those sale transactions, is there anything on a -- you know, a particular routine that you would have on a given day of information that you would review commonly in order to make your decisions about trading for that particular day?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I know specifically I never have a routine to sell at anything.  It's always based on market information, what I got, and I make the decision that morning or night before after looking at certain things, and then next day morning I execute or -- based on those decisions. It's always a news item that's made me do that because I was holding it for longer time.

BY MR. BROWN:

Q.   So just so I'm clear, would you -- would you make a decision based on a particular news item

Page 112

or based on a -- the change in the price?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  Most -- most of the time it's a news -- news item as I recall.  It's never -- I had not set any target or anything because I didn't know it was so volatile, so there was nothing like that.  So -- because at a moment, I'm start at a certain time, and at a moment, I'm down, so both -- so both ways, so ...

BY MR. BROWN:

Q.  So you -- you described Novavax as a volatile stock.  You -- you thought of it as a volatile stock during this time period?

A.  As I was watching, yes, it was a volatile stock based on what news items were coming on, what -- I perfectly remember when Stanley came on, Erck come on, just all kinds of movement in the stock was happening, so that's what I recall.

Q.  You just made a reference to a comment by -- by Mr. Erck.  Are you -- are you recalling

some specific comment or are you just generally speaking of Mr. Erck?

A.    No, nothing specific.  I always remember they would announce, make some CEO is coming, so I would always listen to it, his interview with Meg Tirrell or Cramer or somebody.  So I would listen to it and then see what the experts recommend, and then I would --

Q.    You recall --

A.    -- based on -- based on what Stanley Erck said, I would make the decisions based on that.

Q.    So you recall seeing Mr. Erck appear on Mr. Cramer's program?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  I'm -- I'm not hundred percent sure, but I recall on CNBC very often I think I have seen him in the morning with Cramer, but I'm not -- but I don't want to for sure say.

BY MR. BROWN:

Q.    If -- if you wish, you can continue to

Page 114

flip through the rest of the document.

There -- there are a number of other trades listed on -- that are unredacted, purchases and sales in Novavax stock.

Assuming that -- do you have any reason to think that there's any kind of inaccuracy in the statement that TD Ameritrade provided you regarding the purchases and sales that you made in Novavax stock in May of 2021?

A.   No, I don't think so.  I think they're pretty accurate.

Q.   Okay.  So assuming that all of the sales and purchases that you made in Novavax' stock in this account are unredacted in this form of the document, if I wanted to know what your trading history was on that particular month, would you tell me, Just take a look at that statement, I can trust it?

A.   That's correct.

Q.   Okay.  Let me ask you to take a look then at the June statement.  That's Tab 11, and it's

there.  I never had seen the stock at that low level of 6 or -- and -- and I don't pay attention, but right now, they got some approvals in some countries, but the -- the value is very, very low.  That's what I hear.

Q.   Do you know any particular countries in which you understand that the vaccine has been approved in some way?

A.   Maybe Thailand, Indonesia, something like that, so ...

Q.   Do you know if there's been any kind of approval in the United States specifically?

A.   Yeah.  I think there was some kind of a partial approval or some special approval.  I don't know.  I don't recall exactly because I'm not following that stock any more.

Q.   When did you stop following the stock?

A.   After I sold all the shares, I didn't have any more interest anymore.

Q.   When -- when was it that you remember selling all of the shares and losing interest?

Page 159

A.   I -- I don't recall at this time, but my statement will show it, so ...

Q.   Okay.  Would it have been after October of 2021?

A.   I don't recall.  Possibly.  I'm not sure.

Q.   Do you have an understanding yourself of what you think the amount of -- or first off, do you -- do you believe that you were caused any damage by the alleged false or misleading statements that are set out in the Complaint that was filed on your behalf?

MR. CALANDRA:  Objection to form, but go ahead.

THE WITNESS:  Yes.  Yes, for sure, because so many times I -- I bought stock based on exactly what I heard and on the news item I read something, and then that's why this Complaint was correct to lodge, so ...

BY MR. BROWN:

Q.   Do you have an understanding of the approximate amount that you think you were damaged

by the alleged false or misleading statements?

Just to be clear, I'm talking about you personally

in your trading, not the class.

    A.    Yeah, I think it's -- it's more than

close to a million dollars I'm sure.

    Q.    Okay.  More than a million dollars?

    A.    Yeah, I think so.  I'm -- I'll

have -- I'll have to check.  I can get the number

from Ameritrade and look at it, so ...

    Q.    More than $2 million?

    A.    No.  It should be less than 2.

    Q.    What about your son, do you have an idea

of what amount you believe he was damaged by

trading Novavax stock due to the alleged false or

misleading statements set out in the Complaint?

    A.    Maybe in the hundred to $200,000 range.

I don't recall exactly at this time.

    Q.    Less than your -- than your damage?

    A.    Oh, yes.  Yes.

    Q.    Okay.  Do you have an idea of what the

approximate market capitalization of Novavax is

Page 168

State of Maryland

County of Baltimore, to wit:

I, Michele D. Lambie, a Notary Public of the State of Maryland, County of Baltimore, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 14th day of August 2023.

*Michele D Lambie*