## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

| | |
|---|---|
| SOTHINATHAN SINNATHURAI,<br>Individually and on Behalf of All Others Similarly Situated,<br><br>                                             Plaintiff,<br><br>v.<br><br>NOVAVAX, INC, STANLEY C. ERCK,<br>GREGORY F. COVINO, JOHN J. TRIZZINO, and<br>GREGORY M. GLENN,<br><br>                                             Defendants. | Civil Action No. TDC-21-2910 |

**JOINT DECLARATION OF BRIAN CALANDRA AND MICHAEL H. ROGERS IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (II) CO-LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................................2

II.   SUMMARY OF LEAD PLAINTIFFS' CLAIMS...................................................6

III.  PROSECUTION OF THE ACTION ............................................................................9

    A.   Commencement of the Action and Appointment of Lead Plaintiffs and Co-Counsel ...............................................................................................................9

    B.   Defendants' Motion to Dismiss and Lead Plaintiffs' Response ...........................10

    C.   Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Counsel ...............................................................................12

    D.   Lead Plaintiffs' Continued Investigation and Commencement of Formal Discovery ............................................................................................................13

    E.   Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement .........................................................................................................15

IV.   THE RISKS OF CONTINUED LITIGATION ...........................................................16

    A.   Risks in Proving Liability ....................................................................................17

    B.   Risks in Proving Loss Causation and Damages....................................................18

    C.   Other Risks............................................................................................................19

    D.   The Settlement Is Reasonable in Light of Potential Recovery in the Action ........22

V.    LEAD PLAINTIFFS' COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER................................................................................................................23

VI.   ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ..........................26

VII.  APPLICATION FOR ATTORNEYS' FEES AND EXPENSES .....................................29

    A.   Consideration of Relevant Factors Justifies the Requested Fee ...........................29

    1.   Lead Plaintiffs Support the Fee and Expense Application ...................................30

    2.   The Amount Involved and the Results Obtained..................................................30

    3.   The Complexity and Duration of the Litigation...................................................30

    4.   The Time and Labor of Plaintiffs' Counsel .........................................................31

    5.   The Reputation and Expertise of Plaintiffs' Counsel...........................................33

    6.   Standing and Caliber of Opposing Counsel.........................................................34

    7.   The Contingency Risk Faced by Plaintiffs' Counsel............................................34

    B.   Request for Litigation Expenses ..........................................................................37

    C.   Reimbursement to Lead Plaintiffs Pursuant to PSLRA ........................................39

   D.  The Reaction of the Settlement Class to the Fee and Expense Application ..........40

VIII. MISCELLANEOUS EXHIBITS .................................................................................41

IX. CONCLUSION.........................................................................................................41

We, Brian Calandra and Michael H. Rogers, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I, Brian Calandra, am a partner at Pomerantz LLP ("Pomerantz") and I, Michael H. Rogers, am a partner at Labaton Keller Sucharow LLP ("Labaton"), which together are Court-appointed Co-Lead Counsel for Lead Plaintiffs Jeffrey A. Gabbert, Nuggehalli Balmukund Nandkumar, and David Truong ("Lead Plaintiffs") in the above-captioned action (the "Action").[1] We each have personal knowledge of the matters set forth herein based on our participation in the prosecution and settlement of the claims asserted on behalf of the Settlement Class in this Action.

2.      We respectfully submit this Declaration in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $47,000,000 settlement (the "Settlement"), which the Court preliminarily approved by Order dated January 23, 2024 (the "Preliminary Approval Order") (ECF No. 129), and final approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (collectively, the "Final Approval Motion").

3.      We also respectfully submit this Declaration in support of Co-Lead Counsel's motion, on behalf of Plaintiffs' Counsel,[2] for an award of attorneys' fees in the amount of 33.4% of the Settlement Fund, which equates to $15,698,000, plus interest earned at the same rate as the

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated January 12, 2024 (the "Stipulation"), previously filed with the Court. ECF No. 127-3.

All exhibits referenced herein are attached to this declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex._ -__." The first numerical reference is to the designation of the entire exhibit attached to this declaration and the second reference is to the exhibit designation within the exhibit itself.

[2] "Plaintiffs' Counsel" means Labaton Keller Sucharow LLP, Pomerantz LLP, Cohen Milstein Sellers & Toll LLP, Portnoy Law Firm, Hagens Berman Sobol Shapiro LLP, and Johnson Fistel, LLP.

1

Settlement Fund; payment of Plaintiffs' Counsel's expenses in the amount of $628,893.83; and awards to Lead Plaintiffs Gabbert and Nandkumar (in the amount of $30,000 each), in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses, including lost wages, incurred in connection with their representation of the Settlement Class during the course of this hard-fought litigation (the "Fee and Expense Application").

4.      As part of the Preliminary Approval Order, the Court directed that notice of the Settlement be disseminated to the Settlement Class. *See* Prelim. App. Order ¶7. Pursuant to the Preliminary Approval Order, Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Co-Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and/or publication. *Id.* ¶8.

5.      In total, to date, more than 230,000 copies of the Postcard Notice have been disseminated to potential Settlement Class Members. To date, one request for exclusion has been received and no objections have been filed with the Court or received by Co-Lead Counsel. *See* Declaration of Margery Craig Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Requests for Exclusion Received to Date, dated April 10, 2024 ("Initial Mailing Decl."), attached hereto as Exhibit 1. The deadline for requests for exclusion and objections is May 2, 2024. *See* Prelim. App. Order ¶¶15, 18.

6.      Both the Final Approval Motion and the Fee and Expense Application have the full support of the Lead Plaintiffs.

## I.      INTRODUCTION

7.      This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act. Lead Plaintiffs assert claims against defendant Novavax,

Inc. ("Novavax" or the "Company"), and defendants Stanley Erck ("Erck"), Gregory Covino ("Covino"), John Trizzino ("Trizzino"), and Gregory Genn ("Glenn") (collectively, the "Individual Defendants," and, together with Novavax, the "Defendants").

8.    The operative Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, filed on March 11, 2022 (the "Complaint," ECF No. 56), alleges that Defendants violated Sections 10(b) and 20(a) by making certain statements that Lead Plaintiffs alleged were materially false and misleading about Novavax's failed attempt to bring a critical COVID-19 vaccine candidate, NVX-CoV2327, to market. This included, *inter alia*, statements allegedly concealing manufacturing problems related to purity, potency, contamination, scalability, and supply chain for the vaccine. The Complaint further alleged that the prices of Novavax's common stock were artificially inflated during the Class Period because of Defendants' alleged misstatements, and that when the true facts were revealed, the alleged artificial inflation was removed from the price of Novavax common stock, causing the price to drop and to damage members of the class. Defendants deny any and all allegations of wrongdoing and deny that they have committed any act or omission giving rise to any liability or violation of law.

9.    The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $47 million (the "Settlement Amount")—more than triple the median recovery in federal securities class action settlements in 2023—for the benefit of the Settlement Class. As detailed herein, Lead Plaintiffs and Co-Lead Counsel believe that the proposed Settlement represents an excellent result for the Settlement Class, particularly considering the ongoing risks associated with the pending motion for class certification, Defendants' forthcoming summary judgment motions, and continued litigation in general, which could extend the litigation for years and might result in a smaller recovery for the Settlement Class or no recovery at all. Furthermore, applicable insurance policies could be depleted by the costs of

3

litigating this Action through trial (as well as related derivative actions), potentially leaving next to nothing for Lead Plaintiffs and Settlement Class Members, particularly given the uncertainty of Novavax's financial prospects, as reflected by the Company's issuance of a "Going Concern Letter" on February 28, 2023, discussed below.

10.    The Parties reached the Settlement after more than two years of contested litigation. Co-Lead Counsel's efforts involved, among other things: (i) conducting a comprehensive investigation into the allegedly wrongful acts, which included, among other things, a review and analysis of Novavax filings with the U.S. Securities and Exchange Commission ("SEC"), a review of documents from several government agencies in response to Co-Lead Counsel's requests pursuant to the Freedom of Information Act ("FOIA"), and interviews with former Novavax employees and other potential witnesses with relevant information (eight of whom were cited in the Complaint as confidential witnesses); (ii) briefing Defendants' motion to dismiss; (iii) extensive discovery efforts that included analyzing the production of approximately 57,680 documents (312,063 pages) from Defendants and third parties, and taking or defending five depositions; (iv) fully briefing a motion for class certification; (v) participating in numerous meet-and-confers with Defendants; (vi) briefing and arguing an omnibus motion to compel discovery from Defendants; and (vii) two rigorous, mediated settlement discussions.

11.    On June 27, 2023, the Parties participated in a full-day mediation session with Gregory P. Lindstrom of Phillips ADR (the "Mediator"), a preeminent mediator of complex federal securities class actions. In preparation for the mediation, the Parties provided detailed mediation statements and exhibits to the Mediator, which addressed issues of both liability and damages in connection with Lead Plaintiffs' claims. The Parties were not able to reach an agreement at this mediation and therefore continued litigation.

12.     On November 30, 2023, the Parties participated in a second full-day mediation session before the Mediator, where counsel for the Parties continued to negotiate on behalf of their clients' best interests. At this session, a settlement was reached in connection with a "mediator's recommendation" to settle Lead Plaintiffs' claims for $47 million.

13.     Based on the foregoing efforts, Lead Plaintiffs and Co-Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a very favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

14.     In addition, Lead Plaintiffs seek approval of the proposed Plan of Allocation. Co-Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' damages expert. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis, as described further below, based on their Recognized Loss amounts.

15.     Finally, Co-Lead Counsel, on behalf of Plaintiffs' Counsel, seek approval of their request for attorneys' fees and payment of Litigation Expenses, as set forth herein and in the accompanying Co-Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses ("Fee Brief"). As discussed in detail in the Fee Brief, the requested 33.4% fee is reasonable under the circumstances of this case and within the range of percentage awards granted by courts in the Fourth Circuit in comparable complex litigation.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted

in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested Litigation Expenses of $628,893.83, and the requested awards to Lead Plaintiffs Gabbert and Nandkumar pursuant to the PSLRA, are also fair and reasonable under the circumstances of this case.[3] Accordingly, for the reasons set forth in the Fee Brief and for the additional reasons set forth herein, Co-Lead Counsel respectfully submit that the request for attorneys' fees and payment of Litigation Expenses be approved.

## II.    SUMMARY OF LEAD PLAINTIFFS' CLAIMS

16.    Lead Plaintiffs' claims are set forth in the Complaint, which alleges that Defendants made misrepresentations to investors between May 11, 2021 and October 19, 2021, both dates inclusive (the "Class Period").

17.    Specifically, Lead Plaintiffs allege that the COVID-19 pandemic in 2020 presented an extraordinary opportunity for Novavax and the Individual Defendants. ¶¶51-52.[4] On July 7, 2020, Novavax joined "Operation Warp Speed," the U.S. government's program to facilitate COVID-19 vaccines. ¶¶56–58. Under the program, Novavax had to develop rapidly a large-scale manufacturing operation that could transition into production and stockpiling of its vaccine candidate, NVX-CoV2373, once the drug was approved. ¶58. To that end, the Company contracted with FUJIFILM to manufacture bulk drug substance at facilities in Texas ("FDBT" or "TX Facility") and North Carolina ("FDBU" or "NC Facility"). ¶59. While Novavax had other U.S. facilities, these facilities were the *only* U.S. facilities producing the antigen component of NVX-CoV2373, and thus were critical to Novavax. ¶¶59–60.

---

[3] Lead Plaintiff Trung is not seeking a PSLRA award.

[4] References to "¶_" or "¶¶_" are to paragraphs of the Complaint.

18.     As alleged in the Complaint, however, the TX and NC Facilities were plagued by manufacturing problems that caused lengthy delays throughout the Class Period. ¶75. As a result, Novavax's emergency use application ("EUA"), which it needed the U.S. Food and Drug Administration ("FDA") to grant to start distributing the vaccine to Americans, was significantly delayed by the Company's inability to achieve required purity and potency levels for NVX-CoV2373. ¶¶46, 84–85. In addition, potency and stability issues caused Novavax to struggle to produce enough vaccine doses for several clinical trials in 2021. ¶¶46, 82, 86, 97. Further, supply chain constraints delayed development of NVX-CoV2373 and its associated EUA filing. ¶¶45, 83, 94-95.

19.     The FDA allegedly was also concerned about Novavax's ability to manufacture its vaccine candidate. For example, on April 14, 2021, the FDA issued a formal 52-page investigation memo detailing problems at the TX Facility ("TX FDA Report"), including the failure to properly investigate or record contaminations; investigate, detect, and document deviations; or follow proper cleaning procedures. ¶¶99–100. The FDA allegedly concluded that the TX Facility's "[q]uality oversight over manufacturing and testing operations is sub-optimal" (¶101) and reiterated these findings in an April 28, 2021 memorandum (¶102 n.14). The FDA also allegedly investigated the NC Facility from April 14, 2021 to April 21, 2021, and issued Novavax a Form 483 ("NC Form 483") identifying many quality-related problems at that facility, including inadequate microbial control, a failure to conduct a comprehensive risk assessment evaluating product cross-contamination, inadequate manufacturing process monitoring to ensure quality, inadequate written manufacturing procedures—particularly for "Purification"—and a failure to fully investigate discrepancies. ¶103.

20.    The Complaint further alleges that Defendants received communications documenting the problems with Novavax's development of NVX-CoV2373. For example, Novavax was required to comply with current Good Manufacturing Practices ("cGMP") throughout the development and manufacturing process. ¶¶63–67, 107. Accordingly, Novavax established procedures notifying Defendants of complaints, recalls, FDA inspections, observations, or regulatory actions. ¶¶71–73, 107. In addition, FUJIFILM was contractually obligated to notify Novavax of deviations and out-of-specification results within two business days. ¶108. To that end, the Company had quality control employees and consultants on site in Texas. ¶¶68–70, 109.

21.    Issues at the NC Facility also allegedly were communicated to Novavax. For example, all testing results at the NC Facility were communicated to Novavax via a "batch record," and Novavax had to approve any changes to vaccine manufacturing materials. ¶112.

22.    Although Defendants, as described above, allegedly were aware of problems in Novavax's facilities throughout the Class Period, they assured investors that "nearly all of the major challenges have been overcome and we can clearly see the light at the end of the tunnel." ¶178. Similarly, when an analyst inquired about delays in filings for an EUA, rather than disclose the truth, Defendants responded that while "it probably took a little longer than we expected to get a potency assay that was worked across      I'm happy to say we did. We've crossed that bridge. We're—we made a big breakthrough there and we're now racing towards validating everything and putting it into a package." ¶179. Defendants further touted that "all of our manufacturing sites [are] producing GMP material at scale," and "I think we've eliminated all of the serious hurdles to getting—risk hurdles to getting to where we need to be to get an improved vaccine." ¶¶180–81. The Complaint alleged that these statements were untrue, however, given that, among other things,

8

the TX Facility was closed, and the FDA had identified numerous serious deficiencies at the TX and NC Facilities. ¶¶96–106; 137–40.

23.     On August 5, 2021, Defendants reported that the EUA filing would be delayed until at least the fourth quarter of 2021, and disclosed that "the U.S. government will not fund additional U.S. manufacturing until" the Company aligned its "analytic methods" with the FDA. ¶144. Upon this news, Novavax's share price decreased 19.61%. ¶145.

24.     Then, on October 19, 2021, investors learned about further manufacturing problems with NVX-CoV2373 when *Politico* reported that Novavax "faces significant hurdles in proving it can manufacture a shot that meets regulators' quality standards" for the vaccine candidate and that the Company's "issues are more concerning than previously understood" and could take until the end of 2022 to resolve (the "*Politico* article"). ¶157.

25.     In addition to revealing that Novavax's purity levels for NVX-CoV2373 were around 70%, well below the FDA's requirement of 90%, the *Politico* article reported that Novavax had "consistently run into production problems," including "[t]he methods it used to test the purity of the vaccine." ¶¶158–59. On this news, the price of Novavax's stock fell 14.76%. ¶162.

## III.    PROSECUTION OF THE ACTION

### A.     Commencement of the Action and Appointment of Lead Plaintiffs and Co-Counsel

26.     In November 2021, a class action complaint (*Sothinathan Sinnathurai v. Novavax, Inc., et al.*, 8:21-cv-02910-TDC (ECF No. 1)) was filed in this Court against Novavax, Erck, Covino, and Trizzino, alleging violations of the federal securities laws.

27.     On January 26, 2022, the Court appointed Truong, Nandkumar, and Gabbert as Lead Plaintiffs for the consolidated action. ECF 47. The Court also approved their selection of

9

Pomerantz LLP and Labaton Sucharow LLP (now known as Labaton Keller Sucharow LLP) as Co-Lead Counsel. *Id.*

28.    On March 11, 2022, Lead Plaintiffs filed the Complaint, asserting claims against Defendants under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. ECF No. 56.

**B.    Defendants' Motion to Dismiss and Lead Plaintiffs' Response**

29.    On April 25, 2022, Defendants filed their Motion to Dismiss the Complaint ("Motion to Dismiss"). ECF No. 64. On June 9, 2022, Lead Plaintiffs filed their opposition to Defendants' Motion to Dismiss (ECF No. 65) and on July 11, 2022, Defendants filed their reply (ECF No. 69).

30.    Defendants' motion sought dismissal for failure to plead falsity and scienter. With respect to falsity, Defendants argued that none of the statements were materially false and misleading, specifically arguing, *inter alia*, that: (i) the Complaint only identified problems at two Novavax facilities even though some misstatements related to all of the facilities; (ii) some of the statements were literally true; (iii) Defendants had no duty to give investors a pessimistic view of their ability to manufacturer the vaccine solely due to discrete issues they reasonably believed were resolved; (iv) the Complaint's allegations did not allege with specificity why Defendants' statements were false and misleading and that Plaintiffs "assume[d] that Defendants' statements must have been false simply because manufacturing issues later recurred"; and (v) the Complaint alleged a nonactionable theory of "fraud by hindsight."

31.    Defendants also argued that the challenged statements were largely nonactionable as a matter of law, claiming that they were either statements of (i) corporate optimism or "puffery" that reflected executives' subjective opinions, or (ii) forward-looking business plans and objectives, and so fall into the PSLRA's safe harbor.

10

32.   With respect to scienter, Defendants argued, *inter alia*, that (i) the confidential witnesses cited in the Complaint cannot be credited because they did not interact directly with the Individual Defendants; (ii) the Complaint's allegations must fail because the "core operations" doctrine alone cannot give rise to a strong inference of their scienter; and (iii) their insider stock sales were not suspicious. In support of the latter point regarding insider sales, Defendants specifically argued that the trades were not suspicious because: (i) they were made pursuant to 10b5-1 trading plans; (ii) they occurred months after the alleged misstatements; (iii) the Defendants also acquired Novavax shares during the Class Period; (iv) the trades resembled prior trading patterns; and (v) Defendant Covino sold no stock during the Class Period.

33.   Additionally, Defendants attacked Plaintiffs' "scheme liability" theory, arguing that it was deficient in that it merely recast Plaintiffs' misstatements and omissions theory.

34.   On December 12, 2022, the Court entered its Memorandum Opinion denying in part and granting in part Defendants' Motion to Dismiss (the "MTD Opinion"). ECF No. 75. While the Court denied Defendants' motion in part, the Court granted the motion as to certain theories of liability, including theories pertaining to Novavax's clinical trials and FDA approval. For example, with respect to certain challenged statements regarding the clinical trials, the Court stated, "All of Plaintiffs' allegations of non-compliance with FDA standards relate to manufacturing processes," MTD Opinion, 2022 WL 17585715, at *12, and "Plaintiffs have not alleged that the clinical trial results did not show that the vaccine was safe and efficacious." *Id.*, at *16. Defendants would therefore likely continue to argue, as they did during discovery negotiations, that Novavax's clinical trials are irrelevant to the Parties' surviving claims and defenses.

35.     On December 27, 2022, Defendants filed their Answer to the Complaint (ECF No. 77) and discovery commenced.

**C.      Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Counsel**

36.     On March 16, 2023, Lead Plaintiffs filed their motion for class certification and the appointment of class representatives and class counsel. ECF No. 85.

37.     On September 22, 2023, Defendants filed their opposition to Lead Plaintiffs' motion for class certification and appointment of class representatives and class counsel. ECF 106. On October 11, 2023, Defendants filed a corrected version of their opposition. ECF No. 111-1.

38.     In their opposition, Defendants strenuously argued, among other things, that there was a fundamental "mismatch" between the contents of the alleged misrepresentations and the corrective disclosures, as contemplated by the Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021). If the Court were to agree with Defendants, then the Court could find that Defendants established that their alleged misstatements did not have any impact on Novavax's stock price, effectively ending the case because it could no longer proceed as a class action.

39.     Defendants similarly argued that none of the corrective disclosures alleged by Lead Plaintiffs could have been corrective of earlier statements. For example, Defendants claimed that the anonymously sourced *Politico* article that Lead Plaintiffs allege as their key, final corrective disclosure was laden with incorrect, outdated, and misleading information about Novavax's manufacturing efforts—as, according to Defendants, the market quickly recognized and Novavax itself promptly explained.

40.     Defendants further asserted that Lead Plaintiffs' expert's market efficiency analysis did not properly take into account the unique features of Novavax and its trading environment,

specifically that Novavax was a monoline COVID vaccine company trading in a highly volatile market in the middle of the COVID pandemic.  According to Defendants, after properly controlling for Novavax's stock price volatility, none of the allegedly corrective disclosures were statistically significant but rather were the result of random price movement. Defendants also argued Lead Plaintiffs' expert's analysis was deficient in many other respects, including by attacking his market efficiency analysis under the "*Cammer*" factors enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989).

41.    Additionally, Defendants argued that each of the three proposed class representatives failed to satisfy Rule 23(a)'s requirements.

42.    Had the Court accepted any of Defendants' arguments, there was a significant chance that the motion for class certification would have been denied (effectively ending the case and resulting in zero recovery), or the Class Period could have been shortened, resulting in a lower total damages figure.

43.    On November 13, 2023, Lead Plaintiffs filed their reply to the opposition (ECF No. 122), but the motion was not argued in light of the proposed Settlement.

**D.    Lead Plaintiffs' Continued Investigation and Commencement of Formal Discovery**

44.    Prior to the start of formal discovery, Lead Plaintiffs, through Co-Lead Counsel, conducted a thorough investigation relating to the claims, defenses, and underlying events and transactions that are the subject of the Action. This process included reviewing and analyzing: (i) documents filed publicly by Novavax with the SEC; (ii) research reports issued by financial analysts concerning the Company; (iii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and the Defendants; and (iv) the applicable law governing the claims and potential defenses.

13

45.     Also prior to the start of formal discovery, Lead Plaintiffs submitted requests to the FDA and the SEC pursuant to FOIA, and to the U.S. Government Accountability Office ("GAO") pursuant to the Code of Federal Regulations, Public Availability of Government Accountability Office Records, 4 C.F.R. §81. In response, Lead Plaintiffs received approximately 27 documents from the FDA, approximately 37 documents from the SEC, and approximately 4 documents from the GAO.

46.     Also prior to the start of formal discovery, Lead Plaintiffs conducted numerous interviews of former Novavax employees and other potential witnesses with relevant information. Eight of these witnesses were cited in the Complaint as confidential witnesses. Lead Plaintiffs also consulted with a market efficiency and price impact expert, Chad Coffman of Global Economics Group LLC (n/k/a Peregrine Economics), in order to analyze economic loss and loss causation issues.

47.     In connection with Lead Plaintiffs' March 16, 2023 class certification motion, Defendants propounded document requests on Lead Plaintiffs and each Lead Plaintiff produced documents, which collectively totaled approximately 2,330 pages. Defendants also took, and Co-Lead Counsel defended, depositions of Lead Plaintiffs Truong, Nuggehalli Nandkumar, and Gabbert, as well as Mr. Coffman, Lead Plaintiffs' expert. In addition, Lead Plaintiffs deposed Defendants' expert on market efficiency and price impact, Professor S.P. Kothari of MIT's Sloan School of Management ("Kothari").

48.     On July 18, 2023, Lead Plaintiffs served on Defendants (but did not file, per the Court's local rules) an omnibus motion to compel the production of documents. This motion touched upon many aspects of the discovery process, including the relevant time period, subject matters, document custodians, and search terms. On August 4, 2023, Defendants opposed the

14

motion. On August 18, 2023, Lead Plaintiffs served their reply brief in support of the motion to compel. On August 23, 2023, Lead Plaintiffs filed the motion to compel briefing with the Court. ECF No. 97.

49.    On November 3, 2023, Magistrate Judge Quereshi held a hearing on Lead Plaintiffs' motion to compel. ECF No. 120. Having reviewed the parties' papers and hearing argument, the Magistrate granted in part and denied in part Lead Plaintiffs' motion, requiring, *inter alia*, Defendants to: (i) produce documents concerning purity, potency, or sufficiency of doses for the clinical trials, although they did not have to produce documents concerning other aspects of the clinical trials; (ii) collect the emails of eight additional custodians; and (iii) meet and confer with Lead Plaintiffs about the relevant time period for certain requests in light of Judge Quereshi's rulings. *See id.*

50.    In connection with formal discovery, to date Defendants have produced, and Lead Plaintiffs have analyzed, approximately 57,680 documents (about 312,063 pages). Further, Defendants served, and Lead Plaintiffs responded to, multiple interrogatories and document requests to Lead Plaintiffs.

**E.    Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement**

51.    The Parties began exploring the possibility of a negotiated resolution of the Action in June 2023. The Parties agreed to engage in mediation and, thereafter, retained the Mediator.

52.    On June 27, 2023, Co-Lead Counsel and Defendants' Counsel, among others, participated in a full-day, in-person mediation session before the Mediator. In advance of that session, the Parties submitted detailed mediation statements to the Mediator, together with numerous supporting exhibits, which addressed both liability and damages issues. The session

ended without an agreement being reached. The Parties continued discussions with the Mediator following the mediation to further explore the possibility of a settlement.

53.     The Parties participated in a second in-person mediation session before the Mediator on November 30, 2023. In advance of this session, Co-Lead Counsel submitted a supplemental mediation statement for the Mediator's eyes only, and further exhibits. During the course of mediation, the Mediator presented the Parties with a "mediator's recommendation" to settle for $47 million. At the conclusion of the session, the Parties reached an agreement in principle to settle the Action, which was memorialized in a confidential term sheet executed and finalized on November 30, 2023 (the "Term Sheet").

54.     Thereafter, the Parties ultimately executed the Stipulation, dated January 12, 2024. ECF No. 127-3. On January 12, 2024, Lead Plaintiffs submitted their Unopposed Motion for Preliminary Approval of Settlement and Approval of Notice to the Settlement Class. ECF No. 127.

55.     On January 23, 2024, the Court issued the Preliminary Approval Order. ECF No. 129.

## IV.     THE RISKS OF CONTINUED LITIGATION

56.     The Settlement provides a certain and substantial benefit to the Settlement Class in the form of a non-reversionary cash payment of $47 million. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed to a jury trial, followed by inevitable appeals. In the lead-up to trial, the Parties would face an expensive discovery process, a class certification decision (and potential appeals), and summary judgment motion practice. There was no guarantee that Lead Plaintiffs and the Settlement Class would surmount these hurdles and, even if they did, later achieve any recovery, let alone one greater than $47 million. In addition,

Novavax's ability to pay a judgment was in question given that the Company issued a letter of going concern in February 2023 and analysts began questioning Novavax's viability.

## A.    Risks in Proving Liability

57.    As an initial matter, Lead Plaintiffs faced challenges in proving to the ultimate fact finder that the statements made by Defendants were materially false and misleading. For example, Defendants would likely assert that statements concerning "major challenges" (¶178); a "big breakthrough" (¶179); and "serious hurdles" (¶181) were non-actionable puffery because they were too general and loosely optimistic for investors to rely on them. Defendants would further assert that other statements were opinions or forward-looking statements that were not actionable as a matter of law. ¶¶179-81. Finally, Defendants are likely to argue that certain manufacturing problems did not require disclosure because the securities laws do not require the Company to take a "gloomy" or "defeatist" view of its prospects. Given the nature of Defendants' statements and the arguably temporary nature of the Company's manufacturing problems, Lead Plaintiffs faced a real risk that a jury would disagree that the allegedly false and misleading statements were fraudulent.

58.    Further, to succeed on their claims, Lead Plaintiffs needed to prove that Defendants made misleading statements intentionally or recklessly (*i.e.*, with scienter). Defendants, however, would counter that (i) none of the Individual Defendants knew, at the time they spoke, information that contradicted their public statements, (ii) the allegedly misleading statements were supported by information available to Novavax at the time of the statements, and (iii) the statements aligned with Novavax's internal assessment of the alleged manufacturing issues. Further, Defendants would likely emphasize that Novavax was attempting to develop a novel vaccine in a challenging, quickly evolving environment and on an accelerated timeline. Additionally, Defendants would

17

likely continue to assert that none of the Individual Defendants' insider sales support scienter because they purportedly were pursuant to nondiscretionary trading plans.

### B.      Risks in Proving Loss Causation and Damages

59.      Lead Plaintiffs' damages expert has estimated that class-wide maximum reasonably recoverable damages are approximately $917 million, after removing gains on pre-Class Period purchases. This estimated amount assumes Lead Plaintiffs' complete success in establishing Defendants' liability, and further that the trier of fact would reject all of Defendants' loss causation and damages arguments. In that regard, Lead Plaintiffs would face considerable challenges in establishing loss causation and damages. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").

60.      For instance, Defendants would likely assert that Lead Plaintiffs cannot prove loss causation or damages because they cannot identify a correction of an alleged misstatement that caused Novavax's stock price to decline. In particular, Defendants would argue that the disclosures by Novavax were materializations of risks fully known to investors (and disclosed by Defendants) prior to their purchases during the Class Period. Indeed, as they argued in opposing class certification, Defendants would continue to assert that there was a "mismatch" between the contents of the alleged misrepresentations and the corrective disclosures, as contemplated by the Supreme Court's decision in *Goldman*. *See* 141 S. Ct. 1951. Additionally, Defendants would likely argue that the October 19, 2021 corrective disclosure revealed little new information, and that the new information that was revealed was laden with incorrect and misleading information about Novavax's manufacturing efforts. If these arguments were credited by the Court at summary judgment, or the jury at trial, the class's damages would be eliminated.

18

61. There was also a significant risk that Lead Plaintiffs would not have been able to recover any damages for the stock drop that occurred on October 19, 2021. Defendants could have argued either that: (i) the information revealed on this day was not corrective of any allegedly false and misleading statements; or (ii) the stock drop was not statistically significant because of the inherent volatility in the prices of Novavax stock. If Defendants were to prevail on either of these arguments, damages could have been reduced to approximately $113 million.

62. Overall, Defendants were likely to assert that Novavax's stock prices showed frequent and dramatic upswings and downswings not connected to the release of any Company or industry-specific news, and thus the trading and price behavior of Novavax's stock reflected investor speculation on the likelihood of developing a market-leading vaccine, and thus was significantly based on macro, political and regulatory trends, as well as market sentiment, and not Novavax operating fundamentals or other company-specific news.

63. In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment, trial, or on appeal, they could have dramatically limited—if not eliminated—any potential recovery by the class.

**C.    Other Risks**

64. The fact that Lead Plaintiffs overcame Defendants' Motion to Dismiss was not a guarantee of ultimate success. Lead Plaintiffs would have to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this Action. As discussed above, Lead Plaintiffs faced ongoing risks associated with their pending motion for class certification, which could have been denied, leading to a lengthy appellate process. Indeed, even if the motion were granted, Defendants could have petitioned to appeal pursuant to Rule 23(f).

65. Setting class certification aside, Lead Plaintiffs need to overcome (in full or in large part) Defendants' inevitable summary judgment motions and *in limine* motions, and, of course,

19

prevail at trial. As an initial matter, there was no assurance that Lead Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial. Negative rulings in this regard could have seriously affected Lead Plaintiffs' ability to successfully try the case. Establishing damages at trial would have been an intense expert-driven endeavor. Expert testimony can often rest on many assumptions, any of which risks being rejected by a jury. A jury's reaction to such expert testimony is highly unpredictable, and Lead Plaintiffs recognize that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and find there were no damages, or that damages are only a fraction of the amount claimed by Lead Plaintiffs. Thus, the amount of damages that the class actually could recover at trial, even if successful on all liability issues, was uncertain.

66.     In addition to the challenges involved in securing a favorable jury verdict, post-trial motions or appeals could have reversed a favorable judgment or reduced the class's recovery. *See, e.g., Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 235 (4th Cir. 2004) (affirming judgment on jury verdict finding liability but awarding zero damages to plaintiffs); *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 243, 247 (4th Cir. 1988) (after two trials, reversing jury verdict on material misrepresentation grounds); *Stuckey v. Geupel*, 854 F.2d 1317, 1317 (4th Cir. 1988) (upholding judgment notwithstanding the verdict and setting aside $2.1 million award to plaintiffs on loss causation grounds); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1446, 1449 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant).

67.     Moreover, there was a risk that Lead Plaintiffs and the class would not have been able to fully enforce a favorable final judgment. Defendants' applicable insurance policies could have been depleted by the costs of litigating this Action through summary judgment and trial (as

20

well as related derivative actions), potentially leaving next to nothing for Lead Plaintiffs and class members.

68.     Moreover, post-class period events suggest that Novavax was at risk of lacking funds to fulfill a damage award to Lead Plaintiffs. On February 28, 2023, the Company disclosed in its Form 10-K that "[g]iven our current cash position and cash flow forecast, and significant uncertainties related to 2023 revenue, funding from the U.S. government, and our pending arbitration with Gavi, substantial doubt exists regarding our ability to continue as a going concern through one year from the date that the financial statements included in this Annual Report were issued." Specifically, the Company explained, in part:

> Our 2023 revenue depends on our ability to successfully develop, manufacture, distribute, or market an updated monovalent or bivalent formulation of a vaccine candidate for COVID-19 for the fall 2023 COVID vaccine season, which is inherently uncertain and subject to a number of risks, including regulatory approvals. We experienced delays in early 2023 in manufacturing our BA.5 clinical trial materials, which has the potential to delay regulatory approval from the FDA for our vaccine candidate for the fall 2023 COVID vaccine season.

69.     Indeed, Novavax disclosed within that same Form 10-K that they did not have enough funds, without receiving additional funding, to continue operating. For example, the Company explained:

> We do not currently generate sufficient revenue from product sales, licensing fees, royalties, milestones, contract research or other sources to fully fund our operations. We, therefore, will use our cash resources, and expect to require additional funds, to maintain our operations, continue our research and development programs, advance preclinical studies and clinical trials, seek regulatory approvals and manufacture and market NVX-CoV2373 and any other product candidates that are approved for commercialization.

70.     Thus, the Company disclosed that "[w]e will continue to require significant funding to maintain our current level of operations and fund the further development of our vaccine candidates."

71.     Novavax's financial challenges posed a serious threat to Lead Plaintiffs' ability to recover damages on behalf of the class had the Parties continued litigating.  In fact, the Company's financial position has continued to deteriorate. The Company warned in its Form 10-K filed on February 28, 2024 of "significant uncertainties related to 2024 revenue" and that "substantial doubt exists regarding our ability to continue as a going concern." The Company further disclosed that, "[a]t December 31, 2023, we had $0.6 billion in cash and cash equivalents and restricted cash."

72.     Furthermore, as part of the Company's cost reduction plan, the Company announced in January 2024 "an additional 12% reduction of our global workforce, comprised of an additional 9% reduction in the Company's full-time employees and the remainder comprised of contractors and consultants." Defendants explained during their February 28, 2024 earnings call that, with this 12% reduction, "we have reduced our workforce by over 30% compared to the first quarter of 2023."

73.     Given these significant litigation risks, and risks regarding Defendants' ability to pay a judgment, Lead Plaintiffs and Co-Lead Counsel believe the Settlement represents an excellent result for the Settlement Class that also eliminates the substantial delay and expense of continued litigation.

**D.     The Settlement Is Reasonable in Light of Potential Recovery in the Action**

74.     In addition to the risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. Lead Plaintiffs' consulting damages expert has estimated that class-wide maximum reasonably recoverable damages are approximately $917 million, after removing gains on pre-Class Period purchases. This estimated amount assumes Lead Plaintiffs' complete success in establishing Defendants' liability, and further that the trier of fact would reject all of Defendants' loss causation and damages arguments and find that both allegedly corrective disclosures damaged the class.

22

75.     The $47 million Settlement represents 5.12% of these estimated maximum damages. However, as discussed above, if a jury were to find that recoverable damages were only $113 million, then the $47 million Settlement represents 41.59% of these damages.

76.     As such, the Settlement falls well within the range of recovery that courts regularly approve. According to Cornerstone Research, which conducts annual and semi-annual reviews of securities class action settlements, for cases with total estimated damages (based on Cornerstone's method of analysis) ranging from $500 million to $999 million, median settlements from 2014 to 2022 recovered 3.3% of total estimated damages and 4.6% of damages in 2023. *See* Ex. 2, Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis* (Cornerstone Research 2024), at 6. These percentages of recovery dropped to 2.6% and 2.0%, respectively, for cases with damages estimated at more than $1 billion. *Id.*; *see also* Lead Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Final Approval Brief"), at 17.

77.     Additionally, the $47 million recovery is more than three times the median recovery of $15 million in securities class action settlements in 2023. *See* Ex. 2 at 1. For the period from 2018 through 2022, the median settlement value was $11.7 million, and in 2022 it was $13.5 million. *Id*.

78.     Of course, if Defendants prevailed on any or all of their arguments concerning liability, Lead Plaintiffs would have recovered far less, if anything.

## V.     LEAD PLAINTIFFS' COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER

79.     Pursuant to the Preliminary Approval Order, Co-Lead Counsel and the Court-approved Claims Administrator, Strategic Claims Services ("SCS"), implemented a

23

comprehensive notice program whereby notice was given to potential Settlement Class Members by mail and publication.

80.     The notice program included individual notification by mail in the form of the Postcard Notice in order to save costs, publication of the Summary Notice in a national newspaper focusing on investors, dissemination over the internet using a wire service, and posting of the long-form Notice and Claim Form on the Claims Administrator's website, from which copies of the Notice and Claim Form can be downloaded and claims can be completed using an online portal. *See generally*, Initial Mailing Decl., Ex. 1.

81.     Pursuant to the Preliminary Approval Order, Co-Lead Counsel instructed SCS to disseminate copies of the Postcard Notice and to publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice, Co-Lead Counsel instructed SCS to post downloadable copies of the Notice and Claim Form online at https://strategicclaims.net/novavax (the "Settlement Webpage").

82.     As detailed in the Initial Mailing Declaration, attached hereto as Exhibit 1, SCS mailed the Postcard Notice to potential Settlement Class Members as well as banks, brokerage firms, and other third-party nominees whose clients may be Settlement Class Members. *Id*. at ¶¶ 4-5. To disseminate the Postcard Notice, beginning on February 5, 2024, SCS mailed a copy of the Postcard Notice to the individuals and organizations identified in the Company's transfer agent records. *Id*. at ¶¶5-9 In addition, SCS maintains a proprietary database with names and addresses of the largest and most common banks, brokerage firms, institutions, and other third-party nominees. On February 5, 2024, SCS caused the Postcard Notice to be mailed to the 2,477 nominees and institutional groups contained in the SCS master mailing list. *Id*. at ¶5. SCS directed those who purchased Novavax common stock during the Class Period, for the beneficial interest

of a person or entity other than themselves, to either (i) within ten (10) calendar days of receipt of the Postcard Notice, provide a list of the names and mailing addresses of all such beneficial owners to SCS; or (ii) within ten (10) calendar days of receipt of the Postcard Notice, request from the Claims Administrator sufficient copies of the Postcard Notice to forward to all such beneficial owners and within ten (10) calendar days of receipt of the Postcard Notices, forward them to all such beneficial owners. Nominees were also directed to provide email addresses, to the extent available. *Id*. at ¶¶ 5-9.

83.     As of April 10, 2024, 305,335 potential Settlement Class Members have been mailed or emailed copies of the Postcard Notice. *Id*. at ¶7.

84.     On February 20, 2024, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published once in *The Wall Street Journal* and to be transmitted over *PR Newswire*. *Id*. at ¶10. (confirmations of publications).

85.     Co-Lead Counsel also caused SCS to establish the Settlement Webpage, which became operational on February 5, 2024, to provide potential Settlement Class Members with information concerning the Settlement, including exclusion, objection, and claim-filing deadlines; an online claim filing portal; the date and time of the Settlement Hearing; and downloadable versions of the Notice and Claim Form, as well as copies of the Stipulation and Preliminary Approval Order. *Id*. at ¶12.

86.     SCS maintains a toll-free telephone number for potential Settlement Class Members to call and obtain information about the Settlement and/or request a Notice and Claim Form. SCS promptly responds to each telephone inquiry and will continue to address potential Settlement Class Members' inquiries. *Id.* at ¶11.

87.    The notices and webpage informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application is May 2, 2024, and that the deadline to request exclusion from the Settlement Class is May 2, 2024.

88.    To date, only one (1) request for exclusion has been received.  Initial Mailing Decl., Ex. 1 at ¶ 13, Ex. D.

89.    In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the amount of attorneys' fees and expenses have been entered on the Court's docket or have otherwise been received by Co-Lead Counsel or SCS.

90.    Lead Plaintiffs will file reply papers by May 9, 2024, which will address any objections that may be received. Lead Plaintiffs' reply papers will include a supplemental declaration from SCS addressing whether any additional requests for exclusion have been received.

## VI.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

91.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than May 18, 2024. As set forth in the Stipulation, the Net Settlement Fund will be distributed among eligible Settlement Class Members according to the plan of allocation approved by the Court. Co-Lead Counsel believe that the proposed Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Complaint.

92.     The Plan is set forth on pages 12 to 16 of the Notice. *See* Initial Mailing Decl., Ex. 1 - B (Notice). It was created with the assistance of Lead Plaintiffs' damages expert and is based on the expert's estimations of the amount of alleged artificial inflation in the per share prices of Novavax common stock that allegedly was proximately caused by Defendants' false and misleading statements and omissions. However, the calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial. Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. The computations under the Plan of Allocation are a method to weigh the claims of Authorized Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

93.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Novavax common stock during the Class Period (*i.e.*, from May 11, 2021 through October 19, 2021) that are listed in the Claim Form and for which adequate documentation is provided.

94.     For claimants who sold prior to August 6, 2021, the Recognized Loss Amount is zero given that they sold before the first allegedly corrective disclosure and while share prices were still artificially inflated.

95.     For claimants who sold from August 6, 2021 through October 19, 2021, the Recognized Loss Amount is the lesser of the estimated artificial inflation incorporated into the cost of the share at purchase minus the estimated artificial inflation at the time of sale or the out-of-pocket losses.

96.    For claimants who sold from October 20, 2021 through January 14, 2022, the Recognized Loss Amount is the lesser of the estimated artificial inflation at time of purchase, the actual purchase price minus the average price for a window of time prior to the sale, or the out-of-pocket losses.

97.    For claimants who held Novavax common stock at close of trading on January 14, 2022, the Recognized Loss Amount is the lesser of the estimated artificial inflation at time of purchase, or the actual purchase price minus $164.45 (the mean (average) closing price for Novavax common stock during the 90-day look back period of Section 21D(e)(1) of the Exchange Act)).

98.    The sum of a claimant's Recognized Loss Amounts for all their purchases of Novavax common stock during the Class Period will be the basis for deriving the Claimant's proportionate share of the Net Settlement Fund. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the Claimant's Recognized Loss as compared to the total Recognized Losses of all Claimants.

99.    Once the Claims Administrator has processed all submitted claims and provided claimants with an opportunity to cure deficiencies or challenge rejection determinations, payments will be made to eligible Authorized Claimants using checks and, in some instances, wire transfers. After an initial distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of initial distribution, Co-Lead Counsel will, if feasible and economical, re-distribute the balance among Authorized Claimants who have cashed their checks. Re-distributions will be repeated until the balance in the Net Settlement Fund is no longer economically feasible to distribute. *See* Initial Mailing Decl., Ex. 1 - B at 16. Any balance that remains in the Net Settlement Fund after

28

re-distribution(s), which is not economical to reallocate, after payment of any outstanding Notice and Administration Expenses or Taxes, will be donated to Consumer Federation of America, or such other non-profit organization chosen by the Court.[5] *Id*.

100. Overall, the Plan of Allocation will fairly and rationally allocate the proceeds of the Settlement among eligible Settlement Class Members based on the losses they suffered on transactions in Novavax common stock that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Plaintiffs respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

101. To date, no objections to the proposed Plan of Allocation have been received by Co-Lead Counsel or the Claims Administrator or posted on the Court's docket. *See* Initial Mailing Decl. ¶ 14.

## VII. APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

### A. Consideration of Relevant Factors Justifies the Requested Fee

102. Consistent with the notice to the Settlement Class, Co-Lead Counsel seek, on behalf of Plaintiffs' Counsel, a fee award of 33.4% of the Settlement Fund. Any fee allocations among Plaintiffs' Counsel will in no way increase the fees that are deducted from the Settlement Fund.

103. Co-Lead Counsel submit that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

---

[5] Consumer Federation of America ("CFA") is a non-profit, consumer advocacy organization established in 1968 to advance consumer interests through policy research, advocacy, and education before the judiciary, Congress, the White House, federal and state regulatory agencies, and state legislatures. See generally www.consumerfed.org. CFA has been approved as a cy pres beneficiary in several securities cases, including *In re Livent Corp. Sec. Litig.*, Case No. 190501229 (Pa. Com. Pl. 2021), *In re Broadcom Corp. Sec. Litig.*, No. 01-CV-00275-MLR (C.D. Cal.), and *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 12-cv-04677-YGR (N.D. Cal.).

### 1.      Lead Plaintiffs Support the Fee and Expense Application

104.    Lead Plaintiffs—who were involved throughout the prosecution of the Action and Settlement discussions—have evaluated and support the Fee and Expense Application.  .

### 2.      The Amount Involved and the Results Obtained

105.    Courts in the Fourth Circuit consider the result achieved to be an important factor in making a fee award. *See* Fee Brief, § II.C.1. As discussed above, the $47,000,000 Settlement is a very favorable result when considered on its own, and in view of the substantial risks and obstacles to achieving a recovery and the potential difficulties of being able to enforce a judgment after trial, if the Action were to continue to trial and through likely post-trial motions and appeals.

106.    The recovery was the result of very thorough and efficient prosecutorial and investigative efforts, complicated motion practice, and vigorous settlement negotiations. As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

### 3. The Complexity and Duration of the Litigation

107.    This Action presented substantial challenges from the outset of the case, which were skillfully navigated by Plaintiffs' Counsel over the past two years. The specific risks Lead Plaintiffs faced in proving Defendants' liability and damages are detailed above in Section IV. These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent basis with no guarantee of a favorable result, *see* Section VII.A.7., *infra*.

**4. The Time and Labor of Plaintiffs' Counsel**

108.    The investigation, prosecution, and settlement of the claims asserted in the Action required diligent efforts on the part of Plaintiffs' Counsel. The many tasks undertaken by Plaintiffs' Counsel in this case are detailed above.

109.    Among other efforts, Plaintiffs' Counsel conducted a comprehensive investigation in connection with the preparation of several complaints; opposed Defendants' Motion to Dismiss; engaged in rigorous class, fact, and expert discovery efforts, including defending the depositions of all three Lead Plaintiffs, exchanging multiple expert reports, and expert depositions; fully briefed class certification; and undertook an extensive settlement process with experienced defense counsel and a preeminent mediator.  At all times throughout the pendency of the Action, Plaintiffs' Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial.

110.    Attached hereto are counsel declarations, which are submitted in support of the request for an award of attorneys' fees and payment of litigation expenses. *See* Declaration of Michael H. Rogers Filed on Behalf of Labaton Keller Sucharow LLP ("Labaton Fee Decl."), Ex. 3; Declaration of Brian Calandra Filed on Behalf of Pomerantz LLP ("Pomerantz Fee Decl."), Ex. 4; Declaration of S. Douglas Bunch Filed on Behalf of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein Fee Decl."), Ex. 5; Declaration of Lucas E. Gilmore Filed on Behalf of Hagens Berman Sobol Shapiro LLP ("Hagens Fee Decl."), Ex. 6; Declaration of Michael I. Fistel, Jr., Filed on Behalf of Johnson Fistel, LLP ("Fistel Fee Decl."), Ex. 7; Declaration of Lesley Portnoy, Filed on Behalf of the Portnoy Law Firm ("Portnoy Fee Decl."), Ex. 8.

111.   Included with these declarations are schedules that summarize the time of each firm, as well as each firm's litigation expenses by category (the "Fee and Expense Schedules").[6] The attached declarations and the Fee and Expense Schedules report the amount of time spent by Plaintiffs' Counsel and their "lodestar" calculations, *i.e.*, their hours multiplied by their current hourly rates.  As explained in each declaration, they were prepared from records regularly prepared and maintained by the respective firms.

112.   Plaintiffs' Counsel have collectively expended 6,864.82 hours prosecuting the Action. *See* Exs. 3 - A, 4 - A, 5 - A, 6 - A, 7 - A, 8 - A.[7] The resulting collective "lodestar" is $4,903,403.25. *Id*. The requested fee of $15,698,000 (33.4% of the Settlement Fund) results in a "multiplier" of 3.2 on Plaintiffs' Counsel's lodestar.

113.   The current hourly rates of Plaintiffs' Counsel here range from $750.00 to $1,325.00 for partners, $700 to $995 for of-counsel attorneys, and $450 to $625 for associates and other attorneys. *See* Exs. 3 - A, 4 - A, 5 - A, 6 - A, 7 - A, 8 - A. It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary within the securities class action bar. Exhibit 11, attached hereto, are tables of hourly rates for defense firms doing comparably complex commercial litigation compiled by Labaton from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2023. The analysis shows that across all types of attorneys, Plaintiffs' Counsel's rates are consistent with, or lower than, the firms surveyed.

114.   Co-Lead Counsel will continue to work on the administration of the Settlement after the final Settlement Hearing, but will not seek any additional fees or litigation expenses.

---

[6]   Attached hereto as Exhibit 12 is a summary table of the lodestars and expenses of Plaintiffs' Counsel ("Summary Table of Lodestars and Expenses").

[7]   Exhibit B to each declaration breaks the lodestar down by type of work conducted.

**5. The Reputation and Expertise of Plaintiffs' Counsel**

115.    The expertise and experience of Plaintiffs' Counsel are described in each firm's resume, attached hereto as Exs. 3 - D, 4 - D, 5 - D, 6 - D, 7 - D, , 8 - C.

116.    As demonstrated in the firm resumes of Pomerantz and Labaton, attached hereto as Exhibit 3 - D, 4 - D, Co-Lead Counsel are highly skilled law firms that focus their practices on securities class action litigation.  Indeed, Co-Lead Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. *See id*. Co-Lead Counsel enjoy a well-deserved reputation for skill and success in the prosecution of securities class actions and other complex civil matters.

117.    For example, Pomerantz served as lead counsel in: *In re Petrobras Sec. Litig.*, No. 14-cv-9662 (S.D.N.Y. 2018) ($3 billion recovery); *Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 12-cv-9350 (S.D.N.Y. 2017) ($135 million settlement); *Pirnik v. Fiat Chrysler Automobiles N.V. et al.*, No. 1:15-cv-07199-JMF (S.D.N.Y) ($110 million settlement); and *In re Comverse Technology, Inc. Sec. Litig.*, No. 06-CV-1825 (E.D.N.Y.) ($225 million settlement). Labaton has served as lead counsel in a number of high profile matters: *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re*

*Schering-Plough Corp. / ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million).

118.    Plaintiffs' Counsel's experience, collectively, added valuable leverage during the course of the litigation and in the settlement negotiations.

### 6. Standing and Caliber of Opposing Counsel

119.    The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Here, Defendants were represented by one of the most preeminent defense firms in the country: Ropes & Gray LLP. Defense counsel in this case are highly skilled and experienced securities attorneys with vast resources. In the face of this knowledgeable and formidable defense, Plaintiffs' Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are very favorable to the Settlement Class.

### 7. The Contingency Risk Faced by Plaintiffs' Counsel

120.    From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Plaintiffs' Counsel received no compensation during the course of the Action but incurred more than 6,864.82 hours of time for a total lodestar of $4,903,403.25 and incurred $628,893.83 in expenses in prosecuting the Action for the benefit of the Settlement Class.

121.     Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Plaintiffs' Counsel are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

*122.*     Federal circuit court cases include numerous opinions affirming dismissals with prejudice in securities cases. The many appellate decisions affirming summary judgment dismissals show that even surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig*, 669 F.3d 68 (1st Cir. 2012); *In re Digi Int'l Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

123.     Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

124.     Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542-UU, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2010) (in case tried by Labaton, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd,* 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al*., 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); *Robbins v. Koger Props., Inc*., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).

125.     Moreover, the path to maintaining a favorable jury verdict can be arduous and time consuming. *See, e.g., In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id*.) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

126.     As discussed in greater detail above, Lead Plaintiffs' success was by no means assured. Defendants strongly disputed whether Lead Plaintiffs could establish falsity, materiality, scienter, and loss causation. In addition, Defendants would no doubt have contended, as the case

36

proceeded to summary judgment, that even if liability existed, the amount of damages was substantially lower than Lead Plaintiffs alleged.  Were this Settlement not achieved, Lead Plaintiffs and Plaintiffs' Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain. Further, prolonged litigation would likely quickly result in the wasting of insurance coverage for the claims, and uncertainty with respect to being able to fully enforce a litigated judgment.

### B.      Request for Litigation Expenses

127.    Plaintiffs' Counsel seek payment from the Settlement Fund of their litigation expenses, which were reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.

128.    As set forth in the Fee and Expense Schedules, and the Summary Table of Lodestars and Expenses, Plaintiffs' Counsel's litigation expenses in connection with the prosecution of the Action total $628,893.83. *See* Exs. 3, 4, 5, 6, 7. As attested to, these expenses are reflected on the books and records maintained by each firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of counsel's expenses. The expenses are set forth in detail in Plaintiffs' Counsel's declarations, which identify the specific category of expense—*e.g.*, experts' fees, mediation fees, travel costs, online/computer research, and duplicating. Exs. 3 - C, 4 - C, 5 - C 6 - C, 7 - C.

129.    From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved. Thus, Plaintiffs' Counsel were motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case. Co-Lead Counsel maintained control over the primary expenses in the Action by managing a joint litigation fund ("Joint Litigation Expense Fund" or "Litigation Fund"). Labaton and Pomerantz collectively

contributed $390,000 to the Joint Litigation Expense Fund, which incurred $498,174.53 in expenses. A description of the expenses incurred by the Litigation Fund by category is included in the individual firm declaration submitted on behalf of Labaton. *See* Ex. 3 at ¶7 and Ex. 3 - E. The Litigation Fund has an outstanding balance in the amount of $108,174.53. Upon the Court's approval, this balance will be paid by Labaton and Labaton is seeking this amount in its expense request. *See* Ex. 3 - C.

130.   Plaintiffs' Counsel's expenses include fees and costs for, among other things: (i) experts and consultants in connection with various stages of the litigation; (ii) electronic discovery; (iii) deposition-related expenses; (iv) online factual and legal research; (v) mediation; and (vi) document reproduction. Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

131.   Much of Plaintiffs' Counsel's expenses were for the fees of Lead Plaintiffs' experts and consultants ($464,723.98 or 73.9% of total expenses). *See* Exs. 3 at ¶4, 4 at ¶8. As noted above, Co-Lead Counsel consulted with experts in the fields of market efficiency, loss causation and damages. Plaintiffs' Counsel utilized these experts and consultants in connection with class certification, to assist with discovery and provide expert opinion, in preparation for mediation, and in connection with the development of the proposed Plan of Allocation. *See supra* ¶¶36-43, 46-47.  These experts and consultants were essential to the prosecution of the Action.

132.   Another substantial component of Plaintiffs' Counsel's expenses (*i.e.*, $18,945.32, or approximately 3.01% of the total expenses) was the cost of court reporters, videographers, and transcripts in connection with the depositions counsel took or defended in connection with class certification. *See* Exs. 3 at ¶4, 4 at ¶8.

133.    Another large expense (*i.e.,* $30,269.33, or approximately 4.81% of Plaintiffs' Counsel's total expenses) was for document hosting and litigation support in connection with the more than 300,000 pages produced in the litigation. Co-Lead Counsel used a platform called Relativity managed by an e-discovery vendor to maintain the documents produced by Defendants and third parties so they would be efficiently reviewed and shared by Plaintiffs' Counsel.

134.    Travel costs in connection with the litigation and costs related to working meals, lodging, and transportation total $10,888.94.  All airfare is at economy rates.  Exs. 3 - C, 4 - C, 5 – C, 6 - C, 7 - C.

135.    Plaintiffs' Counsel also incurred a total of $52,125.00 in connection with the mediation sessions with Gregory P. Lindstrom of Phillips ADR. Ex. 3 - E.

136.    Plaintiffs' Counsel's expenses also include the costs of computerized research services such as Lexis, Westlaw, and PACER in the amount of $25,197.81. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class.

137.    The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely paid by clients in non-contingent cases. These expenses include, among others, court fees, duplicating costs, long-distance and conference calling, and postage and delivery expenses. All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary for the successful litigation of the Action.

C.    **Reimbursement to Lead Plaintiffs Pursuant to PSLRA**

138.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).  Accordingly, Lead

Plaintiffs Jeffrey A. Gabbert and Nuggehalli Balmukund Nandkumar seek reimbursement of their reasonable costs incurred directly for their work representing the Settlement Class. *See* Declaration of Jeffrey A. Gabbert ("Gabbert Decl."), ¶¶5-6, Ex. 9; Declaration of Nuggehalli Balmukund Nandkumar ("Nandkumar Decl."), ¶¶5-6, Ex. 10.

139.    Specifically, Lead Plaintiff Gabbert seeks reimbursement of $30,000 for the time he dedicated to the Action. *See* Gabbert Decl., Ex. 9 at ¶¶5-6. Lead Plaintiff Nandkumar seeks reimbursement of $30,000 for the time he dedicated to the Action. *See* Nandkumar Decl., Ex. 10 at ¶¶5-6.

140.    As discussed in Lead Plaintiff Gabbert's and Nandkumar's supporting declarations, each one actively and effectively fulfilled their obligations as a representative of the class, complying with all of the many demands placed upon them during the litigation and settlement of the Action, and providing valuable assistance to Co-Lead Counsel. Each (i) regularly communicated with counsel regarding the posture and progress of the Action; (ii) reviewed significant pleadings, motions, and briefs filed in the Action; (iii) worked with Co-Lead Counsel to produce documents and written discovery responses to Defendants; (iv) prepared for and participated in depositions; and (v) consulted with counsel during the course of the settlement discussions, and evaluated and approved the proposed Settlement. Exs. 9-10. These efforts required Lead Plaintiffs to dedicate time and resources to the Action that they would have otherwise devoted to their professional endeavors, and are precisely the types of activities courts have found support reimbursement to class representatives.

**D.     The Reaction of the Settlement Class to the Fee and Expense Application**

141.    As mentioned above, consistent with the Preliminary Approval Order, a total of 305,335 Postcard Notices have been mailed or emailed to potential Settlement Class Members

advising them that Co-Lead Counsel would seek an award of attorneys' fees not to exceed 33.4% of the Settlement Fund, and payment of expenses in an amount not greater than $1 million. *See* Initial Mailing Decl., Ex. 1 - B at ¶¶ 4, 40.

142.    Additionally, the Summary Notice was published in *The Wall Street Journal* and disseminated over *PR Newswire*. *Id.* at ¶ 10. The long-form Notice and the Stipulation have also been available on the Settlement Webpage maintained by the Claims Administrator. *Id.* at ¶ 12.[8]

143.    While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date there have been no objections to the requested fees and expenses.

144.    Co-Lead Counsel will respond to any objections in their reply papers, which are due to be filed with the Court on May 9, 2024.

## VIII.   MISCELLANEOUS EXHIBITS

145.    Attached hereto as Exhibit 13 is a compendium of unreported cases, in alphabetical order, cited in the accompanying memoranda of law.

## IX.   CONCLUSION

146.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Brief, Lead Plaintiffs respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable. Co-Lead Counsel submit that the requested fee in the amount of 33.4% ($15,698,000) of the Settlement Fund should be approved as fair and reasonable, the request for payment of $628,893.83 in Litigation Expenses,

---

[8]    Lead Plaintiffs' motion for approval of the Settlement and Co-Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement Webpage.

and Gabbert and Nandkumar's requests for $30,000 each, pursuant to the PSLRA, should also be approved.

We each declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 11th day of April 2024, at New York, New York.

_____
BRIAN CALANDRA

Executed this 11th day of April 2024, at New York, New York.

_____
MICHAEL H. ROGERS