IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____
                                 )
SOTHINATHAN SINNATHURAI, et al.,  )
                                 )
              Plaintiffs,         )
                                 )
      v.                          )   Case No. 8:21-cv-02910-TDC
                                 )
NOVAVAX, INC., et al.,            )
                                 )
              Defendants.         )
_____)
                                     Greenbelt, Maryland
                                     May 23, 2024
                                     2:33 p.m.


FAIRNESS HEARING
BEFORE THE HONORABLE THEODORE D. CHUANG
United States District Judge


A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

     LABATON KELLER SUCHAROW LLP
     140 Broadway
     New York, New York  10005
     BY:  MICHAEL H. ROGERS, ESQUIRE
          (212) 907-0814
          mrogers@labaton.com
          NICOLE MARIE ZEISS, ESQUIRE
          (212) 907-0867
          nzeiss@labaton.com

     COHEN MILSTEIN SELLERS & TOLL, PLLC
     1100 New York Avenue, N.W., Suite 500 East
     Washington, D.C.  20005
     BY:  DANIEL STEPHEN SOMMERS, ESQUIRE
          (202) 408-4600
          dsommers@cohenmilstein.com


                PATRICIA KLEPP, RMR
                Official Court Reporter
             6500 Cherrywood Lane, Suite 200
                Greenbelt, Maryland  20770
                   (301) 344-3228


***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

2

A P P E A R A N C E S (Cont'd)

ON BEHALF OF THE DEFENDANTS:

    ROPES & GRAY LLP
    1211 Avenue of the Americas
    New York, New York  10036
    BY:  C. THOMAS BROWN, ESQUIRE
        (212) 596-9812
        thomas.brown@ropesgray.com

    COBURN & GREENBAUM PLLC
    1710 Rhode Island Avenue, N.W., Second Floor
    Washington, D.C.  20036
    BY:  JONATHAN WOLFE GREENBAUM, ESQUIRE
        (202) 744-5003
        jg@coburngreenbaum.com

ALSO PRESENT:

    KIMBERLY JANDRAIN, CORPORATE REPRESENTATIVE, NOVAVAX, INC.

***COMPUTER-AIDED TRANSCRIPT OF STENOTYPED NOTES***

P R O C E E D I N G S

(Call to order of the Court.)

THE COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Maryland is now in session, the Honorable Theodore D. Chuang presiding.

THE COURT:  Thank you, everyone.  Please be seated.

THE COURTROOM DEPUTY:  The matter now pending before this Court is Civil Action No. TDC-21-2910, Sothinathan Sinnathurai v. Novavax, Inc., et al.  We are here today for the purpose of a fairness hearing.

Counsel, please identify yourselves for the record.

MR. SOMMERS:  Good afternoon, Your Honor.  Daniel Sommers, Cohen Milstein Sellers & Toll, local counsel for the lead plaintiffs, and with me this morning are Michael Rogers, Nicole Zeiss, David Schwartz, and Michael Canty from the Labaton firm, and Brian Calandra from the Pomerantz firm.  They are colead counsel in the case.  And Mr. Rogers will be taking the lead this afternoon for Plaintiffs.

THE COURT:  Okay.  And sorry, which firm is Mr. Rogers from?

MR. SOMMERS:  Labaton firm.

THE COURT:  Okay.

And for the defense.

MR. BROWN:  Good afternoon, Your Honor.

C. Thomas Brown of Ropes & Gray on behalf of

defendants.

THE COURT:  Okay.  Good morning -- good afternoon.

Who else?

MR. GREENBAUM:  Good afternoon, Your Honor.  Jonathan Greenbaum, at Coburn & Greenbaum, as local counsel for Novavax.

THE COURT:  Okay.  Good afternoon, and welcome, everyone.  We're here for a hearing on the class action settlement, a motion for final approval.  I did have a number of questions, and I -- with these things, it's never totally clear which side is supposed to answer them or could answer them.  I suspect probably the plaintiffs, but feel free to jump in on the defense side if you think this is your issue.

I did want to get a more final report on how many class members have actually responded and filed claims, how many will receive payments, and as a result, approximately how much will each class member receive or receive per share.  I know somehow there was still the potential to file something, even the last -- since the last brief, so I figured whatever I had before wasn't the final situation.

MS. ZEISS:  Your Honor, Nicole Zeiss from Labaton.  I can address that.

THE COURT:  Okay.

MS. ZEISS:  First, we've had no additional opt-out requests and no additional objections.  As the papers explain,

we've mailed approximately 305,000 notice -- notices, postcard notices.  To date, 47,104 claims have been received.  The deadline was May 18th, so some claim forms are being mailed. This number will increase, and the claims administrator will continue to process claims.

Of those 47,000, just if you're curious, 365 were paper claims, 7900 were submitted on the claim portal, on the website, and 38,827 were submitted by institutional investors through the like e-filing procedure.

THE COURT:  Mm-hmm.

MS. ZEISS:  So the claims administrator is still processing the claims.  It takes quite a bit of time.  Claimants are given a chance to remedy any deficiencies if they didn't submit their claim -- documentation; they're given notice, and they're given 20 days to respond.  So that process hasn't even started.

But so far, of the claims that have been sort of reviewed preliminarily, 19,395 are valid, with recognized losses of about 384 million.  And that is damaged shares, meaning shares that were purchased during the class period and held over at least one disclosure of about 15.6 million damaged shares. In the case, our expert estimated damaged shares of about 37 million, so we're at about 50 percent of that, but we fully anticipate that we, you know, will hit the 37 million estimate of damaged shares.

It's -- 48,000 [sic] claims are still being processed, so those are not even in the numbers.  We expect these numbers to increase, you know, significantly -- 4800, sorry.

So in terms of how much people receive per share, it is too early to tell, but if we -- and unfortunately, Your Honor, I did not do the math.

THE COURT:  So these have been coming in, right?  Are you saying they waited till the -- they waited till May 18th to process anything, or were they doing it on a rolling basis?

MS. ZEISS:  They were doing it on a rolling basis, but the majority --

THE COURT:  So of the original -- you said 19,000 claims are valid.  Well, out of -- what's the percentage rate that they're valid?  Are like 90 percent valid, 50 percent, 95, 5?  I don't have a good sense of --

MS. ZEISS:  Yeah.  So -- well, we've received -- just looking at my calculator.  We've received 47,000 claims, and of those, 20,000 appear to be valid at this point, so --

THE COURT:  Out of how many that have been looked at?

MS. ZEISS:  Out of 30- -- I'm sorry, 42,000 that have been looked at.  So about half are valid.

THE COURT:  Okay.

MS. ZEISS:  But many of the deficient claims will be given a chance to be cured.

THE COURT:  Right, okay.

MS. ZEISS:  And the -- the vast majority of claims come in at the deadline, like the day before.

THE COURT:  Okay.  Well, then, there's probably oversight on my part to have agreed to a system where the deadline is so close to the hearing.  So -- I mean, for example, one of the objectors basically, back-of-the-envelope math, had it as, you know, about 50 cents per share.  Do you have a reason to disagree with that?

MS. ZEISS:  Was it 80 cents per share?

THE COURT:  I don't know, maybe --

MS. ZEISS:  Right.

THE COURT:  -- but it was well under $1 per share, and again, I thought you would be able to tell me whether that was accurate or not; I understand that they're not all done yet, but whether there's a --

MS. ZEISS:  Right.

THE COURT:  -- preliminary way of assessing that, whether it's about the same or vastly higher or lower.

MS. ZEISS:  Well, based on these numbers, it will be higher.

THE COURT:  How much higher?

MS. ZEISS:  Can I borrow somebody's calculator?

So if we assume a net settlement fund of about 31 million, which would be the $47 million gross settlement fund, minus attorney fees and expenses, and divide that by the

rough number of damaged shares right now, which is 15,652,322, that's about $1.98 a share.

THE COURT:  I'm not sure I understand how that is calculated.  You're saying that -- maybe let's go back.  When we say 47,000 claims, are those 47,000 investors or 47,000 shares?

MS. ZEISS:  Claim forms.

THE COURT:  Claim forms.  And on each one, they could have any number of shares; is that what you're saying?

MS. ZEISS:  Yes.

THE COURT:  So -- okay.  So out of those 47,000, what's the measure of how many shares are at issue?

MS. ZEISS:  Yeah.

THE COURT:  Even if it's not a precise number, but how do you estimate that?

MS. ZEISS:  Yeah.  So based on what they've processed so far, there are 15,652,322 damaged shares.  So that means shares that could be eligible for a recovery, because they were purchased during the class period and held over a disclosure.

THE COURT:  15 million plus, you said?

MS. ZEISS:  Yeah, plus.

THE COURT:  Okay, mm-hmm.

MS. ZEISS:  However, you know, they are still processing claims, and 4800 have not been processed.  And those will, I'm sure, also have additional damaged shares.  Our expert --

THE COURT:  So for the -- 15 million is just the 19,000 claims that have been approved.

MS. ZEISS:  Yes, the valid ones, mm-hmm.  And our --

THE COURT:  But you said there's another five-or-so thousand claims plus the ones that can come back later.

MS. ZEISS:  Yes, Your Honor.  So the --

THE COURT:  Okay.  So tell me again how you did the math, here?

MS. ZEISS:  Oh, sure.  And you know, there's two ways to look at the per share figures.  There's the gross per share, which is, you know, before the deduction of fees and expenses, and then there's --

THE COURT:  I'm only interested in what they actually get.

MS. ZEISS:  Okay, that's fine.  So the way I got the number is the 47 million, minus the amount of fees and expenses that we're seeking, which I guess is about 17 million, if you add it all together?  Yeah.  So that's about 30 million as a net settlement fund.  And then I divided that by the 15.6 million damaged shares.

THE COURT:  That are actually the subject of claims?

MS. ZEISS:  Yes, yes.

THE COURT:  And that represents -- you have an actual calculation of 15.6 million damaged shares out of those 19,395 claims.

MS. ZEISS:  Correct.

THE COURT:  So -- hard to completely extrapolate, but -- so you're saying, basically $2 a share if that's all it was.

MS. ZEISS:  Correct.

THE COURT:  And presumably something less than that if there's more.

MS. ZEISS:  Yes, Your Honor.

THE COURT:  Okay.  And what was the average share price during this time period; wasn't it like 130, or 50, or something like that?

MS. ZEISS:  That sounds right to me.

THE COURT:  Okay.

MR. ROGERS:  Yeah.  I mean, the -- Your Honor, the number went as high as that, like 250 or 260.  I think the 90-day moving average, after the final disclosure, was 165, so somewhere in that area.

THE COURT:  Okay.  So then, when you ... I'm trying to remember.  I'm looking back at the papers, here.  So how does that $2 a share or -- it seems like a max of about $2 per share. How does that compare to the actual losses?  I think you estimate in the papers 5.12 percent of the estimated damages was going to get recovered.  And again, I don't remember if that was net or gross, as you said, and also, how that compares to what we're actually dealing with.  Can you elaborate on that?

MS. ZEISS:  Yeah.  The 5 percent was gross, Your Honor.

THE COURT:  Okay.  So it's something less than that on the net, right?

MS. ZEISS:  Yes.

THE COURT:  Okay.  And then, how does that compare to what you -- I mean, that's what you estimated before all this started coming in?

MS. ZEISS:  Yes.

THE COURT:  How does it compare to the actual?

MS. ZEISS:  So the actual damages per share?

Do you want to -- or can you open your phone?

So the -- our expert's estimate of damaged share- -- I'm sorry.  Our expert's estimate of maximum damages in the case, if we had prevailed entirely, and with respect to both disclosures, was 917 million.

THE COURT:  Mm-hmm.

MS. ZEISS:  So if I take that and divide it by our 15.6 million damaged shares, that gives us damages per share of $58.58.

THE COURT:  Okay.  I'm not sure I'm following that, but just accepting that as a concept, okay.

MS. ZEISS:  So --

THE COURT:  But then, also, when you said your $47 million settlement represents 5.12 percent of the estimated

damages, that's the gross.  The actual is about 3.3 percent, is that about right, and you just go with the actual amount going to the class?

MS. ZEISS:  Sounds right, yeah.

THE COURT:  Okay.

Okay.  Would you agree that in the Court's ruling on the motion to dismiss, I looked back at that, and at least the way I look at it, there was some victory on some issues, some -- on others, no.  I think some of the alleged false statements I didn't find could get past that stage.  So I guess, first off, would you agree that it was -- at least at the motion stage, it was a partial victory, not a total victory?  And then, secondly, when you were saying this 917 million, are you talking about what you estimated going into the case or what you estimated after the motion to dismiss?

MR. ROGERS:  Your Honor, Michael Rogers from Labaton. I'll handle these questions.  In terms of the motion to dismiss, I would agree that it was a partial victory and a partial defeat.  As Your Honor knows, at least three or four of the misstatements came out of the case.  Most importantly, the first misstatement, at the early part of the class period, Your Honor's order effectively shortened the class period.  Two individual defendants were also removed.  And as I said, some of the interim statements that, you know, affected our ability to prosecute on the merits didn't have a direct effect on the

length of the class period.

The 917 number is not a number that we calculated at the outset of the case. At the outset of the case -- and Your Honor knows this from the lead plaintiff procedures -- it tends to focus on total losses, you know, market cap losses, losses for individual plaintiffs. To be completely frank, it's not effective from cost and efficiency to retain an expert like Mr. Coffman to run a full-blown event study, to determine with granularity damages (a) for a class that may not be reflective of what the actual class will be -- and again, you know, we're here talking about some of the economic realities, so no need to hide the ball; it's just not effective to spend that kind of money before the motion to dismiss.

So we really had no notion of a number like 917 or the 113 on the other end. The 917 number, however, was calculated relatively early after the motion to dismiss, and that affected the way we prosecuted the case. As Mr. Brown can tell you, there was a lot of very contentious litigation about the issues connected to that. So I can answer more questions about where those numbers came from.

THE COURT: Well, so it's after, right?

MR. ROGERS: Most certainly, yes.

THE COURT: Okay. And then, just -- again, maybe you don't -- maybe you know, maybe you don't, Mr. Brown, but -- and maybe it's in the papers, perhaps, but as we're doing this

comparison, what was your side's estimate, at post-motion to dismiss, of what your exposure was?

MR. BROWN:  Well, Your Honor, so the -- there are two parts to this, and I think I'll pick up first on a number that you heard my friends on the other side mention, which was 113 or so.

We have what we believe are very serious reasons to dispute their ability to prove loss causation, among other things, on one of the alleged corrective disclosures.  So from our perspective, you know, the kind of max number, even assuming that their damages methodology would have survived scrutiny at the class certification stage, we -- assuming their damages methodology had been accepted, which we had a number of contentions with, we still believe that the maximum number that they could prove was something closer to 100, something -- I believe 113 was the exact number.

So from our perspective, analyzing the percentage of payment versus percentage of potential damages actually generates a higher number in that instance than it would under the plaintiff's theory.  Theirs assumes they win on everything and we win on nothing.

THE COURT:  Sure.  No, I understand; I just wasn't sure where you were on that range.

Okay.  And then another question I had, just because it seemed to be omitted from the papers, there -- well, it does

say one of the named plaintiffs is not seeking a compensatory award, Mr. Truong.  Can you explain why that's the case, what happened with that?

MR. ROGERS:  Well, to the extent that we -- we're going to discuss Mr. Truong's specific reasons, I think those were probably privileged.  I mean, if the Court wants a sidebar or -- I certainly wouldn't want to not answer the question, but as Your Honor noticed, Mr. Truong is not seeking a PSLRA service award.  And in connection with not seeking the award, he's not putting in a declaration.

But I can assure you, from my discussions with Mr. Truong's counsel and my of counsel here of our firm, who has communicated with him, that he supported the settlement at the time and continues to support the settlement but has not put in for the PSLRA service award, and as a result, no declaration was submitted.

THE COURT:  Can you give me -- since you're saying it might be privileged, but just -- since you do more of these cases than I see, what are some of the reasons someone in that position would decline to seek the award?

MR. ROGERS:  I can't honestly say that I have come across that before, so I can't say what is typical.

THE COURT:  Not even typical, things that have come up.

MR. ROGERS:  I don't know that I've had experience

with this particular situation.  I would imagine it might be something where the person doesn't feel that the compensation of the service award would be, you know, worth the time for him to do so.  I can't say that's the case here, but I don't -- that would be one thing that would occur to me, but I don't know, in general, what the answer to that would be.

THE COURT:  So what can you tell me about how this came about?  I mean, normally, what happens, I take it, is that you say, hey, we're working on a settlement, we're thinking of, you know, having as part of the plan a certain amount per named plaintiff.  I don't know if any named plaintiffs, either on their own or through counsel, try to negotiate a higher number or propose a number, whether they propose the original number or you do, whether that's something that multiple named plaintiffs do together or they always ask for something different, even though in the end they, I think, oftentimes, get the same.  If this is something you've never seen before, I'm a little concerned about that.

So can you shed any more light on sort of how this happens and how does one say, well, actually, I'm not interested after all in $30,000, which probably would have been approved.  At least, the chances would be very similar to those of the others who have put in for it.  It just seems strange to me.

MR. ROGERS:  Do you want to handle this?

MR. SCHWARTZ:  Yeah.

THE COURT:  Why don't you come up to the microphone.

MR. SCHWARTZ:  Sure.

Good afternoon, Your Honor.  David Schwartz with the plaintiffs and Labaton.  Your question was how -- how do some of these plaintiffs come up with a response to a settlement?

THE COURT:  Well, my real question is, why is this person turning down $30,000, and why is there nothing problematic about that?  And that's what I really want to know.  You can tell me what you think you can tell me that helps me understand that.

MR. SCHWARTZ:  Your Honor, would it be okay if I approach if -- or a sidebar?  Just -- I don't want to reveal anything privileged to the room.

THE COURT:  Any thoughts on this, Mr. Brown, any problem with that?

MR. BROWN:  I have no objection, Your Honor, on this specific question.

THE COURT:  So I guess the question would be, you know, everything's on the record.  I suppose we could seal part of it for now and see what happens, but it's always open to anyone asking for it to be unsealed.  I don't what we're dealing with so --

MR. SCHWARTZ:  Yeah, sure.

THE COURT:  But --

(The following portion is sealed by order of the Court and

is contained in a sealed transcript.)

(Open Court.)

THE COURT:  A few other questions.  Now we're getting into the terms of the award, which I guess that last point was a little bit.  You provided information on a lodestar cross-check for your attorney's fee request, and I think you have a multiplier of about 3.2.  In terms of calculating an estimate of the lodestar amount, to get to that number, though, I mean, it did seem to include all six law firms, I think, that were involved in this.

I understand that that can happen in a case like this, the way they start out, but is there any reason to say that it's not -- would it be unfair for me to conclude that sort of the actual real amount needed to do this case was something less than that, given that -- you don't need six law firms to do any case.  The fact that perhaps this started off with different plaintiffs and they all came together, that can happen, but again, I'm not totally clear on why we needed six law firms here, where's there's almost -- has to be some duplication of effort.

MR. ROGERS:  To the best of my understanding, there is not duplication, Your Honor.  I mean, like -- I think for the moment, we can probably leave aside Pomerantz and Labaton; I think that's not part of the --

THE COURT:  Yeah, I've never understood why we need

two -- two such prominent firms on the same case.

MR. ROGERS:  Well, with all due respect, Your Honor, you appointed us in the lead plaintiff order.

THE COURT:  No, I understand, but that was your proposal, and again, maybe one doesn't think through these things at that moment.  But if the issue is, who can competently do this and is there any reason not to have, you know, more cooks in the kitchen, perhaps, to get the case done, but then, when we're saying, well, we're taking money out of the pockets of the class members because of the significant amount of work that went into this or that -- the estimate of that, why isn't it fair to say, well, you know, whenever you bring in more attorneys or more firms, there's the potential, if not, frankly, the reality of some duplication of effort.

More people just have to learn the basics of the case, if nothing else, and so maybe it isn't in the best interests from a standpoint of the class to have that many lawyers and that many law firms involved, if it's eventually going to come back and they're going to say, well, we want more for the attorneys.

MR. ROGERS:  It's obviously a fair question.  I will have to say that I respectfully disagree with the underlying premise there.  One thing that I will say, just representing to the Court, having done this for a long time, we on the plaintiff's side, it's just ingrained institutionally in us that

there's just no reason to duplicate efforts.  As Your Honor knows, easily half of our cases don't get past the motion to dismiss.  Those that do get into discovery, we sometimes lose at class cert or summary judgment.  So there's really no incentive to duplicate effort.

Now, to the extent that you asked the broader question of why do you need two firms, apart from the --

THE COURT:  Or six.

MR. ROGERS:  I'll get to those next.  I think there's two questions that you're asking, and I do want to handle the Pomerantz, Labaton, and our local counsel.

THE COURT:  Sure.

MR. ROGERS:  I assume you don't object.

I'm too fast; I'm sorry, I'll slow down.  No one's ever told me to slow down.  I'm joking.

So even beyond the obvious sharing of risk that, you know, is part of the business model, it's really like Your Honor said; in one way, it's putting two different heads together.  I've worked with Mr. Calandra on many cases.  Brian and I don't always see eye to eye; we come with different views and different ideas.

Secondarily, as Mr. Brown can certainly say, the amount of work in this case was real.  I don't really -- as much as I admire myself and my partners, I don't think I could have handled Mr. Brown and his very feisty colleague, Mr. Zagnoli, on

a regular basis.  Some cases, Brian took the call.  I was on, making sure I understood what was going on.  Sometimes I couldn't be on the call.

So in terms of the need for two prominent firms to share the load, I really want to convince the Court that there's no reason to duplicate effort; it doesn't do anything.

THE COURT:  Was there a natural -- or was there a formal or informal division into, you have this part, and we have that part, and roughly, how was that done, and what was it?

MR. ROGERS:  Informally.  I would say informally.

THE COURT:  Sure.

MR. ROGERS:  When we'd have a meet-and -- again, starting with the motion to --

MR. CALANDRA:  If -- I can speak to Pomerantz if you want to --

THE COURT:  Well, yeah, I mean, if we need to.  I mean, we'll finish with Mr. Rogers first and then --

MR. ROGERS:  Yeah, so -- yeah.  So you know, for example, in the pleadings, you know, the writing of the complaint and the pre-motion-to-dismiss activity, one firm -- and this is not this case, this is all cases -- one firm will handle the lion's share of the investigation on the complaint, the other firm will handle the motion to dismiss.  Now, there are built-in efficiencies in terms of that; you get different ideas, you get the cross-pollination.

When I get into discovery -- I can't tell you a specific example, but I assure you, what I'm saying is extremely representative.  Mr. Calandra and I would exchange e-mails in advance of knowing that we had a wonderful Friday afternoon just spent talking about discovery with Mr. Brown and his colleagues, and Brian would say, you know, I'm a little more familiar with some of the underlying issues in terms of the remaining scope of the case, I'm going to handle this call, and he would.  There were other times where I would handle it.

Class certification, I believe Mr. Calandra's firm did the opening brief, my firm did the reply.  Obviously, in terms of the individual client, he defended his, I defended mine.  I know that I took Dr. Kothari's deposition in the class certification.  I don't remember, I think Brian might have defended Mr. Coffman.  I think there is an informal division.  And as Your Honor can obviously assume, after a year, two years, three years, certain individual lawyers will develop a certain facility for certain aspects of the case.  Some people are really financially oriented, and they want to go at an economic expert.  Some people are really into the law.

So -- I can give more detail, but if I could turn in to the remaining firms, you know, Mr. -- Cohen Milstein was a court-appointed liaison, Maryland counsel.

THE COURT:  Local counsel, okay.

MR. ROGERS:  The Portnoy firm -- and again,

Mr. Calandra can explain more.  The Portnoy firm was basically lawyers to Mr. Gabbert and were very involved in preparing him -- Mr. Kumar, I apologize, Mr. Kumar and preparing him for his deposition, preparing him for his various aspects of discovery.

In terms of Hagens and Johnston -- look, I mean, I'm just looking at the numbers, you're looking at $100,000; I don't think that moves the needle.  I mean, the work they --

THE COURT:  You heard me talking about 30,000, so I don't know if I agree with you.  We spent about 10 or 15 minutes on $30,000, so --

MR. ROGERS:  Well taken.  They were involved in the factual investigation, they were involved in the research.  I know that I have exchanged discussions, they read some of the papers before they were filed.  But I'm just trying to say that what I meant by the 100,000 not being real money, it is real money, but I don't think it moves the needle tremendously on the multiplier.

THE COURT:  Remind me again how they got in the case, going back to the beginning.

MR. ROGERS:  To the best of my understanding, they originally moved for lead and then put in notices of non-opposition.

THE COURT:  And they had some potential named plaintiffs as well that they were representing?

MR. ROGERS:  That was my understanding, yes, Your Honor.

THE COURT:  Okay, okay.  I mean -- do you want add anything to that, Mr. Calandra, or --

MR. CALANDRA:  I will only add, Your Honor, that it really isn't six firms; it's two firms and local counsel.  And then, the involvement of Johnston, Hagens Berman, and the Portnoy law firm was very cabined.  There was no duplication beyond -- there was at most de minimis duplication. Mr. Portnoy's client is a non-English speaker and required -- who was very unfamiliar -- or I should say an English second language speaker, who was not as familiar with -- who was not as familiar with U.S. securities law and the nature of class actions, so having someone who could work with him directly as we represented the class proved to be invaluable and I think actually helped in the overall process.

And then, when it comes to Hagens and Johnston, as my colleague alluded to, they were involved very early on, and then, as the case, you know -- as the case developed through the motion to dismiss briefing, the substantial discovery that was done here, and the class certification motions, that was a two-headed effort by Pomerantz and Labaton, and we took the special care not to duplicate efforts, because it's not in our own interests to do that.  We run very lean as Your Honor knows from plaintiffs' firms.  And so we use that time when we're not

working on the Novavax case or any other case like it to work on our other cases, many of which don't make it past a motion to dismiss.

So this two-headed monster is actually to the benefit of the class, as it were, as much as a monster can be good for anything.  But the -- this two-pronged attack of handling the case allows us to operate more efficiently and actually reduces costs overall.

THE COURT:  Okay.  So what is your response -- and it could be either you or Mr. Rogers.  What is your response to the objector's point that given -- whether it's the raw dollar amount or the percentage of the loss that they're getting, that this multiplier of 3.2 is still fair and reasonable?

MR. ROGERS:  Well, the objectors seem primarily motivated by their perception of their pro rata recovery, and I know that you and Ms. Zeiss just went through that.  I don't need to tell the Court that a settlement is a compromise by both sides, and the amounts that are going to be dealt with in a settlement fund just are not going to be at the level of what maximum judgment could have been.  I don't need to go through the risks and the contingencies that lead us to that point.

In terms of the -- the multiplier, it's really what we've put into our papers; I mean, it's within the range of reasonableness, it's well within the range --

THE COURT:  Well, but it wasn't as if you all came out

and said, as you're asking the objectors to do, well, you know, there was risk here, so even though you think that you deserve X, you're going to have to settle for Y, because the pot is only as big as it is.  In your case -- now, maybe you've done more than 33 percent in other cases, and I've seen that.  That's generally what the firms ask for.  So you went into this -- even with all the risks, and the litigation issues, and the partial victory on the motion to dismiss, you went in and said, well, we're going to get our full 33 percent.  That was your starting point, or at least, that was where you ended up.

So how do you tell the objectors that we're getting our full 33 percent, we're not taking any kind of percentage loss or raw loss -- not loss, but reduction, in light of the fact that all these compromises had to be made, but you -- we're asking you to do that, or we're telling you to do that.

MR. ROGERS:  No, that's a fair question, Your Honor, and I apologize; my answer's going to be a tad nuanced.  I just want to point two things out that I know the Court knows, but I think it's important to set the context.

We never go into litigation with a fee target in mind, and there's really multiple reasons for that.  Number one, and most importantly, Your Honor and not we decide what the fee is going to be, and we're very mindful of that.  In some cases, not in this case, often when we have these large institutional clients, they will set some kind of a fee, and it can often be a

very good fee, but they'll set it before the case begins pursuant to statute, pursuant to their state laws.

Beyond that, we don't determine a fee, because we're -- and this is going to sound kind of corny, but it's the truth -- we're focusing on winning the case.  Yes, if we win the case, get a good settlement fund, in theory, have a good judgment fund, we know we're going get some fee on that, but I can only say in my experience, I've never -- except in those cases where there's an institutional client, you know what you're maxed out at, and even then, you might discuss somewhat less in light of what the Court wants and what case has been.

But in this case -- and you know, I'm prepared to defend the 3.2 multiplier in terms of your question.  You know, just by way of comparison, Your Honor may recall that about a year and a half ago, Mr. Calandra's firm and mine came in here and got an approval of a 33.4 percent fee on 2U.  Now, I'm not to going impugn our effort to --

THE COURT:  Wasn't that a lower multiplier, though?

MR. ROGERS:  I do not have the number --

THE COURT:  I think it was 1.8?

MR. ROGERS:  I don't have the number before me at this point, but I will say, having litigated both cases, this case went deeper, this case was more contested.  You know, in 2U, I can definitely say that there was definitely some contesting of the motion to dismiss.  Your Honor may remember, there was a

hearing on some issues related to the confidential witnesses. But there was no formal discovery in 2U.  There was an informal discovery before the mediation; we took that very seriously.

In this case, we've had -- again, I give my -- credit to my colleague across the aisle.  Ask me a year ago, I might have had some things different to say.  It was very contested. Your Honor's motion to dismiss order greatly reduced the scope of the case, and I can assure you, Mr. Brown and his colleagues fought every foot of turf over what was and wasn't in, time period, custodians, types of documents.  Judge Quereshi held an hour and a half hearing, that Mr. Brown and Mr. Calandra tilted lances.

We fully briefed the motion for class certification. As Mr. Brown alluded to, in addition to the usual trying to make us an uncertifiable class, they were taking their shots at reducing the size of the class and the amount of damages at issue.  Dr. Kothari raised some incredibly novel issues; I know that because I deposed him.  We took it very seriously.

So the 3.2 multiplier -- I understand Your Honor's question, I'm not avoiding it, but I just -- I don't fairly see it apples to apples in terms of the objectors who are coming in after the case and determine that they wished they had more. You know who else wishes we got more?  Me, Your Honor; we all wish we could have gotten more, but in terms of the fee, the request --

THE COURT:  Aren't they the people who were actually harmed by this practice?  You're just here to --

MR. ROGERS:  And we've recovered for them, Your Honor, we've recovered.  There's a $47 million gross settlement fund.  Some amount of fees and expenses I assume will come out of it, but we've recovered.  I certainly am very sympathetic to the notion that any of the class members didn't receive full recompense for --

THE COURT:  Well, it's not even really close.  Now, I understand these kinds of cases, no one shareholder really can expect to get anywhere near what they ask for, and I think that's typical.  So I'm not saying that there's anything problematic about the total amount; I'm just saying, well, again, since -- of all the issues they raised that caused, you know, some parts of the case to not be completely successful, you're asking for that -- again, you may say you never asked for more than 33, but my guess is, that's probably generally what you get, and you don't usually get a lot more; maybe you get less, but not usually willingly, I would imagine.

So again, sort of a -- largely getting what you went into it looking for and them not, I'm not saying that there's something wrong with that, but I'm not sure that that explains why -- to the extent the number -- overall number is not as big as people thought -- were hoping for, that you still get the same percentage, and their percentage, effectively, goes lower

with every dollar that goes to you.

MR. ROGERS:  And as I said, Your Honor, it's a fair question, and I don't mean to sound glib in my response to it or glib in the response to the objectors, but as I've said before -- and again, I don't want to walk through all the factors.  Your Honor's obviously familiar with the economic incentives, the nature of contingency litigation; I don't want to belabor that, unless you want to hear it.

But we brought a case that had risks.  We litigated it extremely well, against an extremely worthy adversary.  We got what I consider to be a tremendous recovery for the class.  I mean, we haven't even spoken about the fact that the company was in some kind of financial straits at the time and, to some degree, still is; that was a factor.  I'm not going to just go into the details of my work product, but I will assure Your Honor that the economic situation of the company was a factor.  And to me, that goes in the direction of justifying a reasonable fee.

THE COURT:  Okay.

MR. ROGERS:  Thank you.

THE COURT:  I understand.  I would note, though, that -- well, I asked the question, because in -- I think in In re 2U, there weren't any objectors, which I know that it only takes one, but to their credit, in the last one, there weren't any.

My last question -- I guess, maybe, since we're alluding to In re 2U here, it reminded me -- I guess it's really more for Mr. Calandra, on behalf of Pomerantz.  I did look back at the fairness hearing in that case, partly because I knew that -- or expected Mr. Rogers might try to draw a comparison, but in that hearing, I asked your side -- and I believe it was Mr. Lieberman, who I think is actually on this case as well, technically.

I asked him to look into whether it's really appropriate to cite and directly quote, by name, judges in making findings on the record about the quality of your law firm and then putting them in the marketing materials that you send out or use, including the ones that you submit to courts to try to justify your award in this case, and I said, I found it a very -- to be a very unseemly practice.  I asked you to at least look at whether you would really want to continue doing that, and Mr. Lieberman said he would.

So since I got basically the same materials in this case, can you explain what, if any, review of that issue was done and what decisions were made.  I'm assuming either no one actually did a review, or that you did but you decided everything you did was perfectly fine.  So maybe you can just explain to me the situation there.

MR. CALANDRA:  Your Honor, Brian Calandra, Pomerantz, LLP.  I'm actually surprised to hear that there were statements

and quotes from judges in the marketing materials, because we conducted -- with hours that were not billed to the class, we conducted a review specifically because of your comments with -- to Jeremy Lieberman at the 2U hearing.

So I -- and I may be -- you may hold up a piece of paper right now and prove me incorrect, but that was something we took very seriously and actually took efforts to tailor the materials we submitted to not include those kinds of quotes.

THE COURT:  So you still use them; you just were not going to send them to me.

MR. CALANDRA:  If you go to pomlaw.com, you will see Judge Rakoff quoted.  And your Honor, I think --

THE COURT:  I'm looking at your declaration.

MR. CALANDRA:  Yes.

THE COURT:  Declaration of Brian Calandra on behalf of Pomerantz, ECF No. 135-4, 68 pages.

MR. CALANDRA:  Yes.

THE COURT:  Beginning on page 17.  It's basically the same materials I saw last time, 18, 19, 20 -- page 20.  So it's your declaration, sir.

MR. CALANDRA:  You're absolutely right.  But we list the cases where we've had success in the past; that's our firm résumé.  But we do not quote, or at least we really should not, since we reviewed this and went through it, and I'd be very -- I'd be embarrassed, very embarrassed and very surprised if

they're there.  We have --

THE COURT:  I'll have the Clerk hand it to you.
Starting on page 17.

MR. CALANDRA:  As best as I can tell, Your Honor,
this --

THE COURT:  There's at least ten federal judges.

MR. CALANDRA:  Yes.  No, you're --

THE COURT:  Judge Young, Judge Rakoff, probably.

MR. CALANDRA:  I -- yeah.  So I am very embarrassed,
and I am very surprised, because I was not falsely representing
to you that we looked at -- we specifically edited the materials
to remove these cites.  I have no explanation as to why they're
there, because this was something we specifically undertook to
not do.

THE COURT:  Okay.  Maybe you can get me the copy back,
please.  Thanks.

MR. CALANDRA:  And I will go back through my e-mails
to see how this occurred, because that was a concern that we
recognized from Your Honor, and I'm --

THE COURT:  So just to clarify -- and again, it's not
legally important or even really going to make a difference, but
is it, you went through or -- you obviously weren't successful,
but you went -- you had a plan to go through and remove -- was
it the quotations from judges, the names of the judges, or both?

MR. CALANDRA:  Both.

THE COURT:  And was it to make sure that the version submitted in this case to the same judge would not have that or to not have it in the materials at all, for any other usages?

MR. CALANDRA:  Respectfully, Your Honor --

THE COURT:  And again, I'm not saying you -- I can't bind you to anything else; I'm just kind of trying to understand what the thought process was.

MR. CALANDRA:  The thought process here, Your Honor, was that you did not find quotes from judges persuasive in the qualifications of our respective firms to move forward.

THE COURT:  Not persuasive, offensive, whichever adjective you want to use.

MR. CALANDRA:  Absolutely.  It was something that you did not like.  So we removed it, recognizing that --

THE COURT:  For the version coming to me, not --

MR. CALANDRA:  Correct.

THE COURT:  -- for every other usage.

MR. CALANDRA:  Correct.  But --

THE COURT:  But you failed in doing so.

MR. CALANDRA:  I -- and that's me specifically; I do not think you should hold it against my colleagues, because we -- I don't why that's there.  That is my -- that is my fault.

THE COURT:  Well, they don't do that, or at least they don't show me that they do that, but --

MR. CALANDRA:  That is my fault specifically; I -- one

thing you can understand is that we've -- we undertook this review to get rid of that specific material, and it's really -- it's stunning to me that it was there.

But respectfully, some judges view quotes from their colleagues as indicative of the quality of the legal representation.  It's just like, Your Honor, if we were -- if I was litigating in the Southern District and I was before a judge, and someone I know that judge has been with on panels before will -- I will quote and put the Rakoff, J. in my cite, because I hope that that will be picked up on.  And in the same way, although this is --

THE COURT:  So I think the difference is that if this really were a brief -- and we get citations about judges all the time quoting from cases, and -- that might be one thing, but none of this is legal analysis; this is just -- this is not any legal opinion by the judge; it's just, you're a great firm, you're one of the best firms I've ever seen, you're among the best lawyers I've ever seen.  It has no legal significance at all; it's frankly them trying to be nice to all of you, and whether it's something that -- you know, they're doing it for your benefit.

And it's not just that you're quoting it to colleagues; I think what I recall from last time was, it's in your marketing materials.  So you're sending it to potential clients or maybe to potential attorneys who want to join your

firm.  So you're actually looking to monetize it, and I think that's different.  Not to say that you're not trying to monetize it by sending it here, but at least, again, it's within the framework of a court argument of some kind.

These are the materials you use to try to make money, from your firm, basically with testimonials from judges who really are not in the business of marketing for law firms or anyone else, without their direct knowledge, I don't believe -- maybe they have signed off on this; if you want to present some signed authorizations, I'd be happy to look at them -- and you're doing it to make money, and I just think that's wrong.

Now, again, you may not agree.  I have -- every time I decide -- I've got a lot of other cases -- whether I should write to these other judges and say, are you just aware of this, because if you're fine with it, fine, but I'm not sure you're aware of it; I'm pretty sure you're not.

So we can agree to disagree on that, I suppose.  It is troubling, though, that you're telling me you submitted a declaration that you obviously didn't read it all the way through.

MR. CALANDRA:  No, I -- I read my declaration, and I did read the --

THE COURT:  Well, it was your attachment; it was part of the declaration.

MR. CALANDRA:  -- exhibit that was attached.  There

was a -- there was a breakdown.  I would obviously never submit something to the Court that I had not read, and I was the person who attached those files.  Like I said, we run very lean; it wasn't a -- it wasn't an administrative assistant who -- who did that.  So I'm -- yeah --

THE COURT:  Okay.

MR. CALANDRA:  -- that was an -- that was an error, and I -- I regret it.  I -- yeah, I --

THE COURT:  Okay.  No, I understand, I understand; I just wanted to understand what had happened after the last hearing.  But again, it's not -- it's not an issue in the case, it's just something that I was interested in.  So -- okay.

I've asked a lot of questions.  Does anyone have anything that you want to raise, or are you fine at this point?

MR. ROGERS:  I don't really have anything, Your Honor; I think everything is in the papers.  I just want to repeat what Ms. Zeiss said, is that there have been three objections, no institutions.  There have been a total of I believe it's seven, maybe it's eight opt-outs, totaling approximately a thousand shares.  Those are very strong indications of a good settlement that is fair and adequate to the class.  I just want to make that point.

THE COURT:  Okay, thank you.

Anything from your side, Mr. Brown?

MR. BROWN:  Nothing further from us, Your Honor.

38

THE COURT:  Okay, thank you.

So I appreciate the responses to the questions; it helps to clarify the situation.  I am prepared to make some rulings on the record on this issue.

So going back to the beginning, on January 23rd, 2024, the Court granted preliminary approval to the settlement in this case and approved the notice procedures.  The Court also approved the process for getting from that point to now, which included the issuance of notices and giving class members the opportunity to submit claims, object to the settlement, and opt out.

Three objections were filed, seven class members opted out.  We have I believe over 9,000 claims that at least prior to the hearing represented over 79 million shares expected to receive payments from the settlement.  We did hear today that we have about 19,000-plus valid claims that have been identified out of about 42,000 claims that were submitted, but unfortunately, the numbers are not complete.  But there were some estimates made out of that, that give us perhaps about $2 a share per -- per share at issue, perhaps less, based on how many more claims will come in.

Considering the record that was submitted before, the answers to those questions I received today, and the attachments as well, I am able to make certain findings under both Rule 23(e)(2) and the factors that are set forth in

In re Jiffy Lube Securities Litigation, 927 F.2nd 155 (4th Cir. 1991).

First, I do find that the class representatives and class counsel adequately represented the class.  The settlement, which was achieved through formal mediation, was negotiated at arm's length.  The relief for the class is generally adequate, considering the costs, risk, and delay of trial and appeal, the effectiveness of the proposed method of distributing relief and processing claims.  The settlement generally treats class members equitably.  The proposed plan of allocation generally meets the standards of fairness, reasonableness, and adequacy.

Having considered the three objections to the settlement and the plan of allocation in this case, the Court overrules the objections as to the total settlement amount and concludes that on that issue, they do not render the total amount unfair, unreasonable, or inadequate.

On the issue of the objections, the Court concludes that while the per shareholder recovery is minimal, the total award of $47 million is fair and reasonable in light of the litigation risk going forward.

The Court notes that the motion to dismiss was only a partial victory for the plaintiffs, with many of the alleged false statements found to be inadequately supported.  It was also clear at that point that ultimate success at trial would have required the plaintiffs to succeed at the class

certification stage, pretrial motions, trial, and appeal stages, even where there were particular challenges of proof, including particularly as to loss causation and scienter.  In addition, where Novavax's financial condition is uncertain, there would have been a real risk that continuing further could jeopardize even this amount of recovery.

And finally, the settlement is not out of line with other recent securities class action settlements, whether measured by the total dollar amount or by the percent of potential damages recovered.

So the Court overrules the objections as to the total amount.

As for the remaining arguments that the objectors make, that the settlement should provide a recovery for shares transacted outside the class period or for options traded during the class period, the Court finds that those arguments go beyond the scope of this case and do not provide an appropriate basis to reject the settlement, so that those objections are overruled.

So the Court therefore finds that the total settlement amount of $47 million is fair, reasonable, and adequate under the circumstances.

As for the issue of attorney's fees, expenses, and incentive awards, the Court finds that the expenses and incentive awards for the named plaintiffs are reasonable.  I

raised the question of whether one of the named plaintiffs not having an incentive award was problematic.  I still don't fully understand why that happened, but certainly as it relates to the fairness of the overall settlement to everyone else and based on the representation that the -- that named plaintiff has accepted or is -- basically approves of this settlement, I find that those amounts are reasonable.

On the attorney's fees, the Court considers the factors set forth in Barber v. Kimbrell's, Inc., 577 F. 2d 216 (4th Cir. 1978), as well as those identified in Feinberg v. T Rowe Price, 610 F.Supp.3d 758 (D. Md. 2022), to the extent that they are overlapping in some ways.

And I do find that some of those factors support a significant award in this case, including the novelty and difficulty of the issues, which is significant in securities cases in general and in this case specifically; the skill required in light of those complexities; and the experience and reputation of the attorneys; the opportunity costs for the attorneys, given the risk of no recovery at all; and the customary fee and the fee award in similar cases where a one-third share has been approved in numerous cases and this generally was often a reasonable overall award.

Some of the other relevant factors, other listed factors, do not have a significant impact on this issue or this case, such as the expectations at the outset, the time

limitations imposed by the client, the undesirability of the case in the community, and the nature of the relationship with the client.

The Court does, however, have some concerns about the time and labor expended, the amount in controversy and the result obtained, and the objections raised by class members as highlighted by those objections.

Here, where the proposed fee award is about $15.66 million, and the lodestar calculation is about 4.9 million, the multiplier is 3.2, which is higher than in some cases.  And without the specific calculations and despite the arguments today, the Court does find that the multiplier is likely higher than it otherwise could have been because of the number of firms and attorneys involved.  That does demonstrate that the actual amount of work performed was -- involved some amount of duplication of effort.  Even though there was, obviously, some division of labor, just all that coordination that occurs in multi-firm cases such as this one I think leads to no other realistic conclusion.

Now, while a 3.2 multiplier may be justifiable in some cases, here, where the success on the motion to dismiss was only limited and where, in part, as a result of that, the recovery to shareholders amounts to only a matter of a dollar or two per share, there's a real question about whether this overall attorney's fee award is fair and reasonable in light of the

objections.

So in light of this disconnect between the substantial fee award as compared to the lodestar calculation, and given the relatively small recovery provided to shareholders such as the objectors, the Court will reduce the fee award amount to a 28 percent recovery, which is approximately 13.16 million, or a multiple of about 2.7. While the Court recognizes this will not have a material impact on the financial recovery for individual shareholders, it brings the balance between the fee award and the recovery for shareholders sufficiently closer that the Court can make a finding that the allocation and fee are fair and reasonable.

So with these findings, the Court will grant the lead plaintiff's motion for final approval of the class action settlement and approval of plan of allocation, which is ECF 131, and colead counsel's motion for an award of attorney's fees and expenses, ECF 133, but only subject to the modification of the attorney's fee award that I've just outlined.

I will issue the proposed award orders as amended to effectuate the change to the attorney's fees. Otherwise, though, everything else is approved.

Is there anything else we should discuss while we're here today?

MS. ZEISS: Your Honor, just a logistical reminder, we did file the three proposed orders, the final order and judgment

44

negotiated with Defendants, which is ECF 142-2; the proposed plan of allocation order, which is ECF 142-4; and then the fee and expense order, which is ECF 142-3.

THE COURT:  Right.  And I'll try to work off of those as best I can, and we'll probably get those out maybe tomorrow, just to make sure the language is all aligned, but you should see those.  And then -- I think there's nothing further after those are issued, is there, or is there?

MS. ZEISS:  No, Your Honor, unless we have claim disputes.  If we have claim disputes that we're unable to resolve, then we will come back to Your Honor with a motion to resolve those, but if we don't, then you wouldn't see us.

THE COURT:  Do you have a sense of a time frame on that, like when that process will be completed, so we will know when you're done with it?

MS. ZEISS:  It would be early next year.

THE COURT:  Okay.  Well --

MS. ZEISS:  We have some time.

THE COURT:  -- hopefully, we won't hear from you, but okay.

Well, thank you all very much.  I want to thank everyone for the argument today.  I know it was a hard-fought case, as we heard, so I commend everyone for reaching a final resolution.

As I said last time, I'm going to refrain from any

commentary on the quality of counsel, since that's not something I want to be associated with, but I am glad it reached a successful resolution one way or the other.

Thank you very much.

MR. BROWN:  Thank you, Your Honor.

MR. ROGERS:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now stands adjourned.

(The proceedings were adjourned at 3:39 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia Klepp, Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of June, 2024.


_____/s/_____
PATRICIA KLEPP, RMR
Official Court Reporter