# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| SOTHINATHAN SINNATHURAI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NOVAVAX, INC., STANLEY C. ERCK, GREGORY F. COVINO, JOHN J. TRIZZINO, and GREGORY M. GLENN, <br><br> Defendants. | Civil Action No. TDC-21-2910 |

## DECLARATION OF MARGERY CRAIG CONCERNING THE RESULTS OF THE CLAIMS ADMINISTRATION PROCESS

I, Margery Craig, declare as follows:

1.     I am a Project Manager at Strategic Claims Services ("SCS"), a nationally recognized class action administration firm.  I have over sixteen years of experience specializing in the administration of class action cases.  SCS was established in April 1999 and has administered over five hundred and fifty (550) class action cases since its inception.  I am over 21 years of age and am not a party to this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify thereto.

2.     Pursuant to the Court's Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement, dated January 23, 2024 (ECF No. 129, the "Preliminary Approval Order"), the Court approved the retention of SCS as Claims Administrator in connection with the

1

Settlement of this Action.[1] Preliminary App. Order ¶ 8.

3.      As noted in the previously filed Declaration of Margery Craig Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Requests for Exclusion Received to Date, dated April 10, 2024, and the Supplemental Declaration of Josephine Bravata Concerning (A) Mailing of the Postcard Notice; (B) Report on Requests for Exclusion and Objections Received to Date; and (C) Claims Received to Date, dated May 13, 2024 (ECF No. 135-1 and 142-5, the "Mailing Declarations"), SCS or nominees either mailed the Postcard Notice or emailed the direct link to the long-form Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses ("Notice") and Proof of Claim Form and Release Form ("Claim Form"), to the extent emails were provided, to 305,367 potential Settlement Class Members.[2]

## CLAIM PROCESSING PROCEDURES

4.      Under the terms of the Preliminary Approval Order and as set forth in the notices, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to SCS a properly executed Claim Form, together with adequate supporting documentation, by May 18, 2024.

5.      Through September 30, 2024, 89,090 Claim Forms (hereafter referred to as "claims") were submitted in connection with this Settlement.[3] SCS has carefully reviewed, analyzed, and processed all of these claims, and has responded to all Claimant inquiries regarding

---

[1] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated as of January 12, 2024 (ECF No. 127-3, the "Stipulation") and in the Mailing Declarations (defined above).

[2] A copy of the Notice and Claim Form are annexed hereto as **Exhibit A**.

[3] SCS has not processed any claims submitted after September 30, 2024, or any responses to rejections received after March 13, 2025, due to their extreme lateness and because their inclusion would have delayed the finalization of the administration.

the Action, the Settlement and the procedures for filling out Claim Forms.  SCS has also been in close contact with Co-Lead Counsel throughout the administration process.

6. Upon receipt, paper claims received at SCS's mailing address were opened and prepared for scanning.  This process included unfolding documents, removing staples, copying non-conforming sized documents, sorting documents, and copying and sorting the envelope with the return address.  This manual task of preparing paper claims for processing is laborious and time-intensive.  Once prepared, paper claims were scanned along with all accompanying documents, and each claim was assigned a unique claim number.  The information from each claim was entered into a database developed by SCS specifically for the Settlement ("Claims Database").  Next, each claim, along with its supporting documentation, was reviewed in detail to ascertain whether the Claimant purchased eligible shares of Novavax, Inc. ("Novavax") common stock.

7. SCS also received claims through a portal on its website at: www.strategicclaims.net/novavax.  These claims were electronically added to the Claims Database.  Once added to the Claims Database, each claim, along with the documents provided online with the claim, were reviewed in detail to ascertain whether the Claimant purchased eligible shares of Novavax common stock.

8. Additionally, SCS received claims from financial institutions and third-party filers.  Because institutions and third-party filers often report hundreds or thousands of relevant transactions, such claims are submitted using a standardized electronic process involving the submission of Claim Forms and Excel files with account and transaction information.  Once received, the Claim Forms and Excel files were saved in SCS's system.  SCS then formatted the data contained in the Excel files in order to load the claimant information into the Claims Database.

The data from each claim was then reviewed in detail to ascertain whether it contained any purchases of eligible shares of Novavax common stock.

## THE DEFICIENCY AND REJECTION PROCESS

9.      After each claim was reviewed and processed, SCS determined whether: (i) the claim was eligible as submitted; (ii) additional information was required to cure the claim (in the case of deficient claims); or (iii) the claim was ineligible.

10.     During this administration, SCS received claims that were incomplete, not properly documented, or otherwise deficient.   As such, much of SCS's efforts in handling this administration involved Claimant communications so that all Claimants had sufficient opportunity to cure any deficiencies and submit a completed claim.  The "Deficiency Process," which involves letters or emails to Claimants, and/or inbound and outbound calls to Claimants, is intended to assist Claimants in properly completing their otherwise deficient submissions so that they are eligible to participate in the Settlement and receive a payment from the Net Settlement Fund.  As a result of this process, a number of Claimants have cured the deficiencies in their claims and are now eligible to participate in the Settlement.

11.     During the Deficiency Process, SCS mailed notices in connection with deficient claims (the "Deficiency Notice").  The Deficiency Notice described the defect(s) in the claim and what was necessary to cure the claim.   For claims containing both eligible and defective transactions resulting in a partial acceptance, SCS mailed a Deficiency Notice to the Claimant requesting additional information to cure the deficient portion of the claim.  Responses to the Deficiency Notices were carefully reviewed and evaluated by SCS.  If a Claimant's response corrected the defect(s), SCS updated the Claims Database to reflect the change(s) in the status of the claim.  If a Claimant did not respond or responded with inadequate information/documentation, a rejection notice was sent.

12.      Likewise, SCS also mailed notices in connection with ineligible claims, *e.g.*, claims that did not report the purchase of any eligible shares of Novavax stock (the "Rejection Notice"). For claims containing both eligible and ineligible transactions resulting in a partial rejection, SCS mailed a Rejection Notice for only the ineligible transactions. The Rejection Notice advised the Claimant that they could contest SCS's administrative determination to reject their claim (or the ineligible transactions within the claim).

## QUALITY ASSURANCE REVIEW

13.      An integral part of SCS's class action settlement administrations is its quality assurance review. Here, once all claims were fully processed (and responses to Deficiency and Rejection Notices were received), SCS performed a thorough quality assurance check to ensure the accuracy of the claim determinations. This quality assurance review included re-calculation of all large claims and a sampling of smaller claims. In addition, SCS performed a search for duplicate claims by identifying any duplicate Taxpayer I.D. or Social Security Numbers, account numbers, Recognized Loss amounts and/or other claim information. Finally, SCS conducted a review to ensure that all Defendants and other excluded parties pursuant to the Settlement, as well as any valid opt-outs, were not among the eligible Claimants.

14.      SCS also used a variety of fraud protection controls throughout the administration process to identify potentially fraudulent claims. SCS reviewed and compared the entire Claims Database for the Settlement against SCS's "watch list" of known potential fraudulent filers that SCS has developed throughout its experience as a Claims Administrator.

## DISPUTED CLAIM

15.      SCS advised Claimants that they had the right to contest SCS's claim determinations. The dispute of one Claimant remains unresolved and is presented to the Court for review.

16.     **Claim 5027**: The Claimant initially submitted a claim using the website claim portal, without providing information regarding the date they purchased Novavax common stock. SCS notified the Claimant that the claim was deficient. On October 3, 2024, the Claimant sent another screenshot of account information that, again, did not provide the date of purchase. SCS notified the Claimant that the claim was ineligible for failing to provide documentation showing that the shares were purchased during the Class Period. On December 24, 2024, the Claimant sent a screenshot of account information showing that 200 shares of Novavax common stock were purchased on December 6, 2022, *after* the Class Period. On January 3, 2025, SCS emailed the Claimant and advised the Claimant that the 200 shares purchased on December 6, 2022 were purchased outside of the Class Period and were not eligible. The Claimant responded on January 3, 2025 that they disagreed with SCS's determination. On April 14, 2025, SCS sent another email explaining the basis of the rejection and the views of Co-Lead Counsel. The Claimant has not responded. SCS respectfully requests, pursuant to the definition of the certified Settlement Class and the Court-approved Plan of Allocation, that the Court uphold SCS's determination that Claim 5027 is ineligible. **Exhibit B** contains copies of the claim submission and the material correspondence between SCS and the Claimant, with personal information redacted.

## RESULTS OF CLAIMS PROCESSING

17.     SCS's Report of Claims Administrator is annexed hereto as **Exhibit C** and described below.

18.     The annexed Report of Claims Administrator sets forth the final status of the claims submitted to SCS, as follows:

a.    PROPERLY DOCUMENTED CLAIMS:    SCS has identified 31,461[4] properly documented valid claims. These valid claims represent losses of $433,185,489.22.[5] The valid claims were calculated in the manner set forth in the Court-approved Plan of Allocation of the Net Settlement Fund ("Plan of Allocation"), included in the Notice. **Exhibit C-1** is a spreadsheet of the 21,972 properly documented and timely submitted claims. **Exhibit C-2** is a spreadsheet of the 9,489 claims submitted after the Court-approved claims filing deadline, May 18, 2024, but on or before September 30, 2024.

b.    INADEQUATELY DOCUMENTED CLAIMS:    SCS initially identified 931 inadequately documented claims. SCS mailed or emailed inadequacy notices to each of these Claimants, advising them of the nature of their inadequacy and providing them an opportunity to cure. Among these 931 deficient claims, 372 have been successfully cured and are considered valid. The remaining 559 inadequate claims either did not respond to the inadequacy notice or responded with inadequate documentation and were sent a rejection notice setting forth the reason for their inadequacy. To date, none of these Claimants has objected to or contested SCS's determinations. *See* **Exhibit C-3** for a list of the inadequate, rejected claims.

c.    INELIGIBLE CLAIMS:    In addition to the 559 claims discussed above in paragraph 18.b., SCS has identified 57,070 claims that we recommend for complete rejection. Included in this category are: (i) 29,161 claims filed for Novavax publicly traded common stock purchased outside of the Class Period; (ii) 22,572 claims with no Recognized Loss under the Court-approved Plan of Allocation; (iii) 4,353 claims with

---

[4] This number includes 21,972 timely filed valid claims and 9,489 late (but otherwise valid) claims.
[5] This amount includes Recognized Claims for timely filed, valid claims of $406,399,139.90, and Recognized Claims for late (but otherwise valid) claims of $26,786,349.32.

Novavax common stock sold short; (iv) 669 claims reporting shares of Novavax common stock that were not purchased during the Class Period, but were received by gift, inheritance, or operation of law during the Class Period; (v) 267 duplicate claims; (vi) 28 claims filed for securities other than Novavax publicly traded common stock; (vii) 10 claims withdrawn by the filing entity; (viii) 9 potentially fraudulent claims where the Claimant did not respond to the rejection of the claim; and (ix) one claim filed by an excluded party. *See* **Exhibit C-4** for a list of these ineligible claims. While sizeable, it is not unusual to have a large proportion of ineligible claims. We have communicated with these 57,070 Claimants and advised them of our determination. As discussed above, one of these 57,070 ineligible Claimants has contested SCS's determination.

19.     In anticipation of completing this administration, SCS respectfully requests that the Court reject, as untimely, any claims received after September 30, 2024, any responses to deficiency and/or rejection notices received after March 13, 2025, and confirm that SCS's rejection of Claim 5027 is approved.

**SCS'S ADMINISTRATION COSTS AND ESTIMATE TO COMPLETE**

20.     SCS agreed to be the Claims Administrator in exchange for payment of its fees and expenses. SCS has done its best to keep administrative costs as low as possible. Co-Lead Counsel received regular reports and invoices for all of the work SCS performed. In accordance with the Stipulation and the Court's Preliminary Approval Order, SCS has been paid a total of $658,557.66 from the Settlement Fund.

21.     SCS estimates that it will incur $49,970.00 in fees and expenses to conduct the Initial Distribution of the Net Settlement Fund. SCS's costs to complete the Initial Distribution will include, among other things, ordering checks, preparing the distribution list and database for the checks and wires to be issued, creating a database with the payment information, printing and

8

mailing checks, and postage for the checks. SCS will also handle inquiries from Claimants about their Claims and payments as well as perform monthly bank reconciliations to track cleared payments and enter any returned undeliverable payments. Subject to Court approval, SCS respectfully requests that $49,970.00 be set aside from the Initial Distribution for its estimated fees and expenses to be incurred through the Initial Distribution. If less than this estimate is incurred, the Net Settlement Fund will be refunded the difference. **Exhibit D** attached hereto documents SCS's fees and expenses expected to be incurred through the Initial Distribution of the Net Settlement Fund.

## DISTRIBUTION PLAN

22.     Should the Court concur with SCS's administrative determinations concerning the claims recommended for acceptance and rejection, SCS recommends the following Distribution Plan:

(a)     SCS will calculate award amounts to all Authorized Claimants approved by the Court by calculating their *pro rata* share of the Net Settlement Fund in accordance with the Court-approved Plan of Allocation.  SCS will then, pursuant to the terms of the Plan of Allocation, eliminate any Authorized Claimants whose distribution payments calculate to less than $10.00, given the costs of conducting a distribution.  Such Claimants will not receive any distribution from the Net Settlement Fund.

(b)     After eliminating Authorized Claimants who would have received less than $10.00, SCS will recalculate the *pro rata* distribution payments for Authorized Claimants who would receive $10.00 or more.  SCS will then conduct the Initial Distribution of the Net Settlement Fund ("Initial Distribution") in accordance with the Court's order.

(c)     In order to encourage Authorized Claimants to cash their distribution checks promptly, and to avoid or reduce future expenses relating to unpaid distribution checks, all checks shall bear the notation, "CASH PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION 120 DAYS AFTER ISSUE DATE."  Similarly, all other checks issued in connection with subsequent distributions shall bear the same notation.

(d)     Authorized Claimants who do not cash their distribution checks, or negotiate their wire payments, within the time allotted will irrevocably forfeit all recovery from the Settlement unless good cause is shown.  The funds allocated to all such stale-dated payments will be available for re-distribution to other Authorized Claimants in subsequent distributions, if such distributions are determined to be feasible and economical.

(e)     If there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of Initial Distribution, and after payment of outstanding Notice and Administration Expenses, Taxes, amounts resulting from adjustments to claims received on or before September 30, 2024 for good cause shown, if any, the Claims Administrator shall, if feasible and economical, redistribute such balance among Authorized Claimants who have negotiated their payments in an equitable and economic fashion. Additional re-distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter until Co-Lead Counsel, in consultation with SCS, determine that further re-distribution is not feasible and economical.

(f)     At such time as Co-Lead Counsel, in consultation with SCS, determine that further redistribution of the funds remaining in the Net Settlement Fund is not feasible and

10

economical, any otherwise valid claims received after September 30, 2024, or timely claims adjusted after March 13, 2025, if any, may, in the discretion of Co-Lead Counsel, be paid their *pro rata* share of the remaining funds to bring them into parity with other Authorized Claimants who have negotiated all their prior distribution payments.

(g)    Once it is no longer feasible and economical to make further distributions, if any funds shall still remain in the Net Settlement Fund after the above-mentioned distributions, any balance that still remains after payment of any outstanding Notice and Administration Expenses, and Taxes, if any, shall be contributed to Consumer Federation of America, or such other private, non-profit, non-sectarian 501(c)(3) organization designated by Lead Plaintiffs and approved by the Court.

23.    SCS respectfully requests the Court order that: (i) no less than one (1) year after the Initial Distribution of the Net Settlement Fund, SCS may destroy the paper copies of the Claim Forms and all supporting documentation; and (ii) no less than one (1) year after all funds have been distributed, SCS may destroy the electronic copies of the Claim Forms and all supporting documentation.  This is the customary document retention period SCS uses to prevent additional costs to the Settlement Class for storage expenses and related fees.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 15th day of May 2025, in Media, Pennsylvania.

Margery Craig

11